1  Robert B. Carey
   Leonard W. Aragon
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   2425 East Camelback Road, Suite 650
3  Phoenix, Arizona 85016
   Telephone: (602) 840-5900
4  Facsimile: (602) 840-3012
   rcarey@hbsslaw.com
5  leonard@hbsslaw.com

6  Stuart M. Paynter (226147)
   THE PAYNTER LAW FIRM PLLC
7  1200 G Street N.W., Suite 800
   Washington, DC 20005
8  Telephone:  (202) 626-4486
   Facsimile:  (866) 734-0622
9  stuart@smplegal.com

10 Attorneys for Plaintiff

11 [Additional counsel listed on signature page]

12                 UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                      OAKLAND DIVISON

15

16 SAMUEL MICHAEL KELLER, on behalf of     No. CV-09-1967-CW
   himself and all others similarly situated,
17                                          PLAINTIFF'S OPPOSITION TO
                              Plaintiff,    DEFENDANT ELECTRONIC ARTS
18                                          INC.'S MOTION TO DISMISS
         v.
19                                          Date:  October 1, 2009
   ELECTRONIC ARTS, INC.; NATIONAL         Dept:  Courtroom 2, 4th Floor
20 COLLEGIATE ATHLETICS ASSOCIATION;       Judge:  Hon. Claudia Wilken
   COLLEGIATE LICENSING COMPANY,
21
                              Defendants.
22

23

24

25

26

27

28

**STATEMENT OF ISSUES**

1.      Where EA contractually agreed not to replicate Plaintiff's likeness in its videogames, can EA later assert a First Amendment right to replicate Plaintiff's likeness after it violated the contractual prohibition? *See infra* at 5.

2.      Where EA replicates Plaintiff's likeness in its videogames as literally and accurately as possible, can EA claim that its use of Plaintiff's likeness is "transformative"? *See infra* at 5-11.

3.      While courts recognize a public interest in sporting events that permits the reporting of sporting events and statistics notwithstanding players' rights to publicity, is there a general public-interest exception for sports that grants EA a free license to replicate Plaintiff's identity in its videogames? *See infra* at 10-16.

4.      Where plaintiff sufficiently states claims for violating his common-law and statutory rights of publicity, has he likewise pled a predicate violation for claims of civil conspiracy and violating California's Unfair Competition Laws? *See infra* at 16, 17.

5.      Has Plaintiff plausibly alleged that the three defendants engaged in a conspiracy to misappropriate his identity with allegations that:  (i) defendants knew NCAA principles barred licensing to EA a right to replicate student-athletes' identities, (ii) EA's licensing agreement expressly reflected this prohibition, (iii) EA's videogames nonetheless replicated student-athletes' identities, with the NCAA's assistance, (iv) the NCAA scrutinized EA's games for license violations, yet did nothing to stop EA's violations and even aided them, and (v) replicating student-athletes' identities made EA's games more realistic, which increased the games' market value and the royalties EA paid to the NCAA? *See infra* at 17.

6.      Should this Court recognize a claim for unjust enrichment under California law where countless California state courts have already done so? *See infra* at 18.

7.      While a contract between a plaintiff and defendant can preclude an unjust-enrichment claim, but here, there is no contract between Plaintiff and EA, does the license contract between EA and another defendant preclude Plaintiff's claim? *See infra* at 19.

8.      Does Plaintiff seek recoverable relief granting standing to assert his claims where his complaint requests injunctive relief, statutory and punitive damages, and disgorgement of illegal profits?  *See infra* at 19.

9.      Are EA games released before May 5, 2005, pertinent to Plaintiffs' claims under Indiana law when those claims are subject to limitations periods as long as ten years?  *See infra* at 20.

.

**TABLE OF CONTENTS**

**PAGE**

STATEMENT OF ISSUES .................................................................................................. i

I.   INTRODUCTION .................................................................................................. 1

II.  STATEMENT OF FACTS ...................................................................................... 2

III. ARGUMENT ......................................................................................................... 4

    A.   Pleading Standard under Fed. R. Civ. P. Rule 12(b)(6) ............................... 4

    B.   The First Amendment does not entitle EA to freely appropriate student-athletes' likenesses ................................................................................................... 5

        1.   EA's contractual agreement not to replicate student-athletes' identities precludes EA's resort to the First Amendment ................... 5

        2.   EA's use of Keller's image is not transformative ............................. 5

            a.   An expressive work that imitates a celebrity image is not transformative ................................................................. 6

            b.   EA's depiction of Keller and other NCAA players is literal, not transformative ................................................. 9

        3.   There is no general public-interest exception regarding sports that grants free license to appropriate Keller's identity ......................... 11

    C.   EA's use of Keller's likeness does not fall within any public-affairs exemption ...... 15

    D.   The Complaint sufficiently pleads civil conspiracy .................................... 16

    E.   Keller likewise pleads a predicate violation and remedy for § 17200 claim ............... 17

    F.   EA's challenge to Keller's unjust-enrichment claim fails ........................... 18

        1.   The Complaint properly pleads a claim for unjust enrichment ...... 18

        2.   No contract exists between Class members and EA ....................... 19

    G.   Keller pleads recoverable relief ................................................................. 20

    H.   EA Games Released Before May 5, 2005, Are Also at Issue in This Litigation ........ 20

IV.  CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*4 Hour Wireless v. Smith,*
 2002 U.S. Dist. LEXIS 22680 (S.D.N.Y. Nov. 21, 2002)..........................................19, 20

*Baugh v. CBS, Inc.,*
 828 F. Supp. 745 (N.D. Cal. 1993) ...........................................................................16

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) .............................................................................................16, 17

*Broam v. Bogan,*
 320 F.3d 1023 (9th Cir. 2003) ...................................................................................4

*Browne v. McCain,*
 611 F. Supp. 2d 1062 (C.D. Cal. 2009) .....................................................................9

*Butkus v. Downtown Athletic Club of Orlando, Inc.,*
 2008 U.S. Dist. LEXIS 49828 (C.D. Cal. Mar. 31, 2008)...........................................9

*C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced Media, L.P.,*
 505 F.3d 818 (8th Cir. 2007), *cert. denied,*
 128 S. Ct. 2872, 171 L. Ed. 2d 831 (2008)..........................................................12, 14

*CBS Interactive, Inc. v. NFL Players Ass'n,*
 2009 U.S. Dist. LEXIS 36800, 2009 WL 1151982 (D. Minn. Apr. 28, 2009) ..........12, 13

*Cel-Tech. Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
 83 Cal. Rptr. 2d 548 (1999) ......................................................................................17

*Chapman v. Journal Concepts, Inc.,*
 528 F. Supp. 2d 1081 (D. Haw. 2007)......................................................................15

*Comedy III Productions, Inc. v. Gary Saderup, Inc.,*
 25 Cal. 4th 387 (2001)....................................................................................*passim*

*County of San Bernardino v. Walsh,*
 158 Cal. App. 4th 533 (2007) ...................................................................................18

*Curtis Public Co. v. Butts,*
 388 U.S. 130 (1967) ..................................................................................................15

*Dora v. Frontline Video, Inc.,*
 15 Cal. App. 4th 536 (1993) ................................................................................14, 15

*Downing v. Abercrombie & Fitch,*
 265 F.3d 994 (9th Cir. 2001) ...............................................................................12, 15

*Erie Telecommunications v. Erie,*
 853 F.2d 1084 (3d Cir. 1988) ......................................................................................5

*Ghirardo v. Antonioli*,
    14 Cal. 4th 39 (1996)..................................................................................18

*Gionfriddo v. Major League Baseball*,
    94 Cal. App. 4th 400 (2001)......................................................................12

*Gridiron.Com, Inc. v. NFL*,
    106 F. Supp. 2d 1309 (S.D. Fla. 2000)................................................11, 13

*Groucho Marx Productions, Inc. v. Day & Night Co.*,
    523 F. Supp. 485 (S.D.N.Y. 1981), *rev'd on other grounds*,
    689 F.2d 317 (2d Cir. 1982).........................................................................7

*Hirsch v. Bank of Am.*,
    107 Cal. App. 4th 708 (2003)....................................................................18

*Hoffman v. Capital Cities/ABC, Inc.*,
    255 F.3d 1180 (9th Cir. 2001)......................................................................9

*Holt v. Cox Enters.*,
    590 F. Supp. 408 (N.D. Ga. 1984).............................................................15

*King v. Terry*,
    805 N.E.2d 397 (Ind. Ct. App. 2004) ..................................................19, 20

*Kirby v. Sega of Am., Inc.*,
    144 Cal. App. 4th 47 (2006) ...................................................................8, 9

*Lance Camper Mfg. Corp. v. Republic Indem. Co. of Am.*,
    44 Cal. App. 4th 194 (1996) .....................................................................19

*Lectrodryer v. SeoulBank*,
    77 Cal. App. 4th 723 (2000) .....................................................................18

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993) ........................................................................5

*Maheu v. CBS*,
    201 Cal. App. 3d 662 (1988) ...............................................................11, 16

*Mattel Inc. v. Walking Mt. Prods.*
    353 F.3d 792 (9th Cir. 2003) .......................................................................9

*McKell v. Washington Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) .................................................................19

*McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*,
    339 F.3d 1087 (9th Cir. 2003) ..................................................................19

*Mills v. Ramona Tire, Inc.*,
    2007 U.S. Dist. LEXIS 89438 (S.D. Cal. Dec. 5, 2007) ..........................18

