1

2

3                     IN THE UNITED STATES DISTRICT COURT

4                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

5                                              No. C 09-1967 CW
6    EDWARD O'BANNON, on behalf of himself
     and all others similarly situated,       ORDER ON NCAA'S AND
7                                              CLC'S MOTIONS TO
              Plaintiff,                       DISMISS
8                                              (No. C 09-3329 CW,
         v.                                    Docket Nos. 91 and
9                                              92)
     NATIONAL COLLEGIATE ATHLETIC
10   ASSOCIATION and COLLEGIATE LICENSING
     COMPANY,
11
              Defendants.
12   _____/

13
     CRAIG NEWSOME, on behalf of himself       (No. C 09-4882 CW,
14   and all others similarly situated,        Docket Nos. 12 and
                                               14)
15            Plaintiff,

16       v.

17   NATIONAL COLLEGIATE ATHLETIC
     ASSOCIATION and COLLEGIATE LICENSING
18   COMPANY,

19            Defendants.
     _____/
20

21        Plaintiffs Edward O'Bannon and Craig Newsome, in separate

22   complaints, charge Defendants the National Collegiate Athletic

23   Association (NCAA) and the Collegiate Licensing Company (CLC) with

24   engaging in anti-competitive conduct in violation of the Sherman

25   Act.  In addition, they assert related common law causes of action

26   for unjust enrichment and accounting.  NCAA and CLC move separately

27   to dismiss O'Bannon's and Newsome's complaints in their entirety.

28   O'Bannon and Newsome oppose their motions.  The motions were heard

**United States District Court**
For the Northern District of California

on December 17, 2009.  Having considered oral argument and all of
the papers submitted by the parties, the Court GRANTS in part
NCAA's and CLC's Motions to Dismiss O'Bannon's Complaint, and
DENIES them in part (No. C 09-3329 CW, Docket Nos. 91 and 92).  The
Court GRANTS NCAA's and CLC's Motions to Dismiss Newsome's
Complaint (No. C 09-4882 CW, Docket Nos. 12 and 14).

BACKGROUND

Plaintiff Edward O'Bannon, a Nevada resident, competed as a
student athlete on the University of California, Los Angeles men's
basketball team from 1991 to 1995.  Plaintiff Craig Newsome, a
Wisconsin resident, competed as a student athlete on the Arizona
State University football team from 1993 to 1994.  Both maintain
that they participated on their respective teams pursuant to the
rules and regulations of NCAA.

The following allegations are contained in O'Bannon's
complaint.[1]  NCAA, an unincorporated association of various
colleges, universities and regional athletic conferences, governs
collegiate athletics and is headquartered in Indiana.  O'Bannon
alleges that NCAA's rules and regulations constitute anti-
competitive conduct.  He cites NCAA Form 08-3a,[2] which NCAA
requires student athletes to sign each year.  By signing Form 08-
3a, student athletes agree to the following:

> You authorize the NCAA [or a third party acting on behalf
> of the NCAA (e.g., host institution, conference, local
> organizing committee)] to use your name or picture to
> generally promote NCAA championships or other NCAA

---

[1] Newsome's complaint contains allegations similar to those
contained in O'Bannon's more comprehensive complaint.

[2] Newsome refers to Form 09-3a, which appears to contain the
same language as Form 08-3a.

United States District Court
For the Northern District of California

events, activities or programs.

O'Bannon Compl. ¶ 65.  O'Bannon claims that the form requires student athletes to "relinquish all rights in perpetuity to the commercial use of their images, including after they graduate and are no longer subject to NCAA regulations."  O'Bannon Compl. ¶ 9. He asserts that student athletes' participation in intercollegiate athletics events is conditioned on signing this form.

