Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rcarey@hbsslaw.com
        leonard@hbsslaw.com

Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
Christopher L. Lebsock (Cal. Bar No.
    184546)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email:  mlehmann@hausfeldllp.com
        jking@hausfeldllp.com
        abailey@hausfeldllp.com

*Plaintiffs' Interim Co-Lead Class Counsel*
(Additional Counsel Listed on Signature
Page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | ) ) ) ) ) ) ) ) ) |

Case No. C 09-01967 CW

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

1.     Pursuant to the Court's: (1) "Order Granting Plaintiffs Samuel Michael Keller's and Edward C. O'Bannon, Jr.'s Joint Motion to Consolidate Actions" dated January 15, 2010 (*Keller* Dkt. No. 145); (2) "Order on Defendants' Motions to Dismiss and Electronic Arts' Anti-SLAPP Motion to Strike" dated February 8, 2010 (*Keller* Dkt. No. 150); and (3) "Order on NCAA's and CLC's Motions to Dismiss" dated February 8, 2010 (*O'Bannon* Dkt. No. 142), Plaintiffs hereby filed this Consolidated Amended Class Action Complaint.

2.     At the hearing on various motions to dismiss held on December 17, 2009, the Court indicated its preference that the Consolidated Amended Class Action Complaint contain discrete sections for the *Keller* right of publicity-based claims and the *O'Bannon* antitrust-based claims (*see* Tr. of December 17, 2009 Hearing, at 67:3 – 67:19).  Plaintiffs have therefore proceeded accordingly herein.

3.     With respect to the right of publicity and related claims pertaining to video games, as brought in the *Keller* complaint, Plaintiffs Samuel Keller, Bryan Cummings, Lamarr Watkins, and Bryon Bishop (collectively "Right of Publicity Plaintiffs") bring this action individually and as putative class representatives as further described herein. The terms "Right of Publicity", as used herein,  refers to the various claims described in the Right of Publicity  Causes of Action set forth below.

4.     With respect to the antitrust and related claims pertaining to multiple products, as brought in the *O'Bannon* complaint, Plaintiffs Edward  C. O'Bannon, Jr. ("Ed O'Bannon"), Harry Flournoy, Alex Gilbert, Sam Jacobson, Thad Jaracz, David Lattin, Patrick Maynor, Tyrone Prothro, Damien Rhodes, Eric Riley, Bob Tallent, and Danny Wimprine (collectively "Antitrust Plaintiffs" or "Antitrust Class Representatives") bring this action individually and as putative class representative as further described herein. The terms "Antitrust Claims" and "Antitrust", as used herein, refer to the claims described in the Antitrust Causes of Action set forth below.

5.     Plaintiffs, by and through their attorneys, based on their individual experiences, the investigation of counsel, and upon information and belief allege as follows.

## INTRODUCTION TO RIGHT OF PUBLICITY AND RELATED CLAIMS

6.     This suit arises out of the blatant and unlawful use of National Collegiate Athletic Association ("NCAA") student-athlete likenesses in videogames produced by Electronic Arts Inc. ("EA").  Despite clear prohibitions on the use of student names and likenesses in NCAA bylaws, contracts and licensing agreements, EA utilizes the likenesses of individual student-athletes in its NCAA basketball and football videogames to increase sales and profits.  EA also intentionally circumvents the prohibitions on utilizing student-athletes' names in commercial ventures by allowing gamers to upload entire rosters, which include players' names and other information, directly into the game in a matter of seconds.  Rather than enforcing its own rules, the NCAA and its licensing arm, the Collegiate Licensing Company ("CLC"), have sanctioned EA's violations. In fact, the NCAA and the CLC have expressly investigated and approved EA's use of player names and likenesses.  They have done so because EA's use of player names and likenesses benefits the NCAA and CLC by increasing the popularity of the relevant games and thus the royalties that the NCAA and CLC can collect.

7.     This is a proposed class action on behalf of NCAA student-athletes whose likenesses and distinctive appearances have been used without their permission or consent, to increase revenues and profits for Defendants, and in violation of state law.

## INTRODUCTION TO ANTITRUST AND RELATED CLAIMS

8.     Antitrust Plaintiffs and putative Class Representatives Ed O'Bannon, Harry Flournoy, Alex Gilbert, Sam Jacobson, Thad Jaracz, David Lattin, Patrick Maynor, Tyrone Prothro, Damien Rhodes, Eric Riley, Bob Tallent, and Danny Wimprine bring this action both individually and on

behalf of antitrust damages and injunctive relief classes (collectively, the "Antitrust Classes" or "Antitrust Class")) consisting of former student-athletes who competed for NCAA member colleges or universities on those schools': (1) "Division I" men's basketball athletic teams; and (2) "Football Bowl Subdivision" (formerly known until 2006 as "Division I-A") men's football athletic teams whose images have been licensed or sold by Defendants, their co-conspirators, or their licensees from July 21, 2005 and continuing until a final judgment in this matter (the "Antitrust Class Period"), or may be in the future. For purposes of the injunctive relief class only, the Antitrust Plaintiffs also bring this action on behalf of current student-athletes competing on the teams described above, as well as former student-athletes, as both groups' future compensation rights are impacted by the anticompetitive practices described herein.

9.     Defendants NCAA, EA, the CLC (the NCAA's licensing arm), and their co-conspirators have committed violations of the federal antitrust laws by engaging in a price-fixing conspiracy and a group boycott / refusal to deal that has unlawfully foreclosed class members from receiving compensation in connection with the commercial exploitation of their images, likenesses and/or names following their cessation of intercollegiate athletic competition. The Antitrust Plaintiffs also set forth a claim for unjust enrichment and request that the Court require Defendants to provide an accounting of ill-gotten gains and the monies unlawfully withheld from Antitrust Class members. The Antitrust Plaintiffs further request that the Court establish a constructive trust for the benefit of class members and for the purpose of holding in trust the licensing revenues that Defendants and their co-conspirators have unlawfully diverted from Antitrust Class members.

10.   Defendants NCAA, CLC, and EA have additionally conspired to deprive Antitrust Class members from receiving compensation in connection with the use of their names, images, and likenesses in EA's various NCAA video game products.

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 4 -

11.   One of the NCAA's business partners, Thought Equity Motion ("TEM"), has described the NCAA's video content archive as "one of the most unique and valuable content collections in the world."  Collegiate Images, LLC ("CI"), a licensing entity that represents more than 200 of the NCAA's members, repeatedly stresses that in creating a digital library that contains thousands of collegiate games, coaches shows and highlights dating back to the early 1900s, it is helping its members "maximize new revenue streams" and "monetize priceless collegiate video and images."

12.   The Antitrust Class Representatives' collective collegiate experiences include: (1) eight appearances in NCAA national championship games; (2) competing for teams that won two NCAA championship titles, the 1994-95 UCLA men's basketball team, and the 1965-66 Texas Western men's basketball team; (3) competing on opposing teams in a game still considered the most socially significant game in college basketball history, the 1966 Texas Western vs. University of Kentucky men's basketball championship game; (4) competing in the 1979 Indiana State University vs. Michigan State University men's basketball game,  the intense popularity of which is credited for revolutionizing the commercialization of not only the NCAA but the National Basketball Association ("NBA") as well,; (5) competing on the famous "Fab 5"-era University of Michigan basketball teams; (6) competing on teams in the Southeastern Conference (the "SEC"), the Big 10, and the Pac 10, Conference USA, and on teams from the schools of Alabama, Kentucky, UCLA, Syracuse, Stanford, and Memphis.  The Antitrust Class representatives further include multiple All-American players, team captains, a former NCAA Division I basketball coach, and a career military officer who served as a Lt. Colonel in the United States Army.

13.   These players competed in several eras (some as recently as a few years ago), and are representative of the thousands of other unnamed players and teammates from those eras whose

collective efforts conveyed enormous financial benefits and glory upon their schools, conferences, the NCAA, and their many for-profit business partners.  While all of those entities continue to enjoy commercial benefits from the sale and use of the players' images following the conclusion of their collegiate athletic careers and to this day, the players have been foreclosed from participating or sharing in those benefits pursuant to the anticompetitive conduct described herein.  The Antitrust Class Representatives are united in their efforts to achieve fairness for both past and future generations of collegiate athletes.

14.   As utilized herein, the term "former student athletes" includes those individuals that have permanently ceased competing on teams because of, for example, graduation; exhaustion of eligibility; injury; voluntary decisions to cease competition; and involuntary separations from teams due to decisions by coaches, schools, conferences, and/or the NCAA, and also includes those individuals that subsequently became professional athletes, whether prior to or after the exhaustion of their intercollegiate eligibility, and further includes current students that have remained in school but ceased competing on a collegiate athletic team.

15.   The term "Antitrust Damages Class" refers to former student-athletes as described herein.  The term "Antitrust Declaratory and Injunctive Relief Class" includes both former and current student-athletes as described herein.  As noted above, the terms "Antitrust Class" or "Antitrust Classes" include both Antitrust Damages and Declaratory and Antitrust Injunctive Relief class members, unless otherwise specified.

16.   Defendant NCAA describes itself as "the organization through which the colleges and universities of the nation speak and act on athletics matters at the national level" and states that it is a "voluntary association of more than 1,000 institutions, conferences and organizations." The NCAA's official "licensing representative" is CLC, a for-profit entity that is a defendant

herein, which is a division of IMG Worldwide, Inc. ("IMG").  CLC states on its website that there is a "$4.0 billion annual market for collegiate licensed merchandise."

17.  As described below, the NCAA has unreasonably and illegally restrained trade in order to commercially exploit former student-athletes previously subject to its control, with such exploitation affecting those individuals well into their post-collegiate competition lives.  The NCAA's conduct is blatantly anticompetitive and exclusionary, as it wipes out in total the future ownership interests of former student-athletes in their own images -- rights that all other members of society enjoy -- even long after student-athletes have ceased attending a university.

18.  The NCAA, acting through its members, and in conjunction with its for-profit business partners, has eliminated the rights of former student-athletes to receive even a single dollar from the substantial revenue streams described herein.  Former-student athletes do not share in these revenues even though they have never given informed consent to the widespread and continued commercial exploitation of their images. While the NCAA, its members, and its for-profit business partners reap millions of dollars from revenue streams including television contracts, rebroadcasts of "classic" games, DVD game and highlight film sales and rentals, on-demand streaming and sales of games and clips, "stock footage" sales to corporate advertisers and others, photograph sales, video game sales, and jersey and other apparel sales, former student-athletes whose likenesses are utilized to generate those profit-centers receive no compensation whatsoever.

19.  Only within recent years has the NCAA entered into some of the licensing partnerships detailed herein that unlawfully utilize the images of Antitrust Class members.  The related available content featuring images, likenesses, and/or names of former student-athletes, such as DVDs, photos, and video games, continues to grow in both availability and popularity, and growth will continue to explode as merchandise continues to be made available in new

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

delivery formats as developing technology and ingenuity permits, as exemplified by the

substantial library of "on demand" internet content now available for sale for NCAA games going

back several decades.

20.   Article 2.9 of the NCAA's Constitution ("The Principle of Amateurism") states in

part that "[s]tudent participation in intercollegiate athletics is an avocation, and *student athletes*

*should be protected from exploitation by professional and commercial enterprises*."  (emphasis

added).  Article 2.15 of the NCAA's Constitution ("The Principle Governing Postseason

Competition and Contests Sponsored by Noncollegiate Organizations") states the following:

> The conditions under which postseason competition occurs shall be
> controlled to assure that the benefits inherent in such competition
> flow fairly to all participants, to prevent unjustified intrusion on the
> time student-athletes devote to their academic programs, and to
> **protect student-athletes from exploitation by professional and**
> **commercial enterprises**.  (emphases added).

Additionally, the NCAA describes its "NCAA Brand" as follows:  "**Learning. Balance. Spirit.**

**Community. Fair play. Character.**  These are the attributes that the NCAA promotes through its

branding initiative. An important part of the NCAA brand is a consistent image that supports

these attributes." (emphasis in original).

21.   The NCAA accomplishes its unreasonable restraint of trade in part by requiring all

student-athletes to sign a form each year – such as 2008's "Form 08-3a" – that purports to require

each of them to relinquish all rights in perpetuity to the commercial use of their images, including

after they graduate and are no longer subject to NCAA regulations. (*See* Exhibit A).  Form 08-3a

is purposefully misleading, incomplete and ambiguous on its face, and student-athletes, including

minors, must sign it under duress and without informed consent.

22.   The NCAA further requires student-athletes to sign at least one other similarly illegal

consent form pursuant to Article 12.5.1.1 of its Bylaws (the "Institutional, Charitable,

Educational, or Nonprofit Promotions Release Statement"), that allows commercial exploitation

of former student-athletes by effecting another purported perpetual release of rights.  The NCAA's Bylaws contain further provisions allowing for-profit third parties to benefit financially from the commercial exploitation of former student-athletes.  The penalty for a student-athlete who refuses to sign the forms described herein is that the student-athlete is declared permanently ineligible for participation on his or her respective team, unless he or she later signs the forms.

23.   More specifically, Form 08-3a purports to cause student-athletes to release in perpetuity their rights to obtain compensation in connection with use by the NCAA, or the NCAA's designated "third parties," of a student-athlete's "name or picture to generally promote NCAA championships or other NCAA events, activities or programs."  Similar language is contained in the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement."  The NCAA, without advising its student-athletes, has taken that purposefully ambiguous language as a license to develop an array of multi-media revenue streams for itself without providing any compensation whatsoever to the former athletes whose images are sold over and over again via NCAA-owned, controlled, and licensed entities.  Form 08-3a and the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement" are contracts of adhesion, imposed via anticompetitive conduct and agreement, and are plainly unenforceable.

24.   The NCAA's forms in fact do not in any way grant licenses in perpetuity, or even ones extending beyond the conclusion of any student-athlete's collegiate athletics career. Student-athletes have not transferred or conveyed their rights in the licensing or use of their image following the cessation of their participation on NCAA teams.  The NCAA and its members, under its control and direction, have no right to license or use players' images, likenesses and/or names upon the conclusion of their participation in intercollegiate athletics. The NCAA and others, however, have agreed to act as if their forms do grant perpetual licenses with no limits, and further agreed to license and use the wrongfully obtained rights.

25.   In addition to agreeing to wrongfully interpret the release forms as perpetual licenses, the NCAA has operated as an illegal horizontal cartel, additionally facilitated by Defendants CLC and EA.  That cartel has collectively and illegally conspired to limit and depress the compensation of former student-athletes for continued use of their images to zero.  Defendants' and their co-conspirators' actions further constitute a group boycott / refusal to deal.  Their concerted action requires all student-athletes to sign each year the forms described herein that purport to require each of them to relinquish all rights in perpetuity for use of their images.  This concerted action is in effect a refusal to deal with Antitrust Class members on future post-competition rights issues.

26.   The NCAA's abridgement of former student-athletes' economic rights in perpetuity is unconnected to any continuing pro-educational benefits for former student-athletes, who by definition are no longer student-athletes.  Defendants' patently anticompetitive and illegal scheme has unreasonably restrained trade, and is a violation of the Section 1 of the Sherman Act.

27.   In additional to violating the federal antitrust laws, Defendants have unjustly enriched the NCAA, its members, and its for-profit business partners.  Defendants' actions have deprived Antitrust Class members of their ability to exploit their right of publicity, which protects the misappropriation of a person's identity for commercial use by another, and such use can consist of the person's name, visual likeness, or other "indicia of identity" such as voice, photograph, signature, or physical mannerisms.

28.   In September of 2008, the NCAA's then-President, Myles Brand, acknowledged that student-athletes possess a right of publicity.  In connection with an explanation as to why the NCAA would not sue its business partner, the CBS television network, over its use of college player information in its "fantasy sports" statistical game, President Brand wrote the following:

> Some have urged the NCAA to seek legal remedy to this poke in
> the eye of intercollegiate athletics. They want us to sue the

1    producers on the grounds that the use of names of student-athletes
2    violates the principle of amateurism.

3         Well, it does.

4         But that likely isn't good enough to bring suit. The stake in the
     ground is the right to control publicity by athletes of their names,
5    likenesses and identification.  Indeed, courts might very well find
     that student-athletes should be held apart from professional athletes
6    in this application. The benefit that naturally comes with the
     publicity of names and statistics for professionals is critical enough
7    that those athletes assign their rights to organizations to manage.

8         But in the case of intercollegiate athletics, the right of publicity is
9    held by the student-athletes, not the NCAA. We would find it
     difficult to bring suit over the abuse of a right we don't own.
10

11   The NCAA's express acknowledgement of current student-athletes' rights of publicity is equally

12   applicable to former student-athletes.

13        29.  In the NCAA's 2009 "State of the Association" speech, Wallace I. Renfro, the

14   NCAA's vice president and senior advisor to President Myles Brand, stated the following:

15        There are commercial activities in which universities should not
16        engage even if it generates substantial revenues for athletics. A
          crystal clear example is that student-athletes should not be
17        commercially exploited. They are students, not professionals.
          Exploiting student-athletes for commercial purposes is as contrary
18        to the collegiate model as paying them.
19
          There are several orthogonal parameters that must be understood in
20        order to find the balance point for commercial activity.  These
          parameters include the locus of responsibility for controlling
21        commercial activity, the underlying types of activity relevant to
          college sports, and the potential for diminishing or eliminating
22        cases of run-away commercialism.
23
24   Whatever "orthogonal parameters" are being weighed by the NCAA and its business partners,

25   they do not include any form of compensation to former student-athletes.

26        30.  Reasonable and less restrictive alternatives are available than the NCAA's "zero

27   compensation" policy for former student-athletes' licensing rights.  For example, all of the major

28   professional sports, including basketball and football, have identified and utilized group-licensing

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT                    - 11 -
Case No. C 09-01967 CW

methods to share revenues among teams and players.  Additionally, other reasonable and less restrictive alternatives could include the establishment of funds for health insurance, additional educational or vocational training, and/or pension plans to benefit former student athletes.

31.  On behalf of the Antitrust Damages Class described herein, the Antitrust Plaintiffs seek relief herein including monetary damages, to be automatically trebled under the federal antitrust laws; disgorgement and restitution of all monies by which the Defendants have been unjustly enriched; and declaratory relief that Form 08-3a, the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any similar forms regarding future compensation rights are void and unenforceable.  The Antitrust Plaintiffs further seek an accounting of the monies received by Defendants, their co-conspirators, and their licensees in connection with the exploitation of Antitrust Damages Class members' images, likenesses, and/or names and the establishment of a constructive trust to benefit Antitrust Damages Class members.

32.  The Antitrust Plaintiffs, on behalf of both former and current student-athletes, additionally request injunctive relief permanently enjoining the NCAA and its members from utilizing the provisions Form 08-3a, the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any similar forms that purport to deprive former student-athletes of licensing and/or compensation rights, and further enjoining Defendants from selling, licensing, or using former student-athletes' rights.

**JURISDICTION AND VENUE WITH RESPECT TO RIGHT OF PUBLICITY CLAIMS**

33.  This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and the Right of Publicity Plaintiffs and other putative Class members are citizens of different states than Defendants.

34.   This Court has personal jurisdiction over the Right of Publicity Plaintiffs because Plaintiffs Samuel Keller, Bryan Cummings, Bryon Bishop and Lamarr Watkins submit to the Court's jurisdiction.  This Court has personal jurisdiction over Defendants because Defendant Electronic Arts is headquartered in the District and Defendants CLC and NCAA conduct substantial business in the District.  Furthermore, many of the actions giving rise to the complaint took place in the District, including the creation of the software that is the subject of the complaint.

35.   Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporations, are "deemed to reside in any judicial district in which they are subject to personal jurisdiction," and because many of the decisions behind the scheme to use student-athletes' names and likenesses were made in this District.  Because Electronic Arts resides in the District, Defendants all transact business within the District, and a substantial part of the events giving rise to the claims arose in this District, venue is proper.

36.   Assignment to the Oakland division of this Court is appropriate because Defendant EA's headquarters and principal place of business is in Redwood City, California.  Because this action arises in the county of San Mateo, pursuant to Northern District of California, Local Rule 3-2(d), assignment to the Oakland Division is proper.

**JURISDICTION AND VENUE WITH RESPECT TO ANTITRUST CLAIMS**

37.   The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of

$5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the Defendants.

38.   Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

39.   This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletic contests, and/or licensing or selling merchandise throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Additionally, Defendant EA maintains its headquarters in this District.  Numerous NCAA Division I universities or colleges also are found within this District, *i.e.*, the University of California's Berkeley campus ("Cal"), Stanford University, Santa Clara University, the University of San Francisco ("USF"), and St. Mary's College.

## **RIGHT OF PUBLICITY PLAINTIFFS**

40.   Plaintiff Samuel Keller, an individual, is an Arizona resident and the former starting quarterback for the Arizona State University and University of Nebraska football teams.

41.   Plaintiff Bryan Cummings, an individual, is a New York resident and a former linebacker for the University of Buffalo football team.

42.   Plaintiff Lamarr Watkins, an individual, is a New Jersey resident and a former linebacker for the University of Wisconsin football team.

43.   Plaintiff Byron Bishop, an individual, is a South Carolina resident and a former left guard for the University of North Carolina football team.

**ANTITRUST PLAINTIFFS**

44.   The Plaintiffs described below are set forth as Class Representatives for the Antitrust Claims as separately defined and detailed herein.

**Ed O'Bannon**

45.   Antitrust Plaintiff Ed O'Bannon filed the first antitrust action in these consolidated matters, and is a resident of Henderson, Nevada.  Mr. O'Bannon competed on the University of California, Los Angeles ("UCLA") men's basketball team in the 1991-92, 1992-93, 1993-94, and 1994-95 seasons.  UCLA was and is a member of the Pac-10 Conference.  In the 1994-95 season, Mr. O'Bannon led his team to a national championship, and scored 30 points and had 17 rebounds in the championship game.  Mr. O'Bannon received the John R. Wooden award as the nation's most outstanding men's basketball player for the 1994-95 season, and also was selected by the Associated Press as the 1994-95 NCAA postseason tournament's Most Outstanding Player ("MOP").  Mr. O'Bannon competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate athletic career. Mr. O'Bannon signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

46.   Mr. O'Bannon's image, likeness and/or name along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 15 -

compensation paid to him.  For example, on the NCAA's On Demand on-line store, operated in connection with its for-profit business partner Thought Equity Motion ("TEM"), a two DVD "1995 Men's Basketball National Championship Box Set" is offered for $39.99, and described as follows:  "Ed O'Bannon, earning MOP honors, lead UCLA back to prominence by defeating Arkansas 89-78 for their 11th title in school history. The box set also includes the 1995 Final Four Highlights Video featuring UCLA, Arkansas, North Carolina, Oklahoma St."   The Final Four Highlights Video is separately offered for sale for $24.99.  UCLA's NCAA tournament first round game against Florida International from 1994-95 is offered for sale at $24.99, and its description includes the following:  "UCLA was led by All-Tournament Team selections Toby Bailey and Ed O'Bannon, the tournament's Most Outstanding Player."  UCLA's regional semi-final game against Missouri is offered for $24.99, and its description includes the following: "UCLA was led by All-Tournament Team selections Toby Bailey and Ed O'Bannon, the tournament's Most Outstanding Player."  UCLA's national semi-final game against Oklahoma State is offered for sale at $24.99, and its description includes the following:  "UCLA was led by All-Tournament Team selections Toby Bailey and Ed O'Bannon, the tournament's Most Outstanding Player."

47.  As additional examples, other DVDs offered for sale utilizing the image of Mr. O'Bannon and other Antitrust Damages Class members from the 1994-95 season include DVDs of UCLA's regional final game versus the University of Connecticut, available for $24.99, and the championship game versus Arkansas offered for sale at $24.99.  An NCAA tournament first-round game against Tulsa from the 1994-95 season is available for "pre-order," and a description notes that "production of this game has been delayed."  For the 1992-93 season, a "Michigan Men's Basketball Fab Five 1993" three DVD set is offered for $59.99, and one of the games included is a regional game versus UCLA.  That game is also separately offered for sale at

$24.99.  Also available for "pre-order" is UCLA's first round game versus Iowa State.  For the 1991-92 season, four UCLA NCAA tournaments games (against Robert Morris, Louisville, Indiana, and New Mexico State) are available for pre-order.

48.   The DVDs described above are available through numerous other outlets, including UCLA's Official On-Line DVD store, where the 1995 championship game is currently listed as the number three top-selling basketball DVD,  amazon.com, CBS Sports' "Online DVD Store," and wal-mart.com, on which the description of the 1995 championship game includes the following:  "The following content was provided by the publisher . . . The Bruins held off the Razorbacks for a convincing 89-78 victory as Ed O'Bannon, the tournament's Most Outstanding Player, led the Bruins back to the top of the college basketball mountain as the 1995 National Champions."

49.   As an additional example, a DVD of the 1995 Championship game, featuring Mr. O'Bannon and other Antitrust Damages Class members, is available for rental from Blockbuster Video and Netflix.

50.   As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being utilized subject to the anticompetitive restraints detailed herein, on one of the NCAA's on-line photo stores, at least three images of Mr. O'Bannon are offered for sale.  Interested purchasers must call the website's operator to discuss pricing options.  The photos are described as follows:  "UCLA center George Zidek (25) and Oklahoma State center Bryant Reeves (50) and UCLA forward Ed O'Bannon (31) during the NCAA Final Four basketball championship semifinal game held in Seattle, WA at the Kingdome.";  "UCLA forward Ed O'Bannon (31) and Arkansas center Dwight Stewart (15) during the NCAA Men's National Basketball Final Four championship game held in Seattle, WA at the Kingdome.  UCLA defeated Arkansas 89-78 for the title.  O'Bannon was named MVP for the tournament.";  "UCLA's Ed

O'Bannon turns cameraman as he cuts the net following UCLA's 89-78 victory over Arkansas in the Division I Men's Basketball Championship April 3, 1995 in Seattle, Washington.  O'Bannon was named MVP of the tournament."

51.   As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being utilized subject to the anticompetitive restraints detailed herein, the NCAA and its partner TEM also offer for sale to corporate advertisers and others a "stock footage" clip running 1 minute and 7 seconds that features Mr. O'Bannon's performance in the 1994-95 NCAA championship game, as well as interview footage with Mr. O'Bannon and others. The clip is described as follows:  "Ed O'Bannon helps carry UCLA in the 1995 Men's NCAA Division I Basketball Championship against Arkansas."   It appears that at least one additional clip featuring Mr. O'Bannon (titled "1995 UCLA vs. Missouri Ed O'Bannon (#31)") is available. Interested parties must contact Thought Equity for pricing, which appears to vary depending on intended usage.

52.   As another example of formats in which Antitrust Damages Class members' images are being utilized subject to the anticompetitive restraints detailed herein, Mr. O'Bannon's likeness is utilized by the NCAA's business partner and Defendant Electronic Arts, Inc. as a part of its NCAA Basketball 09 video game's "Classic Teams" feature (as described more herein) where game players can select Mr. O'Bannon's 1995 UCLA team.

53.   As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being utilized subject to the anticompetitive restraints detailed herein, UCLA games featuring Mr. O'Bannon also are periodically rebroadcast on ESPN Classic.

54.   On information and belief, Mr. O'Bannon's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

55. As a result of the federal antitrust violations described herein, Antitrust Plaintiff O'Bannon was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**Antitrust Plaintiffs from the Historic 1966 Texas Western vs. Kentucky NCAA Championship Basketball Game**

**Harry Flournoy**

56. Antitrust Plaintiff Harry Flournoy is a resident of McDonough, Georgia. Mr. Flournoy was the captain of the 1966 NCAA men's Division I basketball champion Texas Western (now University of Texas-El Paso a/k/a "UTEP") team, and competed on the team during the 1963-64, 1964-65, and 1965-66 seasons. In the 1965-66 season, Mr. Flournoy lead the team in rebounding and shooting percentage, and was one of the top rebounders in the nation.

57. In the championship game, Texas Western defeated the University of Kentucky in a game that to this day is frequently termed as the most socially significant college basketball game ever played. Texas Western's legendary coach Don Haskins utilized for the first time in NCAA championship history an all-black starting lineup. The team's experience was documented in the popular 2006 movie "Glory Road," created by Walt Disney Pictures and produced by Jerry Bruckheimer. The game is credited with forever changing college basketball, particularly in the South, and the team's dignity throughout the season is credited as a source of inspiration for generations of players. Legendary NBA coach Pat Riley (who played on the Kentucky team) has called the game the "Emancipation Proclamation of 1966 . . . at least in sports." As the *El Paso Times* noted in 2010, "Today, the game remains one of the most-discussed sporting events in history."

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 19 -

58.  In 2003, ESPN reported:

> In the years immediately after Texas Western's title, the integration of college sports took a great leap forward. Between 1966 and 1985, the average number of blacks on college teams jumped from 2.9 to 5.7.
>
> At Northern colleges, where the unwritten rule for coaches had been, "Two blacks at home. Three on the road. And four when behind", things changed quickly.
>
> Blacks now were recruited as reserves as well as starters. Athletes who had been directed to small black schools now were being lured to major state universities.
>
> The bigger change, of course, came in the South. In the 1966-67 season, every Southern conference, even the SEC, had integrated basketball teams. "It was quite clear after March 1966 that Southern basketball teams would have to change or become increasingly noncompetitive nationally," wrote historian Charles Martin.

