LATHAM & WATKINS LLP
DANIEL M. WALL - #102580
dan.wall@lw.com
TIMOTHY L. O'MARA - #212731
tim.omara@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
R. JAMES SLAUGHTER - #192813
rslaughter@kvn.com
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant
ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | Case No. CV-09-1967-CW<br><br>*(Consolidated w/Case Nos. C-09-03329-CW; C-09-04128-CW; C-09-04882-CW; C-09-05100-CW; C-09-05134-CW; C-09-05372-CW; and C-09-05378-CW)*<br><br>**DEFENDANT ELECTRONIC ARTS INC.'S MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Date: February 24, 2011<br>Time: 2:00 PM<br>Place: Courtroom 2, 4th Floor<br>Judge: The Honorable Claudia Wilken |

# TABLE OF CONTENTS

Page(s)

I. Introduction ........................................................................................................................ 1

II. Procedural Background ...................................................................................................... 2

III. Factual Background ............................................................................................................ 4

    A. The Alleged Horizontal Cartel Of NCAA Member Schools, Conferences, And Their Licensing Entity ............................................................. 4

    B. Allegations Concerning EA ..................................................................................... 5

IV. Discussion ........................................................................................................................... 6

    A. The Governing Substantive Law Requires Plaintiffs To Plead Facts Plausibly Indicating EA's Conscious Commitment To An Unlawful Agreement ................................................................................................ 6

    B. Plaintiffs Have Failed To Plead An Unlawful Agreement With EA ..................... 7

        1. Conclusory Allegations Of Antitrust Conspiracy Are Insufficient ................................................................................................. 8

        2. EA Had No Involvement In The Agreements At The Heart Of The Alleged NCAA Conspiracy ............................................................ 9

        3. EA's Trademark License With The NCAA Does Not Imply Conspiracy ................................................................................................. 9

        4. That EA Allegedly Benefits From The Alleged Conspiracy, Or Facilitates It By Licensing Rights From The Alleged Conspirators, Does Not Make EA A Member Of The Conspiracy ............................................................................................... 11

        5. EA's Requests For Greater Rights To Use Player Names And Likenesses Does Not Indicate An Unlawful Conspiracy ............................................................................................... 13

V. Conclusion ........................................................................................................................ 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*49er Cheverolet, Inc. v. General Motors, Corp.*,
  803 F.2d 1463 (9th Cir. 1986) .................................................................................................. 10

*Ashcroft v. Iqbal*,
  129 S.Ct. 1937 (2009) ................................................................................................................ 7

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................................... 2, 7, 9, 16

*Brennan v. Concord EFS, Inc.*,
  369 F. Supp. 2d 1127 (N.D. Cal. 2005) ..................................................................................... 8

*Business Elec. Corp. v. Sharp Elec. Corp.*,
  485 U.S. 717 (1988) ................................................................................................................. 14

*Euromodas, Inc. v. Zanella, Ltd.*,
  368 F.3d 11 (1st Cir. 2004) ...................................................................................................... 15

*Garment Dist. v. Belk Stores, Inc.*,
  799 F.2d 905 (4th Cir. 1986) ................................................................................................... 14

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) ..................................................................................................... 15

*In re Cal. Title Ins. Antitrust Litig.*,
  No. 08-01341, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ................................................... 8

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ......................................................................................................... 9

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 ......................................................................................................... 12, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ..................................................................................... 8

*Kendall v. Visa U.S.A. Inc.*,
  518 F.3d 1042 (9th Cir. 2008). ................................................................................ 7, 8, 10, 11, 13

TABLE OF AUTHORITIES

Page(s)

*Kingray, Inc. v. NBA, Inc.*,
    188 F. Supp. 2d 1177 (S.D. Cal. 2002) ............................................................................... 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..................................................................................................... 11, 13

*Mich. Div.-Monument Builders of Am. v. Mich. Cemetery Ass'n*,
    458 F. Supp. 2d 474 (E. D. Mich. 2006), ............................................................................. 9

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ..................................................................................... 2, 7, 12, 14, 16

*Moss v. U.S. Secret Service*,
    572 F.3d 962 (9th Cir. 2009) ............................................................................................... 7

*United States v. Falcone,*
    109 F.2d 579 (2d Cir.) ....................................................................................................... 12

*Viazis v. Am. Ass'n of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002) ............................................................................................. 15

*Virginia Vermiculite Ltd., v. Historic Green Springs,*
    307 F.3d 277 (4th Cir. 2002) ............................................................................................. 12

**STATUTES**

Sherman Act, 15 U.S.C. § 1 .................................................................................................. 2, 6, 9

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on February 24, 2011 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, Oakland Division, located at 1301 Clay Street, Oakland, CA, Courtroom 2, 4th Floor, before the Honorable Claudia Wilken, Defendant Electronic Arts Inc. will, and hereby does, move to dismiss each of the Antitrust Case Causes Of Action asserted in plaintiffs' Consolidated Amended Class Action Complaint on the grounds that they fail to state a claim upon which relief can be granted. This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the pleadings on file in this action, and upon such other matters presented to the Court at the time of the hearing.

