Gregory L. Curtner (*pro hac vice*)
Robert J. Wierenga (SBN183687)
Kimberly K. Kefalas (*pro hac vice*)
Kimberly L. Scott (*pro hac vice*)
Suzanne L. Wahl (*pro hac vice*)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
101 North Main St., 7th Floor
Ann Arbor, MI  48104
Telephone:  (734) 663-2445
Email: curtner@millercanfield.com
       wierenga@millercanfield.com
       kefalas@millercanfield.com
       scott@millercanfield.com
       wahl@millercanfield.com

Jason A. Geller (SBN168149)
LONG & LEVIT LLP
465 California Street, 5th Floor
San Francisco, CA  94104
Telephone:  (415) 397-2222
Email: jgeller@longlevit.com

Attorneys for Defendant
National Collegiate Athletic Association

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| In re NCAA Student-Athlete Name and Likeness Licensing Litigation | Case No. 09-cv-1967-CW<br><br>**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>Date:  March 3, 2011<br>Time:  2 PM<br>Dept:  Courtroom 2, 4th Floor<br>Judge:  Hon. Claudia Wilken<br>Complaint filed: May 5, 2009 |

## I. THE RIGHT OF PUBLICITY CLAIMS REMAIN DEFECTIVE AND MUST BE DISMISSED

*Plaintiffs' breach of contract claim must be dismissed.* Plaintiffs first argue that they have adequately alleged "consideration" for the NCAA's supposed "contractual" commitment not to use their names or likenesses. *See* Pl. Opp. at 21-22.[1] That retreaded argument is not well taken; the NCAA made no such promise, nor did plaintiffs provide consideration for that (non-existent) promise. While the word "consideration" does appear in the CAC paragraphs identified by plaintiffs, those same paragraphs allege that plaintiffs' "consideration" was given in exchange for the NCAA's supposed agreement to grant plaintiffs eligibility to participate in NCAA athletics – not in exchange for any NCAA promise relating to use of student-athlete images. *See, e.g.,* CAC at ¶196 ("In return and in consideration for the above disclosures, waivers, affirmations and limited license, *the NCAA agrees to grant players eligibility to participate in Division I athletics*") (emphasis added). According to plaintiffs' own allegations, then, the only "consideration" alleged in the complaint was given in exchange for the NCAA's "promise" to grant plaintiffs eligibility in exchange for the signed forms. But the plaintiffs are not suing the NCAA for breach of that supposed "eligibility contract"; they are suing the NCAA for breach of a supposed contract not to use, or allow third parties to use, plaintiffs' names or likenesses. The CAC does not allege, in words or in substance, that plaintiffs provided the NCAA with consideration to support *that* "contract" (or that the NCAA made any such promise). There is simply no connection between the "eligibility contract" that plaintiffs claim to have supported with allegations of consideration and the "use of name and likeness contract" they are supposedly alleging.[2]

---

[1] The NCAA does not concede that California law applies to plaintiffs' claims. As the NCAA stated in its first motion to dismiss, Dkt. 48 at 10 n. 10, plaintiffs have failed to allege sufficient facts for the Court to perform a choice of law analysis as to each plaintiff, and all the state law claims should be dismissed.

[2] A promise to police the entire world on behalf of current or former student-athletes makes no sense. The NCAA bylaws put the burden of compliance on the student-athletes and his or her institution, not on some hypothetically omniscient, omnipresent and omnipotent NCAA. Moreover, plaintiffs fail to allege that the NCAA has breached the "use of name and likeness contract" in the EA videogames. As plaintiffs admit and CLC has demonstrated, the NCAA does not license student-athlete names or likenesses to EA. *See* CAC at ¶198; CLC Op. Br. at 3.

