IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LITIGATION
_____/

No. C 09-1967 CW

ORDER GRANTING EA'S MOTION TO DISMISS AND DENYING CLC'S AND NCAA'S MOTIONS TO DISMISS (Docket Nos. 271, 273 and 274)

Defendants Electronic Arts Inc. (EA), Collegiate Licensing Company (CLC), and National Collegiate Athletic Association (NCAA) move separately to dismiss claims in this consolidated action. Plaintiffs Edward C. O'Bannon, Jr.; Harry Flournoy; Alex Gilbert; Sam Jacobson; Thad Jaracz; David Lattin; Patrick Maynor; Tyrone Prothro; Damien Rhodes; Eric Riley; Bob Tallent; and Danny Wimprine (collectively, Antitrust Plaintiffs) and Plaintiffs Samuel Keller; Bryan Cummings; Lamarr Watkins; and Bryon Bishop (collectively, Publicity Plaintiffs) oppose the motions directed at their respective claims.  The motions were heard on April 7, 2011. Having considered oral argument and the papers submitted by the parties, the Court GRANTS EA's motion and DENIES CLC's and NCAA's motions.

BACKGROUND

In these consolidated cases, Antitrust Plaintiffs bring claims based on Defendants' alleged conspiracy to restrain trade in violation of § 1 of the Sherman Act, and Publicity Plaintiffs bring claims based on Defendants' alleged violations of their statutory and common law rights of publicity.  Antitrust Plaintiffs are eight

former college basketball players and four former college football players, and Publicity Plaintiffs are four former college football players.

NCAA, an unincorporated association of various colleges, universities and regional athletic conferences, governs collegiate athletics and is headquartered in Indiana. The association is subdivided into divisions. These consolidated actions involve practices and license agreements related to NCAA "Division I" men's basketball teams and NCAA "Football Bowl Subdivision," known as "Division I-A" before 2006, men's football teams.

CLC, which is incorporated and headquartered in Georgia, allegedly handles NCAA's license agreements. EA, a Delaware corporation with a principal place of business in California, develops, publishes and distributes video games.

I.   Antitrust Allegations and Claims

Antitrust Plaintiffs allege that, during their respective collegiate careers, they "competed pursuant to the NCAA's rules and regulations" and signed one or more release forms "that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members, and/or its licensees." See, e.g., Consol. Am. Compl. ¶ 45. One such release form is Form 08-3a, which NCAA used in 2008 to assist in certifying a student-athlete's eligibility to compete. Id. ¶¶ 21 and 292. To participate in an NCAA-sanctioned competition, Antitrust Plaintiffs allege, a student-athlete had to sign Form 08-3a or a form similar to it. By signing Form 08-3a, student-athletes agreed to the following:

2

> You authorize the NCAA [or a third party acting on behalf of the NCAA (e.g., host institution, conference, local organizing committee)] to use your name or picture to generally promote NCAA championships or other NCAA events, activities or programs.

Id. ¶ 290 (bracketed text in original).  This statement reflects NCAA Bylaw 12.5.1.1.1, which provides,

> The NCAA [or a third party acting on behalf of the NCAA (e.g., host institution, conference, local organizing committee)] may use the name or picture of an enrolled student-athlete to generally promote NCAA championships or other NCAA events, activities or programs.

Id. ¶ 283 (bracketed text in original).  Form 08-3a states that a student-athlete's release "shall remain in effect until a subsequent Division I Student-Athlete Statement/Drug-Testing Consent form is executed," which Antitrust Plaintiffs allege has the effect of allowing the release to persist in perpetuity.  Id. ¶ 291.

Antitrust Plaintiffs claim that, among other things, release forms like Form 08-3a and NCAA rules like Bylaw 12.5.1.1.1 enable NCAA and CLC to execute license agreements with companies, such as EA, that distribute products containing student-athletes' images, likenesses or names, even after the student-athletes have ended their collegiate athletic careers.  As noted above, CLC allegedly administers NCAA's license agreements.  Antitrust Plaintiffs contend that neither they nor other student athletes consented to these agreements and that they do not receive compensation for the use of their images.

