1    Michael P. Lehmann (Cal. Bar No. 77152)
2    Jon T. King (Cal. Bar No. 205073)
     Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
3    HAUSFELD LLP
     44 Montgomery St., 34th Floor
4    San Francisco, CA 94104
     Tel:  (415) 633-1908
5    Fax:  (415) 358-4980
     Email:   mlehmann@hausfeldllp.com
6             jking@hausfeldllp.com
              abailey@hausfeldllp.com
7
8    Robert B. Carey (*Pro Hac Vice*)
     Leonard W. Aragon (*Pro Hac Vice*)
9    HAGENS BERMAN SOBOL SHAPIRO LLP
     11 West Jefferson Street, Suite 1000
10   Phoenix, Arizona 85003
     Telephone: (602) 840-5900
11   Facsimile:  (602) 840-3012
     Email: rcarey@hbsslaw.com
12           leonard@hbsslaw.com
13
14   ***Plaintiffs' Interim Co-Lead Class Counsel***
     ***(Additional Counsel Listed on Signature Page)***
15

16

17                    UNITED STATES DISTRICT COURT

18                  NORTHERN DISTRICT OF CALIFORNIA

19
     **IN RE NCAA STUDENT-ATHLETE**          Case No. 4:09-cv-1967 CW
20   **NAME & LIKENESS LICENSING**
     **LITIGATION**
21                                           **ANTITRUST PLAINTIFFS' OPPOSITION**
                                             **TO DEFENDANT ELECTRONIC ARTS,**
22                                           **INC.'S MOTION TO DISMISS SECOND**
                                             **AMENDED CONSOLIDATED**
23                                           **COMPLAINT**
24                                           Hearing:      Per Court Order (Dkt. No. 325),
                                                           Motion Submitted On The Papers
25
                                             Judge:        Honorable Claudia Wilken
26
                                             Date:         Complaint Filed: May 5, 2009
27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION. ...................................................................................... 1

II.     THE GOVERNING LEGAL STANDARD ON A MOTION TO DISMISS ................... 2

III.    FACTS ALLEGED IN THE SCAC DEMONSTRATE THAT EA JOINED
        AND PARTICIPATED IN THE CONSPIRACY. ........................................... 4

        A.      Factual Background…………………………………………………………4

        B       The SCAC's New Allegations Against EA……………………………………5

IV.     RESPONSE TO EA'S ARGUMENTS............................................................. 9

        A.      The Antitrust Plaintiffs Are Not Required To Plead That EA Joined
                The Alleged Conspiracy At Its Inception. ............................................. 9

        B.      The Antitrust Plaintiffs Are Not Required To Plead That EA
                Participated In Every Aspect Of The Alleged Conspiracy. ................................11

        C.      The Antitrust Plaintiffs Are Not Required To Make Detailed
                Allegations of EA's Motives....................................................................... 13

        D.      The Cases On Which EA Relies Are Inapposite................................................. 14

        E.      The SCAC Sufficiently Alleges An Unjust Enrichment Claim……………………17

        F.      The SCAC Sufficiently Alleges An Accounting Claim. ........................................17

V.      CONCLUSION. ...................................................................................... 18

# TABLE OF AUTHORITIES

Page(s)

CASES

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) .......................................................................... 2, 3

*Asher v. Reliance Ins. Co.*,
308 F. Supp. 847 (N.D. Cal. 1970) ............................................................ 17

*Babyage.com , Inc. v. Toys "R" Us, Inc.*,
Nos. 05-6792, 06-242, 2008 WL 2644207 (E.D. Pa. July 2, 2008)...................... 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................. 2

*Beltz Travel Serv., Inc. v. International Air Transp. Ass'n*,
620 F.2d 1360 (9th Cir. 1980).................................................................. 10

*Comm. for Immigrant Rights of Sonoma County v. County of Sonoma*,
No. C 08-4220 RS, 2010 WL 2465030 (N.D. Cal. June 11, 2010) ......................... 2

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) .............................................................................. 3

*Fineman v. Armstrong World Indus., Inc.*,
980 F.2d 171 (3d Cir.1992), *cert. denied*, 507 U.S. 921 (1993) ...................... 10, 14

*Flying J Inc. v. TA Operating Corp.*,
No. 1:06-cv-00030 TC, 2007 WL 3254765 (D. Utah Nov. 2, 2007)................................ 14, 15

*Havoco of Am., Ltd. v. Shell Oil Co.*,
626 F.2d 549 (7th Cir.1980)................................................................... 9, 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
738 F.Supp.2d 1011 (N.D. Cal. Mar. 30, 2010)........................................... 4, 11, 15

*In re Fine Paper Antitrust Litig.*,
685 F.2d 810 (3rd Cir. 1982) .................................................................. 11

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................................................ 11

*In re Graphics Processing Units Antitrust Litig.*,
527 F.Supp.2d 1011 (N.D.Cal. 2007) ....................................................... 14, 16

*In re Graphics Processing Units Antitrust Litig.*,
540 F.Supp.2d 1085 (N.D.Cal. 2007) .......................................................... 16

*In re K-Dur Antitrust Litig.*,
338 F.Supp.2d 517 (D.N.J 2004) ............................................. 9

*In re Mercedes-Benz Antitrust Litig.*,
157 F. Supp. 2d 355 (D.N.J. 2001) ......................................... 11

*In re Mid-Atlantic Toyota Antitrust Litig.*,
525 F.Supp. 1265 (D. Md. 1981) ............................................. 9

*In re NASDAQ Market-Makers Antitrust Litig.*,
894 F. Supp. 703, 712 (S.D.N.Y. 1995) ................................... 11

*In re NCAA Student-Athlete Name & Likeness Antitrust Litig.*,
No. C 09-1967, 2011 WL 1642256 (N.D. Cal. May 2, 2011) ................. 1

*In re Nissan Motor Corp. Antitrust Litig.*,
430 F.Supp. 231 (S.D.Fla.1977) .............................................. 9

*In re Packaged Ice Antitrust Litig.*,
723 F.Supp.2d 987, 1006 (E.D. Mich. 2010) ............................... 15

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
587 F. Supp. 2d 27 (D.D.C. 2008) ............................................. 4

*In re Rubber Chemicals Antitrust Litig.*,
504 F. Supp. 2d 777 (N.D. Cal. 2007) ....................................... 11

*In re Southeastern Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008) ...................................... 4

