IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITigation / | No. C 09-01967 CW<br><br>ORDER DENYING EA'S MOTION TO DISMISS (Docket No. 331) |

Defendant Electronic Arts Inc. (EA) moves to dismiss the antitrust claims asserted against it in the Second Consolidated Amended Complaint (2CAC). Plaintiffs Edward C. O'Bannon, Jr.; Harry Flournoy; Alex Gilbert; Sam Jacobson; Thad Jaracz; David Lattin; Patrick Maynor; Tyrone Prothro; Damien Rhodes; Eric Riley; Bob Tallent; and Danny Wimprine (collectively, Antitrust Plaintiffs) oppose the motion. Having considered all of the papers filed by the parties, the Court denies the motion.

BACKGROUND

Because the Court's Order of May 2, 2011 describes the factual allegations and procedural history of the case in sufficient detail, they will not be repeated here in their entirety. In sum, Antitrust Plaintiffs in these consolidated cases bring claims based on an alleged conspiracy among EA, Defendants Collegiate Licensing Company (CLC) and National Collegiate Athletic Association (NCAA) to restrain trade in violation of § 1 of the Sherman Act. Plaintiffs Samuel Keller; Bryan Cummings; Lamarr Watkins; and Bryon Bishop (collectively, Publicity Plaintiffs) bring claims based on

Defendants' alleged violations of their statutory and common law rights of publicity. Publicity Plaintiffs' claims are not at issue here.

In its May 2, 2011 Order, the Court granted EA's motion to dismiss Plaintiffs' § 1 and related common law claims for failure to state a claim. The Court found that the Consolidated Amended Complaint (CAC) filed by Plaintiffs had not alleged a sufficient factual basis for either of its § 1 claims against EA: (1) that EA participated in a price-fixing conspiracy with NCAA and CLC to set at zero dollars the price paid to Plaintiffs and putative class members for use of their images, likenesses and names; and (2) that EA participated in a "group boycott/refusal to deal" conspiracy for use of their images, likenesses and names. The Court noted that, while EA entered into license agreements with CLC that did not compensate Plaintiffs and putative class members for use of their likenesses, Plaintiffs acknowledged that the license agreements were not the agreements to participate in the conspiracies. Accordingly, for both claims, the Court found insufficient factual allegations that EA agreed to participate in the alleged antitrust conspiracies with NCAA and CLC. The Court granted Plaintiffs leave to amend to plead facts demonstrating EA's agreement to engage in the alleged conspiracies.

On May 16, 2011, Plaintiffs filed the 2CAC, adding allegations regarding EA's involvement in the purported conspiracy. Those additional allegations are summarized below.

EA enjoys a "unique relationship" with NCAA that is "exceptionally close, and different from that involving other third

2

parties." 2CAC ¶ 373. EA is the only NCAA licensee which uses images of current or former players, and is the only NCAA licensee or business partner which does not use pre-existing video or photographic images but creates new products. Id. Because of this unique relationship, EA, NCAA and CLC have yearly meetings regarding the product approval process, id., and have had extensive discussions about using student-athlete names in EA's products, id. ¶ 399. In addition, NCAA has allowed EA to propose amendments to NCAA bylaws which would allow the use of student-athlete names in EA's products. Id. When this proposal was discussed by the NCAA Division I Student-Athlete Advisory Committee, EA representatives were allowed to give a presentation regarding EA's NCAA College Football video game and the use of student-athlete likenesses in the game. Id. ¶ 417. EA has also used its high level of access to NCAA "to advocate and obtain agreement on making its NCAA-themed video games as photorealistic as possible." Id. ¶ 399.

Despite prohibitions on including player names in EA games, EA and NCAA have colluded to allow third parties to create modifications allowing users to upload into the games complete roster information, including the heights, weights, names and appearances of student-athletes. Id. ¶ 412. In 2009, EA began offering a "TeamBuilder" page on its website allowing users to upload player and roster information and share it with other users. Id. ¶¶ 413-414. In addition, EA and NCAA have colluded to allow student-athlete names to appear in connection with EA video game promotions on the internet and in television broadcasts. Id. ¶¶ 410-411.

3

In its three licensing agreements with CLC, EA has expressly agreed to abide by the NCAA's rules prohibiting student-athlete compensation, and "agreed to extend its agreement with the NCAA, prohibiting compensation to student-athletes, to former student-athletes." Id. ¶ 400.

On May 31, 2011, EA filed its motion to dismiss the antitrust claims asserted against it in the 2CAC. EA argues that the additional facts alleged by Plaintiffs concern only EA's "rational, legitimate commercial efforts" and do not imply EA's participation in an unlawful antitrust conspiracy. EA's Brief at 7.

Plaintiffs contend that the 2CAC addresses the deficiencies in its allegations against EA by alleging new facts showing that EA joined the conspiracies alleged against NCAA and CLC, and that EA's conduct furthered the ongoing conspiracies.

## LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Dismissal under Rule 12(b)(6) for failure to state a claim is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action,

4

supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

## DISCUSSION

EA contends that, despite the additional allegations in the 2CAC, Plaintiffs fail to plead a sufficient factual basis to suggest that EA entered into any agreement relating to an antitrust conspiracy with NCAA and CLC. Thus, EA argues, Plaintiffs' § 1 and related common law claims fail.

