Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email:   mlehmann@hausfeldllp.com
         jking@hausfeldllp.com
         abailey@hausfeldllp.com

Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
Email: rcarey@hbsslaw.com
         leonard@hbsslaw.com

*Plaintiffs' Interim Co-Lead Class Counsel*
*(Additional Counsel Listed on Signature Page)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | Case No. 4:09-cv-1967 CW (NC) |
| | **CLASS ACTION** |
| | **REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEPOSITION OF NCAA PRESIDENT MARK EMMERT** |
| | Date:  **[No hearing scheduled** <br> Time:  **per Civil Standing Order]** <br> Dept.  SF Courtroom A, 15th Floor <br> Judge:  Hon. Nathanel Cousins |
| | Complaint Filed: May 5, 2009 |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

    A.  The Court's Questions ……………………………………………………………1
    B.  Discovery is Mandatory on Affirmative Defenses…………………………………..3

II.   BACKGROUND ........................................................................................................ - 9 -

III.  ARGUMENT ........................................................................................................... - 10 -

    A.    DR. EMMERT'S DEPOSITION IS APPROPRIATE
          UNDER THE APEX DOCTRINE. ............................................................... - 10 -

          1.    Dr. Emmert Has Unique First-Hand Non-Repetitive
                Knowledge of the Facts at Issue......................................................... - 12 -

          2.    Other Discovery Methods. ................................................................. - 16 -

    B.    PLAINTIFFS ARE ENTITLED TO DISCOVERY ON
          MATTERS RELATED TO THE AFFIRMATIVE AND
          SPECIAL DEFENSES THAT THE NCAA HAS RAISED IN ITS
          PLEADINGS. ......................................................................................... - 17 -

IV.   CONCLUSION ........................................................................................................ - 19 -

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

2

CASES

3

*Affinity Labs of Texas v. Apple, Inc.*,

4

No. C 09-4436 CW (JL), 2011 WL 1753982 (N.D. Cal. May 9, 2011) ................................ 10

5

*Bell Atlantic Corp. v. Twombly*,

550 U.S. 544 (2007) .................................................................................................................. 9

6

*Blankenship v. Hearst Corp.*,

7

519 F.2d 418 (9th Cir. 1975) .................................................................................................... 5

8

*Browning v. City of South Bend*,

9

No. 2:09 cv 203, 2010 WL 3894223 (N.D. Ind. Sept. 30, 2010) ............................................. 5

10

*Calobrace v. Am. Nat'l Can Co.*,

No. 93 C 0999, 1995 WL 51575 (N.D. Ill. Feb. 6, 1995) ........................................................ 5

11

*Celerity v. Ultra Clean Holding*,

12

No. C 05-4374 ................................................................................................................ 3, 5, 6, 12

13

*First Nat'l Mortgage Co. v. Fed. Realty Inv. Trust*,

14

No. C 03-02013 RMW (RS), 2007 WL 4170548 (N.D. Cal. Nov. 19, 2007) ................. 11, 12

15

*First United Methodist Church of San Jose v. Atlantic Mut. Ins. Co.*,

No. C–95–2243 DLJ, 1995 WL 566026 (N.D. Cal. Sept. 19, 1995) ....................................... 6

16

*Google Inc. v. Am. Blind & Wallpaper Factory*,

17

No. C 03-5340 JF (RS), 2006 WL 2578277 (N.D. Cal. Sept. 6, 2006) ................................. 12

18

*Kittok v. Leslie's Poolmart, Inc.*,

19

687 F. Supp. 2d 953 (C.D. Cal. 2009) ................................................................................... 14

20

*Liberty Mut. Ins. Co. v. Superior Court*,

13 Cal. Rptr. 2d 363 (Ct. App., 1st Dist. 1992) ................................................................... 12

21

*Logan v. Chertoff*,

22

No. 4:07-CV-1948 CAS, 2009 WL 4730648 (E.D. Mo. Dec. 9, 2009) ................................. 14

23

*MedImmune LLC v. PDL Biopharma, Inc.*,

24

No. C08-05590, 2010 WL 2640473 (N.D. Cal. June 30, 2010) ............................................ 10

25

*Mehmet v. PayPal, Inc.*,

No. 5:08 CV 1961, 2009 WL 921637 (N.D. Cal. Apr. 3, 2009) ............................................ 12

26

*Messick v. Patrol Helicopters, Inc.*,

27

No. CV-07-039-BU-CSO, 2007 WL 2484957 (D. Mont. Aug. 29, 2007) ...................... 14, 15

28

*Nat'l Union Fire Ins. Co. v. Res. Dev. Servs., Inc.*,
   No. C–10–01324 JF (PSG), 2011 WL 2581386 (N.D. Cal. June 29, 2011)............................ 9

*NCAA v. Board of Regents*,
   468 U.S. 85 (1984) ............................................................................................................ 13

*O'Bannon v. NCAA*,
   No. CV-09-3329-CW (N.D. Cal. Oct. 27, 2009) ...................................................................... 3

*Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*,
   254 F.R.D. 568 (N.D. Cal. 2008) ............................................................................................ 9

*Riddell Sports Inc. v. Brooks*,
   158 F.R.D. 555 (S.D.N.Y. 1994) ............................................................................................ 5

*Websidestory, Inc. v. Netratings, Inc.*,
   No. 06cv408 WQH (AJB), 2007 WL 1120567 (S.D. Cal. Apr. 6, 2007) .................... 6, 10, 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(b)(1).......................................................................................................... 2, 14

Fed. R. Civ. P. 12(f) ................................................................................................................ 15

Fed. R. Civ. P. 15(a)(3)............................................................................................................ 15

Fed. R. Civ. P. 26 .............................................................................................................. 1, 6, 9

Fed. R. Civ. P. 30(b)(6)......................................................................................................... 4, 12

1

## I.      **INTRODUCTION**

2

### A.   **The Court's Questions:**

3

The Honorable Magistrate asked six specific questions in his "Order Setting Briefing

4

Schedule on Plaintiffs' Proposed Motion to Compel Deposition of Mark Emmert" (Dkt. 361).

