1
2
3
4
5

Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
HAUSFELD LLP
44 Montgomery Street, 34th Floor
San Francisco, CA 94104
Tel:     (415) 633-1908
Email:   mlehmann@hausfeldllp.com
         jking@hausfeldllp.com

6
7

*Plaintiffs' Interim Co-Lead Class Counsel
with Principal Responsibility for Antitrust
Claims*

8

[Additional Counsel Listed on Signature Page]

9
10
11

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20

| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | Case No. 4:09-cv-1967 CW (NC) |
|---|---|
| | **ANTITRUST PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL NCAA FINANCIAL DATA** |
| | **[PUBLIC VERSION – REDACTED]** |
| | Date:        August 8, 2012 |
| | Time:        No hearing time specified in Order |
| | Judge:       Hon. Nathanael Cousins |
| | Courtroom:   SF Courthouse A, 15th Floor |

21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**PAGE**

I.      BACKGROUND ...................................................................................................1

        A.      The NCAA, Conferences and Universities Licensing Agreements. ..........2

        B.      The Prior Motions to Compel the Conference and University Level
              Contracts from the NCAA. .........................................................................4

        C.      NCAA and Third-Party Discovery confirms that the contracts include
              payments for non-live rights. ......................................................................5

        D.      Non-live rights can be determined as a percentage of the bundled rights
              licensed. ......................................................................................................7

        E.      The Revenues for use of the name, image and likeness of former
              student athletes is reported to the NCAA. .................................................8

II.     ARGUMENT .......................................................................................................9

        A.      The financial information sought is relevant. .............................................9

        B.      The financial information is not otherwise available. .............................11

        C.      The burden of producing the financial information is minimal. ..............12

        D.      The Protective Order alleviates any confidentiality concerns. ................13

III.    Conclusion ........................................................................................................14

1

## TABLE OF AUTHORITIES

2
                                                                                                          **PAGE**

3    **CASES**

4    *Blankenship v. Hearst Corp.*, 519 F.2d 418 (9th Cir. 1975) ..........................................................9

5    *Graham v. Casey's General Stores*, 206 F.R.D. 251 (S.D. Ind. 2002) .........................................9

6
     *In re NCAA Student-Athlete Name & Likeness Litig.,* C 09-1967 CW, 2011 WL
7        1642256 (N.D. Cal. May 2, 2011)........................................................................................10

8    *In re NCAA Student-Athlete Name & Likeness Litig.,* Nos. 11-mc-80300-CW, 09-cv-
9        01967 CW, 12-mc-80020 CW, 2012 WL 629225 (N.D. Cal. Febr. 27, 2012 .....................11

10   *O'Bannon v. Nat'l Collegiate Athletic Ass'n,* Nos. C 09-1967 CW, C 09-3329 CW, C
         09-4882 CW, 2010 WL 445190 (N.D. Cal. Feb. 8, 2010) .............................................10, 11
11
12   *Shaap v. Executive Indus., Inc* ., 130 F.R.D. 384 (N.D. Ill. 1990) ...............................................9

13   **RULES**

14   Fed. R. Civ. P. 26(b)(1) ...................................................................................................................9

15   Fed. R. Civ. P. 26(b)(2)(C)(iii).......................................................................................................9

16

17

18

19

20

21

22

23

24

25

26

27

28

1        Antitrust Plaintiffs, by their attorneys, respectfully request this Court to enter an Order

2  pursuant to Rule 37(a)(1) and Civil L.R. 37(a) compelling the production of reports detailing NCAA

3  member media and other licensing revenues, which the NCAA maintains in an electronic database

4  titled the "NCAA Membership Financial Reporting System."  In October 2011, in another motion to

5  compel proceeding, the NCAA stated to the court that it did not object to producing revenue

6  information it had collected from its members.  But, when Antitrust Plaintiffs requested this

7  information from the NCAA, it abruptly reneged on that prior promise, and objected to production.

8        The NCAA has refused to produce the information on relevance and confidentiality grounds.

9  Neither ground has merit.  The requested revenue reports may form the basis of a calculation of

10  damages in this litigation, and as such are clearly relevant.  They are also relevant because they

11  demonstrate the magnitude of the benefit that the NCAA and its members receive as a result of

12  exploiting the name, likeness and/or image rights of college athletes, the proposed class in this case.

