Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery Street, 34th Floor
San Francisco, CA 94104
Tel:     (415) 633-1908
Fax:     (415) 358-4980
Email:  mlehmann@hausfeldllp.com
          jking@hausfeldllp.com
          abailey@hausfeldllp.com

Michael D. Hausfeld (admitted *pro hac vice*)
Sathya S. Gosselin (Cal. Bar No. 269171)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeldllp.com
          sgosselin@hausfeldllp.com

*Plaintiffs' Interim Co-Lead Class Counsel with
Principal Responsibility for Antitrust Claims*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **In re NCAA Student-Athlete Name and Likeness Licensing Litigation** | Case No. 4:09-cv-1967 CW (NC) <br><br> **ANTITRUST PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL NCAA FINANCIAL DATA** <br><br> Date:        August 8, 2012 <br> Time:       No hearing time specified <br> Judge:      Hon. Nathanael Cousins <br> Courtroom:  SF Courthouse A, 15th Floor <br> Complaint:  Filed May 5, 2009 |

# TABLE OF CONTENTS

**PAGE**

I.  Introduction  ……………………………………………………………………1

II.  Background  ……………………………………………………………………1

III.  Argument  ……………………………………………………………………3

A.  Multimedia Revenues are Highly Relevant to Plaintiffs' Allegations of Injury
    and Damages Theory……………………………………………………………3

  1.  The Financial Data Is Valuable When Analyzed in Conjunction with
      Other Record Evidence ……………………………………………………4

  2.  The Documents Produced to Date by the NCAA and Others Are Only Part
      of the Damages Puzzle …………………………………………….........4

  3.  The NCAA's Assertions about "Cognizable" Damages Claims are Thinly Veiled
      Attempts to Revisit Their Unsuccessful Motions to Dismiss…………………………..7

B.  The First Amendment Does Preclude Production of Run-Of-The-Mill, Generally Public
    Financial Information Merely Because It Was Collected By An Association…………….9

1.  The NCAA has not identified a First Amendment right that may be impacted by the
    discovery request . ……………………………………………………..10

2.  The NCAA has not established a prima facie showing that limited disclosure of the
    financial information would chill protected activities…………………………...12

IV.  Conclusion ……………………………………………………………..15

# TABLE OF AUTHORITIES

**PAGE**

**FEDERAL CASES**

*American Needle, Inc. v. NFL,*
    130 S.Ct. 2201 (2010) ....................................................................................... 7

*BNLfood Investments Ltd. SARL v. Martek Biosciences Corp.,*
    No. WDQ–11–0446, 2011 WL 6439451 (D. Md. Dec. 14, 2011) ..................................... 8

*Brock v. Local 375, Plumbers Int'l Union of Am.,*
    860 F.2d 346 (9th Cir.1988) ............................................................................... 9

*City of Greenville v. Syngenta Crop Protection, Inc.,*
    Nos. 11-mc-10, 11-mc-1031, 11-mc-1032, 2011 WL 5118601, at *7 (C.D. Ill. Oct. 27,
    2011) ............................................................................................... 11, 13

*Cohlmia v. Ardent Health Services,*
    LLC, 448 F.Supp.2d 1253 (N.D. Okla. 2006) ........................................................... 8

*E .I. Dupont de Nemours & Co. v. Kolon Indus., Inc.,*
    688 F.Supp.2d 443 (E.D. Va. 2009) ...................................................................... 8

*In re Motor Fuel Temperature Sales Practices Litigation,*
    258 F.R.D. 470, 489 (D. Kan. 2009) ("*Motor Fuel*") ...................................... 11, 12, 13

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2009) ..................................................................... *passim*

*United States v. Duke Energy Corp.,*
    218 F.R.D. 468 (M.D.N.C. 2003) ........................................................................ 13

*United States v. Trader's State Bank,*
    695 F.2d 1132 (9th Cir.1983) ............................................................................ 9

*Washington v. Nat'l Football League,*
    No. 11-3354, 2012 WL 3017961 (D. Minn. June 13, 2012) ........................................ 7, 8

**STATE CASES**

*NCAA v. The Associated Press, et al.,*
    18 So.3d 1201 (Fla. Ct. App. 2009) ................................................................. 14, 15

*Sepro Corp. v. Florida Department of Environmental Protection,*
    839 So.2d 781 (Fla. 1st DCA 2003) .................................................................... 15

## I.     INTRODUCTION

The central premise of the NCAA's opposition brief is that the financial data sought cannot be relevant because it is not, standing alone, *perfect* evidence for purposes of ascertaining damages. That assertion reflects a deeply flawed understanding of the discovery process. Relevance is not a test of whether a single piece or source of evidence conclusively establishes some aspect of a party's claims. Just as an antitrust conspiracy is not determined by examining each piece of evidence in a vacuum, neither does a lone financial report need to independently—and perfectly—evince damages in order to have relevance.

