1

2

3

4

5

6

7

8

9

10 **UNITED STATES DISTRICT COURT**

11 **NORTHERN DISTRICT OF CALIFORNIA**

12 **SAN FRANCISCO DIVISION**

| | Case No. 09-cv-01967 CW (NC) |
|---|---|
| **IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION** | *Related to* |
| | 11-mc-80300 CW (NC) |
| | 12-mc-80020 CW (NC) |
| | **ORDER GRANTING PLAINTIFFS' MOTION TO COMPEL FINANCIAL DATA** |
| | Re: Dkt. No. 485 |

&grave;

20

21        Antitrust plaintiffs move to compel the NCAA to produce revenue data it collects from

22 its members, arguing that such information is relevant to its damages calculation.  The NCAA

23 opposes the motion, arguing that the requested data is irrelevant under Federal Rule of Civil

24 Procedure 26 and privileged under the First Amendment.  As the motion is appropriate for

25 determination without oral argument, the hearing scheduled for August 8, 2012, is VACATED.

26 Because the information at issue is relevant and nonprivileged, the motion is GRANTED.

27 //

28

# I. BACKGROUND

**A.    Antitrust plaintiffs' claims**[1]

Antitrust plaintiffs are former student-athletes who played Division I basketball and football at NCAA member institutions.[2]  Antitrust plaintiffs bring two claims against defendants NCAA, Collegiate Licensing Company, and Electronic Arts.  First, antitrust plaintiffs claim that defendants conspired to restrain trade in violation of Section 1 of the Sherman Act by agreeing to fix at zero the amount of compensation antitrust plaintiffs were allowed to receive under NCAA rules for the use of their names, images, and likenesses in products or media.[3]  Second, antitrust plaintiffs claim that defendants engaged in a "group boycott" conspiracy in violation of Section 1 of the Sherman Act by requiring them to sign forms through which student-athletes relinquished for perpetuity all rights pertaining to the use of their images, likenesses, or names, and by subsequently denying them any revenues derived from the for-profit use of their images, likenesses, or names in "television contracts, rebroadcasts of classic games, DVD game and highlight film sales and rentals, on-demand streaming and sales of games and clips, stock footage sales to corporate advertisers and others, photograph sales, video game sales, and jersey and other apparel sales."[4]

Antitrust plaintiffs intend to move to certify two classes to prosecute these claims.  The "Antitrust Declaratory and Injunctive Relief Class" consists of current and former student-athletes who participated in Division I basketball or football and whose images, names, or likenesses have been licensed or sold by defendants, their co-conspirators, or their licensees after the conclusion of the student-athletes' participation in college sports.[5]  The "Antitrust Damages Class" consists of former student-athletes who participated in Division I basketball or football and whose images, likenesses, or names have been licensed or sold by defendants, their

---

[1]  The procedural history of this consolidated action is summarized in the following orders by District Judge Wilken: Order on Motion to Dismiss, May 2, 2011, Dkt. No. 325; Order Consolidating Cases, May 21, 2012, Dkt. No. 458.

[2]  Second Consolid. Am. Compl. ¶ 8., Dkt. No. 327.

[3]  *Id.* ¶¶ 9, 10, 496, 501.

[4]  *Id.* ¶ 18 (internal quotation marks omitted).

[5]  *Id.* ¶¶ 8, 268.

1    co-conspirators, or their licensees from July 21, 2005, until final judgment in this action.[6]

2        With respect to the Antitrust Damages Class, antitrust plaintiffs seek monetary damages

3    "to be automatically trebled under the federal antitrust laws," disgorgement and restitution of all

4    monies by which defendants have been unjustly enriched, declaratory relief, injunctive relief, an

5    accounting, and the establishment of a constructive trust.[7]

6    **B.    Motion to compel**

7        Antitrust plaintiffs move to compel the production of confidential revenue reports

8    compiled by the NCAA, which contain media and licensing revenues obtained by each NCAA

9    member.  Mot., Dkt. No. 485.  Antitrust plaintiffs argue that this information is relevant to their

10   damages calculation, because such calculation requires them to "review the revenue generated

11   by the NCAA and its members from the re-broadcast of games in which student athletes were

12   featured."  *Id.* at 5.

