Michael P. Lehmann (Cal. Bar No. 77152)
Jon T. King (Cal. Bar No. 205073)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email: mlehmann@hausfeldllp.com
        jking@hausfeldllp.com
        abailey@hausfeldllp.com

Michael D. Hausfeld (*pro hac vice*)
Sathya S. Gosselin (Cal. Bar No. 269171)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel:  (202) 540-7200
Fax:  (202) 540-7201
Email: mhausfeld@hausfeldllp.com
        sgosselin@hausfeldllp.com

*Plaintiffs' Interim Co-Lead Class Counsel*
*with Principal Responsibility for the Antitrust Claims*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | Case No. 4:09-cv-1967 CW (NC) |
| This Document Relates to:<br><br>**ANTITRUST PLAINTIFFS' ACTIONS** | **NOTICE OF MOTION AND MOTION BY ANTITRUST PLAINTIFFS FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  March 7, 2013<br>Time:  2:00 p.m.<br>Judge:  Honorable Claudia Wilken<br>Courtroom:  2, 4th Floor |

**[PUBLIC VERSION – PARTIALLY REDACTED]**

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................ - 1 -

STATEMENT OF ISSUES TO BE DECIDED ..................................................... - 1 -

MEMORANDUM OF POINTS AND AUTHORITIES ....................................... - 1 -

    I.      INTRODUCTION ................................................................. - 1 -

    II.     STATEMENT OF FACTS ..................................................... - 3 -

    III.    ARGUMENT ......................................................................... - 9 -

          A.    Standards for Class Certification ..................................... - 9 -

          B.    The Elements Of Rule 23(a) Are Satisfied. ..................... - 10 -

                1.    Class Members Are Sufficiently Numerous. ..................... - 10 -

                2.    Common Questions of Law and Fact Exist. ..................... - 11 -

                3.    The Proposed Class Representatives Have Typical Claims ................................................................................. - 13 -

                4.    The Proposed Class Representatives Will Adequately Represent the Class. ........................................ - 15 -

          C.    Certification Of The Proposed Classes Is Appropriate Under Rule 23(b). ............................................................. - 16 -

                1.    The Proposed AD Class Satisfies the Requirements of Rule 23(b)(3). ........................................ - 16 -

                2.    Common Questions of Law and Fact Predominate ............ - 17 -

                      a.    Liability Is A Predominant Common Issue ........................................... - 17 -

                      b.    Impact Can Be Proven On A Classwide Basis. .......................................................... - 21 -

                      c.    Damages Can Also Be Proven On A Classwide Basis. .................................... - 22 -

                5.    A Class Action is Superior to Other Available Methods of Adjudication ................................................... - 23 -

          D.    The Proposed IR Class Satisfies the Requirements of Rule 23(b)(2). ................................................................. - 24 -

    IV.    THE COURT SHOULD APPOINT HAUSFELD AS CLASS COUNSEL.......................................................................... - 25 -

    V.     CONCLUSION .................................................................. - 25 -

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agnew v. NCAA,*
   683 F.3d 328 (7th Cir. 2012) ("*Agnew*") .................................................................. 12, 19, 20

*Allied Artists Picture Corp. v. Rhodes,*
   496 F. Supp. 408 (S.D. Ohio), *aff'd in part and remanded in part*, 679 F.2d 656
   (6th Cir. 1982) ....................................................................................................................... 21

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
   190 F.3d 1057-58 (9th Cir. 1999) ......................................................................................... 19

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ............................................................................................................... 17

*Associated Film Distribution Corp. v. Thornburgh,*
   683 F.2d 808 (3d Cir. 1982) .................................................................................................. 21

*Banks v. NCAA,*
   977 F.2d 1081 (7th Cir. 1993), *cert. denied*, 113 S.Ct. 2336 ("*Banks*") (Flaum, J.,
   dissenting) ............................................................................................................................. 21

*Barus v. Aspen Realty, Inc.,*
   236 F.R.D. 652 (D. Idaho 2006) ........................................................................................... 11

*Berrien v. New Raintree Resorts, LLC,*
   276 F.R.D. 356 (N.D. Cal. 2011) ("*Berrien*") (Wilken, J.) ............................................... 9, 16

*Blackie v. Barrack,*
   524 F.2d 891 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976) ........................................ 15

*Chamberlan v. Ford Motor Co.,*
   402 F.3d 952 (9th Cir. 2005) ................................................................................................. 10

*Cifuentes v. Red Robin Int'l,*
   No. C-11-535-EMC, 2012 WL 693930 (N.D. Cal. Mar. 1, 2012 (citation omitted)) ............ 13

*Connor B. ex rel. Vigurs v. Patrick,*
   272 F.R.D. 288 (D. Mass. 2011) ........................................................................................... 21

*Cummings v. Connell,*
   316 F.3d 886 (9th Cir. 2003), *cert. denied*, 529 U.S. 927 (2003) ........................................ 15

*DG ex rel. Stricklin v. Devaughn,*
  594 F.3d 1188 (10th Cir. 2010) ................................................................21

*Dupler v. Costco Wholesale Corp.,*
  249 F.R.D. 29 (E.D.N.Y. 2008) ..............................................................13

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ("*Ellis*") ..............................................10, 22

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  131 S.Ct. 2179 (2011) ............................................................................17

*Gen. Tel. of Sw. v. Falcon,*
  457 U.S. 157 (1982) ("*Falcon*") ............................................................10

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) ("*Hanlon*") ................................11, 13, 15

*Hawaii v. Standard Oil Co. of Cal.,*
  405 U.S. 251 (1972) ..................................................................................9

*Holman v. Experian Information Solutions,*
  No. C 11–0180 CW, 2012 WL 1496203 (N.D. Cal. Apr. 27, 2012) ("*Holman*")
  (Wilken, J.) ......................................................................9, 10, 11

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.,*
  276 F.R.D. 364 (C.D. Cal. 2011) ("*AALP*") ......................................11, 22

*In re Apple & AT&T iPad Unlimited Data Plan Litig.,*
  No. C–10–02553 RMW, 2012 WL 2428248 (N.D. Cal. June 26, 2012) ("*Apple*") .........22, 24

*In re Apple iPod iTunes Antitrust Litig.,*
  No. C 05–00037 JW, 2011 WL 5864036 (N.D. Cal. Nov. 22, 2011) ....................................25

*In re Bulk (Extruded) Graphite Products Antitrust Litig.,*
  Civ. No. 02-6030 (WHW), 2006 WL 891362 (D.N.J. Apr. 4, 2006).............................14, 16

*In re Cardizem CD Antitrust Litig.,*
  200 F.R.D. 297 (E.D. Mich. 2001) ("*Cardizem*") ....................................16

*In re Checking Account Overdraft Litig.,*
  281 F.R.D. 667 (S.D. Fla. 2012) ..............................................................12

*In re Citric Acid Antitrust Litig.,*
  MDL No. 95-1092, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996) ("*Citric Acid*") .............11, 17

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
  No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ("*DRAM*")..............passim

iv

*In re Flonase Antitrust Litig.*,
No. 08–CV–3301, 2012 WL 2277840 (E.D. Pa. June 18, 2012) ("*Flonase*") .................12, 21

*In re Indep. Serv. Orgs. Antitrust Litig.*,
203 F.3d 1322 (Fed. Cir. 2000), *cert. denied*, 121 S.Ct. 1077 (2001)....................................21

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
271 F.R.D. 402 (D. Me 2010) ...................................................................................................21

*In re Motor Fuel Temperature Sales Practices Litig.*,
06–2582–KHV, 2012 WL 205904 (D. Kan. Jan. 19, 2012)....................................................12

*In re NCAA I-A Walk-On Football Players Litig.*,
398 F. Supp. 2d 1144 (W.D. Wash. 2005) ("*Walk-On II*") ...............................................19, 20

*In re NCAA I-A Walk-On Players Litig.*,
No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006) ("*Walk-On I*").....................
............................................................................................................................12, 15, 16, 19

*In re NCAA Student-Athlete Name & Likeness Litig.*,
No. C 09-1967 CW, 2011 WL 1642256 (N.D. Cal. May 2, 2011) .........................................17

*In re Neurontin Antitrust Litig.*,
No. 02–md–1390, 2011 WL 286118 (D.N.J. Jan. 25, 2011) ("*Neurontin*") ....................12, 21

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ("*Rubber Chems.*") ......................................................passim

