Gregory L. Curtner (*pro hac vice*)
Robert J. Wierenga (SBN 183687)
Frederick R. Juckniess (SBN 210454)
Kimberly K. Kefalas (*pro hac vice*)
Suzanne L. Wahl (*pro hac vice*)
Jessica A. Sprovtsoff (*pro hac vice*)
Paul E. Bateman, Jr.
SCHIFF HARDIN LLP.
350 S. Main St., Suite 210
Ann Arbor, MI  48104
Telephone:  (734) 222-1500
Facsimile:  (734) 222-1501
Email: gcurtner@schiffhardin.com
        rwierenga@schiffhardin.com
        rjuckniess@schiffhardin.com
        kkefalas@schiffhardin.com
        swahl@schiffhardin.com
        jsprovtsoff@schiffhardin.com

Rocky N. Unruh (SBN 084049)
SCHIFF HARDIN LLP
One Market, Spear Street Tower, Ste 3200
San Francisco, CA 94105
Telephone:  (415) 901-8700
Facsimile:  (415) 901-8701
Email:  runruh@schiffhardin.com

Attorneys for Defendant
National Collegiate Athletic Association

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re NCAA Student-Athlete Likeness Antitrust Litigation | Case No. 09-cv-1967-CW<br><br>**NCAA'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**<br><br>Date:          June 20, 2013<br>Time:         2:00 p.m.<br>Dept:         Courtroom 2, 4th Floor<br>Judge:       Hon. Claudia Wilken<br>Complaint filed:  May 5, 2009 |

1
2
3

# TABLE OF CONTENTS

4

**Pages**

5

TABLE OF CONTENTS ........................................................................................................ i

INDEX OF AUTHORITIES ................................................................................................. ii

6

INTRODUCTION ................................................................................................................. 1

7

STATEMENT OF FACTS .................................................................................................... 1

8

I.      THE RECORD DOES NOT SUPPORT PLAINTIFFS' MOTION ................................... 1

II.     PROFESSOR NOLL'S PROPOSED TESTIMONY CANNOT SUBSTITUTE

9       FOR CLASSWIDE EVIDENCE ................................................................................ 2

10

ARGUMENT ........................................................................................................................ 3

I.      CLASS MEMBERSHIP IS NOT ASCERTAINABLE.................................................... 4

11

II.     THE CLASS DOES NOT SATISFY RULE 23 ............................................................. 6

12

        A.      The class does not satisfy Rule 23(a)(2) ................................................. 7

13

        B.      The class does not satisfy Rule 23(a)(4) ................................................. 8

        C.      The class does not satisfy Rule 23(b)(3)............................................... 11

14
15              1.      Individual issues of causation and antitrust impact will
                        predominate.............................................................................. 11

16                      a.      No common evidence of former SAs impacted by vertical
                                boycotts ......................................................................... 12

17                      b.      No common evidence of SAs impacted by a horizontal
                                restraint......................................................................... 12

18              2.      Individual statute of limitations defenses will predominate ..................... 19

19              3.      Individual defenses of assignment and release preclude certification ...... 19

                4.      Individual damages issues will predominate............................................. 20

20              5.      A class action is not superior to individual actions.................................... 21

21      D.      The Proposed Class Cannot Be Certified Under Rule 23(b)(2)............................ 21

22

III.    PROFESSOR NOLL'S PROPOSED TESTIMONY IS NOT ADMISSIBLE................. 22

IV.     MR. GERBRANDT'S PROPOSED TESTIMONY IS NOT ADMISSIBLE ................. 24

23

V.      THE COURT SHOULD NOT PERMIT PLAINTIFFS TO AMEND THEIR
        COMPLAINT ............................................................................................................ 24

24
25
26
27
28

1

2

3

## TABLE OF AUTHORITIES

4

FEDERAL CASES                                                                    PAGE(S)

5  *Acri v. Int'l Ass'n of Machinists & Aerospace Workers,*
   781 F.2d 1393 (9th Cir. 1986) ........................................................... 24

6
   *Alabama v. Blue Bird Body Co.,*
7  573 F.2d 309 (5th Cir. 1978) ............................................................. 6

8  *Alberghetti v. Corbis Corp.,*
   263 F.R.D. 571 (C.D. Cal. 2010) ....................................................... 8

9
   *Am. Honda Motor Co., Inc. v. Allen,*
10 600 F.3d 813 (7th Cir. 2010) ........................................................... 22

11 *Baltimore Orioles, Inc. v. MLB Players Ass'n,*
   805 F.2d 663 (7th Cir. 1986) ........................................................... 14

12
   *Bieneman v. City of Chicago,*
13 864 F.2d 463 (7th Cir. 1988) ........................................................... 10

14 *Blades v. Monsanto Co.,*
   400 F.3d 562 (8th Cir. 2005) ........................................................... 16

15
   *Bourns, Inc. v. Raychem Corp.,*
16 331 F.3d 704 (9th Cir. 2003) ........................................................... 13

17 *Branch v. City of Myrtle Beach,*
   532 S.E.2d 289 (S.C. 2000) ............................................................. 17

18
   *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
19 509 U.S. 209 (1993) ........................................................................ 24

20 *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.,*
   505 F.3d 818 (8th Cir. 2007) ........................................................... 14

21
   *CBS Interactive Inc. v. NFL Players Ass'n, Inc.,*
22 259 F.R.D. 398 (D. Minn. 2009) ...................................................... 14

23 *Chamberlan v. Ford Motor Co.,*
   402 F.2d 952 (9th Cir. 2005) ............................................................. 6

24
   *Chestnut Fleet Rentals, Inc. v. Hertz Corp.,*
25 72 F.R.D. 541 (E.D. Pa.1976) ........................................................... 7

26 *Concord Boat Corp. v. Brunswick Corp.,*
   207 F.3d 1039 (8th Cir. 2000) ......................................................... 15

27
   *Craftsmen Limousine, Inc. v. Ford Motor Co.,*
28 363 F.3d 761 (8th Cir. 2004) ........................................................... 23

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995)..................................................................................... 22, 23

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ......................................................................................................... 23

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
  773 F.2d 1506 (9th Cir. 1985)......................................................................................... 20

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011)............................................................................. 4, 7, 8, 23

*Fleischman v. Albany Medical Center*,
  No. 1:06-cv-765, 2008 WL 2945993 (N.D.N.Y. July 28, 2008) ..................................... 16

*Gionfriddo v. Major League Baseball*,
  94 Cal.App.4th 400 (2001) ............................................................................................. 14

*Glictronix Corp. v. AT&T*,
  603 F. upp. 552 (D.N.J. 1984) ....................................................................................... 10

*Haskell v. Stauffer Comm., Inc.*,
  26 Kan. App. 541 (1999) ................................................................................................. 13

*Home Placement Serv., Inc. v. Providence Journal Co.*,
  819 F.2d 1199 (1st Cir. 1987) ......................................................................................... 20

*In re Beer Distrib. Antitrust Litig.*,
  188 F.R.D. 549 (N.D. Cal. 1998)....................................................................................... 7

*In re Compensation of Managerial, Professional & Technical Employees Antitrust Litigation*,
  No. 02-cv-2924, 2008 WL 3887619 (D.N.J. Aug. 20, 2008) ............................................ 16

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006)..................................... 6

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) .................................................................................... 12

*In re Hotel Tel. Charges Antitrust Litig.*,
  500 F.2d 86 (9th Cir. 1974)................................................................................... 6, 11, 21

*In re Hydrogen Peroxide Antitrust Litig.*,
  52 F.3d 305 (3rd Cir. 2008) ..................................................................................... 11, 17

*In re NCAA I-A Walk-On Football Players Litigation*,
  No. C-04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006)............................... passim

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ....................................................................................... 11, 12, 20

*In re Online DVD Rental Antitrust Litig.*,
    2010 WL 5396064 at *6 (N.D. Cal Dec. 23, 2010) ............................................................ 11

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ....................................................................................... 6

*In re SRAM Antitrust Litig.*,
    No. 07-MD-01819-CW, 2010 WL 5141861 (N.D. Cal. Dec. 13, 2010) ............................ 22

*In re Tableware Antitrust Litig.*,
    241 F.R.D. 644 (N.D. Cal. 2007) ....................................................................................... 6

*Jackson v. Temple Univ. of Com. Sys. of Higher Educ.*,
    721 F.2d 931 (3d Cir. 1983) ............................................................................................. 17

*Jules Jordan Video, Inc. v. 144942 Canada, Inc.*,
    617 F.3d 1146 (9th Cir. 2010) ........................................................................................... 14

*Kline v. Coldwell, Banker & Co.*,
    508 F.2d 226 (9th Cir. 1974) ............................................................................................. 11

*Lane v. Random House, Inc.*,
    985 F. Supp. 141 (D.D.C. 1995) ........................................................................................ 13

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2001) ........................................................................................... 24

*Mazur v. eBay Inc.*,
    257 F.R.D. 563 (N.D. Cal. 2009) ........................................................................................ 4

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ............................................................................................... 21

*Mendez v. R+L Carriers, Inc.*,
    No. C 11-2478 CW, 2012 WL 586897310 (N.D. Cal. Nov. 19, 2012) ............................... 4

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) .............................................................................................. 23

