1  Michael P. Lehmann (Cal. Bar No. 77152)
   Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
2  HAUSFELD LLP
3  44 Montgomery St., 34th Floor
   San Francisco, CA 94104
4  Tel:  (415) 633-1908
   Fax:  (415) 358-4980
5  E-mail:mlehmann@hausfeldllp.com
           abailey@hausfeldllp.com
6
7  Michael D. Hausfeld (*pro hac vice*)
   Hilary K. Scherrer (Cal. Bar No. 209451)
8  Sathya S. Gosselin (Cal. Bar No. 269171)
   HAUSFELD LLP
9  1700 K Street, NW, Suite 650
   Washington, DC 20006
10 Tel:  (202) 540-7200
   Fax:  (202) 540-7201
11 E-mail: mhausfeld@hausfeldllp.com
           hscherrer@hausfeldllp.com
12          sgosselin@hausfeldllp.com
13
   *Plaintiffs' Interim Co-Lead Class Counsel*
14 *with Principal Responsibility for the Antitrust Claims*

15                **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**
16                      **OAKLAND DIVISION**

17

18 | **IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION** | Case No. 4:09-cv-1967 CW (NC) |

19

20 **REPLY BRIEF OF ANTITRUST PLAINTIFFS IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

21 **This Document Relates to:**

**ANTITRUST PLAINTIFFS' ACTIONS**

22

Date:        June 20, 2013
23 Time:        2:00 p.m.
Judge:       Honorable Claudia Wilken
24 Courtroom:  2, 4th Floor

25

26

27

28

---

1

**TABLE OF CONTENTS**

2

I.      INTRODUCTION .................................................................................. - 1 -

II.     ARGUMENT ........................................................................................ - 3 -

        A.      The Ascertainability Requirement Is Satisfied. ............................... - 3 -

        B.      The Elements of Rule 23(a) Are Satisfied. ..................................... - 6 -

                1.      Common Questions of Law and Fact Exist. .................... - 6 -

                2.      The Proposed Class Representatives Are Adequate. ...................... - 16 -

        C.      Certification of the Proposed Classes Is Appropriate Under Rule 23(b). .. - 18 -

                1.      Common Questions of Law and Fact Predominate. ...................... - 18 -

                        a.      Alleged Individual Issues As To Impact. ......................... - 18 -

                        b.      Alleged Individual Issues As To Damages. ...................... - 29 -

                        c.      Miscellaneous Alleged Individual Issues. .......................... - 29 -

                2.      A Class Action Is The Superior Method of Adjudication. ............. - 30 -

        D.      The Proposed IR Class Satisfies the Requirements of Rule 23(b)(2). ....... - 30 -

III.    SPECIFIC RESPONSES TO EA'S AND CLC'S OPPOSITION ........................ - 32 -

IV.     THE MOTION TO EXCLUDE EXPERT EVIDENCE SHOULD BE
        DENIED. ............................................................................................ - 40 -

V.      CONCLUSION AND RESPONSES TO COURT'S SPECIFIC QUESTIONS.... - 45 -

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

## <u>TABLE OF AUTHORITIES</u>

3
**Page(s)**

CASES

4

5
*A&M Records v. Napster, Inc.*,
 239 F.3d 1004 (9th Cir. 2001) ...................................................................... 19

6

7
*Agnew v. NCAA*,
 683 F.3d 328 (7th Cir. 2012) ........................................................................ 9

8
*Alberghetti v. Corbis Corp.*,
 263 F.R.D. 571 (C.D. Cal. 2010).................................................................. 16

9

10
*Amgen, Inc. v. Connecticut Retirement Plans*,
 133 S.Ct. 1184 (2013) ......................................................................... 2, 3, 18

11
*Asad v. Cont'l Airlines, Inc.*,
 314 F. Supp. 2d 726 (N.D. Ohio 2004) ........................................................ 44

12

13
*Augustin v. Jablonsky*,
 461 F.3d 219 (2d Cir. 2006) .......................................................................... 30

14

15
*Bd. of Tr. of the AFTRA Ret. Fund v. JP Morgan Chase Bank, N.A.*,
 269 F.R.D. 340 (S.D.N.Y. 2010) .................................................................. 30

16

17
*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
 620 F.2d 1360 (9th Cir. 1980) ...................................................................... 32

18
*Betancourt v. Maxim Healthcare Servs., Inc.*,
 No. 10 C 4763, 2011 U.S. Dist. LEXIS 43228 (N.D. Ill. Apr. 21, 2011) .............................. 21

19

20
*Borger v. Yamaha Corp.*,
 625 F.2d 390 (2d Cir. 1980) .......................................................................... 33

21

22
*Bowen v. New York News, Inc.*,
 522 F.2d 1242 (2d Cir. 1975), *cert. denied*, 425 U.S. 936 (1976) ................... 33

23
*Breedlove v. Tele-Trip Co.*,
 No. 91 C 5702, 1993 WL 284327 (N.D. Ill. July 27, 1993)..................................... 31

24

25
*C & W Constr. Co. v. Bhd. of Carpenters & Joiners of Am., Local 745*,
 687 F. Supp. 1453 (D. Haw. 1988)................................................................ 33

26
*Calnetics Corp. v. Volkswagen of Am., Inc.*,
 532 F.2d 674 (9th Cir.), *cert. denied*, 429 U.S. 940 (1976) .......................... 33

27

28

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ...................................................................................33

*CBS Broad. Sys., Inc. v. EchoStar Commc'ns Corp.*,
450 F.3d 505 (11th Cir. 2006), *cert. denied*, 549 U.S. 1113 (2007) ......................44

*City of Vernon v. S. Cal. Edison Co.*,
955 F.2d 1361 (9th Cir.), *cert. denied*, 506 U.S. 908 (1992) ................................33

*Comcast, Inc. v. Behrend*,
133 S.Ct. 1426 (2013) .............................................................................................43

*Danny Kresky Enterp. Corp. v. Magid*,
716 F.2d 206 (3d Cir. 1983) ...................................................................................43

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...................................................................... 1, 2, 40, 41

*Downing v. Abercrombie & Fitch*,
265 F.3d 994 (9th Cir. 2001) ..................................................................................22

*Dryer v. NFL*,
689 F. Supp. 2d 1113 (D. Minn. 2010) ...................................................................22

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ..................................................................................40

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ................................................................................45

*Fishman v. Estate of Wirtz*,
807 F.2d 520 (7th Cir. 1986) ..................................................................................43

*Flintkote Co. v. Lysfjord*,
246 F.2d 368 (9th Cir.), *cert. denied*, 355 U.S. 835 (1957) ..................................33

*Glass v. UBS Fin. Servs., Inc.*,
331 Fed. Appx. 452 (9th Cir. 2009) ........................................................................31

*Havoco of Am., Ltd. v. Shell Oil Co.*,
626 F.2d 549 (7th Cir. 1980) ..................................................................................33

*Herrera v. LCS Fin. Servs. Corp.*,
274 F.R.D. 666 (N.D. Cal. 2011) ..............................................................................3

*Hoexter v. Simmons*,
140 F.R.D. 416 (D. Ariz. 1991) ...............................................................................30

*Image Tech. Servs. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998) ................22, 43

*In re Activision Sec. Litig.*,
    621 F. Supp. 415 (N.D. Cal. 1985).................................................................45

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
    276 F.R.D. 364 (C.D. Cal. 2011).................................................................20

*In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*,
    270 F.R.D. 521 (N.D. Cal. 2010) ...............................................................29

*In re Currency Conversion Fee Antitrust Litig.*,
    264 F.R.D. 100 (S.D.N.Y. 2010)................................................................20

*In re Ethylene Diene Monomer Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    256 F.R.D. 82 (S.D.N.Y. 2009), *reconsideration denied*, 681 F. Supp. 2d 141
    (S.D.N.Y. 2010).........................................................................................20

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004).............................................................33

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002), *cert. denied sub nom. Gaylord Container Corp. v.
    Garrett Paper, Inc.*, 538 U.S. 977 (2003) ...................................................29

*In re Mercedes-Benz Antitrust Litig.*,
    157 F. Supp. 2d 355 (D.N.J. 2001).............................................................33

*In re Napster, Inc. Copyright Litig.*,
    191 F. Supp. 2d 1087 (N.D. Cal.), *aff'd sub nom. A&M Records, Inc. v. Napster,
    Inc.*, 284 F.3d 1091 (9th Cir. 2002)...........................................................41

*In re NCAA I-A Walk-On Football Players Litig.*,
    398 F. Supp. 2d 1144 (W.D. Wash. 2005) ...................................................9

*In re NCAA I-A Walk-On Players Litig.*,
    No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006).......................18

*In re Online DVD Rental Antitrust Litig.*,
    No. 09-2029, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ...........................20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    287 F.R.D. 1 (D.D.C. 2012) .......................................................................20

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. C-07-1819 CW, 2010 U.S. Dist. LEXIS 132172 (N.D. Cal. Dec. 10, 2010)...................41

*In re Tableware Antitrust Litig.*,
    241 F.R.D. 644 (N.D. Cal. 2007) ...............................................................41

*In re Toyota Motor Corp. Unintended Acceleration Mktg. Litig.*,
    284 F.R.D. 485 (C.D. Cal. 2012)...................................................................41

*In re Wells Fargo Home Mortg. Overtime Pay Litiig.*,
    527 F.Supp.2d 1053 (N.D. Cal. 2007), *rev'd*, 571 F.3d 953 (9th Cir. 2009) ...........................21

*Ladegaard v. Hard Rock Concrete Cutters, Inc.*,
    No. 00 c 5755, 2000 WL 1774091 (N.D. Ill. Dec. 1, 2000)...................................31

*LaFlamme v. Carpenters Local No. 370 Pension Plan*,
    212 F.R.D. 448 (N.D.N.Y. 2003) ................................................................31

*Lehrman v. Gulf Oil Corp.*,
    500 F.2d 659 (5th Cir. 1974), *cert. denied*, 420 U.S. 929 (1975) .........................43

*Mansourian v. Regents of Univ. of Cal.*,
    602 F.3d 957 (9th Cir. 2010)....................................................................26

*McReynolds v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir.), *cert. denied*, 133 S.Ct. 338 (2012) ...............................45

*Meijer, Inc. v. Abbott Labs.*,
    No. C 07-5985 CW, 2008 U.S. Dist. LEXIS 78219 (N.D. Cal. Aug. 27, 2008)...................16

*Metro. Intercollegiate Basketball Ass'n v. NCAA*,
    339 F. Supp. 2d 545 (S.D.N.Y. 2004) .........................................................9

*Micro Chem, Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003) ...............................................................44

*Midler v. Ford Motor Co.*,
    849 F.2d 460 (9th Cir. 1988) .................................................................22

*Mueller v. Auker*,
    700 F.3d 1180 (9th Cir. 2012) ...............................................................41

*Nachitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
    247 F.R.D. 253 (D. Mass. 2008) ..............................................................20

*Nerland v. Caribou Coffee Co., Inc.*,
    564 F. Supp. 2d 1010 (D. Minn. 2007) ........................................................31

*Oltz v. St. Peter's Cmty. Hosp.*,
    656 F. Supp. 760 (D. Mont. 1987), *aff'd*, 861 F.2d 1440 (9th Cir. 1988) ...................33

*Park v. El Paso Bd. of Realtors*,
    764 F.2d 1053 (5th Cir. 1985), *cert. denied*, 474 U.S. 1102 (1986) .......................43

*Parrish v. NFL Players Ass'n*,
    No. C 07-00943 WHA, 2007 U.S. DIST. LEXIS 86833 (N.D. Cal. Nov. 14, 2007) ...5, 16, 17

v

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ...................................................................................41

*Rock v. NCAA*,
   No. 1:12-cv-1019 JMS DKL, 2013 U.S. Dist. LEXIS 29034 (S.D. Ind. March 1,
   2013)............................................................................................................................9

*Russell v. NCAA*,
   No. C 11–4938 CW, 2012 WL 1747496 (N.D. Cal. May 16, 2012) ("*Russell*").............29, 32

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 970 (2012) ......................................29

*Straus & Straus v. Am. Publishers' Ass'n*,
   231 U.S. 222 (1913) ...................................................................................................22

*Sullivan v.NFL,*
   34 F.3d 1091 (1st Cir. 1994*), cert. denied,* 513 U.S. 1190 (1995)........................................41

*Tunis Bros. Co. v. Ford Motor Co.*,
   763 F.2d 1482 (3d Cir. 1985), *vacated*...................................................................33

*United States v. 1014.16 Acres of Land*,
   558 F. Supp. 1238 (W.D. Mo. 1983), *aff'd*, 739 F.2d 1371 (8th Cir. 1984) ..........................44

*United States v. ASCAP*,
   712 F. Supp. 2d 206................................................................................................41, 42

*United States v. Consol. Packaging Corp.*,
   575 F. 2d 117 (7th Cir. 1978) ...................................................................................33

*United States v. General Motors Corp.*,
   384 U.S. 127 (1966) ...................................................................................................33

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir.), *cert. denied*, 530 U.S. 1268 (2000) ...............................41

*United States v. Paramount Pictures, Inc.*,
   334 U.S. 131 (1948) ...................................................................................................22

*United States v. W. Elec. Co.*,
   767 F. Supp. 308................................................................................................41

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Service
   Workers Int'l. U., AFL-CIO, v. ConocoPhillips Co.*,
   593 F.3d 802 (9th Cir. 2010) ...................................................................................32

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ...................................................................................45

*Vinci v. American Can Co.*,
  9 Ohio St. 3d 98, 459 N.E.2d 507 (1984) .......................................................................16

*Waits v. Frito-Lay, Inc.*,
  978 F.2d 1093 (9th Cir. 1991), *cert. denied*, 506 U.S. 1080 (1993) ......................................22

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011) ........................................................................................6

*Wang v. Chinese Daily News, Inc.*,
  709 F.3d 829 (9th Cir. 2013) ................................................................................31

*Wendt v. Host Int'l, Inc.*,
  125 F.3d 806 (9th Cir. 1997), *cert. denied*, 531 U.S. 811 (2000) .........................................22

*White v. NCAA*,
  No. Civ. No. 06-999-RGK (C.D. Cal.) ("*White*") ..................................................9, 18, 23, 25

*White v. Samsung Elects. Am.*,
  971 F.2d 1395 (9th Cir. 1992), *cert. denied*, 508 U.S. 951 (1993) ......................................21

