### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| **IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION** | Case No. 4:09-cv-1967 CW (NC) |
| | **REBUTTAL REPORT OF DR. ROBERT McCORMICK IN SUPPORT OF ANTITRUST PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| **This Document Relates to:** **ANTITRUST PLAINTIFFS' ACTIONS** | Date: June 20, 2013 Time: 2:00 p.m. Judge: Hon. Claudia Wilken Courtroom: 2, 4th Floor |

## I. QUALIFICATIONS

1.      I am Robert E. McCormick. From 1982 until my retirement on December 27, 2007, I was employed as faculty in the Department of Economics at Clemson University, most recently as Professor of Economics and BB&T Scholar. On May 8, 2008, I became Professor Emeritus at the John E. Walker Department of Economics, Clemson University, Clemson, SC, 29634. I live at 222 N. Clemson Ave., Clemson, SC, 29631. I maintain intermittent part-time teaching and minor administrative roles at Clemson University.

2.      I earned the B.A. and M.A. degrees in Economics from Clemson University, 1972 and 1974, and the Ph.D. in Economics from Texas A&M University in 1978. In the academic year 1974-75 and again in the year 1977-78, I held the position of Visiting Instructor of Economics in the Department of Economics at Clemson University. From 1978 to 1982, I was Assistant Professor of Business Administration at the Graduate School of Business at the University of

Rochester. From 1982 to 1985, I was Associate Professor of Economics at Clemson University. In 2000 I was named BB&T Scholar and Director of the BB&T Center for Economic Education at Clemson University. In 2002, I was recognized as Senior Fellow at the Property and Environment Research Center (PERC) in Bozeman, MT, a position I still hold. My complete curriculum vita is attached as Appendix A.

3.      I attended the Law and Economics Institute at the University of Miami in 1980. I was a Visiting Research Scholar at the Public Choice Institute at Virginia Polytechnic Institute in the same year. I was a Visiting Professor at the Universidad Francisco Marroquin in Guatemala in 1988 and 1990 and on several occasions at the Consortium International MBA in Asolo, Italy, most recently in 2004. I was an instructor to attorneys at the Federal Trade Commission in 1982 and 1983. In 2001, I was the Julian Simon Research Fellow at PERC in Bozeman, Montana. From 2002 to 2005, I was the Director of the Kinship Conservation Institute housed in Bozeman, MT. Starting in 2006 to the present, I am the Director of TEAM, a training program for environmental scientists and policy makers at PERC in Bozeman, MT.

4.      My teaching responsibilities have been at both the undergraduate and graduate levels and have focused primarily on economic theory, antitrust, financial and managerial economics, sports and economics, property rights and environmental economics, and entrepreneurial economics. I have won several Clemson University teaching awards: the Phil Prince Innovative Teacher of the Year (1996), the Alumni Master Teacher of the Year (1998), the MBA Professor of the Year (2001 and 2004), and the National Scholars Mentor Award (2004 and 2006). I have taught managerial economics for over 30 years at various institutions, and I have developed and taught, at two different schools of business, courses in the economics of property rights and sports and

economics.

5.      I have been a consultant to the U.S. Department of Agriculture, the U.S. Federal Trade

Commission, and the Department of the Treasury of New Zealand. I have testified before the U.S.

Congress on energy deregulation (1996). I have testified before the South Carolina House of

Representatives on energy regulation (1997), and I have prepared testimony for the New Mexico

Public Service Commission on energy issues (1998). I have prepared affidavits for the U.S.

Congress and for argument in U.S. District Court (1994) on telephony. I have prepared affidavits

for the Surface Transportation Board of the U.S. Department of Commerce on mergers and

antitrust issues (2000 and 2003). I prepared a similar argument for the Canadian Transport Act

Review Panel (2000). I have filed an affidavit before the Federal Communications Commission

(2001) concerning open access in telephone and data transmission markets.

6.      I have consulted with both small and large companies on corporate financial affairs,

litigation matters, golf economics, entrepreneurship, organizational structure and architecture,

business planning and development, and financial valuation. I have done business development

and background consulting for a number of NGO's, both large and small, most recently the

Everglades Foundation. I have advised and consulted on valuation and modeling in various

economics matters.

7.      I have been involved in a number of antitrust and corporate litigation matters. These have

involved class certification and common impact, questions of market definition, antitrust liability,

breach of contract, restraints of trade, damage calculations, questions of standing, and business

valuations. I have been deposed in state and federal court cases on numerous occasions. These

cases have involved allegations of antitrust violations in local telephone markets, aircraft parts,

cigarettes, golf clubs, hospital and health care markets, sports apparel markets, smokeless tobacco, intercollegiate sports, timber markets, textile markets, truck and tractor engines, industrial chemicals, and simple contract breaches. Some of these involved liability; others focused on class certification or damage estimates. A list of my recent cases is attached as Appendix B.

8.      My scholarly research covers a rather broad spectrum in the area of microeconomics, including antitrust, public choice, regulation, sports and economics, managerial and financial economics, property and environmental economics, and general microeconomic theory. I have published two books, one on political markets and another on managerial economics. I have published nine monographs on topics including environmental economics, property valuations, the energy and gambling markets, and the regulatory environment. I have published, often with coauthors, more than 40 articles and papers in refereed professional journals and edited volumes. The majority of my work is empirical rather than theoretical.

9.      I am being compensated by the Plaintiffs in this case at the rate of $600 per hour for my services.


**II. ASSIGNMENT**

10.      I have been asked by counsel for the Plaintiffs in this case to comment on the arguments put forth by Defendants' experts Dr. Lauren Stiroh, Dr. Daniel Rubinfeld, and Dr. James Heckman regarding class certification, in particular their criticisms of the testimony of Plaintiffs' expert, Dr. Roger Noll.[1]

---

[1]Expert Report of Daniel L. Rubinfeld Regarding Class Certification (Rubinfeld Report), the Expert Report of Lauren J. Stiroh, Ph.D. In re: NCAA Student-Athlete Name & Likeness Licensing Litigation (Stiroh Report), the Expert Report of James J. Heckman In re: NCAA

11.     I am responding to work already submitted by these experts, and I do not intend to introduce new evidence except as it is responsive to theories, ideas, or data presented by the aforementioned experts for Plaintiffs and Defendants.

12.     As is customary in cases of this sort, it is likely that new information, data, or facts might come to my attention as the case evolves. I reserve the right to amend or alter this report in light of new information.

13.     I have not been retained to offer an opinion on any matter in this case except the analysis of issues regarding class certification. However, for purposes of evaluating the arguments for class certification, I am, as is customary, assuming the allegations of illegal acts are in fact true.

14.     I am basing my opinions on the facts of this case as I have read them in the complaint and other documents, my knowledge and understanding of economic theory and science, my training and expertise in industrial organization and managerial economics, my understanding of collegiate sports and sports and economics in general, and experience as a professor, consultant, educator, and researcher in economics over the past 35-plus years.


**III. DEJA VU**

15.     In earlier litigation involving the NCAA and its regulations and rules concerning intercollegiate athletic participation, I have written about issues concerning class certification.[2] In

---

Student-Athlete Name and Likeness Licensing Litigation (Heckman Report), the Declaration of Alan J. Cox Regarding Class Certification (Cox Declaration).

[2] See Declaration of Robert E. McCormick in Support of Plaintiff's Renewed Motion for Class Certification, August 26, 2006 and Supplemental Declaration of Robert E. McCormick in Support of Plaintiff's Renewed Motion for Class Certification, September 18, 2006 in *Jason*

that case (*White*), Judge Gary Klausner agreed with my opinion and granted class certification. I make note of this solely because:

a.   The arguments made in the case here made by Defendants' three economic experts are remarkably similar to the arguments put forth by Defendant NCAA's expert Dr. Janusz Ordover in the *White* case.[3]

b.   I disagreed with the opinions of Dr. Ordover.

c.   I put forth a model of damages and tendered theory and evidence on the issues in that case. Specifically, I opined that class-wide impact could be established by common proof and damages calculated in a class-wide, formulaic fashion.

d.   The facts of the two cases are *not* identical. However, they are similar and the theories put forth by both Dr. Noll for Plaintiffs and by Drs. Stiroh, Rubinfeld, and Heckman for Defendants are remarkably similar to the arguments pro and con in *White*.

e.   Judge Klausner cited my report several times in his opinion certifying the class and seemingly, given his ruling, rejected the opinion and arguments of Dr. Ordover. He also specifically accepted my reliance on practices in professional leagues as an appropriate model for collegiate sports much as Dr. Noll opines is appropriate in

---

*White, Brian Polk, and Jovan Harris and all others similarly situated, Plaintiffs, vs. National Collegiate Athletic Association, defendant*, Case No. CV 06-0999 RGK (MANx), United States District Court, Central District of California, Western Division. For exposition in this Report, I call this the *White* case.

[3]   The *White* case parallels this case in that it argued that the old grant-in-aid scholarship program did not cover the full cost of attendance for athletes, and more so because it pled for additional payments to athletes to cover those costs borne by the athletes.

this case. Again, I make this point solely because of the parallels between *White* and this case.[4]

## IV. BACKGROUND

16.     In this section I offer a summary of my views on the expert reports by economists for Plaintiffs and Defendants in this case.

    a.      The NCAA is a cartel.

    b.      This cartel effectively extracts economic (Ricardian) rents from college athletes.

    c.      This rent redistribution has no other impacts on the economic conditions in college athletics markets.

    d.      Non-price competition through a variety of recruiting practices replaces the mechanisms that a more competitive marketplace relies on to efficiently assign players to colleges.

    e.      In 1991, the Ivy League undergraduate scholarship cartel was dismantled by consent decree. In the aftermath, there were no discernible differences in enrollment patterns as might be suggested when regular students (or athletes) began to be (or would be) paid more. This strongly suggests that in this case, increased pay to students will have no measurable impact on enrollment patterns.

---

[4] Appendix C and Appendix D are those two filings in the *White* case. The court can observe for itself that my opinions there contrasted with those of Dr. J. Ordover who himself made many of the same arguments as put forth here by Defendants' experts Drs. Heckman, Stiroh, and Rubinfeld. In those two appendices, I have deleted superfluous matter such as my vita and my list of cases. If the Court wishes, I can supply those.

f.   When all is said and done, the only impact of the cartel arrangement that redistributes rents is to lower income of players and raise incomes of the basketball and football programs of the colleges.

g.   A 1/n sharing rule (as described below) is common in group situations similar to this case.

h.   A 1/n sharing rule has efficiency properties in other settings similar to the issues in this case, such as the so-called "rotten kid theorem," and within the experimental economics literature on cooperation.

i.   Formulaic assignment of damages to Plaintiffs via some 1/n sharing rule mimics what exists in similar situations where players instead of teams get player rents.[5]

17.   At its base, the economics of this case is about economic rents. I discuss economic rents in detail below, but for purposes of summary, economic rents are payments to a factor of production, land, labor, cunning, skill, intelligence, or invention, above the amount necessary to induce production. The concept is as old as economics having been discussed in the works of our patriarchs Adam Smith and David Ricardo so much so that rents are sometimes called Ricardian Rents.[6]

---

[5] See *also* Declaration of Daniel A. Rascher in Support of Motion by Antitrust Plaintiffs for Class Certification April 25, 2013 who offers additional details on sharing, specifically that players in situations similar to the facts of this case get 50 percent or more of revenues (¶ 6 and ff.)

[6] See http://www.econlib.org/library/Ricardo/ricP1a.html#2.3 for some of Ricardo's original writings on this concept. He says, for instance, "If the high price of corn were the effect, and not the cause of rent, price would be proportionally influenced as rents were high or low, and rent would be a component part of price." It is a failure to appreciate this point that permeates and flaws the analysis of Defendants' experts, all four. I discuss this in more detail below.

18.     Why is this important? Defendants' experts have confused rents generated from athletic talents with a cost of production of athletic events. Because they have conflated rents with cost, they have misinterpreted the impact of redistributing rents from colleges to athletes.[7]

19.     The NCAA operates as a business for its member colleges and universities. In that business,[8] the NCAA restricts competition for high school athletes to play collegiate football and basketball. The NCAA is a cartel. The economics profession, almost without exception, views the scholarship limitations as a cartel and a highly effective cartel.[9] Economists disagree about almost

---

[7] Dr. Myles Brand, the NCAA's former President, said in a 2006 State of the Association speech entitled, "The Principles of Intercollegiate Athletics,":"So while intercollegiate athletics is often criticized for looking like professional sports on the in-put side - generating revenue - it is rarely understood that intercollegiate athletics and higher education behave like classic nonprofits on the out-put side in the way they redistribute those revenues to support their missions. The business of college sports is not a necessary evil; rather, it is a proper part of the overall enterprise." [Note that he uses the phrase "in-put" where I (cum economist) might say output because I interpret him to mean where the money flows in.] (http://fs.ncaa.org/Docs/NCAANewsArchive/2006/Association-wide/brand%2Bcharts%2Bcourse%2Bfor%2Bcollegiate%2Bmodel_s%2Bnext%2Bcentury%2B-%2B1-16-06%2Bncaa%2Bnews.html)

[8] Again, see Myles Brand, 2006, "On a smaller but similar scale, the business plan for the athletics department mirrors that of the university. Revenue is maximized to meet the mission and strategic emphasis of the department. Athletics departments accrue far more revenue, as a proportion of their budget, from sales of tickets and media rights than the rest of the university."

[9] See, for instance, Arthur Fleisher, Brian Goff, and Robert Tollison, *The National Collegiate Athletic Association: A Study in Cartel Behavior*, 1992, University Of Chicago Press. Gary Becker summarizes the operation of the cartel well:

> The toughest competition for basketball and football players occurs at the Division I level. These sports have both large attendances at games-sometimes, more than 100,000 persons attend college football games- and widespread television coverage. As a result, many Division I schools with big time sports programs get many millions of dollars from their basketball and football programs. Absent the rules enforced by the NCAA, the competition for players would stiffen, especially for the big stars, as they would receive large scholarships and various gifts of cars,

everything, but on this issue there is virtual unanimity. The NCAA is a cartel operating to lower

the costs of a primary input to production of football and basketball, labor. Harvard Professor

Robert Barro says it this way in his tongue in cheek discussion of "the best little monopoly in

---

housing, and cash to themselves and their families. **Payment to players, if
competition for players were allowed to operate freely, would severely eat into
the profits made by colleges from the big time sports.**

**To avoid that outcome, the NCAA sharply limits the number of athletic
scholarships, and even more importantly, limits the size of the scholarships
that schools can offer the best players.** NCAA rules also severely restricts the
gifts and housing players are allowed to receive from alumni and others, do not
allow college players to receive pay for playing for professional teams during
summers or even before they attended college, and limits what they can be paid for
non-playing summer work. The rules are extremely complicated, and they
constitute hundreds of pages that lay out what is permitted in recruiting prospective
students, when students have to make binding commitments to attend schools, the
need to renew athletic scholarships, the assistance that can be provided to players'
parents, and of course the size of scholarships.

**It is impossible for an outsider to look at these rules without concluding that
their main aim is to make the NCAA an effective cartel that severely
constrains competition among schools for players**. The NCAA defends these
rules by claiming that their main purpose is to prevent exploitation of
student-athletes, to provide a more equitable system of recruitment that enables
many colleges to maintain football and basketball programs and actively search for
athletes, and to insure that the athletes become students as well as athletes.

Unfortunately for the NCAA, the facts are blatantly inconsistent with these
defenses. Consider the recent widely publicized violation of NCAA rules by five
Ohio State football players and their coach. The players' "crime" was that they sold
some of their football memorabilia, including signed autographs, for modest sums,
and for tattoos. The coach's "crime" was that he failed to report these violations in
a timely fashion. All the players involved, which includes the star of the team, and
the very respected coach, will have to miss the first 5 games of the 2011 season.
This is almost half of the 12 games played during the regular season. Nothing done
by the players involved stolen property or anything else that would violate any laws
except those imposed on players by the NCAA. (**Bold** added.)
http://www.becker-posner-blog.com/2011/04/the-ncaa-as-a-powerful-cartel-becke
r.html

America":[10]

> Finally, we come to the NCAA, which has successfully suppressed financial competition in college sports. The NCAA is impressive partly because its limitations on scholarships and other payments to athletes boost the profitability of college sports programs. **But even more impressive is the NCAA's ability to maintain the moral high ground**. For example, many college basketball players come from poor families and are not sufficiently talented to make it to the National Basketball Assn. Absent the NCAA, such a student would be able to amass significant cash during a college career. With the NCAA in charge, this student remains poor." (**Bold** added.)

20.     Even among the articles which Dr. Rubinfeld indicates he considered in forming his opinions, the conclusion that the NCAA is a cartel (or alternatively, a monopsony) with respect to its treatment of college athletes is plain — just from the titles that appear in the peer-reviewed literature.[11]

21.     Major college football and basketball players possess extraordinary skills and talent. CBS, NBC, Fox, and ESPN networks pay huge sums to broadcast events displaying these athletes in competition.[12]

---

[10]  Robert Barro, "The Best Little Monopoly in America," *Business Week*. 2002. Online at http://www.businessweek.com/stories/2002-12-08/the-best-little-monopoly-in-america.

[11]  See for example, pp. 104-5 of Dr. Rubinfeld's report where he cites such titles as Brown, Robert W., "Measuring the Cartel Rents in the College Basketball Player Recruitment Market," *Applied Economics*, Vol. 26 (1994), Kahn, Lawrence M., "Markets: Cartel Behavior and Amateurism in College Sports," *Journal of Economic Perspectives,* Vol. 21 (2007) and Leonard, John and Prinzinger, Joseph, "An Investigation into the Monopsonistic Market Structure of Division One NCAA Football and Its Effect on College Football Players," *Eastern Economic Journal*, Vol. 10 (1984).

[12]  For instance, CBS and Turner Broadcasting have paid over $10 Billion for multi-year broadcast rights to just one portion of this, the annual NCAA basketball tournament, commonly called March Madness. This one event produces over $700 million annually for the NCAA and its

22.     The NCAA, acting as cartel agent for its member colleges, has established rules limiting payments to players under the umbrella of amateurism.[13] There can be no doubt the unusual skills of the players on major college football and basketball teams produce enormous rents. Considering that most of them are in the age group 18-24, they do not yet have a college degree. The opportunity cost of the time of these people is low, surely below $50 per hour and probably a lot less.[14] Yet their rare talents and work habits produce huge sums of revenues. This is the definition of rents.

---

member schools. (http://sports.espn.go.com/ncb/news/story?id=5125307).

[13] Note that the amateurism so lauded by the NCAA does *not* extend to coaches or colleges, who routinely charge television networks, fans, and patrons huge sums to watch the amateurs play. As former NCAA President, the late Myles Brand discussed in 2006: " 'Amateur' defines the participants, not the enterprise."

[14] In an open letter to the *New York Times*'s Joe Nocera, NCAA's General Counsel, Donald Remy, explained that the NCAA is fully aware that the reservation price (that is, the actual economic cost to the NCAA) of an athlete is much lower than the rents he can generate

> In economic terms the supply-of-labor function is essentially limitless or unresponsive to price. The players want to play, and many of them effectively will pay tuition and more to be able to play. Some want an education, some want to go pro (few do), and some want both. Some just want to play for their school. Given this highly inelastic supply function, the NCAA rules cannot control this hypothetical market because buying less - by for example reducing the value of a grant-in-aid - would not materially reduce the supply of players.

(http://www.ncaa.org/wps/wcm/connect/public/NCAA/Resources/Latest+News/2012/January/Why+the+New+York+Times+Nocera+is+wrong)

I note, in some substantial agreement with Mr. Remy, that the supply of talent is quite inelastic, perhaps nearly perfectly inelastic as he suggests. Were this true, and I think it is so or nearly so, then for purposes of analysis, this athletic talent is *exactly* like land as described by Ricardo and others. This means that *all of the revenue generated* is rent, and perhaps even more importantly, that there can be *no* economic adjustments to production when the factor is fixed in supply.

23.     By limiting payments to the players, the rents are redistributed from the players to the

colleges. Although I would caution against trivializing the horror that was (and is) slavery by loose

comparisons, for this specific point regarding rents, at least in its economic aspects and effects, the

collegiate cartel acts in a similar fashion to slavery. Under slavery, laborers work, but the owner

gets the bulk of the payments for the production. The rent from work is redistributed from the

worker slave to the slave owner. Basically, nothing else changes. The productivity of the worker is

not changed by the redistribution of the labor value.[15] So unless the owner works the slave *longer*

hours than the slave would voluntarily, then the amount of work done is identical, and the value of

the products made by the slave labor are unaffected by the taking of the wages from the worker. I

discuss this in more detail below, but the argument is simple and a mainstay of economic theory.

Cost is opportunity cost, not accounting cost.[16]

24.     Because Defendants' experts have convoluted rents and cost, they have mischaracterized

the but-for world in the class certification stage of this litigation. Redistributing rents does *not*

---

[15]  Note that two important issues stand to cloud this result. One is agency costs (see Mike
Jensen and William Meckling, "Theory of the Firm: Managerial Behavior, Agency Costs and
Ownership Structure," *Journal of Financial Economics,* (1976):305-60) and the other is income
effects. As rent is redistributed, different people may react differently to the wealth they receive or
lose. It is normal in economic discourse to discount these effects in many instances, in the Coase
Theorem, for instance ("The Problem of Social Cost," *Journal of Law and Economics*,
(1960):1-44). However, assuming these effects away does not mean that they go away.

[16]  For more on the economics of slavery and how the price of cotton might have been affected
by slavery (not by the redistribution of the labor rents) see, Robert Fogel and Stanley Engerman,
*Time on the Cross: The Economics of American Negro Slavery*, vols. 1 and 2, (1974), W. W.
Norton. Fogel won the Nobel Prize, in part for his work on the economics of American slavery.
Their work might be interpreted to suggest that switching ownership of labor from slaves to
landlords may have impacted the price of output but only if the supply of labor was increased as
landlords might have made slaves work longer (or harder) hours than they would have of their own
free will.

change true economic costs. It simply takes money from one person or group and shifts it to another, *without affecting costs or other economic behavior.*

25.    Nobel Laureate Ronald Coase's most famous work on the allocation of property rights makes the point vividly.[17] The reassignment of rights does not impact the allocation of resources. In this case, this straightforward result implies that if players are allowed to own their names, likenesses, and images (instead of these being handed over to the colleges without compensation) no economic consequences will emerge, other than who gets the money.[18] Indeed, Simon Rottenberg predated Coase, in one of, if not the first, academic journal article in economics on sports, when he noted that a main feature of the reserve clause in baseball was "...that ownership of a players' property rights would have no effect on the allocation of players across teams in a league; players will gravitate – or, under a reserve system, be gravitated– to where their marginal revenue product is the highest."[19]

---

[17] See Ronald Coase, "The Problem of Social Cost," *Journal of Law and Economics*, (1960):1-44. Nobel Laureate George Stigler coined the now famous phrase, "the Coase Theorem" that is described in "the problem of social cost." (http://www.econlib.org/library/Enc/bios/Coase.html.) This is one of the most widely cited journal articles in all of economics.

[18] Again, I note the underlying assumptions of zero transactions costs and the absence of income effects for the theorem to hold strictly.

[19] See Simon Rottenberg, "The Baseball Players Labor Market," *Journal of Political Economy,"* Vol. 64, No. 3 (Jun., 1956):242-258. This quotation was taken from a retrospective examination of Rottenberg's contributions by Allen R. Sanderson and John J. Siegfried, "Simon Rottenberg and Baseball, Then and Now: A 50th Anniversary Retrospective," (2006) working paper, Vanderbilt University, online at http://www.accessecon.com/pubs/VUECON/vu06-w06.pdf, page 9. Sanderson and Siegfried go on to say, "Subsequent research has attempted to measure the extent of player mobility before and after free agency, and its impact on competitive balance; the results generally support Rottenberg's predictions and the Coase Theorem." (page 9.)

26.     This point has escaped the attention of Defendants' experts.

27.     The analysis provided by Defendants' experts misses a critical feature of major college athletics, recruiting. Below, I go into detail about the importance of recruiting as a fundamental component of the NCAA cartel. Since players cannot be paid directly for the current labor or the income in the future from their current labor, colleges compete for players in other ways. Instead, they recruit them, and they recruit them with a vengeance. Recruiting is a process that matches players with colleges by offering athletes primarily non-pecuniary benefits. This matching replaces the regular marketplace, but because the non-pecuniary benefits offered to athletes are costly (in a true sense of cost in that they consume real resources), the matching effectively replicates the marketplace. I offer details and evidence on this below, but the primary point here, the recruiting process puts players where they are most valuable, and hence generally replicates the but-for world where players would get paid.[20]  Accordingly, the but-for world is, broadly speaking, like the existing world except for who gets the money, and the worries about class conflict expressed by Defendants' experts are simply pure speculation without justification in economic theory. Recruiting in the NCAA cartel world creates an actual world that strongly resembles the but-for world where athletes get paid for the names, images, and likenesses. The economics of rents and rent-seeking behavior ensures that for the vast predominance of the class of athletes, their but-for school and their actual school would be the same.

28.     There is a clear and straightforward case study that parallels this case. It is the case of the Ivy League scholarship cartel. After the cartel was dissolved, everyone agrees that scholarship

---

[20] In Appendix E, I offer a capsulated summary of the importance of recruiting that should dispel any and all notions that it is anything but a huge matching (non-price) marketplace.

offers have gone up. Even so, there is NO evidence that there has been any reallocation of students. I discuss this in detail below.


## V. ON SPECIALIZED FACTORS OF PRODUCTION, RENT, AND QUASI-RENTS

29.     Experts for Defendants would have the court believe that transferring the rental income currently paid to NCAA and its member institutions would increase the cost of production, and accordingly lead to all sorts of potential changes in college participation in athletics. This is simply not right, out of touch with basic economic theory and principles, and misleading. In order to explain their error in more detail I first explore the basic underlying tenants of economic rent.[21]

---

[21] There is considerable literature in economics on the assumption of profit maximization. Dr. Rubinfeld disagrees that NCAA member colleges and universities are profit maximizers. This is somewhat inconsistent with the literature on how so-called not for profit firms operate and what it is that they maximize. It is standard to assume that colleges and universities are operating in much the same fashion as classical for profit firms, but that they do not dispense their profits. See, for instance, Michael Rothschild and Lawrence White, "The Analytics of the Pricing of Higher Education and Other Services in which Consumers Are Inputs," *Journal of Political Economy*, (1995) who say, "We assumed that universities were profit maximizers and (implicitly) that they were subject to the usual forms of resource constraints." (page 583.) For one explanation of why universities and colleges are organized as not for profit, see E. Fama and M. Jensen, "Separation of Ownership and Control," *Journal of Law and Economics,* (1983):301-325 who basically argue that if colleges could pay a dividend that they would not be able to collect donations. They say, "absent fiat, the form of organization that survives in an activity is the one that delivers the product demanded by customers at the lowest price while covering costs." (page 301) This implies that the organizational structure of colleges is efficient, and this can be interpreted to mean that resources are used wisely, at least as well or better than any other organizational form. In the same volume of the *Journal*, see their other paper, "Agency Problems and Residual Claims," (1983):327-349. See also R. Anderson, P. Porter, and C. Maurice, "The Economics of Consumer-Managed Firms, *Southern Economic Journal,* (1979):119-130 who say, "...consumer-owned, consumer-managed firms, organized to maximize the utility of each member, reach the same long-run equilibrium position as the perfectly competitive firm,..." (page 129). Anderson, Maurice and Porter, in a follow up paper on factor usage come basically the same conclusion ("Factor Usage by Consumer-Managed Firms," *Southern Economic Journal*, (1980):552-30. Also, Douglas W. Caves and Laurits R. Christensen, "The Relative Efficiency of Public and Private Firms in a

30.     Economic rent is a term of art in economics. As noted above, the first use of the term is most likely attributed to the work of David Ricardo nearly 200 years ago in his *Principles of Political Economy and Taxation*, 1817, John Murry, London. Adam Smith and many others also contributed to the early understanding of the concept. The principle was first applied to land, but our understanding now applies to any factor of production which is not perfectly elastically supplied. Such factors of production are said to be "specialized."[22] They are specialized in the sense that as demand for them grows, the additional or marginal units brought to the marketplace are of lower and lower productivity/quality.

31.     Economic rent might be thought of (for land or other specialized factors of production) as that payment in excess of what might be required to get the asset to engage in production.[23] A

---

Competitive Environment: The Case of Canadian Railroads," *Journal of Political Economy* (1980):958-76 find that when not for profit firms (a government firm in this case study) are faced with competition, as major colleges and universities are, that "...any tendency towards inefficiency has been overcome by the benefits of competition." (page 958). In summary, the literature says that when firms are in competition they have to perform efficiently, regardless of organizational structure. Surely, it goes without saying that major colleges and universities are in competition with each other for students, athletes, television revenues, faculty, research dollars, and much more, except of course, when they successfully cartelize, as they have with the NCAA. In fact, doesn't the mere existence of the NCAA imply that colleges and universities tend to maximize profits and use resources efficiently? As Myles Brand, former NCAA President put it in State of the Association address in 2006, "Athletics, like the university as a whole, seeks to maximize revenues. In this respect, it has an obligation to conduct its revenue-generating activities in a productive and sound business-like manner. Anything less would be incompetence at best and malfeasance at worst." (http://fs.ncaa.org/Docs/NCAANewsArchive/2006/Association-wide/brand%2Bcharts%2Bcours e%2Bfor%2Bcollegiate%2Bmodel_s%2Bnext%2Bcentury%2B-%2B1-16-06%2Bncaa%2Bnews .html)

     [22] See, for instance, Gary S. Becker, *Economic Theory*, Alfred Knopf, 1971, page 77.

     [23] There is a nuanced discussion about this exact definition that is not relevant to our discussion here. See, for instance, A. Ross Shepherd, "Economic Rent and the Industry Supply

common definition is "the excess amount earned by a factor [of production] over the sum

necessary to induce it to do its work."[24] Dr. Rubinfeld and the other Defendants' experts make the

mistake of attributing *all* but-for royalty payments to college athletes as a cost of production.

Clearly they are not.[25]

32.     Professor Becker (1971) in his classic treatise on price theory even uses athletes as an

example of those with "superior managerial and other entrepreneurial abilities or from superior

---

Curve," *Southern Economic Journal* (1970) 37 (2): 209–211. This discussion arose in the 1970s
concerning oil which had already been discovered and oil fields which were either undiscovered or
undeveloped. The distinction became known as "old" and "new" oil. Congress attempted to tax
"old" oil when the price of crude rose, under the economic theory that the higher prices to "old" oil
were not necessary to bring that oil to market (by definition), and hence, taxing "old" oil would not
reduce the supply of oil. This is exactly the argument that Defendants' experts get wrong.
Redistributing inframarginal rent *does not* alter the supply of crude. It only affects who gets the
money. And so it is with NCAA athletes. If the rents, now going to the colleges and NCAA, were
redistributed to the athletes, *there would be no change in the supply of athletes.*

    [24] R. H. Wessel, "A Note on Economic Rent," *American Economic Review,"* (1967):1222.
Wessel goes on to point out, and actually anticipates, the center of the arguments in this case. He
says about rent, "It is oriented to the motivates of the supplier of resources and presumably may
serve as the **basis of moral judgments approving or condemning their rewards." (Bold**
added.) (page 1222.) He further adds the underlying reason that the concept is critical in this legal
matter, "The traditional rent concept also enables us to divide, conceptually at least, factor
compensation into two parts, payments which induce factors to work and surplus which only
confers a greater reward for work which would have been done anyway. In classical terms it
distinguishes payments made to over-come 'real costs,' labor pain, abstinence, etc., from
unnecessary bounties." (page 1223.)

    [25] "Third, the loss of large amounts of licensing revenue would substantially affect budgeting
decisions schools would have made regarding revenue allocation, sport sponsorship, scholarship
spending, and athletic spending more broadly." Rubinfeld (page 155). Heckman (page 31):
"Therefore, his analysis cannot be used to preclude the possibility that increased payments to
student-athletes (potentially for NIL rights) can lead universities to alter expenditures for other
services and infrastructure used by these students, or even to eliminate certain intercollegiate
sports teams from their athletic programs."

resources."[26]  And then cites as examples two basketball players, very famous at the time and still

so, Wilt Chamberlain and Lou Alcindor [*sic*].[27]

33.    Professor Becker goes on to say:

> The difference between the revenue and cost of an efficient firm is called
> "economic rent," and is a reward for the scarcity of superior efficiency that would
> vanish as it became common." For example, if 500 Wilt Chamberlains were
> available, each would probably receive no more than $10,000 a year for playing
> basketball, instead of the quarter of a million dollars he is reported to receive. If the
> superior resources and abilities responsible for economic rent can be sold to other
> firms, as can be with a mine or a patent right, economic rent might justifiably be
> called a "cost."[28]

34.    Becker then makes the salient and critical point of analysis revealing the error of

Defendants' experts. "The most important [point] is that rents are **price-determined**, not

price-determining, as are labor, capital, and other conventional costs."[29]  (**Bold** added.) The point

that Becker is making is that if the *rents* currently generated by collegiate athletes and former

athletes are *not* a cost of production to the NCAA and member schools. Transferring these rents to

the athletes, as Dr. Noll suggests, does not raise cost. This point is simple, transparent, obvious,

and not controversial in the economics literature. Drs. Rubinfeld, Heckman, and Stiroh missed the

---

[26]  Becker page 77.

[27]  Lou Alcindor is now Kareem Abdul-Jabbar. (Becker, page 77.) Professor Becker
misspelled Lew Alcindor as Lou Alcindor in his book.

[28]  Becker, page 77. Keep in mind that Professor Becker is writing in the mid-1970s. The
dollar figures he cited are inappropriate to any actual calculations in this case owing to many
factors, notably simple price inflation. When Dr. Becker says "cost" he is meaning, there, a cost to
the individual firm using the asset, but not a social cost.

[29]  Becker, page 78.

point and got the economics wrong.[30]

35.    See *also* Robert Tollison, "Rent Seeking: A Survey," *Kyklos* 35(4) (Dec. 1982:575-604 who says, "Rent is a venerable concept in economics. Defined as a return in excess of an owner's opportunity cost, economic rent has played a prominent role in the history of economic analysis [quoting David Ricardo without citation because of its wide knowledge] ('corn is not high because rent is paid, rent is paid because corn is high')."[31]  In the context of this case, the point is that the rents that would be paid to athletes in the Noll but-for world would *not* increase the cost of production, the prices of tickets, or the prices of video games or replays.[32]

36.    To put this discussion in the most direct context possible, note that the National Council on Economic Education uses the arguments in this case as a teaching point about economic rents and provides the answer given by Dr. Noll and contradicts the analysis of Drs. Rubinfeld, Stiroh, and Heckman.[33]  (Keep in mind that this is a test given to high school students seeking college credit in economics.) The following is question 7 in the teacher's manual, followed by the answer guide (in **bold** in original).

The National Collegiate Athletic Association (NCAA) regulates all college

---

[30]  For additional discussion see, for instance, A. Alchian and W. Allen, *University Economics*, 3*d* ed. 1972 Wadsworth Publishing, page 319. C. E. Ferguson, *Microeconomic Theory*, 3d ed. 1972, Richard D. Irwin, also discusses this point in the context of the long-run increasing cost industry, pages 278-79.

[31]  Tollison, page 575.

[32]  For additional discussion and details on specialized inputs and economic rent, see Robert McCormick, *Managerial Economics,* 1992, Prentice-Hall, Chapter 7.

[33]  Morton, John S.; Goodman, Rae Jean B. (2003)., "The Story of Economic Rent: What do Land, Athletics and Government have in Common." *Advanced Placement Economics* (3 ed.), p. 271.

athletics in the United States. It sets the amount of scholarships, the number of scholarships granted and the regulations for recruiting athletes. The NCAA has hundreds of rules regulating intercollegiate athletics.[34]

A. What effect do these regulations have on who receives the economic rent from college athletics? [answer] ***They set the level of the athletes' benefits and salaries so the universities receive the economic rent. (Bold and italics in original)***

...

C. Who would gain if the NCAA could no longer set rules for college athletics? Why? [answer] ***Probably the athletes who would receive higher salaries and not just standard scholarships. Players in the major-revenue sports would be helped, and players in the low-revenue sports would be hurt.***

37.    Dr. Rubinfeld argues that loss of revenues by colleges (if players were to receive royalties) would lead them to make very different athletic department choices.[35]  While it is true that if colleges lose the rents that they currently extract from the players they will have lower revenues, economic analysis says that the cost and benefits of sports will be unaltered. The rents from the specialized superior skills of the players, currently taken by the colleges through their cartel agent the NCAA, are free money to the schools. How that money is spent has nothing to do with this case. It could be spent to lower tuition, provide scholarships, provide higher salaries to coaches, pave campus streets, or hundreds of other ways, perhaps even leading to lower charitable

---

[34]  Stiroh Deposition, pages 48-49: Q. Do you know if there is any document produced by the NCAA, any reference within the NCAA, of a no-promise-to-pay principle, rule, interpretation, or regulation?
...
A. As -- I can't call anything specific to mind, which doesn't mean it's not there; it means I can't recall it as I sit here

[35]  See Expert Report of Daniel L. Rubinfeld Regarding Class Certification, March 14, 2013, ¶171-176.

contributions or state subsidies.[36] Some of those things may go away, but the revenue generating

process will remain unchanged. The point is that cost is opportunity cost, and rents are not a cost.

They are income received *above* the cost of production. The literature in economics is clear on this

point, and Dr. Rubinfeld's analysis fails because it confuses rents with cost. Dr. Heckman's

analysis suffers the same problem in his discussion of college participation in intercollegiate

athletics.[37] Dr. Stiroh also misses this basic point. Rents are not costs. Because she confuses these

two, she errantly argues that schools might alter their levels of participation in intercollegiate

athletics.[38]

> a.   To make this point vivid and to reveal how Defendants' experts have
>
> misunderstood the market for college athletes, consider the age old problem in
>
> economics of the military draft versus the all voluntary army. Many, if not most,
>
> economics students are forced to learn that a draft, while it results in lower
>
> expenditures on national defense, *does not lower the real or social cost of national*
>
> *defense.* A military draft only shifts the burden from taxpayers to the draftees.

---

[36] See for instance, E. Becker and M. Lindsay, "Does the Government Free Ride?" *Journal of Law and Economics*, 37 (1994):133-152 who say, in part, "We examine the response of state and local governments to voluntary charitable giving and find convincing evidence that private charity crowds out spending by these governments in some cases." (pages 277-78.) In the context of this case, this suggests that when colleges capture rents from college athletes, as they do with NCAA cartelization, the net effect might be to simply lower subsidies from donors, be they private charities or state governments.

[37] See Expert Report of James J. Heckman In re: NCAA Student-Athlete Name and Likeness Licensing Litigation, March 14, 2013, ¶28, page 15, and ¶31 page 17.

[38] See Expert Report of Lauren J. Stiroh, Ph.D. In re: NCAA Student-Athlete Name & Likeness Licensing Litigation, March 14, 2013, ¶34-36, pages 14-15.

REBUTTAL REPORT OF DR. MCCORMICK ISO OF CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
22

b.    For instance, Christopher Jen puts it this way:

> Before the United States abolished the draft in 1973, some of its supporters
> argued that an all-volunteer force (AVF) would be too expensive because
> the military would have to pay much higher wages to attract enlistees. **But
> the draft does not really reduce the cost of national defense. It merely
> shifts part of the cost from the general public to junior military
> personnel** (career personnel are not typically drafted). This tax is especially
> regressive because it falls on low-paid junior personnel, who are least able
> to pay. Moreover, not just draftees pay the tax; so do those who still
> volunteer despite the lower pay. In other words, the draft is a tax on military
> service, the very act of patriotism that a draft is sometimes said to
> encourage. The President's Commission on an All-Volunteer Force
> estimated that the draft tax during the Vietnam War was more than eight
> billion dollars per year in 2003 dollars.[39] (**Bold** added.)

c.    The NCAA cartel in effect, drafts the names, likenesses, and images of collegiate
athletes for its own benefit, denying them to the athletes. As with a military draft,
this does nothing to the cost of production. It only redistributes the rents, and as a
side note, actually disguises the cost of production.

d.    Early on in their economics training, students are taught that there is no difference
in costs between a firm that owns its own buildings versus one who rents its

---

[39] Online at http://www.econlib.org/library/Enc/Conscription.html.

REBUTTAL REPORT OF DR. MCCORMICK ISO OF CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW
23

buildings. In either case the cost of use is the forgone or opportunity cost of the building. This is truly basic economics. While accountants might think that a parent could lower the cost of college education by buying an apartment for her daughter, thereby saving on monthly rental payments, the real cost of education is *not* changed. The apartment *could* be rented to some other student, and therefore costs a parent the amount of the rent if used by the daughter. The same is true of athletes who names, images and likenesses are conscripted without recourse.

## VI. IMPACT OF DIRECT PAYMENTS TO PLAYERS, THE BUT-FOR WORLD

38.   Recruiting in major college football and basketball is big business. The end result of that process is a matching between players and schools that tends to generally emulate the pay for play marketplace. It is Defendants' experts mistake to believe that athletes are randomly or even somewhat carefully placed at schools. The recruiting process is *years* in the making.[40]  The evidence strongly suggests that this matching process generally emulates the marketplace that would be present in a pay for play world and places each student at the school where they are most valuable or where they would choose, *even if they were paid.*  In other words, the concerns expressed by Defendants' experts that it is not possible to forecast the but-for world when players get paid is simply denied by the facts of recruiting. Recruiting creates the but-for world, and there

---

[40]  It is not uncommon for a star player to be offered a scholarship while still in the 10th grade and even occasionally the 9th grade. For instance, as just one example, Clemson University football has offered a scholarship to a prospective wide receiver from New Orleans for the entering freshman class of 2015. The offer was made April 18, 2013, fully two plus years prior to enrollment. (See http://www.tigernet.com/view/recruiting_update.do?id=10719.)

is no reason to think, none, that any player would enroll at a different school if they were paid just as there is no economic reason to think that a slave would work at a different farm once free. Slaves were traded, and rented and they moved to their highest value location.[41]

39.     Because recruiting is such a massive undertaking and because of its depth and details, in the current world of collegiate athletics, players are already playing at the school that values them the most highly, and where they are most comfortable getting educated or preparing themselves for their futures. So if they were paid (as this case pleads), they would not change schools, because they are at the school now who values them most and where their marginal valuation is already at the highest in the market and where they are most suited.[42]

40.     For instance, one prospective college athlete, Deshaun Watson of Gainesville GA, who discusses how they chose a school and how it "fits them":

---

[41] "The domestic slave trade within the United States did not begin, as is often assumed, with the abolition of the transatlantic slave trade in 1807. It originated half a century earlier in the 1760s, and overlapped with the trade from Africa. It was extensive even between 1787 and 1807, a period in which more Africans were forced to these shores than in any two decades in North American history. The domestic trade continued into the 1860s and displaced some 1.2 million men, women, and children, the vast majority of whom were born in America." (http://www.inmotionaame.org/print.cfm;jsessionid=f830265388136667509431?migration=3& bhcp=1.) See *also* http://www.inmotionaame.org/migrations/landing.cfm?migration=3. Sources for those two citations include, "The Domestic Slave Trade," by Michael Tadman, University of Liverpool. He adds, "It appears, then, that owners were usually under no special pressure to sell to traders, and that they did so in order to gain additional profit. And owners seem to have rationalized the resultant destruction of the families of the enslaved with the self-serving notion that, unlike whites, slaves did not have strong attachments to family." (http://www.inmotionaame.org/texts/viewer.cfm?id=3_000T&page=1)

[42] I offer some details in Appendix E on the size and scope of recruiting in college athletics. My reports in White also discuss this to some extent. They are repeated in Appendices C and D minus superfluous appendices.

Prior to the game, the family was on the sidelines when offensive coordinator Chad Morris called his son Chandler over and introduced Chandler to Watson's family. Later, Morris' wife Paula also tried to track down Watson and his family, and Watson's mother told me on the sideline that she appreciates how the Clemson coaches have handled her son's recruitment."They have been tremendous," she told me. "They have been great with us, and this has all been a dream come true." A few minutes later, Watson gazed out at the Clemson players going through their pre-game warmups, smiled brightly and told me after the visit that all of the above reasons were why he was solid to Clemson. **"This is a family here**," he said. "Every time I come here, they make me and my family special. There is nothing like Clemson for me. I know most of the players, and I feel like I am already on the team."[43] (**Bold** added.) [Morris is Coach Chad Morris, Offensive Coordinator for the Clemson football team.][44]

## VII. ON SHARING

41.    Dr. Noll has proposed a 1/n sharing rule for the damages to be apportioned across the members of the proposed class. Defendants' experts have challenged that rule as creating class conflict. It is my assessment that those criticisms are unwarranted and inconsistent with real world examples reported by Dr. Noll and others I detail below. It is my opinion that in the but-for world where athletes negotiate for payments for use of the names, images, and likenesses, that groups would form and share those revenues in a fashion similar to 1/n and that it would not be complicated to derive and administer a formulaic approach to damages that closely mimics the but-for world.

42.    Sharing rules have been studied in several areas within economics. The academic literature

---

[43]  Online at http://www.tigernet.com/view/story.do?id=11628.

[44]  For more on the details and talent of Mr. DeShaun Watson, currently ranked 13th overall recruit and the Number 1 college football quarterback recruit by ESPN *for the class of 2014*, consult http://espn.go.com/college-sports//football/recruiting/playerrankings/_/view/espnu150/sort/rank/class/2014.

on game theory and cooperation are closely linked. One way to interpret this complex and vast literature is to observe that selfish individuals can, under appropriate circumstances, find it in their interest to engage in what might otherwise appear altruistic or non-rational behavior. Various reasons are offered and debated. There is no universal finding, but a fair reading of the literature suggests that cooperation and fairness have long-run efficiency and survival features. Suffice it to say that cooperative sharing rules have received a lot of attention. For instance, one of the classics in the field, Robert Axelrod's *The Evolution of Cooperation*, (1984) Basic Books (and revised edition 2006) report the results of large scale experiments on cooperation which reveal that a tit-for-tat like strategy, 1) be nice, 2) don't be the first to defect, and 3) forgive, has strong survival features. This amounts to a close approximation to the 1/n sharing rule. Axelrod summarizes the first tournament this way:

> "A major lesson of this tournament is the importance of minimizing echo effects in an environment of mutual power . . . . [T]he real costs [of noncooperation] may be in the tertiary effects when one's own isolated defections turn into unending mutual recriminations . . . ."[45]

43.    In Major League Baseball, the players' playoff pool "...is created from 60 percent of the total gate receipts from the first four World Series games; 60 percent of the total gate receipts from the first four games of each League Championship Series; 60 percent of the total gate receipts from the first three games of each Division Series; and 50 percent of the total gate receipts from each of the two Wild Card games (travel costs for each visiting Wild Card team are deducted before this 50

---

[45] Robert Axelrod, *The Evolution of Cooperation*, 1984, Basic Books. See also, Robert E. McCormick, *Managerial Economics,* 1992, Chapter 12. Note the regular way that some bars and restaurants, and virtually all casinos split tips in a sharing fashion.

percent is calculated). The pool is distributed as follows: World Series-winning team: 36 percent;

World Series loser: 24 percent; League Championship Series losers (two teams): 12 percent each;

Division Series losers (four teams): 3.25 percent each; Wild Card game losers (two teams): 1.5

percent each. The amount that each player receives from the pool is determined by a vote of the

players on the team. This vote takes place at a team meeting held before the final game of the

regular season."[46]

44.    I note that major league baseball typically uses a 1/n sharing rule for allocating revenues

from the World Series. It is not, as suggested by Dr. Rubinfeld, that each player gets a different

amount based on his skills or abilities. For instance, note that:

> Each player on the San Francisco Giants got a bonus for winning the World Series.
> This year, the payment -- which is based on a percentage of income from tickets
> sold to World Series games -- set a record: $377,003 per player.[47,48]

## VIII. OTHER POINTS

45.    In the 1970s the NCAA acted to limit the number of scholarships in major college football

and basketball. At that time the ACC already had an annual limit, but most other

conferences did not. The ACC also had an SAT requirement that most other schools did not

have. The limitations on scholarships came in stages, but the critical point is that this

limitation, made at the time as a "cost saving" endeavor, had *no* impact on the competitive

---

[46] http://mlb.mlb.com/pa/info/faq.jsp#playoff.

[47] http://blogs.kqed.org/newsfix/2012/11/26/giants-world-series-share-a-record-377003/

[48] A *New York Times* story compares the per player payouts in baseball to football. They say
that all 47 of the Texas Rangers, losers in the 2012 World Series, each received a payment of
$251,515 while each of the Super Bowl winning New York Giants got $172,000.
(http://fifthdown.blogs.nytimes.com/2012/02/07/for-championship-payouts-baseball-is-better/).

balance in football or basketball. Moreover, there have been no other effects noted. In fact, virtually all observers will say today that the only impact has been to reduce the scholarship costs of athletes.[49]

46.     Indeed, Peter Keating of ESPN reports that:

> The NCAA admits that, for some time now**, its scholarship rules have been geared toward generating money.** "For men's sports in Division I, the NCAA membership determined in 1974 to separate football and basketball financial aid from other sports," says spokesman Cameron Schuh. "**This move was predicated on the ability of those sports at that time to generate revenue for the institutions** as compared to the other sports the institutions fielded." (**Bold** added.)[50]

47.     If scholarship reductions have not led to fundamental changes in athletics, how is it that Defendants' experts believe that reversing those changes will? There is no evidence that these scholarship reductions have had any important changes on major college football or basketball, and therefore, how could reversing them be expected to cause important changes?

48.     In 1991 the Department of Justice charged the Ivy League schools and others with price fixing regarding the awarding of undergraduate financial aid, scholarships. MIT refused to sign the consent decree that the other Ivys accepted, saying, in part, about its position:

---

[49] In 1973 the NCAA imposed a limit of 105 scholarships for football programs. In 1978 the limit was reduced to 95 and then in 1992 the limit was set to 85. Additionally, an annual limit of 25 has been imposed. Keep in mind that 40 years ago it was common for a school to offer 30-40 scholarships per year. In 1973, the University of Pittsburgh signed 90 players. (http://espn.go.com/espnw/title-ix/7959799/the-silent-enemy-men-sports)

[50] See Peter Keating, "The silent enemy of men's sports," *ESPN Magazine* May 23, 2012, online at http://espn.go.com/espnw/title-ix/7959799/the-silent-enemy-men-sports.

MIT said its need-based policy of distributing MIT scholarships is a policy of charitable gifts to students; the Antitrust Division of the Justice Department maintains that it involves price fixing....

The case was fought by MIT after the eight Ivy League colleges agreed in May, 1991 - while admitting no culpability - to sign a consent decree barring such cooperation for 10 years, unless Congress passes legislation to authorize it.

The civil suit involved an agreement that MIT and the eight Ivy League colleges entered into in the 1950s. The colleges agreed to admit students solely on the basis of merit and distribute their scholarship money solely on the basis of need....

Financial aid administrators from the overlap group gathered each spring - the meetings were well-known and acknowledged by the federal government - to review and refine the uniform principles for assessing need, and also to determine the ability of the family of common applicants to pay for college. To accomplish the latter, the administrators took many factors into account, using their professional judgment. Usually - but not always - they reached a consensus on how much commonly admitted students and their parents could afford to pay.

The group believed that the overlap meetings served a public purpose by assuring students were admitted on merit and that available financial aid funds - both the colleges' private funds and government monies - were awarded on the basis of need only, thereby serving the largest possible group of eligible students. They enabled the participating colleges to preserve a need-blind admissions system and avoid the potentially costly results of a bidding system for relatively affluent students who did not need assistance in order to attend college....

However, it was this lack of merit-based aid for the relatively affluent, as opposed to aid based solely on economic need, that prompted a Justice Department suit against MIT and the Ivy League colleges in May 1991. The Justice Department accused the group of violating the Sherman Antitrust Act "by illegally conspiring to restrain price competition on financial aid" to prospective undergraduate students.

The Justice Department said that individual colleges or universities could unilaterally establish a system of need-based aid, but that it was objecting to the "collusive establishment of a policy" to exclude merit as a consideration.

Shortly after the suit was filed, the Ivy League defendants - Brown, Columbia, Cornell, Dartmouth, Harvard, Pennsylvania, Princeton and Yale - signed a consent decree that settled the action against them. In it, they agreed that they would not collaborate on financial aid....

MIT refused to sign. MIT President Charles M. Vest commented, "MIT has a long history of admitting students based on merit and a tradition of ensuring that students receive full financial aid based only on need. Our financial-aid process has been very effective for many years in helping talented students from low-income families attend MIT. We are confident in the integrity of our processes."

MIT's stand set the stage for the 10-day trial, starting June 25 and ending July 9, in US District Court in Philadelphia, where the government's suit had been filed by the then US Attorney General Richard Thornburgh.

In the landmark trial, the Justice Department's Antitrust Division asserted that the overlap agreement constituted price-fixing as defined by the Sherman Antitrust Law.

MIT, through its lead attorney, Thane D. Scott of Palmer and Dodge, countered that the Sherman act was never intended to apply to the kind of arrangements worked out by the overlap colleges for the assigning of essentially charitable funds.

Mr. Scott said that the government's claims were "myopic and misguided," based on "a one-size-fits-all approach under the antitrust laws to police commercial competition."

In his summation on July 9, Mr. Scott said, "MIT's function is to teach, to discover and to build. It is to leave to the next generation a better and more knowledgeable world. Yet in the eyes of the Antitrust Division, such an institution is indistinguishable from a manufacturer of toaster ovens or porcelain fixtures."

He quoted US Supreme Court Chief Justice William Rehnquist in his dissent in the 1984 NCAA-Oklahoma football case: "No decision of the United States Supreme Court suggests that associations of nonprofit educational institutions must defend their self-regulatory restraints solely in terms of their competitive impact, without regard for the legitimate non-economic values they promote."

In presenting its case, MIT made these key points:

> MIT financial aid is a gift policy, not a pricing policy.
> Tuition covers only half the cost of a student's education; all students receive a subsidy of more than $16,000 from MIT's endowment and income.
> Fifty-seven percent of students receive aid at MIT.
> The consent decree gave unequal treatment to non-athlete students by specifically excluding Ivy League athletes from the general ban on collaborative agreements.

The 13 witnesses called by MIT in the Philadelphia trial included four current and former college and university presidents, among them former MIT President Paul E. Gray. Answering the question, "Who is hurt if overlap doesn't continue?," Dr. Gray testified that if fewer financial-aid dollars were available to poorer students, this would "reduce the socio-economic diversity of the undergraduate level." He added, "I think in the end the Institute will suffer."...

Finally, in the wake of the trial, Congress passed, and President George Bush signed, a bill that permits colleges for the next two years to agree with one another to award financial aid only on the basis of "demonstrated financial need." It allows colleges to "discuss and voluntarily adopt defined principles of professional judgment" for determining financial aid but does not permit discussion and agreement in advance of scholarship awards in individual cases.

In addition to the end of the scholarship price cartel wrought by the Ivy League consent decree, Congress also acted. Several changes went into place, including a provision that home equity would not be counted as wealth for purposes of establishing need for need based scholarship funds. These two changes to the market for student finances have been decried by the schools who no longer can set price collectively, but there appears to be hardly any other notable changes.[51]  In the end, competitive pressures appear to rule that market, as I strongly suspect and predict that they will in the parallel, nearly identical market for student athlete financial aid. For instance, the Chronicle story quoting Bill Hall a financial aid officer at Redlands College, says "Colleges that refuse to offer discounts to students from middle- and high-income families will find themselves losing such students to other colleges, he [Bill Hall] said. 'You can't put the genie back in the bottle.'"[52]

MIT reports that they are not sure of any differences in their enrollments after the consent decree.[53,54]

---

[51]  The Chronicle of Higher Education February 18, 2000 Tuition Discounting May Rankle, but It Has Become Widespread BYLINE: BEN GOSE   SECTION: STUDENTS; Pg. A62

[52]  Gose. Page A62.

[53]  Personal correspondence with Director of Admissions for MIT on April 18, 2013. It was also noted that "maybe it is also true that the wealthier schools started enrolling more students who were admitted to several schools."

[54]  The absence of any academic research or other colloquy speaks on the absence of change

49.     Why is the Ivy League/MIT case important for the economics of class certification issues here? In the Ivy League case, arguments were made that parallel the arguments made by Defendants' experts in this case, and, the two cases are almost exactly parallel. The two cases are about a cartel on payments from colleges to students. In the Ivy League case, the defendants there argued that the cartel was important to create diversity, to provide need based scholarships and to make the institutes better. Those lines of reasoning are nearly the same as the ones made here in that Defendants' experts are claiming that there will be considerable shuffling and change in the but-for world that make it impossible to identify the relevant class and that class conflict is the result.

50.     It turns out that those ideas are unfounded in the previous case. In fact, the 1991 Ivy League consent decree was an experiment on this case. Were Defendants' experts in this case correct, there should have been considerable upheaval in the admissions and acceptances not only to the Ivy League schools but other schools who compete with the Ivys. Apparently, no such upheaval has occurred.

---

as well. I also interviewed the Director of Admissions of Clemson University and he was unaware of any impact on Clemson enrollment nor any studies or conferences directed at coping with any changes. If the changes speculated by Defendants' experts had in fact happened when the cartel ban was imposed in 1991 on the Ivy League schools, my experience suggests that we would have heard about it. The Education Conservancy "helps students, colleges and high schools overcome commercial interference in college admissions."
(http://www.educationconservancy.org/aboutus.html). They list as a "Future Project" "Addressing the Antitrust Hurdle: What can be done to reconcile higher education's public mission with the Department of Justice's 1991 decision regarding the Overlap Group Agreements? A coordinated effort to provide tactical solutions." (http://www.educationconservancy.org/). As they say, it is a future project, one that is already 20 some odd years in the making.Taken all together, the silence is deafening.

51.    Robert Bloch, the Justice Department lawyer who headed the investigation into the Ivy

League scholarship price fixing cartel says that in all the years that the Overlap Group set financial

aid offers as a cartel (together as one), it simply deprived many students of higher offers they might

otherwise have received.[55] This implies that there was little or no shuffling, at least in his mind.

This argument, that there is no other effect other than raising the scholarship fees paid to students,

is bolstered by noting that after the Ivy League cartel was busted "...they have continued to use

roughly the same financial-aid formulas, and even today, a lower-income student admitted to more

than one of the institutions is likely to receive strikingly similar offers.[56]

      a.    The U.S. Government Accountability Office has studied the impact of scholarship

           cartels.[57] "A consensus approach to awarding institutional aid that more than two

           dozen highly selective private colleges have adopted has not significantly affected

           how affordable they are." says the *Chronicle of Higher Education,* and goes on to

---

[55]

http://articles.philly.com/1992-02-07/news/26039988_1_financial-aid-financial-aid-student-aid

[56] Chronicle of Higher Education January 30, 1998 Princeton Plans Major Increase in Aid for
Middle- and Low-Income Students; Its move may force other top colleges to change policies -- if
they can afford to BYLINE: Ben Gose SECTION: STUDENTS; Pg. A35

[57] "HIGHER EDUCATION, Schools' Use of the Antitrust Exemption Has Not Significantly
Affected College Affordability or Likelihood of Student Enrollment to Date," United States
Government Accountability Office, Report to Congressional Committees, September 2006. In its
summary the report says, "By providing an exemption to antitrust laws enabling schools to
collaborate on financial aid policies, the Congress hoped that schools would better target aid,
making college more affordable for low income and other underrepresented groups. The
exemption has not yet yielded these outcomes." The mirror image of that statement implies that
eliminating the exemption would also have no impact. Accordingly, since that is exactly the
but-for world in this case, and since the two cases are so nearly the same, it seems reasonable to
conclude, based on the data GAO analyzed, that one would expect no changes were the NCAA
cartel on payments to players be declared illegal.

say,"...that those institutions have not been enrolling significantly more or fewer

low-income or minority students since starting to use the agreed-upon aid

practices.[58]

b.    Moreover, "The government's analysis found "virtually no difference" in the

amounts that students and their families were expected to pay at the 25 institutions

that used the consensus approach and at similar institutions that make aid offers on

their own."[59]

c.    These findings refute defendant's expert Dr. Rubenfeld who argues that there will

be important and significant "shuffling or rematching"[60] in the new world where

---

[58]The Chronicle of Higher Education October 6, 2006 Friday Report Gauges Effect of Data
Sharing BYLINE: SARA HEBEL SECTION: GOVERNMENT & POLITICS; Pg. 22 Vol. 53 No.
7.

[59] The Chronicle of Higher Education October 6, 2006 Friday Report Gauges Effect of Data
Sharing BYLINE: SARA HEBEL SECTION: GOVERNMENT & POLITICS; Pg. 22 Vol. 53 No.
7.

[60]   The term "re-shuffling" is actually the one used by Dr. Heckman to make the same point
although Dr. Rubinfeld also uses it on page 166.   When Dr. Ordover made the identical point in
2006 in the *White* case, he used the expression "'ripple effect" (compare with Dr. Rubinfeld's
"cascading effect" on page 166) but other than the choice of terminology, Dr. Ordover's
explanation, which Judge Klausner rejected as a reason not to certify the class, was eerily similar
to that proposed by Drs. Rubinfeld and Heckman. Compare Ordover (page 85, footnotes omitted):
"Suppose that student-athlete A voluntarily decides to switch from school X in the actual world to
school Y in the but-for world. This shift by A could displace another student-athlete B who
actually received a scholarship at school This displaced student-athlete would then have to make a
choice to either switch to school Z, assuming such choice were available, which could displace
another student-athlete C there, or to stay at school Y as a walk-on. If the student switches, there is
a "ripple effect" whereby the decision of one student- athlete to voluntarily switch schools can
potentially lead to a whole series of not necessarily voluntary shifts by other student-athletes."
What Dr. Rubinfeld said on his page166, seems to differ primarily by using the names of real
schools rather than the letters X and Y: "Every student-athlete that would have made a different

the cartel ban on NIL compensation is erased.[61] In light of the apparent lack of any

evidence of shuffling, the burden to demonstrate that it might exist through

economics evidence rather than musings in a vacuum surely shifts to the

Defendants. As I argue here (and Dr. Noll and Dr. Rascher argue[62]) on the

mimicking effect of recruiting, there is little or no reason to suspect that there will

be any shuffling. If Dr. Rubinfeld has any evidence on this, he should reveal it. I see

none.

## XI. CONCLUSIONS

52.    I have reviewed the work of Drs. Noll, Cox, Rascher, Rubinfeld, Stiroh, and Heckman in

---

decision in the but-for world would have displaced another student-athlete from the but-for roster.
A five star recruit choosing Kentucky instead of UCLA would have bumped another player off the
Kentucky roster and created an opening on the UCLA roster. These decisions would have a
cascading effect, partly due to limited team roster sizes and restrictions on the number of available
athletic scholarships colleges offer. A student-athlete's alternative but-for decision in response to
altered incentives would bump another student from a roster who might enroll elsewhere, bumping
another student, and so on. Furthermore, the re-shuffling of students would impact who would and
would not receive athletic scholarships, which would further impact incentives and the choices
students would make."

[61]    Dr. Rubinfeld summarizes his rematching argument at 16 and then explains it in some
detail at 157-168.

[62] See Noll Reply report, pp. 6-7: "This argument is based on the assumption that the nature
of collegiate athletic and even academic programs, and the distribution of student-athletes among
colleges and universities, will be affected by the outcome of this litigation. The defendants' experts
present no evidence that these hypothetical effects are plausible other than assertions by fact
witnesses who have a stake in the exploitation of student-athletes. In fact, the evidence shows that
all of the increase in revenues for intercollegiate sports during the class period has gone for
increased spending by departments of athletics, so a major spillover effect of an increase in the
amount of this revenue that is paid to student-athletes into academic programs is implausible."
Dr. Rascher makes the point on pages 64-77. See for example 66: "In other words, athlete talent is
already being apportioned across schools by the allegedly constrained market quite similarly to
how the free market is apportioning coaching talent."

the context of this case. It is my opinion that:

a. Dr. Noll is correct in that there is a formulaic approach to damages;

b. Dr. Noll's formula is appropriate to the task and does not create class conflict;

c. Dr. Noll's approach is based on sound theory and evidence of how markets such as this one would work if the NCAA is found liable;

d. The opinions of Drs. Heckman, Stiroh, and Rubinfeld regarding difficulties of assigning damages are not correct, nor are their concerns about who would be in the class in the but-for world;

e. Sports economics makes clear that the market for major college athletes is a sophisticated market;

f. Recruiting emulates a pay-for-play market but redistributes rents to the colleges and away from the players;

g. Players and college would match in the but-for world of this case in the same general way as they do now in the cartel world; and

h. The evidence from the Ivy League consent decree cannot be ignored.

Robert E. McCormick
April 25, 2013

# APPENDIX A

**Vita of Robert E. McCormick, Ph.D.**

Robert E. McCormick
222 N. Clemson Av.
Clemson, SC 29631

864.506.2224
sixmile@clemson.edu
http://sixmile.clemson.edu

**Personal:**   Born December 16, 1946
Citizen of United States
Two sons, Exley and Jesse
Married, Valerie D. McCormick

**Current Position:**   Professor Emeritus, John E. Walker Department of Economics,
Clemson University, December 2007-present
&
Senior Fellow
Property and Environment Research Center
Bozeman, MT, 2001-present

**Education:**   B.A., Economics, Clemson University, August 1972
M.A., Economics, Clemson University, August 1974
Ph.D., Economics, Texas A&M University, May 1978

**Other Full-Time Positions:**

Professor and BB&T Scholar, John E. Walker Department of Economics, Clemson University,
2000 -2007

Director, BB&T Center for Economic Education and Policy Studies, Clemson University,
2000-2007

Spiro Faculty Fellow, Arthur M. Spiro Center for Entrepreneurial Leadership, College of
Business, Clemson University, 2003-2007

Professor of Economics, Department of Economics, Clemson University, 1983-2000

Associate Professor of Economics, Department of Economics, Clemson University, 1982-1983

Assistant Professor of Business and Economics, Graduate School of Management, The University
of Rochester, 1978-1982

Instructor of Economics, Department of Economics, Clemson University, 1977-1978

Instructor of Economics, Department of Economics, Clemson University, 1973-1974

## Other Part-Time Positions:

Senior Fellow, Property Environmental Research Center (PERC), Bozeman, MT,
    June 2002-present

Director, PERC Enviropreneur TEAM Program, 2005-2010

Director, Kinship Conservation Institute, PERC, Bozeman, MT, 2002-2005

Julian Simon Fellow, PERC, Bozeman MT, 2001

Visiting Professor of Business, Consortium International MBA, Asolo, Italy and Ljubljana,
    Slovenia, 1998, 1999, 2000,   2001, and 2004

Academic Director, Arthur M. Spiro Center for Entrepreneurial Leadership, College of Business,
    Clemson University, 1995-2002

Research Fellow, Center for Computer Communication Systems, College of Engineering,
    Clemson University, 1993-1995

Associate Editor, *Southern Economic Journal*, 1996-1999

Associate Editor, *Journal of Corporate Finance*, 1992-present

Senior Research Scholar, Center for Policy Studies, Clemson University, 1986-92

Senior Research Scholar, Center for the Black Experience in Higher Education, Clemson
    University, 1985-92

Instructor, Economics for High School Teachers, National Science Foundation and Clemson
    University, August 1992

Profesor Visitante, Universidad Francisco Marroquin, Guatemala City, Guatemala, 1990
Instructor, A Series of Short-Courses in Economics to the Faculty, Universidad Francisco
    Marroquin, Guatemala, June 1988

Consultant, Bureau of Economics, The Federal Trade Commission, 1980-1985

Instructor, Short Course for Lawyers, Federal Trade Commission, Summer 1982 and Fall 1983

Senior Visiting Research Fellow, Center for the Study of Public Choice, Virginia Polytechnic
        Institute, 1981

Participant at the Fifth Legal Institute for Economists, Law and Economics Center, University of
        Miami, Key Biscayne, Florida, June 11-27, 1980

Consultant, The Department of Agriculture, 1979-1981

Teaching Assistant, Department of Economics, Texas A&M University, 1976-1977

Teaching Assistant, Department of Economics, Clemson University, 1973-1974

Research Assistant, Department of Agricultural Economics, Clemson University, 1973

## Publications:

**Books:**

*Managerial Economics*. 2d edition, Englewood Cliffs, NJ: Prentice Hall (forthcoming), with F.
        Limehouse.

*Managerial Economics*. Englewood Cliffs, NJ: Prentice Hall, 1993.

*Politicians, Legislation, and the Economy: An Inquiry into the Interest Group Theory of
        Government*. Boston: Martinus Nijhoff, 1981, with Robert D. Tollison.

**Papers:**

"The Private Provision of Public Goods: An Analysis of Homes on Golf Courses," *Journal of
        Private Enterprise*,   27(2) Spring 2012: 103-120with Frank Limehouse and Melissa Yeoh.

"Chivalry in golf? Significant tee ratios," *Public Choice* (2010) 142:323-34, with Bob Tollison.

"The Demand for Environmental Quality: An Application of Hedonic Pricing in Golf." *Journal of
        Sports Economics* (June 2010) 11: 261-28, with Frank Limehouse and Peter Melvin.

"Crime on the Court, Another Look: Reply to Hutchinson and Yates." *Journal of Political
        Economy* 115(3) (June 2007):520-21, with Robert D. Tollison.

"More Inconvenient Truths." in *Hoover Digest* 2 (2007), with Terry L. Anderson.

"A Theory of Commodity Bundling in Final Product Markets: Professor Hirshleifer Meets
        Professor Becker."*International Review of Law and Economics (*June 2006), with William
        Shughart and Robert D. Tollison.

"The Relationship Between Net Carbon Emissions and Income." in *You Have to Admit It's Getting Better—The Environment That Is.* Palo Alto: Hoover Press, 2004 ed. by Terry L. Anderson.

"Carbon Emissions, Carbon Sinks, and Global Warming." in *Agricultural Policy and the Environment.* Rowman and Littlefield (2003), ed. by R. Meiners and B. Yandle, with Joshua Utt and Walker Hunter.

"Racial Integration as Innovation: Evidence from Sports Leagues," *American Economic Review* (March 2002):16-26, with Brian Goff and Robert D. Tollison.

"The Response of Workers to Wages: Evidence from Foot Races." *Journal of Sports Economics* (June 2000): 99-122, with Michael T. Maloney.

"Why Do Black Basketball Players Work More For Less Money?" *Journal of Economic Behavior and Organization* (February 2001):201-219, with Robert D. Tollison.

"On Legislatures and Legislative Wage Efficiency." in *Public Choice Companion* (2000), edited by W. Shughart, with Chad Turner.

"Smoking, Insurance, and Social Costs." *Regulation* (Summer 1997):33-37, with Robert D. Tollison and Richard Wagner.

"Stranded on the Road to Electricity Competition." *Forum for Applied Research and Public Policy* 12(3) (Fall 1997):18-21.

"Economic Principles of Contractor Compensation." *Journal of Management in Engineering,* with William E. Howard and Lance Bell,   1997.

"Customer Choice, Utilities Loss: Stranded Cost Recovery in the Deregulation of the U.S. Electric Power Industry." *Natural Resources Journal* (Winter 1997):59-124, with Michael T. Maloney and Raymond Sauer.

"A Financial Market Event Study of the MFJ Restrictions in the Telecommunications Industry." *Managerial and Decision Economics* 16 (1995): 401-425, with Michael T.   Maloney. Reprinted in Richard Higgins & Paul Rubin, *Deregulating Telecommunications*, Wiley: New York, 1995, pages 123-48.

"Private and Public Choices in Public Education: An Investigation of Trustee Effects." *Public*

*Choice* 78 (1994):219-230, with Cora Moore and Bruce Yandle.

"Managerial Decision Making and Capital Structure." *Journal of Business* 66(2) (April 1993):189-217, with Michael T. Maloney and Mark Mitchell.

"An Examination of the Role that Intercollegiate Athletic Participation Plays in Academic Achievement: Athletes' Feats in the Classroom." *Journal of Human Resources* 28(3) (Summer 1993): 555-570, with Michael T. Maloney. Reprinted in *The International Library of Critical Writings in Economics,* ed. by A. Zimbalist and R. Woods, Elgar Press, 2000.

"Preaching Matters." *Journal of Economic Behavior and Organization* 21 (1993):235-50, with Jody Lipford and Robert D. Tollison. Reprinted in *Trade in the Pre-Modern Era 1400-1700*, Edward Elgar Ltd: Chentenham UK, edited by Douglas Irwin, 1994.

"Some Evidence on the Alchian and Allen Theorem: The Third Law of Demand?" *Economic Inquiry* XXXI(3) (July 1993):383-93, with Eric Bertonazzi and Michael T. Maloney.

"Intrafirm Profit Opportunities: Evidence from Professional Basketball." pgs. 3-36 in *Advances in the Economics of Sports*, vol. 1, ed. by Gerald Scully, New York:JAI Press, 1992, with Robert Clement.

"The Review Process in Economics: Some Empirical Findings." *Review of Economics and Statistics* LXXIIA (1990):v-xvii, with David Laband and Michael T. Maloney. Reprinted in *Economics Alert*, No. 2, March 1993, pp. 5-8.

*El Analisis Economico De Lo Politico*, Instituto de Estudios Economicos, 1990, with James M. Buchanan and Robert D. Tollison.

"Athletics and Academics: A Model of University Contributions." in *Sportometrics*, ed. by Brian Goff and Robert D. Tollison, College Station: Texas A&M University, 1990, pages 193-206, with Maurice Tinsley.

"Coaching Team Production." *Economic Inquiry* (April 1989):287-304, with Robert Clement. Reprinted in *Sportometrics*, ed. by Brian Goff and Robert Tollison, College Station: Texas A&M University, 1990, pages 75-92.

"A Review of the Economics of Regulation: The Political Process." in *Regulation and the Reagan Era*, ed. by Roger Meiners and Bruce Yandle, Washington: Holmes and Meier, 1988,

pages 16-40.

"Excess Capacity, Cyclical Production, and Merger Motives: Some Evidence from the Capital Markets." *Journal of Law and Economics* 31(2) (October 1988):321-50, with Michael T. Maloney.

"University Governance: A Property Rights Perspective." *Journal of Law and Economics* (October 1988):423-42, with Roger Meiners.

"The Disinterest in Deregulation: Reply." *American Economic Review* 78(1) (March 1988):284, with William Shughart II and Robert D. Tollison.

"Athletics Versus Academics? Evidence From SAT Scores." *Journal of Political Economy* 95(5) (October 1987):1103-16, with Maurice Tinsley. Reprinted in *Sportometrics*, ed. by Brian Goff and Robert D. Tollison, College Station: Texas A&M University, 1990, pages 179-192.

"Crime and Income Distribution in a Basketball Economy." *International Review of Law and Economics* 6 (June 1986):115-24, with Robert Tollison. Reprinted in *Sportometrics*, ed. by Brian Goff and Robert Tollison, College Station: Texas A&M University, 1990, pages 295-310.

"The Disinterest in Deregulation: Reply." *American Economic Review* 76(3) (June 1986):564-65, with William Shughart II and Robert D. Tollison.

"Inflation, Regulation, and Financial Adequacy." in *Electric Power: Deregulation and the Public Interest*, ed. by John Moorhouse, San Francisco: Pacific Research Institute for Public Policy, 1986, pages 135-160.

"The Disinterest in Deregulation." *American Economic Review* 74 (December 1984):1075-79, with William Shughart II and Robert D. Tollison.

"On the Recovery of Sunk Costs." *Journal of Business* 57(4) (October 1984):417-42, with Kenneth French.

"Economic Regulation, Competitive Governments, and Specialized Resources." *Journal of Law and Economics* 27 (October 1984):329-38, with Michael T. Maloney and Robert D. Tollison.

"Crime on the Court." *Journal of Political Economy* 92 (April 1984):223-35, with Robert D.

Tollison. Reprinted in *Sportometrics*, ed. by Brian Goff and Robert D. Tollison, College Station: Texas A&M University, 1990, pages 59-74.

"The Strategic Use of Regulation: A Review of the Literature." in *The Political Economy of Regulation: Private Interests in the Regulatory Process*, ed. by Robert Rogowsky and Bruce Yandle, Washington: Federal Trade Commission, March 1984, pp. 13-32.

"Regulators as an Interest Group." in *Public Choice II*, ed. by James Buchanan and Robert D. Tollison, Ann Arbor: University of Michigan Press, 1983, with Mark Crain.

"The Economic Organization of the English East India Company." *Journal of Economic Behavior and Organization* 4 (1983):1-17, with Gary Anderson and Robert D. Tollison. Reprinted in *Trade in the PreModern Era, 1400-1700*, edited by Douglas Irwin, London: Edward Elgar Publishing Ltd. 1994.

"A Theory of Cost and Intermittent Production." *Journal of Business* 56(2) (April 1983):139-53, with Michael T. Maloney.

"A Positive Theory of Environmental Quality Regulation." *Journal of Law and Economics* 25(1) (April 1982):99-123, with Michael T. Maloney. Reprinted in *The International Library of Environmental Economics and Policy*, Ashgate Publishing LTD., 2003. Reprinted in *The Political Economy of Environmental Regulation,* Harvard U. Press, 2004, ed. by R. Stavins. Reprinted in *Foundations of Environmental Law and Policy,* Matthew Bender & Company, Inc. forthcoming (2013).

"Why are Inflation Rates Different Across Countries." in *Inflation, the Sheltered Sector and the Use of Resources*, ed. by Karl Brunner, Rochester: Center for Research in Government Policy and Business, 1982.

"Economics and Metrology: Give 'Em and Inch and They'll Take a Kilometer." *International Review of Law and Economics* 1 (1981):207-21, with Roger Faith and Robert D. Tollison.

"The Internalization of Social Costs." in *Analysis of Consumer Policy*, ed. by Robert D. Tollison, Philadelphia: Wharton Applied Research Center, 1981.

"Achieving Cartel Profits Through Unionization: Reply." *Southern Economic Journal* 47(4) (April 1981):1162-64, with Michael T. Maloney and Robert D. Tollison.

"Wealth Transfers in a Representative Democracy: Theory and Evidence." in *Toward a Theory of*

*the Rent Seeking Society*, ed. by James Buchanan, Robert D. Tollison, and Gordon Tullock, College Station: Texas A&M Press, 1980, with Robert D. Tollison.

"Achieving Cartel Profits through Unionization." *Southern Economic Journal* 46(2) (October 1979):628-34, with Michael T. Maloney and Robert D. Tollison.

"Rent Seeking Competition in Political Parties." *Public Choice* 34 (1979):5-14, with Robert D. Tollison.

"The Cost of Voting: It's Fiscal Impact on Government." *Public Choice* 34 (1979):271-84, with Richard McKenzie.

"Legislators as Unions." *Journal of Political Economy* 86(1) (February 1978):63-78, with Robert D. Tollison. Reprinted in *Public Choice II*, ed. by James Buchanan and Robert D. Tollison, Ann Arbor: University of Michigan Press, 1983.

**Monographs:**

*The Everglades: An Economic Evaluation of Ecosystem Services*, prepared for Everglades Foundation, July 2010 with M. Lindsay, R. Clement, D. Fischer, and R. Watson.

*Habitat Farming Enterprise Program Economic Remuneration*, Initiative for Rural Innovation & Stewardship Committee of the North Central Washington Resource Conservation and Development Council, with Reed Watson, February 2009.

*U.S. Economic Freedom Index: 2004 Report,* Pacific Research Institute and *Forbes*, 2004, with L. Macquillan and Ying Huang.

*Economic Freedom in America's 50 States: A 1999 Analysis*. Indianapolis: The State Policy Network, January 1999, with John Byars and Bruce Yandle,

*An Analysis of Potential New Tax Revenues on Video Poker Operations in South Carolina*. Greenville, SC: Collins Entertainment, January 1999.

*The Economic Impact of the Video Poker Industry in South Carolina.* Greenville, SC: Collins Entertainment, August 1998.

*Customer Choice, Consumer Value: An Analysis of Retail Competition in American's Electric Industry.* Washington: Citizens for a Sound Economy Foundation, Volumes I and II, 1997, with Michael T. Maloney and Raymond Sauer.

*Consumer Choice in the Electricity Industry: An Analysis of the Impact in Illinois.* Clemson, SC, 1996, with Mike Maloney.

*Customer Choice in the Arizona Electric Industry,* Arizona Mining Association, 1997, with Michael T. Maloney, & Raymond Sauer.

**Book Reviews:**

A Review of *The Causes and Consequences of Antitrust: The Public-Choice Perspective,* by Fred S. McChesney & William F. Shughart II, Chicago: The U. of Chicago Press, 1995. *Public Choice*, 87 (June 1996):414-16.

*The Economics of the Tobacco Industry*, by Paul R. Johnson, New York: Praeger Publishers, *Southern Economic Journal* 52 (October 1985):584.

## Other Publications:

"Some Aspects of Gambling." *The World and I*, July 2000, 44-45.

"The Wires Charge: Risk and Rates for the Regulated Distributor." *Public Utilities Fortnightly*, September 1, 1997, vol. 135 (6), 26-33 with Michael T. Maloney, and Cleve Tyler.

"Stranded Cost Recovery: All FERC'ed Up." *Public Utilities Fortnightly*, November 15, 1996, 42-47 with Michael T. Maloney and Chad McGowan.

"Shaefer Bill Better than Nothing." *Regulation*, letter to the editor, with Michael T. Maloney, December 10, 1996.

*Instructor's Manual with Tests.* Englewood Cliffs, NJ: Prentice Hall, 1993, with Elizabeth Becker.

"Sacred Cows and Antitrust: The Case of the NCAA." in *New Perspectives*, Washington: U.S. Civil Rights Commission 19 (1) (Winter 1989):47-53 with Roger Meiners.

"Bust the College Sports Cartel." *Fortune* (October 12, 1987):235-36 with Roger Meiners.

"Colleges Get Their Athletes for a Song." *Wall Street Journal* (August 20, 1985):28.

## Research in Progress:

"Impacts of Central Business District Location:   A Hedonic Analysis of Legal Service
    Establishments," working paper September 2010, with Frank Limehouse.

**Inactive Research**

"Good Government." with Robert D. Tollison.

"Taxation Tools and the Weight of State Taxes." 2006, with Robert D. Tollison and Adam Pope.

"The Demand for Environmental Quality and Green Space: An Application of Golf and Real
    Estate Development." 2006, with Frank Limehouse and Peter Melvin.

"The Environmental Nature of the Firm." 2003, with Terry L. Anderson.

"University Operations and Student Satisfaction." 2003, with Brett Dalton, Ray Hernandez, and
    Michael T. Maloney.

"Scholastic Success: A Complete Data Analysis." 2003, with Brett Dalton, Thornton Kirby, and
    John Warner.

"The Microsoft Case."2000, with John Byars, C. Reback, and Robert D. Tollison.

"The Impact of Electricity Deregulation on Shareholder Wealth: The Role of Diversified
    Portfolios." 1998, with Cleve Tyler.

"The Bond Call Provision and the Decision to Call." with Mike Maloney and Maria Quinonez,
    1994, working paper available.

"On the Relative Returns to Mutual Funds." with Su Yang, 1995.

"A Taste Based Theory of Marriage and Divorce." with Elizabeth Becker and Curtis Simon, 1992.

"Male-Female Population Ratios and Illegitimate Births." 1992 with and Mason Gerety, working
    paper available.

"Block Pricing and the Distribution of Demand." with Michael T. Maloney, working paper
    available.

"Estimating the Economic Impact of Intercollegiate Athletic Events." with Michael T. Maloney,

research in progress, preliminary working paper available.

## Presentations:

Liberty Fund Colloquim, "Liberty and the Environment," January 2013, Antigua, Guatemala.

Piedmont Economics Club, "Enviropreneurism" September 2012.

"On the Nonexistence of Externalities," Water Resources and Management, U. North Carolina, September 28, 2012.

"Lectures, PERC's Enviropreneur Institute, June/July 2012, Bozeman, MT.

Lectures, PERC's Enviropreneur Institute, June/July 2011, Bozeman, MT.

"Keynote Panel" 4th Annual Ecosystem Markets Conference, Madison WI, June 29-July 1, 2011

"Bringing Economics to Everlades," SERES Conference, Miami, January 20-21, 2011.

"Our Environment and Our Economy," Everglades Coalition 29th Annual Conference, Ft. Lauderdale FL, January 6-8, 2011.

"Who Dares to Price, Value and Sustain Water Resources?" Water Choices Forum, Florida Earth Foundation, October 19, 2010, Orlando, FL.

"Construction Project Management," a series of lectures, Strathmore Business School, Strathmore University, Nairobi Kenya, September 20-23, 2010.

"Enviropreneurship, Leadership, and Markets." PERC's Enviropreneur Institute, a series of lectures, July 2010, PERC, Bozeman, MT.

"Inconvenient Truths: Climate Change—An Objective View Looking at Both Sides." Environmental Economics Policy Forum 2, University of South Florida, Sarasota, February 12, 2009.

"Enviropreneurship, Leadership, and Markets." PERC's Enviropreneur Institute, a series of lectures, July 2009, PERC, Bozeman, MT.

"Change Management," Keynote address, International Union for Conservation of Nature, World

Conservation Congress, Barcelona Spain, October 2008.

"Enviropreneurship, Leadership, and Markets." PERC's Enviropreneur Institute, a series of lectures, July 2008, PERC, Bozeman, MT.

"Climate Change, another perspective," The 2008 Randolph W. Thrower Symposium, Legal Science: an Interdisciplinary Examination of the Use and Misuse of Science in the Law, Thursday, February 21, 2008,   Emory University School of Law, Atlanta.

"Enviropreneurship, Leadership, and Markets." TEAM, Enviropreneur Camp, series of lectures, July 2007, PERC, Bozeman, MT.

"Economic Theory and Practice." TEAM, Enviropreneur Camp, series of lectures, June 2006, PERC, Bozeman, MT.

"Project Management and Business Planning." series of lectures, Kinship Conservation Institute, Boone and Crockett Ranch, Dupuyer MT, 2005.

"Alternative Golf Facilities." Golf 20/20 Conference, World Golf Village Florida, November 11-13, 2001.

"The Shocking Electrical Mess." Hoover Institution, Stanford University, October 24-26, 2001.

"Agricultural Activity and Global Warming: Sequestration is Cool." a Liberty Fund Conference, Chico Hot Springs, Montana, November 21-24, 2001.

"Economics and the Environment." a series of lectures on economics, statistics, and the environment, the Kinship Conservation Institute, PERC, Bozeman, MT, June 4-29, 2001.

"Evaluating State and Local Regulatory Environments: Issues in Theory and Measurement," The DeVoe L. Moore Center, Florida State University, February 9-11, 2001

"Freedom in the States." The Association of Private Enterprise Education, Las Vegas, NV, April 2-4, 2000.

"Freedom in the States." Heritage Foundation Annual Convention, Chicago, IL, April 27, 2000.
"Freedom in America's 50 States." American Legislative Exchange Council, Nashville, TN, August 13, 1999.

"Consumer Issues." Electric Industry Restructuring: Addressing the Unanswered Questions, Center for Market Processes, George Mason U., Baltimore Md, August 7, 1997.

"Customer Choice, Consumer Value: Real Gains or Rent Redistribution?" National Association of Regulatory Utility Commissioners, Mid-Atlantic Conference, Hot Springs, VA, July 1, 1997.

"Electricity Deregulation in a Low Cost State." Indiana Energy Conference, Indianapolis, IN, October 10, 1996.

"Consumer Choice, Customer Value: The Coming of Competition in Electricity." Center for Energy Studies, LSU, September 30, 1996.

"Economic Efficiency and the Common Law." Liberty Fund Conference, Charleston, SC, October 3-5, 1992.

"Private and Public Choices in Public Education: An Investigation of Trustee Effects," at the Political Economy Research Center's First Political Economy Forum, Bozeman, Montana, June 9-12, 1990.

"The Eclipse of the Corporation." A Series of Lectures presented at the Liberty Fund Conference, Property Rights: Challenges for a Free Society, Abbeville SC, April 6-8, 1990.

"The Market for Corporate Control." the 5th Year Seminar, Department of Economics, Universidad Francisco Marroquin, Guatemala, March 17, 1990.

"Managerial Economics: A Property Rights Perspective." A Series of Lectures presented to the faculty at the Universidad Francisco Marroquin, June 17-25, 1988, Guatemala City, Guatemala.

"State Constitutions." A Series of Lectures presented at the Liberty Fund Series, The Bicentennial of the U.S. Constitution, July 6-11, 1987, Asheville, NC.

"University Governance: A Property Rights Perspective." at the 14th Interlaken Seminar on Analysis and Ideology, Center for Research in Government Policy and Business, Simon Graduate School of Business Administration, University of Rochester, Interlaken, Switzerland, June 8-12, 1987.

"The Strategic Use of Regulation: A Review of the Literature." at The Political Economy of

Regulation: Private Interests in the Regulatory Process, Federal Trade Commission, Washington, DC, March 29-30, 1984.

"The Internalization of Social Costs." at Conference on Analysis of Consumer Policy, Wharton Applied Research Center, University of Pennsylvania, May 15-16, 1981.

"Why Are Inflation Rates Different Across Countries?" at Liberty Fund Conference, Inflation and the Sheltered Sector, Long Island, NY, September 25-27, 1980.

Various workshops at the University of Chicago, Montana State University, University of Rochester, Texas A&M University, VPI, the University of Georgia, Clemson University, Auburn University, Florida State University, Wofford College, Davidson College, the Securities Exchange Commission, and the Federal Trade Commission.

Participant at the Sixth Annual Political Economy Forum, "Who Owns the Environment?" Lone Mountain Guest Ranch, Big Sky, MT, June 12-15, 1997, sponsored by the Political Economy Research Center.

Participant at the Fifth Annual Political Economy Forum, "Wildlife in the Marketplace," Mountain Sky Guest Ranch, Emigrant, MT, June 10-13, 1993, sponsored by the Political Economy Research Center.

Participant at the Fourth Annual Political Economy Forum, "The Political Economy of the American West," Mountain Sky Guest Ranch, Emigrant, MT, June 11-14, 1992, sponsored by the Political Economy Research Center.

Participant at numerous Liberty Fund Conferences, Emory University, Universidad Francisco Marroquin (Guatemala), Virginia Tech, Clemson University, and University of Rochester.

## Refereeing for Professional Journals:

*Journal of Political Economy, Journal of Financial Economics, Journal of Finance, Journal of Law and Economics, Southern Economic Journal, Journal of Business, Economic Inquiry, Journal of Economic Behavior and Organization, Journal of Sports and Economics, Journal of Monetary Economics, Journal of Human Resources, Management Science, Journal of Accounting and Economics, Marketing Science, Public Choice, Journal of Business Research, Economics of Education Review, Public Finance Quarterly, Journal of Economic Education, Studies in Economic Analysis,* and others.

## Grants and Financial Awards:

*Habitat Farming Enterprise Program Economic Remuneration*, Initiative for Rural Innovation & Stewardship Committee of the North Central Washington Resource Conservation and Development Council, 2008-09 with Reed Watson.

"Carbon Sequestration: The International Experience and Evidence," with Reed Watson, 2005.

"Optimize the Project Team's Contribution to Business Results," Construction Industry Institute, 2003, with Lance Bell and Edward Black.

"Tuition and Fees," 2000-present, Clemson University Office of the President.

"The College Experience," 1999-present, Clemson University Office of the Provost.

Founded The Applied Economics Research Group, Fall 1993 with a grant from the Bradley Foundation.

"The Economic Impact of Intercollegiate Athletic Competition," funded by Clemson University Athletic Department and IPTAY, July 1987-June 1989, with Michael T. Maloney.

"University Governance and Productivity," funded by the Bradley Foundation, June 1987-August 1988, with Roger Meiners.

"University Gift Giving: The Relation Between Athletics and Academics," funded by Clemson University Athletic Department and IPTAY, October 1984-August 1985.
"Antitrust Merger Analysis," funded by the Federal Trade Commission, Contract L0996, September 29, 1983, with Michael T. Maloney.

## Academic Honors:

Clemson University National Scholars Mentor of the Year, 2004, 2005, 2006

Clemson University MBA Professor of the Year, 2001, 2004

Clemson University Trustee's Award for Faculty Excellence, 1999

Clemson University Alumni Master Teacher, 1998

Clemson University Trustee's Award for Faculty Excellence, 1997

Clemson University Student Government, Prince Award for Innovation in Teaching, 1996

The Alfred Chalk Distinguished Graduate Student, Texas A&M University, 1978

University Fellowship, Texas A&M University, 1975-76

Environmental Protection Agency Fellowship, Clemson University, 1972-73

## Consulting Activities:

Numerous private law firms (litigation support and expert testimony), Metso Inc. (2012-present); DuPont (2011-present); Mather Consulting (2010-2012), National Wildlife Foundation (2011-present);The Everglades Foundation (2010-present); Lotic LLC (2009-present), The Remediators, (2006-present), The South Carolina Hospital Association (2006), Red Rock Development (2006-07), Palmetto Health (2005-present), ChemWay (2007-present, litigation), America Chemical Council (2003), Ball and Scott Law Firm (2002-06), Consortium of Regional Bell Operating Companies (2001), *Sportometrics* (2001-2009), Canadian Chemical Producers Association (2000); Clemson University Office of the Provost and President (2000-present); Ticketadvantage.com (2000-2005); Chemical Manufacturers Association (2000); gibuddies.com (1999-2003); adidas America (1999-2000, litigation); camprehensive.com (1999-2004); Collins Entertainment (1998-1999);Time-Warner (1999-2001, litigation); Champion Spark Plugs (1999-2000, litigation); BCI (1998-2000, litigation); Memorial Ecosystems (1999-2001), Nathan Associates (Washington, 1998-present, litigation); Arizona Mining Association (1997, litigation and other); Ajo Improvement Company (1996-1997); Electric Lite, Inc. (1996-1999); South Carolinians for Competition in Electricity (1996-97); Citizens for Competitive Power (1997); Central Illinois Light Company (1996); The Citizens for a Sound Economy (1996); The Department of the Treasury, the Government of New Zealand (1995); A consortium of Regional Bell Operating Companies (through Kellogg, Huber & Hansen, 1993-1994, litigation); Capital Economics (1992-present); The South Carolina Aeronautics Commission (1986-87); The Federal Trade Commission (1980-1985); CBS (through Owen Greenhalgh & Myslinski, Washington 1982-83); U.S. Department of Agriculture (1979-81); James Savarese and Associates, Washington (1983 & 1997); Chief Executive, New York (1981), and private law firms.

**Nature of Consulting:** Entertainment, Natural Resource Markets, Health Care Markets, Sports and Economics, Electricity Markets, Telephone Markets, Securities Regulation, Managerial Economics, Network Economics, Financial Valuation, Startup, Antitrust, Market Efficiency, Business Planning, Antitrust, and expert testimony.

## Other Governmental Service:

Prepared affidavit for Federal Communications Commission, 2001, concerning regulations and broadband access in telephony.

Prepared testimony for the Canada Transport Act Review Panel, 2000, concerning railroad regulation in Canada.

Prepared testimony for the Surface Transportation Board, Department of Commerce, 2000, concerning railroad mergers and regulation.

Prepared testimony for the New Mexico Public Service Commission, October 1998.

Presented testimony before the S.C. House of Representatives, Labor, Commerce, and Industry Committee, March 1997 & April 1997, concerning deregulation and competition in electricity markets.

Presented testimony before U.S. House of Representatives, Commerce Committee, Subcommittee on Energy and Power, March 28, 1996, concerning deregulation and

competition in electricity markets.

An affidavit before the Congress of the United States, June 1994, concerning the operation of the telecommunications industry.

## University Service

Clemson University Capital Campaign, Will to Lead, Executive Committee, 2010-present; Clemson University Tuition and Scholarship Task Force (co-chairman) 2009-present; Clemson University Woodland Cemetery Stewardship Committee (chairman), 2000-2007; Clemson University Ad-Hoc Committee on Tuition and Fees, 2000-present, Clemson University Ad Hoc Committee on Entrance Standards, 2000-present, Clemson University Names Committee, 1999-2007, Clemson University Advanced Technology Committee, 1995-1999. Clemson University MBA Advisory Counsel, 1995-2007. Clemson University Ad Hoc Graduate School Planning Committee, 1992. Clemson University Center for the Black Experience in Higher Education, 1989-1992. Clemson University Athletic Council, 1987-1990. Clemson University Teaching Effectiveness Committee, 1986. University of Rochester Library Committee, 1980.

## Military Experience:

1st Lt. U.S. Army, Air Defense Artillery, January 1970-October 1971. Officer Basic Training, Ft. Bliss, Texas, 1970. Basic Training Officer, Ft. Campbell Kentucky, 1970. Fire Platoon Leader, C 7/5, Korea, and Battery Executive Officer, B 6/44, Korea, 1970 and 1971.

Additional training as unit Chemical Officer, Ft. McClellan, Alabama, 1970.

**Dissertation:**

"On the Wage Pay and Outside Earnings of State Legislators."

**Committee:**  Robert B. Ekelund, Jr., Chair

       Wendy Lee Gramm

       Raymond C. Battalio, deceased

# APPENDIX B

List of Cases

(2003-present)


Ongoing:

Report in progress. Case ongoing. United States District Court, Southern District of Florida,

Miami Division, Case No: 1:12-cv-23927-pas. Salud Services, Inc., a Florida

corporation, d/b/a Endeavor Bus Lines; Ready Bus Line, a Minnesota corporation;

Gentry Coach Company, a Tennessee corporation, d/b/a Gentry Trailways; Vandalia

Bus Lines, Inc., an Illinois corporation; Tri-city Charter of Bossier, Inc., a Louisiana

corporation; RBL WISCONSIN, INC., a Wisconsin Corporation; Roadrunner Charters,

Inc., a Texas corporation; and Eclipse Charters & Tours, LLC, an Indiana limited liability

company, Plaintiffs,   vs. Caterpillar, Inc., a Delaware corporation, Defendant. Working

for defendant.


Report filed, rebuttal report filed, and two depositions taken. Case ongoing. In the Court of

Common Pleas for the Thirteenth Judicial Circuit State of South Carolina, County of

Greenville Civil Action No. 2OO9-CP-23-3346 In re International Textile Group Merger

Litigation. Involves damage and liability analysis on behalf of Plaintiff.


Affidavit in the United States District Court, for the District of South Carolina, Beaufort Division,

9:11-cv-OO753-rmg, Robert Elliott Trucking, Inc., Plaintiff V. Caterpillar, Inc. Defendant

opposing motion for class certification. Deposition not yet taken. October 11, 2011.

Motion for class certification denied.

Report submitted in the United States District Court, for the District of South Carolina, Florence
Division, Civil Action No. 4:10-cv-01124-TLW, Stuart Mark Axelrod Plaintiff, vs. AT&T
Inc., BellSouth Advertising and Publishing Corporation (d/b/a AT&T Advertising)
Solutions, AT&T Advertising and Publishing, YellowPages.com, LLC (d/b/a AT&T
Interactive), Defendants. Deposition not yet taken. October 28, 2010.

Affidavit submitted opposing motion for class certification: The Court of Common Pleas for the
Fifth Judicial Circuit State of South Carolina, County of Richland, Civil Action No.
04-CP-40-4116, Jarrod Garrett, Ron J. Gary, John Michael Ross and Lynn Bisbee, on
behalf of themselves and all others similarly situated, Plaintiffs, v. Palmetto Health
Alliance d/b/a Palmetto Health Richland, Palmetto Health Baptist and Palmetto Heath
Baptist Easley, Defendant. Report submitted January 2010. Deposition taken October
2010.

Affidavit submitted opposing motion for Class Certification (Factors on Reasonable Pricing of
Hospital Services): The Court of Common Pleas for the Fifth Judicial Circuit State of
South Carolina, County of Richland, Civil Action No. 04-CP-40-4116, Jarrod Garrett,
Ron J. Gary, John Michael Ross and Lynn Bisbee, on behalf of themselves and all others
similarly situated, Plaintiffs, v. Palmetto Health Alliance d/b/a Palmetto Health
Richland, Palmetto Health Baptist and Palmetto Heath Baptist Easley, Defendant.
Report submitted January 2010. Deposition taken October 2010. Report submitted
January 2010. Deposition taken October 2010.

Affidavit submitted opposing motion for class certification: The Court of Common Pleas for the
Ninth Judicial Circuit State of South Carolina, County of Charleston, Civil Action No.

04-CP-10-3836, Marsha Monteith, on behalf of herself and all others similarly situated, Plaintiff, v. CareAlliance Health Services Corporation, d/b/a Roper St. Francis Healthcare, Roper Hospital, Bon Secours St. Francis Hospital, Roper St. Francis Rehabilitation Hospital and Roper Berkeley Day Hospital, Defendant. Report submitted January 2010. Deposition taken October 2010.

Affidavit submitted opposing motion for Class Certification (Factors on Reasonable Pricing of Hospital Services): The Court of Common Pleas for the Ninth Judicial Circuit State of South Carolina, County of Charleston, Civil Action No. 04-CP-10-3836, Marsha Monteith, on behalf of herself and all others similarly situated, Plaintiff, v. CareAlliance Health Services Corporation, d/b/a Roper St. Francis Healthcare, Roper Hospital, Bon Secours St. Francis Hospital, Roper St. Francis Rehabilitation Hospital and Roper Berkeley Day Hospital, Defendant. Report submitted January 2010. Deposition taken October 2010.

Affidavit submitted opposing motion for class certification: The Court of Common Pleas for the Seventh Judicial Circuit State of South Carolina, County of Spartanburg, Civil Action No. 2007-CP-42-1744, Brett Coley, on behalf of himself and all others similarly situated, Plaintiff, v. Mary Black Memorial Hospital, Defendant. Report submitted January 2010. Deposition taken October 2010.

Affidavit submitted opposing motion for Class Certification (Factors on Reasonable Pricing of Hospital Services): The Court of Common Pleas for the Seventh Judicial Circuit State of South Carolina, County of Spartanburg, Civil Action No. 2007-CP-42-1744, Brett

Coley, on behalf of himself and all others similarly situated, Plaintiff, v. Mary Black Memorial Hospital, Defendant. Report submitted January 2010. Deposition taken October 2010.

Affidavit submitted opposing motion for class certification: The Court of Common Pleas for the Thirteenth Judicial Circuit State of South Carolina, County of Greenville, Civil Action No. 04-CP-23-5676, Greenville Hospital System, Plaintiff, v. Kellie Jean Paulson and Michael A. Paulson,, Defendant. Report submitted January 2010. Deposition taken October 2010.

Affidavit submitted opposing motion for Class Certification (Factors on Reasonable Pricing of Hospital Services): The Court of Common Pleas for the Thirteenth Judicial Circuit State of South Carolina, County of Greenville, Civil Action No. 04-CP-23-5676, Greenville Hospital System, Plaintiff, v. Kellie Jean Paulson and Michael A. Paulson,, Defendant. Report submitted January 2010. Deposition taken October 2010.

Affidavit submitted opposing motion for class certification: The Court of Common Pleas for the Thirteenth Judicial Circuit State of South Carolina, County of Greenville, Civil Action No. 2004-CP-23-6065, Jeyilud Bennett, on behalf of herself and all others similarly situated, Plaintiff, v. Greenville Hospital System, Defendant. Report submitted January 2010. Deposition taken October 2010.

Affidavit submitted opposing motion for Class Certification (Factors on Reasonable Pricing of Hospital Services): The Court of Common Pleas for the Thirteenth Judicial Circuit State

of South Carolina, County of Greenville, Civil Action No. 2004-CP-23-6065, Jeyilud Bennett, on behalf of herself and all others similarly situated, Plaintiff, v. Greenville Hospital System, Defendant. Report submitted January 2010. Deposition taken October 2010.

United States District Court District of South Carolina Spartanburg Division, Case No: 7:08-3518-GRA, Prym Consumer USA, Inc. and William Prym, Inc., Plaintiffs, v. Rhode Island Textile Company, Defendants. Report submitted on March 16, 2009. On appeal.

Report and Rebuttal Report Submitted: In Re: Hydrogen Peroxide Antitrust Litigation Chem-Way Corporation, plaintiff, v. Arkema, Inc., et al. Defendants. In the United States District Court for the Eastern District of Pennsylvania Civil Action No. 05-666 MDL Docket No. 1682. Deposition taken.

Damages Expert Report in preparation for fall 2006: Beatrice C. Romero, Michael Ferree, et al. v. Philip Morris, Incorporated; R. J. Reynolds Tobacco Company; Brown Williamson Tobacco Corp., Lorillard Tobacco Co. Liggett Group, Inc.; and Brooke Group, Ltd. First Judicial District Court, State of New Mexico County of Rio Arriba, Civil Action No. D-0117-cv-200000-972.

Report submitted, deposition taken (April 2009): Robert C. Brandriff et al. v. Dataw Island Owners' Association, Inc., et al. United States District Court for the District of South Carolina Beaufort Division Civil Action No. 9:07-3361. Disposition unknown.

**Settled or Dismissed:**

Declarations prepared and submitted, depositions taken, August 5, 2007, In re Polyester Staple
Antitrust Litigation All Cases, United States District Court, For the Western District of
North Carolina Charlotte Division, MDL Docket No.: 3:03cv1516.

Declaration prepared and submitted, deposition taken, June 12, 2007, In the United States
District Court, For the Central District of California Southern Division, IN RE:
Endosurgical Products Direct Purchaser Antitrust Litigation, Case No.
05-cv-8809-JVS-MLG.

Report submitted, depositions taken: James P. Lundsford v. Callaway Golf Company and
Callaway Golf Sales Company, in the Circuit Court for Sevier County, Tennessee at
Sevierville Civil Action No. 7 03 2141 20 (Gordon Ball, Ball and Scott, Knoxville)

Class Certification Report prepared March 2007, deposition not yet taken. John Mariotti, Jr.,
d/b/a JRM Paving and Sealing and Laura Mariotti, v. Carolina International Trucks,
Inc., International Truck and Engine Corporation, Caterpillar Inc. and Horton, Inc. United
States District Court for District of South Carolina , Florence Division. (U. S. District Court
C.A. No.: 4:06-cv-02156-TLW-TER).

Class Certification report and deposition taken September 2006, Jason White, Brian Polak, and
Jovan Harris, on Behalf of Themselves and All Others Similarly Situated, v. NCAA, Case
No. CV 06-0999 RGK (MANx), United States District Court, Central District of
California, Western Division. Liability report and damages report in preparation for June
2007 trial. Class certified. Case settled.

Case development and substantial consultation, Spartanburg Regional Health Care v. Hill-Rom

(Gordon Ball, Ball and Scott, Knoxville). Case settled.

Case development and analysis: Reading Intl. v. Oaktree Capital Management, et al, U.S.

District Court, NY, 03 Civil 1895 (GEL) (THK). (Lauren Albert, Axinn, Veltrop &

Harkrider, NY)

Expert report prepared, deposition not yet taken: Coleman Properties, LLC, et al. v. AFG

Industries, Inc., Pilkington PLC, Pilkington Libbey-Owens-Ford Co., Inc, Guardian

Industries Corp., and PPG Industries, Inc in the Circuit Court for Sullivan County,

Tennessee at Blountville in the State of Tennessee, No. C2591

Damages report prepared, first deposition taken September 2006, second March 2007 in

Department of Transportation v. Skipper Properties et al. Civil Action No. 03-CV-19718,

in the Superior Court of Bibb County, State of Georgia (Charles Ruffin of Gambrell and

Stolz). Case settled May 2007.

Damages report prepared, entered settlement negotiations, case settled, June 2006; Marion

Crane, et al. v International Paper Company, et al. Civil Action No. : 3:02-3352-22

(Russell Burke, David Eddy, Marguerite Willis, Nexsen Pruet, Columbia, SC)

Liability and Damages, draft report prepared, submission in June 2006, deposition set for fall

2006: Innovative Concept Group, Inc. V. Food Sales of Tennessee, Inc., et al. U.S.

District Court, Middle District of Florida, Tampa Division Civil Action No. 8:03CV1569(Shelly Wilson, Robertson and Overbey) (CASE SETTLED)

Outline for Settlement Negotiations Smokeless Litigation, report prepared (October 2003) and hearings held (October 2003). (settlement negotiations)

Philip Edward Davis v.United States Tobacco Company et al. Circuit Court for Jefferson County, Tennessee at Dandridge. Case No. 17305 IV. Affidavit filed (March 2003) and deposition given (2003). (class certification)

Thomas Ellis et al. v. United States Tobacco Company, et al. Superior Court of the District of Columbia Case No. 02-0004227. Affidavit filed (October 2002) and deposition given (February 2003). (class certification)

Beatrice C. Romero, Michael Ferree, et al. v. Philip Morris, Incorporated; R. J. Reynolds Tobacco Company; Brown Williamson Tobacco Corp., Lorillard Tobacco Co. Liggett Group, Inc.; and Brooke Group, Ltd. First Judicial District Court, State of New Mexico County of Rio Arriba, Civil Action No. D-0117-cv-200000-972. Affidavit Prepared (October 2002), Supplemental Affidavit Prepared (January 2003), Deposition Given (February 2003). (class certification)

# APPENDIX C

MARC M. SELTZER (54534)
STEPHEN E. MORRISSEY (187865)
STEVEN G. SKLAVER (237612)
TIBOR L. NAGY (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150
email: mseltzer@susmangodfrey.com
email: smorrissey@susmangodfrey.com
email: ssklaver@susmangodfrey.com
email: tnagy@susmangodfrey.com

MAXWELL M. BLECHER (26202)
COURTNEY A. PALKO (233822)
BLECHER & COLLINS P.C.
515 S. Figueroa Street, 17th Floor
Los Angeles, California 90071
Telephone: (213) 622-4222
Fax: (213) 622-1656
email: mblecher@blechercollins.com
email: cpalko@blechercollins.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| JASON WHITE, BRIAN POLAK, and JOVAN HARRIS, on Behalf of Themselves and All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br><br>    Defendants. | Case No. CV 06-0999 RGK (MANx)<br><br>**DECLARATION OF ROBERT E. MCCORMICK IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date: September 25, 2006<br>Time: 9:00 a.m.<br>Place: Courtroom of the Hon R. Gary Klausner |

# I. Background and Qualifications

1.     I am Dr. Robert E. McCormick, currently Professor and BB&T Scholar at the John E. Walker Department of Economics, Clemson University, Clemson, South Carolina, 29634. I live at 1156 Old Seneca Road, Six Mile, South Carolina.

2.     I earned the B.A. (1972) and M.A. (1974) degrees in Economics from Clemson University, and the Ph.D. in Economics from Texas A&M University in 1978. In the academic year 1974-75 and again in the year 1977-78, I held the position of Visiting Instructor of Economics in the Department of Economics at Clemson. From 1978 through 1982 I was Assistant Professor of Business Administration at the Graduate School of Business at the University of Rochester. From 1982-85 I was Associate Professor of Economics at Clemson. In 2000 I was named BB&T Scholar and Director of the BB&T Center for Economic Education at Clemson. In 2002 I was recognized as Senior Associate at the Political Economy Research Center in Bozeman, Montana.

3.     I attended the Law and Economics Institute at the University of Miami in 1980. I was a Visiting Research Scholar at the Center for the Study of Public Choice at Virginia Polytechnic Institute in the same year. I was a Visiting Professor at the Universidad Francisco Marroquin in Guatemala in 1988 and 1990 and on several occasions at the Consortium International MBA in Asolo, Italy, most recently in 2004. I have been an instructor to attorneys at the Federal Trade Commission in 1982 and 1983. In 2001 I was the Julian Simon Research Fellow at

the Political Economy Research Center in Bozeman, Montana. From 2002 through 2005 I was Director of Kinship Conservation Institute at Bozeman, MT. At present I am Senior Fellow at PERC in Bozeman and Director of Teaching Environmentalists About Markets, a three-pronged environmental education program at PERC.

4.     My primary teaching responsibilities are focused on economic theory at the undergraduate and graduate levels, antitrust, financial and managerial economics at both levels, sports and economics, and entrepreneurial economics. I have won several Clemson University teaching awards including the Prince Innovative Teacher of the Year (1998), the Alumni Professor of the Year (2000), the MBA Professor of the Year (several occasions), and the National Scholars Mentor Award (2005 & 2006).

5.     I have been a consultant to the U.S. Department of Agriculture, the U.S. Federal Trade Commission, and the Department of the Treasury of New Zealand. I have testified before the U.S. Congress on energy deregulation (1996). I have testified before the South Carolina House of Representatives on energy regulation (1997), and I have prepared testimony for the New Mexico Public Service Commission on energy issues (1998). I have prepared affidavits for the U.S. Congress and for argument in the U.S. District Court (1994) on telephony. I have prepared affidavits for the Surface Transportation Board of the U.S. Department of Commerce on mergers and antitrust issues (2000 and 2003). Similar argument was

708135v1/008924                                    2.

prepared for the Canadian Transport Act Review Panel (2000). I have filed an affidavit before the Federal Communications Commission (2001) concerning open access in telephone and data transmission markets.

6.    I am currently involved in several antitrust and corporate litigation matters. These involve questions of market definition, breach of contract, restraints of trade and damage calculations. I have been deposed in state and federal court cases on numerous occasions. These cases involve allegations of antitrust violations in local telephone markets, aircraft parts, cigarettes, golf clubs, health care markets, sports apparel markets, simple contract breaches, and smokeless tobacco. Some of these involve liability; others focus on class certification. I was recently involved in a case of wrongful death involving the valuation of life of a sports personality in Missouri. That case was settled out of court in the summer of 2002. I am currently involved in several other litigation matters. These include antitrust allegations in timber contracts, polyester fiber market, health care market, and in the cigarette market. I am currently engaged in a case involving property and business evaluation in a takings case.

7.    My scholarly research covers a broad spectrum in the area of microeconomics including the areas of antitrust, public choice, regulation, sports and economics, managerial and financial economics, environmental economics, and general microeconomic theory. I have published two books, one on political markets and a textbook on managerial economics. I have published seven

monographs on topics including the energy and gambling markets and the regulatory environment. I have published, often with coauthors, more than 40 articles and papers in refereed professional journals and edited volumes. I have published a number of articles over my career in sports and economics including work on the relation between sports and academics, alumni giving to sports and academics, rules changes in sports, racial integration in sports, and several other sports related topics. I complete listing of my publications is reported in my *curriculum vitae*, attached as Appendix A to this affidavit.

8.     My current billing rate for consulting in litigation matters is $500 per hour. Over the past four years I have been involved in a number of different legal matters in Federal court and several different state courts, and these are detailed in an appendix to this report.

**II. Assignment**

9.     I have been asked by Plaintiffs' counsel in this litigation to evaluate economic issues relating to class certification. Specifically, I have been asked to assess whether there are class-wide methodologies for assessing the effects of the agreement between the NCAA and its members to restrict the amount of financial aid provided to members of the proposed class through a cap on grants-in-aid ("GIA's"). I have also been asked to determine whether there are practical and feasible techniques for assessing damages on a class-wide basis.

10.     In preparing this affidavit, I have relied on my experience in antitrust

708135v1/008924                                    4.

and general economic matters and a long history of study and analysis of college sports and the NCAA in particular. I have done work for the U.S. Civil Rights Commission on NCAA rules and regulations, and as a matter of course in my classroom activities, I do significant analysis of the NCAA, its roots, and its roles. My staff and I have examined the pleadings in the case as well as publicly available information concerning the NCAA. I expect, consistent with my experience in litigation consulting, that additional relevant information may become available after this affidavit is submitted. Thus, I respectfully reserve the right to amend, change, or alter this affidavit as additional relevant and important information becomes known to me.

11. For the purposes of this affidavit, I have assumed that there is a horizontal agreement between members of the NCAA as alleged by Plaintiffs. Based on my analysis, I conclude that there are well-accepted class-wide methodologies available for assessing the impact of the alleged agreement on all members of the proposed class. I also conclude that there exist well-accepted class-wide methodologies for assessing damages in this case. These conclusions are based on my analysis of the relevant markets, economic theory, and the readily available relevant information required to do damage computations for members of the class. Details of these analyses are described below.

12. The proposed class in this case includes the individuals who received athletic-based grants in-aid ("GIA's") from colleges and universities that sponsor:

i.   football programs sponsored by colleges and universities

     included in NCAA Division I-A ("Major College Football"

     programs); or

ii.  men's basketball programs sponsored by colleges or universities

     in the ACC, Big East, Big 10, Big 12, Pac-10, SEC, Mountain

     West, WAC, Atlantic 10, Conference USA, Mid-American, Sun

     Belt, West Coast, Horizon League, Colonial Athletic

     Association, or Missouri Valley conferences ("Major College

     Basketball" programs), at any time between February 17, 2002

     and the date of class certification in this matter.

This proposed class is well defined and the individuals who might be

members of the class are identifiable by name.[1] This information is readily

available from squad lists in both football and basketball that must be

provided each year from individual schools to their conferences and the

NCAA.[2]

13.   The issues in the case are common to *all* members of the proposed

class. Each member of the class is impacted by the fact that the NCAA restriction

---

[1] Records at NCAA member institutions will also have a home address and other contact information.

[2] The squad lists are not publicly available from the NCAA, but it is my understanding that they can be obtained from the NCAA under the right circumstances, and that for purposes of the matter here, it would be routine to gather that information. I have attached a copy of the form that the NCAA uses to collect these squad lists from its member institutions as Appendix B.

on grants in aid did not allow him to enjoy the benefits of price competition to compensate students athletes for the full cost of attendance. Absent the NCAA GIA restriction, all members of the class, each of whom actually did receive a grant-in-aid, would have, but for the NCAA limitations on awards, either been able to receive additional funds to defray the costs of education or offer his talents in an environment where the individual school could grant him sufficient money to cover all of his educational expenses. It bears noting that every member of the proposed class did in fact receive a grant in aid. The issue here is that the member colleges and universities of the NCAA, acting in concert through the NCAA, have limited expense reimbursement to a level below that required to cover all costs of attending college. The impact of this limitation affects every single student athlete who was offered and accepted a grant-in-aid as each one of them could have received additional monies but for the regulation of the NCAA. Hence the determination of classwide impact is as straightforward as observing the squad lists for each school over each year of the class period. This is not a difficult exercise nor are the squad lists controversial–each school is required to maintain squad lists by NCAA regulation. Listing the members of the class is practical and straightforward.

14. Damage calculations for all members of the class are also easily determined according to a formula that I specify and detail below. The relevant data required to compute damages for each member of the class is readily and easily obtained. The computations are themselves little more than simple arithmetic.

Accordingly, the two primary issues that I have been charged to investigate are discharged in a relatively straightforward manner: *(1)* as a matter of basic economic principles, common impact (that is, antitrust injury) can be readily shown in this case, and *(2)* the damages each class member suffered can be readily calculated.

15.     I have not yet determined the actual amount of damages in this case for any member of the proposed class. Discovery would be needed to actually compute the numbers according to the formula I propose below.

### III. Liability Issues Common to Each Member of the Proposed Class

16.     The factual issues relating to the NCAA and the proposed members of the class, and the role that the NCAA plays in college sports are not unique to each member of the class. Indeed the rules are uniform and the relation of the NCAA to the college sports are common to each and every member of the proposed class in this case.

17.     The NCAA was organized in 1905.[3] It was formed to regulate intercollegiate competition among its member schools at a time when there was considerable external pressure to regulate or even eliminate college football. While its initial charter was focused on player safety and the rules of competition, it has expanded to cover a wide range of business and financial matters relating to the big business of college athletics. The NCAA is comprised of over 1200 member

_____

[3] The original name of the NCAA was Intercollegiate Athletic Association of the United States.

1 │ institutions.

2
3    18.    The NCAA is organized into 3 divisions, I, II, and III[4].  Division I is

4 │ broken into I-A, I-AA and I-AAA.  The distinctions between divisions relate

5 │ primarily to whether the school competes in football, the number of programs

6
7 │ sponsored, the levels of financial aid allowed, and attendance levels at their football

8 │ games.  There are 326 Division I member institutions.  Within each division, there

9 │ are also conferences, which are groups of colleges that organize competition among

10
│ its members.
11

12    19.    The NCAA and its member institutions engage in what by any standard

13 │ is very big business.  A highly abbreviated list of a smattering of their activities

14
│ illustrates the size of this business:
15

16    a.    Television contracts run into the hundreds of millions of dollars

17       annually.[5]

18
19    b.    College coaches often receive salaries in excess of a million dollars per

20       year.

21

22

23    [4] There is a second association of colleges regulating sports, the National Association of
Intercollegiate Athletics (NAIA).  The member schools are uniformly small institutions.  They have no
24 │ substantial media presence nor any national following.  Athletes playing for these schools rarely if ever
become professional football players, and the schools do not compete with NCAA Division IA schools
25 │ for talent.  They take what is left over after rosters have been filled at the large NCAA schools.  Junior
colleges are also comprised of students who do not meet academic standards for NCAA schools, but
26 │ again, their media presence and visibility, not to mention their educational opportunities, do not
compare with the colleges and universities of NCAA Division I.
27

28    [5] Appendix C lists the payouts from the NCAA annual basketball tournament to each conference
in the association.

c.  College coaches regularly sign endorsement contracts with sportswear enterprises for substantial sums.

d.  Ticket revenues and alumni contributions to garner favorable seats and the like typically run into the tens of millions of dollars per year.

e.  Expenditures on stadiums and arenas, construction and upgrades, often exceeds $30 million.

f.  Athletic budgets for major sports schools are usually in excess of $25 million. Even the small programs spend millions annually.

g.  Employees of athletic departments are skilled business people often with advanced degrees in business.

h.  The NCAA has engaged in the standard business practice of eliminating competition by acquiring a rival producer. In 2005, the NCAA purchased the NIT tournament from the MIBA for $56.5 million to settle an antitrust lawsuit.

20.  In 2002-2003, the average Division IA sports program generated over $29 million in revenue[6], for a total of more than $3 billion. Football and basketball are the primary sources, generating more than 80 percent of all athletics revenue. The NCAA Division I basketball tournament is one of the premier college sporting

---

[6] Fulks, Daniel L., "Revenues and Expenses of Division I and II Intercollegiate Athletic Programs 2002-2003" taken from www.ncaa.org/library/research/i_ii_rev_exp/2003/2002-03_d1_d2_rev_exp.pdf at page 31.

events in the world.[7] The current television contract for this event alone is more than $6 billion dollars.[8]

21.     The NCAA is an association of otherwise independent college and universities who compete for all of the other inputs to the production of education and entertainment—faculty, students, and janitors—except for student athletes.

22.     Grant-in-aid agreements between student-athletes and Division 1A schools involve an exchange of services for financial benefits, and a discount on the costs that student-athletes, as consumers of higher education and athletic-related services, incur in attending school.

## IV. THE RELEVANT MARKETS

23.     The question of the relevant markets for assessing the effects of the GIA cap is the same for each member of the proposed class and common to them all, each and every one.

24.     Major college football and basketball are played exclusively by colleges and universities in the United States, and the vast majority of the players are from the United States. Schools from all across the country compete with each other in both the input and output markets. The United States is the relevant geographic market.

---

[7] "Sunday marks the start of the sporting world's most dysfunctional marriage - the combination of college basketball and gambling.. Gambling on college sports has been very good to the National Collegiate Athletic Association, indirectly adding more money to its coffers than it ever paid to Nevada casino." [CNN at http://money.cnn.com/2002/03/08/news/column_sportsbiz).

[8] Ibid.

25.     The relevant product markets in this case are the markets for highly skilled football and basketball players who play major college sports.  In those markets, students select among schools, and schools select among students. Division I-AA and Divisions II and III are not typically a reasonable alternative for individuals wishing to play Major College sports.  Major College sports programs are characterized as those that:

a.     generate large revenues from ticket sales, donations and television contracts,

b.     offer full scholarships for players,

c.     offer a preponderance of opportunities for players who wish to pursue professional sports careers,

d.     have large stadiums/arenas and modern practice facilities,

e.     have seasons culminating in championship tournaments and bowl games that are among the worlds most significant sporting events,

f.     generate significant national media coverage, and

g.     offer the highest quality coaching and training staffs.

h.     combine those athletic benefits with the opportunity to pursue a college degree.

26.     These characteristics are unique to Division I basketball and Division IA football.  As such, there is no reasonable alternative for top high school athletes wishing to compete at the highest level on a national stage.

27.    High school athletes do not consider Division IA or II or III to be reasonable alternatives to participating in Division I athletics[9]. I am unaware of any evidence showing or purporting to show that any significant number of student athletes consider the other categories of schools, Division IAA, Division II, Division III, or other non-NCAA schools as reasonable substitutes.

28.    The student-athletes in the proposed class do not have any reasonably interchangeable substitutes for the schools that compete in the relevant markets.

29.    Professional sports are not reasonably interchangeable substitutes for a participating in Division I college football and basketball because *(a)* they do not combine athletic and education benefits into one bundle in the way of a college education, *(b)* hardly any college student-athletes have the option of choosing to play professional sports either because they are not eligible for drafts under professional league rules or are not sufficiently skilled for a pro career, and *(c)* the difference between professional salaries and college GIA's suggests complete lack of price competition between the two. They are separate product markets.

## V. The GIA Cap

30.    Issues relating to the existence and nature of the GIA cap are common to each member of the proposed class.

31.    Athletic GIA amounts are limited, or capped, by the NCAA by-laws.

---

[9] This conclusion is based on a long series of conversations over time with recruiting specialists, college athletes, and college and professional coaches.

708135v1/008924                                    13.

Schools are allowed to cover tuition and required fees, room and board, and required books. Other typical costs of attendance, such as travel, supplies, transportation, laundry, health insurance, and miscellaneous expenses cannot be covered under the NCAA's GIA cap.[10]

32.     These additional, uncovered costs of attendance are important to students. Schools are required to estimate these costs and report them to the Department of Education as part of their mandated IPEDS survey[11]. The costs are called "Other Expenses" in the IPEDS surveys.[12]

33.     Each school is required to submit annually an official roster, or Squad List, of players in each sport. The Squad List shows whether the player is receiving a GIA and if so, how much. Schools who do not report properly or who violate the

---

[10] 2006-2007 Division I Manual, Article 15, Bylaw 15.02.5, p. 192.

[11] "IPEDS, established as the core postsecondary education data collection program for NCES, is a system of survey components designed to collect data from all primary providers of postsecondary education. IPEDS is a single, comprehensive system designed to encompass all institutions and education organizations whose primary purpose is to provide postsecondary education. IPEDS is built around a series of interrelated components that collect institution-level data in such areas as enrollments, program completions, graduation rates, faculty, staff, finances, institutional prices, and student financial aid."

"The Higher Education Act of 1992 mandated the completion of IPEDS surveys in a timely and accurate manner for all institutions that participate, or are applicants for participation, in any federal student financial assistance program authorized by Title IV of the Higher Education Act of 1965, as amended (20 U.S.C. 1094(a)(17)). Thus, beginning in the 1993 survey year, NCES began to collect detailed data from all postsecondary institutions that met this mandate, including all private less-than-2-year institutions, which NCES had previously only sampled. Institutions that were not eligible to participate in federal student financial aid programs were asked to complete only the Institutional Characteristics survey." [Department of Education, National Center for Educational Statistics at http://nces.ed.gov/ipeds/AboutIPEDS.asp ]

[12] " The amount of money (estimated by the financial aid office) needed by a student to cover expenses such as laundry, transportation, and entertainment." [Department of Education, National Center for Educational Statistics at http://nces.ed.gov/ipeds/glossary/index.asp?charindex=O ].

708135v1/008924                                    14.

1  GIA caps are subject to sanctions, such as additional limits on GIA numbers or

2  amounts.

3

4      34.    The GIA cap applies to all Division I schools, and thus to all members

5  of the proposed class.

6  **VI.    The Competitive Effects of the GIA Cap**

7

8      35.    The competitive effects of the GIA cap are common to all class

9  members and can be resolved on a class-wide basis and using common class-wide

10 methodologies, as explained below.

11

12     a.    First, the question of whether the GIA cap restricts price or output

13            involves factual questions that are common to all class members. The

14            GIA cap is, on its face, a naked restraint on the amount of athletics-

15

16            based financial aid that colleges may pay student-athletes. As a result

17            of the GIA cap, no student athlete receives athletics-based financial aid

18            in excess of the GIA cap. Because all members of the proposed class of

19

20            student-athletes received GIA's from schools in the relevant market and

21            were subject to the GIA cap, the determination that each member of the

22            class was impacted by the GIA cap can be made using straightforward

23

24            accounting methodologies and existing data to identify the members of

25            the class, tabulate the value of the GIA's provided to members of the

26            class, and calculate the costs of attendance incurred by class members

27

28            that were not covered by GIA's.

b. Second, the assessment of any pro-competitive justification that the NCAA may come to offer for the GIA cap involves factual questions that are common to all class members. The NCAA does not appear to have any procompetitive justification for the GIA cap. The NCAA and its supporters have argued that these caps exist to protect amateurism in college sports, to maintain parity of game competition, and to protect the financial viability of college sports[13]. Whether these statements are true or not is not the issue at this stage of the proceedings. The question here is whether these topics are common to all members of the proposed class, and they are.

c. Third, the impact of the GIA cap on the members of the class involves factual questions that can be addressed on a class-wide basis. The demand for student-athletes is such that, absent the GIA cap, student-athletes would have received additional athletics-based financial aid covering up to the full COA.[14]

36. Based on common evidence and common methodologies, it also will be possible to determine whether the GIA cap sets compensation to all class members

---

[13] See, for example, Hawes, Kay, "A Presidential Era - Institutional CEOs Launch Reforms in College Athletics", The NCAA News, December 20, 1999.

[14] See T. Rhoads and S. Gerking, "Educational contributions, academic quality, and athletic success," *Contemporary Economic Policy*, April 2000, at 24; Robert McCormick and Maurice Tinsley, "Athletics versus Academics: Evidence from SAT Scores," *Journal of Political Economy*, 95(5) (October 1987) at 1103.

1   below what they would have received in an unrestricted market.

2   37.     For instance, a benchmark methodology using evidence from
3
4   professional sports leagues can be used to provide class-wide evidence of excess
5   demand for student-athletes and the anticompetitive impact of the GIA cap.  Grant-
6
7   in-aid expenditures average 12 percent of revenue for Division IA football and 5.9
8   percent for Division IA basketball.  Even including revenues and grant-in-aid costs
9   for others mens' and womens' sports (which are subsidized by mens football and
10
11  basketball), player costs are less than 15.5 percent of revenues of NCAA member
12  institutions.  This percentage is extremely low when compared with the professional
13  sports markets that Division I athletes may eventually enter.  While these
14
15  professional markets (that is, the NFL and NBA) are different from college markets,
16  they share certain important characteristics.  Namely, their production functions
17  (types and number of capital and labor inputs) and revenue generation models are
18
19  similar.  Evidence on the value of labor inputs in big time football and basketball in
20  general can be derived by looking at the percentage of revenues paid out to players
21  in professional sports leagues where player compensation is unrestricted.[15]
22
23  38.     In the NFL and NBA, player compensation is approximately 55-65
24  percent of total revenues.[16]  These percentages offer a reasonable estimate of the
25

26  _____

27  [15]There are some restrictions on player compensation in these leagues.  Both have salary caps
    that are negotiated as part of the collective bargaining agreements with the players' unions..

28  [16]See http://www.nflpa.org/CBA/CBA_Complete.aspx#art24 for a discussion of the NFL
    salary cap and http://members.cox.net/lmcoon/salarycap.htm#8 for a discussion of the NBA salary cap.

value of player inputs in the production of sports entertainment. Based on these

percentages, I estimated the value of player inputs for football and basketball in

Division IA. The results are shown below.

| NCAA Division IA Player Costs as a Percentage of Revenue 2002-2003 | | | | |
|---|---|---|---|---|
| **Sport** | **Average Revenues** | **Estimated Value of Player Inputs assuming 55 percent of Revenue** | **Average Actual Grant-In-Aid Costs** | **Excess of Estimated Value over GIA Expenditures** |
| Basketball | $4,216,900 | $2,319,295 | $248,900 | $2,070,395 |
| Football | $12,859,30 0 | $7,072,615 | $1,547,600 | $5,525,015 |
| All Sports (Male and Female) | $29,381,40 0 | $16,159,770 | $4,480,900 | $11,678,870 |
| Source: 2002-2003 NCAA Gender Equity Report at 33. | | | | |

39. If the allegations in this case are proven, then each member of the

proposed class will have suffered antitrust injury. The GIA cap has a common

impact on the class members for several reasons:

    a.    The GIA cap applies to every scholarship football and basketball player

        at every major college

    b.    The GIA cap impacts each class member in the same way

    c.    Every member of the proposed class received a GIA from a school in

        the relevant markets.

40.     According to standard economic theory of competitive labor markets, workers are hired until the point where marginal revenue product is equal to marginal cost. Eliminating the GIA cap increases the marginal cost of each class member. The question regarding common impact is whether the marginal revenue product for every class member is high enough to cover these additional costs, which might range from $1,000 to $5,000 per year, or generally about 5 - 20 percent of current GIA cap amounts. There is both theoretical and empirical evidence to indicate that marginal revenue products far exceed marginal costs, that is, the revenue and cost associated with the marginal players on the teams.

41.     Costs for class members have, in fact, risen dramatically over the past 10 years. The costs of tuition, room and board, and books have risen much faster than inflation. Between 1993 and 2003, these costs increased by 72 percent for in-state student-athletes and 76 percent for out-of-state student athletes, almost triple the rate of inflation[17]. Yet, even in the face of these exploding costs, the number and amount of GIAs awarded has stayed exactly the same.[18]

42.     While the NCAA rules allow for GIAs of less than the full amount, as a practical matter all football and basketball scholarship players are on full

---

[17] Fulks, Daniel L., "Revenues and Expenses of Division I and II Intercollegiate Athletic Programs 2002-2003" taken from www.ncaa.org/library/research/i_ii_rev_exp/2003/2002-03_d1_d2_rev_exp.pdf at page 22.

[18] Ibid. For Division IA men's programs, there were 137 GIA equivalents warded in 1993 and 137 awarded in 2003.

708135v1/008924                19.

scholarship[19]. According to the NCAA's Title IX report from 2002-2003, Division IA schools fill up their full allotment of basketball and football GIAs as shown below.

| Division IA Football and Basketball Average Full GIAs Awarded | | |
|---|---|---|
| Sport | Full Time Equivalent GIAs Awarded | Number of Students Receiving GIAs |
| Basketball | 12.3 | 12.5 |
| Football | 82.3 | 85.9 |

Source: 2002-2003 NCAA Gender Equity Survey[20]

43.    As I have discussed earlier in detail, there are no significant alternative buyers of talented high school football and basketball players who receive scholarships to Division I NCAA schools.

44.    For a well-defined collection of student-athletes in the proposed class, consisting of those individuals who actually receive a GIA from the Major College

---

[19] The following quote is from Myles Brand on the NCAA website in response to a question on the difference between scholarship limits in football and baseball:

"Gary, scholarships are distributed in different ways in different sports. Baseball is an equivalency sport, so they are distributed in smaller chunks in order for each student-athlete to have an opportunity to receive a partial scholarship. In some sports, such as football, each student-athlete has to receive a whole scholarship or nothing of the kind. So it does vary among sports, and some sports have more scholarships than others, but we make up for that by having equivalency sports, such as baseball."

[The NCAA News at http://www.ncaa.org/wps/portal/newsdetail?WCM_GLOBAL_CONTEXT=/wps/wcm/connect/NCAA/NCAA+News/NCAA+News+Online/Association-wide/Callers+get+answers+by+'asking+Myles'+-+6-7-04].

[20] http://www.ncaa.org/library/research/gender_equity_study/2002-03/2002-03_gender_equity_report.pdf

708135v1/008924                                        20.

Football and Major College Basketball programs in the relevant markets, the excess demand for their talents is so great that each and every one of them is impacted by the NCAA limit on the amounts of the GIA. Additional common evidence that may be used to demonstrate this common impact includes:

    a.    The revenues and profits earned by the schools themselves through the talents of the players

    b.    The existence of substantially higher than average salaries paid to other participants in Division I football and basketball (for example, coaches and athletic directors), as compared to the payments to players.

    c.    Large recruiting expenditures that schools spend to compete for the talents of the prospective scholarship athletes.[21]

These examples are illustrative. I understand that fact discovery in this case has recently begun, and I anticipate that additional common evidence of class-wide impact will be developed through discovery.

45.    In sum, given the particular facts alleged by Plaintiffs in this case (notably the naked, identical restraint of the GIA and the readily ascertainable COA at each school), the methodology for ascertaining common impact on the class is pointedly straightforward: because of the demonstrable excess demand for student athletes, and because the gap between the COA and the GIA reflects

---

[21] I also note that any arguments forthcoming from the NCAA as to students or categories of students who are not impacted by the GIA cap would almost surely require substantial discovery and can be resolved on the merits after class certification.

708135v1/008924    21.

such a small percentage of the budgets for Major College Football and Major College Basketball programs, the schools would provide the student-athletes in the proposed class with GIA's covering the full COA absent the GIA cap.

## VIII. Damages

45.    Damages can be calculated on a class-wide basis based on the difference between a GIA and the COA for each of the institutions in the relevant markets. This calculation is pointedly straightforward: class members' damages are simply the difference between two discrete, readily ascertainable figures (the COA for the relevant college and the GIA awarded to the class member). Aggregate damages could be calculated based on the average difference, and individual class members could submit claims based on their particularized circumstances, as routinely occurs in the context of an antitrust class action.

46.    The relevant data required to perform the damage calculations for members of the class are available. The Squad Lists maintained by the NCAA has the amount of the GIA and the U.S. Department of Education IPEDS survey has a category labeled "Other Expenses".[22]

47.    It is possible that removing the GIA cap would alter the allocation of players among teams and hence alter the damage amounts for some individuals. For example, a player who did not have to bear the currently uncovered costs of attendance, such as transportation expenses, might choose a school farther away if

---

[22] See paragraph 32.

708135v1/008924                                    22.

those (higher) costs were covered. This possibility, however, does not change the fact of common impact. Rather, this possibility instead establishes only that these few class members are, if anything, under-compensated by the general damages model, since the restraint led them to attend a presumably less desirable NCAA institution. I can discern no intra-class conflicts arising from this possibility.

48.     The formula for computing damages is

$$D_i = FCOA - GIA_{actual}$$

where $D_i$ is the damages computed for the $i^{th}$ member of the class, FCOA is the full cost of attendance reported in IPEDS and GIA actual is from the squad list. Total class damages are simply the sum of the $D_i$ across all members of the class.

49.     The following is an example of how to calculate damages for a single class member in a single year.[23] The calculation requires knowing only whether the student was considered an in-state or out-of-state student, his GIA amount and the relevant FCOA from the IPEDS database.

| Sample Damage Calculation - In-State Student at University of Texas for School Year 2005-2006 | | | |
|---|---|---|---|
| Year | FCOA | GIA Amount | Damages |
| 2005-2006 | $18,410 | $15,410 | $3,000 |

---

[23]This calculation would be repeated for each year the student was on scholarship.

23.

50.     I have offered one reasonable and formulaic approach where reasonable and accurate data exist. My opinion is that there are statistical and econometric techniques which can be used with sufficient and reliable data, and therefore I believe that a sound and accurate damage model can be constructed to estimate damages using generalized evidence and a generalized approach to the class. I am confident that damages suffered by the class and the class members can be estimated using well-accepted economic and statistical methods.

51.     In summary, the proposed damage model has the following characteristics:

a.     It is formulaic.

b.     Data are readily available for each class member for all components of the formula.

c.     It computes, for each member of the class, his damages, which thereby are *not* an average across the members of the class.


Robert E. McCormick
August 28, 2006

708135v1/008924                              24.

Exhibit A

# Appendix A

**Robert E. McCormick**
**P.O. Box 349**
**Six Mile, SC 29682**

Office       864.656.3441
Home       864.868.9280
FAX  864.656.4532

sixmile@clemson.edu
http://sixmile.clemson.edu

**Personal:**     Born December 16, 1946
                  Citizen of United States
                  Married to Emily B. Wood
                  Two sons, Exley and Jesse

**Current Position:**       Professor and BB&T Scholar
                            John E. Walker Department of Economics
                            Clemson University
                            Clemson, SC 29634-1309 since August 2000

                            Director, BB&T Center for Economic Education and
                            Policy Studies
                            Clemson University, 2000-present.

                            Spiro Faculty Fellow
                            Arthur M. Spiro Center for Entrepreneurial Leadership
                            College of Business
                            Clemson University, 2003-present.

**Education:**       B.A., Economics, Clemson University, August 1972
                     M.A., Economics, Clemson University, August 1974
                     Ph.D., Economics, Texas A&M University, May 1978

EXHIBIT A PAGE 25

708135v1/008924

**Other Full-Time Positions:**

Professor of Economics, Department of Economics, Clemson University, 1983-2000

Associate Professor of Economics, Department of Economics, Clemson University, 1982-1983.

Assistant Professor of Business and Economics, Graduate School of Management, The University of Rochester, 1978-1982.

Instructor of Economics, Department of Economics, Clemson University, 1977-1978.

Instructor of Economics, Department of Economics, Clemson University, 1973-1974.

**Other Part-Time Positions:**

Senior Associate, Property Environmental Research Center (PERC), Bozeman, MT, June 2002-present.

Director, PERC Enviropreneur TEAM Program, 2005-present

Director, Kinship Conservation Institute, PERC, Bozeman, MT, 2002-2005

Julian Simon Fellow, PERC, Bozeman MT, 2001.

Visiting Professor of Business, Consortium International MBA, Asolo, Italy and Ljubljana, Slovenia, 1998, 1999, 2000, 2001, and 2004.

Academic Director, Arthur M. Spiro Center for Entrepreneurial Leadership, College of Business, Clemson University, 1995-2002.

Research Fellow, Center for Computer Communication Systems, College of Engineering, Clemson University, 1993-1995

Associate Editor, *Southern Economic Journal*, 1996-1999

Associate Editor, *Journal of Corporate Finance*, 1992-present

Senior Research Scholar, Center for Policy Studies, Clemson University, 1986-92.

Senior Research Scholar, Center for the Black Experience in Higher Education, Clemson University, 1985-92.

Instructor, Economics for High School Teachers, National Science Foundation and Clemson University, August 1992.

Profesor Visitante, Universidad Francisco Marroquin, Guatemala City, Guatemala, 1990.

Instructor, A Series of Short-Courses in Economics to the Faculty, Universidad Francisco Marroquin, Guatemala, June 1988.

Consultant, Bureau of Economics, The Federal Trade Commission, 1980-1985

Instructor, Short Course for Lawyers, Federal Trade Commission, Summer 1982 and Fall 1983.

Senior Visiting Research Fellow, Center for the Study of Public Choice, Virginia Polytechnic Institute, 1981.

Participant at the Fifth Legal Institute for Economists, Law and Economics Center, University of Miami, Key Biscayne, Florida, June 11-27, 1980.

Consultant, The Department of Agriculture, 1979-1981.

Teaching Assistant, Department of Economics, Texas A&M University, 1976-1977.

Teaching Assistant, Department of Economics, Clemson University, 1973-1974.

Research Assistant, Department of Agricultural Economics, Clemson University, 1973.

**Publications:**
**Books:**
*Managerial Economics*, 2d edition, Englewood Cliffs, NJ: Prentice Hall, forthcoming.

*Managerial Economics*, Englewood Cliffs, NJ: Prentice Hall, 1993.

*Politicians, Legislation, and the Economy: An Inquiry into the Interest Group Theory of Government*, Boston: Martinus Nijhoff, 1981, with Robert Tollison.

EXHIBIT A PAGE 27

**Papers:**

"A theory of commodity bundling in final product markets: Professor Hirshleifer meets Professor Becker", *International Review of Law and Economics,* June 2006, with W. Shughart and R. Tollison.

"The Relationship Between Net Carbon Emissions and Income," in *You Have to Admit It's Getting Better—The Environment That Is,* Palo Alto: Hoover Press, 2004 ed. by Terry Anderson.

"Carbon Emissions, Carbon Sinks, and Global Warming" in *Agricultural Policy and the Environment,* Rowman and Littlefield, 2003, ed. by R. Meiners and B. Yandle, with J. Utt and W. Hunter.

"Racial Integration as Innovation: Evidence from Sports Leagues," *American Economic Review* (March 2002:16-26), with B. Goff and R. Tollison.

"The Response of Workers to Wages: Evidence from Foot Races," *Journal of Sports Economics*, (June 2000):99-122 with Mike Maloney.

"Why Do Black Basketball Players Work More For Less Money?", *Journal of Economic Behavior and Organization,* (February 2001):201-219, with Bob Tollison.

"On Legislatures and Legislative Wage Efficiency" in *Public Choice Companion*, 2000, edited by W. Shughart with Chad Turner.

"Smoking Insurance, and Social Costs," *Regulation* (Summer 1997):33-37 with R. Tollison and R. Wagner.

"Stranded on the Road to Electricity Competition," *Forum for Applied Research and Public Policy*, 12(3) (Fall 1997):18-21.

"Economic Principles of Contractor Compensation," *Journal of Management in Engineering,* " with W. E. Howard and L. Bell, 1997.

"Customer Choice, Utilities Loss: Stranded Cost Recovery in the Deregulation of the U.S. Electric Power Industry," *Natural Resources Journal*, (Winter 1997):59-124 with M. Maloney and R. Sauer.

"A Financial Market Event Study of the MFJ Restrictions in the Telecommunications Industry," *Managerial and Decision Economics,* 16 (1995): 401-425 with Mike Maloney. Reprinted in Richard Higgins & Paul

Rubin, *Deregulating Telecommunications*, Wiley: New York, 1995, pages 123-48.

"Private and Public Choices in Public Education: An Investigation of Trustee Effects," *Public Choice,* 78 (1994):219-230 with Cora Moore and Bruce Yandle.

"Managerial Decision Making and Capital Structure," *Journal of Business*, 66(2) (April 1993):189-217 with Mike Maloney and Mark Mitchell.

"An Examination of the Role that Intercollegiate Athletic Participation Plays in Academic Achievement: Athletes' Feats in the Classroom," *Journal of Human Resources*, 28(3) (Summer 1993): 555-570 with Mike Maloney. Reprinted in *The International Library of Critical Writings in Economics,* ed. by A. Zimbalist and R. Woods, Elgar Press, 2000.

"Preaching Matters," *Journal of Economic Behavior and Organization*, 21 (1993):235-50 with Jody Lipford and Bob Tollison. Reprinted in *Trade in the Pre-Modern Era 1400-1700*, Edward Elgar Ltd: Chentenham UK, edited by Douglas Irwin, 1994.

"Some Evidence on the Alchian and Allen Theorem: The Third Law of Demand?" *Economic Inquiry*, XXXI(3) (July 1993):383-93 with Eric Bertonazzi and Michael Maloney.

"Intrafirm Profit Opportunities: Evidence from Professional Basketball," pgs. 3-36 in *Advances in the Economics of Sports*, vol. 1, ed. by Gerald Scully, New York:JAI Press, 1992 with Robert Clement.

"The Review Process in Economics: Some Empirical Findings," *Review of Economics and Statistics*, LXXIIA (1990):v-xvii, with David Laband and Mike Maloney. Reprinted in *Economics Alert*, No. 2, March 1993, pp. 5-8.

*El Analisis Economico De Lo Politico*, Instituto de Estudios Economicos, 1990, with James M. Buchanan and Robert D. Tollison.

"Athletics and Academics: A Model of University Contributions," in *Sportometrics*, ed. by Brian Goff and Robert Tollison, College Station: Texas A&M University, 1990, pages 193-206, with Maurice Tinsley.

EXHIBIT A PAGE 29

"Coaching Team Production," *Economic Inquiry*, (April 1989):287-304 with Robert Clement. Reprinted in *Sportometrics*, ed. by Brian Goff and Robert Tollison, College Station: Texas A&M University, 1990, pages 75-92.

"A Review of the Economics of Regulation: The Political Process," in *Regulation and the Reagan Era*, ed. by Roger Meiners and Bruce Yandle, Washington: Holmes and Meier, 1988, pages 16-40.

"Excess Capacity, Cyclical Production, and Merger Motives: Some Evidence from the Capital Markets," *Journal of Law and Economics*, 31(2) (October 1988):321-50 with Michael Maloney.

"University Governance: A Property Rights Perspective," *Journal of Law and Economics*, (October 1988):423-42 with Roger Meiners.

"The Disinterest in Deregulation: Reply," *American Economic Review*, 78(1) (March 1988):284 with William Shughart II and Robert D. Tollison.

"Athletics Versus Academics? Evidence From SAT Scores," *Journal of Political Economy*, 95(5) (October 1987):1103-16 with Maurice Tinsley. Reprinted in *Sportometrics*, ed. by Brian Goff and Robert Tollison, College Station: Texas A&M University, 1990, pages 179-192.

"Crime and Income Distribution in a Basketball Economy," *International Review of Law and Economics* 6 (June 1986):115-24 with Robert Tollison. Reprinted in *Sportometrics*, ed. by Brian Goff and Robert Tollison, College Station: Texas A&M University, 1990, pages 295-310.

"The Disinterest in Deregulation: Reply," *American Economic Review* 76(3) (June 1986):564-65 with William Shughart II and Robert Tollison.

"Inflation, Regulation, and Financial Adequacy," in *Electric Power: Deregulation and the Public Interest* ed. by John Moorhouse, San Francisco: Pacific Research Institute for Public Policy, 1986, pages 135-160.

"The Disinterest in Deregulation," *American Economic Review* 74 (December 1984):1075-79 with William Shughart II and Robert Tollison.

"On the Recovery of Sunk Costs," *Journal of Business* 57(4) (October 1984):417-42 with Kenneth French.

EXHIBIT A  PAGE 30

"Economic Regulation, Competitive Governments, and Specialized Resources," *Journal of Law and Economics* 27 (October 1984):329-38 with Michael Maloney and Robert Tollison.

"Crime on the Court," *Journal of Political Economy* 92 (April 1984):223-35 with Robert Tollison. Reprinted in *Sportometrics*, ed. by Brian Goff and Robert Tollison, College Station: Texas A&M University, 1990, pages 59-74.

"The Strategic Use of Regulation: A Review of the Literature," in *The Political Economy of Regulation: Private Interests in the Regulatory Process*, ed. by Robert Rogowsky and Bruce Yandle, Washington: Federal Trade Commission, March 1984, pp. 13-32.

"Regulators as an Interest Group," in *Public Choice II*, ed. by James Buchanan and Robert Tollison, Ann Arbor: University of Michigan Press, 1983, with Mark Crain.

"The Economic Organization of the English East India Company," *Journal of Economic Behavior and Organization* 4 (1983):1-17 with Gary Anderson and Robert Tollison. Reprinted in *Trade in the PreModern Era, 1400-1700*, edited by Douglas Irwin, London: Edward Elgar Publishing Ltd. 1994.

"A Theory of Cost and Intermittent Production," *Journal of Business* 56(2) (April 1983):139-53, with Mike Maloney.

"A Positive Theory of Environmental Quality Regulation," *Journal of Law and Economics* 25(1) (April 1982):99-123 with Michael Maloney, reprinted in *The International Library of Environmental Economics and Policy*, Ashgate Publishing LTD., 2003. Reprinted in *The Political Economy of Environmental Regulation*, Harvard U. Press, 2004, ed. by R. Stavins.

"Why are Inflation Rates Different Across Countries," in *Inflation, the Sheltered Sector and the Use of Resources*, ed. by Karl Brunner, Rochester: Center for Research in Government Policy and Business, 1982.

"Economics and Metrology: Give 'Em and Inch and They'll Take a Kilometer," *International Review of Law and Economics* 1 (1981):207-21 with Roger Faith and Robert Tollison.

"The Internalization of Social Costs," in *Analysis of Consumer Policy*, ed. by Robert Tollison, Philadelphia: Wharton Applied Research Center, 1981.

EXHIBIT A PAGE 31

"Achieving Cartel Profits Through Unionization: Reply," *Southern Economic Journal* 47(4) (April 1981):1162-64 with Michael Maloney and Robert Tollison.

"Wealth Transfers in a Representative Democracy: Theory and Evidence," in *Toward a Theory of the Rent Seeking Society*, ed. by James Buchanan, Robert Tollison, and Gordon Tullock, College Station: Texas A&M Press, 1980, with Robert Tollison.

"Achieving Cartel Profits through Unionization," *Southern Economic Journal* 46(2) (October 1979):628-34 with Michael Maloney and Robert Tollison.

"Rent Seeking Competition in Political Parties," *Public Choice* 34 (1979):5-14 with Robert Tollison.

"The Cost of Voting: It's Fiscal Impact on Government," *Public Choice* 34 (1979):271-84 with Richard McKenzie.

"Legislators as Unions," *Journal of Political Economy* 86(1) (February 1978):63-78 with Robert Tollison. Reprinted in *Public Choice II*, ed. by James Buchanan and Robert Tollison, Ann Arbor: University of Michigan Press, 1983.

**Monographs:**
*U.S. Economic Freedom Index: 2004 Report,* Pacific Research Institute and *Forbes*, 2004, with L. Macquillan and Ying Huang.

*Economic Freedom in America's 50 States: A 1999 Analysis*, with J. Byars and T. B. Yandle, Indianapolis: The State Policy Network, January 1999.

*An Analysis of Potential New Tax Revenues on Video Poker Operations in South Carolina*, Greenville, SC: Collins Entertainment, January 1999.

*The Economic Impact of the Video Poker Industry in South Carolina,* Greenville, SC: Collins Entertainment, August 1998.

*Customer Choice, Consumer Value: An Analysis of Retail Competition in American's Electric Industry,* Washington: Citizens for a Sound Economy Foundation, Volumes I and II, with M. Maloney and R. Sauer, 1997.

*Consumer Choice in the Electricity Industry: An Analysis of the Impact in Illinois* with Mike Maloney, Clemson SC, 1996.

EXHIBIT A PAGE 32

*Customer Choice in the Arizona Electric Industry,* Arizona Mining Association, with Michael Maloney, & Raymond Sauer, 1997.

**Book Reviews:**

A Review of *The Causes and Consequences of Antitrust: The Public-Choice Perspective,* by Fred S. McChesney & William F. Shughart II, Chicago: The U. of Chicago Press, 1995. *Public Choice,* 87 (June 1996):414-16.

*The Economics of the Tobacco Industry,* by Paul R. Johnson, New York: Praeger Publishers, *Southern Economic Journal* 52 (October 1985):584.

**Other Publications:**

"Some Aspects of Gambling," *The World and I,* July 2000, 44-45.

"The Wires Charge: Risk and Rates for the Regulated Distributor," *Public Utilities Fortnightly,* September 1, 1997, vol. 135 (6), 26-33 with M. Maloney, and C. Tyler.

"Stranded Cost Recovery: All FERC'ed Up," *Public Utilities Fortnightly,* November 15, 1996, 42-47 with M. Maloney and C. McGowan.

"Shaefer Bill Better than Nothing," *Regulation,* letter to the editor, with M. Maloney, December 10, 1996.

*Instructor's Manual with Tests,* Englewood Cliffs, NJ: Prentice Hall, 1993, with E. Becker.

"Sacred Cows and Antitrust: The Case of the NCAA," in *New Perspectives,* Washington: U.S. Civil Rights Commission, 19 (1) (Winter 1989):47-53 with Roger Meiners.

"Bust the College Sports Cartel," *Fortune* (October 12, 1987):235-36 with Roger Meiners.

"Colleges Get Their Athletes for a Song," *Wall Street Journal* (August 20, 1985):28.

EXHIBIT A PAGE 33

**Research in Progress:**
"Taxation Tools and the Weight of State Taxes" 2006 with Bob Tollison and Adam Pope.

"The Demand for Environmental Quality and Green Space: An Application of Golf and Real Estate Development," 2006 with F. Limehouse and P. Melvin.

"The Environmental Nature of the Firm," 2003 with T. Anderson.

"Golf Chivalry" 2003 with P. Melvin and B. Tollison.

"University Operations and Student Satisfaction" 2003 with B. Dalton, R. Hernandez, and M. Maloney.

"Scholastic Success: A Complete Data Analysis," 2003 with B. Dalton, T. Kirby, and J. Warner.

"Monopsony and Monopoly: The Perfect Storm, 2004 with R. Tollison.

""Optimize the Project Team's Contribution to Business Results," 2003 with L. Bell and E. Black.

"Voting with Your Lottery Ticket," 2002 with R. Sauer.

"Carbon Sinks Global Warming: Are Rich People Cool?" 2001 with Walker Hunter and Joshua Utt.

"Alternative Golf Facilities," 2001 with Peter Melvin.

"The Shocking Mess of Electricity Regulation," 2001.

"Freedom in the States," 2002 with Bruce Yandle.

"On the Demand and Supply of Golf Courses," 2001 with Peter Melvin.

**Inactive Research**
"The Microsoft Case", 2000, with J. Byars, C. Reback, and B. Tollison.

"The Impact of Electricity Deregulation on Shareholder Wealth: The Role of Diversified Portfolios," 1998 with Cleve Tyler.

EXHIBIT $A$ PAGE 34

708135v1/008924

"The Bond Call Provision and the Decision to Call," with Mike Maloney and Maria Quinonez, 1994, working paper available.

"On the Relative Returns to Mutual Funds," with Su Yang, 1995.

"A Taste Based Theory of Marriage and Divorce," with E. Becker and C. Simon, 1992.

"Male-Female Population Ratios and Illegitimate Births," 1992 with and Mason Gerety, working paper available.

"Block Pricing and the Distribution of Demand," with Mike Maloney, working paper available.

"Estimating the Economic Impact of Intercollegiate Athletic Events," with Mike Maloney, research in progress, preliminary working paper available.

**Presentations:**

"Economic Theory and Practice," TEAM, Enviropreneur Camp, series of lectures, June 2006, PERC, Bozeman, MT.

"Project Management and Business Planning," series of lectures, Kinship Conservation Institute, Boone and Crockett Ranch, Dupuyer MT, 2005.

"Alternative Golf Facilities," Golf 20/20 Conference, World Golf Village Florida, November 11-13, 2001.

"The Shocking Electrical Mess," Hoover Institution, Stanford University, October 24-26, 2001.

"Agricultural Activity and Global Warming: Sequestration is Cool," a Liberty Fund Conference, Chico Hot Springs, Montana, November 21-24, 2001.

"Economics and the Environment," a series of lectures on economics, statistics, and the environment, the Kinship Conservation Institute, PERC, Bozeman, MT, June 4-29, 2001.

"Evaluating State and Local Regulatory Environments: Issues in Theory and Measurement," The DeVoe L. Moore Center, Florida State University, February 9-11, 2001

EXHIBIT A PAGE 35

"Freedom in the States," The Association of Private Enterprise Education, Las Vegas, NV, April 2-4, 2000.

"Freedom in the States," Heritage Foundation Annual Convention, Chicago, IL, April 27, 2000.

"Freedom in America's 50 States," American Legislative Exchange Council, Nashville, TN, August 13, 1999.

"Consumer Issues," Electric Industry Restructuring: Addressing the Unanswered Questions, Center for Market Processes, George Mason U., Baltimore Md, August 7, 1997.

"Customer Choice, Consumer Value: Real Gains or Rent Redistribution?" National Association of Regulatory Utility Commissioners, Mid-Atlantic Conference, Hot Springs, VA, July 1, 1997.

"Electricity Deregulation in a Low Cost State," Indiana Energy Conference, Indianapolis, IN, October 10, 1996.

"Consumer Choice, Customer Value: The Coming of Competition in Electricity," Center for Energy Studies, LSU, September 30, 1996.

"Economic Efficiency and the Common Law," Liberty Fund Conference, Charleston, SC, October 3-5, 1992.

"Private and Public Choices in Public Education: An Investigation of Trustee Effects," at the Political Economy Research Center's First Political Economy Forum, Bozeman, Montana, June 9-12, 1990.

"The Eclipse of the Corporation," A Series of Lectures presented at the Liberty Fund Conference, Property Rights: Challenges for a Free Society, Abbeville SC, April 6-8, 1990.

"The Market for Corporate Control," the 5th Year Seminar, Department of Economics, Universidad Francisco Marroquin, Guatemala, March 17, 1990.

"Managerial Economics: A Property Rights Perspective," A Series of Lectures presented to the faculty at the Universidad Francisco Marroquin, June 17-25, 1988, Guatemala City, Guatemala.

EXHIBIT A  PAGE 36

708135v1/008924

"State Constitutions," A Series of Lectures presented at the Liberty Fund Series, The Bicentennial of the U.S. Constitution, July 6-11, 1987, Asheville, NC.

"University Governance: A Property Rights Perspective," at the 14th Interlaken Seminar on Analysis and Ideology, Center for Research in Government Policy and Business, Simon Graduate School of Business Administration, University of Rochester, Interlaken, Switzerland, June 8-12, 1987.

"The Strategic Use of Regulation: A Review of the Literature," at The Political Economy of Regulation: Private Interests in the Regulatory Process, Federal Trade Commission, Washington, DC, March 29-30, 1984.

"The Internalization of Social Costs," at Conference on Analysis of Consumer Policy, Wharton Applied Research Center, University of Pennsylvania, May 15-16, 1981.

"Why Are Inflation Rates Different Across Countries?" at Liberty Fund Conference, Inflation and the Sheltered Sector, Long Island, NY, September 25-27, 1980.

Various workshops at the University of Chicago, Montana State University, University of Rochester, Texas A&M University, VPI, the University of Georgia, Clemson University, Auburn University, Florida State University, Wofford College, Davidson College, the Securities Exchange Commission, and the Federal Trade Commission.

Participant at the Sixth Annual Political Economy Forum, "Who Owns the Environment?" Lone Mountain Guest Ranch, Big Sky, MT, June 12-15, 1997, sponsored by the Political Economy Research Center.

Participant at the Fifth Annual Political Economy Forum, "Wildlife in the Marketplace," Mountain Sky Guest Ranch, Emigrant, MT, June 10-13, 1993, sponsored by the Political Economy Research Center.

Participant at the Fourth Annual Political Economy Forum, "The Political Economy of the American West," Mountain Sky Guest Ranch, Emigrant, MT, June 11-14, 1992, sponsored by the Political Economy Research Center.

Participant at numerous Liberty Fund Conferences, Emory University, Universidad Francisco Marroquin (Guatemala), Virginia Tech, Clemson University, and University of Rochester.

EXHIBIT A PAGE 37

**Refereeing for Professional Journals:**
*Journal of Political Economy, Journal of Financial Economics, Journal of Finance, Journal of Law and Economics, Southern Economic Journal, Journal of Business, Economic Inquiry, Journal of Economic Behavior and Organization, Journal of Sports and Economics, Journal of Monetary Economics, Journal of Human Resources, Management Science, Journal of Accounting and Economics, Marketing Science, Public Choice, Journal of Business Research, Economics of Education Review, Public Finance Quarterly, Journal of Economic Education, Studies in Economic Analysis,* and others.

**Grants and Financial Awards:**
"Carbon Sequestration: The International Experience and Evidence," with R. Watson, 2005.

"Optimize the Project Team's Contribution to Business Results," Construction Industry Institute, 2003, with Lance Bell and Edward Black.

"Tuition and Fees," 2000-present, Clemson University Office of the President.

"The College Experience," 1999-present, Clemson University Office of the Provost.

Founded The Applied Economics Research Group, Fall 1993 with a grant from the Bradley Foundation.

"The Economic Impact of Intercollegiate Athletic Competition," funded by Clemson University Athletic Department and IPTAY, July 1987-June 1989, with Mike Maloney.

"University Governance and Productivity," funded by the Bradley Foundation, June 1987-August 1988, with Roger Meiners.

"University Gift Giving: The Relation Between Athletics and Academics," funded by Clemson University Athletic Department and IPTAY, October 1984-August 1985.

"Antitrust Merger Analysis," funded by the Federal Trade Commission, Contract L0996, September 29, 1983, with Mike Maloney.

EXHIBIT A PAGE 38

708135v1/008924

**Academic Honors:**

Clemson University National Scholars Mentor of the Year, 2004, 2005, 2006

Clemson University MBA Professor of the Year, 2001, 2004.

Clemson University Trustee's Award for Faculty Excellence, 1999.

Clemson University Alumni Master Teacher, 1998.

Clemson University Trustee's Award for Faculty Excellence, 1997.

Clemson University Student Government, Prince Award for Innovation in Teaching, 1996.

The Alfred Chalk Distinguished Graduate Student, Texas A&M University, 1978.

University Fellowship, Texas A&M University, 1975-76.

Environmental Protection Agency Fellowship, Clemson University, 1972-73.

**Consulting Activities:**

Numerous private law firms, America Chemical Council (2003), Ball and Scott Law Firm (2002-present), Consortium of Regional Bell Operating Companies (2001), *Sportometrics* (2001-present), Canadian Chemical Producers Association (2000); Clemson University Office of the Provost and President (2000-present); Ticketadvantage.com (2000-present); Chemical Manufacturers Association (2000); Sportometrics (1998-present); gibuddies.com (1999-present); adidas America (1999-present, litigation);camprehensive.com (1999-present); Collins Entertainment (1998-1999);Time-Warner (1999-present, litigation); Champion Spark Plugs (1999-present, litigation); BCI (1998-present, litigation); Memorial Ecosystems (1999-present), Nathan Associates (Washington, 1998-present, litigation); Arizona Mining Association (1997, litigation and other); Ajo Improvement Company (1996-1997); Electric Lite, Inc. (1996-present); South Carolinians for Competition in Electricity (1996-97); Citizens for Competitive Power (1997); Central Illinois Light Company (1996); The Citizens for a Sound Economy (1996); The Department of the Treasury, the Government of New Zealand (1995); A consortium of Regional Bell Operating Companies (through Kellogg, Huber & Hansen, 1993-1994, litigation); Capital Economics (1992-present); The South Carolina Aeronautics Commission (1986-87); The Federal Trade Commission (1980-1985); CBS (through Owen Greenhalgh & Myslinski, Washington 1982-83); U.S. Department of

EXHIBIT A PAGE 39

Agriculture (1979-81); James Savarese and Associates, Washington (1983 & 1997); Chief Executive, New York (1981), and private law firms.

**Nature of Consulting:** Entertainment, Natural Resource Markets, Health Care Markets, Sports and Economics, Electricity Markets, Telephone Markets, Securities Regulation, Managerial Economics, Network Economics, Financial Valuation, startup, and Market Efficiency.

**Other Governmental Service:**

Prepared affidavit for Federal Communications Commission, 2001, concerning regulations and broadband access in telephony.

Prepared testimony for the Canada Transport Act Review Panel, 2000, concerning railroad regulation in Canada.

Prepared testimony for the Surface Transportation Board, Department of Commerce, 2000 concerning railroad mergers and regulation.

Prepared testimony for the New Mexico Public Service Commission, October 1998.

Presented testimony before the S.C. House of Representatives, Labor, Commerce, and Industry Committee, March 1997 & April 1997 concerning deregulation and competition in electricity markets.

Presented testimony before U.S. House of Representatives, Commerce Committee, Subcommittee on Energy and Power, March 28, 1996 concerning deregulation and competition in electricity markets.

An affidavit before the Congress of the United States, June 1994, concerning the operation of the telecommunications industry.

**University Service**

Clemson University Woodland Cemetery Stewardship Committee (chairman), 2000-present; Clemson University Ad-Hoc Committee on Tuition and Fees, 2000-present, Clemson University Ad Hoc Committee on Entrance Standards, 2000-present, Clemson University Names Committee, 1999-present, Clemson University Advanced Technology Committee, 1995-1999. Clemson University MBA Advisory Counsel, 1995-present. Clemson University Ad Hoc Graduate School Planning Committee, 1992. Clemson University Center for the Black Experience in Higher Education, 1989-1992. Clemson University Athletic Council, 1987-1990. Clemson University Teaching

EXHIBIT A PAGE 40

Effectiveness Committee, 1986. University of Rochester Library Committee, 1980.

**Military Experience:**
1st Lt. U.S. Army, Air Defense Artillery, January 1970-October 1971. Officer Basic Training, Ft. Bliss, Texas, 1970. Basic Training Officer, Ft. Campbell Kentucky, 1970. Fire Platoon Leader, C 7/5, Korea, and Battery Executive Officer, B 6/44, Korea, 1970 and 1971. Additional training as unit Chemical Officer, Ft. McClellan, Alabama, 1970.

**Dissertation:**
"On the Wage Pay and Outside Earnings of State Legislators."

**Committee:**       Robert B. Ekelund, Jr., Chair
Wendy Lee Gramm
Raymond C. Battalio

References and citations furnished on request.

708135v1/008924

Exhibit B



**Form 06-6**                                                    **Academic Year 2006-07**

## Instructions for Squad Lists – Division I

| | |
|---|---|
| **For:** | NCAA Division I institutions; NCAA Division III institutions with multidivision classification. |
| **Action:** | Complete appropriate squad list for each sport and file in the director of athletics' office. |
| **Due date:** | First day of outside competition in the sport. |
| **Required by:** | NCAA Bylaw 15.5.9.2. |
| **Purpose:** | To qualify student-athletes for intercollegiate competition and assess compliance with NCAA financial aid rules. |

## TO: DIRECTOR OF ATHLETICS.

To be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be included on the institution's squad lists form. (NCAA Bylaw 15.5.9.1)

You must complete a squad list (Form 06-6) for each sport by the first day of outside competition and keep the lists on file in your office. During the year, revise the list whenever a student-athlete joins the squad or a current squad member's status changes. All student-athletes listed on the squad lists must have signed a drug-testing consent form. [Bylaw 30.14-(b)]

Use the version of the squad list that is appropriate for your division and sport. This set of instructions tells you how to fill out each of the following five versions:

| **Form** | **Division/Sport** |
|---|---|
| 06-6a | NCAA Division I-A football. |
| 06-6b | Division I-AA football. |
| 06-6c | Division I head-count sports other than football (i.e., men's and women's basketball, women's gymnastics, women's tennis, women's volleyball). |
| 06-6d | Division I equivalency sports (i.e., sports other than football and the other head-count sports). |
| 06-6e | Division I ice hockey. |
| 06-6f | Division I basketball. |

EXHIBIT $\mathcal{B}$ PAGE 42

Instructions for Squad Lists – Division I
Form 06-6
Page No. 2

_____

| Column on Squad Lists: | Instructions: |
|---|---|
| **Name/ID Number** | Type or print the name and ID number of each student-athlete in the specified sport. Include partial qualifiers, non-qualifiers and students who are fulfilling a transfer residence requirement or an injury-hardship waiver. [Note: Any student-athlete who signs a drug-testing consent form must be included on the institution's squad lists, and any student-athlete who is included on the squad lists must have signed a drug-testing consent form pursuant to Bylaw 14.1.4. See Bylaws 14.1.4.1, 15.5.9.3, 15.5.10.3.1 and 30.14-(b), except that a student-athlete who is "trying out" for a team is not required to be placed on the squad list for 14 days from the first date the student-athlete engages in countable athletically related activities or until the institution's first competition (whichever occurs earlier).] |
| **Eligible to Compete** | Use this column to indicate whether a student-athlete is eligible (Y) or not eligible (N) to represent the institution in competition pursuant to all NCAA, conference and institutional eligibility requirements. |
| **Status of Student** | Describe the status of the student-athlete in these five columns. |
| **Term first enrolled at any institution** | Indicate the term and year of the regular academic year (excluding summer) that the student-athlete first enrolled at any collegiate institution full time. Use **F** for fall, **W** for winter and **S** for spring. |
| **Term first enrolled at your institution** | Indicate the term and year of the regular academic year (excluding summer) that the student-athlete first enrolled at your institution full time. Use **F** for fall, **W** for winter and **S** for spring. |
| **Number of years received financial aid** | Indicate the number of years the student-athlete has received institutional financial aid, not including this year. (See Bylaw 15.02.4.1 for applicable definition of "institutional financial aid.") |

EXHIBIT *B* PAGE 43

Instructions for Squad Lists – Division I
Form 06-6
Page No. 3

---

| **Number of seasons used** | Indicate the number of seasons of competition the student-athlete has used, not including this year. [Note: For student-athletes who do not qualify for four years of competition (e.g., nonqualifiers, partial qualifiers), a notation may be used to indicate the total number of seasons of eligibility available.] |
| --- | --- |
| **Recruited per Bylaw 13.02.10** | Indicate whether your institution recruited the student-athlete as defined in Bylaw 13.02.10.1. Use **Y** for yes and **N** for no. |
| **Financial Aid** | Describe the financial aid each student is receiving in these four columns. |
| **Period of award** | Use **FY** if the award is for the full-academic year. Use **IS** for one semester or **IQ** for one quarter if the award is for less than the full academic year. |
| **Amount of athletics grant** | Indicate the dollar amount your institution awarded the student-athlete in athletics grants-in-aid. To assist in calculations for revenue distribution on Forms 06-6a – 06-6f, calculate the dollar amount of all athletics grants-in-aid awarded in the sport and enter the total in the box provided. |
| **Amount of other countable aid** | Indicate the dollar amount of institutional financial aid (other than athletics grants-in-aid) as set forth in Bylaw 15.02.4.1. (See Bylaw 15.02.4.3.) |
| **Total countable aid** | Indicate the dollar amount of the total countable financial aid by adding the amounts of any athletics grants-in-aid and other countable aid. To assist in monitoring the financial aid requirements for minimum awards (Bylaw 20.9.1.2) on Forms 06-6a – 06-6f, calculate the dollar amount of countable aid awarded in the sport. [Note: **Do not** include the countable aid awarded to **exempt** student-athletes (See "Exempt" below.) **except** for student-athletes who have exhausted their eligibility in a sport during a previous academic year (Bylaw 15.5.1.7) or have a medical exception per Bylaw 15.5.1.4.] Enter the total in the box provided.<br><br>[Note: A work sheet is available for use by institutions that elect to count on-campus employment earnings in order to meet minimum financial aid requirements (Bylaw 20.9.1.2.8). Please contact the NCAA membership services staff.] |

EXHIBIT B PAGE 44

Instructions for Squad Lists – Division I
Form 06-6
Page No. 4

_____

**Exempt**
Indicate whether the student-athlete is exempt from counting against your team limits on financial aid awards. Use **Y** for yes. Student-athletes are exempt if they meet one of the following conditions:

- Regardless of whether they were recruited, they are not receiving institutional financial aid as set forth in Bylaw 15.02.4.1 (Bylaws 15.5.1.2.5 and 15.5.1.3.1);

- They were not recruited and receive institutional financial aid as set forth in Bylaw 15.02.4.1 for which you have on file a statement that the aid was granted without regard to athletics ability (Bylaw 15.5.1.3.2);

- They were recruited, are not participating in Division I football or basketball and receive institutional financial aid as set forth in Bylaw 15.02.4.1 for which you have on file a statement that the aid was granted without regard to athletics ability (Bylaw 15.5.1.2.3); or

- They were recruited, are participating in Division I football or basketball, have not engaged yet in varsity intercollegiate competition and receive institutional financial aid as set forth in Bylaw 15.02.4.1 for which you have on file signed statements that the student-athlete's admission and aid were granted without regard to athletics ability (Bylaw 15.5.1.2.1).

Multiple-sport student-athletes must be listed on all squad lists for sports in which the student-athlete participates. For purposes of counting against your team limit, however, the student-athlete shall be counted in one sport only. (See Bylaw 15.5.7 to determine which sports take precedence in counting against team limits.)

**Countable Players**
Fill in the columns for each student-athlete who is not exempt. Be sure that you are using the right version of the squad list for your division and sport. The instructions that follow for the "Countable Players" section are different depending on the version.

EXHIBIT $\mathcal{B}$ PAGE 45

Instructions for Squad Lists – Division I
Form 06-6
Page No. 5

**Change in Status**

Use this section to indicate a student-athlete's change in status during the academic year. Be sure you are using the right version of the squad list for your division and sport. The instructions that follow for the "Change in Status" section are different depending on the version.

**Revenue Distribution**

**(Division I only)**

Optional: This column may be used to determine the equivalency value on which your institution's dollar amount for revenue distribution is calculated. Indicate the figure by dividing each student-athlete's amount of athletics grant-in-aid by his or her cost for tuition and fees, room and board, and required course-related books, rounded off to two decimal places (e.g., .75). Add the figures and enter the total.

**Contemporaneous**
**Penalties (CP)**
**Information**

This section notes CP the team is subject to based on the Academic Performance Program (APP) for the current year. The formula used to calculate the applicable team's total grant limit for the current year $(x - y)$ is the contemporaneous penalties applicable for the current year $(y)$ subtracted from the maximum team limit for the applicable sport $(x)$. [Note: Contemporaneous penalties owed for the current year must be taken at the next available opportunity, but not later than two academic years (Bylaw 15.5.7).

An institution subject to contemporaneous penalty must impose the penalty in the academic year immediately following the departure of the ineligible student-athlete, unless a prospective student-athlete (i.e., high-school, two-year or four-year) who has signed a financial aid agreement prior to the institution determining that it is subject to the contemporaneous penalty will be impacted. If the penalty cannot be imposed in the academic year immediately following the departure of the ineligible student-athlete, it must be imposed in the following academic year (reference: 01/21/04 official interpretation). Therefore, two columns are included to track penalties – one noting penalties that have been carried forward from the previous academic year (therefore must be applied to the current academic year) and the second noting penalties that are being carried forward to the next academic year.]

EXHIBIT $\mathcal{B}$ PAGE 46

Instructions for Squad Lists – Division I
Form 06-6
Page No. 6

---

**These instructions are for use with:  Form 06-6a  (Division I-A Football).**

<u>Countable Players</u>

| | |
|---|---|
| **Total cost for tuition and fees, room and board, and books** | Indicate the total of each student-athlete's cost for tuition and fees, room and board, and required course-related books, based on the actual cost or average cost of a full grant-in-aid for all students at your institution.  [Note:  If you use the average-cost method, do not combine in-state and out-of-state tuition to arrive at a single average cost for tuition.  Calculate separate average educational costs for in-state and out-of-state students.] |
| | This column is to be completed to assist in monitoring the financial aid requirements for minimum awards (Bylaw 20.9.1.2) and in determining equivalent awards for revenue distribution. |
| **Initial** | Place a mark in this box for each student-athlete (including each initial award recipient) who is receiving or who has received any institutional financial aid that is countable against the maximum aid limits in this academic year. |

*How to calculate your total countable players:*

| | |
|---|---|
| **Overall** | Add the number of overall marks and compare this total to the limit specified in Bylaw 15.5.5.1. |
| **Change in Status** | Use these two columns to indicate a student-athlete's change in status during the academic year (i.e., student-athlete is no longer an active participant in the sport).  [Note:  A student-athlete who is a counter at the time of the change in status remains a counter for the remainder of the academic year unless the student-athlete qualifies for an exception (e.g., Bylaw 15.5.1.4.1, injury or illness prior to initial practice).] |
| **Reason** | Indicate the reason for a change in status as follows: |

- Cut or dismissed from team.

- Exhausted eligibility in the sport.

- Graduated.

Instructions for Squad Lists – Division I
Form 06-6
Page No. 7

_____

&bull; Medical exception resulting from career-ending injury or condition.

&bull; Quit the team.

&bull; Withdrew.

&bull; Use **C** for cut or dismissed, **E** for exhausted eligibility, **G** for graduated, **M** for medical exception, **Q** for quit the team and **W** for withdrew from institution.

**Date**                Indicate the effective date of the change in status.

**Revenue Distribution**    See instructions on Page No. 5.

---

**These instructions are for use with: Form 06-6b (Division I-AA Football).**

**Countable Players**

**Total cost for tuition and fees, room and board, and books**    Indicate the total of each student-athlete's cost for tuition and fees and room and board, and required course-related books, based on the actual cost or average cost of a full grant-in-aid for all students at your institution. [Note: If you use the average-cost method, do not combine in-state and out-of-state tuition to arrive at a single average cost for tuition. Calculate separate average educational costs for in-state and out-of-state students.]

**Initial**    Place a mark in this box for each student-athlete you are counting against the limit on awarding financial aid for the first time. You must include:

&bull; All student-athletes (including transfer residents) who are receiving for the first time institutional financial aid that is countable against the maximum squad limits, except that a student-athlete who has been in residence at the certifying institution for at least two academic years may receive athletically related financial aid for the first time without such aid counting as an initial award, provided the aid falls within the overall grant limit (Bylaw 15.5.5.3.6). [Note: In Division I football, a student-athlete who is a partial qualifier, who was recruited by the awarding institution and

EXHIBIT B PAGE 48

Instructions for Squad Lists – Division I
Form 06-6
Page No. 8

---

who receives institutional financial aid that is not from athletics sources and that is based on financial need only shall be a counter when the student-athlete participates in an institutional practice session or represents the institution against outside competition (Bylaw 15.5.1.2.2)];

- Recruited student-athletes who entered after the first term of the previous academic year, who immediately received athletically related aid and who were not initial counters in the previous year (Bylaw 15.5.5.3.2);

- Nonrecruited student-athletes who received athletically related aid after beginning football practice who were not initial counters in the previous year (Bylaw 15.5.5.3.4); and

- Recruited student-athletes who enter in the fall term of the current academic year and compete on the varsity level and receive institutional financial aid, even though such aid has been certified as having been granted without regard in any degree to athletics ability (Bylaw 15.5.1.2.1).

**Overall**          Place a mark in this box for each student-athlete (including each initial-award recipient) who is receiving or who has received any institutional financial aid that is countable against the maximum aid limits in this academic year.

**Equivalent Award**  Indicate a figure by dividing each student-athlete's total countable aid by the cost for tuition and fees, room and board, and required course-related books, rounded off to two decimal places (e.g., .75). [Note: If you use the **actual** cost for tuition and fees, room and board, and books, the equivalent award is calculated by dividing the **actual** amount of institutional financial aid received by the student-athlete (numerator) by the **actual** value of a full grant-in-aid (denominator). If you use the **average** cost for tuition and fees, room and board, and books, the equivalent award is calculated by dividing the **average** amount of institutional financial aid received by the student-athlete (numerator) by the **average** value of a full grant-in-aid for all students at your institution (denominator).]

Instructions for Squad Lists – Division I
Form 06-6
Page No. 9

_How to calculate your total countable players:_

| | |
|---|---|
| **Initial** | Add the number of initial marks and compare this total to the limit specified in Bylaw 15.5.5.2. |
| **Overall** | Add the number of overall marks and compare this total to the limit specified in Bylaw 15.5.5.2. |
| **Equivalent award** | Add the figures and compare this total to the limit specified in Bylaw 15.5.5.2. |
| **Change in Status** | Use these two columns to indicate a student-athlete's change in status during the academic year (i.e., student-athlete is no longer an active participant in the sport). [Note: A student-athlete who is a counter at the time of the change in status remains a counter for the remainder of the academic year unless the student-athlete qualifies for an exception (e.g., Bylaw 15.5.1.4.1, injury or illness prior to initial practice).] |
| **Reason** | Indicate the reason for a change in status as follows: |

- Cut or dismissed from team.

- Exhausted eligibility in the sport.

- Graduated.

- Medical exception resulting from career-ending injury or condition.

- Quit the team.

- Withdrew.

Use **C** for cut or dismissed, **E** for exhausted eligibility, **G** for graduated, **M** for medical exception, **Q** for quit the team and **W** for withdrew from institution.

| | |
|---|---|
| **Date** | Indicate the effective date of the change in status. |
| **Revenue Distribution** | See instructions on Page No. 5. |

EXHIBIT _B_ PAGE 50

---

**These instructions are for use with:    Form 06-6c
(Division I Head-Count Sports Other Than Football).**

Countable Players

| | |
|---|---|
| **Total cost for tuition and fees, room and board, and books** | Indicate the total of each student-athlete's cost for tuition and fees, and room and board, and required course-related books, based on the actual cost or average cost of a full grant-in-aid for all students at your institution. [Note: If you use the   average-cost method, do not combine in-state and out-of-state tuition to arrive at a single average cost for tuition.   Calculate separate average educational costs for in-state and out-of-state students.] |
| | This column is to be completed to assist in monitoring the financial aid requirements for minimum awards (Bylaw 20.9.1.2) and in determining equivalent awards for revenue distribution. |
| **Overall** | Place a mark in this box for each student-athlete who is receiving institutional financial aid that is countable against the maximum aid limits. |

*How to calculate your total countable players:*

| | |
|---|---|
| **Overall** | Add the overall marks and compare this total to the limits specified in Bylaws 15.5.2.1 or 15.5.4.2 (women's basketball). |
| **Equivalent Award** | For use only in the sports of women's gymnastics, women's volleyball and women's tennis for monitoring the financial aid requirements for minimum awards [Bylaw 20.9.1.2-(b)]. Indicate a figure by dividing each student-athlete's total countable aid by his or her cost for tuition and fees, room and board, and required course-related books, rounded off to two decimal places (e.g., .75). |
| **Change in Status** | Use these two columns to indicate a student-athlete's change in status during the academic year (i.e., student-athlete is no longer an active participant in the sport). [Note: A student-athlete who is a counter at the time of the change in status remains a counter for the remainder of the academic year unless the student-athlete qualifies for an exception (e.g., Bylaw 15.5.1.4.1, injury or illness prior to initial practice).] |

EXHIBIT B PAGE 51

Instructions for Squad Lists – Division I
Form 06-6
Page No. 11

| | |
|---|---|
| **Reason** | Indicate the reason for a change in status as follows: |

- Cut or dismissed from team.

- Exhausted eligibility in the sport

- Graduated.

- Medical exception resulting from career-ending injury or condition.

- Quit the team.

- Withdrew

Use **C** for cut or dismissed, **E** for exhausted eligibility, **G** for graduated, **M** for medical exception, **Q** for quit the team and **W** for withdrew from institution.

| | |
|---|---|
| **Date** | Indicate the effective date of the change in status. |
| **Revenue Distribution** | See instructions on Page No. 5. |

**These instructions are for use with: Form 06-6d (Division I Equivalency Sports).**

**Countable Players**

| | |
|---|---|
| **Total cost for tuition and fees, room and board, and books** | Indicate the total of each student-athlete's cost for tuition and fees, room and board, and required course-related books, based upon the actual cost or average cost of a full grant-in-aid for all students at your institution. [Note: If you use the average-cost method, do not combine in-state and out-of-state tuition to arrive at a single average cost for tuition. Calculate separate average educational costs for in-state and out-of-state students.] |

EXHIBIT B PAGE 52

Instructions for Squad Lists – Division I
Form 06-6
Page No. 12

_____

**Equivalent award**      Indicate a figure by dividing each student-athlete's total countable aid by his or her cost for tuition and fees, room and board, and required course-related books, rounded off to two decimal places (e.g., .75). [Note: If you use the **actual** cost for tuition and fees, room and board, and books, the equivalent award is calculated by dividing the **actual** amount of institutional financial aid received by the student-athlete (numerator) by the **actual** value of a full grant-in-aid (denominator). If you use the **average** cost for tuition and fees, room and board, and books, the equivalent award is calculated by dividing the **average** amount of institutional financial aid received by the student-athlete (numerator) by the **average** value of a full grant-in-aid for all students at your institution (denominator).]

*How to calculate your total countable players:*

**Equivalent award**      Add the figures and compare this total to the limits specified in Bylaw 15.5.3.1.

**Change in Status**      Use these two columns to indicate a student-athlete's change in status during the academic year (i.e., student-athlete is no longer an active participant in the sport).

**Reason**      Indicate the reason for a change in status as follows:

- Cut or dismissed from team.

- Exhausted eligibility in the sport.

- Graduated.

- Medical exception resulting from career-ending injury or condition.

- Quit the team.

- Withdrew.

Use **C** for cut or dismissed, **E** for exhausted eligibility, **G** for graduated, **M** for medical exception, **Q** for quit the team and **W** for withdrew from institution.

**Date**      Indicate the effective date of the change in status.

EXHIBIT *B* PAGE 53

Instructions for Squad Lists – Division I
Form 06-6
Page No. 13

_____

**Revenue Distribution**     See instructions on Page No. 5.

**These instructions are for use with: Form 06-6e (Division I Ice Hockey).**

<u>Countable Players</u>

| | |
|---|---|
| **Total cost for tuition and fees, room and board, and books** | Indicate the total of each student-athlete's cost for tuition and fees, room and board, and required course-related books, based upon the actual cost or average cost of a full grant-in-aid for all students at your institution. [Note: If you use the average-cost method, do not combine in-state and out-of-state tuition to arrive at a single average cost for tuition. Calculate separate average educational costs for in-state and out-of-state students.] |
| **Equivalent award** | Indicate a figure by dividing each student-athlete's total countable aid by his or her cost for tuition and fees, room and board, and required course-related books, rounded off to two decimal places (e.g., .75). [Note: If you use the **actual** cost for tuition and fees, room and board, and books, the equivalent award is calculated by dividing the **actual** amount of institutional financial aid received by the student-athlete (numerator) by the **actual** value of a full grant-in-aid (denominator). If you use the **average** cost for tuition and fees, room and board, and books, the equivalent award is calculated by dividing the **average** amount of institutional financial aid received by the student-athlete (numerator) by the **average** value of a full grant-in-aid for all students at your institution (denominator).] |
| **Overall** | Place a mark in this box for each student-athlete who is receiving institutional financial aid that is countable against the maximum aid limits. |

_How to calculate your total countable players:_

| | |
|---|---|
| **Equivalent award** | Add the figures and compare this total to the limits specified in Bylaw 15.5.6. |
| **Overall** | Add the overall marks and compare this total to the limits specified in Bylaw 15.5.6. |

EXHIBIT *B* PAGE 54

Instructions for Squad Lists – Division I
Form 06-6
Page No. 14

---

**Change in Status**          Use these two columns to indicate a student-athlete's change in
                              status during the academic year (i.e., student-athlete is no longer
                              an active participant in the sport).

**Reason**                    Indicate the reason for a change in status as follows:

- Cut or dismissed from team.

- Exhausted eligibility in the sport.

- Graduated.

- Medical exception resulting from career-ending injury or
  condition.

- Quit the team.

- Withdrew

Use **C** for cut or dismissed, **E** for exhausted eligibility, **G** for
graduated, **M** for medical exception, **Q** for quit the team and **W**
for withdrew from institution.

**Date**                      Indicate the effective date of the change in status.

**Revenue Distribution**      See instructions on Page No. 5.

EXHIBIT B PAGE 55

Instructions for Squad Lists – Division I
Form 06-6
Page No. 15

---

## These instructions are for use with: Form 06-6f (Division I Basketball).

### Countable Players

**Total cost for tuition and fees, room and board, and books**

Indicate the total of each student-athlete's cost for tuition and fees, room and board, and required course-related books, based on the actual cost or average cost of a full grant-in-aid for all students at your institution. [Note: If you use the average-cost method, do not combine in-state and out-of-state tuition to arrive at a single average cost for tuition. Calculate separate average educational costs for in-state and out-of-state students.]

This column is to be completed to assist in monitoring the financial aid requirements for minimum awards (Bylaw 20.9.1.2) and in determining equivalent awards for revenue distribution.

**Overall**

Place a mark in this box for each student-athlete (including each initial award recipient) who is receiving or who has received any institutional financial aid that is countable against the maximum aid limits in this academic year.

*How to calculate your total countable players:*

**Overall**

Add the number of overall marks and compare this total to the limit specified in Bylaw 15.5.4.1.

**Change in Status**

Use these two columns to indicate a student-athlete's change in status during the academic year (i.e., student-athlete is no longer an active participant in the sport). [Note: A student-athlete who is a counter at the time of the change in status remains a counter for the remainder of the academic year unless the student-athlete qualifies for an exception (e.g., Bylaw 15.5.1.4.1, injury or illness prior to initial practice).]

**Reason**

Indicate the reason for a change in status as follows:

- Cut or dismissed from team.

- Exhausted eligibility in the sport.

- Graduated.

Instructions for Squad Lists – Division I
Form 06-6
Page No. 16

- Medical exception resulting from career-ending injury or condition.

- Quit the team.

- Withdrew.

Use **C** for cut or dismissed, **E** for exhausted eligibility, **G** for graduated, **M** for medical exception, **Q** for quit the team and **W** for withdrew from institution.

**Date**    Indicate the effective date of the change in status.

**Revenue Distribution**    See instructions on Page No. 5.

The National Collegiate Athletic Association
May 5, 2006                          JB:cvs

EXHIBIT *B* PAGE 57

**2006-07 Squad List**
**Form 06-6a**
**Division I-A Football**

Institution: _____  City: _____  State: _____  Page: ___ of ___

| Name/ID Number | Eligible to Compete? | Status of Student | | | | | | Financial Aid | | | | | Countable Players | | | Change in Status | | Revenue Dist. Only |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Any institution | Term first enrolled | | No. of years received financial aid | No. of seasons used | Recruited per NCAA Bylaw 13.02.10 | Period of award | Amount of athletics grant | Amount of other countable aid | Total countable aid | Exempt | Total cost for tuition and fees, room and board, and books | Initial | Overall | Reason | Date | Equivalent award |
| | | | Your institution | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | Total | Total | | | Totals | | | | Total |

| Contemporaneous Penalties (CP) | Legislated Maximum Team Limit for Sport (x) | CP Team is Subject to in 2006-07 (y) | CP Carried Over from PREVIOUS Academic Year (if any) Applicable to Current Academic Year (z) | Maximum Team Limit for This Academic Year (x – y) – z | CP Applicable to 2006-07 Carried Over to 2007-08 (if any) |
|---|---|---|---|---|---|

Form completed by: _____  _Signature_  Phone: _____  Date: _____

Form approved by: _____  _Signature_  _Title_  Phone: _____  Date: _____

Head Coach: _____  _Signature_  _Title_  Phone: _____  Date: _____

Director of Athletics: _____  _Signature_  Phone: _____  Date: _____

B    PAGE 58

**2006-07 Squad List**
**Form 06-6b**
**Division I-AA Football**

Institution: _____  City: _____  State: _____  Page ___ of ___

| Name/ID Number | Eligible to Compete? | Status of Student | | | | | | | Financial Aid | | | | | | Countable Players | | | | | Change in Status | | Revenue Dist. |
| | | Any institution | Your institution | No. of years received financial aid | No. of seasons used | Recruited per NCAA Bylaw 13.02.10 | Period of award | Amount of athletics grant | Amount of other countable aid | Total countable aid | Exempt | Total cost for tuition and fees, room and board, and books | Initial | Overall | Equivalent Award | Reason | Date | Equivalent award |
| | | | Term first enrolled | | | | | | | | | | | | | | | |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  | Total | Total |  |  | Totals | | | | | Total |

| Contemporaneous Penalties (CP) | Legislated Maximum Team Limit for Sport (x) | CP Team is Subject to in 2006-07 (y) | CP Carried Over from PREVIOUS Academic Year (if any) Applicable to Current Academic Year (z) | Maximum Team Limit for This Academic Year (x − y) − z | CP Applicable to 2006-07 Carried Over to 2007-08 (if any) |
| --- | --- | --- | --- | --- | --- |

Form completed by: _____ Signature _____ Title _____ Phone: _____ Date: _____

Form approved by: _____ Signature _____ Title _____ Phone: _____ Date: _____

Head Coach: _____ Signature _____ Phone: _____ Date: _____

Director of Athletics: _____ Signature _____ Phone: _____ Date: _____

EXHIBIT B PAGE 59

**2006-07 Squad List**
**Form 06-6c**
**Division I Head-Count Sports Other Than Football**

Institution: _____   City: _____   State: _____   Sport: _____   Page ____ of ____

| Name/ID Number | Eligible to Compete? | Status of Student — Term first enrolled — Any institution | Status of Student — Term first enrolled — Your institution | No. of years received financial aid | No. of seasons used | Recruited per NCAA Bylaw 13.02.10 | Period of award | Financial Aid — Amount of athletics grant | Financial Aid — Amount of other countable aid | Financial Aid — Total countable aid | Exempt | Countable Players — Total cost for tuition and fees, room and board, and books | Countable Players — Overall | Countable Players — Equivalent Award | Change in Status — Reason | Change in Status — Date | Revenue Dist. — Equivalent award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | Total | Total | | | Totals | | | | Total |

| Contemporaneous Penalties (CP) | Legislated Maximum Team Limit for Sport (x) | CP Team is Subject to in 2006-07 (y) | CP Carried Over from PREVIOUS Academic Year (if any) Applicable to Current Academic Year (z) | Maximum Team Limit for This Academic Year (x − y) − z | CP Applicable to 2006-07 Carried Over to 2007-08 (if any) |
|---|---|---|---|---|---|

Form completed by: _____  Phone: _____  Date: _____

Form approved by: _____ Signature _____ Title _____  Phone: _____  Date: _____

Head Coach: _____ Signature _____ Title _____  Phone: _____  Date: _____

Director of Athletics: _____ Signature _____  Phone: _____  Date: _____

FEMININ   B   PAGE 60

# 2006-07 Squad List
## Form 06-6d
## Division I Equivalency Sports

Sport: _____   State: _____

City: _____

Page ____ of ____

Institution: _____

| Name/ID Number | Eligible to Compete? | Status of Student — Term first enrolled — Any institution | Your institution | No. of years received financial aid | No. of seasons used | Recruited per NCAA Bylaw 13.02.10 | Period of award | Financial Aid — Amount of athletics grant | Amount of other countable aid | Total countable aid | Exempt | Countable Players — Total cost for tuition and fees, room and board, and books | Equivalent Award | Change in Status — Reason | Date | Revenue Dist. Only — Equivalent award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | Total | | Total | | Total | | | Total |

| Contemporaneous Penalties (CP) | Legislated Maximum Team Limit for Sport (x) | CP Team is Subject to in 2006-07 (y) | CP Carried Over from PREVIOUS Academic Year (if any) Applicable to Current Academic Year (z) | Maximum Team Limit for This Academic Year (x − y) − z | CP Applicable to 2006-07 Carried Over to 2007-08 (if any) |
|---|---|---|---|---|---|

Form completed by: _____   Signature   _____ Title   Phone: _____   Date: _____

Form approved by: _____   Signature   _____ Title   Phone: _____   Date: _____

Head Coach: _____   Signature   Phone: _____   Date: _____

Director of Athletics: _____   Signature   Phone: _____   Date: _____

EXHIBIT B   PAGE 61

**2006-07 Squad List**
**Form 06-6e**
**Division I Ice Hockey**

Page _____ of _____

Institution: _____  City: _____  State: _____

| Name/ID Number | Eligible to Compete? | Status of Student | | | | | | | | | Financial Aid | | | | Countable Players | | | | Change in Status | | Revenue Dist. Only |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Term first enrolled | | Your institution | No. of years received financial aid | No. of seasons used | Recruited per NCAA Bylaw 13.02.10 | Period of award | Amount of athletics grant | Amount of other countable aid | Total countable aid | Exempt | Total cost for tuition and fees, room and board, and books | Overall | Equivalent Award | Reason | Date | Equivalent award |
| | | Any institution | | | | | | | | | | | | | | | | |

Total / Total / Totals / Total

| Contemporaneous Penalties (CP) | Legislated Maximum Team Limit for Sport (x) | CP Team is Subject to in 2006-07 (y) | CP Carried Over from PREVIOUS Academic Year (if any) Applicable to Current Academic Year (z) | Maximum Team Limit for This Academic Year (x − y) − z | CP Applicable to 2006-07 Carried Over to 2007-08 (if any) |
|---|---|---|---|---|---|

Form completed by: _____ Signature _____ Title _____ Phone: _____ Date: _____

Form approved by: _____ Signature _____ Title _____ Phone: _____ Date: _____

Head Coach: _____ Signature _____ Phone: _____ Date: _____

Director of Athletics: _____ Signature _____ Phone: _____ Date: _____

EXHIBIT B PAGE 62

2006-07 Squad List
Form 06-6f
Division I Basketball

Page _____ of _____
Institution: _____    City: _____    State: _____

| Name/ID Number | Eligible to Compete? | Status of Student | | | | | | | | Financial Aid | | | | | Countable Players | | | | | | Change in Status | | Revenue Dist. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Term first enrolled | | No. of years received financial aid | No. of seasons used | Recruited per NCAA Bylaw 13.02.10 | Period of award | Amount of athletics grant | Amount of other countable aid | Total countable aid | Exempt | Total cost for tuition and fees, room and board, and books | Overall | Equivalent Award | Reason | Date | Equivalent award | Total |
| | | Any institution | Your institution | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | Total | | | | Total | | Totals | | | Total | | Total |

| Contemporaueous Penalties (CP) | Legislated Maximum Team Limit for Sport (x) | CP Team is Subject to in 2006-07 (y) | CP Carried Over from PREVIOUS Academic Year (if any) Applicable to Current Academic Year (z) | Maximum Team Limit for This Academic Year $(x - y) - z$ | CP Applicable to 2006-07 Carried Over to 2007-08 (if any) |
|---|---|---|---|---|---|

Form completed by: _____ Signature _____ Title _____    Phone: _____ Date: _____

Form approved by: _____ Signature _____ Title _____    Phone: _____ Date: _____

Head Coach: _____ Signature _____    Phone: _____ Date: _____

Director of Athletics: _____ Signature _____    Phone: _____ Date: _____

EXHIBIT B PAGE 63

Exhibit C

## Appendix C

## Total Payouts to Conferences from NCAA

| CONFERENCE | 2000-01 | 2001-02 | 2002-03 | 2003-04 | 2004-05 |
|---|---|---|---|---|---|
| America East | 3,817,797 | 4,104,128 | 4,911,200 | 5,492,839 | 5,884,969 |
| Atlantic 10 | 6,972,158 | 7,833,805 | 10,025,675 | 9,798,174 | 10,658,337 |
| Atlantic Coast | 12,082,322 | 13,278,199 | 18,693,714 | 19,837,437 | 22,863,441 |
| Atlantic Sun | 2,583,368 | 2,913,008 | 4,321,031 | 4,946,202 | 4,194,517 |
| Big 12 | 12,969,981 | 13,545,606 | 19,493,807 | 21,970,548 | 24,414,474 |
| Big East | 13,005,068 | 14,218,464 | 19,354,650 | 21,499,569 | 24,147,900 |
| Big Sky | 2,966,173 | 3,028,397 | 3,648,671 | 3,757,655 | 4,142,131 |
| Big South | 1,718,565 | 2,031,928 | 2,652,656 | 3,013,496 | 3,326,432 |
| Big Ten | 15,303,687 | 17,844,659 | 26,105,321 | 28,105,924 | 29,174,596 |
| Big West | 2,712,541 | 3,047,030 | 4,275,817 | 4,396,172 | 4,811,898 |
| Colonial | 3,275,247 | 3,237,359 | 5,308,141 | 5,714,885 | 6,050,520 |
| Conference USA | 8,280,541 | 9,157,744 | 12,081,535 | 12,826,007 | 15,053,917 |
| Horizon League | 2,360,303 | 2,682,686 | 3,696,794 | 4,346,866 | 4,305,834 |
| Independents | 560,944 | 504,724 | 408,412 | 599,992 | 551,848 |
| Ivy Group | 3,448,228 | 3,795,177 | 4,992,195 | 5,345,045 | 5,626,062 |
| Metro Atlantic | 2,635,717 | 2,643,054 | 3,531,839 | 3,763,015 | 3,819,447 |
| Mid-American | 7,229,462 | 7,712,677 | 11,342,865 | 12,329,079 | 12,047,443 |
| Mid-Continent | 2,189,331 | 2,421,228 | 2,979,873 | 3,166,228 | 3,292,356 |
| Mid-Eastern | 2,947,131 | 3,227,561 | 4,406,913 | 4,581,065 | 4,955,288 |
| Missouri Valley | 4,134,920 | 4,409,032 | 6,516,251 | 6,989,464 | 7,480,529 |
| Mountain West | 3,996,631 | 4,305,510 | 6,532,876 | 7,582,048 | 9,322,977 |
| Northeast | 2,851,159 | 3,122,280 | 4,139,492 | 4,498,125 | 4,621,573 |
| Ohio Valley | 2,697,456 | 2,859,492 | 3,996,575 | 4,347,121 | 5,103,712 |
| Pacific-10 | 11,734,197 | 13,504,967 | 19,975,406 | 20,724,687 | 20,156,415 |

EXHIBIT C PAGE 64

708135v1/008924

| CONFERENCE | 2000-01 | 2001-02 | 2002-03 | 2003-04 | 2004-05 |
|---|---|---|---|---|---|
| Southeastern | 14,113,280 | 15,049,983 | 20,147,523 | 22,039,559 | 23,799,335 |
| Southern | 3,015,174 | 3,272,103 | 4,447,053 | 4,512,128 | 4,833,177 |
| Southland | 2,849,136 | 3,085,162 | 4,135,375 | 4,393,883 | 4,801,219 |
| Southwestern | 2,862,609 | 3,184,985 | 4,255,471 | 4,588,656 | 4,820,743 |
| Sun Belt | 3,381,242 | 3,642,988 | 4,874,143 | 5,354,363 | 6,005,373 |
| The Patriot League | 2,788,751 | 3,064,651 | 4,367,567 | 4,740,947 | 5,249,536 |
| West Coast | 2,589,195 | 2,893,899 | 3,639,230 | 4,191,217 | 4,568,506 |
| Western | 7,097,538 | 7,440,579 | 10,765,838 | 10,783,494 | 8,619,856 |
| **TOTAL** | **$171,169,852** | **$187,063,065** | **$260,023,909** | **$280,235,890** | **$298,704,361** |

© The National Collegiate Athletic Association

taken from the web at
http://www.ncaa.org/wps/portal/!ut/p/kcxml/04_Sj9SPykssy0xPLMnMz0vM0Y_Qj
zKLN4j3CQXJgFjGpvqRqCKOcAFfj_zcVH1v_QD9gtzQiHJHRUUAc0tpTA!!/del
ta/base64xml/L3dJdyEvUUd3QndNQSEvNElVRS82XzBfTFU!?CONTENT_URL
=http://www1.ncaa.org/finance/5-yr_conf_summaries/total_distribution

## Basketball Payouts to Conferences

| | | | | | |
|---|---|---|---|---|---|
| America East | 658,602 | 704,698 | 784,182 | 845,783 | 912,225 |
| Atlantic 10 | 3,951,613 | 4,429,530 | 4,705,094 | 4,369,880 | 5,017,235 |
| Atlantic Coast | 7,056,452 | 7,550,336 | 9,802,279 | 9,867,470 | 11,250,770 |
| Atlantic Sun | 658,602 | 805,369 | 1,045,576 | 986,747 | 1,064,262 |
| Big 12 | 6,586,021 | 6,442,953 | 9,148,794 | 10,854,217 | 12,923,182 |
| Big East | 6,868,279 | 7,348,993 | 9,018,096 | 10,431,326 | 11,858,920 |
| Big Sky | 752,688 | 704,698 | 914,879 | 986,747 | 1,064,262 |
| Big South | 470,430 | 604,027 | 784,182 | 845,783 | 912,225 |
| Big Ten | 7,338,710 | 8,859,060 | 12,285,523 | 13,250,603 | 13,379,294 |
| Big West | 564,516 | 704,698 | 914,879 | 986,747 | 1,216,299 |
| Colonial | 752,688 | 704,698 | 1,045,576 | 1,127,711 | 1,064,262 |
| Conference USA | 4,422,043 | 4,127,517 | 4,574,397 | 4,933,735 | 6,081,497 |
| Horizon League | 1,129,032 | 1,208,054 | 1,437,668 | 1,973,494 | 1,672,412 |
| Independents | 0 | 0 | 0 | 0 | 0 |

EXHIBIT C PAGE 65

| | | | | | |
|---|---|---|---|---|---|
| Ivy Group | 752,688 | 805,369 | 914,879 | 986,747 | 912,225 |
| Metro Atlantic | 752,688 | 604,027 | 784,182 | 845,783 | 1,064,262 |
| Mid-American | 1,317,204 | 1,308,725 | 1,960,456 | 2,255,422 | 2,128,524 |
| Mid-Continent | 658,602 | 805,369 | 1,045,576 | 1,127,711 | 912,225 |
| Mid-Eastern | 658,602 | 805,369 | 1,045,576 | 986,747 | 1,064,262 |
| Missouri Valley | 1,599,462 | 1,610,738 | 2,483,244 | 2,819,277 | 3,040,749 |
| Mountain West | 282,258 | 402,685 | 1,045,576 | 1,691,566 | 2,280,561 |
| Northeast | 564,516 | 604,027 | 784,182 | 845,783 | 912,225 |
| Ohio Valley | 564,516 | 604,027 | 784,182 | 845,783 | 912,225 |
| Pacific-10 | 5,927,419 | 6,845,638 | 9,932,976 | 10,008,434 | 9,122,246 |
| Southeastern | 7,715,054 | 7,852,349 | 9,540,885 | 10,713,253 | 12,010,957 |
| Southern | 752,688 | 805,369 | 1,045,576 | 845,783 | 912,225 |
| Southland | 564,516 | 604,027 | 784,182 | 845,783 | 912,225 |
| Southwestern | 564,516 | 604,027 | 784,182 | 845,783 | 912,225 |
| Sun Belt | 658,602 | 604,027 | 784,182 | 845,783 | 912,225 |
| The Patriot League | 564,516 | 604,027 | 784,182 | 845,783 | 912,225 |
| West Coast | 1,505,376 | 1,711,409 | 2,091,153 | 2,537,349 | 2,888,711 |
| Western | 3,387,097 | 3,624,161 | 4,443,700 | 3,946,988 | 3,496,861 |
| **TOTAL** | **$69,999,996** | **$75,000,001** | **$97,499,996** | **$105,300,001** | **$113,724,003** |

© The National Collegiate Athletic Association

taken from the web at
http://www.ncaa.org/wps/portal/!ut/p/kcxml/04_Sj9SPykssy0xPLMnMz0vM0Y_Qj
zKLN4j3CQXJgFjGpvqRqCKOcAFfj_zcVH1v_QD9gtzQiHJHRUUAc0tpTA!!/del
ta/base64xml/L3dJdyEvUUd3QndNQSEvNElVRS82XzBfTFU!?CONTENT_URL
=http://www1.ncaa.org/finance/5-yr_conf_summaries/basketball

EXHIBIT C  PAGE 66

708135v1/008924

Exhibit D

**Appendix D**

History of Litigation Testimony and Reports, 2000-present

**Ongoing:**

Beatrice C. Romero, Michael Ferree, et al. v. Philip Morris, Incorporated; R. J. Reynolds Tobacco Company; Brown Williamson Tobacco Corp., Lorillard Tobacco Co. Liggett Group, Inc.; and Brooke Group, Ltd. First Judicial District Court, State of New Mexico County of Rio Arriba, Civil Action No. D-0117-cv-200000-972. Liability report in preparation.

Damages report prepared, entered settlement negotiations, case settled, awaiting final court approval, June 2006, Marion Crane, et al. v Internation Paper Company, et al. Civil Action No. : 3:02-3352-22

Damages Report in preparation, to be finalized fall 2006, Mt. Vernon Mills v. Wellman Inc. et al. U.S. District Court, Greenville Division, District of South Carolina, 6:04-0273.

Report submitted, depositions taken: James P. Lundsford v. Callaway Golf Company and Callaway Golf Sales Company, in the Circuit Court for Sevier County, Tennessee at Sevierville Civil Action No. 7 03 2141 20.

Expert report prepared, deposition not yet taken: Coleman Properties, LLC, et al. v. AFG Industries, Inc., Pilkington PLC, Pilkington Libbey-Owens-Ford Co., Inc, Guardian Industries Corp., and PPG Industries, Inc in the Circuit Court for Sullivan County, Tennessee at Blountville in the State of Tennessee, No. C2591.

Damages Expert Report in preparation for fall 2006: Beatrice C. Romero, Michael Ferree, et al. v. Philip Morris, Incorporated; R. J. Reynolds Tobacco Company; Brown Williamson Tobacco Corp., Lorillard Tobacco Co. Liggett Group, Inc.; and Brooke Group, Ltd. First Judicial District Court, State of New Mexico County of Rio Arriba, Civil Action No. D-0117-cv-200000-972.

Report submitted, class certification, deposition not yet taken: Alexis Sams v. Palmetto Health Alliance, C/A No. 04-CP-40-4168 and Frances Bonetto v. Palmetto Health Alliance, C/A No. 04-CP-40-4362.

**Settled or Dismissed:**

Outline for Settlement Negotiations Smokeless Litigation, report prepared (October 2003) and hearings held (October 2003). (settlement negotiations)

Philip Edward Davis v.United States Tobacco Company et al. Circuit Court for

708135v1/008924

1  Jefferson County, Tennessee at Dandridge. Case No. 17305 IV. Affidavit filed
2  (March 2003) and deposition given (2003). (class certification)

3  Tennessee Cigarette Affidavit filed (September 2002). Deposition given. (Class
4  certification)

5  Thomas Ellis et al. v. United States Tobacco Company, et al. Superior Court of the
6  District of Columbia Case No. 02-0004227. Affidavit filed (October 2002)
   and deposition given (February 2003). (class certification)
7

8  Beatrice C. Romero, Michael Ferree, et al. v. Philip Morris, Incorporated; R. J.
   Reynolds Tobacco Company; Brown Williamson Tobacco Corp., Lorillard
9  Tobacco Co. Liggett Group, Inc.; and Brooke Group, Ltd. First Judicial
10 District Court, State of New Mexico County of Rio Arriba, Civil Action No.
   D-0117-cv-200000-972. Affidavit Prepared (October 2002), Supplemental
11 Affidavit Prepared (January 2003), Deposition Given (February 2003). (class
12 certification)

13 Artemio Del Serrone, James Hauer, Steven Ren, Heather Snay et. al, v.Philip Morris
14 Companies, Inc., Philip Morris Incorporated, R.J.R. Nabisco Holdings, Corp
   et. al., Circuit Court for the County of Wayne State of Michigan Case No.
15 00-004035-cz. Affidavit filed (class certification). Reply Affidavit filed (class
16 certification). Affidavit and supplemental affidavit filed (damages).
   Deposition Given (October 2001).
17

18 Michael J. Ludke, Scott Nessa, and Thomas J. Marks, et al. v. v.Philip Morris
   Companies, Inc., Philip Morris Incorporated, R.J.R. Nabisco Holdings, Corp
19 et. al. District Court of the Fourth Judicial District of the State of Minnesota in
20 and of the County of Hennepin. File No. MC 00-1954. Affidavit filed
   (February 2001). Reply affidavit filed. Deposition given (March 2001).
21

22 Building Communications Incorporated, v. Ameritech Services, Inc., and Ameritech
23 Michigan Civil Action State of Michigan in the Circuit Court for the County
   of Wayne No. 99-921-323 NZ. Damage report filed (March 2000). Deposition
24 given (March 2000).

25 Advanced Performance Technology, Inc. v. SL Auburn, Inc., and Champion Spark
26 Plug Company, d/b/a Champion Aviation Products in the United States
   District Court For the District of South Carolina Columbia Division C.A.
27 No.: 3:98-2080-19. Deposition given (May 2000).

28

EXHIBIT D    PAGE 68

708135v1/008924

# Exhibit E

**Appendix E**

List of Materials Considered in Forming Opinions

In addition to my formal economics education, the underlying research I have been doing on sports and economics for the best part of the past twenty-five years, my general knowledge of sports as a consumer, my classroom instructional activities, my reading of the general and sports and economics literature, theses and dissertations I have mentored, and countless seminars and conversations with colleagues, I have also relied upon the following specific documents in preparing this declaration:

Plaintiffs' First Amended Complaint, briefing on motion to dismiss, and other documents filed in this action

Indianapolis Star, April 1, 2006, at http://www.indystar.com/apps/pbcs.dll/article?AID=/20060401/SPORTS/604010509

[New York Times, August, 27, 2006 at http://www.nytimes.com/2006/08/27/sports/ncaafootball/27tv.html?pagewanted=1&ei=5070&en=11fb46a77d05a4fe&ex=1157428800&emc=eta1

http://money.cnn.com/2002/03/08/news/column_sportsbiz/.

[CNN at http://money.cnn.com/2002/03/08/news/column_sportsbiz).

http://www1.ncaa.org/finance/5-yr_conf_summaries/basketball .

Department of Education, National Center for Educational Statistics at http://nces.ed.gov/ipeds/AboutIPEDS.asp ]

[Department of Education, National Center for Educational Statistics at http://nces.ed.gov/ipeds/glossary/index.asp?charindex=O ].

Hawes, Kay, "A Presidential Era - Institutional CEOs Launch Reforms in College Athletics", The NCAA News, December 20, 1999.

Fulks, Daniel L., "Revenues and Expenses of Division I and II Intercollegiate Athletic Programs 2002-2003" taken from www.ncaa.org/library/research/i_ii_rev_exp/2003/2002-03_d1_d2_rev_exp.pdf at page 22.

EXHIBIT E PAGE 69

http://www.ncaa.org/library/research/gender_equity_study/2002-03/2002-03_gender_equity_report.pdf

The NCAA News at http://www.ncaa.org/wps/portal/newsdetail?WCM_GLOBAL_CONTEXT=/wps/wcm/connect/NCAA/NCAA+News/NCAA+News+Online/Association-wide/Callers+get+answers+by+'asking+Myles'+-+6-7-04.

Robert McCormick and Maurice Tinsley, "Athletics Versus Academics? Evidence From SAT Scores," *Journal of Political Economy*, 95(5) (October 1987) at 1103.

T. Rhoads and S. Gerking, "Educational contributions, academic quality, and athletic success," *Contemporary Economic Policy*, April 2000, at 248.

Dr. Boyce Watkins, "Professional Amateurism: What is the true economic value of a black male college athlete?" Assistant Professor of Finance  Syracuse University (date unknown) taken from the web at http://www.stepupcollege.org/blackathletes.pdf

NCAA squad list form

NCAA distribution of funds

Billy Hawkins, " Black student athletes at predominately White National Collegiate Athletic Association (NCAA) Division I Institutions and the pattern of oscillating migrant workers," *Western Journal of Black Studies*, 23 (1999) at 1.

EXHIBIT E PAGE 70

708135v1/008924

# **PROOF OF SERVICE**

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 950, Los Angeles, California 90067-6029.

On August 29, 2006, I served the foregoing document(s) described as follows:

**DECLARATION OF ROBERT E. MCCORMICK IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as follows:

_____ BY MAIL:
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ BY PERSONAL SERVICE:
I caused to be delivered such envelope by hand to the offices of the addressee.

_____ BY FEDERAL EXPRESS OR OVERNIGHT COURIER

_____ BY FAX
I served by facsimile as indicated on the attached service list.

__XX__ BY ELECTRONIC MAIL
I caused said documents to be prepared in portable document format (PDF) for e-mailing and served by electronic mail as indicated on the attached service list.

Executed on August 29, 2006, at Los Angeles, California

_____ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

__XX__ (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

| | |
|---|---|
| Helen Danielson | _Helen Danielson_ |
| (Type or Print Name) | (Signature) |

1

MASTER SERVICE LIST

2

**ATTORNEYS FOR PLAINTIFFS**

Marc M. Seltzer

3   Stephen E. Morrissey

Steven G. Sklaver

4   Tibor L. Nagy

5   SUSMAN GODFREY L.L.P.

1901 Avenue of the Stars, Suite 950

6   Los Angeles, California 90067-6039

Telephone: (310) 789-3100

7   Fax: (310) 789-3150

email: mseltzer@susmangodfrey.com

8   email: smorrissey@susmangodfrey.com

9   email: ssklaver@susmangodfrey.com

email: tnagy@susmangodfrey.com

10

11  Maxwell M. Blecher

Courtney A. Palko

12  BLECHER & COLLINS P.C.

515 S. Figueroa Street, 17th Floor

13  Los Angeles, California 90071

14  Telephone: (213) 622-4222

Fax: (213) 622-1656

15  email: mblecher@blechercollins.com

email: cpalko@blechercollins.com

16

**ATTORNEYS FOR DEFENDANTS**

Gregory L. Curtner

Robert J. Wierenga

Kimberly Kefalas

Atleen Kaur

MILLER, CANFIELD, PADDOCK

AND STONE P.L.C.

101 North Main Street, 7th Floor

Ann Arbor, MI 48104-1400

Telephone: (734) 663-2445

Fax: (734) 663-8624

email: curtner@millercanfield.com

email: wierenga@millercanfield.com

email: kefalas@millercanfield.com

email: kaur@millercanfield.com

David M. Balabanian

Frank M. Hinman

Nora C. Cregan

Christina M. Wheeler

BINGHAM MCCUTCHEN LLP

Three Embarcadero Center

San Francisco, CA 94111-4067

Telephone: (415) 393-2000

Fax: (415) 393-2286

email: david.balabanian@bingham.com

email: frank.hinman@bingham.com

email: nora.cregan@bingham.com

email: chris.wheeler@bingham.com

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX D

MARC M. SELTZER (54534)
STEPHEN E. MORRISSEY (187865)
STEVEN G. SKLAVER (237612)
TIBOR L. NAGY (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150
email: mseltzer@susmangodfrey.com
email: smorrissey@susmangodfrey.com
email: ssklaver@susmangodfrey.com
email: tnagy@susmangodfrey.com

MAXWELL M. BLECHER (26202)
COURTNEY A. PALKO (233822)
BLECHER & COLLINS P.C.
515 S. Figueroa Street, 17th Floor
Los Angeles, California 90071
Telephone: (213) 622-4222
Fax: (213) 622-1656
email: mblecher@blechercollins.com
email: cpalko@blechercollins.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JASON WHITE, BRIAN POLAK, and JOVAN HARRIS, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association,<br><br>Defendant. | Case No. CV 06-0999 RGK (MANx)<br><br>**SUPPLEMENTAL DECLARATION OF ROBERT E. MCCORMICK IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>DATE:   September 25, 2006<br>TIME:   9:00 a.m.<br>PLACE:  Courtroom of the Hon. R. Gary Klausner |

1

1

## I.    Background

2    1.    I am Dr. Robert E. McCormick, currently Professor and BB&T
3    Scholar at the John E. Walker Department of Economics, Clemson University,
4    Clemson, South Carolina, 29634. I live at 1156 Old Seneca Road, Six Mile, South
5    Carolina.

6    2.    I have previously prepared a report in this case dated August 28, 2006.
7    My vita and other information about me are included there and are incorporated
8    here by reference.

9    3.    I have been asked by counsel to respond to the report offered on behalf
10   of the defendant in this case by Dr. Janusz A. Ordover and dated September 11,
11   2006 and the transcript of the deposition of Dr. Ordover that was conducted on
12   September 15, 2006, and also to offer additional expert opinions and analysis
13   concerning the class certification-related issues before the court in this case.

14

## II.    SUMMARY OF OPINIONS

15   4.    Based on a careful review and analysis of the report by Dr. Ordover
16   and the transcript of Dr. Ordover's deposition, it is my opinion that Dr. Ordover's
17   opinions and methods are, in many critical respects, simply wrong by any objective
18   standard. I will detail my explanations below. Nothing in all of the materials
19   prepared by Dr. Ordover or the additional information supplied by him changes my
20   original opinions in this case. These errors lead Dr. Ordover to conclude that class-
21   wide methods for ascertaining impact and damages are impossible; those same
22   analyses (his own analyses), once the errors are corrected, support the opposite
23   conclusion, and demonstrate the ease of class-wide methods.

24   5.    In fact, I am more convinced than ever in my opinion, as an economist,
25   that there are class-wide methodologies for adjudicating the issues in this case.
26   Using the very data that Dr. Ordover addresses in his report, and other data that will
27   be available after discovery, it will be possible to construct an economic model for
28   assessing both impact and damages on a class-wide basis.

2

1    6.    In my opinion, Dr. Ordover's work is replete with errors of analysis
2    and fact. I believe that these errors result from Dr. Ordover's complete lack of
3    familiarity with the industry of college sports. For instance, Dr. Ordover is unaware
4    of the critical and valuable role that recruiting plays in the success or failure of
5    college sports teams.[1] Yet, the available data regarding recruiting expenditures
6    provides knowledge that is vital to understanding how valuable even the so-called
7    "marginal"[2] player is on the Division IA football or Division I basketball teams in
8    the relevant markets in this case. Any even-handed consideration of the relevant
9    data concerning recruiting expenditures provides strong evidence of class-wide
10   impact resulting from the GIA cap.[3] While I discuss Dr. Ordover's mathematical
11   and analytical errors specifically when I address some of his false conclusions, it
12   bears mentioning that every important conclusion he draws from his attempt at
13   analysis of actual data is simply wrong (and wrong because he seems ignorant of
14   the meaning of his data) or he interprets the data contrary to their actual fact. In my
15
16   _____

17   [1] The vast set of rules and regulations in place by the NCAA severely limiting recruiting also
     speaks on this point. Were it not for these complex rules and regulations which have "quiet
18   periods" and "dead periods" and many other limitations, including the number of "official visits"
     an athlete can take, these expenditures would be far greater. Some commentators have even
19   called this an "arms race."

20   [2] I use the term "marginal athlete" because he is the last person at each school who actually
     receives a scholarship and thus the person at the margin of the proposed class. The fact is these
21   players are hardly marginal compared to their scholarship costs, and the term is only used because
     of the NCAA regulation which does not allow colleges to have more than 85 football players or
22   13 basketball players on scholarship at any one time.

23   [3] Given Dr. Ordover's previous work on college athletics in the walk-on case, I am somewhat
     surprised that he has not sought out more information on the recruiting practices of the NCAA.
24   Even a rudimentary knowledge of the importance of recruiting speaks volumes on the primary
     issue in this case: would all or nearly all of the members of this proposed class receive additional
25   money from their athletic departments if the GIA cap were replaced with a COA cap? Dr.
     Ordover's opinions seem at times to be made independent of the fact that the student athletes in
26   the class are highly recruited practices would not believe and understand that nearly every player
     on all the teams in the proposed class is far more valuable than the GIA's that they currently
27   receive under NCAA regulations.

28

3

710359v1/008924

1  opinions, Dr. Ordover's fundamental failure to understand the NCAA rules and the

2  data he he used renders his analysis irrelevant.

3      7.    There is a well-defined but-for world. Contrary to Dr. Ordover's

4  analysis, the relevant "but-for" world for analyzing plaintiffs' claims in this case is

5  readily apparent. The only proper way to imagine the but-for world is to assume a

6  change to rule 15.02.5, which would allow the Full GIA to include an additional

7  category of expenses covering the current COA gap, and to leave the rest of the

8  NCAA's by-laws intact. Otherwise the analysis of the but-for world is tainted by

9  other factors.[4] Additional by-laws which might allow for other benefits to athletes

10 serve in no way to mitigate the impact and damages resulting from the limitations

11 imposed by the GIA cap. This lawsuit is about the GIA cap, not about other

12 regulations that the NCAA holds in place or might someday put in place. For

13 purposes of this suit, the relevant economic question is, does the GIA cap impose

14 antitrust injury and economic harm to the plaintiffs? It matters not and is

15 completely irrelevant that plaintiffs are, despite the GIA cap, able to collect money

16 through Pell Grants, loans, grants, or gifts. Instead, the question is, simply and

17 solely, what is the impact of the GIA cap and are there class-wide methods for

18 assessing impact and estimating damages? These other benefits that Dr. Ordover

19 fancifully wishes to count as athletic aid have no bearing on whether the GIA cap

20 impacts the amount of athletic aid a student might otherwise get. In the proper but-

21

22 [4] It is widely recognized that such an experiment is only valid if *one* factor changes. The but-for
   analysis must only change one thing—the presumed violation of the law which is in question.
23 Other things cannot be allowed to change unless they would change automatically by the
   elimination of the assumed illegal acts. Dr. Ordover's analysis would seem to violate this
24 fundamental tenet of antitrust analysis and economic theory, despite his testimony that such
   analysis is something he himself commonly does (Ordover Depo, 86:16-23). Dr. Ordover's
25 testimony that he assumes that "it is entirely possible that in the context of this new world, with
   this by-law being changed, the schools may try to pass another bylaw which says that no student
26 athlete should be compensated more than COA plus 20 percent, whatever it is. In other words,
   there are all these moving parts." (Ordover Depo,77:6-12) is entirely speculative and unhelpful to
27 the analysis of the impact of the alleged misconduct.

28

4

1    for world, I assume that all forms of aid, and specifically non-athletic aid, that are

2    currently irrelevant to the question of a full GIA (per NCAA rules), remain constant

3    and hence irrelevant. Thus, for example, I assume that Pell Grants, which are

4    explicitly allowed under NCAA Bylaws even when a student-athlete receives a Full

5    GIA, continue in force as the proper but-for examination requires.

6         8.      Pell Grants raise no issues of individualized inquiry with respect to

7    class-wide impact (or damages), and Dr. Ordover's conclusion to the contrary is

8    based on misapprehensions and a failure to analyze competition. Using a but-for

9    world that matches the plaintiffs' allegation makes this abundantly clear. Perhaps

10    because Dr. Ordover has mischaracterized this litigation as being about whether or

11    not the class of athletes have sufficient sources of funding, governmental or

12    otherwise, to allow them to cover their cost of attendance, his but-for world does

13    not match the actual allegation and as a consequence he falsely envisions Pell

14    Grants affecting this litigation. "The whole case seems to me -- Maybe I'm wrong.

15    You know, if I'm wrong, you tell me that I'm wrong... -- that there is this somehow

16    gap that the students are not filling; they're not able to cover the cost of

17    attendance... "[5] As a result of this misunderstanding of the case, he erroneously

18    concludes that "I don't see as a matter of economics any substantial difference as

19    between the sources of money, in terms of the welfare or well-being of the student.

20    That's the bottom line."

21        The correct economic question for class certification is not the welfare of the

22    student-athlete, but rather the impact of the alleged antitrust conspiracy. If the

23    alleged antitrust conspiracy were affecting only the children of wealthy

24    industrialists, the question would not hinge of their "welfare or wellbeing," but

25    rather, simply, whether the alleged antitrust violation resulted harm to the class

26    members. Thus, as a matter of economics, the appropriate question is not "is the

27

28    [5] Ordover Deposition, page 52: 18- 53:4.

5

710359v1/008924

1    athlete getting enough money from some outside source" but rather whether, absent

2    the alleged misconduct, would have athlete have received more than he currently

3    does. Dr. Ordover's analysis of Pell grants has no bearing on the actual allegation.

4    In essence, he has devoted a great deal of analysis to demolishing a silly straw man.

5       Factually, through the entire class period, rules existed that explicitly allowed

6    for a student athlete to receive both a full grant in aid, as defined by by-law 15.02.5

7    and a full Pell grant from the federal government.[6] As so, just as with a student who

8    receive an allowance from wealthy parents, who nevertheless could have gotten a

9    larger grant-in-aid in the but-for world, so too could a recipient of a Pell Grant, or

10    any other "non-countable" aid would, in the but-for world, get a larger COA.

11    Demonstrations that the current level of non-athletic but non-countable aid is high

12    are irrelevant to the question. So to argue that the receipt of this money, of itself,

13    demonstrates a lack of class wide impact is simply silly.

14       In his deposition, Dr. Ordover testified to a second form of this opinion, i.e.,

15    it is possible that "in light of this rule, the school could lower a student grant if it so

16    chose. Okay? It could." But Dr. Ordover has undertaken no analysis that this

17    theoretical possibility actually could occur in light of competition for athletes. Dr.

18    Ordover's imagined school could also undertake to lower GIA's in relationship to

19    Pell Grants in today's actual world. If Dr. Ordover were correct, I would expect to

20    see Pell recipients, generally, receiving partial GIAs, and moreover, one would

21    expect, all else equal, that Pell recipients would tend to get a higher percentage of

22    partial GIAs. However, as I discuss below, almost every counter received the

23    maximum GIA possible, and there is no evidence of the minute percentage of

24    athletes who did not being skewed towards Pell recipients. I know of no athletic

25    directors undertaking, in the actual world, the sort of calculation that Dr. Ordover

26    speculates would occur in the but-for world. As with many of Dr. Ordover's other

27

---

28    [6] Prior to 2004, this was rule 15.2.4.1. Since 2004, this has been covered by 15.1.1.

6

1  analyses, he has imagined a problem (in this case hypothetical athletic directors
2  who, contrary to their current behavior, suddenly begin to prey upon the poorest
3  members of the class by reducing their GIAs based on their receipt of government
4  assistance for the poor). No individualized inquiry is needed to investigate a non-
5  event.

6  Moreover, Dr. Ordover's analysis fails to incorporate any meaningful
7  consideration of competition. His analysis assumes that an athletic director can
8  look at a student's financial situation and conclude: "I'm paying for your room and
9  board and half of your tuition; I'm giving you -- as opposed to 100 percent tuition,
10 I'm going to give you 50 percent tuition. You can cover the rest from some other
11 source."[7] But if a student's worth to teams exceeds the value of a full grant in aid
12 equal to COA, an athletic director's desire to economize does not change the
13 competitive environment for that talent. Competition for athletes is dynamic and
14 also protects the GIA's of students once they arrive on campus. A reputation of a
15 school that opportunistically preys upon a student who receive Pell grants will harm
16 future recruiting prospects, and rival schools will be keen to make prospective
17 athletes aware of past opportunism. While Dr. Ordover does acknowledge that,
18 "…in reality there is going to be an issue whether that student will be attracted by
19 an offer of GIA plus some dollars from an alternative school,"[8] he admits that he
20 has done nothing to determine the marginal value of the 85th football player or the
21 13th basketball player on a squad,[9] in essence omitting competition from his model.
22 In my opinion, there exist concrete, class-wide analyses which allow an economist
23 to determine that competition would ensure virtually each class member would

24 ___

[7] Ordover Deposition, p. 84:11-16.
[8] Ordover Deposition, Page 97:21-24. Of course, even this is false. Since GIA's cannot be guaranteed for more than one year by NCAA rule, schools with reputations for behaving opportunistically, even for a player who had no other offers coming out of high school, adds uncertainty to all GIA recipients over the expected value of their future years' grants. Thus dynamic competition for infra-marginal players serves as a bulwark against opportunism for the marginal athlete, and further ties together the fate of the class, rather than creating conflict.
[9] Ordover Deposition:67:25-68:25

7

1  receive a full grant in aid (equal to COA) in the but-for world , just as competition

2  currently ensures that virtually each class member receives a full grant-in-aid.[10]

3      9.    Dr. Ordover has no consideration in his analysis for demand or the

4  forces of competition. For instance, Dr. Ordover claims that a highly individualized

5  analysis would be required to determine whether in the but-for world some players

6  might shift to other schools because they would get more money without the GIA

7  cap. This argument is wrong on several counts. First, the amount of additional

8  money under discussion here—increased GIA's covering the full cost of

9  attendance—reflects a small portion of the athletic budget for each school in the

10  relevant markets. Basic economic analysis confirms that, in a but-for world in

11  which schools were permitted to provide full GIA's equal to the full COA, the

12  schools in the relevant markets would provide these larger GIA's to all or nearly all

13  of the student-athletes in the proposed class. Dr. Ordover's lack of familiarity with

14  the recruiting process makes some of his opinions almost silly; for example, his

15  opinion on the process by which athletic directors' can arbitrarily cut the GIA's of

16  poor students and suffer no long-run consequences in a very competitive market is

17  quite out of touch with the reality of college athletics.[11] Recruiting is a year-round

18  business. Prospective high school players are courted and called regularly and

19  routinely by many schools. They travel on "official" (that is paid) visits to as many

20  as five different schools and often many other "unofficial" (unpaid) visits. They

21  negotiate with coaches on factors such as playing time, position, whether they will

22

23  [10] The same analysis I apply to Pell moneys applies to Assistance Fund and Opportunity Fund money as well. It is clear these moneys, which are very small in comparison to Pell Grants or

24  GIAs, do not cover the items (travel costs, health insurance, school supplies, etc) that comprise the GIA-COA gap. Neverthless if the court were to deems these items relevant, I could build

25  them into a model of impact and damages to identify the categories of class members that were and were not subject to them and easily determine the need for any offsets to damages in a

26  straightforward, formulaic fashion.
[11] Dr. Ordover testified to have no understanding of some of the basic concepts of recruiting in

27  college athletics, neither the amounts spent, nor the rules which limit spending on recruiting such as caps on official visits. See Ordover Deposition, 134:4-135:4.

28

8

710359v1/008924

1  red shirt, and even whether they will get to carry the ball on the first play from

2  scrimmage in their freshman year.[12] The amounts schools spend for all or nearly all

3  of the student athletes in the class shows excess demand that would result in the use

4  of full GIA's equal to COA as a tool of competition, but-for the current GIA cap.

5        10.     Economically, it is incontrovertible that college football and basketball

6  programs are commercial enterprises, and they compete in a well-defined industry.

7  College athletics is most definitely commercial big business. Decisions are made

8  based on costs and revenues. Colleges and their athletic departments buy inputs in

9  many markets, from high skilled coaching labor, to well-trained physicians and

10  trainers, to secretaries and bookkeepers. They engage in commercial transactions.

11  They market their products to major television and radio networks for millions of

12  dollars. They sell tickets to their games. In addition they often sell rights to various

13  seats in stadiums and spaces in parking lots for millions of dollars (collectively)

14  each year. I do not believe anyone could reasonably dispute the fact that major

15  college football and major college basketball are big business and engage in many

16  simple and complex commercial transactions (such as negotiating multi-billion

17  dollar television contracts. In his 2006 "State of the Association" speech, NCAA

18  President Myles declared that the "business plan" for the athletics department is

19  "Revenue is Maximized." He went on to say it was "Nonsense" to think otherwise:

20  "This type of thinking [that maximizing revenue taints the purity of college sports]

21  is both a misinterpretation and a misapplication of amateurism. 'Amateur' defines

22  the participants, not the enterprise. We should not be ambivalent about doing the

23  business of college sports."[13]

24

25  ---

[12] This is a recruiting device reportedly used to some effect by Coach Tommy Bowden of
26  Clemson University.

27  [13]http://www2.ncaa.org/portal/media_and_events/press_room/2006/january/20060107_soa_rls.ht
ml, last visited September 17, 2006.

28

710359v1/008924

1    My analysis as to the availability of class-wide methods for assessing impact
2    and damages does not depend on whether college sports are big business. Rather,
3    those opinions are based on economic analysis of the available data regarding major
4    college sports, and my opinions as to the additional data that will be produced in
5    discovery and will allow the necessary analyses to be completed on a class-wide
6    basis. However, Dr. Ordover's antiquated view of the NCAA as something akin to
7    the FCC[14] obviously blinds him to the normal business forces, such as competition,
8    which are critical to the analysis of demand and class-wide impact and damages.

9    11.    Class-wide damages calculations are unaffected by Dr. Ordover's
10   imagined concerns about Pell Grants (and other Non-Countable Aid), by the receipt
11   of summer school money, by issues related to the calculation of COA, or by issues
12   related to any so-called "reshuffling."

13   Constructing any economic model requires analysis of the available data to
14   identify and inconsistencies and ambiguities and determine how best to resolve
15   them based on the available evidence. Dr. Ordover is wrong when he says that a
16   class-wide model cannot be the sum of the analysis of individual transactions; on
17   some level, all economic models are the sum of individual transactions. Data that
18   are readily available in this case make class-wide analysis possible and relative
19   straight forward. I take up some of Dr. Ordover's critiques in turn:

20   a.    Pell Grants pose not problem for class-wide calculation of
21   damages. As discussed above, in my but-for world, there are excellent bases to
22   assume that the rules on Pell Grants and other countable aid would not change.
23   Under these rules, a student athlete receiving a full GIA (plus Pell money) in the
24   actual world would continue to receive a (larger) full GIA in the but-for world, in
25   addition to any Pell money. My damages model, discussed in my original report, is
26   thus perfectly appropriate for a student with or without Pell. But even if the court

27   ───────────────
[14] Ordover Deposition, 200:17-25.

28

10

1    were to determine, contrary to plaintiffs' allegations and NCAA rules, that damages

2    to the class should be reduced by amounts received in the form of Pell Grants or

3    other non-countable aid, each school's records, whether submitted on a squad list of

4    kept for government financial aid purposes, would make it a matter of data entry to

5    incorporate into my model a deduction for such moneys.

6            b.      The receipt of summer school money is not impediment to the

7    proper calculation of damages. The NCAA points to the case of Jovan Harris and

8    his receipt of money to attend summer school. As a matter of economics, I find the

9    presentation on Page 5 of the NCAA's brief to be quite misleading. Cost of

10   Attendance figures are calculated for academic years. They do not include the cost

11   of summer school attendance. By including Jovan Harris's summer school money,

12   the NCAA has compared an apple (Harris's regular and summer benefits) to an

13   orange (Harris's non-summer COA).  Had the defendants instead compared the

14   academic year to the academic costs, they would have shown Harris with a gap

15   between his full GIA and the COA of $805. To the extent Harris, or other members

16   of the class, are also eligible for damages due to the gap between summer school

17   grants and summer school cost of attendance, a similar calculation, for additional

18   damages can be made for Harris and each member of the class, using identical

19   methodology to my damages model proposed in my original report.

20           c.      Any class-member-specific COA information is handled by

21   means of data entry, not individualized inquiry. In every damages analysis, certain

22   individual facts must be entered into standard spreadsheets for the calculation of

23   damages. In a price-fixing case for outputs, purchasers' quantities and specific

24   discounts are often quite diverse and require the combing of business records, such

25   as invoices. To the extent some schools calculate individualized COA figures for

26   each student, this is also something which basic financial aid forms will reveal, and

27   which, through discovery, I anticipate being able to enter into the database

28   underlying my damages model. It is a simple task to match a player's COA and

1   actual GIA using standard computational tools like spreadsheets. And while the
2   task of data entry is cumbersome, as an expert I have far too much experience with
3   the process of transferring paper business records to electronic formats. From this
4   point, it is formulaic to calculate damages in aggregate and by individual, using the
5   results of this effort.

6       d.    "Reshuffling" issues are unlikely and can be accounted for using my
7   standard damages model. Players, parents, and coaches spend a lot of time, energy,
8   and resources investigating where they best fit, and for Dr. Ordover to presume that
9   a thousand or two thousand dollars per year would substantially upset that well-
10  oiled equilibrium without even one example or other shred of evidence is not very
11  compelling to me. Accordingly, while there might actually be a player or two in the
12  proposed class who would attend a different school and receive a GIA at the other
13  school when the cap were raised to cover COA, these would be very rare cases.
14  Even so, it would have no impact on my damage methodology. A simple example
15  will prove my point. Suppose some player from the Midwest accepts a scholarship
16  to the University of Oklahoma under the GIA cap because, at the margin, he cannot
17  afford to travel to his first choice, UCLA. He would be a member of the proposed
18  class in this case and, if the plaintiffs prevail in this case, he would be allotted, per
19  my class-wide damages methodology, the difference between the current full GIA
20  and a but-for GIA equal to the COA at the University of Oklahoma. Now absent the
21  cap in the but-for world, it is possible (at last theoretically) that he might choose to
22  go to UCLA and receive a full GIA equal to the COA at UCLA. However, if the
23  gap at UCLA is not the same as it is at OU, then it is because the costs are different
24  there and he would also bear those additional costs in the but-for world, by being at
25  the more expensive place. He will not therefore be under-compensated by a model
26  which bases his damages off of his actual world's school – because only in the
27  actual world has he borne costs. And, of course, if the gap is lower at UCLA the
28  same argument holds, he would not be over-compensated because he is still short

12

1    the out-of-pocket expenditures in the actual world. Accordingly Dr. Ordover's
2    concern about class tension or conflict has no merit. Moreover, because the
3    potential cases are truly rare, there is no issue. Two points are obvious to me. Any
4    "reshuffling" among schools would be *de minimis* and irrelevant because students
5    would go to other schools in the same class and would have the same damage
6    claims they have now even if they would have switched schools in the but-for
7    world.

8        Notwithstanding the questions raised by Dr. Ordover, I am confident that the
9    available data would allow me to construct a model for assessing impact and
10   damages using class-wide methods and models. After carefully reviewing the data
11   to correct for those circumstances in which the data, on its face, appears to be
12   ambiguous, incomplete, or inaccurate, I will be able to address impact in a
13   systematic, class-wide fashion. Dr. Ordover has merely highlighted a handful of
14   circumstances in which the data have raised questions, but a rudimentary review
15   has allowed me to address each of the issues Dr. Ordover has identified without
16   great effort.[15]

17       Thus, it is my opinion that there are plausible methods for assessing class-
18   wide damages in a formulaic method and for parsing damages to the individuals in
19   the class. My original report offers some of the plausible methods, and I elaborate
20   and present additional details in this report. Critical to a class-wide analysis is a
21   proper understanding of the indicia of high demand for all student athletes in the
22   class, even the so-called "marginal athlete," many of which Dr. Ordover has
23   misinterpreted and others of which he appears to be completely unaware.

24
_____
25   [15] I understand that in recent years, the NCAA has adopted a reporting tool called "Compliance
     Assistant" which enables athletic departments to track (and report) their student-athletes GIA's
26   electronically. While not universally in force, I believe that for later class years and any future
     years for which damages calculations may be required, this will ease the data entry issue
27   substantially.
     See  http://www1.ncaa.org/membership/membership_svcs/compliance_assistant/index.html,  last
28   visited on September 18, 2006.

13

1    12.    I am confident, despite the criticism by Dr. Ordover, that my
2  comparison of college football to professional football expenditures is quite valid. It
3  is my intent to put in control mechanisms, such as a comparison of other athletic
4  expenses, such as coaching salaries, across the two markets. Further discovery will
5  likely allow for additional refinements.

6    Dr. Ordover puts himself in an odd position when he says that comparing the
7  salary of college football players to professional football players is not valid
8  because they are in different markets. It is routine in economics, in real estate
9  appraisal, and in all forms of antitrust analysis to compare product prices or
10  characteristics across different markets. Imagine a rental conspiracy in Boston.
11  Comparable rental rates in Baltimore and Denver might be useful for modeling the
12  but-for Boston rents. How anyone can dispute the basic economic technique of
13  "benchmarking" one similar market against another leaves me bewildered. For that
14  reason, I disregard Dr. Ordover's criticism of my comparison of professional sports
15  to college sports is outside the bounds of standard analysis..

16    13.    Economically, it is incontrovertible that college football and basketball
17  programs are commercial enterprise, and they compete in a well-defined industry.
18  College athletics is most definitely commercial big business. Decisions are made
19  based on costs and revenues. Colleges and their athletic departments buy inputs in
20  many markets, from high skilled coaching labor, to well-trained physicians and
21  trainers, to secretaries and bookkeepers. They engage in commercial transactions.
22  They market their products to major television and radio networks for millions of
23  dollars. They sell tickets to their games. In addition they often sell rights to various
24  seats in stadiums and spaces in parking lots for millions of dollars (collectively)
25  each year. I do not believe anyone could reasonably dispute the fact that major
26  college football and major college basketball are big business and engage in many
27  simple and complex commercial transactions (such as negotiating multi-billion
28  dollar television contracts. In his 2006 "State of the Association" speech, NCAA

1   President Myles declared that the "business plan" for the athletics department is
2   "Revenue is Maximized." He went on to say it was "Nonsense. This type of
3   thinking [that maximizing revenue taints the purity of college sports] is both a
4   misinterpretation and a misapplication of amateurism. 'Amateur' defines the
5   participants, not the enterprise. We should not be ambivalent about doing the
6   business of college sports."[16]

7       My analysis as to the availability of class-wide methods for assessing impact
8   and damages does not depend on whether college sports are big business. Rather,
9   those opinions are based on economic analysis of the available data regarding major
10  college sports, and my opinions as to the additional data that will be produced in
11  discovery and will allow the necessary analyses to be completed on a class-wide
12  basis. However, Dr. Ordover's antiquated view of the NCAA as something akin to
13  the FCC[17] obviously blinds him to the normal business forces, such as competition,
14  which are critical to the analysis of demand and class-wide impact and damages.

15      14.   In particular, there is class-wide evidence that the marginal athlete (the
16  85th scholarship in football or the 13th in basketball) is worth well more to his
17  school than a Full GIA equal to COA, and that the GIA cap has had an
18  anticompetitive effect upon each member of the proposed class. Thus, concerns
19  about individualized inquiries are misplaced and unwarranted. The concerns that
20  Dr. Ordover raises with respect to so-called "individuated inquires" are not
21  grounded in fact. The circumstances which he imagines that could lead to a lack of
22  common impact do not, in fact, exist. . Although Dr. Ordover has raised a series of
23  false alarms that he claims require individual scrutiny, in truth all class members,
24  including the so-called "marginal athlete," all can be shown with class-wide

25

26  [16] http://www2.ncaa.org/portal/media_and_events/press_room/2006/january/20060107_soa_rls.ht
    ml, last visited September 17, 2006.
27
    [17] Ordover Deposition, 200:17-25.
28

710359v1/008924

1  methodologies to have suffered impact and damages as a result of the GIA cap.
2  The individual examples Dr. Ordover has provided invite individual responses, but
3  the appearance of individuality that Dr. Ordover has attempted to create is an
4  artifact of the errors in his analysis. Instead, there exist class-wide reasons why the
5  concems Dr. Ordover raised do not exist, and a few examples of each type of error
6  in Dr. Ordover's analysis should suffice to demonstrate this.

7        a.    Dr. Ordover claims that there are numerous recipients of partial
8  GIA's, and that, as a result, individual inquiries will be required to assess the issue
9  of anticompetitive impact. However his analysis here is fundamentally flawed and
10  simply wrong. First, even on its own terms, his analysis shows that nearly all
11  members of the proposed class (91 percent) receive full GIA's. Moreover, a more
12  careful analysis of the data shows that the 91 percent figure he presents is a
13  substantial understatement of the actual figure, and that in fact all or nearly all
14  members of the proposed class received full GIA's. Using Dr. Ordover's data, I
15  found very few (if any) concrete examples of a "counter" who did not receive the
16  maximum possible athletic funding allowed under the NCAA rules in place at the
17  time of Dr. Ordover's data.[18] I offer additional details on this point later in my

---

18  [18] In Dr. Ordover's squad list analysis, he identifies 7,106 football and basketball "counters who
19  received the maximum amount of countable aid" and 7,778 counters with positive countable aid.
    Upon further analysis of the 672 athletes that Dr. Ordover considers "partial-scholarship"
20  athletes, I determined that 98 received total financial aid at or above the maximum GIA amount,
21  but a proportion of the financial aid came from other non-athletic sources. Take for example
    David Green from the University of Georgia, who was on the state of Geogia's HOPE
22  Scholarship during the academic years 2002-2003 and 2003-2004, and is listed as receiving a
    partial GIA while also serving as the team's starting quarterback, a position for which there is
23  high demand and intense competition among schools. I also found over four hundred more who
    received GIAs equal to one semester or one or two academic quarters, such as those identified in
24  Dr. Ordover's Exhibit 4. As Dr. Ordover acknowledged in his deposition, treating a student who
    attended school for only a partial year as a partial GIA is a "misrepresentation." (Ordover p.
25  112:1-2) While in the remaining hundred or so athletes for which these simple explanations do
26  not suffice, I would not be surprised to find a handful of students with truly partial GIA's, the
    vast majority of those which Dr. Ordover classified as partial are in fact full grants-in-aid and thus
27  over 98 percent of all GIA's are in fact full. In any event, the existence of a "partial" GIA would
28  not suggest a lack of anticompetitive impact from the GIA cap; rather, it is reasonable to conclude

16

1    report. By carefully analyzing the relevant and readily available data, it is possible
2    to confirm this fact on a class-wide basis that would not require any individualized
3    inquiry at trial into which student-athletes did and did not receive full GIA's.

4         b.    Dr. Ordover's analysis with respect to the claim that many schools do
5    not use their full complement of GIA's is also flawed and simply wrong. As one
6    example, his Table 8 purports to show that approximately 4.3 percent of the
7    available GIA slots in his (non-representative) sample went unused, but Dr.
8    Ordover appears to have made no effort to determine if those unused GIA's were
9    actually available to the school.[19] Despite acknowledging their existence,[20] He has
10   not taken into account the NCAA rules which limit the number of counters a given
11   team may make in a given year (to 25 for football and commonly 4 or 5 in
12   basketball).[21] For example, in 2002-2003, Dr. Ordover's Table 8 shows Wyoming
13   with 80 Counters, but does not indicate that Wyoming had used all 25 of its initial
14   counters, making 80 their true binding limit. Nevertheless, Dr. Ordover erroneously
15   identifies Wyoming as a school in that year which was "not at the NCAA limit"[22]
16   which is an obvious error.[23]    Had Dr. Ordover taken just this additional constraint

17

18   (... cont'd)
     that any recipient of partial GIA's also would have received additional GIA funds if the GIA cap
19   were eliminated, and that their GIA in a "but-for" world would bear the same relationship to a full
     GIA as their current GIA does.

20   [19] At least he reports no such effort nor reveals it in his deposition.

21   [20] Ordover Report, footnote 86.

22   [21] Rule 15.5.5.1 states that a football team may not bring in more than 25 "initial counters" in a
     year. Rule 15.5.4.1, the equivalent rule for basketball, which although it changed during the class
23   period, constrained teams to no more than 5 initial counters in any given year, and as few as 8
     over two years, for portions of the data period.
24
     [22] See Ordover Declaration, Table 8.

25   [23] Despite this being an error, Dr. Ordover explicitly testified in deposition to his belief that
26   Wyoming "at 80 in '03" had made "some voluntary decisions by the recruitment committee or
     whatever you call it, the scouts, the coaches, not to fill the 85-player bench, which in principal
27   they can" Orodver deposition, p. 132:13-17. In fact, in '03, in principal, Wyoming used every
     available GIA.
28

17

1  into account, he would have found that, even for his admittedly non-representative

2  sample, the actual number of cases where a school does not offer the full

3  complement of GIA's is much lower than the number he reports (2 percent or

4  approximately 40 per year), to the point of being trivial and essentially

5  meaningless. As with Dr. Ordover's imagined partial GIA's, a careful analysis

6  reveals that in fact there are class-wide demonstrations of the fact that virtually

7  every one of the 85 football and 13 basketball GIAs available to schools[24] are used

8  in the actual world and would remain used in the but-for world. Accordingly his

9  claim that a class-wide analysis is inappropriate is wrong. A class-wide analysis is

10  entirely feasible using the available data.

11         c.     There are additional binding reasons, other than the one

12  hypothetical explanation posited but not checked or tested by Dr. Ordover, as to

13  why a school might not at any moment be offering its full allotment of GIAs. For

14  instance, given the 85 (and 25) limitation in football or the 13 (and 4-5) limit for

15  portions of the class period in basketball, holding a scholarship open and in reserve

16  has option value to a coach who might wish to motivate several different walk-on

17  players to work sufficiently hard to garner that scholarship.[25] (Dr. Ordover would

18  mistakenly interpret any such scholarship as "unused.") In effect, with the binding

19  annual limits and binding overall limits, coaches in football and basketball have to

20  manage their deliberately and valuable unused inventories of scholarships, and

21  there are bound to be situations where the optimal inventory is not zero.[26] With

---

[24] As well as additional "exempt" GIAs that often push a team above the 85 and 13 limits.

[25] That options have value is not the subject of reasonable dispute in the economics literature.

[26] The literature in economics is replete with discussions of optimal inventories, even to the point of talking about the optimal unemployment rate as a stock of available workers who can quickly be put to work when demand increases unexpectedly. For casual evidence on this point, note the large number of empty parking spaces one regularly sees in shopping mall parking lots. The fact that almost *no* scholarships are left unused stands in stark contrast to what might generally be expected in such a case and actually provides evidence on the extraordinary value that coaches place on having ever scholarship used. This, in turn, of course points out how valuable even the

18

1    these limits in mind, it is easy to ascertain that there is demand for even the

2    marginal athlete and that the calculations performed by Dr. Ordover in Table 8 pose

3    no problem for class-wide determination of impact and damages.

4              d.    In fact some schools actually use more than 85 GIA football

5    athletes at any one time.  Under the NCAA rules, schools are able to reward even

6    some "exempt" (that is, non-counter) student-athletes with full GIA's.  Some of

7    these student-athletes are, by any measure, "stars" who clearly would receive full

8    GIA's even under Dr. Ordover's flawed analysis of the but-for world., For example,

9    in  Dr.  Ordover's  Exhibit  4,  Kyle  Benn,  the  Center  for  the  University  of

10   Washington, who started over 20 games in a row, was named an Academic All-Pac-

11   10 player in his senior year, and later signed with the Tennessee Titans of the

12   NFL,[27] is listed as exempt). In the year analyzed by Dr. Ordover in Exhibit 4, in

13   addition to its maximum allowable GIAs of 84, UW also gave out 6 full GIAs to

14   student-athletes who were not counters.[28] And yet Dr. Ordover's analysis treats a

15   school like the University of Washington in 2001-02 as one that did not give all the

16   scholarships allowed by NCAA regulation.  Based on that inaccurate analysis, he

17   proceeds to conclude that many football players are not sufficiently valuable to

18   their schools that they would earn GIA's covering  the full amount of the COA, and

19   that there is thus a conflict between the members of the proposed class.    As a

20   result, Dr. Ordover's analysis does not demonstrate that there are individualized

21   (… cont'd)

22   marginal or 85th player is to a football team or the 13th player is to a basketball team.

23   [27] Http://gohuskies.cstv.com/sports/m-footbl/mtt/benn_kyle01.html.

      [28] This fact again supports my conclusion that even the 85th player, the marginal player on a
24   football team or 13th player on the basketball team is worth far more than their GIA payment. For
      were it not true, the schools would not have offered more than 85 scholarships. In fact, the past
25   history of college football and basketball reveals, when no such limitations existed, schools gave
      far more than the 85 and 13 limits. And this fact is true not only for the large powerhouse schools,
26   but lowly upstarts and wannabes. (See David Newton, "In 1971, USC left the ACC...Why?" *The*
      *State*,      July      13,      2003,      taken      from      the      web      at
27   www.thestateonline.com/history/files/20030713_C1.pdf.)

28
                                                 19

1 issues for the marginal athlete, but instead that the exemptions are truly *de minimis*
2 and that class-wide methods exist that apply to all class members.

3      e.     An analysis of schools' of recruiting expenditures shows a very
4 high value even for the marginal athlete, and thus class-wide impact. To recruit 25
5 GIA athletes each year (which is approximately 30 percent of the total GIAs on the
6 team), the team expends an amount approximately equal (and on top of) the half the
7 actual GIA cost in football and 150% in basketball. See Table 1.

8 **Table 1**
**Division 1A Recruiting Costs as of 2002-2003[29]**

| | Average Recruiting Expenses Per School | Average Player GIA Costs per School | Estimated Recruiting Cost per New Scholarship Player[30] | Average GIA[31] | Recruiting Cost Per Recruit as % of GIA Costs |
|---|---|---|---|---|---|
| Football | $220,100 | $1,547,600 | $10,358 | $20,236 | **51%** |
| Basketball | $92,600 | $248,900 | $28,492 | $18,713 | **152%** |

15     In 2002-2003, the average recruiting costs for a basketball player was
16 $28,492, or 152 percent of his annual GIA cost. For football, the average recruiting
17 cost was $10,358 or 51 percent of his annual GIA cost. These figures demonstrate
18 the enormous value of players, especially when compared to benchmark data on
19 "cost per hire" in industry.   According to the Society for Human Resource
20 Management, the average cost per hire was $5,681 in 2005;[32] and this figure
21 includes relocation costs which are not a component of the expenditures by NCAA
22 schools.

23 [29] Source: 2002-2003 NCAA Gender Equity Report pp. 31-33

24 [30] Cost per Scholarship player is based on replacing an average of 21.25 players per year in
25 football (1/4th of team) and 3.25 players per year in basketball (1/4th of team).

[31] Calculated as Average GIA expenses / Number of Grants by sport as shown on page 33 of the
26 Gender Equity Survey.

27 [32] Smith, Noel, August, 2005 - "SHRM Human Capital Measure of the Month - Cost Per Hire",
taken from www.shrm.org on 9/18/2006.

28

20

1    When the NCAA punishes a team for recruiting violations (which typically
2 consists of actions by which schools provide players with financial or non-financial
3 benefits in excess of the amounts permitted by current NCAA rules), or when a
4 school requests a self-penalty to avoid the potential of harsher NCAA penalties, this
5 impedes the ability of the team to recruit their "marginal player." The simple fact
6 that the NCAA punishes teams by forbidding them from incurring a GIA cost for
7 what might be their least desired player is ample demonstration that the NCAA
8 believes losing the right to incur this expense carries with it a greater loss in value
9 than the forgone expense. It is no penalty to be forbidden from making a poor
10 economic "purchase."

11    f.    Historical evidence abounds on the continued demand for the
12 marginal athlete even in the face of dramatic price increases. When Title IX was
13 instituted, it was a sudden imposition of what can be thought of as a 100 percent tax
14 on the GIA's provided to men. To an economist, when a 100 percent tax results in
15 zero decrease in quantity demanded, it is powerful evidence that the good is worth
16 substantially more than its cost, even including the tax. The point is, when Title IX
17 regulations were instituted and dramatically increased the cost of giving a GIA,
18 colleges did not reduce the number of GIAs awarded in football and basketball.
19 Again, this provides compelling evidence of class-wide impact.[33]

20    g.    Similarly, the year-over-year increase in the cost of a GIA, at
21 each and every "class school," and the uniform absence of evidence of any decrease
22 in quantity demanded is powerful evidence that the student athletes at the margins

23

24

25 [33] Some schools did in fact eliminate some men's sports, such as wrestling, fencing, and boxing,
26 but this dramatically proves the point. When there was a cost increase, the marginal sports went
   away. The scholarship to the 85th football player did not. It would seem to require hardly any
27 other evidence to conclude that the proposed class of athletes in this case are impacted by the GIA
   cap..

28

21

1    of the proposed class are worth substantially more to their schools than their ever-
2    increasing cost.

3              h.       When the NCAA changed its bylaws so that student athletes
4    were allowed to keep up to half of their Pell grants,[34] there was no decrease in
5    quantity demanded and zero shift away from Pell recipients to non-Pell. The NCAA
6    later amended its rules regarding Pell grants in so that student athletes have since
7    been allowed to keep all of their Pell grant money, again without any impact on
8    their GIA. There was no reduction in the number of GIAs awarded that can be
9    documented, nor any departure of schools from Division IA football or Division I
10   basketball, in fact schools came into those divisions, a point to which I return later.

11             i.       Similarly, pre-1976, the NCAA allowed schools to reimburse
12   student athletes for the cost of certain living expenses which was then loosely called
13   "laundry money." The amount in the 1960s and up until it was eliminated was $15
14   per month, which in present value terms is as much or more than some schools'
15   calculated GIA-COA gap.. Even though the schools in the relevant markets
16   generated far lower revenue from football and basketball in 1975 than they do
17   today,   NCAA programs consistently provided   student athletes some of the
18   expenses sought in this litigation.

19             j.       Similarly, in 2004, the NCAA stopped requiring all schools to
20   reduce GIA's, dollar for dollar, when students received academic awards. In Dr.
21   Ordover's imagined world of individualized inquiry, such a change should have
22   resulted many schools opting to continue, by choice, the old mandatory reductions,
23   continuing to reduce GIA's for athletes who were gifted enough to receive special
24   academic merit awards.  To my knowledge, not a single school has done so since
25   the rule was changed.

26

27   ───────────────
     [34] Byers, at 236.

28

22

1           k.    In practice, there are other simple demonstrations of the excess

2 demand for players that can be shown using class-wide proof. There is no evidence

3 that any state school football or basketball program has shifted the weight of its

4 GIAs from out-of-state to in-state students, even though doing so would save those

5 programs thousands of dollars. This costs the athletic department far more than the

6 damages alleged from the issues in suit, but nevertheless, I see no evidence that

7 schools factor this decision in at all.[35]

8           l.    The willingness of teams to pay the sort of additional benefits

9 which Dr. Ordover outlines in his Table 3,[36] which are items not included in the

10 GIA-COA gap, is further demonstration of the high value placed on even the

11 marginal athlete. While Dr. Ordover seems to imply that such benefits, which

12 would continue in the but-for world, somehow create class conflict, in fact they too

13 are strong demonstrations of the ways in which the NCAA schools attempt to

14 compete for, and compensate beyond current GIA limits, the valuable athletes at

15 their schools.

16          m.    The willingness of teams to bear the cost of walk-ons also shows

17 the value of the GIA players at the margins of the proposed class, and thus class-

18 wide impact. Walk-Ons are an essential part of the practice expenses of a team.

19 And if need be, teams could save money by spending less on walk-ons by having

20 fewer of them. Yet the demand for walk-ons is also high.

21        The evidence on the value of the "marginal player" at the "marginal school"

22 is overwhelming and the hypothetical concerns raised by Dr. Ordover are easily

23 dispelled with class-wide proof such as these. Based on my review of the available

24 evidence, there is little doubt that the GIA cap has resulted in class wide impact to

25

---

26 [35] Later in y report I present evidence on the times series of within and out-of-state rosters for some football and basketball teams.

27 [36] See Ordover Declaration, p. 26.

28

710359v1/008924

1    all or nearly all of the student-athletes in the proposed class, and it is equally clear

2    that the schools in the relevant markets would provide GIA's covering the full COA

3    if they were permitted to do so. The available economic evidence will allow this

4    issue to be addressed on a class-wide basis. And, as I've discussed above, there

5    likewise are viable and practical ways of measuring damages on a class wide basis,

6    which I discuss below.

7        15.    Notwithstanding the questions raised by Dr. Ordover, I am confident

8    that the available data would allow me to construct a model for assessing impact

9    and damages using class-wide methods and models. After carefully reviewing the

10   data to correct for those circumstances in which the data, on its face, appears to be

11   ambiguous, incomplete, or inaccurate, I will be able to address impact in a

12   systematic, class-wide fashion. Dr. Ordover has merely highlighted a handful of

13   circumstances in which the data have raised questions, but a rudimentary review

14   has allowed me to address each of the issues Dr. Ordover has identified without

15   great effort. In the end, I am strongly of the opinion that a class-wide approach for

16   modeling and assessing impact can be accomplished without resort to any questions

17   of individualized issues.

18       16.    The class heterogeneity which Dr. Ordover discusses has very little to

19   do with the question of common impact and/or damages to the propose class in this

20   case. It is quite true that a football powerhouse like Alabama has much higher

21   revenues and expenses than a less dominant football program like the University of

22   Buffalo.[37] But economically, the answers at the margin for a program like Buffalo

23   are the same as for a program like Alabama. The question of whether the marginal

24

---

25   [37] Whether a firm is rich or poor rarely has any impact, in economic theory, as to whether or how

26   it implements economic decisions. In economic theory decisions are based on marginal costs and
     marginal benefits, and especially for firms, the question of rich or poor is rarely relevant. Yet,

27   since Dr. Ordover has made such a to-do about this, I am compelled to respond in those terms in
     spite of the fact that they seem inappropriate to me in the context of economic analysis.

28

24

1  athlete at Buffalo would receive the a GIA equal to the full COA in the but-for
2  world is answered with the same methods as the question for Alabama, and will
3  show the same answer: yes. Dr. Ordover has suggested that any additional expenses
4  such as paying Full GIA's covering the full COA would be too much of a financial
5  burden for some schools in the proposed class, and that therefore, individuals on
6  GIA at those schools should not be in the proposed class. Dr. Ordover even
7  suggests that schools might exist Division I-A over the increased costs that would
8  result from GIA's covering the full COA. I am confident that no such situation
9  exists within the schools in this proposed class. For a school like Buffalo to drop
10 Div1A football, over what I estimate is approximately a $300,000 cost per year
11 (and if it that were to double due to Title IX would not reach $750,000), when by
12 virtue of membership in the MAC conference, it received $987,424 in conference-
13 level distributions,[38] as well as additional revenue benefits from being in Division
14 1A[39] is a conclusion bereft of economic logic. The opportunity cost of leaving a
15 Division 1A conference well exceeds the but-for cost of offering a Full GIA equal
16 to the COA.

---

[38] According to the data available at the Indianapolis Star.

[39] Buffalo also received $460,000 in "guarantee" payments in football (of which over $200,000 was in excess of guarantee game expenses), an amount which would certain decrease if Buffalo left Division 1A. See Indianapolis Star data.

25

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19



20

21      17.    Consistent entry and virtually non-existent exit confirm that Division

22  IA football and Division I basketball that, despite increasing costs, schools view

23  participating in Division I as very desirable.  This data also shows the class-wide

24  impact of the GIA cap.. For decades, the financial or overall economic well being

25  of participating in these ventures has led more and more schools to seek

26  membership. Two charts below show the long and steady increase in programs in

27  the NCAA, and thus demonstrate the economic viability and rewards associated

28

710359v1/008924

with this enterprise.[40] In my opinion this evidence is powerful and allows me to dismiss the concern of Dr. Ordover that some schools in the proposed class would not be willing to continue to operate in the face of a relatively small increase in cost as a result of paying full GIA's equal to the COA instead of the current GIA.

18.    There exist several identifiable sets of class members who are clearly infra-marginal. The aforementioned case of poor Buffalo compared to rich Alabama makes the case for certification of a class including Alabama and other schools from the powerhouse BCS conferences incontrovertible. Dr. Ordover's claim that every single student-athlete requires an individualized inquiry ignores the obvious infra-marginal character of many individuals and firms in this industry. It is not necessary to make an individualized inquiry , to determine that in the but-for world, every single student-athlete who receives a GIA from any ACC basketball team or the teams in the other BCS conferences would receive a full GIA equal to the COA, and that if competition were allowed, they would receive this in the but-for world (and in addition receive any Pell Grants or other non-countable aid). The ACC basketball conference places extremely high value on all of its men's basketball scholarship players, and there can be no doubt competition would compel each school in the conference to offer every player on the team (and more if allowed) additional scholarship money in the small amounts which are the subject of this lawsuit if allowed. Similarly, there is no doubt that in the but-for world, competition among schools would result in every football and basketball players receiving a full GIA from any school in the BCS conferences from receiving a Full GIA equal to the COA. Although it is my opinion that there is ample evidence that every single member of the class would, in fact, also receive a Full GIA equal to the COA (or, at least, a GIA in excess of his current GIA, which is all that would be

---

[40] Source: 1981-1982 2004-2005 NCAA Sports Sponsorship and Participation Report, pp. 123 and 117.

710359v1/008924

1  required to show the fact of impact on a class-wide basis) if competition up to that
2  limit were allowed, it is clearly that, for example, the set of all class members at
3  "BCS" schools easily would pass this hurdle.

4      19.    Dr. Ordover's analysis purports to show, at most, the hypothetical
5  potential for individualized issues regarding a very few (approaching zero),
6  marginal players at a vanishingly small number of marginal schools. However, the
7  vast majority of the schools—and all the players at those schools—are not
8  anywhere close to a financial or economic decision margin. There is absolutely no
9  doubt Dr. Ordover's analysis suggesting the possibility of some individualized
10  issues would not have any application to the schools in the BCS conferences, where
11  there can be no question that they would provide GIAs covering the full COA to all
12  of their student-athletes in the but-for world.

13      20.    Dr. Ordover is incorrect in claiming that the relevant markets are
14  regional or local. Dr. Ordover criticizes my proposed definition of the market,
15  hypothesizes several things as alternatives, but in the end is neither compelling nor
16  offering of any evidence. I collected data on the geographic background of
17  basketball and football players at several, randomly chosen, Division I colleges to
18  represent different regions of the United States.[41] I identified the hometowns of the
19  players on the teams from the rosters for the 2006-2007 season in basketball and the
20  2004 season in football. Table 1 lists the results, and they confirm the geographic
21  definition of the market.[42] In only three of the sixteen basketball teams do more

22

23  ───────────
    [41] For football, I limit my analysis to Division 1A schools.

24  [42] Sources: Official websites of the individual teams: http://uclabruins.cstv.com/,
    http://clemsontigers.cstv.com/, http://nusports.cstv.com/, http://ohiostatebuckeyes.cstv.com/,
25  http://www.ballstatesports.com/, http://utsports.cstv.com/, http://www.texassports.com/,
    http://www.cubuffs.com/, http://www.goduke.com/, http://gostanford.cstv.com/,
26  http://www.goducks.com/, http://www.broncosports.com/, http://und.cstv.com/,
27  http://bceagles.cstv.com/, http://www.gatorzone.com/, http://www.wsuraiders.com/,
    http://tamu.rivals.com/.

28
                                    28

than 10 percent of the players hail from outside the United States. Only three of the sixteen schools have more than half of their players reside within state. Only two of the five football schools have more than half of their players reside within state. The remainder are thus obviously from other states , confirming the interstate reach of virtually ever program. Since there is no Division I college basketball or football played outside the United States, these data confirm my definition of the geographic market according to the Elzinga-Hogarty criteria.[43] There are few basketball and football players in the market from outside the United States, and no players from within the United States that play outside the country in Division I basketball or Division IA football.[44] Moreover, since so many athletes are recruited from out-of-state, and even the "regional" school's reach overlaps substantially with other regions, these markets are national, not regional in scope.

**Table 2**
**Geographic Representation of Players on Several Division IA Football Teams**

| School | Total Players on Roster | Players In-State | | Players Out of Country | |
|---|---|---|---|---|---|
| | | Number | Percent | Number | Percent |
| Clemson | 104 | 46 | 44% | 0 | 0% |
| Notre Dame | 106 | 8 | 8% | 0 | 0% |
| UCLA | 106 | 86 | 81% | 0 | 0% |
| Texas A&M | 115 | 106 | 92% | 0 | 0% |
| Boise State | 108 | 24 | 22% | 4 | 4% |
| Boston College | 101 | 14 | 14% | 2 | 2% |

---

[43] Kenneth G. Elzinga and Thomas F. Hogarty "The Problem of Geographic Market Delineation in Antimerger Suits," 18 *Antitrust Bulletin* at 45.

[44] On rare exceptions, college basketball and football teams will schedule games in a foreign country. These events are rare and the players' market remains inside the United States even though they are performing outside.

29

**Table 3**

**Geographic Representation of Players on Several Division IA Basketball Teams**

| School | Total Players on Roster | Players In-State | | Players Out of Country | |
|---|---|---|---|---|---|
| | | Number | Percent | Number | Percent |
| UCLA | 13 | 9 | 69% | 3 | 23% |
| Clemson | 14 | 5 | 36% | 1 | 7% |
| Northwestern | 15 | 7 | 47% | 4 | 27% |
| Ohio State | 11 | 8 | 73% | 0 | 0% |
| Ball State | 13 | 3 | 23% | 0 | 0% |
| Tennessee | 15 | 5 | 33% | 0 | 0% |
| Texas | 12 | 8 | 67% | 0 | 0% |
| Colorado | 14 | 2 | 14% | 1 | 7% |
| Duke | 12 | 0 | 0% | 1 | 8% |
| Stanford | 14 | 6 | 43% | 0 | 0% |
| Oregon | 11 | 3 | 27% | 1 | 9% |
| Boise State | 14 | 1 | 7% | 0 | 0% |
| Notre Dame | 13 | 2 | 15% | 1 | 8% |
| Boston College | 12 | 0 | 0% | 0 | 0% |
| Florida | 14 | 6 | 43% | 2 | 14% |
| Wright State | 11 | 5 | 45% | 0 | 0% |

## III.   Errors and mistakes by Dr. Ordover

21.   Below, I detail some of the more substantive errors by Dr. Ordover, with focus on those with particularly critical impact on his erroneous conclusions with respect to the student-athletes at the margins of the proposed class.

Dr. Ordover uses NCAA squad list data for analysis, intending to demonstrate a lack of excess demand for the marginal class member. He makes two remarks: an analysis of Division IA football players who Dr. Ordover claims did not receive a full grant in aid, and an analysis of schools which Dr. Ordover claims left available GIA slots unused. These analyses are riddled with error, making them worthless; moreover when those errors are corrected, the conclusions they provide are exactly the opposite of Dr. Ordover's conclusions. As a start, these squad lists, which are required for all schools attended by class members, clearly allow for review and tabulation that allows for identification of class members as well as

30

1    valuing their GIA's. Dr. Ordover's own research team has done so for over
2    12,000[45] student-athletes, and to the extent there are gaps in the record, my staff and
3    I are capable of making determinations from other public sources. Both Dr.
4    Ordover and I have lengthy experience in constructing such data sets and while it is
5    certainly time consuming, it is well within the skill set of most economists used to
6    working with large data sets.

7       22.    More importantly, Dr. Ordover, in an effort to establish that individual
8    issues predominate, has postulated that if many class members are not currently
9    receiving a full grant-in-aid, it is unlikely in any but-for world that they would
10   receive an increased grant-in-aid. Based on these apparent facts, he concludes that
11   if the GIA cap were raised to equal the full COA, then these players would not
12   receive additional aid because they are not now receiving even the full amount.
13   Never mind that the last conclusion is probably wrong owing to the limitation on
14   scholarships but his facts and observations about the squad lists are wrong.

15      23.    However, Dr. Ordover's concerns about the existence of such partial
16   GIA class members are chimerical. One can, of course, imagine that they could
17   exist, but in practice they do not. However, Dr. Ordover, intent on finding such
18   cases, reviewed the NCAA squad lists and saw certain student-athletes with listed
19   GIA values less than 1.0. Either Dr. Ordover does not understand how these lists
20   are created or he is grossly misinterpreting the facts which leads to what Dr.
21   Ordover testified is a "misrepresentation" of the facts.[46] Apparently, when Dr.
22   Ordover performed his analysis prior to his deposition, he was unaware that under
23   NCAA rules, there exist a set of well-defined categories of student-athletes, easily
24   identifiable, for whom a full grant-in-aid will be listed as a value less than 1.0 on a
25   squad list. These students, like the rest of the class, are amenable to  class wide

26
27   [45] Ordover_White_Sep11_Exhibit5a.xls, received by email September 14, 2006.

     [46] Ordover Deposition, p. 112:2-3.
28

31

710359v1/008429

1  methods for assessing impact and damages. Moreover, there is no doubt in my

2  mind that there are class-wide methods for measuring both the full COA and the

3  GIA for every member of the proposed class at every school in the proposed class.

4  24. Dr. Ordover's lack of familiarity with NCAA rules and record-keeping

5  blinds him to certain obvious, identifiable categories of class members, who, for

6  formulaic and easily identified reasons, receive the maximum grant allowed, but

7  who are nevertheless listed at less than 1.0 because their entire category of athletes

8  could not get more. Dr. Ordover's proffered squad list from the University of

9  Washington neatly captures these categories and so I take each up in turn with

10  reference to Dr. Ordover's Exhibit 4.

11  a. Students who graduated early, who exhausted their eligibility, or

12  who matriculated to the school in the middle of the year. In his analysis, Dr.

13  Ordover counts any athlete who, for one of a few well-defined reasons, ceased to be

14  eligible for aid during the course of the school year as a "partial" GIA. For

15  example, it is a fairly common practice for athletes, especially in football, who

16  redshirt early in their career to attend school in their 5th year, and then once their

17  athletic season is over, to graduate.[47] So for example, in the University of

18  Washington squad lists, Kyle R. Benn, Wondame Davis, John B. Hart, Omare G.

19  Lowe, Nicholas L. Olschewski all graduated either after the Fall Quarter or the

20  Winter Quarter of Washington's academic year, and are thus counted as one-third

21  or two-thirds of a GIA. Dr. Ordover's analysis identifies these student-athletes as

22  "partial" GIA recipients, but when shown such a case in deposition, even Dr.

23  Ordover acknowledged that claiming that such a category of student received a

24  "partial" GIA in a meaningful economic sense was a "misrepresentation."

25  b. Similarly, Dr. Ordover treats student who enrolled at a school in

26  mid-year and received full funding thereafter, as a partial GIA. However, for the

27

---

[47] Such a player is commonly called a fifth-year senior.

28

32

1  same reasons as students who graduate in mid-year, students who enroll in mid-
2  year cannot receive a GIA which exceeds their pro rata time on campus. So, for
3  example, although students like Eric Shyne and Francisco Tipoti (who enrolled at
4  the University of Washington one-third of the way through the academic year, and
5  as a consequence received only two-thirds of a GIA) are all treated in Dr. Ordover's
6  analysis as partial. It is my opinion that such a characterization of this category of
7  student is also a serious "misrepresentation;" they are full GIAs for the entire period
8  for which they are eligible for aid.

9       c.     Also similar are students who exhaust their eligibility in mid-
10 year. Dr. Ordover's analysis counts students like James Skurski and John M.
11 Westra as partial GIAs even though they received a full grant-in-aid until they
12 exhausted their eligibility. It is my opinion that Dr. Ordover's classification of this
13 category of student-athlete is also a "misrepresentation."

14      d.     During the entire period from which Dr. Ordover's data is
15 drawn, the NCAA required, by rule 15.1 that the total receipt of athletic and non-
16 athletic aid, with a few exceptions like PELL grants, be capped at the value of a full
17 grant-in-aid. As a consequence, students like Anthony Kelly of the University of
18 Washington, who received academic awards show up on squad lists with GIA
19 reflecting a reduction in the cost of that athlete's GIA, because the athletic
20 department received a discount due to the students receipt of academic money.[48]
21 Another example in Dr. Ordover's data is David Greene, the star quarterback at the
22 University of Georgia. According to Dr. Ordover, Mr. greenee was not worth the
23 full cost of a GIA because he received a partial scholarship. Mr. greenee was the
24 SEC Offensive Rookie of the year in 2002. He holds the current NCAA Division
25 IA record for games won as a quarterback. He was drafted 85th in the 2004 NFL

26

---

27 [48] Anthony Kelley "received the prestigious Mart Gates Scholarship in 2001, allowing him to study abroad in South Africa."

28

player draft, and received a \$650,000 signing bonus. How Dr. Ordover could imply that Mr. greene was not worth a few thousand additional dollars per year to the athletic department of the University of Georgia simply boggles my mind.

e. There are a few other well-defined categories of athletes, all of whom appear on squad lists at a value less than 1.0. For example, there is the case when a school is punished with the loss of GIAs, and similarly, when a school reaches its maximum use of initial counters, some athletes the school may have less than 85 athletes on football scholarship owing to the annual limitation.

25. Based on my knowledge of these categories of student-athletes, my conclusion is that the vast majority of the very small number of student-athletes in the proposed class who could be identified as receiving less than a 1.0 on a squad list fits into one of these five categories, rather than being a true partial GIA in the sense Dr. Ordover intended. Therefore, what Dr. Ordover called "individuated inquiries" are nothing of the sort. In each case raised by Dr. Ordover, a class-wide determination of whether these student have a claim is easily accomplished. If the court were somehow to conclude that a student who graduated one-third of the way through the class was somehow less harmed during his quarter of attendance than students who finished later in the academic year, that decision could be made in aggregate, without individualized inquiry, and the set of students for which this characteristic applied could be easily ascertained. Of course, it is my opinion that a student who received the maximum GIA available to him under NCAA rules, such as a senior who graduated early, were, in fact, harmed equally as the rest of the class members for the period he was in school, but even if the court were to disagree, no individualized inquiry is needed to make this determination. These are easily identified categories, generally indicated on the squad lists themselves (for example, students who graduate early are generally marked with a "G" on squad lists, students who exhaust their eligibility with an "E," etc.) and are thus easy to deal with in a ministerial manner in a class action setting.

34

26. Based on my review of Dr. Ordover's deposition, I believe that he did not intend to say that a person who only goes to school for half a year, but while in school receives a full GIA has earned a partial scholarship, and yet that is precisely what his analysis does. Nor do I believe that he intended to classify an athlete happens to earn an academic scholarship (and who then by rule had his GIA is reduced by the amount of the academic scholarship), as receiving a partial scholarship when in fact he is receiving the maximum amount of money allowed by NCAA rules from his athletic department. However, when these types of "misrepresentations" are corrected, there are scarcely any partial GIAs left. And thus Dr. Ordover's errors become particularly egregious, because it appears to me to be a primary cornerstone of Dr. Ordover's analysis. Dr. Ordover contends that many football and basketball players would not receive additional financial assistance if the GIA cap were raised based primarily on his analysis of these roster data. He seems to believe that since he thinks that there are a lot of players not getting a full ride that the cap is essentially non-binding. Importantly then, to Dr. Ordover there is class conflict because it would require an individual analysis to determine whether a player would get additional money or not if the cap were raised or eliminated. Never mind whether that analysis is right or wrong (it is wrong in my opinion), his entire understanding is based on errant or erroneous facts and is thereby rendered worthless in my judgment. Dr. Ordover has raised what are imagined concerns, and then provided an analytical framework to demonstrate that his fear of lack of demand on margin was not borne out in the data. His conclusions as to the lack of demand for the student-athletes at the margins of the proposed class are simply wrong.

27. It is of primary importance then for the Court to see that Dr. Ordover's conclusion about class conflict, apparently based on fact, is in truth, based on errant analysis, improper interpretation of data, dead wrong, and totally without any merit at all. While I do not concede that if it were true that there were some players not

35

receiving full aid that there might be class conflict, there is no need to address the issue in any detail because the number of such student-athletes who even plausibly may exist is trivially small. Put bluntly, Dr. Ordover has misinterpreted his own data seriously incorrectly, and his primary conclusions are null and void in my mind by that fact.

28.     Dr. Ordover has also attempted to inject issues of individual inquiry into what are actual class-wide issues by his analysis of a set of schools that he maintains do not use their full allotment of GIA counters, and by doing so claims that this is evidence that schools do not value the marginal student-athletes.

29.     For example, in a sample that Dr. Ordover has admitted is not "representative" but was instead selected for the purpose of finding exemplars of individualized issues , Dr. Ordover found that across 77 school-years, 4 percent of all GIA slots that could have been granted were not. (See Ordover Table 8) While I do not believe that 4 percent is a particularly troublesome result (see below on outliers), based on my expertise with respect to NCAA economics, I can easily identify several flaws in Dr. Ordover's analysis that cause him to substantially overstate (by at more than 100 percent) the frequency with which such issues occur.

a.      Failure to account for the initial counter rule, alone, cut his figure to 2 percent – this is approximately 40 total athletes per year in a non-representative sample.

b.      During the 2001-02 school year which Dr. Ordover displays in Exhibit 4, UW was capped at 84 athletes, not 85. This is easily seen by a review of the squad list, but in Dr. Ordover's analysis, no such formulaic adjustment is made, and so a school in this situation would be shown to be short one GIA. Similar Rutgers had penalties too. In fact, both schools gave the maximum number of scholarships that they could under the NCAA rules and regulations. This is easily handled by data entry if one has sufficient knowledge of how to interpret a squad list to identify this reduction.

36

c.      In certain circumstances, when an athlete who would otherwise be a counter is injured for the season, he can be exempted as a counter, and this frees up a counter slot. This is also accounted for on squad lists and is easily and formulaically addressed. For example, as discussed above, UW had 3 such medical exemptions – three counters who UW paid a full GIA, but whom Dr. Ordover's methodology deems to be unused GIA slots.

d.      Certain other NCAA exceptions allow schools to take high quality players, like Kyle Benn from UW, and consider them as exempt, even though, as in Benn's case, they can be starters on the team. This makes Dr. Ordover's focus on counters only miss a great deal of marginal demand for players. For example, in Exhibit 4, UW has 3 players receiving full GIAs who are exempt (for reasons other than medical redshirting). Thus, while Dr. Ordover's style of analysis would show UW at one under the limit, implying that they did not value another athlete at the cost of a GIA, they had actually given out 6 more full GIAs than the NCAA caps would seem to allow.

30.      Holding a scholarship open has option value to a coach who might wish to motivate several different walk-on players to work sufficiently hard to garner that scholarship.[49] In effect, with the binding annual limits and binding overall limits, coaches in football and basketball must manage their inventories of scholarships, and there are bound to be situations where the optimal inventory is not zero.[50] These limits are easily ascertained by formula and basic examination of the

---

[49] That options have value is hardly disputed in the economics literature.  In fact the Nobel prize has been awarded for scholars exploring the value of options in markets.

[50] The literature in economics is replete with discussions of optimal inventories, even to the point of talking about the optimal unemployment rate as a stock of available workers who can quickly be put to work when demand increases unexpectedly. For casual evidence on this point, note the large number of empty parking spaces one regularly sees in shopping mall parking lots. The fact that almost *no* coach leaves open a scholarship stands in stark contrast to what might generally be expected in such a case and actually provides evidence on the extraordinary value that coaches place on having ever scholarship used. Which, in turn, of course points out how valuable even the marginal or 85th player is to a football team or the 13th player is to a basketball team.

37

1 squad lists and pose no problem for class-wide determination of impact and
2 damages.

3       31.    Thus, the 2 percent figure that one gets from Dr. Ordover's results
4 (after fixing his initial counter error) is itself, clearly an overstatement. I conclude
5 that this is a *de minimis* result that in no way changes my opinion that there is
6 excess demand even for the 85th football and 13th basketball player. Dr. Ordover's
7 analysis in Table 8, rather than providing evidence of a lack of demand for the
8 (poorly names) "marginal athlete" (and thereby a supposed need for individualize
9 inquiry), in fact shows that virtually every GIA slot is used, and in some cases,
10 more than 100 percent are used through clever use of exemptions. Rather than
11 disprove excess demand or demonstrate a need for individualize inquiry, once Dr.
12 Ordover's errors of analysis and interpretation are removed, it shows excess demand
13 in spades, on a class-wide basis, provable with formulaic methods that apply to all
14 proposed class members.

15      32.    Moreover, even if there were outliers, which I have not yet been able
16 to locate, statistics has standard, formulaic ways of identifying and dealing with
17 them. While I find Dr. Ordover's concerns about these rare cases to be somewhat
18 imaginary, nevertheless, *de minimis* outliers are a common issue in economics and
19 standard tools exist for identify and determine the significance thereof. Dr.
20 Ordover's concerns that there are many individualized cases in this matter requiring
21 each situation to be determined separately simply does not fit with the facts as I
22 have seen them.

23      33.    Dr. Ordover seems to admit that many players, but not all, would
24 receive additional aid if the NCAA allowed full GIA's to equal COA. However,
25 what he fails to realize that coaches rarely know who is the star and who is the
26 bench warmer when the deals between coaches on the one hand and student athletes
27 and their parents on the other. It is a regular occurrence for coaches to change their
28 two-deep squad charts in football just before the start of the season, using playing

38

1     time as a motivator. And in college basketball bench warmers one month become

2     stars the next and vice versa. Importantly, in both basketball and football, injuries

3     can devastate a team and players who look marginal because they are sitting on the

4     bench getting little playing time may in fact be extremely valuable insurance

5     policies for a team. Accordingly, since the average player is worth so much and the

6     coaches cannot cheaply or readily parse players into categories, Dr. Ordover is

7     incorrect when he claims that schools would not give full COA aid to all players if

8     the NCAA did not limit those payments to the currently defined "full GIA."

9          I declare under penalty of perjury and to the best of my knowledge and

10    ability the foregoing is true and correct.

11

12    Dated: September 18, 2006

13                                     Robert E. McCormick

39

710359v1/008924

1

## PROOF OF SERVICE

2

I, the undersigned, declare:

3

4

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 950, Los Angeles, California 90067-6029.

5

6

On September 18, 2006, I served the foregoing document(s) described as follows:

7

8

**SUPPLEMENTAL DECLARATION OF ROBERT E. MCCORMICK IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**

9

10

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as follows:

11

\_\_\_\_\_ BY MAIL:
    I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

12

13

14

15

\_\_\_\_\_ BY PERSONAL SERVICE:
    I caused to be delivered such envelope by hand to the offices of the addressee.

16

17

\_\_\_\_\_ BY FEDERAL EXPRESS OR OVERNIGHT COURIER

18

\_\_\_\_\_ BY FAX
    I served by facsimile as indicated on the attached service list.

19

20

  XX  BY ELECTRONIC MAIL
    I caused said documents to be prepared in portable document format (PDF) for e-mailing and served by electronic mail as indicated on the attached service list.

21

22

Executed on September 18, 2006, at Los Angeles, California

23

  XX  (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

24

25

_____     
    Helen Danielson                         
    (Type or Print Name)        (Signature)

26

27

28

MASTER SERVICE LIST

**ATTORNEYS FOR PLAINTIFFS**
Marc M. Seltzer
Stephen E. Morrissey
Steven G. Sklaver
Tibor L. Nagy
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6039
         Telephone: (310) 789-3100
         Fax: (310) 789-3150
email: mseltzer@susmangodfrey.com
email: smorrissey@susmangodfrey.com
email: ssklaver@susmangodfrey.com
email: tnagy@susmangodfrey.com

Maxwell M. Blecher
Courtney A. Palko
BLECHER & COLLINS P.C.
515 S. Figueroa Street, 17th Floor
Los Angeles, California 90071
         Telephone: (213) 622-4222
         Fax: (213) 622-1656
email: mblecher@blechercollins.com
email: cpalko@blechercollins.com

**ATTORNEYS FOR DEFENDANTS**
Gregory L. Curtner
Robert J. Wierenga
Kimberly Kefalas
Atleen Kaur
MILLER, CANFIELD, PADDOCK
  AND STONE P.L.C.
101 North Main Street, 7th Floor
Ann Arbor, MI 48104-1400
         Telephone: (734) 663-2445
         Fax: (734) 663-8624
email: curtner@millercanfield.com
email: wierenga@millercanfield.com
email: kefalas@millercanfield.com
email: kaur@millercanfield.com

David M. Balabanian
Frank M. Hinman
Nora C. Cregan
Farschad Farzan
BINGHAM MCCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
         Telephone: (415) 393-2000
         Fax: (415) 393-2286
email: david.balabanian@bingham.com
email: frank.hinman@bingham.com
email: nora.cregan@bingham.com
email: farschad.farzan@bingham.com

**APPENDIX E**

**Some Facts Concerning Modern Recruiting in Major College Athletics**

Football is the largest intercollegiate sport in terms of scholarships per team. For the 120 Division I, Football Bowl Subdivision teams, each school is able to offer 85 full-ride scholarships to play football. Each team is also limited to 25 scholarships per season, as long as it does not take them over the 85 scholarship limit (except as noted below on oversigning). Approximately 3,000 high school football players are being recruited in a given year.[1]

ESPN reports the approximate annual expenditures on football recruiting for most of the major college programs.[2] As example, the University of Alabama, national champions this past season, has spent almost a million dollars each of the past two seasons.

The 120 FBS schools paid $319,053 on average on football recruiting in 2011, and over $31 million as a whole, and some of the smaller schools are near the top.[3]

The popularity of college football recruiting is incontrovertible. It has become such a part of college football's national landscape that at least one analyst asserts that elements of the recruiting season are often more anticipated than the season itself.[4] Internet sites such as Rivals.com, Scout.com, and ESPN.com, arguably the three flagship recruiting venues, enroll thousands of subscribers and draw tens of millions of viewers to their main websites (Feldman 8; Mandel 140-141), and the sports personalities that specialize in recruit talk, such as Tom Luginbill and Tom Lemming, have become permanent fixtures on the media circuit.[5] Major universities have sizable recruitment budgets, and coaches are often judged as much on their recruiting acumen as they are their knowledge of football Xs and Os (Feldman; Curtis 159-162).[6]

---

[1] This number ignores the lower levels of the NCAA such as the Football Championship Subdivision, Division II and III and the National Association of Intercollegiate Athletics.

[2] http://espn.go.com/college-sports/recruiting/football/story/_/id/8041461/the-cost-recruiting.

[3] For an interesting take on the regional impacts of recruiting, see Vaughn May, "Planes Don't Fly North:College Football Recruiting and the Oppositional South," *Studies in Popular Culture* Spring 2012online at www.pcasacas.org/SiPC/34.2/May.pdf.

[4] Low, Chris. "SEC's Recruiting Needs: Western Division." Espn.com. ESPN, 28 Jan. 2011. Web. 11 July 2011. http://espn.go.com/blog/sec/post/_/id/19452/sec-recruing-needs-western-division.

[5] Feldman, Bruce. Meat Market: Inside the Smash-Mouth World of College Football Recruiting. New York: ESPN Books, 2007. Mandel, Stewart. Bowls, Polls, & Tattered Souls. 2nd ed. Hoboken: John Wiley & Sons, Inc., 2008.

[6] Curtis, Brian. Every Week a Season: A Journey Inside Big-Time College Football. New York: Random House, 2005.

SEC teams, on average, invest well over a half a million dollars a year on football recruitment (Wieberg).[7]

The current versions of Rivals.com and Scout.com are about a decade old (Feldman 8), and shows like ESPN's Recruiting Insider have aired for the past few years. This business has spawned a number of other smaller enterprises; other professional recruiting services sell their valuable high school game films to colleges as well (Feldman 9). Unlike the actual football season, recruiting is not confined to a few months in the fall, but is instead a year-round spectacle, extending from the first recruiting rankings in the early spring to the next year's February signing day.

### Junior Days[8]

Under NCAA rules, a high school junior cannot receive a written scholarship offer until September 1. Before that date, prospects can only receive written correspondence from schools such as camp brochures and questionnaires. But with that said, so-called Junior Days have become the norm.[8]

But that does not mean college football coaches cannot make verbal scholarship offers to a prospect while he's visiting their campus on unofficial visits. Under NCAA rules, a prospect attending Junior Day must pay for his own transportation to campus and has to pay for his hotel room if he stays overnight. At Texas, prospects register around 8:30 a.m. and stay on campus for about seven or eight hours. Recruits can't make an official visit to a school, in which the school is allowed to pay for transportation, meals and lodging, until September 1 of the player's senior year of high school.

Georgia defensive line coach Rodney Garner, who oversees the team's recruiting efforts, said the Bulldogs hosted about 150 prospects on campus at two Junior Days in early 2013. Georgia has two more Junior Days planned this spring. "You have to show the players different aspects of your program each time," Garner said. "You have to make sure kids won't get bored. You don't want someone telling you, 'Well, I was at the first junior day and the second junior day, why should I come to this one?' Obviously, the more you can get a player on campus, the better chance you have of signing him. If I've had a young man on campus four times, and he's only been to another school once, I like my chances of getting him."

Garner said the Bulldogs' first junior day took place on the last weekend of official visits for current high school seniors in January 2013. Prospects learned about the school's strength and conditioning program and academics. The second junior day took place in late February. Prospects learned about the school's sports medicine program and the team's philosophies on offense and defense. Prospects also attended Georgia's home basketball game against Florida.

---

[7] Wieberg, Steve. "Will the North Ever Be Able to Rise Again in College Football?" *USA Today.* Gannett Co. Inc., 31 Aug. 2010. Web. 12 July 2011.

[8] See Mark Schlabach, "Junior days get mixed results, reviews," online at http://sports.espn.go.com/ncaa/recruiting/football/columns/story?columnist=schlabach_mark&id=4956171.

A third junior day [was] planned around spring practice in late March 2013, and a fourth junior day [took] place at Georgia's annual spring G-Day game at Sanford Stadium on April 10, 2013.

**Preferred Walk-On's**
Recruited walk-ons are essential to the world of college football. There is a reason your favorite team has 85 scholarships but near 130 players on the roster. Between greyshirts and preferred walk-ons, the bulk of those extra guys were accomplished ballplayers in their own rights. Some of them are the not-as-good teammates of scholarship guys. Some of these players are legacy guys whose dad or brother was a standout and the school wants to see if they can grow into a ballplayer given time. These kids get the same letters and invites to games as the scholarship members of a recruiting class. They take visits and get phone calls from coaches, meet with the coach before making their decision on their future and discuss where the opportunity for them to succeed exists.

**Oversigning**
Oversigning is the practice of signing on National Signing Day more than the allotted 25 players, and then weeding through them so that by August, the number is reduced to 25, or less. Oversigning is evidence that players are worth far more than their cost of scholarships. In 2013 a new NCAA bylaw limits schools to 28 signees between Signing Day and May 31. Unchanged is the rule that declares schools can bring in only 25 new scholarship players each academic year. Also unchanged is the rule that allows schools to have only 85 total players on scholarship at a given time.

The NCAA rule was sponsored by the SEC, home to some of the nation's most notorious oversigners. The SEC passed its own rule in 2009, and that rule was in place last year when Auburn signed 32 players and LSU signed 29.

**An Anecdotal Example of the Intensity of Recruiting as a Matching Process**
As mentioned earlier in my Report regarding the intensity of recruiting, I cited the example of Gainesville GA high school standout, DeShaun Watson. Note the following about the matching process that is recruiting:[9]

Speedster RB thinking "dangerous combination" with Deshaun Watson recruiting cycle told TigerNet this week that his visit to Clemson for the annual Orange and White Game was his best visit he has taken so far. He also will be back on campus for Dabo Swinney's high school camp and will take an official visit when the Tigers take on Georgia in the season opener.

Stanley "Boom" Williams, a 4-star prospect out of Bethlehem (GA) George Walton Academy is a former University of Georgia commit who has been on the Tigers' radar for a while, but the interest has been taken up a notch on both sides after the de-commitment of Dalvn Cook a few weeks ago.

---

[9] Nikki Steele, "Speedster RB thinking 'dangerous combination' with Deshaun Watson," April 24, 2013 10:33 AM, Tigernet, online at http://www.tigernet.com/view/story.do?id=11648.

Williams told TigerNet that the visit was his best so far.

"It was the best visit I have taken so far," he said. "Everything about the visit was great and I can't wait to get back up there."

He then detailed his thoughts on the visit and what he saw out of Clemson's offense.

"I went up and watched the game and then had a meeting with Coach [Tony] Elliott and Coach [Chad] Morris," he said. "Springtime is just a time to see where you are. They didn't play the starters that much so we only got to see them for one series. They came out and looked like they were ready for the upcoming season. I thought they played the game well and wrapped up what they have done so far this year."

What message did Clemson's coaches have for the 5-9, 190-pound speedster who has been clocked at 4.39 in the 40-?

"I was talking to Coach Elliott and he was telling me he would be happy to have me as one of his running backs at Clemson," Williams said. "I just need to do what I need to in order to make it happen. Talking with Coach Morris, he obviously calls the plays and he was telling me how he would get me the ball. He was just saying that he would put the ball in my hands and put me in the best position to score."

Williams said he is still taking a look at all of his top schools and doesn't want to name a leader, but it was clear he is excited about the chance to possibly play with fellow Peach State star and 2014 Clemson commit Deshaun Watson .

 "I'm pretty much just exploring my options. Clemson is one of my top schools, and I am talking with them," he said. "I want to stay in touch, and I will definitely be there for camp, and Deshaun will be there for camp. We will definitely both be there for the first game when they open with Georgia, and I am looking forward to that.

 "I think playing with him would make us a pretty dangerous combination with me running the ball and it could open up the passing game for him to get the ball to the tight ends and wide receivers to make some plays. I think it would definitely be something different and something that everybody would want to see. I definitely think it would be fun and it is definitely an option."

 Williams said that he can't wait to get back to Clemson for the game against the Bulldogs.

 "They are two great teams and they are well-coached," he said. "Coach Swinney and Coach [Mark ] Richt both have a reputation for winning big games. It is a big game for both teams opening up the season. It is going to be a fun game just to see how it turns out and I wish Georgia the best of luck and Clemson the best of luck."

Last season at George Walton, Williams carried the ball 207 times for 1,928 yards and 24 touchdowns.

This story highlights the intensity and details of the matching process that is modern NCAA major college athletics recruiting.

**APPENDIX F**
**Additional Materials Upon Which I Relied**

In addition to the materials documents, websites, and books I have cited in the body of my report, I have examined the following materials.

| |
|---|
| NOTICE OF MOTION AND MOTION BY ANTITRUST PLAINTIFFS FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| Videotaped deposition of ALAN J. COX, PH.D., |
| The Economics of Consumer-Managed FirmsAuthor(s): Richard K. Anderson, Philip K. Porter and S. Charles MauriceSource: Southern Economic Journal, Vol. 46, No. 1 (Jul., 1979), pp. 119-130Published by: Southern Economic AssociationStable URL: http://www.jstor.org/stable/1057007 |
| Factor Usage by Consumer-Managed FirmsAuthor(s): Richard K. Anderson, S. Charles Maurice and Philip K. PorterSource: Southern Economic Journal, Vol. 47, No. 2 (Oct., 1980), pp. 522-530 |
| The Relative Efficiency of Public and Private Firms in a Competitive Environment: The Caseof Canadian RailroadsAuthor(s): Douglas W. Caves and Laurits R. ChristensenSource: Journal of Political Economy, Vol. 88, No. 5 (Oct., 1980), pp. 958-976Published by: The University of Chicago Press |
| The Chronicle of Higher Education February 5, 1999 Changes at Elite Colleges Fuel Intense Competition in Student Aid BYLINE: BEN GOSE SECTION: STUDENTS; Pg. A42 |
| Clemson offers 2015 WR by TigerNet Staff - Thursday, April 18, 2013 11:19 AM |
| The distribution of wins in professional team sports most consistent with the maximization of league profits. |
| DECLARATION OF ALAN J. COX REGARDING CLASS CERTIFICATION |

An economic analysis of cartel behavior within the NCAA

CONTRIBUTORS:
Author:  DeSchriver, T. D. (University of Massachusetts at Amherst)
Author:  Stotlar, D. K. (University of Northern Colorado)
JOURNAL:
Journal of Sport Management [JSM], 10(4), 388 - 400.
YEAR: 1996

DOJ Consent Decree - sixmile.bozeman@gmail.com - Gmail

Expert Report of James J. Heckman
In re: NCAA Student-Athlete Name and Likeness Licensing Litigation

Expert Declaration of D. Rascher

 Agency Problems and Residual ClaimsAuthor(s): Eugene F. Fama and Michael C.
JensenSource: Journal of Law and Economics, Vol. 26, No. 2, Corporations and Private
Property: AConference Sponsored by the Hoover Institution (Jun., 1983), pp. 327-349

Separation of Ownership and Control
Eugene F. Fama; Michael C. Jensen
Journal of Law and Economics, Vol. 26, No. 2, Corporations and Private Property: A
Conference
Sponsored by the Hoover Institution. (Jun., 1983), pp. 301-325.

Report to Congressional Committees
United States Government Accountability Office
GAO
HIGHER EDUCATION
Schools' Use of the Antitrust Exemption Has Not Significantly Affected College Affordability
or Likelihood of Student Enrollment to Date

March 2013Estimating the MRP of Collegiate Athletes
From Professional Factor Shares*

Brian Goff   & Dennis Wilson

Department of Economics
Western Kentucky University

**Antitrust and Higher Education: Was There a Conspiracy to Restrict Financial Aid?**

Dennis W. Carlton; Gustavo E. Bamberger; Roy J. Epstein

*The RAND Journal of Economics*, Volume 26, Issue 1 (Spring, 1995), 131-147.



Jensen and Meckling, Agency Costs, Journal of Financial Economics, 1976

declaration of Kevin Lennon

White Case

**DECLARATION OF ROBERT E. MCCORMICK IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**

White Case

**SUPPLEMENTAL DECLARATION OF ROBERT E. MCCORMICK IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**

**Athletics versus Academics? Evidence from SAT Scores**

Robert E. McCormick; Maurice Tinsley

*The Journal of Political Economy*, Vol. 95, No. 5 (Oct., 1987), 1103-1116.

 Price Fixing among Elite Colleges and UniversitiesAuthor(s): Richard MorrisonSource: The University of Chicago Law Review, Vol. 59, No. 2 (Spring, 1992), pp. 807-835

Stipulated Protective Order Regarding Confidentiality of Documents and Materials

NCAA Second Consolidated Amended Complaints 5-16-11

Noll Expert Report, Appendices, Exhibits

Chronicle of Higher Education

January 30, 1998

Princeton Plans Major Increase in Aid for Middle- and Low-Income Students;
Its move may force other top colleges to change policies -- if they can afford to

BYLINE: Ben Gose

SECTION: STUDENTS; Pg. A35

7 December 2009
Groundhog Day: Recurring Themes on
Reasonable Royalties in Recent IP Damage Cases
By Dr. Elizabeth M. Bailey, Dr. Alan Cox, and Dr. Gregory K. Leonard1

The Chronicle of Higher Education

October 6, 2006 Friday

Report Gauges Effect of Data Sharing

BYLINE: SARA HEBEL

SECTION: GOVERNMENT & POLITICS; Pg. 22 Vol. 53 No. 7

Journal of Intercollegiate Sport, 2010, 3, 3-21
©2010 Human Kinetics, Inc.
An Economic Look at the Sustainability
of FBS Athletic Departments
Rodney Fort
University of Michigan

**The Analytics of the Pricing of Higher Education and Other Services in Which the Customers Are Inputs**

Michael Rothschild; Lawrence J. White

*The Journal of Political Economy*, Volume 103, Issue 3 (Jun., 1995), 573-586.



IZA DP No. 2175
Rottenberg and the Economics of Sport
after 50 Years: An Evaluation
Peter J. Sloane
D I S C U S S I O N P A P E R S E R I E S
Forschungsinstitut
zur Zukunft der Arbeit
Institute for the Study
of Labor
June 2006

Expert Report of Dr. Rubinfeld

 Economic Rent and the Industry Supply CurveAuthor(s): A. Ross ShepherdSource: Southern Economic Journal, Vol. 37, No. 2 (Oct., 1970), pp. 209-211Published by: Southern Economic Association

Speedster RB thinking "dangerous combination" with Deshaun Watson
 by Nikki Steele -- Staff Writer - Wednesday, April 24, 2013 10:33 AM

Expert Report of Dr. Stiroh

NCAA Scholarship Limits and
Competitive Balance in College Football
DANIEL SUTTER
University of Oklahoma
STEPHEN WINKLER
The Oklahoma Publishing Company

KYKLOS, Vol. 35 – 1962 – Fasc. 4, 575–602

**RENT SEEKING: A SURVEY**

ROBERT D. TOLLISON*

The Chronicle of Higher Education
February 18, 2000
Tuition Discounting May Rankle, but It Has Become Widespread
BYLINE: BEN GOSE
SECTION: STUDENTS; Pg. A62

A Note on Economic RentAuthor(s): Robert H. WesselSource: The American Economic
Review, Vol. 57, No. 5 (Dec., 1967), pp. 1221-1226Published by: American Economic
AssociationStable URL: http://www.jstor.org/stable/1814405