# Exhibit 161

Redacted Version

Provisionally Filed Under Seal

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| **In re NCAA Student-Athlete Name and Likeness Licensing Antitrust Litigation** | **Case No. 09-cv-1967-CW** |

**EXPERT SUR-REPLY REPORT OF DANIEL L. RUBINFELD**
**REGARDING CLASS CERTIFICATION**

May 30, 2013

I.      Introduction ................................................................................................. 3
II.     Summary of Opinions ................................................................................. 3
III.    The NCAA Is Appropriately Analyzed as a Joint Venture ....................... 5
IV.     Professor Noll Assumes his Conclusion .................................................... 7
   IV.A.    Amateurism .......................................................................................... 7
   IV.B.    Plaintiffs Characterizations of the Damages and Injunctive Classes Are
   Inconsistent ................................................................................................. 11
   IV.C.    Group Licensing Opportunities Cannot Be Analyzed In Isolation ............... 12
   IV.D.    Plaintiffs Experts Agree that There Are Many "Reasonable" Outcomes...... 15
V.      Professor Noll's But-For World Is Not Supported by Professional Sports Yardsticks
        17
   V.A.     Professor Rascher's European Football Analogue Demonstrates Diversity in
   Outcomes ..................................................................................................... 21
VI.     Professor Noll's But-For World Is Not Supported by Bargaining Theory ............ 23
   VI.A.    Bargaining Theory Does Not Support a 50 percent Allocation to the Group of
   Student-Athletes ........................................................................................... 23
   VI.B.    Bargaining Theory Does Not Support Equal Sharing among Student-Athletes
        26
VII.    There Would Be Substantial Rematching .......................................... 26
   VII.A.   Plaintiffs Experts Do Not Fundamentally Disagree ..................................... 26
   VII.B.   Rematching Is Basic Economics .................................................. 28
   VII.C.   Professor Noll's Rebuttal Report Quantifies These Substantial Differences 29
   VII.D.   Revenue Differences Are Substantial and Pervasive ................................... 30
   VII.E.   Rematching Raises Class Certification Issues for Both the Injunctive Class
   and the Damage Class ................................................................................... 32
   VII.F.   The Coase Theorem Sheds No Light on Extent of Rematching .................. 32
   VII.G.   Plaintiffs' MLB Reserve Clause Analogy Sheds No Light on Rematching . 35
   VII.H.   Current Recruiting Competition Does Not Lead to Same Outcome ............ 37
   VII.I.   The Ivy League Experience Does Not Shed Light on the Extent of
   Rematching Here ........................................................................................... 40
   VII.J.   The Economics of Re-Matching in the Current Case Are Vastly Different
   from White ................................................................................................... 41

## I.   INTRODUCTION

1. I am the Robert L. Bridges Professor of Law and Professor of Economics Emeritus at the University of California, Berkeley and Professor of Law at New York University.   Previously I submitted a report in this matter analyzing economic issues relevant to class certification.[1]   My qualifications are detailed in that report.   A current CV appears as Attachment A to this report and a current list of deposition and trial testimony appears as Attachment B.

2. I have been asked by counsel for the National Collegiate Athletic Association ("NCAA") to review the Reply Brief of Antitrust Plaintiffs in Support of Motion for Class Certification[2] and the supporting expert reports of Robert McCormick,[3] Roger Noll,[4] and Daniel Rascher[5] and to analyze economic issues raised by those materials.   A list of additional materials considered in forming the opinions in this report is attached as Attachment C.

## II.   SUMMARY OF OPINIONS

3. The NCAA is appropriately analyzed as a joint venture.   The NCAA is a partially-integrated joint venture between schools and athletic conferences for the purpose of facilitating intercollegiate athletics.   Professor Noll concedes that the NCAA has a place in college sports and that its existence can benefit student-athletes and college athletics.   It is not a classic cartel, whose purpose is to reduce output and to raise prices. Any assessment of the competitive effects of the conduct challenged by plaintiffs should be analyzed using an appropriate economic framework for evaluating joint ventures.

4. Professor Noll has failed to put forward an appropriate economic methodology for assessing impact and damages using common evidence.   Indeed, Professor Noll has now made clear that he is essentially assuming his conclusion of class-wide

---

[1] Expert Report of Daniel L. Rubinfeld Regarding Class Certification, March 14, 2013 ("Rubinfeld Report").

[2] Reply Brief of Antitrust Plaintiffs in Support of Motion for Class Certification, April 25, 2013 ("Reply Brief").

[3] Rebuttal Report of Dr. Robert McCormick in Support of Antitrust Plaintiffs' Motion for Class Certification ("McCormick Report"), April 25, 2013.

[4] Reply Report on Class Certification of Roger G. Noll, April 25, 2013 ("Noll Reply Report").

[5] Declaration of Daniel A. Rascher in Support of Motion by Antitrust Plaintiffs for Class Certification, April 24, 2013 ("Rascher Declaration").

impact.  His conclusion is based upon the assumption that the essential feature of amateurism is equal pay (irrespective of how substantial) across athletes on a particular team.  He thus assumes that every conference would enter into group licenses or related agreements with student-athletes requiring that athletes share the proceeds equally.  He concedes that athletes have wide ranging values to schools and that if individual licensing were allowed, impact and damages could not be demonstrated using class-wide proof.

5.   If the 32 conferences at issue in this litigation were to compete with each other on sharing of licensing revenues, there would not be a single equilibrium "price" as Professor Noll asserts.  Rather, differently situated conferences would choose from a wide range of possible outcomes – including leaving Division I.  An analysis of competitive outcomes would only be possible through a highly individualized conference by conference or even school by school inquiry.

6.   Even if it is appropriate for Plaintiffs to exclude individual licensing opportunities (and other individualized forms of compensation) from their construction of the challenged conduct for the damages class, this does not mean that these opportunities can be ignored, as Professor Noll does.  The reasonableness of group licensing outcomes depends importantly on the other opportunities that are available.  Critically, Professor Noll fails to evaluate the plausibility of group licenses in the context of available individual licensing opportunities – indeed he just assumes these individual opportunities away.

7.   Neither Professor Noll's assumption that student-athletes would earn 50 percent of licensing revenues, nor his assumption that all student-athletes on a roster would share these proceeds equally is supported by the economic theory of bargaining. Nor is Professor Noll's but-for world supported by analogies to professional sports.   Indeed, Professor Noll's equal-sharing assumption is inconsistent with the wide variation in compensation among professional athletes. To the extent that Professor Noll is relying on professional sports as supportive of his opinions, his analysis is fatally flawed because he has failed to control for the fundamental differences between the NCAA and the professional sports yardsticks that he relies on.

8. As Professor Noll's new calculations for all conferences make clear, in his but-for world there would be very substantial differences in the licensing revenue offered by different schools. It is basic microeconomics that such large financial incentives will influence student-athletes' choices, and Professor Noll does not disagree. This will lead to substantial re-matching between schools and student-athletes which would require individualized inquiry for purposes of evaluating the impact on both the damages class and the injunctive class.

9. Neither the opinions offered by Professor McCormick nor the opinions offered by Professor Rascher shore up the fundamental flaws in Professor Noll's analysis. As discussed in more detail below, Professor McCormick's opinions are particularly devoid of meaningful support and are the results of a deeply flawed and vastly oversimplified application of economic theory. Professor Rascher's opinions, if anything, demonstrate that there are a wide range of potential outcomes that are available in Professor Noll's but for world and that the competitive "chaos" that Professor Noll's but-for world would entail is impossible to evaluate using class-wide proof.

10. This report is not intended to be a point by point rebuttal of plaintiffs' experts' reply reports. Rather, in what follows I address only particular criticisms. Silence on a particular issue should not be taken to mean that I agree with the critique.

## III.   THE NCAA IS APPROPRIATELY ANALYZED AS A JOINT VENTURE

11. The purpose of the Rubinfeld Report and this Sur-Reply Report is to address class certification issues. These reports are not the appropriate forum for a full economic analysis of liability issues, but I discuss briefly here the broad economic framework that is appropriate for evaluating Plaintiffs' allegations. The NCAA is a partially-integrated joint venture between schools and athletic conferences for the purpose of facilitating intercollegiate athletics.[6] An appropriate antitrust economics evaluation of NCAA conduct would follow the joint venture guidelines set forth by the Antitrust Division of the Department of Justice and the Federal

---

[6] Per Article 1.3.1 of the 2012-13 Division I Manual, "[a] basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports."

Trade Commission.[7]   The Guidelines build on existing case law, relevant economics, and when appropriate other Guidelines.[8]   They encompass both horizontal and vertical business practices.[9]   The Guidelines make clear an important distinction between practices that are reasonably necessary to achieve the pro-competitive benefits of the joint venture and those that are not.

12. Seen from an economic perspective, the NCAA is a joint venture whose goals (spelled out broadly in the NCAA's constitution) are to "promote and develop educational leadership, physical fitness, athletics excellence and athletics participation as a recreational pursuit."[10]   The NCAA is not a traditional "cartel" – a horizontal agreement that involves naked restraints on price and/or output.[11]   While Professor McCormick labels the NCAA as a cartel (without any supporting analysis) this does not change the appropriate economic framework for analyzing its competitive effect. The NCAA is a joint venture that has both vertical and horizontal elements in its structure.[12]

13. The joint venture framework is a standard economic approach for evaluating the competitive effects of sports leagues.[13]   Professor Noll and Professor Rascher

---

[7] "Antitrust Guidelines for Collaboration Among Competitors," Federal Trade Commission and the U.S. Department of Justice, April 2000, available at <http://www.ftc.gov/os/2000/04/ftcdojguidelines.pdf>, accessed May 20, 2013.

[8] I served as Deputy Assistant Attorney General for Economics when these Guidelines were developed, and I played an active role in the development process.

[9] Within the collaborations covered by the Guidelines is the special case of a horizontal agreement to fix prices and/or restrict output.

[10] Article 1.2, 2012-2013 NCAA Division I Manual. See also: Article 1.3.1.  The NCAA also describes its mission as "provid[ing] student-athletes with a competitive environment that is safe and ensures fair play."  "Health And Safety," *NCAA.org*, 2013, available at <http://www.ncaa.org/wps/wcm/connect/public/ncaa/health+and+safety/index.html>, accessed May 28, 2013.

[11] In my textbook *Microeconomics,* I define a cartel to be a "market in which some or all firms explicitly collude, coordinating prices and output levels to maximize joint profits."  Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 8th Edition, 2012, Chapter 12.

[12] In her order, Judge Wilken wrote: "Because O'Bannon has not alleged a horizontal agreement and because his antitrust theory is novel, the Court does not apply a per se rule of illegality.  Thus, the Court subjects O'Bannon's allegations to a rule of reason analysis." Order on NCAA's and CLC's Motions to Dismiss, *Edward O'Bannon, on behalf of himself and all others similarly situated v. National Collegiate Athletic Association and Collegiate Licensing Company, and Craig Newsome, on behalf of himself and all others situated v. National Collegiate Athletic Association and Collegiate Licensing Company*, No. C09-1967 CW, pp. 9-10, February 8, 2010.

[13] For a broad discussion of its applicability to sports, see Flynn and Gilbert, "The Analysis of Professional Sports Leagues as Joint Ventures," *The Economic Journal,* Vol. 111.469, February 2001, pp. 27-46. For a more specific discussion in the context of the NCAA, see Rascher and Schwarz "'Amateurism'

appear to agree that this is the appropriate framework for analyzing the competitive effects of the challenged conduct in this case. Professor Noll appears to concede that the NCAA, in general, has a valid business purpose.[14] However, he argues that the particular restrictions being challenged here are not necessary to achieve this purpose. The analysis of liability he presents in his report proceeds under this framework.[15] In his published writings, Professor Rascher has talked through a similar framework for evaluating the NCAA's restrictions on student-athlete compensation.[16] I understand that this is generally the framework that the courts – including the Supreme Court in *Board of Regents* – have applied when analyzing allegations of anticompetitive conduct by the NCAA and that using this framework these courts have deemed the NCAA's amateurism rules procompetitive.[17]

## IV.   PROFESSOR NOLL ASSUMES HIS CONCLUSION

## IV.A.   Amateurism

14. In his reply report and subsequent deposition, Professor Noll makes it clear that he is assuming his conclusion that common evidence can be used to demonstrate impact and damages. Plaintiffs argue that NCAA restrictions for compensating athletes are not in place to preserve amateurism but rather to reduce costs of the NCAA and its member institutions.[18]

15. In his rebuttal testimony, Professor Noll asserts that "the NCAA regards a ban on

---

in Big-Time College Sports," *Antitrust*, Spring 2000, pp. 51-56, and McKenzie and Sullivan, "Does the NCAA Exploit College Athletes? An economics and legal reinterpretation," *The Antitrust Bulletin*, Summer 1987, pp. 373-399; McKenzie, Richard B. and Gordon Tullock, *The New World of Economics*, Sixth Edition, 2012, pp. 325-338.

[14] Deposition of Roger G. Noll, Ph.D., Volume II, May 22, 2013, (hereinafter "Noll Reply Deposition"), p. 676.

[15] Expert Report on Class Certification of Roger G. Noll, Ph.D., August 31, 2012 (hereinafter "Noll Report"), p. 75.

[16] Daniel A. Rascher and Andrew D. Schwarz, "'Amateurism' in Big-Time College Sports," *Antitrust*, Spring 2000.

[17] *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma and University of Georgia Athletic Association*, Supreme Court of The United States, Decided June 27, 1984, ("Board of Regents"), p. 9.; *Joseph Agnew, et al. v. National Collegiate Athletic Association*, United States Court of Appeals for the Seventh Circuit, No. 11-3006, June 18, 2012, (hereinafter, "*Agnew*"), pp. 25-26, 31.

[18] Noll Report, pp. 74-85.

performance-based individualized pay as an essential feature of amateurism."[19] He defines "performance-based individualized pay" as a payment which depends on specific characteristics of the individual athlete, but not to include pay (irrespective of how substantial) that is, for example, equal across athletes on a particular team.[20] Relying on this fundamentally flawed definition, he models the allegedly anticompetitive conduct (at least for the purposes of the damages class) as any NCAA restriction on equal payments to student-athletes above permitted financial aid.

16. Professor Noll asserts that this is a "less restrictive" alternative to the current restrictions that would still preserve the goal of amateurism, but he provides no support for this. To the contrary, I understand that the NCAA, in the context of its principle of amateurism, defines pay to include monetary rewards in excess of allowable grant-in-aid amounts to athletes based on their athletic *participation,* not just their individual performance.[21] According to Kevin Lennon, Vice President of Academic and Membership Affairs at the NCAA, NCAA rules restricting an agreement to pay or a promise to pay a student-athlete in exchange for permission to broadcast a sporting event "are an important part of Division I's approach to amateurism and student-athlete eligibility, and apply to far more behavior than paying student-athletes for appearing in live broadcasts or rebroadcasts."[22]

17. There is no evidence that the NCAA views large payments to student-athletes as consistent with the principles of amateurism. Nor is there any evidence that equal payments to all players on a roster are a key principle of amateurism. Indeed, this is belied by the actual system of scholarships – some putative class members

---

[19] Noll Reply Report, p. 3 (see also p. 20).

[20] Professor Noll narrowly interprets my testimony with respect to the definition as pay that is based on individual characteristics of a particular student-athlete's on-field performance (Noll Reply Report, p. 58). As the broader context of my testimony should make clear, I was not attempting to offer a specific opinion on the definition of amateurism (Deposition of Daniel L. Rubinfeld, April 22, 2013 (hereinafter "Rubinfeld Deposition"), pp. 51-52 and 59-60). Nor was I attempting to suggest that the NCAA would view paying athletes tens or hundreds of thousands of dollars per year – as long as all athletes on a team received the same amount – as consistent with the principles of amateurism.

[21] For example, the NCAA Bylaws addressing amateurism define a "Professional Athlete" (as contrasted with an amateur athlete) as "one who receives any kind of payment, directly or indirectly, for athletics *participation*…" (emphasis added) (Article  12.02.4, 2012-2013 NCAA Division I Manual)

[22] Declaration of Kevin Lennon, (March 14, 2013), ¶ 23.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 8

receive scholarships while others (walk-ons) do not. Professor Noll has not pointed to any other organization that defines amateurism in the same way.[23]

18. Professor Noll's unsupported definition of amateurism (and the resulting construction of the allegedly anticompetitive conduct) leads directly to his conclusion that impact and damages can be demonstrated using common evidence. As he clearly explains:

> The NCAA regards a ban on performance-based individualized pay as an essential feature of amateurism. I assume that during the class period for the damages class the rules of the NCAA and its member conferences would have prohibited individually negotiated payments for participation in games, including the use of the names, images and likenesses (NILs) of student-athletes in televised games, clips from those games, and video games. Thus, I assume that, as a result of these rules, all members of a college team would participate in a group license for the use of the NILs of all members of the team and receive an equal share of licensing revenue from the sale of these group NILs.[24]

19. Professor Noll's "methodology" can be summarized as follows:

    a. Assume that student-athletes possess rights to their name, image, and likeness.

    b. Assume that, in the but-for world, the NCAA would prohibit individual licenses, but allow group licenses with equal payments.

    c. Assume that all conferences would enter into such group licenses or related agreements with all student-athletes.[25]

    d. Assume that all such agreements would identically provide for 50 percent

---

[23] While he asserts that this definition of amateurism is consistent with the definition of other organizations, he has not provided any evidence (nor have I seen any) that there are any organizations that use this definition (Noll Reply Deposition, pp. 561-564. Noll Report, pp. 86-90).

[24] Noll Reply Report, pp. 3-4. See also Noll Reply Report, p. 71 ("[e]qual sharing arises because in the but-for world the NCAA is assumed to require it for the purposes of preserving amateurism.").

[25] Professor Noll's methodology, which assumes that group licenses would be entered into before the start of each season, would provide payment for student-athletes who may not have actually appeared in any game broadcast. Noll Reply Report, pp. 21 and 62 and Deposition of Roger G. Noll, Ph.D., Volume I, February 27, 2013 (hereinafter "Noll Deposition"), p. 336; Rascher Declaration, ¶¶ 16-17. This methodology expands the damages class definition put forward by plaintiffs, which only include student-athletes who "have been" to include student-athletes who have not been included in a broadcast. In their reply brief, plaintiffs seek to get around this by adjusting their class definition to include student-athletes who "*could have been included (by virtue of their appearance in a preseason roster)*." (Reply Brief, pp. 5-6). I also note that Professor Noll's updated damages calculations in his reply report do not even follow this methodological assumption in that he uses new roster data which he testified are end-of-season rosters. Noll Reply Deposition, p. 498.

of the revenues being allocated to the group of student-athletes.

    e.   Assume that all such agreements would identically provide that student-athletes' share of these revenues would be shared equally among all individual student-athletes on a team's roster.

20. Professor Noll has assumed that the NCAA would replace the challenged restriction with another arbitrary and unsupported restriction which he asserts is "less restrictive" (one that happens to produce similar outcomes across class members).

21. This is not a proper economic methodology. As discussed in more detail below, Professor Noll has not pointed to a single example where other sports leagues share broadcast revenue through a group license, as opposed to individually negotiated contracts. He has offered no analysis of why different conferences offering differentiated products – with different competitive positions, different objectives, and different histories – would have reached the exact same market outcome. Indeed, such an analysis is not possible without conducting an individualized conference-by-conference and school-by-school inquiry into how each conference would respond to Professor Noll's hypothesized new restrictions.

22. The vastly oversimplified but-for world assumed by Professor Noll stands in stark contrast to the world predicted by Professor Rascher, with his colleague Mr. Andrew Schwarz,[26] in their writings outside of litigation. They argue that, after removing the NCAA restriction on compensation, the reaction of conferences to easing of NCAA restrictions would vary widely:

> Some conferences might choose to allow their members to pay market rates to athletes in order, as procompetitive joint ventures, to attract top-notch talent and yet maintain competitive balance among the conference members. Other conferences might seek to create salary minima and maxima, which, in the context of the conference as procompetitive joint venture, might survive a similar rule of reason inquiry. Some conferences might choose to remain at the current level of in-kind-only payments, i.e., current NCAA-style amateurism, and seek to differentiate themselves in the market not by attracting the top talent, but instead by offering the "real thing" to those fans who truly prefer this method of

---

[26] Mr. Schwarz is also assisting Professor Noll in this matter (Noll Report, p. 5).

compensation. Finally, an Ivy League structure, where there are no athletic scholarships, might be adopted by some conferences.

Fans would be offered a wide variety of college sports options. The players would also be able to choose among programs and compensation schemes. There would be a diversity of offerings in the market, and these offerings could compete, on the field/court as before, and off the court in the hearts (and wallets) of the fans. The NCAA might argue that this would be chaos, but this chaos is typically defined in the antitrust literature as a competitive marketplace.[27]

23. This is entirely consistent with the opinions in the Rubinfeld Report regarding the inability to demonstrate impact using class-wide proof.[28]   In a but-for world where conferences are competing on wage structure, the result would not be – as Professor Noll speculates – every conference choosing to offer 50% of licensing revenues to student-athletes and sharing those revenues equally among team members.   The result would be conferences making a wide variety of different choices, some of which might be more rewarding for student-athletes than the current system, and some of which (like the "Ivy League structure" mentioned by Professor Rascher) might be less rewarding than the current structure.   Predicting the results of this "competitive" "chaos" is not possible using common economic evidence.

### IV.B.   Plaintiffs Characterizations of the Damages and Injunctive Classes Are Inconsistent

24. Despite his discussion of equal pay being "an essential feature of amateurism," Professor Noll appears to believe the but-for world for the *injunctive* class would be one where schools could offer individual pay or licensing opportunities to student-athletes (e.g., a share of licensing revenue from jerseys, trading cards, bobble-head dolls and other products which include the NIL of a specific athlete). These individualized opportunities would, by their very nature, result in different

---

[27] Daniel A. Rascher and Andrew D. Schwarz, "'Amateurism' in Big-Time College Sports," *Antitrust*, Spring 2000. p. 54.

[28] That Rascher and Schwarz are discussing a world where student-athlete compensation is unrestricted by the NCAA whereas Professor Noll is limiting his analysis to licensing revenue is not relevant.  Just as different conferences would make different choices in an unconstrained world, so too would they make fundamentally different choices in Professor Noll's "less restrictive" world.

compensation for different student-athletes based in substantial part on differences in their performance on the field.  This would appear to be in direct conflict with Professor Noll's definition of amateurism for the damages class which he then abandons for the injunctive class.  Moreover, it is certainly a very different but-for world than the one Professor Noll models for damages.

25. Professor Noll testified clearly at deposition that the reason for this discrepancy is that:



26. Plaintiffs have excluded these products from the damages class to facilitate class certification, but the products are included in the injunctive class because plaintiffs allege that the restrictions on individual pay or licensing opportunities are also anticompetitive.  Thus, it is clear that Professor Noll's proposed damages methodology does not measure the economic harm from the challenged conduct to the putative class members.  Rather, it simply measures the difference between the actual world and the hypothetical "less restrictive" world he constructed to enable class-wide proof.

**IV.C. Group Licensing Opportunities Cannot Be Analyzed In Isolation**

27. Even if it is appropriate for Plaintiffs to exclude individual licensing opportunities (and other individualized forms of compensation) from their construction of the challenged conduct for the damages class, this does not mean that they can be ignored, as Professor Noll does. The reasonableness of group licensing outcomes depends importantly on the other opportunities that are available.

28. Plaintiffs' experts point repeatedly to the existence of both individual and group licensing agreements by professional athletes as evidence that the group licenses

---

[29] Noll Reply Deposition, p. 586.

that Professor Noll assumes would occur in the but-for world are in fact plausible.[30] The question is not simply one of whether group licenses exist. Rather, a key question is whether group licenses would exist at all in Professor Noll's but-for world, and in particular whether the mix of opportunities for individual and group compensation is such that star athletes would be willing to enter into an equal sharing arrangement for a particular component of revenue.

29. As Professor Rascher explains (agreeing with points I made in the Rubinfeld Report), the availability of both individual and group licenses (which Professor Rascher calls a "two-track system") "would help ensure that stars are not unhappy participating in equal-sharing arrangements of group licensing revenue."[31] It is clear that the relative size of these two "tracks" will be an important determinant of stars' willingness to participate in equal sharing arrangements.[32]

30. Professor McCormick, for example, points to what he characterizes as an equal sharing of playoff pool revenue among MLB players.[33] As I explained in the Rubinfeld Report, it is not surprising that professional athletes are willing to share equally revenues that account for a relatively small share of stars' total compensation.[34] However, this provides no evidence that star players would be willing to agree to Professor Noll's but-for world for purposes of damages – where *total* compensation for stars and walk-ons alike is identical. To illustrate, there was enormous variation in salaries among the 2012 San Francisco Giants– from the $19 million earned by Barry Zito to the $480,000 (the major league

---

[30] See, for example Noll Reply Report, pp. 57-59, Rascher Declaration, ¶¶ 6-14.

[31] Rascher Declaration, ¶ 9; Expert Report of Daniel A. Rascher, *Bernard Paul Parrish, et al. v. National Football League Players Association, et al.*, U.S. District Court, Northern District of California, San Francisco Division, Civil Action No. C07 0943 WHA, May 23, 2008, p. 9.

[32] Professor Rascher argues that the evidence in *Parrish* on the importance of individual license is irrelevant to the question of whether there would have been group licensing here (Rascher Declaration, ¶¶ 7-11). But his own explanation of the relationship demonstrates the relevance.

[33] Professor McCormick also points to the fact that "some bars and restaurants, and virtually all casinos split tips in a sharing fashion" (McCormick Report, ¶42, fn. 45). This vague and unsupported statement sheds absolutely no light on the issues in this case.

[34] Rubinfeld Report, ¶ 117. Moreover, Professor McCormick's example doesn't even provide for equal sharing among everyone. The blog that he points to notes that "a full postseason share for the World Series champion San Francisco Giants was worth a record $377,003 … The Giants split $23.5 million, voting 50 full shares, partial shares equivalent to another 11.1, and 12 cash awards." (See: "Giants Get Record $377,003 Bonus Pay for World Series," KQED, November 26, 2012, available at <http://blogs.kqed.org/newsfix/2012/11/26/giants-world-series-share-a-record-377003>, accessed May 24, 2013.)

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 13

minimum)[35] earned by three players.[36] The $377,000 playoff share was only 2% of Mr. Zito's salary.[37]  Factoring in both salary and playoff bonus share does not change the fact that the compensation range was substantial.

31. All of the professional sports analogues to which Professor Noll (and Professors Rascher and McCormick) point are leagues in which there is very wide variation in player compensation.  None of them support the equal sharing assumption on which Professor Noll's class certification opinions critically depends. Critically, Professor Noll fails to evaluate the plausibility of group licenses in the context of available individual licensing opportunities – indeed he just assumes these individual opportunities away.

32. Professor Rascher quantifies the distribution of salary compensation in MLB, the NBA, and the NFL, treating minimum salaries as equally shared revenue and salaries above the minimum as individualized.  Professor Rascher's calculations imply that only about 15% of total MLB compensation is attributable to equally shared minimum salaries, while the other 85% is individualized.[38]  Similarly, under this interpretation, only 20% of compensation in the NBA[39] and 29% of

---

[35] "Average salary for Major Leaguers on the rise," Adam Berry, MLB.com, December 5, 2011, available at <http://mlb.mlb.com/news/article.jsp?ymd=20111205&content_id=26096930&vkey=news_mlb&c_id=mlb>, accessed May 24, 2013.

[36] See: "USA Today | Sports | MLB | Salaries | 2012 San Francisco Giants," USA Today, 2013, available at <http://www.usatoday.com/sports/mlb/salaries/2012/giants/player/all/>, accessed May 24, 2013.

[37] Similarly, in the NFL, Joe Flacco, the quarterback of the Baltimore Ravens, received $172,000 for winning the Super Bowl in 2012. This represented only about 2% of his annual salary. See: NFL Collective Bargaining Agreement, August 4, 2011, p. 168; and "Baltimore Ravens Salaries | NFL Football Salaries and Payroll | FOX Sports on MSN," available at <http://msn.foxsports.com/nfl/team/baltimore-ravens/salary/67065?q=baltimore-ravens>, accessed February 27, 2013.

[38] The MLB has a single uniform salary minimum, which was $480,000 in 2012.  For that season, the average player salary was $3,213,479.  In fact, according to Professor Rascher's source, during much of the damages period, the equally shared portion was a bit lower, or about 13%. "Average salary hits record $3.2M," ESPN, December 12, 2012, available at <http://espn.go.com/mlb/story/_/id/8724285/mlb-average-salary-38-percent-32- million>, accessed May 22, 2013.

[39] For the NBA, the minimum salary is a function of the number of years a player has played.  To calculate the average minimum salary, Professor Rascher assigns to each player the 2009-2010 salary minimum corresponding to the number of years that player has played, and then averages this across all players. He compares this to the average of the players' actual salaries.  The average minimum NBA salary he calculates was $933,194, compared to the total average salary of $4,585,830 (see: Professor Rascher's backup file NBA Player Data Salaries - First Four Years.xlsx).  Professor Rascher also calculates a ratio based on players in their first four years, and argues that this is "akin to the college [] players playing for four years."  Rascher Declaration, ¶¶ 53-55.  However, because college athletes are limited

compensation in the NFL is equally shared.[40]  Of course, even this oversimplified calculation of shared revenue based in salary minimums is substantially different from the group license assumed by Professor Noll.  The restrictions are negotiated by players' unions, often involve minima which vary by years played, as in the NFL and NBA,[41] and are not limited to payments in exchange for licensing player NILs.

33. Moreover, as I explained in the Rubinfeld Report, not all group licenses result in an equal sharing among players on a roster.[42]  Furthermore, individual professional athletes can opt-out of a group license.  For example, Barry Bonds chose to opt out of the group licensing programs administered by the MLB players' association,[43] and Michael Jordan opted out of the NBA group license for video games.[44]

## IV.D.  Plaintiffs Experts Agree that There Are Many "Reasonable" Outcomes

34. Professor Rascher contends that while Professor Noll's methodology is reasonable, "[d]efendants are correct to point out that there are other reasonable models, and they could generate other quantitative outcomes."[45]  Professor Rascher explained:

> [m]y understanding is that Dr. Noll's damages analysis has been put forward, not as Plaintiffs' final damages calculation, but

---

to four years of eligibility, it is not appropriate to apply that condition, which not surprisingly biases the ratio upward.  Indeed, an alternative would be to compare a senior in college to a professional athlete at the peak of their career and work backwards.

[40] The NFL also has a minimum salary based on years played.  The average minimum salary Professor Rascher calculates is $535,972, compared to the average actual salary of $1,867,130 (see: Professor Rascher's backup file NFL Player Data Salaries - First Four Years.xlsx).  Professor Rascher neglects to mention that the NFL salary minima apply to players on the "Active/Inactive" list, whereas for players not on that list, the minima are substantially lower (NFL Collective Bargaining Agreement 2006-2012, page 179).

[41] NFL Collective Bargaining Agreement 2011-2020, Article 26, Section 1; "Minimum Annual Salary Scale," NBA.com, August 4, 2005, available at <http://www.nba.com/news/cba_minimumsalary_050804.html>, accessed May 28, 2013.

[42] Rubinfeld Report, ¶ 117-121

[43] "Bonds will be individually licensed," ESPN.com, November 17, 2003 available at <http://sports.espn.go.com/mlb/news/story?id=1661883>, accessed May 28, 2013.

[44] "Michael Jordan To Appear on Video Game Cover," CNBC.com, June 2, 2010, available at <http://www.cnbc.com/id/37471683/Michael_Jordan_To_Appear_On_Video_Game_Cover>, accessed May 28, 2013.

[45] Rascher Declaration, ¶ 57.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER

rather to show that there is a reasonable method for calculating class-wide, formulaic damages and to demonstrate the feasibility of calculating damages using this methodology.

35. He pointed to an example which he attributes to Dr. Stiroh as another "reasonable outcome."[46] In this example, only 20% of total licensing revenues are shared equally (student-athlete's 50% share of these would amount to only 10% of total revenues flowing to plaintiffs, not the 50% that Professor Noll assumes).

36. Professor Rascher attempts to paint this debate as irrelevant for class certification, but it is clearly relevant and indeed informative as to why class certification is not appropriate. Professor Rascher argues that the fundamental disagreement among the experts is really a merits question – "…simply a discussion about the equilibrium royalty rate" but that "the analysis and effect are common to the class members."[47]

37. In fact, the discussion is not about "the equilibrium royalty rate" – it is much more complicated than that – as Professor Rascher himself has described in his own writings. Even if Professor Noll's but-for world were otherwise reasonable (which I describe for many reasons it is not) there is not a single "equilibrium" royalty rate.  Rather, there are 11 FBS football conferences and 32 Division I basketball conferences[48] all providing differentiated products – different combinations of academic quality, athletic quality, compensation, "fit" and other features.   In equilibrium, it may be that each conference offers a different royalty rate.  Indeed, there is clear evidence in the actual world of substantial diversity in the products offered by and the underlying actions of various conferences.

38. In such an environment, measuring the economic impact of (and damages from) the challenged conduct would require the determination of how *each* conference would determine student-athlete compensation and balance that with other objectives.   This would not be feasible using class-wide evidence.   Rather, it would require a detailed, individualized inquiry into objectives of each conference (and then an analysis of any impacts of differences on student-athlete choices and re-matching).

---

[46] Rascher Declaration, ¶¶ 51, 57.
[47] Rascher Declaration, ¶ 51.
[48] The 32 Division I basketball conferences include the 11 FBS football conferences.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 16

39. The Ivy League provides perhaps the clearest example of this.  As I discussed in the Rubinfeld Report, despite NCAA rules that allow athletic scholarships up to the value of the cost of attendance,[49] the Ivy League has chosen to prohibit its member schools from providing such scholarships.[50] Notwithstanding the evidence of the Ivy League's actual behavior, Professor Noll testified that he believes the Ivy League will, like all other Division I basketball conferences, pay 50% of its broadcast revenues to student-athletes in his but-for world.[51] This is fundamentally at odds with its demonstrated preference to forego athletic scholarships, and is inconsistent with Professor Rascher's writings on what might happen with competition between conferences.   It will clearly take an individualized inquiry into the specific situation of each conference to determine what each conference would do in the but-for world.

## V. PROFESSOR NOLL'S BUT-FOR WORLD IS NOT SUPPORTED BY PROFESSIONAL SPORTS YARDSTICKS

40. As I explained in the Rubinfeld Report, Professor Noll's use of professional sports as an analogue/yardstick is flawed for a number of reasons.[52]

41. In his report Professor Rascher cites to my article on antitrust damages for support.  He quotes the following:

> A number of approaches have been used by experts to evaluate overcharges in antitrust litigation.  The two most common involve the use of *yardsticks* and *benchmarks*.  In a typical yardstick approach, one compares prices, margins, or rates of return during the period in which the antitrust violation is believed to have had an effect (the "impact period") to prices, margins, or rates of return in other markets that are deemed to be reasonably comparable to the market at issue.  In contrast, the benchmark approach evaluates prices only in the market at issue,

---

[49] Rubinfeld Report, ¶ 32.

[50] Ivy League Manual 2011-2012, Part I, B.   According to the Ivy League Manual: "The Group affirm their conviction that under proper conditions intercollegiate competition in organized athletics offers desirable development and recreation for players and a healthy focus of collegiate loyalty.  These conditions require that the players shall be truly representative of the student body and not composed of a group of specially recruited athletes."

[51] Noll Reply Deposition, pp. 626-628.  He testified that the other possibility was the that Ivy League would leave Division I sports (a possibility I raised in the Rubinfeld Report).  Professor Noll appears to have changed his opinion on this issue since his first deposition.  See Noll Deposition, pp. 257-258.

[52] Professor Noll's music analogy is also flawed.  Because none of plaintiffs' experts have added further support to this analogy, I do not address it further here.

comparing prices in the impact period to available prices before and/or after the alleged period of impact (the 'non-impact period'). I comment first on the yardstick approach, after which I consider benchmarks.

A. Yardsticks

Under the yardstick approach, damages are measured by obtaining a "but-for price" from a market (the "comparable market") that closely approximates the market in which the violation occurred. The "but-for price" is a measure of what the price of the product would be if the wrongful behavior had not occurred. A yardstick can come from a different, but related product market in the same or similar geographic market or from a different, but related geographic market in which the same product or products are sold.[53]

42. Professor Rascher's citation, however, is incomplete, omits the context in which the statement is made, and as a result is seriously misleading. The very next paragraph in my article states:

Ideally, the comparable market product should reflect the same degree of competition, the same costs, and the same demand conditions that would have prevailed in the market at issue had there been no wrongful behavior. Of course, it is quite possible for there to be no suitable yardstick in some cases. If an appropriate yardstick is available, it is important to take into account any differences in costs and the extent of competition between the yardstick market and the market at issue in the but-for world.

43. As explained in the Rubinfeld Report, there are numerous differences between college athletics and professional athletics.[54] Indeed, a "Basic Purpose" of the NCAA as spelled out in its constitution is to "retain a clear line of demarcation between intercollegiate athletics and professional sports."[55] These differences are so substantial that they make professional sports an unsuitable yardstick for Professor Noll's but-for world. Importantly, the differences between college and professional sports are not necessarily uniform for all members of the class (e.g., SEC football, Ivy League basketball). Rather, some college conferences may be

---

[53] Rascher Declaration, ¶ 21, citing to Rubinfeld, Daniel L., "Antitrust Damages," Research Handbook on the Economics of Antitrust Law, Edited by Einer Elhauge, Edward Elgar Publishing, 2012.
[54] Rubinfeld Report, ¶¶ 113-135.
[55] Article 1.3.1, 2012-2013 NCAA Division I Manual.

more similar on some dimensions than others. Some differences include:

a. Professional sports leagues negotiate revenue sharing and player compensation through collective bargaining agreements with players unions that establish a wide variety of features of the team-athlete relationship well beyond compensation. Professor Noll asserts that in his but-for world, a union representing student-athletes would not be necessary, and Professor Rascher agrees.[56]

b. Unlike professional athletes, student-athletes are – by definition – both students and athletes and (at least many student-athletes) are motivated by both the educational and athletics aspects of their collegiate experience. Similarly, the NCAA and it members are a mix of highly differentiated conferences and colleges which have goals that extend beyond competition in men's basketball and football.[57] They include not only the fielding of men's football and basketball teams, but at least 14 other college sports, including many women's sports subject to Title IX constraints.[58] In addition they are, of course, in the business of educating students.[59]

c. Even within football and men's basketball, there is greater diversity in intercollegiate athletics as compared with professional sports, both across teams and across athletes. The NFL includes only 32 teams, and the NBA includes only 30 teams. In contrast, the NCAA membership includes 120 FBS teams and over 300 D-I basketball teams, with more athletes per team than the professional leagues as well.[60]

d. Furthermore, there is greater variability in player quality in intercollegiate athletics compared to professional sports, a point on which plaintiff

---

[56] Noll Reply Report, pp. 67 and 71. Rascher Declaration, ¶¶ 6, 28-29.
[57] Rubinfeld Deposition, pp. 23-24, 73.
[58] NCAA Division I Manual, Figure 20-1, p. 349. To compete in the FBS, a school must sponsor at least 16 sports. As I explained in the Rubinfeld Report, ¶125, the NCAA alone sponsors championships in 23 different sports.
[59] "Student-Athlete Benefits," NCAA, February 13, 2013, available at <http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/Finances+Student+Athlete+Benefits>, accessed May 29, 2013.
[60] Rubinfeld Report, ¶¶ 125-126.

experts agree.[61]   This greater variability is also coupled with greater uncertainty in quality of players at the recruitment stage in college as opposed to in professional sports.[62] Student-athletes right out of high school lack both high-level playing experience, and in some cases the maturity that would be expected (and would have been observed) by a professional team.   Professor Rascher points to this uncertainty as a reason why the NCAA needs larger roster sizes than the NFL.[63]  Greater uncertainty is likely to have other implications as well that need to be considered in evaluating the appropriateness of professional sports as analogues. For example, uncertainty might lead to lower minimum salaries and/or lesser reliance on group licensing and greater reliance on individual aspects of compensation.

44. Even if it were possible to rely on professional sports leagues as yardsticks for intercollegiate sports, Professor Noll has not attempted to control or account for these differences.  On the contrary, he has selected aspects of professional leagues where they purport to support his assumptions (e.g., 50/50) while ignoring those aspects which are contrary to his assumptions (e.g., dramatically unequal compensation).[64]

45. Professor Noll also fails to adequately account for the fact that revenue in professional leagues used for salaries pools broadcasting, ticket sales, and various other types of revenue.[65]  Professor Noll is modeling a very specific transaction where the student-athletes are being paid only for the rights to their name, image, and likeness.  The professional sports CBAs do not provide evidence as to what, if anything, teams are willing to pay for the name, image, and likeness of student-athletes as when divorced from athletes' on-field performances and other "sticks"

---

[61] Noll Report, pp. 29-34 and Rascher Declaration, ¶¶35-40.  See also, Rubinfeld Report, ¶¶ 125-126.

[62] Deposition of Daniel A. Rascher, May 21, 2013 (hereinafter "Rascher Deposition"), pp. 87-88.

[63] Rascher Deposition, pp. 87-88.

[64] Noll Report pp. 102-103 and Rascher Declaration, ¶¶ 28-34. See also: NFL Collective Bargaining Agreement 2011, Article 12, Section 6; NBA Collective Bargaining Agreement, Article VII; NHL Collective Bargaining Agreement Summary of Terms, NHL Players Association; MLB Collective Bargaining Agreement 2012-2016, Article VI.

[65] NFL Collective Bargaining Agreement, Article 12, Section 6.  See also:  "NFL Salary Cap FAQ," NFL Salary Cap Guru, September 19, 2012, available at http://nflsalarycapguru.wordpress.com/, accessed May 24, 2013.

in the bundle.[66]  Professor Noll has pointed to no other analogue that can be used to measure the value (if any) of this specific right.

46. Moreover, Professor Noll fails to account for the fact that NCAA rules do not preclude former student-athletes from licensing their NILs.  Indeed, plaintiffs have not identified a single NCAA rule which places restrictions on former student-athletes licensing their image, including for appearing in rebroadcasts.  As Dr. Stiroh and I have pointed out,[67] some former student-athletes have licensed their NILs (while other former student-athletes have not).  The fact that former student-athletes, on whom there is no restriction, do not receive payment for their appearance in rebroadcasts or video clips is inconsistent with Professor Noll's assumption that removing restrictions on current student-athletes would result in each of them receiving payment from broadcasting revenue.

47. According to Professor Rascher, "… an important question is whether the differences between the yardstick leagues and the NCAA, such as those pointed out by Defendants' experts, would cause college sports to split those revenues differently."[68]  Professor Noll has done no analysis to answer this question.  Moreover, as the discussion above makes clear, the important question from a class certification standpoint is whether or not these yardsticks lead to a conclusion that there is an outcome that is common across the class, and in particular, if Professor Noll's but-for world represents a plausible outcome.  And there, the answer is no – outcomes would require individualized inquiries.

## V.A.   Professor Rascher's European Football Analogue Demonstrates Diversity in Outcomes

48. As one possible analogue for the result of Professor Noll's hypothesized but-for world where NCAA conferences would compete against each other for student athletes, Professor Rascher points to European soccer leagues and claims that they compete in this way and give even higher shares of revenue to athletes (and that therefore, the 50-50 division offered by Professor Noll is conservative).[69]

---

[66] Deposition of Robert McCormick, May 15, 2013 (hereinafter "McCormick Deposition"), pp. 85-86, 90.
[67] Rubinfeld Report, ¶¶ 88-89.  Stiroh Report, Exhibits 6, 7, and 8.
[68] Rascher Declaration, ¶ 34.  He concludes that "the answer is no."
[69] Rascher Declaration, ¶¶ 31-32.  Professor Rascher cites a Deloitte study which calculated that the wage to revenue ratio in the English Premier league has risen from about 60% to about 70%, and that for

49. European soccer is a poor analogue for many of the same reasons discussed above in the context of North American professional sports.   Moreover, Professor Rascher focuses only on the upper echelons of European football,[70] but the present case is about much more than the top collegiate football and basketball teams.   Furthermore, Professor Rascher looks only at averages and fails to consideration variation across leagues, which is the more relevant analysis in the context of the question of class certification.

50. A more appropriate analysis of the broader range of European football leagues demonstrates that there is substantial variability among domestic European football leagues and clubs.   The Union of European Football Association ("UEFA"), which regulates the national football associations across Europe, has 53 member associations and 733 teams.[71]   While the "Big 5" leagues are the most famous and prestigious, many leagues of various size and skill compete under the auspices of UEFA.

51. There is substantial variation in the share of revenue going to the athletes across the European soccer associations.   According to the European Club Licensing Benchmarking Report for Fiscal Year 2011, the wage-to-revenue ratio across associations varied by more than a factor of three.[72]   Moreover there is no evidence that the player share of revenue is distributed equally among players. Rather, like the NFL or the NBA, revenues are used to pay salaries which vary by player.   For example, in 2012, Real Madrid's top-paid player, Cristiano Ronaldo, earned nearly $22 million in salary, and the team's second highest paid player,

---

Europe's five major domestic leagues (the "Big 5"), as summarized by Professor Rascher, "…player pay was around 65% of revenues…"

[70] Rascher Report, ¶¶ 31-32.

[71] The European Club Licensing Benchmarking Report Fiscal Year 2011 ("UEFA report"), Union of European Football Association, pp. 8, 15, and 122.

[72] The European Club Licensing Benchmarking Report Fiscal Year 2011, Union of European Football Association, ("UEFA Report"), pp. 96-97.   For example, while the wage-to-revenue ratio for the Italian league (one of the "Big 5") was 71%, for the Armenian league it was 29%, and for the Bulgarian league it exceeded 100%.   UEFA Report, p. 96.   According to the UEFA Report, salary costs and the reported ratios include all personnel costs, not just player costs, so the reported ratios overstate the player share of revenues.   The UEFA Report reports the players costs represent an estimated 81% of total personnel cost, but also that there is substantial range among individual clubs. UEFA Report, p. 97. Some associations include multiple leagues or include multiple countries. (UEFA Report, p. 123).

Ricardo Kaka, earned $14 million.[73] Salaries paid by different teams also vary substantially. For example, the average annual salary for Barcelona, which plays in La Liga, the Spanish top league, was about $7.9 million in 2011 compared with Deportivo La Coruna, also in La Liga, at about $915,000.[74]

52. As this demonstrates, a broader analysis of European football leagues calls into question the appropriateness of European soccer and a yardstick for the NCAA, and further undermines Professor Noll's opinion that there would be a single equilibrium royalty rate across all Division I conferences in his but-for world.

## VI. PROFESSOR NOLL'S BUT-FOR WORLD IS NOT SUPPORTED BY BARGAINING THEORY

### VI.A. Bargaining Theory Does Not Support a 50 percent Allocation to the Group of Student-Athletes

53. Professor Noll continues to rely on a highly simplified theory of bargaining – ignoring a variety of real-world complexities. Indeed, Professor Noll has opined that irrespective of how the bargaining outcome arises (collective bargaining with a union, use of some other aggregating entity, competition between conferences) the "equilibrium" outcome will be the same, and indeed will be identical across all of the conferences and schools at issue here.

54. Professor Noll completely assumes away bargaining power driven by anything other than disagreement payoffs,[75] whereas bargaining power can clearly be an important component of real-world bargaining. As explained by one textbook:

> The drawbacks [with the Nash bargaining solution] are there by design: Nash wanted to characterize a good bargaining outcome; he did not intend the model to illuminate real world bargaining processes. As a result, Nash bargaining never fails; nobody ever receives the fallback [disagreement] payoff (unless they have zero bargaining power). This unrealistic assumption is deliberate: Nash's axioms require that the outcome is on the Pareto frontier. Equally important, bargaining power is simply assumed (with the

---

[73] "The 10 Highest Paid Soccer Players in the World," Business Insider, April 22, 2013, available at <http://www.businessinsider.com/highest-paid-soccer-players-2013-4?op=1>, accessed May 29, 2013.

[74] "Highest Football Clubs," *soccerlens.com*, available at <http://soccerlens.com/highest-football-club-wages/69045/>, accessed May 28, 2013.

[75] Noll Reply Report, p. 62 ("…in a competitive environment, the only source of bargaining power is the threat point (disagreement outcome).")

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 23

symmetry assumption, [alpha] = 1 – [alpha] = ½) and the process of bargaining with its threats, offers, and counteroffers – is absent.[76]

55. Yet the process of bargaining – threats, offers, and counteroffers, as well as other real-word complexities -- can critically affect the outcome of the negotiation.

56. *Broadcast*.  Professor Noll analyzes the hypothetical bargain at the wrong point in time, and as a result, substantially misrepresents the disagreement payoffs.  In his reply report, Professor Noll reiterates that for his bargaining model he "posit[s] a circumstance in which the licenses to use the NILs of student-athletes are annual, reached before the season starts for a year that is already under contract for predetermined fees with video games."[77]  Yet as I explained in the Rubinfeld Report, the "negotiation" (to the extent there is one at all in Professor Noll's but for world) would likely take place during the recruiting process - at a point before the student-athletes would have accepted an offer.[78]  If a player holds out for 50% of broadcast revenue, it is not that the conference's disagreement payoff is zero, rather there are other prospective student-athletes that would be willing to accept a scholarship for less than 50% of broadcast revenue.  Perhaps the player is of lower quality, but the conference would need to trade off the costs and benefits of this cheaper, lower quality player – it would not have to forego all of its revenue.[79]  In short, it is a much more complicated bargaining problem than the simple Nash framework.

57. *Video games*.  In addition to the problems noted above, as I noted in the Rubinfeld report, Professor Noll has failed to put forward any economic model to support his ██████/██████ split with respect to video games.[80]  As Professor Noll concedes, the Nash bargaining framework depends critically on the parties disagreement payoffs (aka threat points) – the profits they could earn without agreement from the other

---

[76] Samuel Bowles, *Microeconomics: Behavior, Institutions, and Evolution*, Copyright 2004, Princeton University Press, Chapter 5, p. 178.

[77] Noll Reply Report, p. 62.

[78] Rubinfeld Report, ¶ 95.

[79] The same would be true of the student-athlete –if he fails to reach agreement with Conference A, he does not necessarily forego all revenue, but instead could turn to a number of other conferences in an effort to reach such an agreement.

[80] Rubinfeld Report, ¶¶ 109, 112, 118.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 24

side.[81]  Professor Noll has failed to model the source of these profits, or identify the relative value of using player NILs.  In his rebuttal report, he seems to imply that the disagreement payoff even for video games is zero.[82]  Even if this were true, his Nash bargaining model would not support a ███████ split.[83]  Moreover, Professor Noll's "facts" notwithstanding, the disagreement payoff is clearly not zero.[84] ████████████████████████████████████████████ ████████████████████████████████████████ ████  To the extent that EA's cancellation of the NCAA basketball game is relevant to this analysis, it only demonstrates the importance of a detailed analysis of the profitability of a game without use of SAs NILs – an analysis that Professor Noll has failed to do.  EA's cancellation of the basketball game, but continuation of the football game, is consistent with NILs being more important in one game than the other.

58. Moreover, schools' decisions about college athletics do not turn solely on profits. Professor Noll and Professor Rascher ignore non-economic/non-profit components of schools' and conferences' objectives.  Schools are educational institutions and many are wary of the effects athletics has on academics. Many schools, irrespective of pure economic/profit motivations, may decide on principle to drop sports if they become professionalized.   There is increasing pressure from some directions for the NCAA and schools to make college athletics less professional and more in line with the academic objectives of the institution.[86] If the NCAA were to decentralize its rules on compensation to the

---

[81] Noll Reply Report, pp. 60-61.

[82] Noll Reply Report, p. 61.  Professor Noll does not affirmatively argue that the payoff is zero, but suggests that my argument that the payoff is positive "ignores the facts."

[83] Rather, if both parties have disagreement payoffs of zero, and all of Professor Noll's other assumptions were to hold (which as I describe elsewhere, they do not), the outcome would be the 50/50 split he puts forward with respect to broadcast revenue.

[84] Rubinfeld Report, ¶ 118-120.

[85] ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████

[86] See, for example, "Restoring the Balance," Knight Commission on Intercollegiate Athletics, June 2010, available at <http://www.knightcommission.org/restoringthebalance>, accessed May 29, 2013.  See also: "Framing the Future: Reforming Intercollegiate Athletics," The Coalition on Intercollegiate Athletics, Adopted 15 June, 2007, available at <http://coia.comm.psu.edu/FTF/FTFproposals.pdf>, accessed, May 7, 2013.  The Coalition on Intercollegiate Athletics is an alliance of faculty senates from FBS schools whose mission is to "provide a national faculty voice on intercollegiate sports issues."

conference level, some conferences may be willing to walk away from Division I athletics rather than provide professional-like salaries to their student-athletes. Professor Noll points to this as a possible action that the Ivy League might take in response to the changes in his but-for world.[87]  Analyzing the likelihood of this response, and the extent to which other conferences might make similar choices, would require an individualized inquiry.

**VI.B.   Bargaining Theory Does Not Support Equal Sharing among Student-Athletes**

59. Professor Noll does not attempt to use bargaining theory as support for his equal sharing assumption (rather he only points to the Nash bargaining solution as support for his 50 percent allocation to schools and to student-athletes).  Professor McCormick points to some aspects of bargaining theory in passing as being consistent with Professor Noll's assumption.[88]

60. Professor McCormick does nothing more than cherry pick a few references from a vast literature to support equal sharing. He says little more than a "be nice" strategy has a strong survival feature as described in, for example, Axelrod's *The Evolution of Cooperation*.[89]  He fails to point out that the "nice" strategy fares well because the parties are equally situated to begin with – a situation that bears no resemblance to the very different situations of five-star recruits and walk-ons.[90]   Professor McCormick's theoretical musings shed no light on the plausibility of equal sharing arrangements among student-athletes that are very differentially situated.   As described elsewhere in this report, the evidence strongly suggests that such an outcome is highly unlikely.

**VII.   THERE WOULD BE SUBSTANTIAL REMATCHING**

**VII.A. Plaintiffs Experts Do Not Fundamentally Disagree**

61. Professor Noll argues that predictions of rematching are "only speculations" – but he himself predicts such rematching will occur ("[n]evertheless...a few of these

---

("Welcome," The Coalition on Intercollegiate Athletics, 2013, available at <http://blogs.comm.psu.edu/thecoia/>, accessed May 29, 2013.)
[87] Noll Reply Deposition, pp. 628.
[88] McCormick Report, ¶¶ 41-44.
[89] Professor McCormick also mentions the "rotten kid theorem," but he never explains it and never explains why it has anything to do with this case (McCormick Report, ¶¶ 16, 42).
[90] Moreover, the "tit for tat" strategy does not fare well against all alternative strategies – it just does well on average.

predictions probably will come true if colleges begin to share licensing income with student athletes…").[91] Indeed, such re-matching forms the basis for a substantial part of what Professor Noll labels deadweight loss and identifies as the anticompetitive harm from the NCAA restrictions.[92] Professor Rascher[93] and Professor McCormick also agree that there will be re-matching.[94] The only disagreement is the extent to which such re-matching would occur.

62. In the Rubinfeld Report I discussed a number of sources of rematching.[95] Financial incentives that are driven by opportunities for licensing revenue in Professor Noll's but-for world would have a great influence over students' school and sports choices. Plaintiffs' experts have indicated agreement on most of these types of re-matching. Briefly, some of the specific types of rematching I discussed previously include:

   a. In the face of substantially increased financial offers, some individuals who did not attend college might have in Professor Noll's but-for world.[96]

   b. Some student-athletes' would have made different decisions about where to attend college.[97] Professor Noll agrees if there is differential pay to students, the matching of players to schools could vary.[98,99]

   c. Some students would have made different decisions about how long to

---

[91] See Noll Reply Report, p. 5; Noll Report, pp. 60-61.

[92] As I describe above, labeling the effects of such re-matching as anticompetitive presumes that the NCAA's restrictions are not procompetitive.

[93] Rascher Declaration, ¶47 citing to Rascher and Schwarz "'Amateurism' in Big-Time College Sports," *Antitrust*, Spring 2000, pp. 51-56, at 55; Rascher Deposition, pp. 266-267.

[94] Professor McCormick spends a considerable part of his report arguing that predictions of such re-matching are the result of a lack of understanding of basic economics (McCormick Report, ¶¶ 34-37). As I describe later in this report, Professor McCormick's assertions are based on a flawed and vastly (and admittedly) oversimplified application of economic theory. Moreover, in the *White* case (where the incremental payments to student-athletes were much smaller and more homogeneous), Professor McCormick himself conceded that some re-matching may occur (McCormick Report, Appendix C, ¶ 47). Professor McCormick also conceded at his deposition in this case that there may be re-matching (McCormick Deposition, pp. 229-232).

[95] Rubinfeld Report, §XI.

[96] Rubinfeld Report, ¶ 165; Noll Report, pp. 8 and 59-60.

[97] Rubinfeld Report, ¶ 161.

[98] Noll Deposition, p. 218. He also agrees that changing the amount that the NCAA allows for financial aid, in particular by allowing it to include travel costs, would influence a student-athletes choice of college.

[99] Noll Report, pp. 31-32, and Noll Deposition, pp. 441-442. *See also*: Roger G. Noll, "The Antitrust Economics of NCAA Restrictions on Athletic Scholarships," p. 48.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 27

participate in college athletics.[100]  Professor Noll concurs that students that otherwise might have left early might have stayed in college longer if they could have been paid as in Professor Noll's but-for world.[101]

d.  Some students would have made different decisions about which sport to play, since in Professor Noll's but-for world the compensation for playing college basketball is much higher than the compensation for playing college football (and both sports would be higher than other NCAA sports).[102]

e.  According to Professor Noll, schools would have altered or reduced how much they would have spent on coaches, training facilities, and other factors important for recruiting student-athletes.  This would have affected matching of student-athletes to schools.[103]  Professor Noll argues that one aspect of anti-competitive harm from NCAA restrictions on student-athlete pay is increased expenditures on these inputs.[104]  Furthermore, he has acknowledged that coaches and facilities are used by schools as recruiting tools.[105]

f.  Schools' decisions about which NCAA conference or division to participate in might have changed.[106]  As Professor Noll hypothesized with the Ivy League,[107] in a but-for world where schools compete on licensing revenues, some schools may choose to leave Division I athletics (e.g., for Division II).

63. Rematching of this sort would have displaced other student-athletes from the but-for rosters, and would have a cascading effect.[108]

## VII.B. Rematching Is Basic Economics

64. In an attempt to argue that my opinion on re-matching lack support, Plaintiffs

---

[100] Rubinfeld Report, ¶ 163.
[101] Noll Report, p. 60.
[102] Rubinfeld Report, ¶ 164.
[103] Rubinfeld Report, ¶ 172-73.
[104] Noll Report, pp. 73-74.
[105] Noll Report, pp. 69 and 74.
[106] Rubinfeld Report, ¶¶ 175-80.
[107] Noll Reply Deposition, pp. 626-628.
[108] Rubinfeld Report, ¶ 166.

point to the fact that I do not cite to any articles from the sports economics literature. But, my opinion does not depend on anything specific to sports economics, it is basic microeconomics.[109]  Workers will choose the employment option that maximizes their utility.  All else equal a higher wage will make a particular option more attractive to the worker.  This is true of relatively small changes in wage rates, and it is certainly true when particular employers increase their wages by hundreds of thousands of dollars per year.

65. Moreover, Plaintiffs have not pointed to a single analogy in the history of sports where such a fundamental change in compensation has occurred.  There is no evidence in the sports economics literature on such re-matching because Professor Noll is modeling a but-for world that is fundamentally different than anything in the literature, and than what has been found in the real world.

**VII.C. Professor Noll's Rebuttal Report Quantifies These Substantial Differences**

66. In the original Noll Report, Professor Noll calculated damages for student-athletes in just two conferences for 2009-10 – the Pac-10 and SEC.  Both are high-revenue conferences.  In the Noll Reply Report, Professor Noll calculates student-athlete payments for all schools and conferences in the damages class for 2008-09 and 2009-10.[110]  Exhibits 1A to 1D to this report summarize these payments for live broadcast damages.

67. Exhibit 1A (basketball) and 1B (football) graph damages per athlete by school ordered from highest to lowest for current broadcast revenue. Exhibit 1C shows the detailed per-school values and Exhibit 1D presents some simple summary statistics demonstrating the substantial variation that is apparent from the graphs.[111]  Professor Noll concludes that a football player at Alabama would have

---

[109] See, for example, Pindyck and Rubinfeld, *Microeconomics*, Eighth Edition, Section 14.1.

[110] In calculating his new damages, Professor Noll has utilized new roster data (Noll Reply Report, pp. 72-74.).  Professor Noll testified that these data use end-of-year rosters, whereas calculations in Noll Reply Report used roster data from the beginning of the season.  This will lead to conflict among student-athletes, some of whom  would prefer to apply on one set of data and others who would prefer another. Noll Reply Deposition, pp. 497-500.

[111] Values shown in Exhibit 1C differ from the damages per athlete reported in Exhibits 38A to 70A to Professor Noll's Reply Report.  The values Professor Noll reports take as the denominator the total player roster-years on the current roster (for example, a senior in their fourth year on the roster would be counted as four separate athletes).  The values reported in Exhibit 1C take as the denominator the number of players on the current roster (counting each player once).  This is consistent with how damages per athlete were reported in the Noll Report Errata, Appendix C-A13 and C-A21.  For

suffered more than twice the alleged damages compared with a football player playing at USC in the 2009-2010 seasons – $███ versus $███ (Exhibit 1C). This is consistent with my discussion in the Rubinfeld Report.[112]

68. Exhibit 1D (columns "Noll Recalculated Per Athlete Damages"), shows that Division I basketball current broadcast damages per athlete range from $███ at North Dakota to $███ at Iowa in the 2009-2010 season, and for BCS football range from $███ at Troy State to $███ at Tennessee. Moreover, within the six top tier conferences,[113] Division I basketball damages per athlete range from $███ at USC to $███ at Iowa in 2009-2010, and BCS football damages range from $███ at Georgia Tech to $███ at Tennessee. Even among lower tier conferences and independents, the lower 10th percentile per athlete damages is a third or less of the upper 10th percentile.

## VII.D. Revenue Differences Are Substantial and Pervasive

69. In the Rubinfeld Report, I presented several examples of large differences in income across schools that would provide substantial incentives for students to re-match.[114] Professor Rascher argues that these comparisons "ignore[] the realities of the rapidly changing college sports broadcast market."[115] He argues that the findings are "interesting quirks of the industry" that are driven by differences in timing in conferences television deals, but that "in the longer-term the payments from each school" will reach a more common equilibrium.[116] Professor Rascher's long run equilibrium, however, is irrelevant to the choice of school for a particular athlete at a particular point in time. In Professor Noll's but-for world, student-

---

example, in his original report, Professor Noll calculates the total pool of live broadcast damages going to Arizona in 2009-2010 for football to be $███ ███ with per-athlete damages of $███ based on a roster size of 93. (Noll Report Errata, Exhibits 12A and Appendix C-A21.) In his reply report, the 2009-2010 pool of damages to Arizona football is $███ ███ but the reported per-athlete damages are only $███ which is based on a roster size of 194. (Noll Reply Report, Exhibits 9A and 42A). In deposition, Professor Noll conceded that the per-player damages he reports in his exhibits have little meaning as they are not per-player damages that he would award to any particular athlete but rather more accurately characterized as per-roster year damages (Noll Reply Deposition, pp. 776-778). Thus, I present the per-player averages here.

[112] Rubinfeld Report, ¶ 161. The results in Exhibit 1C for Kentucky versus UCLA D-I basketball, and Florida versus Vanderbilt D-I basketball are also consistent with my discussion in the Rubinfeld Report.

[113] These include The Big 10, ACC, SEC, Pac-10, Big 12, and Big East conferences as well as Notre Dame.

[114] Rubinfeld Report, ¶ 161.

[115] Rascher Declaration, ¶ 74.

[116] Rascher Declaration, ¶¶ 75, 77.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER

athletes do not benefit from the "longer-term" "equilibrium." Rather, they are in school for limited windows in which revenue is generated based on the television deals in place during the four (plus or minus) years that they are playing college football or basketball.[117]

70. To elaborate, reconsider Professor Rascher's own examples. The television contract for the SEC referred to by Professor Rascher, and listed on his Exhibit 9 runs from 2009 to 2024, or 15 years, and the Pac-12 contract he lists runs from 2011 through 2023, or 12 years. In fact, all of the contracts listed on his exhibit run at least 10 years, with the exception of the Big East contract, which runs 7 years. Students entering and leaving school within those windows would be subject to broadcast contracts in place.

71. Thus, according to Professor Rascher's Exhibit 9, a student considering enrolling in USC or Alabama in 2011 would be evaluating offers of compensation based on the terms of these two contracts, which would compensate a USC athlete more highly than an Alabama athlete, and would be unaffected by contract changes far in the future which might change the relative payment for his NIL he would receive.[118] This student would be incentivized based on the contracts in place, not on any longer term "equilibrium."

72. Moreover, timing differences in negotiating conference television contracts is only one of a number of factors leading to substantial differences in revenues. Indeed, one of the other examples I cited was of two teams in the same conference (and thus governed by the same media deal) – Vanderbilt and Florida. Such discrepancies are clearly unaffected by the timing of the conference television deal.

73. Professor Noll also provides a discussion of timing, which echoes Professor Rascher's arguments. As an alternative method to calculating damages, Professor

---

[117] More specifically, they care about expected four-year stream of revenue at time recruiting decision is made.

[118] Professor Rascher's Exhibit 9 points out that the SEC contract is in the process of renegotiation. However, there is no reason to expect a student-athlete in 2011 would be aware of this at the time they were deciding on their preferred school. Moreover, the renegotiation is related to the addition of two teams to the SEC conference.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 31

Noll suggests "smoothing" licensing revenues over "several years."[119]  Yet this only raises the prospect of additional class conflict.  Consider a student-athlete who enrolled in 2009 in a school that is part of the SEC, when the new higher-revenue SEC contract went into effect.[120]  This student-athlete would not want his or her annual payment "watered down" by a methodology that averages (in some way) previous year's broadcast revenues.

## VII.E.  Remated Raises Class Certification Issues for Both the Injunctive Class and the Damage Class

74. Professor Noll argues that I conflate the two putative classes and that re-matching is only an issue for current students (i.e., members of the injunctive class).[121]  Professor Noll argues that the former students in the damages class would not "relive their lives" and therefore that re-matching is not an issue that he needs to consider in evaluating the damages class.[122]  Professor Noll's argument is fundamentally incorrect as a matter of logic and of economics.  To calculate damages, one needs to compute the difference between a class member's economic position in the actual world and his economic position in the but-for world.  To calculate his economic position in but-for world, including the licensing revenue he would earn in Professor Noll's but-for world, it is clear that one needs to identify which school the student would have attended in the but-for world.  This of course, requires evaluating whether the substantial differences between the actual and but-for worlds would lead to student-athletes making different decisions.

## VII.F.  The Coase Theorem Sheds No Light on Extent of Remateching

75. Remarkably, Professor McCormick asserts that some schools offering student-athletes over $1 million to play college basketball over 4 years (and over $200,000 to play college football) would have no effect on athletes' choices of which school to attend, which sport to play, how long to stay in school, and other decisions.  These conclusions are deeply flawed.

76. In reaching this conclusion, Professor McCormick presents a misleading and

---

[119] Noll Reply Report, p. 68.
[120] See Noll Reply Report, Exhibit 3 and Rascher Declaration, Exhibit 9.
[121] Noll Reply Report, pp. 6-7.
[122] Noll Reply Report, p. 7.

ultimately flawed characterization of the so-called "Coase Theorem." A brief digression on Coase Theorem and on the relevance of economic rents will provide useful background for the substantive analysis that follows.

77. The phrase "Coase Theorem" is a characterization that was applied to the path-breaking law and economics work of Ronald Coase. Curiously, while Ronald Coase's core work emphasized the role that transactions costs and bargaining breakdowns play in the *failure* of non-market transactions to lead to efficient outcomes, the Coase Theorem in various formulations spells out the strong conditions that are necessary for efficient outcomes to be achieved.

78. The substantial literature on the Coase Theorem has both theoretical and empirical components.[123] On the theoretical side, the literature points out – as plaintiffs' experts highlight – that even if multiple allocations of property rights generate the efficient outcome, distribution of incomes (in this case economic rents) may differ substantially.[124] Even under the strict assumption of the Coase Theorem, while short-run outcomes may be the same regardless of the assignment of property rights, the difference in economic rents will lead to different incentives for entry, exit, and allocation of resources. In the context of this case, that means that – as I point out in the Rubinfeld Report – these substantial changes in student-athlete incomes will lead to more athletes applying to schools, fewer athletes leaving school early, and other effects. On the empirical side, the experimental literature points to the frequency of bargaining breakdowns over the division of the bargaining surplus even when the costs of bargaining are relatively low.[125]

79. Professor McCormick's discussion of economic rents is largely a red herring. The term economic rent describes the value of a production input above and beyond the payment made to put that input to use.[126] If, for example, a labor input is paid

---

[123] To put Professor McCormick's suggestion of a lack of knowledge of the implications of the work of Ronald Coase and his classic 1960 article, "The Problem of Social Cost" to rest, I have been teaching courses on the economic analysis of law for over 30 years and I regularly cover the work of Coase and the theory of bargaining in my courses. I particularly recommend the coverage of the Coasian theory in the textbook *Law and Economics*, by Robert Cooter and Thomas Ulen, 6th Edition, Pearson (2011).

[124] See, for example, Cooter, Robert, "The Cost of Coase," *Journal of Legal Studies,* Vol. 11, 1982.

[125] See, for example, Hoffman, Elizabeth and Matthew L. Spitzer, "The Coase Theorem: Some Experimental Tests," *Journal of Law and Economics,* Vol. 25, No. 1, Apr., 1982, pp. 73-98.

[126] Economic rent is the "[a]mount that firms are willing to pay for an input less the minimum amount necessary to obtain it." Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics,* 8th Edition,

a wage equal to the marginal revenue product of the last person hired, those workers whose value is higher than that of the marginal worker will generate economic rents. The bottom line is there are economic rents in the world of student-athletes now and there will be economic rents in the world imagined by Professor Noll. The discussion of economic rents per se does nothing to further an analysis of the but-for world envisioned by Professor Noll.

80. With this background, the flaws in Professor McCormick's analysis become transparent. Indeed, as discussed above, neither Professor Noll nor Professor Rascher agrees with him, and even his own testimony in the *White* case is inconsistent with the opinions in his report here.

81. As Professor McCormick himself concedes, the Coase Theorem depends upon two important assumptions.

> Note that two important issues stand to cloud this result. One is agency costs…and the other is income effects. As rent is redistributed, different people may react differently to the wealth they receive or lose. It is normal in economic discourse to discount these effects in many instances, in the Coase Theorem, for instance… *However, assuming these effects away does not mean that they go away.*[127]

82. Yet that is exactly what Professor McCormick does – his entire discussion assumes these important issues away. While these assumptions may be appropriate under some circumstances, agency costs and income effects are likely very important here. Agency costs (also known as transaction costs), are the costs associated with carrying out market transactions – including the costs of finding parties to transact with, of negotiating transactions, and monitoring to ensure the terms of the transaction are being observed. As Ronald Coase himself explained in his seminal paper, assuming no transaction costs "is, of course, a very unrealistic assumption."[128]

83. Income effects are also likely to be substantial. As critics of the current NCAA

---

2012, Chapter 8. Professor McCormick defines economic rent similarly (McCormick Report, ¶¶ 29-31).

[127] McCormick Report, ¶ 23, fn. 15 (emphasis added). See also McCormick Report, ¶ 25, fn 18.

[128] Coase, Ronald H., "The Problem of Social Cost," *Journal of Law and Economics,* Vol. 3, October 1960, pp. 1-44, at 15.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 34

model sometimes point to, many student-athletes come from relatively low-income families (and like most students, have relatively low-incomes themselves).[129]   Assuming that receiving an extra $1 million of wealth during their college career will have no effect on their behavior is clearly inappropriate. While these assumptions may be valid for small changes, they are clearly inappropriate in the current case.

84.   Moreover, Professor McCormick's theory depends upon ability of teams to pay – one way or another – market prices for a players' talent.  The Coase Theorem rests upon market mechanisms, which will provide incentives for assets to be put to their most productive uses.  If property rights are assigned such that the most productive use is in the hands of another, then market prices create economic incentives that will lead to a market transaction for that asset.  I discuss this in more detail in the next section, in describing why the baseball reserve clause example that plaintiffs' experts point to is not an appropriate analogy to the changes one would see here.

**VII.G. Plaintiffs' MLB Reserve Clause Analogy Sheds No Light on Rematching**

85.   Professor Rascher points to the removal of the reserve clause in major league baseball ("MLB") and the introduction of free agency to support the point that there would be no rematching.

86.   Prior to 1976, Major League Baseball (MLB) included a "reserve clause" in the uniform player contract.  That clause essentially gave a team exclusive rights to any player they signed for as long as they wished, or until a player decided to retire, as long as the salary offered was at least 75% of the salary from the preceding year.[130]  However, under the rules "his contract may be assigned by this team to another team…"[131]   Teams were not allowed to directly negotiate, or contract with a player contracted with another team.  Instead, if they wished to

---

[129] Huma, Ramogi and Ellen Staurowsky, "The Price of Poverty in Big Time College Sport," National College Players Association, p. 4.

[130] Rottenberg, Simon, "The Baseball Players' Labor Market," *The Journal of Political Economy,* Vol. 64, No. 3, June 1956, pp. 242-258, at pp. 244-245; Maxcy, Joel G., "Rethinking Restrictions on Player Mobility in Major League Baseball," *Contemporary Economic Policy*, Vol. 20, No. 2, April 2002, pp. 244-245.

[131] Rottenberg, Simon, "The Baseball Players' Labor Market," *The Journal of Political Economy,* Vol. 64, No. 3, June 1956, pp. 242-258, at pp. 244-245.

secure that player's services, they could negotiate to purchase the player from his current team.[132]

87. In 1976, the MLB and the Major League Players Association negotiated a new Collective Bargaining Agreement which led to the introduction of free agency into MLB.[133]  Under the new agreement, which went into effect for the 1977 season, any MLB player who has accrued at least six years of MLB service time, was eligible to become a free agent at the conclusion of their contract.[134]

88. Professor Rasher cites to the Rottenberg Invariance Principle[135] and to economic literature which he claims demonstrates that there was little movement of players after the introduction of free agency.  He asserts that this then undermines my conclusions (and those of Dr. Stiroh)[136] that there would be substantial movement by players in response to the large payment differences in Professor Noll's but-for world.[137]

89. This is incorrect.  The circumstances in MLB are fundamentally different than those in the NCAA both in the actual world and Professor Noll's but-for world. The Invariance Principle depends critically on the existence of market prices for athlete labor.  As explained by one article:

> …as long as player contracts can be and are sold for cash neither the reserve clause nor the draft will deter the movement of players from small to large markets.  If it is profitable for a player to sell his services to a large city team, then it will be profitable for a team owning his contract to do likewise.  Similarly, the

---

[132] Rottenberg, Simon, "The Baseball Players' Labor Market," *The Journal of Political Economy,* Vol. 64, No. 3, June 1956, pp. 242-258, at pp. 244-245.

[133] Maxcy, Joel G., "Rethinking Restrictions on Player Mobility in Major League Baseball," *Contemporary Economic Policy*, Vol. 20, No. 2, April 2002, pp. 145-159, at 145.

[134] Maxcy, Joel G., "Rethinking Restrictions on Player Mobility in Major League Baseball," *Contemporary Economic Policy*, Vol. 20, No. 2, April 2002, pp. 145-159, at 145.

[135] Rascher Declaration, ¶ 61, fn. 99, citing to Simon Rottenberg, "The Baseball Players' Labor Market," *The Journal of Political Economy,* Vol. 64, No. 3, 1956, pp. 242-258, at p. 255.

[136] Rascher Declaration, ¶¶ 60-62.

[137] Professor Rascher appears to confuse the issues of re-matching and competitive balance (Rascher Report, ¶¶ 60-67; Rascher Deposition, pp. 179-182, 185, 267). Even if Professor Noll's but-for world would leave competitive balance unaffected (which is certainly an open question) it could still substantially affect the re-matching of student-athletes to teams and therefore be inconsistent with class-wide proof of impact and damages. Professor Rascher appears not to be concerned about students choosing Kentucky instead of Indiana, presumably because these are two strong basketball programs and therefore competitive balance might not be substantially affected (Rascher Deposition, pp. 266-267). This still could, however, substantially affect the economic position of those specific student athletes that would have made different choices.

> relatively equal allocation of new talent achieved by the player draft will also be undone by player-cash transactions between teams.  If both owners and players are wealth maximizers (an assumption universal in this literature) the Coase theorem assures us that the ownership of property rights should not alter the allocation resources [Demmert, Demsetz].[138]

90. College athletics – both in the actual world and in Professor Noll's but-for world – is fundamentally different than MLB.  In the pre-free agency "restricted" world in MLB, teams were free to buy and sell players at market prices.  Thus, if the MRP of a player was higher on a different team, that team would have an incentive to purchase the player from his current team.  In the NCAA, teams cannot trade players at all, let alone buy and sell for cash.  There is no evidence that players are matched with their highest MRP school in the actual world.[139]

91. In Professor Noll's but-for world, his "least restrictive alternative" is not a free market for players where they earn their MRP, but one in which players are paid an equal share of team revenues. Thus, it is not the case that in equilibrium players would enroll at the school where their MRP were highest.  As Professor Noll himself postulates, it may be that a star is valued most highly at a smaller school from a lower-revenue conference and in a free market would have an incentive to go to that school.[140]  But in Professor Noll's but-for world, that star would not have an economic incentive to choose that school because it would pay him an equal share of its relatively small revenues and not his MRP.  Similarly, a mid-tier player may have a higher MRP in the starting lineup at a mid-tier school, but could earn more money by getting an equal share as a backup at a Big 6 conference school.

## VII.H. Current Recruiting Competition Does Not Lead to Same Outcome

92. Plaintiffs experts attempt to paper over this fundamental flaw by asserting that the current recruiting environment, despite restrictions on paying players market prices, reaches the same outcomes that a price-based market would.  Professor

---

[138] Daly, George and William J. Moore, "Externalities, Property Rights and the Allocation of Resources in Major League Baseball," *Economic Inquiry,* Vol. 19, January 1981, pp. 77-95, at 78.

[139] As discussed more below, Professor Noll asserts that the current recruiting market yields the efficient match between players and teams but he provides no compelling support for this.

[140] Noll Report, p. 91.

Noll called this the "cousin" of Rottenberg's Invariance Theorem.[141]  Plaintiffs' experts have done little more than assert that this is true.

93. They point to no theoretical literature that demonstrates that non-price competition will yield the same outcomes as price competition.  Indeed, it will not be the case that non-price competition will lead to the same outcome for all student athletes as price competition (on licensing revenue).  Different recruits will place different values on non-price factors such as coaching talent and the quality of training facilities.  It is not the case that simply reducing these expenditures and increasing cash payments will lead all players to be equally well off. Nor is Professor McCormick's reliance on "fit" and "family" compelling support for his opinions that players would not change schools even in the face of large differences in payments.[142] Indeed, Deshaun Watson, the Clemson recruit that Professor McCormick uses as an example in his report, would likely have received substantially higher offers from several other schools, based on Professor Noll's but for world.[143]

94. Plaintiffs experts purported broad empirical support is that in the actual world, the high-revenue schools generally get the best athletes, and that this would continue to be true in the but-for world. As an initial matter, Professor Rascher's argument that the Sun Belt generally does not successfully compete against the Pac-10[144] calls into question Professor Noll's market definition, which lumps schools across the country, from small and large conferences, into the same relevant antitrust market.[145] There is substantial tension between their argument that all Division I basketball and FBS football schools are in the same relevant market, but that there

---

[141] Noll Reply Deposition, pp. 713-714.

[142] McCormick Report, ¶ 40.

[143] According to rivals.com, Mr. Watson received offers from both Clemson and Tennessee, among a number of other schools.  Although Mr. Watson was a 2014 recruit, Professor Noll's 2009-2010 calculations, presented in Exhibit 1C, are illustrative.  A current player on Clemson's football team in the 2009-2010 season would have received about $▮▮▮▮ per year compared with a player at Tennessee whose would have received about $▮▮▮▮. The payments from Alabama, Arizona, Auburn, California, Florida State, Georgia, Ohio State, Oregon, and Vanderbilt, other schools that offered Mr. Watson a scholarship, would have also been higher than those at Clemson (Deshaun Watson Rivals Player Profile, *rivals.com*, available at <http://rivals.yahoo.com/ncaa/football/recruiting/player-Deshaun-Watson-119269> accessed May 29, 2013; "PER_ATHLETE.CSV" and "Create Damages Exhibits.sas" from the backup to Noll Reply Report).

[144] Rascher Declaration, ¶ 72-73.

[145] Noll Report, pp. 15 and 21-36.

will be little to no rematching because the players are already sorted into schools by quality. But even if this is true at a very broad level, it ignores substantial variation even within "high-revenue" schools.

95. Professor Rascher points to a positive correlation between the dollar amount of school football revenues and student-athlete quality, as measured by the sum of committed players' "stars" over 2007-2011,[146] and concludes that this demonstrates that "talent and revenue have already sorted themselves out; a system that allowed schools with more revenue to offer players higher royalty for their NIL rights would not likely generate any significant change in that relationship."[147] But merely identifying a correlation based on some aggregate measure of quality does not say anything about the extent to which there will be differences in the but-for world for a substantial number of individual student-athletes. The relevant question for class certification is not whether a general relationship holds, but rather whether there are frequent cases where that relationship does *not* hold. It is clear from Professor Rascher's Exhibit 7 that there is substantial variability, and there are many schools with low-revenue and high quality recruits and high-revenue and lower-quality recruits. To name just one of many examples, based on Professor Rascher's analysis,[148] Troy State recruits totaled 379 stars, despite Troy State's only $18.4 million in football revenue. This contrasts with, for example, Penn State with recruits totaling 312 stars and $258 million in football revenue. There is a substantial question as to whether Troy State, which Professor Noll calculates would pay football players about █████ per year, would have been as successful in Professor Noll's but-for world where it would be competing for these recruits against schools paying nearly 100 times that at $60,000 per football player per year.

---

[146] Rascher Declaration, ¶66 and Exhibit 7. Rivals.com rates the quality of recruits using a star system, where a higher number of stars indicates a higher quality player. As defined by rivals.com, "[a] five-star prospect is considered to be one of the nation's top 25-30 players, four star is a top 250-300 or so player, three-stars is a top 750 level player, two stars means the player is a mid-major prospect and one star means the player is not ranked." Rivals.com identifies the school a player committed to. See: "Rivals.com Prospect Database: About Football Ratings," available at <http://www.rivals.com/aboutrankings.asp?Sport=1>, accessed May 28, 2013.

[147] Rascher Declaration, ¶ 64.

[148] Rascher Declaration, backup to his Exhibit 7; "PER_ATHLETE.CSV" and "Create Damages Exhibits.sas" from the backup to Noll Reply Report.

**VII.I.  The Ivy League Experience Does Not Shed Light on the Extent of Rematching Here**

96. Professor McCormick spends substantial time analogizing the current matter to the case against "the Ivy League Scholarship cartel," arguing that the evidence from that case (which Professor McCormick asserts showed little to no re-matching after the cartel was disbanded) refutes my argument that there would be substantial re-matching in Professor Noll's but-for world.  In fact, the Ivy League case sheds no light on the issues.

97. Most importantly, even as Professor McCormick tells the story, even after the scholarship agreement was disbanded students were "likely to receive strikingly similar offers" from the various schools.[149]  Thus, according to Professor McCormick, removing the cartel did not lead to differences across schools in the offers they made.  So absent strong economic incentives to make different choices, it is not surprising that there was little re-matching.[150]  In stark contrast, Professor Noll's but-for world creates very different economic incentives than the actual world.  Consequently, the MIT experience is not at all analogous on the most important dimensions.  Moreover, Professor McCormick cites to only a handful of documents to support his opinion, including an unsupported statement by the lead lawyer that worked for the Department of Justice, the plaintiff in the case against MIT.[151]

98. Professor McCormick also cites to the "absence of any economic research" on the topic as evidence of no effect.[152] Professor McCormick is wrong on two counts. First, it is entirely improper as a matter of economics to conclude anything from the lack of prior studies on a particular topic.  This means nothing more than it is an issue for which new analysis may be important.  Second, there is in fact economic research on the topic, including a study in one of the most highly regarded journals in the field - Professor McCormick appears to have just missed

---

[149] McCormick Report, ¶ 51, citing to Ben Gose, "Princeton Plans Major Increase in Aid for Middle- and Low-Income Students," *Chronicle of Higher Education*, January 30, 1998, p. A35; McCormick Deposition, pp. 327-330.
[150] Another difference is Ivy is comparing two groups of students; here it is same students in two worlds.
[151] McCormick Report, ¶ 51.
[152] McCormick Report, ¶ 48, fn 54.

it.[153] Evidence suggests that the mix of students did in fact change after agreement ended. Several authors have found evidence that the end of the Ivy League "cartel" decreased the proportion of minority students.[154]

**VII.J.  The Economics of Re-Matching in the Current Case Are Vastly Different from White**

99.  Professor McCormick argues, with little supporting evidence, that the current case is like *White*, in which the court certified the class.[155]  He admits they are "not identical," but he fails to describe how similar and different they are. Professor McCormick ignores several fundamental economic differences between the two cases, all of which create much more substantial and fundamental conflicts and individualized questions here. The damages/dollars in aggregate and per student-athlete at issue are much larger here than they were in *White*. Moreover, differences across schools are much larger here: whereas in *White*, the damages at issue, which involved payments to cover costs of attendance (i.e., same standard across all schools), ranged from roughly $1,000 to $5,000 per player per year according to Professor McCormick,[156] here, in Professor Noll's but-for world, schools would pay a range of a few hundred dollars to over $300,000 per year. Greater financial differences across schools create much stronger incentives for student-athletes to make different choices than they have in the actual world.[157]

---

[153] At deposition, Professor McCormick appeared to change his position and say that he was aware of the research but didn't find it relevant (McCormick Deposition, pp. 333-336).

[154] See for example: Carlton, Dennis W., Gustavo E. Bamberger, and Roy J. Epstien, "Antitrust and higher education: was there a conspiracy to restrict financial aid?," RAND Journal of Economics, Vol. 26, No. 1, Spring 1995, pp. 131-147; and Hoxby, Caroline M., "Benevolent Colluders? The Effects of Antitrust Action on College Financial Aid and Tuition," NBER Working Paper 7754, June 2000.

[155] McCormick Report, ¶ 15.

[156] Declaration of Robert E. McCormick in Support of Plaintiffs' Renewed Motion for Class Certification, Jason White et al. v NCAA, Case No. CV 06-0999 RGK (MANx), ¶ 40.

[157] In addition, there are a variety of other differences between the *White* case and this case that lead to a much more diverse class (leading to potentially greater conflicts) here, including the inclusion of many smaller, low-revenue conferences than were included in *White*, and the inclusion of not only scholarship but walk-on players (McCormick Deposition, pp. 101-112).

Respectfully Submitted,

_____

Daniel L. Rubinfeld
Oakland, California
May 30, 2013

## Exhibit 1A: Professor Noll's Basketball Broadcast Damages Per Current Athlete, 2009-2010



**Notes:** Per athlete damages  are calculated by dividing Professor Noll's per-school "Damages Summary" reported in his Exhibits 5A through 37A from the Noll Reply Report by the number of current players on the teams' rosters for the 2009-10 season, according to Professor Noll's roster analysis. Values reported represent broadcast damages for current athletes based on Professor Noll's "Scenario A."
**Sources:** *PER_ATHLETE.CSV* and *Create Damages Exhibits.sas* from the backup to Professor Noll's Reply Report, April 25, 2013.

Highly Confidential - Counsel Only: Subject to Protective Order

## Exhibit 1B: Professor Noll's Football Broadcast Damages Per Current Athlete, 2009-2010



**Notes:** Per athlete damages  are calculated by dividing Professor Noll's per-school "Damages Summary" reported in his Exhibits 5A through 37A from the Noll Reply Report by the number of current players on the teams' rosters for the 2009-10 season, according to Professor Noll's roster analysis. Values reported represent broadcast damages for current athletes based on Professor Noll's "Scenario A."
**Sources:** *PER_ATHLETE.CSV* and *Create Damages Exhibits.sas* from the backup to Professor Noll's Reply Report, April 25, 2013.

Highly Confidential - Counsel Only: Subject to Protective Order

**Exhibit 1C: Professor Noll's Broadcast Damages Per Current Athlete, 2009-2010**

| Conference | School | Noll Recalculated Per Athlete Damages[1] | |
|---|---|---|---|
| | | Basketball | Football |
| ACC | Miami (FL) | | |
| ACC | Boston College | | |
| ACC | Virginia Tech | | |
| ACC | Maryland | | |
| ACC | Duke | | |
| ACC | North Carolina State | | |
| ACC | Clemson | | |
| ACC | North Carolina | | |
| ACC | Florida State | | |
| ACC | Georgia Tech | | |
| ACC | Virginia | | |
| ACC | Wake Forest | | |
| Big 12 | Missouri | | |
| Big 12 | Baylor | | |
| Big 12 | Oklahoma | | |
| Big 12 | Texas Tech | | |
| Big 12 | Kansas State | | |
| Big 12 | Iowa State | | |
| Big 12 | Texas | | |
| Big 12 | Colorado | | |
| Big 12 | Oklahoma State | | |
| Big 12 | Nebraska | | |
| Big 12 | Texas A&M | | |
| Big 12 | Kansas | | |
| Big East | Georgetown | | |
| Big East | Seton Hall | | |
| Big East | Villanova | | |
| Big East | Marquette | | |
| Big East | Rutgers | | |
| Big East | Pittsburgh | | |
| Big East | South Florida | | |
| Big East | Syracuse | | |
| Big East | Connecticut | | |
| Big East | Cincinnati | | |
| Big East | St. John's | | |
| Big East | DePaul | | |
| Big East | Louisville | | |
| Big East | Providence | | |
| Big East | West Virginia | | |
| Big Ten | Iowa | | |
| Big Ten | Illinois | | |
| Big Ten | Minnesota | | |
| Big Ten | Ohio State | | |
| Big Ten | Wisconsin | | |
| Big Ten | Northwestern | | |
| Big Ten | Indiana | | |
| Big Ten | Michigan State | | |
| Big Ten | Michigan | | |
| Big Ten | Penn State | | |
| Big Ten | Purdue | | |
| Independent | Notre Dame | | |

Highly Confidential - Counsel Only: Subject to Protective Order

| Conference | School | Noll Recalculated Per Athlete Damages[1] | |
|---|---|---|---|
| | | Basketball | Football |
| Pac-10 | Washington | | |
| Pac-10 | Stanford | | |
| Pac-10 | Arizona State | | |
| Pac-10 | Arizona | | |
| Pac-10 | California | | |
| Pac-10 | Oregon | | |
| Pac-10 | Oregon State | | |
| Pac-10 | UCLA | | |
| Pac-10 | Washington State | | |
| Pac-10 | USC | | |
| SEC | South Carolina | | |
| SEC | Florida | | |
| SEC | Kentucky | | |
| SEC | Georgia | | |
| SEC | LSU | | |
| SEC | Mississippi | | |
| SEC | Alabama | | |
| SEC | Vanderbilt | | |
| SEC | Auburn | | |
| SEC | Tennessee | | |
| SEC | Arkansas | | |
| SEC | Mississippi State | | |
| America East | New Hampshire | | |
| America East | Maine | | |
| America East | Stony Brook | | |
| America East | Boston University | | |
| America East | UMBC | | |
| America East | Vermont | | |
| America East | Albany | | |
| America East | Binghamton | | |
| America East | Hartford | | |
| Atlantic 10 | Temple | | |
| Atlantic 10 | Massachusetts | | |
| Atlantic 10 | Rhode Island | | |
| Atlantic 10 | Fordham | | |
| Atlantic 10 | La Salle | | |
| Atlantic 10 | Richmond | | |
| Atlantic 10 | Duquesne | | |
| Atlantic 10 | Saint Louis | | |
| Atlantic 10 | Saint Joseph's | | |
| Atlantic 10 | George Washington | | |
| Atlantic 10 | Dayton | | |
| Atlantic 10 | Charlotte | | |
| Atlantic 10 | Xavier | | |
| Atlantic 10 | St. Bonaventure | | |
| Atlantic Sun | Campbell | | |
| Atlantic Sun | East Tennessee State | | |
| Atlantic Sun | Belmont | | |
| Atlantic Sun | Jacksonville | | |
| Atlantic Sun | Lipscomb | | |
| Atlantic Sun | Stetson | | |
| Atlantic Sun | Mercer | | |
| Atlantic Sun | North Florida | | |
| Atlantic Sun | Kennesaw State | | |

Highly Confidential - Counsel Only: Subject to Protective Order

| Conference | School | Noll Recalculated Per Athlete Damages[1] | |
|---|---|---|---|
| | | Basketball | Football |
| Atlantic Sun | Florida Gulf Coast | | |
| Atlantic Sun | South Carolina Upstate | | |
| Big Sky | CSU Sacramento | | |
| Big Sky | Montana | | |
| Big Sky | Montana State | | |
| Big Sky | Northern Colorado | | |
| Big Sky | Northern Arizona | | |
| Big Sky | Idaho State | | |
| Big Sky | Weber | | |
| Big Sky | Portland State | | |
| Big Sky | Eastern Washington | | |
| Big South | Coastal Carolina | | |
| Big South | Gardner-Webb | | |
| Big South | Liberty | | |
| Big South | Charleston Southern | | |
| Big South | Radford | | |
| Big South | Winthrop | | |
| Big South | Virginia Military | | |
| Big South | High Point | | |
| Big South | UNC Asheville | | |
| Big South | Presbyterian | | |
| Big West | UC Davis | | |
| Big West | Cal Poly | | |
| Big West | UC Irvine | | |
| Big West | UC Santa Barbara | | |
| Big West | CSU Northridge | | |
| Big West | Long Beach State | | |
| Big West | CSU Fullerton | | |
| Big West | Pacific | | |
| Big West | UC Riverside | | |
| Colonial Athletic | Delaware | | |
| Colonial Athletic | Towson | | |
| Colonial Athletic | William and Mary | | |
| Colonial Athletic | Hofstra | | |
| Colonial Athletic | James Madison | | |
| Colonial Athletic | Northeastern | | |
| Colonial Athletic | George Mason | | |
| Colonial Athletic | UNC Wilmington | | |
| Colonial Athletic | Drexel | | |
| Colonial Athletic | Old Dominion | | |
| Colonial Athletic | VCU | | |
| Colonial Athletic | Georgia State | | |
| Conference USA | UAB | | |
| Conference USA | Southern Methodist | | |
| Conference USA | East Carolina | | |
| Conference USA | Tulane | | |
| Conference USA | Houston | | |
| Conference USA | Marshall | | |
| Conference USA | Rice | | |
| Conference USA | Southern Mississippi | | |
| Conference USA | Memphis | | |
| Conference USA | Tulsa | | |
| Conference USA | UCF | | |
| Conference USA | UTEP | | |

Highly Confidential - Counsel Only: Subject to Protective Order

| Conference | School | Noll Recalculated Per Athlete Damages[1] | |
|---|---|---|---|
| | | Basketball | Football |
| Great West | Texas-Pan American | | |
| Great West | Chicago State | | |
| Great West | N.J.I.T. | | |
| Great West | Utah Valley | | |
| Great West | South Dakota | | |
| Great West | North Dakota | | |
| Great West | Houston Baptist | | |
| Horizon League | Youngstown State | | |
| Horizon League | Wright State | | |
| Horizon League | Cleveland State | | |
| Horizon League | Detroit | | |
| Horizon League | Valparaiso | | |
| Horizon League | Green Bay | | |
| Horizon League | Butler | | |
| Horizon League | Milwaukee | | |
| Horizon League | Illinois-Chicago | | |
| Horizon League | Loyola (IL) | | |
| Independent | Savannah State | | |
| Independent | Longwood | | |
| Ivy League | Brown | | |
| Ivy League | Cornell | | |
| Ivy League | Yale | | |
| Ivy League | Princeton | | |
| Ivy League | Harvard | | |
| Ivy League | Dartmouth | | |
| Ivy League | Columbia | | |
| Ivy League | Pennsylvania | | |
| MAAC | Fairfield | | |
| MAAC | Rider | | |
| MAAC | Iona | | |
| MAAC | Marist | | |
| MAAC | Niagara | | |
| MAAC | Canisius | | |
| MAAC | Siena | | |
| MAAC | Loyola (MD) | | |
| MAAC | Manhattan | | |
| MAAC | St. Peter's | | |
| MAC | Eastern Michigan | | |
| MAC | Miami (OH) | | |
| MAC | Buffalo | | |
| MAC | Bowling Green | | |
| MAC | Ball State | | |
| MAC | Northern Illinois | | |
| MAC | Western Michigan | | |
| MAC | Ohio | | |
| MAC | Akron | | |
| MAC | Kent State | | |
| MAC | Toledo | | |
| MAC | Central Michigan | | |
| MEAC | Bethune-Cookman | | |
| MEAC | Delaware State | | |
| MEAC | Howard | | |
| MEAC | South Carolina State | | |
| MEAC | Norfolk State | | |

Highly Confidential - Counsel Only: Subject to Protective Order

| Conference | School | Noll Recalculated Per Athlete Damages[1] | |
|---|---|---|---|
| | | Basketball | Football |
| MEAC | Hampton | | |
| MEAC | Florida A&M | | |
| MEAC | Coppin State | | |
| MEAC | Morgan State | | |
| MEAC | North Carolina A&T | | |
| MEAC | Maryland-Eastern Shore | | |
| Missouri Valley | Missouri State | | |
| Missouri Valley | Illinois State | | |
| Missouri Valley | Northern Iowa | | |
| Missouri Valley | Southern Illinois | | |
| Missouri Valley | Indiana State | | |
| Missouri Valley | Wichita State | | |
| Missouri Valley | Evansville | | |
| Missouri Valley | Drake | | |
| Missouri Valley | Creighton | | |
| Missouri Valley | Bradley | | |
| Mountain West | New Mexico | | |
| Mountain West | BYU | | |
| Mountain West | TCU | | |
| Mountain West | San Diego State | | |
| Mountain West | Utah | | |
| Mountain West | Wyoming | | |
| Mountain West | UNLV | | |
| Mountain West | Colorado State | | |
| Northeast | Sacred Heart | | |
| Northeast | Robert Morris | | |
| Northeast | Wagner | | |
| Northeast | Quinnipiac | | |
| Northeast | St. Francis (PA) | | |
| Northeast | LIU Brooklyn | | |
| Northeast | Central Connecticut State | | |
| Northeast | Monmouth | | |
| Northeast | Fairleigh Dickinson | | |
| Northeast | St. Francis (NY) | | |
| Northeast | Mount St. Mary's | | |
| Northeast | Bryant University | | |
| Ohio Valley | Eastern Illinois | | |
| Ohio Valley | Eastern Kentucky | | |
| Ohio Valley | Jacksonville State | | |
| Ohio Valley | Tennessee Tech | | |
| Ohio Valley | Tennessee-Martin | | |
| Ohio Valley | Austin Peay | | |
| Ohio Valley | Southeast Missouri State | | |
| Ohio Valley | Murray State | | |
| Ohio Valley | Tennessee State | | |
| Ohio Valley | Morehead State | | |
| Patriot League | Colgate | | |
| Patriot League | Holy Cross | | |
| Patriot League | Bucknell | | |
| Patriot League | Lehigh | | |
| Patriot League | Lafayette | | |
| Patriot League | American University | | |
| Southern Conference | Elon | | |
| Southern Conference | Samford | | |

Highly Confidential - Counsel Only: Subject to Protective Order

| Conference | School | Noll Recalculated Per Athlete Damages[1] | |
|---|---|---|---|
| | | Basketball | Football |
| Southern Conference | Appalachian State | | |
| Southern Conference | Chattanooga | | |
| Southern Conference | Georgia Southern | | |
| Southern Conference | Western Carolina | | |
| Southern Conference | Davidson | | |
| Southern Conference | UNC Greensboro | | |
| Southern Conference | Furman | | |
| Southern Conference | Wofford | | |
| Southern Conference | Citadel | | |
| Southern Conference | Charleston | | |
| Southland | Texas State | | |
| Southland | Sam Houston State | | |
| Southland | Central Arkansas | | |
| Southland | McNeese State | | |
| Southland | Southeastern Louisiana | | |
| Southland | Stephen F. Austin | | |
| Southland | Texas A&M-CC | | |
| Southland | UTSA | | |
| Southland | Northwestern State | | |
| Southland | Lamar | | |
| Southland | Texas-Arlington | | |
| Southland | Nicholls State | | |
| Summit League | Centenary | | |
| Summit League | North Dakota State | | |
| Summit League | Oakland | | |
| Summit League | Southern Utah | | |
| Summit League | Western Illinois | | |
| Summit League | IUPUI | | |
| Summit League | UMKC | | |
| Summit League | IPFW | | |
| Summit League | Oral Roberts | | |
| Summit League | South Dakota State | | |
| Sun Belt | Western Kentucky | | |
| Sun Belt | Arkansas State | | |
| Sun Belt | Troy | | |
| Sun Belt | Florida Atlantic | | |
| Sun Belt | Louisiana-Monroe | | |
| Sun Belt | Middle Tennessee | | |
| Sun Belt | Louisiana-Lafayette | | |
| Sun Belt | North Texas | | |
| Sun Belt | Florida International | | |
| Sun Belt | Denver | | |
| Sun Belt | Arkansas-Little Rock | | |
| Sun Belt | New Orleans | | |
| Sun Belt | South Alabama | | |
| SWAC | Jackson State | | |
| SWAC | Grambling State | | |
| SWAC | Alabama State | | |
| SWAC | Alcorn State | | |
| SWAC | Mississippi Valley State | | |
| SWAC | Southern University | | |
| SWAC | Alabama A&M | | |
| SWAC | Prairie View A&M | | |
| SWAC | Arkansas-Pine Bluff | | |

Highly Confidential - Counsel Only: Subject to Protective Order

| Conference | School | Noll Recalculated Per Athlete Damages[1] | |
| --- | --- | --- | --- |
| | | Basketball | Football |
| SWAC | Texas Southern | | |
| WAC | Nevada | | |
| WAC | Fresno State | | |
| WAC | Hawaii | | |
| WAC | Boise State | | |
| WAC | San Jose State | | |
| WAC | Utah State | | |
| WAC | Louisiana Tech | | |
| WAC | New Mexico State | | |
| WAC | Idaho | | |
| West Coast | Santa Clara | | |
| West Coast | Portland | | |
| West Coast | Saint Mary's (CA) | | |
| West Coast | Loyola Marymount | | |
| West Coast | San Francisco | | |
| West Coast | Pepperdine | | |
| West Coast | Gonzaga | | |
| West Coast | San Diego | | |

**Notes:** Values reported represent only broadcast damages for current athletes based on Professor Noll's "Scenario A"; missing values indicate that the school does not compete in the FBS.

(1) The values reported as "Recalculated Per Athlete Damages" are calculated by dividing Professor Noll's per-school "Damages Summary" reported in his Exhibits 5A through 37A from the Noll Reply Report by the number of current players on the teams' rosters for the 2009-10 season, according to Professor Noll's roster analysis.

**Sources:** *PER_ATHLETE.CSV* and *Create Damages Exhibits.sas* from the backup to Professor Noll's Reply Report, April 25, 2013.

Highly Confidential - Counsel Only: Subject to Protective Order

## Exhibit 1D: Professor Noll's Broadcast Damages Per Current Athlete, 2009-2010

| All Schools | | |
|---|---|---|
| **Statistic** | **Noll Recalculated Per Athlete Damages**[1] | |
| | **Basketball** | **Football** |
| Minimum | | |
| Maximum | | |
| Median | | |
| 10th% | | |
| 90th% | | |

| "Big 6 Conferences"[2] | | | |
|---|---|---|---|
| **Statistic** | | **Noll Recalculated Per Athlete Damages**[1] | |
| | | **Basketball** | **Football** |
| Minimum | | | |
| Maximum | | | |
| Median | | | |
| 10th% | | | |
| 90th% | | | |

| All Schools Except for "Big 6 Conferences"[2] | | | |
|---|---|---|---|
| **Statistic** | | **Noll Recalculated Per Athlete Damages**[1] | |
| | | **Basketball** | **Football** |
| Minimum | | | |
| Maximum | | | |
| Median | | | |
| 10th% | | | |
| 90th% | | | |

**Notes:** Values reported represent broadcast damages for current athletes based on Professor Noll's "Scenario A" and exclude Houston Baptist, which competes in Division I basketball, but for which Professor Noll calculates no basketball broadcast damages.

(1) The values reported as "Recalculated Per Athlete Damages" are calculated by dividing Professor Noll's per-school "Damages Summary" reported in his Exhibits 5A through 37A from the Noll Reply Report by the number of current players on the teams' rosters for the 2009-10 season, according to Professor Noll's roster analysis.

(2) The "Big 6 Conferences" are the ACC, Big Ten, Big 12, Big East, Pac-10, SEC, and the University of Notre Dame.

**Sources:** *PER_ATHLETE.CSV* and *Create Damages Exhibits.sas* from the backup to Professor Noll's Reply Report, April 25, 2013.

Highly Confidential - Counsel Only: Subject to Protective Order

# Attachment A

May 2013

Curriculum Vitae

# DANIEL L. RUBINFELD

**PRESENT POSITIONS**:

Robert L. Bridges Professor of Law, Professor of Economics, Emeritus
University of California, Berkeley, 788 Simon Tower, Boalt Hall,
Berkeley, California 94720
Phone: (510) 642-1959
Fax: Office (510) 642-3767
e-mail: drubinfeld@law.berkeley.edu

Professor, NYU Law School, Fall Semester, 427 Vanderbilt Hall
40 Washington Square West, New York, NY 10003, Phone: (212) 992 8834
drubinfeld@law.nyu.edu, Fax: (212) 995-4590

**ACADEMIC STUDIES**:  Princeton, Mathematics, B.A., June 1967
M.I.T., Economics, M.S., September 1968
M.I.T., Economics, Ph.D., June 1972

**TEACHING EXPERIENCE**:

Suffolk University, Boston, Massachusetts
 Full-time Economics Instructor, 1968-70
Wellesley College, Wellesley, Massachusetts
 Full-time Economics Instructor, 1970-71
University of Michigan, Ann Arbor, Michigan
 Assistant Professor of Economics, 1972-77
 Associate Professor of Economics and Law, 1977-82
 Professor of Economics and Law, 1982-83
 Research Associate, Institute of Public Policy Studies, 1972-82
University of California, Berkeley, 1983 - present
 Robert L. Bridges Professor of Law and Professor of Economics, 1983-Present
Stanford University
 Visiting Professor of Law, Spring 1989 (Economics and Public Policy)
University of Geneva
 Visiting Professor, May 1991 (Antitrust Law and Economics)
Swiss National Bank, Studienzentrum Gerzensee (one week for each visit)
 Visiting Professor of Law and Economics, Spring 1995-97 (Economics of Private Law), 2002
 (Political Economy of Federalism), 2004, 2007 (Competition Law and Economics), 2009, 2011
 (Competition Law and Economics)
New York University
 Visiting Professor, Professor of Law, Spring 1999, Fall 2000, 2003, 2005-2006, 2008-2012
 (Quantitative Methods in Law, Antitrust Law and Economics)
University of Virginia
 Visiting Professor of Law, January 2004 (Antitrust Law and Economics)

University of Hamburg
    Visiting Professor of Law, May 1999, 2002 (Quantitative Methods), June, 2008 (Antitrust Law
    and Economics)
University of Bergen
    Visiting Professor of Law, August 2006, August 2007, August 2008, August 2010
Catholic University of Portugal, Lisbon
    Visiting Professor of Law, April 2009, April 2010
Kiev School of Economics
    Visiting Professor, April 2010


## GOVERNMENT POSITIONS

Economist, Staff of President's Council of Economic Advisers, Summer 1969
Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, June 1997-Dec 1998


## GOVERNMENT CONSULTING

Member, Ann Arbor Rent Control Study Commission, 1973
Consultant, Urban Institute, 1973
Consultant, U.S. Treasury, Program in State and Local Finance, 1984-85
Consultant, National Academy of Sciences, Panel on Taxpayer Compliance, 1985-86
Consultant, U.S. Consumer Product Safety Commission, Safety of
    All-Terrain Vehicles, 1987-88
Consultant and Lecturer, Federal Judicial Center, 1993-97, Use of Regression
    Analysis by the Courts
Consultant, World Bank (South Africa Mission), 1995-1997
Consultant, Antitrust Division, 1999, *U.S. v. Microsoft*
Consultant, Competition Directorate, European Union, 2003-2004, Merger Simulation
Lecturer, Federal Trade Commission, June-July, 2003, Antitrust Economics
Consultant, Federal Trade Commission, Antitrust Division, Dept. of Justice, various State Attorneys
    General


## OTHER POSITIONS HELD:

Research Assistant, William G. Bowen, 1966-67
Research Assistant, Paul A. Samuelson, 1971
Consultant, M.I.T.- Harvard, Joint Center for Urban Studies, Spring and Summer, 1972
Consultant, Urban Institute, 1973
Consultant, National Academy of Sciences, Committee on the Costs of Automobile
    Emission Control, Summer 1974
Consultant, National Academy of Sciences, Panel on Statistical Assessments as
    Evidence in the Courts, 1984
Consultant, National Academy of Sciences, Panel on Taxpayer Compliance, 1985-86
Chair, Program in Law and Economics, UC Berkeley, 1986-97, Co-Chair, 2000-
Member, National Academy of Sciences, Working Panel on Field Experimentation in Criminal Justice,
    1986-87
Chair, Program in Jurisprudence and Social Policy, U.C. Berkeley, 1987-1990, 1998-1999
Member, Board of Directors, American Law and Economics Association, 1994-1996, 2001-2003
Secretary-Treasurer, American Law and Economics Association, 2003-2004
Vice President, American Law and Economics Association, 2004-2005

President, American Law and Economics Association, 2005-2006
Vice Chair, ABA Section on Antitrust, Committee on Economics, 1997-1999
Member, National Academy of Sciences, NSF Blue Ribbon Commission on Digital Preservation,
    2007-2010

**ACTIVITIES AND HONORS**:

Princeton University, 1967, Magna Cum Laude, Phi Beta Kappa
Woodrow Wilson Fellow, 1967
National Science Foundation Fellowship, 1968-69
National Science Foundation Dissertation Fellowship, 1971-72
Winner, National Tax Association, Outstanding Doctoral Dissertation Award, 1972
Research Fellow, National Bureau of Economic Research, Cambridge, Massachusetts, 1975-76
Editorial Board, Public Finance Quarterly, 1980-2003
Editorial Board, Law and Society Review, 1982-1985, 1989-1999
Advisory Panel, NSF, Program in Law and Social Science, 1982-84
Editorial Board, Evaluation Review, 1985-1987
Faculty Advisory Board, U.C. Berkeley, Center for Real Estate and Urban Economics, 1983-97,
    2000-
Co-Editor, International Review of Law and Economics, 1987-2003
Lecturer, California Continuing Judicial Studies Program, 1988-1989
Oversight Panel, NSF Program in Law & Social Science, 1988
Board of Directors, LECG, 1995-1997
Board of Directors, Atlas Assets, Inc., 1989-1997, 1999-2008
Member, Correspondent Comm., Interuniversity Consortium for Political & Social Research, 1991-
Editorial Board, Law and Social Inquiry, 1992-1999, 2002-2004
Fellow, Center for Advanced Study in the Behavioral Sciences, 1992-93
Ida Beam Distinguished Lecturer in Law and Economics, University of Iowa, Spring 1995
John Simon Guggenheim Fellowship, 1995
Faculty Advisory Board, UC Berkeley, Burch Ctr. for Tax Policy & Public Finance, 1994-97, 1999-
Elected to American Academy of Arts and Sciences, 2001
Advisory Council, Master Program on Law & Economics, Universidad de Buenos Aires, 2003-
Research Associate, Law School, Australian National University, 2003-
Editorial Board, Journal of Australian Economic Education, 2003-
Editorial Board, The Reviews of Law and Economics, 2004-
Fellow, National Bureau of Economic Research, 2004-
Member, International Academic Council, U. of St. Gallen, Masters in Law & Economics, 2005-
Honorary Doctorate, U. of Basel, November 2008.
Co-Editor, Journal of Legal Analysis, 2008-

**PUBLICATIONS**:

Books

1.    STATISTICAL ANALYSIS OF ECONOMIC AND FINANCIAL DATA, Dynamics Associates,
    Cambridge, 1971, Revised Edition, 1974.

2.    ECONOMETRIC MODELS AND ECONOMIC FORECASTS (with Robert S. Pindyck), McGraw-
    Hill, January 1976.  Second Edition, 1981, Spanish, Japanese, and Chinese versions available; Third
    Edition, 1990; Fourth Edition, 1998.

3.    ESSAYS ON THE LAW AND ECONOMICS OF LOCAL GOVERNMENTS (Editor), COUPE Papers on Public Economics, Urban Institute, December 1979.

4.    AMERICAN DOMESTIC PRIORITIES: AN ECONOMIC APPRAISAL (Co-editor with John M. Quigley), University of California Press, 1985.

5.    MICROECONOMICS (with Robert S. Pindyck), MacMillan, 1989, Second Edition, 1992, Italian, Spanish, and Russian editions, Third Edition, 1995, Portuguese edition; Fourth edition, 1998, Japanese, Chinese editions; Fifth Edition, 2000, Uzbek, Indonesian, German, Korean editions, Sixth Edition, 2005, Seventh Edition, 2009, Croatian, French, Taiwanese, and Basque editions, Eighth Edition, 2013.

6.    DID MICROSOFT HARM CONSUMERS: TWO OPPOSING VIEWS (with David S. Evans, Franklin M. Fisher, and Richard L. Schmalensee), AEI-Brookings Joint Center for Regulatory Studies, 2000.

7.    ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES (Co-editor with John Harkrider), ABA Antitrust Section, 2005.


Journal Articles

1.    "Credit Ratings and the Market for General Obligation Municipal Bonds," National Tax Journal, March 1973, pp. 17-27.

2.    "The Determination of Equalized Valuation: A Massachusetts Case Study," Public Finance Quarterly, April 1975, pp. 153-161.

3.    "Voting in a Local School Election: A Micro Analysis," Review of Economics and Statistics, February 1977, pp. 30-42.

4.    "Suburban Employment and Zoning: A General Equilibrium Analysis," Journal of Regional Science, March 1978, pp. 33-44.

5.    "Hedonic Housing Prices and the Demand for Clean Air" (with David Harrison, Jr.), Journal of Environmental Economics and Management, March 1978, pp. 81-102, in Joseph Herriges and Cathy Kling, eds., REVEALED PREFERENCE APPROACHES TO ENVIRONMENTAL VALUATION: Volume II, Ashgate Publishing Limited, 2008.

6.    "The Long-Run Effects of a Residential Property Tax and Local Public Services" (with A. Mitchell Polinsky), Journal of Urban Economics, April 1978, pp. 241-262, reprinted in John M Quigley, ed., THE ECONOMICS OF HOUSING, Edward Elgar, 1997.

7.    "On the Measurement of Benefits in an Urban Context:  Some General Equilibrium Issues" (with Paul N. Courant), Journal of Urban Economics, June 1978, pp. 346-356.

8.    "The Air Pollution and Property Value Debate: Some Empirical Evidence" (with David Harrison, Jr.), Review of Economics and Statistics, November 1978, pp. 635-638.

9.    "The Distribution of Benefits from Improvements in Urban Air Quality" (with David Harrison, Jr.), Journal of Environmental Economics and Management, December 1978, pp. 313-332.

10. "Tax Limitation and the Demand for Public Services in Michigan" (with Paul N. Courant and Edward M. Gramlich), <u>National Tax Journal</u>, Supplement, June 1979, pp. 147-157.

11. "Public Employee Market Power and the Level of Government Spending" (with Paul N. Courant and Edward M. Gramlich), <u>American Economic Review</u>, December 1979, pp. 806-817.  Reprinted in W. Patrick Beaton (ed.) MUNICIPAL EXPENDITURES REVENUES AND SERVICES (New Brunswick: Rutgers University, 1983), pp. l80-202.

12. "Why Voters Support Tax Limitation Amendments: The Michigan Case" (with Paul N. Courant and Edward M. Gramlich), <u>National Tax Journal</u>, March 1980, pp. l-20.  Also in TAX AND EXPENDITURE LIMITATIONS  (H. Ladd and N. Tideman, editors), COUPE Papers on Public Economics, Urban Institute, 198l, pp. 37-72.

13. "On the Economics of Voter Turnout in Local School Elections," <u>Public Choice</u>, Fall 1980, pp. 315-331.

14. "Why Voters Turn Out for Tax Limitation Votes" (with Edward M. Gramlich and Deborah Swift), <u>National Tax Journal</u>, March 1981, pp. 115-124.

15. "On the Welfare Effects of Tax Limitation" (with Paul N. Courant), <u>Journal of Public Economics</u>, December 1981, pp. 289-316.

16. "Multiple Regression with a Qualitative Dependent Variable," <u>Journal of Economics and Business</u>, January 1982, pp. 67-78.

17. "Micro Estimates of Public Spending Demand Functions and Tests of the Tiebout and Median Voter Hypotheses" (with Edward M. Gramlich), <u>Journal of Political Economy</u>, June 1982, pp. 536-560.

18. "The Dynamics of the Legal Process" (with Lawrence Blume), <u>Journal of Legal Studies</u>, June 1982, pp. 405-421.

19. "Voting on Public Spending: Differences between Public Employees, Transfer Recipients, and Private Workers" (with Edward M. Gramlich), <u>Journal of Policy Analysis and Management</u>, Summer 1982, pp. 516-533.  Reprinted in PROBLEMI DI AMMINISTRAZIONE PUBBLICA, No. 2/1983, pp. 55-88.

20. "Micro-Based Estimates of Demand Functions for Local School Expenditures" (with Theodore C. Bergstrom and Perry Shapiro), <u>Econometrica</u>, November 1982, pp. 1183-1205.

21. "The Distributional Impact of Statewide Property Tax Relief: The Michigan Case" (with Michael Wolkoff), <u>Public Finance Quarterly</u>, April 1983, pp. 131-153.

22. "The Taking of Land: When Should Compensation Be Paid?" (with Lawrence Blume and Perry Shapiro), <u>Quarterly Journal of Economics</u>, February 1984, pp. 71-92.

23. "On Determining the Optimal Magnitude and Length of Liability In Torts," <u>Journal of Legal Studies</u>, August 1984, pp. 551-563.

24. "Budget Reform and the Theory of Federalism" (with John Quigley), <u>American Economic Review</u>, May 1986, pp. 132-137.

25.    "The Efficiency of Comparative Negligence," <u>Journal of Legal Studies</u>, June 1987, pp. 375-394.

26.    "Tax Reform: Implications for the State-Local Public Sector" (with Paul Courant), <u>Journal of Economic Perspectives</u>, Summer, 1987, pp. 87-100.  Reprinted in Samuel Baker and Catherine Elliot (eds.) READINGS IN PUBLIC SECTOR ECONOMICS (Lexington, Massachusetts:  D.C. Heath and Company, 1990) pp. 585-507.

27.    "Efficient Awards and Standards of Proof in Judicial Proceedings (with David Sappington), <u>Rand Journal</u>, Summer 1987, pp. 308-315.

28.    "Tiebout Bias and the Demand for Local Public Schooling" (with Perry Shapiro and Judith Roberts), <u>Review of Economics and Statistics</u>, August 1987, pp. 426-437.

29.    "The Welfare Implications of Costly Litigation for the Level of Liability" (with A. Mitchell Polinsky), <u>Journal of Legal Studies</u>, January 1988, pp. 151-164, in Alan O. Sykes (ed.) ECONOMICS OF TORT LAW, Elgar, 2007, and in Chris William Sanchirico (ed.), ECONOMICS OF EVIDENCE, PROCEDURE, AND LITIGATION, Elgar, 2007, Chapter 19.

30.    "A Test for Efficiency in the Supply of Public Education" (with Theodore Bergstrom, Perry Shapiro and Judith Roberts), <u>Journal of Public Economics</u>, April 1988, pp. 289-307.

31.    "Robbing Peter to Pay Peter:  The Economics of Local Public Residency Requirements" (with Paul N. Courant), <u>Journal of Urban Economics</u>, May 1988, pp. 291-306.

32.    "The Deterrent Effect of Settlements and Trials" (with A. Mitchell Polinsky), <u>International Review of Law and Economics</u>, June 1988, pp. 109-117.

33.    "Micro-Estimation of the Demand for Schooling: Evidence from Michigan and Massachusetts" (with Perry Shapiro), <u>Regional Science and Urban Economics</u>, January 1989, pp. 381-398.

34.    "Unobservables in Consumer Choice: Residential Energy and the Demand for Comfort" (with John Quigley), <u>Review of Economics and Statistics</u>, August 1989, pp. 416-425.

35.    "Economic Analysis of Legal Disputes and their Resolution" (with Robert Cooter), <u>Journal of Economic Literature</u>, September, 1989, pp. 1067-1097. Reprinted in Richard Posner and Francesco Parisi, eds., ECONOMIC FOUNDATIONS OF PRIVATE LAW, Edward Elgar Publishing, 2002, reprinted in Eric B. Rasmusen (ed.), GAME THEORY AND THE LAW, Edward Elgar Publishing, 2008.

36.    "A Note on Optimal Public Enforcement with Settlements and Litigation Costs" (with A.M. Polinsky), <u>Research in Law and Economics</u>, 1989, pp. 1-8.

37.    "Trial Courts:  An Economic Perspective" (with Robert D. Cooter), <u>Law and Society Review</u>, 1990, pp. 2501-2514.

38.    "A Model of Optimal Fines for Repeat Offenders" (with A. Mitchell Polinsky), <u>Journal of Public Economics</u>, September, 1991, pp. 291-306.  Reprinted in Peder Andersen, Vibeke Jensen and Jorgen Birk Mortensen, eds., GOVERNANCE BY LEGAL AND ECONOMIC MEASURES, Copenhagen, G-E-C Gad Publishers, 1993, pp. 33-52.

39. "Statistical and Demographic Issues Underlying Voting Rights Cases," <u>Evaluation Review</u>, December, 1991, pp. 659-672.

40. "Private Guarantees for Municipal Bonds: Evidence from the Aftermarket" (with John M. Quigley), <u>National Tax Journal</u>, December 1991, pp. 29-39.

41. "Fiscal Federalism in Europe:  Lessons from the American Experience" (with Robert P. Inman), <u>European Economic Review</u>, 1992, pp. 654-660.

42. "Evaluating the Injury Risk Associated with All-Terrain Vehicles:  An Application of Bayes' Rule" (with Gregory B. Rodgers), <u>Journal of Risk and Uncertainty</u>, May 1992, pp. 145-158.

43. "Contingent Fees for Attorneys:  An Economic Analysis," (with Suzanne Scotchmer), <u>Rand Journal</u>, Autumn, 1993, pp. 343-356.

44. "An Economic Model of Legal Discovery" (with Robert Cooter), <u>Journal of Legal Studies</u>, January, 1994, pp. 435-463, reprinted in Chris William Sanchirico (ed.), ECONOMICS OF EVIDENCE, PROCEDURE, AND LITIGATION, Elgar, 2007, Chapter 14..

45. "The EMU and Fiscal Policy in the New European Community:  An Issue for Economic Federalism" (with Robert Inman), <u>International Review of Law and Economics</u>, June, 1994, pp. 147-161.

46. "Designing Tax Policy in Federalist Economies: An Overview," (with Robert P. Inman), <u>Journal of Public Economics</u>, 60, 1996, pp. 307-334.

47. "Antitrust Settlements and Trial Outcomes," (with Jeffrey M. Perloff and Paul Ruud), <u>Review of Economics and Statistics</u>, 1996, pp. 401-409.

48. "Optimal Awards and Penalties when the Probability of Prevailing Varies Among Plaintiffs," (with A. Mitchell Polinsky), <u>Rand Journal</u>, 27, 1996, pp. 269-280.

49. "Federalism and Reductions in the Federal Budget," (with John M. Quigley), <u>National Tax Journal</u>, 49, 1996, pp. 289-302.

50. "Rethinking Federalism," (with Robert P. Inman), <u>Journal of Economic Perspectives</u>, 11 (Fall 1997), pp. 43-64, reprinted in John Kincaid ed., Historical and Theoretical Foundations of Federalism," Sage, 2001.

51. "Does the English Rule Discourage Low-Probability-of-Prevailing Plaintiffs?" (with A. Mitchell Polinsky), <u>Journal of Legal Studies</u>, June 1998, pp. 519-534.

52. "Antitrust Enforcement in Dynamic Network Industries," The <u>Antitrust Bulletin</u>, Fall-Winter 1998, pp. 859-882.  (Translated as "Wettbewerb, Innovation und die Durchsetzung des Kartellrechts in dynamischen, vernetzten Industrien," in <u>GRUR International Gewerblicher Rechtsschutz und Urheberrecht Internationaler Teil</u>, Heft 6, 1999).

53. "Empirical Methods in Antitrust: Review and Evidence," (with Jonathan B. Baker), <u>American Law and Economics Review</u>, Fall, 1999, pp. 386-435.

54. "The Primestar Acquisition of the News Corp./MCI Direct Broadcast Satellite Assets," <u>Review of Industrial Organization</u>, Vol. 16, No. 2, March, 2000, pp. 191-209.

55.    "Market Definition with Differentiated Products: The Post-Nabisco Cereal Merger," <u>Antitrust Law Journal</u>, Vol. 68, No. 1, 2000, pp. 163-185.  (Reprinted in GLOBAL COMPETITION POLICY: ECONOMICS ISSUES AND IMPACATS, David S. Evans and A. Jorge Padilla, eds., LECG, 2004; also available in Peking University, International and Comparative Law Review, Vol.5:8, July 2007, pp. 94-111.)

56.    "Structuring Intergovernmental Grants to Local Governments: Lessons from South Africa," <u>Constitutional Political Economy</u>, Vol. 12, 2001, pp. 173-187.

57.    "Can We Decentralize Our Unemployment Policies?  Evidence from the United States" (with Robert Inman), <u>Kyklos</u>, March 2001, Vol. 54, pp. 287-308.

58.    "U.S. v. Microsoft - An Economic Analysis" (with Franklin M. Fisher), <u>The Antitrust Bulletin</u>, Spring 2001, pp. 1-69.

59.    "Vertical Foreclosure in Broadband Access" (with Hal J. Singer) <u>Journal of Industrial Economics</u>, September, 2001, Vol. 49, pp. 299-318.

60.    "Merger Simulation: A Simplified Approach with New Applications" (with Roy Epstein), <u>Antitrust Law Journal</u>, Volume 69, No. 3, December 2001, pp. 883-919, reprinted in Stefan Vogt, Max Albert, and Dieter Schmidtchen (eds.), THE MORE ECONOMIC APPROACH TO EUROPEAN COMPETITION LAW, (Conferences on the New Political Economy), Tubingen, 2007.

61.    "A Note on Settlements under the Contingent Fee Method of Compensating Lawyers" (with A. Mitchell Polinsky), <u>International Review of Law and Economics</u>, Volume 22, No. 2, September 2002, pp. 217-225.

62.    "Aligning the Interests of Lawyers and Clients" (with A. Mitchell Polinsky), <u>American Law and Economics Review</u>, Volume 5, No. 1, Spring 2003, pp. 165-188.

63.    "Merger Simulation with Brand-Level Margin Data: Extending PCAIDS with Nests" (with Roy Epstein), <u>Advances in Economic Analysis & Policy</u>: Vol. 4: No. 1, Article 2, Berkeley Electronic Press, March 2004.

64.    "Exclusion or Efficient Pricing? The "Big Deal" Bundling of Academic Journals" (with Aaron S. Edlin), <u>Antitrust Law Journal</u>, Volume 72, No. 1, August 2004, pp. 128-159.

65.    "Federalism and the Democratic Transition: Lessons from South Africa" (with Robert P. Inman), <u>American Economic Review</u>, Vol. 95, No. 2, May 2005, pp. 39-43.

66.    "The Bundling of Academic Journals" (with Aaron S. Edlin), <u>American Economic Review</u>, Vol. 95, No. 2, May 2005, pp. 441-446.

67.    "Academic Journal Pricing and the Demand of Libraries" (with Aviv Nevo and Mark McCabe), <u>American Economic Review</u>, Vol. 95, No. 2, May 2005, pp. 447-452.

68.    "A Damage-Revelation Rationale for Coupon Remedies (with A. Mitchell Polinsky), <u>Journal of Law, Economics & Organization</u>, Vol. 23, No. 3, October 2007, pp. 653-661.

69.    "The Deadweight Loss of Coupon Remedies for Price Overcharges" (with A. Mitchell Polinsky),

<u>Journal of Industrial Economics</u>, Vol. LVI, No. 2, June 2008, pp. 402-417.

70.    "Econometric Issues in Antitrust Analysis," <u>Journal of Institutional and Theoretical Economics</u>, Vol. 166(1), 2010, pp. 62-77.

71.    "Understanding UPP" (with Roy J. Epstein), <u>B.E. Journal of Theoretical Economics: Policies and Perspectives</u>," Vol. 10, Issue 1, 2010, Article 21.

72.    "Online Advertising:  Defining Relevant Markets" (with James Ratliff), <u>Journal of Competition Law and Economics</u>, August 7, 2010, pp. 1-34.

73.    "On the Pretrial Use of Economists," <u>The Antitrust Bulletin,</u> Vol. 55, No. 3, Fall 2010, pp. 679-687.

74.    "Federal Institutions and the Democratic Transition: Learning from South Africa, <u>Journal of Law, Economics, and Institutions</u>, Vol. 28, Issue 4, October, 2012, pp. 783-817.

75.    "Would the *Per Se* Illegal Treatment of Reverse Payment Settlements Inhibit Generic Drug Investment?" (with Bret M. Dickey), <u>Journal of Competition Law and Economics</u>, Vol.8, No. 3, 2012, pp. 615-625.

76.    "The Use and Threat of Injunctions in the RAND Context," (With James Ratliff), <u>Journal of Competition Law and Economics</u>, January 2013, 1-22.

77.    "Understanding the Democratic Transition in South Africa," (with Robert Inman), <u>American Law and Economics Review</u>, January 2013, 2-23.


Law Review Articles

1.    "The Judicial Pursuit of Local Fiscal Equity" (with Robert Inman), <u>Harvard Law Review</u>, June 1979, pp. 1662-1750.

2.    "Quantitative Analysis in Antitrust Litigation" (with Peter Steiner), <u>Law and Contemporary Problems</u>, Autumn 1983, pp. 69-141.

3.    "Compensation for Takings:  An Economic Analysis" (with Lawrence Blume), <u>California Law Review</u>, July, 1984, pp. 569-628.  Also in Austin Jaffe (ed.) RESEARCH IN LAW AND ECONOMICS, Volume 10, 1987, pp. 53-103 as well as Kenneth G. Dau-Schmidt and Thomas S. Ulen (eds.), LAW AND ECONOMICS ANTHOLOGY, 1988, PP. 226-234.

4.    "Econometrics in the Courtroom," <u>Columbia Law Review</u>, Volume 85, June 1985, pp. 1048-1097.

5.    "The Assignment of Temporary Justices in the California Supreme Court" (with Stephen Barnett), <u>Pacific Law Journal</u>, July 1986, pp. 1045-1197.

6.    "Regulatory Takings:  The Case of Mobile Home Rent Control," <u>Chicago Kent Law Review</u>, Vol. 67, No. 3, Fall 1992, pp. 923-929.

7.    "Sanctioning Frivolous Suits:  An Economic Analysis" (with A. Mitchell Polinsky), <u>Georgetown Law</u>

Journal, Vol. 82, No. 2, December 1993, pp. 397-435. (translated as "Liti Temerarie E Sanzioni Giudiziarie: Un'Analisi Economica", 14 Rivista Critica del Diritto Privato (1996)).

8.    "Reforming the New Discovery Rules" (with Robert Cooter), Georgetown Law Journal, Vol. 84, No. 1, November 1995, pp. 61-89.

9.    "Making Sense of the Antitrust State Action Doctrine:  Balancing Political Participation and Economics Efficiency in Regulatory Federalism" (with Robert Inman), Texas Law Review, Vol. 75, May 1997, pp. 1203-1299.

10.   "On Federalism and Economic Development," Virginia Law Review, Vol. 83, No. 7, October 1997, pp. 1581-1592.

11.   "Open Access to Broadband Networks: A Case Study of the AOL-Time Warner Merger" (with Hal J. Singer), Berkeley Technology Law Journal, Vol. 16, No. 2, Spring 2001, pp. 631-675.

12.   "3M's Bundled Rebates: An Economic Perspective," Chicago Law Review, Vol. 72, 2005, pp. 243-264.

13.   "Antitrust Class Certification:  Towards an Economic Framework" (with Bret M. Dickey), N.Y.U. Annual Survey of American Law, Vol. 66, No. 3, 2011, pp. 459-486.


Articles in Books

1.    "Credit Ratings, Bond Defaults, and Municipal Borrowing Costs:  A New England Study," 1972 PROCEEDINGS OF THE SIXTY-FIFTH ANNUAL CONFERENCE ON TAXATION, National Tax Association, 1972, pp. 331-350.

2.    "Property Taxation, Full Valuation, and the Reform of Educational Finance in Massachusetts," in PROPERTY TAXATION AND THE FINANCE OF EDUCATION, Committee on Taxation, Resources and Economic Development (University of Wisconsin Press), 1974, pp.189-201.

3.    "Property Values and the Benefits of Environmental Improvements:  Theory and Measurement" (with A. Mitchell Polinsky), in Wingo and Evans, eds., PUBLIC POLICY AND THE QUALITY OF LIFE IN CITIES (Johns Hopkins Press for Resources for the Future), 1977, pp. l54-l80.

4.    "Market Approaches to the Measurement of the Benefits of Air Pollution Abatement," in Ann Friedlaender, ed., APPROACHES TO CONTROLLING AIR POLLUTION (M.I.T. Press), 1978, pp. 240-279.

5.    "Judicial Approaches to Local Public-Sector Equity: An Economic Analysis," in Peter Mieszkowski and Mahlon Straszheim, eds., CURRENT ISSUES IN URBAN ECONOMICS (Johns Hopkins Press), 1979, pp. 542-576.

6.    "The Stimulative Effects of Intergovernmental Grants: Or Why Money Sticks Where it Hits" (with Paul N. Courant and Edward M. Gramlich), in Peter Miezkowski and William Oakland, eds., FISCAL FEDERALISM AND GRANTS-IN-AID, COUPE Papers on Public Economics, Urban Institute, 1979, pp. 5-21.

7.    "On Super-rationality and the School Voting Process," in Clifford Russell, ed., COLLECTIVE

DECISION-MAKING (Johns Hopkins Press), 1979, pp. 75-82.

8.    "Property Tax Reduction in Michigan" (with Robert Vishny) in H. Brazer and D. Laren, eds., MICHIGAN'S FISCAL AND ECONOMIC STRUCTURE (University of Michigan Press), 1982, pp. 530-560.

9.    "Tax Assignment and Revenue Sharing in the United States," in R. Mathews and C. McLure, eds., TAX ASSIGNMENT IN FEDERAL COUNTRIES, (Australian National Univ. Press), 1983, pp. 205-33.

10.    "Residential Choice and the Demand for Public Education:  Estimation Using Survey Data" (with Perry Shapiro and Judith Roberts), in H. Timmermans and R. Golledge, eds., BEHAVIOR MODELLING APPROACHES IN GEOGRAPHY AND PLANNING, (Croom Helm), 1986, pp. 179-197.

11.    "Local Public Economics: A Methodological Review," in A. Auerbach and M. Feldstein, eds., HANDBOOK OF PUBLIC ECONOMICS, Volume II, 1987, pp. 87-161.

12.    "Settlements in Private Antitrust Litigation" (with Jeffrey Perloff) in L. White (ed.), PRIVATE ANTITRUST LITIGATION, M.I.T. Press, 1988, pp. 149-184.

13.    "A Federalist Fiscal Constitution for an Imperfect World: Lessons  from the United States," in H. N. Scheiber (ed.) FEDERALISM,  STUDIES IN HISTORY, LAW, AND POLICY, Institute of Governmental Studies, U.C. Berkeley, 1988, pp. 76-92.

14.    "Public Choices in Public Higher Education," (with John Quigley) in Charles Clotfelter and Michael Rothschild, eds. THE ECONOMICS OF HIGHER EDUCATION, National Bureau of Economic Research, 1993, pp. 243-283.

15.    "European Labor Markets:  The Eastern Dimension" (with Jasminka Sohinger) in W. Dickens, B. Eichengreen, and L. Ulman (eds.) LABOR RESPONSES TO EUROPEAN INTEGRATION, Brookings Institution, 1993, pp. 271-286.

16.    "Reference Guide on Multiple Regression," in Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 1994, pp. 415-470, Second Edition, 2000, pp.179-227 (available at http://www.fjc.gov/public/pdf.nsf/lookup/11.mult_reg.pdf/$File/11.mult_reg.pdf), Third Edition, 2011, pp.

17.    "California Fiscal Federalism: A School Finance Perspective," in B. Cain and R. Noll (eds.), CONSTITUTIONAL REFORM IN CALIFORNIA, Institute of Governmental Studies, UC Berkeley, 1995, pp. 431-453.

18.    "The Political Economy of Federalism," (with Robert Inman), in D. Mueller (ed.), PERSPECTIVES ON PUBLIC CHOICE, Cambridge University Press, New York, 1997, pp. 73-105.

19.    "Federalism as a Device for Reducing the Budget of the Central Government,"(with John M. Quigley), in FISCAL POLICY: LESSONS FROM ECONOMIC RESEARCH, Alan Auerbach (ed.), M.I.T. Press, 1997.

20.    "Guide to Multiple Regression," in Faigman, Kaye, Saks, and Sanders (ed.), MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY, West Publishing Co., St.

Paul, Minn., 1997, Vol. 1, pp. 147-183, Second edition, 2000.

21.     "Discovery", in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW, Peter Newman (ed.), MacMillian Reference Ltd. 1998, pp. 609-615.

22.     "Contingent Fees" (with Suzanne Scotchmer), in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW, Peter Newman (ed.), MacMillian Reference, Ltd., 1998, pp. 415-420.

23.     "Federalism," (with Robert Inman), in THE ENCYCLOPEDIA OF LAW AND ECONOMICS, Boudewijn Bouchaert and Gerrit DeGeest, editors, 2000, Volume V, pp. 661-691, available on-line at http://encyclo.findlaw.com.

24.     "Subsidiarity and the European Union" (with Robert Inman), in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND LAW, Peter Newman (ed.), MacMillian Reference Ltd., 1998, pp. 545-551.

25.     "United States v. Microsoft: An Economic Analysis" (with Franklin M. Fisher), pp. 1-44, and "Misconceptions, Misdirections, and Mistakes," pp. 87-96, in Evans, Fisher, Rubinfeld, and Schmalensee, DID MICROSOFT HARM CONSUMERS?  TWO OPPOSING VIEWS, AEI-Brookings Joint Center for Regulatory Studies, 2000.  An updated and revised version appears in Antitrust Bulletin, Spring, 2001.

26.     "Antitrust Policy," *International Encyclopedia of the Social and Behavioral Sciences,* revised, 2012, www.iesbs.com.

27.     "Ensuring Fair and Efficient Access to the Telecommunications 'Bottleneck',"(with Robert Majure), in Claus-Dieter Ehlermann and Louisa Gosling (eds.), THIRD COMPETITION LAW ANNUAL 1998: Regulating Telecommunications (Hart Publishing: Oxford).

28.     "Innovation and Antitrust Enforcement" (with John Hoven), in Jerry Ellig, ed., DYNAMIC COMPETITION AND PUBLIC POLICY: TECHNOLOGY, INNOVATION, AND ANTITRUST ISSUES, (New York: Cambridge), 2001, pp. 65-94.

29.     "Access Remedies in High Technology Antitrust Cases," in Francois Leveque and Howard Shelanski, eds., MERGER REMEDIES IN AMERICAN AND EUROPEAN COMPETITION LAW, 2003 (Cheltenham, U.K.: Edward Elgar), pp. 137-171.

30.     "Maintenance of Monopoly: *U. S. v. Microsoft,*" in John E. Kwoka. Jr. and Lawrence J. White, eds., THE ANTITRUST REVOLUTION, 5th Edition, 2008 (New York: Oxford University Press), pp. 530-557.

31.     "The Strategic Use of Patents: Implications for Antitrust"(with Robert Maness), in Francois Leveque and Howard Shelanski, eds., ANTITRUST, PATENTS AND COPYRIGHT: EU AND US PERSPECTIVES, 2005 (Cheltenham, U.K.: Edward Elgar), pp. 85-102.

32.     "An Empirical Perspective on Legal Process: Should Europe Introduce Private Antitrust Enforcement?" in Peter Nobel and Marina Gets, eds., NEW FRONTIERS OF LAW AND ECONOMICS, 2006 (Zurich, Switz.: Schulthess), pp. 141-148.

33.     "Empirical Study of the Civil Justice System" (with Daniel P. Kessler), 2007, in Polinsky and Shavell

(eds.), HANDBOOK OF LAW AND ECONOMICS, Chapter 5, pp, 343-402.

34.  "Quantitative Methods in Antitrust," Chapter 30 in Wayne D. Collins (ed.), ISSUES IN COMPETITION LAW AND POLICY, ABA Antitrust Section, 2008.

35.  "On the Foundations of Antitrust Law and Economics," in Robert Pitofsky, ed., WHERE THE CHICAGO SCHOOL OVERSHOT THE MARK: EFFECT OF CONSERVATIVE ECONOMIC ANALYSIS ON U.S. ANTITRUST), Oxford University Press, 2008, pp. 51-74.

36.  "Evaluating Antitrust Enforcement:  Economic Foundations," Chapter 19 in Barry Hawk, ed., INTERNATIONAL ANTITRUST LAW & POLICY, Fordham University School of Law, 2008, pp. 457-469.

37.  "Settlements in Antitrust Enforcement:  A U.S. Economic Perspective," in Claus-Dieter Ehlermann and Mel Marquis (eds.), EUROPEAN COMPETITION LAW ANNUAL 2008: ANTITRUST SETTLEMENTS UNDER EC COMPETITION LAW, Hart Publishing, Oxford and Portland, 2009, pp, 85-92.

38.  "Alternative Economic Designs for Academic Publishing," (with Theodore C. Bergstrom), in Rachelle Dreyfuss, Harry First, and Diane Zimmerman, eds., WORKING WITH THE BOUNDARIES OF INTELLECTUAL PROPERTY, Oxford University Press, 2010, pp. 137-148.

39.  "Revising the Horizontal Merger Guidelines:  Lessons from the U.S. and the E.U. (with Richard Gilbert), in Faure, M. and Zhang, X. (eds.), COMPETITION POLICY AND REGULATION: RECENT DEVELOPMENTS IN CHINA, EUROPE AND THE US, Cheltenham, Edward Elgar, 2011, pp. 262-277.

40.  "Antitrust Damages," Chapter 14, in Einer Elhauge, ed., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW, Edward Elgar, 2012, pp. 377-393.

41.  "Current Issues in Antitrust Analysis," in Josef  Drexl, Wolfgang Kerber, and Rupprecht Podszun, eds., COMPETITION POLICY AND THE ECONOMIC APPROACH: FOUNDATIONS AND LIMITATIONS, UK: Edward Elgar, 2011, pp. 81-93.

42.  "Delta-Northwest: Merger Approval Driven by Consumer Benefits from Airline Network Effects," (with Mark Israel, Bryan Keating, and Robert Willig), in John Kwoka and Lawrence White, eds., THE ANTITRUST REVOLUTION, forthcoming.


Other

1.  "Urban Land Values:  Theoretical and Empirical Essays," Joint Center of Urban Studies, M.I.T./Harvard, September 1972, pp. 1-71.

2.  "What Do Tax Limitation Votes Mean" (with Paul N. Courant and Edward M. Gramlich), in Law Quadrangle Notes, University of Michigan Law School, Spring 1982, pp. 24-28.

3.  Book Review, "Studies in State-Local Public Finance," (Harvey Rosen, ed.), Journal of Economic Literature, December 1987, pp. 1882-1883.

4.      Book Review, "America's Ailing Cities:  Fiscal Health and the Design of Urban Policy," (Helen F. Ladd and John Yinger), <u>Journal of Economic Literature</u>, December 1990, pp. 30-32.

5.      Comments on Scotchmer, "Public Goods and the Invisible Hand," in John M. Quigley and Eugene Smolensky (eds.), MODERN PUBLIC FINANCE (Harvard University Press) 1994, pp. 120-125.

6.      "Mergers and Other Competition Policy Issues in Banking," (with George Rozanski), Appendix to "Enhancing the Role of Competition in the Regulation of Banks -- United States," a note submitted to the Directorate for Financial, Fiscal and Enterprise Affairs, Committee on Competition Law and Policy, Organization for Economic Cooperation and Development, February, 1998.

7.      Comment, "Product and Stock Market Responses to Automotive Product Liability Verdicts," by Steven Garber and John Adams, *Brookings Papers on Economic Activity / Microeconomics 1998*, Washington DC: Brookings Institution.

8.      Declaration before the FCC in the Matter of Applications for Consent to the Transfer of Control of Licenses MediaOne Group, Inc., Transferor to AT&T Corp., Transferee (with J. Gregory Sidak), August 23, 1999 (re: broadband internet access).

9.      Affidavit to FCC In re Consolidated Application of EchoStar Communications Corporation, General Motors Corporation, Hughes Electronics Corporation, Transferors, and EchoStar Communications Corporation, Transferee, for Authority to Transfer Control, February 4, 2002 (re: direct broadcast satellite competition and the market for multi-channel video distribution).

10.     *State of New York, et. al. v. Microsoft*, Amicus Brief (with Timothy Bresnahan, Richard J. Gilbert, George Hay, Bruce Owen, and Lawrence J. White), June 2002.

11.     "Subsidiarity, Governance, and EU Economic Policy," (with Robert P. Inman), CESifoForum, Volume 3, No. 4, Winter 2002, pp. 3-11, www.cesifo.de.

12.     Amici Curiae Submission to the U.S. Supreme Court in Support of Petition for Certiorari in *Conwood Co. v. U.S. Tobacco, Co.* concerning the admissibility of statistical evidence (with Stephen Fienberg, Franklin Fisher, and Daniel McFadden), Nov. 20, 2002.

13.     "The State of Antitrust Enforcement - 2004" (co-authored)," ABA Antitrust Section Task Force.

14.     "Effects of Mergers with Differentiated Products (with Roy J. Epstein)," EU Competition Directorate, October 7, 2004, available at http://europa.eu.int/comm/competition/mergers/others/.

15.     "The American Law and Economics Association," in David Clark (ed.) *Encyclopedia of Law and Society,* Sage Publications, 2007.

16.     "Empirical Methods in Antitrust: New Developments in Merger Simulation," in Stefan Vogt, Fmax Albert and Dieter Schmidtchen (eds.), THE MORE ECONOMIC APPROACH TO EUROPEAN COMPETITION LAW, (Conferences on the New Political Economy), Tubingen, 2007, pp. 277-280.

17.     "Sustainable Economics for a Digital Planet:  Ensuring Long-term Access to Digital Information (various co-authors), Feb. 2010:  Report of the Blue Ribbon Task Force on Digital Preservation and Access.

# Attachment B

Deposition and Trial Experience

### Daniel L. Rubinfeld

**In Re: NCAA Student-Athlete Name & Likeness Licensing Litigation**, 2013, Deposition (Federal District Court, Northern District of California, Oakland Division)

**In Re:  Electronic Books Antitrust Litigation**, 2013, Deposition (Federal District Court, Southern District of New York)

**In Re: Titanium Antitrust Litigation**, 2013, Deposition (Federal District Court, Northern District of Maryland)

**In Re: Androgel Antitrust Litigation**, 2012, Deposition (Federal District Court, Northern District of Georgia)

**Martin Marietta v. Vulcan**, 2012, Deposition, Trial Testimony (Court of Chancery, State of Delaware)

**CTS Eventim v. Live Nation**, 2011, Arbitration Testimony (London Court of International Arbitration)

**In Re: TFT-LCD (Flat Panel) Antitrust Litigation**, 2011, Deposition (Federal District Court, Northern District of California)

**Broadcom v. Emulex**, 2011, Deposition (Federal District Court, Central District of California)

**Sunbeam Television Corp. v. Nielsen Media Research, Inc.,** 2010, Deposition (Federal District Court, Southern District of Florida)

**Michael C. Malaney, et al. v. UAL Corporation, United Air Lines, Inc, and Continental Airlines, Inc.**, 2010, Deposition, Hearing (Federal District Court, Northern District of California)

**In Re Static Random Access Memory (SRAM) Antitrust Litigation,** 2010, Deposition (Federal District Court, Northern District of California)

**In Re Apple & AT&TM Antitrust Litigation,** 2010, Deposition (Federal District Court, Northern District of California)

**In the Matter of the Appeal of BP Pipelines (Alaska) Inc.; ConocoPhillips Transportation Alaska, Inc; ExxonMobil Pipeline Company; Koch Alaska Pipeline Company, LLC; and Unocal Pipeline Company as owners, and Alyeska Pipeline Company, LLC, as agent of the pipeline owners, from Alaska Department of Revenue Decision No. 05-56-17 dated April 3, 2006 and Alaska Department of Revenue Notice of Assessment of Oil and Gas Related Property dated March 1, 2006,** 2009, Deposition (State Assessment Review Board of the State of Alaska)

**Baxter Healthcare Corporation, Baxter International Inc., Baxter Healthcare SA, and Deka Products Limited Partnership v. Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America, and Fresenius USA, Inc.,** 2009, Deposition (Federal District Court, Northern District of California)

**State of California v. Abbott Laboratories, Inc., et al.,** 2009, Deposition (Federal District Court, District of Massachusetts)

**Commonwealth of Kentucky v. Alpharma UPSD, Inc., et al.,** 2009, Deposition (Commonwealth of Kentucky, Franklin Circuit Court)

**Cason-Merenda v. Detroit Medical Center, et al.** 2009, Deposition (Federal District Court, Eastern District of Michigan)

**Rambus, Inc. v. Micron, Inc. et al.**, 2009, Deposition (Superior Court of California, County of San Francisco)

**State of Alabama v. Sandoz, Inc.,** 2009, Deposition, Trial Testimony (Circuit Court of Montgomery County, Alabama)

**DRAM Claims Liquidation Trust v. Hynix Semiconductor, Inc., et al.**, 2008, Deposition (Federal District Court, Northern District of California)

**Marcus v. American Express, Inc.**, 2008, Deposition (Federal District Court, Southern District of New York)

**Omnicare, Inc. v. UnitedHealth Group, Inc.,** 2008, Deposition (Federal District Court, Northern District of Illinois)

**In re K-Dur Antitrust Litigation**, 2007, 2008, Depositions (Federal District Court, District of New Jersey)

**ErinMedia, LLC v. Nielsen Media Research, Inc.,** 2007, Deposition (Federal District Court, Middle District of Florida)

**Omax, Inc. v. Flow International, Inc.**, 2007, Deposition (Federal District Court, Western District of Washington)

**Reilly v. MediaNews Group, Inc., et al.**, 2007, Deposition (Federal District Court, Northern District of California)

**Federal Trade Commission v. Warner Chilcott Holdings Co. III, Ltd., State of Colorado et al. v. Warner Chilcott, Barr Industries**, 2007, Deposition (Federal District Court, District of Columbia)

**Columbus Drywall & Insulation, Inc. v. Masco Corp.**, 2007, Deposition (Federal District Court, Northern District of Georgia)

**In Re Linerboard Antitrust Litigation**, 2006, Deposition (Federal District Court, Eastern District of Pennsylvania)

**In Re Tableware Antitrust Litigation**, 2006, Deposition (Federal District Court, Northern District of California), 2007, Trial

**Fresenius Medical Care v. Baxter**, 2006, 2007, Deposition, Trial (Federal District Court, Northern District of California, on two separate occasions)

**Rodriguez et al. v. Kaplan, BAR/BRI**, 2006, Deposition (Federal District Court, Southern District of California)

**MBDA UK Limited v. Raytheon Company**, 2006, Deposition (American Arbitration Association)

**Kaiser Foundation Health Plan, Inc. v. Abbott Laboratories, Inc. and Geneva Pharmaceuticals,** 2006, Deposition, Trial Testimony (Federal District Court, Central District of California)

**Thales Avionics Inc., v. Panasonic Avionics Corp., Matsushita Electric Industrial Co. Ltd.,** 2006, Deposition (Federal District Court, Central District of California)

**Reading International, Inc., Citadel Cinemas, Inc., and Village East Limited Partnership v. Regal Entertainment Group**, 2005, Deposition (Federal District Court, Southern District of New York)

**Lek Pharmaceuticals D.D., et al. v. Glaxosmithkline PLC., et al.**, 2004, 2005, Depositions (Federal District Court, Eastern District of Virginia)

**Bradburn Parent/Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company)**, 2003, Deposition, Testimony at Class Certification Hearing (Federal District Court, Eastern District of Pennsylvania), 2006 Deposition

**In the matter of:  Certain Coamoxiclav Products, Potassium Clavulanate Products and other Products Derived from Clavulanic Acid**, 2003, Deposition (International Trade Commission)

**Lenscrafters, Inc., v. Fredia Wadley, et al. consolidated with U.S. Vision, Cole Vision, and National Association of Optometrists and Opticians v. Fredia Wadley et al.**, 2002, Deposition (Federal District Court, Middle District of Tennessee)

**Ticketmaster Corporation, et al., v. Tickets.com, Inc.,** 2002, Deposition (Federal District Court, Central District of California)

**In re Cigarette Antitrust Litigation**, 2002, Deposition (Federal District Court, Northern District of Georgia)

**In re Terazosin Hydrochloride Antitrust Litigation**, 2002-2004, Depositions, (Federal District Court, Southern Division of Florida)

**Plaintiffs v. Riso, Inc, RPSI, et al.**, 2001, Deposition (Federal District Court, Northern District of California)

**Yamaha v. Bombardier**, 2001, Deposition, Trial Testimony (International Trade Commission)

**Republic Tobacco, L.P. v. North Atlantic Trading Company, et al.**, 2001, Depositions (Federal District Court, Northern District of Illinois)

**University of Colorado Foundation, Inc. v. American Cyanamid Company**, 2000, Deposition, Trial Testimony (Federal District Court, Eastern District of Colorado)

**In re Polypropylene Carpet Antitrust Litigation**, 1999-2000, Depositions, Testimony at Daubert Hearing (Federal District Court, Northern District of Georgia).

**Bell Atlantic vs. Airtouch**, 1999, Deposition (Federal District Court, Northern District of California)

**PBTC and Neon v. BMC**, 1999, Depositions (State Court, Houston, Texas)

**Moviefone v. PacerCats**, 1997, Arbitration Testimony (American Arbitration Association, New York)

**In re American Honda Motor Co., Inc., Dealership Relations Litigation,** 1997 Deposition (Federal District Court, District of Maryland)

**AMD v. Hyundai**, 1996, Deposition (Federal District Court, Northern District of California)

**In re Brand Name Prescription Drugs Antitrust Litigation**, 1996, Deposition (Federal District Court, Northern District of Illinois)

**Northwest Airlines v. American Airlines**, 1996, Depositions (Federal District Court, District of Minnesota)

**Coors v. Miller Brewing Co.**, 1996, Deposition (Federal District Court)

**Optiva v. Teledyne**, 1996, Deposition (Federal District Court, Western District of Washington)

**State of New York v. Kraft General Foods**, 1996, Depositions, Trial Testimony (Federal District Court, Southern District of New York)

**Internal Revenue Service v. American Stores**, 1995, Trial Testimony (U.S. Tax Court, Northern District of California)

**Williams v. Kaiser Sand and Gravel, Gonsalves v. Kaiser Sand and Gravel**, 1995, Deposition (Superior Court of California, County of Sonoma)

**Californians for Population Stabilization v. Tata Sons Limited, et al.**, 1994, Deposition, Trial Testimony, (Superior Court of California, County of Santa Clara).

**McGovern v. Bunnell**, 1994, Deposition (Superior Court of California, County of San Francisco)

**DSI v. EIS**, 1994, Deposition, Trial (Federal District Court, Washington)

**Centigram v. VMX, Dytel**, 1994, Deposition (Federal District Court, Northern District of California)

**McAlinn v. HCC, Compex Service, Inc., and Compex Systems, Inc.**, 1993, Deposition (Federal District Court, Northern District of California)

**Dart v. Franchise Tax Board of California**, 1993, Deposition (Attorney General's Office, State of California)

**Anderson, et al. v. Texaco Refining & Marketing Inc., et al.**, 1993, Deposition. Trial Testimony (Superior Court of California, County of San Diego)

**City of Long Beach v. Unocal California Pipeline**, 1992, Hearing before the California Public Utilities Commission, Trial Testimony

**EP Technologies, Inc. v. Cardiorhythm**, 1992, Deposition (Federal District Court, Northern District of California)

**City of Long Beach v. Exxon**, 1992, Deposition, Trial Testimony (Federal District Court, Southern District of California)

**Micro Motion v. Exac**, 1991, Deposition, Trial Testimony (Federal District Court, Northern District of California)

**Apple v. Microsoft**, 1991, Deposition (Federal District Court, Northern District of California)

**ATL v. Acuson**, 1990, Testimony at Arbitration Hearing (Superior Court of California, County of Los Angeles)

**Continental v. American Airlines,** 1989, Deposition (Federal District Court, Southern District of California)

**Prosser and Gordon v. Continental Baking Co.** 1989, Depositions, Trial Testimony (Federal District Court, Northern District of California)

**Modine v. Allen**, 1988, Trial Testimony (Federal District Court, Northern District of California)

**Superior Beverage Company, Inc. v. Owens-Illinois, Inc. et al.**, 1987, Court-appointed Expert Report, Testimony (Federal District Court, Northern District of Illinois)

**United Firefighters of Los Angeles and Los Angeles Police Protection League, et. al., v. City of Los Angeles**, 1986 (Superior Court of California, County of Los Angeles)

**Oahu Gas v. Pacific Resources, Inc.**, 1985, Deposition, Trial Testimony (Federal District Court, District of Hawaii)

**Stripper Well Exemption Litigation**, 1984, Testimony at Dept. of Energy Hearing (Federal District Court, District of Kansas)

**Serrano v. Priest**, 1982, Deposition, Trial Testimony (Superior Court of California, County of Los Angeles)

# Attachment C

| List of Additional Materials Considered<br>Expert Sur-Reply Report of Daniel L. Rubinfeld, Ph.D., Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
|---|---|
| **Bates Stamp/Title** | **Date** |
| **Depositions and Exhibits** | |
| Delaney, James E. (Commissioner, Big Ten Conference) (Rough Draft without Exhibits) | 29-May-13 |
| Gerbrandt, Larry | 9-May-13 |
| Heckman, James J. | 29-Mar-13 |
| McCormick, Robert | 15-May-13 |
| Noll, Roger G. | 22-May-13 |
| Rascher, Daniel A. | 21-May-13 |
| Rubinfeld, Daniel L. | 22-Apr-13 |
| Stiroh, Lauren J. | 3-Apr-13 |
| Welty, John D. (President, California State University at Fresno) | 20-May-13 |
| | |
| **Expert Materials** | |
| Amended Declaration of Guy Ben-Ishai, Ph.D., in Support of Opposition to Plaintiffs' Motion for Class Certification | 20-Jun-13 |
| Declaration of Alan J. Cox Regarding Class Certification | 14-Mar-13 |
| Declaration of Daniel A. Rascher in Support of Motion by Antitrust Plaintiffs for Class Certification | 24-Apr-13 |
| Declaration of Lauren J. Stiroh, Ph.D., and Dirk Van Leeuwen | 14-Mar-13 |
| Declaration of Robert E. McCormick in Support of Plaintiffs' Renewed Motion for Class Certification, *Jason White et al. v. NCAA, Case No. CV 06-0999 RGK (MANx)* | 28-Aug-06 |
| Expert Report and Backup of Daniel L. Rubinfeld Regarding Class Certification | 14-Mar-13 |
| Expert Report of Daniel A. Rascher, *Bernard Paul Parrish, et al. v. National Football League Players Association, et al., U.S. District Court, Northern District of California, San Francisco Division, Civil Action No. C07 0943 WHA* | 23-May-08 |
| Expert Report of James J. Heckman | 14-Mar-13 |
| Expert Report of Lauren J. Stiroh, Ph.D. | 14-Mar-13 |
| Rebuttal Report and Backup of Dr. Robert McCormick in Support of Antitrust Plaintiffs' Motion for Class Certification | 25-Apr-13 |
| Reply Report and Backup of Larry Gerbrandt | 25-Apr-13 |
| Reply Report and Backup of Roger G. Noll | 25-Apr-13 |
| Supplemental Declaration of Robert E. McCormick in Support of Plaintiffs' Renewed Motion for Class Certification | 18-Sep-06 |
| | |
| **Legal** | |
| Order Granting Plaintiffs Samuel Michael Keller's and Edward C. O'Bannon, Jr.'s Joint Motion to Consolidate Actions, Case No. 09-1967 CW (Incorrectly omitted from the first List of Materials Considered) | 15-Jan-10 |
| Order on NCAA's and CLC's Motions to Dismiss, Case No. 09-1967 CW (Incorrectly omitted from the first List of Materials Considered) | 8-Feb-10 |
| Consolidated Amended Class Action Complaint, In re NCAA Student-Athlete Name and Likeness Licensing Litigation, Case No. C 09-01967 CW (Incorrectly omitted from the first List of Materials Considered) | 10-Mar-10 |
| Order on Defendants' Motion to Strike, Case No. C 09-1967 CW (Incorrectly omitted from the first List of Materials Considered) | 29-Jan-13 |
| NCAA's Opposition to Motion for Class Certification | 14-Mar-13 |
| Electronic Arts Inc.'s and Collegiate Licensing Company's Opposition to Plaintiffs' Motion for Class Certification | 14-Mar-13 |
| Reply Brief and Exhibits of Antitrust Plaintiffs in Support of Motion for Class Certification | 25-Apr-13 |
| | |
| **Declarations** | |
| Declaration of Kevin Lennon (Vice President of Academic and Membership Affairs, NCAA) | 14-Mar-13 |
| Declaration of Mark Lewis (Executive Vice President for Championships and Alliances, NCAA) | 14-Mar-13 |
| | |
| **Academic Articles, Studies and Texts** | |
| Bamberger, Gustavo E. and Dennis W. Carlton, "Antitrust and Higher Education: MIT Financial Aid (1993)," *The Antitrust Revolution,* 4th Edition, Oxford University Press, 2004, pp. 188-210 | |
| Bowles, Samuel, *Microeconomics: Behavior, Institutions, and Evolution,* Princeton University Press, 2004 | |
| Carlton, Dennis W., Gustavo E. Bamberger and Roy J. Epstein, "Antitrust and Higher Education: Was There a Conspiracy to Restrict Financial Aid?," *The RAND Journal of Economics,* Vol. 26, No. 1, Spring 1995, pp. 131-147 | |
| Coase, Ronald H., "The Problem of Social Cost," *Journal of Law and Economics,* Vol. 3, October 1960, pp. 1-44 | |
| Cooter, Robert and Thomas Ulen, *Law and Economics,* 6th Edition, Pearson, 2011 | |
| Cooter, Robert, "The Cost of Coase," *Journal of Legal Studies,* Vol. XI, 1982 | |
| Daly, George and William J. Moore, "Externalities, Property Rights and the Allocation of Resources in Major League Baseball," *Economic Inquiry,* Vol. XIX, January 1981 | |
| Flynn, Michael A. and Richard J. Gilbert, "The Analysis of Professional Sports Leagues as Joint Ventures," *The Economic Journal* , Vol. 111, February 2001, p. F27-F46 | |
| Gose, Ben, "Princeton Plans Major Increase in Aid for Middle- and Low-Income Students," *Chronicle of Higher Education,* January 30, 1998 | |
| Hoffman, Elizabeth and Matthew L. Spitzer, "The Coase Theorem: Some Experimental Tests," *Journal of Law and Economics,* Vol. 25, No. 1, April 1982 | |

**List of Additional Materials Considered**
**Expert Sur-Reply Report of Daniel L. Rubinfeld, Ph.D., Regarding Class Certification**
*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*

| Bates Stamp/Title | Date |
|---|---|
| Hoxby, Caroline M., "Benevolent Colluders? The Effects of Antitrust Action on College Financial Aid and Tuition," NBER Working Paper 7754, June 2000 | |
| Huma, Ramogi and Ellen Staurowsky, "Study: The Price of Poverty in Big Time College Sport," National Collegiate Players Association, 2012 | |
| Maxcy, Joel G., "Rethinking Restrictions on Player Mobility in Major League Baseball," *Contemporary Economic Policy,* Vol. 20, No. 2, April 2002 | |
| McKenzie, Richard B. and E. Thomas Sullivan, "Does the NCAA Exploit College Athletes? An Economics and Legal Reinterpretation," *The Antitrust Bulletin,* Summer 1987, pp. 373-399 | |
| McKenzie, Richard B. and Gordon Tullock, *The New World of Economics ,* Sixth Edition, Springer, 2012 | |
| Rascher, Daniel A. and Andrew D. Schwarz, "'Amateurism' in Big-Time College Sports," *Antitrust,* Spring 2000, pp. 51-56 | |
| Rottenberg, Simon, "The Baseball Players' Labor Market," *The Journal of Political Economy,* Vol. 64, No. 3, 1956, pp. 242-258 | |
| Rubinfeld, Daniel L., "Antitrust Damages," *Research Handbook on the Economics of Antitrust Law,* Edited by Einer Elhauge, Edward Elgar Publishing, 2012 | |
| Zimbalist, Andrew and Allen Sack, "Thoughts on Amateurism, the O'Bannon Case and the Viability of College Sport," The Drake Group, 2013 | |
| | |
| ***Public Documents*** | |
| Federal Trade Commission and the U.S. Department of Justice, "Antitrust Guidelines for Collaboration Among Competitors," , April 2000, available at http://www.ftc.gov/os/2000/04/ftcdojguidelines.pdf | Apr-00 |
| National Hockey League Players Association, "NHL Collective Bargaining Agreement Summary of Terms" | 12-Jan-13 |
| Union of European Football Association, "The European Club Licensing Benchmarking Report Financial Year 2011" | n.d. |
| | |
| ***Websites*** | ***Date Accessed:*** |
| "Average Salary for Major Leaguers on the Rise," MLB.com, December 5, 2011, available at http://mlb.mlb.com/news/article.jsp?ymd=20111205&content_id=26096930&vkey=news_mlb&c_id=mlb | 24-May-13 |
| "Barcelona, Real Madrid Hold Top Spots Amongst 100 Highest-Paying Teams in Sports," ESPN Media Zone, May 1, 2012, available at <http://espnmediazone.com/us/press-releases/2012/05/barcelona-real-madrid-hold-top-spots-amongst-100-highest-paying-teams-in-sports-part-of-espn-the-magazine-money-issue-on-newsstands-friday/ | 29-May-13 |
| "Bonds Will Be Individually Licensed," ESPN.com, November 17, 2003, available at http://sports.espn.go.com/mlb/news/story?id=1661883 | 28-May-13 |
| "Deshaun Watson Rivals Player Profile," Rivals.com, available at http://rivals.yahoo.com/ncaa/football/recruiting/player-Deshaun-Watson-119269 | 29-May-13 |
| "Framing the Future: Reforming Intercollegiate Athletics," The Coalition on Intercollegiate Athletics, June 15, 2007, available at http://coia.comm.psu.edu/FTF/FTFproposals.pdf | 7-May-13 |
| "Giants Get Record $377,003 Bonus Pay for World Series," KQED, November 26, 2012, available at http://blogs.kqed.org/newsfix/2012/11/26/giants-world-series-share-a-record-377003/ | 28-May-13 |
| "Health And Safety," NCAA.org, 2013, available at http://www.ncaa.org/wps/wcm/connect/public/ncaa/health+and+safety/index.html | 28-May-13 |
| "Highest Football Club Wages," Soccerlens.com, available at http://soccerlens.com/highest-football-club-wages/69045/ | 28-May-13 |
| "Michael Jordan to Appear on Video Game Cover," CNBC, June 2, 2010, available at http://www.cnbc.com/id/37471683/Michael_Jordan_To_Appear_On_Video_Game_Cover | 28-May-13 |
| "Minimum Annual Salary Scale," NBA.com, August 4, 2005, available at <http://www.nba.com/news/cba_minimumsalary_050804.html | 28-May-13 |
| "NFL Salary Cap FAQ," NFL Salary Cap Guru, September 19, 2012, available at http://nflsalarycapguru.wordpress.com/ | 24-May-13 |
| "Restoring the Balance," Knight Commission on Intercollegiate Athletics, June 2010, available at http://www.knightcommission.org/restoringthebalance | 29-May-13 |
| "Rivals.com Prospect Database: About Football Ratings," Rivals.com, n.d., available at http://www.rivals.com/aboutrankings.asp?Sport=1 | 28-May-13 |
| "The 10 Highest Paid Soccer Players in the World," Business Insider, April 22, 2013, available at http://www.businessinsider.com/highest-paid-soccer-players-2013-4?op=1 | 29-May-13 |
| "USA Today | Sports | MLB | Salaries | 2012 San Francisco Giants," USA Today, 2013, available at http://www.usatoday.com/sports/mlb/salaries/2012/giants/player/all/ | 24-May-13 |
| "Welcome," The Coalition on Intercollegiate Athletics, 2013, available at http://blogs.comm.psu.edu/thecoia/ | 29-May-13 |
| | |

**All documents cited in the first Expert Report of Daniel L. Rubinfeld, Ph.D., were also considered.**
**All documents cited in the Rebuttal Report of Dr. Robert McCormick, the Reply Report of Roger G. Noll, and the Declaration of Dr. Daniel A. Rascher were also considered.**