# Exhibit 2

Redacted per 5-31-13 Court Order, Docket 796

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| **In re NCAA Student-Athlete Name and Likeness Licensing Antitrust Litigation** | **Case No. 09-cv-1967-CW** |

**EXPERT REPORT OF DANIEL L. RUBINFELD**
**REGARDING CLASS CERTIFICATION**

March 14, 2013

I.      Introduction ..................................................................................................... 4
   I.A.    Qualifications .............................................................................................. 4
   I.B.    Assignment ................................................................................................. 5
II.     Summary of Opinions ..................................................................................... 6
III.    Background ...................................................................................................... 9
   III.A.   Plaintiffs and Class Definitions ................................................................ 9
   III.B.   Plaintiffs' Allegations ............................................................................. 10
   III.C.   The NCAA and the Structure of College Athletics ................................... 11
      III.C.1.   NCAA ............................................................................................... 11
      III.C.2.   Student-Athletes and Financial Aid ................................................ 12
      III.C.3.   Athletic Conferences ....................................................................... 13
      III.C.4.   BCS Football Bowls ........................................................................ 14
   III.D.   Other Defendants .................................................................................... 14
   III.E.   College Athletics Licensing ..................................................................... 15
      III.E.1.   Overview ........................................................................................... 15
      III.E.2.   Licensing revenue sharing ............................................................... 16
      III.E.3.   Licensed Products ............................................................................ 16
      III.E.4.   Game Broadcasts .............................................................................. 17
      III.E.5.   Video Clips and DVDs ...................................................................... 21
      III.E.6.   Video Games .................................................................................... 22
IV.     Professor Noll's Opinions ............................................................................. 23
V.      The Values of Student-Athletes' Names and Likenesses Vary Enormously ............. 26
VI.     Professor Noll Assumes Away the Class Certification Problem ........................ 30
   VI.A.   Introduction ............................................................................................. 30
   VI.B.   Professor Noll Assumes that All Putative Class Members Own Rights to
   Publicity in Live Broadcasts .................................................................................. 30
   VI.C.   Professor Noll Has Not Specified Which NCAA Rules Would Be
   Changed/Eliminated .............................................................................................. 31
   VI.D.   Professor Noll Has No Opinion as to the Mechanism for Determining
   Student-Athlete Compensation in the But-for World .................................................. 32
   VI.E.   Professor Noll Has Failed to Specify the Details of Any But-for Negotiation
   33
   VI.F.   Professor Noll Assumes that Transactions for NIL Rights Are Separate from
   Transactions for Labor ........................................................................................... 34
   VI.G.   Professor Noll Asserts that Proceeds from Group Licenses Would Be
   Divided Equally .................................................................................................... 35
VII.    Professor Noll's But-For World Is Not Supported by Bargaining Theory ........... 36
VIII.   Professor Noll's But-For World Is Not Supported by His Professional Sports
Analogues .................................................................................................................. 41
      VIII.A.1.   Professional Sports Do Not Have Similar Group Licenses for Broadcast
      Revenue   41
      VIII.A.2.   Professional Sports Group Licenses Do Not Support Equal Sharing ... 42
      VIII.A.3.   Professor Noll Ignores Fundamental Differences between Professional
      Sports and Intercollegiate Sports .............................................................................. 44
      VIII.A.4.   Professional Athletes Negotiate Through Players' Unions ................... 46

VIII.A.5.    Professor Noll Treats Current and Former Student-Athletes the Same, Contrary to Professional League Practices .................................................................. 47

VIII.A.6.    Professor Noll's Team Distribution Methodology Is Not Consistent with the Methodology of Professional Leagues............................................................... 47

VIII.A.7.    Professor Noll's Equal Sharing Assumption Is Not Supported by His Music Analogies............................................................................................................. 48

IX.    Professor Noll's But-for World Is Inconsistent with Competition among Conferences........................................................................................................................... 49

X.    Professor Noll's Equal Sharing Assumption Creates Substantial Conflicts over How to Split Damages among Class Members ............................................................................ 51

XI.    Fundamental Differences in Matching of Student-Athletes to Schools Would in the But-For World Create Substantial Conflicts among the Damages Class Members.... 52

XI.A.    There Are Several Sources of Conflicts....................................................... 52

XI.B.    Student-Athletes Would Have Made Substantially Different Choices with Respect to Schools and Sports in Professor Noll's But-for World ........................... 54

XI.C.    The NCAA or Conferences May Have Altered Other Rules ....................... 58

XI.D.    Schools Would Have Faced Very Different Athletic Department Budget Decisions59

XI.D.1.    Colleges Would Have Made Substantially Different Choices in Spending Athletic Department Revenue.................................................................................. 60

XI.D.2.    Schools Might Have Dropped or Substantially Altered their Men's Basketball and Football Programs ......................................................................... 61

XI.D.3.    The Matching of Schools to Conferences May Have Changed............... 62

XI.D.4.    Licensing Contracts and Licensing Royalties May Have Been Different 63

XII.    Implementation of Professor Noll's Damages Methodology Creates a Class Conflict ................................................................................................................................ 64

# I.    INTRODUCTION

## I.A.    Qualifications

1.    I am the Robert L. Bridges Professor of Law and Professor of Economics Emeritus at the University of California, Berkeley and Professor of Law at New York University.  I served as Deputy Assistant Attorney General for Antitrust at the U.S. Department of Justice from June 1997 through December 1998.  In that position, I was responsible for supervising a staff of approximately 70 Ph.D. economists, financial analysts, and research assistants with respect to a wide range of antitrust matters, including monopolization, price fixing, and other restraints of trade.

2.    I received my A.B. degree in mathematics from Princeton in 1967 and my Ph.D. in economics from M.I.T. in 1972.  I have previously taught at the University of Michigan and have been a Visiting Professor at the law schools of Stanford University, the University of Geneva, the University of Hamburg (on several occasions), the University of Virginia, Catholic University of Lisbon (on several occasions), the University of Bergen, Kiev University, and New York University (on numerous occasions).  During the summer of 2003, at the invitation of the Federal Trade Commission, I offered a mini-course on antitrust economics to staff attorneys.   Several years ago, I received an honorary doctorate from the University of Basel, Switzerland.

3.    I am the author of two textbooks, *Microeconomics* and *Econometric Models and Economic Forecasts* (both with Robert Pindyck).  I have received fellowships from the National Bureau of Economic Research, the John M. Guggenheim Foundation, and the Center for Advanced Studies in the Behavioral Sciences.  I am a past President of the American Law and Economics Association.  I am a current Fellow of the American Academy of Arts and Sciences and a Fellow of the National Bureau of Economic Research.

4.    My research interests have spanned a range of subject matters, including industrial organization and antitrust policy, public economics, the economics of legal rules and institutions, and law and statistics.  I have published or edited seven books and over 100 articles.  I have consulted and testified extensively on

antitrust, intellectual property, public regulation, and damages issues, for private parties and for the U.S. Department of Justice, the Federal Trade Commission, the U.S. Treasury, and various State Attorneys General.

5. My teaching experience includes antitrust law and economics, quantitative methods in law, the economics of legal rules and institutions, and economics and public policy.  I have served on a number of occasions as a lecturer for the Federal Judicial Center concerning the use of statistical methods by the courts.

6. I have previously consulted on issues related to the sports, entertainment, and media industries. These matters involved ticketing at live performance venues (including college and professional sports), the licensing of music in radio and television, and the rating of radio and television shows.

7. I have submitted reports and given testimony (in trial and at judicial hearings) with respect to class certification, for plaintiffs, for defendants, and as a court-appointed expert.

8. A current copy of my curriculum vitae is included as Attachment 1.  A list of prior testifying experience is included as Attachment 2.

9. I am currently being compensated for my work in this case at the hourly rate of $1,200.  I have no financial interest in the outcome of this matter.

**I.B.    Assignment**

10. I have been retained by counsel for the National Collegiate Athletic Association ("NCAA") to evaluate economic issues relevant to certification of the proposed Antitrust Classes with a particular emphasis on economics principles relating to industrial organization and antitrust.  I have also been asked to evaluate the opinions related to class certification offered by Professor Roger Noll, the economist retained by Antitrust Plaintiffs.  While Professor Noll offers a variety of opinions on the merits, I have not been asked to respond to those opinions at this time except to the extent they bear on class certification issues.  A list of documents considered in forming my opinions is attached as Attachment 3.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER

## II.   SUMMARY OF OPINIONS

**Professor Noll's methodology for determining classwide proof of impact and damages fails; it does not account for the substantial heterogeneity in student-athletes, schools, and conferences.**

11. As Professor Noll concedes, student-athletes differ substantially in their values to college athletics programs.   Moreover, schools and conferences differ substantially along many dimensions such as size, relative importance of athletics, and educational quality.  This heterogeneity would create substantial variation in the outcome of any licensing negotiations, such that impact and damages cannot be proven on a classwide basis. Yet Professor Noll assumes away this heterogeneity by arbitrarily assuming (i) that each conference/school would give student-athletes 50 percent of licensing revenue from game broadcasts (and 33 percent from video games), and (ii) that each student-athlete on a team would get an equal share of that revenue.

12. Professor Noll's two assumptions are not supported by bargaining theory. The economic literature on bargaining demonstrates that bargaining outcomes will depend importantly on characteristics of the parties, their information, and the structure of the bargaining process.  Indeed, each bargaining outcome depends on what could be achieved if the bargain breaks down and factors that would affect how parties split any surplus from the negotiation.  Substantial heterogeneity on both sides of the bargain – student-athletes and the NCAA/conferences/schools – creates a wide range of potential outcomes that are entirely consistent with bargaining theory.

13. Professor Noll's two assumptions are not supported by his professional sports analogues.  None of the professional leagues he points to shares broadcast revenue with players through a group license providing equal shares to all players.  Rather, as part of collective bargaining agreements with player unions, revenues are distributed to teams which then pay players a wide range of compensation subject to salary caps, minimum salaries, and other constraints set by the league.

14. Professor Noll's two assumptions are not consistent with competition among conferences for student-athletes on the basis of licensing rules.  Professor Noll has conceded that conferences are heterogeneous and are likely to differ from each

other in the rules they set. He has offered no opinion as to how these licensing rules might differ across conferences and how this might be demonstrable using common proof. Conferences competing on licensing rules would have economic incentives to offer a greater share of licensing revenues to higher value student-athletes.

**There is a substantial conflict over the appropriate methodology for allocating damages.**

15. Professor Noll's equal sharing assumption creates a fundamental class conflict as to how any student-athlete's share of licensing revenue should be determined. Walk-ons, redshirts, and players that never played or otherwise contributed little to team performance and revenues would be substantially better off under Professor Noll's approach, which gives them the same share as a star quarterback. However, star athletes would be substantially better off under a methodology that rewarded them with a share of licensing revenue that is based on the value that they create for the school.

**There is a substantial conflict among putative class members over the extent of "rematching" in the but-for world.**

16. Professor Noll's but-for world creates a fundamentally new economics of college athletics. College basketball players would earn as much as $1 million in licensing revenue over a four-year career and college football players would earn as much as $250,000 (but both football and basketball players at many schools would earn little to no licensing revenue). This enormous variation both within and between conferences would (as Professor Noll concedes) have led student-athletes, colleges, and conferences to make substantially different decisions in the but-for world, resulting in very different matching ("rematching") between student-athletes, colleges, and sports. Professor Noll's damages methodology completely ignores this rematching. Students at high-licensing revenue schools would be better off under Professor Noll's damages methodology. Students at schools with little to no licensing revenue would be better off under a damages

methodology that accounts for rematching, allowing them to demonstrate that they would have chosen a different (high-revenue) school in the but-for world.

**Class-wide proof is not possible for both the damages and injunctive class.**

17. Not only does rematching require individualized inquiry as to the fact and amount of damages, but with fundamental differences in the nature of college athletics in the but-for world, many putative class members would be worse off than they are in the actual world.  In the face of substantially increased expenses, Professor Noll concedes that some schools may eliminate athletic programs or shift to lower NCAA divisions with smaller scholarship obligations.  It could also lead to changes in rules like reductions in scholarship amounts or rosters sizes.  Student-athletes receiving a scholarship (or on a roster) may have lost that scholarship or that roster spot and therefore be worse off in the but-for world.  Predicting the effect of these changes on student-athletes is difficult if not impossible, and in any case would only be feasible through individualized inquiry into the specific circumstances of those conferences, schools, and athletes.

**Professor Noll's analysis is incomplete, unreliable, and speculative.**

18. Professor Noll assumed, without investigation, that all putative class members have marketable rights to their name, image, and likeness ("NIL") as used in game broadcasts and video games.

19. Professor Noll has not spelled out the specific defendant conduct that is anticompetitive, and therefore (with specificity) how his but-for world would differ from the actual world – a fundamental element in any analysis of impact and damages.  Nor has he offered a theory as to how NCAA rules or other conduct restricts former student-athletes from marketing their NILs.

20. Professor Noll has assumed, without support and contrary to the economic incentives of conferences and schools, that negotiations over NILs would occur only after players are on a roster and have, in his view, the ability to hold up a game broadcast.  To the contrary, conferences and schools would have an incentive to conduct this negotiation at the same time they are discussing the

scholarship terms with student-athletes – before they enroll at a school, at which point most student-athletes would have little to no ability to negotiate substantial payments for their NILs.

21. Professor Noll offers no opinions as to the specific mechanism through which student-athletes would earn licensing revenues.  He posits that the arrangement for licensing revenues could have been achieved through student-athletes forming a union, through some other "aggregating entity," or through competition between NCAA conferences over licensing distribution rules.

## III.  BACKGROUND

### III.A.  Plaintiffs and Class Definitions

22. As further detailed in Exhibit 1, "Antitrust Plaintiffs" include 11 former NCAA Division I men's basketball ("D-I basketball") players and five former NCAA Football Bowl Subdivision football ("FBS football") players.[1]

23. Antitrust Plaintiffs seek to certify two classes, which they identify as the "Antitrust Damages Class" and the "Declaratory and Injunctive Relief Class."[2]

    a.  The "Antitrust Damages Class" consists of a group of former student-athletes, specifically:

> All *former* student-athletes residing in the United States who competed on an NCAA Division I (formerly known as "University Division" before 1973) college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team whose images, likenesses and/or names *have been* included in game footage or in videogames licensed or sold by Defendants, their co-conspirators, or their licensees *from July 21, 2005 and continuing until a final judgment in this matter*. The class does not include current student-athletes, the officers, directors, and

[1] Notice of Motion and Motion by Antitrust Plaintiffs for Class Certification and Memorandum of Points and Authorities in Support Thereof, March 7, 2013 ("Class Certification Motion"), fn. 1. Antitrust Plaintiffs include plaintiffs raising claims in the Second Consolidated Amended Class Action Complaint, and the consolidated Robertson and Russell actions. (Second Consolidated Amended Class Action Complaint, *In Re NCAA Student-Athlete Name & Likeness Licensing Litigation*, May 16, 2011 ("SCAC"); Class Action Complaint, William F. Russell v. National Collegiate Athletic Association, et al., October 5, 2011, ("Russell Complaint"); Class Action Complaint, *Oscar P. Robertson, Tate George, and Ray Ellis v. National Collegiate Athletic Association, et al.,* January 2011, ("Robertson Complaint")).  I understand that a separate set of "Right of Publicity Plaintiffs" are pursuing non-antitrust claims (SCAC, p. 2.)  I do not address these claims in this report.

[2] Class Certification Motion, pp. 1-2.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 9

employees of Defendants, the officers, directors, and employees of any NCAA Division I college or university, and the officers, directors, or employees of any NCAA Division I athletic conference.[3]

b. The "Declaratory and Injunctive Relief Class" consists of current and former student-athletes, specifically:

All *current and former* student-athletes residing in the United States who compete on, or competed on, an NCAA Division I (formerly known as "University Division" before 1973) college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team and whose images, likenesses and/or names *may be, or have been,* included in game footage or in videogames licensed or sold by Defendants, their co-conspirators, or their licensees after the conclusion of the athlete's participation in intercollegiate athletics. Excluded from this Class are the officers, directors, and employees of Defendants, the officers, directors and employees of any NCAA Division I college or university, and the officers, directors, or employees of any NCAA Division I athletic conference.[4]

### III.B.  Plaintiffs' Allegations

24. In their complaint, the Antitrust Plaintiffs allege that the NCAA, Electronic Arts, Inc. ("EA"), the Collegiate Licensing Company, LLC. ("CLC"), "and their co-conspirators have committed violations of federal antitrust laws by engaging in a price-fixing conspiracy and a group boycott/refusal to deal that has unlawfully foreclosed class members from receiving compensation in connection with the commercial exploitation of their images, likenesses and/or names following the cessation of intercollegiate athletic competition."[5]

25. Plaintiffs claim that the NCAA unlawfully requires student-athletes who wish to be eligible to participate in intercollegiate athletics to sign forms each year, including a "Student Athlete Statement," that purport to release their rights to their collegiate NILs in perpetuity to the NCAA for free.[6]

---

[3] Class Certification Motion, pp. 1-2 (emphasis added).
[4] Class Certification Motion, p. 2 (emphasis added).  In the SCAC, plaintiffs sought to certify the same two classes of Antitrust Plaintiffs, except that there, they did not limit the coverage to "game footage or video games."  SCAC, p. 76.
[5] SCAC, p. 4.  Antitrust Plaintiffs identify as co-conspirators various other entities which have "participated…in the violations and conspiracy alleged herein, including the NCAA's members." These other entities include firms that have entered into licensing contracts with the NCAA and its members. (SCAC, p. 51).
[6] SCAC, p. 8, and Class Certification Motion, pp. 4-5.  Part IV of Form 08-3a states: "You authorize the

26. As a result, the Antitrust Plaintiffs allege that this "cartel has collectively and illegally conspired to limit and depress the compensation of former student-athletes for continued use of their images to zero."[7]  Antitrust Plaintiffs request monetary damages on behalf of the Antitrust Damages Class (which consists of former student-athletes); that release forms they are required to sign regarding future compensation rights be declared void; and on behalf of former and current student-athletes, that the NCAA and its members be enjoined from utilizing these or similar forms.[8]

### III.C.   The NCAA and the Structure of College Athletics

### III.C.1.   NCAA

27. The NCAA is a non-profit organization with over 1,000 active member schools and nearly 100 member conferences.[9] The NCAA organizes and oversees inter-collegiate athletic competition and athletic programs among its member institutions.  Athletic competition among NCAA schools is organized across three Divisions, each with its own set of rules and requirements, which govern "recruiting, eligibility, financial aid and benefits, among other things."[10]

28.  Division I includes 340 member schools which are permitted under Division bylaws to offer the largest amounts of athletic scholarships subject to a number of restrictions, and which generally have larger athletics programs.[11]   Among member schools that play football, Division I is further divided into 120 FBS

---

NCAA [or third party acting on your behalf of the NCAA (e.g., host institution, conference, local organizing committee)] to use your name or picture to generally promote NCAA championships or other NCAA events, activities or programs." (Part IV of Form 08-3a Academic Year 2008-09, Student-Athlete Statement – Division I).

[7] SCAC, p. 10.

[8] SCAC, p. 12.

[9] "Finances," *NCAA.org, available at*
 http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/index.html, Accessed March 12, 2013; "About the NCAA," *NCAA.org*, available at
 http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new, Accessed August 24, 2012.

[10] "About the NCAA," *NCAA.org*, available at
http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new, Accessed August 24, 2012.

[11] "About the NCAA," *NCAA.org*, available at
http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new, Accessed August 24, 2012; According to the 2009 NCAA Revenues and Expenses Report, the median Division I athletics expenses per institution was about $15.9 million, compared with Division II, with a median of $4.1 million, and Division III with a median of $2.0 million.  2009-10 NCAA Membership Report, pp. 15, 17 and 21.

schools and 122 Football Championship Subdivision ("FCS") schools.[12]

29. The 290 Division II schools offer limited athletically-based financial aid; the 436 Division III schools offer no athletically-based financial aid.[13]

30. In 2009-2010, over 430,000 student-athletes participated in NCAA sports; 5,182 participated in D-I basketball and 14,319 participated in FBS football.[14]

31. The NCAA administers 89 national championships in 23 sports across all Divisions.[15]  This includes D-I basketball but not FBS football.[16]  Since 2005, the NCAA has also operated the pre- and post-season basketball National Invitational Tournament ("NIT"), in which Division I teams compete.[17]

**III.C.2.    Student-Athletes and Financial Aid**

32. Most Division I schools provide athletically-based financial aid.  Under NCAA Division I Bylaws, "[a] student-athlete shall not be eligible to participate in intercollegiate athletics if he or she receives financial aid that exceeds the value of the cost of attendance….  A student-athlete may receive institutional financial aid based on athletics ability … and educational expenses awarded … up to the value of a full grant-in-aid, plus other financial aid up to the cost of attendance."[18]  A

---

[12] The FBS was formerly known as Division I-A, and the FCS was formerly known as Division I-AA.  The remaining 98 Division I schools do not offer football ("About the NCAA," NCAA.org, available at http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new, Accessed August 24, 2012 and "FCS Name No Longer Letter Perfect," *msn.foxsports.com*, available at http://msn.foxsports.com/collegefootball/story/football-championship-subdivision-schools-debate-name change-082712, Accessed March 12, 2013).

[13] "About the NCAA," NCAA.org, available at
 http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new, Accessed August 24, 2012.

[14] "About the NCAA," NCAA.org, available at
 http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new, Accessed August 24, 2012.

[15] "About the NCAA," NCAA.org, available at
 http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new, Accessed August 24, 2012.

[16] "Championship List," *NCAA.org*, available at
 http://www.ncaa.org/wps/wcm/connect/public/ncaa/championships/championships+list, Accessed March 7, 2013; "NCAA Trademarks," *NCAA.org*, available at
http://www.ncaa.org/wps/wcm/connect/public/NCAA/Championships/Broadcasting+and+Marketing/List of+NCAA+Trademarks, Accessed March 7, 2013; "Postseason Football," *NCAA.org*, available at http://www.ncaa.org/wps/wcm/connect/public/NCAA/Championships/Postseason+Football/, Accessed March 7, 2013.

[17] "Basketball Resources: National Invitation Tournament (NIT)," *NCAA*.org, available at http://www.ncaa.org/wps/wcm/connect/public/NCAA/Resources/Basketball+Resources/Basketball+Resou ces+National+Invitation+Tournament+(NIT), Accessed March 7, 2013.

[18] Bylaws 15.1, and 15.02.2 2012-2013 NCAA Division I Manual.  The cost of attendance is defined as "an

"full grant-in-aid" is "financial aid that consists of tuition and fees, room and board, and required course-related books."[19]   For some sports, including D-I basketball and FBS football, the NCAA limits the maximum number of student-athletes on a team (known as "counters") who can receive a grant-in-aid of any amount in any given season.[20]   D-I basketball teams can only have up to a maximum of 13 total counters each season.[21]   FBS football teams can only have 85 total counters each season.[22]   A "walk-on" does not receive any athletically-based financial aid.

### III.C.3.    Athletic Conferences

33.  Athletic conferences ("conferences") are collections of individual schools which have joined together to compete against each other in intercollegiate athletics. Conferences are members of the NCAA, and they and their member schools are governed by NCAA rules and bylaws.[23]   However, conferences also have their own rules and bylaws.[24]   For example, the Ivy League does not offer any athletic scholarships, even though as a Division I conference it is permitted to do so under NCAA bylaws.[25]

34.  In-season athletic competition most often occurs between teams in the same conference, and conferences generally administer their own tournaments and championships.  However, there is substantial inter-conference competition, even during regular sports seasons.

35.  As  discussed  later  in  this  report,  conferences  differ  on  a  wide  range  of

---

amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution." Bylaw 15.02.2.

[19] Bylaw 15.02.5, 2012-2013 NCAA Division I Manual.  There have been a number of changes and adjustments to the NCAA By-laws with respect to grants-in-aid.

[20] Formally, a "counter" is defined by the NCAA as "an individual who is receiving institutional financial aid that is countable against the aid limitations in a sport."  Bylaw 15.02.3, 2012-2013 NCAA Division I Manual.  Counters for D-I basketball and FBS football normally receive full grants-in-aid.

[21] Bylaw 15.5.5.1, 2012-2013 NCAA Division I Manual.

[22] Bylaw 15.5.6.1, 2012-2013 NCAA Division I Manual.

[23] *See* for example: *Big 12 Conference 2012-13 Handbook*, Section 1.3.2: "Only institutions that are committed to comply with NCAA rules and policies shall be members of the Conference.... Each Member accepts the primary responsibility for the administration of rules and regulations…" (http://www.big12sports.com/ViewArticle.dbml?DB_OEM_ID=10410&ATCLID=1514844, accessed August 24, 2012.)

[24] *See* for example: *Big 12 Conference 2012-13 Handbook,* and *Ivy Manual, 2011-2012*.

[25] *Ivy Manual, 2011-2012*, Section X, p. 141.

characteristics, including the size of schools, the sports included, and scholarship rules. Over the years there have been numerous conference "realignments," with schools transferring into and out of conferences.  A few schools are independent and not associated with a conference.

36. Exhibit 2 presents a list of FBS Football and D-I Basketball conferences, and their member schools.

### III.C.4.    BCS Football Bowls

37. While the NCAA does sponsor the FCS football championship and football championships for Division II and Division III, it does not sponsor a football championship for FBS schools.  For the past 15 years, these have been organized and administered by the 11 FBS conferences and the University of Notre Dame through the Bowl Championship Series ("BCS") games.[26]  There are four major BSC bowl games plus a national championship bowl administered by the BCS, and 30 other bowl games tied to the FBS conferences[27] School participation in football bowl games depends on both performance and conference affiliation.[28]

### III.D.  Other Defendants

38. In addition to the NCAA, the defendants in this case also include CLC and EA.[29]

39. CLC is the trademark licensing representative for the NCAA and numerous NCAA institutions.[30]  According to its website, CLC "represents nearly 200 of the nation's top colleges, universities, bowl games, athletic conferences, the Heisman Trophy, and the NCAA," and it serves as the licensing agent for the NCAA, and a number of conferences, schools and bowls.[31]

---

[26] "Championships: Postseason Football," NCAA.org, November 20, 2012, available at http://www.ncaa.org/wps/wcm/connect/public/ncaa/championships/postseason+football/overview, accessed March 13, 2013.
[27] "2012-13 FBS Bowl Schedule," NCAA.org, January 8, 2013, available at http://www.ncaa.com/news/football/article/2012-07-11/2012-13-fbs-bowl-schedule, accessed March 13, 2013.
[28] For example, The Big Ten and The Pac-12 conferences are contractually committed to the Rose Bowl. *BCS Bowl Championship Series 2012-2013 Media Guide*, p. 10.
[29] SCAC, pp. 50-51.  The SCAC also includes an unspecified number of "co-conspirators," which include T3Media (formerly Thought Equity Motion), Collegiate Images, Learfield Sports, and Getty Images. SCAC, pp. 99, 134-135.
[30] CLC was founded in 1981, and was acquired by IMG in 2007.  Deposition of Pat Battle, former CEO of CLC, June 19, 2012, pp. 14-16.
[31] "Clients," Collegiate Licensing Company, 2013, available at http://www.clc.com/Clients.aspx, accessed Mar. 13, 2013 and "About CLC," Collegiate Licensing Company, 2013, available at

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 14

40. EA designs and publishes video games, including games for collegiate football and men's basketball, and games featuring a number of professional sports.[32] Since 1993, EA has published an NCAA football video game (currently called *NCAA Football*).[33] From 1995 through 2009, EA published an NCAA basketball video game, called *NCAA Basketball*.[34] Generally each year, EA has released new, updated versions of the video games.[35]

### III.E. College Athletics Licensing

#### III.E.1. Overview

41. The business of licensing the intellectual property associated with college athletics is complex, and has become increasingly so with the growth of new technologies and products. The NCAA, conferences, schools, and bowl games all license rights to their intellectual property through contracts that they negotiate, either independently or jointly, with a wide variety of entities, including broadcast networks, digital and other media platform providers, and merchandise manufacturers and distributors.

42. Conferences enter into their own licensing agreements for media rights separately and independently of the NCAA. The NCAA does not regulate how conferences can sell their media rights.[36] Some schools enter into their own licensing agreements, although for broadcasting and related media rights, the conference licensing agreements generally take precedence. In addition, schools may assign

---

http://www.clc.com/About-CLC.aspx, accessed March 13, 2013.

[32] "Sports Games - EA," Electronic Arts, 2013, available at http://www.ea.com/sports#9, accessed March 13, 2013.

[33] Weiss, Brett Alan, "Bill Walsh College Football," AllGame.com, available at

http://www.allgame.com/game.php?id=12020, Accessed March 12, 2013; Deposition of Joel Linzner, Executive Vice President of Worldwide Legal and Business Affairs for EA, December 18, 2012 (hereinafter "Linzner Deposition"), p. 125.

[34] This game was originally called NCAA March Madness, and then renamed NCAA Basketball. Witzer, Richard, "EA Sports to Drop College Basketball Franchise," *Examiner.com*, March 7, 2010, available at http://www.examiner.com/article/ea-sports-to-drop-college-basketball-franchise, Accessed March 4, 2013; Gilmore, Dave, "Another March Madness with No College Hoops Game in Sight," *Baltimore* Sun, March 15, 2012, available at

http://www.baltimoresun.com/entertainment/bthesite/game-cache/bal-another-march-madness-kicks-off with-no-college-hoops-game-in-sight-20120315,0,5730117.story, Accessed March 4, 2013.  EA also published a video game called *NCAA Basketball: March Madness Edition*, (SCAC, p. 113).

[35] Linzner Deposition, p. 25; Deposition of Roy Harvey, Executive Producer of Madden Football for EA, January 18, 2013 (hereinafter "Harvey Deposition"), pp. 38-39.

[36] Deposition of Greg Shaheen, former Senior Vice President at NCAA, June 25, 2012, pp. 270-271.

their rights to their conferences for use in certain types of media, such as television broadcasting.[37]

### III.E.2.     Licensing revenue sharing

43. The NCAA distributes revenues to its conference and school members through a variety of NCAA Funds, such as the Basketball Fund, the Grant-in-Aid Fund, and the Sports-Sponsorship Fund.  The method of distribution (e.g. whether directly to schools or to conferences), varies by Fund and depends on each Fund's objectives.[38] Therefore, as conference members, schools obtain NCAA licensing revenues distributed directly from the NCAA, and indirectly through their conferences.   A majority of NCAA distributions are not directly based on participation in the D-I basketball tournament.[39]

44. Each conference has its own rules for distributing revenue to its members.  These rules generally depend on whether revenues are payments from the NCAA, FBS football bowls, or whether the revenues are earned through the conferences' own media contracts.[40]  Likewise FBS football bowls also distribute licensing revenue pursuant to their own rules.[41]

### III.E.3.     Licensed Products

45. In the SCAC, Antitrust Plaintiffs identified a wide range of licensed collegiate sports products purportedly at issue in this case including: media to rebroadcast

---

[37] *See*, for example, Pac-12 2012-13 Handbook, p. 9.

[38] 2012-13 Association-Wide Grants, Programs and Services: "Show Me the Money," downloaded from http://www.ncaa.org/wps/wcm/connect/5b1e2a804cd5049baa09be7c2d0d15b8/2012_13%2BAW_GrantsP ograms_Services.pdf?MOD=AJPERES&CACHEID=5b1e2a804cd5049baa09be7c2d0d15b8 (accessed March 4, 2013)

[39] Division I Revenue Distribution, 2011-2012, available at http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/Finances+Distributions?p (Accessed October 24, 2012).  *See also*: Declaration of Mark Womack in Support of the NCAA's Class Certification Opposition Brief, March 12, 2013 (hereinafter "Womack Declaration (SEC)"), p. 7. Mr. Womack is the Executive Associate Commissioner of the Southeastern Conference.

[40] *See* for example: "Pac-12 Handbook," Pac-12.org, December 4, 2012, available at http://compliance.pac-12.org/tools/handbook.html, accessed March 13, 2013, pp. 22-27; "Patriot League: League Governance," PatriotLeague.org, 2013, available at: http://www.patriotleague.org/ot/league_governance/league_governance-index.html, accessed March 13, 2013, pp. 27-28.  "About the Mountain West: 2012-13 Mountain West Handbook," Mountain West Conference, 2013, available at http://www.themwc.com/about/mw-handbook.html, accessed March 13, 2013, Sections 1.5.1 and 1.5.2.; or "2012-13 Big 12 Conference Handbook," Big12Sports.com, September 1, 2010, available at http://www.big12sports.com/ViewArticle.dbml?DB_OEM_ID=10410&ATCLID=1514844.  Accessed August 24, 2012, pp. 13 and 32.

[41] See for example: *BCS Bowl Championship Series 2012-2013 Media Guide*, p. 6.

games; DVDs, video clips and on-demand (via download) game footage; sports content websites; photographs, posters, and trading cards; action figures, toys and video games; and apparel.[42] However, in their Class Certification Motion, plaintiffs limit the products at issue to game footage (including live broadcasts, rebroadcasts, and highlights/clips) and/or video games licensed or sold by Defendants, alleged co-conspirators, or their licensees, covering D-I basketball and FBS football.[43,44]

### III.E.4.    Game Broadcasts

46. The NCAA, conferences, and FBS football bowls have entered into a wide variety of contractual agreements with broadcasting networks which grant rights for live broadcast and rebroadcast of in-season and post-season games.

47. It is often the case that a licensor will have multiple live broadcast rights contracts with different networks, possibly differentiated by sport and geographic coverage, and often with a secondary license covering games not taken by a primary licensee.

48. More recently, with the expansion of the internet and the spread of cable and satellite TV, contracts also specify rights and restrictions on the platforms on which broadcasters may distribute game footage.[45]

49. ***NCAA broadcast contracts.***  The NCAA licenses broadcasts of the D-I basketball tournament, the pre- and post- season NIT Tournaments, and the championships of other NCAA sports.  The NCAA's most substantial source of broadcasting revenue is the D-I Basketball tournament.

50. The NCAA has entered into a number of broadcast contracts during the Antitrust Plaintiffs damages period.

---

[42] SCAC, pp. 99-138.  See also: Noll Report, p. 11.
[43] Class Certification Motion, pp. 1-2; Noll Report, p. 96.
[44] Professor Noll argues "[m]any other products are excluded from the damages calculations because insufficient information has been produced to support a reasonable damages calculation." (Noll Report, p. 96)
[45] I understand that through a variety of cross-licensing agreements, "classic" games are broadcast on networks like ESPN Classic and some conference networks, like the Big Ten Network.  *See* for example: June 28, 2001 letter summarizing an agreement between CBS and ESPN whereby CBS agreed to grant to ESPN Classic non-exclusive rights to telecast past NCAA championships, attached as Exhibit E to the National Collegiate Athletic Association 2001 Championship Agreement between the NCAA and ESPN, June 29, 2001.  *See also:* SCAC, pp. 134-136.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER

a. CBS Agreement.  From 2002 through 2010, this agreement granted CBS exclusive rights to broadcast the D-I basketball tournament. It also included the rights to broadcast NCAA championships in other sports.[46]

b. Turner/CBS Agreement.  In 2010, the NCAA signed a new agreement with Turner Broadcasting and CBS in 2010, which runs through 2024, giving Turner/CBS exclusive rights to live broadcast of the D-I basketball tournament on television and digital platforms.  The Turner/CBS Agreement does not cover any other sports.[47]

c. ESPN Agreement. Since at least 2001 through 2011, ESPN has contracted with the NCAA for the rights for a number of other NCAA championships.[48]  In 2011, the NCAA signed a new agreement with ESPN, which runs through 2024, renewing ESPN's rights that ESPN had had to broadcast the NIT basketball tournament, including international rights to broadcast the D-I basketball tournament, and granting ESPN the right to broadcast a number of other NCAA championships.[49]

51. *Football Bowl game broadcast contracts.*  Broadcast rights to football bowl games are established through contracts between broadcasters, the bowls, and the FBS conferences.[50]  Revenues pursuant to those contracts are shared with

---

[46] *National Collegiate Athletic Association Championship Agreement Between the NCAA and CBS Broadcasting, Inc.* ("CBS Agreement"), November 18, 1999, pp. 1-2, 5, and 9.  Rights for U.S. broadcast included Division I, II, and III basketball, baseball, men's and women's soccer, golf and cross country, and several other sports.  The contract excluded rights to broadcast football.  CBS was not required to broadcast these championships except "at a minimum, include the final game or competition (as applicable) of each Championship at a mutually agreed optimum time of day in light of prevailing interest…" (CBS Agreement, pp. 5, 10 and Exhibits A1 and A2).  CBS is only required to broadcast D-I basketball. The CBS Agreement also granted to CBS, among a number of other things, the right to develop and maintain the NCAA website, non-exclusive right to engage in merchandise licensing, and rights to sublicense subject to NCAA approval.  (CBS Agreement, pp. 5-6).

[47] *Multi-Media Agreement Between Turner Broadcasting System, Inc. and CBS Broadcasting, Inc., and NCAA*, April 22, 2010.  This agreement only covers broadcasting.

[48] *Championship Agreement between the NCAA and ESPN*, June 29, 2001, pp. 2-3.

[49] *Multi-Media Agreement between ESPN, Inc., ESPN Enterprises, Inc., and the NCAA*, December 15, 2011, ("ESPN Agreement"), pp. 11, 18, 25.

[50] For example, I understand that ESPN Inc. has a media contract with the BCS which includes BCS Properties, LLC., eleven conferences and The University of Notre Dame as parties to the contract. "Summary of Distribution Provisions in Big Ten Rights Agreements,"  Produced as an attachment to a March 20, 2012 letter from Emily Emerson at Meyer Brown, LLC. to Ellen Meriwether at Cefferty Faucher, LLP.

conferences and schools.[51]

52. **_Conference broadcast contracts._** Conferences enter into contracts with broadcasters which grant rights to telecast live in-season and conference championship games. Exhibit 3 shows a listing of a number of conference broadcast contracts. These contracts differ on many dimensions including the ability of the licensee to decide which games and sports to broadcast, control and ownership of rights, distinctions between "live," "re-air," and "archival" broadcast, type of platform (television, digital, etc.) and financial terms. Moreover, some conferences and schools have their own broadcast networks, including, for example, the Big Ten Network, a joint venture between The Big Ten Conference and Fox Sports Network.[52]

53. The Big Twelve Conference is made up of large universities located in the central plains.[53] Its schools compete in both D-I basketball and FBS football. The Big Twelve Conference has had live broadcast contracts with ABC and ESPN/ABC since at least 1996; and with Fox Sports Net since at least 1998.[54] These contracts generate substantial revenue for The Big Twelve Conference. The contracts also impose game airing requirements on the broadcaster. For example, the current contract between The Big Twelve Conference and ESPN/ABC stipulates a minimum number of football and men's basketball games per season plus all men's basketball conference tournament games.[55] It also includes broadcast requirements for women's basketball games and other events.[56]

54. The Ohio Valley Conference consists of 12 smaller universities located in Illinois,

---

[51] "2012-13 Bowl Schedule," _espn_.com, available at http://espn.go.com/college-football/story/_/id/8048429/2012-13-bowl-schedule, Accessed March 13, 2013; and _BCS Bowl Championship Series 2012-2013 Media Guide_, pp. 5-7. See also: "The BCS' Big Split," (Noll backup).

[52] "About Us," Big Ten Network, 2011, available at http://btn.com/about/, accessed March 11, 2013

[53] In 2012, The Big Twelve added the University of West Virginia. Barnhouse, Wendell, "TCU, West Virginia Officially Join Big 12," Big12Sports.com, available at http://www.big12sports.com/ViewArticle.dbml?DB_OEM_ID=10410&ATCLID=205499646, accessed March 12, 2013

[54] _Agreement between ABC and The Big Twelve Conference_, March 10, 1994; and _Agreement Between ESPN/ABC and The Big Twelve Conference_, April 18, 2007. _Telecast Agreement between ESPN/ABC and The Big Twelve Conference_. March 11, 2000. _Amended and Restated Telecast Rights Agreement Between The Big Twelve Conference and Fox Sports Net, Inc._, August 1, 1998; and _Telecast Rights Agreement Between The Big Twelve Conference and Fox Sports Net, Inc._, April 1, 2011.

[55] _Agreement Between ESPN/ABC and The Big Twelve Conference_, April 18, 2007, pp. 6-8 and 10-12.

[56] _Agreement Between ESPN/ABC and The Big Twelve Conference_, April 18, 2007, p. 14.

Missouri, Kentucky, Tennessee and Alabama.   The schools compete in D-I basketball and FCS football. The Ohio Valley Conference had a broadcasting agreement with ESPN, which covered the 2005-06 through 2009-10 seasons, with an option to extend for two more seasons. ███████████████████████

██████████████████████████████████████████████████

███████████████ .[57] ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████[58]

55. In general, mid-major and smaller conferences, like The Ohio Valley Conference, do not have lucrative broadcast contracts.

   a. I understand that The Missouri Valley Conference ("MVC") has contracts with ESPN and Fox Sports Net Midwest covering broadcasting for men's and women's basketball, and other sports.  I further understand that both contracts stipulate some sharing of the production cost.[59]  According to its 2009 Form 990, the MVC reported $1,402,718 in television related revenue and $1,385,662 in television related expenses.[60]

   b. The Horizon League has a broadcast contract with ESPN and a live streaming contract with WebStream Sports. The revenue received by the Horizon League under these contracts does not fully cover the associated production costs incurred by the conference.[61]

56. ***School broadcasting contracts.*** Some individual schools have negotiated their own agreements for broadcast rights for their own teams' games.  Generally, these agreements are with local or regional (often cable) networks, and often there are

---

[57] *Agreement between ESPN and The Ohio Valley Conference*, January 19, 2005, p. 3.
[58] *Agreement between ESPN and The Ohio Valley Conference*, January 19, 2005, p. 4.
[59] Declaration of Douglas Elgin In Support of the NCAA's Class Certification Opposition Brief, March 12, 2012 (hereinafter "Elgin Declaration (MVC)"), pp. 2-3. Mr. Elgin is the Commissioner of the Missouri Valley Conference.  *See also*: *Telecast Rights Agreement between Fox Sports Net Midwest and the MVC* (MVC000020-34, at MVC000024-5), the MVC "shall produce and deliver, at MVC's sole cost and expense, a television program of each Game, pursuant to delivery requirements to be agreed upon as between the FSNM and MVC."
[60] Missouri Valley Conference Form 990, 2009, p. 2.
[61] Declaration of Jonathan B. LeCrone In Support of the NCAA's Class Certification Opposition Brief, March 12, 2013 (hereinafter "LeCrone Declaration (Horizon League)"), p. 3. Mr. LeCrone is the Commissioner of The Horizon League.

no royalty payments as such. Rather, the agreements will often establish which parties bear the cost of production and/or allocate advertising inventory.[62]

### III.E.5.    Video Clips and DVDs

57. Digitization of broadcast content has made it possible to offer games in whole or in part over the internet or other distribution platforms like DVDs.

58. The NCAA entered into an agreement with T3Media (formerly Thought Equity Motion), a for-profit company that provides storage and licensing services for "enterprise-scale" video libraries.[63]  Under the agreement, "T3Media agreed to digitize the NCAA's archive of NCAA footage captured on film or videotape," and in exchange, T3Media became the "exclusive third-party agent for sub-licensing that copyrighted footage to third parties…" [64]  The agreement stipulates that T3Media pay the NCAA a royalty on sales over a revenue milestone.[65]

59. In addition to its agreement with the NCAA, T3Media also has separate agreements with the Big Ten Conference, the Mountain West Conference, and Raycom Sports (which includes ACC and SEC footage).[66]  Collegiate Images, a subsidiary of XOS Digital, Inc. ("XOS"), is also a licensor of archival video content, and also has contractual relationships with conferences and schools.[67]

---

[62] *See* for example: *Cable Distribution and Rebroadcast Licensing Agreement* between the University of Georgia and Cable Sports Southeast, May 5, 2005, and *Amended and Restated Multi-Media Rights Agreement between Bowling Green State University and Learfield Communications Inc.*, January 2011.

[63] "About T3Media," T3Media.com, 2012, available at http://www.t3media.com/company/overview/, accessed March 13, 2013and *Digital Asset Management and Exclusive Content Supplier Agreement for the NCAA between Thought Equity and the NCAA*, September 1, 2005, pp. 1-4.  This agreement was amended in 2007.  *See*: *First Addendum to the Digital Asset Management and Exclusive Content Licensing Agreement between Thought Equity Management, Inc. and the NCAA*, February 1, 2007 and  Declaration of Victoria L. Donovan, March 13, 2013 (hereinafter "Donovan Declaration (T3Media)"), p. 1. Ms. Donovan is Senior Vice President and General Counsel of T3Media.

[64] Donovan Declaration (T3Media), p. 2.

[65] *Digital Asset Management and Exclusive Content Supplier Agreement for the NCAA between Thought Equity and the NCAA*, September 1, 2005, pp. 4-5, and *First Addendum to the Digital Asset Management and Exclusive Content Licensing Agreement between Thought Equity Management, Inc. and the NCAA*, February 1, 2007, pp. 2-3.

[66] Donovan Declaration (T3Media), p. 2.

[67] "XOS College Sports," XOSSports.com, 2013, available at http://www.xossports.com/, accessed March 13, 2013For example, under a 2009 agreement between the SEC and XOS, XOS agreed to digitize SECs video content, including archival games, and was granted limited exclusivity to sub-license game clip and full game content (*Digital Rights Agreement between the Southeastern Conference, XOS Technologies*, July 1, 2009, pp. 2, 8-10 and *Cross-License Agreement between the Southeastern Conference, CBS, ESPN and XOS Technologies*, July 1, 2009, p. 1).

### III.E.6.     Video Games

60. Since at least September, 2004, the CLC has served as the NCAA's licensing agent, and had the exclusive rights (directly or indirectly through a sublicense with CBS) to license NCAA "indicia," including "designs, trademarks, service marks, logo graphics and symbols associated with the NCAA and its championships...," for merchandising purposes.[68] Since at least July 2005, EA has contracted with CLC for those rights for use with EAs production of NCAA football and basketball video games.[69] According to Derek Eiler, former Senior Vice President of CLC, those rights are limited to the use of "trademarks" and do not grant to EA the rights to current or former student-athletes' NILs.[70] I understand Antitrust Plaintiffs allege that, while EAs games do not include the names of current student-athletes, the games are produced "with the purpose of having the game avatars match as closely as possible to the real-life characteristics and vicissitudes of actual student-athletes," and therefore they improperly use the student-athletes likenesses.[71]

61. CLC's agreements with EA for college football and basketball also cover rights to the names and symbols acquired from individual schools, conferences and bowls.[72] The license agreements between EA and CLC include "Institutions" that fall into three types as defined in the agreement.   "CLC Institutions" include several dozen institutions already generally represented by CLC as their licensing agent;

---

[68] *Agency Agreement between CBS Sports and The Collegiate Licensing Company*, March 2006 (Effective September 1, 2004), pp. 1-2, 9; and *Second Supplemental Agreement to the NCAA-CBS Agreement*, pp. 1-2.
██████████████ CBS Agreement, pp. 5-6). ████████████████████████████████████
████████████████████████████████ (*Second Supplemental Agreement to the NCAA-CBS Agreement*, pp. 1-2 and *NCAA and IMG College Letter Agreement*, October 30, 2008, NCAAPROD00292600-604, at 601.
[69] *License Agreement NCAA Football between Electronic Arts, Inc. and Collegiate Licensing Company*, December 18, 2008; and *License Agreement NCAA Basketball between Electronic Arts, Inc. and Collegiate Licensing Company*, December 18, 2008.  Collectively, "2008 EA/CLC football and basketball agreements."
████████████████████████████████████████████████████████████
██████████████████ Deposition of Derek Eiler, former Senior Vice President of CLC, June 29, 2012 (hereinafter "Eiler Deposition"), pp. 125-126.
[70] Eiler Deposition, pp. 26-27.
[71] SCAC, pp. 126, 133-134, and 149-151, and Class Certification Motion, p. 6.
[72] ████████████████████████████████████████████████████████ *See*: "License Agreement – *NCAA Football*," CLC0171417-452, at CLC0171417; "License Agreement – *NCAA Basketball*," NCAAPROD00300482-517, at NCAAPROD00300482; and Eiler Deposition, pp. 48-49.

"Authorizing institutions" are several dozen other institutions not represented by CLC but who have authorized CLC to execute the agreement on their behalf; and "Participating Institutions" are not represented by CLC but have executed individual agreements.[73]

62. Under the licensing agreement between CLC and EA, EA pays a royalty to CLC which then distributes the money to the Institutions through a tiered arrangement based on independent agreements CLC has with the Institutions. As a result, CLC's share of the royalties varies by institution.[74]

## IV. PROFESSOR NOLL'S OPINIONS

63. Professor Roger Noll filed a report in support of plaintiffs' motion for class certification.[75] Professor Noll was asked to "…analyze the plaintiffs' allegations in this matter to determine whether the economic evidence and analysis that would be used to prove liability and to calculate damages involve the use of methods and evidence that are predominantly common to class members."[76] In this regard, Professor Noll concludes:

   a. "The relevant class for liability analysis is the injunctive class, which includes all members of the damages class plus two additional groups: former student-athletes in these sports whose images, likeness and/or names have not but could have been licensed or sold, and all current student-athletes in these sports."[77]

   b. "…all of the liability issues in this matter hinge on market performance, and not the circumstances of a member of the injunctive class, and hence

---

[73] 2008 EA/CLC football and basketball agreements, p. 1 and Appendix A. ████████

████████

   Deposition of Cory Moss, Senior Vice President and Managing Director at CLC, August 16, 2012 (hereinafter "Moss Deposition"), pp. 178-181. It is unclear whether the "Participating Institutions" also receive their distributions through the CLC.

[75] Expert Report on Class Certification of Roger Noll, *In Re. NCAA Student-Athlete Name and Likeness Licensing Litigation*, Case No. C 09-01967 CW, August 31, 2012 (hereinafter "Noll Report"). Professor Noll subsequently filed an addendum. The addendum makes adjustments to "example calculations" of damages Professor Noll provided in the Noll Report. It offers no other clarifications or modifications of his opinions. Corrections and Amendments to Expert Report on Class Certification of Roger Noll, *In Re. NCAA Student-Athlete Name and Likeness Licensing Litigation*, Case No. C 09-01967 CW, November 21, 2012 (hereinafter "Noll Corrections/Amendments").

[76] Noll Report, p. 5.

[77] Noll Report, p. 12.

that liability would be proved by methods that are predominantly common to all class members."[78]

 c. Professor Noll's procedure for calculating damages, which "is a top-down formula that starts with revenues to multi-college organizations during the class period and, based on information from licensing experience allocates this revenue between current and former student-athletes and then to individuals within the damages class … does not depend on any individual characteristics of a student-athlete other than whether the team on which they played had their images, likenesses and/or names licensed.  Hence this method is predominantly common to members of the damages class."[79]

64. Professor Noll opines that there are two relevant antitrust product markets in this case: the "collegiate licensing market," which "includes 'rights to current and former players' images and likenesses' that are used in many products…"[80] and the "education market," "in which student-athletes 'receive a college education and compete at an elite level of intercollegiate competition.'"[81]  Professor Noll limits the education market to the competition available through D-I basketball and FBS football.  According to Professor Noll, "[t]he education market is relevant in the case even though it is not the market of the alleged competitive harm because the two markets are inextricably intertwined."[82] Professor Noll concludes that the NCAA has market power in the two relevant markets that he has identified.[83]  To elaborate, Professor Noll argues: "[t]hus the two markets are linked.  Student-athletes have no competitive substitutes in the licensing market because they have no competitive substitutes in the college education market."[84]

65. Citing to the Complaint, Professor Noll describes the allegedly anticompetitive conduct as follows:

---

[78] Noll Report, p. 7.
[79] Noll Report, pp. 10-11.
[80] Noll Report, p. 14, citing p. 90 of the SCAC.
[81] Noll Report, p. 15, citing p. 92 of the SCAC.
[82] Noll Report, p. 15.
[83] Noll Report, pp. 45-55.
[84] Noll Report, pp. 44-45.

…the NCAA and its member institutions engaged in collusion to fix prices (the compensation from licensing the images, likenesses, and names of former student-athletes is set at zero) and a group boycott/refusal to deal (deny eligibility to participate in intercollegiate sports to any student-athletes who do not agree to give the right to license the use of their images, likenesses, and names after their participation in intercollegiate athletics has ended).[85]

66. Professor Noll points to form agreements signed by student-athletes as part of the allegedly anticompetitive actions, arguing that "in short, the rights to exploit images of student-athletes during the period that they are students, without limit of time, are assigned to the college, subject to limitations in NCAA rules and policies about how these images can be used."[86]

67. Professor Noll concludes that the alleged anti-competitive practices of the NCAA and it members have resulted in four types of anti-competitive harm: NCAA conduct (i) "transfers wealth from student-athletes to the colleges that belong to the NCAA"; (ii) "causes an efficiency loss because … it causes some students to decline scholarship offers or to leave school early due to financial pressures"; (iii) "caused a loss of choice among consumers in the availability of licensed products"; (iv) "leads to inefficient substitution of expenditures to other elements of the budget for athletics that can be used to attract students."[87]

68. Professor Noll proposes to estimate damages by allocating a portion (which he assumes to be 50 percent for broadcasting and game footage and 33 percent for video games) of a measure of licensing revenues for particular products among the relevant class of current and former student-athletes.  He assumes that these revenues would be split equally among all players on a team. Professor Noll includes an "example calculation" of damages to illustrate a procedure that according to Professor Noll, "is predominantly common to all class members." Specifically, he provides an estimate of damages overall and damages per athlete for the 2009-2010 season for schools in the Pac-10 and SEC Conferences.  The estimates purport to identify damages allegedly suffered by both former and

---

[85] Noll Report, p. 11, citing to the SCAC, pp. 4, 10, 149-154.
[86] Noll Report, p. 64-65.
[87] Noll Report, pp. 8-9.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 25

current athletes, from licensing revenue on game broadcasts, video clip game footage and video games.  Based on these examples, live broadcasting accounts for roughly 99% of Professor Noll's total damages.[88]

## V.   THE VALUES OF STUDENT-ATHLETES' NAMES AND LIKENESSES VARY ENORMOUSLY

69. Student-athletes, like professional athletes, vary enormously in their athletic ability, experience, leadership, effort, charisma, and other aspects that affect marketability.   As a result, the value of student-athletes' NILs also vary substantially. Professor Noll does not dispute this – indeed he has offered a similar opinion here and in other contexts.

70. In his report in this case, Professor Noll argues that "[i]n a competitive market, financial aid to student-athletes would be determined by the expected net contribution of the student-athlete to revenues, i.e., the student-athlete's marginal revenue product (MRP)."[89]  Professor Noll goes on to cite to several articles in the economic literature that attempt to estimate MRP for student-athletes, and specifically reporting results from a paper by Lane, Nagel, and Netz which finds a median MRP of about $44,000, but an MRP for "the best players" of over $2,000,000.[90]

71.  The authors of that paper find that roughly 40% of men's basketball players have MRPs that are lower than the full value of a full athletic scholarship.  The authors estimate low MRPs for many players and MRPs for "star players" (i.e., those ultimately drafted by the NBA) at amounts ranging from $150,000 to $2,750,000 at school with low-revenue basketball programs and from $1 to $1.4 million at school with high-revenue basketball programs.[91]   A large fraction of players have

---

[88] Noll Report, Exhibits 12A, 12B, 13A, 13B.
[89] Noll Report, p. 51; *See also*: Deposition of Roger G. Noll, Ph.D., February 27, 2013 (hereinafter "Noll Deposition"), pp. 204-205.
[90] Noll Report, p. 51-52. *See also*: Roger G. Noll, The Antitrust Economics of NCAA Restrictions on Athletic Scholarships, p. 89.
[91] Lane, Erin, Juan Nagel and Janet S. Netz, "Alternative Approaches to Measuring MRP: Are All Men's College Basketball Players Exploited?," *Journal of Sports Economics*, published online, August 12, 2012, pp. 2-3, 11.

very low MRP (the first quartile MRP was as low as $1,000 in one estimate).[92]

72.  This is not to say that it is possible to accurately measure MRP for student-athletes in a formulaic manner.  For example, players who do not play much, if at all, would not have any statistics upon which to base an estimate.   Thus, projecting MRP for first year college players based on high school statistics would be highly imperfect.  Moreover, statistical measures, which are likely to vary substantially from year to year, do not tell a complete story, and the true incremental value that an athlete contributes to a team cannot be reduced to a simple MRP formula.   As Professor Noll explains, student-athletes are complementary in nature; a player's value will depend importantly on the other players on the team, the coach, and other factors.  In any case, Professor Noll has not offered an opinion as to how student-athlete-specific values such as MRP might be calculated, and that such calculations can be done using classwide proof.

73.  To the extent that MRP provides a useful measure, Professor Noll does not acknowledge that many student-athletes' grants-in-aid would exceed their MRP from participating in D-I basketball or FBS football.

74.  Student-athletes reap other benefits over-and-above the grant-in-aid.  Because a student-athlete's grant-in-aid is only a part of the benefits he receives as a student-athlete, it is likely the case that a substantially higher proportion of student-athletes' MRPs are below the full benefits they receive. Other benefits include meals at the athletic department's expense, access to training facilities and coaching, tutoring and counseling, and team athletic apparel.[93]   In addition, student-athletes receive the important benefits that come with exposure, which is often used to recruit potential student-athletes because they view it as "an excellent opportunity."[94]

---

[92] Lane, Nagel, and Netz, p. 11.

[93] Declaration of Lisa Watson in *Jason White, et al., v. NCAA*, September 8, 2006 (hereinafter "Watson Declaration (University of Arizona)"), p. 3.  Ms. Watson was the Compliance Coordinator for Financial Aid at the University of Arizona.  *See also*: Declaration of Doug Elgin in the matter of Jason White, et al., v. NCAA, pp. 3-4.  *See also*: Weiner, Jay and Berkowitz, Steve, "USA TODAY Analysis Finds $120K Value in Men's Basketball Scholarship," USA TODAY, March 30, 2011, available at http://usatoday30.usatoday.com/sports/college/mensbasketball/2011-03-29-scholarship-worth final-four_N.htm, accessed March 13, 2013.

[94] Declaration of John Welty in Support of the NCAA's Class Certification Opposition Brief, March 12, 2013 (hereinafter "Welty Declaration (California State University at Fresno)"), p. 2.  Mr. Welty is the

75. At a conference at Santa Clara Law School, Professor Noll distributed a paper titled "The Economics of Licensing an Athlete's Image." In this paper, Professor Noll explained:

> A second feature of athlete's [sic] images is that they vary enormously in value. All athletes who participate in sporting events that attract an audience create a performance record and some degree of reputation and fame among those who witness their performance, but for the vast majority of athletes the stand-alone value of the use of the athlete's image is zero. Even most major-league professional athletes or members of the U.S. Olympic team have a stand-alone image value at or near zero.[95]

76. Variety in skill, age, marketability, and position lead to wide ranges in salaries (and licensing compensation) for professional athletes in all of the leagues pointed to by Professor Noll as analogues. For example, in the 2012-2013 NFL season, the average salary was $1.9 million, while the highest paid player received $19 million and league minimum was $390,000.[96] Exhibit 4 demonstrates that large variation in salaries was also present for each NFL team. In the 2012-2013 NBA season, the average salary was $4.9 million, with a high of $27.8 million and a minimum of $474,000.[97] For the 2012 MLB season, the highest salary was $30 million, the league minimum $480,000, and the average $3.2 million.[98] Similar wage disparities exist in the National Hockey League, Major League Soccer, and other major team sports.[99]

---

President of California State University at Fresno. *See also*: Declaration of the University of Texas at Austin in Support of the NCAA's Class Certification Opposition Brief, March 13, 2013 (hereinafter "University of Texas Declaration"), p. 5.

[95] Roger G. Noll, "The Economics of Licensing an Athlete's Image" (Noll Exhibit p. 2).

[96] "Kansas City Chiefs Salaries," FoxSports.com, 2013, available at http://msn.foxsports.com/nfl/team/kansas-city-chiefs/salary/67049?q=kansas-city-chiefs, accessed February, 27, 2013. Professor Noll agrees that there is wide variation in compensation for NFL players (Noll Deposition, pp. 77-82).

[97] "NBA Player Salaries - 2012-2013," ESPN.com, 2013, available at http://espn.go.com/nba/salaries/_/page/1, accessed March 13, 2013; "2011 CBA Minimum Annual Salary Scale," RealGM.com, 2013, available at http://basketball.realgm.com/nba/info/minimum_scale, accessed February 27, 2013.

[98] "Average Salary Hits Record $3.2M," Associated Press, ESPN.com, December 7, 2012, available at http://espn.go.com/mlb/story/_/id/8724285/mlb-average-salary-38-percent-32-million, accessed February 27, 2013; "2012 MLB Top 25 Player Salaries," USA TODAY, 2012, available at http://content.usatoday.com/sportsdata/baseball/mlb/salaries/player/top-25, accessed February 27, 2013.

[99] "2012 MLS Player Salaries: October 1, 2012: Alphabetical," Major League Soccer Players Union, October 1, 2012, available at

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 28

77. In *Bernard Paul Parrish, et al. v. National Football League Players Association, et al.* (hereinafter "*Parrish*"), which involved the licensing of NIL of retired NFL players, Professor Noll, who filed an expert report and testified on behalf of the defendants, argued that "these data actually confirm what you would expect as an economist, which is that licensing revenue ought to be a lot like player salaries…."[100]; and "the reason [why retired NFL players would have different licensing values] is basically the same reason the salaries differ, is that players differ in their contribution to the team."[101]

78. In that case, Professor Noll analyzed actual licensing revenue received by retired NFL players in the class from that case, from 2003 to early 2008.  He found that about 82% of the 2095 players in his sample received no payment, whereas about 12% got over $1000.[102]

79. These conclusions are further supported by evidence in this case provided by T3Media.  The evidence shows that former D-I basketball players have been paid a range of licensing fees for use of their images in video clips. ████████████

████████████████████████████

████ [103]

80. Additional support is found in actual licensing agreements entered into by former student-athletes for appearing on trading cards. █████████

████████████████████████████

████████████████

---

http://www.mlsplayers.org/files/October%201,%202012%20Salary%20Information%20%20Alphabetical.pdf, accessed March 1, 2013; Becker, Michael, "Professional Lacrosse is Hardly Glamorous," Daily Orange, April 24, 2004, available at http://dailyorange.com/2004/04/professional lacrosse-is-hardly-glamorous, accessed March 1, 2013.

[100] Testimony of Roger Noll in *Bernard Paul Parrish Herbert Anthothy Adderley, Walter Roberts III vs. National Football League Players Association and National Football League Players Incorporated D/B/A Players Inc.,* U.S. District Court, Northern District of California, No. C 07-0943 WHA, (hereinafter "Noll Parrish Testimony"), November 4, 2008, p. 2163.

[101] Noll Parrish Testimony, November 4, 2008, p. 2166.

[102] Expert Report of Roger G. Noll, *Bernard Paul Parrish, et al. v. National Football League Players Association, et al.*, U.S. District Court, Northern District of California, San Francisco Division, Civil Action No. C07 0943 WHA, June 12, 2008 (hereinafter "Noll Parrish Report"), pp. 21-23.

[103] ████████████████████████████

████████████████████████████

████████████████████████



## VI.   Professor Noll Assumes Away the Class Certification Problem

### VI.A.   Introduction

81. Despite the undisputed fact that the values of student-athletes to schools vary widely, Professor Noll assumes an overly simplified but-for world in which every conference and/or school pays out 50% of broadcast revenue and 33% of video game revenue to student-athletes and every athlete on a team receives an equal share, and therefore, under his methodology no individualized inquiry is conducted.   Professor Noll's vastly oversimplified economic analysis of the effects of the allegedly anticompetitive conduct is the accumulation of a number of fundamental flaws.

### VI.B.   Professor Noll Assumes that All Putative Class Members Own Rights to Publicity in Live Broadcasts

82. Professor Noll's theory is premised upon the assumptions that (1) student-athletes own the right to include their NIL in a broadcast, (2) potential licensees (e.g., broadcasters) believe that they need such licenses, (3) licensees would be unwilling to enter into a license without a specific license from the student-athlete, and (4) current and former student-athletes have not been compensated for this right because of anticompetitive conduct by the defendants.

83. While the extent to which students-athletes have a right is ultimately a legal question, the question implicates fundamental economic questions in this case – the value that student-athletes would have received for this right in a world in

---

[104] Declaration of Jason Masherah, October 31, 2012 (hereinafter "Masherah Declaration (Upper Deck)"), p. 3.  Mr. Masherah is the Vice President of Marketing and Business Development for Upper Deck.
[105] Masherah Declaration (Upper Deck), p. 4.  Bill Russell, also a named plaintiff appeared on "college themed Upper Deck trading cards."  Masherah Declaration  (Upper Deck), p. 3 and Exhibit 3.

which there was no  anticompetitive conduct.  Understanding the economic value of a right requires an understanding of the strength of that right and the extent to which it is legally enforceable.

84. I understand that rights of publicity depend in part upon state laws, and that these rights can differ substantially state to state.  I also understand that several states, including for example, California and Hawaii, have publicity rights laws that expressly exempt sports broadcasts from uses that require participant consent.[106] Thus, in these states, student-athletes would not, as Professor Noll assumes in his Nash bargaining discussion, have veto power over the broadcast.

85. I will point out in a later discussion that the values of these rights also vary substantially across schools and products.

**VI.C.   Professor Noll Has Not Specified Which NCAA Rules Would Be Changed/Eliminated**

86. A proper specification of the but-for world starts with the actual world, removes the challenged conduct, and determines how the world would have looked without that conduct.  Yet Professor Noll does not offer a clear view as to which specific NCAA rules are anticompetitive.  He points generally to conspiracies to fix the price of licensing at zero and to exclude student-athletes who refuse to agree to this restriction.  But, he fails to provide any specificity as to the exact mechanism of the conspiracy, the particular NCAA rules that are anticompetitive, and other relevant factors.

87. Professor Noll's but-for world is one in which current and former student-athletes would receive compensation for participation in broadcasts and video games, but not for other uses of their NIL.  Yet Professor Noll appears to believe that but-for the allegedly anticompetitive conduct, student-athletes would collect licensing revenues from a much broader range of products.  Indeed, Professor Noll appears to believe that the injunctive class includes student-athletes whose NIL was used in other products such as jerseys, calendars, and bobblehead dolls.[107]

88. Nor does Professor Noll provide any specifics as to what NCAA conduct is currently constraining former student-athletes from earning revenue by licensing

---

[106] Cal. Civ. Code § 3344(d), and Hawaii Statute (482P-7 (b)(2).
[107] Noll Deposition, pp. 143-145, 151 and 232-234.

their NIL. Professor Noll agreed that after exhausting their college eligibility, former student-athletes "could do individual licenses, yes, or they can be part of a group that does group licensing."[108]

89. The existence of such a restriction is inconsistent with the wide range of evidence that former student-athletes are in fact earning licensing revenues based on their NILs from their collegiate careers. For example, David Lattin, one of the antitrust plaintiffs, received compensation by granting the rights to his life story to Walt Disney Pictures to make *Glory Road*, a movie based on Lattin's 1966 championship season at Texas Western.[109] In additional, Tate George, another antitrust plaintiff, received compensation from Thought Equity Motion for signing a release for a famous shot he made in the NCAA D-I basketball tournament.[110] Several other antitrust plaintiffs have also licensed their NIL.[111]  Upper Deck signs agreements, separate from those with CLC, "to obtain name, image, and likeness rights of former student-athletes."[112]

**VI.D.   Professor Noll Has No Opinion as to the Mechanism for Determining Student-Athlete Compensation in the But-for World**

90. Despite repeated references to professional sports players unions, Professor Noll does not appear to be offering the opinion that but-for the challenged conduct, college athletes would necessarily have formed a union to negotiate with the NCAA, conferences, and/or schools over licensing revenue.  Rather he has opined that there are a wide variety of possible but-for worlds including those where student-athletes form a union (or unions), but also an "aggregation entity," or even one where there is no negotiation between student-athletes and the NCAA/conferences/schools but one where conferences unilaterally set

---

[108] Noll Deposition, p. 154.  Professor Noll also agreed that most former student-athletes have no licensing value and do not make much money from licensing (Noll Deposition, pp. 155-156).  *See also*: Noll Deposition, pp. 419-420, 426-427.

[109] Contract between David Lattin and Walt Disney Pictures, July 13, 2004. (AP001796-804, at AP001796 7, Deposition of David Lattin, named antitrust plaintiff, November 10, 2011, Exhibit 111)

[110] Deposition of Tate George, named antitrust plaintiff, March 9, 2012 (hereinafter "George Deposition"), p. 38.

[111] Deposition of Thad Jaracz, named antitrust plaintiff, November 30, 2011, pp. 90-95; Contract between New Life Art, Inc. and Tyrone Prothro, June 16, 2008. (AP01938-41, at AP01938, Deposition of Tyrone Prothro, named antitrust plaintiff, November 9, 2011 (hereinafter "Prothro Deposition"), Exhibit 93).

[112] Masherah Declaration (Upper Deck), p. 2.

compensation rules absent any restrictions imposed by the NCAA.[113]  Regardless of the mechanism, Professor Noll asserts that student-athletes would receive a group license covering broadcast and video game revenues, that this license would entitle them to 50 percent (or 33 percent) of gross revenues received by the schools, and that this license would split the student-athletes share equally among all student-athletes on the roster.

91. Yet as described in more detail later in this report, these different mechanisms would have very different implications for the but-for world.  As discussed elsewhere in this report, a negotiation between a union and the NCAA/conferences/schools might be very different than unilateral actions by the conferences.

**VI.E.   Professor Noll Has Failed to Specify the Details of Any But-for Negotiation**

92. To the extent that Professor Noll believes that a negotiation between the NCAA and/or its members on the one hand, and student-athletes and/or a union or other "aggregation entity" on the other hand, would determine the licensing outcome in the but-for world, he has failed to provide a wide range of details on this negotiation. These details have important implications for the ultimate outcome and without them it is speculative to assert that any proof of the outcome of such negotiation(s) can be demonstrated using class wide evidence.

93. If Professor Noll contends that student-athletes would have formed a union or some other "aggregation entity," he has failed to explain how such an organization would operate.  Important questions that Professor Noll has failed to address include:

    a.  Would the negotiation be with the NCAA, conferences, or schools?

    b.  Would there be a single union (or other aggregation entity) covering the entire membership of the NCAA, or would there be separate unions by conference or by school?

    c.  Would the union represent all student-athletes or only a subset?

       i.  How would union membership work?  Opt-in or opt-out?

       ii.  Which student-athletes would be members?

---

[113] Noll Deposition, p. 432.

    iii.  Would the union include student-athletes from all sports or just football and men's basketball?

    iv.  Would the union include walk-ons or just scholarship athletes?

    v.  Would the union include former student-athletes?

d.  When would the negotiation have occurred?

e.  What time period would be covered by the negotiation?

f.  How often would the parties need to renegotiate terms?

g.  Which rights would be negotiated?  Would there be one negotiation over all rights or would there be separate negotiations over each product (live, rebroadcast, video games, video clips)?

h.  Would the negotiation have a cap on revenues that could be paid to students or would the negotiation spell out payments to individuals.

i.  To what extent do state laws prohibit collective bargaining with student-athletes?

## VI.F.  Professor Noll Assumes that Transactions for NIL Rights Are Separate from Transactions for Labor

94. Professor Noll appears to assume that student-athletes negotiate (or are otherwise awarded licensing fees) for the value of their NIL only after they are enrolled. Under this assumption (combined with his "ex ante" assumption that a school would need NIL rights from all students on the roster because it would never be sure which athletes would appear in a broadcast), Professor Noll concludes that each and every player would hold veto power over a broadcast and have the ability to "hold up" schools.

95. This does not make economic sense.  As described above, most student-athletes have relatively low value as athletes to universities. They receive value only as a result of Noll's unrealistic assumptions. Conferences and/or schools would have strong economic incentives to negotiate with student-athletes (or otherwise set rules) for NILs such that terms are agreed to on licensing rights at the time the student-athlete is enrolling and the schools are establishing the other aspects of the student's scholarship package.[114] Students do not have the ability to "hold up"

---

[114] Professor Noll appears to concede that this is a reasonable point for the negotiation to occur – he

at this time.[115]  As pointed out previously, the supply of student-athletes is much larger than the demand; a walk-on or marginal scholarship player would have little to no bargaining power before being enrolled and joining a team.  The value of the students' NIL rights are directly derived from the value of the students' participation in athletics.

**VI.G.   Professor Noll Asserts that Proceeds from Group Licenses Would Be Divided Equally**

96. Despite the widespread evidence that but-for any restrictions on student-athlete compensation, compensation would vary enormously among student-athletes (and would not be subject to classwide proof), Professor Noll avoids this problem by assuming that all student-athletes in the class at a given school in a given year, by current or former status, would receive an equal share of revenue from a "group license" or licenses in the but-for world.   However, not even the 16 antitrust plaintiffs can agree on the appropriate way to divide revenue. For example, Tate George believes star players should receive higher compensation than their teammates,[116] while Sam Jacobson believes all players on the team should receive equal compensation.[117]

97. As described above, this creates a but-for world in which athletes with wildly different values would get the same licensing revenue. To illustrate, Professor Noll's analysis shows a Stanford basketball player whose team is televised in a "live" game in the 2009-2010 season would have received about $236,000 in licensing revenues but-for the allegedly anticompetitive conduct for just that year.[118]  Each player on Professor Noll's Stanford roster for the 2009-2010 season would be awarded that same amount, including Landry Fields (a star player since

---

testified that one possible but-for world is that "[t]here can be a uniform student-athlete agreement that's part of the scholarship, part of the financial aid package" (Noll Deposition, pp. 189-190).  Of course, such agreements need not be uniform and need not provide each student-athlete with the same licensing revenue. Indeed, this is not a stable equilibrium.

[115] Indeed, this solution to the hold-up problem – negotiating at an earlier time before substantial market power is obtained – is described in the economic literature in other contexts, such as the negotiations surrounding the formation of standard-setting organizations.

[116] George Deposition, pp. 98-99.

[117] Deposition of Sam Jacobson, named antitrust plaintiff, November 7, 2011 (hereinafter "Jacobson Deposition"), pp. 146-148.

[118] Noll Corrections/Amendments, Attachment_2: Appendix C-A13.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 35

drafted by the NBA),[119] Andy Brown (who tore his ACL on first day of practice of 2009 season and was red-shirted),[120] and Tavita Pritchard (the quarterback on the Stanford football team and walk-on who joined the team in the middle of the basketball season after football season ended – and played a total of two minutes (one game) all season).[121]   According to Professor Noll's methodology, each suffered about $236,000 in lost royalties.

98.  Moreover, in Professor Noll's but-for world there would be large differences in per-player revenues between football and basketball even at the same school, with the differences driven largely by differences in the number of players per team. Professor Noll's analysis shows that Stanford basketball players each suffered about $236,000 in lost royalties from "live" broadcast for just the single 2009-2010 season, whereas each football player on Stanford's roster – including star quarterback and future No. 1 NFL draft pick Andrew Luck – suffered a loss of about $37,000.[122]

99.  Professor Noll's equal sharing assumption appears to be driven by his belief that players would negotiate a group license for all of the products at issue.[123] Professor Noll then asserts that "… standard practice in group licensing is for this revenue to be divided equally among all members of the group at a particular college."[124] As discussed in more detail below, Professor Noll's assumption is without support.

## VII.  PROFESSOR NOLL'S BUT-FOR WORLD IS NOT SUPPORTED BY BARGAINING THEORY

100.   Professor Noll argues that Nash bargaining theory supports his assumption of a 50/50 split of revenues between schools and student-athletes.[125]  This is based

---

[119] "Landry Fields Player Bio," NBA, 2013, available at
 http://www.nba.us/playerfile/landry_fields/bio.html, accessed March 7, 2013.
[120] "Andy Brown Profile," GoStanford.com, 2013, available at
http://www.gostanford.com/sports/mbaskbl/mtt/brown_andy00.html, accessed March 7, 2013.
[121] "Tavita Prichard Added to Men's Basketball Roster," GoStanford.com, January 27, 2010, available at
http://www.gostanford.com/sports/m-baskbl/spec-rel/012710aaa.html, accessed March 7, 2013; "Tavita
Prichard - Stanford Basketball," Cardinal Update, 2013, available at
http://cardinalupdate.com/stanford-basketball/roster_player/tavita-pritchard, accessed March 7, 2013.
[122] Noll Corrections/Amendments, Attachment_2: Appendix C-A21.
[123] Noll Report, p. 101.
[124] Noll Report, p. 10.
[125] Noll Report, p. 102.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 36

on an oversimplified and unsupported view of the hypothetical bargaining process.

101.     First, the economic literature on bargaining is vast and complex, involving both cooperative as well as uncooperative bargaining. [126]  Within the category of non-cooperative bargaining, the Nash bargaining model has played an important role.  However, it is not the only plausible bargaining model; bargaining models vary along many dimensions, including the timing of offers and counteroffers and the symmetry or asymmetry of the information available to the parties. Furthermore, within the Nash bargaining framework there are a range of possible outcomes depending on the initial position of the bargainers and their relative bargaining power.  Indeed, the Nash bargaining model depends critically on several assumptions, none of which Professor Noll has investigated or demonstrated would hold in this case.

102.     Formally, the simple Nash bargaining model involves two players negotiating the allocation of a divisible good (money) between them. If the players cannot agree, then each receives a disagreement payoff, denoted by $d_1$ for player 1 and $d_2$ for player 2.  The disagreement payoffs, which are sometimes described as threat points (the threat of a bargaining breakdown), characterize the outcomes that would arise if the bargaining were entirely unsuccessful.[127]  An allocation consists of an $\alpha$ such that player 1 gets a share $\alpha$ of the good and player 2 gets a share of $(1-\alpha)$.

103.     The Nash solution to the bargaining model above allocates the good as follows: first, each player is allocated his disagreement payoff.  The remainder of the good is then allocated between the two players based on their preferences.[128] Professor Noll's 50/50 split relies upon a disagreement payoff of $0 for both the school and the student-athlete – as he explains, he assumes that "[o]ne cannot

---

[126] Non-cooperative models are often applied to games in which the parties have antagonistic interests. Here the interests of the parties are not entirely antagonistic, since achieving a satisfactory bargaining solution can increase the value of the game (i.e., generate more licensing revenue).

[127] Robert Cooter and Thomas Ulen, *Law and Economics*, 5th Edition, Chapter 2.  Professor Noll agrees that the threat points are fundamental in determining the Nash bargaining outcome.

[128] *See* for example:  Muthoo, Abhinay, *Bargaining Theory with Applications*, Cambridge University Press, 1999, p. 14-16. *See also*: Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 8th Edition, 2012, Chapter 12.

license a telecast of a game if ether the colleges or the players do not agree to a license."[129]   Second, the simple Nash bargaining model assumes that if both players have similar preferences (as discussed further below) then the remainder will be split equally among them. Clearly, both the disagreement payoff of the players and the similarity of their preferences play an important role in determining the Nash solution to the game.

104.     Neither of these assumptions is consistent with the realities of the industry. First, in many cases, the disagreement payoff of the NCAA is much greater than $0, which would mean, all else equal, that the NCAA would earn well more than 50 percent of available profits.

105.     I understand that in many states, as indicated above, broadcasters do not need the student-athletes' agreement to televise a game.  Mark Womack, the Executive Associate Commissioner of the SEC testified that it is the SEC's understanding that it does not need to obtain student-athletes rights in order to broadcast sporting events.[130]  In these cases, the Nash bargaining outcome – consistent with basic intuition – would be that the college retains all of the net licensing revenue.  The college disagreement payoff from the broadcasting of these games in these states will equal the full sum of the licensing revenues, while the student disagreement payoff will equal zero.  This will increase the overall disagreement payoff of the colleges, leading to an overall bargaining solution that allocates less than 50 percent for the athletes and more than 50 percent for the college.  The higher the share of licensing revenues from broadcasts in states that do not require student agreement, the higher the share of the colleges in the hypothetical group licensing agreement.  This is consistent with the understanding of conferences and schools.

106.     I further understand that to the extent to which waivers exist they differ substantially across schools, and that the NCAA does not oversee the

---

[129] Noll Report, pp. 101-102.
[130] Declaration of the Big Twelve Conference, Inc., in Support of the NCAA's Class Certification Opposition Brief, March 14, 2013 (hereinafter "Big Twelve Declaration"), p. 2, and Welty Declaration (California State University at Fresno), p. 4.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 38

administering or collection of these forms.[131]  For example, the SEC requires all student-athletes at its member schools to sign a consent form every year allowing the conference to use student-athletes "name and likeness to promote the broadcast of the games."[132]  However, the ACC does not have "any forms that student-athletes have to sign specifically to participate in NCAA-sanctioned games."[133]  Furthermore, even within the SEC, specific language included in the forms may differ.[134]

107.     The law and economics literature on the economics of property law is informative with respect to this literature.  Among other things, the law and economics literature points to the importance of the initial property rights as determined by the law (and the means of enforcing those rights) in the determination of bargaining outcomes.  Differing property rights are likely to yield different bargaining outcomes.[135]

108.     Understanding the likely results of these negotiations would require an understanding of the parties' views of the relevant state laws.  I do not see how this would be possible using classwide evidence.

109.     The disagreement payoff for the NCAA is also substantial with respect to revenues from video games.  Even in the plaintiffs' but-for world, the NCAA can license NCAA-based video games without agreement from players.  These licenses could include the venues, team names, team jerseys, school mascots etc., but not infringe on the rights of publicity of former or current student-athletes (to the extent that, as Antitrust Plaintiffs allege, EA's games currently do so).  While player likenesses may provide added value to the game, an NCAA-based video game would nonetheless be valuable to gamers and provide nonzero disagreement payoffs to the NCAA and colleges.[136]  Nor is EA required to include every NCAA

---

[131] Deposition of David Knopp, Managing Director in the Championships and Alliance Group for the NCAA, May 24, 2012 (hereinafter "Knopp Deposition"), pp. 101-102, 274-275.

[132] Womack Deposition, pp. 33-34.

[133] Deposition of John Swofford, Commissioner of the Atlantic Coast Conference, January 15, 2013 (hereinafter "Swofford Deposition"), p. 43.

[134] Womack Declaration (SEC), p. 5.

[135] *See* for example: Cooter and Ulen, *Law and Economics*, Chapters 3 and 4; Douglas Baird, Robert Gertner, and Randall Picker, *Game Theory and the Law*, 1998.

[136] *See* for example: Pat Battle (then CEO of CLC), where Mr. Battle notes on December 19, 2006 that "adding [player] names further authenticates the game, just as previously adding stadiums, cheerleaders,

player in its game – *NCAA Football* for example currently supports a roster of only "68 and a couple custom [players]", much smaller than the approximate 105-player roster size (85 scholarships plus 20 walk-ons) of an NCAA football team.[137]   In contrast, the disagreement payoff for student-athletes would be $0 because but-for successful agreement with the NCAA they would not earn revenue from video games.   Under the Nash bargaining model, estimating the split of licensing revenue between the NCAA and the student-athletes would require estimating the disagreement payoff of the NCAA – that is, the revenue that the NCAA could have earned for a video game that does not, in plaintiffs' view, infringe upon the NIL.   Professor Noll has not conducted an analysis of this issue and there is no evidence to suggest that his 2/3–1/3 split assumption is consistent with the Nash bargaining outcome.

110.      Third, the simple Nash bargaining outcome relied on by Professor Noll depends upon the two parties (i.e., the school and the student-athlete) having identical preferences and bargaining power.   Professor Noll has offered no support for this assumption.   In reality, negotiations often are driven by asymmetries between the bargaining parties. These asymmetries include time preference (impatience), risk aversion, and negotiating skill.[138]   Richer bargaining models that incorporate these factors are widely used in economics, yet Professor Noll has not referenced or relied on them.

111.      Fourth, Professor Noll incorrectly asserts that neither the colleges nor the student-athletes incur incremental costs in producing the licensed product.[139] Although in his discussion of Nash bargaining he acknowledges that players consider revenues net of costs, Professor Noll has given no indication in his discussion of his damages how, or even whether, he would account for these costs. As discussed above, some conferences do bear the production costs associated with the broadcast of games.

---

fight songs, mascots, etc…  helped with authenticity. [….][M]aking the game more authentic play[s] a role in growing sales … but you cannot attribute a specific sales increase percentage to a particular feature that has or will be added to the game." *See*: Battle Deposition, Exhibit 336, p. 1.
[137] Harvey Deposition, p. 24; 2012-2013 NCAA Division I Manual, Bylaws 15.5.6.1 and 17.9.2.
[138] *See* for example: Muthoo, Abhinay, *Bargaining Theory*, pp. 16, 63, 66-67.
[139] Noll Report, pp. 46-47.

112.     Thus, the economic theory of bargaining is inconsistent with Professor Noll's assumption that student-athletes at every school in every conference would receive a 50 percent share of licensing revenues for broadcast products and 33 percent of video games.  Rather, economic theory is consistent with the variety of evidence discussed elsewhere in this report – that the results of bargaining (to the extent there is any in Professor Noll's but-for world) would depend importantly on conference, school, sport, and individual athlete. Determining these outcomes would require individualized inquiry and would not be subject to classwide proof.

## VIII.    PROFESSOR NOLL'S BUT-FOR WORLD IS NOT SUPPORTED BY HIS PROFESSIONAL SPORTS ANALOGUES

113.     Professor Noll's reliance on licensing practices of professional sports leagues to support his analysis of intercollegiate athletics is flawed for several reasons.  Professor Noll draws inappropriate conclusions from professional sports leagues. Professor Noll also ignores fundamental differences between professional and intercollegiate athletics.

### VIII.A.1.  Professional Sports Do Not Have Similar Group Licenses for Broadcast Revenue

114.     According to Professor Noll, all the relevant products in this case, including the licensing of broadcast rights, would be covered under a group license, where "the common practice is for the group license to include the entire team and, for players who are not restricted by NCAA rules, for all team members to share equally in the players' share of licensing revenues."[140]  However, none of the three leagues Professor Noll cites, the NFL, the NBA, or the NHL structure their licensing this way with respect to the broadcasting of games or video clips from broadcasts. Therefore, none of these leagues provide support for Professor Noll's assertion that collegiate broadcast licensing would function as a group license.

115.     ████████████████████████████████████████████

████████████████████████████████████████████

---

[140] Noll Report, p. 40.



116.     The only professional sports licensing contracts Professor Noll cites are the ones listed in his Exhibit 5, and the agreement EA has with the NFL and NFLPA for the *Madden NFL Football* video game.  However, none of these cover broadcasting; rather, they are all licenses for merchandise.[143]

### VIII.A.2.  Professional Sports Group Licenses Do Not Support Equal Sharing

117.     While video game licensing in professional leagues can be in the form of a group license, video games represent less than 1 percent of the value of alleged damages in this case, based on Professor Noll's example calculations.[144]  In fact, all of the examples of group licenses referenced by Professor Noll cover relatively small amounts of most professional athletes' compensation, while the bulk of the compensation is determined by individual salary and licensing negotiations, not group licensing negotiations between players and teams.  It is perhaps not surprising that star players are willing to accept an equal share of this group-licensing pie; they can negotiate their full value through their salary and individual licensing opportunities.[145]  Yet Professor Noll is speculating about an

---

[141] Declaration of Keith Gordon, February 26, 2013 (hereinafter "Gordon Declaration (NFLPA)"), p. 7.  Mr. Gordon is the President of National Football League Players Incorporated; Declaration of Ronald Klempner, March 5, 2013 (hereinafter "Klempner Declaration (NBPA)"), pp. 4-5.  Mr. Klempner is the Interim Executive Director and Deputy General Counsel of the National Basketball Players Association..

[142] Gordon Declaration (NFLPA), p. 7; and Klempner Declaration (NBPA), pp. 4-5.

[143] Professor Noll's backup provides little information on the underlying license agreement.  Neither plaintiffs nor Professor Noll have produced these contracts or any detailed description of what they contain.

[144] Noll Report, Exhibits 12A, 12B, 13A, 13B.

[145] Plaintiffs' economic expert in *Parrish*, Dr. Daniel Rascher, makes a related point in his expert report.  He says: "Importantly, the NFLPA allows so-called "ad hoc" or "premium" licensing, which are for licensing deals of five or fewer players.  By making this distinction, the NFLPA (and other sports unions) are able to diffuse the potential tensions between stars and other players, allowing stars to sign individual (or small-group) deals, while participating equally in larger group licensing."  Expert Report of Roger G. Noll, *Bernard Paul Parrish, et al. v. National Football League Players Association, et al.*, U.S. District

entirely different outcome – where the group license is the only source of revenue and the *total* compensation received by all players on a team is identical.

118.    Yet even for merchandising, professional league group license agreements are not as simple as Professor Noll describes.



.[146]

.[147]

119.    Second, these group licensing agreements do not necessarily stipulate equal sharing among players on the roster.   For example, in professional basketball, NBA players must have been on an active roster for a minimum of 41 games during the season, in order to receive a distribution.[148]

120.    In the NFL, the NFL Players Association handles merchandising rights for active players, including video game rights, through group licensing arrangements.[149]   Revenue generated from video game licensing is not shared equally by all players – practice squad players get less than active players.[150]

121.    Professor Noll is aware of this.[151]   In *Parrish*, Professor Noll criticized Dr. Rascher's use of the concept of a group license:

> Group licenses frequently cover only a subset of players.   In these cases, license revenue is shared only among the players who are covered by the license, not all players, with the players not covered by the license receiving nothing.   In addition, group licenses often

---

Court, Northern District of California, San Francisco Division, Civil Action No. C07 0943 WHA, August 22, 2008, p. 5.

[146] Noll Report, p. 103.

[147]

(EA0032769-95, at 77-78).

[148] Klempner Declaration (NBPA), p. 4.

[149] Gordon Declaration (NFLPA), pp. 2-3.

[150] Gordon Declaration (NFLPA), pp. 3-4.

[151] In his Expert Report in *Parrish*: with respect to group licensing in the NFL, Professor Noll wrote "[p]ractice squad players get a smaller share, and non-qualifying active players receive nothing." Noll Parrish Report, p. 50.

divide revenue unequally among the players that they cover." [152]

122.     Later in that report, Professor Noll went on to argue:

[i]n fact, the market values of licenses for retired players vary substantially, many retired players rights have no market value. Dr. Rascher's incorrect assertion that revenues from group licenses commonly are divided equally is not a valid basis for calculating injury or damages.[153]

### VIII.A.3.  Professor Noll Ignores Fundamental Differences between Professional Sports and Intercollegiate Sports

123.     There are important differences in the structure and nature of competition between professional sports leagues and the NCAA and its members.  These differences have important implications for the bargaining positions and relative licensing values of players and the NCAA and its members.  It is therefore not reasonable to assume that the outcome of negotiations for licensing revenues in professional leagues would be reflective of negotiations in intercollegiate athletics.[154]

124.     First, whereas professional leagues bring together organizations (teams, owners, and players) focused singularly on producing competition in their sport, the NCAA and it members are a mix of highly differentiated conferences and colleges which have goals that extend beyond athletic competition and profit maximization to the broader educational experience – indeed, a specific purpose of the NCAA is "to retain a clear line of demarcation between intercollegiate athletics and professional sports," and many schools view intercollegiate athletics as "part of [their] educational mission."[155]  Professor Noll clearly acknowledges

---

[152] Noll Parrish Report, p. 11.

[153] Noll Parrish Report, p. 62.

[154] Professor Noll cites an overly-simplified Nash bargaining model and argues that "[t]he evidence from professional sports is consistent with Nash bargaining theory."  He then uses this to support his 50-50 split of revenue between schools and student-athletes.  (Noll Report, pp. 102-103).  Even if such a simple model provided an accurate representation of bargaining in professional sport, it does not follow that it bears any relationship to how a negotiation would occur in intercollegiate athletics.

[155] Declaration of Stan Albrecht in Support of the NCAA's Class Certification Opposition Brief, March 12, 2013 (hereinafter "Albrecht Declaration (Utah State)"), p. 4.  Mr. Albrecht is the President of Utah State University.  *See also*: Welty Declaration (Fresno State), p. 2; LeCrone Declaration (Horizon League), p. 4; Womack Declaration (SEC), p. 2; Declaration of Timothy P. White in Support of the NCAA's Class Certification Opposition Brief, March 13, 2013 (hereinafter "White Declaration (CSU)"), p. 2.  Mr. White

this complex set of academic motives when he defines one of the relevant products as combining the opportunity for high-level athletic competition bundled with an education.[156]  Indeed, in *MIBA v NCAA* Professor Noll testified: "I think the – one of the sources of great heterogeneity among the NCAA members is their degree of interest in the noneconomic part of intercollegiate athletics.  They differ in the relative emphasis they place on the commercial versus the academic."[157]

125.      Second, professional sports leagues administer competition for a single sport, whereas the NCAA, conferences, and schools sponsor a large number of sports.  As pointed out above, the NCAA alone sponsors championships in 23 different sports.  Moreover, because most intercollegiate sports generate little if any revenue, schools may rely on revenue generated from men's basketball and football in part to support these other sports.  In addition, Title IX stipulates that schools receiving federal funding must provide both sexes "equal opportunity" in college athletics. In order to be in compliance with this policy, schools must provide athletic scholarships "on a substantially proportional basis to the number of male and female participants in the institution's athletic program," provide male and female athletes equal "treatment, benefits, and opportunities," and that the schools equally accommodate the interests of male and female athletes.[158] Therefore, in order to comply with Title IX, some revenue from men's basketball and football are often used to fund various women's athletic programs.   In contrast, revenues generated by, say football in the NFL, go entirely towards support of football.  Therefore it is not credible to assume that the NCAA and its member schools and conferences would be necessarily willing to agree to the same split of revenue as would professional league owners.

126.      Third, there is greater diversity in teams and players at the intercollegiate

---

is the Chancellor of California State University; Declaration of Patrick Harker in Support of the NCAA's Class Certification Opposition Brief, March 13, 2013 (hereinafter "Harker Declaration (University of Delaware)"), p. 2; and University of Texas Declaration, p. 7.
Declaration of James Delany in Support of the NCAA's Class Certification Opposition Brief, March 14, 2013 (hereinafter "Delany Declaration (Big Ten)"), p. 3.  Mr. Delany is the Commissioner of the Big Ten.
[156] Noll Report, pp. 14-15.
[157] Noll Deposition (May 25, 2005) in *MIBA v NCAA*, pp. 70-73.
[158] "A Policy Interpretation: Title IX and Intercollegiate Athletics," Federal Register, Vol. 44, No. 239, December 11, 1979, US Department of Education Office for Civil Rights, March 14, 2005, available at http://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html, accessed March 13, 2013.

level than at the professional level. The NFL includes only 32 teams, and the NBA includes only 30 teams.[159] In contrast, the NCAA membership includes 120 FBS teams and over 300 D-I basketball teams. The schools that field these teams vary widely in the size of their athletics programs and athletic budgets, the ability to recruit top players, and the level of competition. The NCAA member schools also vary in the level of athletic financial aid they support. The Ivy League provides no athletically-based financial aid, for example. Thus the range of value of college basketball and football players is likely much greater than even the range of value of professional athletes.

### VIII.A.4. Professional Athletes Negotiate Through Players' Unions

127.     Another difference between Professor Noll's but-for world and professional sports may be the way in which licensing revenue is negotiated. Revenue sharing in professional sports is in part the outcome of a negotiation between the leagues and players' unions. As discussed above, Professor Noll is not specifically offering the opinion that NCAA current and former players would form a union – he testified that the but-for world could be one in which there was a union, an "aggregation entity", or where conferences unilaterally set and compete on new compensation rules.[160]

128.     However, if Professor Noll does hold the opinion that intercollegiate negotiation would be through a union, he has offered no explanation of how such a union would come about, or why it would resemble a professional players union.

129.     Moreover, professional sports unions incur costs in order to provide services to their player members. These costs include the administration of group licensing and benefit programs, the provision of services for retired players, and promotional and other activities. In order to cover those costs, unions collect dues from their members and/or retain revenue from other sources, such as from

---

[159] "NFL Football Teams," ESPN.com, 2013, available at http://espn.go.com/nfl/teams, accessed March 13, 2013 and "NBA Basketball Teams," ESPN.com, 2013, available at http://espn.go.com/nba/teams, accessed March 13, 2013.
[160] Noll Deposition, p. 432.

revenue earned from licensing.[161]   For example, in 2009 the National Football League Players Association raised its annual union dues from $10,000 to $15,000 per member.[162]

130.      In *Parrish*, Professor Noll testified that "[t]he common practice among all [professional] sports unions is to pay a substantial fraction, if not all, of the costs of the union not from dues, but from licensing revenues."[163]   Yet, Professor Noll has ignored those costs in his analysis, and in his example calculations of damages.

### VIII.A.5.  Professor Noll Treats Current and Former Student-Athletes the Same, Contrary to Professional League Practices

131.      Professor Noll assumes that his methodology would be applied identically for current and former student-athletes, with the only difference being the size of the revenue pool allotted to each group.   In professional sports leagues, retired players are represented by retired players unions, which negotiate at least some licensing revenues separately from active player unions.[164] The outcomes achieved by these different negotiations can be quite different.

132.      In *Parrish*, Professor Noll agreed the licensing value of most retired professional football players' may be zero, and he even explicitly rejected equal sharing as a valid basis for assessing damages.[165]

### VIII.A.6.  Professor Noll's Team Distribution Methodology Is Not Consistent with the Methodology of Professional Leagues

133.      Although he does not offer an explicit opinion as to how licensing revenue pools would be distributed to teams in his but-for world, Professor Noll's damages calculations incorporate such distributions.   His methodologies ignore complexities found in professional league distribution practices, and are at times

---

[161] *See* for example: "NFL Player Contract" discussion of the group licensing program: "In consideration for this assignment of rights, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA and as otherwise determined by the NFLPA board."   2011 NFL CBA, p. 258.

[162] Belson, Ken, "Players Preparing for Chance the Checks Will Stop," The New York Times, February 5, 2011, available at http://www.nytimes.com/2011/02/06/sports/football/06lockout.html?_r=0, accessed February 27, 2013.

[163] Noll Parrish Testimony, November 4, 2008, pp. 2191-2192.

[164] For example, neither the NFLPA nor the NBPA are currently responsible for group licensing of retired players (Gordon Declaration (NFLPA), fn. 1.; Klempner Declaration (NBPA), p. 3).

[165] Noll Parrish Report, pp. 8 and 21-22;

completely at odds with them.

134.      For example, the basic methodology for how broadcast revenues are distributed in the NFL (whose collective bargaining agreement Professor Noll cites), is completely opposite to Professor Noll's methodology for NCAA broadcast revenue.  Professor Noll distributes revenue to schools (i.e. teams) unequally, based on NCAAs actual relative distributions, but then assumes these revenues are distributed equally among men's basketball players (after splitting the pool into active and former players).  In contrast, the NFL distributes broadcasting rights revenue equally among league teams subject to league restrictions,[166] but the money gets distributed to players through highly variable salaries determined on a team-by-team basis.

135.      Professor Noll also ignores the complexities found in professional sports distribution rules.  To take one example, professional teams are not always required to spend the entire salary cap pool of revenue each year – it is a cap, not a fixed requirement.  In contrast, Professor Noll requires the entire amount distributed to schools on behalf of players go to the players year-by-year – his 50-50 split is a requirement, not a cap.

### VIII.A.7.   Professor Noll's Equal Sharing Assumption Is Not Supported by His Music Analogies

136.      Professor Noll cites licensing agreements in the music industry as support for his assumptions as to how colleges and student-athletes would allocate licensing revenues.[167]   These do not support Professor Noll's but-for world, for several reasons.  First, Professor Noll points to music licensing only as support for his 50/50 split between the schools and the student-athletes; he does not argue that the music licensing analogues support his assumption that all players receive an equal share.[168]   Second, music licensing, which involves composers, artists, and publishers, is not entirely analogous to licensing of student-athlete NILs.  Third, the music industry, like professional sports, is one in which there is tremendous variation in the compensation earned by "performers."

---

[166] Constitution and Bylaws of the National Football League, Effective February 1, 1970 (2006 Rev.), p. 46.
[167] Noll Report, pp. 103-104.
[168] Noll Report, pp. 103-104.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 48

## IX.   PROFESSOR NOLL'S BUT-FOR WORLD IS INCONSISTENT WITH COMPETITION AMONG CONFERENCES

137.     As noted above, Professor Noll testified that a plausible but-for world is one in which the NCAA removes any restrictions on compensation for use of NIL rights and NCAA conferences each set their own rules.  Professor Noll testified that because such conferences could compete for student-athletes by setting these rules, such an outcome would not be anticompetitive.[169]

138.     Professor Noll appears to believe that his assumed outcome, in which student-athletes receive 50 percent of revenues for broadcast and video clips and 33 percent for video games, and split it equally among players, is consistent with competition between conferences because competition would lead all schools/conferences to offer (in equilibrium) the same amount.[170]

139.     This opinion is flawed, inconsistent with economic theory, and at odds with the evidence of conference competition in the actual world.

140.     If licensing revenues were the only factor in student-athletes' choices of schools, it would be licensing *dollars* that student-athletes would care about, not the *share* of licensing revenues passed on to the student. A 50% share of $1,000,000 obviously not the same as a 50% share of $0.

141.     Moreover, licensing revenue is not the only factor that students would consider.  One would expect conferences to compete based on a diverse combination of academic quality, athletic opportunity, social opportunities, licensing revenues, "fit", and other factors.  Conferences and colleges would need to find a combination of characteristics that would allow them to compete against other conferences and schools for student-athletes.  However, this would not mean that competition between schools would lead schools to identical outcomes.  Indeed, heterogeneity on the part of students and schools would mean that a wide variety of bundles of these characteristics may be equilibrium outcomes.

---

[169] Professor Noll testified, "I agree with the economics literature which says rules at the conference level, where there's conference competition, don't – are not, in my view, anticompetitive, that the conferences can do whatever they want, because they're competing with each other for student-athletes" (Noll Deposition, pp. 255-257).
[170] Noll Deposition, p. 190.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 49

142.     I believe that Professor Noll and I are in agreement on this point.  At one point in a discussion over the effects of any NCAA restraints he testified:

> … in fact the premise, of course, [conferences] would all adopt the same rules is false.  We know that because of the voting behavior at the NCAA over the rules changes, that different conferences want to do different things… …we know, for example, that the Pac-10 and the Big Ten tend to disagree with the SEC, a lot, at these meetings.  We know that the Big 12 has made proposals that it can't get the other conferences to go along with.  So – the premise – that they would all do the same thing we know to be false just from the records of the NCAA meetings, because conferences – specific conferences or groups of conferences do propose changes that don't get adopted because they get voted down by the other conferences.[171]

143.     Elsewhere at his deposition, Professor Noll notes that the Ivy League, although a member of the NCAA, does not offer athletic scholarships.[172]     He further testified that "I suspect that no matter what the outcome of this case is, they'll continue not to give athletic scholarships.  And I have not [sic] objection to that, because it occurs at the conference level."[173]  By that same logic, there is no evidence to suggest that the Ivy League (and perhaps other conferences with similar views)[174] would offer a share of licensing revenues to student-athletes.

144.     Moreover, current competition among conferences demonstrates that allowing conferences and schools to set their own rules would lead to substantial diversity.   For example, as Professor Noll notes, schools can compete under existing rules for NCAA athletes based on the quality of their athletic facilities.  Yet this has not resulted in homogeneity in school facilities.

145.     In any case, Professor Noll offers no methodology for determining which set of rules that each NCAA conference would develop in his but-for world.  Understanding what the choices made by each conference would only be possible through an individualized inquiry.

146.     In addition to his assumption about all conferences setting the same licensing rules, Professor Noll's opinions that competition between conferences

---

[171] Noll Deposition, pp. 259-260.
[172] Noll Deposition, pp. 257, 351.
[173] Noll Deposition, pp. 351-352.
[174] The Pioneer Football League also does not offer scholarships to any of their football players ("About the PFL," *pioneer-football.com*, available at http://www.pioneer-football.org/pfl/default/.  Accessed March 12, 2013.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 50

would lead to an equilibrium with equal sharing among players on a given team is also fundamentally inconsistent with conferences' economic incentives. In Professor Noll's but for world, teams would pay each player – from a star quarterback to a walk-on – the same amount of money. Yet there would be strong economic incentives for conferences to deviate from Professor Noll's supposed equilibrium.

147.     Suppose that conference rules are such that Conference A and Conference B are each offering both a star quarterback and a walk-on $250,000 in licensing revenue over 4 years. In the process of recruiting the star quarterback, Conferences are going to have an incentive to increase the licensing revenue to the star, up to the point at which it equals his MRP. Similarly, the supply of walk-on players far exceeds schools demand for them so conferences have little incentive to offer the walk-on $250,000. Negotiating rights at the time of recruiting would eliminate the hold-up problem which drives Professor Noll's assumed damages. While some highly valued recruits might be able to negotiate a sizeable share of licensing revenue from conferences or schools, as discussed above, most student-athletes have little value to schools above the next best recruit and therefore would have little to no bargaining power at the time of recruiting to make additional demands of licensing revenue.

## X.   PROFESSOR NOLL'S EQUAL SHARING ASSUMPTION CREATES SUBSTANTIAL CONFLICTS OVER HOW TO SPLIT DAMAGES AMONG CLASS MEMBERS

148.     In addition to assuming away the question of whether damages can be reliably calculated on a class-wide basis, Professor Noll's equal sharing assumption creates conflicts among the members of the damages class.

149.     Professor Noll would award substantial damages to many putative class members who had little economic value to their institution and their college football or basketball team – for example, walk-ons, injured players, and other players who saw little playing time. In contrast, many other players have economic value far greater than the amount that Professor Noll's damages would award them. These players have a strong incentive to argue for a but-for world in

which student-athletes would receive compensation more in line with the relative value that their NIL brought their school.

150.    None of the three named plaintiffs who were in school during the damages period (and therefore eligible to receive damages from live broadcast revenues – by far and away the largest sum of revenue at issue) were five-star recruits.[175] Indeed two named plaintiffs, Tyrone Prothro and Patrick Maynor, were rated as 2-star recruits out of a possible 5 stars.[176]  Two star recruits may be happy with the damages allocated in Professor Noll's but-for world.[177]  In contrast, many putative class members were highly recruited during the damages period and may stand to lose substantial damages should Professor Noll's but for world be adopted instead of one that allows compensation in line with a players' value.


XI.    **FUNDAMENTAL DIFFERENCES IN MATCHING OF STUDENT-ATHLETES TO SCHOOLS WOULD IN THE BUT-FOR WORLD CREATE SUBSTANTIAL CONFLICTS AMONG THE DAMAGES CLASS MEMBERS**

**XI.A.  There Are Several Sources of Conflicts**

151.    Professor Noll's damages methodology and calculations assume that the *only* change between the actual and but-for worlds would be the distribution of actual world fixed pools of licensing royalties from the NCAA and its member schools to members of the putative class (i.e., student-athletes who in fact participated in men's basketball and football).  Yet Professor Noll's but-for world would fundamentally alter college athletics and the choices that student-athletes,

---

[175] The three players are Damien Rhodes, Patrick Maynor, and Tyrone Prothro.  These three players' teams made a total of only two bowl game appearances combined while they were on the active rosters.  None of the three played in the NFL. ("Alabama Bowl History," CollegeFootballPoll.com, n.d., available at http://www.collegefootballpoll.com/bowl_history_alabama.html, accessed March 13, 2013, "Stanford Bowl History," CollegeFootballPoll.com, n.d., available at http://www.collegefootballpoll.com/bowl_history_stanford.html, accessed March 13, 2013, and "Syracuse Bowl History," CollegeFootballPoll.com, n.d., available at http://www.collegefootballpoll.com/bowl_history_syracuse.html, accessed March 13, 2013).

[176] "Tyrone Prothro," BamaMag.com, 2013, available at
 http://alabama.scout.com/a.z?s=14&p=8&c=1&nid=326041, accessed March 13, 2013 "William T. Dwyer," The Bootleg, 2013, available at http://stanford.scout.com/a.z?s=18&p=8&c=1&nid=734743, accessed March 13, 2013, and "Damien Rhodes," Scout.com, 2013, available at http://recruiting.scout.com/a.z?s=73&p=8&c=1&nid=4900, accessed March 13, 2013.  The ratings were issued by scount.com, a college recruiting website.

[177] Damien Rhodes and Tyrone Prothro each played one season during the damages period (2005) and Patrick Maynor played three seasons (2005-2007). None of the three played in the NFL.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 52

conferences, and schools would make.  It is inconsistent to take the position, as Professor Noll does, that on the one hand, the markets for licensing for rights to student-athletes and for the opportunity for higher education and elite athletic competition are "inextricably intertwined,"[178] and on the other hand, to assume that nothing would change in the but-for world except the sharing of licensing royalties.

152.       Professor Noll constructs a but-for world in which many college basketball players, from the star to the last man on the bench, would earn nearly $1 million over a 4-year career and many college football players would earn nearly $250,000 over a 4-year career (over and above the value of the GIA). There are also a number of broad areas where other substantial changes would be likely, all of which would have affected the way in which student-athletes were matched to schools (and sports) in the but-for world.[179]

153.       First, the substantial financial incentives that are driven by opportunities for licensing revenue in Professor Noll's but-for world would have great influence over students' decisions about whether to attend college, where to attend college, which sports to play, and how long to participate.  This would likely result in very different but-for matching of student-athletes in men's basketball and football programs across schools and teams than have existed in the actual world.

154.       Second, these substantial changes may have affected other NCAA and conference rules in addition to those challenged by the plaintiffs.

155.       Third, the loss of large amounts of licensing revenue would substantially affect budgeting decisions schools would have made regarding revenue allocation, sport sponsorship, scholarship spending, and athletic spending more broadly.

156.       Fourth, the fundamental change in the finances of NCAA members would lead to shifts in conference alignments and may lead some schools to drop football and/or basketball programs.

157.       Finally, but-for player re-allocations and school choices regarding their

---

[178] Noll Report, p. 15.
[179] For example, in *In Re NCAA I-A Walk-On Football Player Litigation*, the court denied the motion for class certification on the grounds that matching student-athletes to schools, and scholarship awards in the but-for world would create "competing interests" within the class and would require significant inquiry. (Case Order, *In Re NCAA I-A Walk-On Football Player Litigation*, May 3, 2006, pp. 14, 18, 19).

athletics programs, which I label "rematching," could even result in changes in the value of broadcast and other licensing agreements upon which damages are calculated.

158.        Individual class member damages are given by the differences between the licensing revenues the class members would have earned in the but-for world, and the licensing revenues, if any, the class members did earn in the actual world. Licensing revenues in the but-for world are, in turn, a function of the schools the student-athletes would have attended, the sport(s) the athletes would have played, and the duration of participation in those sports. Thus, calculating damages requires an assessment of the extent to which, for each student-athlete, the matching of an athlete between school and sport would have been different in the but-for world than it would be in the actual world. Such an analysis is not possible using class-wide methods.[180] And, as pointed out, such rematching creates substantial conflicts among class members.

159.        In the next several subsections, I discuss in greater detail these types of changes that would be expected in Professor Noll's but-for world.

## XI.B. Student-Athletes Would Have Made Substantially Different Choices with Respect to Schools and Sports in Professor Noll's But-for World

160.        The student-athletes' economic incentives in Professor Noll's but-for world would affect student decisions as to what school to attend, what sport to play, and how long to play. This would impact the make-up of rosters and allocation of scholarships, which would further alter students' athletic opportunities and incentives.

161.        Schools would differ substantially in the amount of licensing revenue they distribute to student-athletes. Such large discrepancies would undoubtedly influence a student-athlete's choice of schools, as Professor Noll agrees.[181] Indeed, his report presents a model of schools choice in the but-for world in

---

[180] Professor Noll appears to agree. He testified "… I don't see how I would even approach the issue of trying to figure out, well, in – what would the class of 2006 have done had they known they were going to get these results [licensing revenues like those Professor Noll is estimating as damages]. I don't know how to – I don't think that question is answerable." (Noll Deposition, pp. 210-211).

[181] *See* for example: Roger G. Noll, "The Antitrust Economics of NCAA Restrictions on Athletic Scholarships," p. 8.

which choice depends in part on the licensing revenue offered by the school.[182]

    a.  For example, Alabama and USC are two traditional football powers that recruit against each other. Professor Noll shows that Alabama had 18 recruiting "wins" and eight "losses" to USC in 2007-2011.[183] Professor Noll estimated that a football player who played in the Southeastern Conference on the 2009-2010 University of Alabama roster would have received $62,443 from "live" broadcast licensing revenue for that year ($249,772 over four years), whereas a football player who played in the Pac-10 Conference on the USC roster would have only received $28,428 ($113,712 over four years),[184] or less than half of what the Alabama player would have received.

    b.  Similarly, Kentucky and UCLA are two traditional basketball powers that recruit against each other. Professor Noll estimated that a player on the 2009-2010 men's basketball roster at the University of Kentucky would have received about $273,000 in that year, compared with a student who was on the roster for UCLA, who would have only received about $196,000 from "live" broadcasting.[185]

    c.  Professor Noll estimated that a men's basketball player who played in the Southeastern Conference on the 2009-2010 Vanderbilt roster would have received about $178,000 from "live" broadcast licensing revenue for that year, whereas basketball player who was on the University of Florida roster (also in the Southeastern Conference) would have received about $296,000 in that year.[186] Over a four year period, this is a difference of almost $500,000.

    d.  Such large discrepancies in compensation would have surely affected players' choices of schools in the but-for world. A basketball player that may have chosen UCLA over Kentucky in the actual world may very well

---

[182] Noll Report, p. 72.
[183] Noll Report, Exhibit 4.
[184] Noll Corrections/Amendments, Attachment_2: Appendix D-A19 and C-A21.
[185] Noll Corrections/Amendments, Attachment_2: Appendix D-A10 and C-A13.
[186] Noll Corrections/Amendments, Attachment_2: Appendix D-A10 Similarly, payments for PAC-10 basketball from "live broadcast" are about $171,000 at Washington State and about $252,000 at Washington ( Noll Corrections/Amendments, Attachment_2: Appendix C-A13.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 55

have made a different choice when presented with a $300,000 difference in four-year compensation in Professor Noll's but-for world. Professor Noll notes that removing restrictions on student-athlete compensation could have effects on the competition between schools for student-athletes.[187]

162.        Professor Noll also argues that student-athletes have a strong financial incentive to attend colleges close to home due to NCAA restrictions on transportations costs in financial aid packages.[188] In a world in which student-athletes are earning substantial licensing royalties, such transportation cost concerns would no longer be significant for many student-athletes.

163.        Second, in addition to affecting a student-athlete's choice of school, these financial incentives would also affect the length of time a student remained in school and participated in college football or basketball. Professor Noll argues that the current cap on financial aid may cause some students to leave college early, and that in his but-for world, students might have stayed in college longer than they would have but-for income from licensing.[189] A student that left school early in the actual world, perhaps anticipating some chance of the payoff from success in a professional league, might have stayed in school longer in order to benefit from additional years-worth of licensing revenues.[190] From 2006 to 2010, 244 underclassmen declared for the NFL draft. Of those 244, 60 players (almost 25%) were not drafted.[191] In Professor Noll's but-for world, it is plausible that many of these undrafted underclassmen (and perhaps many of those drafted) would have stayed in school.

164.        Third, the substantial differences in licensing payments between football

---

[187] Noll Report, p. 91.

[188] Noll Report, p. 31and Noll Deposition pp. 441-442. *See also*: "Roger G. Noll, The Antitrust Economics of NCAA Restrictions on Athletic Scholarships," p. 48.

[189] In the context of caps on financial aid, Professor Noll states: "[a]nother plausible effect of the cap on financial aid is to cause early departures from college." (Noll Report, p. 60) Noll Deposition, pp. 362-363.

[190] This would be particularly likely in basketball, in which certain star players choose a school where they will get a lot of playing time and be featured as freshmen, only to turn professional after one season.

[191] McKnight, Michael, "For Many Underclassmen, NFL Draft is a Humbling Experience,"*si.com*, April 27, 2011, available at
http://sportsillustrated.cnn.com/2011/writers/the_bonus/04/27/undrafted.players/index.html. Accessed March 8, 2013.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 56

and basketball (and between both sports and any other college sports, where there would be no licensing revenue in Professor Noll's but-for world) would have affected some students' choices as to which sports to play. It is common for students to be recruited for, and indeed to play, multiple sports at the college level. A student who chose football over basketball in the actual world might have made a different decision in Professor Noll's but-for world, where licensing payments for basketball are as much as 5 to 10 times higher than licensing payments for football.

165. Fourth, individuals that were not student-athletes in the actual world may have been student-athletes in Professor Noll's but-for world. Students who did not attend college in the actual world might have decided to attend in the but-for world. Professor Noll notes that some students may have chosen not to attend college for financial reasons, but might have made a different decision in the but-for world.[192] A student who attended college but chose not to play basketball or football might have instead chosen to play. Indeed, in Professor Noll's but-for world, non-scholarship "walk-on" players receive the same licensing payment as star players. There would be substantial additional competition for these walk-on spots in the but-for world including from athletes who turned down walk-on offers from a D-I basketball or FBS football in favor of a scholarship position in Division II or FCS.[193] In Professor Noll's but-for world, FBS schools would likely forego signing their walk-ons and instead "sign players that might otherwise be starters on other teams, including teams in [FCS] and Division II."[194]

166. Every student-athlete that would have made a different decision in the but-for world would have displaced another student-athlete from the but-for roster. A five star recruit choosing Kentucky instead of UCLA would have bumped another

---

[192] Noll Report, p. 8, 59. *See also*: Roger G. Noll, "The Antitrust Economics of NCAA Restrictions on Athletic Scholarships," p. 98.

[193] Mr. Tim Selgo, Director of Intercollegiate Athletics at Grand Valley State University (a Division II school), stated that "[m]any players will choose to attend a school that offers them a football scholarship regardless of what division it is in, over walking on." Declaration of Tim Selgo in *In re NCAA I-A Walk-On Football Players Litigation*, February 7, 2006, p. 3. Mr. Selgo is the Director of Intercollegiate Athletics at Grand Valley State University.

[194] Declaration of Gary Gray *In Re NCAA I-A Walk-On Football Players Litigation*, May 7, 2005, p. 4. Mr. Gray is the Associate Athletics Director of Compliance for the University of Oregon.

player off the Kentucky roster and created an opening on the UCLA roster. These decisions would have a cascading effect, partly due to limited team roster sizes and restrictions on the number of available athletic scholarships colleges offer. A student-athlete's alternative but-for decision in response to altered incentives would bump another student from a roster who might enroll elsewhere, bumping another student, and so on. Furthermore, the re-shuffling of students would impact who would and would not receive athletic scholarships, which would further impact incentives and the choices students would make. Finally, there is also a dynamic component to all of this re-matching, as a change in the roster in one season would affect the roster in subsequent years.

167.      Professor Noll agrees that changes in financial incentives would affect a student-athlete's choices in the respects discussed above.[195] Professor Noll's Exhibits 8 and 9 purport to demonstrate that NCAA scholarship limits create a deadweight loss resulting from an "inefficient" allocation of student-athletes.[196] In fact, his discussion of these exhibits repeatedly highlight how student-athletes' decisions may have been different had scholarships not been restricted.

168.      Professor Noll states that "[b]ecause the NCAA limits the number of athletic scholarships, a price increase [in the student's cost of college attendance] does not reduce the number of scholarships awarded, but instead the expected effect is to change the identities of the students who accept an athletic scholarship."[197]

## XI.C.  The NCAA or Conferences May Have Altered Other Rules

169.      As Professor Noll concedes, in his-but for world the NCAA or conferences may have changed other rules. He testified "the world we're talking about is hard to define at this point, because what other rules are going to change at the conference level in response to changing this rule, I don't know."[198]

170.      Schools' decisions regarding how much financial aid to offer would likely

---

[195] Professor Noll testified "I would expect that if the mechanism for distributing the revenues produced significant differences among schools, then in fact there would be a change in which schools people attended, where some players attended, yes." (Noll Deposition, pp. 208-210).
[196] Noll Report, pp. 58-63.
[197] Noll Report, p. 58.
[198] Noll Deposition, pp. 219-220.

be impacted by a loss of licensing revenue.[199]   Under the NCAA's Bylaws, Division I schools are limited to a maximum of 13 men's basketball scholarships and FBS schools are limited to 85 football scholarships each year.[200]   A loss of substantial net revenue may cause schools to re-allocate their athletic scholarship opportunities, such as deciding to provide fewer or no scholarships in these two men's sports.

   a. Alternatively, schools could reduce the amount of the GIA. This would alter the financial incentives student-athletes face, and would contribute to the re-matching of students to schools discussed above.

   b. Conferences could adjust rules on rosters – decreasing roster sizes and/or creating distinctions among active and non-active rosters. Whereas FBS Football teams have rosters as large as 105 players (85 scholarship players, 20 walk-ons), NFL teams are limited to active rosters of 53 players and practice squad players (with lower minimum salaries) of 8 players.[201]

   c. The NCAA or conferences could have established salary caps or other rules to help maintain competitive balance in a world where schools are able to offer substantial licensing revenues to players.

### XI.D.  Schools Would Have Faced Very Different Athletic Department Budget Decisions

171.     The loss of half of their licensing revenue each year as would occur in Professor Noll's but-for world would almost certainly have substantial impacts on how schools structure and fund their athletics programs.  While Professor Noll

---

[199] In addition, schools have obligations under Title IX to provide athletic opportunities to men and women on a non-discriminatory basis ("A Policy Interpretation: Title IX and Intercollegiate Athletics," Federal Register, Vol. 44, No. 239, December 11, 1979, US Department of Education Office for Civil Rights, March 14, 2005, available at http://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html, accessed March 13, 2013).  A loss of substantial licensing revenue which would be given exclusively to men in Professor Noll's but-for world would likely impact in important ways policies schools would implement in order to comply with Title IX (*See* for example: Womack Declaration (SEC), pp. 6, 8; LeCrone Declaration (Horizon League), p. 5; White Declaration (CSU), p. 3, Harker Declaration (University of Delaware), p. 6, Delany Declaration (Big Ten), p. 4, and Welty Declaration (California State University at Fresno), p. 7.
[200] 2012-13 NCAA Division I Manual, July 2012, Sections 15.5.5.1 and 15.5.6.1.
[201] NFL Collective Bargaining Agreement, August 4, 2011, p. 145, Article 25, Sections 1, 4 and p. 160, Article 33, Section 1(a). *See also*: p. 161, Article 33, Section 3 and p. 146, Article 26, Section 1(a); 2012 2013 NCAA Division I Manual, Bylaws 15.5.6.1 and 17.9.2.

acknowledges these effects,[202] his damages methodology completely ignores them.  For some schools, loss of these revenues would likely affect scholarship offerings, sports sponsorship, and even conference alignment.  For example, Mr. Larry Teis, Director of Athletics at Texas State University stated in the context of an increase in the grant-in-aid limits, that Texas State would likely move to an "equivalency"-type model for providing financial aid.[203]  This would affect revenue distribution and ultimately which student-athletes would have and would not have suffered alleged harm.

### XI.D.1.    Colleges Would Have Made Substantially Different Choices in Spending Athletic Department Revenue

172.    A loss of licensing revenue may reduce how much schools would have spent on coaches, training facilities, and other factors important for recruiting student-athletes.  Indeed, Professor Noll claims that one of the anticompetitive effects of the challenged conduct is inefficient substitution of revenue away from student-athletes and to other inputs to collegiate athletics, including coaches and training facilities.[204]  He testified that eliminating half of the licensing revenue from school athletic budgets every year would be expected to reduce spending on these inputs.[205]  Professor Noll concedes that student-athletes base their choices of schools in a significant part on the quality of the coaches and facilities.[206]

173.    Thus, to the extent that Professor Noll is correct that there is inefficient substitution towards coaches and training facilities in the actual world, this too would lead to student-athletes making different choices in the but-for world.  Lower salaries for coaches may very well have affected the matching of coaches to schools, and thus students who chose a school because of the coach may have made a different choice in the but-for world.  Alternately, student-athletes who did

---

[202] Noll Deposition, pp. 130-131.

[203] Declaration of Larry Teis (Texas State University), September 2006, p. 3.  For some sports known as "equivalency sports," the NCAA rules impose a limit on the total dollar amount of grants-in-aid that can be provided, and the individual schools determine how they will divide the grand-in-aid pool among the student-athletes, such that some or all student-athletes on a team may receive partial grants-in-aid.  Bylaw 15.5.3, 2012-2013 *NCAA Division I Manual*.

[204] Noll Report, pp. 9 and 67-68.  *See also*: Roger G. Noll, "The Antitrust Economics of NCAA Restrictions on Athletic Scholarships," p. 73.

[205] *See* for example: Noll Deposition, pp. 130-131.

[206] Noll Report, pp. 69 and 74.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER

not have a good relationship with an existing coach might have played for more years in a but-for world with a different coach.

174.    In addition, this might alter the success of schools' athletic programs.  For example, appearances in the D-I basketball tournament, NIT or football bowl games might have been different in the but-for world.  This would also affect school funding that is dependent on the success of the athletics programs (e.g. boosters and alumni donations).   These changes would change incentives of student-athlete in the but-for world.

### XI.D.2.    Schools Might Have Dropped or Substantially Altered their Men's Basketball and Football Programs

175.    School net income from men's basketball and football would clearly be substantially reduced in Professor Noll's but-for world. While many top-tier schools may have still remained substantially profitable, other schools closer to the margin may have decided to leave Division I athletics.[207]   They may have chosen to move to another NCAA division where such licensing revenue was not shared. They may have chosen to make football or basketball a club sport.  Or, they may have decided to drop football or basketball altogether. For example, According to John Welty, the President of Fresno State, the school's athletic department currently relies on a subsidy from the institution which accounts for about 34% of the departments operating budget.[208] Further, Welty believes that Fresno state, and other schools, could leave Division I if revenue is assigned to student-athletes in the manner described by Professor Noll.[209] Indeed Stan Albrecht, the President of Utah State University, says that his institution "would not be able to fund the 16 sports that the NCAA requires to qualify for Division I," under Noll's claim for player revenue assignment.[210] Here too, Professor Noll concedes that such effects are possible.[211]

---

[207] Welty Declaration (California State University at Fresno), March 12, 2013, p. 3, and Harker Declaration (University of Delaware), p. 6.
[208] Welty Declaration (California State University at Fresno), p. 3.
[209] Welty Declaration (California State University at Fresno), p. 6, and Harker Declaration (University of Delaware), pp. 5-6.
[210] Albrecht Declaration (Utah State), p. 4
[211] Professor Noll testified "… is it the case that if costs go way up for intercollegiate football, some teams will drop college football or move to a lower division?  Of course.  That's likely to happen if costs go up." (Noll Deposition, pp. 130-131).  *See also*: Noll Report, pp. 92-93 (on Financial Distress).

176.     Indeed, even in the actual world, without the additional burden of substantial licensing payments, schools have made decisions to drop these programs.  At the end of 2009, both Hofstra University and Northeastern University decided to drop their FCS football programs citing financial constraints.[212]  It is plausible that a loss of half of their licensing royalties would lead other schools, including FBS schools, to drop their programs.  As with the other factors described above, the loss of roster spots at these types of schools would have further exacerbated the complexity of the re-matching of student-athletes to schools in the but-for world.

### XI.D.3.     The Matching of Schools to Conferences May Have Changed

177.     The but-for world put forth by Professor Noll might even have resulted in a change in the make-up of conferences.  For example, a decision by a school to drop its football program would reduce the number of teams in that conference, or cause the school to choose to change conference based on other factors such as size of their athletic program or scholarship offerings.

178.     Moreover, one but-for world about which Professor Noll speculates is a world in which conferences each set their own compensation rules absent an NCAA restriction, and compete with each other for students in part based upon these rules.  If this is the case, there would be strong incentives for schools to realign with conferences that share their philosophy about such compensation rules.

179.     Realignment might affect whether a school competes in a FBS or FCS football conference, which would affect alleged damages, since FCS licensing revenue is not part of the relevant products in this matter.

180.     Realignment would affect NCAA and bowl revenue distributions that the schools would receive.

181.     Professor Noll's damages methodology, which involves distributing funds to conferences and then down to the conferences' member schools, depends on the

---

[212] Marcus, Steven, "End of Hofstra Football Program Shocks Players," Newsday, December 3, 2009, available at http://www.newsday.com/sports/college/end-of-hofstra-football-program-shocks-players-1.1635404?qr=1, accessed March 13, 2013 ; and Greer, Jeff, "Northeastern Discontinues Football," US News and World Report, November 24, 2009, available at http://www.usnews.com/education/blogs/paper-trail/2009/11/24/northeastern-discontinues-football, accessed March 13, 2013.

assumption that the actual conference make-up is the same as the but-for conference make-up.  Conference re-alignment, whether caused by elimination of football or other reasons related to schools' loss of licensing revenue, would render Professor Noll's methodology unreliable.

182.      In summary, though Professor Noll agrees that student-athletes base their collegiate athletics decisions on factors such as scholarship offers, coaching and facility quality, and the quality of the division and conference, and while he has acknowledged that his but-for world would change these factors, his methodology does not and cannot account for them.

### XI.D.4.    Licensing Contracts and Licensing Royalties May Have Been Different

183.      Finally, changes that would occur in the but-for world flowing from the cascade of re-matching discussed above would be expected to alter the value of licensing agreements, which Professor Noll assumes would be unchanged.  The rematching of players and coaches to schools, of schools to conferences, and the variety of other changes described above would have fundamentally changed the value of the college athletics product that the NCAA and the conferences were selling.  Such changes would have clearly affected the revenues that the NCAA and the conferences would have earned and even the types of licensing agreements that would have been entered into. Indeed, actual conference broadcast contracts sometimes include provisions to alter or even cancel the contract if conference membership changes.[213]

184.      Moreover, while Professor Noll appears to envision a but-for world that does not pay student-athletes while in school, but rather pays them from a trust fund upon graduation, such large sums would substantially change the way in which college sports are viewed.  To the extent an important part of the value of the college athletics product offered by the NCAA and its members is the amateur nature of the competition, and the differentiation that this may provide from professional sports, for example, then the but-for revenue earned by the product could be substantially lower.

185.    In sum, the financial incentives in Professor Noll's but-for world are so fundamentally different than those in the actual world that it would almost surely be the case that substantial rematching between student-athletes and schools, coaches and schools, and schools and conferences would have occurred. Because Professor Noll's damages depend fundamentally on the school, sport, and duration in the but-for world, to the extent such damages can be reliably calculated at all, can only be done on the basis of an individualized inquiry.

186.    Moreover, such rematching introduces large and insurmountable economic conflicts between putative class members. Putative class members who attended schools and participated in sports where licensing revenues are large under Professor Noll's methodology would have an incentive to argue that there would be no rematching in the but-for world and that actual and but-for rosters would be identical. In contrast, putative class members who attended schools and participated in sports where licensing revenues are smaller (and/or who were only on rosters for a year or two) would have an incentive to argue that in Professor Noll's but-for world they would have made a substantially different choice entitling them to a substantially larger amount of damages. Putative class members, arguing over the same pot of damages accruing to a particular roster spot on a particular team, presents a very real conflict to the putative class.[214]

## XII. IMPLEMENTATION OF PROFESSOR NOLL'S DAMAGES METHODOLOGY CREATES A CLASS CONFLICT

187.    Professor Noll proposes to measure damages as a fixed share (50 percent for broadcasts, 33 percent for video games) of the total licensing revenues for game broadcasts and video games. He then proposes to allocate this fixed pool of damages by conference, school, sport, and eligibility status (current/former). He

---

[214] Purported class members in *In Re NCAA I-A Walk-On Football Players Litigation* accused the NCAA of unlawfully restricting the number of scholarships that can be offered by each team, and were owed compensation. In denying the certification of the class, the court found that intra-class conflict because athletes would "have an incentive to prove that he would have received a scholarship, while others would not have been awarded the scholarship for which he would have been competing." Similarly, athletes in Professor Noll's alleged class would have an incentive to prove that they would have made decisions in the but-for world, which would award them the greatest revenue, which would have a direct effect on the amount of revenue received by others in the proposed class (Case Order *In Re NCAA I-A Walk-On Football Player Litigation*, May 3, 2006, pp. 21).

then allocates each bucket of damages equally to all players of the same type on the same team.

188.     Because he is allocating a fixed pool of damages, Professor Noll's methodological decisions are inherently the subject of class conflict. A decision to use a particular methodological allocation will benefit some putative class members at the expense of others. The amount of damages at issue is substantial and these allocation decisions can have very large impacts on the amounts received by putative class members. As discussed previously in this report, the conflict is particularly important with respect to the allocation of revenues among teammates (Professor Noll chooses to give each an equal share, whereas others would be better off under a methodology that allocated revenues based on the players' values to the team.). Similar conflicts exist with respect to each of Professor Noll's other allocations – conference, school, sport, and eligibility status. Professor Noll provides little support for the method or data used to perform the allocation on each of these dimensions – and indeed appears to have changed his opinions as to the appropriate methodology on some dimensions.[215]

Respectfully Submitted,

Daniel L. Rubinfeld
Oakland, California
March 14, 2013

---

[215] In his report Professor Noll proposes allocating revenues equally to players at the school level, while in deposition he proposes allocations at the conference level. Noll Report, pp. 101 and 211-212.

HIGHLY CONFIDENTIAL –COUNSEL ONLY: SUBJECT TO PROTECTIVE ORDER Page 65

## Exhibit 1: Named Antitrust Plaintiffs

| Named Plaintiff | School | Sport | Years Eligible | Position |
|---|---|---|---|---|
| Bill Russell | San Francisco | Basketball | 1953-1956 | Center |
| Oscar Robertson | Cincinnati | Basketball | 1957-1960 | Guard-Forward |
| Harry Flournoy | Texas Western | Basketball | 1963-1966 | Forward |
| David Lattin | Tennessee State & Texas Western | Basketball | 1964-1967 | Center |
| Thad Jaracz | Kentucky | Basketball | 1965-1968 | Center |
| Bob Tallent | Kentucky & George Washington | Basketball | 1966-1967, 1969 | Guard |
| Kerwin Ray Ellis | Ohio State | Football | 1977-1980 | Safety |
| Alex Gilbert | Indiana State | Basketball | 1979-1980 | Forward |
| Tate George | Connecticut | Basketball | 1987-1990 | Guard |
| Eric Riley | Michigan | Basketball | 1989-1993 | Center |
| Ed O'Bannon | UCLA | Basketball | 1991-1995 | Forward |
| Sam Jacobson | Minnesota | Basketball | 1994-1998 | Guard-Forward |
| Danny Wimprine | Memphis | Football | 2001-2004 | Quarterback |
| Damien Rhodes | Syracuse | Football | 2002-2005 | Running Back |
| Tyrone Prothro | Alabama | Football | 2003-2005 | Wide Receiver |
| Patrick Maynor | Stanford | Football | 2004-2008 | Linebacker |

Notes: "Years Eligible" for basketball plaintiffs are based on later year of a given season. For example, the 1995-96 basketball season is denoted as 1996.

Sources: Second Consolidated Amended Complaint ("SCAC"), May 16, 2011; Oscar P. Robertson, et al., *Class Action Complaint*, January 26, 2011 ("Robertson complaint"); William F. Russell, et al., Class Action Complaint, October 5, 2011 ("Russell complaint"); named plaintiff depositions.

Highly Confidential - Counsel Only: Subject to Protective Order

# Exhibit 2: Schools and Conferences that Compete in FBS or Division-I Basketball

## FBS & Division-I Basketball Conferences

| **Atlantic Coast Conference** | **Big 12 Conference** | **Big East Conference** |
|---|---|---|
| Boston College | Baylor University | University of Cincinnati |
| Clemson University | Iowa State University | University of Connecticut |
| Duke University | University of Kansas | DePaul University* |
| Florida State University | Kansas State University | Georgetown University* |
| Georgia Institute of Technology | University of Oklahoma | University of Louisville |
| University of Maryland, College Park | Oklahoma State University | Marquette University* |
| University of Miami (Florida) | Texas Christian University | University of Notre Dame* |
| North Carolina State University | Texas Tech University | University of Pittsburgh |
| University of North Carolina, Chapel Hill | University of Texas at Austin | Providence College* |
| University of Virginia | West Virginia University | Rutgers, State Univ of New Jersey, New Brunswick |
| Virginia Tech | | Seton Hall University* |
| Wake Forest University | **Conference USA** | University of South Florida |
| | University of Alabama at Birmingham | St. John's University (New York)* |
| **Big Ten Conference** | University of Central Florida | Syracuse University |
| University of Illinois, Champaign | East Carolina University | Temple University** |
| Indiana University, Bloomington | University of Houston | Villanova University* |
| University of Iowa | Marshall University | |
| University of Michigan | University of Memphis | **Pacific 12 Conference** |
| Michigan State University | Rice University | University of Arizona |
| University of Minnesota, Twin Cities | Southern Methodist University | Arizona State University |
| University of Nebraska, Lincoln | University of Southern Mississippi | University of California, Berkeley |
| Northwestern University | University of Texas at El Paso | University of California, Los Angeles |
| The Ohio State University | Tulane University | University of Colorado, Boulder |
| Pennsylvania State University | University of Tulsa | University of Oregon |
| Purdue University | | Oregon State University |
| University of Wisconsin, Madison | **Mountain West Conference** | University of Southern California |
| | Boise State University | Stanford University |
| **Mid-American Conference** | California State University, Fresno | University of Utah |
| University of Akron | Colorado State University | University of Washington |
| Ball State University | University of Hawaii, Manoa** | Washington State University |
| Bowling Green State University | University of Nevada, Las Vegas | |

Highly Confidential - Counsel Only: Subject to Protective Order

| | | Southeastern Conference |
|---|---|---|
| University at Buffalo | University of Nevada | University of Alabama |
| Central Michigan University | University of New Mexico | University of Arkansas, Fayetteville |
| Eastern Michigan University | San Diego State University | Auburn University |
| Kent State University | U.S. Air Force Academy | University of Florida |
| University of Massachusetts, Amherst** | University of Wyoming | University of Georgia |
| Miami University (Ohio) | | University of Kentucky |
| Northern Illinois University | **Western Athletic Conference** | Louisiana State University |
| Ohio University | University of Denver* | University of Mississippi |
| University of Toledo | University of Idaho | Mississippi State University |
| Western Michigan University | Louisiana Tech University | University of Missouri, Columbia |
| | New Mexico State University | University of South Carolina, Columbia |
| **Sun Belt Conference** | San Jose State University | University of Tennessee, Knoxville |
| University of Arkansas, Little Rock* | Seattle University* | Texas A&M University, College Station |
| Arkansas State University | Texas State University-San Marcos | Vanderbilt University |
| Florida Atlantic University | University of Texas at Arlington* | |
| Florida International University | University of Texas at San Antonio | **Independents** |
| University of Louisiana at Lafayette | Utah State University | Brigham Young University** |
| University of Louisiana at Monroe | | University of Notre Dame** |
| Middle Tennessee State University | | U.S. Military Academy** |
| University of North Texas | | U.S. Naval Academy** |
| University of South Alabama | | |
| Troy University | | |
| Western Kentucky University | | |

**Division-I Basketball Conferences Only (No Football)**

| America East Conference | Atlantic 10 Conference | Atlantic Sun Conference |
|---|---|---|
| University at Albany | Butler University | East Tennessee State University |
| Binghamton University | University of Dayton | Florida Gulf Coast University |
| Boston University | Duquesne University | Jacksonville University |
| University of Hartford | Fordham University | Kennesaw State University |
| University of Maine, Orono | George Washington University | Lipscomb University |
| University of Maryland, Baltimore County | La Salle University | Mercer University |
| University of New Hampshire | University of Massachusetts, Amherst | University of North Florida |
| Stony Brook University | University of North Carolina, Charlotte | Northern Kentucky University |
| University of Vermont | University of Rhode Island | University of South Carolina Upstate |

Highly Confidential - Counsel Only: Subject to Protective Order

| **Big Sky Conference** | University of Richmond | Stetson University |
|---|---|---|
| California State University, Sacramento | St. Bonaventure University | **Big West Conference** |
| Eastern Washington University | Saint Joseph's University | California Polytechnic State University |
| Idaho State University | Saint Louis University | California State University, Fullerton |
| University of Montana | Temple University | California State University, Northridge |
| Montana State University-Bozeman | Virginia Commonwealth University | University of California, Davis |
| University of North Dakota | Xavier University | University of California, Irvine |
| Northern Arizona University | | University of California, Riverside |
| University of Northern Colorado | **Big South Conference** | University of California, Santa Barbara |
| Portland State University | Campbell University | University of Hawaii, Manoa |
| Southern Utah University | Charleston Southern University | Long Beach State University |
| Weber State University | Coastal Carolina University | University of the Pacific |
| | Gardner-Webb University | |
| **Colonial Athletic Association** | High Point University | **Horizon League** |
| University of Delaware | Liberty University | Cleveland State University |
| Drexel University | Longwood University | University of Detroit Mercy |
| George Mason University | University of North Carolina, Asheville | University of Illinois at Chicago |
| Georgia State University | Presbyterian College | Loyola University Chicago |
| Hofstra University | Radford University | Valparaiso University |
| James Madison University | Virginia Military Institute | University of Wisconsin-Green Bay |
| University of North Carolina, Wilmington | Winthrop University | University of Wisconsin, Milwaukee |
| Northeastern University | | Wright State University |
| Old Dominion University | **Great West Conference** | Youngstown State University |
| Towson University | Chicago State University | |
| College of William and Mary | Houston Baptist University | **Metro Atlantic Athletic Conference** |
| | New Jersey Institute of Technology | Canisius College |
| **Ivy League** | University of Texas, Pan American | Fairfield University |
| Brown University | Utah Valley University | Iona College |
| Columbia University-Barnard College | | Loyola University Maryland |
| Cornell University | **Northeast Conference** | Manhattan College |
| Dartmouth College | Bryant University | Marist College |
| Harvard University | Central Connecticut State University | Niagara University |
| University of Pennsylvania | Fairleigh Dickinson University, Metropolitan Campus | Rider University |
| Princeton University | Long Island University-Brooklyn Campus | Siena College |
| Yale University | Monmouth University | St. Peter's University |

Highly Confidential - Counsel Only: Subject to Protective Order

**Mid-Eastern Athletic Conference**
- Bethune-Cookman University
- Coppin State University
- Delaware State University
- Florida A&M University
- Hampton University
- Howard University
- University of Maryland Eastern Shore
- Morgan State University
- Norfolk State University
- North Carolina A&T State University
- North Carolina Central University
- Savannah State University
- South Carolina State University

**Patriot League**
- American University
- Bucknell University
- Colgate University
- College of the Holy Cross
- Lafayette College
- Lehigh University
- U.S. Military Academy
- U.S. Naval Academy

**Southwestern Athletic Conference**
- Alabama A&M University
- Alabama State University
- Alcorn State University
- University of Arkansas, Pine Bluff
- Grambling State University
- Jackson State University
- Mississippi Valley State University
- Prairie View A&M University
- Southern University, Baton Rouge

- Mount St. Mary's University
- Quinnipiac University
- Robert Morris University
- Sacred Heart University
- St. Francis College Brooklyn
- Saint Francis University (Pennsylvania)
- Wagner College

**Missouri Valley Conference**
- Bradley University
- Creighton University
- Drake University
- University of Evansville
- Illinois State University
- Indiana State University
- Missouri State University
- University of Northern Iowa
- Southern Illinois University at Carbondale
- Wichita State University

**Southern Conference**
- Appalachian State University
- College of Charleston (South Carolina)
- The Citadel
- Davidson College
- Elon University
- Furman University
- Georgia Southern University
- University of North Carolina at Greensboro
- Samford University
- University of Tennessee at Chattanooga
- Western Carolina University
- Wofford College

**Ohio Valley Conference**
- Austin Peay State University
- Belmont University
- Eastern Illinois University
- Eastern Kentucky University
- Jacksonville State University
- Morehead State University
- Murray State University
- Southeast Missouri State University
- Southern Illinois University Edwardsville
- Tennessee State University
- Tennessee Technological University
- University of Tennessee at Martin

**Southland Conference**
- University of Central Arkansas
- Lamar University
- McNeese State University
- Nicholls State University
- Northwestern State University
- Oral Roberts University
- Sam Houston State University
- Southeastern Louisiana University
- Stephen F. Austin State University
- Texas A&M University-Corpus Christi

**West Coast Conference**
- Brigham Young University
- Gonzaga University
- Loyola Marymount University
- Pepperdine University
- University of Portland
- University of San Diego
- University of San Francisco
- Santa Clara University

Highly Confidential - Counsel Only: Subject to Protective Order

| | **Summit League** | St. Mary's College of California |
|---|---|---|
| Texas Southern University | Indiana University-Purdue University, Fort Wayne | |
| | Indiana University-Purdue University at Indianapolis | |
| **Independents** | University of Missouri-Kansas City | |
| California State University, Bakersfield | University of Nebraska, Omaha | |
| University of New Orleans | North Dakota State University | |
| | Oakland University | |
| | University of South Dakota | |
| | South Dakota State University | |
| | Western Illinois University | |

Notes: (1) * Denotes that the school only plays basketball in that conference.

(2) ** Denotes that the school only plays football in that conference.

(3) University of South Alabama plays football and basketball in the Sun Belt Conference.

Sources: (1) http://web1.ncaa.org/onlineDir/exec2/sponsorship?sortOrder=1&division=All&sport=MFB, accessed March 13, 2013.

(2) http://web1.ncaa.org/onlineDir/exec2/sponsorship?sortOrder=1&division=All&sport=MBB, accessed March 13, 2013.

(3) http://usajaguars.com/schedule.aspx?path=football and http://usajaguars.com/schedule.aspx?path=mbball, accessed March 13, 2013.

Highly Confidential - Counsel Only: Subject to Protective Order

**Exhibit 3: Conference Contracts**

| Bates Range | Conference | Contracting Party | Media Contract | Term | Sports Covered |
|---|---|---|---|---|---|
| ATEN000073-078 | Atlantic 10 | Collegiate Images | Content and Trademark License Agreement | 2006-2013 | Unspecified |
| ATEN000079-090 | Atlantic 10 | CSTV | CSTV/Atlantic-10 Heads of Agreement | 2006-2011 | Football, Basketball (Men's and Women's), and Olympic Sports |
| ATEN000092-107 | Atlantic 10 | ESPN | ESPN Agreement | 2006-2013 | Basketball (Men's and Women's) |
| TEXAS000077-115 | Big 12 | ABC/ESPN | Telecast Agreement | 1996-2008 | Football |
| TEXAS000038-076 | Big 12 | ABC/ESPN | Telecast Agreement | 2000-2008 | Football and Men's Basketball |
| BIG_12_NCAA_00000792-836 | Big 12 | ABC/ESPN | Telecast Agreement | 2008-2016 | Football, Basketball (Men's and Women's), and Olympic Sports |
| BIG_12_NCAA_00000837-840 | Big 12 | ABC/ESPN | Continuation of Telecast Agreement after loss of Colorado and Nebraska | 2010-2011 | Football, Basketball (Men's and Women's), and Olympic Sports |
| TEXAS000465-472 | Big 12 | ESPN/Creative Sports | ESPN Agreement | 1996-2001 | Basketball (Men's and Women's) |
| BIG_12_NCAA_00000841-910 | Big 12 | FOX | Fox Telecast Rights Agreement | 2012-2025 | Football, Basketball (Men's and Women's), and Olympic Sports |
| TEXAS000130-149 | Big 12 | National Sports Partners/Fox Sports | Telecast Rights Agreement | 1998-2007 | Football, Basketball (Men's and Women's), and Olympic Sports |
| HW1000181-183 | Big Sky | Altitude Sports & Entertainment | Programming Term Sheet | 2007-2010 | Men's Basketball |
| HW1000169-172 | Big Sky | Altitude Sports & Entertainment | Programming Term Sheet | 2008-2012 | All sports |
| HW1000165-168 | Big Sky | Altitude Sports & Entertainment | Programming Proposal | 2009-2013 | All sports |
| HW1000154-156 | Big Sky | Altitude Sports & Entertainment | Programming Term Sheet | 2010-2013 | Basketball (Men's and Women's) |
| HW1000191-199 | Big Sky | ESPN | ESPN Men's Basketball Agreement | 2006-2011 | Men's Basketball |
| HW1000173-175 | Big Sky | KHQ | KHQ Broadcast Agreement | 2009-2010 | Men's Basketball and Football |
| HW1000146-149 | Big Sky | KHQ | KHQ Broadcast Agreement | 2011-2012 | Men's Basketball and Football |
| HW100079 | Big Sky | KIZZ | KIZZ Broadcast Agreement | 2007 | Men's Basketball |
| HW1000184-186 | Big Sky | KPAX | KPAX Broadcast Agreement | 2006-2010 | Football and Basketball (Men's and Women's) |
| HW1000176-178 | Big Sky | KPAX | KPAX Broadcast Agreement Extension | 2010-2012 | Football and Basketball (Men's and Women's) |
| HW1000150-153 | Big Sky | KSE Media | Syndication and Transport Agreement | 2011 | Football |
| HW1000159-162 | Big Sky | KSE Media | Syndication and Transport Agreement | 2009-2010 | Football |
| HW1000163-164 | Big Sky | Northern Arizona University | Television Rights Agreement | 2008-2009 | Football and Basketball (Men's and Women's) |
| HW1000157-158 | Big Sky | Northern Arizona University | Radio Broadcast Agreement | 2009-2010 | Basketball (Men's and Women's) |
| CUSA_NCAA00000565-570 | Conference USA | Collegiate Images | Content and Trademark License Agreement | 2007-2010 | Unspecified |
| CUSA_NCAA00000571-601; CUSA_NCAA000162;352 | Conference USA | CSTV | Broadcast and Properties Rights Agreement | 2005-2011 | Football, Basketball (Men's and Women's), and Olympic Sports |
| CUSA_NCAA00000509-520 | Conference USA | CSTV/CBSC | Rights Agreement Extension | 2011-2016 | Football, Basketball (Men's and Women's), and Olympic Sports |
| CUSA_NCAA00000765-783 | Conference USA | ESPN | Short Form Television Rights Agreement | 2001-2009 | Football, Basketball (Men's and Women's), and Olympic Sports |
| CUSA_NCAA00000784-797 | Conference USA | ESPN | Rights Agreement | 2005-2011 | Football and Basketball (Men's and Women's) |
| CUSA_NCAA00000821-835 | Conference USA | ESPN | Binding Term Sheet | 2005-2011 | Football, Basketball (Men's and Women's), and Olympic Sports |
| CUSA_NCAA00000861-886 | Conference USA | ESPN | Content and Trademark License Agreement | 2011-2016 | Football, Basketball (Men's and Women's), and Olympic Sports |
| HORIZON000008-017 | Horizon League | ESPN | Broadcast Rights Agreement | 2005-2010 | Basketball and other non-football |
| IVY000130-135 | Ivy | Ivy Creative | Broadcast Agreement | 2010-2011 | Football |
| NBCU_00225-234 | Ivy | Versus | License Agreement | 2010-2011 | Football |
| IVY000001-018 | Ivy | YES Network | Production and Cablecast License Agreement | 2005-2006 | Football and Basketball (Men's and Women's) |
| MEAC000084-091 | Mid Eastern Conference | ESPN | Broadcast rights Agreement | 2005-2015 | Basketball |
| MEAC000026-039 | Mid Eastern Conference | ESPN | Broadcast rights Agreement | 2005-2015 | All Sports |
| MEAC00111-135 | Mid Eastern Conference | ESPN | Broadcast Rights Agreement | 2011-2019 | Men's Basketball |
| MVC000004-018 | Missouri Valley | Fox Sports Midwest | Broadcast Rights Agreement | 2005-2011 | All sports |
| MVC000020-034 | Missouri Valley | Fox Sports Midwest | Telecast Rights Agreement | 2000-2001 | Basketball (Men's and Women's) and other non-football |
| MVC000035-050 | Missouri Valley | Fox Sports Midwest | Telecast Rights Agreement | 2001-2003 | Basketball (Men's and Women's) and other non-football |
| MVC000068-081 | Missouri Valley | Fox Sports Midwest | Telecast Rights Agreement | 1999-2000 | Basketball (Men's and Women's) and other non-football |
| MVC000151-067 | Missouri Valley | Fox Sports Midwest | Telecast Rights Agreement | 2005-2010 | Basketball (Men's and Women's) and other non-football |
| OVC000030-050 | Ohio Valley Conference | ESPN | Broadcast Rights Agreement | 2000-2005 | Basketball and other non-football |
| OVC000026-038 | Ohio Valley Conference | ESPN | Broadcast Rights Agreement | 2005-2010 | Basketball (Men's and Women's) |
| OVC000002-025 | Ohio Valley Conference | ESPN | Broadcast Rights Agreement | 2010-2013 | Football, Basketball (Men's and Women's), and Olympic Sports |
| OVC000054-069 | Ohio Valley Conference | IMG/Host Communications | Multimedia and Sports Marketing Agreement/Telecast | 2008-2013 | All sports |
| PATRIOT000063-067 | Patriot League | CBSC | Broadcast Rights Agreement | 2010-2015 | Football and Basketball (Men's and Women's) |
| PATRIOT000043-048 | Patriot League | ESPN | Television and Streaming Agreement | 2006-2008 | Basketball (Men's and Women's) |
| PATRIOT000085-061 | Patriot League | CSTV/CBSC | Conference Rights Agreement | 2011-2015 | All Sports |
| PATRIOT000077-083 | Patriot League | CSTV/CBSC | Program License Agreement | 2008-2010 | Men's Basketball |
| PATRIOT000068-075 | Patriot League | CSTV/CBSC | Programming Agreement | 2009-2010 | Men's Basketball |
| PATRIOT000018-025 | Patriot League | ESPN | Basketball Championship Television Agreement | 2005 | Basketball (Men's and Women's) |
| PATRIOT000027-042 | Patriot League | ESPN | Broadcast Agreement | 2005-2008 | Basketball (Men's and Women's) and other non-football |
| PATRIOT000002-017 | Patriot League | ESPN | Broadcast Agreement | 2008-2011 | Basketball (Men's and Women's) and other non-football |
| PATRIOT000086-104 | Patriot League | NCSN | Sports Program Agreement | 2003-2008 | Basketball (Men's and Women's) |
| FLORIDA000236-246 | SEC | CBS | Broadcast Agreement Extension | 2001-2009 | Football and Basketball (Men's and Women's) |
| FLORIDA000247-251 | SEC | CBS | Broadcast Agreement Extension | 2009-2016 | Football and Basketball (Men's and Women's) |
| LSU000226-296 | SEC | CBS/ESPN/XOS | Cross-License Agreement | 2009-2016 | All sports |
| FLORIDA000353-380 | SEC | ESPN | Broadcast Agreement | 1996-2001 | Football, Basketball (Men's and Women's), and Other Sports |
| FLORIDA000381-391 | SEC | ESPN | Nonstandard Television Agreement | 2001-2009 | Football, Basketball (Men's and Women's), and Olympic Sports |

Highly Confidential - Counsel Only: Subject to Protective Order

| FLORIDA000392-434 | SEC | Jefferson Pilot Sports | Football and Basketball Telecast Rights Agreement | 2001-2009 | Football and Men's Basketball |
| SOCON 0085-0103 | Southern | ESPN | Broadcast Agreement | 2010-2015 | Men's Basketball and Other sports |
| SOCON 0109-126 | Southern | IMG | License Agreement | 2010-2011 | All sports |
| SOCON 0062-0083 | Southern | Sport south Network | Telecast Rights Agreement | 2007-2010 | Football, Basketball (Men's and Women's), and Olympic Sports |
| SUMMIT 00038-049 | Summit League | ESPN | Broadcast Agreement | 2010-2015 | Basketball (Men's and Women's) |
| SUMMIT 000013-021 | Summit League | Midcontinent Communications | Telecast Agreement | 2010 | Basketball (Men's and Women's) |
| SUMMIT 000002-012 | Summit League | Midcontinent Communications | Telecast Agreement | 2011 | Basketball (Men's and Women's) |
| NBCU 00176-178 | Sun Belt | Cable Sports Southeast | Broadcast Agreement | 2009 | Basketball (Men's and Women's) and Baseball |
| WAC000069-099 | WAC | ESPN | Broadcasting Agreement | 2008-2017 | Football, Basketball (Men's and Women's) |
| RAY000118-137 | ACC | Raycom | Digital Rights Management Agreement | Unspecified | Unspecified |
| TEM 0446-479 | Big Ten | Thought Equity Motion | Digitization and Distribution Agreement | 2008-Unknown | All sports |
| BTN0117-077 | Big Ten | Thought Equity Motion | Footage License Agreement | Unknown | Men's Basketball |
| WASHSTATE 004501-511 | Pac-10 | Interactive Entertainment Holdings | Olympic Sports Videocasting Agreement | 2004-2004 | Olympic Sports |
| WASHSTATE 004532-563 | Pac-10 | Pac 10 Properties | Basketball Tournament Agreement | 2002-2007 | Basketball (Men's and Women's) |
| WASHSTATE 004567-618 | Pac-10 | Fox Sports Net | Basketball Agreement | 2005-2012 | Basketball (Men's and Women's) |
| WASHSTATE 004620-658 | Pac-10 | ABC | Football Television Rights Agreement | 2007-2011 | Football |
| WASHSTATE 004664-711 | Pac-10 | Fox Sports Net | Football Television Rights Agreement | 2007-2012 | Football and Other sports (not Men's Basketball) |
| WASHSTATE 006396-403 | Pac-10 | ESPN and Fox Broadcast Companies | Conference Media Rights Agreement | 2012-2024 | Football, Basketball (Men's and Women's), and Olympic Sports |
| RAY000001-022 | ACC | Jefferson Pilot Sports | Football Telecast Rights Agreement | 2000-2003 | Football |
| RAY00023-065 | ACC | Jefferson Pilot Sports | Basketball Telecast Rights Agreement | 2001-2011 | Basketball (Men's and Women's) |
| RAY000066-117 | ACC | Raycom/Jefferson Pilot Sports | Amendment to Telecast Rights Agreement | 2001-2011 | Football, Basketball (Men's and Women's) |
| SWAC 000005-008 | SWAC | ESPN | Television Rights Agreement | 2005-2012 | Football, Basketball (Men's and Women's), and Olympic Sports |
| TEM 0432-445 | Raycom | Thought Equity Motion | Content Licensing Agreement | 2009-Unknown | Unspecified |

Highly Confidential - Counsel Only: Subject to Protective Order



**Exhibit 4: 2012 NFL Player Salaries by Team**

Notes: (1) Data appears to attribute a full year salary to individuals who are only on the roster for partial years.
(2) The five entries that were below the 2012 league minimum of $390,000 were dropped.
Source: 2012 NFL Team Salary and Payroll Data, msn.foxsports.com/nfl, accessed February 27, 2013.

Highly Confidential - Counsel Only: Subject to Protective Order

# Attachment A

Deposition and Trial Experience

**Daniel L. Rubinfeld**

**In Re: Titanium Antitrust Litigation**, 2013, Deposition (Federal District Court, Northern District of Maryland)

**In Re: Androgel Antitrust Litigation**, 2012, Deposition (Federal District Court, Northern District of Georgia)

**Martin Marietta v. Vulcan**, 2012, Deposition, Trial Testimony (Court of Chancery, State of Delaware)

**CTS Eventim v. Live Nation**, 2011, Arbitration Testimony (London Court of International Arbitration)

**In Re: TFT-LCD (Flat Panel) Antitrust Litigation**, 2011, Deposition (Federal District Court, Northern District of California)

**Broadcom v. Emulex**, 2011, Deposition (Federal District Court, Central District of California)

**Sunbeam Television Corp. v. Nielsen Media Research, Inc.,** 2010, Deposition (Federal District Court, Southern District of Florida)

**Michael C. Malaney, et al. v. UAL Corporation, United Air Lines, Inc, and Continental Airlines, Inc.**, 2010, Deposition, Hearing (Federal District Court, Northern District of California)

**In Re Static Random Access Memory (SRAM) Antitrust Litigation,** 2010, Deposition (Federal District Court, Northern District of California)

**In Re Apple & AT&TM Antitrust Litigation,** 2010, Deposition (Federal District Court, Northern District of California)

**In the Matter of the Appeal of BP Pipelines (Alaska) Inc.; ConocoPhillips Transportation Alaska, Inc; ExxonMobil Pipeline Company; Koch Alaska Pipeline Company, LLC; and Unocal Pipeline Company as owners, and Alyeska Pipeline Company, LLC, as agent of the pipeline owners, from Alaska Department of Revenue Decision No. 05-56-17 dated April 3, 2006 and Alaska Department of Revenue Notice of Assessment of Oil and Gas Related Property dated March 1, 2006,** 2009, Deposition (State Assessment Review Board of the State of Alaska)

**Baxter Healthcare Corporation, Baxter International Inc., Baxter Healthcare SA, and Deka Products Limited Partnership v. Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America, and Fresenius USA, Inc.,** 2009, Deposition (Federal District Court, Northern District of California)

**State of California v. Abbott Laboratories, Inc., et al.,** 2009, Deposition (Federal District Court, District of Massachusetts)

**Commonwealth of Kentucky v. Alpharma UPSD, Inc., et al.,** 2009, Deposition (Commonwealth of Kentucky, Franklin Circuit Court)

**Cason-Merenda v. Detroit Medical Center, et al.** 2009, Deposition (Federal District Court, Eastern District of Michigan)

**Rambus, Inc. v. Micron, Inc. et al.**, 2009, Deposition (Superior Court of California, County of San Francisco)

**State of Alabama v. Sandoz, Inc.,** 2009, Deposition, Trial Testimony (Circuit Court of Montgomery County, Alabama)

**DRAM Claims Liquidation Trust v. Hynix Semiconductor, Inc., et al.**, 2008, Deposition (Federal District Court, Northern District of California)

**Marcus v. American Express, Inc.**, 2008, Deposition (Federal District Court, Southern District of New York)

**Omnicare, Inc. v. UnitedHealth Group, Inc.,** 2008, Deposition (Federal District Court, Northern District of Illinois)

**In re K-Dur Antitrust Litigation**, 2007, 2008, Depositions (Federal District Court, District of New Jersey)

**ErinMedia, LLC v. Nielsen Media Research, Inc.,** 2007, Deposition (Federal District Court, Middle District of Florida)

**Omax, Inc. v. Flow International, Inc.**, 2007, Deposition (Federal District Court, Western District of Washington)

**Reilly v. MediaNews Group, Inc., et al.**, 2007, Deposition (Federal District Court, Northern District of California)

**Federal Trade Commission v. Warner Chilcott Holdings Co. III, Ltd., State of Colorado et al. v. Warner Chilcott, Barr Industries**, 2007, Deposition (Federal District Court, District of Columbia)

**Columbus Drywall & Insulation, Inc. v. Masco Corp.**, 2007, Deposition (Federal District Court, Northern District of Georgia)

**In Re Linerboard Antitrust Litigation**, 2006, Deposition (Federal District Court, Eastern District of Pennsylvania)

**In Re Tableware Antitrust Litigation**, 2006, Deposition (Federal District Court, Northern District of California), 2007, Trial

**Fresenius Medical Care v. Baxter**, 2006, 2007, Deposition, Trial (Federal District Court, Northern District of California, on two separate occasions)

**Rodriguez et al. v. Kaplan, BAR/BRI**, 2006, Deposition (Federal District Court, Southern District of California)

**MBDA UK Limited v. Raytheon Company**, 2006, Deposition (American Arbitration Association)

**Kaiser Foundation Health Plan, Inc. v. Abbott Laboratories, Inc. and Geneva Pharmaceuticals,** 2006, Deposition, Trial Testimony (Federal District Court, Central District of California)

**Thales Avionics Inc., v. Panasonic Avionics Corp., Matsushita Electric Industrial Co. Ltd.,** 2006, Deposition (Federal District Court, Central District of California)

**Reading International, Inc., Citadel Cinemas, Inc., and Village East Limited Partnership v. Regal Entertainment Group**, 2005, Deposition (Federal District Court, Southern District of New York)

**Lek Pharmaceuticals D.D., et al. v. Glaxosmithkline PLC., et al.**, 2004, 2005, Depositions (Federal District Court, Eastern District of Virginia)

**Bradburn Parent/Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company)**, 2003, Deposition, Testimony at Class Certification Hearing (Federal District Court, Eastern District of Pennsylvania), 2006 Deposition

**In the matter of:  Certain Coamoxiclav Products, Potassium Clavulanate Products and other Products Derived from Clavulanic Acid**, 2003, Deposition (International Trade Commission)

**Lenscrafters, Inc., v. Fredia Wadley, et al. consolidated with U.S. Vision, Cole Vision, and National Association of Optometrists and Opticians v. Fredia Wadley et al.**, 2002, Deposition (Federal District Court, Middle District of Tennessee)

**Ticketmaster Corporation, et al., v. Tickets.com, Inc.,** 2002, Deposition (Federal District Court, Central District of California)

**In re Cigarette Antitrust Litigation**, 2002, Deposition (Federal District Court, Northern District of Georgia)

**In re Terazosin Hydrochloride Antitrust Litigation**, 2002-2004, Depositions, (Federal District Court, Southern Division of Florida)

**Plaintiffs v. Riso, Inc, RPSI, et al.**, 2001, Deposition (Federal District Court, Northern District of California)

**Yamaha v. Bombardier**, 2001, Deposition, Trial Testimony (International Trade Commission)

**Republic Tobacco, L.P. v. North Atlantic Trading Company, et al.**, 2001, Depositions (Federal District Court, Northern District of Illinois)

**University of Colorado Foundation, Inc. v. American Cyanamid Company**, 2000, Deposition, Trial Testimony (Federal District Court, Eastern District of Colorado)

**In re Polypropylene Carpet Antitrust Litigation**, 1999-2000, Depositions, Testimony at Daubert Hearing (Federal District Court, Northern District of Georgia).

**Bell Atlantic vs. Airtouch**, 1999, Deposition (Federal District Court, Northern District of California)

**PBTC and Neon v. BMC**, 1999, Depositions (State Court, Houston, Texas)

**Moviefone v. PacerCats**, 1997, Arbitration Testimony (American Arbitration Association, New York)

**In re American Honda Motor Co., Inc., Dealership Relations Litigation,** 1997 Deposition (Federal District Court, District of Maryland)

**AMD v. Hyundai**, 1996, Deposition (Federal District Court, Northern District of California)

**In re Brand Name Prescription Drugs Antitrust Litigation**, 1996, Deposition (Federal District Court, Northern District of Illinois)

**Northwest Airlines v. American Airlines**, 1996, Depositions (Federal District Court, District of Minnesota)

**Coors v. Miller Brewing Co.**, 1996, Deposition (Federal District Court)

**Optiva v. Teledyne**, 1996, Deposition (Federal District Court, Western District of Washington)

**State of New York v. Kraft General Foods**, 1996, Depositions, Trial Testimony (Federal District Court, Southern District of New York)

**Internal Revenue Service v. American Stores**, 1995, Trial Testimony (U.S. Tax Court, Northern District of California)

**Williams v. Kaiser Sand and Gravel, Gonsalves v. Kaiser Sand and Gravel**, 1995, Deposition (Superior Court of California, County of Sonoma)

**Californians for Population Stabilization v. Tata Sons Limited, et al.**, 1994, Deposition, Trial Testimony, (Superior Court of California, County of Santa Clara).

**McGovern v. Bunnell**, 1994, Deposition (Superior Court of California, County of San Francisco)

**DSI v. EIS**, 1994, Deposition, Trial (Federal District Court, Washington)

**Centigram v. VMX, Dytel**, 1994, Deposition (Federal District Court, Northern District of California)

**McAlinn v. HCC, Compex Service, Inc., and Compex Systems, Inc.,** 1993, Deposition (Federal District Court, Northern District of California)

**Dart v. Franchise Tax Board of California**, 1993, Deposition (Attorney General's Office, State of California)

**Anderson, et al. v. Texaco Refining & Marketing Inc., et al.**, 1993, Deposition. Trial Testimony (Superior Court of California, County of San Diego)

**City of Long Beach v. Unocal California Pipeline**, 1992, Hearing before the California Public Utilities Commission, Trial Testimony

**EP Technologies, Inc. v. Cardiorhythm**, 1992, Deposition (Federal District Court, Northern District of California)

**City of Long Beach v. Exxon**, 1992, Deposition, Trial Testimony (Federal District Court, Southern District of California)

**Micro Motion v. Exac**, 1991, Deposition, Trial Testimony (Federal District Court, Northern District of California)

**Apple v. Microsoft**, 1991, Deposition (Federal District Court, Northern District of California)

**ATL v. Acuson**, 1990, Testimony at Arbitration Hearing (Superior Court of California, County of Los Angeles)

**Continental v. American Airlines,** 1989, Deposition (Federal District Court, Southern District of California)

**Prosser and Gordon v. Continental Baking Co.** 1989, Depositions, Trial Testimony (Federal District Court, Northern District of California)

**Modine v. Allen**, 1988, Trial Testimony (Federal District Court, Northern District of California)

**Superior Beverage Company, Inc. v. Owens-Illinois, Inc. et al.**, 1987, Court-appointed Expert Report, Testimony (Federal District Court, Northern District of Illinois)

**United Firefighters of Los Angeles and Los Angeles Police Protection League, et. al., v. City of Los Angeles**, 1986 (Superior Court of California, County of Los Angeles)

**Oahu Gas v. Pacific Resources, Inc.**, 1985, Deposition, Trial Testimony (Federal District Court, District of Hawaii)

**Stripper Well Exemption Litigation**, 1984, Testimony at Dept. of Energy Hearing (Federal District Court, District of Kansas)

**Serrano v. Priest**, 1982, Deposition, Trial Testimony (Superior Court of California, County of Los Angeles)

# Attachment B

December 2012

Curriculum Vitae

## DANIEL L. RUBINFELD

**PRESENT POSITIONS**:

Robert L. Bridges Professor of Law, Professor of Economics,
University of California, Berkeley, 788 Simon Tower, Boalt Hall,
Berkeley, California 94720
Phone: (510) 642-1959
Fax: Office (510) 642-3767 / Home (510) 843-9898
e-mail: drubinfeld@law.berkeley.edu

Visiting Professor, NYU Law School, Fall Semester, 427 Vanderbilt Hall
40 Washington Square West, New York, NY 10003, Phone: (212) 992 8834
drubinfeld@law.nyu.edu, Fax: (212) 995-4590

**ACADEMIC STUDIES**:     Princeton, Mathematics, B.A., June 1967
                          M.I.T., Economics, M.S., September 1968
                          M.I.T., Economics, Ph.D., June 1972

**TEACHING EXPERIENCE**:

Suffolk University, Boston, Massachusetts
        Full-time Economics Instructor, 1968-70
Wellesley College, Wellesley, Massachusetts
        Full-time Economics Instructor, 1970-71
University of Michigan, Ann Arbor, Michigan
        Assistant Professor of Economics, 1972-77
        Associate Professor of Economics and Law, 1977-82
        Professor of Economics and Law, 1982-83
        Research Associate, Institute of Public Policy Studies, 1972-82
University of California, Berkeley, 1983 - present
        Robert L. Bridges Professor of Law and Professor of Economics, 1983-Present
Stanford University
        Visiting Professor of Law, Spring 1989 (Economics and Public Policy)
University of Geneva
        Visiting Professor, May 1991 (Antitrust Law and Economics)
Swiss National Bank, Studienzentrum Gerzensee (one week for each visit)
        Visiting Professor of Law and Economics, Spring 1995-97 (Economics of Private Law), 2002
        (Political Economy of Federalism), 2004, 2007 (Competition Law and Economics), 2009
        (Competition Law and Economics)
New York University
        Visiting Professor of Law, Spring 1999, Fall 2000, 2003, 2005-2006, 2008-2011 (Quantitative
        Methods in Law, Antitrust Law and Economics)
University of Virginia
        Visiting Professor of Law, January 2004 (Antitrust Law and Economics)

University of Hamburg
    Visiting Professor of Law, May 1999, 2002 (Quantitative Methods), June, 2008 (Antitrust Law and Economics)
University of Bergen
    Visiting Professor of Law, August 2006, August 2007, August 2008, August 2010
Catholic University of Portugal, Lisbon
    Visiting Professor of Law, April 2009, April 2010
Kiev School of Economics
    Visiting Professor, April 2010


## GOVERNMENT POSITIONS

Economist, Staff of President's Council of Economic Advisers, Summer 1969
Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, June 1997-Dec 1998


## GOVERNMENT CONSULTING

Member, Ann Arbor Rent Control Study Commission, 1973
Consultant, Urban Institute, 1973
Consultant, U.S. Treasury, Program in State and Local Finance, 1984-85
Consultant, National Academy of Sciences, Panel on Taxpayer Compliance, 1985-86
Consultant, U.S. Consumer Product Safety Commission, Safety of
    All-Terrain Vehicles, 1987-88
Consultant and Lecturer, Federal Judicial Center, 1993-97, Use of Regression
    Analysis by the Courts
Consultant, World Bank (South Africa Mission), 1995-1997
Consultant, Antitrust Division, 1999, *U.S. v. Microsoft*
Consultant, Competition Directorate, European Union, 2003-2004, Merger Simulation
Lecturer, Federal Trade Commission, June-July, 2003, Antitrust Economics
Consultant, Federal Trade Commission, Antitrust Division, Dept. of Justice, various State Attorneys
    General


## OTHER POSITIONS HELD:

Research Assistant, William G. Bowen, 1966-67
Research Assistant, Paul A. Samuelson, 1971
Consultant, M.I.T.- Harvard, Joint Center for Urban Studies, Spring and Summer, 1972
Consultant, Urban Institute, 1973
Consultant, National Academy of Sciences, Committee on the Costs of Automobile
    Emission Control, Summer 1974
Consultant, National Academy of Sciences, Panel on Statistical Assessments as
    Evidence in the Courts, 1984
Consultant, National Academy of Sciences, Panel on Taxpayer Compliance, 1985-86
Chair, Program in Law and Economics, UC Berkeley, 1986-97, Co-Chair, 2000-
Member, National Academy of Sciences, Working Panel on Field Experimentation in Criminal Justice,
    1986-87
Chair, Program in Jurisprudence and Social Policy, U.C. Berkeley, 1987-1990, 1998-1999
Member, Board of Directors, American Law and Economics Association, 1994-1996, 2001-2003
Secretary-Treasurer, American Law and Economics Association, 2003-2004
Vice President, American Law and Economics Association, 2004-2005

President, American Law and Economics Association, 2005-2006
Vice Chair, ABA Section on Antitrust, Committee on Economics, 1997-1999
Member, National Academy of Sciences, NSF Blue Ribbon Commission on Digital Preservation, 2007-2010


**ACTIVITIES AND HONORS**:

Princeton University, 1967, Magna Cum Laude, Phi Beta Kappa
Woodrow Wilson Fellow, 1967
National Science Foundation Fellowship, 1968-69
National Science Foundation Dissertation Fellowship, 1971-72
Winner, National Tax Association, Outstanding Doctoral Dissertation Award, 1972
Research Fellow, National Bureau of Economic Research, Cambridge, Massachusetts, 1975-76
Editorial Board, Public Finance Quarterly, 1980-2003
Editorial Board, Law and Society Review, 1982-1985, 1989-1999
Advisory Panel, NSF, Program in Law and Social Science, 1982-84
Editorial Board, Evaluation Review, 1985-1987
Faculty Advisory Board, U.C. Berkeley, Center for Real Estate and Urban Economics, 1983-97, 2000-
Co-Editor, International Review of Law and Economics, 1987-2003
Lecturer, California Continuing Judicial Studies Program, 1988-1989
Oversight Panel, NSF Program in Law & Social Science, 1988
Board of Directors, LECG, 1995-1997
Board of Directors, Atlas Assets, Inc., 1989-1997, 1999-2008
Member, Correspondent Comm., Interuniversity Consortium for Political & Social Research, 1991-
Editorial Board, Law and Social Inquiry, 1992-1999, 2002-2004
Fellow, Center for Advanced Study in the Behavioral Sciences, 1992-93
Ida Beam Distinguished Lecturer in Law and Economics, University of Iowa, Spring 1995
John Simon Guggenheim Fellowship, 1995
Faculty Advisory Board, UC Berkeley, Burch Ctr. for Tax Policy & Public Finance, 1994-97, 1999-
Elected to American Academy of Arts and Sciences, 2001
Advisory Council, Master Program on Law & Economics, Universidad de Buenos Aires, 2003-
Research Associate, Law School, Australian National University, 2003-
Editorial Board, Journal of Australian Economic Education, 2003-
Editorial Board, The Reviews of Law and Economics, 2004-
Fellow, National Bureau of Economic Research, 2004-
Member, International Academic Council, U. of St. Gallen, Masters in Law & Economics, 2005-
Honorary Doctorate, U. of Basel, November 2008.
Co-Editor, Journal of Legal Analysis, 2008-


**PUBLICATIONS**:

Books

1. STATISTICAL ANALYSIS OF ECONOMIC AND FINANCIAL DATA, Dynamics Associates, Cambridge, 1971, Revised Edition, 1974.

2. ECONOMETRIC MODELS AND ECONOMIC FORECASTS (with Robert S. Pindyck), McGraw-Hill, January 1976.  Second Edition, 1981, Spanish, Japanese, and Chinese versions available; Third Edition, 1990; Fourth Edition, 1998.

3.      ESSAYS ON THE LAW AND ECONOMICS OF LOCAL GOVERNMENTS (Editor), COUPE Papers on Public Economics, Urban Institute, December 1979.

4.      AMERICAN DOMESTIC PRIORITIES: AN ECONOMIC APPRAISAL (Co-editor with John M. Quigley), University of California Press, 1985.

5.      MICROECONOMICS (with Robert S. Pindyck), MacMillan, 1989, Second Edition, 1992, Italian, Spanish, and Russian editions, Third Edition, 1995, Portuguese edition; Fourth edition, 1998, Japanese, Chinese editions; Fifth Edition, 2000, Uzbek, Indonesian, German, Korean editions, Sixth Edition, 2005, Seventh Edition, 2009, Croatian, French, Taiwanese, and Basque editions, Eighth Edition, 2013.

6.      DID MICROSOFT HARM CONSUMERS: TWO OPPOSING VIEWS (with David S. Evans, Franklin M. Fisher, and Richard L. Schmalensee), AEI-Brookings Joint Center for Regulatory Studies, 2000.

7.      ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES (Co-editor with John Harkrider), ABA Antitrust Section, 2005.


<u>Journal Articles</u>

1.      "Credit Ratings and the Market for General Obligation Municipal Bonds," <u>National Tax Journal</u>, March 1973, pp. 17-27.

2.      "The Determination of Equalized Valuation: A Massachusetts Case Study," <u>Public Finance Quarterly</u>, April 1975, pp. 153-161.

3.      "Voting in a Local School Election: A Micro Analysis," <u>Review of Economics and Statistics</u>, February 1977, pp. 30-42.

4.      "Suburban Employment and Zoning: A General Equilibrium Analysis," <u>Journal of Regional Science</u>, March 1978, pp. 33-44.

5.      "Hedonic Housing Prices and the Demand for Clean Air" (with David Harrison, Jr.), <u>Journal of Environmental Economics and Management</u>, March 1978, pp. 81-102, in Joseph Herriges and Cathy Kling, eds., REVEALED PREFERENCE APPROACHES TO ENVIRONMENTAL VALUATION: Volume II, Ashgate Publishing Limited, 2008.

6.      "The Long-Run Effects of a Residential Property Tax and Local Public Services" (with A. Mitchell Polinsky), <u>Journal of Urban Economics</u>, April 1978, pp. 24l-262, reprinted in John M Quigley, ed., THE ECONOMICS OF HOUSING, Edward Elgar, 1997.

7.      "On the Measurement of Benefits in an Urban Context:  Some General Equilibrium Issues" (with Paul N. Courant), <u>Journal of Urban Economics</u>, June 1978, pp. 346-356.

8.      "The Air Pollution and Property Value Debate: Some Empirical Evidence" (with David Harrison, Jr.), <u>Review of Economics and Statistics</u>, November 1978, pp. 635-638.

9.      "The Distribution of Benefits from Improvements in Urban Air Quality" (with David Harrison, Jr.), <u>Journal of Environmental Economics and Management</u>, December 1978, pp. 313-332.

10.     "Tax Limitation and the Demand for Public Services in Michigan" (with Paul N. Courant and Edward M. Gramlich), <u>National Tax Journal</u>, Supplement, June 1979, pp. 147-157.

11.     "Public Employee Market Power and the Level of Government Spending" (with Paul N. Courant and Edward M. Gramlich), <u>American Economic Review</u>, December 1979, pp. 806-817. Reprinted in W. Patrick Beaton (ed.) MUNICIPAL EXPENDITURES REVENUES AND SERVICES (New Brunswick: Rutgers University, 1983), pp. l80-202.

12.     "Why Voters Support Tax Limitation Amendments: The Michigan Case" (with Paul N. Courant and Edward M. Gramlich), <u>National Tax Journal</u>, March 1980, pp. l-20. Also in TAX AND EXPENDITURE LIMITATIONS (H. Ladd and N. Tideman, editors), COUPE Papers on Public Economics, Urban Institute, 198l, pp. 37-72.

13.     "On the Economics of Voter Turnout in Local School Elections," <u>Public Choice</u>, Fall 1980, pp. 315-331.

14.     "Why Voters Turn Out for Tax Limitation Votes" (with Edward M. Gramlich and Deborah Swift), <u>National Tax Journal</u>, March 1981, pp. 115-124.

15.     "On the Welfare Effects of Tax Limitation" (with Paul N. Courant), <u>Journal of Public Economics</u>, December 1981, pp. 289-316.

16.     "Multiple Regression with a Qualitative Dependent Variable," <u>Journal of Economics and Business</u>, January 1982, pp. 67-78.

17.     "Micro Estimates of Public Spending Demand Functions and Tests of the Tiebout and Median Voter Hypotheses" (with Edward M. Gramlich), <u>Journal of Political Economy</u>, June 1982, pp. 536-560.

18.     "The Dynamics of the Legal Process" (with Lawrence Blume), <u>Journal of Legal Studies</u>, June 1982, pp. 405-421.

19.     "Voting on Public Spending: Differences between Public Employees, Transfer Recipients, and Private Workers" (with Edward M. Gramlich), <u>Journal of Policy Analysis and Management</u>, Summer 1982, pp. 516-533. Reprinted in PROBLEMI DI AMMINISTRAZIONE PUBBLICA, No. 2/1983, pp. 55-88.

20.     "Micro-Based Estimates of Demand Functions for Local School Expenditures" (with Theodore C. Bergstrom and Perry Shapiro), <u>Econometrica</u>, November 1982, pp. 1183-1205.

21.     "The Distributional Impact of Statewide Property Tax Relief: The Michigan Case" (with Michael Wolkoff), <u>Public Finance Quarterly</u>, April 1983, pp. 131-153.

22.     "The Taking of Land: When Should Compensation Be Paid?" (with Lawrence Blume and Perry Shapiro), <u>Quarterly Journal of Economics</u>, February 1984, pp. 71-92.

23.     "On Determining the Optimal Magnitude and Length of Liability In Torts," <u>Journal of Legal Studies</u>, August 1984, pp. 551-563.

24.     "Budget Reform and the Theory of Federalism" (with John Quigley), <u>American Economic Review</u>, May 1986, pp. 132-137.

25.     "The Efficiency of Comparative Negligence," <u>Journal of Legal Studies</u>, June 1987, pp. 375-394.

26.     "Tax Reform: Implications for the State-Local Public Sector" (with Paul Courant), <u>Journal of Economic Perspectives</u>, Summer, 1987, pp. 87-100.  Reprinted in Samuel Baker and Catherine Elliot (eds.) READINGS IN PUBLIC SECTOR ECONOMICS (Lexington, Massachusetts:  D.C. Heath and Company, 1990) pp. 585-507.

27.     "Efficient Awards and Standards of Proof in Judicial Proceedings (with David Sappington), <u>Rand Journal</u>, Summer 1987, pp. 308-315.

28.     "Tiebout Bias and the Demand for Local Public Schooling" (with Perry Shapiro and Judith Roberts), <u>Review of Economics and Statistics</u>, August 1987, pp. 426-437.

29.     "The Welfare Implications of Costly Litigation for the Level of Liability" (with A. Mitchell Polinsky), <u>Journal of Legal Studies</u>, January 1988, pp. 151-164, in Alan O. Sykes (ed.) ECONOMICS OF TORT LAW, Elgar, 2007, and in Chris William Sanchirico (ed.), ECONOMICS OF EVIDENCE, PROCEDURE, AND LITIGATION, Elgar, 2007, Chapter 19.

30.     "A Test for Efficiency in the Supply of Public Education" (with Theodore Bergstrom, Perry Shapiro and Judith Roberts), <u>Journal of Public Economics</u>, April 1988, pp. 289-307.

31.     "Robbing Peter to Pay Peter:  The Economics of Local Public Residency Requirements" (with Paul N. Courant), <u>Journal of Urban Economics</u>, May 1988, pp. 291-306.

32.     "The Deterrent Effect of Settlements and Trials" (with A.Mitchell Polinsky), <u>International Review of Law and Economics</u>, June 1988, pp. 109-117.

33.     "Micro-Estimation of the Demand for Schooling: Evidence from Michigan and Massachusetts" (with Perry Shapiro), <u>Regional Science and Urban Economics</u>, January 1989, pp. 381-398.

34.     "Unobservables in Consumer Choice: Residential Energy and the Demand for Comfort" (with John Quigley), <u>Review of Economics and Statistics</u>, August 1989, pp. 416-425.

35.     "Economic Analysis of Legal Disputes and their Resolution" (with Robert Cooter), <u>Journal of Economic Literature</u>, September, 1989, pp. 1067-1097. Reprinted in Richard Posner and Francesco Parisi, eds., ECONOMIC FOUNDATIONS OF PRIVATE LAW, Edward Elgar Publishing, 2002, reprinted in Eric B. Rasmusen (ed.), GAME THEORY AND THE LAW, Edward Elgar Publishing, 2008.

36.     "A Note on Optimal Public Enforcement with Settlements and Litigation Costs" (with A.M. Polinsky), <u>Research in Law and Economics</u>, 1989, pp. 1-8.

37.     "Trial Courts:  An Economic Perspective" (with Robert D. Cooter), <u>Law and Society Review</u>, 1990, pp. 2501-2514.

38.     "A Model of Optimal Fines for Repeat Offenders" (with A. Mitchell Polinsky), <u>Journal of Public Economics</u>, September, 1991, pp. 291-306.  Reprinted in Peder Andersen, Vibeke Jensen and Jorgen Birk Mortensen, eds., GOVERNANCE BY LEGAL AND ECONOMIC MEASURES, Copenhagen, G-E-C Gad Publishers, 1993, pp. 33-52.

39. "Statistical and Demographic Issues Underlying Voting Rights Cases," <u>Evaluation Review</u>, December, 1991, pp. 659-672.

40. "Private Guarantees for Municipal Bonds: Evidence from the Aftermarket" (with John M. Quigley), <u>National Tax Journal</u>, December 1991, pp. 29-39.

41. "Fiscal Federalism in Europe:  Lessons from the American Experience" (with Robert P. Inman), <u>European Economic Review</u>, 1992, pp. 654-660.

42. "Evaluating the Injury Risk Associated with All-Terrain Vehicles:  An Application of Bayes' Rule" (with Gregory B. Rodgers), <u>Journal of Risk and Uncertainty</u>, May 1992, pp. 145-158.

43. "Contingent Fees for Attorneys:  An Economic Analysis," (with Suzanne Scotchmer), <u>Rand Journal</u>, Autumn, 1993, pp. 343-356.

44. "An Economic Model of Legal Discovery" (with Robert Cooter), <u>Journal of Legal Studies</u>, January, 1994, pp. 435-463, reprinted in Chris William Sanchirico (ed.), ECONOMICS OF EVIDENCE, PROCEDURE, AND LITIGATION, Elgar, 2007, Chapter 14..

45. "The EMU and Fiscal Policy in the New European Community:  An Issue for Economic Federalism" (with Robert Inman), <u>International Review of Law and Economics</u>, June, 1994, pp. 147-161.

46. "Designing Tax Policy in Federalist Economies: An Overview," (with Robert P. Inman), <u>Journal of Public Economics</u>, 60, 1996, pp. 307-334.

47. "Antitrust Settlements and Trial Outcomes," (with Jeffrey M. Perloff and Paul Ruud), <u>Review of Economics and Statistics</u>, 1996, pp. 401-409.

48. "Optimal Awards and Penalties when the Probability of Prevailing Varies Among Plaintiffs," (with A. Mitchell Polinsky), <u>Rand Journal</u>, 27, 1996, pp. 269-280.

49. "Federalism and Reductions in the Federal Budget," (with John M. Quigley), <u>National Tax Journal</u>, 49, 1996, pp. 289-302.

50. "Rethinking Federalism," (with Robert P. Inman), <u>Journal of Economic Perspectives</u>, 11 (Fall 1997), pp. 43-64, reprinted in John Kincaid ed., Historical and Theoretical Foundations of Federalism," Sage, 2001.

51. "Does the English Rule Discourage Low-Probability-of-Prevailing Plaintiffs?" (with A. Mitchell Polinsky), <u>Journal of Legal Studies</u>, June 1998, pp. 519-534.

52. "Antitrust Enforcement in Dynamic Network Industries," The <u>Antitrust Bulletin</u>, Fall-Winter 1998, pp. 859-882.  (Translated as "Wettbewerb, Innovation und die Durchsetzung des Kartellrechts in dynamischen, vernetzeten Industrien," in <u>GRUR International Gewerblicher Rechtsschutz und Urheberrecht Internationaler Teil</u>, Heft 6, 1999).

53. "Empirical Methods in Antitrust: Review and Evidence," (with Jonathan B. Baker), <u>American Law and Economics Review</u>, Fall, 1999, pp. 386-435.

54. "The Primestar Acquisition of the News Corp./MCI Direct Broadcast Satellite Assets," <u>Review of Industrial Organization</u>, Vol. 16, No. 2, March, 2000, pp. 191-209.

55.  "Market Definition with Differentiated Products: The Post-Nabisco Cereal Merger," Antitrust Law Journal, Vol. 68, No. 1, 2000, pp. 163-185.  (Reprinted in GLOBAL COMPETITION POLICY: ECONOMICS ISSUES AND IMPACATS, David S. Evans and A. Jorge Padilla, eds., LECG, 2004; also available in Peking University, International and Comparative Law Review, Vol.5:8, July 2007, pp. 94-111.)

56.  "Structuring Intergovernmental Grants to Local Governments: Lessons from South Africa," Constitutional Political Economy, Vol. 12, 2001, pp. 173-187.

57.  "Can We Decentralize Our Unemployment Policies?  Evidence from the United States" (with Robert Inman), Kyklos, March 2001, Vol. 54, pp. 287-308.

58.  "U.S. v. Microsoft - An Economic Analysis" (with Franklin M. Fisher), The Antitrust Bulletin, Spring 2001, pp. 1-69.

59.  "Vertical Foreclosure in Broadband Access" (with Hal J. Singer) Journal of Industrial Economics, September, 2001, Vol. 49, pp. 299-318.

60.  "Merger Simulation: A Simplified Approach with New Applications" (with Roy Epstein), Antitrust Law Journal, Volume 69, No. 3, December 2001, pp. 883-919, reprinted in Stefan Vogt, Max Albert, and Dieter Schmidtchen (eds.), THE MORE ECONOMIC APPROACH TO EUROPEAN COMPETITION LAW, (Conferences on the New Political Economy), Tubingen, 2007.

61.  "A Note on Settlements under the Contingent Fee Method of Compensating Lawyers" (with A. Mitchell Polinsky), International Review of Law and Economics, Volume 22, No. 2, September 2002, pp. 217-225.

62.  "Aligning the Interests of Lawyers and Clients" (with A. Mitchell Polinsky), American Law and Economics Review, Volume 5, No. 1, Spring 2003, pp. 165-188.

63.  "Merger Simulation with Brand-Level Margin Data: Extending PCAIDS with Nests" (with Roy Epstein), Advances in Economic Analysis & Policy: Vol. 4: No. 1, Article 2, Berkeley Electronic Press, March 2004.

64.  "Exclusion or Efficient Pricing? The "Big Deal" Bundling of Academic Journals" (with Aaron S. Edlin), Antitrust Law Journal, Volume 72, No. 1, August 2004, pp. 128-159.

65.  "Federalism and the Democratic Transition: Lessons from South Africa" (with Robert P. Inman), American Economic Review, Vol. 95, No. 2, May 2005, pp. 39-43.

66.  "The Bundling of Academic Journals" (with Aaron S. Edlin), American Economic Review, Vol. 95, No. 2, May 2005, pp. 441-446.

67.  "Academic Journal Pricing and the Demand of Libraries" (with Aviv Nevo and Mark McCabe), American Economic Review, Vol. 95, No. 2, May 2005, pp. 447-452.

68.  "A Damage-Revelation Rationale for Coupon Remedies (with A. Mitchell Polinsky), Journal of Law, Economics & Organization, Vol. 23, No. 3, October 2007, pp. 653-661.

69.  "The Deadweight Loss of Coupon Remedies for Price Overcharges" (with A. Mitchell Polinsky),

Journal of Industrial Economics, Vol. LVI, No. 2, June 2008, pp. 402-417.

70.     "Econometric Issues in Antitrust Analysis," Journal of Institutional and Theoretical Economics, Vol. 166(1), 2010, pp. 62-77.

71.     "Understanding UPP" (with Roy J. Epstein), B.E. Journal of Theoretical Economics: Policies and Perspectives," Vol. 10, Issue 1, 2010, Article 21.

72.     "Online Advertising:  Defining Relevant Markets" (with James Ratliff), Journal of Competition Law and Economics, August 7, 2010, pp. 1-34.

73.     "On the Pretrial Use of Economists," The Antitrust Bulletin, Vol. 55, No. 3, Fall 2010, pp. 679-687.

74.     "Federal Institutions and the Democratic Transition: Learning from South Africa, Journal of Law, Economics, and Institutions, Vol. 28, Issue 4, October, 2012, pp. 783-817.

75.     "Would the Per Se Illegal Treatment of Reverse Payment Settlements Inhibit Generic Drug Investment?" (with Bret M. Dickey), Journal of Competition Law and Economics, Vol.8, No. 3, 2012, pp. 615-625.

76.     "The Use and Threat of Injunctions in the RAND Context," (With James Ratliff), Journal of Competition Law and Economics, January 2013, 1-22.

77.     "Understanding the Democratic Transition in South Africa," (with Robert Inman), American Law and Economics Review, January 2013, 2-23.


Law Review Articles

1.      "The Judicial Pursuit of Local Fiscal Equity" (with Robert Inman), Harvard Law Review, June 1979, pp. 1662-1750.

2.      "Quantitative Analysis in Antitrust Litigation" (with Peter Steiner), Law and Contemporary Problems, Autumn 1983, pp. 69-141.

3.      "Compensation for Takings:  An Economic Analysis" (with Lawrence Blume), California Law Review, July, 1984, pp. 569-628.  Also in Austin Jaffe (ed.) RESEARCH IN LAW AND ECONOMICS, Volume 10, 1987, pp. 53-103 as well as Kenneth G. Dau-Schmidt and Thomas S. Ulen (eds.), LAW AND ECONOMICS ANTHOLOGY, 1988, PP. 226-234.

4.      "Econometrics in the Courtroom," Columbia Law Review, Volume 85, June 1985, pp. 1048-1097.

5.      "The Assignment of Temporary Justices in the California Supreme Court" (with Stephen Barnett), Pacific Law Journal, July 1986, pp. 1045-1197.

6.      "Regulatory Takings:  The Case of Mobile Home Rent Control," Chicago Kent Law Review, Vol. 67, No. 3, Fall 1992, pp. 923-929.

7.      "Sanctioning Frivolous Suits:  An Economic Analysis" (with A. Mitchell Polinsky), Georgetown Law

Journal, Vol. 82, No. 2, December 1993, pp. 397-435. (translated as "Liti Temerarie E Sanzioni Giudiziarie: Un'Analisi Economica", 14 Rivista Critica del Diritto Privato (1996)).

8.      "Reforming the New Discovery Rules" (with Robert Cooter), Georgetown Law Journal, Vol. 84, No. 1, November 1995, pp. 61-89.

9.      "Making Sense of the Antitrust State Action Doctrine:  Balancing Political Participation and Economics Efficiency in Regulatory Federalism" (with Robert Inman), Texas Law Review, Vol. 75, May 1997, pp. 1203-1299.

10.     "On Federalism and Economic Development," Virginia Law Review, Vol. 83, No. 7, October 1997, pp. 1581-1592.

11.     "Open Access to Broadband Networks: A Case Study of the AOL-Time Warner Merger" (with Hal J. Singer), Berkeley Technology Law Journal, Vol. 16, No. 2, Spring 2001, pp. 631-675.

12.     "3M's Bundled Rebates: An Economic Perspective," Chicago Law Review, Vol. 72, 2005, pp. 243-264.

13.     "Antitrust Class Certification:  Towards an Economic Framework" (with Bret M. Dickey), N.Y.U. Annual Survey of American Law, Vol. 66, No. 3, 2011, pp. 459-486.


Articles in Books

1.      "Credit Ratings, Bond Defaults, and Municipal Borrowing Costs:  A New England Study," 1972 PROCEEDINGS OF THE SIXTY-FIFTH ANNUAL CONFERENCE ON TAXATION, National Tax Association, 1972, pp. 331-350.

2.      "Property Taxation, Full Valuation, and the Reform of Educational Finance in Massachusetts," in PROPERTY TAXATION AND THE FINANCE OF EDUCATION, Committee on Taxation, Resources and Economic Development (University of Wisconsin Press), 1974, pp.189-201.

3.      "Property Values and the Benefits of Environmental Improvements:  Theory and Measurement" (with A. Mitchell Polinsky), in Wingo and Evans, eds., PUBLIC POLICY AND THE QUALITY OF LIFE IN CITIES (Johns Hopkins Press for Resources for the Future), 1977, pp. l54-l80.

4.      "Market Approaches to the Measurement of the Benefits of Air Pollution Abatement," in Ann Friedlaender, ed., APPROACHES TO CONTROLLING AIR POLLUTION (M.I.T. Press), 1978, pp. 240-279.

5.      "Judicial Approaches to Local Public-Sector Equity: An Economic Analysis," in Peter Mieszkowski and Mahlon Straszheim, eds., CURRENT ISSUES IN URBAN ECONOMICS (Johns Hopkins Press), 1979, pp. 542-576.

6.      "The Stimulative Effects of Intergovernmental Grants: Or Why Money Sticks Where it Hits" (with Paul N. Courant and Edward M. Gramlich), in Peter Miezkowski and William Oakland, eds., FISCAL FEDERALISM AND GRANTS-IN-AID, COUPE Papers on Public Economics, Urban Institute, 1979, pp. 5-21.

7.      "On Super-rationality and the School Voting Process," in Clifford Russell, ed., COLLECTIVE

DECISION-MAKING (Johns Hopkins Press), 1979, pp. 75-82.

8.    "Property Tax Reduction in Michigan" (with Robert Vishny) in H. Brazer and D. Laren, eds., MICHIGAN'S FISCAL AND ECONOMIC STRUCTURE (University of Michigan Press), 1982, pp. 530-560.

9.    "Tax Assignment and Revenue Sharing in the United States," in R. Mathews and C. McLure, eds., TAX ASSIGNMENT IN FEDERAL COUNTRIES, (Australian National Univ. Press), 1983, pp. 205-33.

10.    "Residential Choice and the Demand for Public Education:  Estimation Using Survey Data" (with Perry Shapiro and Judith Roberts), in H. Timmermans and R. Golledge, eds., BEHAVIOR MODELLING APPROACHES IN GEOGRAPHY AND PLANNING, (Croom Helm), 1986, pp. 179-197.

11.    "Local Public Economics: A Methodological Review," in A. Auerbach and M. Feldstein, eds., HANDBOOK OF PUBLIC ECONOMICS, Volume II, 1987, pp. 87-161.

12.    "Settlements in Private Antitrust Litigation" (with Jeffrey Perloff) in L. White (ed.), PRIVATE ANTITRUST LITIGATION, M.I.T. Press, 1988, pp. 149-184.

13.    "A Federalist Fiscal Constitution for an Imperfect World: Lessons  from the United States," in H. N. Scheiber (ed.) FEDERALISM,  STUDIES IN HISTORY, LAW, AND POLICY, Institute of Governmental Studies, U.C. Berkeley, 1988, pp. 76-92.

14.    "Public Choices in Public Higher Education," (with John Quigley) in Charles Clotfelter and Michael Rothschild, eds. THE ECONOMICS OF HIGHER EDUCATION, National Bureau of Economic Research, 1993, pp. 243-283.

15.    "European Labor Markets:  The Eastern Dimension" (with Jasminka Sohinger) in W. Dickens, B. Eichengreen, and L. Ulman (eds.) LABOR RESPONSES TO EUROPEAN INTEGRATION, Brookings Institution, 1993, pp. 271-286.

16.    "Reference Guide on Multiple Regression," in Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 1994, pp. 415-470, Second Edition, 2000, pp.179-227 (available at http://www.fjc.gov/public/pdf.nsf/lookup/11.mult_reg.pdf/$File/11.mult_reg.pdf), Third Edition, 2011, pp.

17.    "California Fiscal Federalism: A School Finance Perspective," in B. Cain and R. Noll (eds.), CONSTITUTIONAL REFORM IN CALIFORNIA, Institute of Governmental Studies, UC Berkeley, 1995, pp. 431-453.

18.    "The Political Economy of Federalism," (with Robert Inman), in D. Mueller (ed.), PERSPECTIVES ON PUBLIC CHOICE, Cambridge University Press, New York, 1997, pp. 73-105.

19.    "Federalism as a Device for Reducing the Budget of the Central Government,"(with John M. Quigley), in FISCAL POLICY: LESSONS FROM ECONOMIC RESEARCH, Alan Auerbach (ed.), M.I.T. Press, 1997.

20.    "Guide to Multiple Regression," in Faigman, Kaye, Saks, and Sanders (ed.), MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY, West Publishing Co., St.

Paul, Minn., 1997, Vol. 1, pp. 147-183, Second edition, 2000.

21.     "Discovery", in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW, Peter Newman (ed.), MacMillian Reference Ltd. 1998, pp. 609-615.

22.     "Contingent Fees" (with Suzanne Scotchmer), in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW, Peter Newman (ed.), MacMillian Reference, Ltd., 1998, pp. 415-420.

23.     "Federalism," (with Robert Inman), in THE ENCYCLOPEDIA OF LAW AND ECONOMICS, Boudewijn Bouchaert and Gerrit DeGeest, editors, 2000, Volume V, pp. 661-691, available on-line at http://encyclo.findlaw.com.

24.     "Subsidiarity and the European Union" (with Robert Inman), in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND LAW, Peter Newman (ed.), MacMillian Reference Ltd., 1998, pp. 545-551.

25.     "United States v. Microsoft: An Economic Analysis" (with Franklin M. Fisher), pp. 1-44, and "Misconceptions, Misdirections, and Mistakes," pp. 87-96, in Evans, Fisher, Rubinfeld, and Schmalensee, DID MICROSOFT HARM CONSUMERS?  TWO OPPOSING VIEWS, AEI-Brookings Joint Center for Regulatory Studies, 2000.  An updated and revised version appears in Antitrust Bulletin, Spring, 2001.

26.     "Antitrust Policy," *International Encyclopedia of the Social and Behavioral Sciences,* revised, 2012, www.iesbs.com.

27.     "Ensuring Fair and Efficient Access to the Telecommunications 'Bottleneck',"(with Robert Majure), in Claus-Dieter Ehlermann and Louisa Gosling (eds.), THIRD COMPETITION LAW ANNUAL 1998: Regulating Telecommunications (Hart Publishing: Oxford).

28.     "Innovation and Antitrust Enforcement" (with John Hoven), in Jerry Ellig, ed., DYNAMIC COMPETITION AND PUBLIC POLICY: TECHNOLOGY, INNOVATION, AND ANTITRUST ISSUES, (New York: Cambridge), 2001, pp. 65-94.

29.     "Access Remedies in High Technology Antitrust Cases," in Francois Leveque and Howard Shelanski, eds., MERGER REMEDIES IN AMERICAN AND EUROPEAN COMPETITION LAW, 2003 (Cheltenham, U.K.: Edward Elgar), pp. 137-171.

30.     "Maintenance of Monopoly: *U. S. v. Microsoft*," in John E. Kwoka. Jr. and Lawrence J. White, eds., THE ANTITRUST REVOLUTION, 5th Edition, 2008 (New York: Oxford University Press), pp. 530-557.

31.     "The Strategic Use of Patents: Implications for Antitrust"(with Robert Maness), in Francois Leveque and Howard Shelanski, eds., ANTITRUST, PATENTS AND COPYRIGHT: EU AND US PERSPECTIVES, 2005 (Cheltenham, U.K.: Edward Elgar), pp. 85-102.

32.     "An Empirical Perspective on Legal Process: Should Europe Introduce Private Antitrust Enforcement?" in Peter Nobel and Marina Gets, eds., NEW FRONTIERS OF LAW AND ECONOMICS, 2006 (Zurich, Switz.: Schulthess), pp. 141-148.

33.     "Empirical Study of the Civil Justice System" (with Daniel P. Kessler), 2007, in Polinsky and Shavell

(eds.), HANDBOOK OF LAW AND ECONOMICS, Chapter 5, pp, 343-402.

34.  "Quantitative Methods in Antitrust," Chapter 30 in Wayne D. Collins (ed.), ISSUES IN COMPETITION LAW AND POLICY, ABA Antitrust Section, 2008.

35.  "On the Foundations of Antitrust Law and Economics," in Robert Pitofsky, ed., WHERE THE CHICAGO SCHOOL OVERSHOT THE MARK: EFFECT OF CONSERVATIVE ECONOMIC ANALYSIS ON U.S. ANTITRUST), Oxford University Press, 2008, pp. 51-74.

36.  "Evaluating Antitrust Enforcement:  Economic Foundations," Chapter 19 in Barry Hawk, ed., INTERNATIONAL ANTITRUST LAW & POLICY, Fordham University School of Law, 2008, pp. 457-469.

37.  "Settlements in Antitrust Enforcement:  A U.S. Economic Perspective," in Claus-Dieter Ehlermann and Mel Marquis (eds.), EUROPEAN COMPETITION LAW ANNUAL 2008: ANTITRUST SETTLEMENTS UNDER EC COMPETITION LAW, Hart Publishing, Oxford and Portland, 2009, pp, 85-92.

38.  "Alternative Economic Designs for Academic Publishing," (with Theodore C. Bergstrom), in Rachelle Dreyfuss, Harry First, and Diane Zimmerman, eds., WORKING WITH THE BOUNDARIES OF INTELLECTUAL PROPERTY, Oxford University Press, 2010, pp. 137-148.

39.  "Revising the Horizontal Merger Guidelines:  Lessons from the U.S. and the E.U. (with Richard Gilbert), in Faure, M. and Zhang, X. (eds.), COMPETITION POLICY AND REGULATION: RECENT DEVELOPMENTS IN CHINA, EUROPE AND THE US, Cheltenham, Edward Elgar, 2011, pp. 262-277.

40.  "Antitrust Damages," Chapter 14, in Einer Elhauge, ed., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW, Edward Elgar, 2012, pp. 377-393.

41.  "Current Issues in Antitrust Analysis," in Josef  Drexl, Wolfgang Kerber, and Rupprecht Podszun, eds., COMPETITION POLICY AND THE ECONOMIC APPROACH: FOUNDATIONS AND LIMITATIONS, UK: Edward Elgar, 2011, pp. 81-93.

42.  "Delta-Northwest: Merger Approval Driven by Consumer Benefits from Airline Network Effects," (with Mark Israel, Bryan Keating, and Robert Willig), in John Kwoka and Lawrence White, eds., THE ANTITRUST REVOLUTION, forthcoming.


Other

1.  "Urban Land Values:  Theoretical and Empirical Essays," Joint Center of Urban Studies, M.I.T./Harvard, September 1972, pp. 1-71.

2.  "What Do Tax Limitation Votes Mean" (with Paul N. Courant and Edward M. Gramlich), in Law Quadrangle Notes, University of Michigan Law School, Spring 1982, pp. 24-28.

3.  Book Review, "Studies in State-Local Public Finance," (Harvey Rosen, ed.), Journal of Economic Literature, December 1987, pp. 1882-1883.

4.      Book Review, "America's Ailing Cities:  Fiscal Health and the Design of Urban Policy," (Helen F. Ladd and John Yinger), <u>Journal of Economic Literature</u>, December 1990, pp. 30-32.

5.      Comments on Scotchmer, "Public Goods and the Invisible Hand," in John M. Quigley and Eugene Smolensky (eds.), MODERN PUBLIC FINANCE (Harvard University Press) 1994, pp. 120-125.

6.      "Mergers and Other Competition Policy Issues in Banking," (with George Rozanski), Appendix to "Enhancing the Role of Competition in the Regulation of Banks -- United States," a note submitted to the Directorate for Financial, Fiscal and Enterprise Affairs, Committee on Competition Law and Policy, Organization for Economic Cooperation and Development, February, 1998.

7.      Comment, "Product and Stock Market Responses to Automotive Product Liability Verdicts," by Steven Garber and John Adams, *Brookings Papers on Economic Activity / Microeconomics 1998*, Washington DC: Brookings Institution.

8.      Declaration before the FCC in the Matter of Applications for Consent to the Transfer of Control of Licenses MediaOne Group, Inc., Transferor to AT&T Corp., Transferee (with J. Gregory Sidak), August 23, 1999 (re: broadband internet access).

9.      Affidavit to FCC In re Consolidated Application of EchoStar Communications Corporation, General Motors Corporation, Hughes Electronics Corporation, Transferors, and EchoStar Communications Corporation, Transferee, for Authority to Transfer Control, February 4, 2002 (re: direct broadcast satellite competition and the market for multi-channel video distribution).

10.     *State of New York, et. al. v. Microsoft*, Amicus Brief (with Timothy Bresnahan, Richard J. Gilbert, George Hay, Bruce Owen, and Lawrence J. White), June 2002.

11.     "Subsidiarity, Governance, and EU Economic Policy," (with Robert P. Inman), CESifoForum, Volume 3, No. 4, Winter 2002, pp. 3-11, www.cesifo.de.

12.     Amici Curiae Submission to the U.S. Supreme Court in Support of Petition for Certiorari in *Conwood Co. v. U.S. Tobacco, Co.* concerning the admissibility of statistical evidence (with Stephen Fienberg, Franklin Fisher, and Daniel McFadden), Nov. 20, 2002.

13.     "The State of Antitrust Enforcement - 2004" (co-authored)," ABA Antitrust Section Task Force.

14.     "Effects of Mergers with Differentiated Products (with Roy J. Epstein)," EU Competition Directorate, October 7, 2004, available at http://europa.eu.int/comm/competition/mergers/others/.

15.     "The American Law and Economics Association," in David Clark (ed.) *Encyclopedia of Law and Society,* Sage Publications, 2007.

16.     "Empirical Methods in Antitrust: New Developments in Merger Simulation," in Stefan Vogt, Fmax Albert and Dieter Schmidtchen (eds.), THE MORE ECONOMIC APPROACH TO EUROPEAN COMPETITION LAW, (Conferences on the New Political Economy), Tubingen, 2007, pp. 277-280.

17.     "Sustainable Economics for a Digital Planet:  Ensuring Long-term Access to Digital Information (various co-authors), Feb. 2010:  Report of the Blue Ribbon Task Force on Digital Preservation and Access.

# Attachment C

| List of Materials Considered |||
|---|---|---|
| **Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification** |||
| ***In re NCAA Student-Athlete Name & Likeness Licensing Litigation*** |||
| | Bates Stamp/Title | *Date* |
| **_Depositions and Exhibits_** | | |
| | ***Collegiate Licensing Company*** | |
| | Battle, Pat (President and CEO) | 19-Jun-12 |
| | Eiler, Derek (Former Senior Vice President and Managing Director) | 29-Jun-12 |
| | Kirkpatrick, David (Vice President of Non-Apparel Marketing) | 14-Nov-12 |
| *30(b)(6)* | Moss, Cory (Senior Vice President and Managing Director, Collegiate Licensing Company) | 16-Aug-12 |
| | | |
| | ***Electronic Arts*** | |
| | Edelstein, Jordan (Vice President of Marketing) | 14-Dec-12 |
| *30(b)(6)* | Harvey, Roy (Former Executive Producer of NCAA Football) | 18-Jan-13 |
| | Linzner, Joel (Executive Vice President of Worldwide Legal and Business Affairs) | 18-Dec-12 |
| | Sitrin, Todd (Vice President of Product and Brand Marketing for EA Sports) | 25-Jan-13 |
| | Strausser, Jeremy (Producer of NCAA Football) | 11-Dec-12 |
| | | |
| | ***National Collegiate Athletic Association*** | |
| | Berst, David (Vice President of Division I) | 25-May-12 |
| | Byers, Walter (Former Executive Director) | 1-Jun-12 |
| | Davis, Peter (Director of Corporate Relationships) | 6-Jun-12 |
| | Emmert, Mark (President) | 6-Mar-12 |
| | Kerrin, Bo (Former Assistant Director for Membership Services) | 12-Dec-12 |
| | Knopp, David (Managing Director of Championships and Alliances) | 24-May-12 |
| | Lennon, Kevin (Vice President of Academic and Membership Affairs) | 20-Dec-12 |
| | Renfro, Wallace (Vice President and Chief Policy Advisor) | 26-Jun-12 |
| | Shaheen, Greg (Former Senior Vice President) | 25-Jun-12 |
| | Weitekamp, Greg (Director of Championships and Alliances) | 5-Jun-12 |
| | | |
| | ***Plaintiffs*** | |
| | Ellis, Kerwin Ray | 3-Nov-11 |
| | Flournoy, Jr., Harry | 8-Nov-11 |
| | George, Tate | 9-Mar-12 |
| | Gilbert, Alexander | 4-Nov-11 |
| | Jacobson, Sam | 7-Nov-11 |
| | Jaracz, Thad | 30-Nov-11 |
| | Lattin, David | 10-Nov-11 |
| | Maynor, Patrick | 14-Nov-11 |
| | O'Bannon, Jr., Edward Charles | 1-Nov-11 |
| | Prothro, Tyrone | 9-Nov-11 |
| | Rhodes, Damien | 15-Nov-11 |
| | Riley, Eric | 11-Nov-11 |
| | Robertson, Oscar Palmer | 26-Jul-12 |
| | Russell, William F. | 7-Dec-12 |
| | Tallent, Robert | 1-Dec-11 |
| | Wimprine, Danny | 2-Dec-11 |
| | | |
| | ***Other*** | |
| | Baughman, Dutch (Executive Director, Division IA Athletic Directors Association) | 14-Jan-13 |
| | Beebe, Robert (Former Commissioner, Big 12 Conference) | 8-Jan-13 |
| | Bilas, Jay (Of Counsel, Moore and Van Allen; and Basketball Analyst, ESPN and CBS Sports) | 2-Feb-12 |
| | Kerrin, Bo (Associate Athletics Director for Compliance, Louisiana State University) | 12-Dec-12 |
| | Plonsky, Christine (Director of Women's Athletics and Executive Senior Associate Assistant Director for Men's and Women's External Services, University of Texas) | 10-Dec-12 |
| *30(b)(6)* | Sankey, Greg (Executive Associate Commissioner, Southeastern Conference) | 20-Dec-12 |
| *30(b)(6)* | Swofford, John (Commissioner, Atlantic Coast Conference) | 15-Jan-13 |
| | Vaccaro, John Paul (Owner, Vaccaro Sports Partnerships) | 4-Dec-12 |
| *30(b)(6)* | Womack, Mark (Executive Associate Commissioner, Southeastern Conference) | 20-Dec-12 |
| | | |
| **_Expert Materials_** | | |
| | Expert Report and Backup of Larry Gerbrandt | 31-Aug-12 |
| | Expert Report on Class Certification and Backup of Roger G. Noll | 31-Aug-12 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| List of Materials Considered<br>Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
| --- | --- |
| **Bates Stamp/Title** | **Date** |
| Corrections and Amendments to Expert Report on Class Certification and Backup of Roger G. Noll | 21-Nov-12 |
| Report of Roger G. Noll, "The Antitrust Economics of NCAA Restrictions on Athletic Scholarships," in the matter of O'Bannon v. NCAA | 2-Feb-13 |
| | |
| ***Expert Depositions*** | |
| Gerbrandt, Larry | 8-Jan-13 |
| Gerbrandt, Larry | 12-Feb-13 |
| Noll, Roger G. | 28-Feb-13 |
| | |
| ***Legal*** | |
| Second Consolidated Amended Class Action Complaint, In re NCAA Student-Athlete Name and Likeness Licensing Litigation, Case No. C 09-01967 CW | 16-May-11 |
| Notice of Motion and Motion by Antitrust Plaintiffs for Class Certification and Memorandum of Points and Authorities in Support Thereof | 31-Aug-12 |
| Declaration of Sathya S. Gosselin in Support of Motion by Antitrust Plaintiffs for Class Certification | 30-Aug-12 |
| Proposed Order Granting Antitrust Plaintiffs' Motion for Class Certification | 31-Aug-12 |
| Antitrust Plaintiffs' Objections and Responses to Defendant Collegiate Licensing Company's First Set of Interrogatories | 7-Sep-12 |
| Antitrust Plaintiffs' Supplemental Objections and Responses to Defendant Collegiate Licensing Company's First Set of Interrogatories | 24-Sep-12 |
| Antitrust Plaintiffs' Objections and Responses to NCAA's First Set of Interrogatories | 24-Sep-12 |
| Antitrust Plaintiffs' Objections and Amended Responses to Defendant Electronic Arts Inc.'s First Set of Requests for Admissions to Antitrust Plaintiffs | 24-Sep-12 |
| Antitrust Plaintiffs' Supplemental Objections and Responses to Electronic Arts Inc.'s Second Set of Interrogatories to Antitrust Plaintiffs | 26-Sep-12 |
| Antitrust Plaintiffs' Responses and Objections to NCAA's Second Set of Interrogatories | 30-Sep-12 |
| Antitrust Plaintiffs' Second Supplemental Objections and Responses to Electronic Arts Inc.'s Second Set of Interrogatories to Antitrust Plaintiffs | 2-Oct-12 |
| Antitrust Plaintiffs' Second Supplemental Objections and Responses to Defendant Collegiate Licensing Company's First Set of Interrogatories | 2-Oct-12 |
| Antitrust Plaintiffs' Amended Responses and Objections to NCAA's First Set of Interrogatories | 3-Oct-12 |
| Antitrust Plaintiffs' Supplemental Objections and Responses to Electronic Arts Inc.'s First Set of Interrogatories to Antitrust Plaintiffs | 8-Oct-12 |
| | |
| ***Laws and Regulations*** | |
| Cal. Civ. Code § 3344(d) | 1995 |
| Federal Register, Vol. 44, No. 239 | 11-Dec-79 |
| Hawaii Statute 482P-7 (b)(2) | |
| State of Texas, Government Code, Title 6, Subtitle A, Chapter 617, Sec. 617.001, "Collective Bargaining and Strikes" | 1-Sep-93 |
| USC Title 17, Circular 92, "Copyright Law for the United States and Related Laws Contained in Title 17 of the United States Code" | Dec., 2011 |
| | |
| ***Declarations*** | |
| ***NCAA Student-Athlete Name & Likeness Licensing Litigation*** | |
| Declaration of Jason Masherah | 31-Oct-12 |
| Declaration of Keith Gordon | 26-Feb-13 |
| Declaration of Ronald Klempner | 5-Mar-13 |
| Declaration of Mark Womack in Support of the NCAA's Class Certification Opposition Brief | 11-Mar-13 |
| Declaration of John Welty in Support of the NCAA's Class Certification Opposition Brief | 12-Mar-13 |
| Declaration of Jonathan B. LeCrone in Support of the NCAA's Class Certification Opposition Brief | 12-Mar-13 |
| Declaration of Stan L. Albrecht in Support of the NCAA's Class Certification Opposition Brief | 12-Mar-13 |
| Declaration of Todd Petr in Support of the NCAA's Class Certification Opposition Brief | 12-Mar-13 |
| Declaration of Larry Scott in Support of the NCAA's Class Certification Opposition Brief | 13-Mar-13 |
| Declaration of Patrick Harker in Support of the NCAA's Class Certification Opposition Brief | 13-Mar-13 |
| Declaration of Timothy P. White in Support of the NCAA's Class Certification Opposition Brief | 13-Mar-13 |
| Declaration of The University of Texas at Austin in Support of the NCAA's Class Certification Opposition Brief | 13-Mar-13 |
| Declaration of Victoria L. Donovan in Support of the NCAA's Class Certification Opposition Brief | 13-Mar-13 |
| Declaration of Bob Bowlsby in Support of the NCAA's Class Certification Opposition Brief | 14-Mar-13 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| List of Materials Considered<br>Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
|---|---|
| **Bates Stamp/Title** | **Date** |
| Declaration of James E. Delany in Support of the NCAA's Class Certification Opposition Brief | 14-Mar-13 |
| Declaration of Nathan O. Hatch of the NCAA's Class Certification Opposition Brief | 14-Mar-13 |
| | |
| ***NCAA I-A Walk-On Football Players Litigation*** | |
| Declaration of Gary Gray in Support of the NCAA's Opposition to Plaintiff's Motion for Class Certification | 25-May-05 |
| Declaration of Judith Sweet in Support of the NCAA's Opposition to Plaintiff's Motion for Class Certification | 25-May-05 |
| Declaration of Randy Ross in Support of the NCAA's Opposition to Plaintiff's Motion for Class Certification | 25-May-05 |
| Declaration of Morgan Burke in Support of the NCAA's Opposition to Plaintiff's Motion for Class Certification | 25-May-05 |
| Declaration of Gary Gray in Support of the NCAA's Opposition to Plaintiff's Second Motion for Class Certification | 6-Feb-06 |
| Declaration of Tim Selgo | 7-Feb-06 |
| Declaration of Mark Murphy | 8-Feb-06 |
| Declaration of Sonny Lubick | 8-Feb-06 |
| Declaration of Judith Sweet in Support of the NCAA's Opposition to Plaintiff's Second Motion for Class Certification | 9-Feb-06 |
| Declaration of Craig Angelos | 10-Feb-06 |
| Declaration of Craig Thompson | 10-Feb-06 |
| Declaration of Don James | 10-Feb-06 |
| Declaration of Edward C. Driscoll, Jr. | 10-Feb-06 |
| Declaration of George Rush | 10-Feb-06 |
| Declaration of H. Wright Waters | 10-Feb-06 |
| Declaration of Tyrone Willingham | 10-Feb-06 |
| Declaration of William Tarlton Turner | 10-Feb-06 |
| Declaration of Morgan Burke in Support of the NCAA's Opposition to Plaintiff's Motion for Class Certification | 10-Feb-06 |
| Declaration of Professor Janusz A. Ordover in Support of the NCAA's Opposition to Plaintiffs' Second Motion for Class Certification | 10-Feb-06 |
| Declaration of Randy Ross in Support of the NCAA's Opposition to Plaintiff's Motion for Class Certification | 13-Feb-06 |
| | |
| ***Jason White, et al., v. NCAA*** | |
| Declaration of Tom Yeager | 7-Sep-06 |
| Declaration of Keith Martin | 8-Sep-06 |
| Declaration of Lynn Holzman | 8-Sep-06 |
| Declaration of Bob Toledo | 8-Sep-06 |
| Declaration of Derek Van Der Merwe | 8-Sep-06 |
| Declaration of Daniel Guerrero | 8-Sep-06 |
| Declaration of Doug Elgin | 8-Sep-06 |
| Declaration of Lisa Watson | 8-Sep-06 |
| Declaration of Ted Leland | 8-Sep-06 |
| Declaration of Farschad Farzan in Support of Defendant NCAA's Opposition to Plaintiff's Renewed Motion for Class Certification | 11-Sep-06 |
| Declaration of Marvin Carmichael | 11-Sep-06 |
| Declaration of Warde Manuel | 11-Sep-06 |
| Declaration of Bill Hogan | 11-Sep-06 |
| Declaration of Michael Katz | 11-Sep-06 |
| Declaration of Larry Teis | 11-Sep-06 |
| Declaration of Professor Janusz A. Ordover in Support of Defendant NCAA's Opposition to Plaintiffs' Renewed Motion for Class Certification | 11-Sep-06 |
| Declaration of Janusz A. Ordover in Support of Motion to Decertify Class | 6-Sep-07 |
| Declaration of Farschad Farzan | 14-Sep-07 |
| Declaration of Brenda Maiggard | 8-Oct-07 |
| Declaration of Debbie Van Saun | 9-Oct-07 |
| Declaration of Melody Reifel Werner | 9-Oct-07 |
| Declaration of Peter Wong | 10-Oct-07 |
| Declaration of Eric Toliver | 11-Oct-07 |
| Declaration of Paola Caoile | 11-Oct-07 |
| Declaration of Sandy Ross | 11-Oct-07 |
| Declaration of Jerry Hausman | 12-Oct-07 |
| Declaration of Norm Bedford | 12-Oct-07 |
| Declaration of Roberta Johnson | 12-Oct-07 |
| Declaration of Christina E. Ruff | 15-Oct-07 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| List of Materials Considered<br>Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
|---|---|
| **Bates Stamp/Title** | **Date** |
| Declaration of Cynthia Van Pelt | 15-Oct-07 |
| Declaration of Raul H. Lerma | 15-Oct-07 |
| Declaration of Christi Gibbs | 16-Oct-07 |
| Declaration of Joshua Matthew Snyder | 16-Oct-07 |
| Declaration of Richard J. Franchak | 16-Oct-07 |
| Declaration of Stephen Corder | 16-Oct-07 |
| Declaration of Cindy Burnette | 17-Oct-07 |
| Declaration of Pam Herriford | 17-Oct-07 |
| Declaration of Cari S. Wickliffe | 18-Oct-07 |
| Declaration of Jeremy Rosner | 18-Oct-07 |
| Declaration of Joel McMullen in Support of Motion to Decertify Class | 18-Oct-07 |
| Declaration of Kathy Arnold, | 18-Oct-07 |
| Declaration of Amy Folan | 19-Oct-07 |
| Declaration of Cindy B. Deffenbaugh | 19-Oct-07 |
| Declaration of Daniel W. McCarthy | 19-Oct-07 |
| Declaration of Janet Oberle | 19-Oct-07 |
| Declaration of Jean Berger | 19-Oct-07 |
| Declaration of Sandy Calhoun | 19-Oct-07 |
| Declaration of Lynn Holzman | 20-Oct-07 |
| Declaration of Thomas J. Kane | 20-Oct-07 |
| Declaration of Amy Keating in Support of NCAA's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment | 22-Oct-07 |
| | |
| ***Other Legal Filings*** | |
| NCAA v. Board of Regents of the University of Oklahoma, 468 U.S. 85 (1984) | 1984 |
| Baltimore Orioles, v. Major League Baseball Players Association, 805 F. 2d 663, Court of Appeals, 7th Circuit, 1986 | 1986 |
| United States of America v. American Society of Composers, Authors and Publishers, Second Amended Final Judgment, Civ. Action No. 41-1395 | 11-Jun-01 |
| Order Denying Class Certification, in re NCAA I-A Walk-On Football Players Litigation, Case No. C04-1254C | 3-May-06 |
| Second Amended Complaint for Violation of Section 1 of the Sherman Act, 15 USC § 1, Jason White, et al., v. National Collegiate Athletic Association, Case No. CV 06-0999 RGK (MANx) | 8-Sep-06 |
| Defendant's Motion to Dismiss Plaintiffs' Amended Complaint, Jason White, et al., v. National Collegiate Athletic Association, Case No. CV 06-0999 RGK (MANx) | 20-Sep-06 |
| Plaintiffs' Motion for Class Certification, Jason White, et al., v. National Collegiate Athletic Association, Case No. CV 06-0999-RGK (MANx) | 19-Oct-06 |
| Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, Bernard Paul Parrish, et al, v. National Football League Players Association, No. C 07-00943 WHA | 29-Apr-08 |
| Expert Report of Daniel A. Rascher, in the Matter of Bernard Paul Parrish, et al., v. National Football League Players Association, et al. | 23-May-08 |
| Expert Report of Roger G. Noll, in the Matter of Bernard Paul Parrish, et al., v. National Football League Players Association, et al. | 12-Jun-08 |
| Expert Reply Report of Daniel A. Rascher, in the Matter of Bernard Paul Parrish, et al., v. National Football League Players Association, et al. | 26-Jun-08 |
| Order Denying Defendants' Motion for Summary Judgment, Bernard Paul Parrish, et al, v. National Football League Players Association, No. C 07-00943 WHA | 6-Aug-08 |
| Transcript of Proceedings, Bernard Paul Parrish, et al., v. National Football League Players Association, et al., Case No. C 07-0943 WHA, volume 10 | 4-Nov-08 |
| Transcript of Proceedings, Bernard Paul Parrish, et al., v. National Football League Players Association, et al., Case No. C 07-0943 WHA, volumes 11 | 5-Nov-08 |
| Order Granting Motion for Final Approval of the Settlement Agreement and Proposed Plan of Distribution, Herbert Anthony Adderley v. National Football League Players Association, No. C 07-00943 WHA Class Action | 23-Dec-09 |
| Agnew v. National Collegiate Athletic Association, 2011 U.S. Dist. LEXIS 98744 (S.D. Ind. 2011) | 1-Sep-11 |
| Agnew v. National Collegiate Athletic Association, 683 F.3d 328 (7th Cir. 2012) | 9-Jan-12 |
| Rock v. NCAA, Order Granting Defendant's Motion to Dismiss | 1-Mar-13 |
| | |
| ***Interviews*** | |
| Interview with Doug Elgin (Commissioner, Missouri Valley Conference) and Jack Watkins (Associate Commissioner, Missouri Valley Conference) | 8-Oct-12 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| List of Materials Considered<br>Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
|---|---|
| **Bates Stamp/Title** | **Date** |
| Interview with Victoria Donovan (Vice President and General Counsel, T3Media) and Emily Cooper (Outside Counsel, T3Media) | 29-Oct-12 |
| Interview with Herb Carter (CFO and Associate Commissioner, Sun Belt Conference) and Scott Connors (Assistant Commissioner, Sun Belt Conference) | 14-Nov-12 |
| Interview with Mark Womack (Executive Associate Commissioner, Southeastern Conference) | 26-Feb-13 |
| Interview with John Welty (President, California State University, Fresno) | 5-Mar-13 |
| Interview with Patrick Harker (President, University of Delaware) | 6-Mar-13 |
| Interview with Jon LeCrone (Commissioner, Horizon League), Beth Opell (Director of Finance, Horizon League), and Christine Halstead (Assistant Director of Championships and Compliance, Horizon League) | 7-Mar-13 |
| Interview with Jim Delany (Commissioner, Big Ten Conference) | 11-Mar-13 |
| Interview with Stan Albrecht (President, Utah State University) | 11-Mar-13 |
| | |
| ***Bates Documents*** | |
| ATEN000073-090 | |
| ATEN000092-107 | |
| BIG_12_NCAA_00000386-387 | |
| BIG_12_NCAA_00000792-910 | |
| BTN013-037 | |
| CAL000447-452 | |
| CAL000475-482 | |
| CLC0160523-71452 | |
| CUSA_NCAA00000493-520 | |
| CUSA_NCAA00000565-601 | |
| CUSA_NCAA00000765-797 | |
| CUSA_NCAA00000821-835 | |
| CUSA_NCAA00000861-886 | |
| CUSA_NCAA00032915-928 | |
| CUSA_NCAA00162321-352 | |
| CUSA_NCAA00166337-343 | |
| EA0032594-613 | |
| FLORIDA000236-246 | |
| FLORIDA000247-251 | |
| FLORIDA000252-330 | |
| FLORIDA000344-434 | |
| FSU000001-036 | |
| GEORGIA000246-250 | |
| GEORGIA000256 | |
| GTECH 000155-160 | |
| GTECH 000898-949 | |
| HORIZON000008-017 | |
| HWJ 000146-179 | |
| HWJ 000181-186 | |
| HWJ 000191-199 | |
| IMG00000021-104 | |
| IVY000001-018 | |
| IVY000130-135 | |
| LSU 000220-224 | |
| LSU 000226-296 | |
| MEAC000004-011 | |
| MEAC000026-039 | |
| MEAC000065-071 | |
| MEAC000111-135 | |
| MICHIGAN000201-211 | |
| MVC000004-018 | |
| MVC000020-081 | |
| NBCU 00017-033 | |
| NBCU 00078-115 | |
| NBCU 00119-167 | |
| NBCU 00176-185 | |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| List of Materials Considered<br>Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
|---|---|
| **Bates Stamp/Title** | *Date* |
| NBCU 00199-207 | |
| NBCU 00221 | |
| NBCU 00225-251 | |
| NCAAPROD00085035-038 | |
| NCAAPROD00181209-245 | |
| NCAAPROD00223433-442 | |
| NCAAPROD00245187-188 | |
| NCAAPROD00292350-362 | |
| NCAAPROD00292600-604 | |
| NCAAPROD00292647-734 | |
| NCAAPROD00292761-773 | |
| NCAAPROD00293070-121 | |
| NCAAPROD00293387-449 | |
| NCAAPROD00295334-396 | |
| NCAAPROD00296077-081 | |
| NCAAPROD00300324-434 | |
| NCAAPROD00305524-565 | |
| NCAAPROD00305663-669 | |
| NCAAPROD00342782-783 | |
| NCAAPROD00342862-870 | |
| NCAAPROD00344462-474 | |
| NCAAPROD00390031-057 | |
| NCAAPROD00428802-812 | |
| NCAAPROD00602238-285 | |
| NCAAPROD00602378-539 | |
| NEBRASKA000001-006 | |
| NEBRASKA000008-013 | |
| NEBRASKA000015-020 | |
| NEBRASKA000022-026 | |
| NEBRASKA000028-072 | |
| NEBRASKA000074-112 | |
| NEBRASKA000115-124 | |
| NEBRASKA000126-130 | |
| NEBRASKA000132-147 | |
| NEBRASKA000149-156 | |
| NEBRASKA000163-166 | |
| NEBRASKA000168-175 | |
| NEBRASKA000177-179 | |
| NEBRASKA000181-184 | |
| NEBRASKA000220-308 | |
| NEBRASKA000311-316 | |
| NEBRASKA000318-324 | |
| NEBRASKA000326-333 | |
| NEBRASKA000335 | |
| NEBRASKA000337-341 | |
| NEBRASKA000343 | |
| OHIO000001-151 | |
| OVC000001-069 | |
| PATRIOT 000002-025 | |
| PATRIOT 000027-048 | |
| PATRIOT 000053-061 | |
| PATRIOT 000063-075 | |
| PATRIOT 000077-083 | |
| PATRIOT 000086-104 | |
| PRINCETON000008-027 | |
| RAY000001-137 | |
| SDSU000001-013 | |
| SOCON 0058 | |
| SOCON 0062-083 | |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| List of Materials Considered | |
|---|---|
| **Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification** | |
| *In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
| **Bates Stamp/Title** | **Date** |
| SOCON 0085-103 | |
| SOCON 0109-126 | |
| SUMMIT 000002-021 | |
| SUMMIT 000028-049 | |
| SUNBELT000076-100 | |
| SWAC 000001-008 | |
| TEM 0432-718 | |
| TEXAS000017-207 | |
| TEXAS000210-258 | |
| TEXAS000277-386 | |
| TEXAS000439-454 | |
| TEXAS000465-472 | |
| UNC 000005-130 | |
| USF000001-010 | |
| WAC000001-024 | |
| WAC000052-099 | |
| WAC000266-296 | |
| WASHSTATE 001393-483 | |
| WASHSTATE 004470-511 | |
| WASHSTATE 004532-563 | |
| WASHSTATE 004567-618 | |
| WASHSTATE 004620-658 | |
| WASHSTATE 004664-711 | |
| WASHSTATE 006396-403 | |
| WKENT 000392-417 | |
| | |
| ***Contracts and Agreements*** | |
| Agreement by and between Bowling Green State University and Falcon Sports Properties, LLC, a wholly owned subsidiary of Learfield Communications, Inc. | 1-Jul-07 |
| Multi-Media Rights Agreement by and between South Dakota State University and Jackrabbit Sports Properties, LLC, a company wholly owned by Learfield Communications | 1-Jul-11 |
| Multi-Media Rights Agreement by and between Texas A&M and Jackrabbit Sports Properties, LLC, a company wholly owned by Learfield Communications | n.d. |
| Multi-Media Rights Agreement between Buffalo Sports Properties, LLC and the Regents of the University of Colorado, a Body Corporate | 1-Jul-01 |
| Content License Agreement between Collegiate Images, LLC and University Athletic Association | Mar., 2003 |
| ***Academic Texts and Articles*** | |
| Brown, Robert W., "An Estimate of the Rent Generated by a Premium College Football Player," *Economic Inquiry*, Vol. 31 (1993), pp. 671-684 | 1993 |
| Brown, Robert W., "Measuring the Cartel Rents in the College Basketball Player Recruitment Market," *Applied Economics*, Vol. 26 (1994), pp. 27-34 | 1994 |
| Brown, Robert W. "Research Note: Estimates of College Football Player Rents," *Journal of Sports Economics*, Vol. 12 (2011), pp. 200-212 | 2011 |
| Brown, Robert W. and Jewell, R. Todd, "Measuring Marginal Revenue Product in College Athletics: Updated Estimates," *Economics of College Sports*, edited by John Fizel and Rodney Fort, Praeger, 2004, pp. 153-162 | 2004 |
| Cooter, Robert and Ulen, Thomas, *Law and Economics*, 5th Edition, Pearson, 2008 | 2008 |
| Douglas Baird, Robert Gertner, and Randall Picker, *Game Theory and the Law*, Harvard University Press, 1998 | 1998 |
| Goodwin, Daniel, "Not Quite Filling the Gap: Why the Miscellaneous Expense Allowance for Student-Athletes Leaves the NCAA Still Vulnerable to Antitrust Litigation," *Boston College Law Review*, Vol. 1 | 20-Apr-12 |
| Johansen, David, "A Superstar Exception to Professional Baseball Licensing Logic?," *Willamette Sports Law Journal*, Spring 2007 | 2007 |
| Kahn, Lawrence M., "Markets: Cartel Behavior and Amateurism in College Sports," *Journal of Economic Perspectives*, Vol. 21 (2007), pp. 209-226 | 2007 |
| Lane, Erin, Juan Nagel and Janet S. Netz, "Alternative Approaches to Measuring MRP: Are All Men's College Basketball Players Exploited?," Journal of Sports Economics, published online, August 12, 2012 | 2012 |
| Lazaroff, Daniel E., "The NCAA in Its Second Century: Defender of Amateurism or Antitrust Recidivist?," *Oregon Law Review*, Vol. 86, No. 2 (2007), at pp. 329-371 | 2007 |

| List of Materials Considered<br>Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
| --- | --- |
| **Bates Stamp/Title** | **Date** |
| Leonard, John and Prinzinger, Joseph, "An Investigation into the Monopsonistic Market Structure of Division One NCAA Football and Its Effect on College Football Players," *Eastern Economic Journal,* Vol. 10 (1984), pp. 4557-4567. | 1984 |
| LeRoy, Michael H., "An Invisible Union for an Invisible Labor Market: College Football and the Union Substitution Effect," *Wisconsin Law Review,* Vol. 2012, Issue 5 (Fall 2012) | 2012 |
| Litan, Robert E., Peter M. Orszag, Jonathan M. Orszag, "The Empirical Effects of Collegiate Athletics: An Interim Report," *Sebago Associates* , August 2003 | Aug., 2003 |
| Muthoo, Abhinay, Bargaining Theory with Applications, Cambridge University Press, 1999 | 1999 |
| Noll, Roger G., "The Economics of Licensing an Athlete's Image," 1:30pm Panel (2010) | 2010 |
| Pindyck, Robert S. and Rubinfeld, Daniel L., Microeconomics, 8th Edition, Pearson, 2012 | 2012 |
| Vrooman, John, "The Economic Structure of the NFL," *The Economics of the National Football League: The State of the Art* , edited by K.G. Quinn, Springer, 2012 | 2012 |
| Vrooman, John, "Theory of the Perfect Game: Competitive Balance in Monopoly Sports Leagues," *Review of Industrial Organization,* (2009), Vol. 34, Issue 1, at pp. 5-44 | 2009 |
| Yair Eilat, Bryan Keating, Jonathan Orszag, and Robert Willig, "An Econometric Analysis of the Matching Between Football Student-Athletes and Colleges," Supplement No. 4B, Division I Board of Directors Meeting | Apr., 2009 |
| Zimmeck, Sebastian, "A Game-Theoretic Model for Reasonable Royalty Calculation," *Albany Law Journal of Science and Technology,* Vol. 22, Issue 2, Jul. 10, 2012, at pp. 357-410 | 10-Jul-12 |
| | |
| ***News and Press*** | |
| Associated Press, "NCAA Changes Rules at Convention," *The New York Times,* Jan. 19, 2013 | 19-Jan-13 |
| Belson, Ken, "Players Preparing for Chance the Checks Will Stop," *The New York Times,* Feb. 5, 2011 | 5-Feb-11 |
| Cacciola, Scott, "Swimming's Rich Little Poor Girl," *The Wall Street Journal,* Jan. 11, 2012 | 11-Jan-12 |
| Condotta, Bob, "Huskies' Austin Seferian-Jenkins Will Not Play Basketball," *The Seattle Times,* Jan. 3, 2013 | 3-Jan-13 |
| Greer, Jeff, "Northeastern Discontinues Football," *US News and World Report,* Nov. 24, 2009 | 24-Nov-09 |
| Greer, Jeff, "Report Says Current Costs Make College Sports 'Unsustainable,'" *US News and World Report,* Oct. 26, 2009 | 26-Oct-09 |
| Hiestand, Michael, "ESPN Rights Fees Skyrocket for College Football Playoff," *USA TODAY,* Nov. 15, 2012 | 15-Nov-12 |
| Jessop, Alicia, "The Business of the Rose Bowl," *Forbes,* Jan. 1, 2013 | 1-Jan-13 |
| Marcus, Steven, "End of Hofstra Football Program Shocks Players," *Newsday,* Sep. 19, 2012 | 19-Sep-12 |
| Sandomir, Richard, "Pro Basketball; NBA Players Have a $20 Million War Chest Available," *The New York Times,* Nov. 5, 1998 | 5-Nov-98 |
| Thamel, Pete, "With Big Paydays at Stake, College Teams Scramble for a Spot," *The New York Times,* Sep. 19, | 19-Sep-11 |
| Weiner, Jay and Berkowitz, Steve, "USA TODAY Analysis Finds $120K Value in Men's Basketball Scholarship," *USA TODAY,* Mar. 30, 2011 | 30-Mar-11 |
| Zinser, Lynn, "ESPN Outbids Fox Sports and Wins BCS Rights," *The New York Times,* Nov. 18, 2008 | 18-Nov-08 |
| | |
| ***Public Documents*** | |
| Articles of Association of the American Society of Composer, Authors and Publishers, ASCAP | May, 2002 |
| Big 12 Conference, 2012-13 Handbook | 2012 |
| Big Sky Conference, 2010-2011 Constitution of the Big Sky Conference | 2010 |
| Big Ten Conference, Form 990 for the Year Ending June 30, 2008 | 30-Jun-08 |
| Big West Conference, 2012-13 Manual | 1-Aug-12 |
| Bowl Championship Series 2012-2013 Media Guide | July, 2012 |
| Colonial Athletic Association, 2011-2012 Handbook and Bylaws | 2011 |
| Electronic Arts, Form 10-K, Filed May 28, 2010 for the Year-Ending March 31, 2010 | 31-Mar-10 |
| Major League Baseball Players Association, "MLB 2007-2011 Basic Agreement" | 2007 |
| Major League Baseball Players Association, "MLB 2012-2016 Basic Agreement" | 2012 |
| Major League Soccer Players Union, "2012 MLS Player Salaries" | 1-Oct-12 |
| Mid-American Conference, 2002-03 Constitution of the Mid-American Conference | 2002 |
| Missouri Valley Conference, Bylaws of the Missouri Valley Conference | Aug., 2006 |
| Missouri Valley Conference, Form 990 for the Year Ending June 30, 2010 | 30-Jun-10 |
| Mountain West Conference, Mountain West Conference Handbook 2010-2011 | 2010 |
| National Basketball Association, "Uniform Player Contract - Exhibit A" | 2005 |
| National Basketball Association, "Uniform Player Contract - Article II" | 2005 |
| National Basketball Players Association, "NBPA Collective Bargaining Agreement" | 2005 |
| National Collegiate Athletic Association, Form 900 for the Year Ending August 31, 2009 | 31-Aug-09 |
| National Football League Alumni Services, Inc., Group Licensing Agreement | |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| | List of Materials Considered<br>Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
|---|---|---|
| **Bates Stamp/Title** | | *Date* |
| | NCAA and Subsidiaries, "Consolidated Financial Statements as of and for the Years Ended August 31, 2011 and 2010, Supplementary Information as of and for the Year Ended August 31, 2011, and Independent Auditors Report" | 31-Aug-11 |
| | NCAA Division I Intercollegiate Athletics Programs Report, "Revenues and Expenses," 2004-2010 | Aug., 2011 |
| | NCAA Division II Intercollegiate Athletics Programs Report, "Revenues and Expenses," 2004-2009 | Aug., 2010 |
| | NCAA Division III Intercollegiate Athletics Programs Report, "Revenues and Expenses," 2004-2009 | Aug., 2010 |
| | NCAA Eligibility Center, "2012-13 Guide for the College-Bound Student-Athlete: Your Path to the Student-Athlete Experience," 2012 | 2012 |
| | NCAA Football, "Added and Discontinued Programs," 2010 | 2010 |
| | NCAA Press Release, 2009 Final Four-Detroit, "NCAA Hoop City Refreshed by Coca-Cola Brings the Ultimate NCAA Basketball Experience to Detroit" | 6-Mar-09 |
| | NCAA Research, College Board of Midwestern Regional Forum, "The Student-Athlete: Recruitment, College Choice and Predictors of Academic Success" | 14-Feb-12 |
| | NCAA, "Total Revenue Distribution by Conference," 2010-2011 | 2011 |
| | NCAA, 2005-06 NCAA Division I Manual | July, 2005 |
| | NCAA, 2006-07 NCAA Division I Manual | July, 2006 |
| | NCAA, 2009-10 NCAA Membership Report | 2010 |
| | NCAA, 2012-13 NCAA Division I Manual | July, 2012 |
| | NCAA, 2012-13 NCAA Division II Manual | July, 2012 |
| | NCAA, 2012-13 NCAA Division III Manual | July, 2012 |
| | NCAA, Division I Men's Basketball Championship, Principles and Procedures for Establishing the Bracket | 2012 |
| | NCAA, Form 11-3a, Student-Athlete Statement - NCAA Division I, Academic Year 2011-12 | 2012 |
| | NCAA, Form 12-3c, Student-Athlete Statement - NCAA Division III, Academic Year 2012-13 | 2013 |
| | NFL Players Association, "NFL Collective Bargaining Agreement," 2006-2012 | 2006 |
| | NFL Players Association, "NFL Collective Bargaining Agreement," 2011-2020 | 4-Aug-11 |
| | NFL, "Constitution and Bylaws of the National Football League," Effective February 1, 1970 (2006 Rev.) | 1-Feb-70 |
| | Northeast Conference, 2009-10 Northeast Conference Policy Manual | 2009 |
| | Ohio Valley Athletic Conference, OVAC By-Laws and Regulations, Revised 2012 | 18-Apr-12 |
| | Pac-12 Conference, 2012-13 Pac-12 Handbook | 2012 |
| | Pacific-10 Conference, Form 990 for the Year Ending June 30, 2008 | 30-Jun-08 |
| | Patriot League, 2011-12 Patriot League Policy and Procedures Manual | 2011 |
| | Patriot League, 2012-13 Patriot League Policy and Procedures Manual | 2012 |
| | Presidential Task Force, Division I Amateurism Cabinet, "Final Report of the NCAA Task Force on Commercial Activity in Division I Intercollegiate Athletics," Supplement No. 6 Addendum | Jan., 2009 |
| | Southeastern Conference, 2009-2010 SEC Manual and Commissioner's Regulations | 2009 |
| | Southwestern Athletic Conference, 2008-2009 SWAC Constitution, Bylaws and Sports Regulations | 2008 |
| | Sun Belt Conference, Form 990 for the Year Ending June 30, 2008 | 30-Jun-08 |
| | The Ivy League, Ivy Manual 2011-2012 | Aug., 2011 |
| | United States Olympic Committee, 2010 Annual Report | 2010 |
| | United States Olympic Committee, 2011 Annual Report | 2011 |
| | United States Tennis Association Incorporated and Affiliates, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 | 31-Dec-09 |
| | United States Tennis Association, 2012 USTA Professional Circuit Consent and Waiver Form | 2012 |
| | United States Tennis Association, Likeness Release and Waiver | 30-Sep-10 |
| | Western Athletic Conference, WAC 2010-11 Code Book | 2010 |
| | | |
| ***Websites*** | | *Date Accessed:* |
| | "2011-12 NHL Salaries by Team," *USA TODAY,* 2012, available at:<br>http://content.usatoday.com/sportsdata/hockey/nhl/salaries/team/2011 | 1-Mar-13 |
| | "2012 MLB Top 25 Player Salaries," *USA TODAY,* 2012, available at:<br>http://content.usatoday.com/sportsdata/baseball/mlb/salaries/player/top-25 | 27-Feb-13 |
| | "2012-13 Association-Wide Grants, Programs and Services: 'Show Me the Money,'" *National Collegiate Athletic Association,* 2013, available at:<br>http://www.ncaa.org/wps/wcm/connect/5b1e2a804cd5049baa09be7c2d0d15b8/2012_13%2BAW_Grants_Programs_Services.pdf?MOD=AJPERES&CACHEID=5b1e2a804cd5049baa09be7c2d0d15b8 | 4-Mar-13 |
| | "2012-13 Men's Basketball Schedule," *University of South Alabama,* 2013, available at:<br>http://usajaguars.com/schedule.aspx?path=mbball | 13-Mar-13 |
| | "2012-2013 College Football Bowl Game Schedule," *CollegeFootballPoll.com,* 2012, available at:<br>http://www.collegefootballpoll.com/bowl_games_bowl_schedule.html | 18-Feb-13 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **List of Materials Considered** | |
| **Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification** | |
| ***In re NCAA Student-Athlete Name & Likeness Licensing Litigation*** | |
| *Bates Stamp/Title* | *Date* |
| "2013 Football Schedule," *University of South Alabama,* 2013, available at: http://usajaguars.com/schedule.aspx?path=football | 13-Mar-13 |
| "About CLC," *Collegiate Licensing Company,* 2013, available at: http://www.clc.com/About-CLC.aspx | 8-Mar-13 |
| "About Pac-12 Enterprises," *Pacific-12 Enterprises,* n.d., available at: http://pac-12.com/AboutPac-12Enterprises/AboutPac-12Enterprises.aspx | 24-Aug-12 |
| "About the NCAA: History," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/history? | 24-Aug-12 |
| "About the NCAA: Membership," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/membership+new? | 24-Aug-12 |
| "About the NCAA: National Office," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/national+office+new? | 24-Aug-12 |
| "About Us," *Big Ten Network* , 2013, available at: http://btn.com/about/ | 4-Mar-13 |
| "Alabama Bowl History," *CollegeFootballPolls.com,* n.d., available at: http://www.collegefootballpoll.com/bowl_history_alabama.html | 11-Mar-13 |
| "Andy Brown Profile," *Stanford University's Official Athletic Site,* 2013, available at: http://www.gostanford.com/sports/m-baskbl/mtt/brown_andy00.html | 7-Mar-13 |
| "A Policy Interpretation: Title IX and Intercollegiate Athletics (Federal Register, Vol. 44, No. 239)," *US Department of Education Office for Civil Rights,* Mar. 14, 2005, available at: http://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html | 8-Mar-13 |
| "Arizona Cardinals Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/arizona-cardinals/salary/67066?q=arizona-cardinals | 14-Mar-13 |
| "Atlanta Falcons Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/atlanta-falcons/salary/67038?q=atlanta-falcons | 14-Mar-13 |
| "Baltimore Ravens Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/baltimore-ravens/salary/67065?q=baltimore-ravens | 14-Mar-13 |
| "Basketball Resources: National Invitation Tournament (NIT)," *National Collegiate Athletic Association,* Dec. 2, 2010, available at: http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/Championships? | 7-Mar-13 |
| "BCS Background," *Bowl Championship Series* , Jan. 16, 2012, available at: http://www.bcsfootball.org/news/story?id=4809699 | 18-Feb-13 |
| "Becoming Eligible: Amateurism," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/eligibility/becoming+eligible/amateurism | 24-Aug-12 |
| "Bill Walsh College Football: Review," *Allgame.com,* 2010, available at: http://www.allgame.com/game.php?id=12020 | 12-Mar-13 |
| "Bill Walsh College Football," *GameFAQs* , 2013, available at: http://www.gamefaqs.com/segacd/922256-bill-walsh-college-football/data | 29-Nov-12 |
| "Bowl Championship Series on Television and Radio," *Wikipedia,* Jul. 5, 2012, available at: http://en.wikipedia.org/wiki/Bowl_Championship_Series_on_television_and_radic | 14-Feb-13 |
| "Buffalo Bills Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/buffalo-bills/salary/67039?q=buffalo-bills | 14-Mar-13 |
| "Carolina Panthers Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/carolina-panthers/salary/67063?q=carolina-panthers | 14-Mar-13 |
| "Championships List: Overview," *National Collegiate Athletic Association* , Sep. 24, 2012, available at: www.ncaa.org/wps/wcm/connect/public/ncaa/championships/championships+list | 7-Mar-13 |
| "Championships: Finances," *National Collegiate Athletic Association* , May 29, 2012, available at: www.ncaa.org/wps/wcm/connect/public/ncaa/championships/finances/overview | 15-Oct-12 |
| "Chicago Bears Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/chicago-bears/salary/67040?q=chicago-bears | 14-Mar-13 |
| "Cincinnati Bengals Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/cincinnati-bengals/salary/67041?q=cincinnati-bengals | 14-Mar-13 |
| "CLC History," *The Collegiate Licensing Company,* Aug. 24, 2012, available at: http://www.clc.com/clcweb/publishing.nsf/Content/history.html | 24-Aug-12 |
| "Cleveland Browns Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/cleveland-browns/salary/67042?q=cleveland-browns | 14-Mar-13 |
| "Clients: Institutions," *The Collegiate Licensing Company* , Aug. 24, 2012, available at: http://www.clc.com/clcweb/publishing.nsf/Content/institutions.html | 24-Aug-12 |
| "Dallas Cowboys Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/dallas-cowboys/salary/67043?q=dallas-cowboys | 14-Mar-13 |
| "Damien Rhodes Profile," *Scout.com,* 2013, available at: http://recruiting.scout.com/a.z?s=73&p=8&c=1&nid=4900 | 11-Mar-13 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| List of Materials Considered<br>Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification<br>*In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
|---|---|
| **Bates Stamp/Title** | **Date** |
| "Denver Broncos Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/denver-broncos/salary/67044?q=denver-broncos | 14-Mar-13 |
| "Derrick Hopkins Football Bio," *Go USF Bulls.com,* Jan. 2, 2012 available at: http://www.gousfbulls.com/ViewArticle.dbml?SPSID=37330&SPID=2981&DB_LANG=C&DB_OEM_ID=7700&ATCLID=3662562&Q_SEASON=2012 | 12-Mar-13 |
| "Derrick Hopkins Track and Field Bio," *Go USF Bulls.com,* Dec. 6, 2011, available at: http://www.gousfbulls.com/ViewArticle.dbml?SPSID=36719&SPID=2927&DB_LANG=C&DB_OEM_ID=7700&ATCLID=204885462&Q_SEASON=2012 | 13-Mar-13 |
| "Detroit Lions Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/detroit-lions/salary/67045?q=detroit-lions | 14-Mar-13 |
| "Division I Streamlines Rulebook: 2013 NCAA Convention," *National Collegiate Athletic Association,* Jan. 19, 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/resources/latest+news/2013/january/division+i+streamlines+rulebook | 8-Mar-13 |
| "ESPN, SEC Agreement 2009-2024," *SEC Digital Network,* Sep. 2, 2010, available at: http://www.secdigitalnetwork.com/NEWS/tabid/473/Article/132060/unprecedented-espn-agreement.aspx | 15-Nov-12 |
| "Event/Championship Licensing: NCAA/Bowl/Conference Licensing," *The Collegiate Licensing Company ,* Aug. 24, 2012, available at: http://www.clc.com/clcweb/publishing.nsf/Content/championship+licensing.htm | 24-Aug-12 |
| "FCS Name No Longer Letter Perfect," *FOX Sports,* Aug. 27, 2012, available at: http://msn.foxsports.com/collegefootball/story/football-championship-subdivision-schools-debate-name-change-082712 | 12-Mar-13 |
| "Finances," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/index.html | 12-Mar-13 |
| "Finances: Expenses," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/Finances+Expenses? | 24-Oct-12 |
| "Games," *2KSports,* 2013, available at: http://2ksports.com/games/ | 29-Nov-12 |
| "Green Bay Packers Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/green-bay-packers/salary/67046?q=green-bay-packers | 14-Mar-13 |
| "Houston Texans Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/houston-texans/salary/67071?q=houston-texans | 14-Mar-13 |
| "Indianapolis Colts Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/indianapolis-colts/salary/67048?q=indianapolis-colts | 14-Mar-13 |
| "Introduction of NCAA On Demand Puts the Best Moments in College Athletics in the Hands of Fans," *T3 Media ,* Mar. 7, 2007, available at: http://www.t3media.com/news-post/introduction-of-ncaa-on-demand/ | 2-Oct-12 |
| "Jacksonville Jaguars Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/jacksonville-jaguars/salary/67064?q=jacksonville-jaguars | 14-Mar-13 |
| "Kansas City Chiefs Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/kansas-city-chiefs/salary/67049?q=kansas-city-chiefs | 14-Mar-13 |
| "Landry Fields Bio Page," *NBA.com,* 2013, available at: http://www.nba.us/playerfile/landry_fields/bio.html | 7-Mar-13 |
| "Mack Brown Discusses Network," *ESPN.com,* Oct. 22, 2012, available at: http://espn.go.com/college-football/story/_/id/8538420/mack-brown-texas-longhorns-coach-discusses-longhorn-network-commitments | 5-Mar-13 |
| "Major League Baseball Players Association: Frequently Asked Questions," *Major League Baseball,* 2012, available at: http://mlb.mlb.com/pa/info/faq.jsp | 7-Nov-12 |
| "Major League Baseball Players Association: Licensing - The Players Choice Group Licensing Program," *Major League Baseball,* 2012, available at: http://mlb.mlb.com/pa/info/licensing.jsp | 7-Nov-12 |
| "Miami Dolphins Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/miami-dolphins/salary/67052?q=miami-dolphins | 14-Mar-13 |
| "Minnesota Vikings Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/minnesota-vikings/salary/67053?q=minnesota-vikings | 14-Mar-13 |
| "NBA Teams," *ESPN.com ,* 2013, available at: http://espn.go.com/nba/teams | 4-Mar-13 |
| "NCAA Championships: Broadcasting and Marketing," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/championships/broadcasting+and+marketing | 24-Aug-12 |
| "NCAA Finances: Championships," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/Championships? | 24-Oct-12 |
| "NCAA Finances: Distributions," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/Finances+Distributions? | 24-Oct-12 |
| "NCAA Finances: Revenue," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/NCAA/Finances/Revenue | 29-Nov-12 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **List of Materials Considered** | |
| **Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification** | |
| *In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
| **Bates Stamp/Title** | *Date* |
| "NCAA Finances: Student-Athlete Benefits," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/finances/finances+student+athlete+benefits | 24-Oct-12 |
| "NCAA Football 13," *EA Sports* , n.d., available at: http://www.easports.com/ncaa-football | 29-Nov-12 |
| "NCAA Research," *National Collegiate Athletic Association,* May 9, 2012, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/resources/research/research+home | 24-Aug-12 |
| "NCAA Sports Sponsorship: Basketball," *National Collegiate Athletic Association,* 2006, available at: http://web1.ncaa.org/onlineDir/exec2/sponsorship?sortOrder=1&division=All&sport=MBB | 13-Mar-13 |
| "NCAA Sports Sponsorship: Football," *National Collegiate Athletic Association,* 2006, available at: http://web1.ncaa.org/onlineDir/exec2/sponsorship?sortOrder=1&division=All&sport=MFB | 13-Mar-13 |
| "NCAA Trademarks," *National Collegiate Athletic Association,* 2013, available at: http://www.ncaa.org/wps/wcm/connect/public/ncaa/resources/research/research+home | 24-Aug-12 |
| "NFL Media Rights Deals For '07 Season," *Sports Business Journal* , Sep. 6, 2007, available at: http://www.sportsbusinessdaily.com/Daily/Issues/2007/09/Issue-238/NFL-Season-Preview | 13-Nov-12 |
| "NFL Teams," *ESPN.com* , 2013, available at: http://espn.go.com/nfl/teams | 4-Mar-13 |
| "New England Patriots Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/new-england-patriots/salary/67054?q=new-england-patriots | 14-Mar-13 |
| "New Orleans Saints Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/new-orleans-saints/salary/67055?q=new-orleans-saints | 14-Mar-13 |
| "New York Giants Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/new-york-giants/salary/67056?q=new-york-giants | 14-Mar-13 |
| "New York Jets Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/new-york-jets/salary/67057?q=new-york-jets | 14-Mar-13 |
| "Oakland Raiders Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/oakland-raiders/salary/67050?q=oakland-raiders | 14-Mar-13 |
| "Pat Maynor Profile," *Scout.com,* 2013, available at: http://stanford.scout.com/a.z?s=18&p=8&c=1&nid=734743 | 11-Mar-13 |
| "Patriot League Presidents Endorse Change in Football Athletic Aid Policy," *Patriot League* , Feb. 13, 2012, available at: http://www.patriotleague.org/sports/m-footbl/spec-rel/021312aac.html | 29-Nov-12 |
| "Philadelphia Eagles Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/philadelphia-eagles/salary/67058?q=philadelphia-eagles | 14-Mar-13 |
| "Pioneer Football League: About the PFL," *Pioneer Football League,* 2013, available at: http://www.pioneer-football.org/pfl/default/ | 12-Mar-13 |
| "Pittsburgh Steelers Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/pittsburgh-steelers/salary/67067?q=pittsburgh-steelers | 14-Mar-13 |
| "Player Bio: Evan Moore," *Stanford University's Official Athletic Site,* 2013, available at: http://www.gostanford.com/sports/m-footbl/mtt/moore_evan01.html | 5-Mar-13 |
| "Player Bio: Mark Bradford," *Stanford University's Official Athletic Site,* 2013, available at: http://www.gostanford.com/sports/m-footbl/mtt/bradford_mark01.html | 5-Mar-13 |
| "Player Membership Registration," *Retired Players Association,* 2011, available at: http://www.nflretiredplayersassociation.org/player-memberships.asp | 27-Feb-13 |
| "Postseason Football," *National Collegiate Athletic Association,* Nov. 20, 2012 | 12-Mar-13 |
| "Preserving and Monetizing the NCAA's Assets," *T3 Media* , 2012, available at: http://www.t3media.com/resources/case-studies/preserving-and-monetizing-the-ncaas-assets/ | 29-Nov-12 |
| "Prospective Student-Athlete Information," *The Ivy League,* 2012, available at: http://www.ivyleaguesports.com/information/psa/index | 29-Nov-12 |
| "San Diego Chargers Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/san-diego-chargers/salary/67068?q=san-diego-chargers | 14-Mar-13 |
| "San Francisco 49ers Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/san-francisco-49ers/salary/67059?q=san-francisco-49ers | 14-Mar-13 |
| "Seattle Seahawks Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/seattle-seahawks/salary/67060?q=seattle-seahawks | 14-Mar-13 |
| "St. Louis Rams Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/st.-louis-rams/salary/67051?q=st.-louis-rams | 14-Mar-13 |
| "Stanford Bowl History," *CollegeFootballPolls.com,* n.d., available at: http://www.collegefootballpoll.com/bowl_history_stanford.html | 11-Mar-13 |
| "Syracuse Bowl History," *CollegeFootballPoll.com,* n.d., available at: http://www.collegefootballpoll.com/bowl_history_syracuse.html | 11-Mar-13 |
| "Taking RWC 2011 to an Audience of 4 Billion," *Rugby World Cup,* Feb. 24, 2010, http://www.rwc2011.irb.com/destinationnewzealand/news/newsid=2036054.html | 30-Aug-12 |

| | List of Materials Considered | |
|---|---|---|
| | **Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification** | |
| | *In re NCAA Student-Athlete Name & Likeness Licensing Litigation* | |
| | *Bates Stamp/Title* | *Date* |
| | "Tampa Bay Buccaneers Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/tampa-bay-buccaneers/salary/67061?q=tampa-bay-buccaneers | 14-Mar-13 |
| | "Tavita Pritchard, Stanford Basketball," *Cardinal Update,* 2013, available at: http://cardinalupdate.com/stanford-basketball/roster_player/tavita-pritchard | 7-Mar-13 |
| | "Tavita Pritchard Added to Men's Basketball Roster," *Stanford University's Official Athletic Site,* Jan. 27, 2010, available at: http://www.gostanford.com/sports/m-baskbl/spec-rel/012710aaa.html | 7-Mar-13 |
| | "Television: MVC on TV," *Missouri Valley Conference,* 2012, available at: http://www.mvc-sports.com/television/default/ | 5-Oct-12 |
| | "Tennessee Titans Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/tennessee-titans/salary/67047?q=tennessee-titans | 14-Mar-13 |
| | "Tennis Growth Skyrockets 43 Percent!," *Tennis Industry Association and United States Tennis Association Press Release,* Mar. 19, 2009, available at: http://www.tennisindustry.org/PDFs/PressReleases/TennisGrowth.pdf | 30-Aug-12 |
| | "The Value of One Year of a Division I Men's Basketball Scholarship," *USA TODAY,* Mar. 29, 2011, available at: http://usatoday30.usatoday.com/sports/college/mensbasketball/2011-value-of-college-scholarship.htm | 8-Mar-13 |
| | "Tyrone Prothro Profile," *Scout.com,* 2013, available at: http://alabama.scout.com/a.z?s=14&p=8&c=1&nid=326041 | 11-Mar-13 |
| | "USA TODAY College Football Coach Salary Database, 2006-2011," *USA TODAY,* Nov. 17, 2011, available at: http://usatoday30.usatoday.com/sports/college/football/story/2011-11-17/cover-college-football-coaches-salaries-rise/51242232/1 | 13-Sep-12 |
| | "USA TODAY Sports' College Athletics Finances," *USA TODAY,* May 16, 2012, available at: http://usatoday30.usatoday.com/sports/college/story/2012-05-14/ncaa-college-athletics-finances-database/54955804/1 | 13-Sep-12 |
| | "Washington Redskins Salaries," *Fox Sports.com,* 2013, available at: http://msn.foxsports.com/nfl/team/washington-redskins/salary/67062?q=washington-redskins | 14-Mar-13 |
| | Associated Press, "Average Salary Hits Record $3.2M" *ESPN.com,* Dec. 7, 2012, available at: http://www.espn.go.com/mlb/story/_/id/8724285/mlb-average-salary-38-percent-32-million | 27-Feb-13 |
| | Associated Press, "Multiyear Scholarships Plan Moves On," *ESPN.com,* Feb. 17, 2012, available at: http://espn.go.com/college-sports/story/_/id/7587582/challenge-ncaa-multiyear-scholarship-plan-falls-short | 29-Nov-12 |
| | Barnhouse, Wendell, "TCU, West Virginia Officially Join Big 12," *Big12Sports.com,* Jul. 1, 2012, available at: http://www.big12sports.com/ViewArticle.dbml?DB_OEM_ID=10410&ATCLID=205499646 | 12-Mar-13 |
| | Becker, Michael, "Professional Lacrosse Is Hardly Glamorous," *The Daily Orange,* Apr. 21, 2004, available at: http://dailyorange.com/2004/04/professional-lacrosse-is-hardly-glamorous/ | 1-Mar-13 |
| | Brady, Erik, et al, "Salaries for College Football Coaches Back on Rise," *USA TODAY,* Nov. 17, 2011, available at: http://usatoday30.usatoday.com/sports/college/football/story/2011-11-17/cover-college-football-coaches-salaries-rise/51242232/1 | 17-Nov-11 |
| | Brennan, Eamonn, "Is the D-League a Viable Alternative?" *ESPN.com,* May 6, 2011, available at: http://m.espn.go.com/ncb/story?storyId=6490719&wjb=&pg=1 | 9-Oct-12 |
| | Citron, Jeffrey, "Bonds Lets Down the Whole Team," *Sports Business Journal* , Dec. 8, 2003, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2003/12/20031208/Opinion/Bonds-Lets-Down-The-Whole-Team | 12-Nov-12 |
| | Dinich, Heather, "Playoff Plan to Run Through 2025," *ESPN.com,* Jun. 27, 2012, available at: http://espn.go.com/college-football/story/_/id/8099187/ncaa-presidents-approve-four-team-college-football-playoff-beginning-2014 | 18-Feb-13 |
| | Dosh, Kristi, "Conference Moves: Revenues Up, Costs Up," *ESPN.com,* Jun. 18, 2012, available at: http://espn.go.com/blog/ncfnation/post/_/id/62146/conference-moves-revenues-up-costs-up | 10-Mar-13 |
| | Fisher, Eric, "After Big Distribution in 2007, MLBPA Again Saving Up Funds," *Sports Business Journal* , May 4, 2009, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2009/05/20090504/This-Weeks-News/After-Big-Distribution-In-2007-MLBPA-Again-Saving-Up-Funds.aspx | 12-Nov-12 |
| | Fisher, Eric and Mullen, Liz, "MLB Players Receive Labor Peace Dividend," *Sports Business Journal* , May 5, 2008, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2008/05/20080505/This-Weeks-News/MLB-Players-Receive-Labor-Peace-Dividend.aspx | 12-Nov-12 |
| | Gilmore, Dave, "Another March Madness with No College Hoops Game in Sight," *Baltimore Sun* , Mar. 15, 2012, available at: http://www.baltimoresun.com/entertainment/bthesite/game-cache/bal-another-march-madness-kicks-off-with-no-college-hoops-game-in-sight-20120315,0,5730117.story | 4-Mar-13 |
| | Goldman, Tom, "Almost-NBA Players Take Home Paltry Salaries," *NPR.org,* Feb. 7, 2007, available at: http://www.npr.org/templates/story/story.php?storyId=7239948 | 9-Oct-12 |
| | Gotthelf, Josh, "Outlook Dims for NBA Deal," *Sports Business Journal* , Oct. 5, 1998, available at: http://www.sportsbusinessdaily.com/Journal/Issues/1998/10/19981005/No-Topic-Name/Outlook-Dims-For-NBA-Deal.aspx | 12-Nov-12 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **List of Materials Considered** | |
| **Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification** | |
| ***In re NCAA Student-Athlete Name & Likeness Licensing Litigation*** | |

| Bates Stamp/Title | Date |
|---|---|
| Hruby, Patrick, "The Olympics Show Why College Sports Should Give Up on Amateurism," *The Atlantic,* Jul. 25, 2012, available at: http://www.theatlantic.com/entertainment/archive/2012/07/the-olympics-show-why-college-sports-should-give-up-on-amateurism/260275/ | 29-Aug-12 |
| Jacobson, David, "MLB's Revenue-Sharing Formula," *CBS News* , Jul. 14, 2008, available at: http://www.cbsnews.com/8301-505125_162-51210897/mlbs-revenue-sharing-formula/ | 7-Nov-12 |
| Kaplan, Daniel , "Big Changes in New NFL-NFLPA Licensing Deal," *Sports Business Journal* , Aug. 22, 2011, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2011/08/22/Leagues-and-Governing-Bodies/NFL-licensing.aspx | 12-Nov-12 |
| Kaplan, Daniel , "Despite Media Deals, Player Pay to Stay Flat," *Sports Business Journal* , Apr. 2, 2012, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2012/04/02/Labor-and-Agents/NFL-cap.aspx | 12-Nov-12 |
| Kaplan, Daniel , "Lockout Muddies NFLPA Revenue Numbers," *Sports Business Journal* , Jun. 11, 2012, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2012/06/11/Labor-and-Agents/NFLPA | 12-Nov-12 |
| Kaplan, Daniel , "Moody's: NFL Media Rights to Double," *Sports Business Journal* , Mar. 14, 2011, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2011/03/Mar-14/Leagues-and-Governing-Bodies/NFL-Moodys.aspx | 12-Nov-12 |
| Kaplan, Daniel , "NFL Warns Sponsors about Deals with Players Trade Group," *Sports Business Journal* , Mar. 21, 2011, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2011/03/21/Labor-and-Agents/NFL-rights.aspx | 12-Nov-12 |
| Kaplan, Daniel , "NFLPA Fiscal 2007 Earnings $26M, Report Says," *Sports Business Journal* , Sep. 22, 2008, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2008/09/20080922/This-Weeks-News/NFLPA-Fiscal-2007-Earnings-$26M-Report-Says.aspx | 12-Nov-12 |
| Kaplan, Daniel and Mullen, Liz, "Commercial Revenue Drops Again at NFLPA," *Sports Business Journal* , Jun. 7, 2010, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2010/06/20100607/This-Weeks-News/Commercial-Revenue-Drops-Again-At-NFLPA.aspx | 12-Nov-12 |
| Katz, Andy, "NCAA Buys Tournaments, Ends NIT Litigation," *ESPN.com* , Aug. 17, 2005, available at: http://sports.espn.go.com/ncb/news/story?id=2136724 | 15-Feb-13 |
| Klause, Chris, "Athletic Scholarships: Head Count Versus Equivalency," *National Collegiate Scouting Association* , Sep. 22, 2009, available at: http://www.ncsasports.org/blog/2009/09/22/athletic-scholarships-head-count-versus-equivalency/ | 29-Nov-12 |
| Lev, Michael , "McKay Center Gives USC 'Huge' Recruiting Edge," *The Orange County Register,* Aug. 21, 2012, available at: http://www.ocregister.com/articles/usc-369193-center-mckay.html | 9-Oct-12 |
| McKnight, Michael , "For Many Underclassmen, NFL Draft Is a Humbling Experience," *Sports Illustrated (SI.com)* , Apr. 27, 2011, available at: http://sportsillustrated.cnn.com/2011/writers/the_bonus/04/27/undrafted.players/index.html | 8-Mar-13 |
| Murschel, Matt and Parsons, Brant, "ACC, Orange Bowl Reach New 12-Year Deal," *College Gridiron 365,* Nov. 15, 2012, available at: http://www.orlandosentinel.com/sports/blogs/college-gridiron-365/os-fbc-acc-orange-bowl-reach-new-12year-deal-20121115,0,2689079.post | 14-Feb-13 |
| O'Shaughnessy, Lynn, "8 Things You Should Know About Sports Scholarships," *CBS MoneyWatch,* Sep. 20, 2012, available at: http://www.cbsnews.com/8301-505145_162-57516273/8-things-you-should-know-about-sports-scholarships/ | 12-Mar-13 |
| Remy, Donald, "Why the New York Times' Nocera Is Wrong," *National Collegiate Athletic Association,* Jan. 6, 2012, available at: http://www.ncaa.org/wps/wcm/connect/public/NCAA/Resources/Latest+News/2012/January/Why+the+New+York+Times+Nocera+is+wrong | 11-Sep-12 |
| Sanserino, Michael , "College Coaches' Salaries Continue to Soar," *Pittsburgh Post-Gazette,* Mar. 29, 2012, available at: http://www.post-gazette.com/stories/sports/pitt-big-east/college-coaches-salaries-continue-to-soar-281942/ | 9-Oct-12 |
| Smith, Erick, "Assistant Football Coaches See Surge in Pay in Down Economy," *USA TODAY,* Dec. 21, 2010, available at: http://content.usatoday.com/communities/campusrivalry/post/2010/12/assistant-football-coaches-see-surge-in-pay-in-down-economy/1 | 9-Oct-12 |
| Smith, Michael and Ourand, John, "History with ACC Secures Future for Raycom," *Sports Business Journal* , Oct. 4, 2010, available at: http://www.sportsbusinessdaily.com/Journal/Issues/2010/10/20101004/This-Weeks-Issue/History-With-ACC-Secures-Future-For-Raycom.aspx | 12-Nov-12 |
| Taylor, Adam, "Here's How Much Olympic Athletes Really Get Paid," *Business Insider,* Jul. 19, 2012, available at: http://www.businessinsider.com/heres-how-much-olympic-athletes-really-get-paid-2012-7 | 13-Nov-12 |
| Watson, Graham, "South Alabama Left Out of EA Sports' NCAA Football 13 Because of Poor Research," *Yahoo!,* Jun. 13, 2012, available at: http://sports.yahoo.com/blogs/ncaaf-dr-saturday/south-alabama-left-ea-sports-ncaa-13-because-173346569--ncaaf.html | 29-Nov-12 |
| Weiss, Brett Alan, "Bill Walsh College Football: Synopsis," *Allgame.com,* 2010, available at: http://www.allgame.com/game.php?id=12149&tab=review | 12-Mar-13 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| | Bates Stamp/Title | Date |
|---|---|---|
| | **List of Materials Considered**<br>**Expert Report of Daniel L. Rubinfeld, Ph.D. Regarding Class Certification**<br>***In re NCAA Student-Athlete Name & Likeness Licensing Litigation*** | |
| | Wieberg, Steve, "John Calipari Defends One-and-Done Philosophy at Kentucky," *USA TODAY,* Mar. 9, 2012, available at: http://usatoday30.usatoday.com/sports/college/mensbasketball/sec/story/2012-03-09/kentucky-calipari/53424952/1 | 9-Oct-12 |
| | Williams, Pete, "Pure Revenue Sharing Across the Board," *Sports Business Journal* , Mar. 29, 1999, available at: http://www.sportsbusinessdaily.com/Journal/Issues/1999/03/19990329/No-Topic-Name/Pure-Revenue-Sharing-Across-The-Board.aspx?hl=MLB%20Properties%20Inc&sc=0 | 9-Nov-12 |
| | Witzer, Richard, "EA Sports to Drop College Basketball Franchise," *Examiner.com,* Mar. 7, 2010, available at: www.examiner.com/article/ea-sports-to-drop-college-basketball-franchise | 4-Mar-13 |
| | | |
| | **All documents cited in the Expert Report of Daniel L. Rubinfeld, Ph.D., including Attachments, Exhibits and Backup Materials to be produced, were also considered.** | |
| | **All documents cited in the Expert Report of Professor Roger G. Noll, including Attachments, Appendices, Exhibits and Backup Materials, were also considered.** | |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER