Michael P. Lehmann (Cal. Bar No. 77152)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Tel:  (415) 633-1908
Fax:  (415) 358-4980
E-mail:mlehmann@hausfeldllp.com
         abailey@hausfeldllp.com

Michael D. Hausfeld (*pro hac vice*)
Hilary K. Scherrer (Cal. Bar No. 209451)
Sathya S. Gosselin (Cal. Bar No. 269171)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel:  (202) 540-7200
Fax:  (202) 540-7201
E-mail: mhausfeld@hausfeldllp.com
         hscherrer@hausfeldllp.com
         sgosselin@hausfeldllp.com

*Plaintiffs' Interim Co-Lead Class Counsel*
*with Principal Responsibility for the Antitrust Claims*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| **IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION** | Case No. 4:09-cv-1967 CW (NC) |
| | **SUPPLEMENTAL BRIEF OF ANTITRUST PLAINTIFFS IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| **This Document Relates to:**<br><br>**ANTITRUST PLAINTIFFS' ACTIONS** | Date:        June 20, 2013<br>Time:        2:00 p.m.<br>Judge:      Honorable Claudia Wilken<br>Courtroom: 2, 4th Floor |

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................... - 1 -

II.     ARGUMENT ............................................................................................... - 2 -

    A.     The Welty Deposition ...................................................................... - 2 -

    B.     The Delany Deposition ..................................................................... - 6 -

    C.     The LeCrone Deposition .................................................................. - 9 -

    D.     The Lewis Deposition ..................................................................... - 11 -

III.    CONCLUSION .......................................................................................... - 11 -

1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Baxter Int'l v. McGaw, Inc.*,
   No. 95 C 2723, 1998 U.S. Dist. LEXIS 2422 (N.D. Ill. Feb. 27, 1998) ................................ 12

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ........................................................................................................ 12

*Hart v. Electronic Arts*,
   No. 11-3750, 2013 U.S. App. LEXIS (3d Cir. May 21, 2013) .......................................... 6, 7

*Leyva v. Medline Industries*,
   No. 11-56849, 2013 U.S. App. LEXIS 10649 (9th Cir. May 28, 2013) .............................. 12

*Stanley v. University of Southern California,*
   13 F.3d 1313 (9th Cir. 1994) ............................................................................................... 5

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a) .............................................................................................................. 12

Fed. R. Civ. P. 23(b) .............................................................................................................. 12

Fed. R. Civ. P. 23(g) .............................................................................................................. 12

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANTITRUST PLAINTIFFS' SUPP. BRIEF ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW (NC)

## I.      INTRODUCTION

Soon after the Defendants filed their oppositions to the motion for class certification and the 28 factual declarations submitted in support thereof, the Antitrust Plaintiffs ("Plaintiffs") sought leave to take the depositions of twelve of those 28 declarants prior to April 25, 2013, the date on which Plaintiffs' reply brief had to be filed. "Joint Statement of Antitrust Plaintiffs And Defendants Re: Motion To Compel Depositions Or, In the Alternative, To Strike Declarations," at 1 n.1 (Mar. 28, 2013) (Dkt. No. 724). The motion was not ruled on before that date; the Magistrate Judge did not hold a hearing on this motion until May 5.  In his "Order Re: Discovery Disputes" (May 9, 2013) (Dkt. No. 773), the Magistrate Judge allowed the Plaintiffs to take the depositions of only four of the twelve declarants they sought to depose: (1) John Welty ("Welty"), the President of the California State University at Fresno ("Fresno State"); (2) Jonathan LeCrone ("LeCrone"), Commissioner of the Horizon League ("HL"); (3) James Delany ("Delany"), Commissioner of the Big Ten Conference ("Big Ten"); and (4) Mark Lewis ("Lewis"), Executive Vice-President of Championships & Alliances for Defendant National Collegiate Athletic Association ("NCAA").[1] Pursuant to a directive from this Court, the Magistrate Judge also permitted the filing of the present brief concerning those depositions.

On the whole, the four deponents revealed that the NCAA's counsel (or in Delany's case, counsel for the Big Ten) had a major role in drafting the declarations. Delany, for example, didn't write *a single word* of his declaration. This fact obviously bears on the weight that this Court should accord these declarations. Plaintiffs believe that the same scenario exists as to the other factual declarations submitted by Defendants, something they would have shown had they been able to take the other depositions that they requested.

Moreover, the depositions revealed facts that undermine the Defendants' oppositions to class certification and are inconsistent with other declarations submitted by Defendants. After being deposed, it is clear that the opinions expressed in the declarations (on which

---

[1] The respective declarations for these individuals are found at Dkt. Nos. 695-4 (Welty); 695-11 (LeCrone); 681-2 (Delany); and 695-12 (Lewis).

Defendants' experts extensively relied, having done no empirical analysis themselves) are faulty at best, and flatly wrong at worst. Welty admitted that in Plaintiffs' "but for" world, top college sports prospects would likely not sign up with Fresno State, just as they do not do so in today's real world. Delany disclosed that the Big Ten uses standardized release forms for student-athletes ("SAs"), which they must sign in order to participate and for which they receive nothing in return. LeCrone admitted that SAs are not compensated for use of their names, images and/or likenesses ("NIL") pursuant to a longstanding "industry standard." Although he, like the other college and conference witnesses, decried "pay for play" (mistakenly assuming that "pay for play" is the focus of this litigation), he admitted that SAs already are paid "salaries" for their sports performances—in the form of "grants in aid" ("GIA"). He also conceded that the argument that compensating SAs for use of their NIL might lead to reductions in sports programs was entirely speculative. In short, the declarants' deposition testimony *supports* Plaintiffs' motion for class certification—and presents serious questions about the credibility of Defendants' other declarations.

## II.    ARGUMENT.

### A.  The Welty Deposition

Welty has been President of Fresno State since 1991.[2] Transcript of Depo. of John Welty at 38, attached Exhibit 2 to the SSGD. He has no economic training. *Id*. at 34. He previously served in the admissions office of Michigan State University; was an assistant to a Vice-President of Student Affairs at the Southwest State University in Marshall, Minnesota; served as a Director of Residences at the State University of New York at Albany; and was President of the Indiana University of Pennsylvania. *Id*. at 33-37. Thus, he has *never* held a position in *any* collegiate athletic department.

Mark Emmert, the President of the NCAA, asked Welty to prepare the declaration that

---

[2] Welty has announced that he is retiring in the summer of 2013. *See* http://www.fresnostatenews.com/2012/08/president-john-d-welty-announces-retirement/, attached as Exhibit 1 to the accompanying "Second Supplemental Declaration of Sathya Gosselin" ("SSGD").

1   was ultimately submitted in this litigation. *Id*. at 14-15. The NCAA's counsel sent Welty a

2   draft, which Welty then edited. *Id*. at 17-19. In editing the draft, Welty did not review the

3   reports of plaintiffs' or defense experts; he briefly reviewed some "articles" about them. *Id*. at

4   24-25. He did not read the class certification motion or the opposition filings. *Id*. at 25-26. In

5   making his edits to his draft declaration, the only research Welty did was to confirm certain

6   numbers in that declaration relating to Fresno State; he did not communicate with other

7   personnel at Fresno State or at other colleges. *Id*. at 22, 27-30. Thus, Welty's opinions about

8   the alleged "but for" world posited by Dr. Roger Noll ("Noll"), Plaintiffs' expert, were based

9   on no empirical research.

10      Welty agreed, moreover, that intercollegiate sports is a big business generating

11   hundreds of millions of dollars in revenue. *Id*. at 90-91.[3] He noted that the Fresno State

12   intercollegiate sports program obtains funds from a host of sources having nothing to do with

13   the television broadcasting of college games (and hence not subject to any remedy of revenue-

14   sharing). Thus, for example, tuition and general state funds provide Fresno State with $220-

15   $230 million annually, $8 million of which is allocated to intercollegiate athletics;

16   approximately 25% of that allocation goes to football and another 12-13% goes to basketball.

17   *Id*. at 51-52. A similar allocation is made out of the $3.7 million in private donations received

18   annually. *Id*. at 52-53. In addition, the athletic program receives: (a) revenue from the sale of

19   advertising and the marketing of team and college logos by Learfield Sports; and (b) revenue

20   from radio broadcasts of football games. *Id*. at 53-54, 56.

21      Fresno State also garners revenue from the NCAA in connection with "March

22   Madness," the post-season NCAA basketball championship tournament series in which it has

23   participated. *Id*. at 58-59. The NCAA allocates a portion of the hundreds of millions of dollars

24   received from the broadcasting of the tournament to the Mountain West Conference

25

26   ─────────────────
     [3] Conversely, his testimony also confirms that SAs often get the short end of the deal to play
     intercollegiate athletics. The graduation rate for Fresno State football players is only in the

27   high 50-low 60 percent range; for basketball players, the graduation rate is only somewhere in
     the 50-59 percent range. *Id*. at 100-01.

28

ANTITRUST PLAINTIFFS' SUPP. BRIEF ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW (NC)

1    ("MWC"), of which Fresno State is a member; Fresno State's portion of that money is based

2    on its participation in March Madness, and the rest is allocated on a *pro rata* basis to members

3    of the MWC. *Id*. at 58-59. The MWC also receives revenue from separate television contracts

4    with ESPN and CBS with respect to football games; one-third to one-half of its regular season

5    football games are televised pursuant to those contracts. *Id*. at 60-61. In short, Fresno State

6    earns ample money from television contracts that it could share with its football and

7    basketball players.[4]

8         Welty has never discussed with any Fresno State administrators the possibility of

9    leaving the NCAA's Division I if this lawsuit is successful. He testified that Fresno State

10   explored the possibility of exiting Division I five to six years ago (before the *O'Bannon*

11   lawsuit was filed) (*id*. at 41-42), but it has obviously not taken that step. This is hardly

12   surprising; Welty admits that leaving Division I would have a negative financial impact on

13   Fresno State. *Id*. at 63. Although Welty mentioned that other college presidents have indicated

14   that their schools might drop out of Division I "if we move outside" of the present model, he

15   could not identify a single such president. *Id*. at 105-06.

16        On the issue of significant amounts of "rematching"—whether many SAs would play

17   for different schools in the "but for" world—Welty's testimony was devastating to the

18   NCAA's position. One of Defendants' experts, Professor James Heckman, relied extensively

19   on Welty's declaration in determining his opinions about Plaintiffs' "but for" world.[5] Welty

20   admitted that, in the current world, a star athlete considering playing for a Penn State or

21   University of Southern California ("USC") would likely not consider going to Fresno State.

22   *Id*. at 45-46. In the "but for" world affected by changes in the NCAA's rules, Welty also

23   agreed that "top recruits" would still enroll with "major schools" and would not end up at

24

25   [4] Welty admitted that the men's football and basketball coaches are among the highest-paid
     personnel at Fresno State: the football coach receives $650,000 annually in salary plus
26   bonuses, while the basketball coach has earnings that place him in the second position. *Id*. at
     85-86.
27   [5] *See* "Expert Report of James J. Heckman," at 17 n.9, 20 n.23, 24 n.27 (Mar. 14, 2013) (Dkt.
     No. 681).
28

ANTITRUST PLAINTIFFS' SUPP. BRIEF ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW (NC)

Fresno State. *Id*. at 96. He also conceded that USC and the University of California at Los Angeles were not going to start recruiting merely average to good SAs in basketball or football if revenue sharing with SAs comes to pass. *Id*. at 97-98. Asked if the pool of SA candidates available to Fresno State would likely change if group licenses were instituted, Welty candidly admitted "probably not." *Id*. at 97.[6]

Welty did raise potential concerns that revenue sharing with male SAs might violate Title IX, referring to lawsuits that have been filed against Fresno State and the advice of some unnamed staffer at the college. *Id*. at 91, 107. He neglected to note, however, that the lawsuits involved claims of retaliatory terminations of female coaches or athletic department officials; that kind of claim is far afield from the issues presented in this litigation.[7] As for the advice about equal pay, it ignores the fact, as explained in Plaintiffs' certification reply brief (Pls.' Reply at 26-27 n.24) that Title IX can be satisfied by means other than absolute parity.[8] It also ignores the fact (*id*. at 28-29) that Division I men's football and basketball teams receive many perquisites not provided equally to women's teams. Nor is it at all clear that group licensing fees would be considered financial assistance within the meaning of the Title IX regulations any more than the pay that SAs may get for working at summer camps under the

---

[6] In his sur-rebuttal declaration, the NCAA's expert, Dr. Daniel Rubinfeld, notes that he reviewed Welty's deposition ("Expert Sur-Reply Report of Dr. Daniel Rubinfeld Regarding Class Certification," Attch. C (May 30, 2013) (Dkt. No. 790-1)), but he fails to mention this testimony. On the other hand, Welty's testimony is consistent with the rebuttal report of Dr. Daniel Rascher ("Rascher"), one of Plaintiffs' expert witnesses. "Declaration of Dr. Daniel A. Rascher In Support of Motion By Antitrust Plaintiffs For Class Certification," ¶ 73 (Apr. 25, 2013) (Dkt. No.748-4) ("RD").

[7] *See* Erin E. Buzuvus, *Sidelined: Title IX Retaliation Cases And Women's Leadership In College Athletics*, 17 Duke J. of Gender Policy 1, 1-2 (2010), excerpts of which are attached as Exhibit 3 to the SSGD. Among the allegations of misconduct at Fresno State were those of a "2000 incident in which male athletic department staff made posters depicting stick figures of female athletes' bodies with male administrators' heads and proclaimed 'Ugly women's athletes Day'" and the plan of Fresno State Athletic Director Scott Johnson to "'get rid of lesbians in the athletic department,' and his preference for hiring 'female coaches who were straight and attractive.'" *Id*. at 12.

[8] Indeed, even under the Equal Pay Act, the Ninth Circuit has held, for example, that a college may pay different salaries to coaches of different genders if the coaching positions are not substantially equal in terms of skill, effort, responsibility, and working conditions. *Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1321 (9th Cir. 1994) (citing 29 U.S.C. § 206(d)(1)).

ANTITRUST PLAINTIFFS' SUPP. BRIEF ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW (NC)

new rules announced by the NCAA in February of 2013.[9]

**B.  The Delany Deposition**

Delany reviewed *none* of the pleadings or reports filed in this case in connection with his declaration. Transcript of Depo. of Jim Delany at 25-26, 62-63 ("Delany Dep."), attached as Exhibit 4 to the SSGD. The *sole* item that he considered was a 1996 article he wrote for *NCAA News* that railed against "pay for play." *Id*. at 15. As he conceded, he "didn't do a lot to prepare" for the declaration; beyond re-reading his prior article, his efforts amounted to "not much." *Id*. at 21. His lack of preparation was understandable, given that his declaration was ghostwritten *entirely* by attorneys. He "did not draft a single word" of his declaration; that was the task of the Big Ten's counsel. *Id*. at 23-25.  Delany conceded that his declaration represented his own "personal opinion," not the views of the Big Ten or any of its member institutions. *Id*. at 13-15.[10] Indeed, he told no one from the Big Ten member schools about his declaration in advance of its filing; afterward, he mentioned to some members of the Executive Committee of the Big Ten's Board of Directors that he had prepared a declaration, but did not discuss its contents. *Id*. at 12-13.

Delany operated on the premise that the claims made by Plaintiffs in this case amounted to "pay for play," which he opposes. *Id*. at 6-7. However, further questioning revealed that his concept of "pay for play" is vague and uncertain. Asked whether claims for compensation for use of an SA's name image and/or likeness ("NIL") in videogames produced by defendant Electronic Arts, Inc. ("EA") constituted "pay for play", Delany said: "I know it's an issue. Beyond that, I don't have a specific knowledge." *Id*. at 8.[11] Asked if

---

[9] These are discussed in "Reply Brief of Antitrust Plaintiffs In Support of Motion for Class Certification," at 15 (Apr. 25, 2013) (Dkt. No. 748) ("Pls.' Reply").

[10] *See* Delany Dep. at 34("How that gets played out, I don't know. That is certainly not the commissioner's call. That is not an individual president's call. Ultimately, it's a call by the boards of trustees of these universities.").

[11] In connection with this testimony, it should be noted that very recently, the United States Court of Appeals for the Third Circuit, in *Hart v. Elec. Arts*, *Inc.*, No. 11-3750, 2013 U.S. App. LEXIS 10171 (3d Cir. May 21, 2013), ruled that the First amendment does not shield EA from liability for failing to compensate SAs for use of their NIL in its NCAA-themed videogames. The court specifically noted the verisimilitude between in-game avatars and

claims for compensation by former SAs for use of their NIL constituted "pay for play," Delany professed to have no opinion. *Id*. Asked if group licenses on merchandise that featured the NIL of SAs constituted "pay for play," Delany said he had not "given a lot of thought to that." *Id*. at 31. He gave the same answer to questions about the Texas A&M University's quarterback Johnny Manziel being allowed to recover for misuses of his "Johnny Football" moniker or former SAs being compensated for use of their NIL in game rebroadcasts. *Id*. at 31-32. On the other hand, Delany thought—rather inconsistently—that athletes participating in the Olympics while receiving compensation for endorsements, but not for their participation in sporting events, constitutes "pay for play." *Id*. at 30-31. In short, it is clear Delany is viewing this case through a lens that does not fit Plaintiffs' claims.

On the issue of whether the members of the Big Ten would leave Division I if plaintiffs prevailed, Delany gave his *personal* "belief" that some might explore that option. *Id*. at 28.[12] The only example he could give was Mary Sue Coleman, President of the University of Michigan ("UM"), whom he said had "real questions" about whether UM personnel "would be supportive of a system that required some form of 'pay for play.'" *Id*. at 29. This is hardly a persuasive example, given the UM's profits from its athletic programs.[13] Delany noted that others within the Big Ten would disagree with his view. *Id*. One such person is likely Harvey Perlman, Chancellor of the University of Nebraska-Lincoln and a member of the Executive Committee of the Board of Directors of the Big Ten (*id*. at 10), who has already

corresponding real world SAs. *Id*. at *8-9. It also noted at some length how the NCAA bylaws (which EA exploited, as noted in plaintiffs' reply brief (Pls.' Reply at 35-40)), precluded the plaintiff, like other similarly situated SAs from being compensated for use of his NIL. *Hart*, 2013 U.S. App. LEXIS 10171, at *4-5. Even the dissenting opinion noted that "[w]ere this case viewed strictly on the public's perception of fairness, I have no doubt Hart's position would prevail." *Id*. at *82 (Ambro, J., dissenting).

[12] This contrasts with a press statement given in early May, where Delany was quoted as saying "[w]e don't want to go to Division III, we want to [stay with] Division I. *See* http://espn.go.com/blog/bigten/post/_/id/76016/delany-talks-committee-ed-obannon-case, attached as Exhibit 5 to the SSGD.

[13] For example, in 2011, the UM received $122.7 million in total athletic revenue. *See* http://www.annarbor.com/sports/michigan-athletic-department-spent-1118-million-in-2011-had-a-total-revenue-of-1227-million/ (attached as Exhibit 11 to the SSGD).

1  voiced his disagreement.[14]

2      On the issue of SA releases, Delany's testimony underscored the use of standardized

3  forms designed to assure compliance with NCAA rules. He testified that the Big Ten requires

4  SAs to sign releases for the use of their NIL. He characterized this as "simply the way it's

5  been done for many, many years," that institutions use a "form release," and that the Big Ten

6  adopted a "uniform release" in 2007. *Id*. at 36-37. The release is a condition for participating

7  in intercollegiate sports. *Id*. at 40. Delany was uncertain about the precise reasons for the

8  releases; he called it "the practice that institutions participated in" so that each such institution

9  would be "in compliance with NCAA rules and have the necessary permissions to do what it

10  was doing." *Id*. at 46.

11      These releases apply to broadcasting contracts entered into by the Big Ten and its

12  members; "[f]or many, many, many decades … we want[ed] to make sure that television

13  entities … can't do anything -- nor can we -- that is in violation of the rules that the NCAA

14  has adopted." *Id*. at 39. Therefore, when entering into a broadcasting contract, "our use of [an

15  SA's] likeness has to be consistent with whatever the prevailing NCAA rules are over time.  I

16  think that -- that is boilerplate so that our schools can be in compliance, whether it be in the

17  area of television or the area of any other area." *Id*. Delany had no idea if these releases

18  authorized the use of SA's NIL in videogames or clips of broadcast footage. *Id*. at 44-45. He

19  had no idea if the releases allowed broadcasters to air rebroadcasts of Big Ten games without

20  paying compensation for use of SAs' NIL. *Id*. at 45. And he did not know if Big Ten games

21  could be telecast if such releases were not obtained. *Id*. at 54.[15]

22      Delany was candid about what SAs got in exchange for these releases: "[n]othing that

23  

24  [14] *See* "Supplemental Declaration of Sathya S. Gosselin in Support of Class Certification,"
Ex. 107 (Apr. 25, 2013) (Dkt. No. 749-55).

25  [15] Despite claiming no knowledge of whether the releases allowed use of the SAs' NIL rights,
the Big Ten media contracts give those rights away. *See* BIGTEN000027-31 at 28 (attached

26  as Exhibit 6 to the SSGD) ("the names and likenesses of Conference Players" are
"Conference Marks" granted by the Big Ten) and BIGTEN000032-34 at 33 ((attached as

27  Exhibit 7 to the SSGD) (the contract "permit[s] ESPN/ABC to use the names and likenesses
of the individual participants").

28

1    I know of." *Id.* at 39. He could not say if compensating SAs for use of their NIL would result

2    in less money being made available to pay coaches. *Id.* at 55. All he could say was that

3    compensating SAs for use of their NIL would have an "impact on opportunities, generally

4    speaking . . . . And I think that--that there would, undoubtedly, be a reduction in dollars

5    available and part of that, I think, reduction would be--would impact other people's

6    opportunities." *Id.* at 56. This vague subjective prediction of "impact" on "opportunities" is

7    speculative at best, especially given the Big Ten's recent financial disclosures.[16]

8        On the issue of potential Title IX liability in plaintiffs' but for world, Delany

9    expressed uncertainty. *Id.* at 56-57. He did admit that, currently, only 35% of the Big Ten's

10   athletic budget goes to women's sports, and expressed the view that this allocation was in

11   compliance with Title IX, given the "opportunities" provided to female SAs. *Id.* at 57-58.

12   Thus, his testimony undermines the notion expressed by the NCAA and its experts that Title

13   IX concerns would somehow operate as an insuperable obstacle to plaintiffs' proposed relief.

14       **C.  The LeCrone Deposition**

15       LeCrone was asked by the NCAA to submit a declaration in this litigation; he received

16   a draft that he then edited. Transcript of Depo. of Jonathan LeCrone at 9-11 ("LeCrone

17   Dep."), attached as Exhibit 9 to the SSGD. Although his declaration opines that Plaintiffs'

18   experts gave incorrect opinions, he did not actually read any of their expert reports and relied

19   instead on discussions with counsel or NCAA personnel about what those experts supposedly

20   said. *Id.* at 47-52.

21       The HL has a national broadcasting contract with ESPN, which goes back to 1992 and

22

23   _____

     [16] According to a May 15, 2012 article in *USA Today* (available at

24   http://www.usatoday.com/story/sports/college/2013/05/15/big-ten-record-revenue/2164593/
     (attached as Exhibit 8 to the SSGD)), based on its recently-filed federal tax return, the Big

25   Ten generated more than $315 million in revenue for the fiscal year ending June 30, 2012.
     Delany was credited with more than $2.8 million in compensation for the 2011 calendar year,

26   including a $1 million payment that Big Ten Deputy Commissioner and Treasurer Brad
     Traviolia described as a deferred payment and retention bonus. These statistics only further

27   corroborate the conclusion that no member of the Big Ten would seriously wish to decamp to
     Division II or III if Plaintiffs prevail, because too much money is at stake.

28

ANTITRUST PLAINTIFFS' SUPP. BRIEF ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW (NC)

1  was renewed most recently in 2010. *Id*. at 19. The individual schools also have local

2  broadcast contracts. *Id*. at 21. In addition, there is a league agreement with IMG to obtain

3  corporate sponsorship deals. *Id*. at 24-25. LeCrone claims that the HL loses money on the

4  ESPN and IMG deals; it has to subsidize the production of games to be telecasted out of

5  money it receives from the NCAA, which amounted to $4.8 million in 2012. *Id*. at 24-25, 41.

6      Of course, given that the HL obtains so little in broadcast revenues, the damages

7  attributable to it in plaintiffs' "but for" world are equally small. Plaintiffs estimate that in

8  2009-10, the SAs would be collectively allocated $80,000 spread across the ten teams in the

9  HL at that time, based on the league's own public tax returns. RD at 67 & n.152. Thus,

10  potential single damages were only $8,000 per college in that period and could be potentially

11  less in earlier periods. LeCrone was asked whether hypothetical damages of $5,000 per HL

12  SA would prompt reductions in sports programs by universities within the league. He couldn't

13  answer, saying any answer would be "speculative." LeCrone Dep. at 69. That is exactly the

14  point, however. These types of speculative concerns should not defeat class certification.

15      Unlike Delany, LeCrone believes that the HL needs no releases from SAs to use their

16  NIL in game telecasts. He conceded that "[w]e don't own any rights, the league does not own

17  any rights of the student-athletes, the name, likenesses, or images." *Id*. at 35. He claims that

18  the HL merely conveys to ESPN what is necessary to cover the event. *Id*. at 35, 75. In his

19  view, it is "implausible" to get prior permission from SAs to use their NIL in games and

20  neither any prior consultation nor any release is needed. *Id*. at 32, 45. He has never spoken to

21  any SA about getting paid for use of his NIL. *Id*. at 63. LeCrone referred to this as an

22  "industry standard" based on his 35 years of experience (*id*. at 45), thus underscoring one of

23  the many predominant common questions that this case presents.

24      In LeCrone's view, allocating any broadcast money to SAs is "ludicrous, makes no

25  sense, violates every principle of amateurism and of what we do in the Horizon League . . . ."

26  *Id*. at 53. The HL follows the NCAA amateurism rules and paying any money to SAs or

27  groups of SAs "just runs contrary to the fundamental purpose of our business." *Id*. at 52, 61.

28

1    Again, this demonstrates a predominant common question for purposes of class certification.

2         This notion of no "pay for play",[17] however, collides with LeCrone's view of GIAs to

3    SAs. He conceded that SAs are offered GIAs to play intercollegiate sports. *Id*. at 59. As he put

4    it, "I suppose you could translate that into some sort of salary. But they [GIAs] are providing

5    a benefit to the student-athletes certainly to participate in sports . . . ." *Id*. Of course, if SAs

6    are viewed as employees getting "some sort of salary" to play sports, it is completely illogical

7    to deny them compensation for use of their NIL. The only explanation for this is the decades-

8    old collusive "industry standard" that LeCrone describes.[18]

9         In short, LeCrone's testimony provides ample support for the certification of the

10   proposed classes.

11        **D.  The Lewis Deposition**

12        The deposition of Lewis revealed that he has little experience with the NCAA and

13   basically parroted the statements of the NCAA's counsel. Lewis joined the NCAA only in

14   April of 2012. Transcript of Depo. of Mark Lewis at 8, attached as Exhibit 10 to the SSGD.

15   Counsel prepared his declaration, and he edited it. *Id*. at 9. In working on that declaration, he

16   read the NCAA's current broadcast contracts and the current licensing agreement between EA

17   and defendant Collegiate Licensing Company. *Id*. at 11, 16. He spoke only with the NCAA's

18   counsel about his declaration and relied on what they told him for pronouncements extending

19   to the NCAA's past licensing practices. *Id*. at 13, 16-17, 38. He has never negotiated a

20   broadcast contract for the NCAA. *Id*. at 38. In short, Lewis functions as a mouthpiece for the

21   NCAA's counsel in this litigation and his declaration should be discounted accordingly.[19]

22        **III.    CONCLUSION.**

23

24   ───────────────────
[17] Like Delany, LeCrone views compensation for use of an SA's NIL as part of a "pay for

25   play concept." *Id*. at 68.
[18] Like Welty and Delany, LeCrone raised potential Title IX "implications" if Plaintiffs

26   prevailed, but admitted that he did not know what they were. *Id*. at 67.
[19] *Cf. Baxter Int'l v. McGaw, Inc*., No. 95 C 2723, 1998 U.S. Dist. LEXIS 2422, at *17 (N.D.

27   Ill. Feb. 27, 1998) (trial court characterized patent witness who had let counsel prepare much
     of his report as a "shill" and "mouthpiece").

28
───────────────────
ANTITRUST PLAINTIFFS' SUPP. BRIEF ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW (NC)

1    For the foregoing reasons and on the materials submitted in conjunction with this

2    brief, as well as those set forth in their other briefs and the supporting materials thereto,

3    Plaintiffs ask that the Court grant the motion for class certification, certify the proposed

4    classes pursuant to Fed. R. Civ. P. 23(a) and/or 23(b)(2) and 23(b)(3), and appoint Hausfeld

5    LLP as Class Counsel under Fed. R. Civ. P. 23(g).[20]

6

7    Dated: June 6, 2013                           Respectfully submitted,

8                                                   By:  /s/ Michael P. Lehmann
                                                    Michael P. Lehmann (Cal. Bar No. 77152)
9                                                   Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
                                                    HAUSFELD LLP
10                                                  44 Montgomery St., 34th Floor
                                                    San Francisco, CA 94104
11                                                  Tel:  (415) 633-1908
                                                    Fax:  (415) 358-4980
12                                                  E-mail: mlehmann@hausfeldllp.com
                                                            abailey@hausfeldllp.com
13

14                                                  Michael D. Hausfeld (*pro hac vice*)
                                                    Hilary K. Scherrer (Cal. Bar No. 209451)
15                                                  Sathya S. Gosselin (Cal. Bar. No. 269171)
                                                    HAUSFELD LLP
16                                                  1700 K Street, NW, Suite 650
                                                    Washington, DC 20006
17                                                  Tel:  (202) 540-7200
                                                    Fax:  (202) 540-7201
18                                                  E-mail: mhausfeld@hausfeldllp.com
                                                            hscherrer@hausfeldllp.com
19

20    _____

21   [20] In addition to the authorities cited in previous briefs in support of this conclusion, the Court
     is also asked to consider the United States Court of Appeals for the Ninth Circuit's very
22   recent opinion in *Leyva v. Medline Indus.*, No. 11-56849, 2013 U.S. App. LEXIS 10649 (9th
     Cir. May 28, 2013) ("*Leyva*"). There, the Ninth Circuit, in reversing as an abuse of discretion
23   the denial of class certification, reiterated the view that, even after the United States Supreme
     Court's opinion in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), the dollar amount of
24   damages for potential class members is typically an individual question that will not defeat
     class action treatment. *Leyva*, 2013 U.S. App. LEXIS 10649, at *8-9. And the Ninth Circuit
25   distinguished *Comcast* where the plaintiffs' damage theory would be proven by showing
     money lost by each class member through defendant's unlawful practices, which was subject
26   to common formulaic proof. *Id*. Likewise, the Ninth Circuit said that the mere possibility of
     individualized damage determinations is insufficient to preclude a finding of superiority under
27   Fed. R. Civ. P. 23(b). *Id*. at *11-12.

28

sgosselin@hausfeldllp.com

*Plaintiffs' Interim Co-Lead Class Counsel with Principal Responsibility for the Antitrust Claims*

ANTITRUST PLAINTIFFS' SUPP. BRIEF ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW (NC)

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2013, I served the foregoing document on counsel by filing the public redacted version via the Court's CM/ECF system, which will send an email notice to all registered parties. On June 6, 2013, I also served the non-public version on counsel for all parties via email.

*/s/ Hilary Scherrer*
Hilary K. Scherrer

ANTITRUST PLAINTIFFS' SUPP. BRIEF ISO CLASS CERTIFICATION, Case No. 4:09-cv-1967 CW (NC)