**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE NCAA STUDENT-ATHLETE
NAME & LIKENESS LICENSING
LITIGATION

_____/

No. C 09-1967 CW

ORDER DENYING
MOTIONS TO DISMISS
(Docket Nos. 856,
857, 858)

Plaintiffs, a group of current and former college athletes, pursue this putative class action against Defendant National Collegiate Athletic Association (NCAA).  They initially brought claims against Collegiate Licensing Company (CLC) and Electronic Arts Inc. (EA) as well, but recently agreed to settle those claims.  Accordingly, this order only addresses Plaintiffs' claims against the NCAA.

The NCAA moves to dismiss the antitrust claims from Plaintiffs' Third Amended Consolidated Class Action Complaint (3CAC).  After considering the parties' submissions and oral argument, the Court denies the NCAA's motion to dismiss.

BACKGROUND

Plaintiffs are twenty-five current and former student-athletes who played for NCAA men's football or basketball teams between 1953 and the present.  Docket No. 832, 3CAC ¶¶ 25-233. All played at the Division I level, the highest level of collegiate athletic competition,[1] and many went on to play

---

[1] Prior to 1973, Division I was known as the "University Division." In college football, the division was later subdivided into two

professionally, as well.  Id.  In the present case, four of the Plaintiffs (Right-of-Publicity Plaintiffs) allege that the NCAA misappropriated their names, images, and likenesses in violation of their statutory and common law rights of publicity.  The other twenty-one Plaintiffs (Antitrust Plaintiffs) allege that the NCAA violated federal antitrust law by conspiring with EA and CLC to restrain competition in the market for the commercial use of their names, images, and likenesses.  This order addresses only the latter set of claims, which arise under the Sherman Antitrust Act, 15 U.S.C. § 1 et seq.

Antitrust Plaintiffs[2] initiated the first of these consolidated actions in 2009 and filed a Second Amended Consolidated Class Action Complaint (2CAC) in May 2011.  Docket No. 327, 2CAC.  Their 2CAC alleged that the NCAA, an unincorporated association of universities and regional sports conferences, which governs collegiate athletics, required student-athletes to sign various release forms as a condition of their eligibility to compete.  According to Plaintiffs, those forms "require[d] each of them to relinquish all rights in perpetuity to the commercial use of their images, including after they graduate and are no longer subject to NCAA regulations."  Id. ¶ 21.  The 2CAC alleged that the NCAA relied on these "purposefully misleading" forms, along with its own bylaws, to sell or license student-athletes' names, images, and likenesses to third parties

---

subdivisions now known as the "Division I Football Bowl Subdivision" and the "Division I Football Championship Subdivision."  For the sake of simplicity, this order refers to all of these divisions as "Division I."

  [2] All subsequent references to "Plaintiffs" in this order allude specifically to the twenty-one Antitrust Plaintiffs and not to the four Right-of-Publicity Plaintiffs, whose claims are not at issue here.

United States District Court
For the Northern District of California

such as EA and CLC.  Id.  EA allegedly profited from the use of these names, images, and likenesses by publishing NCAA-branded videogames that feature player-avatars modeled after real student-athletes.  Id. ¶¶ 168, 173.  CLC, meanwhile, allegedly represented the NCAA in its licensing agreements with EA and other producers of NCAA-branded merchandise.  Id. ¶¶ 16, 341.

The 2CAC alleged that the NCAA enlisted these companies in "a price-fixing conspiracy and a group boycott / refusal to deal that [] unlawfully foreclosed [student-athletes] from receiving compensation in connection with the commercial exploitation of their images, likenesses and/or names following their cessation of intercollegiate athletic competition."  Id. ¶ 9.  Their complaint sought both injunctive and compensatory relief.  In particular, Plaintiffs requested a permanent injunction ending the alleged group boycott and monetary damages compensating them for the nonconsensual, commercial use of their names, images, and likenesses.

In September 2012, Plaintiffs moved to certify a class to pursue their antitrust claims.  Docket No. 554 (subsequently re-filed as Docket No. 651), Class Cert. Mot.  Their motion, however, relied on a theory of antitrust liability that had not been clearly plead in their 2CAC.  The new theory deviated in three critical respects from the theory plead in their complaint.

First, Plaintiffs narrowed their proposed class definition from a class of student-athletes whose names, images, or likenesses were used for a wide range of commercial purposes -- including in videogames, apparel, highlight films, and other NCAA-branded merchandise -- to a smaller class of student-athletes

whose names, images, and likenesses were featured specifically "in game footage or in videogames."  Id. at 1-2.

Second, Plaintiffs altered their damages theory by placing greater emphasis on the revenue that the NCAA derives from the use of student-athletes' names and images in live television broadcasts.  Before filing their class certification motion, Plaintiffs had focused primarily on revenue derived from the commercial use of their names, images, and likenesses in archival game footage -- as well as videogames and other merchandise -- but not live game broadcasts.  In fact, during discovery proceedings in February 2012, Plaintiffs expressly stated that they did not "claim rights to be compensated for appearing in live broadcasts or playing on the field."  Docket No. 420, 2/8/2013 Hrg. Tr. 15:21-:22 (emphasis added).[3]  While their 2CAC referred briefly to the revenue generated from the sale of live broadcasting rights, 2CAC ¶ 169, its discussion of broadcast-related revenue focused primarily on the sale of archival footage to advertisers, television networks, and fans, see id. ¶¶ 53, 119, 294, 306, 334-64, 420-27 (alleging that former student-athletes' names and images are featured without their consent in "'stock footage' sold to corporate advertisers," "rebroadcasts of 'classic' games," and "DVD game and highlight film[s]").

Third and finally, the motion for class certification identified two new markets where Defendants had allegedly restrained competition: (1) the "Division I college education

---

[3] See also 2/8/2013 Hrg. Tr. 14:21-:22 ("[Plaintiffs' Counsel]: . . . I will agree that our claims do not emanate from the live broadcasts.").

4

**United States District Court**
For the Northern District of California

market" where colleges and universities compete to recruit the best student-athletes; and (2) the "market for the acquisition of group licensing rights for the use of student-athletes' names, images and likenesses in the broadcasts or rebroadcasts of Division I basketball and football games and in videogames featuring Division I basketball and football." Class Cert. Mot. at 18. Previously, Plaintiffs had only alleged harm to the general "collegiate licensing market in the United States, including licensing rights to current and former players' images and likenesses," without reference to any specific "group licensing" market. 2CAC ¶ 306. Furthermore, the 2CAC appeared to conflate the demand for student-athletes' names, images, and likenesses in the collegiate licensing market with the demand for student-athletes among schools in the "Division I college education market." Id. ¶ 312. Plaintiffs' class certification motion made clear that these were two distinct markets.

Citing the various changes to Plaintiffs' theory of the case, Defendants moved in October 2012 to strike the class certification motion. Docket No. 639, Mot. Strike. The Court denied the motion to strike but granted Defendants leave to file supplemental briefs opposing class certification so that they could address the changes to Plaintiffs' antitrust theory. Docket No. 673, Order Denying Defs.' Mot. Strike, at 1-2. To further ensure that Defendants had an adequate opportunity to respond to Plaintiffs' new theory, the Court stated that it would also construe any arguments raised in Defendants' motion to strike as part of their opposition to Plaintiffs' class certification motion. Id. at 1.

The Court heard oral argument on class certification in June 2013. Although Defendants had already been granted several opportunities to attack Plaintiffs' new antitrust allegations, see Docket Nos. 639, 648, 677, 680, 794, 789, at the hearing they nevertheless argued that they had not received adequate notice of Plaintiffs' theory and that Plaintiffs should be required to file a new complaint. The Court therefore directed Plaintiffs to amend their complaint "the minimum amount necessary" to incorporate the new allegations raised in their class certification motion. Docket No. 830, Order Granting Pls. Leave to Amend. The Court also permitted Plaintiffs to add a current student-athlete to the complaint. Id.

On July 19, 2013, Plaintiffs filed their 3CAC. The 3CAC maintains Plaintiffs' basic price-fixing and group boycott claims while adding the new allegations raised in their class certification motion.[4] Although EA and NCAA had previously responded to these new allegations in their joint motion to strike and in various class certification briefs, see Docket Nos. 639, 648, 677, 680, 794, 789, they nonetheless sought leave to move again for dismissal of the new complaint. Docket Nos. 834, 838. The Court granted their request on September 10, 2013 and set an expedited schedule for briefing the motions to dismiss. Docket No. 855, Order Resolving Miscellaneous Mots., at 3-5. Although CLC did not request leave to file a motion to dismiss, the Court permitted it to file one anyway in the interest of fairness. Id.

---

[4] The 3CAC also added six current NCAA football players to the complaint as class representatives. 3CAC ¶¶ 3, 212-36. One of these players, however, voluntarily dismissed his claims on July 30, 2013. Docket No. 835.

The Court explained that while it was "reluctant to delay this case further," it nevertheless found itself "compelled to allow an additional round of motions . . . due to Defendants' insistence on pursuing all available procedural steps, and the untimely changes in Plaintiffs' theory of the case." Id. at 1. EA, CLC, and NCAA each moved to dismiss shortly thereafter. Docket Nos. 856, 857, 858.

In September 2013, while those motions were still pending, EA and CLC agreed to a settlement with Plaintiffs. They filed a stipulation stating that they had resolved "all claims asserted by all Plaintiffs in this matter against EA and CLC." Docket No. 861, Stipulation, at 1. Accordingly, their motions to dismiss are denied without prejudice as moot. The stipulation noted, however, that the "settlement does not affect Plaintiffs' claims against Defendant National Collegiate Athletic Association." Id.

DISCUSSION

I. NCAA's Motion to Dismiss

    A. Legal Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d

United States District Court
For the Northern District of California

896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

B.  Analysis

The NCAA argues that Plaintiffs' antitrust claims should be dismissed for three reasons. First, it contends that Plaintiffs' claims are "nothing more than a challenge to the NCAA's rules on amateurism" and therefore must be dismissed under NCAA v. Board of Regents, 468 U.S. 85, 102 (1984). NCAA Mot. Dismiss at 5. Second, it argues that these claims must be dismissed because, under both state and federal law, student-athletes "have no protectable name, image or likeness right in sports broadcasts." Id. at 3. Finally, it argues that the Copyright Act, 17 U.S.C. §§ 101 et seq., preempts any rights of publicity that Plaintiffs would otherwise enjoy. As explained more fully below, none of these arguments provides grounds for dismissing Plaintiffs' claims at this stage.

1.  NCAA v. Board of Regents

To state a claim under § 1 of the Sherman Act, a plaintiff must allege "'(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'" Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Cir. 2001) (citations omitted).[5]  Here, Plaintiffs allege that the NCAA's current rules and licensing agreements operate together to restrain competition in two distinct but related national markets: the "college education" market and the "group licensing" market for student-athletes' names, likenesses, and images.  3CAC ¶ 391.

The NCAA denies that it unreasonably restrains competition in these markets and argues that the Supreme Court has explicitly endorsed its rules prohibiting student-athlete compensation.  For support, it cites Board of Regents, 468 U.S. at 91-94, which involved an antitrust challenge to an NCAA rule capping the total number of football games that Division I schools were allowed to televise each season.  The rule was part of a broader plan to "limit[] the total amount of televised intercollegiate football" in order to "reduce, insofar as possible, the adverse effects of live television upon football game attendance."  Id.  The Supreme Court held that this plan violated § 1 of the Sherman Act.  Id. at 106 ("The anticompetitive consequences of this arrangement are apparent.").  It explained that "many telecasts that would occur in a competitive market are foreclosed by the NCAA's plan" because the plan prevented schools from selling the broadcast rights to their own football games.  Id. at 107-08.  The NCAA failed to offer a legitimate "procompetitive" justification for the plan so, under the rule of reason, the Court held that the plan was an unlawful restraint of trade.  Id. at 113-20.

---

[5] For reasons explained in prior orders, Plaintiffs' claims in this case must be analyzed under the rule of reason.  See Docket No. 151, Order Granting in Part and Denying in Part NCAA's Mot. Dismiss, at 9-10.

**United States District Court**
For the Northern District of California

     In reaching this conclusion, however, the Court acknowledged
that the NCAA must be given some leeway to adopt anticompetitive
rules without running afoul of the Sherman Act.  It reasoned that
intercollegiate athletics is "an industry in which horizontal
restraints on competition are essential if the product is to be
available at all."  <u>Id.</u> at 101.  The Court explained,

> What the NCAA and its member institutions
> market in this case is competition itself --
> contests between competing institutions.  Of
> course, this would be completely ineffective
> if there were no rules on which the
> competitors agreed to create and define the
> competition to be marketed.  A myriad of rules
> affecting such matters as the size of the
> field, the number of players on a team, and
> the extent to which physical violence is to be
> encouraged or proscribed, all must be agreed
> upon, and all restrain the manner in which
> institutions compete.

<u>Id.</u>  The Court further noted that the NCAA sought to market a
"particular brand" of athletic competition -- namely, college
sports -- which differs from comparable professional sports
leagues because it is tied to an "academic tradition."  <u>Id.</u>
Proceeding from this premise, the Court then articulated the
statement on which the NCAA now relies: "In order to preserve the
character and quality of the [NCAA's] 'product,' athletes <u>must not
be paid</u>, must be required to attend class, and the like."  <u>Id.</u> at
102 (emphasis added).

     This statement does not preclude Plaintiffs' claims here.  As
explained above, <u>Board of Regents</u> focused on a different set of
competitive restraints than the rules challenged in this case.
Indeed, the Supreme Court never even analyzed the NCAA's ban on
student-athlete compensation under the rule of reason nor did it
cite any fact findings indicating that this ban is the type of

United States District Court
For the Northern District of California

restraint which is "essential if the [NCAA's] product is to be available at all." Id. at 101. More importantly, the Court never examined whether or not the ban on student-athlete compensation actually had a procompetitive effect on the college sports market,[6] despite its own statement that naked restraints on price or output "place upon [the defendant] a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." Id. at 113 (emphasis added).

This is precisely why many courts have construed the dicta from Board of Regents narrowly, recognizing that it authorizes only a limited range of restraints on competition -- specifically, restraints necessary to ensure that college sports remains a

---

[6] Even if the Court had examined the compensation ban under the rule of reason, Plaintiffs have plausibly alleged that the "business of college sports" has changed dramatically over the three decades since Board of Regents was decided. 3CAC ¶¶ 113, 427-30. "Antitrust law generally seeks to punish and prevent harm to consumers in particular markets, with a focus on relatively specific time periods." Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1184 (1st Cir. 1994) (emphasis added), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010). This is why, in antitrust cases, courts "ordinarily focus on harm to the competitive process in the relevant market and time period." Id. (emphasis added); see also United States v. Sargent Elec. Co., 785 F.2d 1123, 1127 (3d Cir. 1986) ("Because Sherman Act conspiracies involve a relevant market and that market may vary over time, the government's task in drafting indictments is somewhat more complex than in other conspiracy contexts."); United States v. Int'l Bus. Machines Corp., 1997 WL 217588 (S.D.N.Y.) ("[W]hereas IBM formerly had a great degree of market power in an antitrust sense, that market power has been substantially diminished, and is continuing to diminish, to the point of its disappearance in the sense of a threat of antitrust violation."), aff'd, 163 F.3d 737 (2d Cir. 1998). Thus, Board of Regents offers limited guidance in determining the impact of the NCAA's ban on student-athlete pay on the demand for college sports today. See generally Banks v. NCAA, 977 F.2d 1081, 1099 (7th Cir. 1992) (Flaum, J., concurring in part and dissenting in part) ("The NCAA continues to purvey, even in this case, an outmoded image of intercollegiate sports that no longer jibes with reality. The times have changed.").

United States District Court
For the Northern District of California

viable product.[7]  In recent years, courts have held that NCAA rules restricting the size and availability of student-athletes' scholarships and financial aid grants may be challenged under the Sherman Act, even though they relate to forms of student-athlete compensation.  See, e.g., Rock v. NCAA, 2013 WL 4479815, at *14 (S.D. Ind.) (holding that a former college football player stated a valid antitrust claim against the NCAA by alleging that its rules "limit the number and distribution of Division I football scholarships and that, as a result, the student-athletes in the market received less for their labor than they would have received without the restrictions"); White v. NCAA, Case No. 06-999, Docket No. 72, slip op. at 3 (C.D. Cal. Sept. 20, 2006) (holding that former college football and basketball players stated a valid antitrust claim against the NCAA by alleging that its limits on financial aid for student-athletes restrained competition in markets where "colleges and universities compete to attract

---

[7] See, e.g., Metro. Intercollegiate Basketball Ass'n v. NCAA, 339 F. Supp. 2d 545, 548 (S.D.N.Y. 2004) ("[T]he challenged rules and expansions [governing Division I schools' participation in year-end basketball tournaments] are not so obviously reasonable as to fall into the group of restrictions sanctioned by Board of Regents."); Law v. NCAA, 902 F. Supp. 1394, 1404 (D. Kan. 1995) ("Although this Court concludes from the Supreme Court's analysis in Board of Regents that the NCAA's 'vital role' in making college sports available to the public entitles it to a rule of reason review of the NCAA legislation at issue here, the Court does not believe that the Supreme Court intended to give the NCAA carte blanche in imposing restraints of trade on its member institutions or other parties because of its role in the marketplace."), aff'd, 134 F.3d 1010 (10th Cir. 1998); see also Gary R. Roberts, "The NCAA, Antitrust, and Consumer Welfare," 70 Tul. L. Rev. 2631, 2659 (1996) ("Despite the Board of Regents dictum suggesting the Court already knows the answer, it is not at all clear that college sports' great popularity is substantially greater because the athletes are paid only with in-kind 'academic services.' . . . [Ultimately,] the question of how much of the consumer utility generated by intercollegiate athletics is dependent upon the limitations on athlete compensation is one of fact that would have to be developed in a full record.").

student-athletes"); <u>In re NCAA I-A Walk-On Football Players</u>

<u>Litig.</u>, 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005) (holding that

former college football players stated a valid antitrust claim by

alleging that NCAA restrictions on the number of full scholarships

that Division I schools may offer restrain competition in the

"market in which NCAA member schools compete for skilled amateur

football players").

     In each of these cases, former student-athletes were able to

state a valid antitrust claim against the NCAA by alleging that

its rules hinder competition in the market for student-athletes.

Likewise, Plaintiffs in the present case allege that the NCAA's

rules prohibiting monetary compensation for student-athletes

ultimately restrain competition among Division I schools in the

market for football and basketball players -- the "college

education" market identified in their 3CAC.  Plaintiffs' theory of

anticompetitive harm proceeds as follows.  Division I football and

basketball programs routinely compete to recruit the best

athletes.  In order to attract the top talent, these programs

offer recruits a variety of non-monetary privileges and incentives

such as scholarships, access to state-of-the-art training

facilities, and -- at the most elite programs -- the opportunity

to compete on a national stage.  NCAA rules, however, forbid these

programs from offering monetary compensation to any recruit for

his athletic labor or for the commercial use of his name, image,

and likeness.  3CAC ¶ 397.  Plaintiffs allege that this

prohibition restrains competition in the market for Division I

student-athletes and "result[s] in lower compensation [for the

**United States District Court**
For the Northern District of California

student-athletes] than would otherwise prevail in a more competitive market." Id. ¶ 398.

These allegations are sufficient to state a Sherman Act claim.   In Agnew v. NCAA, the Seventh Circuit recognized that a pair of former college football players could have stated a valid antitrust claim against the NCAA by alleging that its scholarship rules stifled competition among NCAA schools in the "market to attract student-athletes."  683 F.3d 328, 347 (7th Cir. 2012). Although the court dismissed the plaintiffs' claims because they failed to identify such a market, it also recognized that "colleges do, in fact, compete for student-athletes" and "the only reason that colleges do not engage in price competition for student-athletes is that other NCAA bylaws prevent them from doing so." Id. at 346-47.  Because these colleges derive economic benefits from recruiting the best student-athletes, the court found that "the transactions between NCAA schools and student-athletes are, to some degree, commercial in nature, and therefore take place in a relevant market with respect to the Sherman Act." Id. at 340-41 ("No knowledgeable observer could earnestly assert that big-time college football programs competing for highly sought-after high school football players do not anticipate economic gain from a successful recruiting program.").  The court therefore concluded that the "proper identification of a labor market for student-athletes . . . would meet plaintiffs' burden of describing a cognizable market under the Sherman Act." Id. at 346; accord Rock, 2013 WL 4479815, at *14; White, Case No. 06-999, Docket No. 72, slip op. at 3; In re NCAA I-A Walk-On Football Players Litig., 398 F. Supp. 2d at 1150.

Critically, the Agnew court found that Board of Regents did not pose a barrier to the plaintiffs' antitrust claims. In fact, the court specifically recognized that Board of Regents -- which involved an antitrust challenge brought by universities -- provides only limited guidance in cases involving claims by student-athletes, noting,

> The Sherman Act clearly applies to at least some of the NCAA's behavior. The question for us, however, is whether and when the Sherman Act applies to the NCAA and its member schools in relation to their interaction with student-athletes. The Supreme Court has not weighed in on this issue directly, but Board of Regents, the seminal case on the interaction between the NCAA and the Sherman Act, implies that all regulations passed by the NCAA are subject to the Sherman Act.

Agnew, 683 F.3d at 338-39 (citations omitted; emphasis in original). Although the plaintiffs in Agnew focused on the NCAA's scholarship rules, rather than its rules prohibiting student-athletes from licensing their publicity rights, the court's rationale for distinguishing Board of Regents is still persuasive here: in short, Board of Regents did not address the impact of the NCAA's horizontal restraints on student-athletes. Indeed, none of the parties or amici curiae who participated in Board of Regents represented the interests of student-athletes.

Thus, while Board of Regents gives the NCAA "ample latitude" to adopt rules preserving "the revered tradition of amateurism in college sports," 468 U.S. at 120, it does not stand for the sweeping proposition that student-athletes must be barred, both during their college years and forever thereafter, from receiving any monetary compensation for the commercial use of their names, images, and likenesses. Although it is possible that the NCAA's

United States District Court
For the Northern District of California

ban on student-athlete pay serves some procompetitive purpose, such as increasing consumer demand for college sports, Plaintiffs' plausible allegations to the contrary must be accepted as true at the pleading stage.  Brennan v. Concord EFS, Inc., 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005) ("Whatever the merits of these [procompetitive] arguments, they are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage."); see also Paladin Associates, Inc. v. Montana Power Co., 328 F.3d 1145, 1156 (9th Cir. 2003) (stating that courts must "review all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice" in order to "determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects" (emphasis added)).

> 2.   Publicity Rights in Sports Broadcasts

The NCAA contends that the First Amendment and the California Civil Code bar student-athletes from asserting any rights of publicity in the use of their names, images, and likenesses during game broadcasts.  Although Plaintiffs have not technically asserted any right-of-publicity claims here,[8] their rights of publicity nevertheless remain relevant because their antitrust claims depend in part on the existence of a "group licensing" market where, absent NCAA rules, student-athletes would be able to sell their publicity rights in "broadcasts or rebroadcasts of

---

[8] As noted above, the twenty-one Plaintiffs who assert antitrust claims in this action are distinct from the four Plaintiffs who asserted right-of-publicity claims.  See 3CAC ¶¶ 2-3.  Only the antitrust claims are at issue here.

Division I basketball and football games." 3CAC ¶ 391. If broadcasters were simply allowed to use student-athletes' names, images, and likenesses without student-athletes' consent -- as the NCAA contends -- then there would be no demand among broadcasters for those student-athletes' publicity rights. Thus, the NCAA argues, Plaintiffs' lack of publicity rights in sports broadcasts mandates the dismissal of any antitrust claims premised on the unauthorized use of their names, images, and likenesses in those broadcasts.[9]

Neither the First Amendment nor the California Civil Code requires dismissal of Plaintiffs' antitrust claims. Section 3344(d) of the California Civil Code provides that an individual has no right of publicity in the "use of [his or her] name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account." Cal. Civ. Code § 3344(d). This provision only applies to right-of-publicity claims brought under California law. As such, even if it precludes Plaintiffs from selling or licensing their publicity rights in California, it does not prevent them from doing so in any other state that recognizes the right of publicity. Once again, Plaintiffs allege harm to a national market for the

_____

[9] The Court notes that, even if Plaintiffs lack publicity rights in broadcast footage, the "group licensing" market they identify would still encompass the market for group licenses to use their names, images, and likenesses in videogames. The NCAA does not argue that the First Amendment or California Civil Code precludes Plaintiffs from selling the rights to use their names, images, and likenesses in videogames. Such an argument would likely fail in light of the Ninth Circuit's recent decision in this case. In re NCAA Student-Athlete Name & Likeness Licensing Litig., 724 F.3d 1268, 1284 (9th Cir. 2013) ("EA's use of the likenesses of college athletes like Samuel Keller in its video games is not, as a matter of law, protected by the First Amendment.").

licensing rights to their names, images, and likenesses in game broadcasts.  To disprove the existence of this market at the pleading stage, the NCAA would have to identify a law or set of laws that precludes student-athletes from asserting publicity rights to game broadcasts in <u>every</u> state.  It has not done so here.

Although the First Amendment -- unlike the California Civil Code -- does impose certain limits on the right of publicity in every state, the NCAA has not shown that those limits preclude Plaintiffs from asserting publicity rights in the specific types of broadcasts at issue here.  Neither the Supreme Court nor the federal courts of appeals have ever squarely addressed whether the First Amendment bars athletes from asserting a right of publicity in the use of their names, images, or likenesses during sports broadcasts.  The only case in which the Supreme Court has ever sought to balance an individual's right of publicity against First Amendment concerns is <u>Zacchini v. Scripps-Howard Broadcasting Co.</u>, 433 U.S. 562 (1977).  There, the Court held that a television station was not entitled to First Amendment protection for broadcasting the entire fifteen-second "human cannonball" act of a performer at an Ohio county fair.  <u>Id.</u> at 563-64.  The Court reasoned that the station was not protected because it filmed and broadcast the performer's entire act without the performer's consent and, in so doing, undermined the performer's economic livelihood by reducing demand for his live show.  <u>Id.</u> at 575-76 ("The effect of a public broadcast of the performance is similar to preventing petitioner from charging an admission fee.").

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Zacchini does not provide a clear test for balancing the right of publicity against free speech concerns.  However, lower court decisions provide some guidance in this area.  In Pooley v. Nat'l Hole-In-One Ass'n, for instance, a federal district court held that the First Amendment did not bar a professional golfer's right-of-publicity claim against a company that used footage of him to promote its fundraising events.  89 F. Supp. 2d 1108, 1110 (D. Ariz. 2000).  The court held that the company's use of the footage -- which showed the golfer making a hole-in-one at a professional tournament more than a decade earlier -- was not protected because the company used it for "strictly commercial" purposes.  Id. at 1114.  The court explained that "when the purpose of using a person's identity is strictly to advertise a product or a service, as it is here, the use is not protected by the First Amendment."  Id. at 1113 (emphasis in original).  Critically, the court distinguished between the original broadcast of the golfer's hole-in-one -- which, it suggested, was entitled to First Amendment protections -- and "its subsequent unauthorized reproduction," which was "not automatically privileged simply because the hole-in-one continued to be a 'newsworthy' event."  Id. at 1114.

A similar case, Dreyer v. NFL, 689 F. Supp. 2d 1113 (D. Minn. 2010), also held that use of footage of an athlete's past accomplishments is not entitled to First Amendment protection when it is done exclusively for commercial purposes.  In Dreyer, a group of former professional football players alleged that the NFL had violated their rights of publicity "by using video footage from games in which they played as part of the NFL Films'

**United States District Court**
For the Northern District of California

1  promotional videos." Id. at 1115.  After conducting a lengthy

2  analysis of the footage under the Eighth Circuit's "commercial

3  speech" test, the court denied the NFL's motion for judgment on

4  the pleadings.  Id. at 1121 ("Plaintiffs sufficiently established

5  that the constitutional protection to be afforded the films may

6  not outweigh Plaintiffs' interests in their own identities.").  As

7  in Pooley, the Dreyer court's decision rested on the plaintiffs'

8  allegations "that the films' entire purpose is to promote the

9  NFL."  Id. at 1120 (emphasis added); see also Jordan v. Jewel Food

10  Stores, Inc., 851 F. Supp. 2d 1102, 1105 (N.D. Ill. 2012)

11  (applying "commercial speech" test to determine whether former

12  professional basketball player was entitled to summary judgment on

13  his right-of-publicity claims).

14       Under the framework adopted in these cases, the central

15  question in determining whether the First Amendment bars an

16  athlete's right-of-publicity claim is whether the defendant's use

17  of the athlete's name, image, or likeness is primarily

18  "commercial."  See generally Laura Lee Stapleton & Matt McMurphy,

19  "The Professional Athlete's Right of Publicity," 10 Marq. Sports

20  L.J. 23, 44-45 (1999) ("Courts are forced to conduct a very

21  delicate balancing act in determining where 'newsworthy' ends and

22  'commercial' begins").  This typically involves a "highly fact

23  specific analysis."  Id.; see also Dreyer, 689 F. Supp. 2d at 118

24  ("A court must examine the 'content, form, and context' of the

25  speech 'as revealed by the whole record' to determine whether the

26  speech is commercial speech." (citing Connick v. Myers, 461 U.S.

27  138, 147-48 (1983))).  The Ninth Circuit has noted that "in many

28  areas 'the boundary between commercial and noncommercial speech

**United States District Court**
For the Northern District of California

has yet to be clearly delineated.'"  <u>Charles v. City of Los</u>
<u>Angeles</u>, 697 F.3d 1146, 1151 (9th Cir. 2012) (citations omitted).
Thus, even though the commercial speech determination is a
question of law, courts are sometimes reluctant to make this
determination at the pleading stage, before the record has been
more fully developed.

In the present case, Plaintiffs provide only general
descriptions of the "broadcasts [and] rebroadcasts of Division I
basketball and football games" in which they assert publicity
rights.  3CAC ¶ 391.  Although their complaint refers to several
different types of game footage -- including live game broadcasts,
rebroadcasts of "classic games," highlight films, and "'stock
footage' sold to corporate advertisers," <u>id.</u> ¶¶ 372, 440-72 -- it
offers scant details about each of these specific categories.
Thus, it is difficult to determine with any certainty whether
these broadcasts are primarily commercial in nature.
Nevertheless, on the present motion, the allegations in the 3CAC
must be construed in the light most favorable to Plaintiffs.  When
viewed in this light, it is plausible that at least some of the
broadcast footage described in the complaint -- particularly the
promotional highlight films and the "stock footage" sold to
advertisers -- was used primarily for commercial purposes.  <u>See</u>
<u>Dreyer</u>, 689 F. Supp. 2d at 1120 ("Giving Plaintiffs the benefit of
every reasonable inference about the [NFL highlight] films, it is
a plausible inference that the films are advertisements within the
meaning of the [commercial speech] test.").

Thus, the First Amendment does not provide a basis for
dismissing Plaintiffs' broadcast-related claims at this stage.

Should the NCAA raise this issue again at summary judgment, Plaintiffs will need to submit evidence that the relevant broadcast footage on which their claims are based -- including both the archival game footage and the live game broadcasts -- was used primarily for commercial purposes.  See generally Hunt v. City of Los Angeles, 638 F.3d 703, 715 (9th Cir. 2011) ("Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." (citations omitted)).

> 3.   Copyright Act Preemption

The NCAA's final argument in support of dismissal is that the "Copyright Act preempt[s] the application of any applicable right of publicity laws to the broadcast of college football and basketball games."  NCAA Mot. Dismiss 3.  For support, the NCAA relies principally on Jules Jordan Video, Inc. v. 144942 Canada Inc., 617 F.3d 1146, 1155 (9th Cir. 2010), where the Ninth Circuit held that an adult film actor's right-of-publicity claim against a film production company was preempted by the Copyright Act.

Jules Jordan is inapposite here because the right-of-publicity claim in that case was based not merely on the misappropriation of the plaintiff's name, image, and likeness but on the sale of counterfeit DVDs featuring films that the plaintiff had produced.  "The essence of [the plaintiff]'s claim [was] that the [] defendants reproduced and distributed the DVDs without authorization."  Id. at 1153, 1155 (noting that the plaintiff's right-of-publicity claim was "based entirely on the

United States District Court
For the Northern District of California

misappropriation of the DVDs and [his] appearance therein"
(emphasis added)).  Because the plaintiff owned a copyright in the
films, the court concluded that the plaintiff's "right of
publicity claim falls within the subject matter of copyright, and
[] the rights he asserts are equivalent to the rights within the
scope of § 106 of the Copyright Act."  Id.

In contrast, the rights Plaintiffs seek to assert in the
present case are fundamentally different from those protected by
the Copyright Act.  Plaintiffs here do not own copyrights in any
of the game footage described in their complaint and, thus, do not
seek to protect their copyrights in that footage.  Rather, they
seek the right to license the commercial use of their names,
images, and likenesses in certain broadcast footage.  See 1 Nimmer
on Copyright § 1.01[B][1][c], at 1–30 ("The 'work' that is the
subject of the right of publicity is the persona, i.e., the name
and likeness of a celebrity or other individual.  A persona can
hardly be said to constitute a 'writing' of an 'author' within the
meaning of the Copyright Clause of the Constitution.").  The
Dreyer court relied on this same distinction in rejecting the
NFL's argument that the Copyright Act preempted the right-of-
publicity claims of former players who were featured without their
consent in promotional highlight films.  Dreyer, 689 F. Supp. 2d
at 1121.

Further, Plaintiffs' underlying claims here are not preempted
by the Copyright Act because they are based principally on an
injury to competition, not simply misappropriation.  Whatever
preemptive effect the Copyright Act has on right-of-publicity
claims, federal courts have made clear, "Intellectual property

rights do not confer a privilege to violate the <u>antitrust</u> laws." <u>See, e.g.</u>, <u>United States v. Microsoft Corp.</u>, 253 F.3d 34, 63 (D.C. Cir. 2001) (emphasis added; citations and quotation marks omitted) (rejecting defendant's argument that it could not incur antitrust liability merely by exercising its copyrights); <u>see also</u> <u>Ralph C. Wilson Indus., Inc. v. Chronicle Broad. Co.</u>, 1982 WL 257, at *2 (N.D. Cal.) ("The fact that the Copyright Act permits the grant of a geographically exclusive license does not immunize such licenses from attack under the antitrust laws."). Therefore, the NCAA's motion to dismiss Plaintiffs' Sherman Act claims on this basis is denied.

CONCLUSION

For the reasons set forth above, the NCAA's motion to dismiss (Docket No. 857) is DENIED. NCAA shall file its answer within fourteen days of this order. EA and CLC's motions to dismiss (Docket Nos. 856, 858) are denied, without prejudice, as moot. They, along with Plaintiffs, shall file their motion for preliminary settlement approval as soon as practicable.

IT IS SO ORDERED.


Dated: 10/25/2013

CLAUDIA WILKEN
United States District Judge