*Montana v. San Jose Mercury News*, *Inc.*,
    34 Cal. App. 4th 790 (1995)................................................................14, 16

*Moore v. University of Notre Dame,*
   968 F. Supp. 1330 (N.D. Ind. 1997) ................................................................. 15

*National Collegiate Athletic Ass'n v. Board of Regents,*
   468 U.S. 85 (1984) ........................................................................................... 15

*Nordberg v. Trilegiant Corp.,*
   445 F. Supp. 2d 1082 (N.D. Cal. 2006) ............................................................ 18

*Page v. Bakersfield Uniform & Towel Supply Co.,*
   239 Cal. App. 2d 762 (1966) ............................................................................ 20

*Paragould Cablevision, Inc. v. Paragould,*
   930 F.2d 1310 (8th Cir. 1991) ........................................................................... 7

*Parrish v. National Football League Players, Inc.,*
   2009 U.S. Dist. LEXIS 4239 (N.D. Cal. Jan. 13, 2009) .................................. 11

*Pecover v. Electrics Arts Inc.,*
   2009 U.S. Dist. LEXIS 49140 (N.D. Cal. June 5, 2009) ................................. 18

*Peterson v. Cellco P'ship,*
   164 Cal. App. 4th 1583 (2008) ...................................................................... 2, 18

*Picton v. Anderson Union High Sch. Dist.,*
   50 Cal. App. 4th 726 (1996) ............................................................................. 20

*Regents of Univ. of California v. American Broadcasting Cos.,*
   747 F.2d 511 (9th Cir. 1984) ............................................................................ 15

*Roots Ready Made Garments v. Gap Inc.,*
   2008 U.S. Dist. LEXIS 9191, 2008 WL 239254 (N.D. Cal. Jan. 28, 2008) ..... 19

*Shum v. Intel Corp.,*
   499 F.3d 1272 (Fed. Cir. 2007) ........................................................................ 18

*Time, Inc. v. Johnston,*
   448 F.2d 378 (4th Cir. 1971) ............................................................................ 15

*Weber v. Dep't of Veterans Affairs,*
   521 F.3d 1061 (9th Cir.), *cert. denied,* ___ U.S. ___, 129 S. Ct. 754, 172 L. Ed. 2d
   726 (2008) .......................................................................................................... 5

*Winter v. DC Comics,*
   30 Cal. 4th 881 (2003) ....................................................................................... 8

*Zoeller v. E. Chi. Second Century, Inc.,*
   904 N.E.2d 213 (Ind. 2009) .............................................................................. 19

## STATUTES

CAL. BUS. & PROF. CODE § 17203 .......................................................................... 17

CAL. CIV. PROC. CODE § 3344(a) .................................................................... *passim*

1

IND. CODE § 34-11-2-7 ........................................................................................................20

2

IND. CODE § 34-11-1-2(a) ..................................................................................................20

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

Defendant Electronic Arts, Inc. ("EA") produces collegiate and professional sports video-games so realistic they claim, "You're in the game!"  For the rights to digitally replicate professional football and basketball players' likenesses, EA pays the respective players associations tens of millions of dollars each year.  For rights to digitally replicate collegiate game environments in its NCAA videogames, EA pays similarly enormous sums to the NCAA and its licensing affiliate, defendant Collegiate Licensing Company ("CLC").

Yet for rights to digitally replicate collegiate student athletes in its NCAA videogames, EA pays nothing and has no agreement with the students.  Yet, the student athletes' detailed images are uniformly used.  EA uses these images even though, consistent with NCAA rules protecting student-athletes' amateurism, EA's license to produce NCAA videogames expressly bars it from replicating college players' likenesses.  EA replicates their likenesses anyway, down to their appearances, jersey numbers, playing styles, personal history and idiosyncratic gear.  As a third-party beneficiary of the license prohibition (as well as a person whose image was used without authorization throughout his academic career), Mr. Keller, on behalf of other student-athletes, sues EA for this misappropriation.

EA moves to dismiss on various baseless grounds.  It asserts the First Amendment as a defense.  But the First Amendment does not protect EA's unauthorized use of Keller's likeness because (i) EA surrendered any First Amendment right by agreeing to a contractual bar against such use (*see infra* at 5); (ii) EA replicates players' likeness and identities as literally as possible, and thus the replications are not "transformative" (*see infra* at 5-11); and (iii) there is no general public-interest exception for sports that grants free license to appropriate Keller's identity (*see infra* at 10-16).

Next, Keller's civil-conspiracy and unfair competition claims have merit because he pleads underlying violations.  Further, an inference of conspiracy is plausible here because EA, the NCAA and CLC all knew that fundamental NCAA principles and their license agreement prohibit exploiting college players' likenesses, and the NCAA scrutinized EA's games for license

1   violations, but there was so much money to be made by exploiting player likenesses that the

2   NCAA and CLC agreed to ignore EA violations.  *See infra* at 16-17.

3        Next, Keller can assert his unjust-enrichment claim independently, as many California

4   courts have held.  See, for example, *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593

5   (2008).  Nor does the EA's contract with CLC disable the claim because there is no contract

6   directly between Keller and EA.  *See infra* at 17-20.

7        Finally, the Complaint requests injunctive relief, statutory and punitive damages, and

8   disgorgement of illegal profits, which are recoverable and grant Keller standing to assert his

9   claims.  *See infra* at 19.  For all these reasons, the Court should deny EA's motion to dismiss.[1]

10   ## II.     STATEMENT OF FACTS

11        EA produces the NCAA Football, NCAA Basketball and NCAA March Madness video-

12   game franchises.  ¶ 11.[2]  Videogame titles within these franchises simulate basketball and football

13   games between NCAA member schools.  *Id.*  Consumers demand that these games simulate actual

14   college games in the most realistic manner possible.  *Id.*  As a result, each year EA spends millions

15   to ensure its games' realism, and advertises this realism in the promotion of its products.  Specifi-

16   cally, under a license with the CLC, the NCAA's licensing company, EA replicates team logos,

17   uniforms, mascots, fight songs and even member school stadiums with almost photographic

18   realism.  *Id.*

19        EA, however, is not permitted to utilize player names or likenesses.  ¶ 12.  NCAA Bylaw

20   12.5 specifically prohibits the commercial licensing of an NCAA athlete's "name, picture or

21   likeness." ¶ 13.  NCAA student-athletes are strictly amateurs that, by NCAA rules, may not benefit

22   economically from any success on the field.  ¶ 14.  A fundamental NCAA principle applying to all

23   NCAA Division I members is that "[s]tudent-athletes shall be amateurs in an intercollegiate sport,

24   and their participation should be motivated primarily by education and by the physical, mental and

25

26       [1] EA's motion to dismiss duplicates a substantial portion of EA's briefing on its motion to

27   strike (Dkt. No. 35).  Keller's response to the motion to dismiss likewise substantially reiterates pp. 10-25 of his opposition to the motion to strike.

28       [2] "¶ __" refers to paragraphs of the Complaint (Dkt. No. 1), unless otherwise noted.

social benefits to be derived." NCAA Division I Manual, Principle 2.9.[3] The principle continues, "[s]tudent participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises." *Id*. The NCAA Manual also provides that student-athletes names, pictures and likenesses cannot be used in any commercial item (except for items sold at the athlete's own school). *Id*. at 12.5.1.1(h). Nor can NCAA student-athlete likenesses be reproduced in trading cards offered for sale. *Id*. at 12.5.1.1.4.

Thus, before being allowed to compete each year, all Division I NCAA athletes sign a contract agreeing that they have "read and understand" the NCAA's rules on prohibitions on the commercial use of their name, picture or likeness and affirming that "to the best of [their] knowledge [they] have not violated any amateurism rules." ¶ 14. Consistent with NCAA rules and student-athlete contracts, the licensing agreements between EA and the CLC explicitly prohibit using NCAA athlete names and/or likenesses in NCAA-branded videogames. ¶ 15. NCAA athletes are ostensibly the intended beneficiaries of the NCAA likeness prohibitions and the contractual provisions that incorporate them in contracts between and among the CLC, NCAA and EA. *Id.*

But in reality, EA, with the knowledge, participation and approval of the NCAA and CLC, extensively uses actual player names and likenesses, including the name and likeness of Plaintiff Keller. ¶¶ 12, 42. Indeed, EA seeks to replicate precisely each school's entire roster. ¶ 17. With rare exception, virtually every real-life NCAA Division I football or basketball player for a particular year has a corresponding player in the EA videogame for that year with the same jersey number, and virtually identical height, weight, build, and home state. *Id.* In addition, EA matches the player's skin tone, hair color, and even a player's hair style (although this last characteristic can vary over even a single season). *Id.* EA even matches players' idiosyncratic equipment preferences such as wristbands, headbands, facemasks and visors. ¶ 26. In fact, to ensure it matches these unique player equipment preferences as accurately as possible, EA sends detailed questionnaires to NCAA team equipment managers to glean individual players' idiosyncratic details. ¶ 31.

---

[3] Copies of the cited NCAA principles are attached at Appendix A hereto.

1   In fact, as purchased, the only meaningful detail EA's games omit[4] is the player's name on

2   the jersey.   ¶ 34.  As one commentator observed, "the omission of players' names seems little more

3   than a formality, done with a wink and a nudge."  *Id.*  Despite this omission, videogame players

4   rarely if ever distinguish between the "real" player and the videogame version.  ¶ 35.  In any case,

5   this omission has little practical consequence because in reality EA designed its games so that

6   entire Division I rosters can be almost instantly loaded into the game.  ¶ 36.  Once loaded, players'

7   names instantly appear on jerseys and in-game announcers refer to players by name.  ¶ 37.

8       The NCAA expressly approved this conduct in advance.  ¶ 1.  Specifically, under its

9   licensing program, the NCAA is required to approve every iteration of NCAA-brand videogames

10  before their release.  ¶ 15.  NCAA executives grant this approval despite being aware of EA's use

11  of player names and likenesses.  ¶¶ 1, 15, 55.  Defendants' motivation to join this conspiracy is to

12  increase profits.  ¶ 12.  As Defendants know full well, heightened realism in NCAA videogames

13  translates directly into increased sales, and therefore increased revenues for EA and increased

14  royalties for the NCAA and CLC.  *Id.*

15      As a result of this conduct, Keller and putative Class members have been deprived of valu-

16  able rights of publicity, specifically the rights to control the commercial use of their names and

17  likenesses.  ¶ 40.  The commercial value of Keller and Class members' names and likenesses is

18  amply demonstrated by the extraordinary efforts undertaken by EA both to duplicate likenesses in

19  its NCAA videogames and to permit videogame players to instantaneously download player

20  rosters.  The fact that EA pays $35 million each year to license *NFL* football players' names and

21  likenesses further confirms the value of Keller and Class members' names and likenesses.  ¶ 40.

22                          **III.   ARGUMENT**

23  **A.    Pleading Standard under Fed. R. Civ. P. Rule 12(b)(6)**

24      Rule 12(b)(6) motions are viewed with disfavor.  *Broam v. Bogan*, 320 F.3d 1023, 1028

25  (9th Cir. 2003).  A claim may be dismissed under Rule 12(b)(6) only if it does not "state a claim

26  upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a motion to

27  _____

28      [4] Except for the players' home towns, which for whatever reason are routinely replaced with a
    nearby locale in the same state.

1   dismiss under Rule 12(b)(6), the plaintiff's complaint is liberally construed and all allegations of

2   material fact are to be taken as true, as well as any reasonable inferences drawn from them, and

3   construed in the light most favorable to Plaintiffs.  *E.g.*, *Broam*, 320 F.3d at 1028.  A complaint

4   "need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to

5   relief that is plausible on its face.'"  *Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th

6   Cir.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, __ U.S. __, 129

7   S. Ct. 754, 172 L. Ed. 2d 726 (2008).

8   **B.      The First Amendment does not entitle EA to freely appropriate student-athletes'**
         **likenesses**

9

10          **1.      EA's contractual agreement not to replicate student-athletes' identities**
                    **precludes EA's resort to the First Amendment**

11          While EA insists that the First Amendment grants it a right to appropriate student-athletes'

12  identities in its videogames, EA's contract with CLC actually governs.  Irrespective of First

13  Amendment rights it might have had, EA agreed by contract not to use student-athlete likenesses in

14  its videogames, thereby waiving any potential First Amendment right to do so.  ¶¶ 13-15; *Leonard*

15  *v. Clark*, 12 F.3d 885, 889-90 (9th Cir. 1993) (affirming district court decision not to reach the

16  issue of whether a labor union's free-speech rights had been violated where the district court had

17  first determined that the union waived its First Amendment protections in a collective bargaining

18  agreement); *Erie Telecomms. v. Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988) ("constitutional rights,

19  like rights and privileges of lesser importance, may be contractually waived").  Keller and the

20  purposed Class, as third-party beneficiaries of that contract, base their claims on EA's breach.  EA

21  cannot now turn to the First Amendment to "recapture surrendered rights."  *See Paragould*

22  *Cablevision, Inc. v. Paragould*, 930 F.2d 1310, 1314 (8th Cir. 1991).

23          **2.      EA's use of Keller's image is not transformative**

24          EA's First Amendment defense fails even aside from this contractual waiver.  Realism is a

25  key selling feature that distinguishes EA games from the myriad of other sports videogames.  *E.g.,*

26  ¶ 11.  Far from transformative, EA replicates players' identities as closely and literally as possible.

27

28

**a.     An expressive work that imitates a celebrity image is not transformative**

Two California Supreme Court decisions establish the range of expressive works that may be sufficiently transformative to invoke First Amendment protection.  The California court of appeals applied this standard in a videogame context in a manner showing that EA's use of Keller's image is not transformative.

The Supreme Court's *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001), addressed whether an artist's sketch of "The Three Stooges" comedy team reproduced onto T-shirts was entitled to First Amendment protection from the plaintiff's right-of-publicity claims. The owner of the rights to the former comedy act objected to the sale of the T-shirts and filed suit for violating its rights of publicity.  The artist asserted First Amendment rights in defense.

Rejecting the defense, the Court noted the tension between a celebrity's right to publicity and the First Amendment.  *Id*. at 396-97.  The court described the high degree of First Amendment protection for noncommercial speech about celebrities, but recognized that the right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility.  *Id*. at 397-99.  The court resolved this tension by adopting and defining a test for when an expressive work incorporating a celebrity image without the image owner's authorization enjoys First Amendment protection.  To reconcile these opposing rights, the court followed authorities "concluding that depictions of celebrities amounting to little more than the appropriation of the celebrity's economic value are not protected expression under the First Amendment."  *Id*. at 400. Protecting the right of publicity serves to prevent unjust enrichment by the theft of good will. Allowing the defendant to get free some aspect of the plaintiff that would have market value and for which he would normally pay serves no social purpose.  *Id*. (quoting *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576 (1977)).  The state's interest in preventing the out-right misappropriation of others' intellectual property is not automatically trumped by the interest in free expression or dissemination of information.  Rather, as in the case of defamation, the state-law interest and the interest in free expression must be balanced, according to the relative importance of the interests at stake.  *Id*.

The balance tips in favor of the right of publicity where, as here, the expressive work simply imitates or reproduces the image of another.  *Id.*  While the "public interest in entertainment will support the sporadic, occasional and good-faith imitation of a famous person, … it does not give a privilege to appropriate another's valuable attributes on a continuing basis as one's own without the consent of the other."  *Id.* at 402 (quoting *Estate of Presley v. Russen*, 513 F. Supp. 1339, 1359-60 (D.N.J. 1981)).  The court thus adopted a test that reconciles these competing rights by whether the expressive work imitates or instead transforms a public figure's image:

> When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist.

> On the other hand, when a work contains significant transformative elements, it is not only especially worthy of First Amendment protection, but it is also less likely to interfere with the economic interest protected by the right of publicity.

*Id*. at 405 (citations and footnotes omitted).  The *Comedy III* court cited decisions involving an Elvis impersonator (*Estate of Presley*) and a play featuring characters resembling the Marx Brothers[5] as instances where the public interest yielded to the right to publicity.  *Id.* at 402-03.

Applying this test, *Comedy III* affirmed plaintiff's right of publicity over the defendant's First Amendment right arising from defendant's sketch.  While recognizing that "all portraiture involves the making of artistic choices," the court found that "when an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame, then the artist's right of free expression is outweighed by the right of publicity."  *Id.* at 408.  The court recognized the sketch at issue demonstrated the defendant's "undeniable" artistic skill, but found that it nonetheless reflected defendant's "goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame."  *Id.* at 409.

The California Supreme Court next applied the transformative test to cartoon figures evoking – but significantly departing from – the images of rock-musician brothers John and Edgar

---

[5] *Groucho Marx Productions, Inc. v. Day & Night Co.*, 523 F. Supp. 485 (S.D.N.Y. 1981), *rev'd on other grounds*, 689 F.2d 317 (2d Cir. 1982).

1   Winters.  *See Winter v. DC Comics*, 30 Cal. 4th 881 (2003).  The cartoon characters did not "depict

2   plaintiffs literally…. [T]o the extent the drawings … resemble plaintiffs at all, they are distorted for

3   purposes of lampoon, parody, or caricature.  And the Autumn brothers are but cartoon characters –

4   half-human and half-worm – in a larger story."  *Id*. at 890.  In contrast to the *Comedy III* sketch, the

5   drawings in *Winter* were "fanciful, creative characters, not pictures of the Winter brothers.  This

6   makes all the difference."  *Id*. at 892.[6]

7          The California court of appeals applied the transformative test to determine whether a

8   videogame character that borrowed features of an entertainer's image enjoyed First Amendment

9   protection.  *See Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47 (2006).  That analysis directly

10  applies here.  Plaintiff was the lead singer of a musical group who sued a videogame distributor for

11  breaching her right to publicity.  The game featured a female lead character that resembled plaintiff

12  in many respects.  The court meticulously compared the features of the plaintiff and the video

13  character, 144 Cal. App. 4th at 51-52, 56-57, to conclude there were sufficient dissimilarities such

14  that the video character (named "Ulala") was an expressive or transformative character rather than

15  a literal depiction of the plaintiff:

16              First, Ulala is not a literal depiction of Kirby.  As discussed above, the
               two share similarities.  However, they also differ quite a bit: Ulala's
17             extremely tall, slender computer-generated physique is dissimilar from
               Kirby's.  Evidence also indicated Ulala was based, at least in part, on
18             the Japanese style of "anime."  Ulala's typical hairstyle and primary
               costume differ from those worn by Kirby who varied her costumes and
19             outfits, and wore her hair in several styles.  Moreover, the setting for
               the game that features Ulala – as a space-age reporter in the 25th
20             century – is unlike any public depiction of Kirby.  Finally, we agree
               with the trial court that the dance moves performed by Ulala –
21             typically short, quick movements of the arms, legs and head – are
               unlike Kirby's movements in any of her music videos.
22
23  *Id*. at 61.  The court concluded, "[t]aken together, these differences demonstrate Ulala is

24  'transformative,' and respondents added creative elements to create a new expression."  *Id*.[7]

25          [6] Not only were the plaintiff cartoon characters depicted as giant mutant worms, they were also
    not musicians, but "vile, depraved, stupid, cowardly, subhuman" gun fighters engaged in "wanton
26  acts of violence, murder and bestiality for pleasure …."  *Id*. at 886.  EA reaches very far indeed to
    assert that *Winter* applies here.
27
            [7] EA incorrectly describes *Kirby*'s analysis as more focused on the videogame as a whole than
28  the particular video character.  EA Br. at 10.  The decision does not support EA's view.

1     The Ninth Circuit has embraced this First Amendment transformative test.  See, for

2  example, *Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, 812 (9th Cir. 2003) (citing *Comedy III*);

3  *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 n.2 (9th Cir. 2001) (same); *Browne v.*

4  *McCain*, 611 F. Supp. 2d 1062, 1072 (C.D. Cal. 2009) (same); *Butkus v. Downtown Athletic Club*

5  *of Orlando, Inc.*, 2008 U.S. Dist. LEXIS 49828, at *27 (C.D. Cal. Mar. 31, 2008).

6          **b.     EA's depiction of Keller and other NCAA players is literal, not**
                    **transformative**

7          In the present case, EA's depiction of Plaintiff Sam Keller in its NCAA Football videogame

8  is literal rather than transformative, which defeats EA's First Amendment defense.  Keller, for

9  example, was the starting quarterback for Arizona State University in 2005, and wore jersey No. 9.

10  ¶ 45.  His virtual counterpart in EA's NCAA 2006 Football videogame was a literal copy of Keller.

11  Like real-life Keller, virtual-Keller[8]:  (i) plays the same position, (ii) wears the same jersey

12  number; (iii) is the same height; (iv) is the same weight; (v) has the same skin tone; (vi) has the

13  same hair color; (vii) has the same hair style; (viii) is right-handed; (ix) wears the same equipment;

14  (x) plays with the same playing style;[9] (xi) is from the same state; (xii) has the same facial features,

15  and (xiii) is the starting quarterback for Arizona State University's football team.  ¶¶ 43-53.

16          Compare these facts to the Ulala character in the videogame at issue in *Kirby*.  Ulala and

17  Kirby shared some physical similarities, but "they also differ[ed] quite a bit …."  *See Kirby*, 144

18  Cal. App. 4th at 61.  One was tall and slender, one was not.  *Id.*  Ulala's hairstyle and primary

19  costume differed from those worn by Kirby.  In contrast, virtual-Keller and Plaintiff are exactly the

20  same in all material respects – EA has not even tried to identify any meaningful difference.

21          Likewise, "the setting for the game that features Ulala – as a space-age reporter in the 25th

22  century – is unlike any public depiction of Kirby."  *Id.* at 59.  Here, the world in which virtual-

23  Keller plays replicates Keller's actual playing environment to the fullest extent of EA's abilities.

24  ───────────────────

25          [8] EA acknowledges that it releases its annual edition of NCAA Football no later than July of
   the previous year; for example, NCAA Football 06 would be released in July 2005.  *See* EA's

26  Motion to Dismiss (Dkt. No. 34) at 3.  Keller's likeness from the 2005 season would be in the
   NCAA Football 06 game.

27          [9] For example, if the computer was controlling virtual-Keller, it would match real-life Keller's
   preference of throwing from a "pocket" formed by his offensive line after the ball is snapped.  ¶ 48.

28  This is in sharp contrast to numerous other quarterback playing styles.

1  The virtual uniform, field, logos, stadiums, and mascots purposefully match their real-world

2  counterparts exactly.  ¶ 11.  Indeed, EA spends millions each year to ensure the realism of the

3  games, and advertises this realism in the promotion of its products.  ¶ 11.

4        Virtual-Keller's literal depiction of Keller, coupled with the virtual environment that liter-

5  ally tries to replicate the actual playing environment, is the same sort of "literal, conventional de-

6  pictions" of a public figure as the sketch in *Comedy III*, 25 Cal. 4th at 409.  The misappropriation is

7  also done for the same reason – to exploit the public figure's fame – where realistic replication of

8  student-athletes sells more EA videogames.  ¶ 11.  As in *Comedy III*, the balance of competing

9  rights denies EA any First Amendment protection for exploiting Keller's image for economic gain.

10        Furthermore, EA's misappropriation of student-athletes' likenesses is not static.  Each year

11  EA releases a new game that deliberately appropriates the year's new crop of players.  For exam-

12  ple, Keller transferred from Arizona State University to the University of Nebraska in 2006.  ¶ 46.

13  Due to NCAA regulations, Keller "redshirted" (sat out) the 2006 season and did not begin playing

14  again until 2007.  ¶ 46.  When he resumed play, Keller changed his jersey number from 9 to 5.  ¶

15  49.

16        Before his arrival, the virtual Nebraska player wearing jersey No. 5 was an African-

17  American senior, wide receiver from North Carolina who was 6'1" and 195 pounds.  ¶ 52.  This

18  matches the real-life player who wore jersey number 5 in 2006, Shamus McKoy.  ¶ 52.  But when

19  Keller began playing, the virtual No. 5 was changed to match Keller in all material respects.  ¶ 51.

20  The 6'1, 195-pound African-American wide receiver became a 6'4", 227-pound Caucasian

21  quarterback.  ¶¶ 51-52.  Remarkably, the virtual player even wore a dark visor, which Keller wore

22  for the first time at Nebraska, and is an unusual piece of equipment for quarterbacks to wear.  ¶ 51.

23  In short, the virtual world replicated the real-world.  Virtual-Keller, once again, had the same

24  physical attributes as Keller, but was now the starting quarterback for Nebraska, just like the real-

25  life Keller.[10]

26

27       [10] Later, Keller would change his jersey number to 5, but this was only after the game featuring

28  him was researched and released.

Indeed, EA games' replication of NCAA Division I teams, players and game environments is the heart of their attraction to videogamers and distinguishes EA's NCAA/NFL/NBA video-games from their competitors.  *See supra* at 2, 4, 9; ¶ 11.[11]

### 3.    There is no general public-interest exception regarding sports that grants free license to appropriate Keller's identity

EA insists there is an "anything about sports" public-interest rule that trumps athletes' pub-licity rights to use of their identities and grants EA free use of those identities.  But EA undercuts its First Amendment public-interest argument by purchasing rights from the NFL Players Union for its NFL games.  *See Parrish v. National Football League Players, Inc.*, 2009 U.S. Dist. LEXIS 4239, at *11 (N.D. Cal. Jan. 13, 2009) (recognizing that active players in the National Football League are paid "massive dollars" for the license to use their names and likenesses in EA video-games).  EA annually pays $35 million to the NFL Players Union to use NFL players' images in the same kind of video games.  Similarly, it buys rights from the NCAA to replicate game environments and team images in its NCAA games.  *See generally Gridiron.Com, Inc. v. NFL*, 106 F. Supp. 2d 1309, 1315 (S.D. Fla. 2000) (rejecting argument that "the [NFL player] information the websites produce are entitled to Free Speech protection" in part because the websites' publisher "actively sought out and obtained over 150 NFL Player's publicity rights").

More to the point, EA's "anything about sports" public-interest rule does not exist.  The right of publicity yields to free use of a public figure's likeness only to the extent reasonably required to convey news to the public.  It does not extend to EA's replication of student-athletes' identities for video-gaming purposes.  According to the Ninth Circuit, "[t]he First Amendment defense extends 'to almost all *reporting* of recent events,' as well as to publications about 'people

---

[11] Finally, EA contends that the only "meritorious misappropriation claims" are those that target advertising.  EA Br. at 15.  But "[t]he appropriation of name or likeness need not give the appearance of an endorsement of the product or service in question."  *Maheu v. CBS*, 201 Cal. App. 3d 662, 677 (1988) (quoting *Eastwood v. Superior Ct.*, 149 Cal. App. 3d 409, 419 (1983)). *Comedy III* proves as much.  And even though the misappropriation claim in *Kirby* similarly did not involve an advertisement, the court would have found in plaintiff's favor had the videogame character more closely copied plaintiff's identity.  Further, California Civil Code § 3344(a), the basis for Keller's statutory-violation claim, expressly prohibits misappropriating a person's likeness "on or in products, merchandise, or goods," as distinguished from misappropriating a person's likeness "for purposes of advertising or selling, or soliciting purchases …."

1   who, by their accomplishments, mode of living, professional standing, or calling, create a legiti-

2   mate and widespread attention to their activities.'"  *Downing v. Abercrombie & Fitch*, 265 F.3d

3   994, 1001 (9th Cir. 2001) (quoting *Eastwood*, 149 Cal. App. 3d at 422; emphasis added).  The right

4   to report on any particular matter of public interest stems from a balancing of competing rights:

5      The First Amendment requires that the right to be protected from
       unauthorized publicity "be balanced against the public interest in the

6      dissemination of news and information consistent with the
       democratic processes under the constitutional guaranties of freedom

7      of speech and of the press."

8   *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 409 (2001).

9     In sports contexts, courts find that this balance allows reporting of an athlete's statistics and

10  image to the public, as EA's authorities show.  In *Gionfriddo*, former baseball players sued defen-

11  dants association, licensing agent, and television producer, claiming that including the players' sta-

12  tistics and names in programs and websites were unauthorized and violated their publicity rights.

13  But the challenged uses made historical facts publicly available through game programs, websites

14  and video clips.  94 Cal. App. 4th at 406, 415.  The precise information consisted of "factual data

15  concerning the players, their performance statistics, and verbal descriptions and video depictions of

16  their play," which the court characterized "as mere bits of baseball's history."  *Id.* at 410.  The

17  court stated that, given the public interest in baseball, this interest extends to publication of "factual

18  data" about player accomplishments and other baseball news.  *Id.* at 411.  *See also id.* at 415-16.

19    EA's federal authorities, *C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced*

20  *Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007); and *CBS Interactive, Inc. v. NFL Players Ass'n*,

21  2009 U.S. Dist. LEXIS 36800, 2009 WL 1151982 (D. Minn. Apr. 28, 2009), similarly permitted

22  reporting of publicly available sports data.  Both decisions evaluated fantasy-sports games that

23  imported player performance statistics from the public domain.  In *C.B.C. Distribution*, the Eighth

24  Circuit balanced the parties' competing rights to the record before it, concluding that defendants'

25  state-law rights of publicity must defer to plaintiff's First Amendment free-expression right.  505

26  F.3d at 823.  The court focused on the kind of information at issue, which was "all readily available

27  in the public domain."  *Id.*  The court reasoned "it would be strange law that a person would not

28  have a first amendment right to use information that is available to everyone."  *Id.*  The court

PLAINTIFF'S OPP. TO ELECTRONIC ARTS'S
MOTION TO DISMISS - No. CV-09-1967-CW

010123-11 322179 V1

adopted *Gionfriddo*'s conclusion that reporting and discussing "factual data concerning the athletic performance" of professional baseball players is protected expression. *Id*. at 823-24.

The district court in *CBS Interactive* applied *C.B.C. Distribution* to a NFL football fantasy-sports product. 2009 U.S. Dist. LEXIS 36800, at *46-47, 65. As in *C.B.C.*, the fantasy-sport product at issue in *CBS Interactive* compiled public information about professional ball players and reported them to gamers via games and websites. *Id.* at *6-7. Even as to the product's websites, which reported biographical information about the players that went beyond their actual statistics, the use of this information was "akin to newspapers and magazines …." *Id*. at *62.

These decisions are distinguishable, however, because they did *not* concern an effort to appropriate athletes' identities separate and apart from reporting past performance data. While fantasy-sports products allow gamers to create fantasy teams comprised of the current statistics of real players chosen by the gamers, any such fantasy team's performance "depends on the actual performance of the fantasy team's players on their respective actual teams during the course of the major league baseball season." *Id.* at 820-21. The fantasy-sports products are thus in essence databases of reported statistics that, as they update over the course of a playing season, determine the outcome of gamers' choices.

But EA's games are very different. As already shown (*see supra* at 9-11), EA games digitally replicate NCAA players' identities for gamers to manipulate. Each gamer controls a virtual-player that has the same likeness as a college athlete in the putative Class, and is able to manipulate that player and any other player in the game. Likewise, the computer controls all other players using the real-life players' actual playing style. EA games do not report real-life statistics or provide a database of player performance. While fantasy-sports products use existing player statistics and other historical facts from the public domain to mirror the real players, EA games digitally *replicate* the players for gamers to control independently and prospectively. The EA games thus trespasses far beyond the mere reporting of publicly available sports information, thereby distinguishing *Gionfriddo*, *C.D.C.* and *CBS*. *See Gridiron.Com*, 106 F. Supp. 2d at 1315 (First Amendment must defer to right of publicity for unauthorized uses of player images that "go way beyond merely conveying the news").

1      Moreover, *C.B.C. Distribution* balanced the competing rights in favor of free expression

2   because the right of publicity was asserted by "handsomely" paid professional athletes.  This,

3   according to the Eighth Circuit, minimized the states' interests in protecting players' rights to pub-

4   licity from defendants' use of player statistics.  505 F.3d at 824.  But here, Keller and the rest of the

5   Class are students and amateur athletes who, by NCAA rules, must be "protected from exploitation

6   by … commercial enterprises."  NCAA Rules 2.9; *see also* NCAA Rules 12.5.1.1(h), 12.5.1.1.4.

7   Reflecting this NCAA requirement, EA contractually agreed, in order to obtain its annual license

8   from the NCAA/CLC, not to commercially exploit players and their likenesses.  ¶¶ 1, 12, 15.

9   Thus, while EA previously agreed that the student-athletes' interest in avoiding exploitation of

10  their likenesses was paramount, EA *now* says the public's general interest in sports overrides the

11  players' interest and grants free use of player identities.

12     To the contrary (and in contrast to professional athletes as found by *C.D.C.*), the student-

13  athlete Class members have a compelling interest in prohibiting misappropriation of their identi-

14  ties.  Their interest in preventing commercial exploitation of identities trumps any free expression

15  right by EA to do so.  Under the Eighth Circuit's analysis, the balance of competing rights favors

16  the student-athletes.[12]

17     EA's other authorities also relate to reporting of particular newsworthy sporting events.  EA

18  cites *Montana v. San Jose Mercury News Inc.*, 34 Cal. App. 4th 790 (1995), which held that

19  quarterback Joe Montana's leading "his team to four Super Bowl championships in a single

20  decade," was "clearly a newsworthy event," and that posters depicting this success thus enjoyed

21  First Amendment protection.  *Id*. at 795.  EA fails to identify any similarly "newsworthy event"

22  that could possibly protect its misappropriating Keller's image.  Further, *Montana* did *not* find

23  there was sufficient public interest in all sports-related information to invoke universal First

24  Amendment protection.

25     Similarly, *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993), held that a surfing

26  video documentary was in the public interest because it chronicled "a certain time and place in

27  ───────────────
         [12] Indeed, all of EA's authorities on this issue involve professional athletes or other celebrity
28  professionals.  *See supra* at 8.

PLAINTIFF'S OPP. TO ELECTRONIC ARTS'S
MOTION TO DISMISS - No. CV-09-1967-CW                    - 14 -

010123-11 322179 V1

1   California history and, indeed, in American legend." *Id.* at 543.  The plaintiff's contribution to the

2   development of the surf life-style and his influence on the sport was "the point of the program." *Id.*

3   The *Dora* decision thus instructs that journalism explaining, profiling, or examining a social

4   subculture, such as surfing, is valuable and relevant because it serves as a type of anthropological

5   reflection on modern society.  *Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d 1081, 1097 (D.

6   Haw. 2007) (explaining *Dora*).  But *Dora* did not find a public interest in surfing generally that

7   grants a *carte blanche* right to appropriate images of surfers.  *See Downing*, 265 F.3d at 1002

8   (unauthorized use of famous surfers' pictures not protected).

9          Another EA authority, *Holt v. Cox Enters.*, 590 F. Supp. 408, 412 (N.D. Ga. 1984), cited in

10  EA's brief at 11 n.5, similarly discusses whether the defendants' reporting of the plaintiffs' on-field

11  performance was protected.  *Holt* does not create a sweeping "anything about sports" public-

12  interest exception to student-athletes' rights of publicity.

13         Finally, to the extent any of EA's remaining authorities address the public's interest in

14  college sports at all, they do not involve disputes arising from the reporting of game or player

15  information.[13]

16  **C.     EA's use of Keller's likeness does not fall within any public-affairs exemption**

17         EA asserts a similarly sweeping, but incorrect, view of the § 3344 exception for "public

18  affairs.  Section 3344(d) of the California Civil Code provides:  "For purposes of this section, a use

19  of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or

20  sports *broadcast or account*, or any political campaign, shall not constitute a use for which consent

21

22         [13] *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 135-36, 154-55 (1967) (noting public interest in
    article exposing college athlete director's corrupt acts of fixing result of football game); *National
23  Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 117 (1984) (in antitrust action, Court
    noted NCAA regulatory controls are precompetitive for enhancing "public interest in
24  intercollegiate athletics"); *Regents of Univ. of California v. American Broadcasting Cos.*, 747 F.2d
    511, 521 (9th Cir. 1984) (in another antitrust action, court found that "the public interest is served
25  by preserving the competitive influence of consumer preference in the college broadcast market");
    *Time, Inc. v. Johnston*, 448 F.2d 378, 380 (4th Cir. 1971) (article dealt entirely with plaintiff's
26  performance as a professional basketball player; as such, "he was … a 'public figure'" for having
    "offered his services to the public as a paid performer and had thereby invited comments on his
27  performance as such"); *Moore v. University of Notre Dame*, 968 F. Supp. 1330 (N.D. Ind. 1997)
    (Notre Dame football fan publication's reporting of football coach's termination was matter of
28  public interest).

1    is required under subdivision (a)."  (Emphasis added.)   This "public affairs" exemption is similar

2    to the exception developed under the common law tort for publication of matters of "public

3    interest."  *See, e.g., Montana*, 34 Cal. App. 4th at 793-94.  As the *Montana* court explains, "[l]ike

4    the common law cause of action, the statutory cause of action specifically exempts from liability

5    the use of a name or likeness in connection with the *reporting* of a matter in the public interest,"

6    *Id.* (emphasis added; citing § 3344(d)).

7           Accordingly, all of EA's authorities (and every decision we have found) that applied

8    § 3344(d) to dismiss a claim involved some sort of factual reporting.  *Dora* concerned a video

9    documentary about surfing.  *Montana* considered posters of newsworthy photographs reprinted

10   from the defendant's newspaper.  *Gionfriddo* examined websites, documentaries and day-of-game

11   programs.  Other authorities are likewise.  The court in *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 754

12   (N.D. Cal. 1993), looked at a television news magazine program.  The plaintiff in *Maheu v. CBS*,

13   201 Cal. App. 3d 662 (1988), challenged defendants' reporting in a book and magazine articles.

14          EA's games, by contrast, do not constitute factual reporting, *see supra* at 13, and EA's

15   appropriation of Keller's identity hence is not within § 3344(d).

16   **D.      The Complaint sufficiently pleads civil conspiracy**

17          EA urges dismissal of Keller's conspiracy claim on the ground that he has not pled an

18   underlying tort.  But Keller has adequately pled EA's violations of his common-law and statutory

19   right to publicity, so this dismissal argument fails.

20          Keller has also sufficiently alleged a conspiracy under the pleading standards established by

21   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*").  *Twombly* reaffirmed that "a

22   complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."

23   550 U.S. at 555.  For a complaint lacking direct, factual conspiracy allegations, "we do not require

24   heightened fact pleading of specifics, but only enough facts to state a claim to relief that is *plausible*

25   on its face."  *Id.* at 570 (emphasis added).  For such a complaint, the relevant standard is whether

26   the claim for relief was "plausible."  *Id.* at 556, 557 & n.5.  To plead a conspiracy, a complaint must

27   allege only "enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at

28   556.  The factual allegations must "raise a right to relief above the speculative level," or make a

showing of a "reasonably founded hope that the [discovery] process will reveal relevant evidence" to support a conspiracy claim. *See id.* at 559 (citation omitted); *see also id.* at 556.

Keller's complaint easily meets this standard by alleging circumstances that make an inference of a conspiracy between the three defendants at least plausible. The complaint alleges that (i) the three defendants knew NCAA principles barred the CLC from licensing to EA a right to replicate student-athletes' identities (¶¶ 1, 12-15), (ii) the licensing agreement expressly reflected this prohibition (¶¶ 1, 15), (iii) EA's games nonetheless replicated student-athletes' identities, with the NCAA's assistance (¶¶ 1, 12, 16-37, 43-53), (iv) the NCAA scrutinized EA's games for license violations, yet did nothing to stop EA's violations and even aided them (¶¶ 1, 12, 15, 31, 38, 41), and (v) replicating student-athletes' identities made EA's games more realistic, which increased their market value and the royalties EA paid to the NCAA (¶¶ 1, 11-12, 30). Indeed, the complaint alleges that EA sends detailed questionnaires to NCAA team equipment managers to glean information about idiosyncratic individual player details. ¶ 31. The stunning accuracy of EA's replications of student basketball and football players, down to individual players' arm-bands, wrist straps and back plates (¶¶ 26-29), shows that these NCAA managers respond with the requested details. This conduct certainly suggests a conspiracy and makes it reasonable to expect that discovery into the issue will be fruitful.

EA fails to address these allegations, relying instead on the conclusory, and patently false, assertion that the Complaint recites only the legal elements of a conspiracy. EA Br. at 19.

**E.    Keller likewise pleads a predicate violation and remedy for § 17200 claim**

EA also moves to dismiss Keller's § 17200 claim on the ground that he has not pled an underlying tort. But the complaint adequately pleads EA's underlying violations of law. EA also urges dismissal on the ground that the claim seeks relief that § 17200 does not permit. But Keller requests injunctive relief (¶ 84), as the UCL allows, *see* CAL. BUS. & PROF. CODE § 17203; *Cel-Tech. Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 83 Cal. Rptr. 2d 548, 560 (1999).

**F.      EA's challenge to Keller's unjust-enrichment claim fails**

    **1.      The Complaint properly pleads a claim for unjust enrichment**

EA asserts that Keller's unjust-enrichment claim should be dismissed because it is not an independent claim under California law.  EA Br. at 20-21.  To the contrary, unjust enrichment has long been recognized as a valid cause of action.  The "elements of an unjust enrichment claim are the receipt of a benefit and the unjust retention of the benefit at the expense of another."  *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008); *Hirsch v. Bank of Am.*, 107 Cal. App. 4th 708, 722 (2003) ("Appellants have stated a valid cause of action for unjust enrichment"); *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000) (listing the "elements for a claim of unjust enrichment"); *County of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542-43 (2007) (upholding damages award based on unjust-enrichment claim); *Mills v. Ramona Tire, Inc.*, 2007 U.S. Dist. LEXIS 89438, at *10-11 (S.D. Cal. Dec. 5, 2007) (plaintiff "adequately pled a claim for unjust enrichment"); *see also Shum v. Intel Corp.*, 499 F.3d 1272, 1279 (Fed. Cir. 2007) (recognizing unjust enrichment as a "separate claim" under California law).  It is thus no surprise that this Court repeatedly upholds unjust-enrichment claims, including most recently against EA.  *See Pecover v. Electronics Arts Inc.*, 2009 U.S. Dist. LEXIS 49140, at *18-19 (N.D. Cal. June 5, 2009).

Keller alleges all the elements of an unjust-enrichment claim:  (i) he and the proposed Class conferred benefits onto EA in the form of its appropriation of their likenesses for use in two widely popular videogames; (ii) Keller received no compensation in exchange; and (iii) "it would be unjust for EA … to retain the benefits attained by their wrongful actions."  ¶¶ 90-91.

Despite some confusion regarding the interrelationship between unjust enrichment and restitution, California courts routinely hear claims for restitution based on the theory of unjust enrichment.  *See, e.g., Ghirardo v. Antonioli*, 14 Cal. 4th 39, 50 (1996) (finding claim for damages "that rest[ed] on a theory of unjust enrichment" was sufficiently plead); *accord Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006).  Keller's unjust-enrichment claim

specifically seeks "full restitution of [EA's] … enrichment, benefits and ill-gotten gains …." ¶ 91.
Keller's unjust-enrichment claim therefore should be sustained as an independent cause of action.[14]

Finally, EA does not dispute that Indiana also recognizes a claim for unjust enrichment.
*See, e.g., Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009); *King v. Terry*,
805 N.E.2d 397, 400 (Ind. Ct. App. 2004).

### 2.     No contract exists between Class members and EA

Echoing its co-defendants, EA next contends that Keller's unjust-enrichment claim fails
because of "a valid express contract covering the same subject matter." EA Br. at 21. Specifically,
EA points to the form contracts signed between Keller and Class members and the NCAA. This,
of course, only highlights the fatal flaw in its argument:  the contract is not between Keller and EA.

Recognizing this flaw, EA argues that an unjust-enrichment claim may be dismissed
"regardless of whether or not the contract at issue is between the plaintiff and the moving defen-
dant." *Id.* EA cites a decision applying New York law, *4 Hour Wireless v. Smith*, 2002 U.S. Dist.
LEXIS 22680 (S.D.N.Y. Nov. 21, 2002), as its sole support. But EA misstates the law. As EA's
only California precedent states, an unjust-enrichment claim fails only where "there exists *between
the parties* a valid express contract covering the same subject matter." *Lance Camper Mfg. Corp.
v. Republic Indem. Co. of Am.*, 44 Cal. App. 4th 194, 203 (1996) (emphasis added). Significantly,
the Ninth Circuit expressly rejects EA's theory that unjust-enrichment claims are barred "where an
express contract covers the subject matter" even if the defendant is "technically not [party]" to the
contract. *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1092
(9th Cir. 2003). As the Ninth Circuit observed, "[t]his approach, which focuses on the subject
matter of the parties' dispute rather than the binding obligations of the parties to the contract,
ignores the exclusive nature of the contract." *Id.*

Moreover, EA's *4 Hour Wireless* decision not only involved New York law, but the court
found that the non-contracting party did not receive anything of value from the plaintiff. 2002 U.S.

---

[14] In EA's authority, *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1490 (2006),
plaintiffs could not establish their entitlement to restitution. And the conclusory ruling in *Roots
Ready Made Garments v. Gap Inc.*, 2008 U.S. Dist. LEXIS 9191, at *20-21, 2008 WL 239254
(N.D. Cal. Jan. 28, 2008), provides no analysis whether a right to restitution was established.

Dist. LEXIS 22680, at *6.  Here, by contrast, EA concedes that California law governs its motion, EA Br. at 16 n.7, and Keller has alleged that EA increased its profits as the result of misappropriating Keller and Class members' names and likenesses into its games.  ¶¶ 1, 40-41, 89-91.

**G.      Keller pleads recoverable relief**

Asserting that Keller does not plead damages for any of his claims (EA Br. at 16-17), EA again ignores the Complaint's pertinent allegations.  As to EA's violation of § 3344 (Count II), Keller seeks and is entitled to, at minimum, statutory and punitive damages, plus injunctive relief.  CAL. CIV. PROC. CODE § 3344(a).  Keller's common-law claims (Counts III, IV and VII) and his UCL § 17200 claim (Count V) all entitle him at least to disgorgement of profits and injunctive relief.  Complaint at 21 ¶¶ C, D, F (Prayer for Relief).

EA also insists that, even if it misappropriated student-athletes' identities as alleged, the Court should allow it to keep its millions in illegal profits and deny the athletes any damages because EA could not have paid Keller and the Class in the first instance.  EA Br. at 17.  But EA's authorities stand for a different proposition:  that a plaintiff with dirty hands cannot recover on a contract.  *See Page v. Bakersfield Uniform & Towel Supply Co.*, 239 Cal. App. 2d 762, 772 (1966); *Picton v. Anderson Union High Sch. Dist.*, 50 Cal. App. 4th 726, 734 (1996).  Here, by contrast, there is no contract to enforce.  More to the point, as between the Plaintiff Class and EA, the Class is blameless.  Only EA violated the law.  EA should not be heard to argue that, because its conduct was illegal was from beginning, the Court should allow it to retain illegal profits.

**H.      EA Games Released Before May 5, 2005, Are Also at Issue in This Litigation**

EA's suggests that the California four-year statute of limitations is the longest applicable limitations period.  EA Br. at 7.  To the contrary, the Indiana's ten-year limitations period, Ind. Code § 34-11-1-2(a), applies to Plaintiffs' common-law right-of-publicity, breach-of-contract and civil-conspiracy claims, and courts apply a six-year statute of limitations to Indiana claims for unjust enrichment, *King v. Terry*, 805 N.E.2d at 400 (applying IND. CODE § 34-11-2-7).  Accordingly, EA games released before May 5, 2005, are also at issue.

**IV.      CONCLUSION**

For the reasons set forth above, the Court should deny EA's motion to dismiss.

Dated:  September 1, 2009

HAGENS BERMAN SOBOL SHAPIRO LLP


By _____ s/ Shana E. Scarlett _____
SHANA E. SCARLETT
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Robert B. Carey
Leonard W. Aragon
HAGENS BERMAN SOBOL SHAPIRO LLP
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rcarey@hbsslaw.com
leonard@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@smplegal.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiff*

I, Shana E. Scarlett, am the ECF User whose ID and password are being used to file this OPPOSITION TO DEFENDANT ELECTRONIC ARTS INC.'S MOTION TO DISMISS.

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Shana E. Scarlett<br>
SHANA E. SCARLETT

## Mailing Information for a Case 4:09-cv-01967-CW

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Leonard W Aragon**
  leonard@hbsslaw.com,amyn@hbsslaw.com

- **Christopher J. Banks**
  cbanks@morganlewis.com,cericson@morganlewis.com

- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

- **Robert B. Carey**
  rob.carey@att.net,cindyj@hbsslaw.com

- **Gregory L. Curtner**
  curtner@millercanfield.com,misislan@millercanfield.com,chapmand@millercanfield.com

- **Gennaro August Filice**
  hhauck@filicebrown.com,dverduga@filicebrown.com

- **Cindy Dawn Hanson**
  chanson@kilpatrickstockton.com

- **R. Charles Henn , Jr**
  chenn@kilpatrickstockton.com,aljones@kilpatrickstockton.com,efesshazion@kilpatrickstockton.com

- **Daniel E. Jackson**
  djackson@kvn.com,mcanales@kvn.com,efiling@kvn.com

- **Atleen Kaur**
  kaur@millercanfield.com,misislan@millercanfield.com,chapmanD@millercanfield.com

- **Kimberly K. Kefalas**
  kefalas@millercanfield.com,kaiser@millercanfield.com,chapmand@millercanfield.com

- **Jon T. King**
  jking@hausfeldllp.com,dbone@hausfeldllp.com

- **Robert Adam Lauridsen**
  alauridsen@kvn.com,efiling@kvn.com,rcirelli@kvn.com

- **Stuart McKinley Paynter**
  stuart@smplegal.com

- **Kent Michael Roger**
  kroger@morganlewis.com,wschaub@morganlewis.com,jowyang@morganlewis.com,hhoying@morganlewis.com,jennifer.calvert@morganlewis.com,cholsome@morga

- **Shana E. Scarlett**
  shanas@hbsslaw.com,sf_filings@hbsslaw.com,jeneld@hbsslaw.com

- **Robert James Slaughter**
  rjs@kvn.com,efiling@kvn.com,toneill@kvn.com,mls@kvn.com

- **Robert Addy VanNest**
  rvannest@kvn.com,efiling@kvn.com,sjacob@kvn.com,scole@kvn.com

- **Matthew S. Weiler**
  mweiler@morganlewis.com,kolson@morganlewis.com

- **Robert James Wierenga**
  wierenga@millercanfield.com,misislan@millercanfield.com,chapmanD@millercanfield.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
William H. Brewster
Kilpatrick & Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309-4530
```

# Appendix A

# MANUAL

## 2008-09 NCAA® DIVISION I MANUAL

NCAA

Constitution
Operating Bylaws
Administrative Bylaws
*Effective August 1, 2008*

## 2.3 THE PRINCIPLE OF GENDER EQUITY [*]

**2.3.1 Compliance With Federal and State Legislation. [*]**  It is the responsibility of each member institution to comply with federal and state laws regarding gender equity.  *(Adopted: 1/11/94)*

**2.3.2 NCAA Legislation. [*]**  The Association should not adopt legislation that would prevent member institutions from complying with applicable gender-equity laws, and should adopt legislation to enhance member institutions' compliance with applicable gender-equity laws.  *(Adopted: 1/11/94)*

**2.3.3 Gender Bias. [*]**  The activities of the Association should be conducted in a manner free of gender bias. *(Adopted: 1/11/94)*

## 2.4 THE PRINCIPLE OF SPORTSMANSHIP AND ETHICAL CONDUCT [*]

For intercollegiate athletics to promote the character development of participants, to enhance the integrity of higher education and to promote civility in society, student-athletes, coaches, and all others associated with these athletics programs and events should adhere to such fundamental values as' respect, fairness, civility, honesty and responsibility. These values should be manifest not only in athletics participation, but also in the broad spectrum of activities affecting the athletics program. It is the responsibility of each institution to:  *(Revised: 1/9/96)*

(a) Establish policies for sportsmanship and ethical conduct in intercollegiate athletics consistent with the educational mission and goals of the institution; and  *(Adopted: 1/9/96)*

(b) Educate, on a continuing basis, all constituencies about the policies in Constitution 2.4-(a).  *(Adopted: 1/9/96)*

## 2.5 THE PRINCIPLE OF SOUND ACADEMIC STANDARDS [*]

Intercollegiate athletics programs shall be maintained as a vital component of the educational program, and student-athletes shall be an integral part of the student body. The admission, academic standing and academic progress of student-athletes shall be consistent with the policies and standards adopted by the institution for the student body in general.

## 2.6 THE PRINCIPLE OF NONDISCRIMINATION [*]

The Association shall promote an atmosphere of respect for and sensitivity to the dignity of every person. It is the policy of the Association to refrain from discrimination with respect to its governance policies, educational programs, activities and employment policies including on the basis of age, color, disability, gender, national origin, race, religion, creed or sexual orientation. It is the responsibility of each member institution to determine independently its own policy regarding nondiscrimination.  *(Adopted: 1/16/93, Revised: 1/16/00)*

## 2.7 THE PRINCIPLE OF DIVERSITY WITHIN GOVERNANCE STRUCTURES [*]

The Association shall promote diversity of representation within its various divisional governance structures and substructures. Each divisional governing body must assure gender and ethnic diversity among the membership of the bodies in the division's administrative structure.  *(Adopted: 1/9/96 effective 8/1/97)*

## 2.8 THE PRINCIPLE OF RULES COMPLIANCE [*]

**2.8.1 Responsibility of Institution. [*]**  Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs. It shall monitor its programs to assure compliance and to identify and report to the Association instances in which compliance has not been achieved. In any such instance, the institution shall cooperate fully with the Association and shall take appropriate corrective actions. Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance.

**2.8.2 Responsibility of Association. [*]**  The Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance.

**2.8.3 Penalty for Noncompliance. [*]**  An institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association.

## 2.9 THE PRINCIPLE OF AMATEURISM [*]

Student-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercol-

legiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises.

## 2.10 THE PRINCIPLE OF COMPETITIVE EQUITY [*]

The structure and programs of the Association and the activities of its members shall promote opportunity for equity in competition to assure that individual student-athletes and institutions will not be prevented unfairly from achieving the benefits inherent in participation in intercollegiate athletics.

## 2.11 THE PRINCIPLE GOVERNING RECRUITING [*]

The recruiting process involves a balancing of the interests of prospective student-athletes, their educational institutions and the Association's member institutions. Recruiting regulations shall be designed to promote equity among member institutions in their recruiting of prospective student-athletes and to shield them from undue pressures that may interfere with the scholastic or athletics interests of the prospective student-athletes or their educational institutions.

## 2.12 THE PRINCIPLE GOVERNING ELIGIBILITY [*]

Eligibility requirements shall be designed to assure proper emphasis on educational objectives, to promote competitive equity among institutions and to prevent exploitation of student-athletes.

## 2.13 THE PRINCIPLE GOVERNING FINANCIAL AID [*]

A student-athlete may receive athletically related financial aid administered by the institution without violating the principle of amateurism, provided the amount does not exceed the cost of education authorized by the Association; however, such aid as defined by the Association shall not exceed the cost of attendance as published by each institution. Any other financial assistance, except that received from one upon whom the student-athlete is naturally or legally dependent, shall be prohibited unless specifically authorized by the Association.

## 2.14 THE PRINCIPLE GOVERNING PLAYING AND PRACTICE SEASONS [*]

The time required of student-athletes for participation in intercollegiate athletics shall be regulated to minimize interference with their opportunities for acquiring a quality education in a manner consistent with that afforded the general student body.

## 2.15 THE PRINCIPLE GOVERNING POSTSEASON COMPETITION AND CONTESTS SPONSORED BY NONCOLLEGIATE ORGANIZATIONS [*]

The conditions under which postseason competition occurs shall be controlled to assure that the benefits inherent in such competition flow fairly to all participants, to prevent unjustified intrusion on the time student-athletes devote to their academic programs, and to protect student-athletes from exploitation by professional and commercial enterprises.

## 2.16 THE PRINCIPLE GOVERNING THE ECONOMY OF ATHLETICS PROGRAM OPERATION [*]

Intercollegiate athletics programs shall be administered in keeping with prudent management and fiscal practices to assure the financial stability necessary for providing student-athletes with adequate opportunities for athletics competition as an integral part of a quality educational experience.

## 12.5 PROMOTIONAL ACTIVITIES

### 12.5.1 Permissible.

**12.5.1.1 Institutional, Charitable, Education or Nonprofit Promotions.**  A member institution or recognized entity thereof (e.g., fraternity, sorority or student government organization), a member conference or a noninstitutional charitable, educational or nonprofit agency may use a student-athlete's name, picture or appearance to support its charitable or educational activities or to support activities considered incidental to the student-athlete's participation in intercollegiate athletics, provided the following conditions are met: *(Revised: 1/11/89, 1/10/91, 1/10/92)*

(a) The student-athlete receives written approval to participate from the director of athletics (or his or her designee who may not be a coaching staff member), subject to the limitations on participants in such activities as set forth in Bylaw 17; *(Revised: 1/11/89, 4/26/01)*

(b) The specific activity or project in which the student-athlete participates does not involve cosponsorship, advertisement or promotion by a commercial agency other than through the reproduction of the sponsoring company's officially registered regular trademark or logo on printed materials such as pictures, posters or calendars. The company's emblem, name, address, telephone number and Web site address may be included with the trademark or logo. Personal names, messages and slogans (other than an officially registered trademark) are prohibited; *(Revised: 1/11/89, 1/10/91, 5/6/08)*

(c) The name or picture of a student-athlete with remaining eligibility may not appear on an institution's printed promotional item (e.g., poster, calendar) that includes a reproduction of a product with which a commercial entity is associated if the commercial entity's officially registered regular trademark or logo also appears on the item; *(Adopted: 11/12/97)*

(d) The student-athlete does not miss class; *(Revised: 1/11/89)*

(e) All moneys derived from the activity or project go directly to the member institution, member conference or the charitable, educational or nonprofit agency; *(Revised: 1/11/89, 1/10/92)*

(f) The student-athlete may accept actual and necessary expenses from the member institution, member conference or the charitable, educational or nonprofit agency related to participation in such activity; *(Revised: 1/11/89, 1/10/92, 4/28/05)*

(g) The student-athlete's name, picture or appearance is not used to promote the commercial ventures of any nonprofit agency; *(Adopted: 1/10/92)*

(h) Any commercial items with names, likenesses or pictures of multiple student-athletes (other than highlight films or media guides per Bylaw 12.5.1.7) may be sold only at the member institution at which the student-athletes are enrolled, institutionally controlled (owned and operated) outlets or outlets controlled by the charitable or educational organization (e.g., location of the charitable or educational organization, site of charitable event during the event). Items that include an individual student-athlete's name, picture or likeness (e.g., name on jersey, name or likeness on a bobble-head doll), other than informational items (e.g., media guide, schedule cards, institutional publications), may not be sold; and *(Adopted: 1/16/93, Revised: 1/9/96, 4/27/06 effective 8/11/06)*

(i) The student-athlete and an authorized representative of the charitable, educational or nonprofit agency sign a release statement ensuring that the student-athlete's name, image or appearance is used in a manner consistent with the requirements of this section. *(Revised: 1/11/89, 1/10/92)*

**12.5.1.1.1 Promotions Involving NCAA Championships, Events, Activities or Programs.**  The NCAA [or a third party acting on behalf of the NCAA (e.g., host institution, conference, local organizing committee)] may use the name or picture of an enrolled student-athlete to generally promote NCAA championships or other NCAA events, activities or programs. *(Adopted: 8/7/03)*

**12.5.1.1.2 Promotions Involving Commercial Locations/Sponsors.**  A member institution or a charitable, educational or nonprofit organization may use the appearance, name or picture of an enrolled student-athlete to promote generally its fundraising activities at the location of a commercial establishment, provided the commercial establishment is not a cosponsor of the event and the student-athlete does not promote the sale of a commercial product in conjunction with the fundraising activity. A commercial establishment would become a cosponsor if the commercial establishment either advertises the presence of the student-athlete at the commercial location or is involved directly or indirectly in promoting the activity. *(Adopted: 1/10/92)*

**12.5.1.1.3 Distribution of Institutional Items through Commercial Outlets.**  A member institution may distribute noncommercial items that include names or pictures of student-athletes (items not for sale) at commercial establishments, provided the institution generally distributes such items to other commercial establishments in the community and the distribution of the items does not require the recipient to make a purchase at the commercial establishment. *(Adopted: 1/16/93, Revised: 5/21/08)*

**12.5.1.1.4 Player/Trading Cards.**  A member institution or recognized entity thereof (e.g., fraternity, sorority or student government organization), a member conference or a noninstitutional charitable, educational or nonprofit agency may distribute but may not sell player/trading cards that bear a student-athlete's name or picture. *(Adopted: 1/11/94 effective 8/1/94)*

**12.5.1.1.4.1 Exception—Olympic/National Team.**  A national governing body may sell player/trading cards that bear the name or picture of a student-athlete who is a member of the Olympic/national team in that sport, provided all of the funds generated through the sale of such cards are deposited directly with the applicable Olympic/national team. *(Adopted: 1/6/96)*

**12.5.1.1.5 Schedule Cards.**  An advertisement on an institution's wallet-size playing schedule that includes the name or picture of a student-athlete may include language other than the commercial product's name, trademark or logo, provided the commercial language does not appear on the same page as the picture of the student-athlete. A violation of this bylaw shall be considered an institutional violation per Constitution 2.8.1; however, such a violation shall not affect the student-athlete's eligibility. *(Adopted: 1/10/92, Revised: 1/14/08, 5/21/08)*

**12.5.1.1.6 Effect of Violations.**  If an institution, without the student-athlete's knowledge or consent, uses or permits the use of the student-athlete's name or picture in a manner contrary to Bylaw 12.5.1.1, the violation shall be considered an institutional violation; however, the student-athlete's eligibility shall not be affected. In addition, a violation of Bylaw 12.5.1.1 related to any permissible promotional activity in which the only condition of the legislation not satisfied is the failure to obtain written approval from the director of athletics (or his or her designee who may not be a coaching staff member) shall be considered an institutional violation; however, the student-athlete's eligibility shall not be affected, provided the approval would have been granted if requested. *(Adopted: 1/14/97, Revised: 4/26/07)*

**12.5.1.2 United States Olympic Committee/National Governing Body Advertisement Prior to Collegiate Enrollment.**  Prior to initial, full-time collegiate enrollment, an individual may receive payment for the display of athletics skill in a commercial advertisement, provided: *(Adopted: 1/11/94)*

(a)  The individual receives prior approval to appear in the advertisement from the U.S. Olympic Committee or the applicable national governing body;

(b)  The U.S. Olympic Committee or national governing body approves of the content and the production of the advertisement;

(c)  The individual forwards the payment to the U.S. Olympic Committee or national governing body for the general use of the organization(s); and

(d)  The funds are not earmarked for the individual.

**12.5.1.3 Continuation of Modeling and Other Nonathletically Related Promotional Activities after Enrollment.**  If an individual accepts remuneration for or permits the use of his or her name or picture to advertise or promote the sale or use of a commercial product or service prior to enrollment in a member institution, continued remuneration for the use of the individual's name or picture (under the same or similar circumstances) after enrollment is permitted without jeopardizing his or her eligibility to participate in intercollegiate athletics only if all of the following conditions apply: *(Revised: 1/14/97, 3/10/04)*

(a)  The individual's involvement in this type of activity was initiated prior to his or her enrollment in a member institution;

(b)  The individual became involved in such activities for reasons independent of athletics ability;

(c)  No reference is made in these activities to the individual's name or involvement in intercollegiate athletics;

(d)  The individual does not endorse the commercial product; and *(Revised: 3/10/04)*

(e)  The individual's remuneration under such circumstances is at a rate commensurate with the individual's skills and experience as a model or performer and is not based in any way upon the individual's athletics ability or reputation.

**12.5.1.4 Congratulatory Advertisement.**  It is permissible for a student-athlete's name or picture, or the group picture of an institution's athletics squad, to appear in an advertisement of a particular business, commercial product or service, provided:

(a)  The primary purpose of the advertisement is to publicize the sponsor's congratulations to the student-athlete or team;

(b)  The advertisement does not include a reproduction of the product with which the business is associated or nay other item or description identifying the business or service other than its name or trademark;

(c)  There is no indication in the makeup of wording of the advertisement that the squad members, individually or collectively, or the institution endorses the product or service of the advertiser;

(d)  The student-athlete has not signed a consent or release granting permission to use the student-athlete's name or picture in a manner inconsistent with the requirements of this section; and