O'Bannon also cites NCAA Bylaw Article 12.5.1.1, which provides,

> A member institution or recognized entity thereof (e.g., fraternity, sorority or student government organization), a member conference or a non-institutional charitable, educational or nonprofit agency may use a student-athlete's name, picture or appearance to support its charitable or educational activities or to support activities considered incidental to the student-athlete's participation in intercollegiate athletics, provided the following conditions are met:
>
> ...
>
> (i) The student-athlete and an authorized representative of the charitable, educational or nonprofit agency sign a release statement ensuring that the student-athlete's name, image or appearance is used in a manner consistent with the requirements of this section.

O'Bannon Compl. ¶ 74.

O'Bannon claims that, among other things, Form 08-3a and Article 12.5.1.1 enable NCAA to enter into licensing agreements with companies that distribute products containing student athletes' images.  He alleges that neither he nor other student athletes consent to these agreements and that they do not receive compensation for the use of their images.  He claims that CLC, which is incorporated and has a principal place of business in Georgia, serves as NCAA's "licensing arm" and facilitates these arrangements.  O'Bannon Compl. ¶ 80.

3

**United States District Court**
For the Northern District of California

O'Bannon asserts that NCAA's and CLC's actions excluded him
and other former student athletes from the collegiate licensing
market.  He claims that, because NCAA has rights to images of him
from his collegiate career, it, along with its co-conspirators, fix
the price for the use of his image at "zero."  O'Bannon Compl.
¶ 86.  He maintains that this conduct "has artificially limited
supply and depressed prices paid by Defendants and their co-
conspirators to Plaintiff and the members of the Class for use of
their images after cessation of participation in intercollegiate
sports."  O'Bannon Compl. ¶ 182.

Based on this alleged conduct, O'Bannon and Newsome plead that
Defendants violated section 1 of the Sherman Act by agreeing to fix
prices and to engage in a group boycott, both of which constitute
unreasonable restraints of trade.  In addition, they assert related
claims for unjust enrichment and an accounting.  The remedies they
seek include monetary relief, disgorgement of profits from the
wrongful use of putative class members' images and a permanent
injunction prohibiting Defendants from using former student
athletes' images without valid consent.  O'Bannon and Newsome
intend to prosecute this case as a class action on behalf of former
student athletes.

PROCEDURAL HISTORY

O'Bannon filed his complaint on July 21, 2009; Newsome filed
his on October 14, 2009.  The Court consolidated their actions,
along with several others making similar claims, with Keller v.
Electronic Arts, Inc., et al., No. C 09-1967 CW.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the

4

United States District Court
For the Northern District of California

claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a).  Dismissal under Rule 12(b)(6) for failure to state a

claim is appropriate only when the complaint does not give the

defendant fair notice of a legally cognizable claim and the grounds

on which it rests.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555

(2007).  In considering whether the complaint is sufficient to

state a claim, the court will take all material allegations as true

and construe them in the light most favorable to the plaintiff.  <u>NL</u>

<u>Indus., Inc. v. Kaplan</u>, 792 F.2d 896, 898 (9th Cir. 1986).

However, this principle is inapplicable to legal conclusions;

"threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements," are not taken as true.

<u>Ashcroft v. Iqbal</u>, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009)

(citing <u>Twombly</u>, 550 U.S. at 555).

DISCUSSION

I.   Sherman Act Claims

     NCAA asserts that O'Bannon and Newsome have failed to state

claims for unreasonable restraints of trade under section 1 of the

Sherman Act.  CLC argues that, even if O'Bannon and Newsome have

stated section 1 claims, they have not alleged facts that tend to

show that it was involved in the purported antitrust conspiracy.

Defendants also maintain that O'Bannon and Newsome lack Article III

and antitrust standing to bring their claims.  The Court considers

these arguments and O'Bannon's and Newsome's complaints in turn.

     A.   O'Bannon

          1.   Violation of Section 1 of the Sherman Act

     In order to state a claim under section 1 of the Sherman Act,

a plaintiff "must demonstrate: '(1) that there was a contract,

5

combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'" <u>Tanaka v. Univ. of S. Cal.</u>, 252 F.3d 1059, 1062 (9th Cir. 2001) (quoting <u>Hairston v. Pac. 10 Conference</u>, 101 F.3d 1315, 1318 (9th Cir. 1996)).

> a.   Existence of a Contract, Combination or Conspiracy

NCAA argues that O'Bannon fails to allege sufficient facts to show that it conspires with its member schools and conferences to restrain trade.  As noted above, CLC separately asserts that, even if O'Bannon satisfies his pleading requirement as to NCAA, he does not allege facts that CLC is involved in the alleged conspiracy.

O'Bannon pleads sufficient factual allegations to show an agreement among Defendants and their purported co-conspirators. With regard to an agreement among NCAA and its members, O'Bannon alleges that NCAA represents itself as "a bottom-up organization in which the members rule the Association." <u>O'Bannon</u> Compl. ¶ 56. The members presumably agree to abide by the organization's constitution, bylaws and rules.  With regard to Form 08-3a, O'Bannon cites Article 3.2.4.6 of the NCAA Constitution, which requires member schools to "administer annually . . . a signed statement for each student athlete . . . ." <u>O'Bannon</u> Compl. ¶ 60; <u>see also</u> <u>O'Bannon</u> Compl. ¶¶ 61-64.  These allegations adequately support an inference that there was an agreement among NCAA and its members.  <u>Cf.</u> <u>Hairston</u>, 101 F.3d at 1319 (finding that the athletic conference's agreement to sanction a member university "fulfill[ed] the 'contract, combination, or conspiracy' prong").

United States District Court
For the Northern District of California

O'Bannon also pleads agreements among NCAA, its members, CLC and various distributors of material related to college sports. These alleged agreements are for licenses to distribute products or media containing the images of O'Bannon and other former student athletes.  For example, O'Bannon pleads an arrangement involving NCAA, CLC and Electronic Arts, Inc. concerning video games that contain the likenesses of former student athletes.  O'Bannon alleges that CLC is the "licensing representative" of NCAA, and that CLC represents colleges, universities and athletic conferences. O'Bannon Compl. ¶¶ 97-98.   These allegations sufficiently support O'Bannon's theory that, after NCAA and its members obtain releases from student athletes, CLC brokers agreements that do not compensate him or the putative class members for the use of their images.  This demonstrates CLC's role in the alleged conspiracy.

Accordingly, O'Bannon adequately pleads facts to satisfy the first prong of his Sherman Act claims.

b.   Unreasonable Restraints of Trade

The Sherman Act does not condemn every restraint of trade; instead, the law "was intended to prohibit only unreasonable restraints of trade."  NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 98 (1984) (emphasis added).

To determine whether an alleged restraint is unreasonable, a court may employ a rule of reason analysis or a per se rule of illegality.  Under the rule of reason analysis, which presumptively applies, Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006), a restraint is unreasonable if "the restraint's harm to competition outweighs its procompetitive effects," Tanaka, 252 F.3d at 1063.  The rule

7

of reason analysis imposes an initial burden on the plaintiff to show that the "restraint produces 'significant anticompetitive effects' within a 'relevant market.'" <u>Id.</u> (citation omitted).  A relevant market

> encompasses notions of geography as well as product use, quality, and description.  The geographic market extends to the "area of effective competition . . . where buyers can turn for alternative sources of supply."  The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand.

<u>Id.</u> at 1063 (citing <u>Oltz v. St. Peter's Cmty. Hosp.</u>, 861 F.2d 1440, 1446 (9th Cir. 1988)).  Because "the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." <u>Newcal Indus., Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1045 (9th Cir. 2008).

Certain agreements, however, are considered <u>per se</u> illegal, which obviates the need for an analysis of reasonableness.  "The <u>per se</u> rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work . . . ." <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 886 (2007).  "Resort to <u>per se</u> rules is confined to restraints . . . that would always or almost always tend to restrict competition and decrease output." <u>Id.</u>  A "<u>per se</u> rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." <u>Id.</u> at 886-87 (citations omitted).  Courts should be reticent to adopt a <u>per se</u> rule "where

United States District Court
For the Northern District of California

the economic impact of certain practices is not immediately obvious." Id. at 887.

Seeking to avoid a rule of reason analysis, O'Bannon alleges that Defendants' conduct constituted price-fixing and a group boycott.  Only horizontal price-fixing agreements between competitors are considered per se illegal.  Dagher, 547 U.S. at 5.[3] Likewise, group boycotts could be subject to a per se rule of illegality.  However, "precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors." NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135-36 (1998).

O'Bannon's allegations do not suggest the existence of a horizontal agreement to fix prices or to engage in a group boycott. As noted above, horizontal agreements occur between direct competitors.  Here, he maintains that NCAA, its member schools and various businesses conspired to fix the price of former student athletes' images at zero and to boycott former student athletes in the collegiate licensing market.  Nowhere, however, does O'Bannon allege that the parties to this agreement were direct competitors in this market.  He does not claim that the member schools compete with each other to profit from former student athletes' images. Because O'Bannon has not alleged a horizontal agreement and because his antitrust theory is novel, the Court does not apply a per se

---

[3] O'Bannon argues that Defendants' price-fixing scheme is per se unreasonable because "[a]ny conspiracy to fix prices . . . is illegal per se." O'Bannon Opp'n to NCAA's Mot. at 4.  O'Bannon misstates the law.  As noted above, horizontal agreements to fix prices are per se illegal.  In contrast, "[v]ertical price restraints are to be judged according to the rule of reason." Leegin Creative, 551 U.S. at 907.

9

United States District Court
For the Northern District of California

rule of illegality.  Thus, the Court subjects O'Bannon's allegations to a rule of reason analysis.  As noted above, under this analysis, O'Bannon has an initial burden of alleging a "relevant market" and "significant anticompetitive effects."

O'Bannon identifies the relevant market as the "collegiate licensing market" in the United States.  O'Bannon Compl. ¶ 79. O'Bannon alleges that the market's products are rights to use the images of athletes connected with collegiate sports; without these rights, licensees would be unable to market and distribute their own products legally.  O'Bannon pleads facts showing that the market exists, including CLC's representation that it manages "more than 75% share of the college licensing market."  O'Bannon Compl. ¶ 36.  As noted above, he identifies numerous agreements entered into by NCAA and its members, including agreements for the broadcast of athletics events.  These factual allegations suggest that the market exists.

O'Bannon has also sufficiently plead significant anti-competitive effects.  O'Bannon pleads that he and putative class members are excluded from the market by Defendants' actions.  This alleged exclusion decreases the number of competitors in the market.[4]  See Coalition for ICANN Transparency, Inc. v. VeriSign, Inc., 567 F.3d 1084, 1090 (9th Cir. 2009) (stating that the elimination of competition is "precisely the type of allegation required to state an injury to competition").  Further, O'Bannon

---

[4] The Court notes that O'Bannon purportedly quotes language from Harkins Amusement Enterprises v. General Cinema Corporation, 850 F.2d 477 (9th Cir. 1988); however, the quoted language does not appear in that case.  O'Bannon must ensure that he accurately represents case law.

10

United States District Court
For the Northern District of California

pleads that Defendants' conduct decreases the number of licenses available on the market. This allegation also supports the existence of anti-competitive effects.

Accordingly, under a rule of reason analysis, O'Bannon pleads facts to make out a <u>prima facie</u> case that Defendants' conduct constitutes an unreasonable restraint of trade.

### c.   Impact on Interstate Commerce

O'Bannon alleges that the anti-competitive effects of which he complains occur in the nation-wide collegiate licensing market. Thus, O'Bannon adequately pleads an impact on interstate commerce.

### d.   Statute of Limitations

NCAA argues that, even if O'Bannon pleads a cognizable section 1 claim, he is nonetheless barred by the Sherman Act's four-year statute of limitations. 15 U.S.C. § 15b. O'Bannon responds that the continuing violation doctrine applies.

> Under the continuing violation doctrine, an antitrust claim accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act. A continuing violation is one in which the plaintiff's interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured.

<u>Pace Indus., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 237 (9th Cir. 1987) (citing <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 338 (1971)). A plaintiff must allege "an overt act by the defendant . . . to restart the statute of limitations." <u>Pace Indus, Inc.</u>, 813 F.3d at 237.

O'Bannon alleges that NCAA continues to enter into agreements that allow the use of his image without compensation paid to him. He claims that in 2007, NCAA entered into an agreement with Thought

Equity Motion, Inc. to offer "classic" college basketball games online.  O'Bannon Compl. ¶¶ 108-111.  This supports an inference that the image of O'Bannon as a former college basketball player was included in that agreement.  Thus, O'Bannon has sufficiently alleged a continuing violation.

> 2.  Article III and Antitrust Standing

NCAA argues that O'Bannon has failed to establish that he has Article III and antitrust standing to bring this case.

A plaintiff has Article III standing when (1) he or she suffers a concrete, particularized injury; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Wedges/Ledges of Cal., Inc. v. City of Phoenix, 24 F.3d 56, 61 (9th Cir. 1994).  The absence of any one element deprives a plaintiff of Article III standing and requires dismissal.  See Whitmore v. Fed. Election Comm'n, 68 F.3d 1212, 1215 (9th Cir. 1995).

Separate from Article III standing, a plaintiff asserting antitrust claims must also allege antitrust standing.  Gerlinger v. Amazon.com Inc., 526 F.3d 1253, 1256 (9th Cir. 2008) (citing Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 538 (1983)).  To have antitrust standing, a plaintiff must successfully allege antitrust injury.  Glen Holly Entertainment v. Tektronix, Inc., 352 F.3d 367, 371 (9th Cir. 2003) (citing Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1054-55 (9th Cir. 1999)).  Antitrust injury consists of "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and

United States District Court
For the Northern District of California

(4) that is of the type the antitrust laws were intended to prevent." <u>Glen Holly</u>, 352 F.3d at 372.

O'Bannon has established that he has Article III standing.  He alleges that Defendants' actions have deprived him of compensation for the use of images of himself from his collegiate career.  That injury is traceable to Defendants' conduct, which includes, but is not limited to, NCAA's rules and regulations.  Further, O'Bannon's injury can be redressed by this Court's order.

O'Bannon has similarly established antitrust standing.  As discussed above, he has sufficiently alleged violations of section 1 of the Sherman Act, and has plead injury as a result of the alleged violations.  O'Bannon's allegations of anti-competitive conduct establish that the harm caused to him is of the type the antitrust laws were intended to prevent.  In particular, Defendants' actions have allegedly prevented O'Bannon and other student athletes from participating in the collegiate licensing market.  In doing so, Defendants have decreased competition in the market.  Antitrust law is intended to prevent such harm.  "The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 458 (1993).

B.   Newsome

Newsome pleads sufficient facts to suggest the existence of a conspiracy.  However, he does not meet his burden with respect to alleging unreasonable restraints of trade.  Like O'Bannon, Newsome pleads that Defendants engaged in price-fixing and a group boycott, in order to avoid a rule of reason analysis of his claims.  His

13

allegations are similar to those of O'Bannon and, for the reasons stated above, they are not sufficient to warrant a _per se_ rule analysis.

Newsome's complaint, which represents a truncated version of the _O'Bannon_ complaint, does not contain sufficient allegations to make out a _prima facie_ case under a rule of reason analysis. Among other things, he does not plead a relevant market. Accordingly, the Court dismisses Newsome's claims for violations of section 1 of the Sherman Act.

## II.   Common Law Claims

NCAA and CLC argue that O'Bannon's and Newsome's common law claims must fail because they are wholly derivative of the antitrust claims. This argument is unavailing as to O'Bannon because he sufficiently alleges antitrust claims. However, because Newsome does not state antitrust claims, his common law claims fail.

The Court considers the sufficiency of O'Bannon's common law claims below.

### A.   Unjust Enrichment

O'Bannon alleges claims of "unjust enrichment" to recover Defendants' profits acquired through their alleged anti-competitive practices. CLC, in its motion, argues that, even if his antitrust claims survive, O'Bannon does not make factual allegations that support his unjust enrichment claim against CLC. For the purposes of this motion, the Court assumes that O'Bannon's claims arise under California law.

California courts appear to be split on whether there is an independent cause of action for unjust enrichment. Baggett v.

14

United States District Court
For the Northern District of California

Hewlett-Packard Co., 582 F. Supp. 2d 1261, 1270-71 (C.D. Cal. 2007) (applying California law).  One view is that unjust enrichment is not a cause of action, or even a remedy, but rather a general principle, underlying various legal doctrines and remedies. McBride v. Boughton, 123 Cal. App. 4th 379, 387 (2004).  In McBride, the court construed a "purported" unjust enrichment claim as a cause of action seeking restitution.  Id.  There are at least two potential bases for a cause of action seeking restitution: (1) an alternative to breach of contract damages when the parties had a contract which was procured by fraud or is unenforceable for some reason; and (2) where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct and the plaintiff chooses not to sue in tort but to seek restitution on a quasi-contract theory.  Id. at 388.  In the latter case, the law implies a contract, or quasi-contract, without regard to the parties' intent, to avoid unjust enrichment.  Id.

Another view is that a cause of action for unjust enrichment exists and its elements are receipt of a benefit and unjust retention of the benefit at the expense of another.  Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 726 (2000); First Nationwide Savings v. Perry, 11 Cal. App. 4th 1657, 1662-63 (1992).

Even under the more restrictive analysis of McBride, O'Bannon sufficiently pleads his unjust enrichment claims.  He alleges that CLC profited from brokering licensing agreements for products that contain his image.  These agreements arose in part, O'Bannon alleges, from the anti-competitive conduct discussed above, including the requirement to sign Form 08-3a.  O'Bannon maintains that student athletes sign Form 08-3a "under duress and without

15

United States District Court
For the Northern District of California

informed consent." <u>O'Bannon</u> Compl. ¶ 9.  These allegations
sufficiently support restitution claims against under California
law.

        B.   Accounting

An action for accounting, which is equitable in nature, "may
be brought to require a defendant to account to a plaintiff for
money or property, (1) where a fiduciary relationship exists
between the parties, or (2) where, though no fiduciary relationship
exists, the accounts are so complicated that an ordinary legal
action demanding a fixed sum is impracticable."  Witkin, <u>California
Procedure</u>, Pleading § 775 (4th ed.); <u>Civic W. Corp. v. Zila
Industries</u>, 66 Cal. App. 3d 1, 14 (1977).

O'Bannon does not allege a fiduciary relationship between
himself and NCAA or CLC, and therefore must plead facts showing the
existence of complicated accounts that make an ordinary legal
action impracticable.  He does not do so.  Accordingly, his common
law accounting claims against NCAA and CLC are dismissed with leave
to amend.  If he means to imply that he is entitled to some
ascertainable percentage of every license agreement that involved
his image, and that there are many, he should say so directly.

CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART NCAA's and
CLC's motions to dismiss O'Bannon's complaint, and DENIES them in
part.  (No. C 09-3329 CW, Docket Nos. 91 and 92.)  O'Bannon's claim
for an accounting is dismissed with leave to amend to allow him to
plead facts supporting the existence of complicated accounts.  The
Court GRANTS with leave to amend NCAA's and CLC's motions to
dismiss Newsome's complaint.  (No. C 09-4882 CW, Docket Nos. 12 and

14.)

     In accordance with this Court's Order of January 15, 2010, which consolidated the O'Bannon and Newsome actions with the Keller action, No. C 09-1967 CW, O'Bannon and Newsome have thirty days from the date of this Order to file a consolidated amended complaint.  A case management conference is scheduled for April 27, 2010 at 2:00 p.m.

     IT IS SO ORDERED.


Dated: February 8, 2010                  _____
                                         CLAUDIA WILKEN
                                         United States District Judge