59.  In 2007, Mr. Flournoy's 1966 Texas Western Team was inducted into the James Naismith Basketball Hall of Fame, along with other luminaries such as L.A. Lakers coach Phil Jackson, and Mr. Flournoy delivered the acceptance speech on behalf of his teammates and coaches.  In 2007, Mr. Flournoy also addressed the United States troops with his teammates on teamwork and diversity issues, focusing on the strength of a unit based on collective individual talents and not outward appearances throughout Germany, England, and the Netherlands while touring with Armed Forces Entertainment.  Additionally in 2007, Mr. Flournoy was inducted into the Texas Black Sports Hall of Fame.  In 2008, Mr. Flournoy was named a "Texas Hero" by the NAACP.  In 2002, Mr. Flournoy also was inducted in the University of Texas, El Paso Sports Hall of Fame.

60.  The NCAA has featured the Texas Western team in its NCAA Hall of Champions in Indianapolis.  Additionally, during broadcasts of the yearly NCAA tournament, the NCAA has run commercials for its NCAA on-demand and DVD website store featuring the Texas Western

team.  The NCAA also prominently features the 1966 Texas Western team on the first page of its DVD / on-demand website in connection with products for sale utilizing the names, images, and/or likenesses of the members of the Texas Western and Kentucky teams, including Mr. Flournoy.  The site elsewhere states:  "On March 19, 1966, Texas Western College, now known as the University of Texas at El Paso (UTEP), put an all-black starting five on the floor for the first time in an NCAA basketball championship. That night the Texas Western Miners . . . defeated coach Adolph Rupp's #1 ranked all-white Kentucky Wildcats, 72-65."

61.  Mr. Flournoy competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate athletic career.  Mr. Flournoy signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

62.  Mr. Flournoy's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.  For example, on the NCAA's On Demand on-line store, operated in connection with its for-profit business partner Thought Equity Motion, a two-DVD pack is offered for sale featuring a DVD of the 1966 championship game and the Glory Road movie for $44.99.  The individual game DVD is one of the NCAA's "Featured Games" offered for sale at $24.99.  A 1966 NCAA regional final game featuring Texas Western vs. Kansas University is offered for sale at $150 per DVD, or via bulk orders for 25 or more DVDs at pricing available on request. A 1966 NCAA national semi-final game featuring Texas Western vs. the University of

Utah is offered for sale at $150 per DVD, or via bulk orders for 25 or more DVDs at pricing available on request.

63.   The NCAA also offers one-time viewings of the 1966 championship game via its "NCAA On Demand Theatre" and "Watch Now" on-demand streaming video features, with pricing for such offerings listed at "starting at $3.99."  The game is the first game listed in the list of "our top 50 NCAA games."

64.   The championship game is also offered for sale via myriad other outlets. For example, via Amazon.com (for $24.99), Walmart.com ($38.21 for the game plus the Glory Road movie; $13.86 for the game); CBS Sports on-line DVD store ($25.00 for the game plus the Glory Road move, and $14.95 for the game, noting that "Other key players for the Miners included Harry Flournoy . . .").  The game also is available for rental via Netflix.

65.   As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being utilized subject to the anticompetitive restraints detailed herein, on one of the NCAA's on-line photo stores, at least three images of Mr. Flournoy are offered for sale.  On NCAAPhotos.com, an image with the caption "Bobby Joe Hill (14) and Harry Flournoy (44) are surrounded . . ." is offered for sale at price points ranging from $15 to $200.  A team photo featuring Mr. Flournoy and his teammates with the national championship trophy is available at the same price points.  An image featuring Mr. Flournoy and certain teammates leaving the floor with the trophy is offered at the same price points.  An image of Mr. Flournoy and his team in a huddle at a time out is offered for sale at the same price points.  At least two additional images of Mr. Flournoy playing in the championship game are for sale via Getty Images' website, and upon information and belief, Getty Images has had a contractual relationship with the NCAA relating to photo sales.

66.   Mr. Flournoy's likeness additionally has been used in Defendant EA's video games, such as NCAA 09 in its Classic Teams feature, as well as in one or more additional video games authorized by the NCAA.

67.   Additionally, Mr. Flournoy's image, likeness and/or name has been used in replays of the championship game and clips from the game including on the ESPN Classic network.

68.   Upon information and belief, Mr. Flournoy's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

69.   As a result of the federal antitrust violations described herein, Antitrust Plaintiff Flournoy was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**Thad Jaracz**

70.   Antitrust Plaintiff Thad Jaracz is a resident of Crestwood, Kentucky.  Mr. Jaracz was a member of, and a three year starter for, the University of Kentucky basketball team in the 1965-66, 1966-67, and 1967-68 seasons under legendary coach Adolph Rupp, and competed for Kentucky in the Southeastern Conference ("SEC").  Mr. Jaracz competed in the 1966 championship game as described above with respect to Mr. Flournoy, and was Kentucky's starting center.  Mr. Jaracz was an All-American and All-SEC player in the 1965-66 season.  Mr. Jaracz was appointed as Team Captain for the 1968 season.  During Mr. Jaracz's career, his Kentucky teams won two SEC championships, enjoyed a number one national ranking, and finished as the NCAA national champion runners-up in 1966.

71.   Mr. Jaracz was drafted by the Boston Celtics in 1968, and drafted by the United States Army in 1969.  He served 21 years as an Army Officer and retired as a Lieutenant Colonel in 1990.

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 23 -

72.  Mr. Jaracz competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate athletic career.  Mr. Jaracz signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

73.  Mr. Jaracz's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

74.  Mr. Jaracz's image, likeness and/or name is being offered for sale and use in connection with the Texas Western vs. Kentucky game as described above with respect to Mr. Flournoy and the description of game films and clips and myriad distribution channels.

75.  Additionally, Mr. Jaracz's image, likeness and/or name is offered for sale in connection with additional games on the NCAA's website, *i.e.*, the 1966 Kentucky vs. Duke national semi-final game (offered for $150 or orders of 25 or more with pricing available on request); the 1966 Kentucky vs. Michigan NCAA tournament regional game (same pricing); and the 1968 Kentucky vs. Ohio State NCAA regional tournament game (same pricing).

76.  Mr. Jaracz's image, likeness and/or name is also offered for sale and use on one of the NCAA's photo store websites, NCAAPhotos.com, i.e., one that is captioned **"Texas Western ""UTEP""** Bobby Joe Hill (14) and Harry Flournoy (44) are surrounded by Kentucky's Larry Conley (40), Tommy Kron (30) and Thad Jaracz (55) during the NCAA Men's National Basketball Final Four championship

game . . ." and offered at price points ranging from $15 to $200, and another captioned "Kentucky forward/center Thad Jaracz (55) during the NCAA Men's National Basketball Final Four championship game against Texas Western ""UTEP"" held in College Park, MD, at the Cole Fieldhouse." (same price points).

77. Mr. Jaracz's image, likeness, and/or name also is utilized in connection with one or more video games licensed by the NCAA.

78. Upon information and belief, Mr. Jaracz's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

79. As a result of the federal antitrust violations described herein, Antitrust Plaintiff Jaracz was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**David Lattin**

80. Antitrust Plaintiff David Lattin is a resident of Houston, Texas. Mr. Lattin (known as "Big Daddy D") was one of the stars of the 1966 NCAA men's Division I basketball champion Texas Western (now University of Texas-El Paso a/k/a "UTEP") team described above in the section regarding Antitrust Plaintiff Flournoy, and competed on the team during the 1965-66 and 1966-67 seasons. In the championship season, Mr. Lattin was the second-leading scorer on the team, and was the team's leading rebounder in 4 out of 5 of the NCAA tournament games, including the championship game. In the championship game, Mr. Lattin scored 16 points and had 9 rebounds, and had a pivotal, game-changing slam dunk whose importance was highlighted in the Glory Road movie, and continues to resonate today as one of the most significant plays in NCAA tournament history.

81.  Mr. Lattin was named an All-American during both his 1965-66 and 1966-67 seasons.  He established and still holds a number of school NCAA tournament records.  Over the eight NCAA tournament games in which he participated in during two seasons, Mr. Lattin averaged 19.5 points per game and 11 rebounds per game.

82.  In 1967, Mr. Lattin was a first round draft pick of the San Francisco (now Golden State) Warriors, and played professionally for eight seasons including with the world-famous Harlem Globetrotters.

83.  In 2007, Mr. Lattin along with teammates including Antitrust Plaintiff Flournoy addressed the United States troops on teamwork and diversity issues, as discussed above, throughout Germany, England, and the Netherlands while touring with Armed Forces Entertainment.

84.  Mr. Lattin competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate athletic career.  Mr. Lattin signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

85.  Mr. Lattin's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

86.   Mr. Lattin's image, likeness and/or name has been used in all of the DVD, on-demand, video game and classic game broadcast products as discussed above in the section regarding Antitrust Plaintiff Flournoy, and distributed through the same channels.

87.   Additionally, Mr. Lattin's image, likeness and/or name has been used in several images offered for sale by the NCAA on one of its photo stores located at NCAAPhotos.com. For example, a photo captioned "David Lattin (42) and a Texas Western teammate compete for control of a rebound" is offered for sale at various price points ranging from $15 to $200. Additionally, Mr. Lattin's image, likeness and/or name is used in the team photo described above, as well as the huddle photo described above.

88.   Upon information and belief, Mr. Lattin's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

89.   As a result of the federal antitrust violations described herein, Antitrust Plaintiff Lattin was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**Bob Tallent**

90.   Antitrust Plaintiff Bob Tallent is a resident of Arlington, Virginia**.**  Mr. Tallent played basketball for the University of Kentucky, and competed in the SEC under the legendary coach Adolf Rupp through his junior year of college.  He was a member of the UK team known as "Rupp's Runts" because the two tallest members of the team were "only" 6'5".  He was a sophomore when they played in the finals of the 1966 NCAA Championship against Texas Western, as described above.

91.   Mr. Tallent played one phenomenal season at the NCAA Division I George Washington University after transferring from Kentucky, set several single-season school records

including for scoring (28.9 points per game), and was the fifth leading scorer in the country. After his MVP season and first team All-Southern Conference selection, he was drafted by teams in the NBA and ABA before an injury cut his playing career short.

92. Mr. Tallent later served as head coach for the George Washington University team for seven seasons (1974 – 1981), including a 20-win season in 1976. He also served for several prior seasons as the school's freshman team coach, and assistant coach. He was elected to the George Washington Athletic Hall of Fame team in 1990. In 2001, Mr. Tallent was elected to the George Washington All-Century basketball team.

93. Mr. Tallent competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image, likeness and/or name following the end of his intercollegiate athletic career. Mr. Tallent signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

94. Mr. Tallent's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

95. Mr. Tallent's image, likeness and/or name has been used in all of the DVD, on-demand, video game and classic game broadcast products as discussed above in the section regarding Plaintiff Flournoy with respect to the Texas Western vs. Kentucky game, and distributed through the same channels. Mr. Tallent's image has further been used in the

connection with sales regarding the other Kentucky games identified in the section above regarding Antitrust Plaintiff Jaracz.

96.   Upon information and belief, Mr. Tallent's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

97.   As a result of the federal antitrust violations described herein, Antitrust Plaintiff Tallent was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**Antitrust Plaintiff from the Historic 1979 Michigan State vs. Indiana State NCAA Championship Game**

**Alex Gilbert**

98.   Antitrust Plaintiff Alex Gilbert is a resident of St. Louis, Missouri.  Mr. Gilbert competed for the Indiana State University men's NCAA Division I basketball team in the 1978-79 and 1979-80 seasons.  Mr. Gilbert was a starting forward for the team described below that competed in the landmark 1979-80 NCAA championship game, along with his teammate, legendary college and NBA Hall of Fame player Larry Bird.  In that game, the Indiana State team competed against the Michigan State University team, led by the charismatic and transcendent superstar Earvin "Magic Johnson," who would go on to fame along with Mr. Bird as one of the very greatest collegiate and professional players of all time.

99.   In the 1979-80 tournament, Mr. Gilbert, playing as a starter alongside Mr. Bird, contributed in numerous ways including in the championship game.  For example, in the national semifinal game against DePaul prior to the Michigan State game, Mr. Gilbert had 12 points and 5 rebounds, second only to Mr. Bird in both categories.  In the regional final game against

Arkansas, Mr. Gilbert also had 12 points, and in the regional semi-final against Oklahoma, Mr. Gilbert again had 12 points as well as 9 rebounds. In the opening round game against Virginia Tech, Mr. Gilbert had 12 points to go with 7 rebounds (second only to Mr. Bird).

100. In 1999, the 1978-79 team including Mr. Gilbert was inducted into the Indiana State University Athletics Hall of Fame. Mr. Gilbert was chosen by the Milwaukee Bucks in the 1980 NBA Draft.

101. It is impossible to overstate the importance of the 1979 championship game to the business of college sports. In 2010, Seth Davis, the CBS Sports television studio analyst and writer for *Sports Illustrated* published the book "When March Went Mad: The Game That Transformed Basketball." The book's liner notes state:

> On March 26, 1979, basketball as we know it was born. The NCAA championship game played that day not only launched the epic rivalry between Earvin "Magic" Johnson and Larry Bird, it also transformed the NCAA tournament into a multibillion-dollar enterprise and laid the foundation for the resurgence of the NBA. To this day, it remains the highest-rated basketball game, college or pro, in this history of television.

The book further states the following:

> By one measure, the impact of the 1979 NCAA championship game would be apparent a few days later. Nielsen Media Research reported that the contest had generated a 24.1 rating, which meant that nearly a quarter of all television sets in America were tuned in that night. Thirty years later, that remains the highest Nielsen rating for any basketball game, college or pro, in the history of the sport. Thanks to the proliferation of channels that has taken place since then, it's unlikely the number will ever be surpassed by another basketball game.

The book further states the following:

> The game of basketball was about to change forever. The 1979 championship game helped to catapult college basketball, and especially the NCAA tournament, into the national consciousness.
>
> . . .

The television rights fees have undergone a similar explosion. The 1979 NCAA tournament gross $5.2 million in TV revenue. That figure doubled when NBC renewed its contract for two years in 1980. When CBS wrested the rights from NBC prior to the 1982 tournament, it paid $48 million for three years. CBS's price doubled again when it forked over $96 million for another three years in 1985. The fees grew so fast that in 1999 CBS and the NCAA agreed to an eleven-year, $6 billion deal that commenced with the 2003 tournament.

102. In Mr. Davis' book, he quotes Larry Bird as follows:

"We didn't have a lot of NBA talent on our team, but we were a team," Bird said. "When you have a team of guys who know their roles and stick to their roles, you can't get any better than that. Yeah, I was the focal point, and I was the one scoring the points and getting the rebounds, but if it wasn't for these other four guys with me, it would have never worked."

103. Mr. Gilbert competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image, likeness and/or name following the end of his intercollegiate athletic career. Mr. Gilbert signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

104. Mr. Gilbert's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

105. The NCAA through its DVD website offers the 1979 championship game for $24.99. It additionally offers for sale a pack of all of the Final Four games from that year. Additional tournament games such as the ones described above against Oklahoma and Virginia Tech also are available for purchase.

106. Games utilizing the image, likeness and/or name of Mr. Gilbert are made available through numerous other distribution channels.  For example, the 1979 championship game is available via amazon.com for $24.99, and a Final Four highlight DVD also is available for $24.99.  The game also is available via CBS Sports' DVD site individually, as for $39.90 as a part of a "Michigan State NCAA DVD Bundle set" including another game from the 2009 tournament and a highlight DVD.  The championship game also is available for sale for $24.95 via Michigan State's on-line DVD store, as are various Final Four highlight and bundle DVDs featuring the game, and also available for sale via the Big 10 Network's on-line DVD store.

107. The championship game is a mainstay of "classic sports" and other networks to this day.  As just a few examples, in 2009, ESPN Classic and ESPN2 replayed the game on March 26th, April 3rd, and April 5th.  The Big 10 Network replayed the game on March 24, 2009 and June 1, 2009.

108. Mr. Gilbert's name, image, and/or likeness also has been used in connection with video games authorized by the NCAA.

109. Upon information and belief, Mr. Gilbert's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

110. As a result of the federal antitrust violations described herein, Antitrust Plaintiff Gilbert was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

1

**Antitrust Plaintiff from the Famous "Fab 5"-era University of Michigan Basketball Teams**

2

3

**Eric Riley**

4

5        111.    Antitrust Plaintiff Eric Riley is a resident of Cleveland, Ohio.  Mr. Riley competed

6   on the University of Michigan men's Division I basketball team in the Big 10 Conference.  Mr.

7   Riley was a redshirt on Michigan's 1988-89 national championship team, and additionally

8   competed for the team in the 1989-90, 1990-91, 1991-92, and 1992-93 seasons.  Mr. Riley's

9   teams in 1991-92 and 1992-93 are famous teams known as the "Fab Five" teams, and reached the

10  NCAA championship game in both seasons.  In 1991-92, Mr. Riley led the team in rebounding

11  and blocked shots, and was second in the Big-10 Conference in rebounding.  Mr. Riley had

12  exceptional performances in various games including in the NCAA tournament, such as a 15

13  point and 10 rebound performance in the 1991-92 tournament against Oklahoma State in the

14  regional finals, one of the games described below that is offered for sale.

15

16        112. The "Fab Five" was the nickname given to the Michigan 1991 recruiting class that

17  joined Mr. Riley and his teammates already at Michigan.  In their freshman season, these five

18  players were starters, and along with Mr. Riley and his other teammates, the team reached the

19  national championship game and caused a nationwide sensation due to their collective youth,

20  energetic style of play, and fashion style.  *USA Today* stated the following in 2002 with respect to

21  the team:

22

23              Their talent was breathtaking; their trash-talking, baggy-shorts
                style endearing; their influence profound, even to this day.

24

25              They drew record television audiences, set fashion trends and
                touched off a licensing and merchandising boom that perhaps
26              nudged all of college athletics along its current marketing-crazed
                course.

27

                . . .

28

The [1992 championship game against Duke] remains the most-watched game in college basketball history, with nearly 21 million homes tuned to the telecast. The [1993 championship game against the University of North Carolina] the following year remains the second-most-watched game, viewed in almost 20.7 million homes.

. . .

The Fab Five made the Michigan brand red-hot, and the school cashed in. Annual athletic royalties more than tripled, from $2 million in the pre-Fab year of 1990-91 to a peak of $6.2 million in '93-94.

. . .

"Kids could relate to the Fab Five and wanted to emulate them. Wearing Michigan merchandise became a way that you could transform yourself into being as 'cool' as the Fab Five," says Derek Eiler of the Atlanta-based Collegiate Licensing Co.

"The increase in sales of Michigan merchandise started first in Ann Arbor and then (spread) in the state, and then in the Midwest, and pretty soon there was Michigan merchandise in almost every retail channel in the U.S. The trend has continued today. Michigan is still one of only a handful of universities that are successful selling their products at the national level."

**Even admissions soared**

With the Fab Five came another kind of bump in sales. Applications for admission went from 17,744 in 1991, the year before the Five arrived, to 19,687 in 1996, a year after the last had left.

From '91 to last year, when more than 24,000 applications poured in, the climb was 36%.

"We've done a lot of things to make that happen. I'm reluctant to say it was strictly athletics," says Ted Spencer, Michigan's director of admissions. "But ... many, many would come to our table and our sessions (at college fairs) and say, 'Boy, I want to go to Michigan because of the Fab Five.' Not all of them were the kind of kids we were looking for. But a number of them were the kind of kids we were."

113. Mr. Riley was drafted by the Dallas Mavericks in the 1993 NBA draft, and competed

in the NBA for five seasons for teams including the Boston Celtics and Houston Rockets.

114. Mr. Riley competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image, likeness and/or name following the end of his intercollegiate athletic career.  Mr. Riley signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

115. Mr. Riley's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

116. For example, on the NCAA's On Demand on-line store, operated in connection with its for-profit business partner Thought Equity Motion, the following NCAA tournament games and highlight DVDs are each available for sale prices ranging from $24.99 to $150, sometimes including in multi-DVD sets:  1990 Michigan vs. Illinois; 1990 Michigan vs. Loyola; 1992 "Michigan Men's Basketball Fab Five 1992" DVD; 1992 Duke Championship collection (featuring various games including vs. Michigan); 1992 Final Four Highlights DVD; 1992 Michigan vs. Cincinnatti; 1992 Michigan vs. Duke; 1992 Michigan vs. East Tennessee State; 1992 Michigan vs. Ohio State; 1992 Michigan vs. Oklahoma State; 1992 Michigan vs. Temple; 1992 National Championship Box Set; 1993 Final Four Highlights DVD; 1993 Michigan vs. Coastal Carolina; 1993 Michigan vs. George Washington; 1993 Michigan vs. Temple; 1993 Michigan vs. UCLA; 1993 Michigan vs. North Carolina; 1993 Michigan vs. Kentucky; 1993 National Championship Box Set; "Michigan Men's Basketball Fab Five 1993" DVD; "North Carolina Basketball National Championship Collection."

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 35 -

117. Additionally, the NCAA offers the 1992 and 1993 national championship games featuring the Michigan teaming for one-viewing streaming video purchase at price points of "$3.99 and up."

118. Many of the game and highlights DVDs are available through myriad other distribution outlets such as Amazon.com; walmart.com; and CBS Sports' DVD store.

119. Numerous of Mr. Riley's games have been replayed on various "classic" game broadcasts, such as on the Big 10 Network this year and on ESPN Classic.

120. Through one of its on-line photo stores, the NCAA currently sells as least four pictures of Mr. Riley, *i.e.*, ones captioned "University of North Carolina center Eric Montross (00) guards against University of Michigan center Eric Riley (42) during the NCAA National Basketball Championship game at the Superdome in New Orleans" (offered at various pricing points between $15 and $200); "University of Michigan center Eric Riley (42) muscles his way into North Carolina center Eric Montross (00) during the NCAA National Basketball Championship game at the Superdome in New Orleans, LA" (same pricing points); "University of Michigan center Eric Riley (42) puts the ball up on the glass while North Carolina center Eric Montross (00) among others waits for the rebound during the NCAA National Basketball Championship game at the Superdome in New Orleans, LA" (same pricing points); and "University of North Carolina center Eric Montross (00), University of Michigan center Eric Riley (42) and Michigan forward Ray Jackson (21) wait for the ball to drop in the hoop during the NCAA National Basketball Championship game at the Superdome in New Orleans, LA" (same pricing points).

121. Upon information and belief, Mr. Riley's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

122. As a result of the federal antitrust violations described herein, Antitrust Plaintiff Riley was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**Antitrust Plaintiffs from Powerhouse Athletic Conferences the Big 10, the SEC, the Pac-10, the Big East, and Conference USA**

**Patrick Maynor**

123. Antitrust Plaintiff Patrick Maynor, an individual, is a resident of Palm Beach Gardens, Florida. Mr. Maynor competed on the Stanford University football team from 2004-08 as a linebacker, and was a three year starter. He was a Butkus Award candidate, the annual award given to the top college linebacker in the nation, and was recognized as a 2008 All-Pacific-10 Conference Honorable Mention linebacker.

124. In 2007, Mr. Maynor led his team with a career-high 16.5 tackles for loss and a 1.50 tackles for loss per game average that ranked second in the Pac-10 Conference and tied for 12th in the entire NCAA. In 2007, he also had five double-digit tackle games in 2007, including a career-high-tying 13 versus Washington and Oregon, and 10 against UCLA as well as at Oregon State and at Washington State. In 2009, Mr. Maynor spent time with the NFL's Chicago Bears in training camp.

125. Mr. Maynor competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate athletic career. Mr. Maynor signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to

his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

126. Mr. Maynor's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

127. As an example of formats in which Antirust Damages Class members' images, likenesses and/or names are being used subject to the anticompetitive restraints detailed herein, Mr. Maynor's likeness was used by the NCAA's business partner and co-conspirator Electronic Arts, Inc. as a part of, for example, its NCAA Football 07 game, in addition to other games. As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being used subject to the anticompetitive restraints detailed herein, several photos of Mr. Maynor are being sold in Reply Photos, *i.e.*, one captioned "Chike Amajoyi, Sione Fua, Tom Keiser and Pat Maynor of the Stanford Cardinal during Stanford's 23-10 win over the San Jose State Spartans on September 20, 2008 at Stanford Stadium in Stanford, California" (offered at various price points between $29.95 and $425.95); one captioned "16 September 2006: Walt Harris, Jon Cochran, Chris Marinelli, Alex Fletcher, Jeff Edwards, Josiah Vinson, Tavita Pritchard, Nate Wilcox-Fogel, Chris Horn, David Lofton, Patrick Danahy, Derek Belch, Jay Ottovegio, Jim Dray, Andrew Phillips, Aaron Zagory, Leon Peralto, Marcus Rance, Will Powers, Austin Yancy, Josh Catron, Pat Maynor, Matt Kopa, Brian Bulcke, Trevor Hooper, David Jackson, Jason Evans and the team run out on the field after the anthem for the first time during Stanford's 37-9 loss to Navy during the grand opening of the new Stanford Stadium in Stanford, CA." (same price points); and one captioned "6 October 2007: Pat Maynor, Erik Lorig,

Clinton Snyder, and Bo McNally during Stanford's 24-23 win over the #1 ranked USC Trojans in the Los Angeles Coliseum in Los Angeles, CA" (same price points).

128. As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being used subject to the anticompetitive restraints detailed herein, another photo of Mr. Maynor is offered for sale via Getty Images website captioned "STANFORD, CA - SEPTEMBER 1: Linebacker Pat Maynor #44 of the Stanford Cardinal is congratulated by teammate Tim Sims #14 after Maynor made a big play during the UCLA Bruins 45-17 defeat of Stanford at Stanford Stadium September 1, 2007 in Stanford, California." Upon information and belief, the NCAA and/or its members have had a contractual relationship with Getty Images allow for the sale of photographs containing the images of current and former NCAA student-athletes.

129. On information and belief, Mr. Maynor's image has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

130. As a result of the federal antitrust violations described herein, Antitrust Plaintiff Maynor was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**Tyrone Prothro**

131. Terrence "Tyrone" Prothro, an individual, is a resident of Tuscaloosa, Alabama and a former football player for the University of Alabama, a Division I member school of the NCAA. Mr. Prothro competed from 2003-2005 as a wide receiver and kick returner, was a three year starter, and wore the number 4 jersey.

132. During his time at Alabama, he was named Second-Team All SEC both as a return specialist and a wide receiver in 2004 and 2005.  In 2004, he led the SEC in kick returns.  Mr. Prothro achieved notoriety for an outstanding catch during a game against Southern Mississippi in 2005 which has become known as "The Catch."  He won the "Best Play" award at the 2006 ESPYS, and "The Catch" won the Pontiac "Game Changing Award of the Year", which resulted in a $100,000 donation to the general scholarship fund for the University of Alabama.  Fox Sports' "The Best Damn Sports Show" ranked his catch as the eighth greatest catch of all time.

133. In high school, Mr. Prothro played cornerback and running back for Cleburne County.  He amassed 92 touchdowns and 8,099 career all-purpose yards, third best in Alabama high school history.

134. In 2005, during a game against the Florida Gators, Mr. Prothro suffered an open compound fracture of both major bones (tibula and fibula) of his lower left leg, ending his junior season.  Despite extensive rehabilitation and numerous surgeries, Mr. Prothro was unable to resume his football career.  He continues to suffer the debilitating effects of his injury, and will require additional future surgeries.

135. Mr. Prothro competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image following the end of his intercollegiate athletic career.  Mr. Prothro signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

136. Mr. Prothros's image, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

137. Mr. Prothro's image, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.

138. As an example of formats in which Antitrust Damages Class members' images are being used subject to the anticompetitive restraints detailed herein, Mr. Prothro's likeness was used by the NCAA's business partner and co-conspirator Electronic Arts, Inc.  EA's NCAA College Football 04, 05 and 06 editions for the Playstation 2 game system contain teams that include the Alabama Crimson Tide.  In 2006, the player wearing jersey number 4 and playing wide receiver was 5'8" 176 lb, with dark skin and close cropped dark hair.  Mr. Prothro is a 5'8" African American who played wide receiver and wore jersey number 4.  In the 2005 version, EA's game includes distinctive black ankle braces worn by Prothro.

139. Photographs of "The Catch" are also available for purchase from a website, www.alabamacrimsontideprints.com, where prices range from $17.99 to $34.99, and from www.gettyimages.com, which has numerous photographs of Mr. Prothro accepting his ESPY award and playing in the September 17, 2005 game against University of South Carolina.  Upon information and belief, the NCAA and/or its members have had a contractual relationship with Getty Images that allows for the sale of photographs containing the images of current and former NCAA student athletes.

**Sam Jacobson**

140. Antitrust Plaintiff Samuel Jacobson ("Sam Jacobson") is a resident of Apple Valley, Minnesota.  Mr. Jacobson played high school basketball at Park of Cottage Grove High School, where in 1994 he was named "Mr. Basketball" for the state of Minnesota.

141. Mr. Jacobson competed on the University of Minnesota ("Minnesota") men's basketball team from 1994-95, 1995-96, 1996-97 and 1997-98 seasons in the Big 10 Conference.  Mr. Jacobson was named to the All Big Ten Second Team in 1997 and 1998, to the NABC All District Team in 1997 and 1998, and was the MVP of the 1998 Minnesota Gophers.  Mr. Jacobson was named Honorable Mention All-America by the AP in 1998, and was a nominee for the 1998 Naismith Player of the Year award.  Mr. Jacobson was also named to the Under 22 National USA Men's basketball team.

142. Mr. Jacobson finished as the eighth leading scorer in the history of the University of Minnesota.  He led University of Minnesota to the Final Four of the 1997 NCAA Men's Basketball national tournament, where Mr. Jacobson was named to the Midwest Regional Team. In his final season with the University of Minnesota, Mr. Jacobson led the Minnesota's basketball team to the National Invitational.   After his collegiate career ended, Mr. Jacobson was selected by the Los Angeles Lakers with their first pick in the 1998 NBA draft (26th overall).   Mr. Jacobson played in the NBA for four seasons, and then played a few more seasons in overseas leagues.

143. Mr. Jacobson competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image, likeness and/or name following the end of his intercollegiate athletic career. Mr. Jacobson signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-

athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

144. Mr. Jacobson's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.  For example, on the NCAA's On Demand on-line store, operated in connection with its for-profit business partner Thought Equity Motion, the following DVD's are offered at a cost of $24.99 each:  "1997 NCAA Division I Men's Basketball Regional Semi Finals - Clemson vs. Minnesota" and "1997 NCAA Division I Men's Basketball Regional Finals - UCLA vs. Minnesota."  This site sells copies of other games utilizing the image of Mr. Jacobson and other Antitrust Damages Class members from the 1995 and 1997 seasons, including the following:  "1995 NCAA Division I Men's Basketball 1st Round - Minnesota vs. St. Louis;" "1997 NCAA Division I Men's Basketball 1st Round – Southwest Texas State vs. Minnesota;" "1997 NCAA Division I Men's Basketball 1st Round - Temple vs. Minnesota;" "1997 NCAA Division I Men's Basketball 2ndt Round - Minnesota vs. Temple" and "1997 NCAA Division I Men's Basketball National Semi Final - Kentucky vs. Minnesota."  While not currently in production, these games are available for purchase via custom order at a cost of $150 each.

145. As additional examples, DVDs available for purchase from Amazon.com which feature Mr. Jacobson while he was playing basketball for the University of Minnesota include the following:  "1997 NCAA Division 1 Men's basketball final four highlight video;"  "1997 NCAA Division 1 Men's basketball regional final - UCLA v. MN" and "1997 NCAA Division 1 Men's basketball regional semi-final - Clemson v. MN."  These DVD's are available from Amazon.com for $24.99 each.

146. Similarly, photos of Mr. Jacobson are offered by Getty Images, including games from the 1997 NCAA tournament: Minnesota v. Kentucky (photos Editorial #298338, #298165, #297832, #297776, #254791, #254715, and #254589); and Minnesota v. Clemson (photos: Editorial #294053, #291649 and #1396224).   The website also offers photos of Mr. Jacobson playing against other Big 10 teams:  Minnesota v. Purdue (photos Editorial #352735, #352273, #349385, #346565, #346543, and #296263); Minnesota v. Iowa (photos: Editorial #347377); and Minnesota v. Northwestern (photo: Editorial #298159).  On information and belief, Getty Images has had a contractual relationship with the NCAA relating to photo sales.

147. As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being utilized subject to the anticompetitive restraints detailed herein, numerous images of Mr. Jacobson are for sale on several on-line photo stores.  For example, Photoshelter.com has available for download, a photo from the March 29, 1997 semi-final game between Minnesota and Kentucky.  The photo is described as follows: "29 MAR 1997: University of Kentucky guard Wayne Turner (5) scores against University of Minnesota center Trevor Winter (50), guard Sam Jacobson (5) and forward Courtney James (4) during the Final Four semifinal game. Kentucky defeated Minnesota 78-69 in the semifinal game held at the RCA Dome in Indianapolis, IN. Rich Clarkson/NCAA Photos."   No pricing is available, however, according to Photoshelter.com, NCAA photos is the owner of the copyright on this photo.

148. As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being utilized subject to the anticompetitive restraints detailed herein, Minnesota games featuring Mr. Jacobson also are periodically rebroadcast on ESPN Classic and/or one or more other networks.

149. As another example of formats in which Antitrust Damages Class members' images, likenesses and/or names are being utilized subject to the anticompetitive restraints detailed herein,

the video game College Hoops 2K6 licensed by the NCAA has a "Legacy Mode" in which the 1997 Minnesota Gophers' team can be "unlocked."

150. On information and belief, Mr. Jacobson's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

151. As a result of the federal antitrust violations described herein, Antitrust Plaintiff Jacobson was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**Damien Rhodes**

152. Antitrust Plaintiff Damien Rhodes is a resident of Manlius, New York.  Mr. Rhodes was a member of the Syracuse University football team in the Big East Conference from the 2002 – 2005 seasons, and a highly-accomplished running back.  He was honored as a member of the Big East Conference All-Freshman Team, and as a 2nd Team All-Big East Running Back during his career.  He finished first in Syracuse University history for total yards gained by a player.

153. Mr. Rhodes competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image, likeness and/or name following the end of his intercollegiate athletic career. Mr. Rhodes signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

154. Mr. Rhodes' image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without

compensation paid to him.  For example, in 2002, Syracuse played (and Mr. Rhodes played in) a game against Virginia Tech that went into three overtimes has been featured as "Classic" game and replayed or one or more networks, and will continue to be replayed.

155. From 2003 to 2006, Rhodes was the featured back for the Syracuse football team in the NCAA College Football videogames created by Defendant EA Sports.  The featured running back was African-American (as is Mr. Rhodes) and had the same height, weight and jersey number (1) as Mr. Rhodes.  The internet application for the game (such as Xbox Live for Xbox) allowed a user to download names of players, and his name would appear on the running back with Number 1 on the jersey.

156. Mr. Rhodes' images, likenesses and/or name also has been utilized in various Getty Images' photographs.  Upon information and belief, the NCAA and/or its members have had a contractual relationship with Getty Images allow for the sale of photographs containing the images of current and former NCAA student-athletes.

157. On information and belief, Mr. Rhodes' image, likeness and/or name  has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

158. As a result of the federal antitrust violations described herein, Antitrust Plaintiff Rhodes was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

**Danny Wimprine**

159. Antitrust Plaintiff Danny Wimprine is a resident of River Ridge, Louisiana.  Mr. Wimprine was the starting quarterback on the University of Memphis ("Memphis") Tigers men's football team during the 2001 through 2004 seasons and competed for Memphis in Conference USA.  He holds numerous Memphis football records, including passing yards (10,215),

completions (808), and touchdown passes (81).  Mr. Wimprine was the first player in school history to throw for more than 7,000 yards in a career.  He was named Conference USA Player of the Week many times during his college career.  Mr. Wimprine also holds the Conference USA record for second most touchdown passes in one game (5).  He was named the 2003 New Orleans Bowl MVP.  In 2004, Mr. Wimprine was a candidate for the Davey O'Brien National Quarterback Award, an award given annually to the nation's top quarterback.  During his senior year, he was named to the All-Conference USA second team.  In 2009, Mr. Wimprine was listed as one of the top five Memphis Athletes of the Decade in the *Memphis Flyer*.

160. Following his career at the University of Memphis, Mr. Wimprine earned a position on the Canadian Football League's Edmonton Oilers (2005) and Calgary Stampeders (2006). From there, he returned home to New Orleans and joined the Arena Football League's New Orleans VooDoo.  Wimprine learned the system in 2007 and, in 2008, became the starter, tying the league record with five wins in his first five starts and earning Player of the Week Honors.  In 2008, Mr. Wimprine earned a quarterback rating of 113.45, completing 60.6% of his passes while throwing 85 touchdowns and only 11 interceptions.  During the 2008 season, Mr. Wimprine tied an AFL record for the most consecutive games won in a row (5) by a rookie, and was also voted mid-season AFL 1st team quarterback and was on the "Watch List" for player of the year.

161. Mr. Wimprine competed pursuant to the NCAA's rules and regulations, and has been deprived of compensation by Defendants and their co-conspirators for the continued use of his image, likeness and/or name following the end of his intercollegiate athletic career. Mr. Wimprine signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees).

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 47 -

162. Mr. Wimprine's image, likeness and/or name, along with those of other Antitrust Damages Class members, is being offered for sale and/or used during the Antitrust Class Period in at least the ways described below, without informed consent from him and without compensation paid to him.  For example, Mr. Wimprine's likeness has been used in the video game "NCAA Football", published by Defendant Electronic Arts, Inc.

163. DVDs of games in which Danny Wimprine played were also sold.  These games include: the September 6, 2003 game between the Mississippi Rebels and the Memphis Tigers; the 2003 New Orleans Bowl; and the 2004 GMAC Bowl.

164. Mr. Wimprine has been featured in numerous broadcasts of "classic" games, including games against Louisville from his senior year, Mississippi, and others.

165. Mr. Wimprine wore number 18 while a quarterback at Memphis and at least thousands of replica Memphis football jerseys bearing his number were sold.

166. On information and belief, Mr. Wimprine's image, likeness and/or name has been used and sold in additional ways for additional uses via the licensing entities such as Defendant CLC and TEM described herein.

167. As a result of the federal antitrust violations described herein, Antitrust Plaintiff Wimprine was injured in his business or property, and was unfairly deprived of compensation in connection with the use and sale of his image, likeness and/or name.

## **RIGHT OF PUBLICITY DEFENDANTS**

168. Defendant EA, a Delaware corporation, is a multi-billion dollar interactive entertainment software company that produces the NCAA Football, NCAA Basketball and NCAA March Madness videogame franchises.  It describes itself as the "world's leading interactive entertainment software company."  Its revenues support this claim.  In just one fiscal year (2008), Electronic Arts posted net revenues, calculated under GAAP, of $3.67 billion.

Electronic Arts' principal place of business is Redwood City, California, but Electronic Arts sells its games directly to consumers throughout the country through its website www.ea.com and indirectly through major retailers in all fifty states.

169. Defendant NCAA is an unincorporated association that acts as the governing body of college sports.  Although it describes itself as "committed to the best interests . . . of student athletes," the NCAA's true interest is in maximizing revenue for itself and its members, often at the expense of its student-athletes.  While extolling the virtues of "amateurism" for student-athletes, the NCAA itself runs a highly professionalized and commercialized licensing operation that generates hundreds of millions in royalties, broadcast rights and other licensing fees each year.  The annual revenues for the NCAA in fiscal year 2007-08 were $614 million.  Almost 90% of the NCAA's annual budget revenues stem from marketing and television rights, with only 9-10% coming from championship game revenues.  The NCAA's operations are also highly profitable.  The direct expenses for operating the actual games that generated the $614 million in revenues was only $59 million

170. Defendant CLC, a Georgia corporation headquartered in Atlanta, Georgia, is the nation's leading collegiate trademark, licensing, and marketing company.  CLC represents nearly 200 colleges, universities, bowl games, and athletic conferences, including the NCAA.  Its primary service is to market and sell its clients.

**ANTITRUST DEFENDANTS**

171. Defendant NCAA is an unincorporated association with its principal place of business located in Indianapolis, Indiana.

172. Defendant CLC is a for-profit corporation incorporated under the laws of Georgia with its principal place of business located at 290 Interstate N Circle SE, Suite 200, Atlanta, Georgia  30339.  IMG College, a division of IMG, identifies CLC as its "licensing team," and

states that CLC is "the unrivaled leader in collegiate brand licensing, managing the licensing rights for nearly 200 leading institutions that represent more than $3 billion in retail sales and more than 75% share of the college licensing market."   IMG identifies itself as "a leading collegiate marketing, licensing and media company."

173. Defendant EA is a for-profit corporation incorporated under the laws of Delaware with its principal place of business located in this District at 209 Redwood Shores Parkway, Redwood City, California 94065**.**  EA is publicly traded on the NASDAQ stock exchange (ticker symbol:  ERTS) and identifies itself as "the world's leading interactive entertainment software company" and states that it "develops, publishes, and distributes interactive software worldwide for video game systems, personal computers, cellular handsets and the Internet."  In its 2008 fiscal year, EA had revenues of $3.67 billion and 27 of its titles sold more than one million copies.  As described herein, the NCAA has entered into license agreements with EA relating to the use of the likenesses of members of the Antitrust Classes in video games available via various platforms.

174. Whenever in this Complaint reference is made to any act, deed, or transaction of the Defendants, the allegation means that the Defendants engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of Defendants' business or affairs.

## **ANTITRUST CO-CONSPIRATORS**

175. Various other persons, firms, corporations, and entities (including, but not limited to, TEM, CI, Getty Images, and Learfield Sports) have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein, including the NCAA's members.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have

performed acts and made statements in furtherance of the antitrust violations and other violations alleged herein.

176. At all relevant times, each co-conspirator was an agent of Defendants and each of the remaining co-conspirators, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Defendants and each co-conspirator ratified and/or authorized the wrongful acts of Defendants and each of the other co-conspirators.  Defendants and the co-conspirators, and each of them, are participants as aiders and abettors in the improper acts and transactions that are the subject of this action.

**INTERSTATE TRADE AND COMMERCE WITH RESPECT TO ANTITRUST CLAIMS**

177. The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

178. During the Antitrust Class Period, Defendants transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.

**RIGHT OF PUBLICITY ALLEGATIONS**

179. EA produces the NCAA Football, NCAA Basketball and NCAA March Madness videogame franchises.  Videogame titles within these franchises simulate basketball and football matches between NCAA member schools.  Consumers demand that these matches simulate actual college matches in the most realistic manner possible.  In the words of CLC President Pat Battle: "A failure to keep up with technology and take full advantage from a consumer standpoint may make the NCAA [video game] titles less valuable."  As a result, each year EA spends millions of dollars to ensure the realism of the games, and advertises this realism in the promotion of its products.  Specifically, pursuant to a license with CLC, the NCAA's licensing company, EA replicates team logos, uniforms, mascots and member school stadiums with almost photographic realism.  In addition to computer generated images, Electronic Arts includes actual photographs of uniformed student-athletes in the games.

180. As discussed in more detail below, EA is not permitted to utilize player names and likenesses.  In reality, however, EA with the knowledge, participation and approval of the NCAA and CLC extensively utilizes actual player names and likenesses allowing a player of an EA game to identify the college athlete playing the game.  The motivation of Defendants is simple:  more money.  As the NCAA, CLC and EA know, heightened realism in NCAA videogames translates directly into increased sales, and therefore, increased revenues for Electronic Arts and increased royalties for CLC and the NCAA.

## A.    Prohibitions on Use of Names or Likenesses

181. The NCAA does not officially permit the licensing of NCAA athlete likenesses or the use of their names.  In fact, NCAA Bylaw 12.5 specifically prohibits the commercial licensing of an NCAA athlete's "name, picture or likeness."

182. To help enforce this rule, all incoming freshman and transfer students, including Right of Publicity Plaintiffs and class members, are required to enter into a contract with the NCAA that prohibits the student-athlete from using his name, picture or likeness for commercial purposes.

183. Likewise, the contract prohibits the NCAA from using Right of Publicity Plaintiffs' and class members' names, pictures and likeness for commercial purposes.

184. The NCAA, however, sanctions, facilitates and profits from EA's use of student-athletes' names, pictures and likenesses despite contractual obligations prohibiting such conduct.

## B.    The Contract Between the NCAA and the Student-Athletes

185. The contract each incoming freshman and transfer student-athlete signs is titled Form 08-3a Student-Athlete Statement –Division I.  *See* Exhibit A.

186. The contracts used during the class period are, upon information and belief, substantively analogous to Exhibit A, if not identical, and are also titled Form 08-3a.

187. All Plaintiffs and putative class members entered into such contracts and signed Form 08-3a in exchange for certification from the NCAA that allows them to participate in sanctioned NCAA Division I sporting events.  The contract has seven parts, all of which must be executed by the student to receive certification that he is eligible to participate in NCAA Division I sporting events.

188. Part I requires the student-athlete to affirm his eligibility to participate in NCAA events.  Among other things, the student-athlete affirms that he has received a copy of the NCAA rules and that he had an opportunity to ask questions about them.  He also affirms that he "meet[s] the NCAA regulations for student-athletes regarding eligibility recruitment, financial aid, amateur status and involvement in gambling activity."

189. Part II requires the student-athlete to waive certain privacy rights under the Family Educational Rights and Privacy Act of 1974.  Among other things, the student-athlete agrees to permit the disclosure of education records, drug test results, social security numbers, race and gender identification, diagnosis of certain education related disabilities, financial aid records, and "any other papers or information pertaining to your NCAA eligibility."

190. Part III requires the student-athlete to affirm that he has read and understands the NCAA amateurism rules.

191. Part IV requires the student to authorize and grant a limited license to the "NCAA [or a third party acting on behalf of the NCAA (*e.g.*, host institution, conference, local organizing committee)] to use the student-athlete's "name or picture to generally promote NCAA championships or other NCAA events, activities or programs."

192. Part V requires the student-athlete to disclose whether he has ever tested positive for a banned substance by the NCAA and/or by a non-NCAA national or international athletics organization.

193. Part VI is for transfer students only.  The contractual provision requires the student-athlete to identify himself, if appropriate, as a transfer student and to describe, if applicable, any previous involvement in NCAA rules violation(s).

194. Part VII is for incoming freshmen only.  The contractual provision requires the student-athlete to confirm that he has a validated ACT and/or SAT score.

195. The contract is valid from the date the document is signed and remains in effect until a subsequent Division I Student-Athlete Statement/Drug Testing Consent form is executed.

196. The contract is required by the NCAA Constitution and Bylaws, and student-athletes are ineligible to participate in any intercollegiate competition unless they execute the contract.  In return and in consideration for the above disclosures, waivers, affirmations and limited license, the NCAA agrees to grant players eligibility to participate in Division I athletics. The contract is an adhesion contract due to the unequal bargaining power of the parties and the take it or leave it nature of the contract.

197. EA is not a third party acting on behalf of the NCAA, as contemplated by section IV of the contract.  Nor is Electronic Arts using Plaintiffs' or class members' names, pictures, or likenesses to generally promote an NCAA championship or other NCAA event, activity or program as contemplated by section IV of the contract.  Instead, EA is using Right of Publicity Plaintiffs' and class members' names, pictures, and likenesses for commercial purpose and without consent.

198. The NCAA has a duty to NCAA athletes to honor its own rules prohibiting and contractual obligations relating to the use of student likenesses and pictures.  CLC is likewise

contractually obligated to honor NCAA prohibitions on the use of student likenesses. Specifically, the licensing agreements between the NCAA and CLE and between EAand CLC explicitly prohibit the use of NCAA athlete names and/or likenesses in NCAA branded videogames.  Under the NCAA's licensing program, the NCAA and its member institutions, through CLC, are required to approve every EA videogame produced pursuant to the license before its release.  Ostensibly NCAA athletes are the intended beneficiaries of the NCAA likeness prohibitions and the contractual provisions that incorporate them in contracts between and among CLC, NCAA and EA.

### C.    EA's Blatant Use of Player Names and Likenesses

199. Ea purports to honor the NCAA's rule nominally prohibiting the use of player likenesses.  In fact, it does not.  As an EA spokesperson candidly acknowledged in a 2006 interview with *The Indianapolis Star*, its real mindset with regard to the use of player names and likenesses can be summed up in one sentence:  "Ok, how far can we go?"

200. The answer can be found in the games themselves.  EA seeks to precisely replicate each school's entire team.  With rare exception, virtually every real-life Division I football or basketball player in the NCAA has a corresponding player in EA's games with the same jersey number, and virtually identical height, weight, build, and home state.  In addition, EA matches the player's skin tone, hair color, and often even a player's hair style, although this last characteristic can be highly variable over even a single season.

201. EA's misappropriation of player likenesses is not limited to superstars at large schools or top programs.  Kent State Golden Flashes running back Eugene Jarvis, for example, stands a mere 5'5" and weighs only 170 pounds.  He is also an African-American red-shirt junior from Pennsylvania who wears number 6 for the Golden Flashes.  And although he is extremely

1
2
3
4
5

talented, Mr. Jarvis is unusually small for a college football player.  For these reasons, one would

expect a randomly generated virtual running back for the Golden Flashes to be somewhat

dissimilar to Mr. Jarvis.  But here are the first two profile pages for Golden Flashes player

number 6 from the NCAA 2009 Football game:



6
7
8
9
10
11
12
13
14
15
16
17
18
19

202. Number 6 for the Golden Flashes is clearly Mr. Jarvis.  Both players are 5'5", 170

20
21
22

pound African-American players.  Both are also red-shirt juniors from Pennsylvania, and both are

the starting running back for the Golden Flashes.  This is not a mere coincidence.

23
24
25
26
27

203. EA's blatant misappropriation of player likenesses is highlighted by a comparison of

EA's NCAA titles to its titles based on professional leagues for which EA has the legal right to

player likenesses through license agreements with the relevant players' unions.  If EA were not

utilizing actual player likenesses, one would expect significant changes to the virtual player once

28

the corresponding real player entered a professional league.  In fact, the likeness of NCAA

players who later enter a professional league remains virtually identical across titles.

204. For example, the profile below on the left, taken from the 2008 NCAA football game,

shows number 77, an offensive lineman for the Michigan Wolverines.  During that period of time,

Jake Long wore number 77 for the Wolverines.  On the right is a screenshot of Jake Long from

the Madden NFL 2009 football game.  The two pictures are virtually identical.

 

205. The similarities in the two images are not mere coincidence.  Indeed, it would be

nearly statistically impossible for randomly generated players to match so closely their real-world

counterparts.  Mr. Long and Mr. Jarvis are not unique examples.  They were randomly chosen to

show how similar almost all players are to their virtual counterparts.

206. Misappropriation of basketball players is equally egregious.  For example,

Georgetown All-American center Roy Hibbert is 7'2" – unusually tall even for a college

basketball player – and weighs 275 pounds.  In the 2007 season, Mr. Hibbert was also an African-

American senior from Maryland who often played with an arm or elbow sleeve.  He also wore

jersey number 55 for the Georgetown Hoyas.  One would expect a randomly generated "No. 55"

for Georgetown to have, at most, a couple of these characteristics.  But here is the profile for

Georgetown number 55.

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

1

2

3

4

5

6

7

8

9

10



11

12

13

14

15

16



17

18   207. Number 55 in EA's NCAA 08 March Madness is clearly supposed to be Mr. Hibbert.

19   The two match in every respect.  Both have the exact same height and weight.  Both are African-

20   American players from Maryland.  Both are seniors in the 2007 season, and both are the starting

21   center for the Georgetown Hoyas.  In fact, both even wear an arm sleeve.

22   208. And like football players, the misappropriation of likenesses is not limited to

23   superstars or top programs.  For example, Travis Pinick is a guard/forward who wears number 5

24   for the Yale Bulldogs, a school known more for academics than basketball.  Mr. Pinick is 6'7",

25   weighs 210 pounds, and went to high school in California.  Unsurprisingly, virtual "No. 5" for the

26   Bulldogs is also a guard/forward from California with the exact same height and weight.

27

28

209. In addition to the physical features, EA even matches players' idiosyncratic equipment preferences such as wristbands, headbands, facemasks and visors.

210. For example, in the 2009 NCAA Football game, Texas Tech wide receiver "No. 5" plays with a back plate under his uniform just like the real number 5, Texas Tech All-American wide receiver Michael Crabtree.  Additionally, both are 6'3" red-shirt sophomore wide receivers from Texas.

211. In the same game, Kansas State quarterback "No. 1" plays with an arm sleeve just like the real number 1, Kansas State All-American quarterback Josh Freeman.  Mr. Freeman is also a 6'6", 250 pound, junior quarterback from Missouri, just like his virtual twin.

212. Likewise, Ohio State linebacker "No. 33" plays with thin arm-bands on his upper arm, just below his bicep, wrist wraps and gloves.  Interestingly, so does the real number 33, Ohio State All-American, Nagurski Trophy[1] winner, and Butkus Award[2] winner, linebacker James Laurinaitis.  Both are also 6'3", 244 pound seniors from Minnesota.

213. Once again, these are not unique examples.  Defendants deliberately and systematically misappropriate players' likenesses to increase revenues and royalties at the expense of student-athletes.

214. In fact, to ensure it matches these unique player equipment preferences as accurately as possible, Electronic Arts sends detailed questionnaires to NCAA team equipment managers to glean precisely the idiosyncratic individual player details.

215. When players have unique highly identifiable playing behaviors, 'EA's attempts to match those as well.

216. EA also matches the virtual player's home state to the player's actual home state, and often lists a city close to the player's real hometown as the virtual player's home town.

---

[1] The award given to the top defensive player in the country.
[2] The award given to the top college linebacker.

217. The only detail that EA omits is the real-life player's name on the jersey of his electronic equivalent. As one commentator observed, "the omission of players' names seems little more than a formality, done with a wink and a nudge."

218. Despite the lack of players' names on jerseys, gamers rarely if ever distinguish between the "real" player and the player in EA's videogames. For example, through its website www.easportsworld.com, EA allows gamers to post short video clips from the videogame. Clips that feature unique plays are often labeled with actual player names even though they feature only EA's computer generated simulations.

219. The omission of players' names has little consequence because EA has intentionally designed its game so that players of the game can easily upload entire rosters of actual player names. Companies such as Gamerosters.com LLC each year release data files that contain the complete rosters for each NCAA Division I school. These rosters can be placed on a flash drive or memory card, and then easily uploaded to the game. Once uploaded, the default jerseys in the game that contain only players' numbers are replaced with jerseys that contain both players' actual names and actual numbers and in-game announcers then refer to players by their real names. These third parties often correct minor and insignificant mistakes in height or weight thus making EA's representations all the more accurate.

220. In the most recent versions of its games for the Sony Play Station 3, EA intentionally made the process of obtaining actual player names even easier by allowing players to share rosters online using its "EA Locker" feature. The EA Locker feature allows gamers to upload rosters from other gamers while in the game itself. Prior to the EA Locker, gamers had to download rosters from a computer, upload the files to the gaming console and then transfer the rosters to the game. Now the gamer can obtain full NCAA rosters in a matter of seconds without

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

using a computer.  Furthermore, numerous websites, such as www.freencaa09rosters.com, keep a list of players who offer free NCAA rosters utilizing the EA Locker feature.

221. EA could easily block users from uploading actual player names and in fact, does block users from uploading certain names, for example, names that contain profanities.

222. EA additionally encourages and facilitates the use of players' names and likenesses by allowing gamers to post screen shots – electronic pictures taken from their game – containing players' real names on its website.  For example, the following is a screenshot taken directly from www.easportsworld.com that clearly shows the names of three players from the UCLA Bruins.  In addition to the names, the virtual players match their real life counterparts in all other material respects:



223. The 2010 version of NCAA basketball, which came out after this lawsuit was filed, proudly points out the realism in the game and the likeness is startling.  What you see in the game aims to replicate what you see on a broadcast.   Here are a few examples of overlays you will see at different points in the game.

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

**Pre-game**



**Starting Lineups**



224. No. 13 of Stanford is recognizable as Stanford Guard Emmanual Igbinosa and No. 10 is Guard Drew Shiller.

225. No. 12 in the game, identified as a Junior forward, is recognizable as Duke's Kyle Singler, and the remaining starting lineup directly corresponds to actual Duke players with the same jersey numbers.

226. These are not isolated examples.  These examples do, however, illustrate the blatant and continued use of student-athlete likenesses in NCAA-related games, especially when one considers that these images are taken from a game that was released after the filing of this lawsuit.

## V.    INJURY TO RIGHT OF PUBLICITY CLASS MEMBERS AND PLAINTIFFS

227. Player names and likenesses and publicity rights are extremely valuable, intangible property.  For example, it has been publicly reported that EA paid the NFL Players Union, through their licensing arm, nearly thirty-five million dollars each year for the use of players' names and likenesses.

228. Despite contractual provisions prohibiting the use of player names and likenesses and in clear violation of the NCAA's own rules, the NCAA, CLC and EA have agreed between and among each other, and conspired to permit the use of player names and likenesses in EA's videogames for their own monetary gain and without any compensation to the individual athletes. In furtherance of the conspiracy, EA produced these games improperly using player likenesses with the knowledge and consent of the CLC and the NCAA.  Specifically, despite their affirmative duties to prevent the utilization of player names and likenesses and in furtherance of the conspiracy, the CLC and the NCAA have intentionally ignored EA's blatant use of NCAA

athlete names and likenesses and in fact have explicitly approved the utilization of NCAA athlete names and likenesses.

229. Like virtually every other player, Right of Publicity Plaintiffs had their names and likenesses replicated in several games.

**Samuel Michael Keller**

230. Right of Publicity Plaintiff Sam Keller enrolled at Arizona State on a scholarship offer in 2003, as the ninth-ranked quarterback in his class. He played in six games as a true freshman, passing for 247 yards and a touchdown.

231. In 2004, as a sophomore, Keller played back-up to senior Andrew Walter. He played in only six games, but threw for 606 yards and five touchdowns with only one interception. Keller earned his first career start in the Sun Bowl against Purdue, leading a fourth-quarter comeback victory with 370 yards and three touchdowns. He earned the Sun Bowl Most Valuable Player Award.

232. As a junior in 2005, Keller played well in his first four games of the season. He had 461 yards against LSU, followed up by 409 yards against Northwestern. He continued with 300-yard performances against USC and Oregon State. In just four games, he passed for 1,582 yards. Unfortunately, he suffered an injury that limited him to only three more starts. Nonetheless, he finished the season with 2,165 yards and 20 touchdowns in just over six full games. To put this into perspective, over his six and one-half games, he averaged over three touchdowns per game. This average would be higher than the averages of all quarterbacks playing a full season that year—this includes Matt Leinart, Michael Vick, Brady Quinn, Vince Young, Jay Cutler and Colt Brennan. If he wasn't injured and his performance stayed at this level, he would have likely entered the NFL draft as a highly touted quarterback with almost 40 touchdowns and close to 4000 yards.

233. In 2006, Keller transferred from Arizona State to the University of Nebraska.  Due to NCAA transfer rules, he was forced to sit out his senior season, but red-shirted to save his final year of eligibility.

234. In 2007, as a red-shirt senior, Keller finished the season with 2,422 yards and 14 touchdowns in nine games.  Keller also set a Nebraska career and single-season record by completing 63.1 percent of his passes, as well as a record for passing yards per game in a single season and career.

235. Keller wore number 9 on his jersey at Arizona State.  The virtual player who wears number 9 for Arizona State in NCAA Football 2005 has the same height, weight, skin tone, hair color, hair style, handedness, home state, play style (pocket passer), visor preference, and facial features as Sam Keller.  Player number 9 is also the starting quarterback for Arizona State and his school year corresponds with Keller's school year.

236. Upon his arrival at Nebraska, Keller wore number 5, which he kept throughout 2006.  He continued to use number 5 during the spring game in 2007, but later, shortly before playing in his first game at Nebraska in fall 2007, Keller switched to number 9.

237. The 2008 game, however, was researched before Keller made his switch, perhaps as early as 2007 when Keller was a red-shirt senior (not playing for a year), and was too late to catch Keller's abrupt switch to number 9.  Although named by year, the game incorporates the team that began playing the preceding year—*e.g.*, the 2007-2008 team would appear in the 2008 game.

238. Virtual player number 5 has the same height, weight, skin tone, home state, handedness, and facial features as Sam Keller.  Virtual player number 5 is also the starting quarterback for the University of Nebraska.  Remarkably, the virtual player also wears a dark visor, which Keller wore for the first time at Nebraska.  But Keller only wore it prior to his first

real game, switching at that time to a clear visor.  That is, he only wore a dark visor when he was wearing the number 5 jersey.

239. The virtual Nebraska player wearing number 5 a year before Keller played at Nebraska was a senior wide receiver from North Carolina who was African American, 6'1," and 195 pounds.  This virtual player's description perfectly describes the actual player, Shamus McKoy.

240. It is not coincidental that the virtual number 5 is virtually identical in all material respects to the former Arizona State quarterback who just transferred to Nebraska.  Compare the two images and it is obvious they are not randomly generated:

1

2

3

4

5

6

7



8

9

10

11

12

13

14



15

16

17

18

19

20

21



22

23

24

25

26

27

28



Keller, a graduate of the University of Nebraska with a degree in Political Science, never

consented to the use of his name or likeness in any Electronic Arts product.

### Bryan Christopher Cummings

241. Right of Publicity Plaintiff Bryan Cummings enrolled at the The State University of

New York at Buffalo on a scholarship offer in 2002.  He started eight games as a true freshman at

middle linebacker.

242. In 2003, as a sophomore, Cummings started all 11 games at middle linebacker, and

was fifth on the team in tackles.

243. As a junior in 2004, Cummings was voted captain (the only junior captain), started

every game and was second on the team in tackles.

244. In 2005, as a senior, Cummings was unanimously chosen as team captain, started

every game and was second on the team in tackles.

245. Cummings wore number 46 throughout his career at the University at Buffalo.

According to the official school roster, Mr. Cummings was 6'3 and weighed 223 pounds his

junior year and 226 pounds his senior year.  Cummings finished his career with top ten school

records in career tackles, career solo tackles, and forced fumbles.

246. The virtual player who wears number 46 for the University of Buffalo in NCAA

Football 2005 has the same height, weight, skin tone, hair color, hair style, handedness, home

state (Ohio), and facial features as Bryan Cummings.  Player number 46 is also the starting

middle linebacker for the University at Buffalo.

247. In addition to having a virtual player in NCAA Football 2005 that matches

Cummings in almost all aspects, there is an actual picture of Cummings in NCAA Football 2010

that is shown when a player selects the University of Buffalo as his or her team.  Cummings never

consented to any use of his likeness, image, or picture by EA Sports.

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 68 -

248. Right of Publicity Plaintiff Bryon Bishop is a South Carolina resident and the former starting left guard for the University of North Carolina football team.

249. Bishop enrolled at the University of North Carolina in 2004. He did not play in his freshman season. Instead, he took a "red-shirt" year that preserved four years of NCAA eligibility. He did not play in 2005 due to a back injury, but saw action in five football games as a sophomore in 2006.

250. In 2007, Bishop's junior year, he played in two football games at left guard. And in 2008, as a red-shirt senior, Bishop started in four games at left guard and played in nine games.

251. Bishop wore North Carolina jersey number 76. In 2007, Bishop was officially listed at 6'3" and weighed 300 pounds. In 2008, Bishop was officially listed at 6'4" and weighed 310 pounds. The player who wears number 76 for North Carolina in NCAA Football 2008 and 2009 has the same height, weight, skin tone, hair color, hair style and home state as Bryon Bishop.

252. North Carolina player number 76 is also the starting left guard for the University of North Carolina in NCAA Football 2009, and his school year corresponds with Bishop's school year . Bishop never consented to any use of his likeness or image by EA Sports.

## Lamarr Watkins

253. Right of Publicity Plaintiff Lamarr Watkins enrolled at the University of Wisconsin – Madison in 2002. As a true freshman, Watkins played in all 14 games, including starts at outside linebacker in each of the final six games.

254. As a sophomore, Watkins played in 12 of 13 games, including two starts at linebacker, and was a standout on special teams. As a junior, Watkins played in five games. In 2005, Watkins started all 13 games, including a bowl game against Auburn University.

255. Watkins wore number 24 on his jersey at Wisconsin.  The virtual player who wears number 24 for Wisconsin in NCAA Football 2004 and 2005 has the same height, weight, skin tone, hair color, hair style, handedness, home state (2005 only), and facial features as Watkins.

256.  Player number 24 is also a sophomore right outside linebacker for Wisconsin, just like Watkins.  Watkins never consented to any use of his image or likeness by EA Sports.

## VI.     COMMON COURSE OF CONDUCT EMANATING FROM CALIFORNIA AND INDIANA

257. EA is headquartered in Redwood City, California and is therefore a California resident and citizen.  As a California resident and citizen, Electronic Arts is subject to California laws.  Moreover, the primary executives responsible for negotiating the licensing agreements for NCAA games reside and work in California.  Upon information and belief, the administration of licenses and negotiation of contracts with the NCAA and CLC have required frequent contact in Indiana by EA, including but not limited to meeting at the NCAA's headquarters in Indiana.  Further, EA has used and continues to use Right of Publicity Plaintiffs' and class members' likenesses in Indiana by selling – as well as promoting and advertising – its games in Indiana, causing its games to be sold in Indiana, transporting its games into Indiana, causing its games to be transported into Indiana, and by, upon information and belief, sending personnel to NCAA members schools located in Indiana to use student-athletes likenesses to help them form its game images.   EA's personnel obtain information regarding player equipment preferences, playing style and appearances for use in its games to increase realism by creating virtual payers that approximate their real-life counterparts as realistically as possible.    In addition, through its website www.easportsworld.com and other similar and successor websites, EA has knowingly and intentionally published, disseminated, distributed and exhibited player likenesses in Indiana.

258. The NCAA has its principal place of business in Indiana and is therefore an Indiana resident and citizen. As an Indiana resident and citizen, the NCAA is subject to Indiana laws. The primary executives responsible for negotiating the licensing agreements for the NCAA games produced by EA reside and work in Indiana. Approval to unlawfully utilize player likenesses was granted by NCAA executives located in Indiana. Upon information and belief, the administration of licenses and negotiation of contracts with the NCAA and CLC has required frequent contact with California, including but not limited to meetings at Electronic Arts' headquarters in California regarding player likenesses and frequent reaching out to individuals in the state via interstate wires and the internet. Further, the NCAA has approved and facilitated EA personnel visiting member schools for the purpose of using player likenesses to develop the virtual players in its games. They have done so because EA's use of player names and likenesses benefits the NCAA by increasing the popularity of the relevant games and thus the royalties that the NCAA and CLC can collect.

259. The CLC has its principal headquarters in Atlanta, Georgia. Its contracts with the NCAA were negotiated in Indiana and are governed by Indiana law. The administration of the contracts, including the provisions regarding player likenesses, requires frequent contact and travel to Indiana. Its contracts with EA were negotiated, in whole or in part, with executives located in California and are subject to California law. The administration of the contracts, including the provisions regarding player likenesses, requires frequent contact with California. In negotiating and executing the player likeness provisions of the license with Electronic Arts, CLC was directed by the NCAA and executives of the NCAA in Indiana.

260. Defendants' unlawful conspiracy took place in California and Indiana. Specifically, the unlawful course of conduct was directed and ratified by Defendants in both California and Indiana.

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 71 -

## VII.   RIGHT OF PUBLICITY CLASS ACTION ALLEGATIONS

261. Right of Publicity Plaintiffs sue on their own and on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23.  The putative Right of Publicity Class[3] is defined as:

> Virtual Player Class:

> All NCAA football and basketball players listed on the official opening-day roster of a school whose team was included in any interactive software produced by Electronic Arts, and whose assigned jersey number appears on a virtual player in the software.

> Photograph Class:

> All persons whose photographed image was included in any NCAA-related interactive software produced by Electronic Arts.

262. Excluded from both classes are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies, class counsel and their employees, and the judicial officers, and associated court staff assigned to this case.  Also excluded from the Virtual Player Class are the limited number of players whose assigned jersey number appears in the game, but the virtual players' height is not within one inch of the player's roster height and the virtual player's weight is not within 10% of the player's roster weight.  Also excluded from the Photograph Class are those people who gave written consent to be included in the NCAA-related interactive software produced by Electronic Arts.  For purposes of the Civil Conspiracy and Breach of Contract claims only, excluded from the Photograph Class are persons who did not sign form 08-3a.

263. The persons in the Right of Publicity Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Right of Publicity Class is easily ascertainable,

---

[3] Though it consists of two components, the Right of Publicity class is, for convenience, referred to throughout in the singular.

as each class member can by identified by using Defendants' records.  Plaintiffs are informed and believe that there are many thousands of Right of Publicity Class members.

264.  There are common questions of law and fact specific to the Right of Publicity Class that predominate over any questions affecting individual members, including:

(a)   Whether Electronic Arts utilizes NCAA player likenesses in its videogames;

(b)   Whether such use is unlawful;

(c)   Whether NCAA's duty of good faith and fair dealing requires them to protect players' likeness rights when dealing with Electronic Arts,

(d)   Whether NCAA and CLC have conspired with Electronic Arts to illegally use players' likenesses,

(e)   Whether Defendants have authorized, approved, or permitted Electronic Arts' use of NCAA player likenesses in its videogames;

(f)   Whether Electronic Arts' conduct violates Indiana Code § 32-36-1-1;

(g)   Whether Electronic Arts' conduct violates California Civil Code § 3344;

(h)   Whether Electronic Arts' conduct constitutes an unfair trade practice;

(i)   Whether class members have been damaged by Defendants' conduct and the amount of such damages;

(j)   Whether treble damages are appropriate and the amount of such damages;

(k)   Whether punitive damages are appropriate and the amount of such damages;

(l)   Whether statutory damages are appropriate and the amount of such damages; and

(m)   Whether Defendants should disgorge their unlawful profits and the amount of such profits.

265. Plaintiffs' claims are typical of the Right of Publicity Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Right of Publicity Class, and Right of Publicity Plaintiffs challenge the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

266. Plaintiffs will fairly and adequately protect the interests of the class.  They will vigorously pursue the claims and have no antagonistic conflicts.  Right of Publicity Plaintiffs have retained counsel who are able and experienced class action litigators and are familiar with the videogame industry.

267. Defendants have acted or refused to act on grounds that apply generally to the Right of Publicity Class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  A class action is also appropriate because Defendants have acted and refuse to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.  Questions of law or fact common to class members predominate over any questions affecting only individual members.  Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of class members to pursue their claims.  It is not anticipated that there would be difficulties in managing this case as a class action.

## ANTITRUST ALLEGATIONS

## CLASS ACTION ALLEGATIONS WITH RESPECT TO ANTITRUST CLAIMS

268. Antitrust Plaintiffs bring this action under Federal Rule of Civil Procedure  23(b)(2) and (b)(3) on their own behalf and on behalf of the following Antitrust Classes:

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 74 -

The "Antitrust Declaratory and Injunctive Relief  Class":

> All current and former student-athletes residing in the United States who compete on, or competed on, an NCAA Division I college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team and whose images, likenesses and/or names may be, or have been, licensed or sold by Defendants, their co-conspirators, or their licensees after the conclusion of the athlete's participation in intercollegiate athletics.

> The Class also excludes the officers, directors, and employees of Defendants, the officers, directors and employees of any NCAA Division I college or university, and the officers, directors, or employees of any NCAA Division I athletic conference.

The "Antitrust Damages Class":

> All former student-athletes residing in the United States who competed on an NCAA Division I college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team whose images, likenesses and/or names have been licensed or sold by Defendants, their co-conspirators, or their licensees from July 21, 2005 and continuing until a final judgment in this matter.  The class does not include current student-athletes.

> The Class also excludes the officers, directors, and employees of Defendants, the officers, directors, and employees of any NCAA Division I college or university, and the officers, directors, or employees of any NCAA Division I athletic conference.

Members of the Antitrust Damages and Declaratory and Antitrust Injunctive Relief Classes are collectively referred to herein as the "Antitrust Class" or the "Antitrust Classes" unless otherwise individually specified.

269. In addition to seeking certification of nationwide classes for the antitrust claims, Plaintiffs also seek certification of a nationwide class for purposes of their unjust enrichment / constructive trust and accounting claims.

270. Antitrust Plaintiffs do not know the exact number of Antitrust Class members, because that information is in the exclusive control of Defendants and third parties, including the NCAA's members.  However, due to the nature of the trade and commerce involved, Plaintiffs believe that the Antitrust Class members number in the thousands and are geographically diverse

so that joinder of all Antitrust Class members is impracticable.  Given that the NCAA is selling and licensing the images, likenesses and/or names of players from many decades, as described herein, it stands to reason that there are more former student athletes than current ones affected by the NCAA's anticompetitive practices described herein.

271. There are questions of law and fact common to members of both the Antitrust Damages Class and the Antitrust Declaratory and Injunctive Relief Class, including but not limited to the following:

a. whether Defendants and their co-conspirators engaged in or entered into a contract, combination, or conspiracy among themselves to fix, depress, maintain, and/or stabilize prices paid to Antitrust Class members for use of their images, likenesses and/or names after the conclusion of their participation in intercollegiate athletics;

b. whether Defendants' unlawful conduct has enabled them to decrease, maintain, or stabilize below competitive levels the output, and compensation / royalties that Antitrust Class members would receive for use, of their images, likenesses and/or names in a market free of anticompetitive constraints;

c. the duration of the contract, combination, or conspiracy alleged herein;

d. whether Defendants violated Section 1 of the Sherman Act;

e. whether Defendant NCAA's Form 08-03a, and any similar forms, are void and unenforceable;

f. whether Defendant NCAA's "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any similar forms, are void and unenforceable; and

g. whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and Antitrust Class members.

272. Additional common questions of law of fact specific to the Antitrust Damages Class include the following:

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 76 -

a. the appropriate measure of damages sustained by Plaintiffs and class members; and

b. whether Defendants have been unjustly enriched.

273. The common questions with respect to the Antitrust Damages Class predominate over questions, if any, that affect only individual Antitrust Damages Class members.

274. With respect to the Antitrust Declaratory Relief and Injunctive Relief Classes, common questions of law or fact include the following:

a. whether injunctive relief is appropriate;

b. if injunctive relief is appropriate, what types of such relief are suitable in this matter;

c. whether declaratory relief is appropriate;

d. whether a constructive trust for the benefit of class members should be established; and

e. whether an accounting is appropriate.

275. With respect to members of the Antitrust Declaratory and Injunctive Relief Class, Defendants have acted or refused to act on grounds generally applicable to the Antitrust Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Antitrust Declaratory and Injunctive Relief Class as a whole.

276. Antitrust Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Antitrust Class members.  By advancing their claims, Antitrust Plaintiffs will also advance the claims of all Antitrust Class members, because Defendants participated in activity that caused all Antitrust Class members to suffer similar injuries.

277. Antitrust Plaintiffs and their counsel will fairly and adequately protect the interests of absent Antitrust Class members.  There are no material conflicts between Antitrust Plaintiffs' claims and those of absent Antitrust Class members that would make class certification inappropriate.  Counsel for Antitrust Plaintiffs are highly experienced in complex class action

litigation, including antitrust litigation, and will vigorously assert Plaintiffs' claims and those of absent Antitrust Class members.

278. A class action is superior to other methods for the fair and efficient resolution of this controversy.  The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court.  The damages suffered by Antitrust Plaintiffs and each Antitrust Damages Class member are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent class certification, it would not be feasible for Plaintiffs and Antitrust Class members to redress the wrongs done to them.  It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## THE NCAA AND ITS CONTROL OF THE COLLEGIATE LICENSING MARKET

279. Each year, the colleges and universities who are members of the NCAA award more than 11,500 athletic scholarships to men's football and basketball players.

A.      **The NCAA and its Structure and Governance.**

280. In its Consolidated Statement of Financial Position, dated August 31, 2008, the NCAA stated the following:

> The National Collegiate Athletic Association (the NCAA or the Association) is an unincorporated not-for-profit educational organization founded in 1906.  The NCAA is the organization through which the colleges and universities of the nation speak and act on athletics matters at the national level.  It is a voluntary

association of more than 1,000 institutions, conferences and organizations devoted to the sound administration of intercollegiate athletics in all its phases.  Through the NCAA, its members consider any athletics issue that has crossed regional or conference lines and is national in character.  The NCAA strives for integrity in intercollegiate athletics and serves as the colleges' national athletics accrediting agency.  A basic purpose of the NCAA is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body.

The NCAA operates through a governance structure which empowers each division to guide and enhance their ongoing division-specific activities.  In Division I, the legislative system is based on conference representation and an eighteen member Board of Directors that approves legislation.  The Division II and III presidential boards are known as the Presidents Council; however, legislation in Division II and III is considered through a one-school, one-vote process at the NCAA Annual Convention. The governance structure also includes an Executive Committee composed of sixteen chief executive officer (member institution chief executive officers) that oversee association-wide issues which is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies and general principles of the NCAA. The Executive Committee has representation from all three divisions and oversees the Association's finances and legal affairs.

281. On its website, the NCAA further describes itself as being "comprised of institutions, conferences, organizations and individuals committed to the best interests, education and athletics participation of student-athletes."  The NCAA further states that its members are the "colleges, universities and conferences that make up the NCAA," and that "[t]he members appoint volunteer representatives that serve on committees which introduce and vote on rules called bylaws. The members also establish programs to govern, promote and further the purposes and goals of intercollegiate athletics."  The NCAA additionally states "[m]any believe the Association rules college athletics; however, it is actually a bottom-up organization in which the members rule the Association."

282. The 2008-09 NCAA "Division I Manual" is comprised of the NCAA's Constitution, its Operating Bylaws, and its Administrative Bylaws, which together span more than 400 pages. These rules regulate all aspects of collegiate athletic competition, and demonstrate the NCAA's control of the collegiate licensing market and the horizontal agreements by which the NCAA's members agree to abide by, implement, and enforce the rules.

B.      **The NCAA's Anticompetitive Form 08-3a.**

283. Bylaw 12.5.1.1.1 ("Promotions Involving NCAA Championships, Events, Activities or Programs") states the following:

> The NCAA [or a third party acting on behalf of the NCAA (*e.g.*, host institution, conference, local organizing committee)] may use the name or picture of an enrolled student-athlete to generally promote NCAA championships or other NCAA events, activities or programs.

284. Before a student-athlete commences athletic participation each year, the NCAA requires that he or she sign its "Form 08-3a." titled "Student-Athlete Statement."  The form is of particular importance due to its provision regarding student-athletes' release of rights in connection with use of their images, likenesses and/or names.  It appears that the title of this form changes each year in connection with the applicable year.

285. The mandatory nature of the form on which student-athletes must agree to the terms of Bylaw 12.5.1.1.1 is detailed in the Constitution and Bylaws.  Specifically, Article 3.2.4.6 of the Constitution ("Student-Athlete Statement") states the following:

> An active member shall administer annually, on a form prescribed by the Legislative Council, a signed statement for each student-athlete that provides information prescribed in Bylaws 14.1.3 and 30.12.

286. Bylaw 14.1.3.1 ("Content and Purpose"), referred to in Article 3.2.4.6 of the Constitution, details the contents of the required form and states the following:

> Prior to participation in intercollegiate competition each academic

year, a student-athlete shall sign a statement in a form prescribed by the Legislative Council in which the student athlete submits information related to eligibility, recruitment, financial aid, amateur status, previous positive drug tests administered by any other athletics organization and involvement in organized gambling activities related to intercollegiate or professional athletics competition under the Association's governing legislation. Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition. Violations of this bylaw do not affect a student-athlete's eligibility if the violation occurred due to an institutional administrative error or oversight, and the student-athlete subsequently signs the form; however, the violation shall be considered an institutional violation per Constitution 2.8.1.

287. Bylaw 14.1.3.2 ("Administration") continues that "[t]he institution shall administer this form individually to each student-athlete prior to the individual's participation in intercollegiate competition each year. Details about the content, administration, and disposition of the statement are set forth in Bylaw 30.12."

288. Bylaw 30.12 ("Student-Athlete Statement"), referred to in Article 3.2.4.6 of the Constitution and in Bylaw 14.1.3.2, states the following:

The following procedures shall be used in administering the student-athlete statement required in Bylaw 14.1.3:

(a) The statement shall be administered individually to each student-athlete by the athletics director or the athletics director's designee prior to the student's participation in intercollegiate competition each academic year;

(b) The statement shall be kept on file by the athletics director and shall be available for examination upon request by an authorized representative of the NCAA; and

(c) The athletics director shall promptly notify in writing the vice president of NCAA's education services group regarding a student-athlete's disclosure of a previous positive drug test administered by any other athletics organization.

289. Form 08-3a states that it is "required by NCAA Constitution 3.2.4.6 and NCAA Bylaws 14.1.3.1 and 30.12," and that its purpose is "[t]o assist in certifying eligibility." It further

notes that "[t]his NCAA Division I statement/consent form shall be in effect from the date this document is signed and shall remain in effect until a subsequent Division I Student-Athlete Statement/Drug-Testing Consent form is executed."  Form 08-3a has seven parts, including the following:  "[a]statement concerning eligibility;" "[a]n affirmation of status as an amateur athlete;" and "[a] statement concerning the promotion of NCAA championships and other NCAA events."

290. Under Part IV ("Promotion of NCAA Championships, Events, Activities or Programs"), student athletes must sign and agree to the following:

> You authorize the NCAA [or a third party acting on behalf of the NCAA (e.g., host institution, conference, local organizing committee)] to use your name or picture to generally promote NCAA championships or other NCAA events, activities or programs.

291. Part IV, described in the preceding paragraph, has been utilized by the NCAA and its co-conspirators to engage in the unlawful licensing of Antitrust Class members' commercial rights.  Its provision stating that it "shall remain in effect until a subsequent Division I Student-Athlete Statement/Drug-Testing Consent form is executed" has the effect of granting a purported release in perpetuity.

292. Notably, Form 08-3a states that it is "required by NCAA Constitution 3.2.4.6 and NCAA Bylaws 14.1.3.1 and 30.12" and that its purpose is to "assist in certifying eligibility."  The referenced sections of the Constitution and Bylaws, however, do not convey, transfer, or grant any rights of the student-athlete to the NCAA, its member institutions, or its licensees.  The sections referenced regarding the Constitution and Bylaws have to do with matters concerning eligibility, disclosure of educational and drug testing records, and affirmation of amateur status requirements.  Relying on these provisions, the NCAA has created an anti-competitive and unconscionable perpetual release relating to image rights.

293. The "authorization" described above in Form 08-3a is entirely coerced and uninformed and is even signed, in some cases, by minors.

294. Form 08-3a is evidence of the NCAA's repeated attempts to obfuscate issues about sales of merchandise by referring to the vague and ambiguous concept of "promot[ion] of NCAA championships or other NCAA events, activities or programs of college athletics."  The ambiguous word "support" also appears in the "Institutional, Charitable, Education or Nonprofit Promotions Release" mandated by Article 12.5.1.1 of the Bylaws.  No reasonable person, upon reading Form 08-3a, and the "Institutional, Charitable, Education or Nonprofit Promotions Release" described below, would interpret phrases such as "support educational activities," or "generally promote NCAA championships or other NCAA events, activities or programs" to specifically grant a license in perpetuity for former players' images to be used for profit, over many years, in DVDs, on-demand video, video games, photographs for sale, "stock footage" sold to corporate advertisers, "classic games" for re-broadcast on television, jersey and apparel sales, and other items.

295. The NCAA's releases described herein are also notable for their failure to indicate that legal rights are being relinquished, and for their failure to counsel student-athletes, who are sometimes minors, that they may wish to seek legal advice in connection with the release of future compensation rights.

296. At a hearing in this matter on December 17, 2009, upon questioning from the Court, counsel for the NCAA confirmed the NCAA's interpretation of its release forms as follows:

> "[THE COURT]:  SO DO YOU VIEW THE THINGS THAT THEY SIGNED, OR SOME PEOPLE MAY HAVE SIGNED, AND WHEN THEY GRADUATE FROM COLLEGE, AFTER THAT, THEY ARE NOT BOUND BY IT ANYMORE?
>
> [NCAA Counsel]:  IT DEPENDS ON WHICH THING WE ARE TALKING ABOUT, YOUR HONOR.

1    **[THE COURT]:**   ANY OF THEM. DO THEY ALL END ON
2    GRADUATION OR IS THERE SOME THAT YOU CONTEND
     REALLY DO CONTINUE TO APPLY?

3
     **[NCAA Counsel]:**  THE FORM O8-3A AND 09-3A, BY THEIR
4    TERMS, GIVE THE NCAA A LIMITED RIGHT, AND IT'S
     LIMITED TO USE CERTAIN LIKENESSES THAT WERE
5    CREATED DURING THE TIME PERIOD THAT THE PERSON
     WAS A STUDENT ATHLETE FOR THE LIMITED PURPOSE
6    OF PROMOTING NCAA CHAMPIONSHIPS AND GENERAL
7    NCAA EVENTS.

8    **[THE COURT]:**  ONLY UP UNTIL THE TIME THEY
     GRADUATE?
9
     **[NCAA Counsel]:**  NO, THAT CONTINUES.
10

11   (12/17/10 Hearing Tr., at 44:19 – 45:9)

12       297. This is not the first occasion in which the NCAA has sought to prevent input from

13   legal counsel on matters that affect student-athletes' post-collegiate endeavors.  In an Opinion

14   dated February 12, 2009, in the matter of *Oliver v. National Collegiate Athletic Association*

15   *("Oliver")*, Judge Tygh M. Tone of the Common Pleas Court of Erie County, Ohio, examined the

16
     NCAA's Bylaw 12.3.2.1.  That Bylaw states that "A lawyer may not be present during
17
18   discussions of a contract offer with a professional organization or have any direct contact (in

19   person, by telephone or by mail) with a professional sports organization on behalf of the

20   individual. A lawyer's presence during such discussions is considered representation by an

21   agent." A player utilizing an "agent" in such negotiations is deemed ineligible under the NCAA's

22   rules, whereas one who does not utilize an agent can retain his eligibility if he chooses to return to

23
     school and not become a professional.  The court ruled that "Bylaw 12.3.2.1 is arbitrary and
24
25   capricious and against the public policy of the State of Ohio as well as all states within this Union

26   and further limits the player's ability to effectively negotiate a contract."

27       298. The court in *Oliver* further stated that the effect of the Bylaw "is akin to a patient

28   hiring a doctor but the doctor is told by the hospital board and the insurance company that he (the

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT                    - 84 -
Case No. C 09-01967 CW

doctor) cannot be present when the patient meets with a surgeon because the conference may improve his patient's decision making power." The court additionally stated that "[i]f the Defendant [NCAA] intends to deal with this athlete or any athlete in good faith, the student-athlete should have the opportunity to have the tools present (in this case an attorney) that would allow him to make a wise decision without automatically being deemed a professional, especially when such contractual negotiations can be overwhelming, even to those who are skilled in their implementation."

299. On October 9, 2009, *The New York Times* reported that the NCAA agreed to settle the case and pay Mr. Oliver $750,000.

300. The NCAA, through its total control of intercollegiate athletics, and due to a gross disparity in bargaining power, requires student-athletes to sign nonnegotiable forms, as the terms are nonnegotiable. Any Class member declining to do so is barred by the NCAA and the relevant member institution from all further intercollegiate athletic competition.

C.     **The NCAA's Anti-Competitive "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement" Mandated by NCAA Bylaws Section 12.5.1.1.**

301. Article 12.5.1.1 ("Institutional, Charitable, Education or Nonprofit Promotions") also results in the creation of an unconscionable release that benefits members. This release also is the product of the anticompetitive agreement described herein among the NCAA and its members. Article 12.5.1.1 states in pertinent part the following:

> A member institution or recognized entity thereof (e.g., fraternity, sorority or student government organization), a member conference or a non-institutional charitable, educational or nonprofit agency may use a student-athlete's name, picture or appearance to support its charitable or educational activities or to support activities considered incidental to the student-athlete's participation in intercollegiate athletics, provided the following conditions are met:
>
> (a)   The student-athlete receives written approval to participate from the director of athletics (or his or her designee who may

not be a coaching staff member), subject to the limitations on participants in such activities as set forth in Bylaw 17;

(b) The specific activity or project in which the student-athlete participates does not involve co-sponsorship, advertisement or promotion by a commercial agency other than through the reproduction of the sponsoring company's officially registered regular trademark or logo on printed materials such as pictures, posters or calendars. The company's emblem, name, address, telephone number and Web site address may be included with the trademark or logo. Personal names, messages and slogans (other than an officially registered trademark) are prohibited;

(c) The name or picture of a student-athlete with remaining eligibility may not appear on an institution's printed promotional item (e.g., poster, calendar) that includes a reproduction of a product with which a commercial entity is associated if the commercial entity's officially registered regular trademark or logo also appears on the item;

(d) The student-athlete does not miss class;

(e) **All moneys derived from the activity or project go directly to the member institution, member conference or the charitable, educational or non-profit agency** (emphasis added);

(f) The student-athlete may accept actual and necessary expenses from the member institution, member conference or the charitable, educational or nonprofit agency related to participation in such activity;

(g) The student-athlete's name, picture or appearance is not used to promote the commercial ventures of any nonprofit agency;

(h) Any commercial items with names, likenesses or pictures of multiple student-athletes (other than highlight films or media guides per Bylaw 12.5.1.7) may be sold only at the member institution at which the student-athletes are enrolled, institutionally controlled (owned and operated) outlets or outlets controlled by the charitable or educational organization (e.g., location of the charitable or educational organization, site of charitable event during the event). Items that include an individual student-athlete's name, picture or likeness (e.g., name on jersey, name or likeness on a bobble-head doll), other than informational items (e.g., media guide, schedule cards, institutional publications), may not be sold; and

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT                          - 86 -
Case No. C 09-01967 CW

    (i)  **The student-athlete and an authorized representative of the charitable, educational or nonprofit agency sign a release statement ensuring that the student-athlete's name, image or appearance is used in a manner consistent with the requirements of this section**. (emphasis added).

302. The preceding Bylaw, with its mandated release pursuant to subsection (i), has been utilized by the NCAA's members to engage in the unlawful licensing of Antitrust Class members' rights, as intended by the NCAA.  Just as described herein with respect to the NCAA's Form 08-3a, this mandated release constitutes an unconscionable contract that is both procedurally and substantively unconscionable.

303. Bylaw 12.5.1.7 ("Promotion by Third Party of Highlight Film, Videotape or Media Guide") states the following:

    Any party other than the institution or a student-athlete (e.g., a distribution company) may sell and distribute an institutional highlight film or videotape or an institutional or conference media guide that contains the names and pictures of enrolled student-athletes only if:

    (a)  The institution specifically designates any agency that is authorized to receive orders for the film, videotape or media guide;

    (b)  Sales and distribution activities have the written approval of the institution's athletics director;

    (c)  The distribution company or a retail store is precluded from using the name or picture of an enrolled student-athlete in any poster or other advertisement to promote the sale or distribution of the film or media guide; and

    (d)  There is no indication in the makeup or wording of the advertisement that the squad members, individually or collectively, or the institution endorses the product or services of the advertiser."

304. The above-provision appears to purport to give third parties (meaning for-profit "distribution companies") the right to "sell and distribute" highlight films upon approval from the school, without even mandating a release from the student-athlete.  However, the release that the

1  NCAA mandates in its Bylaw 12.5.1.1(h), described a few paragraphs above, has been utilized by

2  the NCAA and its members to unlawfully license and use the commercial rights of former

3  student-athletes' rights in the use of their images.

4

5      305. The *Des Moines Register* recently confirmed that schools do in fact require student-

6  athletes to sign the NCAA's mandated consent forms, and reported the following in an article that

7  also described two schools' receipt of funds relating to the NCAA's video game license

8  agreement with Defendant EA (as further detailed herein):

9          The athletic departments for Iowa and Iowa State ask for student-
           athletes' consent before using their likeness on any promotional
10         material for the schools.

11         "Generally, the way we approach it is we've been very conservative
12         over the years," Iowa athletic director Gary Barta said.  "When we
           do sell the likeness of a student-athlete, we have signed permission
13         ... and all the proceeds from those sales go back directly to benefit
           student-athletes in general (through the school's athletic fund)."
14

15  The "consent" and "permission," described above, however, is entirely coerced and uninformed,

16  as intended by the NCAA and its business partners - its member schools, conferences, and for-

17  profit licensees, and as such constitutes an unconscionable contract and is the product of

18  anticompetitive conduct and agreement.

19
           D.      **The Collegiate Licensing Market.**
20

21      306. The NCAA and its members control the collegiate licensing market in the United

22  States, including licensing rights to current and former players' images and likenesses (which are

23  utilized in, for example, items such as DVDs of game films, on-demand sales of game films,

24  "stock footage" for corporate advertisers, "classic" games shown on the cable television network

25  "ESPN Classic" and other networks, photographs, video games, and in other merchandise).

26      307. IMG, the owner of the NCAA's licensing arm, Defendant CLC, recognizes the

27  college market on its website as follows:  "IMG College is a leading collegiate marketing,

28

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

licensing and media company that can create and build comprehensive marketing platforms that leverage the marketing potential of the college sports and on-campus market. " IMG continues that "[c]onsumer devotion to college institutions is unrivaled, but the complexity of the space makes it challenging for marketers to tap the full potential. With our expertise, broad relationships and portfolio of properties, IMG College can help brands create platforms to reach millions of passionate, loyal fans." IMG further states that "[o]ur licensing team, The Collegiate Licensing Company, is the unrivaled leader in collegiate brand licensing, managing the licensing rights for nearly 200 leading institutions that represent more than $3 billion in retail sales and more than 75% share of the college licensing market." IMG on its website further states: "[h]aving originally contracted with IMG College in 1976, the NCAA has trusted the Company for nearly 30 years to lead the industry in delivering the power of the collegiate market to consumers nationwide."

308. The NCAA and its members have the ability to control price and exclude competition. The NCAA and its members control the output and set the price for licensed merchandise and licensing rights and have the power to exclude from this market any member who is found to violate its rules. The NCAA can and does exclude both current and former student-athletes from this market, as evidenced by the usage of the anticompetitive forms described herein. The NCAA and its members have obtained a 100% share in the licensing market. With respect to current student-athletes, those players would collectively have a share of that market absent the vehicles described herein by which they are required to transfer those rights to the NCAA, its members, and others. Former student-athletes, including the members of the Antitrust Damages Class described herein, also would have a share of the market, absent the anticompetitive practices described herein.

309. The NCAA (through its members) thus totally controls the licensing rights market, and is able to dictate the supply and the terms upon which licensed products and licenses are bought and sold.

310. Another indicator of the NCAA and its members' power include the fact that *all* student-athletes are required to sign the forms described herein and pursuant to which the NCAA has unlawfully licensed the rights of former student-athletes are forced to release all future rights to the commercial use of their images.  Student-athletes must sign these forms, even if he or she does not receive a scholarship.  The NCAA has the power to impose and enforce the releases, and to exclude non-signing athletes from participation in all future intercollegiate competition, as well as penalize schools whose athletes violate the terms of the forms and related rules, regardless of whether the athlete receives any scholarship funds.

311. The NCAA, through its member schools, imposes a wide variety of conditions on student-athletes.  For example, they may not receive compensation beyond educational expenses approved by the NCAA; they may not retain an agent for exploitation of their future professional career; they must meet minimum requirements for educational progress; and they are strictly limited in receiving compensation for non-athletic services that might be understood to reflect on their athletic ability.  If student-athletes had the opportunity to receive a college education and compete at an elite level of intercollegiate competition without these restrictions, many student-athletes would choose to do so.  The fact that they agree to these conditions demonstrates the market power of the NCAA member schools, *i.e.*, the lack of any reasonable substitute for those who wish to receive a college education and compete in elite intercollegiate athletic competition.

312. The demand for student-athletes is such that, absent the unlawful Form 08-3a, the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement," and any other similar device that the NCAA has utilized to attempt to eliminate compensation owed to

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

former student-athletes, the colleges and universities participating in the relevant markets would have competed against each other by offering higher amounts of post-graduation licensing revenues to student athletes. For example, schools, in order to compete with each other, could offer players a portion of the revenue that the schools in turn receive via the NCAA and other sources for commercial exploitation of those players' images. But under current anticompetitive conditions, compensation is "capped" at zero by artificial rules imposed by the NCAA that result in lower compensation than would otherwise prevail in a more competitive market.

313. Thus, for the members of the proposed Antitrust Damages Class, increased competition on the terms of post-career revenue distribution for former athletes would result in additional revenue for all members of the proposed class.

314. All NCAA members have agreed to utilize and abide by the NCAA's Bylaws, including the provisions detailed herein that mandate the use of Form 08-3a and the "Institutional, Charitable, Educational, or Nonprofit Promotions Release Statement" discussed herein, which have been used by the NCAA and its member institutions and conferences to fix the prices at which former student-athletes are paid for their commercial licensing rights or foreclosed from exercising any such rights.

315. The NCAA and its members are able to engage in these anticompetitive agreements and arrangements, as there are no acceptable substitutes for major college football or major college basketball.

316. The agreement among the NCAA and its members to jointly appropriate student-athletes' rights after the expiration of the students' eligibility as an amateur athlete is not necessary to achieve the NCAA's stated goal of clearly demarcating between college and professional sports, or to serve any pro-educational purpose, or any other legitimate, pro-competitive purpose in the marketing of college sports.

317. Moreover, reasonable and less restrictive alternatives are available than the NCAA's "zero compensation" policy for former student-athletes' licensing rights.  For example, all of the major professional sports, including basketball and football, have identified and utilized group-licensing methods to share revenues among teams and players.  Additionally, other reasonable and less restrictive alternatives could include the establishment of funds for health insurance, additional educational or vocational training, and/or pension plans to benefit former student athletes.

## **FACTUAL ALLEGATIONS**

A.   **The NCAA's 2009 "State of the Association" Speech Regarding Commercial Exploitation of Student-Athletes.**

318. As noted above in the Introduction, Wallace Renfro, the NCAA's vice president and senior advisor to President Myles Brand gave its 2009 "State of the Association" speech.  Mr. Renfro's remarks are notable for the contrast with the NCAA's actual conduct in exploiting former student-athletes, and his acknowledgment that "[g]eneration of much needed revenue does not justify the exploitation of student-athletes."  Certainly the same holds true with respect to former student-athletes.  Specifically, Mr. Renfro's remarks included the following:

> Any adequate policy of commercial activity must ensure that student-athletes are not commercially exploited.

> Call this the condition of non-exploitation.

> This condition is further delineated in the paper you received as you arrived today.  When we say "student-athlete exploitation in commercial activity," we should have a specific definition in mind.

> Since student-athletes are amateurs, not paid professionals, they cannot accept payment for endorsing or advertising any commercial product or service.

> It also means they should not be put in a position in which the natural interpretation by a reasonable person is that they are endorsing or advertising a commercial product or service.

> But most cases of exploitation are subtle and indirect.

1

2

3

> Instead of obvious product endorsement, the marketing can include game pictures, films, audio or video of student-athletes that make it appear to a reasonable person that a student-athlete is endorsing a specific commercial product.

4

5

> The student-athlete may well have no knowledge or awareness that his or her reputation, image or name is being used for these commercial purposes.

6

> But exploitation may be the result, nonetheless.

7

> Generation of much needed revenue does not justify the exploitation of student-athletes.

8

9

> We can – and we should – debate the nature of proper commercial conduct.  However, one principle is not subject to debate: commercial exploitation of student-athletes is not permissible.

10

> Period.

11

    B.       **The NCAA's Web of Licensing Agreements With For-Profit Entities.**

12

13

14

15

16

17

18

19

319. In the early 1980s, the total retail market for products identified with college athletics was estimated to be under $100 million per year.  The typical outlets for such sales were college book stores or other campus locations.  In the mid-1990s, the market was estimated to have grown to $2.5 billion per year, with the predominant sales locations being retail and chain stores. IMG now estimates that the market is a $4.0 billion per year. The growth of the market has been explosive, and advances in technology and product delivery outlets, namely, the internet, cable television delivery systems, and video game technology advances, have accelerated the growth.

20

21

22

23

24

25

320. A review of even the limited public information available regarding the NCAA's financial operations details the explosive growth in revenue that it has received in connection with sales of NCAA-related merchandise.  In its 2002-03 Revenue Report, the NCAA listed receipt of "royalties" of $3.8 million, and $6.2 million in "sales and services" (along with $370 million in television revenue).

26

27

321. In its 2007-08 report, the NCAA listed $552 million in total revenue for "television and marketing rights fees" of which $529 million was elsewhere attributed to revenues from its

28

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

television contract with CBS, leaving an apparent $23 million difference attributable to royalties. Additionally, the NCAA reported approximately $14.5 million in revenue for "sales and services." Thus, in just a few years, it appears that the combination of royalties and sales and services went from $10 million for the 2002-03 fiscal year ($3.8 million plus $6.2 million), to $37.5 million ($23 million plus $14.5 million) in for the 2007-08 fiscal year. That number only represents the NCAA's portion obtained pursuant to currently unknown royalty rates, and does not represent the total value of the associated sales via the NCAA's licensees, or sales made by member conferences and schools of goods.

322. Within recent years, the NCAA has entered into some of the licensing partnerships detailed herein that unlawfully utilize the images of Antitrust Class members. The related available content featuring likeness of former student-athletes, such as DVDs, photos, and video games, continues to grow in both availability and popularity, and growth will continue to explode as merchandise continues to be made available in new delivery formats as developing technology and ingenuity permits, as exemplified by the substantial library of "on demand" internet content now available for sale for NCAA games going back several decades.

323. Through the NCAA's web of licensing agreements with for-profit companies, the NCAA sells its rights, its members' rights, and Damages Class members' rights that unlawfully exercises via the anticompetitive and unconscionable conduct described herein. On its website, the NCAA directs interested parties to contact Defendant CLC for licensing information.

324. In the "Frequently Asked Questions" portion of its website, the NCAA provides various information with respect to licensing. Most notably, there is no information whatsoever regarding the rights of players – current or former – with regard to licensed merchandise. This total absence of information regarding the rights of players in the commercial licensing and usage

of their images also is observed on the websites of the NCAA's licensing arm, Defendant CLC.

The NCAA states the following regarding CLC:

> The Collegiate Licensing Company is the licensing representative for the NCAA. CLC is responsible for administering the licensing program, including processing applications, collecting royalties, enforcing trademarks and pursuing new market opportunities for the NCAA.

### i)   CLC.

325. On its website, under "Terms of Use," Defendant CLC states the following:

> The Collegiate Licensing Company ("CLC") is the trademark licensing representative for nearly 200 colleges, universities, bowl games, athletic conferences, the Heisman Trophy and the NCAA ("CLC Institutions"). Based in Atlanta, CLC is a full-service licensing company, which employs a staff of more than 80 licensing professionals with the capability to establish and manage every aspect of a collegiate licensing program.

326. CLC further states that it "is a division of global sports and entertainment company IMG," that it was founded in 1981, and that it is "the oldest and largest collegiate licensing agency in the U.S." On its website, CLC provides some information regarding its history and licensing operations. The content is notable for several reasons, as it details information about licensing agreements for coaches, universities, and the NCAA. There is not a single word devoted to the rights of former players. Specifically, CLC states the following:

> Since its early days in 1981, CLC's mission has been to serve as the guiding force in collegiate trademark licensing and one of the top sports licensing firms in the country. As such, our company and staff have dedicated ourselves to being a center of excellence in providing licensing services of the highest quality to institutions, licensees, retailers, and consumers.

> The consolidated approach to licensing offered by CLC provides every institution with a greater voice in the market, increased exposure, the broadest range of available licensing services, and reduced administration expenses, while still allowing for independent decision-making by each and every client. This approach, combined with our committed staff and industry-leading services has helped to guide and shape the $4.0 billion annual market for collegiate licensed merchandise. CLC's long-standing relationships with retailers and licensees have also been essential to the growth of the industry and the success of each client's individual licensing program.

1
2
3
4

> Today, the CLC Consortium represents the consolidated retail power of the many colleges, universities, athletic conferences, bowl games, and other collegiate institutions that comprise the CLC Consortium. The collective efforts that have contributed to the growth of the collegiate licensing industry will remain an important cornerstone of the industry in the future.

5

### ii)  **IMG.**

6

327. As noted above, Defendant CLC identifies itself as a division of IMG. One of IMG's

7

divisions and/or brands appears to be known as "IMG College."   IMG has stated the following

8

with respect to IMG College:

9
10
11
12
13
14

> Named by the *Sports Business Journal* as America's Top Sports Marketing Agency, IMG College (formerly HOST) provides extensive, yet varied sports marketing services for several NCAA® Division I universities and conferences. IMG College represents Arizona, Cincinnati, Connecticut, Florida, Furman, Gonzaga, Kansas, Kentucky, Michigan, Nebraska, Ohio State, Oklahoma State, Oregon, Rice, South Alabama, Tennessee, Texas, Western Kentucky, Wofford and several conferences, including the Southeastern Conference, the Ohio Valley Conference, the Southern Conference and the West Coast Conference.

15

> . . .

16
17
18

> The rights to these schools, conferences, and properties include some, or all, of the following: radio and television programs, publishing, printing, creative design, marketing, licensing, Internet, national advertising and signage sales, and numerous lifestyle and event marketing platforms.

19
20
21
22

> Additionally, IMG College holds the distinct position of having the longest consecutive relationship with the National Collegiate Athletic Association® (NCAA), over and above any other contractor. Having originally contracted with IMG College in 1976, the NCAA has trusted the Company for nearly 30 years to lead the industry in delivering the power of the collegiate market to consumers nationwide.

23
24
25

> Through an agreement with CBS Sports, IMG College oversees select NCAA rights including licensing, printing & publishing and special event promotions, like the NCAA Hoop City® interactive events.

26

328.    IMG also has stated the following regarding IMG College:

27
28

> Host Communications, Inc. (HOST) and the Collegiate Licensing Company (CLC) were joined to form IMG College, the premier college marketing, licensing and media company. IMG College

creates opportunities for corporations to connect with specific audiences within the collegiate market . . .

Through its unique relationships with many of the elite universities and conferences, IMG College ultimately offers platforms that provide companies immediate access to more than 110 million loyal, passionate collegiate fans and alumni and more than 15 million students enrolled in NCAA member institutions.

329.    IMG also has stated that it "helps marketers leverage the passion and loyalty of America's strongest collegiate brands."  It further has stated that "IMG College is a leading collegiate marketing, licensing and media company that can create and build comprehensive marketing platforms that leverage the marketing potential of the college sports and on-campus market."  IMG also has stated that "[c]onsumer devotion to college institutions is unrivaled, but the complexity of the space makes it challenging for marketers to tap the full potential.  With our expertise, broad relationships and portfolio of properties, IMG College can help brands create platforms to reach millions of passionate, loyal fans."

330.    IMG has also stated that "[o]ur licensing team, The Collegiate Licensing Company, is the unrivaled leader in collegiate brand licensing, managing the licensing rights for nearly 200 leading institutions that represent more than $3 billion in retail sales and more than 75% share of the college licensing market."

C.    **Description of Revenue Streams Relating to the Commercial Exploitation of Images of Former Student-Athletes.**

331.    There are a vast number of revenue streams generated in connection with collegiate sports.  Many of those revenue streams are generated at least in part from the continuing commercial exploitation of the images, likenesses and/or names of former student-athletes.  The following descriptions detail some of the current revenue streams of which Antitrust Plaintiffs are aware.

a.    **Media Rights for Televising Games.**

332.     The NCAA, as well as individual conferences and schools, negotiates various deals with television networks to televise regular season and post-season games.  In 1999, the NCAA and the CBS television network negotiated a deal that became effective in 2003, and that provided CBS with an 11-year right to televise the NCAA men's postseason basketball tournament in exchange for a staggering $6 billion.

333.     In 2008, the ESPN network and the NCAA's Southeastern Conference negotiated a deal by which ESPN will pay the Southeastern Conference $2.25 billion over 15 years to have the rights to televise all conference games that are not televised by the CBS network under another deal.  In 2008, the Big Ten Network, operated by media giant News Corp., reached a deal with the Big Ten Conference to televise conference games, and was estimated to potentially require a $2.8 billion payment to the Big Ten Conference over the course of 25 years.

334.     Many telecasts of games, in particular the NCAA tournament games, frequently show video clips of former student-athletes competing in prior tournament games as means of further enhancing viewers' experience of the current games.

335.     No valid and lawful releases with informed consent from Antitrust Class members have been obtained for the use of those clips, and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreement described herein.

### b.  **DVD and On-Demand Sales and Rentals.**

336.     The NCAA, in March of 2007, launched its "NCAA On Demand" website, which offers for sale telecasts of games from numerous decades in the DVD and "on-demand" delivery formats.  This is not to be confused with a separate on-demand service by which live games are shown.  In the "About Us" section of the website, the NCAA states the following:

> NCAA On Demand is a partnership between the NCAA and
> Thought Equity Motion, centered on providing fans of college

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT                              - 98 -
Case No. C 09-01967 CW

athletics access to memorable moments and games of past collegiate events.  NCAA On Demand will initially focus on NCAA championships, but will expand into the premier site for college athletics video with content from games and events from regular season and conference championships as well as unique content that has never been seen before.

Through a number of relationships NCAA On Demand will provide fans with video imagery in a variety of formats from DVDs to digital video.  Fans will be able to relive past games through video streaming or purchase the game for their own collection.  Additionally, NCAA On Demand will develop key elements that will allow fans to truly integrate with the collegiate athletics experience.

337.    TEM identifies itself as the "world's largest supplier of online motion content, licensing and professional representation services to the agency, entertainment and corporate production industries."  TEM has entered into a partnership with the NCAA to offer for sale DVDs and internet content utilizing images of Class Members.  Additionally, TEM offers for sale more than 12,000 video clips of portions of NCAA games for uses including corporate advertisements, corporate in-house presentations, films, and television programs, as well as additional highlight films, complete games and interviews that utilize the images of Class Members.  On its website, Thought EquityTEM states the following:

We're pleased to announce the launch of NCAA On Demand.  For the first time, college sports fans and athletes can access the entire NCAA Championship Collection, which contains nearly 5,000 championship games.  While many fans have experienced college sports through football bowl games or March Madness, NCAA On Demand now makes championships from all 23 NCAA sports available.

Select content is available through free Internet streaming, so you can check out classic college highlights of Michael Jordan, Magic Johnson, Larry Bird and many others.

338.    In an article dated March 7, 2007, the NCAA and TEM issued a press release that stated in part the following:

"The NCAA is excited that supporters of collegiate athletics will

have unprecedented access to the NCAA Championship Collection. We are pleased to open our archives to fans, former student-athletes, and member institutions that have added so much to American sports and society," said Greg Shaheen, NCAA's senior vice president for Basketball and Business Strategies.

"NCAA On Demand has always been a big part of our vision for making the NCAA video archive more accessible and valuable," said Kevin Schaff, CEO of Thought Equity Motion. "Since we took over the management of the archive in 2005, we have had thousands of requests for classic games from fans and former student-athletes from all over the country.  Through our partnership with the NCAA, we are proud to be able to make these moments accessible to the people who created them."

339.    The "accessibility" to "former student-athletes" comes at a price, and there is substantial irony in that such individuals must pay $24.99 to purchase footage of a game in which they played, and for which they never lawfully licensed, conveyed, or transferred their rights for compensation for use of those images, and for which are not provided any compensation in connection with any sales.  Meanwhile, the NCAA and TEM receive a continuing revenue stream.

340.    At least the following numbers of games are available in various Men's sports: Basketball – 2,468; Football – 464; and Baseball – 525.  Purchases of individual games typically cost $24.99.  Various box sets are also available, and the purchase price typically exceeds $100 for those sets.

341.    Defendant CLC, the NCAA's official licensing company, states on its website, as a part of its "Terms of Use" Agreement, the following:

The Collegiate Exchange ("TCE") - TCE is CLC's online business-to-business trading exchange. TCE is provided by CLC in conjunction with iCongo.com. Through this site, retailers can view catalogs from participating licensees and place orders for collegiate merchandise. Only collegiate retail stores and licensees can participate in this program. There are costs for licensees to participate in TCE. Please visit http://www.thecollegiateexchange.com to view terms and conditions specific to TCE.

1
2
3

The Collegiate Exchange's website in turn indicates that retailers can purchase hundreds of licensed products for sale, including "Highlight Tapes/DVDs."

4
5
6
7
8
9
10
11
12
13
14

342.    The NCAA also recently entered into yet another venture with a for-profit entity to sell DVDs.  On January 20, 2009, the NCAA announced the release of its DVD titled "NCAA March Madness:  The Greatest Moments of the NCAA Tournament," with a suggested retail price of $19.95.  The NCAA's business partners in this venture are a for-profit entity called Genius Products LLC, as well as Thought Equity.  In a press release, the three entities described the DVD as "the first DVD officially produced and branded by the NCAA to feature the greatest moments from more than 70 years of tournament action."  In the partners' press release, Thought Equity is described as "the world leader in providing access to high quality film, video and music content.  The company's forward-thinking approach to digital video has produced an array of products and services to meet the exploding demand of new media."

15
16
17
18
19
20

343.    NCAA DVDs also are available through myriad other outlets.  For example, hundreds of NCAA DVDs are available from CBS Sports' "Online DVD Store."  On Amazon.com, more than 1,600 NCAA sports DVDs are for sale.  NCAA DVDs also are for sale via myriad other outlets, such as, for example, walmart.com, the NBC network's sports website, FantasyPlayers.com's website, Barnes & Noble's website, and the Big Ten Network's website.

21
22

344.    Additionally, hundreds of NCAA games and highlight films are available for rental from Blockbuster Video and Netflix, including via their websites.

23
24
25
26
27

345.    No valid and lawful releases with informed consent from Antitrust Class members have been obtained for the use of their images, likenesses and/or names in DVDs and on-demand delivery formats, and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreement described herein.

28

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

346.   Only through the discovery process will Plaintiffs be able to ascertain the true scope of sales, in terms of outlets, license agreements, and sales volume of DVD products containing the images of class members.

### c. **The NCAA's New "Vault" Website Operated in Connection with TEM.**

347.   On March 3, 2010, *The New York Times* reported on the debut of a new NCAA commercial venture with Thought Equity called "The Vault" in an article titled "N.C.A.A. Tournament Goes Online, Clip by Clip" as follows:

> With its tournament approaching, the N.C.A.A. has found a way to exploit a portion of its men's basketball tournament archive by ceding a significant amount of clip selection to fans.  Through a deal with the N.C.A.A., Thought Equity Motion has digitally diced every tournament game this decade from the Round of 16 forward into all of its notable plays, and assigned a Web address to each of them. It lets fans watch any of the games, or thin slices of them, and link to social networking sites like Facebook or Twitter or to their blogs.
>
> **The NCAA Vault, at NCAA.com/vault, is making its formal debut Wednesday after finishing its beta phase.**
>
> "Fans want basketball content, and we wanted to find a way to get people to connect to it," said Kevin Schaff, chief executive of Thought Equity Motion, which digitizes and stores video archives.
>
> . . .
>
> Schaff added, "People want to consume the moment and discuss it." He said that the site's goal was to extend
> the tournament's mania beyond its natural period.
>
> . . .
>
> The site, which is advertiser-supported, breaks games into small bits and divides them into packaged sections like dunks, great shots and great blocks. But it also lets fans choose clips from each game's play-by-play log.
>
> One Tweeter called it "the answer to all hoops junkies problems," while another said he was "going to lose hours of time watching games."

. . .

Gregg Winik, the chief executive of CineSport, an online highlights provider for local media Web sites, and a former executive at NBA Entertainment, said that the mixture of video and social network had created a "big and bold step" in the evolution of sports video archives.

"The old idea in the industry was to protect the archive and drive fans to the broadcasts," he said. "Now, people are saying, 'Internet video is a real business.' "

348.    In a trade publication published by the Sports Video Group ("SVG"), an organization formed "to bring the entire sports industry closer together so that it can more effectively share information about best practices and new technologies that impact the industry," SVG, in connection with an interview with Thought Equity's Dan Weiner, Vice President of Marketing and Product, explained in unvarnished terms the explicit commercial nature of the enterprise.  Specifically, Sports Video Group reported the following on March 3, 2010:

TEM began its work with the NCAA across all of its sports, turning shelves of videotapes into a centralized, digitized historical archive. In addition to serving as a backup, the archive can be searched and accessed by schools and alumni for commercialization and revenue opportunities.

. . .

The vault contains every full-length basketball game from the Sweet Sixteen round through the championship of every NCAA Tournament from 2000 to '09. (Additional games are already in the works).

. . .

"Over time, it's not about this one site that we built," Weiner says. "It's about being able to go to SI, ESPN, USA Today, and anyone else who can get the specs for the API and create a licensing deal with the NCAA. The Web-development team at ESPN or SI can take their own NCAA page and build their own version of this Vault, hooking up our video into their player without having to deal with a video file or do editing."

Everyone from Web publishers to iPhone-app creators can work

1

2

3

through this API to build applications, providing new opportunities for monetization and ad revenue for the NCAA. For this year, however, the Vault is part of the NCAA site and the existing advertising-support model on that site.

4

5

6

"This is something that we see as a leading-edge development in sports-rights development," Weiner says. "This unlocks the archive and brings it to life. Rather than creating a bunch of DVDs, you bring the content forward, bring it to life, make it very easy to publish and access."

7

8

. . .

9

10

The next steps for this Vault will be to expand it beyond the Sweet Sixteen round, and beyond the last decade. Additional games will be added to the Vault as soon as this year's tournament is complete, with more on the horizon.

11

12

13

"We're talking with the NCAA about expanding this to other sports of theirs as well," Weiner says. That means that a NCAA baseball or soccer vault could soon be on the way.

349.    No valid and lawful releases with informed consent from Antitrust Class members

14

15

16

17

have been obtained for the use of their images, likenesses and/or names  in this new vault website, and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreement described herein.

18

19

**d.   Video-Clip Sales to Corporate Advertisers and Others.**

20

21

22

23

24

25

26

27

350.    Via another of TEM's websites, there are more than 12,000 NCAA related clips spanning several decades offered for sale as "stock footage."  The overwhelming majority of them are from NCAA Division I men's basketball games.  The clips run for varying time periods, generally ranging from 10 seconds to several minutes.  Many of them indicate that the full game for which from which the clips were culled, as well as related highlight films, also are available for sale via TEM.  For many items, prices are not shown, and prospective buyers are asked to contact the company for pricing.  One interview clip appeared to cost approximately $150.

28

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

351.    In a brochure describing its partnership with the NCAA, TEM makes clear the unmistakable pecuniary purpose of its venture with the NCAA.  For example, Thought Equity touts its role in "[d]elivering value through the preservation and monetization of the NCAA's footage assets." Thought Equity further states that "[i]n 2005, the NCAA was searching for a partner to preserve and manage the vast NCAA content library with two primary directives in mind:  1. Preservation of historic footage and current content [and] 2. Accessibility to the entire NCAA footage library to drive revenue generation."  TEM goes on to state that "[a]s the NCAA's exclusive licensing agent, Thought Equity drives revenue through the licensing of NCAA sports content for use in films, commercials, corporate productions, documentaries and emerging media applications."  TEM further states that it has assisted the NCAA in being "among the first-to-market with innovative ways to monetize their video assets across the entire spectrum of emerging media."  TEM claims that it "is committed to the continued growth of this amazing library, enhancing its value through the preservation and monetization of the NCAA's valuable footage assets, [and] providing the premiere online destination" for NCAA footage.

352.    TEM further states that "[y]ear over year, Thought Equity Motion has grown licensing revenue by nearly 100%."  Kevin Schaff, TEM's founder and CEO is quoted as stating that its NCAA collection "is one of the most unique and valuable content collections in the world."

353.    TEM also stresses its cost-saving function as follows:  "Thought Equity also staffs the functions of receiving and fulfilling all footage requests, including research and technical support – costs that previously added to the NCAA national office overhead."  TEM further states that it provides services including restoration, digitizing content, and making content available on-line "at no charge to the NCAA."

354.     TEM further notes that "[t]o date, Thought Equity has digitized and brought online nearly 7,000 hours of NCAA sports action and manages more than 20,000 hours of content in the NCAA library."  TEM further notes that "[n]ew NCAA content is continually added to ensure the online library is a timely resource for NCAA content."

355.     TEM additionally states that "NCAA footage is sought-after content for advertisers, corporations and entertainment producers as it delivers all the action, drama and emotion unique to athletic competition."  TEM further states that "[b]ringing the NCAA content online has been a key component to unlocking the value of the library."  TEM also states that its online platform has "help[ed] drive revenue growth by making purchasing content easy and fast."

356.     TEM further states that "NCAA Corporate Champions and Partner companies as diverse as Coca-Cola, AT&T, State Farm Insurance, and Lowe's have tapped the NCAA library to create messaging to inform and inspire their audiences."  TEM further states that it has "licensed NCAA content for use in hundreds of television programs, films, commercials and corporate productions."  Moreover, Thought Equity states that "[l]ooking to the future, exploding growth in emerging media such as online and mobile advertising and entertainment translates to significant new revenue streams for footage licensing and programming opportunities."

357.     TEM further states that its library can be utilized to allow NCAA member institutions to create other revenue centers, e.g., "to create original programs and promotions such as coaches' shows, Hall of Fame and museum exhibits, web sites and entertainment featured on in-venue video boards."

358.     TEM further states that it "brings value to the NCAA by continually creating innovative ways to leverage their video assets," and touting its "ability to drive revenue employing its deep licensing expertise."

359.    TEM further states that "[a]ny use of NCAA content featuring individuals or brands must be cleared for use," and that it "brings deep expertise to navigating the complexities of clearing NCAA student athletes, individual's licenses and institutional trademarks, protecting both amateur status and rights."

360.    No valid rights from Antitrust Damages Class members have been obtained by the NCAA, its members or its licensees for the use of those class members' images, likenesses and/or names  in video clips for sales to corporate advertisers and others, and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreements described herein.

### e.   **Premium Content on Websites.**

361. Numerous NCAA schools and conferences make available, or plan to make available, streaming on-demand video content available to users for one-time and/or subscription fees.  This video content utilizes the images of Antitrust Damages Class members.

362. On July 27, 2009, *Sports Business Daily* reported that the Southeastern Conference and XOS Technologies were teaming to form the SEC Digital Network that will "aggregate all sports content and distribute it in a centralized model."

363. Similarly, CSTV's website indicates that CSTV.com "includes a network of approximately 215 official college athletic websites."  CSTV further states that it "was founded in 1999 by Brian Bedol and Stephen D. Greenberg, co–founders of Classic Sports Network, and Chris Bevilacqua, a former Nike executive. CSTV officially launched in April 2003 from the network's New York City based Chelsea Piers Studio, the Field House. In January 2006, CSTV was purchased by CBS Corporation and became the 24–hour college sports network from CBS Sports."

364.    No valid rights from Antitrust Damages Class members have been obtained by the NCAA, its members or its licensees for the use of those class members' images, likenesses and/or names  in premium website content, and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreements described herein.

### f. **Photos.**

365.    Replay Photos, LLC ("Replay Photos") operates "The Official NCAA Photo Store" in conjunction with the NCAA through which photographs of Class members are available for purchase, as well as a separate website, through which additional photographs of Class members are available for purchase.  Thousands of photographs from postseason tournaments in numerous sports are offered for sale.

366.    In February of 2009, the NCAA and The Associated Press announced a three-year partnership and in a press release stated the following:

> The NCAA and The Associated Press this week announced a three-year content partnership making AP the worldwide distributor of NCAA Championship photography and creating the largest collection anywhere of collegiate sports photos.  Under the agreement, AP Images will serve as the NCAA's exclusive photo licensing agent, including retail sales of archival photos, for all NCAA Championships and events.
>
> . . .
>
> "In partnership with Rich Clarkson and Associates, the NCAA has compiled an archive of photos representing the greatest moments in NCAA Championship history," said Greg Weitekamp, NCAA director of broadcasting.  "Combine the history of the NCAA photo archives with the depth of photos compiled by AP Images over the last 100 years, and the NCAA and the AP Images partnership will create the single greatest collection of collegiate sports photos."
>
> . . .
>
> The new agreement between the NCAA and AP Images will allow the NCAA to include NCAA photos in the AP Images archives, where they

will then be made available for editorial and commercial use.  In addition, the partnership will provide the NCAA with access to AP Images' archive of NCAA photography.

The partnership with the NCAA, headquartered in Indianapolis, will also include a consumer outlet at NCAA.com, where consumers will be able to purchase photos.  NCAA Championship photos will be available on the APImages.com site.

367.    Replay Photo also has entered into contractual arrangements with at least 62 universities by which it offers for sale thousands of photographs of current and former student-athletes.  Framed versions of the photographs can cost up to several hundred dollars.  The list of available sports include at least the following:  men's and women's basketball; football; baseball; crew; men's and women's cross country; golf; gymnastics; men's and women's soccer; softball; men's and women's swimming and diving; men's and women's tennis; men's and women's track and field; men's and women's volleyball; water polo; and wrestling.

368.    No valid rights from Antitrust Damages Class members have been obtained by the NCAA, its members or its licensees for the use of those class members' images, likenesses and/or names  in the aforementioned photos, and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreements described herein.

## g.  Action  Figures, Trading Cards, and Posters.

369.    On April 27, 2009, *Sports Business Daily* reported that certain former college football players will be paid a royalty for the sale of action figures depicting them in their college uniforms, and that their former schools also will be paid a royalty.  Specifically, *Sports Business Daily* stated the following:

Phoenix-based McFarlane Toys has been producing action figures of professional athletes for more than a decade, but never before has the company tapped the college market.  That will change later this year with the release of six action figures that portray NFL stars in their college gear, including Tom Brady in his Michigan uniform

1   and Peyton Manning in his Tennessee garb.

2   "There's not much out there on the college market that's player-
3   centric," said founder Todd McFarlane, whose businesses include
    everything from comics to toys and film animation.  "If a guy had a
4   decent career, let's see if the fans are still fond of him."
    Tennessee's Peyton Manning is one of three SEC alumni in the six-
5   figure set.

6   . . .

7   Now he's going to put some of those professional stars in their
8   college football gear to tap into the passion of the college fan.  In
    addition to Brady and Manning, the company will produce action
9   figures representing Adrian Peterson (Oklahoma), JaMarcus Russell
    (LSU), Ray Lewis (Miami) and Hines Ward (Georgia).
10

11  . . .

12  To obtain the license, McFarlane went through IMG's Collegiate
    Licensing Co., the licensing agent for those schools.  He'll also pay
13  the players a royalty. Current college players are not allowed to be
    featured in commercial endeavors such as this, according to NCAA
14  guidelines, which is why McFarlane went with the professionals.

15  "There's two pieces to the deal," McFarlane said.  "You pay for the
16  uniform, which goes to the school, and you pay the player.  That
    beefs up the money going out, so you have to make sure you have a
17  model that works."

18

19

20  These 6-inch-tall action figures will sell for about $10 each and hit
    stores such as Wal-Mart, Target and Toys "R" Us, as well as the
21  local specialty stores that sell collectibles, by August, just in time
    for the start of a new football season.
22

23  . . .

24  Fathead also is thought to be considering a line of posters that
    would feature NFL stars in their college uniforms.
25

26  . . .

27

28

370.     The above information is significant.  The NCAA's licensing arm, Defendant

CLC, has participated in a deal which expressly recognizes that former college players should be

paid a royalty when their image is utilized for profit.

371.     No valid rights from Antitrust Damages Class members have been obtained by the

NCAA, its members or its licensees for the use of those class members' images, likenesses and/or

names  in the aforementioned items, and any purported transfer of former student-athletes' rights

relating to this usage is the product of the anticompetitive agreements described herein.

### h.   Video Games.

372.     The images and likenesses of college student-athletes and former student-athletes

also appear in video games devoted to NCAA college basketball and football.  The NCAA has

executed a license for video games with Defendant EA , a global interactive software company.

EA identifies itself as "the world's leading interactive entertainment software company" and states

that it "develops, publishes, and distributes interactive software worldwide for video game

systems, personal computers, cellular handsets and the Internet."

373.     EA markets a wide variety of sports-based video games under the label EA

Sports.  EA Sports describes their video games as including "simulated sports titles with realistic

graphics based on real-life sports leagues, players, events and venues."  Their advertising taglines

-  "If it's in the game, it's in the game," subsequently shortened to "It's in the game" - expressly

and openly makes a major selling point out of the fact that all aspects of the real-life games

appear in their video games.  EA Sports releases new iterations of most of their games annually,

three of which are titled "NCAA Football,"  "NCAA Basketball" and "NCAA Basketball: March

Madness Edition."

374.    EA's NCAA football games consistently have enjoyed sales of more than one million units per year, and currently sales are estimated at more than two million units per year. On EA's website, NCAA Football 10 for the Playstation 3 game platform is offered for sale at $59.95 per unit.  In 2008, with respect to its basketball games, EA stated that "[t]he market leader in basketball videogame sales, EA SPORTS basketball franchises (NBA LIVE, NBA STREET and NCAA March Madness) have combined generated more than $1 billion in retail sales over the past 10 years."  On EA's website, NCAA Basketball 09 is currently listed with a manufacturers' suggested retail price of $59.95 per unit.

375.     EA has acknowledged that its NCAA games are among its major revenue drivers. For example, in an SEC Form 10-K, EA stated that "[f]or fiscal year 2008, net revenue in North America was $1,942 million, driven by Rock Band, Madden NFL 08, and NCAA Football 08."

376. *Legal Affairs* magazine reported the following in 2006 regarding EA's NCAA Football 06, which is instructive for its description of the game's use of player images, as well as the interaction among the NCAA and Defendants CLC and EA:

> THE BEST PLAYER IN COLLEGE FOOTBALL THIS SEASON is arguably the quarterback at the University of Southern California. He is a senior, listed at 6-foot-5 inches and 225 pounds.  He wears number 11.  His name is Matt Leinart.  The best player in the wildly popular video game called "NCAA Football 06" also happens to be a quarterback at USC.  He, too, is a senior, listed at 6-foot-5 inches and 225 pounds.  And, not coincidentally, he wears number 11. His name, however, is QB #11.
>
> You don't have to know a PlayStation from a train station to get what's going on.  QB #11 is the digitized analogue of Leinart; he resembles the living version right down to the mop of dark hair on his head.  So why doesn't the game from Electronic Arts use Leinart's name? National Collegiate Athletic Association regulations prohibit companies from profiting off a student-athlete's likeness, so EA does this two-step - with the NCAA's blessing.  In exchange for a cut of revenues from the video game, the association has granted the software company the right to reproduce the stadiums, uniforms, and mascots of schools that are members of the NCAA, and the game-makers do so with almost photographic

accuracy.  Under the current regulations, the only thing off-limits is the use of players' names and recognizable facial features.  The NCAA doesn't want member-schools marketing their student-athletes for commercial purposes, and, in order to prohibit them from doing that, it has to restrain itself as well.

Even though QB #11 is not identified by name, however, EA and the NCAA might struggle to keep straight faces when they claim that he is not supposed to represent Leinart for the purpose of making a profit.  EA is the North Star of a burgeoning sports video game industry, which made revenues of $1.9 billion in 2004, and the company's hallmark is precise, nay obsessive, attention to detail.  EA's slogan boasts, "If it's in the game, it's in the game."  That means nailing the little stuff, capturing nuances like a player's wristband placement and facemask style.  In its annual iterations of "NCAA Football," the software company makes the game as lifelike as possible, within the constraints marked by the NCAA.  A quick survey of the rest of the players for USC's 2005-2006 Trojans reveals that everyone has a digitized doppelganger that's dead on.  Tight end Dominique Byrd -- pardon, TE#86 -- sports braids like his real-life model's.  The height and weight of backup defensive end Rashaad Goodrum, aka DE #44, are as true as Leinart's, though Goodrum played just a few downs during the 2004-2005 season.

"NCAA Football 06" has pinpoint-accurate rosters for all 117 Division 1-A football programs (which engage in the highest level of collegiate competition), not to mention graphics so advanced that you can see the stadium reflected in a quarterback's helmet, the face paint on a cheerleader's cheeks, the Nike swoosh on a tailback's cleats, and the haze around the lights during a night game at the University of Florida's stadium, the Swamp.  For all these reasons, the omission of players' names seems little more than a formality, done with a wink and a nudge in order to keep the NCAA satisfied.

Especially since an owner of the video game can change QB #11 to Matt Leinart by fiddling with a few buttons.  Once the owner inputs a player's name, it appears on the back of the player's jersey and can be shouted by the virtual announcers who do the play-by-play for the games within the game.  Game owners can also adjust a virtual player's facial hair, adding, say, a goatee to match the real player's face, since players are known to change their looks from time to time.  Although not approved by the NCAA, memory cards for automatically uploading each school's roster are available from independent manufacturers.  Oddly, the main difference between the players and their video facsimiles are their hometowns, which in the game are intentionally off by a few suburbs (QB #11's "hometown" of La Habra, Calif., is 15 miles from Leinart's native Santa Ana).  But the point is, in EA's hyper-detailed world, video

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT                           - 113 -
Case No. C 09-01967 CW

game characters now have hometowns.  The NCAA's amateurism regulations, originally designed to guard against things like posters and trading cards featuring individual athletes, likely never contemplated a day when an amateur's digital likeness could fetch a profit.

. . .

A key player in managing that distinction is the Collegiate Licensing Company or CLC, which handles product licensing for collegiate sports organizations like bowl games committees, athletic conferences, and the NCAA. CLC performs two tasks for the association: protecting the amateur standing of its members' athletes and obtaining for members the most lucrative licensing deals.  Last summer, an NCAA subcommittee on amateurism invited Pat Battle, the president of CLC, and athletic directors and athletes from Division I-A schools to a meeting—the one at which Brand spoke—about licensing and promotion issues.

At that meeting, Battle suggested something Brand probably didn't want to hear: that revenues for the NCAA would increase if the association's limits on video games were eased. He indicated that game manufacturers were growing frustrated with the restrictions, and that the NCAA needed to address that frustration or risk diminishing a valuable source of revenue. "It's a concern, and I stand by that," Battle said recently. "A failure to keep up with technology and take full advantage from a consumer standpoint may make the NCAA [video game] titles less valuable."

. . .

"I think EA will continue to push for more leeway," said CLC's Battle. EA seems to think it will, too. "This has been an ongoing discussion: 'O.K., how far can we go?' " EA spokeswoman Jennifer Gonzalez told *The Indianapolis Star* earlier this year.

Since it started making "NCAA Football," EA has gained substantial concessions from the NCAA. The early versions of the game weren't nearly as accurate as the latest ones in terms of the height, weight, or skin color of the athletes. But the NCAA may balk at going further: It's unlikely that EA will ever be allowed to include player names.

THIS IS NOT THE FIRST TIME that the NCAA's rules about amateurism have struggled to address new licensing opportunities. About 15 years ago, college-apparel sales exploded into a substantial source of revenue for major athletic programs, and one of the touchiest issues involved replica jerseys.  They featured a star

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 114 -

player's number and school colors, but not his name, even though
every fan knew whose jersey he was buying.  Replica jerseys are
still big business: Every Saturday, Matt Leinart looks up to see
USC's stands swelling with a sea of maroon No. 11 jerseys, which
sell for about $50 each online and at the campus bookstore.

The jerseys were green-lighted under the NCAA's rules for the
same reason that "NCAA Football" was approved: The association
considers a jersey number a step removed from a player's identity.
"I see nothing wrong with selling jerseys with just numbers on
them," Brand said at last summer's meeting. "But I would draw the
line at selling the names."

The argument can be made that the video game industry deserves
more leeway than apparel makers, because games ostensibly
promote entire teams—even if those teams feature a few superstars.
"The jerseys are centered around one or two players, whereas the
video game features every player on the team," CLC's Battle
explained.  "If the video games wanted to use the name and likeness
of one or two players, that would be impossible. But if we're
looking at a situation where the entire team is being promoted, it
may change the discussion."  EA would argue that the video games
are similar to television broadcasts, which are obviously filled with
plenty of highlights and interviews with individual players, yet are
licensed by the NCAA for big bucks and regarded as innocuous
staples of Americana.

377. *Legal Affairs* further reported the following in its January / February 2006 issue:

Last summer, an NCAA subcommittee on amateurism invited Pat
Battle, the president of CLC, and athletic directors and athletes
from Division I-A schools to a meeting—the one at which Brand
spoke—about licensing and promotion issues.

At that meeting, Battle suggested something Brand probably didn't
want to hear:  that revenues for the NCAA would increase if the
association's limits on video games were eased. He indicated that
game manufacturers were growing frustrated with the restrictions,
and that the NCAA needed to address that frustration or risk
diminishing a valuable source of revenue. "It's a concern, and I
stand by that," Battle said recently. "A failure to keep up with
technology and take full advantage from a consumer standpoint
may make the NCAA [video game] titles less valuable."

. . .

"I think EA will continue to push for more leeway," said CLC's
Battle.  EA seems to think it will, too. "This has been an ongoing

discussion: 'O.K., how far can we go?' " EA spokeswoman Jennifer
Gonzalez told The Indianapolis Star earlier this year.

Since it started making "NCAA Football," EA has gained
substantial concessions from the NCAA.  The early versions of the
game weren't nearly as accurate as the latest ones in terms of the
height, weight, or skin color of the athletes.

378. The above information regarding the ongoing discussions between Defendants

NCAA, CLC, and EA is significant.  Each agreed to allow more and more realistic depictions of

player likeness including former players, to act as if they had the rights to do so, and to not tender

any compensation to former players for doing so.

379. The *NCAA News*, on June 21, 2004, provided more detail on the discussions

involving the NCAA, CLC, and EA, and also served as a conduit to further communicate the

message to the NCAA's members the importance of video game licensing revenues.  Specifically,

*The NCAA News* reported that the NCAA's Agents and Amateurism Subcommittee of its

Academics / Eligibility / Compliance Cabinet met on June 9th and 10th, and stated that Pat Battle

of the Defendant CLC made a presentation to the group, which as well as the following panelists:

Ohio State University Athletics Director Andy Geiger, University of Connecticut Athletics

Director Jeff Hathaway, Miami (Ohio) University Athletics Director Brad Bates and University of

Notre Dame Associate Athletics Director Bill Scholl.  The *NCAA News* specifically stated the

following:

The CLC's Battle, however, indicated interest in seeing the NCAA
allow more latitude in the marketing areas, specifically in video
games. His concerns centered on the risk of losing business rather
than gaining it, though he did project that licensing revenues would
increase dramatically under more flexible rules. Battle said video
game manufacturers appear to be more and more frustrated with
NCAA restrictions, especially since the technology exists to
produce a much more realistic version -- and thus a much more
attractive and marketable version – of college football and
basketball games.

CLC's and EA's message to the NCAA and its members was heeded and agreed to.

380. EA has expressly incorporated the likenesses of Antitrust Damages Class members into its games. As one example, NCAA Basketball 09 has a "Classic Teams" feature in which game players can choose to play with "classic teams." These "classic teams" expressly use the likenesses of Class members, in a fashion identical to that described above. A post on EA's game forum website dated March 12, 2009 identifies the roster of each of these classic teams, and provides the players' name; position; uniform number; type of t-shirt worn underneath a jersey; sock length; and use of ankle braces, knee braces, wrist taping. The post further specifically identifies the following "classic teams" as being incorporated into the game:  2008 Kansas Jayhawks; 2007 Florida Gators; 2006 George Mason Patriots; 2005 North Carolina Tarheels; 2005 Illinois Fighting Illini; 2004 Connecticut Huskies; 2003 Syracuse Orangemen; 2002 Maryland Terrapins; 2001 Duke Blue Devils; 1999 Connecticut Huskies; 1997 Arizona Wildcats; 1996 University of Massachusetts Minutemen; 1996 Kentucky Wildcats; 1995 Wake Forest Demon Deacons; 1995 UCLA Bruins; 1994 Arkansas Razorbacks; 1993 North Carolina Tarheels; 1993 Michigan Wolverines; 1992 Duke Blue Devils; 1991 UNLV Runnin' Rebels; 1991 Georgetown Hoyas; 1991 Arkansas Razorbacks; 1990 LSU Tigers; 1990 Loyola Marymount Lions; 1990 Georgia Tech Yellow Jackets; 1989 Syracuse Orangemen; 1989 Michigan Wolverines; 1988 Kansas Jayhawks; 1987 Indiana Hoosiers; 1986 Navy Midshipmen; 1986 Louisville Cardinals; 1986 Duke Blue Devils; 1985 Villanova Wildcats; 1985 St. John's Redmen; 1984 Georgetown Hoyas; 1983 North Carolina State Wolfpack; 1983 Houston Cougars; 1982 North Carolina Tarheels; 1981 Virginia Cavaliers; 1981 Indiana Hoosiers; 1980 Louisville Cardinals; 1979 Michigan State Spartans; and 1979 Indiana State Sycamores.

381. All of EA's  NCAA-related video games use photographic-like realism in the depiction of all aspects of the visual presentation, including the player uniforms, school logos, stadiums and mascots.  While not identifying them by name, EA also uses likenesses of numerous

specific former student-athletes in their games.  The players on the virtual college teams in the games correspond exactly to their real-life counterparts in many characteristics, such as position, jersey number, race, size, height, weight and home state.  Even uniquely identifiable idiosyncratic characteristics of real-life players appear in their video game virtual counterparts.

382. Each year, the NCAA games sold by EA feature the likenesses of players, including ones that no longer are NCAA athletes.  For example, NCAA Football 09 and NCAA Basketball 09 are currently for sale, and feature substantial numbers of former NCAA players.  Additionally, versions based on prior years are also for sale.  For example, "March Madness 06," "March Madness 07," and "March Madness 08" are all listed for sale via Electronic Arts' website, which also notes that the games are available via retailers.  These games also feature the likenesses of substantial numbers of former players.

383. On April 23, 2009, EA announced that former college players Michael Crabtree, Brian Johnson, Brian Orakpo and Mark Sanchez "will be featured on platform exclusive covers of EA SPORTS NCAA® Football 10, available in stores July 14th" and that "[e]ach cover athlete led his team on a memorable run toward the BCS National Championship, helping to shape the competitive landscape of college football in 2008."  Electronic Arts further stated that "[d]eveloped in Orlando, Florida by EA Tiburon, and licensed by The Collegiate Licensing Company, NCAA Football 10 will be available on the Xbox 360® video game and entertainment system, the PlayStation®2 and PLAYSTATION®3 computer entertainment systems, and the PSP® (PlayStation®Portable)."  On EA's website, the players' mentioned above appear in mock-ups of packaging covers for the game, as well as sample screen shots from the game, in their college team uniforms.  The cover of NCAA Basketball 09 features the likeness of former UCLA basketball player Kevin Love in his collegiate uniform.  It appears that licensing deals have been struck with the players depicted on the covers.

384. An EA press release dated September 11, 2008, in which EA announced the release of NCAA Basketball 09, also stated that "*NCAA Basketball 09* will feature Division I coaches in-game for the first time. Each coach will provide real time instruction and feedback, helping gamers control the tempo by executing their team's offense and defense to perfection." It appears that licensing deals have been struck with these coaches for use of their likenesses.

385. EA and the NCAA also purposefully and knowingly allow third parties to create and market modifications to the NCAA games which allow players to upload complete roster information for various teams, including player names. The NCAA and CLC have allowed this because it benefits them financially by increasing the popularity of EA's NCAA games, thereby increasing the royalty payments to the NCAA.

386. The NCAA, as well as individual schools and conferences, benefits financially from the NCAA's license agreement with EA. For example, the *Des Moines Register* recently reported that one school alone, Iowa State University, has received royalties from football and basketball video games averaging $17,600 a year in the last two years. It was further reported that for the University of Iowa, "such [video game royalty] allocations come from the Big Ten Conference as part of a package that includes television and other licensing revenue."

387. The NCAA also had a license with 2K Sports, a subsidiary of Take-Two Interactive Software, Inc., for video games rights for college basketball. 2K Sports has produced several iterations of their college basketball video game between 2005 and 2008 (College Hoops 2K6, College Hoops 2K7, and College Hoops 2K8.) which they still market and sell. 2K Sports discontinued the series and the NCAA subsequently granted EA the exclusive license for college basketball.

388. In an interview dated September 21, 2005, Mike Mahar, the producer of EA's NCAA March Madness 06 game, stated the following about the 39 All-Time Teams in that year's game:

1
2
3
4

There are 14 new All-time teams to the game this year. Highlights include All-Georgia (Dominique Wilkins), All-Gonzaga (we have such depth now we can start compiling all time teams for the best 'mid-majors'), All-NC State (David Thompson), and All-Time teams for the ACC, Big East, Big Ten, Big 12, SEC, PAC 10, and CUSA.....basically the best players ever from each of the 'major conferences.

5
6
7
8
9
10

We select a wide range of players from each school/conference using websites and the respective Hall of Fame. From there we send the list out to as many basketball experts as possible.....for example I asked Kenny Smith who he thought should be on the All-Time Carolina team when he was recording here last year. Occasionally, player's names are passed by Dick Vitale, we use existing lists such as the ACC Top 50 players of all time...etc. After we have the short list we look at the ratings, historical stats, and achievements as well as players who will be popular with our consumers and we come up with the bench and the starting 5.

11

389. In a November 12, 2008 interview, Novell Thomas, EA's Associate Producer for

12

NCAA Basketball 09 stated the following:

13
14

However, rather than talking about the 2008-2009 teams, I'm going to take you back to the past and talk about classic teams.
. . .

15
16
17
18
19
20
21

The Tournament of Legends is a customizable, 64 team, single elimination tournament. Top teams from the 50's, 60's, 70's, 80's, 90's and 2000's are selectable. Coming up with and nailing down the legendary teams was not an easy process. A lot of time was spent researching the best teams and players from the various eras. Some of the factors we looked at were: championships won, win/loss records, team personnel and memorable team and player performances. To ensure that we had the correct teams selected, we leveraged our partners and contacts at ESPN and Blue Ribbon. We also got Basketball Hall of Fame contributor, Dick Vitale's thoughts and recommendations - after all, he's been around college basketball for years and has seen all of these teams and players first hand.

22
23

Here's a breakdown of the various players and teams throughout the various eras. I apologize in advance for not being able to include names:

24
25
26
27

50's....One of the best players of all time played during this era. The University of San Francisco's center, #6, is arguably one of the best players to play that position. He won two championships and many many more at the professional level. Any player who averages 20 points and 20 rebounds per game during his college career, is definitely worth   playing with. However, you can't forget about 1957 Kansas' center #13 (who averaged 30pts and 18rpg in college) or 1954 LaSalle's ball handling big man.

28

60's....The center #11, from Ohio State was one of the greats from this era. He was an unbelievable rebounder, scorer and passer (24ppg/17rpg). But we all know that this era belongs to UCLA's center, #33. It's tough to argue that he's not the #1 player of all time. He won 3 National Championships and awarded 3-Tournament MOP honors. The only thing that stopped him from getting four of each was perhaps the rule which deemed freshmen ineligible.

70's....there were some great players from this era but I've got to start off with the guy nicknamed "Pistol" who averaged 44 points per game. He wore #23 and played point guard for LSU and averaged 44 points per game. Did I say that he averaged 44 ppg. That's unbelievable. The 70's started off with a bang and ended off with an even bigger bang. Two of college basketball's greatest players, in Indiana States forward #33 and Michigan State's Magician #33. They went head to head for the national championship in 1979 and this game is said to have changed basketball forever and very few disagree.

80's....The talent level and number of elite players continued to pour in during this era. Indiana's point guard #11 dazzled the competition with his smooth controlling style; Houston's center #34 and small forward #22, members of Phi Slama Jama were great to watch with their up-tempo style; North Carolina's shooting guard #23 (aka. "the great one") needs no introduction and #52 their power forward was also known for having a few 'Big Games' of his own; there was also the center from Navy, "the Admiral" who brought some excitement to that program; and you can't forget about the center from Georgetown #33. These were college basketballs' best during this time and now members of the NBA's greatest 50 players of all time. With all of these great players there were definitely some great games and upsets. NC State over Houston and Villanova over Georgetown were two upsets during this era which people still talk about to this day.

90's....The talent continued to pour into college basketball during this era. The style of play changed drastically and the up-tempo style really took over (make sure you check out the Producer Diaries for Game Tempo). You had teams pushing the ball in transition, pressing and trapping in the full court and really increasing the entertainment value in college basketball. My favorite team during the early 90's was definitely UNLV. They had guys who could GO and the athleticism amongst their forwards/centers was second to none. The ameba defense they use to play still gives me chills and those lob passes and screams were the icing on the cake. You can't forget about Duke. The Blue Devils had some great players who made big plays at big times. However, 1996 Kentucky raised the bar to an entirely new level. The talent level was off the charts and 4-5 players could play multiple positions on the court. They had big guys (6'8 and taller) constantly shooting threes, guards throwing down sick dunks...that roster had so many future NBA stars (I believe 7 of them ended up playing in the association), which further emphasizes how talented they were. But the most talented player probably came from the

ACC's Wake Forest, "the Big Fundamental" - a true big man who had a great feel for the game. He knew when to kick it out and when to go to work in the post.

2000's....2005 Illinois and 2005 North Carolina had some future NBA talent as well but nothing during this era was bigger than the Florida Gators back to back championships. 4 out of their 5 starters are now in the NBA but for them to win back to back championships during this day and age, when parity is at an all time high, is really impressive. There weren't too many people who believed it could be done but they proved us all wrong.

There were a ton of teams and players who I did not mention but as you can tell, we've now granted users the ability to determine who the best legendary teams of all time are. I encourage all of you to load up the Tournament of Legends mode and take your favorite team to the winners circle. Or better yet, try to win the championship with a team from each era and see the difference in the various teams styles of play.

I really enjoy these legendary teams and everything that comes along with them: the classic team logos, the classic jerseys, old school sneakers (ie. Chuck Taylors) and overall look, will definitely get you in that "old school" realm.

Here's a list of all the teams in the ESPN Classic Tournament of Legends:

| Arizona | 1997 |
| Arkansas | 1991, 1994 |
| Cal | 1959 |
| Cincinnati | 1962 |
| Connecticut | 2004, 1999 |
| Duke | 2001, 1986, 1992 |
| Florida Gators | 2007 |
| George Mason | 2006 |
| Georgetown | 1991, 1984 |
| Georgia Tech | 1990 |
| Houston | 1983 |
| Houston | 1968 |
| Illinois | 2005 |

| | | |
|---|---|---|
| 1 | Indiana | 1981, 1976, 1987 |
| 2 | Indiana State | 1979 |
| 3 | Kansas | 1952, 1957, 1988, 2008 |
| 4 | Kentucky | 1996, 1978, 1954 |
| 5 | LaSalle | 1954 |
| 6 | Louisville | 1980, 1986 |
| 7 | Loyola Maramount | 1990 |
| 8 | LSU | 1970, 1990 |
| 9 | Marquette | 1977 |
| 10 | Maryland | 2002 |
| 11 | Michigan | 1993, 1989 |
| 12 | Michigan State | 1979 |
| 13 | Navy | 1986 |
| 14 | North Carolina | 1957, 1982, 1993, 2005 |
| 15 | North Carolina State | 1974, 1983 |
| 16 | Ohio State | 1960 |
| 17 | San Francisco | 1956 |
| 18 | St. John's | 1985 |
| 19 | Syracuse | 1989, 2003 |
| 20 | Texas Western | 1966 |
| 21 | UCLA | 1968, 1967, 1972, 1975, 1995 |
| 22 | Umass | 1996 |
| 23 | UNLV | 1991 |
| 24 | Villanova | 1985 |
| 25 | Virginia | 1981 |
| 26 | Wake Forest | 1995 |
| 27 | West Virginia | 1959 |
| 28 | | |

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

390. Numerous athletes featured on the covers of EA's various games have made telling admissions about the use of their likenesses in the games. For example, in a November 21, 2005 interview with Raymond Felton, former point guard for the University of North Carolina men's basketball team, Mr. Felton stated:

> I usually play the sports games like March Madness, NBA Live, Madden, and MVP Baseball. We used to play in the dorms all the time last year, but I never played as North Carolina. I'm not the type of person who really likes to play as himself. I always check out what I look like, but I don't want to spend time working on my jumper in the game when I can work on it in real life.

391. In an interview dated June 23, 2006, Adam Morrison, former Gonzaga University men's basketball player and a player featured on the cover of EA's March Madness 07, stated: ""Everyone always thinks they should be faster. You look at what your overall rating is, and on the EA college basketball game last year, if you had that three-point icon under your feet, you were happy."

392. In an interview dated June 16, 2009, former Oklahoma University men's basketball player Blake Griffin, who appears on the cover of EA's NCAA Basketball 10, stated: "It's crazy how much it looks like the guys on our team."

393. EA's representative regularly attend practices for NCAA teams with the permission of NCAA member schools to study in detail the physical attributes and playing characteristics of players.

394. There is rampant commercialization within the context of EA's games. A multitude of non-player individuals and corporations are featured in the game, all presumably pursuant to lucrative contractual arrangements with EA. Each year, more and more third parties participate in revenue derived from and relating to EA's games, and each year, class members are entirely excluded from such participation. With respect to various items of athletic-related gear and

apparel, as described below, class members are being used as walking-billboards for corporate interests without compensation.

395.    For example, in EA's NCAA Basketball 09, video game players can make various shoe selections to have players choose among at least the Nike, Adidas and Reebok brands, all of which are identified by name as well as by their logos on the shoes.  Those logos additionally appear on team uniforms.

396.    The box cover for NCAA Basketball 09 prominently notes that the game is "Featuring ESPN."  Dick Vitale, a prominent announcer on the ESPN television network, serves as a game announcer in EA's game, and his image appears on posters in crowds.

397. Moreover, there are numerous references to arenas with corporate sponsorships.  As just a few examples, Ohio State's Value City Arena, the University of Colorado's Coors Event Center, and DePaul University's Allstate Arena are all featured.

398. In 2008, EA announced a deal with the National Association of Basketball Coaches, a group representing NCAA Division I and other basketball coaches.  Pursuant to the deal, coaches' names and likenesses began appearing in EA's NCAA Basketball 10, released in December of 2009.  In NCAA Basketball 09, Kansas Coach Bill Self is featured to provide an introduction to the game.

399. With respect to EA's NCAA Football 09, the commercialization is even more prevalent.  There are a myriad of branding options per player, including an option to select Riddell Revolution, Adams or Schutt helmets and facemasks.  For visors, there are options for video game players to select options for at least the Nike, Under Armour, and Oakley brands.  For shoes, there are options to select at least the Nike and Adidas brands.  Those corporate logos also appear on player jerseys.  There is an additional option to select Nike gloves.

400. During the process of loading the game, there is a prominent full-screen devoted to the Coca-Cola Company's "Coke-Zero Season Showdown" promotion.  A pre-game weather report is sponsored by The Weather Channel / Weather.com, and game players can also select a "live-feed" from the Weather Channel.

401. There also is substantial ESPN branding.  ESPN college football announcers Kirk Herbstreet and Lee Corso are utilized, and ESPN personality Erin Andrews provides side-line reports.  There also is a Lee Corso "Ask Corso" default setting for assistance in choosing which play to run that appears along with an image of him.

402.    No valid rights from Antitrust Class members have been obtained by the NCAA, its members, or its licenses for the use of their images, likenesses, and/or names in video games, and any purported transfer or usage of student-athletes' rights relating to this usage is the product of the anticompetitive agreements described herein.

**i.   Rebroadcasts of Classic Games.**

403.    In 1997, the ESPN cable television network acquired the Classic Sports Network for an amount reported to be between $175 and $200 million, and renamed it "ESPN Classic." ESPN Classic replays games from a variety of sports and seasons that are considered to be "classics" in some way.  ESPN describes ESPN Classic as follows:

> ESPN Classic is a 24-hour, all-sports network devoted to telecasting the greatest games, stories, heroes and memories in the history of sports. ESPN Classic presents programming from the NFL, NBA, MLB, NHL, NASCAR, boxing (including the ESPN Big Fights Library), tennis, golf, college football and basketball, Olympics and others. ESPN Classic is a wholly owned subsidiary of ESPN, The Worldwide Leader in Sports.

404.    As indicated above ESPN Classic has acquired the rights to rebroadcast various "classic" college basketball and football games, and does so. These rebroadcasts feature and utilize the images of Damages Class Members.

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

405.    Various conferences and universities also run their own networks that replay classic games.  For example, the Big Ten Network states the following on its website:

**Big Ten's Greatest Games**

They are epic sports battles that are etched in hearts and minds of Big Ten fans across the nation.  They are unforgettable moments that stir passion and pride.  They are echoes of both triumphant victories and devastating defeats.

Throughout the winter, college football fans will have the opportunity to relive the best of those match-ups on the Big Ten Network series, "The Big Ten's Greatest Games."  The Big Ten Network will also televise classic games throughout the basketball season. Use the list to the right to find full season listings.

Our "Greatest Games" schedule features five Big Ten national championships, including Indiana's title games in 1981 and 1987, Michigan's championship game in 1989 and Michigan State's titles in 1979 and 2000. Additional games from the NCAA Elite Eight and Sweet 16 will air throughout the winter, as will memorable regular season classics.

Northwestern's 2005 overtime victory against Iowa premiered on Dec. 1 and the Illinois' 2004 ACC-Big Ten Challenge win against Wake Forest debuted on Dec. 8.  Both games will re-air several times during the course of the season.

If there's a game that you want to see on "Greatest Games," use the form below to drop us a line. Our "Greatest Games" crew wants to hear from you!

406.    The Big Ten Network's "Season 1" of classic men's basketball games, which was broadcast in late 2007 and early 2008, featured 36 games ranging from 1983 to 2007 featuring the following teams:  Connecticut, Duke, Georgetown, Georgia Tech, Illinois, Indiana, Iowa, Kentucky, LSU, Michigan, Michigan State, Minnesota, North Carolina, Northwestern, Ohio State, Penn State, Purdue, Texas, and Wisconsin.

407.    It appears that by the next season, The Big Ten Network had reached an agreement to show NCAA tournament games.  Whereas the first season's offerings did not appear to be NCAA tournament games, nearly all games shown in the next season were from the NCAA

tournament.  The Big Ten Network's "Season 2" of classic men's basketball games, which was broadcast in late 2008 through March of 2009, featured 16 games ranging from 1979 to 2008 featuring the following teams:  Arizona, Florida, Illinois, Indiana, Indiana State, Iowa, Kansas, Kentucky, Maryland, Michigan State, Minnesota, North Carolina, Northwestern, Ohio State, Oklahoma, Purdue, Seton Hall, St. John's University, Syracuse, Wake Forest, and Wisconsin.  The games included NCAA tournament championship games, and games from the NCAA tournament's "Sweet Sixteen," "Elite Eight" and "Final Four" rounds.

408.    The Big Ten Network had similar numbers of offerings for men's football games.  In Season 1, it rebroadcast approximately 30 different games ranging from the 1990 to 2006 seasons, and in Season 2 it rebroadcast a similar number of games ranging from the 1981 to 2006 seasons.

409.    As another example, the Brigham Young University cable television network, available via cable systems around the country such as the Comcast network in the San Francisco Bay Area, runs the "BYU Television" cable television network, on which it rebroadcasts various games.  For example, on May 30, 2009, the network was scheduled to run a "BYU Classic Sports" presentation of a 2002 men's basketball game between BYU and Utah, followed by a 1988 game between BYU and Hawaii.  Later that day, the network was scheduled to rebroadcast a 1986 football game between BYU and the University of New Mexico.

410.    No valid rights from Antitrust Damages Class members have been obtained by the NCAA, its members, or its licensees for the use of their images, likenesses and/or names in rebroadcasts of "classic" games , and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreements described herein.

**j.   Jerseys, T-Shirts and Other Apparel.**

411.     Defendants and their co-conspirators, through the release process described herein, also have allowed former players' indicia of identity, namely, their uniform numbers and names, to be utilized in connection with sales of replica and actual jerseys and other apparel offered for sale.  In addition to featuring sometimes current players, replica jerseys also are sold featuring the numbers and names of former players.

412.     For example, the University of Connecticut, through its online athletics store, sells a replica basketball jersey bearing the number 4.  This number clearly corresponds to former star player Ben Gordon, who played for three years at UConn before turning professional in 2004. Indeed, many other websites sell similar jerseys and specifically reference Mr. Gordon and his number 4.

413.     The NCAA's President, Myles Brand, was referenced in a 2004 article in *The New York Times* in connection with jersey sales featuring current players as follows:  "Even Myles Brand, the President of the N.C.A.A. said he had ethical concerns about the marketing of star players' numbers, although he ruled out permitting athletes to make money from the sale of replicas of their uniforms."  The article further stated that "[p]layers' number are a meaningful substitute for their names . . ."

414.     The NCAA, in fact, has examined, and blessed, its members' use of players' uniform numbers for replica jersey sales.  As a 2008 article on CNBC.com stated, "For years, the NCAA has turned a blind eye to the fact that its member institutions give the [apparel companies] of the world specific numbers that match up to their best players.  The schools know the reality of the situation, which is that numbers that correspond to the stars will sell better than a generic No. 1. And just because the NCAA forbids the selling of the jerseys with the names on the back doesn't mean you can cut the player out of the equation.  Everyone knows what's going on."

415.    *The New York Times* further reported that "[j]erseys like these are also sold around the country in Wal-Mart, Sears and other stores under agreements with manufacturers and the [Defendant] Collegiate Licensing Company, which oversees licensing, marketing and distribution of royalties for the N.C.A.A. and nearly 200 universities, said Derek Eiler, the company's chief operating officer."

416.    *The New York Times* further reported in 2004 that "[w]hile sales figures are hard to acquire, N.C.A.A. officials estimated that Division I universities that sell the most T-shirts and other team apparel each generate about $6 million to $7 million a year in sales.  About 6 percent of those revenues, or perhaps $360,000, involves the sale of replica jerseys."

417.    In addition to replica jersey sales, dozens of the NCAA's members sell the actual jerseys worn by former players to the operators of websites such as www.collegejersey.com, which then offers the jerseys for sale, typically for prices ranging from several hundred dollars up to $1000 or more.  These jerseys often bear the players' names on the back.  For example, on June 16, 2009, there were more than 30 former UCLA football players' jerseys offered for sale that bear players' names on the back.  Additional information is supplied regarding the year the jersey was worn, and often additional details on the particular player, such as the position that he played.  In the UCLA example, the players played between 1995 and 2004.

418.    Additionally, certain schools sell "game worn" uniforms directly.  For example, as of June 16, 2009, Ohio State University was offering for sale via its online memorabilia store approximately 30 "game worn" jerseys from the 2005 season bearing various uniform numbers.  Each one is offered at $200.  The complete player roster from that season, which lists player names and uniform numbers, is readily available on-line from websites such as scout.com.

419.    No valid rights from Antitrust Damages Class members have been obtained by the NCAA, its members, or its licensees for the use of their images, likenesses and/or names in

apparel sales, and any purported transfer of former student-athletes' rights relating to this usage is the product of the anticompetitive agreements described herein.

D.     **The Reality for Players After College**.

420.     There is a vast amount of information available that documents the realities of student-athlete life in the Division I revenue producing sports, i.e., men's basketball and football. Those athletes typically do not enjoy an academic experience anything like that of "regular" students.  Such athletes frequently are required by the university to devote more than 40 hours a week to their sports, can have enormous travel demands placed upon them, are often spoon-fed a curriculum of athlete-friendly classes that are nothing like those experienced by the general student population, and their graduation rates frequently are abysmal.

421.     Two Michigan State University law professors, Robert A. McCormick and Amy Christian McCormick, recently conducted a study regarding Division I athletes in the revenue generating sports, and concluded that those athletes "daily burdens and obligations not only meet the legal standard of employee, but far exceed the burdens and obligations of most university employees."

422.      After they spend their college years juggling athletic and academic requirements, many student-athletes wind up substantially in debt because their scholarships did not fully cover the basic necessities of life.  A recent study illustrated that so-called "full scholarships" can leave student-athletes with as much as $30,000 in normal student expenses uncovered over the course of their collegiate athletic careers.

423.     Moreover, many former student-athletes have continuing medical bills and treatments resulting from their participation in intercollegiate athletics.  These medical treatments and attendant financial responsibility can continue long after the conclusion of a student-athlete's

collegiate sports career.  On July 16, 2009, *The New York Times*, in an article titled "College

Athletes Stuck With the Bill After Injuries," reported the following:

> After years of concerns about inadequate health coverage for college athletes, the National Collegiate Athletic Association started requiring universities to make sure their athletes had insurance before competing.

> But the association never established clear standards for that coverage when it introduced the rule four years ago, leaving colleges to decide for themselves. While some colleges accept considerable responsibility for medical claims, many others assume almost none, according to a review of public documents from a cross section of universities and interviews with current and former athletes, trainers, administrators and N.C.A.A. officials.

> . . .

> Other athletes discover their financial problems long after their bodies have healed. An Ohio University football player, temporarily paralyzed during a workout, learned that he still owed $1,800 in unpaid medical bills when he went to buy a car six years after his injury.

> Many students, whether athletes or not, have medical insurance through their parents. But these plans often exclude varsity sports injuries, limit out-of-state treatment or do not cover much of the bill. Some colleges buy secondary policies to fill the gaps, although even these plans have holes. And only players hurt badly enough to require extensive care can turn to the N.C.A.A. for coverage. Its catastrophic insurance carries a $75,000 deductible, which will increase to $90,000 next year.

> . . .

> Even scholarship athletes in major sports can end up in similar situations.

> Jason Whitehead, a former football player at Ohio University, was so badly injured during a workout in 2001 that he had to be airlifted to a hospital. He was temporarily paralyzed.

> "The next day, when I woke up, the doctor came in and informed me that surgery went well, but this was a career-ending injury," he said. "You're a 19-year-old kid. It took awhile to sink in."

He said he took the bills not covered by his father's insurance to the Ohio University trainers. His father's insurance and Ohio University refused to pay the claims.

Whitehead lost his scholarship one academic year after being medically disqualified by a team physician, per university policy. University officials declined to comment on his situation, citing their commitment to student privacy. They also said they would not pay bills for procedures that occurred more than a year earlier.

But Whitehead, now a 28-year-old district manager for Frito Lay in the Cleveland area, said he discovered he owed roughly $1,800 in unpaid medical bills while reviewing paperwork to buy his first car about six years after his injury.

"The coach says: 'You're on full scholarship. If you ever get hurt, we'll make sure to take care of you,' " he said. "There's a lot of us out there that get used."

424.     The overwhelming majority of players do not turn professional, and those that do turn professional typically do not remain professionals for very long.  Those that do become professionals often emerge from universities totally unprepared to manage their finances, and thus frequently fall prey to financial predators, as a recent expose in *Sports Illustrated* magazine documented.

425.     The rare player who reaches the top professional ranks in basketball and is drafted at least likely will have a guaranteed contract for a few years; in the National Football League, the rare player who reaches the professional ranks does *not* have a guaranteed contract and can be cut from the team at any time due to injury or non-performance.

426.     Whatever the realities of student-athlete life may be, the NCAA is not entitled to abridge those student-athletes' economic rights in perpetuity.

## ANTITRUST ALLEGATIONS

427.     Defendants' contract, combination, and conspiracy described herein consisted of a continuing agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or

stabilize prices received by Antitrust Plaintiffs and Antitrust Class members for use and sale of their images, likenesses and/or names at zero dollars in the United States, its territories and possessions.

428.    Defendants' and their co-conspirators' actions also can be understood as a group boycott/ refusal to deal.

429.    Defendants CLC, EA and various co-conspirators facilitated the contract, combination and conspiracy described herein, and benefited financially from its operation.

430.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

> a.  agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Antitrust Plaintiffs and Antitrust Class members for use and sale of their images, likenesses and/or names;
>
> b.  agreeing to limit output of the use or sale of the images, likenesses and/or names of Antitrust Plaintiffs and Antitrust Class Members;
>
> c.  agreeing to boycott and refuse to deal with Antitrust Plaintiffs and Antitrust Class members regarding compensation for the use and sale of their images, likenesses and/or names; and
>
> d.  implementing and monitoring the conspiracy among cartel members.

431.    The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain and/or stabilize prices paid to Antitrust Plaintiffs and Antitrust Class members for the sale and use of their images, likenesses and/or names.

432.    Defendants' actions constitute an unreasonable restraint of trade.

# **RIGHT OF PUBLICITY CAUSES OF ACTION**

## **FIRST CAUSE OF ACTION**

### **(Deprivation of Rights of Publicity, Violation of Indiana Code § 32-36-1-1) (As Against Electronic Arts)**

1.      Right of Publicity Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

2.      Right of Publicity Plaintiffs and class members' names, voices, signatures, photographs, images, likenesses, distinctive appearances, gestures, and mannerisms have commercial value.  For commercial purposes, EA has used and continues to use Right of Publicity Plaintiffs' and class members' names, images, likenesses and distinctive appearances without their consent in connection with and for the purposes of advertising, selling and soliciting purchases of its videogames, including its NCAA Football, NCAA Basketball and NCAA March Madness franchises.

3.      Specifically, EA has used Right of Publicity Plaintiffs' names, images, likenesses and distinctive appearances by incorporating such items into its virtual players in its NCAA Football videogames that are sold in Indiana.  It has used these items in creating and crafting its games by gathering information in Indiana that is used to model the content of its NCAA-related games.  The use of Right of Publicity Plaintiffs' rights of publicity increases the realism of the games by including, among other things, literal depictions of Plaintiffs and class members in the game.  This allows EA to increase sales and profits.

4.      EA never received Right of Publicity Plaintiffs' or class members' consent, written or otherwise, to use their likenesses, images, names, or other distinctive appearances.

5.      EA's actions are pursuant to, and in furtherance of, its unlawful conspiracy with the NCAA and CLC to misappropriate Right of Publicity Plaintiffs' and class members' names, images, likenesses and distinctive appearances for commercial purposes.

6.      Defendants have willfully and intentionally used and continued to use Right of Publicity Plaintiffs' and class members' rights of publicity.

7.     Defendants undertook actions in furtherance of their conspiracy within the State of Indiana.  Specifically, Defendant NCAA is located in Indiana and all conduct of the NCAA alleged herein took place or was ratified in Indiana.  In addition, NCAA has hosted meetings in Indiana, contracted in Indiana, and NCAA's decisions and approvals for the use of player names and likenesses arose in and emanated from Indiana.

8.     Likewise, EA has solicited, advertised, and sold its games in Indiana directly to Indiana consumers, and developed information in Indiana to be used in its games' development.  Upon information and belief, EAs has sold thousands of games to Indiana consumers during the class periods via its website, and has sold tens of thousands of games through retailers.

9.     As a result of Electronic Arts' conduct, Plaintiffs have been injured.

### SECOND CAUSE OF ACTION
### (Deprivation of Rights of Publicity Violation of California Civil Code § 3344)
### (As Against EA)

10.     Right of Publicity Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

11.     EA has knowingly and intentionally utilized and continue to utilize the names and likenesses of Right of Publicity Plaintiffs and class members in videogames produced by EA without the consent of Right of Publicity Plaintiffs and class members.  This conduct has occurred in and emanated from California, specifically EA's headquarters.

12.     EA has used and continues to use Right of Publicity Plaintiffs' and class members' names and likenesses for the purposes of advertising, selling and soliciting purchases of Electronic Arts' videogames, including its NCAA Football, NCAA Basketball and NCAA March Madness franchises.  Most decisions and policy relating to this conduct has occurred in and emanated from California, specifically Electronic Arts' headquarters.

13.     As a result of EA's misappropriation of their publicity rights, Right of Publicity Plaintiffs and class members have been injured.

### THIRD CAUSE OF ACTION
### (Violation of Rights of Publicity California Common Law)
### (As Against EA)

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 136 -

14.     Right of Publicity Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

15.     Pursuant to its unlawful conspiracy, EA has utilized and continues to utilize the names, likenesses and identities of Plaintiffs and class members in Electronic Arts' videogames without their consent and for their own commercial advantage.

16.     As a result of EA's misappropriation of their publicity rights Right of Publicity Plaintiffs and class members have been injured.

**FOURTH CAUSE OF ACTION**
**(Civil Conspiracy)**
**(As Against All Defendants)**

17.     Right of Publicity Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

18.     On information and belief, Defendants, and each of them, have conspired and combined with each other, and possibly with third parties, to use class members' likenesses without permission, and have achieved a meeting of the minds, through either express or tacit agreement, on an object or course of action of the conspiracy, including depriving class members of their right to protect their names, likenesses and rights to publicity and their contractual, property rights.

19.     Defendants have formed and operated a civil conspiracy with each other, performing as a part of the conspiracy numerous overt acts in furtherance of the common design, including one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal.

20.     As a result of the conduct of Defendants and the conspiracy, Right of Publicity Plaintiffs and class members have been damaged as described above.

**FIFTH CAUSE OF ACTION**

**(Violation of the Unfair Competition Act,**

**California Business & Professions Code § 17200, *et seq*.)**
**(As Against EA)**

21.     Right of Publicity Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

22.     EA's  conduct and unlawful conspiracy, as alleged above, constituted and constitutes unfair, unlawful and fraudulent business practices in violation of Section 17200, *et seq*. of the California Business and Professions Code.  The conduct is unfair, unlawful, and fraudulent because among other things it violates California Civil Code § 3344.

23.     EA's conduct has further caused and is causing damage and irreparable injury to Plaintiffs and class members.  Plaintiffs and class members are accordingly entitled to disgorgement of EA's profits and injunctive relief, plus interest and attorneys' fees, pursuant to California Code of Civil Procedure § 1021.5 and request the following injunctive relief:  (a) that EA be ordered to cease and desist from continuing to unlawfully utilize Right of Publicity Plaintiffs and class members names and likenesses and (b) that EA disgorge all its profits obtained from the utilization of Right of Publicity Plaintiffs and class members names and likenesses.

**SIXTH CAUSE OF ACTION**

**(Breach of Contract)**
**(As Against NCAA)**

24.     Defendant NCAA entered into uniform or substantially similar contracts (which are identical in material terms) with class members.  *See* Exhibit A.

25.     Right of Publicity Plaintiffs and class members are required to enter into the contract attached as Exhibit A.  The contract prohibits the student-athlete from using his name, picture or likeness for commercial purposes, but authorizes and licenses the NCAA, and certain authorized representatives, to use the student-athletes' name or picture to promote NCAA championships or other NCAA events, activities or programs.

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

26.     Likewise, the contract prohibits the NCAA from using Right of Publicity Plaintiffs' and class members' names, pictures and likeness for commercial purposes, but grants a limited license to the NCAA, and certain authorized representatives, to use the student-athletes' name or picture to promote NCAA championships or other NCAA events, activities or programs.

27.     In consideration for the above disclosures, waivers, affirmations and limited license, the NCAA agrees to grant players eligibility to participate in Division I athletics.

28.     EA is not an authorized NCAA representative under the contract, and in fact EA is contractually prohibited from using player names and likenesses.

29.     The NCAA videogames produced by EA do not promote NCAA events, activities, programs or championships, as contemplated by the contract.

30.     The NCAA videogames produced by EA are for commercial purposes only.

31.     The NCAA sanctions, facilitates and profits from EA's commercial use of student-athletes' names, pictures and likenesses despite contractual obligations prohibiting such conduct.

32.     Additionally, the contracts impose specified duties on Defendant NCAA and require it to fulfill certain obligations to class members, including a duty to deal fairly and in good faith with Plaintiffs and class members.

33.     In furtherance of the unlawful conspiracy alleged above and with the knowledge and consent of CLC and EA, the NCAA breached its contracts with class members by, among other things, (1) seeking to accomplish indirectly through its relationship and agreements with Defendant Electronic Arts that which it could not do directly (profit from class members' likenesses); (2) failing to insure and protect class members' rights of when it established contractual relationships with the other Defendants; (3) permitting the other Defendants to use Right of Publicity Plaintiffs and class members' names and likenesses – such as when it expressly permitted EA to utilize players' names and likenesses; (4) purposely ignoring that the other Defendants were using class members' likenesses, despite the fact that class members only gave Defendant NCAA limited publicity rights and for NCAA events; and (5) not abiding by the terms of its own contracts.

34.     As a proximate result of Defendants' conduct, Right of Publicity Plaintiff and class members have been injured.

### SEVENTH CAUSE OF ACTION

**(Unjust Enrichment)**
**(As Against EA and CLC)**

35.     Right of Publicity Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

36.     To the detriment of Right of Publicity Plaintiffs and class members, Defendants EA and CLC have been and continue to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.  EA and CLC have been unjustly benefited through the sale of videogames that utilize the names and likenesses of Plaintiffs and Class Members.

37.     Between Defendants EA/CLC and Right of Publicity Plaintiffs/class members, it would be unjust for Electronic Arts and CLC to retain the benefits attained by their wrongful actions.  Accordingly, Right of Publicity Plaintiffs and class members seek full restitution of EA's and CLC's enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

### ANTITRUST CASE CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**

**Unreasonable Restraint of Trade**

**(Against All Defendants)**

433.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs dealing with the claims of the Antitrust Class.

434.   Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, have entered into a continuing contract, combination, and conspiracy in restraint of trade to artificially depress, fix, maintain, and/or stabilize the prices paid (specifically, depressing, fixing, maintaining and stabilizing them at zero dollars) to Antitrust Class members for the use of, and to limit supply for, licensing and sale of their images, likenesses and/or names in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). If Plaintiffs and Antitrust Class members were free to license and sell the rights to their images, likenesses and/or names, many more licenses would be sold.  This output restriction also has the effect of raising the prices charged by the NCAA and CLC for licensing rights.

435.   Defendants' unlawful conduct resulted in Antitrust Plaintiffs and Class members losing their freedom to compete.  This unreasonable restraint on competition has artificially limited supply and depressed prices paid by Defendants and their co-conspirators to Antitrust Plaintiffs and the members of the Antitrust Class for use of their images images, likenesses and/or names after cessation of participation in intercollegiate sports.

436.   Antitrust Plaintiffs and the members of the Antitrust Class received less than they otherwise would have received for the use of their images, likenesses and/or names in a competitive marketplace, were thus damaged, and seek to recover for those damages.

437.   On information and belief, the NCAA always conditioned eligibility to play NCAA Division I college or university men's basketball or NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football on the perpetual relinquishment to the NCAA and its members by the student-athlete of all rights to his image, likeness and/or name associated with the playing of those sports.

1   438.   Defendants and their co-conspirators' total abridgment of compensation rights for

2   former student-athletes are not connected to any legitimate non-commercial goal.  Defendants'

3   actions are solely to enhance revenue for themselves and their for-profit business partners, by

4   cutting costs, *i.e.*, eliminating the need to pay any compensation to former student-athletes for the

5   continuing commercial exploitation of their images, likenesses and/or names.  Defendants'

6   actions have no relationship to any alleged goal of "amateurism," or pro-educational purposes, as

7   former student-athletes by definition are no longer members of athletic teams under the NCAA's

8   control.  Thus, the NCAA's actions directly regulate a commercial market and therefore are

9   illegal.

10   439.   Defendant CLC has facilitated this illegal scheme, and has financially benefited

11   from it.

12   440.   Defendant EA has participated in this illegal scheme, and has financially benefited

13   from it.

14   441.   As a direct and proximate result of Defendants' scheme, Antitrust Plaintiffs and

15   the members of the Antitrust Class have been injured and financially damaged in amounts which

16   are presently undetermined.  Antitrust Plaintiffs' and Antitrust Class members' injuries consist of

17   receiving lower prices for use of their images than they would have received absent Defendants'

18   conduct.  Antitrust Plaintiffs' and Antitrust Class members' injuries are of the type the antitrust

19   laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

20   442.   Defendants' and their co-conspirators' have collectively conspired to illegally limit

21   and depress the compensation of former student-athletes for continued use of their images to zero.

22   This anticompetitive and illegal scheme has unreasonably restrained trade.

23   443.   The anticompetitive effects of Defendants' scheme substantially outweigh any

24   alleged procompetitive effects that may be offered by Defendants, including that their collusive

conduct is shielded by its concept of "amateurism."  Reasonable and less restrictive alternatives

are available to Defendants' current anticompetitive practices.

444.   Antitrust Plaintiffs and Antitrust Class members are entitled to a declaratory

judgment declaring as void and unenforceable all forms that purport to grant, transfer, or convey

the rights of former student-athletes in the use of their images.

445.   Antitrust Plaintiffs and the Antitrust Class are entitled to a permanent injunction

that terminates the ongoing violations alleged in this Complaint.

## SECOND CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**

**Unreasonable Restraint of Trade – Group Boycott / Refusal to Deal**

**(Against All Defendants)**

446.   Antitrust Plaintiffs incorporate and re-allege each allegation set forth in the

preceding paragraphs dealing with the claims of the Antitrust Class.

447.   Defendants and their co-conspirators, by and through Defendants' and co-

conspirators' officers, directors, employees, agents, or other representatives, entered into a

continuing contract, combination, and conspiracy in restraint of trade to effectuate a horizontal

group boycott of Antitrust Class Members.  Defendants' group boycott / refusal to deal

encompasses Defendants' concerted refusal to compensate Antitrust Class Members for use of

their images, likenesses and/or names and to otherwise concertedly act to prevent Class Members

from being compensated for use of their images, likenesses and/or names, in the United States

and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

448.   Defendants' group boycott / refusal to deal includes Defendants' concerted action

to require all current student-athletes to sign forms each year that purport to require each of them

to relinquish all rights in perpetuity for use of their images, likenesses and/or names.  This

concerted action is in effect a refusal to deal with Antitrust Class members on future post-competition compensation rights issues, and forecloses them from access to the market. Defendants use the eligibility rules as a threat of a boycott to force all student-athletes to sign the forms.

449.    Defendants' group boycott / refusal to deal also includes Defendants' ongoing concerted action to deny Antitrust Class Members compensation in the form of royalties for the continued use of their images, likenesses and/or names for profit, including, but not limited to, through restrictions in the Bylaws.

450.    Plaintiffs and the members of the Antitrust Class received less than they otherwise would have received for the use of their images in a competitive marketplace, were thus damaged, and seek to recover for those damages.

451.    On information and belief, the NCAA always conditioned eligibility to play NCAA Division I college or university men's basketball or NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football on the perpetual relinquishment to the NCAA and its members by the student-athlete of all rights to his image, likeness and/or name associated with the playing of those sports.

452.    Defendants and their co-conspirators' total abridgment of compensation rights for former student-athletes are not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and their for-profit business partners, by cutting costs, *i.e.*, eliminating the need to pay any compensation to former student-athletes for the continuing commercial exploitation of their images, likenesses and/or names. Defendants' actions have no relationship to any alleged goal of "amateurism," or pro-educational purposes, as former student-athletes by definition are no longer members of athletic teams under the NCAA's

control.  Thus, the NCAA's actions directly regulate a commercial market and therefore are illegal.

453.    CLC has facilitated this illegal group boycott/refusal to deal, and has financially benefited from it.

454.    Defendant EA has participated in this illegal scheme, and has financially benefited from it.

455.    As a direct and proximate result of Defendants' group boycott, Antitrust Plaintiffs and the members of the Antitrust Class have been injured and financially damaged in amounts which are presently undetermined.  Antitrust Plaintiffs' and Antitrust Class members' injuries consist of denial of compensation for use of their images, likenesses and/or names.  Antitrust Plaintiffs' and Antitrust Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

456.    Defendants' and their co-conspirators' have collectively conspired to illegally deny compensation to former student-athletes for continued use of their images, likenesses and/or names in unreasonable restraint of trade.

457.    The anticompetitive effects of Defendants' group boycott substantially outweigh any alleged pro-competitive effects that may be offered by Defendants, including that their collusive conduct is shielded by its concept of "amateurism" or pro-educational purpose. Reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

458.    Antitrust Plaintiffs and the Antitrust Class are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

1

## THIRD CLAIM FOR RELIEF

2

### Unjust Enrichment

3

### (Against All Defendants)

4      459.    Antitrust Plaintiffs incorporate and re-allege each allegation set forth in the

5

preceding paragraphs dealing with the claims of the Antitrust Class.

6      460.    Defendants have been unjustly enriched as a result of the unlawful conduct

7

8  detailed herein at the expense of Antitrust Plaintiffs and Antitrust Class members.  Under

9  common law principles of unjust enrichment, Defendants should not be permitted to retain the

10 benefits conferred upon them via their wrongful conduct, and it would be unjust for them to be

11 allowed to do so.

12     461.    Antitrust Plaintiffs seek disgorgement of all Defendants' profits resulting from the

13 wrongful conduct described herein and establishment of a constructive trust from which Antitrust

14 Plaintiffs and the Class members may seek restitution.

15

## FOURTH CLAIM FOR RELIEF

16

### Accounting

17

### (Against All Defendants)

18

19     462.    Antitrust Plaintiffs incorporate and re-allege each allegation set forth in the

20 preceding paragraphs dealing with the claims of the Antitrust Class.

21     463.    As a result of the illegal conduct alleged herein, Defendants have received

22 licensing revenues in various forms and amounts, including both licensing fees and royalty

23 payments.  As an alternative to their damage claims, Antitrust Plaintiffs and the members of the

24 Antitrust Class seek to recover a share of these revenues generated from the exploitation of their

25 likenesses and images, likenesses and/or names.

26

27

28

464.    Upon a determination of liability, an accounting of the licensing revenues that Defendants have wrongfully diverted to themselves and  other entities will be required in order to determine damages in the form of each Antitrust Plaintiff's and  Antitrust Class members' share of these licensing revenues.

465.    These licensing revenues are collected by Defendants as a result of  numerous licensing agreements among many different entities, including the Defendants and their co-conspirators, and likely thousands of companies that license, manufacture, market and sell various products and services bearing the likenesses and images of Antitrust Plaintiffs and the members of the Antitrust Class.  The structure of the many relationships between these entities and terms of the various agreements governing the licensing transactions are not known to Antitrust Plaintiffs and the members of the Antitrust Class.

466.    Antitrust Plaintiffs and the members of the Antitrust Class cannot identify at this time, among other things; (a) all of the entities that have entered into licensing and/or royalty agreements with the Defendants and their co-conspirators, (b) how the licensing revenue due to the Defendants and their co-conspirators from each of those agreements is calculated, (c) the amount of that revenue, and (d) which members of the Antitrust Class' images, likenesses and/or names are associated with which agreements.  Antitrust Plaintiffs seek to recover for themselves and the members of the Antitrust Class a percentage of the revenue from Defendants and their co-conspirators for every unlawful licensing and/or royalty agreement involving their image, likenesses, and/or names; this percentage and amount is ascertainable and will be decided by this Court upon a determination of liability.

467.    The amount of licensing revenue generated from the exploitation of these images, likenesses and/or names, including the tracing the revenue resulting from each transaction, requires a full and complete accounting.  This is so because determining the amounts due will

involve a fuller understanding and accounting of the various transactions, agreements, parties and revenues involved.

468.    Calculation of the amounts due to Antitrust Plaintiffs and Antitrust Class members may well  be complex.  Industry accounting standards may need to be determined, understood and applied, revenues may need to be traced through the various Defendants and their co-conspirators and parties involved in the transactions, and tax consequences may also be considered.

## **RIGHT OF PUBLICITY PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment against Defendants as follows:

A.    Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Right of Publicity Plaintiffs as the Class Representatives and their counsel of record as Class Counsel;

B.    A declaration by this Court that Defendants' conduct constituted a conspiracy, and that they are each jointly and severally liable for the conduct of or damage inflicted by any other defendant;

C.    Actual damages, statutory damages, punitive damages, and such other relief as provided by the statutes cited herein;

D.    Disgorgement of all profits earned by Defendants from the sale of videogames containing the likenesses of Plaintiffs and class members;

E.    Prejudgment and post-judgment interest on such monetary relief;

F.    Equitable relief in enjoining future use of the names or likenesses of Right of Publicity Plaintiffs and class members in videogames, and declaring null, void and/or unenforceable any contractual provisions or NCAA rules purporting to limit the rights of Plaintiffs and class members to receive compensation for their injuries;

G.    Seizure and destruction of all copies of any videogames in the possession, custody or control of Defendants or third parties (to the extent permitted by law ) that infringe upon Right of Publicity Plaintiffs' and class members' rights of publicity;

1    H.    The costs of bringing this suit, including reasonable attorneys' fees; and

2    I.    All other relief to which Plaintiffs and class members may be entitled at law or in

3    equity.

5    **ANTITRUST PRAYER FOR RELIEF**

6    WHEREFORE, Plaintiffs prays as follows:

7    A.    That the Court determine that this action may be maintained as a class action under

8    Rule 23 of the Federal Rules of Civil Procedure;

9    B.    That the contract, combination, or conspiracy, and the acts done in furtherance

10   thereof by Defendants and their co-conspirators, be adjudged to have been in violation of

11   Section 1 of the Sherman Act (15 U.S.C. § 1);

12

13   C.    That judgment be entered for Antitrust Plaintiffs and members of the Antitrust

14   Class against Defendants for three times the amount of damages sustained by Plaintiffs and the

15   Class as allowed by law, together with the costs and expenses of this action, including reasonable

16   attorneys' fees;

17   D.    That Defendants be ordered to disgorge all profits earned via the wrongful use and

18   sale of Antitrust Class members' images, likenesses and/or names as described herein;

19

20   E.    That Antitrust Plaintiffs and Antitrust Class members be awarded any available

21   prejudgment and post-judgment interest;

22   F.    That Antitrust Plaintiffs and Antitrust Class members are entitled to Declaratory

23   relief declaring as void and unenforceable any releases that purport to have caused Antitrust

24   Plaintiffs and Class member to relinquish rights to compensation for use of their images after they

25   no longer are student-athletes, and further declaring as void and unenforceable all NCAA and

26   member license agreements that purport to represent that Antitrust Class members have released

27   future compensation rights for the use of their images after they no longer are student-athletes;

28

G.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

H.      That Antitrust Plaintiffs and Antitrust Class members are further entitled to equitable relief permanently enjoining the future use of the release forms described herein, and enjoining Defendants and their co-conspirators from selling, licensing or using former student-athletes' rights that Defendants do not own; and

I.      That Antitrust Plaintiffs and Antitrust Class members have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## RIGHT OF PUBLICITY
## JURY DEMAND

Right of Publicity Plaintiffs demand a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

## ANTITRUST JURY DEMAND

Antitrust Plaintiffs demand a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

1   Dated:  March 10, 2010

2   HAGENS BERMAN SOBOL SHAPIRO LLP          HAUSFELD LLP

3   /s/ Robert B. Carey_____          /s/ Jon T. King_____

4
5   Robert B. Carey (*pro hac vice*)          Michael P. Lehmann (Cal. Bar No. 77152)
    Leonard W. Aragon (*pro hac vice*)          Jon T. King (Cal. Bar No. 205073)
6   11 West Jefferson          Christopher L. Lebsock (Cal. Bar No.
    Suite 1000 Phoenix, AZ, 85003               184546)
7   Telephone: (602) 840-5900          Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
    Facsimile: (602) 840-3012          44 Montgomery Street, 34th Floor
8   rcarey@hbsslaw.com          San Francisco, CA 94104
    leonard@hbsslaw.com          Tel:  (415) 633-1908
9                                                     Fax:  (415) 358-4980
    Steve W. Berman WSBA #12536 (*Pro Hac Vice*)          Email:   mlehmann@hausfeldllp.com
10  HAGENS BERMAN SOBOL SHAPIRO LLP                      jking@hausfeldllp.com
11  1918 Eighth Avenue, Suite 3300                      clebsock@hausfeldllp.com
    Seattle, Washington 98101                      abailey@hausfeldllp.com
12  Telephone:  (206) 623-7292
    Facsimile:   (206) 623-0594          Michael D. Hausfeld (*pro hac vice*)
13  E-Mail:          steve@hbsslaw.com          HAUSFELD LLP
14                                                     1700 K Street, NW, Suite 650
    ***Plaintiffs' Interim Co-Lead Class Counsel***          Washington, DC 20006
15                                                     Tel:  (202) 540-7200
                                                       Fax:  (202) 540-7201
16                                                     Email:  mhausfeld@hausfeldllp.com
                                                               mjones@hausfeldllp.com
17
18                                                     ***Plaintiffs' Interim Co-Lead Class Counsel***

19
    ***Additional Counsel for Right of Publicity and***
20  ***Related Claims***:

21
22  Shana E. Scarlett (Cal. Bar No. 217895)          Stuart M. Paynter (Cal. Bar. No. 226147)
    HAGENS BERMAN SOBOL SHAPIRO LLP          THE PAYNTER LAW FIRM PLLC
23  715 Hearst Avenue, Suite 202          1200 G Street N.W., Suite 800
    Berkeley, CA 94710          Washington DC 20005
24  Telephone: (510) 725-3000          Telephone: (202) 626-4486
    Facsimile: (510) 725-3001          Facsimile: (866) 734-0622
25  shanas@hbsslaw.com          *stuart@smplegal.com*

26

27

28
    CONSOLIDATED AMENDED CLASS
    ACTION COMPLAINT                              - 151 -
    Case No. C 09-01967 CW

Howard J. Sedran
Austin B. Cohen
Levin Fishbein Sedran & Berman
Suite 500
510 Walnut Street
Philadelphia, PA  19106
Phone: 215-592-1500
Fax: 215-592-4663
Email:  hsedran@lfsblaw.com
            acohen@lfsblaw.com

Michael Ram
Karl Olson
RAM & OLSON
555 Montgomery Street, Suite 820
San Francisco, California 94111
Phone: (415) 433-4949
Email: mram@ramolson.com

Roberta D. Liebenberg
Donald L. Perelman
FINE, KAPLAN AND BLACK, R.P.C.
1835 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Phone: (215) 567-6565
Email:  rliebenberg@finekaplan.com

Howard J. Sedran
Austin B. Cohen
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Phone: (215) 592-1500
Email:  hsedran@lfsblaw.com

*Additional Counsel for Antitrust and Related Claims:*

William A. Isaacson (*pro hac vice*)
Tanya Chutkan (*pro hac vice*)
Jack Simms (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, 8th Floor
Washington, DC 20015
Tel:  (202) 237-2727
Fax:  (202) 237-6131
Email:  wisaacson@bsfllp.com
            tchutkan@bsfllp.com
            jsimms@bsfllp.com

Steven A. Asher
David H. Weinstein
Mindee J. Reuben
Jeremy S. Spiegel
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103
Telephone: (215) 545-7200
Email:  asher@wka-law.com

Joseph C. Kohn
Robert J. LaRocca
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
Phone: (215) 238-1700
Email:  jkohn@kohnswift.com

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19130
Phone: (215) 963-0600
Email:  grodos@barrack.com

John F. Cove, Jr. (Cal. Bar No. 212213)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA  94612
Tel:  (510) 874-1000
Fax:  (510) 874-1480
Email:  jcove@bsfllp.com

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 152 -

Thomas V. Girardi
Stephen Gerard Larson
Girardi & Keese
1126 Wilshire Boulevlard
Los Angeles, CA 90017
213-977-0211
Fax: 213-481-1554
Email: slarson@girardikeese.com

Jay L. Himes
Morissa Falk
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel:  (212) 907-0700
Fax:  (212) 818-0477
Email:  jhimes@labaton.com
        mfalk@labaton.com

Bonny E. Sweeney (176174)
Carmen A. Medici (248417)
COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
Email:  bonnyS@csgrr.com
        cmedici@csgrr.com

Daniel S. Mason (Cal. Bar No. 54065)
Jiangxiao Hou (Cal. Bar # 215256)
ZELLE HOFMANN VOELBEL & MASON
LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Tel:  (415) 693-0700
Fax:  (415) 693-0770
Email:  dmason@zelle.com
        ahou@zelle.com

Jonathan W. Cuneo
CUNEO GILBERT & LADUCA LLP
507 C. Street, NE
Washington, DC 20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
Email:  Jonc@cuneolaw.com

Daniel Cohen
CUNEO GILBERT & LADUCA LLP
106-A  S. Columbus Street
Alexandria, VA 22314
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
Danielc@cuneolaw.com

Vincent J. Esades
David Woodward
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Tel:  (612) 338-4605
Fax:  (612) 338-4692
Email:  vesades@heinsmills.com

Bryan L. Clobes
Ellen Meriwether
Michael Tarringer
Tim Fraser
Cafferty Faucher LLP
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Tel: 215-864-2800
Fax: 215-864-2810
bclobes@caffertyfaucher.com

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Joseph R. Saveri (State Bar No. 130064)
Kelly M. Dermody (State Bar No. 171716)
Eric B. Fastiff (State Bar No. 182260)
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Fax: (415) 956-1008
Email: jsaveri@lchb.com

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bruce L. Simon (Cal. Bar. No. 96241)
Jessica L. Grant (Cal. Bar. No. 178138)
PEARSON, SIMON, WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 1430
San Francisco, CA 94104
Tel: (415) 433-9000
Fax: (415) 433-9008
Email: bsimon@pswplaw.com
          jgrant@pswplaw.com

Steven J. Greenfogel
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 564-5182
Fax: (215) 569-0958
Email: sgreenfogel@mcgslaw.com

Mitchell J. Rapp (Michigan Bar No. P43081)
Shawn D. Stuckey (MN Bar No. 0388976)
ZELLE HOFMANN VOELBEL & MASON LLP
500 Washington Avenue South, Suite 400
Minneapolis, MN  55415
Telephone: (612) 339-2020
Facsimile:  (612) 336-9100
Email: mrapp@zelle.com
          sstuckey@zelle.com

Brian M. Sund
Joshua G. Hauble
Jackson D. Bigham
MORRISON FENSKE & SUND, P.A.
5125 County Road 101, Suite 202
Minnetonka, MN 55345
Tel: (952) 975-0050
Fax: (952) 975-0058
Email: bsund@morrisonfenske.com
          jhauble@morrisonfenske.com

Eugene A. Spector
Jeffrey J. Corrigan
Jay S. Cohen
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
Email: espector@srkw-law.com
          jcorrigan@srkw-law.com
          jcohen@srkw-law.com
          jspector@srkw-law.com

Jason A. Zweig
Kaplan Fox & Kilsheimer
850 Third Avenue, 14th Floor
New York, NY 10022
Tel.: 212-687-1980
Fax: 212-687-7714
jzweig@kaplanfox.com

Mary Jane Fait
Adam J. Levitt
Wolf Haldenstein Adler Freeman & Herz LLP
55 West Monroe Street
Suite 1111
Chicago, IL 60603
Tel: 312-984-0000
Fax: 312-984-0001
fait@whafh.com
levitt@whafh.com

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

- 154 -

Rosemary M. Rivas
Tracy H. Tien
Finkelstein Thompson LLP
100 Bush Street, Suite 1450
San Francisco, CA 94104
Telephone: 415-398-8700
Facsimile: 415-398-8704
rrivas@finkelsteinthompson.com

Richard M. Volin
Finkelstein Thompson LLP
1050 30th Street, N.W.
Washington, DC 20007
Tel: 202-337-8000
Fax: 202-337-8090
rvolin@finkelsteinthompson.com

Michael J. Flannery
Carey & Danis, LLC
8235 Forsyth Boulevard, Suite 1100
St. Louis, MO 63105
Tel: 314-725-7700
Fax: 314-721-0905
mflannery@careydanis.com

Stephen A. Weiss
Seeger Weiss LLP
One William Street
New York, NY 10004
Tel: 212-584-0700
Fax: 212-584-0799
sweiss@seegerweiss.com

Harris L. Pogust
Pogust Braslow & Millrood, LLC
161 Washington Street, Suite 1520
Conshohocken, PA 19428
Tel: 610-941-4204
Fax: 610-941-4245
hpogust@cpm-law.com

Michael E. Criden
Kevin B. Love
Criden & Love, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Tel: 305-357-9000
Fax: 305-357-9050
mcriden@cridenlove.com
klove@cridenlove.com

Lee Albert
Murray, Frank & Sailer LLP
275 Madison Avenue
Suite 801
New York, NY 10016
Tel: 212-682-1818
Fax: 212-682-1892
lalbert@murrayfrank.com

Eric L. Cramer
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
215-875-3000
Fax: 215-875-4604
Email: ecramer@bm.net

Joshua P. Davis
Law Offices of Joshua P. Davis
437A Valley Street
San Francisco, CA 94131
415-422-6223
Email: davisj@usfca.edu

Kendall S. Zylstra
Stephen E. Connolly
Faruqi & Faruqi LLP
2600 Philmont Avenue
Suite 324
Huntingdon Valley, PA 19006
215-914-2460
Fax: 215-914-2462
Email: kzylstra@faruqilaw.com

Faruqi & Faruqi, LLP
2600 Philmont Avenue
Suite 324
Huntingdon Valley, PA 19006
215-914-2460
Fax: 215-914-2462
Email: sconnolly@faruqilaw.com

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT
Case No. C 09-01967 CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Ball
BALL & SCOTT, A PROFESSIONAL
ASSOCIATION
550 Main Avenue, Suite 750
Knoxville, TN 37902
Tel:  (865) 525-7028
Fax:  (865) 525-4679
Email:  GBall@ballandscott.com


Allan Steyer (Cal. Bar. No. 100318)
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
Tel:  (415) 421-3400
Fax:  (415) 421-2234
Email:  asteyer@steyerlaw.com

Derek G. Howard (SBN 118082)
MURRAY & HOWARD, LLP
900 Larkspur Landing Circle, Suite 103
Larkspur, California 94939
Telephone: (415) 461-3200
Facsimile:  (415) 461-3208
E-mail: dhoward@murrayhowardlaw.com

Garrett D. Blanchfield, Jr.
REINHARDT WENDORF & BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN   55101
Tel:  (651) 287-2100
Fax:  (651) 287-2103
Email: g.blanchfield@rwblawfirm.com

K.A.D. Camara
Joe Sibley
CAMARA & SIBLEY LLP
2339 University Boulevard
Houston, Texas  77005
Tel:  (713) 893 7973
Fax: (713) 583-1131
Email: camara@camarasibley.com
          sibley@camarasibley.com

Stanley D. Bernstein
Ronald J. Aranoff
Dana Statsky Smith
BERSTEIN LIEBHARD LLP
10 East 40th Street, 22nd Floor
New York, New York 10016
Tel:  (212) 779-1414
Fax:  (212) 779-3218
Email:  bernstein@bernlieb.com
            aranoff@bernlieb.com


Carl A. Taylor Lopez
LOPEZ & FANTEL
1510 114th Avenue
Seattle, WA 98122-4024
Tel: (206) 322-5200
Email: clopez@lopezfantel.com


GUSTAFSON GLUEK PLLC
Daniel E. Gustafson
Jason S. Kilene
David A. Goodwin
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
Email: dgustafson@gustafsongluek.com
          jkilene@gustafsongluek.com


SALTZ MONGELUZZI BARRETT &
BENDESKY, PC
Simon Paris
Patrick Howard
One Liberty Place
52nd Floor 1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 575-3986
Fax: (215) 496-0999
Email: sparis@smbb.com


RODA NAST, P.C.
Dianne M. Nast
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000
Fax: (717) 892-1200
Email: dnast@rodanast.com

1   Kimberly A. Kralowec
    THE KRALOWEC LAW GROUP
2   188 The Embarcadero, Suite 800
    San Francisco, CA 94105
3   Tel:  (415) 546-6800
    Fax:  (415) 546-6801
4   Email:  kkralowec@kraloweclaw.com

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT                               - 157 -
Case No. C 09-01967 CW