## RELIEF SOUGHT

Defendant Electronic Arts Inc. seeks dismissal of the "Antitrust Case Causes Of Action" asserted in plaintiffs' Consolidated Amended Class Action Complaint ¶¶ 433-468 with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: January 18, 2011

Respectfully Submitted,

LATHAM & WATKINS LLP
  Daniel M. Wall
  Timothy L. O'Mara


By   /s/ Timothy L. O'Mara
  Timothy L. O'Mara
  Attorneys for Defendant
  ELECTRONIC ARTS INC

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. Introduction

The gist of the antitrust claims in this case is that the National Collegiate Athletic Association ("NCAA") and its member institutions conspired to steal student-athletes' publicity rights.[1] Plaintiffs' theory is that NCAA member schools and athletic conferences participated in a "price-fixing conspiracy and a group boycott," the essence of which was to use the NCAA's constitution, bylaws, and Division I rules to force student-athletes to relinquish for zero consideration all rights to profit from the use of their likenesses as NCAA athletes.[2] This, allegedly, would increase the NCAA members' profits from licensing such rights.

The question presented by this motion is why Electronic Arts Inc. ("EA") is part of this case.

Defendant NCAA is a membership organization composed mainly of four-year higher education institutions and collections of institutions known as conferences. Defendant Collegiate Licensing Company ("CLC") represents the NCAA and various NCAA member schools in connection with certain trademark licensing. By contrast, EA is a public company that develops and publishes videogames. EA is not a member of the NCAA, it does not represent the NCAA in licensing or any other matters, and is not an agent of the NCAA for any purposes. EA's only relation to the NCAA is as one of many trademark licensees that are allowed by contract to use specified NCAA intellectual property for certain purposes. In other words, EA is in an arms-length relationship to the NCAA and CLC, the buy-side of an ordinary trademark licensing relationship.

One can search the Amended Complaint in vain for a reason why EA, as an arms-length trademark licensee, is alleged to be a member of the supposed conspiracy. Plaintiffs rightly do not allege that EA is a party to or had anything to do with the adoption of the NCAA's

---

[1] The Court has stayed the "Right of Publicity Causes of Action" and held that Electronic Arts Inc. "need not respond" to those claims. Order Granting In Part And Denying In Part EA's Motion To Stay at 12-13, No. 09-1967 (N.D. Cal. Dec. 17, 2010), Doc. #253.

[2] Consolidated Amended Complaint ("Am. Compl.") ¶¶ 9, 21-25, No. 09-1967 (N.D. Cal. Mar. 10, 2010) Doc. #175.

constitution, operating bylaws, administrative bylaws, or eligibility rules. Rather, as far as one can tell, EA is tied to the alleged conspiracy simply because (a) it is a licensee and (b) its NCAA-branded videogames allegedly contain likenesses of NCAA student-athletes. But there is nothing about EA's status as a licensee or the content of its videogames that implies ***participation in an upstream conspiracy*** among trademark owners (i.e., the NCAA and its members). For purposes of this motion, we may assume as plaintiffs allege that EA benefits from the "zero price" that the NCAA and its members allegedly "pay" for student-athletes' publicity rights—in exactly the same way that any manufacturer benefits from its suppliers cutting their costs. That does not imply participation in whatever the suppliers or, as here, licensors, allegedly did to lower their costs.

As a matter of law, plaintiffs are required to plead facts demonstrating that each alleged conspirator, EA included, made "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). In *Twombly*, the Supreme Court held that pleading the conclusion is not enough, and that instead a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made" and thus "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiffs have failed to meet those standards. Even generally, they only allege that EA "facilitated" the alleged conspiracy, Am. Compl. ¶¶ 25, 222, 429, and there are no ***facts*** in the 468 paragraphs of the Amended Complaint indicating illegal agreement. After *Twombly*, an antitrust case cannot proceed on such a complaint. Consequently, all claims of the Antitrust Plaintiffs against EA, as set-forth in the Amended Complaint, must be dismissed.[3]

## II. Procedural Background

This lawsuit originated as two separate putative class actions: the *Keller* right of

---

[3] The Antitrust Plaintiffs allege claims for relief under Section 1 of the Sherman Act, unjust enrichment, and accounting (collectively "antitrust claims"). Am. Compl. ¶¶ 433-468. Plaintiffs' common law claims fail because they are wholly derivative of the antitrust claims. Further, with respect to plaintiffs' claim for accounting, plaintiffs have not pled a fiduciary relationship or the "existence of complicated accounts that make an ordinary legal action impracticable." Order on NCAA's and CLC's Motions to Dismiss at 16, No. 09-1967 (N.D. Cal. Feb. 8, 2010) Doc. #142.

publicity case and the *O'Bannon* antitrust case.[4] *Keller* was filed in May 2009, and it is brought on behalf of a putative class of current and former NCAA student-athletes against EA, NCAA, and the CLC. In *Keller*, plaintiffs contend that defendants conspired to utilize class members' names, images, and likenesses in EA's NCAA-branded videogames in violation of state laws governing rights of publicity.[5]

The *O'Bannon* antitrust action was filed in July 2009 against the NCAA and its trademark licensing agent, CLC.[6] As originally pled, *O'Bannon* was a *horizontal* price-fixing / group boycott conspiracy. EA was not a defendant in the original *O'Bannon* case, nor was any other *down-stream* licensee. The NCAA and CLC moved to dismiss on the ground that there were inadequate allegations of a horizontal conspiracy related to the use of NCAA Division I rules and forms to preclude student-athletes from licensing their collegiate likenesses. The Court denied the motions, ruling that O'Bannon pled sufficient facts to permit a Section 1 rule of reason inquiry into the NCAA's rules and forms. *See* Order on NCAA's and CLC's Motions to Dismiss at 6, No. 09-1967 (Feb. 8, 2010, N.D. Cal.) Doc. #142. The Court reasoned that the NCAA's "bottoms-up" governance structure and comprehensive "constitution, bylaws, and rules" provided a sufficient basis to infer "an agreement" **between the NCAA and its member institutions**. *See id*. Similarly, the Court determined that the CLC was sufficiently involved in the NCAA's alleged anticompetitive activity, by virtue of its role as the "licensing representative" that brokers licensing deals for the NCAA and its members. *See id*. at 7.

Plaintiffs subsequently moved to consolidate *Keller* and *O'Bannon*. The Court granted the motion. Only thereafter, when plaintiffs filed the Amended Complaint, was EA named as a defendant to the antitrust claims. Am. Compl. ¶ 9. As such, this motion to dismiss represents the first opportunity for EA to address (and for the Court to consider) the plaintiffs' unsupported claim that EA—as a downstream, arms-length licensee—agreed to join and participate as a co-

---

[4] *Keller v. Electronic Arts Inc., et al.*, ("*Keller*"), No. 09-1967 (N.D. Cal. May 5, 2009) Doc. #1, and *O'Bannon v. National Collegiate Athletic Association and Collegiate Licensing Company* ("*O'Bannon*"), No. C 09-3329 (N.D. Cal. July 21, 2009) Doc. #1.

[5] *See Keller* Class Action Complaint, No. 09-1967 (N.D. Cal. May 5, 2009) Doc. #1.

[6] *See O'Bannon* Class Action Complaint, No. C 09-3329 (N.D. Cal. July 21, 2009) Doc. #1.

conspirator in the alleged conspiracy among the NCAA and its member institutions.

**III.    Factual Background**

    **A.    The Alleged Horizontal Cartel Of NCAA Member Schools, Conferences, And Their Licensing Entity[7]**

Plaintiffs' antitrust-based claims arise from a pair of NCAA Division I rules that plaintiffs allege constitute "eligibility rules" that student-athletes purportedly must comply with to play college sports.[8] At issue are NCAA Division I Form 08-3a and NCAA Division I Bylaw 12.5.1.1 which, according to plaintiffs, disenfranchise student-athletes of the legal rights for the commercial use of their names, likeness, and images (collectively, "publicity rights").[9]

According to plaintiffs, the NCAA allegedly operated an antitrust conspiracy, comprised of its member schools, that used Division I Form 08-3a and Bylaw 12.5.1.1, and/or the "predecessors" or "precursors" to that form and rule, to force student-athletes to relinquish for zero consideration the legal rights to profit from the use of their likenesses as NCAA athletes.[10] Plaintiffs further allege that "the NCAA's Constitution, its Operating Bylaws, and Administrative Bylaws" constitute the "agreement" between NCAA member institutions "to abide by, implement, and enforce" the challenged rules.[11] In overall terms, plaintiffs contend that the NCAA and its member institutions conspired to utilize the NCAA Division I rules as a tool to steal student-athletes' publicity rights, which were later sold for royalties and other licensing fees.[12] Plaintiffs characterize the NCAA rules as unreasonable restraints of trade and anticompetitive horizontal

---

[7] This brief addresses the claims alleged against EA only. Nothing herein should be construed as an admission or agreement by EA that any allegation regarding the NCAA, its members, or the CLC is accurate or sufficient to state a claim.

[8] Am. Compl. ¶¶ 21-22, 448. EA does not concede or agree that the Division I forms and rules at issue are in fact "eligibility rules" or that any of plaintiffs' allegations regarding the NCAA constitution, bylaws, and Division I rules are accurate.

[9] Am. Compl. ¶¶ 21-23, 282-294, 301-303. *See also id*. ¶¶ 45, 61, 72, 84, 93, 103, 114, 125, 135, 143, 153, 161. Plaintiffs allege that Form 08-3a is the release form the NCAA used in 2008, and that prior iterations of the form are titled differently. Additionally, plaintiffs contend that the NCAA used other forms, "including scholarships and eligibility papers," as "precursors" to Form 08-3a. *Id.*

[10] *Id*. ¶¶ 21-23, 25, 281, 289-92, 301-02, 304, 310, 312, 314.

[11] *Id*. ¶¶ 282, 314. *See also id*. ¶¶ 283-92, 301-03 (identifying several provisions of the NCAA's Constitution and Bylaws that allegedly require member schools and conferences to enforce the allegedly anticompetitive "eligibility" rules (i.e., Form 08-3a and Bylaw 12.5.1.1)).

[12] *Id*. ¶ 18. *See also* ¶¶ 9-10, 17, 18-29, 316, 319-419.

agreements that "fix the prices" of their publicity rights at zero, and exclude or "boycott" them from the "collegiate licensing market." Am. Compl. ¶¶ 9, 25, 314, 427-28, 430-31.

The CLC is the entity that licenses NCAA trademarks to third parties, and which plaintiffs characterize as the NCAA's "licensing arm." *Id*. ¶¶ 324-25. Plaintiffs claim the CLC "facilitated" the illegal cartel "operated by the NCAA" by representing the NCAA and negotiating on its behalf to license intellectual property rights to downstream parties. *Id*. ¶¶ 323-24, 439, 453. Plaintiffs identified ten categories of products for which CLC or other NCAA licensing agents have supposedly granted licenses where student-athletes' publicity rights are allegedly used, including DVDs, on-demand "streamed" games, video clips, photographs, videogames, and television broadcasts of "classic" games. Notably, with the single exception of EA, not one other downstream licensee was named as a defendant in this lawsuit. *Id*. ¶¶ 306, 319-419.

### B. Allegations Concerning EA

EA is mentioned 124 times in the Amended Complaint. However, nearly all of the allegations about EA are in relation to the Right of Publicity Claims and concern the alleged ***use*** of plaintiffs' publicity rights, which is alleged to be ***against*** NCAA policies.[13] As to EA's participation in an antitrust conspiracy to steal those rights in the first place, there is nothing meaningful. The Section 1 conspiracy allegations are so scant that we quote them here:[14]

> ¶ 9. Defendants NCAA, EA, the CLC (the NCAA's licensing arm), and their coconspirators have committed violations of the federal antitrust laws by engaging in a price-fixing conspiracy and a group boycott / refusal to deal that has unlawfully foreclosed class members from receiving compensation in connection with the commercial exploitation of their images, likenesses and/or names following their cessation of intercollegiate athletic competition.
>
> ¶ 10. Defendants NCAA, CLC, and EA have additionally conspired to deprive Antitrust Class members from receiving compensation in connection with the use of their names, images, and likenesses in EA's various NCAA video game products.
>
> ¶ 25. In addition to agreeing to wrongfully interpret the release forms as perpetual licenses, the NCAA has operated as an illegal horizontal

---

[13] *See, e.g.,* Am. Compl. ¶ 6.

[14] There is one additional set of allegations about EA, not quoted, to the effect that EA has sought greater rights to use student-athlete likenesses in its videogames and that the NCAA and CLC have acquiesced in part. Whether this conduct supports an antitrust conspiracy claim is addressed in Part IV.C.5, below.

¶ 52. cartel, additionally facilitated by Defendants CLC and EA. That cartel has collectively and illegally conspired to limit and depress the compensation of former student-athletes for continued use of their images to zero.

¶ 52. As another example of formats in which Antitrust Damages Class members' images are being utilized subject to the anticompetitive restraints detailed herein, Mr. O'Bannon's likeness is utilized by the NCAA's business partner and Defendant Electronic Arts, Inc. as a part of its NCAA Basketball 09 videogame's "Classic Teams" feature…where game players can select Mr. O'Bannon's 1995 UCLA team.[15]

¶ 173. As described herein, the NCAA has entered into license agreements with EA relating to the use of the likenesses of members of the Antitrust Classes in video games available via various platforms.

¶ 429. Defendants CLC, EA and various co-conspirators facilitated the contract, combination and conspiracy described herein, and benefited financially from its operation.

¶ 440. Defendant EA has participated in this illegal scheme, and has financially benefited from it.

¶ 454. Defendant EA has participated in this illegal scheme, and has financially benefited from it.

These allegations do not identify a single fact suggesting EA's participation in the alleged conspiracy.

## IV. Discussion

### A. The Governing Substantive Law Requires Plaintiffs To Plead Facts Plausibly Indicating EA's Conscious Commitment To An Unlawful Agreement

To state a claim under Section 1 of the Sherman Act, plaintiffs must allege evidentiary facts that, if true, plausibly indicate (1) an agreement between two or more people that (2) unreasonably restrains trade. *Twombly*, 550 U.S. at 553-57; *Kendall v. Visa U.S.A. Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). Proof of an "agreement" is *the* key element in an antitrust conspiracy: "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade … but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (citations omitted).

In *Twombly*, the Supreme Court held that a plaintiff purporting to plead a Section 1 claim

---

[15] The same allegation (likeness used in an EA videogame) is made with respect to plaintiffs Flournoy, Maynor, Prothro, Rhodes, and Wimprine. *Id*. ¶¶ 66, 127, 138, 155, 162.

cannot rest on conclusory allegations. *Twombly*, 550 U.S. at 556-557.[16] Rather, a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made" and thus "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

The Supreme Court's *Monsanto* decision articulated the basic test for what must be proved with respect to a Section 1 *vertical* conspiracy:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the [parties]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Monsanto*, 465 U.S. at 768. A plaintiff must plead the "conscious commitment to a common scheme" **by each named defendant**. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (a properly pled antitrust conspiracy must allege specific *facts* "that each individual defendant joined the conspiracy and played some role in it"). *See also In re Cal. Title Ins. Antitrust Litig.*, No. 08-01341, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009) ("A complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it."); *Kendall*, 518 F.3d at 1048 (holding that plaintiffs must not only allege knowing, active, and intentional participation, but also must allege specific *facts* regarding each defendant's participation in the common scheme, including "who, did what, to whom (or with whom), where, and when"). If a plaintiff cannot "specifically connect[]" a particular defendant to the alleged conspiracy, then that defendant must be dismissed from the case. *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1136 (N.D. Cal. 2005).

**B.     Plaintiffs Have Failed To Plead An Unlawful Agreement With EA**

Although plaintiffs refer to their antitrust claims under various labels—e.g., group

---

[16] *See also id.* at 557 (plaintiffs must plead *facts* "plausibly suggesting (not merely consistent with)" an agreement in violation of Section 1 to survive a motion to dismiss); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-1950 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief.").

boycott, refusal to deal, and price-fixing—the factual predicate for each is the same: plaintiffs claim that EA was a participant in the alleged conspiracy by the NCAA and its member institutions to misappropriate the Antitrust Class plaintiffs' publicity rights through the use of Division I rules and forms. The core problem with the Amended Complaint is that there are no factual allegations indicating this was in fact the case.

### 1. Conclusory Allegations Of Antitrust Conspiracy Are Insufficient

As shown in Part III.B, above, where the EA-specific conspiracy allegations in the Amended Complaint are quoted, most everything plaintiffs say about EA's role in the alleged conspiracy is conclusory. These generic allegations of purported concerted action (a) lack any factual allegations regarding the terms, timing, or circumstances surrounding the alleged agreement, (b) are mostly not specific to EA, and (c) do not even attempt to identify EA's particular role, participation or "conscious commitment" in the anticompetitive conspiracy allegedly operated by the NCAA and facilitated by the CLC.

Such generic allegations are insufficient as a matter of law to state a Section 1 antitrust conspiracy claim against EA. *See Twombly*, 550 U.S. at 564 (holding where only "a few stray statements speak directly of agreement," they "are merely legal conclusions resting on the prior allegations"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (holding "conclusory allegations of agreement" fail to meet minimum Section 1 pleading standards, because they do not "specif[y] any particular activities by any particular defendant; it is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts what so ever" about each defendant's connection to and participation in the alleged conspiracy).[17] In fact, with respect to EA, the Amended Complaint is more deficient than the one the Supreme Court dismissed in *Twombly*, which at least involved conclusory allegations of a horizontal conspiracy among firms operating at the same market level (namely, telecommunications providers). Here, conclusory allegations of conspiracy are particularly misplaced because EA operates at a

---

[17] *See also Mich. Div.-Monument Builders v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 485 (E. D. Mich. 2006), *aff'd* 524 F.4d 726 (6th Cir. 2008) ("Plaintiffs cannot escape their burden of alleging that each defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply to numerous parties without any specific allegations as to any individual … defendant.").

different level in the vertical distribution chain from the NCAA and the CLC. EA is an independent, third-party licensee that licenses intellectual property rights from the alleged cartel. There is no particular reason to think that a down-stream licensee, like EA, would be part of an upstream cartel. Plaintiffs thus needed to explain why EA was added to this case by pleading facts indicating conspiracy. They completely failed to do so.

### 2. EA Had No Involvement In The Agreements At The Heart Of The Alleged NCAA Conspiracy

Plaintiffs identify the NCAA's constitution, bylaws, and eligibility rules as the "agreements" allegedly used to operate a horizontal cartel comprised of the NCAA's member schools and conferences. *See* Am. Compl. ¶¶ 187-196, 282-294, 301-03, 314. By doing so, they have effectively pled EA out of the conspiracy. EA is not a member of the NCAA, an agent or representative of the NCAA, or otherwise subject to any of its governing rules. Moreover, plaintiffs allege no facts indicating that EA had any role in creating, implementing, or maintaining the NCAA forms or rules referenced in the Amended Complaint. Thus, according to the Amended Complaint itself, EA has no alleged connection to the "agreement" that forms the basis of plaintiffs' antitrust claims (i.e., the alleged conspiracy to impose NCAA Division I "eligibility" rules to misappropriate student-athletes' publicity rights). Consequently, plaintiffs' conspiracy claims against EA fails as a matter of law. *See, e.g., Kendall*, 518 F.3d at 1048 (motion to dismiss granted where plaintiffs failed to allege facts to support theory of conspiracy); *see also Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1191-1192 (S.D. Cal. 2002) (granting motion to dismiss vertical price fixing claim where (i) "terms of the NBA-DirecTV contract show that the NBA Defendants did not attempt to fix the price," and (ii) the operative complaint does not "suggest[] that, notwithstanding the terms of the written NBA-DirecTV contract, there existed a separate conspiracy or contract pursuant to which the Defendants agreed to fix prices.").

### 3. EA's Trademark License With The NCAA Does Not Imply Conspiracy

Plaintiffs do allege, and there is no dispute, that EA entered into and financially benefited from its trademark license with the NCAA. There is no question, however, that trademark licenses and similar vertical buy-sell transactions occur regularly in the ordinary course of

business, and are in most circumstances competitively benign. The mere existence of such an agreement does not imply *an unlawful agreement* of the type condemned by Section 1 of the Sherman Act. *See*, *e.g.*, *49er Cheverolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986) (dismissing vertical price-fixing claims based on examination of language in the distribution agreement that formed the basis of the complaint, and emphasizing that "[t]he antitrust laws are not offended by agreements as such, but only by those with an anticompetitive content.").[18] Here, plaintiffs do *not* allege that EA's license with the NCAA constitutes (a) an express agreement to join and participate in the allegedly illegal cartel "operated" by the NCAA and "facilitated" by the CLC (Am. Compl. ¶¶ 25, 323-24, 439, 453), (b) an agreement between EA and the NCAA to boycott or deprive plaintiffs of an opportunity to negotiate fair value for the use of their publicity rights, or (c) an agreement to use the NCAA's Division I rules to secure student-athletes' publicity rights. Consequently, the mere fact that the license exists does nothing to advance plaintiffs antitrust claims against EA.[19]

Furthermore, the fact that EA entered into an arms-length, for-profit licensing agreement with the NCAA makes EA no different than the dozens of other distributors and manufacturers that also license the NCAA's intellectual property rights. Am. Compl. ¶¶ 175, 306, 319-419. Indeed, the Amended Complaint explicitly alleges that there are many other NCAA trademark

---

[18] The leading antitrust treatise cautions courts against inferring unlawful conspiracy from ordinary commercial relationships:

> Given the ubiquity of vertical agreements, we need to be clear on which ones should be of concern to antitrust law. … [V]irtually every case [alleging vertical conspiracy] … involves firms who are the parties to *some* agreement…. [I]t would be pointless to conclude that the agreement requirement [of Section 1] is met because the manufacturer and dealer are engaged in buying and selling with each other. That would be tantamount to eliminating the agreement requirement altogether.

Areeda & Hovenkamp, Antitrust Law, ¶ 1437b (3d ed. 2010).

[19] If anything, EA's license cuts against the allegation that EA is a member of an alleged NCAA-led antitrust conspiracy to steal student-athlete publicity rights. Plaintiffs allege that EA's license agreements do not include a license grant of student-athlete publicity rights and "explicitly prohibit the use of NCAA athlete names and/or likenesses in NCAA branded videogames." Am. Compl. ¶ 198; *see also id*. p.139, ¶ 28. In other words, the license agreement is directly at odds with the primary benefit of being in the alleged antirust cartel—namely, the commercial exploitation of student-athletes' publicity rights via "the NCAA's web of *licensing agreements* with for-profit companies." *Id*. ¶ 323 (emphasis added). *See also id*. ¶¶ 331-371, 387, 403-419.

licensees—broadcasters, apparel manufacturers, and so forth—and that other licensees use student-athlete names and likenesses in their products.[20] In fact, the Amended Complaint even alleges that the NCAA entered into a license agreement with another videogame publisher, 2K Sports, "for videogame rights for college basketball." *Id*. ¶ 387. Yet neither 2K Sports nor any other NCAA licensee (besides EA) was sued as a "co-conspirator" to the alleged upstream cartel. Plaintiffs thus implicitly acknowledge that having an NCAA trademark license—even one that might allow the licensee to profit from the alleged NCAA-level conspiracy—does not infer that the licensee joined the NCAA-level conspiracy. At most, an NCAA trademark license is "conduct as consistent with permissible competition as with illegal conspiracy," and therefore "does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 588 (1986). *See also Kendall*, 518 F.3d at 1049.

4. **That EA Allegedly Benefits From The Alleged Conspiracy, Or Facilitates It By Licensing Rights From The Alleged Conspirators, Does Not Make EA A Member Of The Conspiracy**

The *unstated* thesis of plaintiffs' case is that because (a) EA allegedly benefits somehow (apparently by not paying college players) from the alleged NCAA conspiracy to use its eligibility rules to steal players' rights of publicity, and (b) the alleged conspirators profit from the EA trademark license agreement, then (c) they must all be parties to the same conspiracy. There is no legal or logical basis for inferring a conspiracy on this basis.

In the first place, there is no antitrust violation for "facilitating" a conspiracy by doing business with the alleged conspirators. The only "facilitation" that matters for purposes of a Section 1 claim is in forming or carrying out the unlawful agreement, which means providing positive assistance to the conspiracy in some way that is necessary to its success. *See Virginia Vermiculite Ltd., v. Historic Green Springs,* 307 F.3d 277, 282 (4th Cir. 2002) ("concerted activity susceptible to sanction by section 1 is activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, but for the concert, would naturally be frustrated by their competing interests").[21] Even then, one must also

---

[20] *See, e.g.*, Am. Compl. ¶¶ 18, 331-371, 387, 403-419.

[21] This is consistent with general conspiracy law. *See United States v. Falcone,* 109 F.2d 579, 581 (2d Cir.), *aff'd,* 311 U.S. 205 (1940) (suppliers of sugar, yeast, and cans are not guilty of

establish that each charged party "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 768. In this case, ***EA is accused only of licensing the rights that the purported NCAA-level cartel offered to license***, through its licensing agent, the CLC. It obviously could have done that without being a member of the alleged cartel—as other licensees allegedly did. Negotiating and contracting with an independent, third-party licensor in an arms-length, commercial transaction does not make EA or any other licensee liable for conspiracy. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (holding that normal business interaction "is presumed legitimate and is not a basis from which to infer conspiracy, without more.").

Nor does it matter that EA allegedly "benefits" from the cartel.[22] The relevant question is whether the alleged benefit reasonably implies conspiracy. Substantive "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588. In particular, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id*. Rather, to infer conspiracy, there must be evidence that "tends to exclude the possibility of independent action." *Monsanto*, 465 U.S. at 764.[23]

That a licensee benefits from its licensor's business practices does not exclude the possibility that it acts and receives such benefits independently. All trademark licensees want to acquire the rights they need at the lowest possible cost, down to, and including zero. If, as

---

conspiracy to operate illicit stills simply because they knew "that others will make an unlawful use" of their goods).

[22] The purported benefit—being allowed to use student-athlete publicity rights without paying for them—is not nearly as clear as plaintiffs allege. First, plaintiffs admit that EA has entered into (paid for) "licensing deals" directly with several former student-athletes. Am. Compl. ¶ 383. Second, if the NCAA and CLC constitute an anticompetitive cartel, it hardly follows that they would pass on the fruits of any anticompetitive behavior to licensees like EA. Indeed, the Amended Complaint states that the NCAA and CLC give EA fewer rights than it wants in exchange for the royalties it pays. *Id*. ¶ 376.

[23] *See also Kendall*, 518 F.3d at 1049 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws."); *In re Graphics Processing Units Litig.*, 527 F. Supp. 2d at 1023 (dismissing complaint that infers agreement from "conduct [that is] consistent with conspiracy but…equally consistent with lawful conduct").

alleged, the NCAA members conspired to set a zero price for the publicity rights at issue—and if they passed on the benefits of that conduct to licensees—EA and every other licensee would automatically and independently benefit from that whether or not they joined the conspiracy. The receipt of such benefits therefore "does not give rise to an inference of conspiracy." *Matsushita,* 475 U.S. at 597.

### 5. EA's Requests For Greater Rights To Use Player Names And Likenesses Does Not Indicate An Unlawful Conspiracy

To the extent the Amended Complaint contains any factual allegations about communications between EA, on the one hand, and the NCAA and CLC on the other, they are found primarily in paragraphs 372 to 402. The gist of those paragraphs is that EA allegedly wants to offer its customers increasingly realistic images of NCAA student-athletes, has asked the NCAA and CLC for the rights to do so, and has gotten some but not all of the leeway it has requested.[24] As a matter of law, those allegations do not permit an inference of conspiracy among EA, the NCAA, and the CLC.

Antitrust law has a great deal of experience with this type of allegation, because it is structurally similar to the pattern in hundreds of vertical price-fixing cases where a manufacturer was accused of terminating a distributor at the behest of other, competing distributors who complained about excessive discounting practices. The core issue is whether a conspiracy between the manufacturer and complaining distributors can be inferred from the combination of (i) complaints and (ii) allegedly anticompetitive action by the manufacturer. The answer provided by the Supreme Court in *Monsanto* and *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 726-28 (1988), is emphatically no.

First, the Court noted in *Monsanto* that parties in a vertical relationship, like EA has with the NCAA and CLC, are ordinarily "in constant communications about prices and marketing

---

[24] More specifically, plaintiffs allege that EA expressed "frustration" over NCAA prohibitions on depicting student-athletes' likenesses in its videogames, and that EA pushed the NCAA for more "leeway" as part of an "ongoing discussion . . . [of] how far can we go" to make NCAA videogames more realistic and marketable." Am. Compl. ¶¶ 376-79. Plaintiffs claim that, as a result of these communications, the NCAA relaxed its standards prohibiting licensees from depicting student-athletes' likenesses. In addition, plaintiffs also allege that EA representatives regularly attend practices of the NCAA teams and players they seek to simulate in NCAA videogames. *Id.* ¶ 393.

strategy." *Monsanto,* 465 U.S. at 762. These interactions, which are "natural … unavoidable … [and] arise in the normal course of business…do not indicate illegal concerted action." *Id.* at 763. Under any other rule, parties in a vertical relationship "would be likely to forgo legitimate and competitively useful conduct rather than risk treble damages." *Sharp Elec.*, 485 U.S. at 728. Second, the Court in *Monsanto* held that one cannot infer conspiracy simply from that fact that the upstream seller made a policy decision "in response to complaints" of downstream buyers. *Monsanto*, 465 U.S. at 763 (price-fixing agreement cannot "be inferred merely from the existence of [buyer] complaints," or because a supplier later took action "in response to complaints," because that "could deter or penalize perfectly legitimate conduct"); *Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1156-57 (9th Cir. 1988) (following the "clear" rule of *Monsanto*; holding that buyer complaints about pricing that "preceded or precipitated" a supplier's response is not sufficient evidence of a vertical price-fixing conspiracy).[25] Under the *Monsanto/Sharp* line of cases, the upstream party's policy decisions infer conspiracy only if they are inconsistent with rational, lawful, and independent business judgment.

Under these standards, taking plaintiffs' allegations at face value, neither EA's *alleged* requests to its licensor for "leeway" to use player images nor any *alleged* "leeway" it received reasonably infers an agreement among the NCAA, the CLC, and EA *to deny compensation to student-athletes*. A licensee's desire to get the broadest set of rights for its licensing dollar is completely normal and can be expected regardless of how the licensor acquired the bundle of rights conveyed in the license. Simply stated, how an IP owner acquired its rights (whether by lawful or unlawful means) is completely separate from subsequent licensing discussions. Without something more, licensing discussions alone do not remotely imply that the licensees

---

[25] *See also*, *e.g.*, *Garment Dist. v. Belk Stores, Inc.*, 799 F.2d 905, 909 (4th Cir. 1986) (holding that vertical price-fixing conspiracy cannot be inferred from a manufacturer that complies with a buyer's demands, because a "manufacturer is not prohibited from avoiding the potential loss of many of its dealers because it acted in response to price complaints"); *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763 (5th Cir. 2002) (holding that evidence of "complaints are insufficient evidence of concerted action, because dealer-initiated contact fails to establish that a manufacturer has imposed restrictions collusively, not based on its independent business judgment"); *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 13-14 (1st Cir. 2004) (no agreement may be inferred from evidence that manufacturer acted in response to complaints from major dealer).

1 were involved in any way with the original acquisition of rights.

2 Moreover, plaintiffs admit that EA has legitimate business reasons to interact with the NCAA and CLC in connection with developing and marketing commercially successful videogames. *See*, *e.g.*, Am. Compl. ¶ 198 ("NCAA and its member institutions, through CLC, are required to approve every EA videogame produced pursuant to the license before its release."). Similarly, the fact that EA, the CLC, and the NCAA allegedly engaged in "on going discussion[s]" to establish "how far can we go" is equally consistent with all parties' interest in maximizing business opportunities within permissible legal boundaries. *Id*. ¶ 376.[26] Indeed, none of the plaintiffs' allegations are inconsistent with the parties' legitimate and presumed pro-competitive interest in developing a high quality and commercially successful videogame. Nor do any of the plaintiffs' allegations distinguish EA and its conduct from any other downstream trademark licensee of the NCAA.

Consequently, plaintiffs' antitrust allegations against EA—the only licensee sued in this lawsuit—are not sufficient to survive a motion to dismiss. *See Monsanto*, 465 U.S. at 762-3 (holding that a conspiracy cannot be inferred from "constant communications about prices and marketing strategy" between buyers and sellers, which are "legitimate….natural…and… unavoidable"); *Twombly*, 550 U.S. at 554 (dismissing complaint based on conduct that is consistent with "a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market").

## V.  Conclusion

For these reasons, plaintiffs' antitrust-based claims against EA should be dismissed.

Dated: January 18, 2011

LATHAM & WATKINS LLP
Daniel M. Wall
Timothy L. O'Mara

By:  /s/ Timothy L. O'Mara
TIMOTHY L. O'MARA
Attorneys for Defendant
ELECTRONIC ARTS INC.

---

[26] *See*, *e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134-35 (3d Cir. 1999) (holding "profit is always a motivating factor in the conduct of a business. Profit is a legitimate motive … and something more is required before a court can conclude that competitors conspired.").