Plaintiffs next appear to argue that since Form 08-3a refers to certain Division I Bylaws, the Form contains an implicit "contractual" term by which the NCAA promises student-athletes that it will enforce all of those Bylaws (including Division I Bylaw 12.5.1). *See* Pl. Opp. at 22-23. This argument does nothing to solve plaintiffs' lack of consideration problem, as discussed above. Nor is it a plausible, or permissible, reading of Form 08-3a, which says nothing about the enforcement of NCAA Bylaws at all, let alone contains any NCAA contractual promise to student-athletes that it will enforce Division I Bylaw 12.5 or any other NCAA Bylaw. *See* CAC at Ex. A. Plaintiffs cannot allege a breach of contract claim against the NCAA by pretending that the incorporated Form 08-3A contains language it does not contain. *NFL Properties, Inc. v. Dallas Cowboys*, 922 F. Supp. 849, 852-53 (S.D.N.Y. 1996) ("To the extent that the content of the contracts conflicts with allegations about those contracts made in the Complaint, the actual language of the contracts must control."). Indeed, this Court rejected this same argument by plaintiffs when it granted the NCAA's previous motion to dismiss. *See Keller* Order, Dkt. 150, at 18. Plaintiffs' breach of contract claim should again be dismissed, this time with prejudice.

***Plaintiffs' conspiracy claim must be dismissed.*** Plaintiffs' conspiracy allegations against the NCAA remain insufficient as well. In light of plaintiffs' allegations regarding the contracts between the NCAA, CLC and EA, *see* CAC at ¶198 (alleging that licensing agreements "explicitly prohibit the use of NCAA athlete names and/or likenesses in NCAA branded videogames"), plaintiffs' entirely conclusory assertion that the NCAA had a "meeting of the minds" with EA to engage in the "unlawful act" of violating plaintiffs' alleged rights of publicity, *id.* at 137, ¶¶18, 19, is insufficient. Alleging that the NCAA approved EA's games is *not* the same thing as alleging that the NCAA "conspired" with EA to violate plaintiffs' rights, since it impermissibly ignores the possibility that the NCAA approved the games because it believed those games do not use student-athlete images.[3] It is plaintiffs' burden to allege facts to

---

[3] An entity that engages in legitimate business with a party that is acting tortiously cannot be deemed a coconspirator, absent clear evidence of an agreement to join in the tortious conduct. *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1590 (1995); *see also Harris v. Capitol Records Corp.*, 64 Cal. 2d 454, 462 (1966) (finding the mere fact that defendants knew of rack-jobber's actions was insufficient to prove conspiracy with him).

"nudge their claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and they have failed to do so.

## II. THE ANTITRUST CLAIMS REMAIN DEFECTIVE AND MUST BE DISMISSED

The antitrust plaintiffs spend most of their time deriding the NCAA's arguments as simple rehashes of arguments that this Court has considered, and rejected, before. That is a remarkably mistaken line of attack, since plaintiffs did not make their concession that the market for "individual endorsements" was "not precluded" until oral argument on the last motion to dismiss – long after the NCAA's last round of briefs had been filed. Plaintiffs then proceeded to contradict themselves in the CAC, adding new allegations that the types of products that plaintiffs apparently consider to be "individual endorsements" – i.e., photographs in which newly named plaintiffs appear by themselves or with one or two other student-athletes – are "subject to the anticompetitive restraints" after all.[4] The NCAA has had no prior opportunity to address plaintiffs' wildly fluctuating allegations on this critical point. Nor could the NCAA have addressed the serious *Twombly* problems raised by the new antitrust plaintiffs, who played NCAA sports decades before Messrs. O'Bannon and Newsome, prior to this motion.

The antitrust plaintiffs have focused on the supposed lack of novelty in the NCAA's arguments because they have no response to their substance. Remarkably, plaintiffs concede that the new antitrust plaintiffs ***do not know, and cannot allege***, what NCAA forms they signed (if any), or what language those forms contained. Pl. Opp. at 17-18. Instead, they claim their fact-free boilerplate allegations that they probably signed some NCAA forms, and that the NCAA has spent the last several decades participating in a conspiracy to use those unidentified "forms" to preclude them from one or more "markets," are sufficient until discovery allows them to figure out whether the facts actually support their claims. *Id.* at 18. Plaintiffs have it backwards:

> In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence

---

[4] *See, e.g.*, CAC at ¶¶50, 76, 87, 120, 128, 139.

> of illegal agreement. . . . Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.
>
> * * *
>
> [I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528, n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." . . .

*Twombly*, 550 U.S. at 556-60.

The new antitrust plaintiffs' claims clearly fail the *Twombly* standard for Section 1 pleadings. Plaintiffs have not alleged facts showing that they signed **any** NCAA forms that mentioned the use of their name, likeness or image, let alone that the NCAA and its many alleged "co-conspirators" have agreed to use those unidentified forms while also agreeing to boycott the plaintiffs over the last several decades. Their attempt to substitute conclusory boilerplate for those facts is insufficient, as a matter of law. *See, e.g., Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). And without those alleged facts, plaintiffs' lengthy allegations that the NCAA and others are earning "collegiate licensing" revenue without plaintiffs' permission are nothing more than allegations of commercial conduct "that could just as well be independent action." *Twombly,* 550 U.S. at 560. That is not enough to send these antitrust claims into discovery.

Plaintiffs' attempt to downplay their concession that the market for "individual endorsements" is not precluded by the alleged conspiracy, Pl. Opp. at 18-20, also fails. Plaintiffs have not even tried to answer the main point of the NCAA's argument: if (as plaintiffs allege) the NCAA's forms and rules are used to "boycott" plaintiffs in the "market" for licensing their "collective" images,[5] why has that "boycott" left the market for "individual endorsements"

---

[5] Plaintiffs have not alleged any facts to support their new claim that the relevant market is for "collegiate athletic games," or any other "collective" form of licensing.

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**
Case No. 09-cv-1967-CW
4

unaffected? *See* NCAA Mot. at 6-7. Plaintiffs do not answer this argument because they cannot: the CAC contains no facts to support their wholly implausible claim that the NCAA's forms and rules, which do not discuss either "collective" or "individual" licensing activities by former student-athletes, somehow foreclose competition in the "market" for the former but not the latter.

Indeed, plaintiffs' opposition only makes the problems with their antitrust claims more pronounced, because plaintiffs have now contradicted their own market definition. The CAC defines the relevant market as the market for "collegiate licensing," and clearly includes the types of "individual endorsements" that plaintiffs now admit are not precluded by the alleged conspiracy. CAC at ¶306; *see also* CAC at p. 97 (describing "revenue streams relating to the commercial exploitation of images of former student-athletes," which include allegations about individual contracts for action figures, ¶¶369-70, and video game covers, ¶383). Plaintiffs try to fix this problem in their opposition by redefining their relevant market, much more narrowly, as the "market for the licensing of collegiate athletic games." Pl. Opp. at 18. This gets them nowhere: they are bound by their own allegations regarding the relevant market, and cannot change those allegations in their opposition. *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1145 (N.D. Cal. 2010). Moreover, it is plaintiffs' affirmative burden to allege and prove a relevant market, and they should not be permitted to contradict themselves on this critical issue whenever the exigencies of a particular argument dictate that they do so. *Tanaka v. USC*, 252 F.3d 1059, 1063 (9th Cir. 2001). At a minimum, plaintiffs should be required to amend their complaint to define, once and for all, the market they claim is at issue here: the "market for individual endorsements," the "market for collegiate athletic games," or the "collegiate licensing market."

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
By:  */s/ Robert J. Wierenga*
    Gregory L. Curtner (*pro hac vice*)
    Robert J. Wierenga (SBN183687)
    Attorneys for Defendant
Dated: February 10, 2011    National Collegiate Athletic Association

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**
Case No. 09-cv-1967-CW
5

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2011, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification to the e-mail addresses registered.

By: <u>*/s/ Robert J. Wierenga*</u>
Robert J. Wierenga (SBN183687)
MILLER, CANFIELD PADDOCK AND STONE
Attorneys for Defendant NCAA

18,803,321.1\063863-00040

**DEFENDANT NCAA'S REPLY IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**
Case No. 09-cv-1967-CW