Antitrust Plaintiffs posit that Defendants engaged in anticompetitive conduct in two ways.  First, they contend that Defendants conspired to fix the prices they received for the "use and sale of their images, likenesses and/or names at zero dollars."

3

Consol. Am. Compl. ¶ 427.  Second, Antitrust Plaintiffs assert that Defendants engaged in a "group boycott / refusal to deal" conspiracy that required "all current student-athletes to sign forms each year that purport to require each of them to relinquish all rights in perpetuity for use of their images, likenesses and/or names" and "to deny Antitrust Class Members compensation in the form of royalties for the continued use of their images, likenesses and/or names for profit."  Consol. Am. Compl. ¶¶ 448 and 449.

Antitrust Plaintiffs bring the following claims against all Defendants: (1) violation of § 1 of the Sherman Act for an unreasonable restraint of trade; (2) violation of § 1 of the Sherman Act for a group boycott and refusal to deal; (3) unjust enrichment; and (4) an accounting.

Antitrust Plaintiffs intend to move to certify two classes to prosecute these claims.  The proposed "Antitrust Declaratory and Injunctive Relief Class" consists of:

> All current and former student-athletes residing in the United States who compete on, or competed on, an NCAA Division I college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team and whose images, likenesses and/or names may be, or have been, licensed or sold by Defendants, their co-conspirators, or their licensees after the conclusion of the athlete's participation in intercollegiate athletics.

Consol. Am. Compl. ¶ 268.  The proposed "Antitrust Damages Class" consists of:

> All former student-athletes residing in the United States who competed on an NCAA Division I college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team whose images, likenesses and/or names have been licensed or sold by Defendants, their co-conspirators, or their licensees from July 21, 2005 and continuing until a final judgment in this matter. The class does not include current student-athletes.

4

Id.

## II. Right of Publicity Allegations and Claims

Publicity Plaintiffs allege that EA misappropriates student-athletes' likenesses in its NCAA Football, NCAA Basketball and NCAA March Madness video game franchises. These games, according to Publicity Plaintiffs, are developed and distributed pursuant to license agreements with CLC, NCAA and NCAA member institutions.

Publicity Plaintiffs contend that, in these video games, consumers simulate football and basketball matches between teams from NCAA-member schools. The teams in the video games are comprised of virtual football and basketball players that EA allegedly designed to resemble the actual student-athletes on those teams. For instance, virtual players purportedly share attributes of the student-athletes, including jersey numbers, height, weight, home state, skin tone and hair color. According to Publicity Plaintiffs, EA omits student-athletes' names in the video games, and the virtual players are identified only by their jersey number. However, EA has allegedly designed the games to allow consumers to upload rosters, created by third parties, which contain the names of student-athletes. Uploading these rosters has the effect of re-labeling the virtual players with the respective student-athletes' names. NCAA and CLC allegedly know that EA's video games are designed with these features, which enhance the games' realism.

Publicity Plaintiffs contend that EA's use of student-athletes' likenesses violates its license agreements with CLC and

NCAA,[1] CLC's agreements with NCAA and NCAA's contract with student-athletes. Publicity Plaintiffs point to NCAA Bylaw 12.5, which prohibits the commercial licensing of a student-athlete's "'name, picture or likeness.'" Consol. Am. Compl. ¶ 181. They maintain that Form 08-3a, which Publicity Plaintiffs assert is a contract between student-athletes and NCAA, reflects this prohibition and restricts student-athletes and NCAA from engaging in such licensing. Like the Antitrust Plaintiffs, Publicity Plaintiffs allege that student-athletes are required to sign Form 08-3a, or a form similar to it, to participate in NCAA-sanctioned competitions.

Publicity Plaintiffs assert seven causes of action: (1) violation of Indiana right of publicity, against EA; (2) violation of California statutory right of publicity, against EA; (3) violation of California common law right of publicity, against EA; (4) civil conspiracy, against EA, NCAA and CLC; (5) violation of California Business & Professions Code §§ 17200, et seq., against EA; (6) breach of contract, against NCAA; and (7) unjust enrichment, against EA and CLC.

---

[1] For instance, one of EA's license agreements with CLC states,

> Licensee recognizes that any person who has collegiate athletic eligibility cannot have his or her name and/or likeness utilized on any commercial product without the express written permission of the Institution. Therefore, in conducting licensed activity under this Agreement, Licensee shall not encourage or participate in any activity that would cause an athlete or an Institution to violate any rule of the National Collegiate Athletic Association (NCAA) or other governing body. Moreover, Licensee acknowledges and agrees that no license or right is being granted hereunder to utilize the name, face or likeness of any past or current athlete of any Institution.

See, e.g., Boyle Decl., Ex. 1 § 2(f).

6

Publicity Plaintiffs intend to move to certify a class, apparently comprised of two sub-classes, to prosecute these claims. The class is defined to include a "Virtual Player Class," which consists of "[a]ll NCAA football and basketball players listed on the official opening-day roster of a school whose team was included in any interactive software produced by Electronic Arts, and whose assigned jersey number appears on a virtual player in the software;" and a "Photograph Class" that consists of "[a]ll persons whose photographed image was included in any NCAA related interactive software produced by Electronic Arts." Consol. Am. Compl. ¶ 261.

III. Procedural History

The antitrust-related claims in the Consolidated Amended Complaint are based on those originally brought by O'Bannon (Case No. C 09-3329 CW, Docket No. 1); the right of publicity claims are based on those originally brought by Keller (Docket No. 1). NCAA and CLC moved to dismiss O'Bannon's complaint, and NCAA, CLC and EA moved to dismiss Keller's complaint.[2] In addition, EA moved to strike Keller's complaint pursuant to California Code of Civil Procedure section 425.16, which addresses Strategic Lawsuits Against Public Participation (SLAPP). The Court granted in part and denied in part NCAA's and CLC's motions to dismiss O'Bannon's complaint. (Docket No. 151.) The same day, with regard to Keller's complaint, the Court denied EA's motions to dismiss and

---

[2] NCAA and CLC also moved to dismiss antitrust-related claims brought by Newsome, which were similar to those alleged by O'Bannon. However, Newsome's complaint was less comprehensive than O'Bannon's and was dismissed in its entirety. (Docket No. 151, at 14.)

anti-SLAPP motion to strike, denied CLC's motion to dismiss and granted in part and denied in part NCAA's motion to dismiss. (Docket No. 150.) Plaintiffs were granted leave to amend. They filed the Consolidated Amended Complaint on March 10, 2010.

EA appealed the Court's denial of its anti-SLAPP motion to strike. Based on EA's appeal, which is currently pending before the Ninth Circuit, the Court stayed all proceedings and discovery on claims against EA that are identical to those addressed in the Court's February 8, 2010 Order.

## LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Dismissal under Rule 12(b)(6) for failure to state a claim is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

## DISCUSSION

I.  EA's Motion to Dismiss

EA contends that Antitrust Plaintiffs fail to plead a

8

sufficient factual basis to suggest that it engaged in an antitrust conspiracy with NCAA and CLC.  Thus, EA argues, Antitrust Plaintiffs' § 1 and related common law claims fail.[3]

To state a claim for a violation of § 1 of the Sherman Act, a plaintiff must plead, among other things, facts suggesting the existence of "a contract, combination or conspiracy among two or more persons or distinct business entities" that was intended to impose an unreasonable restraint of trade.  Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008) (citing Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 507 (9th Cir. 1989)).  The allegations must point "toward a meeting of the minds" with regard to concerted, anticompetitive conduct.  Kendall, 518 F.3d at 1048.  An "account of a defendant's commercial efforts" is not, on its own, sufficient to support a § 1 claim.  Id.  Antitrust Plaintiffs bring two § 1 claims that rest on two separate alleged conspiracies joined by EA.

The first claim is directed at an alleged price-fixing conspiracy intended to set at zero dollars the price paid to Antitrust Plaintiffs and putative class members for the use of their "images, likenesses and/or names."  Consol. Am. Compl. ¶ 434.  Antitrust Plaintiffs, however, do not plead facts suggesting that EA joined such a conspiracy.  Antitrust Plaintiffs note that EA entered into license agreements with CLC that did not compensate them and putative class members for the use of their likenesses.  However, Antitrust Plaintiffs disavow use of these agreements to

---

[3] EA did not raise these arguments in the previous round of motions to dismiss because O'Bannon had not brought antitrust-related claims against EA.

show the price-fixing conspiracy, stating that, while EA's license agreements furthered the conspiracy, the "agreements are obviously not the agreement among Defendants to participate in this unlawful and anticompetitive scheme." Opp'n 15:2-3. Antitrust Plaintiffs do not identify any other agreement to which EA was a party that relates to the alleged price-fixing scheme.

Antitrust Plaintiffs note that, in concluding that O'Bannon had adequately plead CLC's role in the alleged antitrust conspiracies, the Court noted his allegations regarding "agreements among NCAA, its members, CLC and various distributors of material related to college sports." O'Bannon v. Nat'l Collegiate Athletic Ass'n, 2010 WL 445190, at *3 (N.D. Cal.). Included among these agreements was an arrangement involving NCAA, CLC and EA. Id. This observation, however, did not concern any alleged agreement by EA to join an antitrust conspiracy. O'Bannon had not named EA as a Defendant with respect to his antitrust claims. Further, as noted above, Antitrust Plaintiffs now clarify that these agreements facilitated, but did not form the basis of, any alleged antitrust conspiracy.

Antitrust Plaintiffs also cite the Court's conclusion that Keller plead sufficient facts to support his theory that Defendants conspired to use his likeness without his consent. See Keller v. Electronic Arts, Inc., 2010 WL 530108, at *8 (N.D. Cal.). However, the conspiracy alleged by Keller had goals different from that charged by Antitrust Plaintiffs. Lacking factual allegations of an agreement, Antitrust Plaintiffs' § 1 claim against EA based on an alleged price-fixing conspiracy must be dismissed.

Antitrust Plaintiffs' second § 1 claim involves an alleged

conspiracy to engage in a "group boycott / refusal to deal" to deny compensation to Antitrust Plaintiffs and putative class members for the use of their "images, likenesses and/or names." Consol. Am. Compl. ¶ 447. This purported conspiracy involves "Defendants' concerted action to require all current student-athletes to sign forms each year that purport to require each of them to relinquish all rights in perpetuity for use of their images, likenesses and/or names" and to deny compensation "through restrictions in the [NCAA] Bylaws." Id. ¶ 448. The Consolidated Amended Complaint, however, does not contain any allegations to suggest that EA agreed to participate in this conspiracy.

Accordingly, Antitrust Plaintiffs' § 1 claims against EA are dismissed with leave to amend to plead facts demonstrating EA's agreement to engage in an antitrust conspiracy with NCAA and CLC. Because Antitrust Plaintiffs' common law claims against EA are based on their § 1 claims, their common law claims are also dismissed with leave to amend.

II.  CLC's Motion to Dismiss

As noted above, CLC's motions to dismiss O'Bannon's § 1 claims and Keller's civil conspiracy theory of liability[4] were denied. CLC now moves to dismiss Antitrust Plaintiffs' § 1 claims and Publicity Rights Plaintiffs' civil conspiracy theory, which are based on O'Bannon's claims and Keller's theory respectively. CLC asserts that the Consolidated Amended Complaint contains new

---

[4] Under California law, civil conspiracy "is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510 (1994) (citation omitted).

11

allegations that contradict the notion that it was involved in any conspiracy to engage in anticompetitive conduct or to permit the use of student-athletes' likenesses without their consent. The Court rejected CLC's previous arguments that Plaintiffs fail to state a claim that it was involved in any such conspiracies. Thus, the Court considers only whether any new allegation cited by CLC warrants reconsideration of the Court's previous ruling.

CLC relies primarily on the allegation, plead in Keller's original complaint but not in O'Bannon's, that EA's license agreements "explicitly prohibit the use of NCAA athlete names and/or likenesses in NCAA branded videogames." Consol. Am. Compl. ¶ 198. This allegation and the related contract language cited by CLC do not warrant reconsideration of the Court's previous rulings.

Antitrust Plaintiffs' § 1 claims are not predicated solely on EA's license agreements. The claims also encompass agreements for rights to televise games, DVD and on-demand sales and rentals, and sales of stock footage of competitions, to name a few. See, e.g., Consol. Am. Compl. ¶¶ 332-360. Further, that EA's agreements prohibited such use does not belie the alleged antitrust conspiracy between NCAA and CLC. According to the Consolidated Amended Complaint, CLC is NCAA's licensing representative, and it brokers and administers license agreements on behalf of NCAA and member institutions. Further, CLC allegedly represents itself as a division of an entity that "holds the distinct position of having the longest consecutive relationship with the National Collegiate Athletic Association® (NCAA)." Consol. Am. Compl. ¶ 327. These allegations, along with those indicating that CLC administered licenses for various products and media containing the images of

12

former student-athletes, support an inference that CLC knew of and agreed to facilitate NCAA's alleged effort to reduce competition in the purported collegiate licensing market.

As noted above, Keller alleged that EA's license agreements prohibited the use of student-athletes' names and likenesses. In ruling on CLC's motion to dismiss Keller's claims, the Court concluded that this allegation was not antithetical to his assertion that NCAA, CLC and EA engaged in civil conspiracy. The result is not different here.

CLC cites Hart v. Electronic Arts, Inc., 740 F. Supp. 2d 658 (D.N.J. 2010), which is neither controlling nor on point. Hart, like Publicity Rights Plaintiffs, alleged that EA used his likeness without his consent. Id. at 660. However, EA was the only defendant in that action and the court held that Hart's civil conspiracy claim failed because his complaint contained no allegations suggesting "a conspiratorial agreement between [EA] and those parties to utilize his image in disregard of his rights." Id. at 671. Keller's allegations, on which Publicity Plaintiffs' allegations are based, were not similarly deficient.

Accordingly, CLC's motion to dismiss is denied.

III. NCAA's Motion to Dismiss

NCAA moves to dismiss Antitrust Plaintiffs' § 1 claims and Publicity Rights Plaintiffs' breach of contract claim and civil conspiracy theory.

A.   Antitrust Claims

NCAA asserts that some or all of the antitrust claims must be dismissed for three reasons.

First, NCAA contends that Antitrust Plaintiffs have failed to

13

allege a restraint on trade, noting that their theory relies heavily on Form 08-3a, which was used only during the 2008-2009 academic year. Although none of the Antitrust Plaintiffs was a student-athlete during that academic year, they allege that the forms they signed contained language similar to that used in Form 08-3a. More specific pleading, as sought by NCAA, is not required.

Second, NCAA asserts, as it did with respect to O'Bannon's complaint, that Antitrust Plaintiffs' allegations that some former student-athletes have licensed their collegiate likenesses is inconsistent with Antitrust Plaintiffs' theories of anticompetitive conduct. The Court, however, previously rejected this argument, and NCAA does not offer any reason that justifies reconsideration.

Finally, NCAA argues that Antitrust Plaintiffs have failed to allege antitrust injury. The Court also rejected this argument with respect to NCAA's motion to dismiss O'Bannon's complaint, and NCAA does not offer any reason that compels reconsideration.

Accordingly, NCAA's motion to dismiss Antitrust Plaintiffs' § 1 claims is denied.

B.  Breach of Contract Claim

In his original complaint, Keller brought a breach of contract claim, alleging that he had a contract with NCAA under which NCAA promised not to use or license his likeness for commercial purposes. By signing the purported contract, Keller alleged, student-athletes agreed that "they have 'read and understand' the NCAA's rules" and that "to the best of [their] knowledge [they] have not violated any amateurism rules." Keller Compl. ¶ 14 (Docket No. 1). The Court concluded that this language did not support an inference that the student-athletes had a contract with

14

1  NCAA and dismissed Keller's breach of contract claim with leave to
2  amend to plead an enforceable contract.  NCAA contends that
3  Publicity Plaintiffs have not cured this deficiency.

4    "A contract is an agreement to do or not to do a certain
5  thing."  Cal. Civ. Code § 1549.  Unlike Keller's original
6  complaint, the Consolidated Amended Complaint contains allegations
7  that satisfy this definition.  For their breach of contract claim,
8  Publicity Plaintiffs rely on Form 08-3a.  They allege that, among
9  other things, they offered as consideration to NCAA a license to
10 use their names or pictures "to generally promote NCAA
11 championships or other NCAA events, activities or programs."
12 Consol. Am. Compl., Ex. A, at 4.  Publicity Plaintiffs contend that
13 this license did not permit NCAA to use student-athletes' names,
14 pictures and likenesses for commercial purposes.  In exchange, NCAA
15 allegedly agreed "to grant players eligibility to participate in
16 Division I athletics."  Consol. Am. Compl. at 139.

17   NCAA argues that the alleged contract does not contain a
18 promise that it will not use Publicity Plaintiffs' and putative
19 class members' names for commercial purposes.  However, neither
20 "law nor equity requires that every term and condition be set forth
21 in a contract." <u>Frankel v. Bd. of Dental Examiners</u>, 46 Cal. App.
22 4th 534, 545 (1996).  It is reasonable to infer that Publicity
23 Plaintiffs understood that they granted a limited license to NCAA
24 to use their names and likenesses to promote NCAA events and that
25 the license did not permit the use of their names and likenesses
26 for other purposes.  Although discovery may reveal no such
27 understanding, at this stage, Publicity Plaintiffs have plead the
28 existence of a contract.

Accordingly, NCAA's motion to dismiss Publicity Plaintiffs' breach of contract claim is denied.

C. Civil Conspiracy Theory of Liability

NCAA asserts that Publicity Plaintiffs' civil conspiracy theory of liability must be dismissed for the same reasons raised by CLC, which were rejected above. Accordingly, NCAA's motion to dismiss this theory is denied.

CONCLUSION

For the foregoing reasons, the Court GRANTS EA's motion to dismiss (Docket No. 271) and DENIES CLC's (Docket No. 274) and NCAA's (Docket No. 273) motions to dismiss. Antitrust Plaintiffs' claims against EA under § 1 of the Sherman Act and California common law are dismissed with leave to amend to plead a factual basis for EA's participation in an antitrust conspiracy.

Within fourteen days of the date of this Order, Plaintiffs may file a consolidated second amended complaint to cure the deficiencies associated with Antitrust Plaintiffs' § 1 claims. If Plaintiffs do so, EA shall answer or move to dismiss the amended § 1 claims and related common law causes of action within fourteen days of the date the amended pleading is filed. If a motion to dismiss is filed, Antitrust Plaintiffs' opposition shall be due fourteen days thereafter. EA's reply shall be due seven days after any opposition is filed. Any motion to dismiss will be taken under submission on the papers. Because leave to amend is limited to claims against EA, NCAA and CLC shall not file motions to dismiss Plaintiffs' amended pleading, if one is filed. Instead, NCAA and CLC shall answer the amended pleading within fourteen days of the date it is filed.

16

If Plaintiffs do not amend the Consolidated Amended Complaint, NCAA and CLC shall answer the Consolidated Amended Complaint within twenty-eight days of the date of this Order.

Within twenty-eight days of the date of this Order, NCAA and CLC shall respond to the complaint filed in <u>Robertson v. NCAA</u>, Case No. C 11-00388 CW.

IT IS SO ORDERED.

Dated: May 2, 2011

CLAUDIA WILKEN
United States District Judge