*In re Static Random Access (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ................................... 11, 14

*In re Tableware Antitrust Litig.*,
No. C-04-3514 (VRW) (N.D. Cal.) (June 29, 2007) ...................... 9, 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009) ...................................... 2

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
No. C 07-05634 CRB, 2011 WL 1753738 (N.D.Cal. May 9, 2011) ............. 3

*In re Urethane Antitrust Litig.*,
683 F.Supp.2d 1214 (D. Kan. 2010) .......................................... 9

*In re Vitamins Antitrust Litig.*,
MDL Docket No. 1285 (D.D.C.) ................................................ 9

*Indutrial Bldg. Materials, Inc. v. Interchemical Corp.*,
437 F.2d 1336 (9th Cir. 1971) ................................................ 9

*Jung. v. American Association of Medical Colleges*,
   300 F.Supp.2d 119 (D.D.C. 2004) ........................................................................ 12

*Keller v. Electronic Arts, Inc.*,
   No. C 09-1967 CW (N.D. Cal.) ...................................................................... 1, 12

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008)............................................................... 14, 15, 16

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000).................................................................................. 3

*Langdon v. Credit Management, LP*,
   No. C 09-3286 VRW, 2010 WL 3341860 (N.D. Cal. Feb. 24, 2010) ...................... 3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1985)................................................................................... 13, 14

*Matsushita, Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984)............................................................................................. 14

*Moundridge v. Exxon Mobil Corp.*,
   250 F.R.D. 1 (D.D.C. 2008).................................................................................. 14

*Operating Engineers' Pension Trust Fund v. Clark's Welding & Machine*,
   No. 09-0044 SC, 2009 WL 1324049 (N.D. Cal. May 8, 2009) ................................ 3

*Poller v. Columbia Broad. Sys., Inc.*,
   368 U.S. 464 (1962) .............................................................................................. 2

*Silvas* v. *E\*Trade Mortg. Corp.*,
   514 F.3d 1001 (9th Cir. 2008)................................................................................ 3

*Spectators' Communication Network, Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir.2001)................................................................................. 10

*Starr v. Sony BMG Music Entertainment*,
   592 F.3d 314 (2d Cir. 2010), *cert. denied*, 131 S.Ct. 901 (2011) .......................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .............................................................................................. 3

*Townshend v. Rockwell Int'l Corp.*,
   No. C99-0400SBA, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000) ........................ 16

*Tunis Bros. Co. v. Ford Motor Co.*,
   763 F.2d 1482 (3d Cir. 1985)............................................................................... 11

*United States. v. Bibbero*,
   749 F.2d 581 (9th Cir. 1984), *cert. denied*, 471 U.S. 1103 (1985)........................ 10

*United States v. Consolidated Packaging Corp.*,
      575 F. 2d 117 (7th Cir. 1978) .................................................................................................. 11

*United States v. Miller*,
      693 F.2d 1051 (11th Cir.1982) ................................................................................................. 10

*United States v. Pack*,
      773 F.2d 261 (10th Cir.1985) ................................................................................................... 10

*United States v. Paramount Pictures*,
      334 U.S. 131 (1948) ................................................................................................................. 13

*ZF Meritor, LLC v. Eaton Corp.*,
      No. 06-623 SLR, 2011 WL 843928 (D. Del. March 10, 2011) ....................................... 13, 14

OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6) ................................................................................................................. 3, 16

1

### I.        INTRODUCTION.

2

    Ed O'Bannon, Harry Flournoy, Alex Gilbert, Sam Jacobson, Thad Jaracz, David Lattin,

3

Patrick Maynor, Tyrone Prothro, Damien Rhodes, Eric Riley, Bob Tallent, and Danny Wimprine

4

("Antitrust Plaintiffs") hereby respond to Electronic Arts, Inc.'s ("EA") motion to dismiss the

5

antitrust claims against it in the "Second Consolidated Amended Class Action Complaint" (May

6

16, 2011)(Dkt. No. 327) ("SCAC"). EA was not named as a defendant in the original antitrust

7

complaint filed by Ed O'Bannon ("*O'Bannon* Complaint") as to which this Court denied motions

8

to dismiss. *O'Bannon v. NCAA,* Nos. C 09-1967 CW, C 09-3329 CW, C 09-4882 CW, 2010 WL

9

445190 (N.D. Cal. Feb. 8, 2010) ("*O'Bannon*").  The Antitrust Plaintiffs subsequently added EA

10

as a named defendant in the Consolidated Amended Complaint ("CAC") and included allegations

11

illustrating EA's participation in the conspiracy at issue.

12

    This Court has found that the *Keller v. Electronic Arts, Inc*., No. C 09-1967 CW (N.D.

13

Cal.) ("Right of Publicity Plaintiffs") adequately alleged that EA joined and participated in an

14

unlawful conspiracy with the other Defendants to violate the rights of publicity of current and

15

former student athletes. *Keller v. Electronic Arts, Inc*., Nos. C 09-1967 CW, 2010 WL 530108 at

16

*8 (N.D.Cal. Feb. 8, 2010) ("*Keller*").  It subsequently held with respect to the CAC, however,

17

that "the conspiracy alleged by Keller had goals different from that charged by Antitrust

18

Plaintiffs" the Court dismissed the Antitrust Plaintiffs' claims against EA with leave to amend

19

directing the Antitrust Plaintiffs to "plead facts demonstrating EA's agreement to engage in an

20

antitrust conspiracy with NCAA and CLC." *In re NCAA Student-Athlete Name & Likeness

21

Antitrust Litig*., No. C 09-1967, 2011 WL 1642256 at *6 (N.D. Cal. May 2, 2011) ("*NCAA*").

22

    The Antitrust Plaintiffs have added extensive new allegations against EA which support a

23

reasonable inference that they agreed to join the antitrust conspiracy with the National Collegiate

24

Athletic Association ("NCAA") and Collegiate Licensing Company ("CLC").  *See* SCAC ¶¶373,

25

377, 388, 399-400, 404, and 407-18. These paragraphs allege facts showing that EA participated

26

in and contributed to the conspiracy

27

28

---

EA contends that the additional facts pled in the SCAC are equally consistent with permissible competition as with an illegal conspiracy and that a motion to dismiss should therefore be granted. "Defendant Electronic Arts, Inc.'s Motion To Dismiss Second Consolidated Amended Class Action Complaint," p. 6 (May 31, 2011) ("EA Memo").  That argument, however, improperly conflates the standard on a motion for summary judgment with the standard on a motion to dismiss. The same is true with respect to EA's argument that it did not agree to participate in the conspiracy because it did not commit the same conduct or share the same motives as the NCAA and the CLC. *Id*., p. 7.  Moreover, it is not necessary to plead that each defendant had a role in every detail in the execution of the conspiracy or had identical motives to establish liability.

EA also argues incorrectly that the antitrust claims against it should be dismissed because the SCAC does not allege that EA participated in the conspiracy between the NCAA and the CLC from the outset. EA Memo, p. 2.  EA's argument ignores the rule that an antitrust defendant who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy.

The allegations in the SCAC support the inference that EA agreed to join and participate in the ongoing conspiracy involving the NCAA and its member universities and CLC.

## II.        THE GOVERNING LEGAL STANDARD ON A MOTION TO DISMISS.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*") and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ("*Iqbal")* did not alter the fundamental standards applicable to motions to dismiss in this Circuit.  *See In re TFT-LCD (Flat Panel) Antitrust Litig*., 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009) ("*LCDs*") (noting that "neither *Twombly* nor the Court's prior order requires elaborate fact pleading.  Further, the Supreme Court has recognized that 'in complex antitrust litigation,' 'motive and intent play leading roles,' and 'the proof is largely in the hands of the alleged conspirators.'") (quoting *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473 (1962));  *Comm. for Immigrant Rights of Sonoma County v. County of Sonoma,* No. C 08-4220

RS, 2010 WL 2465030, at *4 (N.D. Cal. June 11, 2010) ("[e]ven under *Iqbal* and *Twombly* a plaintiff need not plead evidentiary matters or be able to prove a case at the pleading stage.").[1]

Accordingly, a court deciding a 12(b)(6) motion must assess the complaint in the light most favorable to the plaintiff, with all properly pleaded factual allegations taken as true. *Silvas* v. *E*Trade Mortg. Corp.,* 514 F.3d 1001, 1003 (9th Cir. 2008) ("[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party."). *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2011 WL 1753738 at *2 (N.D.Cal. May 9, 2011) (motion to dismiss must be denied where allegations construed in the light most favorable to plaintiffs supports an inference that defendants joined and participated in the conspiracy.") In addition, all reasonable inferences must be drawn in Antitrust Plaintiffs' favor (*Operating Engineers' Pension Trust Fund v. Clark's Welding & Machine*, No. 09-0044 SC, 2009 WL 1324049 at *2, *14 (N.D. Cal. May 8, 2009)), and the Court must evaluate the claims as alleged in the SCAC, not as recast by Defendants (*see Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989-91 (9th Cir. 2000)).

In determining the plausibility of the SCAC, the Court must consider Plaintiffs' allegations as a whole, and not evaluate the sufficiency of each allegation independently. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). Under *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), this principle applies in particular to antitrust allegations, which cannot be evaluated on a piecemeal basis. Post-*Twombly* decisions have followed this approach and rejected invitations to compartmentalize

---

[1] As former Chief Judge Vaughn Walker stated in *Langdon v. Credit Management, LP*, No. C 09-3286 VRW, 2010 WL 3341860, at *4 (N.D. Cal. Feb. 24, 2010), "[d]efendant's reliance on *Iqbal* is misplaced. *Iqbal* involved a claim subject to a defense of qualified immunity; this defense, the Court determined, required somewhat detailed factual recitations in order for the complaint to plead around that defense. Similarly, the Supreme Court's earlier FRCP 12(b)(6) pleading decision, [*Twombly*], involved an antitrust claim predicated on parallel conduct which, because such conduct is not itself unlawful, required pleading of facts to take the claim into the realm of illegality. Although *Iqbal* and *Twombly* apply without regard to the subject matter of the claim asserted, both presented situations in which a safe harbor required factual detail to navigate. In the court's view, these decisions did not alter pleading standards outside these and analogous situations."

and assess factual allegations independently. *See, e.g., In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011, 1019 (N.D. Cal. Mar. 30, 2010) ("*CRT*") (in complex conspiracy cases, courts in this district review specific allegations in the context of the complaint taken as a whole); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33 n. 4 (D.D.C. 2008) ("*Twombly* did not change this principle: '[T]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quoting *In re Southeastern Milk Antitrust Litig.,* 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008)).

### III.   FACTS ALLEGED IN THE SCAC DEMONSTRATE THAT EA JOINED AND PARTICIPATED IN THE CONSPIRACY.

#### A.   Factual Background.

EA describes itself as "the world's leading interactive entertainment software company" and states that it "develops, publishes, and distributes interactive entertainment software worldwide for video game systems, personal computers, cellular handsets and the Internet." SCAC ¶173.  The NCAA, through CLC, has entered into broad license agreements with EA relating to the use of current and former student athletes' likenesses – including those of the putative Antitrust Class – in video games available through the platforms described above.  *Id.* EA produces the NCAA Football, NCAA Basketball, and NCAA March Madness video game franchises.  *Id.* ¶179.  The videogames within these franchises simulate basketball and football games between NCAA member schools.  *Id.*  In its 2008 fiscal year, EA had revenues of $3.67 billion and 27 of its titles sold more than one million copies.  *Id.* ¶173.

The NCAA, according to its Bylaws, does not permit the commercial licensing of an NCAA athlete's "name, picture or likeness."  NCAA Bylaw 12.5;  SCAC ¶181.  Despite this prohibition, the SCAC alleges that the NCAA sanctions, facilitates, and profits from EA's use of student-athletes' names, pictures, and likenesses.  *Id.* ¶184.  In 2006, it was reported that, "with the NCAA's blessing," EA contrived to get around the NCAA prohibition on using student-athlete images for commercial use by doing a "two-step":

> In exchange for a cut of revenues from the video game, the association has granted the software company the right to reproduce the stadiums, uniforms, and mascots of schools that are members of the NCAA, and the game-makers do so with almost

photographic accuracy.  Under the current regulations, the only thing off-limits is the use of players' names and recognizable facial features.

*Id.* ¶378.

EA has expressly incorporated the images and likenesses of members of the putative Antitrust Class into its games.  For example, EA's NCAA Basketball 09 video game has a "Classic Teams" feature in which game players can choose to play with "classic teams" which expressly use Class members' likenesses without actually identifying them by name.  *Id.* ¶379.  In order to increase the popularity of EA's games and thereby increase the royalty payments the NCAA receives, the NCAA and EA also purposefully and knowingly have allowed third parties to create and market modifications to the NCAA games which permit players to upload complete roster information for various teams, including present and former student-athletes' names.  *Id.* ¶¶379, 412.  EA's game forum website lists a post from March 12, 2009 identifying the roster of each of these classic teams, and provided the student-athlete's name, position, uniform number, type of t-shirt worn beneath the uniform jersey, sock length, and any use of ankle braces, knee braces, or wrist taping.  The post specifically identifies dozens of college teams from specific years as being incorporated into the game.  *Id.* ¶379.[2]  Neither the NCAA, CLC  nor EA have obtained valid rights from members of the putative Antitrust Class for the commercial use of their images and likenesses in video games. Nonetheless, those licenses reflect the value for the images and likenesses of student-athletes, despite the fact that there were no rightful transfers or licensing of student-athletes' rights.  *Id.* ¶419.

## B.     The SCAC's New Allegations Against EA.

The SCAC alleges new facts showing that EA joined Defendants' conspiracy by agreeing to boycott former student athletes and to deny them compensation for EA's use of their images,

---

[2] EA has also increased internal commercialization within its games, which feature numerous individuals other than student-athletes and corporations, all presumably pursuant to lucrative commercial contracts with EA.  *Id.* ¶390.  For example, in EA's NCAA Basketball 09 video game, players can make shoe selections from among Nike, Adidas, and Reebok brands, all of which are identified by name as well as by their logos, and it includes references to arenas with corporate sponsorships (*id.* ¶¶391, 393), to various television networks  (*id.* ¶¶392, 397), as well as coaches' names and likenesses (*id.* ¶394).  All these actions by EA in conjunction with the assistance of CLC and the NCAA serve to exploit student-athletes' images for profit, despite the NCAA's prohibition on such use.

likenesses and names.  The SCAC alleges conduct by EA that furthered the Defendants' ongoing conspiracy to exclude former student athletes from the collegiate licensing market and deny them compensation for the commercial exploitation of their names, likenesses and images.  These new allegations, listed below, are sufficient to reasonably infer that EA agreed to join the conspiracy:

- **EA has a unique relationship with the NCAA and CLC that was exceptionally close and qualitatively different from the NCAA and CLC's relationship with other third parties including licensees.** EA is the only NCAA licensee or business partner that makes brand-new products, not based on pre-existing actual content such as filmed images or photographs, that utilize the images of current and former student-athletes. SCAC ¶373. "**Indeed, EA and the NCAA have had extensive discussions about the use of the names of student-athletes in its videogames and EA reached agreement with the NCAA to propose amendments to the NCAA's bylaws that would accomplish just that.**" *Id.* ¶399; emphases added.

- As the NCAA's only partner with respect to the development of electronic video games featuring the images and likenesses of current and former student-athletes, EA has been granted unrivaled access to the highest levels of the NCAA's hierarchy. EA has stated that **"[h]aving the partnership with the NCAA gives us the opportunity to work directly with all of the partners that are part of the NCAA….. "** *Id.* ¶408; emphases added. "With respect to the inclusion of actual student-athlete names and likenesses in EA's NCAA-themed video games, [Sean] O'Brien [producer of EA's NCAA Baketball 08] said **that he would like to see those in the games and that the NCAA 'know[s] how we feel....The NCAA knows we want it and they're investigating it for us.'"** *Id.*; emphases added. O' Brien has also stated that having real players' names in the video games "was **'[s]omething that we are constantly exploring and continuing to explore with the NCAA. I think we have made a lot of progression so I hope to be there one day soon.'"** *Id.* ¶407; emphases added. EA has used this access and input "to advocate and obtain agreement on making its NCAA-themed videogames as photorealistic as possible, **all the while knowing and agreeing with the NCAA's position that student-athletes would receive no remuneration for the use of their enhanced images and likenesses.**" *Id.* ¶¶399, 407; emphases added.

- In its three contracts with the CLC, EA "**expressly agreed to abide by the NCAA's rules with respect to student-athletes which prohibited EA from offering any student-athlete compensation for the use of the athlete's name, image or likeness in its NCAA-themed video games. EA further agreed to extend its agreement with the NCAA, prohibiting compensation to student-athletes, to former student-athletes.**" *Id.* ¶400; emphases added.

- EA and the NCAA **have colluded to allow third parties to use the names of student-athletes in connection with televised presentations of EA video games without compensation**. For example, EA and the NCAA have agreed to allow ESPN's "College Game Day" television program to broadcast simulated game action from NCAA Football 09 video game, while identifying players represented in EA's videogame by name. *Id.* ¶410.

- EA and the NCAA **have colluded to allow third parties to create and market modifications to the NCAA video games which allow players to upload complete roster information for various teams, including player names**. To facilitate easy use of its information by **purchasers** of its games, EA developed a "TeamBuilder" page on its website that lets users create and upload profiles of current and former NCAA football players to be incorporated into EA's games. *Id.* ¶¶ 410, 413.

- The SCAC also alleges that "**EA has continued to seek to further collude with the NCAA to deprive current and former student-athletes of rights with respect to EA's video-games.**" *Id.* ¶417; emphases added. For **example**, in 2010, **EA was a major proponent of Proposal 2010-26, which would have modified NCAA Bylaw 12.5.1.1 to formalize the ability of commercial entities to use student-athletes' names and likenesses.** Minutes of the NCAA Division I Student-Athlete Advisory Committee meeting held in Indianapolis on November 19-21, 2010, at which Proposal 2010-26 was discussed, indicate that **EA representatives gave a presentation to the committee regarding the NCAA College Football video game and the use of student-athletes' likeness in the game.** The SCAC specifically alleges the names of the EA representatives who attended this meeting. *Id.* ¶417.

- Neither the NCAA nor CLC have brought any legal action, or encouraged any member school or CLC client, or current or former student-athlete, to stop EA's use of player images and likenesses in EA's NCAA-themed games which is a marked departure from the NCAA and CLC's historical practice of aggressively enforcing intellectual property and contractual rights in a myriad of other contexts. *Id.* ¶418.

Thus, the SCAC accomplishes what this Court requested. It identifies agreements between EA and NCAA/CLC, including agreements to abide by the NCAA's Bylaw 12.5.1.1 and agreements to exploit the names, images and likenesses of student-athletes without compensation.

This point can be put in perspective by considering what EA's and NCAA's counsel said in the April 7, 2011 the hearing on prior motions to dismiss. EA's counsel conceded that if

student-athletes had enforceable rights with respect to their names, images and likenesses, then EA's action in foregoing from offering them compensation for the use of such names, images and likenesses "might be conceivably a[n] antitrust conspiracy"; however, he contended that nothing like that occurred because "those right were already gone by virtue of the amateurism rules." Transcript of April 7, 2011 Hearing, pp. 9, 10. As EA's counsel explained it, "we don't really have any even--opportunity to bid for the rights we really care about." *Id*., p. 11. Not five minutes later, counsel for the NCAA got up at the hearing and undermined these contentions. He said that the NCAA never took the rights of a student-athlete to his name, image and likeness; "[t]hey are at all times owned by the student-athlete." *Id*., p. 18. The NCAA's counsel stated that a student-athlete cannot exercise those rights while remaining a student, but, nevertheless, "[t]hey own their rights at all times. And that's a key point" *Id*., p. 19.  If this is correct, then *nothing* prevented EA from going to a student athlete and agreeing to pay him for the current use of those rights, with no money changing hands until *after* the student-athlete graduated from college and ceased being a student. And certainly nothing precluded EA from paying former student-athletes for the use of their names, images and likenesses *after* they have graduated from college and *after* the applicability of the amateurism rules to them have come to an end.  EA refraining from doing so-- because it agreed to abide by the NCAA's bylaws--is indeed "conceivably a[n] antitrust conspiracy".

EA contended at the hearing, as it did in its brief, that its interactions with NCAA were "normal lawful activity" between a licensor and licensee. *Id*., p. 12. But does a typical licensee consider a licensor to be its development "partner"?  Does a typical licensee agree with its licensor to modify the latter's internal bylaws in the manner desired by the licensee? Does a typical licensee participate in internal lobbying activities within the licensing body to get its wishes carried out? Does a typical licensee have the licensor "investigate" how the licensee can increase its exploitation of student-athletes' names, images and likenesses? This is not the conduct of separate businesses in an arms' length licensing arrangement. It is instead conduct that

raises at least an inference of a meeting of a collusive agreement, an inference that Antitrust

Plaintiffs are entitled to have drawn in their favor in determining a motion to dismiss.

## IV.   RESPONSE TO EA'S ARGUMENTS.

### A.   The Antitrust Plaintiffs Are Not Required To Plead That EA Joined The Alleged Conspiracy At Its Inception.

EA incorrectly argues that the antitrust claims against it should be dismissed because the

SCAC does not allege that EA participated in the conspiracy between the NCAA and the CLC

from the outset in that "there are no allegations suggesting that EA had any role in adopting the

'amateurism' rules that allegedly force student-athletes to relinquish their publicity rights for zero

consideration" or to fix at zero the price former student athletes are paid for the use of their

images, likenesses and names."  EA Memo, p. 2.

EA's argument ignores the rule that an antitrust defendant "who enters a conspiracy late,

with knowledge of what has gone before, and with the intent to pursue the same objective, may be

charged with preceding acts in furtherance of the conspiracy."  *Indutrial Bldg. Materials, Inc. v.

Interchemical Corp*., 437 F.2d 1336, 1343 (9th Cir. 1971). *Accord Havoco of Am., Ltd. v. Shell

Oil Co*., 626 F.2d 549, 554 (7th Cir.1980) ("*Havoco*"); *In re Urethane Antitrust Litig*., 683

F.Supp.2d 1214, 1234 (D. Kan. 2010) (denying motion to dismiss); *In re K-Dur Antitrust Litig*.,

338 F.Supp.2d 517, 538-39 (D.N.J  2004) ("a co-conspirator is liable for all acts committed in

furtherance of a conspiracy, regardless of when it entered the conspiracy"); *In re Mid-Atlantic

Toyota Antitrust Litig*., 525 F.Supp. 1265, 1281 (D. Md. 1981) (denying motion to dismiss); *In re

Nissan Motor Corp. Antitrust Litig*., 430 F.Supp. 231, 232 (S.D.Fla.1977) (explaining that "proof

of unlawful affiliation is sufficient to render a co-conspirator liable for all damages that the

conspiracy caused, regardless of the exact time defendant became a member or the extent of its

participation").[3]

---

[3] This principle has been recognized in the jury instructions given in recent civil antitrust
trials. *See e.g*., *In re Tableware Antitrust Litig.*, No. C-04-3514 (VRW) (N.D. Cal.) (June 29,
2007) (Judge Vaughn R. Walker) http://apps.americanbar.org/antitrust/at-committees/at-
trial/pdf/jury-instructions/tableware-15.pdf  ("[a] conspiracy is an agreement to do something
unlawful in which each person found to be a member of the conspiracy is liable for all acts and
statements of the other members made during the existence of and in furtherance of the

Moreover, a defendant's agreement to join an ongoing conspiracy "can be inferred from acts that furthered the conspiracy's purpose." *United States v. Miller*, 693 F.2d 1051, 1053 (11th Cir.1982) ("*Miller*"). In *United States. v. Bibbero*, 749 F.2d 581 (9th Cir. 1984), *cert. denied*, 471 U.S. 1103 (1985), for example, the Ninth Circuit held that although the defendant was not an original conspirator in a scheme to smuggle marijuana, his agreement to join the conspiracy could be reasonably inferred from his assistance in subsequent smuggling operations where he "undoubtedly understood the full scope of the conspiracy while he was a participant and must have realized that his own profits from the enterprise were dependent upon the success of each off-loading operation." 749 F.2d at 588. A single conspiracy may involve several subagreements or subgroups of conspirators, some of whom join later and perform different tasks.  *Id*. at 587.

Because there is rarely any direct evidence of a defendant's agreement to join a conspiracy, "the defendant's assent can be inferred from acts that furthered the conspiracy's purpose." *Miller*, 693 F.2d at 1053.  Even a single overt act by the defendant can be sufficient to connect him to the conspiracy if that act leads to a reasonable inference of intent to participate in the conspiracy. *United States v. Pack*, 773 F.2d 261, 266 (10th Cir.1985).

Applying this rule in group boycott cases, courts have held that "a rational factfinder could infer agreement with the objective from knowledge of the objective and action calculated to achieve the objective despite differing motives." *Fineman v. Armstrong World Indus., Inc*., 980 F.2d 171, 212 (3d Cir.1992), *cert. denied*, 507 U.S. 921 (1993) ("*Fineman*"). *See also Spectators' Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir.2001).

conspiracy."); *In re Vitamins Antitrust Litig*., MDL Docket No. 1285 (Misc. NO. 99-197) (D.D.C.) (June 13, 2003) (Judge Thomas F. Hogan)  http://apps.americanbar.org/antitrust/at-committees/at-trial/pdf/jury-instructions/vita.pdf  ("[a] person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it…. If someone joins a conspiracy, even only a part of the conspiracy, then it is responsible for the whole conspiracy.").

**B.      The Antitrust Plaintiffs Are Not Required To Plead That EA Participated In Every Aspect Of The Alleged Conspiracy.**

EA's argument that it could not have participated in the conspiracy because it had no role in adopting the NCAA's  "amateurism' rules ignores the rule that "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. International Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir. 1980). *See Tunis Bros. Co. v. Ford Motor Co*., 763 F.2d 1482, 1491 n.16 (3d Cir. 1985), *vacated and remanded on other grounds*, 475 U.S. 1105 (1986), *reinstated*, 823 F.2d 49 (3d Cir. 1987) ("[c]o-conspirators need not be intimately familiar with each and every detail of the conspiracy.  A conspirator need not know all the other conspirators, nor have direct contact with them . . . A plaintiff 'need not show that the defendant participated in every transaction or even that he knew the identities of his alleged conspirators or the precise role which they played."); *Havoco*, 626 F.2d at 554 ("[i]t is well recognized that a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators"); *United States v. Consolidated Packaging Corp.*, 575 F. 2d 117, 126 (7th Cir. 1978) ("[e]ven a single act may be sufficient to draw a defendant within the ambit of a conspiracy where the act is such that one may infer from it an intent to participate in the unlawful enterprise"); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 375 (D.N.J. 2001) (as a matter of law, "[t]hat a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy, such as attending a meeting, does not affect its status as a conspirator") .

The SCAC thus sets forth EA's role in the alleged conspiracy and is more than adequate to plausibly suggest that EA participated in it, which is all that is required:

> [Certain defendants'] central point of contention appears to be the lack of specific allegations directed at their particular company. This argument fails. For pleading purposes, allegations of antitrust conspiracy need not be detailed on a "defendant by defendant" basis. *See SRAM*, 580 F. Supp. 2d at 903-907 (rejecting argument plaintiffs must allege each defendant's specific role in an antitrust conspiracy); *accord In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3rd Cir. 1982); *In re* [*NASDAQ*] *Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995).

*In re Flash Memory Antitrust Litig*., 643 F. Supp. 2d 1133, 1142 n. 7 (N.D. Cal. 2009). *Accord CRT*, 738 F.Supp.2d at 1019; *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 790 (N.D. Cal. 2007) (allegations of "general participation" in conspiracy sufficient to state antitrust claim against individual defendant).

The SCAC does allege facts showing that EA has been deeply complicit in the scheme to commercially exploit names, likenesses and images of former student athletes without compensation and, in fact has taken the laboring oar in furthering that scheme. The antitrust conspiracy in this case involves multiple participants who performed different tasks in furtherance of it. The SCAC states, *inter alia*, that EA agreed to be bound by the NCAA's bylaws (including Bylaw 12.5.1.1); that it viewed the NCAA as a "partner"; that it continually explored with the NCAA how to make its video games as realistic as possible while denying compensation for the student-athletes depicted in them; that it lobbied for and agreed with the NCAA to try to achieve the passage of an amended Bylaw 12.5.1.1 that, in one of its iterations, would have formally permitted commercial use of student-athlete names; that it informally colluded with the NCAA and others to exploit the use of their names in conjunction with its video games. SCAC ¶¶ 111 399-400, 407-408, 410, 412-413, 417. EA seeks to recast those allegations as only implicating the NCAA eligibility forms and argues that EA was not a party to any unlawful agreement. But as this Court recognized in denying defendants' motion to dismiss the *Keller* Right of Publicity Plaintiffs' complaint, which included a civil conspiracy claim:

> Plaintiff alleges that there were meetings among Defendants in California and Indiana. He asserts that Defendants knew of NCAA principles barring the license of student-athlete identities, but nonetheless approved EA's games containing the athletes' likenesses without their consent. Finally, he claims that EA's actions violated his California statutory and common law rights of publicity. These factual allegations sufficiently support liability under Plaintiffs' civil conspiracy claim.

*Keller*, 2010 WL 530108, at *8 (footnote and internal cites to complaint omitted). The SCAC, has the same and additional allegations that support Antitrust Plaintiffs' conspiracy claims as to EA.

### C.     The Antitrust Plaintiffs Are Not Required To Make Detailed Allegations of EA's Motives.

Nor must the Antitrust Plaintiffs plead some overarching motive on the part of EA. As the court said in *Jung. v. American Association of Medical Colleges*, 300 F.Supp.2d 119, 159 (D.D.C. 2004), in distinguishing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1985), a case involving summary judgment on which EA relies  (EA Memo, p. 6):

> The Court concludes that application of the *Matsushita* rule simply is not appropriate in the context of a motion to dismiss. A motion to dismiss for failure to state a claim generally is made before discovery and should be evaluated on the basis of the four corners of the pleading.... A summary judgment motion commonly is filed after at least some discovery and it turns on whether there is a genuine issue of material fact for trial; it is only in that post-discovery context in which the plausibility of competing motives should be assessed.

Even if some motive must be established at the pleading stage, one can fairly be inferred from the SCAC: by not paying student-athletes for the use of their images and likenesses, EA made more profit. *See* SCAC ¶377.

Similarly, in *ZF Meritor, LLC v. Eaton Corp*., No. 06-623 SLR, 2011 WL 843928 (D. Del. March 10, 2011), the district court recently denied a motion to dismiss rejecting the same argument that EA makes here namely that each co-conspirator must share a common motive of fixing prices or "excluding competitors from the marketplace." *Id*. at *10.

> Defendant is incorrect in its assertion that plaintiffs were required to prove that both defendant and the OEMs desired to achieve an illegal objective, *i.e.,* exclusion of plaintiffs from the Class 8 transmission marketplace. "[A]cquesense [*sic*] in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."

*Id*. (*quoting United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948)). As the district court concluded, parties who do business with the primary defendants whom they know are excluding plaintiffs from the market with the intention of obtaining the lowest price for defendants demonstrate a commitment to a common scheme, and thus, may be liable as co-conspirators:

> "Though ... co-conspirators must share a commitment to a common scheme which has an anticompetitive objective, they need not share an identical motive for engaging in concerted action in violation of section 1 of the Sherman Act." ... Here, at the very least, the OEMs entered into the LTAs with the intention of obtaining the lowest price for defendant's transmissions, thus demonstrating a

sufficient "commitment to a common scheme" to satisfy the requirements of Section 1 of the Sherman Antitrust Act.

*Id*. (*quoting Fineman*, 980 F.2d at 214.)[4]

### D.   The Cases On Which EA Relies Are Inapposite.

EA relies on four key cases: *Matsushita*, *Monsanto Co. v. Spray-Rite Service Corp*., 465 U.S. 752 (1984) ("*Monsanto*"); *Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042 (9th Cir. 2008) ("*Kendall*"); and *In re Graphics Processing Units Antitrust Litig*., 527 F.Supp.2d 1011 (N.D.Cal. 2007) ("*GPU I*") *See* EA Memo, p. 6.  None of these decisions are apposite.

*Monsanto* involved a post-trial appeal and set forth the standard for evaluating a *motion for a directed verdict* in the context of vertical conspiracy allegations.  See 465 U.S. at 759, 768. Not only is *Monsanto* irrelevant for purposes of assessing EA's motion to dismiss, it is also involved claims plainly distinguishable from the allegations at issue here.

*Matsushita* involved the standard to be applied on a *motion for summary judgment*. That is not the procedural posture of this case. EA cites *Matsushita* for the proposition that where conduct is equally consistent with illegal conspiracy as with permissible competition, no inference of collusion is warranted. But on a *motion to dismiss*, *all inferences have to be drawn in favor of the non-movant*. The case law illustrates this point. Indeed, this Court rejected the same argument, in *In re Static Random Access (SRAM) Antitrust Litig*., 580 F. Supp. 2d 896 (N.D. Cal. 2008) ("*SRAM*").  In *SRAM*, this Court, when confronted with evidence pled in a complaint that defendants claimed was susceptible to an innocent interpretation, similarly concluded that under Rule 8, all competing inferences must be drawn in a plaintiff's favor.  *Id*. at 901-02.  *Accord*, City of *Moundridge v. Exxon Mobil Corp*., 250 F.R.D. 1, 5 (D.D.C. 2008) (noting that "a complaint need not be dismissed where it does not 'exclude the possibility of independent business action.' Such a requirement at this stage in the litigation would be counter to Rule 8's requirement of a

---

[4] *See also* the jury instructions in *In re Tableware Antitrust Litig*., No. C-04-3514 (VRW) (N.D. Cal.) (June 29, 2007) (Judge Vaughn R. Walker) ("[t]he conspiracy is proven if the evidence establishes that the parties knowingly worked together to accomplish a common purpose. It is not essential that all persons acted exactly alike; nor is it necessary that they all possessed the same motive for entering the agreement.")

short, plain statement with 'enough heft to "sho[w] that the pleader is entitled to relief." ' ").[5]

In *Kendall*, the plaintiffs alleged a conspiracy predicated solely on the fact that certain banks which issued Visa and MasterCard credit cards also had a "proprietary interest" in the Visa and MasterCard "consortiums," and that the consortiums set interchange fees which they charged to the banks, which were then ultimately passed on to merchants. 518 F.3d at 1049. The plaintiffs alleged, in conclusory fashion, that the banks conspired both through and with the consortiums to which they belonged. *Id*. All of this was *after* the plaintiffs had been given leave to take discovery concerning the alleged conspiracy. The Ninth Circuit held that bare allegations of ownership and control of the consortiums that set fees, especially after discovery had been allowed, did not state a Section One claim. *Id*. at 1049, 1050 (plaintiffs "simply allege the consortiums are coconspirators, without providing any facts to support such an allegation, despite having deposed executives from both MasterCard and Visa"). Notably absent was any allegation that the banks agreed to abide by or charge the fees set by the consortiums. *Id*. at 1048.

*Kendall* is limited to its particular circumstances, *i.e.*, a case in which plaintiffs alleged no facts--even after discovery--other than parallel conduct to support their claim of conspiracy. *See Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 324 (2d Cir. 2010), *cert. denied*, 131 S.Ct. 901 (2011); *In re Packaged Ice Antitrust Litig.*, 723 F.Supp.2d 987, 1006 (E.D. Mich. 2010); *Babyage.com , Inc. v. Toys "R" Us, Inc.*, Nos. 05-6792, 06-242, 2008 WL 2644207 at *4 n.4 (E.D. Pa. July 2, 2008). As Judge Conti held in *CRT*:

> [*Kendall*] is distinguishable. The Ninth Circuit panel affirmed the district court's dismissal of an antitrust action where, after conducting discovery, plaintiffs were unable to amend their complaint to plead evidentiary facts showing banks entered into agreements to restrain

---

[5] Similarly, in *Flying J Inc. v. TA Operating Corp.*, No. 1:06-cv-00030 TC, 2007 WL 3254765 (D. Utah Nov. 2, 2007), decided after *Twombly*, the complaint referred to an e-mail that plaintiffs asserted evidenced the alleged conspiracy. *Id*. at *1. Defendants responded with their own self-serving interpretation of the e-mail and alleged that it merely reflected the author's independent knowledge of competitive behavior. The court denied a motion for judgment on the pleadings, and rejected the argument that, where two interpretations of a piece of evidence are possible-one favoring collusion and the other favoring competition-*Twombly* requires the court to resolve the dispute in favor of defendants. *Id*. ("[i]t could be read, and it is a plausible reading, to say that Mr. Hinderliter did not just understand what his competitors were doing, but that he spoke with those competitors about the subject of the alleged agreement.").

trade.  Here, the complaints allege a governmental investigation, hundreds of meetings between 1995 and 2007, and detailed allegations concerning the structure and typical pattern of those meetings. (Internal citations omitted).

738 F.Supp.2d at 1019.

As for *GPU I*, EA relies on it to argue that an "ordinary business interaction 'is presumed legitimate and is not a basis to infer a conspiracy without more." EA Memo at 6.  However, the court in *GPU I*, like those in *Kendall* and *Twombly*, found that the plaintiffs had failed to allege facts supporting the existence of any conspiracy and found that "[a]ttendance at industry trade shows" not "ordinary business interaction" was an insufficient basis to allege conspiracy. 527 F. Supp.2d at 1023.  Moreover, EA fails to mention that in *In re Graphics Processing Units Antitrust Litig.*, 540 F.Supp.2d 1085 (N.D.Cal. 2007), Judge Alsup ruled that the additional allegations in the amended complaint adequately supported the inference of an antitrust conspiracy and denied defendants' motions to dismiss.

EA attempts to dismiss the new allegations as nothing more than the conduct of an ordinary licensee seeking to maximize its license rights.  In fact the allegations show that EA was not acting as an ordinary licensee but was an active partner and a driving force in the conspiracy to expand the commercial exploitation of student athletes' images, likenesses and names while prohibiting compensation to current and former student-athletes.  While agreeing with the other defendants to deny compensation to former student athletes, EA colluded with the other them to exploit student athletes' names, images and likenesses to maximize its profits.  NCAA's and CLC's conduct in turning a blind eye towards EA's commercial use of student-athletes' names, images and likenesses supports the inference that EA had joined the conspiracy.  EA's conduct has furthered the boycott against former student athletes and the conspiracy to deny them compensation by colluding with the other Defendants to increase commercial exploitation of their images and likenesses without compensation.

The specific allegations of the SCAC summarized above directly contradict EA's assertion, that it was merely exercising its legitimate business rights as a licensee and seeking to maximize its profits.  *See Townshend v. Rockwell Int'l Corp.*, No. C99-0400SBA, 2000 WL

433505, at *6 (N.D. Cal. Mar. 28, 2000) ("[b]ecause the question of capability to enter a conspiracy is a question of fact and because the case law does not establish that [licensor] and [licensee] are legally incapable of entering into a conspiracy," dismissal under Rule 12(b)(6) is not warranted).  In short, EA's arguments based on its role as a downstream licensee are entirely without merit.  The SCAC includes detailed allegations regarding EA's direct involvement in a conspiracy that foreclosed Antitrust Plaintiffs and putative Antitrust Class members of participation in the market for the licensing of their names, images and likenesses – a foreclosure that has greatly benefited EA.

### E.   The SCAC Sufficiently Alleges An Unjust Enrichment Claim.

Just as the *O'Bannon* complaint sufficiently alleged an unjust enrichment claim as to the NCAA and CLC (2010 WL 445190 at *8), the SCAC adequately pleads an unjust enrichment claim as to EA. *See* SCAC ¶¶372-419, 513-15.  Indeed, the Antitrust Plaintiffs specifically allege that EA, like CLC, unlawfully obtained commercial revenues that rightfully belong to the Antitrust Plaintiffs and the members of the putative Antitrust Class.  *Id*. ¶¶406, 514.  As such, the SCAC sets forth a claim for unjust enrichment against EA and supports imposition of a constructive trust.  *See Asher v. Reliance Ins. Co.*, 308 F. Supp. 847, 852 (N.D. Cal. 1970) (constructive trust imposed by law to prevent party from benefitting by that which he has wrongfully obtained or detained).

### F.   The SCAC Sufficiently Alleges An Accounting Claim.

In denying the accounting claim in the *O'Bannon* complaint with leave to amend, the Court stated that he had failed to "plead facts showing the existence of complicated accounts that make a legal action impracticable. . . . If he means to imply that he is entitled to some ascertainable percentage of every license agreement that involved his image, and that there are many, he should say so directly." 2010 WL 445190 at *8.  Based on this guidance, the Antitrust Plaintiffs included in the SCAC more specific allegations to support the accounting claim.  *See* SCAC ¶¶462-68.  These allegations were deemed sufficient as to the NCAA and CLC.

1  Accordingly, and despite EA's conclusory claim to the contrary, the Antitrust Plaintiffs have

2  satisfied the pleading requirements for their accounting claim.

3      **V.      CONCLUSION.**

4      For all of the foregoing reasons, the Antitrust Plaintiffs request that the Court deny EA's

5  motion to dismiss.

6

7  Dated:  June 14, 2011                          Respectfully Submitted,

8                                                 HAUSFELD LLP

9

10                                                 _/s/ Michael P. Lehmann_____
                                                   Michael P. Lehmann
11                                                 Jon T. King
                                                   Arthur N. Bailey, Jr.
12                                                 44 Montgomery Street, 34th Floor
                                                   San Francisco, CA 94104
13                                                 Tel:  (415) 633-1908
                                                   Fax:  (415) 358-4980
14                                                 Email:  mlehmann@hausfeldllp.com
15                                                         jking@hausfeldllp.com
                                                           abailey@hausfeldllp.com
16
                                                   Michael D. Hausfeld (*pro hac vice*)
17                                                 Hilary K. Scherrer
                                                   HAUSFELD LLP
18                                                 1700 K Street, NW, Suite 650
                                                   Washington, DC 20006
19                                                 Tel:  (202) 540-7200
                                                   Fax:  (202) 540-7201
20                                                 Email:  mhausfeld@hausfeldllp.com
21                                                         hscherrer@hausfeldllp.com

22                                                 ***Plaintiffs' Interim Co-Lead Class***
                                                   ***Counsel with Principal Responsibility***
23                                                 ***for Antitrust Claims***

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Michael P. Lehmann, whose ECF User ID and password are being used to e-file this document, declare that I am over the age of eighteen (18) and not a party to the entitled action. I am a partner in the law firm of HAUSFELD LLP, and my office is located at 44 Montgomery Street, Suite 3400, San Francisco, California  94104.

On June 14, 2011, I caused to be filed the following:

**ANTITRUST PLAINTIFFS' OPPOSITION TO DEFENDANT ELECTRONIC ARTS, INC.'S MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT**

with the Clerk of the Court using the Official Court Electronic Document Filing System which served copies on all interested parties registered for electronic filing.

I also certify that I caused true and correct Chambers Copies of the foregoing document(s) to be hand-delivered to the following Judge pursuant to Civil L.R. 3-12(b) by noon of the following day:

The Hon. Claudia Wilken
U.S.D.C., Northern District of California
Oakland Division
1301 Clay Street, Suite 400 S
Oakland, CA 94612-5212

I declare under penalty of perjury that the foregoing is true and correct.

_/s/ Michael Lehmann_____