To state a claim for a violation of § 1 of the Sherman Act, a plaintiff must plead, among other things, facts suggesting the existence of "a contract, combination or conspiracy among two or more persons or distinct business entities" that was intended to impose an unreasonable restraint of trade. Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008) (citing Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 507 (9th Cir. 1989)). The allegations must point "toward a meeting of the minds" with regard to concerted, anticompetitive conduct. Kendall, 518 F.3d at 1048. An "account of a defendant's commercial efforts" is not, on its own, sufficient to support a § 1 claim. Id. Plaintiffs bring two § 1 claims that rest on two separate alleged conspiracies joined by EA: a price-fixing conspiracy, and a group boycott/refusal to deal conspiracy.

I. Price-Fixing Conspiracy

EA asserts that the additional facts alleged by Plaintiffs fall into two categories: (1) allegations regarding EA's efforts to obtain additional rights to use student-athlete names and

5

likenesses; and (2) allegations regarding EA's alleged use of student-athlete publicity rights. According to EA, these allegations of its commercial efforts are insufficient on their own to state a claim that EA agreed to participate in an antitrust price-fixing conspiracy.

EA is correct that many of Plaintiffs' new allegations do not suggest anything more than EA's commercial efforts to obtain new rights and use its existing rights. However, Plaintiffs have added a significant additional allegation: that in addition to agreeing to abide by NCAA's rules prohibiting compensation of current student-athletes, EA also agreed not to offer compensation to former student-athletes.

Because Plaintiffs previously stated that EA's license agreements with CLC were not the agreements forming the basis of the conspiracy, EA contends that Plaintiffs' failure to plead the existence of any other agreements is fatal to their antitrust claim. Plaintiffs appear to have changed course, and now assert that EA's license agreements, in which it agreed not to offer compensation to former student-athletes, do represent its agreements to engage in the antitrust conspiracy with NCAA and CLC.

Plaintiffs' argument is based in part on NCAA's concession, at the April 7, 2011 hearing on NCAA, CLC and EA's previous motions to dismiss, that student-athletes own the rights to their names, images and likenesses at all times but, under NCAA rules, may not exercise them while remaining student-athletes. Plaintiffs contend that this means nothing prevented EA from offering compensation to current students, with no money changing hands until after

6

graduation, or from offering compensation to former students.

EA correctly points out that agreeing to compensate current students would be futile, even if no money changed hands initially, because such an agreement would destroy those students' eligibility to compete as student-athletes. However, EA does not dispute Plaintiffs' argument with respect to former students. Indeed, it appears that NCAA's rules on amateurism have not prevented EA from compensating former student-athletes in limited circumstances. Significantly, Plaintiffs allege that EA has entered into licensing agreements with some former student-athletes to use their images on the covers of EA's NCAA video games, although not in the games themselves. 2CAC ¶¶ 382, 385-388.

The allegation that EA agreed not to compensate former student-athletes for use of their images, likenesses and names, going beyond the requirements of NCAA's rules and policies, satisfies the requirement that Plaintiffs plead the existence of a price-fixing agreement involving EA. The agreement not to compensate shows EA was not merely "doing business in the context of the NCAA's amateurism policies." EA's Reply at 4. Instead, it suggests that EA was actively participating to ensure that former student-athletes would not receive any compensation for use of their images, likenesses and names. Because Plaintiffs have plead an agreement to engage in price-fixing, setting student-athletes' compensation at zero dollars, EA's motion to dismiss Plaintiffs' first claim for relief is denied.

II. Group Boycott/Refusal to Deal Conspiracy

EA argues that Plaintiffs' second claim for relief must be

7

dismissed because Plaintiffs still have not plead that EA provided assistance necessary to NCAA's efforts to maintain its rules barring compensation of student-athletes related to their athletic skills.  As the Court noted in its previous order, Plaintiffs' group boycott claim is based on the allegation that Defendants acted in concert to deny compensation to student-athletes by requiring them to sign forms purporting to relinquish all rights in perpetuity to their images, likenesses and names.  The Court held that Plaintiffs' complaint "does not contain any allegations to suggest that EA agreed to participate in this conspiracy."

As noted above, Plaintiffs have plead that EA agreed not to offer compensation to former student-athletes, which is allegedly not required by NCAA rules or policies.  This allegation sufficiently suggests EA's agreement to participate in the claimed group boycott conspiracy.  Because student-athletes retain rights to their images, likenesses and names, and can license them once they are no longer student-athletes, EA's alleged agreement not to offer compensation could demonstrate its participation in the group boycott.  If EA had not made this agreement, its attempts to compensate former players for appearing in its video games likely would have undermined the ability of NCAA and CLC to continue their alleged boycott of former student-athletes.  EA does not explain how this agreement fits into the category of its "rational, legitimate commercial efforts."  Therefore, EA's motion to dismiss Plaintiffs' second claim for relief is denied.

III. Common Law Claims

Because EA moves to dismiss Plaintiffs' common law claims on

8

the grounds that they are based on Plaintiffs' Sherman Act claims, EA's motion to dismiss the common law claims is denied as well.

## CONCLUSION

For the foregoing reasons, EA's motion is DENIED.  (Docket No. 331.)  EA shall answer the Second Consolidated Amended Complaint within fourteen days of this order.

IT IS SO ORDERED.

Dated: 7/28/2011

CLAUDIA WILKEN
United States District Judge