5

6

The NCAA's Opposition does not respond, or half-responds, to many.  For clarity:

7

(1) **What is the status of the other depositions noticed in this case?**  Plaintiffs have

8

requested dates since July for NCAA personnel; the NCAA has resisted for months

9

and has given no specific dates for anyone. (King Decl., at ¶4).

10

(2) **Might the depositions of eight current NCAA employees make the deposition of**

11

**Emmert duplicative?**  No.  The NCAA did not respond to the Court's question.  It

12

only terms them "high-level managers" (Opp. at 2, n.1).  That term is correct, they are

13

individuals including the Director of Broadcasting, and others associated with media

14

contracts and video-game rights.  No one among them, as far as Plaintiffs know, and

15

the NCAA did not state, have anything to do with Presidential Emmert's "hundreds of

16

conversations" with the NCAA's members on issues regarding his Presidential Retreat

17

and his recent statements and examinations of the collegiate model, amateurism, and

18

19

competitive balance.  The NCAA's lack of a response is telling.

20

(3) **Why should Emmert's deposition be taken first, if the named plaintiffs have yet**

21

**to be presented for depositions noticed for June 2011?**  The NCAA acknowledges

22

that eight Plaintiff depositions are occurring the first two weeks of November.

23

Plaintiffs have asked the NCAA for several weeks when it would like to conduct even

24

more; it has not responded.  The NCAA neglected to inform the Court that it and its

25

licensing arm CLC served a total of approximately *two thousand document requests*

26

27

on the Plaintiffs, with objections and responses pertaining to approximately 1500 of

28

- 1 -

them to first be due in June on 30 days' notice, followed up by approximately *twenty*

*subpoenas to individuals and entities associated with those Plaintiffs* served in rolling

waves in July and August, then threatened in writing to further pursue subpoenas to

those Plaintiffs' "parents and grandparents."  (King Decl., at ¶¶ 5,6, and Exh. A).  The

NCAA also failed to mention that lead defense counsel in July requested in writing

postponement of Plaintiffs' deposition schedule because of the very requests and

subpoenas that the NCAA served, stating: "We think, given the document issues and

the third party document delays, together with everyone's hope to only do this once

and yesterday's ruling making EA more interested, that we should defer all plaintiff

depositions until late September . . . I'd like to start with O'Bannon on Tuesday

September 27 . . ."  (King Decl., at ¶7, Exh. B).  Plaintiffs have sought to deal with

these scheduling developments in a professional and non-public manner, and there are

additional details that could be shared on the NCAA's extensive delays on producing

documents relating to the named plaintiffs, but request that no more improper and

misleading statements be countenanced on scheduling issues.

(4) **Do the plaintiffs object to taking the deposition in Indianapolis?**  No.

(5) **Does the NCAA object to a deposition in San Francisco?**  Yes.

(6) **Why, or why not, should the deposition be directly supervised by the Court or a**
**neutral mediator?**  Plaintiffs raised this in the joint submission as a further protective

measure to give added comfort to the Court.  The NCAA then told plaintiffs it did not

want that.  Opp. Br., Wierenga Decl., Exh. 5.  Then Plaintiffs said fine, it was only

offered for the NCAA's benefit.  *Id.*  Now, the NCAA anew calls Plaintiffs' deposition

notice a "public relations stunt" and a "harassment tactic." (Opp. at 11).  Plaintiffs are

open to any way that the Court would like to proceed, but respectfully request more

1    civility in the NCAA's communications in this matter.

2    **B. Discovery is Mandatory on Affirmative Defenses.**

3    The NCAA's opposition is informed by an issue much larger and more fundamental than

4    simply whether Plaintiffs are entitled to depose President Emmert.  The issue is whether Plaintiffs

5    can obtain discovery on asserted affirmative defenses.  Once resolved, and the Federal Rules of

6    Civil Procedure and caselaw make quick work of that, it is readily apparent that Plaintiffs should

7    be allowed to conduct their deposition.

8

9    "Is plaintiff entitled to discovery on the affirmative defenses raised
     by defendants?  Of course it is."

10

11   "[T]he court anticipates that further discovery [on affirmative
     defenses] will narrow the issues for trial, and therefore serve the
12   interests of judicial economy. "

13   "[D]efendants shall, within 30 days, review, evaluate and dismiss
     any affirmative defenses that are truly unnecessary and amend any
14   that clearly do not provide an adequate factual basis."

15   *State of New York  v. Micron Tech., Inc.*, No. C 06-6436 PJH, 2009 WL 29883, *6-7, 21 (N.D.

16   Cal. Jan. 5, 2009) (Hamilton, J.).

17

18   The NCAA should be put to the test.  It should either withdraw its affirmative defenses

19   once and forever on which it seeks to bar discovery, or follow the Federal Rules of Civil

20   Procedure.  Plaintiffs have made this request to the NCAA since May of this year in numerous

21   meet/confers, and tellingly, it never happens.  This state of affairs obligates the NCAA to live

22   with the words that it writes, and obligates Plaintiffs, out of their duties to absent class members,

23   to fully explore and evaluate the defenses.  While the NCAA would like to keep defenses at the

24   ready in its "hip pocket," that is exactly what the federal rules and caselaw expressly prohibit, and

25   motion practice may be necessary at this point to excise improper defenses.  *See Palmer v.*

26   *Oakland Farms, Inc.*, No. 5:10cv00029, 2010 U.S. Dist. LEXIS 63265, at *14-17 (W.D. Va. June

27

28

24, 2010) ("Moreover, by applying the *Twombly-Iqbal* heightened pleading standard to affirmative defenses, a plaintiff will not be left to the formal discovery process to find-out [sic] whether the defense exists and may, instead, use the discovery process for its intended purpose of ascertaining the additional facts which support a well-pleaded claim or defense.").

The NCAA's opposition ignores a number of things, such as that it has asserted *all* of its defenses not just to the Antitrust Plaintiffs' damages claims for former student athletes, but to the Right of Publicity Plaintiffs' damages claims for *current* student-athletes, and to the Antitrust Plaintiffs' injunctive relief claims for *current* student-athletes. It understandably seeks to recast this case as far away from current student-athletes as possible, and from President Emmert, but that is not the way that Judge Wilken has ordered this case to proceed in discovery. The NCAA also makes much of when President Emmert took office, but neglects to inform the Court that Plaintiffs allege continuing violations, and that President Emmert also was the head of major NCAA member schools for 15 years, exactly the type of college leaders that were invited to his private summit in August. (Dkt. 360, at 4). This alone is unique, as there is no individual in the country that has helmed the NCAA and a member university, let alone three universities.

Additionally, NCAA unfortunately has not provided any of the customary affidavits in connection with these types of motions describing President Emmert's duties and knowledge, or anyone else's duties or knowledge. This appears to be a tactical gambit, part of a "keep them guessing strategy" to capitalize on information asymmetry. Plaintiffs have located a document titled "Policies and Operating Procedures" from the NCAA, dated October 2010, the start of President Emmert's tenure, that states "Speaking Agent Policy – The president of the Association and the chair of the Executive Committee are the only individuals authorized to speak on behalf of the Association except as outlined below." (King Decl, Exh. C).

The NCAA's Bylaws further state in Rule 31.5.4.2 that "[t]he NCAA president shall be

responsible for the oversight and administration of all marketing, *licensing*, promotions and public affairs initiatives . . . negotiations with respect to awarding merchandising, marketing and *licensing rights* (including corporate partner rights) shall be conducted by the NCAA president, who shall have the authority to determine the specific terms and conditions and to execute and enforce contracts for the awarding of such rights on behalf of the Association.").  (King Decl., Exh. D).  As the Court likely is aware, the formal name of this consolidated litigation is In re NCAA Student-Athlete *Licensing* Litigation (Dkt. 145, at 4) (emphasis added).  President Emmert clearly has, by rule, unique ability to speak on behalf of the NCAA and to oversee all licensing and to personally handle contractual issues regarding licensing.

The NCAA seeks to avoid its discovery obligations by misinterpreting the Federal Rules of Civil Procedure.  Under the NCAA's interpretation of Rule 26, a party may obtain discovery regarding *only* matters relevant to its claims, but must remain in the dark as to its adversary's defenses, which are off-limits and inappropriate for discovery.   The NCAA argues amateurism, commercialism, and competitive balance in college sports are not at issue because Plaintiffs did not raise these topics in their pleadings.  The NCAA, however, ignores *that it placed amateurism, commercialism, and competitive balance at issue in its Answer and discovery responses*.

Indeed, one of the NCAA's special and affirmative defenses asserts that the NCAA rules serve a number of purported procompetitive purposes, including the "creation of amateur college sports" and the promotion of "competitive balance."   Amateurism and competitive balance do not implicate some "unpled theory" of Plaintiffs' case—rather, they come straight, and verbatim, from the NCAA's pleadings.

The NCAA, in fact, went even further in its interrogatory responses, putting its financial-aid rules directly in play in this case.  The NCAA's response seems to be that its members can do whatever they want, unless they tell anyone about it, in which case visited upon them will be the

full force of the NCAA's rules including on financial aid and protection of amateurism and

competitive balance:

**INTERROGATORY NO. 10**

> Under NCAA rules, are NCAA Members permitted to provide compensation or benefits to former student-athletes in connection with the continuing licensing, sale, use, display or monetization of their Names, Images, and/or Likenesses after the period when the student-athlete participated in intercollegiate athletics?

**ANSWER**

> [N]othing in NCAA rules prohibits NCAA member institutions from providing compensation, benefits or other consideration to former student-athletes in connection with "the continuing licensing, sale, use, display or monetization of their Names, Images, and/or Likenesses after the period when the student-athlete participated in intercollegiate athletics," provided such consideration was not offered as an inducement for the student-athlete to attend, and/or compete for, the NCAA member institution in question. If a NCAA member institution utilizes promises or agreements to pay post-eligibility compensation of any sort – including compensation of the sort identified in this Interrogatory – as a means of inducing student-athletes who still possess NCAA eligibility to attend or compete for the institution, that institution may be found to have violated, *inter alia*, Division I Bylaws 13, 15 and/or 16.

The NCAA cannot invoke defenses and positions to attack Plaintiffs' claims and, at the

same time, maintain that they are irrelevant for discovery purposes. This stance is squarely

contradicted by the plain language of Rule 26, which allows for discovery of "any nonprivileged

matter that is relevant to any party's claim *or defense*." Fed. R. Civ. P. 26(b)(1) (emphasis

added). Perhaps recognizing that its arguments find no basis in Rule 26 or federal discovery

practice, the NCAA also argues that it may raise preemptive defenses in its answer and "reserve"

those defenses (i.e., bar related discovery) until it decides to formally assert them. The NCAA

does not explain just how Plaintiffs are to divine which defenses in the NCAA's pleadings are fair

game and which are "reserved" and thus not suitable for discovery.

And the NCAA does not explain why Plaintiffs, before obtaining discovery, must prove

that *a defense pled by the NCAA* is actually not "reserved" and is instead relevant to Plaintiffs' claims.   This novel approach to pleading is contrary to the plain language of Rule 8, which requires a party to "state in short and plain terms *its defenses to each claim asserted against it*." Fed. R. Civ. P. (8)(b)(1)(A) (emphasis added).  Put simply, by pleading its defenses, reserved or not, the NCAA tied them to the claims asserted by Plaintiffs.  Pleadings are formal assertions of claims and defenses.  If the NCAA truly believes that the issues of amateurism and competitive balance are irrelevant to this litigation, then it must withdraw its related affirmative and special defense.  Otherwise, the issues are appropriate for discovery.

The caselaw best explains the folly of the NCAA's position, and rejects any notion of asserting discovery bars to "conditional" or "reserved" defenses:

> • *Austin v. City & Cnty. Of Denver*, No. 05-cv-01313, 2006 U.S. Dist. LEXIS 32048 (D. Colo. May 19, 2006) (granting plaintiff's motion to compel discovery; "Plaintiff is entitled to conduct discovery based on the defenses asserted in this case and, just as importantly, is entitled to assume that all affirmative defenses have been raised in good faith[,]" and "Plaintiff should be permitted to explore the *bona fides* of that affirmative defense.").

> • *Cuiksa v. Hallmark Hall of Fame Productions, Inc.*, No. 00-1389, 2004 U.S. Dist. LEXIS 2177, *9–10 (D. Kan. Jan. 26, 2004) ("similar to any other claim or defense, plaintiff is entitled to discovery concerning this affirmative defense. . . .  the court is unwilling to allow a party, under the guise of 'trial strategy,' to withhold discovery concerning an affirmative defense raised in its answer and then reintroduce the defense in the pretrial order.").

> • *Olin Corp. v. Cont'l Cas. Co.*, No. 2:10-cv-00623, 2011 U.S. Dist. LEXIS 98177, *10 (D. Nev. Aug. 30, 2011) (ordering defendants to respond fully to discovery request regarding affirmative defenses because "[i]f [defendant] raises a defense, albeit conditionally, [plaintiff] still has a right to obtain discovery relevant to that conditional defense.").

> *Messick v. Patrol Helicopters, Inc.*, No. CV-07-039-BU-CSO, 2007 WL 2484957, at *4 (D. Mont. Aug. 29, 2007) ("The Federal Rules of Civil Procedure do not provide a mechanism for a party to 'reserve the right' to assert a defense. Under the plain language of Rule 8, a claim or defense is either asserted or it is not.").

> • *Vera v. O'Keefe*, No. 10cv1422-L, 2011 U.S. Dist. LEXIS 108908, *5–6 (S.D. Cal. Sept. 23, 2011) (ordering defendant to respond to an interrogatory because "[p]laintiff is entitled to discovery of information relevant to that asserted defense").

> • *The Milton H. Green Archives, Inc. v. CMG Worldwide, Inc.*, No. CV 05-2200, 2007 U.S. Dist. LEXIS 97275, *30–34 (C.D. Cal. May 14, 2007) (ordering defendants to produce documents that form the basis of certain affirmative defenses).

1

2

3

• *Teck Metals, Ltd. V. London Mkt. Insur.*, No. CV-05-411, 2010 U.S. Dist. LEXIS 127902 (E.D. Wash. Aug. 25, 2010) (recommending ordering defendant to respond to plaintiff's discovery requests regarding affirmative defenses; noting "discovery is not to be conducted piecemeal ").

4

5

6

7

8

9

10

11

12

13

14

15

16

Plaintiffs are entitled to full discovery on the NCAA's affirmative and special defenses, including the NCAA's contention that its rules serve legitimate, procompetitive purposes, such as the creation of a "product" of amateur college athletics and the promotion of competitive balance. This discovery necessarily implicates NCAA President Mark Emmert, who has taken an active and hands-on approach to the issues of amateurism, the collegiate model, and competitive equity during his tenure at the NCAA. Far from being removed from the "daily subjects of the litigation," Dr. Emmert, by his own admission, has had "hundreds" of conversations with the membership regarding these issues and convened a "Presidential Retreat" in August to address them. Through his conversations with NCAA members and his role as President, Dr. Emmert has unique, first-hand knowledge of how the NCAA rules purportedly further the goals of amateurism and competitive balance.

17

18

19

20

21

22

23

24

25

26

27

Given his involvement in these issues, deposition of Dr. Emmert does not raise the same concern that traditionally evokes application of the apex doctrine—that is, harassment of high-level officers who have no knowledge of the issues at stake. The NCAA advances a construction of a rule that is completely untethered to its purpose. Instead of serving as a shield against harassing discovery practices, the apex doctrine, according to the NCAA, functions as a sword to immunize top-level officers from discovery. But courts do not take such an expansive view of the apex doctrine. The default rule is still that a noticed deposition should proceed, as it is "very unusual" for a court to prohibit the taking of a deposition altogether. *See Celerity v. Ultra Clean Holding*, No. C 05-4374 MMC (JL), 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) (quoting *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979)).

28

1
2

## II.   <u>BACKGROUND</u>

3

Plaintiffs filed this litigation against the NCAA two and a half years ago, on May 5, 2009,

4

and the NCAA moved to dismiss the consolidated cases.  In their opposition brief to those

5

motions, filed nearly exactly two years ago, the Antitrust Plaintiffs did note that "this case does

6

not involve questions of the protection of amateur sports, the student athletic experience, or other

7

goals."  Dkt. 107, at 3.  Of course, at that time, the only issues in the case were those raised in the

8

Antitrust Plaintiff's original complaint, which has been superseded twice.  The NCAA had yet to

9

assert a defense based on amateurism—in fact, the NCAA had not asserted any defenses, or filed

10

any discovery responses.

11

That changed in the Spring of this year, as it become more evident that the NCAA

12

intended to rely on certain purported procompetitive purposes—specifically, the promotion of

13

amateurism and competitive balance—to justify the restraints it has imposed.  The NCAA also

14

explicitly referenced additional rules and bylaws besides those referenced in Plaintiffs' claims,

15

Form 08-3a and Bylaw 12.5.1.1.  For instance, in responding to the Antitrust Plaintiffs' first set of

16
17

interrogatories, the NCAA stated that Bylaws 13, 15 and/or 16[1] barred NCAA member

18

institutions from promising or agreeing to pay student-athletes post-eligibility compensation,

19

including compensation in connection with licensing or use of former student-athletes' names,

20

images, and likenesses.  *See* Ex. A., Answer to Interrog. 10, at 15.  And on May 31, 2011, when

21

the NCAA formally answered Plaintiffs' claims, it asserted that it acted with procompetitive

22

purposes and that its rules -- including those pertaining to financial aid -- promote amateurism

23

and competitive balance.  Dkt. 330, at 56-57.  Thus, notwithstanding the NCAA's repeated

24
25

representations to the contrary, the issues of amateurism and commercialism are very much at

26

27

---

[1] These bylaws address "Recruiting," "Financial Aid," and "Awards, Benefits and Expenses for Enrolled Student-Athletes," respectively.

28

1    issue in this case *because the NCAA chose to raise them.*

2         Plaintiffs filed a notice of deposition of Mark Emmert on May 4, 2011.  Following meet

3    and confers with the NCAA's counsel, Plaintiffs withdrew the notice without prejudice, and

4    stated that it was done dependent on a review of the NCAA's yet unstated affirmative defenses.

5    (King Decl, at ¶8). Following the NCAA's filing of its Answer on May 31, 2011, which made

6    explicit the NCAA's intent to rely on amateurism and competitive balance as defenses, all

7    Plaintiffs once again noticed the deposition of Dr. Emmert.  The NCAA resisted efforts to depose

8    Dr. Emmert, as well as the other witnesses noticed by Plaintiffs that same day.  And then, in mid-

9    June, President Emmert announced with much fanfare his president summit meeting and since

10   then has continued to write and speak publically on what appears to be a weekly basis on core

11   issues regarding the NCAA's defenses.

12   **III.   ARGUMENT**

13

14   **A.     DR. EMMERT'S DEPOSITION IS APPROPRIATE UNDER THE APEX
            DOCTRINE.**

15

16        Under the Federal Rules, a party seeking to prohibit discovery carries a "heavy burden" of

17   showing why discovery should be denied.  *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th

18   Cir. 1975) (concluding the district court erred by forbidding plaintiff from taking deposition of

19   George Hearst).  "[A] strong showing is required before a party will be denied entirely the right to

20   take a deposition." *Id.*  This burden remains the same whether the issue is raised in a motion to

21   compel or a motion for a protective order.  *See Browning v. City of South Bend*, No. 2:09 cv 203,

22   2010 WL 3894223, at *1 (N.D. Ind. Sept. 30, 2010) ("[T]he party requesting a protective order or

23   opposing a motion to compel bears the burden of showing why the information is not

24   discoverable."); *Calobrace v. Am. Nat'l Can Co.*, No. 93 C 0999, 1995 WL 51575, at *1 (N.D.

25   Ill. Feb. 6, 1995) ("Although this matter is at issue on the Motion to Compel filed by Plaintiffs

1    rather than a Motion for a Protective Order, Federal Rule of Civil Procedure 26(c) is applicable . .

2    . .”); *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 558 (S.D.N.Y. 1994) (noting that there is

3    “little functional difference” between a motion to compel and a motion for a protective order,

4    “since in both cases the party resisting discovery has the burden of supporting its position”

5    (listing cases)).  It also remains the same for depositions involving high-level corporate officers,

6    as it is “very unusual . . . for a court to prohibit the taking of a deposition altogether absent

7    extraordinary circumstances.” *See Celerity* , 2007 WL 205067, at *3 (quoting *Salter*, 593 F.2d at

8    651).

9            However, “courts are sometimes willing to protect high-level corporate officers from

10   depositions when the officer has no first-hand knowledge of the facts of the case or where the

11   officer’s testimony would be repetitive.” *First United Methodist Church of San Jose v. Atlantic*

12   *Mut. Ins. Co.*, No. C–95–2243 DLJ, 1995 WL 566026, at *2 (N.D. Cal. Sept. 19, 1995).  “Where

13   a high-level decision maker *removed from the daily subjects of the litigation* has no unique

14   personal knowledge of the facts at issue, a deposition of the official is improper.” *Celerity*, 2007

15   WL 205067, at *3 (internal quotation marks omitted) (emphasis added).  “This is especially so

16   where the information sought in the deposition can be obtained through less intrusive discovery

17   methods . . . or from depositions of lower-level employees with more direct knowledge of the

18   facts at issue.” *Id.*  Accordingly, “[w]hen determining whether to allow an apex deposition,

19   courts will often consider: (1) whether or not the high-level deponent has unique first-hand non-

20   repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the

21   deposition has exhausted other less intrusive discovery methods.” *Websidestory, Inc. v.*

22   *Netratings, Inc.*, No. 06cv408 WQH (AJB), 2007 WL 1120567, at *2 (S.D. Cal. Apr. 6, 2007).

23   “[W]here a corporate officer has first-hand knowledge of important, relevant, and material facts

24   in the case the deposition should be allowed.” *See First United Methodist Church*, 1995 WL

1   566026, at *2.

2        The NCAA cannot show good cause for an order prohibiting Plaintiffs from taking the

3   deposition of Dr. Emmert.  *See* Fed. R. Civ. P. 26(c).  Through his role as President for the

4   NCAA as well as his "hundreds" of conversations with NCAA members, Dr. Emmert has unique,

5   first-hand knowledge of the defenses related to amateurism and the NCAA rules that *the NCAA*

6   *placed at issue in this litigation*.  (*See* NCAA Answer at 56-57.)  Not only is Dr. Emmert a person

7   with unique, first-hand knowledge of the facts in this case, he is *the only person* with knowledge

8   of relevant facts regarding his conversations with NCAA membership regarding the sustainability

9   of the NCAA model and rules.  Moreover, given the scheduling of depositions in this case, Dr.

10  Emmert's deposition likely will occur after several others, ensuring that counsel is well prepared.

11

12

13        **1.        Dr. Emmert Has Unique First-Hand Non-Repetitive Knowledge of the Facts**
                    **at Issue.**

14

15        As this case has progressed, the NCAA has increasingly shown that it intends to rely on

16  amateurism and competitive balance, as well as the rules governing financial aid, as defenses to

17  Plaintiffs' claims.  On May 31, 2011, the NCAA made this intent official, submitting an

18  affirmative and special defense, No. 24, that details the purported "legitimate procompetitive

19  purposes" served by the NCAA rules, including those pertaining to financial aid.  (*See* NCAA

20  Answer at 56-57.)  Specifically, the NCAA asserted that its rules:

21

22     •   "promote the creation and enhancement of amateur college athletics as 'products' or
           activities that are distinct from professional and other amateur athletics";

23

24     •   "allow the creation of a 'product' – amateur college athletics – that would not
           otherwise exist, and are accordingly precompetitive";

25     •   "promote the creation and maintenance of several unique features of NCAA college
           athletics";

26

27     •   "promote competitive balance between and among NCAA member institutions in the
           various sports in which they compete";

28

- "help to minimize or eliminate the effect of boosters, agents, gamblers and other professionalizing or improper influences on college athletics";

- "help to preserve institutional control over athletics departments at NCAA member institutions, and thus maximize the integration between athletics and education at those institutions";

- "help to insure that student-athletes are integrated into the student body as a whole and that education remains an important component of the student-athlete experience"; and

- "help ensure that sports other than football and men's basketball are played at an intercollegiate level between NCAA member institutions."

*See id.*

Dr. Emmert has *admitted* that he has unique, first-hand knowledge of these topics in statements that he has made to the media during his tenure as NCAA President.  As chronicled in the Joint Statement (Dkt. 360), Dr. Emmert has stated that:

- he has had "hundreds of conversations with the membership," during which it has become "clear" to him that "Division I Athletics is at a crossroads";

- there are "fundamental concerns that commercialism is overwhelming amateurism";

- he has surveyed "presidents and Division I stakeholders" about the issues affecting the amateur model;

- "[t]he gap in revenue . . . is coming to redefine what we mean by competitive equity"; and

- "[i]n order to protect student-athlete success, the collegiate model, amateurism and competitive equity, there must be substantive change to the enterprise."

Dr. Emmert's statements make clear that he has first-hand knowledge about amateurism and competitive equity—two purported "legitimate procompetitive purposes" raised *explicitly* in the NCAA's answer.  Moreover, this knowledge is unique.  For one, Dr. Emmert has taken an active role in addressing the rise of commercialism and competitive imbalance and shaping policy for the organization and its members regarding those issues.  In addition, Dr. Emmert has personally spoken to a number of NCAA members regarding the challenges, including commercialism,

1  facing the amateur model.   The NCAA has not once provided the name of any specific person

2  who possesses the same unique and first-hand knowledge of the content of these conversations as

3  Dr. Emmert does. (King Decl., at ¶9).

4          Recognizing that it has no basis to contend that Dr. Emmert does not have unique, first-

5  hand knowledge of one of the its chief defenses, the NCAA resorts to devising a novel, and

6  creative, rule limiting discovery only to a plaintiff's *claims*, and to misconstruing the nature of

7  Plaintiffs' arguments.  First, the NCAA maintains that Plaintiffs are not entitled to depose Dr.

8  Emmert because he does not have unique, first-hand knowledge of Form 08-3a, Division I Bylaw

9  12.5.1.1, Electronic Arts' video games, and the contracts between the NCAA and Electronic Arts

10  and Collegiate Licensing Company.  (NCAA Br. at 4.)  Under the NCAA's interpretation of Rule

11  26, Plaintiffs may obtain discovery on *only matters related to their claims*, and within those

12  claims, only on certain topics.  But this interpretation ignores the plain language of Rule 26,

13  which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is

14  relevant to any party's claim *or defense*."[2]  *See* Fed. R. Civ. P. 26(b)(1); *see also Nat'l Union Fire*

15  *Ins. Co. v. Res. Dev. Servs., Inc.*, No. C–10–01324 JF (PSG), 2011 WL 2581386, at *1 (N.D. Cal.

16  June 29, 2011) ("Rule 26(b) states that a party may obtain discovery regarding any matter, not

17  privileged, that is relevant to the claim or defense of any party.").  It also fails to consider the

18  Federal Rules contemplate broad and liberal discovery—not limited inquiry into a small subset of

19  *one* party's claims.  *See Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 575

---

[2] The NCAA suggests that *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), limits a party's discovery to *only matters pertaining to that party's pled claims*.  (NCAA Br. at 12 ("A plaintiff should only be permitted to take discovery on those claims he had adequately pled under *Twombly* . . . .").)  But *Twombly* did not involve Rule 26—it addressed pleading standards under Rule 8.  *Id.* at 553-62.  The court did note that "proceeding to antitrust discovery can be expensive," *id.* at 558, but it never stated that once a plaintiff has adequately pled its claims under Rule 8 and survived a motion to dismiss, as is the case here, that its discovery must be limited to only its claims, and that it may not seek discovery regarding the defenses of its adversary.

1    (N.D. Cal. 2008) ("The scope of discovery permissible under Rule 26 should be liberally

2    construed; the rule contemplates discovery into any matter that bears on or that reasonably could

3    lead to other matter that could bear on any issue that is or may be raised in a case.").  In short, the

4    NCAA cannot seriously contend that Plaintiffs are barred from discovery relating to defenses that

5    NCAA has pled; this argument is at odds with both the language of and purpose behind Rule 26.

6    

7            Second, the NCAA misstates the purpose of Plaintiffs' notice to depose Dr. Emmert,

8    claiming that Plaintiffs wish to depose Dr. Emmert regarding his statements and quotations

9    themselves.  (*See* NCAA Br. at 7-8.)  Thus, according to the NCAA, Plaintiffs' basis for deposing

10   Dr. Emmert is "nothing more than the assertion that he has unique knowledge regarding his own

11   public statements."  (*See id.* at 8.)  This argument is disingenuous on its face.  This case is *not* one

12   in which a party seeks discovery from a corporate high-level officer only regarding the statements

13   he has made to the press.  *See Affinity Labs of Texas v. Apple, Inc.*, No. C 09-4436 CW (JL), 2011

14   WL 1753982, at *4, 6 (N.D. Cal. May 9, 2011) ("Affinity seeks to depose Mr. Jobs on these

15   

16   public statements . . . . It is these types of statements . . . on which Affinity seeks to depose Mr.

17   Jobs.").  Rather, Plaintiffs cite to Dr. Emmert's statements only to show that he indeed has

18   unique, first-hand knowledge of the defenses raised by the NCAA.  *See MedImmune LLC v. PDL*

19   *Biopharma, Inc.*, No. C08-05590, 2010 WL 2640473, at *2 (N.D. Cal. June 30, 2010) (noting that

20   the documents established the officer "was much more than an observer of events going on

21   around him.  Instead, it appears that he was the guiding hand and actual participant in the

22   

23   discussions and events which are of concern in the current litigation"); *Websidestory, Inc.*, 2007

24   WL 1120567, at *3 (emails established knowledge).  Ironically, the NCAA contends that

25   Plaintiffs have not "even tried" to show that Dr. Emmert has unique, first-hand knowledge (*see*

26   NCAA Br. at 1), yet, at the same time, criticizes their use of Dr. Emmert's statements to show

27   that he possesses knowledge.  The NCAA cannot have it both ways.  Dr. Emmert has unique,

28

first-hand knowledge of matters related to the defenses that NCAA has pled, and Plaintiffs are entitled to depose him on those matters.

**2.     Other Discovery Methods.**

Plaintiffs have attempted to depose other NCAA employees for months, but have still not received a single date.   The NCAA has yet to (1) provide availability dates for the witnesses that Plaintiffs noticed in July, and (2) identify any specific persons who possess the same unique, first-hand knowledge regarding the protection of amateurism and competitive equity, and participated in meetings with the membership about this issue, as Dr. Emmert has apparently hundreds of times already.  (King Decl., at ¶10).  Plaintiffs should not be required to rely on NCAA's empty promises and sit back and watch the discovery deadline come and go before seeking to depose Dr. Emmert.  *See Websidestory*, 2007 WL 1120567, at *4 (allowing for deposition of former CEO when, due to dilatory discovery conduct by both parties, there was "little time remaining in the schedule before the discovery cut-off of April 10, 2007 to pursue other alternative discovery methods").  Moreover, by the time Dr. Emmert is deposed, document production will be substantially complete, and many fact depositions will have occurred.

In addition, even though Dr. Emmert's deposition will occur toward the end of discovery in this case, there is no requirement that it *must*.  The NCAA advances an overly rigid and mechanical application of the apex doctrine that requires *all* discovery be completed before the depositions of high-level corporate officers.  (*See* NCAA Br. at 5-6.)  But this position ignores one of the reasons behind the apex doctrine, which is to ensure, through other discovery, that a corporate officer has unique, first-hand knowledge before subjecting him or her to a deposition. Here, Dr. Emmert, through his own statements, has already demonstrated that he has unique, first-hand knowledge of the defenses pled by the NCAA, and the NCAA has provided no affidavits, declarations, or any specifics to the contrary.

**B.     PLAINTIFFS ARE ENTITLED TO DISCOVERY ON MATTERS RELATED TO THE AFFIRMATIVE AND SPECIAL DEFENSES THAT THE NCAA HAS RAISED IN ITS PLEADINGS.**

In what has become a familiar refrain in this case, the NCAA contends that the issues of amateurism and commercialism play no role in this case, and thus they are irrelevant and not suitable for discovery.  Tellingly, the NCAA limits the scope of relevant topics in this litigation to those related to Plaintiffs' claims,[3] completely ignoring the other half of this case—*the defenses explicitly raised by the NCAA itself*.   The NCAA has pled the affirmative and special defense that its rules have purported "legitimate procompetitive purposes" by promoting, among other things, amateurism and competitive balance and by preventing commercialism.  (NCAA Answer at 56-57.)  And its brief, including a gratuitous (and out-of-content) reference to *NCAA v. Board of Regents*, 468 U.S. 85 (1984),[4] further demonstrates the NCAA's intent to rely on it to combat *any* attack on its rules.  (*See* NCAA Br. at 15.)  The NCAA cannot seriously contend that Plaintiffs are not entitled to test this defense through discovery.  As discussed previously, this argument is wholly unsupported by Federal Rule of Civil Procedure 26, which allows for discovery of matters related to claims *and defenses*.  Perhaps recognizing that its position has no basis in the rules of discovery, the NCAA turns to the rules related to pleading.  But its pleading arguments are likewise without merit.

---

[3] *See, e.g.*, NCAA Br. at 7 ("Unable to demonstrate that President Emmert has unique, first-hand, non-repetitive knowledge of facts *related to their claims* . . . ." (emphasis added)); *id.* at 8 ("The problem is that none of these statements concerns *any of the claims in the SCAC*." (emphasis added)); *id.* at 9 ("Plaintiffs have failed to show that President Emmert's speeches, conversations or meetings are somewhat *relevant to their claims*." (emphasis added)).

[4] NCAA's emphasis on *NCAA v. Board of Regents* is curious, given that the Supreme Court concluded the restraints in that case were *not* justified under a rule-of-reason analysis.  Moreover, the discussion quoted by the NCAA merely stands for the uncontroversial proposition that leagues, by their nature, have "rules on which the competitors agreed to create and define the competition to be marketed," and thus it would be inappropriate to blindly apply a *per se* analysis to these rules.  468 U.S. at 100-01.  The Supreme Court expressly noted that "[t]his decision is not based on . . . the NCAA's historic role in the preservation and encouragement of intercollegiate athletics."  *Id.* at 100.

First, the NCAA claims that Plaintiffs have attempted to insert an "unpled theory" into the case.  (*See* NCAA Br. at 10, 12, 14-15.)  The NCAA's only bases for this contention, however, are its own interpretation of Plaintiffs' claims and unsupported, and self-serving, characterizations of statements allegedly made by Plaintiffs' counsel.  (*See* NCAA Br. at 10 n.4, 14-15).  The latter should be dismissed out of hand by this Court.  *See Kittok v. Leslie's Poolmart, Inc.*, 687 F. Supp. 2d 953, 962 (C.D. Cal. 2009) (giving little weight to defendant's assertion that opposing counsel had conceded in a meet-and-confer that its client's testimony was "inadequate" because "defendant offers no evidence of such a concession other than unsupported statements in defendant's counsel's declaration"); *Logan v. Chertoff*, No. 4:07-CV-1948 CAS, 2009 WL 4730648, at *2 (E.D. Mo. Dec. 9, 2009) ("The Court will not grant plaintiff relief based on his obscure and unsupported statements regarding opposing counsel.").[5]  And the former is simply an attempt to hide the elephant in the room—the NCAA's own answer.  The NCAA raised the issues of amateurism, commercialism, and competitive balance in its pleadings.  It cannot now pin these issues to an "unpled theory" of Plaintiffs' case.

Second, unable to entirely shed its pleading, the NCAA ultimately concedes that it has pled an affirmative defense based on the promotion and protection of amateurism, but contends that it merely "has reserved the right" to formally assert this defense at some future time should Plaintiffs advance "unpled theories," and until Plaintiffs do so, discovery is improper on related topics.  (*See* NCAA Br. at 11 n.5, 15.)  But the NCAA's answer *is* a formal assertion of its defenses to Plaintiffs' current claims.  *See* Fed. R. Civ. P. 8(b)(1) ("In responding to a pleading, a party must: (A) state in short and plain terms *its defenses to each claim asserted against it . . . .*"

---

[5]     It is an unfortunate circumstance that the NCAA mars nearly every verbal meet/confer, which are required by the Local Rules, by emerging afterwards with a miraculous, unsupported, untrue, unwritten "concession" by which it believes the Plaintiffs have amended their pleadings verbally and essentially admitted total defeat.  Plaintiffs would prefer that the parties focus on productive work based on Judge Wilken's numerous orders deny motions to dismiss, the complaint and Answer in this matter, and the Federal Rules of Civil Procedure's instructions on discovery.

1   (emphasis added)); *see Messick v. Patrol Helicopters, Inc.*, No. CV-07-039-BU-CSO, 2007 WL

2   2484957, at *4 (D. Mont. Aug. 29, 2007) ("The Federal Rules of Civil Procedure do not provide a

3   mechanism for a party to 'reserve the right' to assert a defense. Under the plain language of Rule

4   8, a claim or defense is either asserted or it is not."). If the NCAA now admits this defense is

5   irrelevant, it should be stricken from its pleadings. *See* Fed. R. Civ. P. 12(f) ("The court may

6   strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or

7   scandalous matter."). The same is true if the defense is "reserved" and contingent on Plaintiffs'

8   raising additional claims. *See Messick*, 2007 WL 2484957, at *4 (citing Northern District of

9   California cases and striking defendant's "reserved defenses" of contribution and

10  indemnification). If Plaintiffs bring allegedly "new" claims in the future, the NCAA's recourse is

11  to file an amended answer. *See* Fed. R. Civ. P. 15(a)(3). Until then, the NCAA must allow

12  discovery on its pleaded defenses or withdraw them from the case.

13

14  **IV.   CONCLUSION**

15         Unlike many "apex deponents," Mark Emmert is not removed from "the daily subjects of

16  the litigation." President Emmert has unique, first-hand knowledge of matters directly related to

17  the defenses explicitly pled in NCAA's Answer. Accordingly, Plaintiffs should be entitled to

18  take Dr. Emmert's deposition.

1    Dated: October 21, 2011                    Respectfully Submitted,

2    HAUSFELD LLP                               HAGENS BERMAN SOBOL SHAPIRO
                                                LLP
3    /s/ Jon T. King_____
                                                /s/ Robert B. Carey_____
4    Michael P. Lehmann (Cal. Bar No. 77152)
5    Jon T. King (Cal. Bar No. 205073)          Robert B. Carey (*pro hac vice*)
     Arthur N. Bailey, Jr. (Cal. Bar No. 248460) Leonard W. Aragon (*pro hac vice*)
6    44 Montgomery Street, 34th Floor           11 West Jefferson
     San Francisco, CA 94104                    Suite 1000 Phoenix, AZ, 85003
7    Tel: (415) 633-1908                        Telephone: (602) 840-5900
8    Fax: (415) 358-4980                        Facsimile: (602) 840-3012
     Email: mlehmann@hausfeldllp.com            Email: rcarey@hbsslaw.com
9         jking@hausfeldllp.com                        leonard@hbsslaw.com
          abailey@hausfeldllp.com
10                                              Steve W. Berman WSBA (*pro hac vice*)
11   Michael D. Hausfeld (*pro hac vice*)       HAGENS BERMAN SOBOL SHAPIRO LLP
     HAUSFELD LLP                               1918 Eighth Avenue, Suite 3300
12   1700 K Street, NW, Suite 650               Seattle, Washington 98101
     Washington, DC 20006                       Telephone: (206) 623-7292
13   Tel: (202) 540-7200                        Facsimile: (206) 623-0594
14   Fax: (202) 540-7201                        E-Mail: steve@hbsslaw.com
     Email: mhausfeld@hausfeldllp.com
15                                              *Plaintiffs' Interim Co-Lead Class Counsel*
      *Plaintiffs' Interim Co-Lead Class Counsel* *With Primary Responsibility for the*
16   *with Primary Responsibility for the*      *Right of Publicity Claims*
     *Antitrust Claims*
17

18

19

20

21

22

23

24

25

26

27

28