13  Indeed, this Court has already made that relevance determination in a related prior motion.  The

14  reports are the least burdensome method by which to obtain this information about the revenues

15  derived by the 300+ Division I members from the conduct contested in the Complaint.  And any

16  confidentiality concerns about the revenue data should assuaged by the Protective Order in this case.

17        Antitrust Plaintiffs, after exhaustive negotiations to obtain the information in the least

18  burdensome manner possible (for parties and non-parties), move for an order compelling its

19  production.  The support for this motion is set forth below and in the Declaration of Renae D. Steiner

20  (hereafter "Steiner Decl."), filed herewith.

## I.      BACKGROUND

21        In brief, the Complaint alleges that the NCAA, its member schools and conferences, and

22  various other co-conspirators have violated the federal antitrust laws by conspiring to foreclose

23  Plaintiffs and class members from receiving compensation in connection with the commercial

24  exploitation of their names, images, and/or likenesses during and after their college playing days.

25  (Compl. ¶ 9.)[1]  The Complaint further alleges that the NCAA, its members, and its for-profit business

26  partners reap billions of dollars in revenue from the commercial exploitation of student athlete

27

---

[1] "Compl." refers to the Second Consolidated and Amended Complaint (Dkt. No. 327) in the consolidated action.

28

images through, among other things, television broadcasts and rebroadcasts, sales and rentals of DVD game and highlight films, on-demand streaming and sales of games and clips and video games (collectively, "multimedia use").  Plaintiffs and other former players – whose names, images and likenesses Defendants utilized to generate revenue – receive no compensation for these uses. (Compl. ¶ 18.)  Below are listed the types of agreements that purport to license the use of media containing names, images and likenesses of student athletes.

> **A.      The NCAA, Conferences and Universities Licensing Agreements.**

The NCAA and its members, at both the conference and university levels, commercially exploit current and former student athletes in a variety of multimedia.  The NCAA, its conferences and university members enter into agreements with broadcasters and other licensees that purport to convey the rights to utilize the images and likenesses of current and former student athletes, thus creating a broad range of multimedia revenue streams for themselves.

Although the NCAA is a party to some contracts, other contracts are executed at the conference or university level.  In brief, the types of contracts that purport to convey the rights to utilize the images and likenesses of current and former student athletes include:

**NCAA contracts**

1.      The agreements between the NCAA and CBS/Turner to broadcast the men's basketball tournament nationally and the agreement between the NCAA and ESPN to broadcast the men's basketball tournament internationally.

2.      The agreement between the NCAA and Turner to digitize footage and operate a website (www.ncaa.com) that uses past men's basketball game footage linked to advertising by the NCAA's Corporate Champions and Partners, as well as other commercial entities.

3.      The agreement between the NCAA and TEM to digitize footage, operate a website that uses past men's basketball game footage linked to advertising by the NCAA's Corporate Champions and Partners, as well as other commercial entities.

4.      The licensing agreements by which the NCAA sells DVDs of game films, on-demand game films, footage and clips.

5.      The agreements between the NCAA and EA (via licensing arm CLC) to use the names, images and likenesses of former and current student athletes in video games.

**Conference contracts**

6.      The agreements between conferences and one or more broadcasters (CBS, ESPN, Fox Sports, Raycom, etc.) to broadcast and re-broadcast regular season basketball and football games.

7.      The agreements that some conferences have with broadcasters to show live and "classic" games on conference or school-owned networks, such as the Big Ten Network and MountainWest Sports Network and on other cable television networks like ESPN Classics.

8.      The agreements between conferences and commercial entities such as ESPN, CBS or XOS to digitize and use archived footage on conference websites to generate advertising revenue.

9.      The licensing agreements by which conferences sell DVDs of game films, on-demand game films, footage and clips.

**University contracts**

10.     The agreements many universities have with one or more broadcasters to broadcast and re-broadcast regular season basketball and football games.

11.     The agreements that some universities have with broadcasters to show live and "classic" games on school-owned networks, such as The Longhorn Network and BYUtv.

12.     The agreements between universities and commercial entities such as ESPN, CBS or XOS to digitize and use archived footage on university websites.

13.     The licensing agreements by which universities sell DVDs of game films, on-demand game films, footage and clips.

 14.     The agreements between universities and EA (via the licensing arm, CLC) to use the names, images and likenesses of their former and current student athletes in video games.

The Complaint alleges that these multimedia sales generates more than $3 billion in annual sales for the NCAA and its member institutions and that it is dominated and controlled, through various licensing and other agreements, by the NCAA and its members.  (Compl. ¶¶ 306-09.)  The NCAA and its members make billions from these arrangements.

To date, the NCAA has produced the agreements to which it is a party, i.e., those agreements listed in 1-5, above.  The NCAA refused to produce all other contracts, i.e., those listed in 6-13, which contain the revenue information that were the subject of a prior motion to compel.  That prior motion practice is discussed in the following section.

**B.** **The Prior Motions to Compel the Conference and University Level Contracts from the NCAA.**

In October 2011, Antitrust Plaintiffs moved to compel the NCAA to produce the agreements listed as 6-13, above.  The NCAA resisted, arguing that it was not in possession, custody or control of the contracts.  Joint Statement of Plaintiffs and NCAA Re: Plaintiffs' Proposed Motion to Compel NCAA to Produce Documents at 3-5 (Dkt. 378).  The NCAA further stated that collecting this information from "over 300 non-party NCAA member institutions will be unduly burdensome."  Joint Statement of Plaintiffs and NCAA Re: Plaintiffs' Proposed Motion to Compel NCAA to Answer Interrogatories at 5 (Dkt. 377).  Although it argued that it was not in possession, custody or control of the contracts, the NCAA never raised relevancy or confidentiality concerns, and, in fact, suggested the opposite:  ***"To be absolutely clear, the NCAA has never objected to producing any document it actually has in its possession, custody or control, even if those documents came into its possession from its members."*** Joint Statement of Plaintiffs and NCAA Re: Plaintiffs' Proposed Motion to Compel NCAA to Produce Documents at 3 (Dkt. 378) (emphasis added).

On November 4, 2011, the Court asked the NCAA to explain what information it had, and how it obtained it.  Dkt. 382 at 1-2 ("Of particular interest to the Court are the associational rules that govern the NCAA. What specific powers does the NCAA have within its bylaws to "collect information and data from members?")  In response, the NCAA asserted that it did not have the authority to require the contracts themselves to be produced to the NCAA.  Rather, the NCAA asserted that it only has the right to obtain, and did obtain, revenue information from each of its members.  Declaration of S. David Berst in Support of Defendant NCAA's Response to Motions to Compel NCAA to Produce Documents and Interrogatory Responses (Dkt. 387) ("Berst Declaration");  *see also* Curtner Decl., Ex. 6 (Dkt. 388) (two-page instruction form for financial submissions).

Based on the NCAA's assertion that it was not in possession, custody or control of its members' contracts, the court denied Antitrust Plaintiffs' motion to compel.  Order Denying Plaintiffs' Motion to Compel NCAA Responses to Document and Interrogatory Requests (Dkt. 410).

Because the court ruled that the NCAA did not have to obtain the relevant contracts, Antitrust Plaintiffs proceeded on a two-pronged discovery path:  first, to obtain exemplar contracts from some

of the largest conferences and universities to see how live and non-live rights were treated, and second, to obtain the media and licensing revenue figures from the NCAA.  Those efforts are described below.

> **C.     NCAA and Third-Party Discovery confirms that the contracts include payments for non-live rights.**

Antitrust Plaintiffs allege that the Defendants have used collusive means to foreclose former student-athletes from payment for the use of their name, image or likeness in a variety of multimedia. In order to calculate damages,  the Antitrust Plaintiffs must review the revenue generated by the NCAA and its members from the re-broadcast of games (or portions of games) in which student-athletes were featured.

In the Joint Statement, Antitrust Plaintiffs offered to submit exhibits showing that (1) re-broadcast (or "archival") footage is part of the "bundled rights" conveyed in many contracts, and the value of those archival rights can be measured as a percentage of broadcast revenues received and (2) that the re-broadcast and footage revenues are contained in the broadcast revenue category in the NCAA Data.   We offer examples of those documents, below, and then follow with a section on the valuation of bundled rights (i.e., both live and non-live rights) agreements.

Discovery obtained to date confirms that media contracts include both live rights and non-live rights.  For example, contracts



At the conference level, the ███████ and the SEC conferences provide another example of media rights agreements that contain the right to exploit both live and non-live game footage. The



The Big Ten Network has both a website and a TV channel that broadcast a variety of "classic games" and highlight shows that incorporate archived footage containing the image or likeness of former student athletes.   For example, the Big Ten Network has regular shows titled "Big Ten Football Replay" that replays prior years' games[2]  and "Big Ten Best" which features the top players of the decade by position.[3]  In addition, the website features much of the same content, showing condensed games or clips of former student athletes, with advertising embedded in and around the content.[4]  On Monday, July 16, 2012, the Big Ten Network featured re-broadcasts of six past football games from 2000 to 2011, re-broadcasts of two past basketball games from 2009 and 2012, and twice presented a 30-minute program on Ron Dayne, a former running back from the University of Wisconsin who won the Heisman Trophy in 1999.[5]

The SEC also has a number of media rights agreements.  The SEC has media agreements with ESPN and CBS.  In its negotiations with ESPN, CBS, and Turner, the SEC obtained ownership of the copyrights of substantially all of the athletic events broadcast in the past, and to be broadcast in the future by those entities.   The SEC packaged and licensed all that content to a company called XOS.

---

[2] http://btn.com/shows/big-ten-football-reply/  accessed July 16, 2012.
[3] http://btn.com/2011/09/13/big-tens-best-qbs-of-the-2000s/  accessed July 16, 2012.
[4] Id.
[5] http://btn.com/shows/ accessed July 16, 2012.

1    In return for the license to distribute, reproduce, sublicense, syndicate and exploit for

2 financial consideration the SEC content via the SEC's official website,[6] and through sales of

3 archived games, XOS shares a minimum of 40% of the gross revenues with the SEC members.

4 Steiner Decl., Ex. 3 at -258.   In addition to the advertising revenue generated by the SEC website,

5 XOS offers 611 past football games[7] or 374 men's basketball games[8] to rent, own or purchase on

6 DVD.[9]

7    At the university level, the University of Texas (UT) sold both its third-tier live game rights

8 and its archived games to ESPN, for ESPN's use on The Longhorn Network, a set of cable and

9 digital networks.  *See* Steiner Decl., Ex. 4 at -19 (Section 2.A. i (live rights) and Section 2.A.ii

10 archived rights: "UT shall grant to ESPN a non-exclusive license to distribute during the Term and

11 within the Territory certain UT-owned and controlled historical/archived video content with respect

12 to UT athletic events and programs").  For example, scheduled for broadcast on July 17, 2012 are

13 archived football games from 2005 and 2006 and basketball games from 2008 and 2009.[10]  In return

14 for the limited live game rights and the archived rights, ESPN agreed to pay UT at least $10,980,000

15 million per year.

16    **D.    Non-live rights can be determined as a percentage of the bundled rights licensed.**

17    Using the total revenues generated by media uses of student athletes name, image or

18 likenesses, Antitrust Plaintiffs can then estimate the value of the archived rights that use the names,

19 images and likenesses of former student athletes.  In a similar manner, TEM, CBS and the NCAA

20 have, in the ordinary course of their business, attempted to value archived rights.  TEM and others

21 sell clips of archived footage at uniform rates (via a "rate card.")  ██████████████████

22 ████████████████████████████████████████████████████████████████

23 ---

[6]http://www.secdigitalnetwork.com/secsports/home.aspx, accessed July 16, 2012.

24 [7]http://www.secondemand.com/Theater/TabId/2117/gallery.aspx?ProductID=7299ece1-eb27-4d1f-80cc-4cd10f207cf8#tutorials,  accessed July 16, 2012.

25 [8]http://www.secondemand.com/Theater/TabId/2117/gallery.aspx?ProductID=7299ece1-eb27-4d1f-80cc-4cd10f207cf8#tutorials,  accessed July 16, 2012.

26 [9]http://www.secondemand.com/Theater/TabId/2117/03-11-2012-Vanderbilt-vs-Kentucky---Mens-

27 Basketball.aspx?ProductID=9e596202-da42-4e10-b6c9-40eb51e93124#tutorials, accessed July 16, 2012.

[10] http://espn.go.com/longhornnetwork/index?date=20120717#args=date-20120717

28

1 ██████████████████████████████ When attempting to determine how to monetize archived footage for

2 websites, ████████████████████████████████████████████████████████████

3 ████████████████████████████████ As another example, Kevin Schaff, CEO and

4 founder of TEM (Thought Equity Motion), the firm that was hired by the NCAA and the Atlantic

5 Coast Conference ("ACC") to digitize and sell men's basketball tournament archived footage, has

6 stated publicly that he would peg the value of non-live rights at 10% of the value of live rights.  See

7 Steiner Decl., Ex. 7.

8      Thus, total revenues from media uses are relevant to the claims in this case.  Below we

9 discuss how the NCAA obtains the media revenue information from each of its 300+ Division I

10 members.

11      **E.**     **The Revenues for use of the name, image and likeness of former student athletes**
           **is reported to the NCAA.**

12      As shown above, Antitrust Plaintiffs have confirmed that the NCAA, the conferences and the

13 universities enter into media agreements that exploit for commercial uses the name, image and

14 likenesses of current and former student athletes.  The revenue derived from the commercial

15 exploitation is then reported by each and every Division I member to the NCAA.  Antitrust Plaintiffs

16 merely seek those reports.

17      As the NCAA has acknowledged, by specific legislation it had the right to obtain, and does

18 obtain, certain financial information from each of its members.  As David Berst, the NCAA's Vice-

19 President for Division I, has sworn in a prior declaration, the NCAA rules require each member to

20 submit an audited report detailing its financial information:

21      . . . Bylaw 3.2.4.16 requires a member institution to "submit financial data
      detailing revenues, expenses and capital related to its intercollegiate athletics

22       program to the NCAA on an annual basis in accordance with the financial
      reporting policies and procedures," and Bylaw 3.2.4.16.1 requires this financial

23       report to be "subject to annual agreed-on verification approved by the
      membership.

24

25 Berst Declaration at ¶7 (Dkt 387).

26      That financial information is not publicly-available.  As the NCAA concedes in its portion of

27 the Joint Statement, the information certainly exists, but the NCAA considers it confidential.  Thus,

28 the question presented is whether the information gathered by the NCAA is relevant, and whether its

confidentiality, however articulated, somehow forecloses production to Plaintiffs here.   In the next section, we show that the information is relevant to the damages calculation and that the confidentiality concerns (to the extent ingenuous) are alleviated by the Protective Order.

## II.   ARGUMENT

The Federal Rules of Civil Procedure define relevance broadly.  Fed. R. Civ. P. 26(b) was amended in 2000 and permits discovery into "any nonprivileged matter that is relevant to any party's claim or defense." Even after the 2000 Amendments it is clear that liberal discovery remains the standard.  The party seeking discovery does not need to establish the information is admissible at trial, only that it is reasonably calculated to lead to the discovery of admissible evidence.  Fed. R. Civ. P. 26(b)(1).

It is also well established that the party resisting discovery bears the burden of showing why a discovery request should be denied.  *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975). Specifically, the party opposing discovery bears the burden of demonstrating the discovery is overly broad and unduly burdensome, or not relevant. *Graham v. Casey's General Stores*, 206 F.R.D. 251, 254 (S.D. Ind. 2002). To meet this burden, the objecting party must specifically detail the reasons why the request is irrelevant. *Id.*, citing *Shaap v. Executive Indus., Inc* ., 130 F.R.D. 384, 387 (N.D. Ill. 1990).  Finally, in evaluating a request to limit or prohibit discovery, a court must weigh the burden or expense of the proposed discovery and its likely benefit taking into account "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii).

As we will show below, the discovery sought is relevant and important to the damages calculations, and the only burden forwarded by the NCAA is light.

### A.   The financial information sought is relevant.

After the Court denied several rounds of dismissal motions, Plaintiffs began merits discovery. Antitrust Plaintiffs requested financial reports from the NCAA database:  "Request No. 6 (Third

Set): All information submitted to the NCAA by NCAA members pursuant to the NCAA's 'NCAA Membership Financial Reporting System.'"[11]

In negotiating the production of the NCAA Data, Antitrust Plaintiffs agreed to seek the information only for the class period, and to only those lines of the forms that delineate payments received by the school for revenues derived from the licensing and sale of game footage and video games. Because Antitrust Plaintiffs have samples of the NCAA Data from FOIA and other sources, the request to the NCAA has been limited to specifically identified lines or fields in the uniform forms:

- Broadcast Television, Radio and Internet Rights[12] ("School Media Rights")

- NCAA/Conference Distributions[13] ("Distributions")

- Royalties, Licensing, Advertisements and Sponsorships[14] ("Royalties")

This court has already ruled, at least twice, that revenues derived from the use of former student athletes' name, image and likeness are relevant to the damages inquiry. In denying Defendants' motions to dismiss, the Court has confirmed that the Complaint adequately alleges a conspiracy to restrain trade among the NCAA and its member schools and conferences, and the defendant licensees CLC and EA. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n,* Nos. C 09-1967 CW, C 09-3329 CW, C 09-4882 CW, 2010 WL 445190 (N.D. Cal. Feb. 8, 2010). Specifically, it concluded that "O'Bannon . . . pleads agreements among NCAA, its members, CLC and various distributors of material related to college sports . . . [relating to] licenses to distribute products or media containing the images of O'Bannon and other former student athletes." *Id.* at *3. Moreover, the Court specifically acknowledged that Plaintiffs' antitrust claims "encompass agreements for

---

[11] Antitrust Plaintiffs also asked for the operating instructions: "Request No. 5 (Third Set): All Documents describing the purpose and operations of the NCAA's 'NCAA Membership Financial Reporting System,' including instructions to members."

[12] This is Line 10, described as "institutional revenue received directly for radio and television broadcasts, Internet and e-commerce rights received through institution-negotiated contracts." See Steiner Decl., Ex. 8 at page 2.

[13] This is Line 9, described as "revenues received from participation in bowl games and tournaments and all NCAA distributions. This category includes amounts received for direct participation or through a sharing arrangement with an athletics conference, including shares of conference television agreements. If known by sport, report as such." *Id.*

[14] This is Line 12, described as "all revenue from corporate sponsorships, licensing, sales of advertisements, trademarks and royalties." *Id.*

1    rights to televise games, DVD and on-demand sales and rentals, and sales of stock footage of

2    competitions, to name a few."  (*See, In re NCAA Student-Athlete Name & Likeness Litig.,* C 09-1967

3    CW, 2011 WL 1642256, at *6 (N.D. Cal. May 2, 2011) (*citing* Compl. ¶¶ 332-60)).  The Court

4    further acknowledged that Plaintiffs' allegations concerning the numerous agreements entered into

5    by NCAA and its members, including agreements for the broadcast of athletics events, support

6    Plaintiffs' definition of the relevant product market.  *O'Bannon*, 2010 WL 445190, at *5.

7          The NCAA has produced its own broadcast and footage sales information, implicitly

8    conceding the relevance.  The NCAA's relevance objection also flies in the face of this Court's order

9    of February 27, 2012, in which the Court *explicitly acknowledged* the relevance of this broadcasting

10   and licensing revenue.  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.,* Nos. 11-mc-

11   80300-CW, 09-cv-01967 CW, 12-mc-80020 CW, 2012 WL 629225, at *5 (N.D. Cal. Feb. 27, 2012)

12   ("The agreements responsive to these requests are at least marginally relevant" because they concern

13   for-profit uses of the images, likenesses, or names of student-athletes, including in rebroadcasts and

14   sales of clips and games.)

15            **B.    The financial information is not otherwise available.**

16         No equivalent public information exists.  As the NCAA has acknowledged, the scant publicly

17   available data is aggregated at a level that does not provide the detailed information needed. That

18   public data, which schools submit to the federal government for purposes of Title IX compliance

19   reporting, merely states each school's *total* revenues (derived from, e.g., media contracts, ticket

20   sales, booster donations, and school or state contributions) and expenditures by sport.  *See* Steiner

     Decl., Ex. 9.

21         Other the other hand, the private NCAA Data breaks out revenues by twelve categories.  *See*

22   Steiner Ex. 8 at page 2.  Moreover, the NCAA Data distinguishes between revenues generated by

23   athletics (such as media rights) and general funds allocated to universities broadly (such as student

24   fees or state funding).

25          The NCAA has acknowledged, publicly and privately, that the data it obtains is superior to

26   the publicly-available data.  In a prior submission, the NCAA submitted its instruction page to the

27   NCAA Membership Financial Reporting System.  *See* Dkt. 388-7, Ex. 6.  That exhibit—a two-page

28   instruction to its members—specifically noted that there are two separate reports: one that collects

1    data required to be reported to the Department of Education (EADA data) and one that collects more

2    detailed information, and which would not be submitted to the Department of Education or the

3    public. *Id.*

4        As noted below, it is only those three categories described earlier – School Media Rights,

5    Distributions and Royalties – that Antitrust Plaintiffs seek.  In his

6

7

8

9

10

11

12

13

14

15

16



17        Thus, the information is not only relevant, but also otherwise unavailable to Antitrust

18   Plaintiffs.  As explained in the next sections, the burden of producing this important information is

19   minimal and any confidentiality concerns are addressed by the robust Protective Order lodged in this

20   case.

21       **C.      The burden of producing the financial information is minimal.**

22        The NCAA admits that it has this information in an easily-accessible format: the NCAA

23   electronically collects this information from its members via an on-line portal as a part of the

24   "NCAA Membership Financial Reporting System."  Indeed, in their Joint Statement portion, the

25   NCAA acknowledges that the only way the Antitrust Plaintiffs could otherwise obtain the NCAA

26   Data is to issue open-records requests to the 345 Division I members, many of which are not public

27   universities, and would not be subject to open-records requests.  Clearly, the burden to Antitrust

28

1   Plaintiffs of obtaining the NCAA Data through other, piecemeal means greatly outweighs the burden
2   to the NCAA of producing these electronic reports.
3          Any argument that an order compelling production of the NCAA Data would have a chilling
4   effect on future efforts by the NCAA to obtain member financial information is unpersuasive.  First,
5   each conference's members already share in the financial revenues from conference-wide
6   agreements, so each conference's members already know its most-direct competitors' revenues from
7   those agreements.  To the extent school-specific media revenues are not otherwise known to their
8   Division I colleagues, the argument that the NCAA cannot perform its associational function if the
9   NCAA Data is disclosed is undermined by its assertion in the Joint Statement that *USA Today* has
10  obtained this information from 100 schools.   That disclosure did not prompt any action by the
11  Division I membership to shut down the NCAA Data collection process.  Some universities, like the
12  University of Kansas, post both the EADA report and the NCAA Data report on its public website.
13  *See* http://www.kuathletics.com/ot/kan-financial-information.html, accessed July 17. 2012.
14         In addition, the supposed concern that universities are competitors that do not want to
15  disclose to each other their revenues is belied by the ███████████████████████████████
16  ████████████████████████████████████████████████████████████████
17  ████████████
18  ███████████████████████████████████████████████████
19  ███████████████████████████████████████████████████████
20  ██████████████████████████████████████████████████████████
21  █████████████████████████████████████████████████
22  ███████████████████
23         If confidentiality vis-à-vis each other were a concern, the members of Division I would have
24  not approved the development of the ███████████████.
25         **D.      The Protective Order alleviates any confidentiality concerns.**
26         The Protective Order in this litigation, already amended twice to increase confidentiality
27  protections, should assuage any concerns about public disclosure.   The information can be produced
28  at the most sensitive designation, that of "outside attorneys' eyes only."  Such protections have been

sufficient for reams of other financial data, from both parties and non-parties alike.  And, Antitrust Plaintiffs are willing to discuss any further reasonable limitations on disclosure of the NCAA Data.

## III.   CONCLUSION

For the reasons stated above, Antitrust Plaintiffs respectfully request an order compelling the immediate production of the NCAA Data for the fields requested.


Dated:  July 17, 2012

Respectfully Submitted,


HAUSFELD LLP

/s/ Jon T. King_____

Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
44 Montgomery Street, 34th Floor
San Francisco, CA 94104
Tel:      (415) 633-1908
Fax:      (415) 358-4980
Email:   mlehmann@hausfeldllp.com
               jking@hausfeldllp.com

Michael D. Hausfeld (pro hac vice)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel:  (202) 540-7200
Fax:  (202) 540-7201
Email:  mhausfeld@hausfeldllp.com

***Plaintiffs' Interim Co-Lead Class Counsel with Principal Responsibility for Antitrust Claims***