Failing that argument, the NCAA insists that the financial data—which predominantly public institutions, subject to open-records laws, submit to the NCAA—is privileged First Amendment speech, deserving of an absolute prohibition on disclosure in litigation (despite a robust protective order) because the NCAA would be irrevocably compromised if its members learned that their financial submissions are discoverable in litigation. That novel First Amendment argument fares no better. The First Amendment privilege against associational activities is a narrow doctrine, a limited shield against disclosure where production would deter *the exercise of protected activities*. Merely asserting, as the NCAA does, that an association with economic interests necessarily warrants First Amendment protections of this sort, for *any* activities it deems confidential, is simply wrong. Taken to its logical extreme, the NCAA's position would effectively foreclose any discovery of trade associations or similar entities, in any litigation. Not surprisingly, the NCAA has argued this precise associational privilege before—and lost. It should lose here too.

The financial data is relevant, is not protected from discovery by the First Amendment, and should be produced. Absent production, the NCAA cannot, in fairness, later claim data deficiencies in Antitrust Plaintiffs' damages methodology.

1

## II.   BACKGROUND

2

Antitrust Plaintiffs allege that the defendants have colluded to foreclose former student-

3

athletes from payment for the use of their name, image or likeness in a variety of multimedia uses.

4

At the heart of Antitrust Plaintiffs' claims are allegations of conspiracy: (1) a price-fixing conspiracy

5

to set at zero dollars the price paid to Antitrust Plaintiffs for the use of their names, images, and

6

likenesses ("NIL"); and (2) a group boycott/refusal-to-deal when it comes to the use of Antitrust

7

Plaintiffs' NIL.   Among the allegations that have survived scores of motion to dismiss:

8

9

10

11

12

13

14

15

- "The NCAA, acting through its members, and in conjunction with its for-profit business partners, has eliminated the rights of former student-athletes to receive even a single dollar from the substantial revenue streams described herein. Former-student athletes do not share in these revenues even though they have never given informed consent to the widespread and continued commercial exploitation of their images. While the NCAA, its members, and its for-profit business partners reap millions of dollars from revenue streams *including television contracts, rebroadcasts of "classic" games, DVD game and highlight film sales and rentals, on-demand streaming and sales of games and clips, "stock footage" sales to corporate advertisers and others*, photograph sales, video game sales, and jersey and other apparel sales, former student-athletes whose likenesses are utilized to generate those profit-centers receive no compensation whatsoever."  Second Consol. Am. Compl. ¶ 18 (Dkt. No. 327);

16

17

- Antitrust Plaintiffs were injured by receiving lower prices for the use of their NIL than they would have received absent Defendants' conduct.  *Id.* ¶ 495.

18

19

- Antitrust Plaintiffs received less than they otherwise would have received for the use of their NIL in a competitive marketplace, were thus damaged, and seek to recover those damages.  *Id.*  ¶ 504;

20

21

22

- Antitrust Plaintiffs seek disgorgement of all the defendants' profits resulting from the wrongful conduct described herein and establishment of a constructive trust from which Antitrust Plaintiffs may seek restitution.  *Id.* ¶ 515;

23

24

- Antitrust Plaintiffs seek to recover a percentage of the revenue from Defendants and their co-conspirators for every unlawful licensing and/or royalty agreement involving their NIL.  *Id.* ¶521.

25

The NCAA argued, in a pair of motions to dismiss, that Antitrust Plaintiffs did not plead

26

cognizable antitrust injuries.  Never has the NCAA succeeded.  *See* Order Denying Mot. to Dismiss

27

at 14 (Dkt. No. 325) (May 2, 2011) ("Finally, NCAA argues that Antitrust Plaintiffs have failed to

28

1    allege antitrust injury. The Court also rejected this argument with respect to NCAA's motion to

2    dismiss O'Bannon's complaint, and NCAA does not offer any reason that compels

3    reconsideration.").

4              Notably, the parties do not—and cannot—dispute the contents or the location of the financial

5    data at issue here.  The NCAA freely admits that it possesses the financial data; that it is readily

6    available; and that the data contain line-item reports from Division I member colleges and

7    universities listing the revenues those members receive from, among other media activities, the re-

8    broadcast and other licensing of game footage.  Instead , the NCAA argues relevance and a First

9    Amendment shield.

10

11   **III.    ARGUMENT**

12        **A.    Multimedia Revenues are Highly Relevant to Plaintiffs' Allegations of Injury
              and Damages Theory.**

13

14             At bottom, the NCAA hopes to thwart Antitrust Plaintiffs' discovery efforts by dictating what

15   it is that the Antitrust Plaintiffs "need," all in the guise of a relevance objection.  (Opp'n at 4.)  This

16   Court should not credit the NCAA's impermissibly restrictive view of the scope of discovery.

17   Rather than engage with the actual standard for relevance in any meaningful way, the NCAA instead

18   inventories the financial data categories—(1) "Broadcast, Television, Radio and Internet Rights"

19   revenue; (2) "NCAA/Conference Distributions" revenue; and (3) "Royalties, Licensing,

20   Advertisements and Sponsorships" revenue—and abruptly concludes that "[t]here is no way to break

21   down the number the NCAA receives by type of revenue . . . to get the data plaintiffs claim they

22   need."  (Opp'n at 4.)  ***Yet that is a damages methodology assertion, and a premature one at that.***

23   (*See also* Opp'n at 6 ("Giving the plaintiffs the information the NCAA does have is *nonsensical*.

24

25   Plaintiffs *could not* use that data to perform their damages analysis . . . .") (emphasis added), 8

26   (asserting  that "[t]here is *no way* to determine, from the information submitted to the NCAA,"

27   rebroadcast or media use revenues of concern in this litigation).  The NCAA will have ample

28

1    opportunity to critique Antitrust Plaintiffs' damages methodology once that work is complete; before

2    that time, however, Antitrust Plaintiffs are entitled to seek discovery of relevant data sources for the

3    task at hand.

4            1.      The Financial Data Is Valuable When Analyzed in Conjunction with Other
                     Record Evidence
5

6            The NCAA would have the Court believe that Antitrust Plaintiffs have gone to great lengths,

7    and filed this motion to compel, even though the financial data has no utility whatsoever.  Nothing

8    could be further from the truth.  What the NCAA fails to appreciate is that Antitrust Plaintiffs intend

9    to use the financial data as one among many data points needed for a robust damages methodology.

10   That these materials alone do not furnish a pre-packaged damages statement, which Antitrust

11   Plaintiffs readily admit, is no reason to deny discovery.  Indeed, the NCAA's proposal would make

12   the perfect the enemy of the good.

13

14           A few examples are in order.  First, the "NCAA/Conference Distributions" category enables

15   Antitrust Plaintiffs to divide conference television revenues, listed on each conference's publically-

16   available IRS Form 990, by sport as between football and basketball.  Often, a conference negotiates

17   a joint television contract that encompasses men's football and basketball.  Schools in that

18   conference in turn allocate that revenue *by sport* in the financial data submitted to the NCAA.  Thus,

19   by using both pieces of information, Antitrust Plaintiffs are able to ascertain member revenues by

20   sport *even where the underlying conference contract lumps both sports together*.

21

22           To provide another example, the "Broadcast, Television, Radio, and Internet Rights"

23   financial data is useful when paired with other materials obtained from members and conferences in

24   discovery that identify separately the revenue attributable to certain of the rights categories (e.g.,

25   radio).  In this way, Antitrust Plaintiffs may be able to back out revenue not at issue in this case.  The

26   "Royalties, Licensing, Advertisements, and Sponsorships" financial data, meanwhile, can serve as a

27

28

ANTITRUST PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL NCAA FINANCIAL DATA
CASE  No. 4:09-CV-1967-CW (NC)
4

check against other record evidence accounting for these revenue streams in the event that those streams are not broken out by sport.

2.      The Documents Produced to Date by the NCAA and Others Are Only Part of the Damages Puzzle.

To date, the NCAA has produced documents showing the revenues that it receives directly from the exploitation of student-athletes' NIL for multimedia use.[1]  Likewise, Defendant Electronic Arts has produced documentation of the licensing revenues it pays to the NCAA and its members for the use of student-athletes' NIL in video games.  As the NCAA points out in its brief, Antitrust Plaintiffs have managed to obtain, through discovery, certain unredacted conference contracts with complete revenue terms (from, *e.g.*, the Missouri Valley Conference and the Ohio Valley Conference) (Opp'n at 5), although Antitrust Plaintiffs have not yet received these materials from several of the six major conferences that are responsible for the majority of the revenue in Division I football.  Similarly, Thought Equity Motion and XOS Digital (two of the licensing arms of the NCAA and certain of its members) have produced *some* revenue reports demonstrating the revenues garnered by *some* schools and conferences for the licensing of footage outside of the typical rebroadcast arena (e.g. for the use of a clip appearing in a television sitcom).

These materials are an important piece of the damages puzzle.  But they are just a piece. And, although XOS Digital, Thought Equity Motion, and CLC have produced documents like those found at Wierenga Exhs. A and B, other licensing companies have not done so.  Accordingly, Antitrust Plaintiffs cannot be certain that, outside of the financial data sought here, piecemeal non-

---

[1] Because document review is ongoing, Antitrust Plaintiffs cannot confirm that all direct revenue data has been produced, and do not waive their right to seek production of additional documents, if necessary.

party discovery will yield a comprehensive catalogue of these revenues.[2]  The financial data sought here helps ensure that Antitrust Plaintiffs can account for (1) the licensing of footage by *all* licensees; and (2) the direct uses by *all* NCAA members—on their television channels, on their conference websites, on their individual team web sites, and through other commercial vehicles such as DVD and on-demand sales.

The Southeastern Conference (SEC) provides a helpful example of what has and has not been produced to date.   As explained in Antitrust Plaintiffs' opening brief, the SEC has a number of media-rights agreements, but it retains the archive rights to its games.   For the marketing and licensing of those archival rights, the SEC has hired XOS Digital.  (*See* Opening Br. at 6 and Steiner Ex. 3.)  As the licensing arm for the SEC, XOS issues quarterly reports to SEC members of the licensing revenues received from sales of SEC clips, highlights, photos, and other multimedia uses. *See* Wierenga Ex. A.[3]  Those quarterly licensing reports are extensive *but not exhaustive*.  For example, SEC members have their own websites, where they generate revenue by featuring archival footage in tandem with advertising or corporate sponsorship.  One example is the University of Alabama athletics website.[4]  As noted on the bottom of the web page, CBS Interactive manages the University of Alabama athletics website.  But because CBS Interactive is not a party to this litigation, the revenues generated by the University of Alabama (whether as a separate digital-rights agreement or as part of a CBS bundled television-and-web rights agreement) through the use of former athletes' NIL have not yet been produced.   Those revenues are, however, captured in the financial data

---

[2] The NCAA notes that USA Today might provide an alternative source for the financial data but does not even attempt to explain why a non-party might be a preferable source of discovery.   (Opp'n at 9.)  And, as the NCAA points out, USA Today only possesses the financial data for public institutions, leaving 34% of Division I unaccounted for.  http://www.ncaa.org/wps/wcm/connect/public/NCAA/About+the+NCAA/Who+We+Are/Differences+Among+the+Divisions/Division+I/About+Division+I (last visited Aug. 3, 2012) ("In Division I, 66 percent of the members are public institutions; 34 percent are private.").

[3] To suggest that the XOS production contains 3417 royalty reports similar to the one attached as Wierenga Ex. A is slightly misleading.  Some reports are quarterly reports by school or conference. Most, however, are individual reports of a single clip license.

[4] http://www.rolltide.com/index-main.html (last visited August 2, 2012).

1   submitted to the NCAA by the University of Alabama, demonstrating yet again why this avenue of

2   discovery is vastly superior to the piecemeal subpoena and open-records approach that the NCAA

3   champions.

4           3.      The NCAA's Assertions about "Cognizable" Damages Claims Are Thinly
                    Veiled Attempts to Revisit Their Unsuccessful Motions to Dismiss.
5

6           The NCAA's cursory attempt to challenge an aspect of Plaintiffs' damages theory—*while*

7   *opposing a motion to compel discovery*—is procedurally flawed, meritless, and at odds with the

8   many orders from this Court denying various defendants' motions to dismiss and for judgment on the

9   pleadings.  (Dkt. Nos. 151, 325, 345, 455.)  Apart from some black-letter law on the requirement of

10  antitrust injury, the NCAA relies entirely on *Washington v. Nat'l Football League*, No. 11-3354,

11  2012 WL 3017961 (D. Minn. June 13, 2012), for its proposal that rebroadcast revenues could not

12  possibly be relevant to any "cognizable" damages claim here.  (Opp'n at 10-11.)  Yet *Washington*

13  presents an altogether different scenario.

14          To begin with, as even the NCAA notes, *Washington* concerned a motion to dismiss, with

15  which the NCAA has been repeatedly unsuccessful in this litigation.  The NCAA attempts to sidestep

16  that inconvenient fact by noting that it is not again seeking dismissal (nor could it); rather, the NCAA

17  is merely seeking to frustrate discovery relevant to claims *that this Court has consistently upheld*.

18          The NCAA also elides the *Washington* court's primary concern, that concerted action was

19  simply impossible under *American Needle, Inc. v. NFL*, 130 S.Ct. 2201 (2010) because the NFL and

20  its teams were effectively a single owner of the intellectual property at issue, certain "NFL Films"

21  productions.  The opposite is true in this instance, illustrated ironically by the very discovery sought

22  here: an accounting of each school's revenues derived from the licensing of discrete intellectual

23  property at the school and conference level.  Whereas in *Washington* only one entity produced,

24  marketed, and licensed the product, here *every* Division I school licenses its own footage, under

25  unique television contracts and other licensing agreements.

Even the language from *Washington* that the NCAA quotes at length is no help to their cause. First, the restraints alleged in this litigation are considerably more than "a copyright in the game footage." *Id*. at *3. Nor do Plaintiffs here "contend that, because the game footage involved here is owned collectively, the antitrust laws somehow prescribe how the collective can market and sell the intellectual property it owns." *Id*. *Washington*'s "Mission: Impossible" example has no application either. Tom Cruise's contract no doubt releases certain rights, including the right of publicity, *in exchange for remuneration*, *future residuals, and royalties* (among other things perhaps). Not so here. Hollywood and professional sports are distinguishable precisely because actors and athletes are compensated for the use of their NIL. Moreover, the *Washington* court explicitly acknowledged the right of publicity triggered by any "refus[al] to pay Plaintiffs for the use of their images in copyrighted material." *Id.*

Lastly, the NCAA seems to suggest that Plaintiffs are somehow required to demonstrate antitrust injury *before* obtaining relevant discovery. (Opp'n at 10, 12.) That is not the case. *See*, *e.g.*, *BNLfood Investments Ltd. SARL v. Martek Biosciences Corp.*, No. WDQ–11–0446, 2011 WL 6439451, at *4 (D. Md. Dec. 14, 2011) (other than the sufficiency of the pleadings, judicial analysis of antitrust injury will not precede discovery); *E .I. Dupont de Nemours & Co. v. Kolon Indus., Inc*., 688 F.Supp.2d 443, 460 (E.D. Va. 2009) (same); *Cohlmia v. Ardent Health Services*, LLC, 448 F.Supp.2d 1253, 1263 (N.D. Okla. 2006) (same).

At bottom, the NCAA seeks to re-litigate settled aspects of this case.[5] For example, it insists that Plaintiffs have yet to explain how rebroadcast revenues are "connected to some allegedly anticompetitive aspect of the NCAA's broadcasting and archival licensing entities" and are accordingly not entitled to the discovery sought here. (Opp'n at 12 (emphasis omitted).) Yet over

---

[5] The NCAA further argues that "student athletes have clearly consented" to the uses complained of. (Opp'n at 2 n.2.) That merits argument is for another day and has no place here.

1   two years ago, in denying the defendants' motion to dismiss, this Court explained that Plaintiffs had

2   sufficiently pleaded Section One claims that "encompass agreements *for rights to televise games*,

3   DVD and on-demand sales and rentals, and sales of stock footage of competitions, to name a few."

4   (Dkt. No. 325 at 12; *see also* Dkt. No. 151 at 10 (acknowledging that Plaintiffs' allegations include

5   "numerous agreements entered into by NCAA and its members, *including agreements for the*

6   *broadcast of athletics events*").

   **B.      The First Amendment Does Not Preclude Production of Run-Of-The-Mill,**
7   **         Generally Public Financial Information Merely Because it Was Collected by an**
8   **         Association.**

9            The NCAA has not demonstrated that it has a First Amendment right to protect the financial

10  data.  Before addressing the question of whether the financial data ***should*** be protected by the First

11  Amendment, the court has to answer the question of whether the First Amendment ***could*** possibly be

12  impacted by the discovery sought here.  The answer to that foundational question is no—there is no

13  arguable First Amendment infringement here.

14           In the Ninth Circuit, a claim of First Amendment privilege is subject to a two-part

15  framework.  *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009).  First, the party

16  asserting the privilege "must demonstrate a '*prima facie* showing of arguable first amendment

17  infringement.'"  *Id.,* quoting *Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349-50

18  (9th Cir.1988) (quoting *United States v. Trader's State Bank*, 695 F.2d 1132, 1133 (9th Cir. 1983)).

19  "This prima facie showing requires appellants to demonstrate that enforcement of the discovery

20  requests will result in (1) harassment, membership withdrawal, or discouragement of new members,

21  or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members'

22  associational rights."  *Perry*, 591 F.3d at 1160.  Only after making a *prima facie* showing does the

23  evidentiary burden shift to the party seeking the discovery to show the need for such discovery.  *Id.*

24  at 1161.

But, before applying this two-step test, the Court must first address whether the First Amendment privilege, as a categorical matter, could even apply to the NCAA financial data. *See Perry*, 591 F.3d at 1161 ("Before we apply these rules to the discovery at issue on this appeal, we address the district court's apparent conclusion that the First Amendment privilege, as a categorical matter, does not apply"). Only after identifying the associational right—in *Perry*, internal communications about how to advocate certain political beliefs—did the Ninth Circuit address whether the right could be chilled by disclosure of the materials sought.

Thus, the First Amendment analysis truly has three steps: (1) identifying the First Amendment activity, if any, subject to protection; (2) determining if the discovery request has a chilling effect on that activity; and (3) if a chilling effect exists, balancing the burden against the need for discovery. Here, the NCAA fails at the first and second steps; even if it did not, any minimal chilling effect is greatly outweighed by Antitrust Plaintiffs' need for the financial data.

1.   The NCAA Has Not Identified a First Amendment Right That Might Be Impacted by the Discovery Request.

It is the NCAA's burden to identify a potentially-protectable First Amendment right. It has not done so. In fact, in its opposition brief, it skips the identification of the right entirely. Rather, the NCAA blithely states, without more, that "communications between the NCAA and its members," "full and frank discussions," and a vague need to "determine its strategy" (Opp'n at 12, 15) is enough to trigger the First Amendment balancing test.[6] The NCAA is wrong.

*Perry* is dispositive on this point: mere association is not sufficient; the requested disclosure has to chill participation ***in a protected activity***. *Perry* at 1162 (after identifying the protected activity—arising from a request for internal campaign communications—the court found that disclosure of that information might "have such [chilling] effect on the exercise of protected

---

[6] Indeed, it is hard to understand on what topic the NCAA members could have "full and frank discussions" about the individual member expenses, revenues, salaries, and facilities information contained in the NCAA financial data without running afoul of the antitrust laws.

activities."). *See also In re Motor Fuel Temperature Sales Practices Litigation*, 258 F.R.D. 407, 412-13 (D. Kan. 2009) (identifying, for the balancing test, the claimed associational privilege related to confidential internal trade association communications about lobbying and legislation); *City of Greenville v. Syngenta Crop Protection, Inc.*, Nos. 11-mc-10, 11-mc-1031, 11-mc-1032, 2011 WL 5118601, at *7 (C.D. Ill. Oct. 27, 2011) (determining first that the focus of a subpoena to an advocacy group was for documents related to communications about lobbying for the use of Atrazine, a controversial agricultural chemical).[7]

The purported First Amendment activity alleged here—"full and frank conversations" about each member's separate financial information—may be an activity, but it is not a protected one. The disclosure of the NCAA financial data certainly does not infringe on the freedom to associate, as the members of the NCAA are obviously publicly known. Likewise, the freedom to contribute to causes privately is also not implicated, as the "contributions" each member makes to the association—those revenues generated by the men's basketball tournament, game and clip sales and so on that are used to operate the association—are also publicly disclosed.

The NCAA claims that the financial information is used to "provide the chief executives and other campus decision makers of our member institutions with empirical data to assist them in making their formal decisions." Martin Decl., Ex. 1 at page 2.[8] The NCAA has made no showing that the financial data is related in any way to protected speech—that is, the "freedom to associate with others for the common advancement of political beliefs and ideas." *See Perry*, 591 F.3d at

---

[7] The *Taylor* case cited by the NCAA is irrelevant. *See City of Greenville*, 2011 WL 5118601, at *9 ("None of these cases involve asserting a First Amendment privilege in discovery. Rather, they all involve facial challenges to mandatory disclosure statutes. . . . *Taylor* involved a statute mandating disclosure of parties contributing to lobbying efforts . . . .").

[8] Indeed, to find that "full and frank conversations" about revenues and expenses, done under cloak of a trade association, is First Amendment-protected speech shielded from discovery would allow competitors to price fix with impunity.

1159; *Motor Fuel*, 258 F.R.D. at 412-14 (disclosure of internal communications regarding trade association's legislative affairs and lobbying efforts on the matter of automatic temperature compensation for retail motor fuel).

Because the speech and association here is not First Amendment-protected conduct, the Court need not address whether disclosure of the financial data would chill "full and frank conversations" about, *e.g*., college athletics revenues and expenses.[9]  But, if the Court did so inquire, the NCAA has not met its burden at step two either.

> 2.    The NCAA Has Not Established a *Prima Facie* Showing that Limited Disclosure of the Financial Information Would Chill Protected Activities.

Putting aside the NCAA's failure to identify a protected activity, to invoke associational privilege against disclosure at step two the NCAA must demonstrate an objectively reasonable probability that compelled disclosure would chill associational rights, *i.e*. that disclosure would likely deter membership due to fears of threats, harassment or reprisal from either government officials or private parties which may affect members' physical well-being, political activities, or economic interests.  *See, e.g., Perry*, 591 F.3d at 1160.

In *Perry*, the Ninth Circuit looked to declarations from several individuals that attested to the impact of compelled disclosure on political participation and strategy.  *See id*. at 1163.  Likewise, in *In re Motor Fuel Temperature Sales Practices Litig.,* 641 F.3d 470, 491 (10th Cir. 2011), the court noted "affidavits which describe harassment and intimidation of a group's known members, and the resulting reluctance of people sympathetic to the goals of the group to associate with it for fear of reprisals."  (internal quotes omitted).

---

[9] The financial data does not touch the members' participation in advocacy activities or the free and open exchange of ideas about legislative matters.  To the extent that the NCAA, a non-profit organization, lobbies the government, that activity is far afield of this limited document request.

The NCAA's only attempt to establish an objectively reasonable probability of a chilling effect is the declaration of an NCAA staff member.  In that declaration, Mr. Martin does not attest that he has spoken with any Division I members, that they have expressed these concerns to him, or why he is competent to testify about what 300+ NCAA Division I members "believe."   Mr. Martin declaration is little more than his own views about how members may view the request for discovery and should be disregarded in its entirety. (*See* Opp'n at 14 ("As Mr. Martin testifies, *NCAA members believe* that opening confidential internal NCAA communications up to discovery by the plaintiffs will have a chilling effect on the NCAA's ability to foster full and frank conversations.") (emphasis added))*; see generally United States v. Duke Energy Corp*., 218 F.R.D. 468, 473 (M.D.N.C. 2003) (conclusory allegations that members will withdraw as a result of enforcement of a discovery order are insufficient to demonstrate that disclosure would chill party's First Amendment rights). *Compare Perry*, 591 F.3d at 1160 (declaration of member that she would no longer participate if her private communications about controversial topic were subject to disclosure); *City of Greenville*, 2011 WL 5118601, at *7 (listing six sworn statements of association members, including those who testified that they would no longer be part of a trade organization if internal communications about the dangerous agricultural chemical Atrazine were subject to public disclosure).

Here, none of the 300+  Division I members of the NCAA submitted an affidavit attesting to a chilling impact or describing harassment, intimidation, or a reluctance to associate with the NCAA that might result.  The NCAA served objections to this discovery request on September 2011.  *See* accompanying Decl. of Jon T. King., Ex. A (objections to request No. 6, not raising any First Amendment objections, nor doing so in the General Objections).

The nearly ten months since that time provided an ample opportunity to canvas the members; their silence is telling.

Indeed, it is hard to imagine that a Division I member, most of which are public institutions, would withdraw from the NCAA or otherwise limit their participation in NCAA activities because

their revenue reports are subject to limited disclosure in litigation. First, most of the public institution members know, when they submit the data, that it will be subject to the open records laws of their home states. *See NCAA v. The Associated Press*, 18 So.3d 1201 (Fla. Ct. App. 2009) (listing dozens of states with broad public records laws).[10] Second, for at least five years, *USA Today* has obtained, through public records requests, the very same financial data from public members (225 in all) and published it online, in part.[11] In the five years or more of publication, there is no evidence that any of these 225 institutions have sought to withdraw from the NCAA for this reason or attempted to change the NCAA Bylaws so that they do not have to submit this data to the NCAA. As Mr. Martin acknowledges, "all NCAA Bylaws . . . can be changed or abrogated by the Division I membership at any time they see fit to do so." Martin Decl., ¶15. That the membership has taken no steps to change or abrogate the Bylaw that permits the NCAA to collect this data speaks volumes about the disingenuous nature of the NCAA's argument.

### 1. The NCAA Has Tried This Before—and Failed.

This is not the first time the NCAA has asserted an associational privilege on documents that are, for the most part, subject to open records laws. In *NCAA v. The Associated Press*, 18 So.3d 1201 (Fla. Ct. App. 2009), the NCAA resisted production of the investigative records that formed the basis of an infraction report issued against Florida State University. *Id.* at 1205. The NCAA keeps certain records electronically on "custodial websites," and only allows members to view the documents or data, but not to download the documents. *Id.* Thus, Florida State did not have physical possession of the investigative records sought by the press via Florida's open records laws. *Id.* at 1206.

---

[10] The aggregated numbers are required to be submitted to the federal government, and those aggregated reports are publicly available. Why would the NCAA members be subject to harassment for disaggregated numbers, but not aggregated numbers? The NCAA does not explain.

[11] *See* http://www.usatoday.com/sports/college/story/2012-05-14/ncaa-college-athletics-finances-database/54955804/1 (last visited Aug. 3, 2012).

In resisting production of the investigative records, which the Court concluded were subject to Florida's open record laws, *id*. at 1207, the NCAA raised many of the same arguments it raises here: (1) that it promised to keep the records confidential; and (2) that producing the records impinged on its First Amendment associational privilege.  As to a promise of confidentiality, the court reasoned that the NCAA could not have expected to keep the records private: "[A] private party cannot render public records exempt from disclosure merely by designating information it furnishes a governmental agency confidential. The right to examine these records is a right belonging to the public; it cannot be bargained away by a representative of the government."  *Id*. at 1208-09 (citations omitted).  Just so here: the supposed "promise" by the NCAA to its members—most of them public institutions—that it would keep their information private cannot change the fundamental nature of the documents.

The court likewise rejected the NCAA's associational-privilege argument, despite the NCAA's hyperbole that requiring it to produce the investigative records would "rip the heart out of the NCAA."  *Id*. at 1212.  According to the court, the NCAA's freedom of expression or association was not impaired in any way by production of the investigative records.  *Id*. at 1214.  So too here.[12]

## IV.    CONCLUSION

For the foregoing reasons, Antitrust Plaintiffs respectfully submit that the Court should grant its motion to compel limited discovery.

//

//

---

[12] Here, the associational privilege (if there is one) is less central to the NCAA's function than in *Associated Press*.  In the *Associated Press* case, the records related to a core function of the NCAA—investigating rules compliance issues.  *Id*. at 1212.  Here, the records relate to an ancillary task of maintaining financial reports from the member schools to create spending trend reports.  The NCAA and its members are free to associate and discuss anything they wish *about* the financial reports; disclosure here will not change that.  And any conceivable chilling effect is ameliorated by the protective order in this case.  *See Perry*, 591 F. 3d at 1164 (noting that a protective order can mitigate the harms of disclosure).

1    Dated:  August 3, 2012                    Respectfully Submitted,

2

3                                             HAUSFELD LLP

4                                             /s/ Jon T. King_____

5                                             Michael P. Lehmann (Cal. Bar No. 77152)
                                              Jon T. King (Cal. Bar No. 205073)
6                                             Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
                                              44 Montgomery Street, 34th Floor
7                                             San Francisco, CA 94104
                                              Tel:     (415) 633-1908
8                                             Fax:     (415) 358-4980
                                              Email:   mlehmann@hausfeldllp.com
9                                                      jking@hausfeldllp.com
                                                       abailey@hausfeldllp.com
10

11                                            Michael D. Hausfeld (admitted pro hac vice)
                                              Sathya S. Gosselin (Cal. Bar No. 269171)
12                                            HAUSFELD LLP
                                              1700 K Street, NW, Suite 650
13                                            Washington, DC 20006
                                              Tel:  (202) 540-7200
14                                            Fax:  (202) 540-7201
                                              Email:  mhausfeld@hausfeldllp.com
15                                                     sgosselin@hausfeldllp.com

16

17                                            *Plaintiffs' Interim Co-Lead Class Counsel with*
                                              *Principal Responsibility for Antitrust Claims*
18

19

20

21

22

23

24

25

26

27

28