13        During negotiations, antitrust plaintiffs agreed to restrict the time period for the

14   information they seek to the class period, which ranges from July 2005 until final judgment in

15   this action.  *Id.* at 10.  They also agreed to limit the information to the following three revenue

16   categories: (1) broadcast television, radio, and internet rights ("School Media Rights"); (2)

17   NCAA/conference distributions ("Distributions"); and (3) royalties, licensing, advertisements,

18   and sponsorships ("Royalties").  The School Media Rights category refers to "institutional

19   revenue received directly for radio and television broadcasts, internet and e-commerce rights

20   received through institution-negotiated contracts."  Steiner Decl., Ex. 8 at 2.  The Distributions

21   category refers to "revenues received from participation in bowl games and tournaments and all

22   NCAA distributions.  This category includes amounts received for direct participation or

23   through a sharing arrangement with an athletics conference, including shares of conference

24   television agreements."  *Id.*  Finally, the Royalties category refers to "all revenue from corporate

25   sponsorships, licensing, sales of advertisements, trademarks and royalties."  *Id.*  The revenue

26   information that falls within these limitations is the information at issue in antitrust plaintiffs'

27   motion.

28

[6] *Id.*
[7] *Id.* ¶¶ 31-32.

1   The NCAA objects to producing the requested data, arguing that the data is irrelevant

2   under Rule 26 and that the data is privileged under the First Amendment.  Opp'n, Dkt. No. 491.

3   ## II. STANDARD OF REVIEW

4   Under Federal Rule of Civil Procedure 34, a party may serve on another party a request

5   to produce documents and other tangible things within the responding party's possession,

6   custody, or control.  FED. R. CIV. P. 34(a)(1).  The scope of the request is governed by Rule

7   26(b), which allows a party to obtain discovery concerning any nonprivileged matter that is

8   relevant to any party's claim or defense.  FED. R. CIV. P. 34(a)(1); FED. R. CIV. P. 26(b)(1).

9   "Relevant information need not be admissible at the trial if the discovery appears reasonably

10  calculated to lead to the discovery of admissible evidence."  FED. R. CIV. P. 26(b)(1).  Each

11  request must describe "with reasonable particularity" the items to be produced.  FED. R. CIV. P.

12  34(b)(1).  The party to whom the request is directed must respond in writing within thirty days

13  after being served with the request.  FED. R. CIV. P. 34(b)(2)(A).  If that party fails to respond or

14  to produce the requested documents, the requesting party may move for an order compelling

15  production.  FED. R. CIV. P. 37(a)(3)(B).  The motion must include a certification that the

16  movant has in good faith conferred or attempted to confer with the person or party failing to

17  produce the discovery in an effort to obtain the discovery without court action.  FED. R. CIV. P.

18  37(a)(1).

19  ## III. DISCUSSION

20  **A.    The information sought is relevant under Rule 26**

21  The court finds that the information that antitrust plaintiffs seek is relevant under Rule

22  26.  In the operative complaint, antitrust plaintiffs claim that the NCAA "act[ed] through its

23  members" to "eliminate the rights" of antitrust plaintiffs to receive any compensation from

24  "television contracts, rebroadcasts of 'classic' games, DVD game and highlight film sales and

25  rentals, on-demand streaming and sales of games and clips, 'stock footage' sales to corporate

26  advertisers and others, photograph sales, video game sales, and jersey and other apparel sales."[8]

27  Antitrust plaintiffs further contend that the NCAA and its members have been unjustly enriched

28

---

[8] Second Consolid. Am. Compl. ¶ 18.

as a result of these actions at antitrust plaintiffs' expense.[9]  Because the information at issue includes revenue data derived from television and licensing contracts, the information appears reasonably calculated to lead to the discovery of admissible evidence with respect to the damages antitrust plaintiffs seek.  That the requested data is reported by NCAA members to the NCAA in aggregated form does not affect this finding.

**B.     The information sought is not privileged under the First Amendment**

The NCAA argues that the requested information is privileged under the First Amendment because its disclosure "could chill the willingness and ability of the NCAA and its members to engage in candid and sensitive communications going forward, based on their fear that a future litigant might also seek discovery relating to those communications."  Opp'n at 14.

"A party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment privilege."  *Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2009) (citations omitted).  "This privilege applies to discovery orders even if all of the litigants are private entities."  *Id.* at 1140 n.5 (citations and internal quotation marks omitted).  In the Ninth Circuit, a party asserting the privilege must demonstrate that the enforcement of the discovery request will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights."  *Id.* at 1140 (citation and internal quotation marks omitted).  If the party asserting the privilege makes this prima facie showing, then the evidentiary burden shifts to the other party to "demonstrate[] an interest in obtaining the disclosure it seeks . . . which is sufficient to justify the deterrent effect . . . on the free exercise . . . of [the] constitutionally protected right of association."  *Id.* (citation omitted).

Here, the court finds that the NCAA has not shown that the disclosure of the requested information would have a chilling effect on the associational rights of the NCAA or its members.  The NCAA's assertion of the First Amendment privilege is based exclusively on a declaration submitted by the NCAA's Managing Director of Finance and Operations, Keith Martin, which states that the disclosure of the requested information would prevent the NCAA

---

[9] *Id.* ¶ 27.

from gathering facts "for its associational mission" and from "determin[ing] its strategy as an association" because it would chill its members' willingness to communicate "regarding policies and strategies" and to "agree to bylaws that require the disclosure of confidential financial information." *Id.* at 14-15.

This argument is unpersuasive for two reasons. First, the NCAA does not explain why a failure by its members to provide it with confidential financial information would have a negative effect on the organization or on its formulation and implementation of policies and strategies. Without an explanation of how the associational viability of the NCAA depends on its ability to collect financial information from its members, the conclusory statements in Martin's declaration are insufficient to demonstrate a negative impact on NCAA members' associational rights. Furthermore, none of the NCAA's members have submitted declarations attesting to the negative impact that disclosing the data to antitrust plaintiffs could have on their associational rights. *Cf. Perry*, 591 F.3d at 1143 (finding that parties asserting First Amendment privilege made prima facie showing of First Amendment infringement because they submitted "declarations from several individuals" showing how each individual would be personally affected by the disclosure of non-public communications).

Second, the NCAA's nebulous allegations of a potential chilling effect are outweighed by the protective order that already is in place to limit the dissemination of confidential materials obtained through discovery. *See id.* at 1140 n.6 ("A protective order limiting the dissemination of disclosed associational information may mitigate the chilling effect and could weigh against a showing of infringement."). Moreover, antitrust plaintiffs have stated that they are willing to add further limitations to that protective order to ensure that the confidentiality of the data at issue is adequately protected.

As the NCAA has not made a prima facie showing that the disclosure of the requested information would infringe its First Amendment rights, the court finds that the documents are not privileged under the First Amendment.

//

1

**IV. CONCLUSION**

2      As the information requested by antitrust plaintiffs is relevant and nonprivileged under

3  Rule 26, antitrust plaintiffs' motion to compel is GRANTED.  The NCAA must produce the

4  information at issue by September 5, 2012.  Before that date, the parties must meet and confer

5  to review and discuss the protective order governing discovery in this case.  Any party may

6  submit a proposed modification to the protective order after the parties have met and conferred.

7      IT IS SO ORDERED.

8
DATE: August 6, 2012

9                                                    _____
                                                     Nathanael M. Cousins
10                                                   United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28