*In re S. Cent. States Bakery Prods. Antitrust Litig.*,
86 F.R.D. 407 (M.D. La. 1980) ................................................................................................16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. C 07-01819 CW, 2008 WL 4447592 (N.D. Cal., Sept. 29, 2008) ("*SRAM*")
(Wilken, J.) .........................................................................................................................passim

*In re Tableware Antitrust Litig.*,
241 F.R.D. 644 (N.D. Cal. 2007) ("*Tableware*") ..................................................9, 15, 17, 23

*In re Victor Technologies Securities Litig.*,
102 F.R.D. 53 (N.D. Cal. 1984) ...............................................................................................13

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012).................................................................................................11

*In re Wellbutrin XL Antitrust Litig.*,
No. 08–2431, 2011 WL 3563385 (E.D. Pa. Aug. 11, 2011) ...................................................12

*Int'l Boxing Club of N.Y., Inc. v. United States*,
358 U.S. 242 (1959) ..................................................................................................................18

*Kaminske v. JP Morgan Chase Bank, N.A.*,
  No. CV 09-6352-JVS .................................................................................. 25

*Kohen v. Pac. Inv. Mgmt. Co., LLC*,
  571 F.3d 672 (7th Cir. 2009), *cert. denied*, 130 S.Ct. 1504 (2010) ........................ 21

*Law v. NCAA*,
  902 F. Supp. 1394 (D. Kan. 1995) .............................................................. 20

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ..................................................................... 13

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ..................................................................... 21

*Metro Intercollegiate Basketball Ass'n v. NCAA*,
  339 F. Supp. 2d 545 (S.D.N.Y. 2004) ("*MIBA*") ...................................... 12

*Miller v. Optimum Choice, Inc.*,
  No. DKC 2003-3653, 2006 WL 2130640 (D. Md. July 28, 2006) ........................ 13

*Mims v. Stewart Title Guar. Co.*,
  590 F.3d 298 (5th Cir. 2009) ..................................................................... 21

*NCAA v. Board of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ("*Board of Regents*") ................................................ 3, 4, 7, 20

*Oster v. Lightbourne*,
  No. C 09–4668 CW, 2012 WL 685808 (N.D. Cal. March 2, 2012) (Wilken, J.) ................. 12

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ................................................................................. 9

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ....................................................................... 2

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) .................................................................. 24

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
  No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ............................... 22

*Smilow v. Sw. Bell Mobile Sys.*,
  323 F.3d 32 (1st Cir. 2003) ...................................................................... 13

*Storer Cable Commc'ns v. City of Montgomery*,
  806 F. Supp. 1518 (M.D. Ala. 1992) ......................................................... 21

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ................................................................17

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
  209 F.R.D. 159 (C.D. Cal. 2002) ("*Thomas*")................................................passim

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001) ..................................21

*Vallabhapurapu v. Burger King Corp.*,
  No. C 11–00667 WHA, 2012 WL 2568183 (N.D. Cal. July 2, 2012) ...................................24

*Vedachalam v. Tata Consultancy Servs., Ltd.*,
  No. C 06–0963 CW, 2012 WL 1110004 (N.D. Cal. Apr. 2, 2012) (Wilken, J.)....................12

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011) ........................................................................10, 11

*Welling v. Alexy*,
  155 F.R.D. 654 (N.D. Cal. 1994) ..............................................................11

*White v. NCAA*,
  Civ. No. 06-0999 VBF (C.D. Cal.) ("*White*") ................................................passim

*Wiesfeld v. Sun Chem. Corp.*,
  84 Fed. Appx. 257 (3d Cir. 2004) ...............................................................2

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir.) ......................................................................23

**STATUTES**

Sherman Act § 1 ...............................................................................18

**OTHER AUTHORITIES**

1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3:3 (4th ed. 2002)
  ("Newberg") .................................................................................11

*except as permitted by the governing legislation of the Association.*" Ex. 7 .................8

Fed. R. Civ. P. 23 .......................................................................1, 10, 13

Fed. R. Civ. P. 23(a) and (b)(3) ..............................................................1

Fed. R. Civ. P. 23(g) ..................................................................15, 16, 25

Rule 23(a) ..............................................................................3, 10, 12

Rule 23(a)(2) ................................................................................................ 11, 12, 13, 25

Rule 23(a)(3) ................................................................................................ 15

Rule 23(a)(4) ................................................................................................ 15, 16

Rules 23(a) and (b) ................................................................................................ 9

Rule 23(a) and Rule 23(b)(2) ................................................................................................ 2, 10

Rule 23(a) and Rule 23(b)(3) ................................................................................................ 10

Rule 23(b) ................................................................................................ 10, 16

Rule 23(b)(2) ................................................................................................ 24, 25

Rule 23(b)(3) ................................................................................................ 12, 16, 25

"Student-Athlete Statement" (the "Form") ................................................................................................ 4

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on March 7, 2013, at 2:00 p.m., in Courtroom 2 of the Honorable Claudia Wilken, the Antitrust Plaintiffs ("Plaintiffs")[1] will, and hereby do move the Court, pursuant to Fed. R. Civ. P. 23, for an order certifying the classes described below.  Plaintiffs will also move the Court to appoint the law firm of Hausfeld LLP ("Hausfeld") as Antitrust Class Counsel.  This motion is based on this submission, the accompanying declarations and exhibits, the SCAC, the pleadings and other documents on file in this case, and any argument presented to the Court.

**STATEMENT OF ISSUES TO BE DECIDED**

The issues to be decided are: (1) whether the Court should certify as a class action the proposed Classes defined below; (2) whether the Court should appoint Plaintiffs as Class representatives; and (3) whether the Court should appoint Hausfeld as Class Counsel.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Plaintiffs seek certification under Fed. R. Civ. P. 23(a) and (b)(3) of the following Antitrust Damage Class ("AD Class"):

> All former student-athletes residing in the United States who competed on an NCAA Division I (formerly known as "University Division" before 1973) college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team whose images, likenesses and/or names have been included in game footage or in videogames licensed or sold by Defendants, their co-conspirators, or their licensees from July 21, 2005 and continuing until a final judgment in this matter.  The class does not include current student-athletes,  the officers, directors, and employees of Defendants, the officers, directors, and employees

---

[1] The terms "Antitrust Plaintiffs" and "Plaintiffs" refer to the plaintiffs raising antitrust claims in the Second Consolidated Amended Class Action Complaint (May 16, 2011) (Dkt. No. 327) ("SCAC") and the consolidated *Russell* and *Robertson* actions: Ed O'Bannon, Oscar Robertson, Bill Russell, Ray Ellis, Harry Flournoy, Tate George, Alex Gilbert, Sam Jacobson, Thad Jaracz, David Lattin, Patrick Maynor, Tyrone Prothro, Damien Rhodes, Eric Riley, Bob Tallent, and Danny Wimprine.

of any NCAA Division I college or university, and the officers, directors, or employees of any NCAA Division I athletic conference.

Plaintiffs also seek certification under Rule 23(a) and Rule 23(b)(2) of the following Declaratory and Injunctive Relief Class ("IR Class"):

All current and former student-athletes residing in the United States who compete on, or competed on, an NCAA Division I (formerly known as "University Division" before 1973) college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team and whose images, likenesses and/or names may be, or have been, included in game footage or in videogames licensed or sold by Defendants, their co-conspirators, or their licensees after the conclusion of the athlete's participation in intercollegiate athletics. Excluded from this Class are the officers, directors, and employees of Defendants, the officers, directors and employees of any NCAA Division I college or university, and the officers, directors, or employees of any NCAA Division I athletic conference.[2]

Former player class members have two components to their damages—damages sustained while those individuals were competing under collusive restraints, and damages sustained by the continued licensing or sale of their images after they ceased participating in collegiate athletics. While Plaintiffs do not seek compensation to be paid to current student-athletes while they maintain their eligibility, discovery to date shows that the NCAA's purported justifications for the challenged restraint can easily be accommodated by a less restrictive alternative, namely that monies generated by the licensing and sale of class members' names, images and likenesses can be temporarily held in trust for those individuals until the cessation of their collegiate careers. *See, e.g.*, Ex. 42 at 172-80; Ex. 45 at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 46 at BIG_12_NCAA_00000010; Ex. 47 at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 48 at ▮▮▮▮▮▮▮▮▮▮▮; Ex. 68 at ▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 73 at 128-39, 161-64; Exs. 6, 21, 44, 67, 69-70, 74-75, 81. The record compiled to date

---

[2] These definitions track those set forth in the SCAC, with the exceptions that in both, the phrase "included in game footage or videogames" has been added. *See Wiesfeld v. Sun Chem. Corp.*, 84 Fed. Appx. 257, 259 (3d Cir. 2004) ("The District Court considered this revised class definition in its analysis, and we will do the same."); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) (holding that a court "is not bound by the class definition proposed in the complaint"). The AD Class and the IR Class will be referred to collectively as the "Classes."

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

1    shows that predominant issues of law and fact exist in this case with respect to the AD Class

2    and that Defendants acted or refused to act in a manner generally applicable to the members

3    of the IR Class. Both classes satisfy the requirements of Rule 23(a) in that they number at

4    least in the thousands, common questions of law and fact abound, the Plaintiffs' claims are

5    typical, and both Plaintiffs and Hausfeld will adequately represent the interests of the

6    proposed Classes, and continue to vigorously prosecute the case through trial, if necessary.

7    **II.   STATEMENT OF FACTS**

8          This statement of facts is taken from the SCAC; public sources; the accompanying

9    reports of Plaintiffs' experts, Dr. Roger Noll ("RNR") and Larry Gerbrandt ("LGR"), attached

10   hereto as Exhibits A and B, respectively; and from documents produced by, and deposition

11   testimony from, parties and third parties, which are attached as numbered exhibits (designated

12   as "Ex. __") to the accompanying Declaration of Sathya S. Gosselin.

13         It is undisputed that the NCAA and its member schools have agreed not to pay, and do

14   not pay, current or former student-athletes in Division I football or basketball for the use of

15   their names, images and likenesses in connection with television broadcasts of games and

16   videogames. As ██████████████████████████████████████████████

17   ███████████████████████████████████████████

18   ███████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ██████████████████████████████████████████████

21   ████████████████████████ Ex. 1. As the Southeastern Conference

22   ("SEC") has argued in a discovery dispute in this case, even if the NCAA and its members

23   were misappropriating the name and likeness rights of student-athletes, they are allegedly free

24   to do so with impunity under *NCAA v. Board of Regents of Univ. of Okla.,* 468 U.S. 85 (1984)

25   ("*Board of Regents*"), which purportedly "allows the NCAA to condition participation in

26   college sports on maintenance of amateur status. Paying athletes for appearing in

27   broadcasts—either while they are enrolled or promising to do so after they leave college—

28

1    would fly in the face of the precedent set by *Board of Regents*."  Ex. 2 at 18.

2              This prohibition applies regardless of whether the compensation for use of a student-

3    athlete's name, image and likeness is paid to him while he is in college or is deferred until

4    after graduation. As the Bowl Championship Series stated in a letter arising from another

5    discovery dispute in this case, "[w]hether a payment is made to a student-athlete during his

6    years in college or a promise is made to pay the student-athlete after he leaves school is of no

7    moment. Deferred compensation remains just that - compensation - and is forbidden by the

8    NCAA's amateurism rules." Ex. 3 at 2-3. This sentiment was echoed by current NCAA

9    President Mark Emmert ("Emmert") in his deposition; when asked if an NCAA member

10   could share revenue with former student-athletes if it wished to do so, he responded: "They

11   are not free to do so if that was a--an agreement that was struck before or during the time that

12   the individual was a student-athlete."  Ex. 4 at 30-31; Ex. 49 at 79-88.

13             This is a horizontal agreement not to compete. The NCAA Division I schools

14   undisputedly compete for student-athletes. *See, e.g.,* Ex. 7 at 79-141. The agreement is carried

15   out through NCAA bylaws. SCAC ¶¶283-95.  Bylaw 12.5.1.1.1 gives the NCAA the right to

16   use a student-athlete's name and likeness to promote NCAA championships, events,

17   activities, and programs. Ex. 7. Going back to at least 2004, every student-athlete has been

18   compelled to sign a standardized "Student-Athlete Statement" (the "Form") promulgated by

19   the NCAA; Form 08-3a (SCAC Ex. A) is an example for the 2008-09 academic year.[3] The

20   contents of this form and the requirements of how each NCAA member institution

21   administers it are spelled out in Article 3.2.4.6 of the NCAA Constitution and Bylaw 14.1.3.

22   Ex. 7. A portion of the Form requires student-athletes to authorize the NCAA or those acting

23   on its behalf to use the student-athlete's name or picture for any of the purposes outlined by

24   _____

     [3] These Forms operated as unfair contracts of adhesion. As ██████████████████

25   ████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████████

27   ██████████████████████████████████████  Ex. 6.

                                    - 4 -
28   ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
                    [PUBLIC VERSION – PARTIALLY REDACTED]

1    Bylaw 12.5.1.1.1. The Form suggests that completing and signing this provision is a

2    prerequisite for eligibility to play in intercollegiate athletics. As recognized in ██████

3    ████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ██████ Ex. 5; *see* Ex. 4 at 75-79, 152-53; *see also* Ex. 52 at BIG_12_NCAA_00000004;

9    Ex. 71 at 301-02. Thus, consent procured by the use of the Form was obtained by a common

10   course of misrepresentation.[4]

11        The NCAA has contended that the Form was only in existence for a portion of the

12   period in question. But there is no dispute that the principle of "amateurism" expressed in the

13   NCAA Constitution has been invoked for decades to deny compensation for use of a student-

14   athlete's name, image or likeness. *E.g.*, Ex. 43.

15        As Dr. Noll ████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████ RNR at 44.

20        The NCAA's "no compensation" policies also extend to former student-athletes whose

21   names, images and likenesses in game footage from their college playing years continue to be

22   exploited long after their amateur status has ended. The NCAA's own counsel admitted this to

_____

[4] Various other ancillary NCAA bylaws facilitate the restraints being challenged here. For
example, NCAA Bylaw 12.5.1.1 authorizes member institutions (or an entity thereof) to use a
student-athlete's name, picture or appearance to promote activities "incidental" to the student-
athlete's participation in intercollegiate athletics with all the revenues therefrom going to the
institution or entity. SCAC ¶¶ 301-02. Other NCAA Bylaws prohibit member institutions
from giving benefits to prospective student-athletes unless permitted by NCAA regulations
(Bylaw 12.2.1), and require certification of compliance with NCAA legislation or adherence
to NCAA rules (Bylaws 3.2.1.2, 14.01.3, 18.4.2.1, 22.2.1.2). Ex. 7.

1   the Court in a hearing held in December of 2010. SCAC ¶296. Emmert stated in his

2   deposition that "we don't share revenue with student-athletes after they have left their NCAA

3   participation . . . because . . . we have made policy decisions to focus revenue streams on the -

4   - the opportunities that are provided during their time as student-athletes, while they are

5   student-athletes" and that "it is a general policy that's decided every time we make budgetary

6   allocations." Ex. 4 at 29-30.

7   ██████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████████

9   ████████ *See, e.g.*, Ex. 77 at 13-14; Ex. 78 at 32-33; *see also* Ex. 50, Ex. 71 at 294-96.██

10  ██████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████████████

13  ███████████████████████████████████████████ *See, e.g.,* Ex. 51 at 33-34; Ex. 76 at

14  33-34. Defendants Electronic Arts, Inc. ("EA") and Collegiate Licensing Company ("CLC")

15  are complicit in the NCAA's scheme. The NCAA requires its business partners to follow its

16  rules and regulations, and both EA and CLC have done so. *E.g.*, Ex. 40 at 32-33; Ex. 72 at 77,

17  118-19; Ex. 73 at 207-09; Ex. 76 at 12; Ex. 80 at 161-62. The NCAA knew full well,

18  however, that EA made its videogames with the purpose of having the game avatars match as

19  closely as possible the real-life characteristics and vicissitudes of actual student-athletes. For

20  example, ████████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████████

23  ███████████████████████████████████████████ Ex. 8 at

24  ██████████████; *see also* Exs. 20, 55-58, 60, 65-66. ████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ██████████████████████████████████████████████████████

28

1     █████████████ Ex. 9 at ████████████████████████████

2     ████████ *E.g.*, Exs. 10, 20, 55-58, 60, 65-66.

3         This unlawful scheme is not justified by principles of "amateurism" or "competitive

4 balance." As Byers, who led the NCAA from 1951 to 1988, wrote in his book, and confirmed

5 at his deposition, "[w]hereas the NCAA defends its policies in the name of amateurism and

6 level playing fields, they actually are a device to divert the money elsewhere." Ex. 11 at 376;

7 *see* Exs. 59, 64. Indeed, the NCAA is a completely commercialized body. ███████████

8 ████████████████████████████████████████████████████████

9     █████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 Ex. 12 at ████████████; *see also* Exs. 61-63, 79; Ex. 40 at 25-27, 54, 69.  Dr.

15 Noll in his declaration convincingly refutes the NCAA's class-wide amateurism defense.[5]

---

[5] RNR at 75-90. Indeed, since *Board of Regents* was decided by the Supreme Court in 1984, the following has occurred, just to give a few examples: (a) between 1985-86 and 2009-10, at 44 universities among the five major conferences, average compensation for head football coaches increased by 652% (from $273,300 to $2,054,700); (b) the University of Alabama became the first college to pay its football coach $4 million a year, while the University of Texas ("UT") was the first to top the $5 million mark in 2009; (c) in 2012, more than half of Division I-A coaches earned more than $1 million, including nearly 30 who earned more than $2 million; (d) in 1996, the SEC signed a 5-year, $85 million TV deal with CBS, averaging $17 annually, while in 2008, it signed a 15-year, $3 billion TV deal with ESPN and CBS, for an annual average of $200 million, representing a 1076% increase; (e) a total of 450 college football games are scheduled to be broadcast by ESPN and its affiliates alone in 2012, compared with a total of 228 games televised by all broadcasters in 1982; (f) at least another 247 games are scheduled to air in 2012, including games on NBC (32 games), CBS (15 games), Fox and its affiliates (165 games), the PAC-12 network (35 games), and Comcast SportsNet, among others; (g) while EA's NCAA football videogames did not exist in 1984, "NCAA Football 12," the most recent EA title, sold 700,000 units during its first two weeks, setting a record for that particular game; (h) UT, which had a $6.2 million athletic budget in 1984, spent $127 million in 2009, and its football team earned $71 million in 2010 (making it the NCAA's most profitable football team), and launched its own sports network in a television deal worth $300 million; (i) in 2011, the SEC distributed $220 million to its member schools, a 1196% increase over the $18.4 million that it distributed in 1984; and (j) in

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

1    As for "competitive balance," ████████████████████
2    ████████████████████████████████████████████████████████
3    ████████████████████ Ex. 13; *see also* Ex. 42 at 139-41. Byers, in testimony given in
4    *White v. NCAA*, Civ. No. 06-0999 VBF (MANx) (C.D. Cal.) ("*White*")—which he reaffirmed
5    at his deposition in this case—stated that "competitive balance" is "an art form that a person
6    likes to use but has no relevancy particularly. Competitive balance is an elastic term that can
7    be stretched in any direction you want to justify a present circumstance. [Here,] what the
8    NCAA is trying to defend." Ex. 14 at 48. Byers went on to state that no defense of
9    competitive balance could justify caps to grants-in-aid ("GIAs") (the formal name for athletic
10   scholarships) imposed by the NCAA. *Id.* at 50.

11   Indeed, the NCAA has had a history of paying student-athletes—when it wants to do
12   so. In its Bylaw 12.02.3, a "professional athlete" is defined as "one who receives any kind of
13   payment, directly or indirectly, for athletics participation *except as permitted by the governing*
14   *legislation of the Association."* Ex. 7 (emphasis added). Similarly, "pay" is defined in Bylaw
15   12.02.2 as "receipt of funds, awards or benefits *not permitted* by the governing legislation of
16   the Association for participation in athletics." *Id.* (emphasis added). While the NCAA adopted
17   a principle of amateurism as early as 1916, by 1929 the Carnegie Foundation reported that 81
18   of 112 colleges were violating the principle by subsidizing student-athletes. Ex. 15 at 45. In
19   1957, the NCAA allowed schools to offer what have come to be called athletic scholarships,
20   which covered room, board, tuition, fees, and laundry expenses for student-athletes. *Id.* at 46.
21   At the time, an athletic scholarship was a four-year award; in 1973, the four-year athletic
22   scholarship was replaced with a one-year award, renewable on a year-to-year basis. *Id.* at 47.
23   In 2012, schools authorized the option of returning to a four-year award. Ex. 16.

24   The NCAA's hypocrisy is further demonstrated by the $2,000 stipend issue. In

_____

26   2012, "March Madness," the annual postseason college basketball tournament, was expected
27   to yield $771 million for the NCAA, thanks in part to $10.8 billion deal struck in 2010 with
     CBS and Turner Broadcasting for television rights. Exs. 22-33; *see* LGR at 29.

28

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

October 2011, the Division I Board of Directors voted to allow its member conferences to decide whether to pay their athletes an annual stipend of $2,000 to cover the "incidental costs" of a college education. Exs. 17-19. Earlier this year, the stipend was reaffirmed, but its implementation was deferred. Exs. 17-19. This episode only illustrates the subjective and ever-changing criteria applied by the NCAA and its member Division I institutions as to when and how they will compensate student-athletes. [6]

## III.   ARGUMENT

### A.   Standards for Class Certification

As the United States Supreme Court has recognized, antitrust class actions play an important role in the enforcement of the antitrust laws.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972).  Because of this critical enforcement role, "courts resolve doubts in these actions in favor of certifying the class."  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) ("*Rubber Chems.*") (citations omitted).[7]

In determining whether Plaintiffs have satisfied their burden under Rules 23(a) and (b), this Court has recognized that it "must conduct a rigorous analysis, which may require it to probe behind the pleadings before coming to rest on the certification question."  *Holman v. Experian Information Solutions*, No. C 11–0180 CW, 2012 WL 1496203 at *6 (N.D. Cal. Apr. 27, 2012) ("*Holman*") (Wilken, J.) (internal quotations omitted) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) ("*Dukes*") (quoting *Gen. Tel. of Sw. v. Falcon*, 457 U.S. 157 (1982) ("*Falcon*")); *accord Berrien v. New Raintree Resorts, LLC*, 276 F.R.D. 356,

---

[6] The NCAA and its members are likewise now considering radical changes to the amateurism bylaw, demonstrating yet again the fickle nature of supposedly "time-honored" bedrock principles. *See* Ex. 75; *see also* Ex. 59.

[7] *Accord In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) ("*Tableware*"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C 07-01819 CW, 2008 WL 4447592 at *2 (N.D. Cal., Sept. 29, 2008) ("*SRAM*") (Wilken, J.); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166 at *3 (N.D. Cal. June 5, 2006) ("*DRAM*").

359 (N.D. Cal. 2011) ("*Berrien*") (Wilken, J.). As the Ninth Circuit has stated, referring to *Falcon*, "[t]he Supreme Court thus recognized over twenty years ago that a rigorous analysis does not always result in a lengthy explanation or in-depth review of the record." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005) (quoting *Falcon*, 457 U.S. at 160). This "rigorous analysis" can require consideration of supplementary submissions beyond the complaint, as Plaintiffs have done here. *Holman*, 2012 WL 1496203, at *6. It can also overlap with issues relating to the merits. *Id.* As the Supreme Court noted in *Dukes*, however, Rule 23 authorizes a limited inquiry into the merits only for the purpose of determining if certification is proper. 131 S.Ct. at 2552 n. 6. The Ninth Circuit explained this point in *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982, 983 n.8 (9th Cir. 2011) ("*Ellis*"): "[t]he district court is required to examine the merits of the underlying claim in this context, only inasmuch as it may determine whether common questions exist; not to determine whether class members can prevail on the merits of their claims." Thus, for example, it would be improper to determine on a certification motion which of the parties' respective experts had more credible findings and observations; "[t]o hold otherwise would turn class certification into a mini-trial." *Id.* Similarly, at the class certification stage, neither Plaintiffs nor their experts are required to establish that Defendants' conduct was anticompetitive or that it had an anticompetitive impact on competition. *SRAM*, 2008 WL 4447592, at *5; *DRAM*, 2006 WL 1530166, at *9.

For certification of a class under Federal Rule of Civil Procedure 23, Plaintiffs must satisfy the prerequisites set forth in Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as at least one of the subsections of Rule 23(b). *See Rubber Chems.*, 232 F.R.D. at 349-50. Here, the proposed AD Class satisfies the requirements of Rule 23(a) and Rule 23(b)(3) and the proposed IR Class satisfies the requirements of Rule 23(a) and Rule 23(b)(2). Accordingly, the Court should grant Plaintiffs' motion for class certification.

**B. The Elements of Rule 23(a) Are Satisfied.**

**1. Class Members Are Sufficiently Numerous.**

Where the precise size of a putative class is unknown, but "'general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.'" *SRAM*, 2008 WL 4447592, at \*3 (quoting 1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3:3 (4th ed. 2002) ("Newberg")). There are tens of thousands of former student athletes in the AD Class and many more IR Class members (accounting for current athletes). Accordingly, numerosity is present. *See, e.g.*, *Barus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 655 (D. Idaho 2006); *Welling v. Alexy*, 155 F.R.D. 654, 656 (N.D. Cal. 1994). As Judge Fern Smith noted in *In re Citric Acid Antitrust Litig.*, MDL No. 95-1092, 1996 WL 655791, at \*6 (N.D. Cal. Oct. 2, 1996) ("*Citric Acid*"), even an imprecise estimate that class members number in the thousands suffices for purposes of establishing numerosity. Moreover, class actions are particularly appropriate where, as here, the proposed class members are "geographically dispersed." *Rubber Chems.*, 232 F.R.D. at 350-51; *DRAM*, 2006 WL 1530166, at \*3.

### 2.  Common Questions of Law and Fact Exist.

To satisfy Rule 23(a)(2), "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("*Hanlon*"). Only one significant issue of law or fact need be demonstrated to meet this requirement. *Dukes,* 131 S.Ct. at 2566; *Holman*, 2012 WL 1496203, at \*6. As leading commentators have noted, "[i]n an antitrust action on behalf of purchasers who have bought the defendants' products at prices that have been maintained above competitive levels by unlawful conduct, the courts have held that the existence of an alleged conspiracy or monopoly is a common issue that will satisfy . . . Rule 23(a)(2) . . . ." Newberg, § 3:10.[8]

---

[8] *Accord In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y. 2012); *DRAM*, 2006 WL 1530166, at \*3 (quoting *Rubber Chems.*, 232 F.R.D. at 351) ("the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist"). This analysis is unaffected by the Supreme Court's decision in *Dukes*. Courts in subsequent decisions, including this Court, have readily distinguished *Dukes* and certified classes where Defendants victimized members of a putative class through a common course of conduct. *See, e.g., In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 368 (C.D. Cal. 2011) ("*AALP*"); *Schultz v. Qualxserv, LLC*, Nos. 09–CV–17–AJB (MDD), 09–CV–2081,

---

- 11 -

A similar rationale applies to student-athletes challenging the application of the NCAA's bylaws. In one case, for example, the application of NCAA Bylaw 15.5.5, which imposed annual limits on the number of football scholarships a member school could award was found to create common issues of whether a horizontal restraint existed, the definition of the relevant market in which it operated, whether injury to competition was shown, and the appropriateness of the requested remedies. *In re NCAA I-A Walk-On Players Litig.*, No. C04-1254C, 2006 WL 1207915, at *5 (W.D. Wash. May 3, 2006) ("*Walk-On I*").[9] The same court noted that the operation of the Rule of Reason within a defined relevant market creates common issues. *Id.* at *10.[10] Similarly, as noted in the October 19, 2006 order granting class certification in *White* (Ex. 41 at 3), where a class of student-athletes challenged the NCAA's caps on GIAs, "[t]he commonality requirement of Rule 23(a)(2) is met."[11]

In this case, there are numerous common questions of law and fact, including: the definition of the relevant market and the NCAA's power within it, whether Defendants unlawfully conspired to pay nothing for the use of the names, images and likenesses of

---

2012 WL 1439066, at *4, *6 (S.D. Cal.Apr. 26, 2012); *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667, 674 (S.D. Fla. 2012); *Vedachalam v. Tata Consultancy Servs., Ltd.*, No. C 06–0963 CW, 2012 WL 1110004, at *10 (N.D. Cal. Apr. 2, 2012) (Wilken, J.); *Oster v. Lightbourne*, No. C 09–4668 CW, 2012 WL 685808 at *5 (N.D. Cal. March 2, 2012) (Wilken, J.); *In re Motor Fuel Temperature Sales Practices Litig.*, 06–2582–KHV, 2012 WL 205904, at *11,*14 (D. Kan. Jan. 19, 2012).

[9] For non-sports examples on how the existence of a relevant market and a defendant's power within that market present common issues, see, e.g., *In re Flonase Antitrust Litig.*, No. 08–CV–3301, 2012 WL 2277840, at *8 (E.D. Pa. June 18, 2012) ("*Flonase*"); *In re Wellbutrin XL Antitrust Litig.*, No. 08–2431, 2011 WL 3563385, at *6 (E.D. Pa. Aug. 11, 2011); *In re Neurontin Antitrust Litig.*, No. 02–md–1390, 2011 WL 286118, at *8 n. 23 (D.N.J. Jan. 25, 2011) ("*Neurontin*").

[10] The court in *Walk-On I* found that Rule 23(a) was satisfied, but declined to certify a class under Rule 23(b)(3) because individual issues would predominate as to which players would receive scholarships. 2006 WL 1207915, at *12. There is no similar issue here, because *all* former student-athletes who are part of the proposed AD Class would receive compensation.

[11] *See also Agnew v. NCAA*, 683 F.3d 328, 338 n.4 (7th Cir. 2012) ("*Agnew*") ("It is unquestionable that the member schools of the NCAA agreed to follow the NCAA's Bylaws, thus meeting the first element of a Sherman Act claim"); *Metro Intercollegiate Basketball Ass'n v. NCAA*, 339 F. Supp. 2d 545, 549, 551-52 (S.D.N.Y. 2004) ("*MIBA*") (plaintiff showed horizontal conspiracy among NCAA's member institutions with respect to postseason competition rules).

---

- 12 -

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

members of the Classes, whether defendants' actions violated the Sherman Act, whether their

conduct caused injury to competition and to Plaintiffs and members of the proposed Classes,

the appropriate measure of damages sustained by Plaintiffs and other members of the

proposed AD Class, and whether Plaintiffs and other members of the proposed Classes are

entitled to injunctive relief. SCAC ¶¶ 77-78.

In addition, the NCAA has pled numerous affirmative defenses that themselves

present common issues, such as lack of antitrust injury, failure to allege a product market,

procompetitive justifications (such as competitive balance, promotion of control over athletic

departments, student-athlete integration, etc.), unclean hands, that an injunction would not be

in the public interest, the claimed noncommercial nature of the practices at issue, lack of

malice, and so on. NCAA Response and Answer to Second Consolidated Amended Class

Action Complaint at 54-57 (May 31, 2011) (Dkt. No. 330). These defenses can be considered

in determining the issue of commonality and they underscore the fact that the requirements of

Rule 23(a)(2) have been met.[12] *See* RNR at 74-75.

### 3.   The Proposed Class Representatives Have Typical Claims.

As noted in *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites,*

*Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002) ("*Thomas*") (citations omitted), "[t]he typicality

requirement is satisfied if each class member's claim arises from the same course of events

that led to the claims of the representative parties and each class member makes similar legal

arguments to prove the defendant's liability." *See SRAM*, 2008 WL 4447592, at *3. Under the

permissive standards of Rule 23, class representatives' claims "need not be substantially

identical" to those of absent class members, as "[s]ome degree of individuality is to be

expected in all cases." *Hanlon*, 150 F.3d at 1020; *Cifuentes v. Red Robin Int'l*, No. C-11-535-

EMC, 2012 WL 693930, at *5 (N.D. Cal. Mar. 1, 2012) (citation omitted); *see Lozano v.*

---

[12] *See, e.g., Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 39-40 (1st Cir. 2003); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y. 2008); *In re Victor Technologies Securities Litig.*, 102 F.R.D. 53, 62 (N.D. Cal. 1984); *Miller v. Optimum Choice, Inc.*, No. DKC 2003-3653, 2006 WL 2130640, at *7 (D. Md. July 28, 2006).

1    *AT&T Wireless Servs., Inc.*, 504 F.3d 718, 734 (9th Cir. 2007). Indeed, "[a] finding of

2    typicality will generally not be precluded even if there are 'pronounced factual differences'

3    where there is a strong similarity of legal theories." *In re Bulk (Extruded) Graphite Products*

4    *Antitrust Litig.*, Civ. No. 02-6030 (WHW), 2006 WL 891362, at *5 (D.N.J. Apr. 4, 2006).

5         Here, *all* members of the proposed Classes received no compensation from

6    Defendants for the license or sale of their names, images and likenesses. The Plaintiffs

7    suffered from this same failure to pay, as detailed exhaustively in paragraphs 45-167 of the

8    SCAC. All members of the proposed Classes will prove their damages or entitlement to

9    injunctive relief in the same way: by establishing what Defendants should have paid them.

10   Thus, the proof does not depend on any one class member's individual circumstances, and in

11   fact will be the same whether there is one plaintiff or several thousand class members.[13] *See*

12   *Thomas*, 209 F.R.D. at 164 ("Courts consistently certify classes because the complaints

13   themselves provide sufficient incentive—[because] individual plaintiffs cannot prove their

14   own claims without proving the class claims.") (quoting *Citric Acid*, 1996 WL 655791, at *6)

15   (brackets in original).

16         These principles have been followed in cases challenging NCAA bylaws. In *White*, for

17   example, the court rejected the arguments that typicality was absent because the inherent

18   variation in skill among student-athletes created a conflict of interest that destroyed adequacy

19   of representation. The court stated: "[h]ere, plaintiffs allege a horizontal agreement by the

20   NCAA in violation of the Sherman Act. Plaintiffs and all members of the proposed class

21   allege they were affected by the GIA cap in the same way. The Court finds plaintiffs have met

22   ─────────────────

23   [13] As Dr. Noll states:

24

25

26

27         RNR at 47-48.

─────────────────────────────────

- 14 -

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

[PUBLIC VERSION – PARTIALLY REDACTED]

1    the typicality requirement of Rule 23(a)(3)." Ex. 41 at 3. Likewise, in *Walk-On I*, the court

2    stated that proof of a Sherman Act violation would be based on common evidence of the

3    operation of the NCAA's bylaws as a horizontal restraint and that divergent injury and

4    damages issue did not preclude a finding of typicality. 2006 WL 1207915, at *6 (emphases in

5    original). A similar result applies here.

6

7                    **4.   The Proposed Class Representatives Will Adequately Represent the
                          Class.**

8            The adequacy requirement has two elements: (1) the class representative's interests

9    must not conflict with those of the proposed class members; and (2) counsel for the proposed

10   class must be qualified, experienced, and able to prosecute the action vigorously. *Hanlon*, 150

11   F.3d at 1020; *SRAM*, 2008 WL 4447592, at *3.[14]  Both are satisfied here.

12           All members of the proposed Classes share an interest in establishing liability and

13   preventing future antitrust violations by Defendants. *See Tableware*, 241 F.R.D. at 649

14   ("Members of the class were allegedly overcharged for tableware and have a mutual and

15   coterminous interest in establishing defendants' liability and recovering damages."). As such,

16   there are no conflicts among members of the proposed Classes, and certification is

17   appropriate.

18           Hypothetical conflicts posited by Defendants cannot defeat certification. "[T]his

19   circuit does not favor denial of class certification on the basis of speculative conflicts."

20   *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003), *cert. denied*, 529 U.S. 927 (2003)

21   (affirming class certification where defendant "produced no evidence that class members

22   actually possess opposing views").[15] "[C]ourts are generally skeptical of defenses to class

23   _____

24   [14] The second element of the adequacy test is governed by Fed. R. Civ. P. 23(g). While
     adequacy of class counsel was previously scrutinized under Rule 23(a)(4) along with
25   adequacy of the class representative, Rule 23(g) now guides the court in assessing class
     counsel as part of the certification decision, but it does not introduce an entirely new element
26   into the class certification process. *See* Fed. R. Civ. P. 23(g), advisory committee note.

27   [15] *See Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir.1975), *cert. denied*, 429 U.S. 816 (1976)
     ("We agree that class members might at some point during this litigation have differing

28                                              - 15 -
─────────────────────────────────────────────────────────────
        ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
                         [PUBLIC VERSION – PARTIALLY REDACTED]

1   certification based on conflicts between the proposed class members. . . . Such arguments are

2   unavailing except in the rarest of cases where a conflict is 'so palpable as to outweigh the

3   substantial interest of every class member in proceeding with the litigation.'"  *Bulk Graphite*,

4   2006 WL 891362, at *8 (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D.

5   493, 514-15 (S.D.N.Y. 1996) ("*NASDAQ*")); *see Berrien*, 276 F.R.D. at 361.

6         In *White*, for example, the court rejected adequacy challenges to the proposed class

7   based on differences in athletic skill (and hence economic value among its members). Ex. 41

8   at 3. Similarly, in *Walk-On I*, the court rejected an adequacy challenge based on differences in

9   putative class members' potential damages. 2006 WL 1207915, at *8-*9.

10        The proposed Classes have been well represented by the existing Co-Interim Class

11  Counsel, Hausfeld, which has vigorously prosecuted this action.  It has spent considerable

12  time and resources on this litigation since it was filed, overseeing the briefing and argument

13  of motions, serving discovery, taking depositions, and working with experts.  It readily

14  satisfies the adequacy test under Rule 23(a)(4) and the requirements of Rule 23(g).

15

16  **C.  Certification of the Proposed Classes Is Appropriate Under Rule 23(b).**

17      **1.  The Proposed AD Class Satisfies the Requirements of Rule 23(b)(3).**

18        Rule 23(b)(3) authorizes the Court to certify a class action if "the questions of law or

19  fact common to the members of the class predominate over any questions affecting only

20  individual members, and . . . a class action is superior to other available methods for the fair

21  and efficient adjudication of the controversy." In order to satisfy the predominance test,

22  _____

23  interests. We altogether disagree, for a spate of reasons, that such potential conflicts afford a
    valid reason at this time for refusing to certify the class."); *In re Cardizem CD Antitrust Litig.*,
24  200 F.R.D. 297, 306 (E.D. Mich. 2001) ("*Cardizem*") ("Defendants' arguments about
    potential conflicts are thus insufficient to deny class certification."); *In re S. Cent. States*
25  *Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 418 (M.D. La. 1980) ("A naked allegation of
    antagonism cannot defeat class certification; there must be an actual showing of a real
26  probability of a potential conflict which goes to the subject matter of the suit."); *SRAM*, 2008
    WL 4447592, at *4 ("[t]he mere potential for a conflict of interest is not sufficient to defeat
27  class certification; the conflict must be actual, not hypothetical").

28
ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

common questions need not be dispositive. *Tableware*, 241 F.R.D. at 651; *Citric Acid*, 1996 WL 655791, at *8. "[A]ll that is required to meet the predominance element is that individual issues not overwhelm the common questions so as to render the class action valueless." *Thomas*, 209 F.R.D. at 167 (citing cases).

The predominance inquiry "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S.Ct. 2179, 2184 (2011). As this Court noted in *SRAM*, 2008 WL 4447592, at *5:

> To obtain class certification in a Sherman Act § 1 claim, Plaintiff must establish the predominance of common issues related to three key elements: (1) whether there was a conspiracy to fix prices in violation of the antitrust laws; (2) whether Plaintiff sustained an antitrust injury, or the "impact" of Defendants' unlawful activity; and (3) the amount of damages sustained as a result of the antitrust violations.

This Court has held that Plaintiffs' Sherman Act claims must be tested under the Rule of Reason and found that a *prima facie* "unreasonable restraint of trade" had been pled by Plaintiff Ed O'Bannon. *O'Bannon v. NCAA*, Nos. C 09-1967 CW, C 09-3329 CW, C 09-4882 CW, 2010 WL 445190, at *5 (N.D. Cal. Feb. 8, 2010); *see In re NCAA Student-Athlete Name & Likeness Litig.*, No. C 09-1967 CW, 2011 WL 1642256, at *5 (N.D. Cal. May 2, 2011).[16]

## 2. **Common Questions of Law and Fact Predominate.**

### a. **Liability Is a Predominant Common Issue.**

This is an antitrust case involving an alleged collusive agreement to fix the amount paid to present and former student-athletes for the license or sale of their names, images and likenesses at zero. As the United States Supreme Court has explained, "predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc.*

---

[16] Under the Ninth Circuit's Rule of Reason analysis, a restraint is unreasonable if its harm to competition outweighs its procompetitive effects; the plaintiff initially must show a harm to competition in a relevant market and if it does, the defendant must come forth with evidence of procompetitive effects, and the plaintiff must show that any legitimate purposes could be accomplished by less restrictive alternatives. *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001); *Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996); *see* RNR at 8.

*v. Windsor*, 521 U.S. 591, 625 (1997). "In price-fixing cases, 'courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present.'" *Thomas*, 209 F.R.D. at 167 (quoting *NASDAQ*, 169 F.R.D. at 518).

Plaintiffs will establish Defendants' violations of federal antitrust law through common evidence that relates to Defendants' conduct, not that of individual members of the proposed AD Class. *See, e.g., SRAM*, 2008 WL 4447592, at *5 ("Plaintiff alleges that Defendants conspired to raise, fix, maintain, and stabilize the price of SRAM through in-person, telephone and email communications. This claim requires proof common to all class members. Therefore, the Court finds that common issues predominate as to the element of antitrust violation"); *DRAM*, 2006 WL 1530166, at *7 ("Plaintiffs allege that defendants fixed, raised, stabilized, and maintained at artificially high levels the prices they charged for DRAM sold in the United States. . . . . To prove these violations, all class members must establish that the defendants engaged in the conspiracy to fix prices in violation of section 1 of the Sherman Act. This requires proof common to all plaintiffs.").

Here, as Dr. Noll explains, the NCAA's rules adversely affect two markets: the student-athlete Division I college education market and the market for the acquisition of group licensing rights for the use of student-athletes' names, images and likenesses in the broadcasts or rebroadcasts of Division I basketball and football games and in videogames featuring Division I basketball and football. RNR at 10, 37-38, 40.

As to the former, this market can be shown by a comparison of student-athlete admittance into Division I schools versus schools in other divisions; it is a distinction based on ███████████████ and is subject to a classwide method of proof. *Id*. at 38; *see id*. at 30 & RNR Ex. 2; *see also Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959) (relevant market was championship boxing contests rather than all boxing contests). ████

████████████████████████████████████████████████████████████

1   ████████████████████████████████████████████████

2   ████████████████████████████████████   RNR at 58.

3       The licensing market identified by Dr. Noll is a distinct labor input market to the

4   market for Division I intercollegiate football and basketball, in which student-athletes are

5   sellers. *See Agnew*, 683 F.3d at 337 n.3, 346 (labor market for student-athletes cognizable

6   under the Sherman Act and NCAA is a monopsonist within that market); *In re NCAA I-A*

7   *Walk-On Football Players Litig.*, 398 F. Supp. 2d 1144, 1151 (W.D. Wash. 2005) ("*Walk-On*

8   *II*") (plaintiff sufficiently pled an input market in which NCAA Division I-A schools compete

9   for student-athletes); *White* (Ex. 41) at 2, 7 (court certified class of those who receive GIAs

10  from Division I-A school football programs); *see also Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of*

11  *Cal.*, 190 F.3d 1057-58 (9th Cir. 1999) ("market participants" not confined to competitors or

12  consumers, but may include others who can suffer antitrust injury, such as potential entrants,

13  licensors, suppliers, landlords, dealers and indirect purchasers).

14      Dr. Noll found clear-cut injury caused in this market by operation of the NCAA's

15  rules (RNR at 49-50):

16  

17

18

19

20

21

22      As with the agreements alleged in *Agnew*, *White* and *Walk-On I*, the horizontal

23  agreement not to compensate student athletes for use of their names, images and likenesses

24  cannot seriously be in dispute. Nor can it be disputed that, assuming such an agreement to

25  eliminate payment to former student-athletes for the use of their names, images and likeness

26  exists, it is injurious to competition and it is harmful to members of the AD Class. Member

27  schools of the NCAA that would have competed for student-athletes by offering them

28

1   compensation for the use of their names, images and likenesses have agreed not to engage in

2   such competition.

3       The Defendants' claimed (and class-wide) affirmative defenses, such as amateurism or

4   competitive balance, are unavailing. As Dr. Noll notes, they have no persuasive factual basis.

5   RNR at 75-92. In addition, they have no application to this input market and only apply (to

6   the extent they apply at all) to the adjacent market for Division I intercollegiate basketball and

7   football. However, anticompetitive effects in one market cannot be justified by alleged

8   procompetitive effects in another market. *Law v. NCAA*, 902 F. Supp. 1394, 1406 (D. Kan.

9   1995) (citing cases), *aff'd*, 134 F.3d 1010 (10th Cir. 1998), *cert. denied*, 525 U.S. 822 (1998).

10  Finally, even if these alleged procompetitive benefits were cognizable in the market in

11  question, they only create more predominating common issues. Moreover, as explained

12  above, the argument that the challenged practices are "non-commercial" and are thus saved

13  under the Rule of Reason because they somehow preserve principles of amateurism or

14  "competitive balance" is unpersuasive. Those goals certainly have no application to former

15  student-athletes. Courts have questioned the alleged non-commercial nature of various NCAA

16  bylaws and policies. *See Board of Regents,* 468 U.S. at 112-13 (fixing price structure for

17  televising of games improper); *Agnew*, 683 F.3d at 344 (one year limit on scholarships and

18  limits on the number of scholarships per team are likely commercial); *Walk On II*, 398 F.

19  Supp. 2d at 1148 (bylaw limiting football scholarships may be commercial).

20      Indeed, the opinions of several courts detail how intercollegiate Division I basketball

21  and football have become big businesses worth many hundreds of millions of dollars. *See*

22  *Board of Regents*, 468 U.S. at 92-94 (discussing lucrative NCAA sports television contracts);

23  *Agnew*, 683 F.3d at 340-41 (footnote omitted) ("Despite the nonprofit status of NCAA

24  member schools, the transactions those schools make with premier athletes—full scholarships

25  in exchange for athletic services—are not noncommercial, since schools can make millions of

26  dollars as a result of these transactions. Indeed, this is likely one reason that some schools are

27  willing to pay their football coaches up to $5 million a year rather than invest that money into

28

- 20 -

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

1   educational resources"); *Banks v. NCAA*, 977 F.2d 1081, 1099-1100 (7th Cir. 1993), *cert.*

2   *denied*, 113 S.Ct. 2336  ("*Banks*") (Flaum, J., dissenting) (discussing the business of

3   intercollegiate sports). Even if Defendants had some legitimate objectives in not

4   compensating student-athletes for the use of their names, images or likenesses while they

5   attended college, those goals could be accommodated by other means, such as withholding

6   payment until after graduation or paying student-athletes compensation in the form of

7   increased living costs.[17]

8                   **b.   Impact Can Be Proven on a Classwide Basis.**

9           At this stage, Plaintiffs are not required actually to prove impact and need only

10   demonstrate that impact may be established through classwide evidence. Indeed, "class-wide

11   impact is usually found to exist where the defendants are shown to have used collusively-set

12   list prices for the product at issue." *Rubber Chems.*, 232 F.R.D. at 352.[18]  As the Court in

---

[17] Defendants have argued at various hearings in this case that their class-wide conduct is protected by federal copyright laws. That argument is unconvincing. The Copyright Act in no way automatically precludes antitrust claims. "Intellectual property rights do not confer a privilege to violate the antitrust laws." *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001); *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000), *cert. denied*, 121 S.Ct. 1077 (2001); *Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d 808, 816 (3d Cir. 1982), *on remand*, 614 F. Supp. 110 (E.D. Pa. 1985), *aff'd*, 800 F.2d 369 (3d Cir. 1986), *cert. denied*, 107 S. Ct. 1573 (1987) ; *Storer Cable Commc'ns v. City of Montgomery*, 806 F. Supp. 1518, 1535 (M.D. Ala. 1992); *Allied Artists Picture Corp. v. Rhodes*, 496 F. Supp. 408, 447 (S.D. Ohio), *aff'd in part and remanded in part*, 679 F.2d 656 (6th Cir. 1982). The Magistrate Judge assigned to this case has suggested as much as well. Tr. of Proceedings at 10-11 (Dkt No. 424) (Feb. 8, 2012).

[18] This conclusion is not undermined by the fact that a former student-athlete might receive the occasional endorsement payment from a third-party for use of his name, image or likeness on a "one-off" basis, such as when a theatrical film is made of a game in which he played or he is remunerated to appear on the cover of an EA videogame. These types of uses do not fall within the class definitions of the Classes and the restraint advanced in this motion. Indeed, even if some members of the proposed AD Class regularly received payments for some uses of their names, images and likenesses (which they did not), that fact would not defeat certification. As Circuit Judge Richard Posner wrote in *Kohen v. Pac. Inv. Mgmt. Co., LLC*, 571 F.3d 672, 677 (7th Cir. 2009), *cert. denied*, 130 S.Ct. 1504 (2010), merely because a "class will often include persons who have not been injured by the defendant's conduct," "[s]uch a possibility or indeed inevitability does not preclude class certification." *Accord Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823, 825 (7th Cir. 2012); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010); *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009); *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 295 (D. Mass. 2011); *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 419 (D. Me 2010); *Flonase*, 2012 WL 2277840, at *17-*18; *Neurontin*, 2011 WL 286118, at *8

---

                                                     - 21 -

*DRAM* noted, all that is needed at the class certification stage is a "sufficient showing" that classwide impact can be shown through common proof "and [courts] must avoid engaging in a battle of expert testimony." *DRAM*, 2006 WL 1530166, at *9; *accord AALP*, 276 F.R.D. at 373, at *10; *SRAM*, 2008 WL 4447592, at *5. As noted earlier, the Ninth Circuit repeated this point last year in the *Ellis* decision.

Here, Dr. Noll sums up how common issues of impact predominate as follows (RNR at 74-75):



### c. **Damages Can Also Be Proven on a Classwide Basis.**

Damages to the proposed AD Class can also be proven through common evidence. As noted in *Rubber Chems.*, 232 F.R.D. at 354, "[p]laintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. . . . The Court need only determine that Plaintiffs have proffered a method that is not so insubstantial or unreasonable as to amount to no method at all. They have met their low burden here."[19] Here, the process involves three steps: (a) collecting information about the revenues of the NCAA and members

n.23; *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. 04-5898, 2010 WL 3855552, at *28 (E.D. Pa. Sept. 30, 2010).

[19] *Accord In re Apple & AT&T iPad Unlimited Data Plan Litig.*, No. C–10–02553 RMW, 2012 WL 2428248, at *3 (N.D. Cal. June 26, 2012) ("*Apple*"); *SRAM*, 2008 WL 4447592, at *6; *DRAM*, 2006 WL 1530166, at *10.

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

from the licensing of game telecasts and videogames; (b) determining how this revenue would be allocated between colleges and student-athletes in the absence of the restrictions that the NCAA imposes; and (c) allocating the student-athlete share of this revenue among members of the class. RNR at 95-96, 89-90.[20] The first step can be determined from available data obtained publicly or through discovery. *Id*. at 95-96; LGR at 8-27. The second is based on a 50-50 split for telecasts and a one-third split for video games, based on recognized economic principles, examples from professional sports, and examples from music artists' licensing. RNR at 101-102. The third is based on equal allocations among all members of a team in a given year, and these team members are then further divided according to whether they were current or former players at the time that the revenue was generated. *Id*. at 102. A sample computation is provided in Dr. Noll's declaration. *Id*. at 103-104 & RNR Exs. 14-15.

### 3.   A Class Action is Superior to Other Available Methods of Adjudication.

The factors pertinent to a finding that a class action is a superior method of adjudication include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action. *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1189 (9th Cir.), *on reh'g*, 273 F.3d 1266 (9th Cir. 2001); *Tableware*, 241 F.R.D. at 651.

It has been held that "[i]n antitrust cases such as this, the damages of individual direct purchasers are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress. A class action is the superior

---

[20] This analysis focuses on group licenses for telecasts (both live broadcasts and rebroadcasts) and for video games; licenses for more individualized items (like jerseys) are excluded from the class-wide damage analysis. RNR at 86.

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

1   method of resolving this controversy." *SRAM*, 2008 WL 4447592, at \*7; *accord, e.g.,*

2   *Thomas*, 209 F.R.D. at 168 ("Plaintiffs argue that class treatment of antitrust actions is

3   inherently superior to individualized actions and, given the wealth of case law on the subject,

4   the Court is inclined to agree."); *DRAM*, 2006 WL 1530166, at \*11 (superiority satisfied).

5           Class certification in this case would be far superior to, and more manageable than,

6   any other procedure for the treatment of the factual and legal issues raised by Plaintiffs'

7   claims.  Here, no other individual lawsuits are pending and the cases have already been

8   consolidated by this Court for purposes of judicial efficiency. *See DRAM*, 2006 WL 1530166,

9   at \*11. Indeed, in a case such as this one, the members of the Class have an interest in limiting

10  the costs of litigation by pooling together with other plaintiffs. *Thomas,* 209 F.R.D. at 168.

11          Having multiple individual actions would not serve the goals of efficiency. *DRAM*,

12  2006 WL 1530166, at \*11 ("it would be unnecessarily duplicative, and judicially inefficient,

13  for the court to mandate individual trials"). Moreover, if proposed Class members had to

14  proceed with separate actions, this litigation would be unwieldy and unmanageable.

15          **4.   The Proposed IR Class Satisfies the Requirements of Rule 23(b)(2).**

16          Plaintiffs also seek to certify an IR class under Rule 23(b)(2). Having separate damage

17  and injunctive relief classes is perfectly proper, which has been recognized in this district. *See*

18  *Vallabhapurapu v. Burger King Corp.*, No. C 11–00667 WHA, 2012 WL 2568183, at \*4

19  (N.D. Cal. July 2, 2012); *Apple*, 2012 WL 2428248, at \*8. The former class is directed to

20  retrospective damage relief and is confined to former student-athletes, while the latter class

21  seeks injunctive relief with respect to future conduct and includes both current and former

22  student-athletes.

23          Rule 23(b)(2) is satisfied where "'class members complain of a pattern or practice that

24  is generally applicable to the class as a whole.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1125

25  (9th Cir. 2010) (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998), *cert. denied*,

26  119 S.Ct. 1140 (1999)). "The fact that some class members may have suffered no injury or

27  different injuries from the challenged practice does not prevent the class from meeting the

28

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

1    requirements of Rule 23(b)(2)." *Id.* Here, the same types of Defendants' conduct that provide

2    common issues under Rule 23(a)(2) and predominance under Rule 23(b)(3) furnish the

3    "pattern or practice" sufficient to implicate Rule 23(b)(2).  Plaintiffs' unjust enrichment and

4    accounting claims are similarly certifiable under Rule 23(b)(2) or Rule 23(b)(3).

5    **IV.    THE COURT SHOULD APPOINT HAUSFELD AS CLASS COUNSEL**

6            In appointing Class Counsel, the Court should apply the same standard it did in

7    appointing Interim Class Counsel. "In addition, the Court may consider 'any other matter

8    pertinent to counsel's ability to fairly and adequately represent the interests of the class.'"

9    *Kaminske v. JP Morgan Chase Bank, N.A.*, No. CV 09-6352-JVS (RNBx), 2011 WL 521338,

10   at *2 (C.D. Cal. Jan. 3, 2011) (quoting Fed. R. Civ. P. 23(g)(1)(B)).

11           Here, as noted above, the Court appointed Hausfeld as Co-Interim Class Counsel and

12   no one disputes that its work in prosecuting this action has been diligent. This firm, which

13   diligently prosecuted the case, and has expended substantial resources in protecting the rights

14   of the proposed Classes, should be appointed as Class Counsel.[21]

15   **V.    CONCLUSION**

16           For the foregoing reasons, the Court should grant Plaintiffs' motion for class

17   certification, certify the proposed AD Class pursuant to 23(b)(3), certify the proposed IR

18   Class pursuant to Rule 23(a)(2), and appoint Hausfeld as Class Counsel under Rule 23(g).

19

20   Dated: August 31, 2012                    Respectfully submitted,

21                                             By:  */s/ Michael P. Lehmann*
                                               Michael P. Lehmann (Cal. Bar No. 77152)
22                                             Jon T. King (Cal. Bar No. 205073)
                                               Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
23                                             HAUSFELD LLP
                                               44 Montgomery St., 34th Floor
24

25   [21] The Court originally appointed Hausfeld and Hagens Berman as Co-Interim Class Counsel,
     but the latter firm has not participated significantly in the prosecution of the antitrust claims.
26   Therefore, the Court should now appoint Hausfeld as sole Antitrust Class Counsel. *See In re
     Apple iPod iTunes Antitrust Litig.,* No. C 05–00037 JW, 2011 WL 5864036, at *4 n.25 (N.D.
27   Cal. Nov. 22, 2011).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

San Francisco, CA 94104
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email: mlehmann@hausfeldllp.com
         jking@hausfeldllp.com
         abailey@hausfeldllp.com

Michael D. Hausfeld (*pro hac vice*)
Sathya S. Gosselin (Cal. Bar. No. 269171)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel:  (202) 540-7200
Fax:  (202) 540-7201
Email: mhausfeld@hausfeldllp.com
         sgosselin@hausfeldllp.com

ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
[PUBLIC VERSION – PARTIALLY REDACTED]

# Exhibit A

# DOCUMENT SUBMITTED UNDER SEAL

# Exhibit B

# DOCUMENT SUBMITTED UNDER SEAL