*Pace Indus., Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987) ............................................................................................. 19

*Pryor v. Aerotek Scientific, LLC*,
    278 F.R.D. 516 (C.D. Cal. 2011) ......................................................................................... 4

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009) ......................................................................................... 16

*Retail Clerks Local 187 AFL-CIO v. Univ. of Wyoming*,
    531 P.2d 884 (Wyo. 1975) ................................................................................................. 18

1

2

3

4

*Rock v. Nat'l Collegiate Athletic Ass'n,*
 1:12-CV-1019, 2013 WL 786775 (S.D. Ind. Mar. 1, 2013) ................................................. 25

*Somers v. Apple, Inc.*,
 258 F.R.D. 354 (N.D. Cal. 2009) .................................................................................. 17, 20

*Texaco, Inc. v. Ponsolt,*
 939 F.2d 794 (9th Cir. 1991).............................................................................................. 24

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
 445 F.3d 311 (4th Cir. 2006)............................................................................................... 19

*TK-7 Corp. v. Estate of Barbouti,*
 993 F.2d 722 (10th Cir. 1993)............................................................................................. 24

*Todd v. Exxon Corp.,*
 275 F.3d 191 (2d Cir. 2001)................................................................................................ 16

*Toffoloni v. LFP Publ'g Group*, LLC,
 572 F.3d 1201 (11th Cir. 2009)........................................................................................... 13

*Toscano v. PGA Tour, Inc.*,
 201 F. Supp. 2d 1106 (E.D. Cal. 2002)............................................................................... 20

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.*,
 245 F.3d 1048 (9th Cir. 2001)............................................................................................. 25

*Wal-Mart Stores, Inc. v. Dukes*,
 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ...................................................................... 4, 7

*Walter v. NBC Television Network, Inc.*,
 811 N.Y.S.2d 521 (2006)..................................................................................................... 13

*Wang v. Chinese Daily News, Inc.*,
 No. 08-55483, 2013 WL 781715 (9th Cir. March 4, 2013)................................................ 22

*Weisfeld v. Sun Chemical Corp*,
 210 F.R.D. 136 (D.N.J. 2002).............................................................................................. 16

*White v. NCAA*,
 2:06-cv-0099, Doc. No. 95 (C.D. Cal. Oct. 19, 2006)......................................................... 6

*Wilcox Dev. Co. v. First Interstate Bank of Oregon, N.A.*,
 97 F.R.D. 440 (D. Or. 1983)................................................................................................ 20

*Yeager's Fuel, Inc. v. Penn. Power & Light Co.*,
 162 F.R.D. 471 (E.D. Pa. 1995)............................................................................................ 9

*Zinzer v. Accufix Research Inst., Inc.*,
 253 F.3d 1180 (9th Cir. 2001)............................................................................................. 11

1

2

3

4

*Zivkovic v. S. Ca. Edison Co.*,
   302 F.3d 1080 (9th Cir. 2002)...........................................................................28

5

**FEDERAL STATUTES**

6

National Labor Relations Act, 129 U.S.C. § 152(2) ...................................................17

7

Rules Enabling Act, 28 U.S.C. § 2072(b) ..................................................................21

8

9

**STATE STATUTES**

10

5 Ill. Comp. Stat. § 315/3(n) (2011)........................................................................18

11

Cal. Civ. Code. § 3344(d) .....................................................................................13

12

Colo. Exec. Order D 028 07(II)(B) ..........................................................................18

13

Fla. Stat. § 447.203(3)(i) (2007) ............................................................................18

14

Fla. Stat. § 540.08 ...............................................................................................13

15

Ga. Code Ann. § 20-2-989.10 (1992) .......................................................................17

16

Haw. Rev. Stat. § 89-6(f)(14) (2012).......................................................................18

17

Iowa Code § 20.4(4) (2010) ...................................................................................18

18

Md. Code, State Pers. & Pens. § 3-102 (2012) ...........................................................18

19

Minn. Stat. § 179A.03 (2012) ................................................................................18

20

N.C. Gen. Stat. § 95-98 (1959) ...............................................................................17

21

Neb. Rev. Stat. § 597.790(c) ..................................................................................13

22

Ohio Rev. Code Ann. § 4117.01(C) (2011) ................................................................18

23

Ohio Rev. Code Ann. § 2741.02(d)(1)......................................................................13

24

Okla. Stat. Ann. Tit. 12, § 1449(d) ..........................................................................13

25

S.D. Codified Laws § 3-18-1 ..................................................................................18

26

Tenn. Code. § 47-25-1107(a) ..................................................................................13

27

Tex. Gov't Code § 617.002 (1993) ...........................................................................17

28

Va. Code Ann. § 40.1-57.2 (1993).......................................................................17, 18

1
2
3
4

**RULES**

5   Fed. R. Civ. P. 23 ................................................................................................ 6, 12

6   Fed. R. Civ. P. 23(a) ................................................................................................. 6

7   Fed. R. Civ. P. 23(a)(2) ............................................................................................ 7

8   Fed. R. Civ. P. 23(a)(4) ............................................................................................ 8

9   Fed. R. Civ. P. 23(b)(2) .......................................................................................... 21

10  Fed. R. Civ. P. 23(b)(3) ............................................................................... 6, 11, 21

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Antitrust Plaintiffs ("APs") move this Court to certify a class potentially spanning hundreds of thousands of current and former Division I football and men's basketball student-athletes ("SAs"), who attended more than 300 schools over the course of 60 years, on the theory that NCAA amateurism rules illegally "restrained" every one of those SAs from selling his school the "broadcast license" supposedly needed to legally broadcast the football or basketball games in which he played. Even ignoring the legal futility of that argument – it is settled law that the NCAA's amateurism rules do ***not*** violate the Sherman Act – APs' motion must be denied because there is no evidence (certainly no common, ***classwide*** evidence) to support it.[1] There is no classwide evidence that APs' hypothetical "broadcast licenses" exist, that NCAA schools would be interested in buying them, or that SAs are in a position to sell them, nor could there be: many state publicity rights laws, and federal Copyright law, deny sporting event participants the legal right to interfere with sports broadcasts.  There is no classwide evidence how APs' hypothetical "group licensing" transactions would be carried out, which of the putative class members might have benefited from those transactions, or how much they might have received. There is no evidence of any kind that the NCAA does anything to restrain former SAs from selling what APs call their "name, image or likeness" ("NIL") after graduation. There is, in short, no evidence, classwide or otherwise, that NCAA amateurism rules actually injured the business or property of the putative class members. The motion should be denied.[2]

## STATEMENT OF FACTS

### I.    The Record Does Not Support Plaintiffs' Motion

APs' motion is remarkable for its lack of supporting evidence. APs submitted ***no*** evidence from the named plaintiffs, for an obvious reason: their sworn testimony does not support this motion. Named plaintiffs admit that no defendant interfered with their efforts to license a collegiate NIL after graduation, using Form "08-3a," any other form, or any other means.

---

[1]   It must also be denied because APs new theory of liability is found nowhere in the SCAC.
[2]   The NCAA also joins the arguments made by EA and CLC in their separate brief.

Wierenga Decl., Exs. 7-22.[3] Former SAs routinely license, for varying fees, their NIL in products like archival footage. Exs. 8-9, 11, 13, 15-16, 18-20, 94-95, 141 (T3Media Decl. ¶¶8-9); *see also* EA/CLC Opp. at 11-14.

The NCAA does not claim it controls SA NIL rights, either during or after their time in school. Ex. 153, Lewis Decl. ¶7-9, Exs. 96-101. NCAA rules have never required SAs to provide licenses for game broadcasts. Ex. 154, Lennon Decl. ¶10-21, and the NCAA does not obtain such releases from student-athletes or anyone else. Ex. 153, Lewis Decl. ¶10; Ex. 96-101. The evidence that APs promised of NCAA "perpetual release" forms being used to "boycott" former SAs has failed to materialize.

Nor does the record contain any – let alone classwide – evidence to support APs' new "live broadcast" theory. That theory hinges on the notion that schools must obtain "group broadcast licenses" from SAs in order to broadcast their games, but APs have submitted no evidence of SAs actually providing those "group licenses" to their schools (or anyone else), much less at a price "fixed" at zero. Nor have APs submitted evidence that (or which) schools would suddenly start seeking such licenses if the NCAA's amateurism rules were eliminated; which SAs those "group licenses" might cover; or how much the SAs might be paid for their share of the "group license." Tellingly, not a single named plaintiff has provided any testimony about NCAA rules supposedly preventing him from selling a "broadcast license" to his school.

## II.    Professor Noll's Proposed Testimony Cannot Substitute for Classwide Evidence

Instead of relying on evidence, APs rely on Roger Noll. Noll proposes to opine that NCAA amateurism rules prevent SAs from collectively negotiating with their schools to sell their "group broadcast licenses." If those amateurism rules were eliminated, he claims, the putative class members – ***all*** of them, from Bill Russell in the 1950s to Patrick Maynor in the 2000s – would have demanded, and received, their school's agreement to pay them exactly 50% of their gross broadcast revenues. Dkt. 633, Noll Rpt. 101-104. He also claims that all of the players on a given team roster – from the superstars like Oscar Robertson to the walk-on who sat on the bench

---

[3]    Unless otherwise noted, exhibits are attached to the Wierenga Declaration.

the entire season – would have split those revenues equally. *Id.* at 105. Noll calls this his "top down" formula. *Id.* at 10. It is not science. Ex. 1, Heckman Rpt. ¶¶27-44.

Noll has no more evidence for any of this than APs do. Noll simply assumes that all SAs "implicitly" license "use" of NILs to their schools, that the NIL "rights" of all of the SAs on a team's "roster" at the start of a season are equally valuable to the schools, and that some coercive mechanism for "collective" negotiation of group licenses between SAs and schools or conferences would develop if NCAA amateurism rules were removed. None of these or numerous other assumptions is supported by evidence or economic theory, and none holds up under real world market conditions. Ex. 2, Rubinfeld Rpt. ¶¶81-152; Stiroh Rpt. ¶¶33-50, 60-108.[4] Nor do any of Noll's simplistic damages calculations – his work in this case is limited to arithmetic, not statistical regressions or correlation analyses – come close to demonstrating classwide impact. Noll admits that (a) he did not model a but-for world, (b) he did not account for many necessary variables, and (c) his assumptions about consistent "group license" terms between schools and conferences, and about "collective negotiations" and equal distribution among teammates, might not hold true. Ex. 4, Noll Dep. 142:13-143:7, 195:20-196:1, 211:7-14, 219:7-220:11, 231:2-4; 405:12-25, 436:9-13; *see also* Ex. 1, Heckman Rpt. ¶14-44. His "methodology" produces accordingly absurd results: he claims, for example, that a walk-on basketball player at Stanford who did not play in a single game would be paid over $230,000 ***per year*** in "group licensing" fees, while Andrew Luck, Stanford's starting quarterback (and top NFL draft pick) would receive less than $40,000. Dkt. 651:5-7, Noll Rpt. at Appx. C-A13, C-A21.[5] This brief is supported by the Expert Reports of James Heckman, Ph.D., Daniel Rubinfeld, Ph.D., and Lauren Stiroh, Ph.D.[6]

## ARGUMENT

---

[4]    Lauren Stiroh, Ph.D.'s report is filed as Ex. C to the Declaration of Christina Fahmy in support of the EA/CLC brief.

[5]    Ex. 2, Rubinfeld Rpt. ¶99.

[6]    Professor Heckman is a widely recognized expert on human capital investments. He concludes that Noll does not provide any "reliable methodology" or "rigorous" or "principled economic model" to support a claim of class-wide impact or damages, that student-athletes attain better human capital and labor market outcomes than their peers, and that Noll "ignores human capital investments and instead attributes harm based on arbitrary simplifications" Ex. 1, Heckman Rpt. ¶¶11-12, 14-26, 27-31.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). This Court must therefore conduct a "rigorous analysis" of APs' proffered class-wide claims and proof, even if "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011). Such factual disputes are resolved by the "persuasiveness of the evidence presented." *Mendez v. R+L Carriers, Inc.*, No. C 11-2478 CW, 2012 WL 5868973, at *10 (N.D. Cal. Nov. 19, 2012) (Wilken, J.). APs' motion does not withstand "rigorous analysis."

I.      **Class Membership Is Not Ascertainable**

A party seeking class certification must demonstrate that an identifiable and ascertainable class exists. *Mazur v. eBay Inc.,* 257 F.R.D. 563, 567 (N.D. Cal. 2009). The class must be sufficiently definite to determine if a particular person is a member. *See, e.g., Pryor v. Aerotek Scientific, LLC,* 278 F.R.D. 516, 523 (C.D. Cal. 2011). APs' proposed class includes all former FBS football and Division I men's basketball players "whose images, likenesses and/or names have been included in game footage or in videogames licensed or sold by Defendants, their co-conspirators, or their licensees from July 21, 2005."  CCM at 1-2. Hundreds of thousands of people are potentially in this class, and APs have provided no method to determine which potential members actually satisfy the class definition.

*No way to determine which class members had their NIL "included in game footage."* First, APs fail to show that it is possible to identify game footage "licensed or sold" since 2005. APs have not provided such a list; they have only generated a list of "game footage" **broadcast** in Nielsen metered markets (omitting over 20% of the country) during one year. Ex. 5, Gerbrandt Dep. 102:13-24.; Ex. 156, Stiroh/Van Leeuwen Decl. This is not sufficient; plaintiffs have not shown that games are "licensed or sold" the same year they are broadcast. Moreover, even if APs could show which **teams** had game footage "licensed or sold" during the class period, they have

provided no feasible way to determine which **class members** appeared in that footage.[7] APs' response to this problem is to simply assume it away and use an inaccurate assumption as a proxy: that a school or conference would need a release from every SA who appears on a team's "roster" at the start of a given year.[8] This is indefensible. It is common for FBS football and men's basketball "rosters" of the sort used by Professor Noll to include SAs who never take the field, much less "appear" in the broadcast; it is equally common for FBS football and men's basketball teams to play games that are never broadcast or rebroadcast. Ex. 143, Elgin Decl. ¶10; Ex. 145, Welty Decl. ¶¶8-9; Ex. 146, Harker Decl. ¶7; Ex. 147, Ex. 148, Univ. Texas-Austin Decl. ¶7;Womack Decl. ¶¶9-12; Ex. 150, Scott Decl. ¶10; Ex. 152, LeCrone Decl. ¶7; Ex. 157, Massaro Decl. ¶7; Ex. 158, Von Der Merwe ¶6. Neither APs nor their experts attempt to account for this disconnect between the actual evidence and their class definition.

  ***No way to determine which "game footage" was licensed by "defendants or their co-conspirators."*** Nor have APs proposed an administratively feasible method of delineating which sales of "game footage" were supposedly made pursuant to the alleged "conspiracy," and which were not. APs cannot claim the involvement of the NCAA in all of the licensing deals, since the NCAA licenses only "game footage" from the Division I men's basketball championship, and plays no role in the sale or licensing of "game footage" from regular season men's basketball games or FBS football games. Ex. 4, Noll Dep. 470:13-471:20; Ex. 3, Delany Decl. ¶4; Ex. 103, Traviolia Decl. ¶ 6; Ex. 145, Welty Decl. ¶¶ 8-9; Ex. 147, Womack Decl. ¶8; Ex. 148, Univ. Texas-Austin Decl. ¶7; Ex. 151, Bowlsby Decl. ¶5; Ex. 153, Lewis Decl. ¶¶3-5. Nor can they point to the existence of NCAA rules, since they have made no showing that those rules have any common effect on the language included in "game footage" licensing deals. The broadcast contracts that have been produced in this case contain terms which vary widely with respect to the rights that are being transferred.[9] There is no feasible way for the court to determine which of

---

[7]   Ex. 37, APs' Amended Responses to NCAA's Second Set of Interrogatories at 9 ("there is no clearly identifiable way to determine every instance of re-broadcast or clip usage that is not unduly burdensome for Plaintiffs."); *see also* Ex. 5, Gerbrandt Dep. 121:11-122:16.
[8]   Ex. 4, Noll Dep. 136:19-137:15; 138:13-139-1.
[9]   *See* Wahl Decl., Exs. 1-75.

these broadcast contracts – much less the untold others that APs failed to obtain during discovery – were made pursuant to the alleged "conspiracy," and which were not. *In re Hotel Tel. Charges,* 500 F.2d 86, 89 (9th Cir. 1974) (class could not be certified when plaintiffs would have to prove numerous alleged co-conspirators each "knowingly participated" in the conspiracy).[10]

## II.  The Class Does Not Satisfy Rule 23

The APs have also failed to satisfy Rules 23(a) and 23(b)(3). APs' brief relies heavily on cases in which classes pursuing price-fixing theories were certified, but those cases get them nowhere, because this is not a price-fixing case.[11] APs have not offered any evidence that student-athletes ***actually*** transfer "group licensing" rights in "game footage" or videogames to their school or conference at any "price," fixed or otherwise. Instead, they rely on Noll's assertions that (1) since such transfers supposedly "must" occur in order for games to be broadcast, the transfers must be happening "implicitly,"[12] and (2) since he cannot observe any real-world payments being made in connection with these imaginary transactions, the price must be "fixed" at zero. Noll Dep. 224:6-228:6. APs would thus have this Court believe that this is a price-fixing case in which both the transactions, and the prices, are wholly hypothetical (but nonetheless wholly restrained).

Nonsense. It is far more accurate to characterize this as a case involving "business not done." APs are claiming that NCAA rules prevented APs, while they were SAs, from ***attempting*** to sell their NIL rights in "game footage" or videogames. Ex. 4, Noll Dep. 224:6-228:6. APs have avoided this far more accurate characterization of their claims because "business not done" cases are much harder to certify as class actions than price-fixing cases. *In re NCAA I-A Walk-On*

---

[10]  *See also Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978).

[11]  APs also rely heavily on cases that predate *Dukes* and the recent amendments to Rule 23, or were decided before plaintiffs had the benefit of full discovery. *See, e.g.*, *White v. NCAA*, 2:06-cv-0099, Doc. No. 95 (C.D. Cal. Oct. 19, 2006) (Dkt. 651-2, Ex. 41); *Chamberlan v. Ford Motor Co.*, 402 F.2d 952, 962 (9th Cir. 2005); *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *2 (N.D. Cal. June 5, 2006); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005). Those cases are of little help on this motion, which was filed after plaintiffs had the benefit of several years of discovery.

[12]  Noll has to call the transfers "implicit" because there is no evidence of them actually happening. APs, and Noll, ignore the contracts produced as evidence in this case, which show wide variety in rights-granting provisions. *See* Wahl Decl., Exs. 6-11, 13-30, 32-38; Stiroh Rpt. ¶47; Rubinfeld Rpt. ¶¶81-100. Gerbrandt disagreed with Noll's "implicit" theory. Ex. 5, Gerbrandt Dep. at 260:12-16.

*Football Players Litigation*, No. C-04-1254C, 2006 WL 1207915, at *7 (W.D. Wash. May 3, 2006) ("*Walk-Ons*") (discussing problems with certifying class actions in antitrust cases "where claims involve amounts of business *not done*") (emphasis in original).[13]

That this case involves potential, not actual, "sales" of SAs' NIL rights creates several highly individualized issues that preclude certification. Unlike plaintiffs in price-fixing cases, APs must prove more than the existence of a conspiracy and the effect it had on prices. Instead, they must prove: (1) the existence of the "product" SAs were purportedly "prevented" from selling (i.e., a valuable legal right in the broadcast of "game footage"); (2) their ability to sell that "product"; (3) the willingness and ability of their school or conference to buy the "product;" (4) the "price" that would have been paid and (5) what effect, if any, NCAA rules might have had on these hypothetical transactions. They must do this for a class that appears to include hundreds of thousands of potential "sellers," who would have been dealing with more than 300 different "buyers," over some 60 years, dating back to a time when the ultimate products about which APs complain—"lucrative" television broadcasts of college sports—simply did not exist at all, much less in the form they exist today. APs' flimsy attempts to demonstrate how this herculean task could be achieved on behalf of the class as a whole do not withstand rigorous analysis.

A.      **The class does not satisfy Rule 23(a)(2)**

APs have failed to satisfy the test for commonality established in *Dukes* and *Ellis*. In *Dukes*, the Supreme Court noted that "[w]hat matters to class certification is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 131 S.Ct. at 2551. The Ninth Circuit held the same in *Ellis*, finding that evidence of an employer's pervasive culture of gender stereotyping would not be sufficient to satisfy Rule 23(a)(2) without evidence showing that those pervasive attitudes resulted in actual, classwide gender discrimination. 657 F.3d at 983.

APs fail to clear a similar hurdle here. Their proposed showing that class members competed pursuant to uniform NCAA amateurism rules does ***not*** constitute classwide evidence

---

[13]      *See also In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. 549, 554-55 (N.D. Cal. 1998); *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 544-49 (E.D. Pa.1976).

that it was those rules – and not some other cause – that caused class members allegedly not to be paid for the supposed "inclusion" of their NIL in "game footage" or videogames. APs have failed to provide classwide evidence that SAs actually transfer their "group broadcast rights" to schools or conferences in the real world, or that they would begin making (or being paid for) those transfers if NCAA amateurism rules were eliminated. *See* Section II.C., below. This evidentiary gap between plaintiffs' proposed common liability issue ("Are the NCAA's amateurism rules legal?") and the question their theory would require this Court to answer ("Was it the NCAA's rules, or something else, that prevented class members from being paid for 'appearing' in 'game footage' or videogames?") means that NCAA rules are not enough to establish commonality.

### B.    The class does not satisfy Rule 23(a)(4)

The APs' proposed classwide proofs also fail to satisfy the adequacy requirement of Rule 23(a)(4) because they create intolerable conflicts between class members.[14]

***There is an actual, present conflict regarding which class members would have been able to sell their NIL rights, and for how much.*** The first conflict between the putative class members arises from a fact that Noll readily admits: in the real world, some class members have more valuable "licensing" rights than others, and some class members have rights that are effectively worthless. Ex. 4, Noll Dep. 191:4-8. Noll testified at length in a prior matter that the value of athletes' NIL rights can vary dramatically from player to player, and for that reason it is wrong to assume those players would share "group licensing" revenue equally.[15]  The record here is consistent: neither the NFL or NBA "group licensing" programs necessarily result in payments to all players. *See* Gordon Decl. ¶¶7-17 and Klempner Decl.¶9 (players must be on roster for 41 games) (submitted with EA/CLC brief); Rubinfeld Rpt. ¶2.

---

[14]    Additionally, APs fail to satisfy Rule 23(a)(4) because the named APs do not want to represent, or believe they are representing, current SAs. *See, e.g.*, Ex. 15, O'Bannon Dep. 278:6-17; Ex. 7, Ellis Dep. 105:4-11. This alone makes named APs inadequate class representatives. *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 579-81 (C.D. Cal. 2010) (Rule 23(a)(4) not satisfied where named plaintiffs did not wish to represent non-famous class members).

[15]    In *Parrish v. NFLPA*, Noll testified that only 379 out of 2095 retired NFL players who participated in the NFLPA's group licensing program earned any licensing income. Ex. 6, Noll *Parrish* Report at 21-23. Of those who received licensing revenue, the top 100 NFL players received over 90 percent of payments, while the bottom 179 NFL players received only 2 percent. *Id.* at 23.

As a result, the putative class members have an actual, present conflict over both (1) who would have been successful in APs' purported but-for world in selling their NIL rights, and (2) how much money they would have earned from those sales. *Walk-Ons* is instructive. The *Walk-Ons* plaintiffs sought to certify a class of FBS football players who had played without receiving a scholarship, arguing that the class members' failure to receive financial aid was caused by the NCAA bylaw that limits FBS schools to providing 85 football scholarships. 2006 WL 1207915 at *1-2. In support of their motion, plaintiffs offered expert testimony that purported to demonstrate that in the "but-for" world, each school would have offered 20 additional scholarships. Critically, however, plaintiffs could not identify **which** class members would have received those scholarships, creating the possibility of serious conflict:

> If, for example, the players can prove that each school would have awarded 20 additional scholarships, they then will have to prove *who* would have received those scholarships – and for each to prove that *he* would have been in that group, he will have to prove that others were not. Therefore, *even if* the Court accepts the sufficiency of Plaintiffs' expert's proposed method of establishing classwide antitrust injury and classwide damages, the Court finds that no method at all has been presented by Plaintiffs' expert to deal with the problem of intra-class antagonism at the damages calculation and distribution phase.

*Id.* at *9 (emphasis in original). Rule 23(a)(4) therefore was not satisfied. *Id.*

This class presents the same, fatal conflict. APs' proposed damages methodology will produce only a lump damages sum for each football and basketball team, and APs have "no method at all" to deal with conflicts between class members over how the damages should be apportioned. This is an actual conflict, because every dollar awarded to one class member is necessarily a dollar taken from another.[16] APs attempt to avoid this by having Noll assert that class members would have uniformly sold their rights in "group licenses" that divided revenue absolutely equally between every player on a particular team, but this assumes the problem away rather than solving it, since equal apportionment reduces payments to "high-value" players in favor of increasing payments to "low-value" players.[17] Ex.2 , Rubinfeld Rpt. ¶¶69-80, 101-124;

---

[16]  *See Yeager's Fuel, Inc. v. Penn. Power & Light Co.*, 162 F.R.D. 471, 478 (E.D. Pa. 1995) (Class conflicts prevent certification of a class of " competitors in a limited market seeking damages for lost business"); Stiroh Rpt. ¶¶89-101.

[17]  This problem is made worse by the insuperable difficulties in determining who is in the class,

Stiroh Rpt. ¶¶89-101.  Noll concedes this problem too, admitting that SAs in a competitive market would not adopt his "equal division" approach to revenue distribution unless they were coerced into doing so by some third party—a union, some "union-like" collective or perhaps a mandatory conference rule. Ex. 4, Noll Dep. 431:11-15. Noll's admission that his damages model could be achieved only through coercion, and would not be the "free market" result in a but-for world, is an admission that class members have antagonistic interests. The class cannot be certified. *See Glictronix Corp. v. AT&T*, 603 F. Supp. 552, 585-86 (D.N.J. 1984).

   ***Substitution effects would create intolerable conflicts.*** Noll also concedes that removing NCAA amateurism rules, or radically increasing the amount of money schools give to football and men's basketball players, would change which SAs attended which schools. *See also* Ex. 1, Heckman Rpt. ¶¶21-23. Noll theorizes that, if NCAA rules did not exist, SAs who in the real world did not play NCAA sports would have done so. Dkt. 633, Noll Rpt. at 58-59; Ex. 4, Noll Dep. 364:13-365:13. Those hypothetical entering SAs would have displaced at least some of the SAs who actually ***did*** play, and are now putative class members. Ex. 2, Rubinfeld Rpt. ¶173; Ex. 4, Noll Dep. 209:14-18, 210:20-25, 219:7-17. Since this latter group of SAs cannot claim to have been injured by the NCAA amateurism rules—they benefited from those rules, Ex. 1, Heckman Rpt. ¶¶39-41—this creates a conflict between class members, who would be competing to prove that they would not have been one of the SAs displaced by Noll's admitted substitution effect. The same conflict prevented certification in *Walk-Ons*. 2006 WL 1207915 at *8-9[18]

   There is a similar issue even for putative class members who would remain in the class after Noll's "hypothetical" SAs substituted back into NCAA athletics. Noll's model implies that different NCAA schools would have paid different amounts to their SAs: *e.g.*, some NCAA basketball teams would pay "licensing" fees worth more than $300,000 per year, while others

---

as Noll's "sample" damages analyses make plain. In many instances, the number of players recorded on the rosters used by Noll is contradicted by other, publicly available rosters for the team in question – sometimes substantially so. Wierenga Decl. ¶¶43-81. Noll, for example, reports 77 players on the 2009 Mississippi State football roster; a different roster reports 101 players. *Id.* at ¶46.The fact that Noll's "methodology" simply divides team damages by number of players makes this a conflicts issue, because some SAs would prefer the smaller roster be used, while others (who appear only on the larger roster) would prefer the larger.
[18]   *See also Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988).

would have paid only $3,000 or less. This obviously would incentivize SAs on the "poorer-paying" teams to attempt to win slots on the "better-paying" teams, likely causing a "cascade effect" of substitution among the class members. Talented class members at schools with smaller "license rights" would no doubt argue that they would—and could—have taken roster spots from walk-ons at larger schools, if there could be more than a million dollars at stake (as APs' model absurdly suggests). Ex. 2, Rubinfeld Rpt. ¶172; Stiroh Rpt. ¶¶82; Ex. 146, Harker Decl. ¶¶11-13; Ex. 148, Univ. Texas-Austin ¶17. This type of internal conflict between class members is unacceptable. *See Walk-Ons*, 1207915 WL at *8-9, 11-14.

### C.   The class does not satisfy Rule 23(b)(3) [19]

#### 1.   Individual issues of causation and antitrust impact will predominate.

APs' assertion that they need do nothing more than allege a horizontal conspiracy to satisfy predominance, CCM at 4, is incorrect. *Hotel Tel. Charges*, 500 F.2d at 87-89 ("The appellees' allegation that a conspiracy existed to violate the antitrust laws does not insure that common questions will predominate"); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 326 (3rd Cir. 2008). APs must also demonstrate that they can use common evidence to prove that each class member has suffered antitrust "impact," that is, an actual injury caused by the defendants' alleged wrongdoing. "Proof of injury is an essential substantive element of an antitrust claim," *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226, 233 (9th Cir. 1974), and APs must show that "each member of the class was in fact injured." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008). [20] "Predominance will not be found" when injury or impact can only be shown individually. *In re Online DVD Rental Antitrust Litig.*, 2010 WL 5396064, at *6 (N.D. Cal Dec. 23, 2010).

APs, again, have offered no evidence on impact, choosing to rely instead on their SCAC

---

[19]   In order to satisfy Rule 23(b)(3), plaintiffs must demonstrate that common questions of law and fact predominate over individual issues and that class action is a superior method to resolve the claims. *Zinzer v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1188-1193 (9th Cir. 2001).

[20]   That APs' case is brought as a class action does not excuse absent class members from making this showing. Courts may not "allow the procedural device of the class action to wear away the substantive requirements to maintain a private antitrust cause of action." *Hotel Tel. Charges*, 500 F.2d at 89.

allegations and Professor Noll. CCM at 17-21. As *Dukes* made clear, the former is insufficient as a matter of law; Rule 23 is not a pleading standard. 131 S. Ct. at 2551. Nor do Noll's *ipse dixit* assertions and evidence-free "methodology" suffice. [21]

a.   No common evidence of former SAs impacted by vertical boycotts

Former SAs compete freely to sell whatever rights they own after graduation. *See* Ex. 4, Noll Dep. 420:4-11. There is *no* evidence to the contrary, and no evidence—let alone ***common*** evidence—that the NCAA, any current or prior NCAA "form," or any "lingering" effect of NCAA rules  prevents former SAs from selling their NILs, either individually or as a group. *Id.* Indeed, there is ample evidence to the contrary. The NCAA does not control SA NIL rights, and specifically informs SAs and third parties that SAs retain their rights. Ex. 154, Lennon Decl. ¶¶4-9; Exs. 96-97, 99, 101. When the NCAA licenses its copyrighted footage, it specifically disclaims ownership of any rights that individuals pictured in the footage may own, including those of SAs. Ex. 153, Lewis Decl. ¶¶7-10. T3Media, which manages the NCAA's footage archive, does the same. Ex. 141, T3Media Decl. ¶6. Indeed, former SAs are frequently paid for their appearances in licensed archival footage, and neither the NCAA nor its licensees takes any steps to prevent this. Ex. 141,T3Media Decl. ¶¶8-9; Exs. 94-95, T3Media Releases; Exs. 9, 15. Former SAs are also frequently paid for appearing in trading cards, video games and other types of merchandise, also without NCAA interference. *See* EA/CLC Opp. at 12-14; Exs. 8-9, 11, 13, 15-16, 18-20. This evidence of former SAs engaging in the sale or licensing of their NILs, unaffected by the NCAA, its licensees, its rules or its forms, is flatly inconsistent with APs' approach of simply presuming that every "failure" of class members to be paid for the (hypothetical) "inclusion" of their NIL in "game footage" must be the result of an antitrust conspiracy.

b.   No common evidence of SAs impacted by a horizontal restraint.

Nor do APs have any method of proving antitrust injury to SAs on a classwide basis on

---

[21]   *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491-92 (N.D. Cal. 2008) (plaintiffs must "demonstrate through 'properly-analyzed, reliable evidence' that a common method of proof exists to prove impact on a class-wide basis"); *New Motor Vehicles,* 522 F.3d at 28 (when class proponents pursue "a novel or complex theory as to injury" the district court "must engage in a searching inquiry into the viability of that theory and the existence of the facts necessary" for it.)

their claims related to the NCAA's amateurism rules. APs rely on their expert's assertion that former SAs are impacted *after* graduation because the rules (a supposed "horizontal" agreement among NCAA members) illegally "forced" them to "implicitly" "transfer" their "group licensing" rights to their school or conference, for free, *while they were still in school*, by preventing SAs from threatening to withhold those rights unless their school promised to engage in post-graduation broadcast revenue sharing. Ex. 4, Noll Dep. 227:22-228:24. Noll's "group licensing transactions" raise a host of individualized issues.

*No common evidence that SAs have "broadcast licenses" to sell.* The "product" Noll claims SAs would be selling absent NCAA amateurism rules is the legal permission to include their NIL in live broadcasts of NCAA football or men's basketball games. Ex. 4, Noll Dep. at 138:19-139:1. As a necessary first step to proving their claims, therefore, each class member would have to establish that he actually owned such a right, which is a question of state publicity rights law. *Id.*; Noll Dep. 203:14-16. This cannot be done on a classwide basis, because several states, including California, have publicity rights laws that expressly exempt sports broadcasts from uses that require participant consent. *See, e.g.*, Cal. Civ. Code § 3344(d).[22]   Several others have right of publicity laws that do not extend to newsworthy events.[23]   No SA governed by these state laws at the time of his attempted "sale" of his "broadcast license" would have had anything to sell, which creates serious individualized liability issues. Nor have APs explained how an SA without a legally cognizable "broadcast right" could have antitrust standing to pursue a claim based on those rights. *See Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003) (antitrust plaintiffs must show that they were "an actual competitor . . . or ready to be a competitor" in the relevant market). Class members whose states deny them legal rights related to game broadcasts were not "ready to be a competitor" for the sale of those rights.

*No common evidence that schools would purchase SA "broadcast licenses."* Even if

---

[22]   *See also* Ohio Rev. Code Ann. § 2741.02(d)(1); Neb. Rev. Stat. § 597.790(c); Okla. Stat. Ann. Tit. 12, § 1449(d); Tenn. Code. § 47-25-1107(a); Florida Statutes § 540.08 (news broadcasts).

[23]   *See, e.g., Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995); *Toffoloni v. LFP Publ'g Group, LLC*, 572 F.3d 1201 (11th Cir. 2009); *Haskell v. Stauffer Comm., Inc.*, 26 Kan. App. 541 (1999); *Walter v. NBC Television Network, Inc.*, 811 N.Y.S.2d 521 (2006).

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
ANN ARBOR

APs could present classwide evidence that class members all had a "broadcast right" to sell, that would not be sufficient to prove that those transactions would have occurred but for NCAA rules. APs have put no evidence in the record that schools or conferences think they need to obtain those rights from game participants before a broadcast, and the evidence is to the contrary. Ex. 2, Rubinfeld Rpt. ¶¶82-85; Ex. 145, Welty Decl. ¶¶12-13; Ex. 148, Univ. Texas-Austin Decl. ¶9; Ex. 155, Hatch Decl. ¶¶ 10-11; Ex. 158, Van Der Merwe ¶¶10-11; Ex. 160, Swofford Decl. ¶12. It is well settled that the Copyright Act would preempt any claim related to the broadcasts of games in which putative class members appeared. *See, e.g., Baltimore Orioles, Inc. v. MLB Players Ass'n*, 805 F.2d 663, 674-75 (7th Cir. 1986); *Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146, 1155 (9th Cir. 2010). Similarly, several courts have held that the First Amendment preempts the application of right of publicity laws to matters of public interest, including sports broadcasts and media. *See, e.g., C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007); *CBS Interactive Inc. v. NFL Players Ass'n, Inc*., 259 F.R.D. 398 (D. Minn. 2009); *Gionfriddo v. Major League Baseball*, 94 Cal.App.4th 400 (2001). In light of these legal authorities establishing that APs' hypothetical "group licenses" are not needed for live or archival broadcasts,[24] a school-by-school inquiry would be needed to determine whether, and which, schools might nonetheless be willing to pay for those unnecessary "licenses."[25] Ex. 2, Rubinfeld Rpt. ¶¶82-85, 106-109; Stiroh Rpt. ¶¶48-50.

  ***No common evidence of the value of SA "broadcast licenses."*** Noll's "model" of hypothetical "group license" transactions depends on the assumption that the SAs on a team can stop their games from being broadcast by collectively withholding permission for that broadcast. Ex. 4, Noll Dep. 138:19-139:1. This supposedly makes every player on the roster a "co-monopolist" with every other player, and the school, over the right to make the broadcast. This "co-monopoly," and the (necessarily) equal value it supposedly endows on each player's "broadcast license," is the primary support for Noll's "equal allocation" model of damages. *Id.* at

---

[24] *Gionfriddo*, 94 Cal.App.4th at 410 ("It is manifest that as news occurs, or as a baseball season unfolds, the First Amendment will protect mere recitations of the players' accomplishments").
[25] Indeed, Professor Noll concedes he did not model a but-for world based on market forces that would account for the impact of copyright preemption. Ex. 4, Noll Dep. 167:13-23.

177:3-23. But neither evidence nor economic theory supports it, and the analysis of SA "leverage" his "model" requires would be highly individualized. Ex. 2, Rubinfeld Rpt. ¶¶69-80; Ex. 148, Univ. Texas-Austin Decl. ¶¶14-17; Ex. 159, Carter Decl. ¶9.

First, Noll's "model" inappropriately ignores the fact that, even under his theory, a school would not need a "broadcast license" from players who appear on a roster but do not play in the game. The potential value of a SA's "broadcast license" would thus rise and fall with the likelihood that he would appear in the game, which in turn would depend on the value of his "athletic labor," i.e., his skill. Ex. 2, Rubinfeld Rpt. ¶¶76, 98-99, 154-55. Players whose skills made it certain or likely they would play would have more valuable rights than other, less-skilled players; players who certainly would ***not*** play (because they were injured, had been "redshirted," or simply were not good enough) would hold "licenses" with no value. *Id.* APs have no way of distinguishing between players with valuable "athletic labor" (and thus valuable "broadcast licenses") and those without,[26] nor have they attempted to demonstrate how any class members would have fared in a market for their "licenses" that was free of the alleged restraint . The class cannot be certified without this evidence. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (to establish antitrust impact, plaintiffs are "required to construct a hypothetical market, a but-for market, free of the restraints alleged to be anticompetitive").

Without Noll's "equal leverage" assumption, APs would be left to prove that the individual "value" of each class member's NIL was such that every NCAA school would have been willing to license the NIL at the "price" generated by Noll's damages models. Noll admits that he has done no econometric work to demonstrate that would be the case, Ex. 4, Noll Dep. 24:14-20, and the absurdity of his damages calculations proves why it cannot be presumed. Noll claims, for example, that the "price" for the "broadcast license" held by a University of Florida

---

[26]   At his deposition, Noll tried to fill this hole in his theory by claiming that every player would have equal leverage before the season began, when schools were unsure who would play and the fourth-string punter's "broadcast license" was every bit as valuable as the star quarterback's. Noll Dep. at 138:19-139:1. But he has no evidence to support his notion that before a season schools have absolutely no ability to tell which players will play and which won't, and it makes no sense. Noll has done no work to demonstrate that "preseason" values of SA "broadcast licenses" would be completely detached from the expected value of their "athletic labor," as his "equal leverage" model illogically requires. Ex. 2, Rubinfeld Rpt. ¶¶95-96.

basketball player *who did not play in a single game* would have been $295,475 in 2009. The "price" for similar players at the University of Mississippi would be $254,651; at USC it would be $186,865. The "price" for walk-on and starting football players alike at Mississippi State would be $66,610; Alabama, $62,548; Arizona State, $44,497. Exs. 38-41, Noll Appendices.

In *Walk-Ons*, the court refused to certify a class based on the presumption that every class member would have received full athletic scholarships absent NCAA rules. 2006 WL 1207915 at *9. APs are now asking this Court to certify a class based on the presumption that the same SAs would have received significantly ***more*** money in payment for their "broadcast licenses," regardless of whether those players actually played or appeared in broadcasts. The Court cannot do so.[27] APs' failure to provide a common method for demonstrating the value of each class member's "broadcast license" means that individual questions of impact and damages will predominate, as the parties litigated which class members held "broadcast licenses" valuable enough for schools to purchase, and at what price. *See* Stiroh Rpt. ¶¶89-91; Ex. 6, Noll *Parrish* Rpt. at 11-12, 21-23, 47, 50. Antitrust cases brought by employees based on "wage-fixing" theories[28] pose very similar problems, and courts typically refuse to certify classes in those cases.[29] The same problems prevent certification here.

Second, APs have not introduced any classwide evidence that SAs would uniformly have been willing to exercise any "leverage" created by their alleged ownership of critical "broadcast rights" by threatening to sit out of televised games, or even quit a team, if they did not like the "licensing" deal offered by their school. *Cf.* Ex. 4, Noll Dep. 185:2-186:3. APs have literally no evidence that any SA would be willing to do so, nor has Noll performed any actual analysis of the extent to which SAs could drive up the "price" of their "broadcast licenses" by threatening to

---

[27]   *See Blades v. Monsanto Co.*, 400 F.3d 562, 572-74 (8th Cir. 2005) (denying class certification when plaintiffs failed to offer evidence connecting alleged price-fixing conspiracy to classwide evidence of injury).

[28]   APs themselves seem to think this is an apt comparison; they claim this case involves a restraint on a "labor input" market. CCM at 19.

[29]   *See Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009); *Fleischman v. Albany Med. Center*, No. 1:06-cv-765, 2008 WL 2945993, at *6 (N.D.N.Y. July 28, 2008); *In re Compensation of Managerial, Prof'l & Technical Emp.Antitrust Litig.*, No. 02-cv-2924, 2008 WL 3887619 (D.N.J. Aug. 20, 2008); *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136 (D.N.J. 2002); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 202 n.5 (2d Cir. 2001).

withhold those licenses from the market.  This is fatal to their motion.[30]

Noll attempts to avoid all of these problems by claiming that the professional leagues prove that his "equal allocation" model is possible, but that does not work. Even if the Court ignored the very obvious problem that NFL and NBA players are professional, unionized employees and SAs are not, Ex. 1, Heckman Rpt. ¶¶14-19, 36-38, the examples undercut, rather than support, his point. The NFL and NBA do **not** distribute broadcast revenue equally to every player on their teams' rosters in exchange for a "group broadcast license;" instead, that money is used to fund player salaries, which can vary tremendously from player to player. *See* Klempner Decl. ¶¶12-13; Gordon Decl. ¶22; Ex. 2, Rubinfeld Rpt. ¶¶76, 118-136; Stiroh Rpt. ¶100. The NFL and NBA "group licenses" to which Noll refers relate to merchandise, not broadcast, *id.*, and APs are no longer attempting to license a merchandise class. Noll's theory finds no support in the professional leagues.

*No common evidence as to how the "group licensing" transactions would be carried out.* As Noll admits, there are a number of ways that his hypothesized "group licensing" negotiations could take place. Ex. 4, Noll Dep. 431:11-15. Would players sell their hypothetical group license to their school? Their conference? As part of a union, or some other collective? When—during the recruiting process, before each game, or some other time? Noll has no evidence on any of these questions. Ex. 2, Rubinfeld Rpt. ¶¶50-51. He appears to assume that collective bargaining by football or men's basketball SAs is at least a possibility, Ex. 4, Noll Dep. 186:12-187:25, but that is dubious at best; federal labor law does not apply to state institutions, and many states prohibit public entities, including public universities, from engaging in collective bargaining.[31] Nor would the uniform ability to organize necessarily provide for common impact,

---

[30]   *See Hydrogen Peroxide*, 552 F.3d at 325 (antitrust plaintiffs must show that impact is both "plausible in theory" *and* "susceptible to proof at trial through available evidence common to the class"); *Somers v. Apple, Inc.*, 258 F.R.D. 354, 359-61 (N.D. Cal. 2009) (denying class certification when expert did not proffer a specific economic model or examine data).

[31]   All states and the "political subdivisions thereof" are exempt from the National Labor Relations Act, 129 U.S.C. § 152(2), and this exemption includes state universities. *See, e.g.*, *Jackson v. Temple Univ. of Com. Sys. of Higher Educ.*, 721 F.2d 931, 933 (3d Cir. 1983). States where collective bargaining with state employees is prohibited: Ga. Code Ann. § 20-2-989.10 (1992) (Georgia); N.C. Gen. Stat. § 95-98 (1959) (North Carolina); *Branch v. City of Myrtle Beach*, 532 S.E.2d 289, 292 (S.C. 2000); Tex. Gov't Code § 617.002 (1993) (Texas); Va. Code

because the type of union would matter a great deal: a "group licensing" deal struck by a school-specific union, for example, might differ from that by a conference-wide union, let alone a NCAA-wide union. Ex. 2, Rubinfeld Rpt. ¶¶90-91, 142-52, 176-77, 184-89; Stiroh Rpt. ¶¶36, 43, 84-86. All of these "collectively negotiated" deals would likely look very different than a licensing scheme imposed by conference rule, which Noll also admits would be possible and might vary from conference to conference. Ex. 4, Noll Dep. 220:8-11; Ex. 2, Rubinfeld Rpt. ¶¶90-91, 168. And all of these hypothetical "group" deals would differ substantially from licensing deals struck between individual SAs and schools. Noll has not demonstrated how any of this could be resolved on a class-wide basis, a failure that is fatal to APs' motion.

*No common evidence which Division I schools would spend more money on their football or men's basketball players.* Nor have APs provided any common evidence, which, if any, of the hundreds of schools fielding men's basketball and FBS football teams would actually respond to the removal of NCAA amateurism rules by agreeing to provide additional financial assistance beyond whatever the class member received in the real world. Ex. 1, Heckman Rpt. ¶¶27-35. APs' class certification theory depends on the assumption that each and every one of the schools in question would be willing, and able, to split its "broadcast revenue" 50-50 with its football and men's basketball players, a loss of significant revenue compared to real world practice. Ex. 3, Delany Decl. ¶8; Ex. 147, Womack Decl. ¶23; Ex. 149, White Decl. ¶5; Ex. 146, Harker Decl. ¶17. APs provide no evidence to support this assumption, and it is incorrect.

Professor Noll admits that some schools might exit Division I or FBS football rather than professionalize their men's basketball and football teams, and both the record evidence and economic theory support that hypothesis. Ex.4, Noll Dep. 131:14-20, 361:3-362:25; Ex. 2, Rubinfeld Rpt. ¶¶182-83; Ex. 147, Womack Decl. ¶¶6, 23;Ex. 3, Delany Decl. ¶10; Ex. 149,

Ann. § 40.1-57.2 (1993) (Virginia). States where university students cannot collectively bargain: Colo. Exec. Order D 028 07(II)(B) (Colorado); Fla. Stat. § 447.203(3)(i) (2007) (Florida); Haw. Rev. Stat. § 89-6(f)(14) (2012) (Hawaii); 5 Ill. Comp. Stat. § 315/3(n) (2011) (Illinois); Iowa Code § 20.4(4) (2010) (Iowa); Md. Code, State Pers. & Pens. § 3-102 (2012) (Maryland); Minn. Stat. § 179A.03 (2012) (Minnesota); Ohio Rev. Code Ann. § 4117.01(C) (2011) (Ohio); S.D. Codified Laws § 3-18-1 (South Dakota); *Retail Clerks Local 187 AFL-CIO v. Univ. of Wyoming*, 531 P.2d 884, 888 (Wyo. 1975).

White Decl. ¶7; Ex. 144, Albrecht Decl. ¶¶11-12; Ex. 148, Univ. Texas-Austin Decl. ¶19; Ex. 146, Harker Decl. ¶¶11-19. The likelihood that at least some schools would simply stop providing athletics-based financial aid in AP's "but for" world – either by eliminating their football or men's basketball team, or by adopting a Division III model of prohibiting all athletics-based aid – means that some portion of the class is better off in the real world than they would have been in AP's "but for" world, and therefore suffered no antitrust impact from Division I's allegedly illegal rules. APs have no method of dealing with this, or sorting out which putative class members were impacted and which were not. Nor do they have a common method for dealing with the "substitution effects" discussed above in section II.B, which creates similar issues regarding individualized impact.

### 2. Individual statute of limitations defenses will predominate

APs' abandonment of the *post-eligibility* theory in their SCAC, in favor of a theory focused on negotiations between putative class members and their schools or conferences while they are in school, raises statute of limitations issues for each individual class member that will predominate over common issues. Because many putative class members (including most of the named plaintiffs) attended school well outside the applicable 4-year limitations period, this creates obvious, individualized statute of limitations defenses. *See Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237-38 (9th Cir. 1987).[32] Those defenses will predominate.

### 3.   Individual defenses of assignment and release preclude certification

Individual defenses based on releases that class members have given to their schools, conferences or third parties would also predominate over any common issues. The record demonstrates that many class members have, in fact, released any claims they might have related to the broadcast or rebroadcast of their sporting events. Exs. 23-24. It is undisputed that these

---

[32]   APs will no doubt claim that class members' claims are timely under the continuing violation doctrine, but the continuing violation doctrine is a fact-specific inquiry; a plaintiff is required to show that defendants took an actual, additional illegal act that caused antitrust injury within the limitations period. *Id.* Plaintiffs have proposed no way that showing could be made with common evidence for tens or hundreds of thousands of class members. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 327 (4th Cir. 2006) (class not certified when plaintiffs failed to show that statute of limitations defenses could be resolved with common evidence).

releases are ***not*** required by NCAA rules, nor are they issued pursuant to those rules. Ex. 154, Lennon Decl. ¶¶19-21; Exs. 96, 100. APs have provided no common proof that these releases were "coerced" as a part of any alleged "conspiracy," and that cannot simply be presumed. The court would have to conduct an individualized inquiry related to each release. *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Products Liab. Litig.*, No. 10-2172-CJC, 2013 WL 150205, at *4, (C.D. Cal. Jan. 9, 2013).

### 4.   Individual damages issues will predominate

Individualized damages issues would also predominate. The record in this case demonstrates that licensing transactions are inherently individualized, with some players able to command large sums and many unable to command any sums at all. Ex. 2, Rubinfeld Rpt. ¶¶69-81. Even Noll agrees with this. Ex. 6, Noll Parrish Rpt. 21-23. APs have failed to demonstrate how the Court could address these individualized issues on behalf of the class.

APs have not fixed this problem with Noll's simplistic damages formula. Antitrust plaintiffs are required "to anticipate a hypothetical free market" when establishing damages. *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir.1985); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1125 (E.D. Cal. 2002). Noll admits he did not attempt to do so. Ex. 4, Noll Dep. 195:20-196:1, 231:2-4. Instead, his approach is pure speculation: there is no record evidence that, but-for NCAA rules, putative class members would uniformly have entered into his "equal allocation" group licensing deals. While antitrust plaintiffs are given some leeway when proving damages, speculation is not permitted. *Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1205 (1st Cir. 1987) (antitrust damages evidence that is "pure speculation and guesswork" is insufficient as a matter of law); *see also Somers*, 258 F.R.D. at 359-61; *Wilcox Dev. Co. v. First Interstate Bank of Oregon, N.A.*, 97 F.R.D. 440, 447 (D. Or. 1983). Nor are APs permitted to pursue a "fluid recovery" approach to damages, as Noll does by aggregating damages across the class in a manner that does not accurately reflect the number of plaintiffs actually injured by defendants or the amount of economic harm actually caused by defendants. *New Motor Vehicles,* 522 F.3d at 28. This approach to damages violates the Rules

Enabling Act, 28 U.S.C. § 2072(b), and has been rejected by this Circuit and others. *Hotel Tel. Antitrust Lit.*, 500 F.2d at 89-90 (9th Cir. 1974); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008).

### 5.   A class action is not superior to individual actions

Finally, APs have failed to demonstrate that a class action would be superior to individual litigation of the class members' purported claims. Their complete failure to collect classwide data renders classwide resolution of their claims impossible, and certainly not superior to individual cases. Moreover, permitting APs to attempt to prove their purely hypothetical theory, on behalf of their ill-defined yet massive class, would be utterly unmanageable, and would involve impermissible compromises for both class members (whose purportedly valuable damages claims are reduced to crude averages) and defendants (who have many highly individualized defenses that cannot be addressed in a class proceeding). *Walk-Ons*, 2006 WL 1207915, at *14 (class action not superior when "[t]he potential of thousands of complicated jury trials on antitrust injury and damages is great").

Nor have APs demonstrated any particular reason why these claims must, or should, be resolved in a class action. If the individual damages claims really are as big as APs claim, with class members routinely entitled to hundreds of thousands of dollars in damages, *see* Exs. 38-41, Ex. 2, Rubinfeld Rpt. ¶168, individual actions are possible, eliminating the need or desirability of class resolution. *Walk-Ons*, 2006 WL 1207915 at *14 (class action not superior "when the recovery for each individual – the cost of an entire college education in some cases – likely would be substantial enough to encourage" individual suits). [33]

### D.   The proposed class cannot be certified under Rule 23(b)(2)

APs' request to certify the class under Rule 23(b)(2) must also be rejected. *Dukes* clearly established that "individualized monetary claims belong in Rule 23(b)(3)," not Rule 23(b)(2) classes, 131 S.Ct. at 2558, and potentially permissible "incidental" monetary claims are obviously not what APs are seeking here. *Id.* at 2560-61. APs seek substantial damages on behalf of a class

---

[33]   Plaintiffs' request to certify a class related to their state law claims fail for all of the above reasons, since plaintiffs have never articulated a basis for liability beyond their antitrust claims.

of persons who are overwhelmingly no longer eligible for NCAA athletics and, therefore, could not benefit from injunctive relief aimed at changing the NCAA's amateurism or eligibility rules. The APs' demand for damages predominates over any request for injunctive relief.

Moreover, the named plaintiffs, who are all ***former*** SAs, do not have standing to seek injunctive relief in the form of NCAA rules changes, since they could not possibly benefit from, or be affected by, those changes. They cannot represent a class seeking relief that they personally do not have standing to seek. *See, e.g., Wang v. Chinese Daily News, Inc.*, __ F.3d __, No. 08-55483, 2013 WL 781715, at *4 (9th Cir. March 4, 2013).

## III. Professor Noll's Proposed Testimony Is Not Admissible

Professor Noll's proposed economic testimony falls far short of the standard for admissible economics evidence.[34] Noll admits that he has done none of the necessary work to support his opinions via a scientific methodology or to consider relevant variables. Ex. 4, Noll Dep. 139:2-10, 195:4-7, 209:14-210:25, 212:8-20, 219:7-220:11. He concedes he did not construct a model to demonstrate what would have happened in the but-for world without the NCAA's amateurism rules. *Id.* at 195:20-196:1, 231:2-4. He did not perform a regression or any other form of econometric analysis to support his opinions on liability or common impact.[35] *Id.* at 24:14-20. He admits that one of the key features of his "model"—the 50-50 "revenue split" between schools and class members—is based not on any economic analysis, but rather his personal "assumption" that it is correct. *Id.* at 120:8-121:14. His only "calculations" are simple arithmetic used to calculate damages for SAs who were on actual rosters—though he admits that those may not be the SAs who would have been on the "but-for" rosters.[36] Dkt. 633, Noll Rpt. 58-

---

[34]   The fact that Noll holds a PhD, and has testified in many past antitrust cases, is not sufficient to make his every opinion a matter of expert economic analysis. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995) ("*Daubert II*") ("something doesn't become 'scientific knowledge' just because it's uttered by a scientist"); *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010).

[35]   This lack of actual economic analysis distinguishes Noll's work here from his work in *In re SRAM*, where Noll performed a correlation analysis. *In re SRAM Antitrust Litig.*, No. 07-MD-01819-CW, 2010 WL 5141861, at *3 (N.D. Cal. Dec. 13, 2010).

[36]   Additionally, Noll has not even performed all of the damages calculations he claims are necessary. Noll has only calculated damages for 22 schools out of the roughly 346 who participate in Division I men's basketball and FBS football. Noll admitted he would like additional discovery, but discovery is closed. Ex. 4, Noll Dep. 33:8-24.

59; Ex. 4, Noll Dep. 207:24-208:3, 210:7-211:14. He has provided no scientific methodology capable of being tested or "falsified" as required under *Daubert*. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) (internal citation omitted); *Ellis*, 657 F.3d at 982 "Personal opinion, not science, is testifying here." *Daubert II*, 43 F.3d at 1316.[37]

Nor would Noll's testimony be admissible even if the Court overlooked his failure to employ reliable economic methodologies. Noll admits that he failed to consider multiple variables that would have likely had a large impact on his analysis, making his "methodology" little more than his own opinion and intuition.[38] For example, Noll's model relies on the existence of a union, "collective" or other means of "coercion" to force class members to accept the non-market "prices" implied by that model, but he has no idea, let alone evidence, how that coercion would come about. Second, Noll admits that removing NCAA rules could result in schools or conferences offering different levels of payment to different "equivalence classes" of student-athletes, Ex. 4, Noll Dep. 191-4-8, but his model has no means of identifying, or dealing with, this likelihood of differential impact. Third, Noll admits that, faced with a 50% reduction of revenue, some schools might exit college sports, change divisions or offer fewer scholarships. *Id.* at 131:14-20; 361:3-362:25. His model therefore awards damages to some number of class members who benefited from the alleged restraint, rather than being injured by it, and he has no means of identifying those class members. Finally, Noll's model is based on the (frankly ludicrous) assumption that class members who attended school 50 years ago would have reached exactly the same "media deals" with their schools as current student-athletes might reach, even though he admits the marketplace changed radically over that time. *Id.* at 243:19-245:15.

At every turn, Noll simply ignored facts and variables that would almost certainly change the outcomes in his proposed world. "Expert testimony is useful as a guide to interpreting market

---

[37]  *See also Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (When expert "assumed" that lost growth was due to defendants' alleged conspiracy but did not determine what other factors may have affected the growth rate, the opinion was not admitted, as it "failed to incorporate all aspects of economic reality").

[38]  *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (where expert failed to test his hypothesis by calculating any of the relevant variables, his report was based on "nothing more than his training and years of experience" and his testimony was excluded).

facts, but it is not a substitute for them." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). His testimony is not admissible.

## IV.  Mr. Gerbrandt's Proposed Testimony is Not Admissible

Plaintiffs proffer Mr. Gerbrandt as a media expert who can provide a basis for Noll to divide broadcast revenue between current and former SAs, but his deposition testimony shows that he flunks the first requirement of an expert witness: he cannot testify about the "expert" analysis he proposes to provide. He admits that the calculations underlying his analysis were performed by unidentified employees of the OSKR consulting firm, not him, and he could not answer basic questions about how that work was done. *See, e.g.,* Ex. 5, Gerbrandt Dep. 114:9-23. His lack of familiarity with the methods and reasons underlying "his" proposed testimony precludes him from offering that testimony in this case. *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993); *see also* Ex. 156, Stiroh/Van Leeuwen Decl.

## V.  The Court Should Not Permit Plaintiffs to Amend Their Complaint

As noted in Defendants' Motion to Strike, Dkt. 639, APs are seeking to certify unpled class claims based on a theory which, for three years, they denied they were advancing. This was APs' deliberate, tactical decision, and they should not be permitted to amend their SCAC at this late date to avoid the consequences of that decision. Each of the relevant elements, "(1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party," *Texaco, Inc. v. Ponsolt*, 939 F.2d 794, 799 (9th Cir. 1991), weighs against amendment.

APs clearly engaged in undue delay and bad faith. *See, e.g.*, Dkt. 639 at 19-21. APs not only failed to seek timely leave to amend while discovery was still open, they rejected  the possibility of amendment when asked by Magistrate Judge Cousins at the October 3, 2012, hearing, ***after*** defendants objected to their change in theory. 10/3/12 Tr. at 22:24-23:3.[39] There is no reason to relieve them of that choice. *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393 (9th Cir. 1986); *Lopez v. Smith* 203 F.3d 1122 (9th Cir. 2001).

Moreover, defendants would be substantially and unfairly prejudiced by amendment at

---

[39]  APs further insisted to the Court in responding to Defendants' Motion to Strike that there was no need to amend the SCAC. Dkt. 643 at 14-16.

this late date. Defendants and the Court took APs at their word that this case did not involve live broadcast, or a challenge to the NCAA's amateurism rules, and discovery was limited accordingly. Dkt. 639 at 7-8, 20. Defendants instead provided significant and costly discovery aimed at APs' claims that defendants had organized vertical conspiracies to "boycott" former SAs after graduation, issues that APs have essentially abandoned.[40] Defendants would require significant **additional** discovery to address APs' challenge to the NCAA's amateurism rules. This justifies denying amendment. *Texaco*, 939 F.3d at 799; *Zivkovic v. S. Ca. Edison Co.*, 302 F.3d 1080 (9th Cir. 2002).

Finally, any amendment to challenge the NCAA's amateurism and eligibility rules under the antitrust laws would be futile. *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001). APs' class claims mount a frontal assault on the NCAA's amateurism rules: their theory is that the Sherman Act **requires** that NCAA schools be permitted to engage in full-throated commercial competition for SAs, with payments of more than $1 million per SA over the course of a 4- or 5-year collegiate career supposedly becoming commonplace. It is settled law, however, that the NCAA amateurism and eligibility rules that prevent this "pay-for-play" approach to college athletics are presumptively procompetitive and reasonable as a matter of law. *See, e.g.*, Dkt. 639 at 20-21; *Rock v. NCAA*, 2013 WL 786775 at *12 (S.D. Ind. Mar. 1, 2013) (NCAA Division III prohibition on athletics-based financial aid is "presumptively pro-competitive as a matter of law"). APs' attack on these settled legal principals would be futile.

Respectfully submitted,

Dated: March 14, 2013                          Schiff Hardin LLP


                                               By: */s/ Gregory L. Curtner*
                                               _____
                                                    Gregory L. Curtner
                                                    Attorneys for Defendant
                                                    National Collegiate Athletic Association

---

[40]  The NCAA produced substantial written and testimonial discovery, all tailored to the SCAC, none of it covering APs' new "live broadcast" theory. Kefalas Declaration.

1

2

**CERTIFICATE OF SERVICE**

3      I hereby certify that on March 14, 2013, I electronically filed the foregoing document with the

4      Clerk of the Court using the CM/ECF system which will send notification to the e-mail

5      addresses registered.

6

7

By:   */s/ Gregory L. Curtner*

8      Gregory L. Curtner (*pro hac vice*)
SCHIFF HARDIN LLP

9      Attorneys for Defendant NCAA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28