*Wolph v. Acer Am. Corp.*,
  272 F.R.D. 477 (N.D. Cal. 2011) ............................................................................3

*Zeisel v. Diamond Foods, Inc.*,
  No. C 10–01192 JSW, 2011 WL 2221113 (N.D. Cal. June 7, 2011) ..............................................3

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ......................................................................................19, 31

**STATUTES**

15 U.S.C. § 26 ..............................................................................................31

**OTHER AUTHORITIES**

Fed. R. App. P. 32.1 ........................................................................................31

Fed. R. Civ. P. 15(a)(2) ....................................................................................45

Fed. R. Civ. P. 23(a)(4) ....................................................................................15

Fed. R. Civ. P. 23(b)(2) ...............................................................................passim

Fed. R. Civ. P. 23(b)(3) ......................................................................1, 18, 19, 30

Fed. R. Civ. P. 23(c)(4) ....................................................................................45

Fed. R. Civ. P. 23(g) .......................................................................................45

Fed. R. Civ. P. 37 ................................................................................................................. 1

Fed. R. Evid. 703 ............................................................................................................... 44

N.D. Cal. Civil L.R. 7-3(c) .................................................................................................. 1

## I.    INTRODUCTION

Pursuant to the Court's order on the motion to strike (Dkt. No. 673) ("SO"), as modified by the Court's order permitting Defendants Collegiate Licensing Company ("CLC") and Electronic Arts, Inc. ("EA") to file a separate supplemental brief (Dkt. No. 676), the Antitrust Plaintiffs ("Plaintiffs") hereby file this consolidated reply brief in support of their motion for certification of an antitrust damage class ("AD Class") under Fed. R. Civ. P. 23(b)(3) and a Declaratory and Injunctive Relief Class ("IR Class") under Fed. R. Civ. P. 23(b)(2) and in response to the oppositions of the National Collegiate Athletic Association ("NCAA"), CLC and EA.[1] As required by the SO, this brief also: (a) contains Plaintiffs' opposition to Defendants' motion to exclude the testimony of Plaintiffs' class certification experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*")[2] and (b) contains responses to certain questions asked by the Court.

Plaintiffs assert that the principal restraint challenged here—depressing to zero the amounts paid to current and former student-athletes ("SAs") for use of their names, images and likenesses ("NIL") in television broadcasts and rebroadcasts and in videogames by, *inter alia*, refusing to enter into NIL group licenses with such SAs based on team rosters—was the product of an overarching horizontal and vertical price-fixing conspiracy and a group boycott. This conspiracy was accomplished, *inter alia*, through NCAA Bylaws 12.5.1 and 12.5.2 and related bylaws, rules and standardized forms; a host of NCAA bylaws (as discussed below)

---

[1] These oppositions (respectively, Dkt. Nos. 677 and 680) will be referred to herein as "NCAA Br." and "EA-CLC Br." The definitions of the two proposed Classes are set forth at pages 1-2 of Plaintiffs' initial brief in support of certification (Dkt. No. 651) ("CCM").

[2] Given the liberal standards of admissibility, Plaintiffs make no *Daubert* challenge as to Defendants' experts, but do contend that those expert reports are entitled to little weight, because, *inter alia*, they are based on self-serving declarations from representatives of the NCAA and its members not disclosed in discovery, and has refused to make certain of them available for depositions. Pursuant to Fed.R.Civ.P. 37, Plaintiffs have asked the magistrate judge to either order those depositions to occur or strike those declarations. Dkt. No. 724. Given that the time to take these depositions has now passed, the declarations should be stricken, pursuant to N.D. Cal. Civil L.R. 7-3(c). Defense expert declarations relying on them should be stricken in part as well.

relating to amateurism and prohibiting payments to SAs during their eligibility years; and the NCAA interpretations of these bylaws, all of which applied to all NCAA member conferences and schools and were accepted and implemented by EA and CLC. Defendants have raised numerous common affirmative defenses to these claims. In their briefs, Defendants largely (but not totally) sidestep the issues of conspiracy and those defenses by instead jointly raising a myriad of reasons why class certification should be denied, why EA and CLC did not participate in any alleged conspiracy, why the evidence of Plaintiffs' experts should be excluded under *Daubert*, and why Plaintiffs should not be permitted to amend their "Second Consolidated Amended Class Action Complaint" (May 16, 2011) (Dkt. No. 327) ("SCAC").

These arguments are unavailing. Participants in the proposed classes can be readily identified from Defendants' own records, a fact that they conceal from the Court. The existence of common questions is clear and among them are the questions relating to Defendants' failure to pay former SAs for use of their NIL in game footage and videogames and their justification of this practice on the basis of the NCAA's amateurism rules. Similarly, and contrary to Defendants' arguments, disputes over the "but-for" world where current and former SAs would obtain group licenses for use of their NIL will also not preclude certification. Defendants' other alleged individual issues fly in the face of settled precedent from this district and elsewhere. The proposed IR Class is appropriate for certification under Rule 23(b)(2) because it seeks prospective relief on behalf of current and former SAs, all of whom are being injured by Defendants' ongoing conduct. EA's and CLC's separate arguments relating to alleged lack of common proof of conspiracy are basically a rehash of their prior unsuccessful dismissal motions and are inconsistent with  this Court's prior orders, settled case law, and their own internal documents. Finally, Defendants' *Daubert* motion is patently unwarranted and their position that Plaintiffs may not amend their SCAC (assuming that is what the Court wishes) is belied by controlling Ninth Circuit authority.

Plaintiffs' analysis of Rule 23 in this brief is informed by the United States Supreme Court's recent opinion in *Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 133

S.Ct. 1184 (2013) ("*Amgen*"), where it noted that Rule 23 "grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1194-95.

## II.   ARGUMENT

### A.   The Ascertainability Requirement Is Satisfied.

The Defendants argue that the identities of the members of the proposed classes are insufficiently ascertainable. They overstate the nature of this requirement. The fact that a plaintiff cannot, at the time of moving for class certification, identify all putative class members or might have to resort to documents to identify such members does not preclude certification. "[T]he identity of the class members need not be known at the time of certification" if the class definition is sufficient. *Zeisel v. Diamond Foods, Inc.*, No. C 10–01192 JSW, 2011 WL 2221113, at *6 (N.D. Cal. June 7, 2011). Moreover, "[i]t is not fatal for a class definition to require some inquiry into individual records, as long as the inquiry is not so daunting as to make the class definition insufficient." *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 673 (N.D. Cal. 2011) (internal quotations and citations omitted).[3]

At the outset, it is important to note that the Defendants' arguments on ascertainability distort or camouflage market realities. As explained below, Defendants' broadcast and videogame licenses ██████████████████████████████████████

████████████████████████████████████████ ▪

---

[3] *See Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) (class of purchasers who "experienced problems with their computers" sufficiently ascertainable; "[w]here Plaintiffs' allegations of the existence of a defect are susceptible to proof by generalized evidence, the actual injuries suffered by each class member need not be identical to demonstrate that an identifiable and ascertainable class exists").

[4] *See, e.g.*, SGD Ex. 97 at §§3.1.3, 6.23 (contract between Fox Broadcasting ("Fox") and the Big 12 Conference ("Big 12")); SGD Ex. 98 at §16 (contract between Big 12 and ESPN); SGD Ex. 99 at FBC007, FBC008, FBC009, FBC012 (contract between conferences and Fox), FBC018-22 (2005 and 2009 Cotton Bowl agreements with Fox); Ex. 100 at §15 (agreement between Florida State University and Fox); SGD Ex. 101 at NBCU00008-09 (University of Alabama agreement), NBCU00017-18 (University of Auburn agreement), NBCU00025, NBCU 00028 (Clemson University Agreement), NBCU00070-71 (Georgia Tech agreement), NBCU00119 (University of Miami agreement), NBCU00179-80 (University of Tennessee

1 ████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ███████████████████████████████████████████████

4          The NCAA argues as a preliminary matter that Plaintiffs have not demonstrated which

5 Division I football and basketball game footage was licensed or sold by them since July 21,

6 2005 (four years preceding the filing of the *O'Bannon* complaint). NCAA Br. at 5-6.  In his

7 initial expert report, Plaintiffs' expert, Dr. Roger Noll ("Noll"), identified revenue coming

8 from two sources other than videogames: (a) televised broadcasts and rebroadcasts of game

9 footage and (b) sales or licensing of highlights and clips of game footage by Thought Equity

10 Motion (now T3 Media) and Collegiate Images ("CI")/XOS. Dkt. No. 633 at 96 & Ex. 11

11 ("RNR"). With respect to the former, detailed information on live broadcasts and rebroadcasts

12 of NCAA game footage is available from Nielsen Media Services and was utilized by Larry

13 Gerbrandt ("Gerbrandt") in his expert report. Dkt. No. 634 at ¶¶59-62 ("LGR"). With respect

14 to the latter, Noll did a sample analysis of revenues for clips from Pac-10 and SEC games in

15 2009-10 (broken out by games between particular teams) and clips of  games involving

16 former players that were used during the same period. RNR Exs. C-A6 to A11, C-A19 to 20,

17 C-B1 to B11, D-A6 to A8, D-A17 to A20, B-B4 to D-B8, D-B17.  As discussed below,

18 Plaintiffs can extend this analysis at trial to all sales or licenses from the Class Period.

19          The NCAA also criticizes the Plaintiffs for using team rosters, asserting that there is

20 no "feasible way" to determine which SA appears in game footage and that rosters include

21 many SAs who do not appear in a broadcast. NCAA Br. at 5. EA and CLC likewise contend

22 that there is no "administratively feasible" way to determine whether a SA's NIL was used in

23 the former's videogames without examining thousands of avatars. EA-CLC Br. at 7. These

24 contentions are unpersuasive for several reasons. *First*, as to both the NCAA and EA, they

25

26 agreement), and NBCU00199-200 (Vanderbilt University agreement); SGD Ex. 102 at
   TEXAS000030-31 (agreement between University of Texas ("UT") and ESPN, attached to
27 the accompanying Supplemental Declaration of Sathya S. Gosselin in Support of Class
   Certification ("SGD").

28

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1   ignore how *real world* group licenses are utilized in the analogous setting of professional

2   sports, the benchmark that Noll considered. As Noll testified, in his "but for" world, group

3   licensing transactions would occur at the beginning of a season before any games are played,

4   and would include "the group of players in advance of the season for whom the university has

5   to acquire the right to appear, because they might appear. One—one can't predict in August

6   who's going to play in November." Noll Depo. at 138-39 ("RND") (SGD Ex. 1).

7       This is consistent with how group licenses operate in the real world in professional

8   sports leagues. For example, in *Parrish v. NFL Players Ass'n*, No. C 07-00943 WHA, 2007

9   U.S. Dist. LEXIS 86833, at *8 (N.D. Cal. Nov. 14, 2007), the court quoted retired National

10  Football League ("NFL") player group licensing agreements and noted that "these agreements

11  provided for payments for the names, images, and likenesses of retired players, regardless of

12  whether they were actually used by EA"; it concluded that breach of contract claims were

13  adequately pled, regardless of whether the NIL of the named plaintiffs were ever used under

14  certain EA license agreements. Ronald Klempner, a defense declarant and Executive Director

15  of the National Basketball Players' Association, made a similar point about National

16  Basketball Association ("NBA") group licenses. Dkt. No. 694 at ¶9. Dr. Daniel Rascher

17  ("Rascher"), Director of Academic Programs for the Sport Management Master's Program and

18  Professor at the University of San Francisco and President of SportsEconomics, LLC, states at

19  paragraph 16 of his accompanying rebuttal declaration in support of Plaintiffs ("DRRD") that

20  "the typical practice in *group* licensing in sports is that licenses are negotiated on behalf of the

21  group in advance of usage." (Emphasis in original).[5] *See id.* at ¶¶9-12 (discussing record in

22  the *Parrish* case).

23      *Second*, even if the Court were to deem the present proposed AD Class definition

24  ambiguous in this respect, additional language could be added to it that resolves any alleged

25  ambiguity: "All former student-athletes whose images, likenesses and/or names have been

---

[5] Defendants' expert, Dr. Daniel Rubinfeld ("Rubinfeld") relies on Rascher's testimony in
*Parrish*, (Dkt. No. 681 at ¶117 n. 145), but the latter's declaration refutes the former's
conclusions.

1   included *or could have been included (by virtue of their appearance in a preseason team*

2   *roster)* in game footage or in videogames."[6]

3      *Third*, EA argues that while real-world NCAA Division I football teams have 85-105

4   players, EA uses only 68 players per team in its videogames, so rosters would be

5   overinclusive.  EA-CLC Br. at 9. This argument fails for the reason described above.

6   Moreover, what EA and CLC fail to tell the Court (and as will be discussed in more detail

7   below) is that, even if more specificity were required, "the common practice with EA on all

8   titles" is to use SAs' actual names as "place holders" for in-game avatars. Exh. 20 at

9   CLC0181360 to the first declaration of Sathya Gosselin (Dkt. No. 651) ("FGD"). As the

10  document goes on to say, in modeling the in-game avatars, EA used "current players['] names

11  on the jerseys in the game" but took them out of the final version; EA said that "they have to

12  put the player names in so it will calculate the correct stats but then they take them off." *Id*. at

13  CLC0181361. ██████████████████████████████████████████████████

14  ███████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████████

17  ███████████████    *See* the accompanying Noll rebuttal declaration at 22-24 ("RNRD"). This is

18  discussed in more detail below in the separate section on EA and CLC. In short, those SAs

19  who are included in EA's videogames are readily identifiable ████████████████  and it is

20  disingenuous of EA to pretend otherwise.

21      **B.      The Elements of Rule 23(a) Are Satisfied.**

22          **1.      Common Questions of Law and Fact Exist.**

23      Under *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2556 (2011), only one

24  common question of law or fact is necessary to satisfy the requirements of Rule 23(a)(2).

25  _____

26  [6]Even if some higher standard of identification were needed, records exist making it possible.
    For example, with respect to Division I football, the NCAA maintains a website that shows
    how many games a given SA played. *See, e.g.*, SGD Ex. 2. Likewise, to give a Division I

27  basketball example, ESPN has a website for Division I teams that gives game-by-game recaps
    on a player-by-player basis. *See, e.g.*, SGD Ex. 3.

28

1    Here, there are many.

2        **The NCAA's declarations**. A host of common issues (and an illustration of how the

3    NCAA and its declarants are inconsistent) is provided in two declarations submitted by

4    NCAA personnel: one by Kevin Lennon ("Lennon"), the NCAA's Vice-President of

5    Membership & Academic Affairs for the NCAA ("KLD") (Dkt. No. 695-13) and another by

6    Mark Lewis ("Lewis"), the NCAA's Vice-President for Championships & Alliances of the

7    NCAA ("MLD") (Dkt. No. 695-12)).

8        Lennon says that the NCAA's rules "do not apply" to former SAs. KLD ¶4. This

9    includes NCAA bylaw 12.5.1. *Id.* ¶11. He states that: (a) the NCAA rules do not require SAs

10   to transfer their NIL rights to the NCAA as a condition of eligibility (*Id.* ¶7); (b) that Bylaw

11   12.5.1 does not prevent current SAs from selling or licensing their NIL and does not address

12   any loss of eligibility if an SA did so (*id.* ¶12); and (c) that this bylaw does not require an SA

13   to consent to use of his NIL for any promotion permissible under that bylaw (*id.* ¶14). Lennon

14   views NCAA Form 08-3a (and its predecessors and successors) as merely asking SAs to

15   consent to their "use" in such promotions. *Id.* ¶15. He claims that an SA who refused to sign

16   the form would still be eligible to play NCAA sports. *Id.* ¶16. Lennon says NCAA rules do

17   not require SAs to convey their NIL to the NCAA with respect to game broadcasts and

18   rebroadcasts and no SA has been declared ineligible because he has refused to sign a release

19   form issued by a school or conference relating to such broadcasts or rebroadcasts. *Id.* ¶¶19-20.

20   He goes on to state that "[t]here are no NCAA rules that specifically address the possibility of

21   a student-athlete being paid, or receiving a promise of payment, in exchange for permission to

22   broadcast a sporting event in which the student-athlete appears. An agreement to pay, or

23   promise to pay, a student-athlete in this manner would likely constitute a violation of several

24   of the NCAA's general amateurism and eligibility  rules. . . ." *Id.* ¶22. He then lists eight such

25   rules, all of which the NCAA's member institutions are bound to obey. *Id.* He says that in

26   determining whether EA makes appropriate use of SAs' NIL, these rules are considered. *Id.*

27   ¶24. *See* RNRD at 15-17.

28

1    Lewis says that: (a) the NCAA licensing to television networks of the broadcast rights

2  to NCAA championship games has nothing to do with the NCAA's amateurism or eligibility

3  rules. MLD ¶6; (b) the NCAA has never sold or licensed the NIL of current or former SAs

4  and when it licenses archival footage, the license does not cover the rights of any individuals

5  depicted in the footage. *Id.* ¶¶7-8; and (c) the NCAA is not the owner of any individual rights

6  that may exist with respect to rebroadcasts and does not obtain licenses or releases from any

7  SAs that appear in broadcasts of its championship events. *Id.* ¶¶9-10. Lewis does not cite to

8  the NCAA's amateurism bylaws.

9    These two declarations present a host of common questions of law and fact.   There is

10  a common question as to what rights to an SA's NIL the NCAA and its member institutions

11  have. Plaintiffs agree that the NCAA and its constituent entities do not own SAs' NIL rights

12  and cannot use them without the SAs' consent or release and without proper remuneration.

13  But several of the defense declarants, such as those for the Missouri Valley Conference and

14  the Horizon League, say that they can convey current and former SAs' NIL to broadcasters,

15  but have obtained no releases from the affected SAs. Dkt. No. 695-2 at ¶¶12, 17; Dkt. No,

16  695-11 at ¶¶11, 17.  Other declarants, including those for UT, Wake Forest University, or the

17  Atlantic Coast Conference, say they do not need releases or consents from SAs who appear in

18  the broadcasts of their games.  Dkt. No. 695-7 at ¶9;  Dkt. No. 695-14 at ¶11; Dkt. No. 695-19

19  at ¶12. Dr. James Heckman ("Heckman"), one of the defense experts, testified in his

20  deposition that "[m]y understanding on an athlete currently enrolled in a college that has him

21  sign a contract, is that he loses—a contract that forbids him, basically appropriates or gives

22  the university or the college the right to his names, likeness and image, that he forfeits the

23  right to that and that such contracts are common among individuals in these Division I

24  conferences." Heckman Depo. at 29-30 (SGD Ex. 5).

25    There is also a common question as to the SAs' ownership of their respective NILs.

26  Plaintiffs agree that SAs own the rights in their individual NILs at all times, both during their

27  eligibility years and after they graduate. They also agree that these rights are applicable to the

28

1    use of their NIL in game broadcasts and rebroadcasts and in videogames. However, as noted

2    above, Heckman disagrees with these conclusions, saying that SAs do "surrender" their NIL

3    rights during their eligibility years. *Id*. at 26-27. His position is contrary to that of Lennon's

4    and more consistent with the NCAA's counsel previous statements to the Court that those

5    rights cannot be exercised while an SA is in college. *See* Plaintiffs' opposition to the motion

6    to strike at 13 (Dkt. No. 646) ("MTSO"). Plaintiffs' view is that an SA's NIL rights can be

7    exercised at all times and that an SA can be remunerated after graduation for agreeing to

8    license his NIL rights during his eligibility years.

9         Another common question is whether the NCAA rules apply to former SAs.  Plaintiffs

10   agree that they should have no application whatsoever; however, former SAs are foreclosed

11   from receiving deferred compensation for broadcasts or rebroadcasts of footage of NCAA

12   games generated during their eligibility years. Defendants' expert, Lauren Stiroh ("Stiroh"),

13   conceded in her deposition that SAs get no direct revenue allocations from broadcast contracts

14   and that this is a common issue. Stiroh Depo. at 76-77, 79 (SGD Ex. 6).

15        As for Bylaw 12.5.1, there is a common question as to whether it is part of the

16   NCAA's eligibility/amateurism rules. Plaintiffs agree that it is not; it is a commercial rule

17   subject to antitrust scrutiny, as courts have held with respect to other NCAA commercial

18   rules.[7] There is also a common question as to how Bylaw 12.5.1 (and related Bylaw 12.5.2)

19   have been and should be interpreted; Plaintiffs contend that the NCAA and its member

20

21

22   [7] *See, e.g., Agnew v. NCAA*, 683 F.3d 328, 344 (7th Cir. 2012) ("*Agnew*") (NCAA rules
     limiting sports scholarships to one year and limiting the number of sports scholarships per
23   team); *In re NCAA I-A Walk-On Football Players Litig.*, 398 F. Supp. 2d 1144, 1149 (W.D.
     Wash. 2005) (NCAA rules dealing with grant-in-aid scholarships); *Metro. Intercollegiate
24   Basketball Ass'n v. NCAA*, 339 F. Supp. 2d 545, 547-48 (S.D.N.Y. 2004) (NCAA postseason
     rules alleged to protect the connection between athletics and academics); *Rock v. NCAA*, No.
25   1:12-cv-1019 JMS DKL, 2013 U.S. Dist. LEXIS 29034, at *12-13 (S.D. Ind. March 1, 2013)
     (following *Agnew*); Civil Minutes at 3-4 (Sept. 20, 2006) in *White v. NCAA*, No. Civ. No. 06-
26   999-RGK (MANx) (C.D. Cal.) ("*White*") (attached as SGD Ex. 7). *See also* SGD Exs. 8
     (recent legal article criticizing NCAA's amateurism defense), 89 (2013 report by the Drake
27   Group ("Drake Group Report") criticizing NCAA's use of amateurism rules to deny
     compensation to SAs for use of NIL). *See also* RNRD at 19-20, 37-39.

28
     ─────────────────────────────────────────────
                                    - 9 -
     ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1 institutions have interpreted those bylaws to give them the power to use an SA's NIL without

2 consent or remuneration.

3         With respect to the common questions of the meaning and effect of NCAA Form 08-

4 3a (and its predecessors and successors), Plaintiffs agree that it should not be viewed as an

5 open-ended conveyance of the right to use an SA's NIL in connection with any promotional

6 use. That has not been the view of the NCAA, however. The language of Part IV of the

7 standard form—authorizing the NCAA or those acting on its behalf to use an SA's NIL "in

8 accordance with NCAA Bylaw 12.5, including to promote NCAA championships, or other

9 NCAA events, activities or programs" (Dkt. No. 695-16 at Ex. A) —has been interpreted by

10 the highest NCAA executives to encompass use of an SA's NIL in broadcasts, rebroadcasts

11 and videogames.[8]

12         Plaintiffs also assert that the signing of Part IV of NCAA Form 08-3a (and its

13 predecessors and successors) should not be a prerequisite to eligibility in Division I men's

14 football or basketball. But the instructions on each such form state that Part IV must be

15 "complet[ed] and sign[ed]" in order to "participate in intercollegiate competition." SGD Ex.

16 9. The NCAA's own personnel have noted that this Form is given to incoming SAs as part of

17 a mass of initial documents to sign with little explanation. CCM at 4 n.3.[9]

18

19     ———————————

[8] Since the filing of the *O'Bannon* lawsuit, certain NCAA member conferences or
20 universities, like the Southeastern Conference ("SEC") or UT, have promulgated additional
release forms. The SEC's form specifically grants broadcast rights to the NCAA as well. Dkt.
21 No. 695-6 at ¶15. UT's form specifically incorporates by reference the NCAA rules. Dkt. No.
695-7 at Ex. A. As noted above, Heckman testified that these types of clauses are common in
22 Division I conferences.

23 [9]As one recent article has noted, "[i]n a recent survey of 213 Division I compliance officers,
Ithaca College sport management professor Ellen Staurowsky found that 20 percent have
24 witnessed athletes who did not want to sign part or all of the Student-Athlete Statement,
which helps make an athlete eligible. Staurowsky said compliance officers tell athletes to sign
25 anyway. When Staurowsky asked if the document giving the NCAA promotional rights is
necessary for an athlete to sign to be eligible, 80 percent of compliance officers said it is not.
26 Yet many tell their athletes that it is. 'Many said that it really doesn't have anything to do with
eligibility, apart from the fact that (compliance officers say) in order to be eligible athletes
27 must sign that form,' Staurowsky said. 'That's a very interesting way of explaining things.'"
SGD Ex. 11.

28

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1    Lennon's declaration specifically notes that any attempt to pay SAs for use of their

2    NIL rights is "likely" to render them ineligible under the NCAA's amateurism rules. This is a

3    common question as well. Plaintiffs contend that Defendants' use of the NCAA's amateurism

4    rules as a defense to this suit is a ruse and that if compensation for use of an SA's NIL is

5    deferred until after graduation, the amateurism rules do not apply because, as Lennon admits,

6    the amateurism rules have no application to former SAs. Indeed, Lennon's position about the

7    potential applicability of amateurism rules is difficult to reconcile with his citation to the

8    lawsuit by Johnny Manziel ("Manziel"), the Heisman Trophy-winning freshman quarterback

9    at Texas A&M University, for infringement of his "Johnny Football" trademark. KLD ¶9. In

10   that situation, a current SA is being allowed to keep any proceeds of a suit to redress

11   misappropriation of his NIL so long as those proceeds are not paid to him until after his

12   eligibility expires. SGD Ex. 10. There exists the obvious question of why this is permissible

13   for Manziel, but putative members of the AD Class cannot be paid after they graduate for use

14   of their NIL during their eligibility years.

15       Thus, the Lennon and Lewis declarations themselves raise a host of common issues.

16       **Common questions as to alleged immunization of the NCAA's conduct under the**

17   **antitrust laws and the agreement among the NCAA and its members**. In addition to

18   Lennon's declaration, Defendants raise issues in their briefs of whether the NCAA's

19   amateurism rules immunize them from antitrust liability and whether there is any evidence of

20   an agreement among the NCAA and its members with respect to the conduct at issue. NCAA

21   Br. at 1, 7-8, 12; EA-CLC Br. at 15-16. These also are common questions of law and fact and

22   the record shows that they can be answered by considering the common, classwide evidence

23   of the conduct of the NCAA and its members.

24       Walter Byers ("Byers"), Executive Director of the NCAA from 1951 to 1987, laid out

25   some of the background on amateurism and the NCAA in his 1995 book *Unsportsmanlike*

26   *Conduct*, excerpts of which are attached as Ex. 11 to the FGD. He noted that suggestions for

27   changing the compensation rules for SAs (a term he disfavored) were proposed at the 89th

28

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1    NCAA Conference in January of 1995 and were met with a "defensive circling of the

2    wagons"; "the NCAA leadership unanimously agreed that it would be heresy to permit

3    athletes to have equal access to the marketplace, say, for example, like coaches." *Id*. at 371,

4    372. Byers was clear: "[c]ollege amateurism is not a moral issue; it is an economic

5    camouflage for monopoly practice." *Id*. at 376. Most sports governing bodies have abandoned

6    any moralistic stand on amateurism; "[t]he NCAA seems to be an island, defending its

7    exclusive view for the benefit of its clients, the member colleges." *Id*. at 378. As Byers went

8    on to note, "[p]rotecting young people from commercial evils is a transparent excuse for

9    monopoly operations that benefit others"; he called on the courts to use the antitrust laws to

10    "break up the collegiate cartel." *Id*. at 388.

11        In a November 2007 e-mail, ███████████████████████████████

12    ████████████████████████████████████████████████

13    ████████████████████████████████████████

14    ████████████████████████████████████████

15    ██████████████████████████████████████████████

16    ████████████████████████████████████████████

17    ██████████████████████████████████████████████

18    ██████████████████████████████████████████████

19    SGD Ex. 12 at NCAAPROD00247417.

20        Brand wanted to permit the further exploitation of an SA's NIL, but not pay the SA for

21    doing so. In this goal, he had an ally in David Berst ("Berst"), Vice-President for the NCAA's

22    Division I. In January of 2008, Berst conducted a study of amateurism in the NCAA and

23    concluded it was "a definition that was not steeped in any sacred absolute principle that had to

24    be preserved. It continues to be a balancing of vocation vs. avocation influences and can be

25    modified as views change while preserving the line between us and the pros." FGD Ex. 59 at

26    NCAAPROD00141286. In a subsequent e-mail, Berst told Brand that it was only in the

27    1960s-early 1970s that the members of the NCAA realized that college sports could be a

28

1   significant revenue generator; Berst believed that the NCAA should permit the use of a SA's

2   NIL, so long as the SA continued to receive no remuneration. FGD Ex. 61 at

3   NCAAPROD185745-46. Brand liked the idea and wanted something to recommend to the

4   Presidents. As discussed further below, the NCAA's philosophy as to EA's use of SAs' NIL

5   in its videogames also reflected Brand's views. Indeed, as Greg Shaheen ("Shaheen"), former

6   NCAA Senior Vice-President, Basketball and Business Strategies testified in his deposition,

7   Brand was known to implement legislative proposals relating to SAs' rights that had yet to be

8   formally accepted by the Presidents. Shaheen Depo. at 150-57 (SGD Ex. 13).

9          During this period, internal committees of the NCAA proposed NCAA Legislation

10  2010-26 (and related legislation extending back to 2004) that would have expanded Bylaw

11  12.5.1 to more broadly codify the NCAA's ability to exploit SAs' NIL. One of the goals of

12  such legislation was to "replace[] outdated aspects of the NCAA's current legislation in this

13  area with more modern legislation that are [*sic*] clear, easier to apply and accommodate legal

14  concerns (e.g. UBIT, antitrust, SA rights)." SGD Ex. 14 at NCAAPROD00359434. █████

15  ███████████████████████████████████████████████████████████

16  ███████████████████████████████████ SGD Ex. 15 at

17  NCAAPROD00359230. Indeed, as early as 2004, ███████████████████████

18  ███████████████████████████████████████████████████████████

19  ██████████████ SGD Ex. 16. ██████████████████████████████████

20  ███████████████████████████████████████████████████████████

21  ███████████████████████ SGD Ex. 68 at NCAAPROD496363. Other documents

22  mention ███████████████████████████████ SGD Exs. 17 & 18 at

23  NCAAPROD00496363 and NCAAPROD00580462. Thus, internally, ██████████████

24  ██████████████████████████████

25          The filing of the *O'Bannon* suit in July of 2009 put the NCAA's hypocritical thinking

26  to the test, causing consternation in certain quarters. Dan Beebe ("Beebe"), former

27  Commissioner of the Big 12, said in a July 27, 2009 e-mail that with respect to the suit, the

28

- 13 -

Big 12's board was "uneasy with the exploitation of player's names and likenesses for commercial purposes." FGD Ex. 46 at Big 12_NCAA_00000014. Bill Powers of UT wrote an e-mail to Beebe, saying "it looks like the NCAA makes money from the licenses. Why should we be defendants in this, rather than plaintiffs representing our students?" FGD Ex. 52 at Big12_NCAA_00000005. In the same document, Harvey Perlman ("Perlman"), Chancellor of the University of Nebraska-Lincoln ("UNL"), stated, "[t]his whole area of name and likeness and the NCAA is a disaster leading to a catastrophe as far as I can tell." *Id*. at Big12_NCAA_00000004.[10]

Brand died in September of 2009 and was replaced by the NCAA's current President, Mark Emmert ("Emmert"). In one of the most candid admissions in the NCAA internal documents, Wally Renfro ("Renfro"), Vice-President and Senior Advisor to the President of the NCAA, told him in an October 17, 2010 memorandum that intercollegiate athletics "is as thoroughly commercialized as professional sports", that this commercialization has occurred at the expense of SAs, and that this "fairness issue" is part of the "great hypocrisy of intercollegiate athletics." FGD Ex. 12 at NCAAPROD14807-08. In the same document, Renfro noted that the NCAA's "cradle-to-grave approach to amateurism" is based on outdated romantic notions not found in the NCAA constitution and bylaws; Renfro thought it was permissible, for example, for SAs to hire agents just so long as monetary benefits were not obtained through such a relationship. *Id*. In his deposition in this case, Renfro conceded that "amateurism has a narrow meaning within the constitution but is applied broadly and, in my estimation, far too broadly to the entirety of intercollegiate athletics." FGD Ex. 42 at 137.

Others began sounding similar concerns, as criticisms of the NCAA's practices intensified. In an August 4, 2011 e-mail, Dutch Baughman, Executive Director of the Division I-A Athletic Directors Association, told Emmert that the NCAA should consider "narrowing limitations on SA access with revenues associated with licensing and marketing of athletes'

---

[10] The NCAA never conducted any study or poll demonstrating that paying SAs would somehow diminish the public interest in intercollegiate athletics. Shaheen Depo. at 124-25.

names and likenesses." FGD Ex. 48 at NCAAPROD168124. A 2011 Presidential Retreat feedback memorandum reflecting the view of 18 conferences indicated that while SAs should not be paid, consideration should be given to defraying certain SA expenses or lost income opportunities that other students have. FGD Ex. 62 at 2. A recent NCAA webpage notes that while the principle of amateurism has served the NCAA "well in litigation", the future of intercollegiate athletics will likely require "a better understood definition of amateurism that isolates the principle to the way in which SAs are viewed without imposing its avocational nature on revenue-producing opportunities." FGD Ex. 43.

In January of this year, the NCAA took a halfhearted step in trying to pay more money to SAs by adopting a limited "deregulation" (effective August 1) of certain aspects of its rules, which would include providing SAs with $300 annually over and above "actual and necessary" expenses so long as they come from an "otherwise permissible source" and deregulating summer camps and clinics, which would appear to allow SAs to receive salaries for working at them. SGD Ex. 19 at 26-30, 37. As Emmert explained in a January 2012 media conference, "[t]he model of scholarship support, for example, is now over 40 years old. But 40 years ago student-athletes weren't putting in 40 to 50 hours a week working on their sport and competing at the highest levels." SGD Ex. 20 at 11. The reference to "working" on one's sport is telling.[11] As Byers said in his book, it does not take much "to picture an athletic governing body as a monopolistic organization operating an air-tight racket of supplying cheap athletic labor." FGD Ex. 11 at 388 (internal quotations omitted).

The NCAA's modification of its position this year is at odds with the notion of amateurism advanced in its defense of this case. As one commentator has noted with respect to the January 2013 rule changes, "[o]nce you let athletes have money simply because they are athletes, no matter how little it is and no matter what you call it, you're into pay-for-play and that's the ballgame. Not even the NCAA, which has a gift for obfuscation that rivals

---

[11] For statistical evidence on how much SAs work at their sport, *see* SGD Ex. 21 at 9.

1 Richard Nixon's on a good day, can argue seriously that paying an athlete $300 is ethical, but

2 that paying him or her $500 or $1,000 — or $10,000, for all that — is not." SGD Ex. 22 at 1.

### 2.    The Proposed Class Representatives Are Adequate.

4       Under Fed. R. Civ. P. 23(a)(4), there must be a showing, *inter alia*, that the named

5 class representatives have no conflicts with proposed class members that would prevent them

6 from adequately representing the class. CCM at 15. As this Court has said in the context of

7 conflicts among putative class members, "the mere potential for a conflict of interest is not

8 sufficient to defeat class certification; the conflict must be actual, not hypothetical." *Meijer,*

9 *Inc. v. Abbott Labs*., No. C 07-5985 CW, 2008 U.S. Dist. LEXIS 78219, at *14-15 (N.D. Cal.

10 Aug. 27, 2008) (Wilken, J.) (citing, *inter alia, Soc. Servs. Union, Local 535 v. County of*

11 *Santa Clara*, 609 F.2d 944, 948 (9th Cir. 1979) ("[m]ere speculation as to conflicts that may

12 develop at the remedy stage is insufficient to support denial of initial class certification.")).

13       The NCAA raises two alleged conflicts. *First*, it contends that some members of the

14 putative AD Class have licensing rights that are worth more than others and would be

15 disadvantaged by a group license that compensated equally all players on a team because

16 "low value" players would make more money at the expense of "high value" players.[12]

17 NCAA Br. at 8-10. *Second*, it contends that if the challenged NCAA rules did not exist, more

18

---

19 [12] The notion that a class cannot consist of both types of players is legally unsound. In *Vinci v.*
*American Can Co*., 9 Ohio St. 3d 98, 100-01, 459 N.E.2d 507 (1984), the Ohio Supreme
20 Court upheld certification of a class of Olympians suing for misappropriation of their NIL,
saying "[w]hile it may be true that the more notable athletes in the class represented by
21 appellee may be entitled to recover more damages than appellee himself, the injury, *i.e.*, the
alleged invasion of privacy, is a common thread connecting all members of the class as
22 defined by the trial court." Similarly, in *Parrish v. NFL Players Ass'n*, No. C 07-00943
WHA, 2008 WL 1925208, at *3 (N.D. Cal. Apr. 29, 2008) ("*Parrish*"), the court granted class
23 certification, saying that "[d]espite the varying celebrity of retired players, the proposed class
as a whole has a common interest in determining what, if any, rights they have under the
24 GLAs [group licenses]." *See also Alberghetti v. Corbis Corp*., 263 F.R.D. 571, 576 (C.D. Cal.
2010) (although court denied certification because named plaintiffs and their counsel
25 disagreed over the nature of the class, the court noted that "[p]laintiffs are typical in spite of
the fact that they are artists and entertainers who seek to represent the interests of class
26 members who are not artists, entertainers, or celebrities. . . . If Defendant violated an
individual's rights, it does not matter whether that individual was a well-known entertainer or
27 a nameless face in the crowd. Both people are entitled to legal relief"). *Cf.* Stiroh Depo. at 207
(increases by equal amounts across schools unlikely to affect where an SA goes).

28

1 players might seek to play Division I men's basketball and football and would displace

2 current players. *Id*. at 10-11.

3        Neither of these alleged concerns involves actual conflicts. Pursuant to the NCAA's rules

4 and practices, no SAs are getting paid for the use of their NIL during their eligibility years.

5 The alleged conflicts, if they were to arise at all, would "develop at the remedy stage" and, as

6 noted above, are insufficient to deny class certification.

7        As to the first of these alleged conflicts, the evidence from the professional leagues is

8 that proceeds from group licenses are shared on an equal basis among superstars and

9 benchwarmers.  *Parrish*, 2008 WL 1925208, at *4 ("the group licensing revenue[s] for *active*

10 NFL players were distributed *equally* among the players despite the varying celebrity among

11 such players") (emphases in original).

12        Moreover, Defendants ignore what Noll said in his deposition. He agreed that for

13 purposes of a group license, he was valuing equally the rights of all players on a team, but

14 distinguished that situation from "individual licenses that go beyond that for featured players

15 as you [EA] do, or which players appear on the cover of the box, as you do, but there's a

16 distinction to be made between the group license, where everything is shared equally, versus

17 the—the individual licenses for featured players." RND at 376. *See id*. at 233-34, 237-39;

18 DRRD at ¶¶10-11. In this respect, Noll said that he was following "what you actually do with

19 the NFLPA, which is you have group licenses for teams and then individual licenses for

20 featured players."  RND at 376. EA's expert, Alan Cox, ████████████████████████

21 ██████ Cox Depo. at 21-22 (SGD Ex. 88). Noll viewed the group licenses as part of the AD

22 Class of former SAs, whereas the individual licenses would be encompassed within the IR

23 Class of current and former SAs. RND at 377; RNRD at 9. And, of course, predominance is

24 not a requirement under Rule 23(b)(2).

25        The second of these alleged conflicts is also speculative. Noll assumes a "but-for"

26 world where NCAA Division I team scholarship limits (85 in football, 13 in basketball (RNR

27 Ex. 1C)) remain unchanged. Therefore, the actual degree of substitution would likely be

28

small. RND at 364. And it needs to be kept in mind that, under Plaintiffs' model, the proceeds from any group license will not be paid during an SA's eligibility years, but only after he graduates, so the degree of displacement is entirely speculative.[13]

### C.    Certification of the Proposed Classes Is Appropriate Under Rule 23(b).

#### 1.    Common Questions of Law and Fact Predominate.

The United States Supreme Court recently clarified the standard to be applied under Rule 23(b)(3) in *Amgen*, where it noted that the rule "requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class"; a plaintiff need not demonstrate that he will "win the fray." 133 S.Ct. at 1191. Here, the common issues as to liability and impact identified above clearly predominate over individual issues. Defendants contend the opposite. With these principles from *Amgen* in mind, Plaintiffs turn to the issue of whether common questions predominate pursuant to Rule 23(b)(3).

#### a.    Alleged Individual Issues As To Impact.

The NCAA contends that there is no evidence that Plaintiffs were impacted by any conspiracy to deprive former SAs of the right to license their NIL because there was no such conspiracy. NCAA Br. at 12. This argument has been dealt with above; acceptance of it would require Plaintiffs to show that they will "win the fray," something the Supreme Court in *Amgen* said is not their burden.

---

[13] The NCAA relies heavily on the decision in *In re NCAA I-A Walk-On Players Litig.*, No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006). NCAA Br. at 9, 21. There, the plaintiffs proposed a "but for" world where schools would add 20 more football scholarships per year if the challenged NCAA rule did not exist. The court declined to grant class certification because there were individual issues as to which class members would get those additional scholarships.  2006 WL 1207915 at *12-13. Here, by contrast, Noll assumes a "but for" world where *all* SAs on a team roster would receive a group license at the very beginning of the playing season. Thus, the case is distinguishable. Indeed, as noted by Robert McCormick ("McCormick"), Professor Emeritus at the John Walker Department of Economics at Clemson University at paragraphs 15 and 50-51 of his accompanying rebuttal declaration ("RMRD"), the arguments advanced by Defendants here were similar to those advanced unsuccessfully in *White* and in the government prosecution against the Massachusetts Institute of Technology over price-fixing of scholarships.

1    The NCAA points to isolated instances of EA's licensing of SAs' NIL for use in

2    videogames (discussed below) and licensing of trading cards and other types of merchandise

3    that are not part of the Rule 23(b)(3) class claims. It also points to a declaration from T3

4    Media ("T3") (formerly Thought Equity Motion ("TEM")) (NCAA Ex. 141) that says T3

5    "encourage[s]" sub-licensees to obtain clearances from all rights holders, but does not police

6    them to ensure compliance with this requirement. This is analogous to the conduct of a

7    company like Napster, Inc., which the Ninth Circuit found had secondary liability for

8    copyright infringement by creating an internet file sharing system that allowed its users to

9    exchange copyrighted material. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1020-21 (9th

10   Cir. 2001). The detailed allegations of the *O'Bannon* complaint filed in July of 2009 (which

11   mentions TEM) put EA on notice that rights violations were occurring, yet neither it nor its

12   licensor, the NCAA, did anything to stop them.

13   The NCAA also contends that there is no common evidence that the alleged horizontal

14   conspiracy to enforce its amateurism rules had any impact on SAs. NCAA Br. at 12-13.

15   However, it is undisputed that the NCAA and its members do not compensate putative class

16   members for the use of their NIL in game broadcast or rebroadcasts. That fact itself is

17   common evidence and the internal NCAA documents cited above demonstrate that the NCAA

18   and its members did so deliberately. Moreover, the NCAA's (and its experts') arguments are

19   premised on the faulty notion that Defendants' conduct must be the sole cause of Plaintiffs'

20   injury. *Id*. at 2, 7-8; Dkt. No. 684-3 at ¶¶28, 115 (Stiroh). That is an incorrect standard. "[I]t is

21   enough that the illegality is shown to be a material cause of the injury; a plaintiff need not

22   exhaust all possible alternative sources of injury in fulfilling his burden of proving

23   compensable injury under § 4 [of the Clayton Act]." *Zenith Radio Corp. v. Hazeltine*

24   *Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("*Zenith*").

25   The NCAA further contends that in the "but for" world envisioned by Plaintiffs, a host

26   of individual issues abound such as: (a) whether SAs would have "group broadcast rights" (a

27   term never used by Noll (RNRD at 20)) to sell because of state right of publicity laws, the

28

---

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

First Amendment or copyright laws; (b) the value of "broadcast licenses"; (c) whether and how group licensing transactions would be carried out; and (d) whether Division I schools would spend more money on players. NCAA Br. at 13-19.

At the outset, it must be noted these types of arguments are legally insufficient to defeat a finding of predominance. This point is exemplified by the opinion granting certification in *In re Currency Conversion Fee Antitrust Litig*., 264 F.R.D. 100 (S.D.N.Y. 2010). In that case, as here, "both sides offer[ed] experts who agree[d] on a methodology of determining class-wide impact: comparing actual prices to those that would exist in a 'but for' environment—that is, without the allegedly unlawful activity." *Id*. at 115. The plaintiffs' expert said the conversion surcharge for foreign currency transactions in the "but for" world absent the conspiracy would have been zero, while the defense expert argued that the defendant banks would have imposed the same 2% that they did in actuality. *Id*. (This is the mirror image of the dispute among Noll and the defense experts here). The district court found predominance satisfied, saying "when both experts rely on evidence common to the class, this Court should not resolve which 'but for' price is correct." *Id*.[14] *See* DRRD at ¶46.

---

[14]*Accord In re Aftermarket Auto. Lighting Prods. Antitrust Litig.,* 276 F.R.D. 364, 373-74 (C.D. Cal. 2011) ("[a]s Plaintiffs point out in their Reply, in situations where a court is confronted with two opposing expert analyses or econometric models of what the "but for" world would look like, the Court is not supposed to decide at the certification stage which expert analysis or model is better"); *In re Ethylene Diene Monomer Propylene Diene Monomer (EPDM) Antitrust Litig.,* 256 F.R.D. 82, 95 (S.D.N.Y. 2009), *reconsideration denied*, 681 F. Supp. 2d 141 (S.D.N.Y. 2010) ("*EPDM*") (it is not the court's task on a certification motion to determine which competing view of pricing in the "but for" world is persuasive; instead, it "need only determine whether the plaintiffs have demonstrated that the issue of antitrust impact is susceptible to proof applicable to the whole class"); *Nachitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd*., 247 F.R.D. 253, 272-73 (D. Mass. 2008) (court found predominance was satisfied where plaintiffs' expert criticized the defense expert for assuming that the challenged anticompetitive conduct would continue unabated in the "but for" world); *In re Rail Freight Fuel Surcharge Antitrust Litig*., 287 F.R.D. 1, 69 (D.D.C. 2012) (following *EPDM*); *In re Online DVD Rental Antitrust Litig*., No. 09-2029, 2010 WL 5396064, at *10 (N.D. Cal. Dec. 23, 2010) (rejecting arguments that plaintiffs failed "to discuss or explain the importance of certain competitive variables in the but for world"" because those arguments "are ultimately directed to the merits of plaintiffs' ability to prove impact;" they "do not . . . establish that plaintiffs' methodology for proving impact will necessarily require individualized evidence") (emphasis removed).

1    In addition and as discussed further below, Defendants' experts have made no

2    empirical analysis of the present constrained market and how it relates to the "but for" world

3    envisioned by Dr. Noll. Instead they engage in predictions that if that "but for" world ever

4    came to pass, the structure of Division I men's football and basketball would collapse. These

5    predictions are bereft of any empirical support and instead depend largely on declarations

6    submitted in opposition to the certification by conference and university heads (*i.e.*,

7    representatives of the alleged co-conspirators) that are self-serving and not credible. RNRD at

8    42-46. As a result, these declarations, many of which were apparently based on a common

9    template, need to be "carefully scrutinized" by the Court. *In re Wells Fargo Home Mortg.*

10   *Overtime Pay Litiig*., 527 F.Supp.2d 1053, 1061 (N.D. Cal. 2007), *rev'd on other grounds*,

11   571 F.3d 953 (9th Cir. 2009); *Betancourt v. Maxim Healthcare Servs., Inc*., No. 10 C 4763,

12   2011 U.S. Dist. LEXIS 43228, at *21 (N.D. Ill. Apr. 21, 2011).

13   Despite the irrelevance of, and dubious support for, Defendants' arguments, Plaintiffs

14   will proceed to rebut each in turn.

15   **State right of publicity laws**. Defendants claim that variations in state law concerning

16   the right of publicity and state laws mentioning live sports broadcasts preclude certification.

17   NCAA Br. at 13. But it bears reemphasizing that Plaintiffs here are pursuing antitrust claims,

18   not claims based on state statutes conferring causes of action for breach of the right of

19   publicity.[15] A uniform federal cause of action cannot be transformed into multiple state law

20   causes of action based on different claims. Indeed, the NCAA routinely enters into national

21   television contracts where these alleged variations of state law are not mentioned and appear

22   to be of no concern. *E.g*., FGD Ex. 51 at NCAAPROD00295372 (nationwide broadcasting

23   contract between NCAA and Turner Sports Interactive making Indiana law applicable, which

24   has no provisions dealing with sports broadcasts). As Noll noted, he has never seen a national

25

26

27   [15] This point also disposes of Defendants' arguments based on First Amendment preemption
     of right of publicity claims. NCAA Br. at 14.

28

1    broadcasting contract that made distinctions among state laws. RND at 223-24.[16]  This is

2    consistent with his (uncontested) view of a national geographic market applicable here.

3        **Copyright.** Defendants' argument of preemption under the Copyright Act (NCAA Br.

4    at 14) is similarly misplaced. This is an antitrust case and the Ninth Circuit has explained the

5    intersection between antitrust and copyright law by noting that "case law supports the

6    proposition that a holder of a patent or copyright violates the antitrust laws by 'concerted and

7    contractual behavior that threatens competition.'" *Image Tech. Servs. v. Eastman Kodak Co.*,

8    125 F.3d 1195, 1215 (9th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998) ("*Image*") (quoting

9    *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1185 n.63 (1st Cir. 1994)).[17]

10   Moreover, even if one were to take the view that Plaintiffs' antitrust claims depend on state

11   law rights of publicity, the Ninth Circuit has ruled repeatedly that right of publicity claims are

12   not preempted by federal copyright law, decisions that Defendants inexplicably fail to cite.[18]

13       **The views of schools about whether they need to obtain licenses for use of SAs'**

14   **NIL.** The NCAA also cites declarations from some college personnel about whether they

15   need to obtain NIL licenses from SAs. NCAA Br. at 14. The typical formulation in these

16   largely standardized declarations is that the declarant does not "believe" that obtaining

17   releases from SAs is "necessary" to televise sporting events. *E.g.*, Dkt. Nos. 695-7 at ¶9; 695-

18   14 at ¶11. The personal beliefs of the declarants are hardly the basis for a finding of lack of

---

[16] As he also noted, the right of publicity is also a creature of federal law and state common law, not just statutory law. *Id.* at 223. *See, e.g.*, *White v. Samsung Elecs. Am.*, 971 F.2d 1395, 1397-98 (9th Cir. 1992), *cert. denied*, 508 U.S. 951 (1993) (discussing California common law right of publicity claim); *Dryer v. NFL*, 689 F. Supp. 2d 1113, 1121-22 (D. Minn. 2010) (upholding claim by class of retired professional football players that uncompensated use of their NIL was in violation of the federal Lanham Act).

[17] *See, e.g.*, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 143, (1948) (holding that horizontal conspiracy to engage in price-fixing in copyright licenses violates the Sherman Act); *Straus & Straus v. Am. Publishers' Ass'n*, 231 U.S. 222, 234 (1913) ("[n]o more than the patent statute was the copyright act intended to authorize agreements in unlawful restraint of trade…").

[18] *See, e.g.*, *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 811 (9th Cir. 1997), *cert. denied*, 531 U.S. 811 (2000); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1100 (9th Cir. 1991), *cert. denied*, 506 U.S. 1080 (1993); *Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir. 1988).

1   predominance. Their beliefs may be premised on theories of copyright or state right of

2   publicity laws that have no foundation. And those beliefs might change if the Court were to

3   order the injunctive relief sought by the IR Class.

4         **The valuation of group licenses**. The NCAA's next argument is that non-common

5   issues exist as to the value of each Class member's NIL because some Class members might

6   never play in a game. NCAA Br. at 14-17. But, as noted above in connection with the

7   discussion of ascertainability, Noll reasonably assumes that the group license would be

8   transacted *before* the beginning of a playing season, when a school would not know who on

9   its roster would actually play in games.

10         **How group license transactions would be carried out**. The NCAA next argues that

11   there is no evidence of how group license transactions would be carried out, noting that it

12   cannot be through a union because many states would prohibit SAs from bargaining

13   collectively. *Id.* at 17-18. However, Noll explained that it would *not* be necessary to create a

14   union; some non-union "aggregation entity" or even the NCAA conferences themselves could

15   assume that task. RND at 184-85, 378-79, 417. *See also* DRRD at ¶¶46-47.

16         There is precedent for this. For example, as part of the class settlement in the *White*

17   case discussed above, the NCAA "created the Former Student-Athlete Fund web site to assist

18   qualified candidates applying for receipt of career development services and/or

19   reimbursement of educational expenses under the terms of the agreement with plaintiffs in a

20   federal antitrust lawsuit."[19] The settlement in the *White* case made $10 million available over

21   the course of three years to former SAs who made claims for reimbursement of educational

22   expenses incurred while in college, such as tuition, fees, books, supplies and equipment of

23   instruction up to a limit of $2,500 per year, plus a one-time payment of up to $500 to cover

24   post-graduate "career development" expenses. SGD Ex. 24 at 10-11.There is no reason why

25

26

---

27   [19] SGD Ex. 23. The stipulated settlement in the *White* case and the amended order of final
approval are attached as SGD Exs. 24 & 25.

28

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1    an analogous type of mechanism could not be ordered here, either as part of some eventual

2    classwide settlement or as part of a litigated classwide judgment.

3          The Defendants themselves recognized as much. For example, David Knopp

4    ("Knopp"), the NCAA's Managing Director of Strategic Activation, raised the idea of

5    creating a "student opportunity fund" that would allow schools to seek money for use by

6    "eligible student-athletes in ways that normally would have been impermissible under NCAA

7    rules." FGD Ex. 73 at 127-40. This is also reflected in notes of an October 6, 2008

8    Presidential Task Force meeting where Brand conceded this could be done as a "best

9    practice." FGD Ex. 68 at NCAAPROD00272005. ███████████████████████

10   ██████████████████████████████████████████████████████████████

11   ██████████████████████████████████

12         Similarly, Cory Moss, Senior Vice-President of CLC, wrote in 2009, soon after the

13   *O'Bannon* lawsuit was filed, that "[s]hould we really begin work on a formal College Student

14   Athlete Players Association (current and former) to be ready depending on the results of the

15   EA lawsuits?" FGD Ex. 81 at CLC0186203. The proposed CSAPA would have a Board of

16   Directors and would do "whatever is necessary to ensure that licensing and marketing rights

17   of former collegiate student-athletes are protected and revenue opportunities are pursued." *Id.*

18   at CLC0186204. Likewise, in October of 2012, the Big 12 decided to create a committee

19   headed by Oliver Luck, Athletics Director for West Virginia University, to study what

20   collegiate athletics would look like if Plaintiffs prevailed in this action; he was quoted as

21   saying "[w]e'll have to create what I imagine is some kind of national system to accomplish

22   what all the schools and the NCAA have tried to do to promote events and generate revenue."

23   SGD Ex. 27.

24         **Whether schools would spend more money on football or basketball players**.

25   Finally, the NCAA offers a "parade of horribles" about how, in Plaintiffs' "but for" world,

26   schools might withdraw from Division I and migrate to Division III or how they would have

27   to stop providing financial aid to SAs. NCAA Br. at 18-19. These self-serving, speculative

28

1   opinions are entitled to no weight in determining whether individual issues overwhelm

2   common ones.[20]

3       For example, Jim Delany ("Delany"), Commissioner of the Big Ten Conference ("Big

4   Ten"), declares that all the schools in the conference might have to leave Division I if

5   Plaintiffs prevail. Dkt. No. 681-2 at ¶9. A host of subsequent news articles have pointed out

6   that: (a) Delany's declaration was based on a 1996 article he had written opposing "pay for

7   play" in general; (b) his declaration represented only his beliefs and he has not polled the

8   presidents of the Big Ten; (c) notwithstanding the pendency of this suit, the Big Ten in 2012

9   voted to add the University of Maryland and Rutgers University to the conference because

10  they are situated in lucrative metropolitan areas for purposes of broadcasting contracts; (d)

11  Delany has a storied history of making sweeping pronouncements about the Big Ten that are

12  contradicted by what the conference does soon thereafter; and (e) "Delany's claim [in his

13  declaration] is perhaps his most absurd in a career full of sky-is-falling, pouting

14  proclamations." SGD Exs. 28-31.[21] As one of these articles points out, the other declarations

15  on which the NCAA relies appear to be based on templates probably written by its lawyers.[22]

16      The testimony of one of Defendants' experts, Dr. Daniel Rubinfeld ("Rubinfeld"),

17  illustrates the problems with Defendants' critiques of Noll's "but for" world. ████████

18  ██████████████████████████████████████████████████████████████

---

19  [20] An analogous argument—that impact could not be proven on a classwide basis because

20  some NCAA member schools could not absorb the cost increases associated with higher
    grants-in-aid for SAs—was rejected by the court in *White*, which granted class certification.

21  FGD Ex. 41 at 5.

22  [21] Delany also ignores the fact that back in 2011, the Big Ten was considering paying a cost of
    living stipend to SAs of $2000-$5000, possibly using Big Ten broadcasting revenues. SGD

23  Ex. 32. Heckman noted in his deposition that in the context of labor-management bargaining,
    a "standard strategy for bargaining would be to talk about the grief that would be caused by
    the union demands" with resulting "overstatement." Heckman Depo. (SGD Ex. 5) at 111.

24  Heckman termed this as a consideration about when to "strategically lie even to produce an
    outcome that's favorable to yourself." *Id*. at 112.  The declarations from representatives of

25  NCAA schools and conferences must be evaluated for credibility in this context.

26  [22] Stiroh, a key defense expert, admitted that it did not matter to her whether what Delany and
    the other declarants from NCAA colleges said was true or not. SGD Ex. 6 at 115-17. Indeed,

27  she said that in analyzing the "but for" world, one should not "dismember the entire market
    structure to determine the impact" of a pricing change on a particular product. *Id*. at 172.

28



It is instructive to compare the canned, tailored-for-litigation apocalyptic pronouncements by conference and college declarants with a recent article about Josephine Potuto, who was the former chair of the NCAA Division I Infractions Committee. In that article, it is stated:

> Yet Potuto, a Nebraska law professor who is president of Football Bowl Subdivision faculty athletics representatives, said college players should profit off their own name and likeness. And she think[s] it's possible without destroying college sports.
>
> "I don't know that it would be such a terrible, dramatic, awful thing," she said. "We should look at what it looks like and talk about what maybe the consequences might be. If boosters involve[] themselves in ways that tilt things, maybe you say the players can't get the money until they leave school. I think it's worth looking at seriously instead of worrying the house will fall down." (SGD Ex. 33).[24]

---

[23] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Rubinfeld Depo. at 98-99. Therefore, the former should not offset the latter.

[24] *See also* SGD Ex. 21 at 15 (proposing SAs get a portion of college sports revenue, which would be placed in an "educational lock box" accessible after graduation). Some of the NCAA's factual declarants have argued that Plaintiffs' "but for" world raises Title IX concerns. But the Ninth Circuit has held that even where there is gender inequality in

1   Perlman of UNL also stated recently that a Plaintiffs' victory in this case would not be a

2   "game-changer" for the NCAA. SGD Ex. 107.

3           Furthermore, Rascher points out how Defendants' analysis of allocations to SAs does

4   not comport with *real world* examples. He notes that the NBA historically allocated 49% to

5   57% of revenues to players, the NFL 48% to 57%, the National Hockey League 54% to 75%,

6   the Canadian Football League 56%, the PGA Tour over 60%, the Premier Soccer League in

7   England over 70%, and the "Big 5" soccer leagues in Europe 65%. DRRD at ¶¶23-24, 30-33,

8   47. In Major League Baseball ("MLB"), where there is no salary cap, the allocation to players

9   has been 51% to 67%. *Id.* at ¶¶29, 49-50, 62. *See* RMRD at ¶43. So Noll's 50%-50%

10  allocation (with only 33% going to SAs with respect to videogames) is, if anything,

11  "conservative." DRRD at ¶34. *See* RMRD at ¶¶41-44.

12          There have also been many prior instances where creation of an open market for

13  athletes did not result in dire predictions of ruin coming to pass—examples include tennis, the

14  Rugby Union and the Olympics. DRRD at ¶63. Another example is MLB: when the reserve

15  clause ended by arbitral decree in 1973 and player free agency (whereby players with a

16  certain minimal number of years of experience could negotiate with multiple teams in a

17  competitive market) came into effect, there were predictions that the game would be

18  destroyed, but instead player compensation climbed to 50% or more, no teams left, six teams

19  have been added, and the minimum annual player compensation is $490,000. *Id.* at ¶¶51, 56,

20  62-63. Moreover, competitive balance was not harmed. *Id.* at ¶63.

21          In the NCAA itself, where there has been dramatic revenue growth of 8.1% annually

22  since 1985, there has been little change in the "haves" and "have-nots" among Division I

23  teams, a fact Emmert himself has admitted repeatedly. *Id.* at ¶¶68-71, 73. *See also* SGD Ex.

24  90. Defense experts' predictions of SAs shifting from the Sun Belt Conference ("SBC") to the

---

25  intercollegiate athletics, Title IX can be satisfied by showing that the institution at issue has a

26  "history and continuing practice of program expansion" for the underrepresented gender or
    otherwise "fully and fairly accommodate[s]" the interests of women. *Mansourian v. Regents*

27  *of Univ. of Cal.*, 602 F.3d 957, 964-65 (9th Cir. 2010). It is completely speculative that neither
    could be accomplished in Plaintiffs' "but-for" world.

28

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

Pac-12 or from the University of Southern California ("USC") to Alabama ignores basic points like whether the Pac-12 wants any SBC SAs or the television revenue structures of USC and Alabama.  DRRD at ¶¶72-77.[25] Rascher shows that the extensive peer-reviewed literature (including Ronald Coase's Nobel Prize winning work) has concluded that little or no 'reshuffling' is likely, and that Defendants' speculation is inconsistent with this extensive economic literature.

Moreover, the economic dislocation predicted by Defendants ignores the fact that Division I men's football and basketball is rife with unnecessary expenditures that could be modified or eliminated so that more money could be allocated directly to SAs. The sums spent on FBS coaches' salaries are one example. Between 2006 and 2011, FBS coaches' salaries increased by 55%, with salaries for coaches in the six major conferences climbing from an average of $1.4 million to $2.125 million. SGD Ex. 21 at  9. Other unnecessary expenses abound. It has been noted by the National Women's Law Center that several Division I football teams spend hundreds of thousands of dollars to fly personnel to games on chartered jets and that UT (whose representatives are among the declarants presented by the NCAA) spent $120,000 to repanel the office of its football coach in mahogany. SGD Ex. 35 at 2. During the NCAA basketball March Madness season, schools subsidize "spirit squads" that fly on chartered jets and often stay at luxurious hotels. SGD Ex. 36. And the University of Oregon, "which already boasts an indoor practice field, an athletic medical center, and a brand-new basketball arena and academic study center for athletes—is building a new complex for its football program that will contain, among other things, movie theaters, an Oregon football museum, a players' lounge and deck, a dining hall and private classrooms for top players. Oh, and there's a double-decker sky bridge." SGD Ex. 37. There is enough waste

---

[25] Much of the defense experts' analysis is based on a declaration by Todd Petr ("Petr"), the NCAA's Managing Director of Research (Dkt. No. 695-1), which asserts that most college athletic programs are losing money. As Rascher explains, this declaration is suspect because: (a) most college profit and loss statements understate profits from sports activities, as economic literature reflects; (b) Petr makes various adjustments designed to mask profitability; (c) his declaration runs counter to basic tenets of industrial economics; and (d) it is belied by the statements of other NCAA and college personnel. DRRD at ¶¶89-111.

in these types of expenditures to permit a reallocation of some of the broadcast revenues to the SAs who make this all possible. *See* RNR at 69-74; Drake Group Report at 13-16 (SGD Ex. 89).

### b.      Alleged Individual Issues As To Damages.

Defendants contend that individual issues will predominate as to proof of damages. NCAA Br. at 20-21; EA-CLC Br. at 18-19. That is simply not the case. As noted above, for the AD Class, Noll proposes the remedy of a group license applicable to all SAs on a team roster whereby each SA within his own team would get the same fixed sum, regardless of whether the SA was a superstar or a journeyman player.[26] As noted above, this is what is done in professional sports leagues. Thus, individual issues simply do not predominate with respect to the monetary relief that Plaintiffs seek.

Even if there were such individual issues, however, settled Ninth Circuit precedent indicates that the amount of damages is "invariably an individual question" that "does not defeat class action treatment." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1026 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 970 (2012) (citing *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)); *see In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 530 n.8 (N.D. Cal. 2010) ("*Conseco*").

### c.      Miscellaneous Alleged Individual Issues.

**Limitations issues**. Defendants also argue that because Plaintiffs have supposedly abandoned their post-eligibility theory of liability, individual issues concerning the statute of limitations bar class certification. NCAA Br. at 19. Of course, no such abandonment has occurred. And all claims for damages are confined to injuries occurring during the four years preceding the filing of the *O'Bannon* complaint.[27] In any event, individual defenses based on

---

[26] As also noted above, Noll asserts that individualized licenses for superstars would be encompassed within the relief available under Rule 23(b)(2). RNRD at 9.

[27] For claims of older players, the Court has already held that the continuing violation doctrine applies. *O'Bannon v. NCAA,* Nos. C 09-1967 CW, C 09-3329 CW, C 09-4882 CW, 2010 WL 445190, at *5-6 (N.D. Cal. Feb. 8, 2010); *Russell v. NCAA*, No. C 11–4938 CW, 2012 WL 1747496, at *4 (N.D. Cal. May 16, 2012) ("*Russell*").

1  the statute of limitations "do not bar certification where there is otherwise a sufficient

2  showing of commonality." *Conseco*, 270 F.R.D. at 530 (*citing Cameron v. E.M. Adams &*

3  *Co.*, 547 F.2d 473, 477-78 (9th Cir. 1976)); *see In re Linerboard Antitrust Litig.*, 305 F.3d

4  145, 162 (3d Cir. 2002), *cert. denied sub nom. Gaylord Container Corp. v. Garrett Paper,*

5  *Inc.*, 538 U.S. 977 (2003) (granting class certification of antitrust case over objections based

6  on individual limitations issues).

7       **Releases and assignments**. Defendants also contend that the presence of individual

8  releases and assignments for some absent class members means that common issues do not

9  predominate, citing to one unsigned and one signed release form. NCAA Br. at 19-20.

10  However, one of the common issues here is whether any such releases are unenforceable

11  because they constitute contracts of adhesion. CCM at 4-5 & n.3. In any event, courts have

12  ruled that the possibility that some absent class members may be subject to unique defenses

13  does not preclude class certification under Rule 23(b)(3).[28]

        **2.**     **A Class Action Is The Superior Method of Adjudication.**

15       There is also no basis for Defendants' arguments that the proposed class action is not

16  superior to other methods of adjudication. The NCAA takes the extraordinary position that it

17  is better to have tens of thousands of individual actions brought against it than a single class

18  action. NCAA Br. at 21. This argument defies common sense. Concerns for judicial efficiency

19  and the interests of members of the putative Classes would not be served by such a result.

20  Indeed, the Defendants (and the judiciary) would *benefit* by having their defenses adjudicated

21  conclusively on a classwide basis in a single forum.

     **D.**     **The Proposed IR Class Satisfies the Requirements of Rule 23(b)(2).**

23       The IR Class is brought on behalf of both current and former SAs. The NCAA

24  contends that a Rule 23(b)(2) class should not be certified because Plaintiffs seek primarily

---

[28] *See, e.g., Augustin v. Jablonsky,* 461 F.3d 219, 225 (2d Cir. 2006); *Bd. of Tr. of the AFTRA Ret. Fund v. JP Morgan Chase Bank, N.A.,* 269 F.R.D. 340, 346 (S.D.N.Y. 2010); *Hoexter v. Simmons*, 140 F.R.D. 416, 423 (D. Ariz. 1991).

monetary relief and because the named class representatives, all former SAs, cannot represent a class that includes current SAs. NCAA Br. at 21-22.[29] EA and CLC further contend that no IR Class should be certified as to them because Plaintiffs can obtain all the relief they need from the NCAA. EA-CLC Br. at 19. None of these arguments have merit.

The first argument ignores the fact that the IR Class is directed to prospective conduct by Defendants, not retrospective damage claims. It is concerned with conduct that has yet to occur and is the proper target of injunctive relief.

The second argument ignores the fact that the named class representatives include persons like Patrick Maynor, who was a current SA during a portion of the damage period (commencing four years prior to the filing of the *O'Bannon* complaint on July 21, 2009). MTSO at 11-12. Moreover, the Ninth Circuit has rejected a similar argument in *Glass v. UBS Fin. Servs.*, *Inc.*, 331 Fed. Appx. 452, 455 (9th Cir. 2009) (cited pursuant to Fed. R. App. P. 32.1), a case involving affirmance of the district court's approval of a classwide settlement of employment claims, where it stated that former employees could represent a class of present and former employees because both were interested in obtaining compensation for the unlawful practices alleged. [30]

The final argument ignores the fact that EA has engaged in specific conduct of its own that violates Plaintiffs' rights, like knowingly creating roster additions to its videogames and making them available to end users (all with the knowledge and support of CLC). Thus, in order to afford full relief and ensure no repetition of improper practices, the Court needs to

---

[29] In fact, current SAs clearly support the goals sought to be achieved in this lawsuit. SGD Ex. 21.

[30] *Accord, e.g.*, *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1034 (D. Minn. 2007); *LaFlamme v. Carpenters Local No. 370 Pension Plan*, 212 F.R.D. 448, 456 (N.D.N.Y. 2003); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 c 5755, 2000 WL 1774091, at *6 (N.D. Ill. Dec. 1, 2000); *Breedlove v. Tele-Trip Co.*, No. 91 C 5702, 1993 WL 284327, at *7-8 (N.D. Ill. July 27, 1993).  Defendants' reliance on *dicta* in *Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 834-35 (9th Cir. 2013) that a former employee may lack standing to seek injunctive relief in an overtime wage class action is not persuasive. While a former employee may suffer no ongoing injury from denial of overtime pay, here, both former and current SAs are suffering ongoing injury as the result of Defendants' antitrust violations.

1   issue an injunction against all Defendants. This is consistent with the injunctive provisions of

2   the Clayton Act (15 U.S.C. § 26), which have been read by the United States Supreme Court

3   to encompass not just injunctions against the specific unlawful conduct at issue, but also

4   injunctions against all related unlawful acts. *Zenith*, 395 U.S. at 133.

5   **III.    SPECIFIC RESPONSES TO EA'S AND CLC'S OPPOSITION**

6           EA and CLC additionally contend that they were just following the NCAA's rules,

7   that there has been no showing by classwide proof that they participated in any "broadcast

8   conspiracy" involving the NCAA or its members, and that misconduct with regard to the

9   videogames can be shown with common proof. EA-CLC Br. at 10-15. They are wrong.

10          **Plaintiffs claim one overarching conspiracy**. EA and CLC's arguments are based on

11  the erroneous premise that there are multiple conspiracies alleged here that operate

12  independently from each other. Plaintiffs allege one overarching conspiracy that was

13  implemented through multiple means, some involving broadcast footage and some involving

14  videogames. The Court accepted this point in *Russell*, where it declined to find "two separate

15  and unrelated categories of allegations," but instead found allegations of an "an overarching

16  conspiracy in which NCAA and its co-conspirators have worked together to depress to zero

17  the amount paid to student-athletes for their likenesses" and that EA and CLC were accused

18  of conduct "in furtherance of the overall, multifaceted conspiracy." 2012 WL 1747496, at *3.

19          Because EA and CLC are participants in one overarching conspiracy, it is irrelevant

20  that they may not have participated in every facet of it.  Their arguments based on the premise

21  that there are multiple conspiracies alleged here that operate independently from each other is

22  contrary to the accepted allegations in this case, which are controlling for purposes of this

23  motion.  *See United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv.*

24  *Workers Int'l. U., AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 808-10 (9th Cir.

25  2010) ("[p]laintiffs' theory of liability is controlling in determining the predominance of

26  common issues"). Plaintiffs' allegation of one overarching conspiracy is consistent with

27  established law.  "Participation by each conspirator in every detail in the execution of the

28

conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir. 1980).[31]

Similarly, the mantra that EA and CLC simply followed the NCAA's rules does not absolve them from liability and certainly does not preclude certification of the proposed Classes as to them.[32] Even one who is coerced to participate in, or acquiesces to, a scheme in violation of the antitrust laws is liable for the injury and damage caused by that scheme.[33]

**If there was a separate "broadcast conspiracy", EA and CLC participated in it.** Even assuming *arguendo* that there was a separate conspiracy to not compensate Class members in connection with broadcast footage, CLC's and EA's participation in that conspiracy can be demonstrated through common proof.

To begin with, Plaintiffs will use common proof to show that CLC and EA integrated broadcast footage into the latter's videogames. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[31] *See Tunis Bros. Co. v. Ford Motor Co.*, 763 F.2d 1482, 1491 n.16 (3d Cir. 1985), *vacated & remanded on other grounds*, 475 U.S. 1105 (1986), *reinstated*, 823 F.2d 49 (3d Cir. 1987); *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980); *United States v. Consol. Packaging Corp.*, 575 F. 2d 117, 126 (7th Cir. 1978); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538-39 (D.N.J. 2004); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 375 (D.N.J. 2001).

[32] There are abundant examples of entities at different levels of distribution (*e.g.*, franchisors and franchisees, a publisher and its dealers) forming an overarching conspiracy to violate the antitrust laws. *See, e.g., United States v. General Motors Corp.*, 384 U.S. 127, 142-43 (1966); *Borger v. Yamaha Corp.*, 625 F.2d 390, 395 (2d Cir. 1980); *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1256 (2d Cir. 1975), *cert. denied*, 425 U.S. 936 (1976).

[33] *See, e.g., Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 916-17 (9th Cir. 2008); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir.), *cert. denied*, 506 U.S. 908 (1992); *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 682 (9th Cir.), *cert. denied*, 429 U.S. 940 (1976); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 375 (9th Cir.), *cert. denied*, 355 U.S. 835 (1957); *C & W Constr. Co. v. Bhd. of Carpenters & Joiners of Am., Local 745*, 687 F. Supp. 1453, 1462-63 (D. Haw. 1988); *Oltz v. St. Peter's Cmty. Hosp.*, 656 F. Supp. 760, 763 (D. Mont. 1987), *aff'd*, 861 F.2d 1440, 1451 (9th Cir. 1988).

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW



*Second*, Plaintiffs will use common proof to show that EA and CLC integrated their

---

[34] CLC operated CI until 2008, when it was sold to XOS.  The press release announcing that sale stated: "CI will maintain its long-standing strategic relationship with The Collegiate Licensing Company (CLC), a division of IMG Worldwide.  CLC was an original founding member of CI and it will remain strategically aligned to help expand CI's campus relationships as well as revenue opportunities in the college market." SGD Ex. 40 at 2.

[35] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As noted above, soon after the inception of this litigation, the SEC developed a release of its own. *See also* SGD Ex. 42 at NCAAPROD00120406 (the SEC needs this new rule change because its major media contract was expiring, and it was negotiating to set up its own SEC Network). On April 16, 2013, the SEC announced the formation of its own network. SGD Ex. 43.

[36] In an August 2007 e-mail string from Shaheen to Brand, Shaheen wrote, "the evolution of the video technology . . . is amazing" and "[i]f we are allowing it in broadcast, videogames are literally no different now-they look and feel the exact same way." FGD Ex 9 at NCAAPROD188960. *See also* SGD Ex. 50 at NCAAPROD00206075 ("TV and videogames . . . are converging in other ways. For instance, obviously videogames [are] more broadcast like and TV broadcasts have incorporate[d] videogame graphics to help illustrate different features of the TV broadcast"); FGD Ex. 53.

1    videogame footage into broadcast coverage—in order to make the connection between the

2    videogame avatars and real SAs.  The NCAA was well aware and approved of the ever-

3    increasing convergence between television and videogames, acknowledging that the public

4    understood that the avatars were modeled so that "the public make[s] the association with the

5    current student-athlete. . . And it appears to be working. . ." SGD Ex. 47 at

6    NCAAPROD00391555.  EA and CLC worked diligently to connect the videogames to live

7    broadcast coverage.  For example, ███████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████  ▪   Thus, it is clear that, if necessary, Plaintiffs could show with common proof

13   that CLC and EA participated is a so-called separate "broadcast conspiracy."

14          **EA and CLC did not just "follow the rules."**  The argument that CLC and EA did

15   nothing more than follow NCAA rules, in addition to be legally insufficient to insulate them

16   from liability, is also factually incorrect.  For example, Plaintiffs will prove through common

17   evidence that CLC gave multiple presentations to NCAA committees, imploring them to

18   adopt a revision to the NCAA bylaws that was designed, in the NCAA's own words, to

19   expand the scope of student athlete image use and to "*accommodate legal concerns* (e.g.,

20   unrelated business income tax, antitrust, *student-athlete rights*.)"   SGD Ex. 51 at

21   CLC0185998 (emphases added); SGD Ex. 52 at CLC0182304; SGD Ex. 53 at EA0038179.[38]

22   _____

23   [37] ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   [38] The NCAA was very clear in its presentations that "student-athlete rights" were implicated
     in its media uses.  For example, Brand stated that because of increasing expenditures
26   "institutions—and the national office—are seeking ways to commercialize their rights, and
     those of SAs."  *See* SGD Ex. 54.  Likewise, Shaheen noted that "the Big 6" (the six largest
27   conferences) "will 'make or break' the student-athlete likeness proposals" and that "the
     SEC—for one—needs the legislation as much as the others and the NCAA";  Berst agreed,

28

1    When EA complained that the proposed amendment to NCAA Bylaw 12.5.1 would

2  not allow the unfettered use of student athletes' NIL without compensation, CLC's President,

3  Pat Battle, told Shaheen that he would "tell Joel [Linzner of EA] just to hold off and that *we*

4  have things under control *working behind the scenes*."  SGD Ex. 56 at CLC0181124

5  (emphases added).

6    EA, CLC and the NCAA also worked together to affirmatively mislead the public and

7  SAs about the lengths EA went to model the avatars after real players. ███████████████

8  ██████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ██████████████████████.

13    There is a wealth of common evidence from Defendants' own documents and

14 testimony that will be used to show, on a common basis, that EA, CLC and the NCAA

15 colluded to use former and current SAs' NIL in their videogames without compensation.[39]

16 ████████████████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████

24 ████████████████These factual issues are therefore predominantly common ones.

25

26 observing that the rule changes were necessary and will "benchmark our next media
   contract."  *See* SGD Ex. 55 at NCAAPROD00120405-06.

27 [39] ████████████████████████████████████████████████████████████████
   ████████████████████████████████████████████

28



Plaintiffs will use common evidence—

40

41

42See also SGD Ex. 65 at CLC0185571
Ex. 66 at NCAAPROD00227429
(handwritten notes: "fans kind of know who the player is");

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1    ███████████████████████████████████  Strauser Depo. at 36; Linzner Depo.

2    at 191.

3    ████████████████████████████████████████████████

4    ███████████████████  SGD Ex. 71 at EA0104947.[43]  Throughout the Class Period, NCAA

5    administrators noted "real concern" that use of SAs' NIL in videogames "adds to the

6    argument that student-athletes should be unionized and receive a cut of the profits, etc."  SGD

7    Ex. 108 at NCAAPROD00335182.  Numerous NCAA employees--including those that were

8    technically in charge of approving EA's videogames--knew that the videogames were

9    depicting real SAs, but were overruled by Brand and Shaheen.  For example, Peter Davis

10   ("Davis"), the former NCAA Director of Corporate Alliances, admitted that there are

11   "likenesses of student-athletes" in the videogame. FGD Ex. 66 at NCAAPROD00206315. ██

12   █████████████████████████  ███████  ████████████████████████

13   ██████████████████████████████████████

14   ████████████████████████████████; SGD Ex. 75 at

15   NCAAPROD00082521 ("[a]t times it seems like we're really pushing the envelope on

16   amateurism and use of student-athletes for profit"). *See* FGD Ex. 56, FGD Ex. 57 at

17   NCAAPROD00083731-33; FGD Ex. 60 ("anyone can look at the game and see a

18   resemblance to the student-athlete in question"); SGD Ex. 66 at NCAAPROD00227429-30.

19   Nevertheless, they were powerless to do anything about it, as, according to Davis, "Myles

20   [Brand] and GAS [Shaheen] are all okay with it so who am I to disagree?! :)" FGD Ex. 57 at

21

22   ████████████████████████████████████████

23   ██████████████████████████████████████

24   █ ███████████████████████████████████

25   ███████████████████████████████████████

26   █ █████████████████████████████████████

27   █████████████████████████████████████

28   ██████████████████████████

1  NCAAPROD00083731.[45]

2      Despite these numerous internal misgivings, Brand and Shaheen were undeterred. ██

3  ██████████████████████████████████████████████████████████

4  SGD Ex. 77 at NCAAPROD00247339.  Shaheen also worked "behind the scenes" (*see* SGD

5  Ex. 56 at CLC0181124) to obtain a series of increasingly liberal "interpretations" of existing

6  bylaws to give EA what it wanted.  He did so for one reason: money.

7      ██████████████████████████████████████████████████

8  ████████████████████████████████████████████ Linzner

9  Depo. at 237-38. ████████████████████████████████████████

10 ██████████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████

15     The NCAA, now "incentivized," looked the other way on the increasingly obvious

16 misuse of NIL.  *First*, it took the position that the images were not "likenesses" unless they

17 were developed using "mapping technology."  FGD Ex. 55. ████████████████████

18 ██████████████████████████████████████████████████████████

19 ████████████ SGD Ex. 105 at EA0117645. ██████████████████████

20 ████████████████████████, the NCAA allowed EA to create a "defined mechanism to add

21 the names of student-athletes."[46] ████████████████████████████████

22 _____

23 [45] Any argument that "Membership Services" ("MS"), the group that was supposed to be
   protecting the SAs by applying the amateurism rules, prohibited use of SAs' NIL in
   commercial products is apocryphal. ████████████████████████████████████

24 ████████████████████████████████████████████████████████ ██

25 ████████████████████████████████████████████████████████ █

26 ████████████████████████████████████████████████████████████

27 [46] The NCAA concluded that this was "permissible" so long as the videogame manufacturer
   did not market this feature to the public. FGD Ex. 58 at NCAAPROD00100838.  Even this

28

1

2

3                    ██████████        SGD Ex. 81 at EA0190404.[47] EA bragged to the press that "100 percent

4    count on having rosters with names available for all schools shortly after release."  SGD Ex.

5    80.

6            Why was EA so confident that name rosters would be available shortly after release?

7

8

9

10   This summary of common evidence that will be used to prove that Defendants used

11   the NIL of SAs in EA's videogames rebuts fully any argument that Plaintiffs need to prove

12   their case of NIL misuse in the videogames on an avatar-by-avatar basis.

13   **IV.    THE MOTION TO EXCLUDE EXPERT EVIDENCE SHOULD BE DENIED.**

14           Defendants also seek to exclude the expert declarations of Noll and Gerbrandt

15   submitted in support of Plaintiffs' motion for class certification. NCAA Br. at 22-24. That

16   request should be rejected. At the very least, if the Court has concerns about the testimony of

17   Noll or Gerbrandt, it should conduct a *Daubert* hearing.

18           Defendants' analysis ignores controlling law in this Circuit and the Federal Rules of

19   Evidence. The Ninth Circuit has held that a *Daubert* analysis applies at the class certification

20   stage. *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 982 (9th Cir. 2011). Federal Rule of

21   Evidence 702 governs the admissibility of Noll's and Gerbrandt's testimony. Pursuant to that

22

23   anti-marketing limitation was circumvented with impunity by EA. Sean O'Brien ("O'Brien"),
     the producer of EA's NCAA Basketball '08, touted in a 2008 interview discussing its
24   "partnership" with the NCAA, that "EA put forth significant effort to make sure that gamers
     had the ability to share all kinds of files online. . . . It's above board with the NCAA and it's
25   perfectly legal--100 percent count on having rosters with names available for all schools
     shortly after release." SGD Ex. 80.
26

     [47] *See* SGD Ex. 82 at EA0044291 ████████████████████████
27

28

rule, the expert evidence has to "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue" and the witness has to be sufficiently qualified to render the opinion. As the Ninth Circuit has explained in *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010), this requirement goes to relevance: "'the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology.' Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." "Shaky but admissible evidence" is dealt with by cross-examination or counter-evidence, not exclusion. 598 F.3d at 564. The Ninth Circuit has also recognized that the experience of the witness can be a factor favoring admissibility and has tailored the requirements for admissibility to the type of expertise at issue.[48] Indeed, a review of the case law after *Daubert* indicates that exclusion of expert testimony is the exception rather than the rule. *See* Fed. R. Evid. 702, Advisory Committee Notes (2000).

With these principles firmly in mind, the declarations and testimony of Noll and Gerbrandt are admissible. Each is well qualified. Noll is Professor *emeritus* of Economics at Stanford University and a Senior Fellow at the Stanford Institute for Economic Research, where he is Co-Director of the Program on Regulatory Policy. He is a world-renowned economist who has testified in multiple antitrust cases,[49] including cases involving the NCAA. The Court is familiar with Noll from the *SRAM* case, where he served as an expert for the direct purchaser plaintiffs.[50] Gerbrandt is founder and principal of Media Valuation

---

[48] *E.g., Mueller v. Auker*, 700 F.3d 1180, 1191 (9th Cir. 2012); *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir.), *cert. denied*, 530 U.S. 1268 (2000). *See In re Toyota Motor Corp. Unintended Acceleration Mktg. Litig.*, 284 F.R.D. 485, 498-99 (C.D. Cal. 2012).

[49] *See, e.g., Sullivan v.NFL,* 34 F.3d 1091, 1100-01 (1st Cir. 1994*), cert. denied,* 513 U.S. 1190 (1995); *United States v. ASCAP*, 712 F. Supp. 2d 206, 210 & n.1, 214 n.9, 244-46 (S.D.N.Y. 2010) ("*ASCAP*"); *In re Napster, Inc. Copyright Litig.,* 191 F. Supp. 2d 1087, 1097, 1100, 1102, 1106, 1107 & n.14 (N.D. Cal.), *aff'd sub nom. A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002); *United States v. W. Elec. Co.*, 767 F. Supp. 308, 312 n.16, 318 n.49, 320, 326 n.90 (D.D.C. 1991); *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007); RNR at 2-4 & Appx. A.

[50] *See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig.,* No. C-07-1819 CW, 2010 U.S. Dist. LEXIS 132172, at *41, *47 n.2 (N.D. Cal. Dec. 10, 2010); *In re Static*

Partners and has more than 30 years of experience as a media and entertainment analyst and as a media executive at firms such as A.C. Nielsen Co. He has testified as a valuation expert in other cases.[51]

The testimony of both witnesses is likely to both assist the trier of fact either to understand the evidence or to determine a fact at issue. Noll's initial report focuses on how the issues of liability and damages in this case can be proven on a classwide basis. RNR at 6. He has extensive analyses of the relevant market for Rule of Reason purposes (*id*. at 14-48), the NCAA's market power (*id*. at 48-55), the anticompetitive conduct being alleged (*id*. at 55-74), the alleged business justifications for that conduct (*id*. at 74-95), and proof of damages on a classwide basis (*id*. at 95-108). All of these matters will assist the Court in deciding the motion for class certification. Gerbrandt's report, based on his extensive expertise in valuation of broadcast rights, provides an analysis of media economics of collegiate athletics and of the relative valuation of initial broadcasts and rebroadcasts of NCAA Division I football and basketball games. LGR at 4-5, 11-19. The substance of both reports is directly relevant to the motion at hand and will assist the Court.

Defendants mount a very narrow attack on Noll. They do not criticize his consideration of the relevant markets, the NCAA's possession of monopoly power within them, the operation of the NCAA's rules or their effect; indeed, if anything, their analysis shows *more* competitive harm arising from the operation of those rules. RNRD at 4-5, 14. The few comments Rubinfeld has on market power are simply off the mark. *Id*. at 17-18. Instead, Defendants create a series of "straw man" arguments that assail Noll for things he did *not* say in his declaration and for assumptions about the "but for" world that he did *not* make. *Id*. at 7-8, 19-21, 66-67. As he notes, "[t]he plaintiffs do not seek to replace the current model of providing financial aid packages of equal value to all student-athletes on the same team who

---

*Random Access Memory (SRAM) Antitrust Litig.,* No. C-07-1819 CW, 2010 U.S. Dist. LEXIS 141670, at *15, *52 (N.D. Cal. Dec. 7, 2010).

[51] *See, e.g., ASCAP*, 712 F. Supp. 2d at 210, 213, 214 n.10; LGR Ex. 1.

receive scholarships for Division IA (D1A, now Football Bowl Subdivision, or FBS) football or Division I (D1) men's basketball with a system of individually negotiated contracts." *Id.* at 3. Unlike Noll's analysis, Defendants' false critiques are not based on any empirical study and run counter to the views expressed in the literature of sports economics about the NCAA's cartel. *Id.* at 2-3, 26. Here, we are dealing with a present-day world in which the NCAA's amateurism rules deny remuneration to class members for use of their NIL in television broadcasts and rebroadcasts and in videogames, both during their eligibility years and after graduation. The existence and effects of the restraint are clear-cut and recognized by economists. RNR at 55-74. *See* RMRD at ¶¶19-20.

As for Noll's damage analysis, Plaintiffs are given leeway to present a damage analysis reasonably tailored to the facts of their specific case.[52] Noll has made an allocation based on the well-recognized economic theory of bargaining devised by James Nash, Jr. ("Nash") and on the benchmark of what is done in professional sports and the entertainment industry with respect to allocation of licensing revenue.  RNR at 101-04; *see* RNRD at 10-11 (Noll defending his use of Nash bargaining theory). Noll's use of a "yardstick" approach is both legally and economically sound. *Image*, 125 F.3d at 1221-22; DRRD at ¶¶21-23. Thus, his allocation is based not on any "personal 'assumption'" or his "opinion and intuition" (NCAA Br. at 22-23), but on real world analogues and accepted economic theories.[53] Stiroh

---

[52] *See, e.g.*, *Fishman v. Estate of Wirtz*, 807 F.2d 520, 551 (7th Cir. 1986); *Danny Kresky Enterp. Corp. v. Magid*, 716 F.2d 206, 213 (3d Cir. 1983); *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1068 (5th Cir. 1985), *cert. denied*, 474 U.S. 1102 (1986); *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974), *cert. denied*, 420 U.S. 929 (1975).

[53] Noll's testimony stands in stark contrast to that of the defense experts. For example, Heckman did no original empirical analysis, did not make any analysis of the linkage between the Plaintiffs' theory of liability and their theory of damages (*see Comcast, Inc. v. Behrend*, 133 S.Ct. 1426 (2013) ("*Comcast*")), gave no real consideration to the antitrust issues addressed by Noll, and was startlingly unfamiliar with the facts, such as Emmert's 2012 statement quoted earlier. Heckman Depo. at 17-18, 51-52, 56-57, 68-69, 73, 127-28, 148-49, 154. His testimony is therefore entitled to little weight, as other courts have found. *Id.* at 122-23. *See* RNRD at 28-30. In contrast, unlike *Comcast*, where the Supreme Court found that plaintiffs' damage expert failed to extract from his model damages for liability theories that were rejected by the district court on summary judgment, no such problem exists for Noll. Stiroh didn't know who Brand was, could not remember what NCAA rules she read, had made no study of how colleges compete for SAs, had not seen any signed SA release, reviewed what was probably not even a "representative sample" of such releases, and only

---

- 43 -

has criticized him for only analyzing revenues from the Pac-10 and the SEC during the 2009-10 season, but, in his rebuttal declaration, he has expanded his analysis (based primarily on data produced after the filing of his initial report) to NCAA Division I men's football and basketball generally over a two-year period. RNRD at 12 & Exs. 5A-70B.

As for Gerbrandt, Defendants claim that his report is inadmissible, because specific calculations were made by a consulting firm with whom he worked and because of various methodological criticisms. NCAA Br. at 24. But those appendices are largely compilations of data from recognized sources used in his profession. To the extent Gerbrandt in his report relied on data analyses performed by another consultant, that was perfectly permissible under Fed. R. Evid. 703.[54] And, as he points out in his accompanying rebuttal declaration, the other criticisms either yield *de minimis* variations or depend on mischaracterizations of his report.

To be sure, Defendants have proffered competing expert reports that disagree with the conclusions expressed by Noll and Gerbrandt. But that is not a reason to declare the Plaintiffs'

---

had a vague "understanding" of what such releases say, has made no independent analysis of the constraints created by the NCAA rules in any market identified by Noll, is unaware of how revenue is allocated in professional sports, and is unaware of the contents of many of the NCAA's declarations. Stiroh Depo. at 12, 61-63, 71-72, 85-86, 99-102, 125-26, 150-51, 162-63, 175-76, 197-98. She stated that she was not testifying about the facts, but only presenting her opinions of Noll's "but for" world. *Id*. at 37-38, 140-41. *See* RNRD at 31-37, 60-62. ███████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████ Rubinfeld Depo. at 6-7, 11, 13, 25-28, 50-51, 53-54, 62-63, 72-73, 99-106, 114-16, 122-23. *See* RNRD at 30-31, 65-67. As McCormick explains, both Rubinfeld and Stiroh confuse economic rents (the payment in excess of what might be required to get the asset to engage in production) with costs. By not paying SAs for their NIL, rents are diverted from players to colleges; Noll's "but for" world would entail a redistribution of a portion of those rents back to players. RMRD at ¶¶17-18, 22-24, 37. Cox, EA's witness, did not ██████████████████████████████████████████████████████████████ Cox Depo. at 66, 94. *See* RNRD at 20-21. As for Guy Ben-Ishai, Defendants used him to compare four attributes of actual SAs on rosters and find exact matches in EA videogame avatars (one pound or one inch off would create a mismatch); many other attributes were not tested and six of the 31 rosters he studied are not even part of the AD Class. Ben-Ishai Depo. at 45-48. 52-53, 64-66, 83-84 (SGD Ex. 87).

[54] *See, e.g., CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 517 n. 25 (11th Cir. 2006), *cert. denied*, 549 U.S. 1113 (2007); *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004); *United States v. 1014.16 Acres of Land*, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983), *aff'd*, 739 F.2d 1371 (8th Cir. 1984).

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1    expert reports inadmissible. "When the parties' experts rely on conflicting sets of facts, it is

2    not the role of the trial court to evaluate the correctness of facts underlying one expert's

3    testimony." *Micro Chem, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).

4    **V.   CONCLUSION AND RESPONSES TO COURT'S SPECIFIC QUESTIONS.**

5         For the foregoing reasons, as well as those set forth in their initial brief, the Court

6    should grant Plaintiffs' motion for class certification, certify the proposed AD Class pursuant

7    to 23(b)(3), certify the proposed IR Class pursuant to Rule 23(b)(2), and appoint Hausfeld

8    LLP as Class Counsel under Fed. R. Civ. P. 23(g).

9         The Court has requested that Plaintiffs address certain specific questions in this reply.

10   SO at 2. The first is what Plaintiffs would do if the Court held that their current theories were

11   not pled adequately in the SCAC. If the Court were to so hold, Plaintiffs would seek leave to

12   amend the SCAC to conform to evidence obtained through subsequent discovery, as permitted

13   by Fed. R. Civ. P. 15(a)(2). In this Circuit, the policy favoring leave to amend "is 'to be

14   applied with *extreme liberality*.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048,

15   1051 (9th Cir. 2003) (citations omitted, emphasis added).  Indeed, there normally exists "a

16   *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.* at 1052. The second

17   question the Court asked is what Plaintiffs would do if leave to amend were denied. If the

18   Court were to so rule, Plaintiffs would ask it to grant class certification with respect to those

19   theories that the Court concludes are encompassed within the SCAC.[55] In addition, if the

20   Court were to deny the motion to certify any class under Rules 23(b)(2) or 23(b)(3), Plaintiffs

21   would ask the Court to consider certification of particular issues under Fed. R. Civ. P.

22   23(c)(4).[56]

23

24   [55] The Plaintiffs would also have the option of including any damage claims relating to the
     sharing of live broadcast revenues obtained during an SA's eligibility years in a separate

25   complaint to be consolidated with this case should the Court conclude that such claims are not
     comprehended within the SCAC and that it did not wish to allow Plaintiffs to amend the

26   SCAC in order to add such claims.

27   [56] *See McReynolds v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 672 F.3d 482, 491-92 (7th
     Cir.), *cert. denied*, 133 S.Ct. 338 (2012); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227,
     1234 (9th Cir. 1996); *In re Activision Sec. Litig.*, 621 F. Supp. 415, 438 (N.D. Cal. 1985).

28

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1    Dated: April 25, 2013                     Respectfully submitted,

2                                              By:  _/s/ Michael P. Lehmann_____
                                               Michael P. Lehmann (Cal. Bar No. 77152)
3                                              Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
                                               HAUSFELD LLP
4                                              44 Montgomery St., 34th Floor
                                               San Francisco, CA 94104
5                                              Tel:  (415) 633-1908
                                               Fax:  (415) 358-4980
6                                              E-mail:mlehmann@hausfeldllp.com
                                                      abailey@hausfeldllp.com
7

8                                              Michael D. Hausfeld (*pro hac vice*)
                                               Hilary K. Scherrer (Cal. Bar No. 209451)
9                                              Sathya S. Gosselin (Cal. Bar. No. 269171)
                                               HAUSFELD LLP
10                                             1700 K Street, NW, Suite 650
                                               Washington, DC 20006
11                                             Tel:  (202) 540-7200
                                               Fax:  (202) 540-7201
12                                             E-mail: mhausfeld@hausfeldllp.com
                                                       hscherrer@hausfeldllp.com
13                                                     sgosselin@hausfeldllp.com
14

15                                             *Plaintiffs' Interim Co-Lead Class Counsel*
                                               *with Principal Responsibility for the Antitrust*
16                                             *Claims*

17

18

19

20

21

22

23

24

25

26

27

28
ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that on April 25, 2013, I served the foregoing document on counsel by

4    filing the public redacted version via the Court's CM/ECF system, which will send an email

5    notice to all registered parties.  On April 25, 2013, I also served the non-public version on

6    counsel for all parties via an FTP site.

7

8                                            */s/ Sathya Gosselin*

9                                            Sathya S. Gosselin

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 47 -

ANTITRUST PLAINTIFFS' REPLY ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW