IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE NCAA STUDENT-ATHLETE
NAME & LIKENESS LICENSING
LITIGATION

_____/

No. C 09-1967 CW

ORDER GRANTING IN
PART AND DENYING
IN PART MOTION FOR
CLASS
CERTIFICATION
(Docket No. 651)

Plaintiffs, a group of current and former college athletes, move for class certification to pursue their antitrust claims against Defendant National Collegiate Athletic Association (NCAA).[1] The NCAA opposes the motion.  After considering the parties' submissions and oral argument, the Court grants in part the motion for class certification and denies it in part.

BACKGROUND

The procedural history and factual background of this case are described at length in the Court's order denying the NCAA's motion to dismiss.  Docket No. 876, at 1-7.  Accordingly, this order provides only the background necessary to resolve the instant motion.

Plaintiffs are twenty-five current and former student-athletes who played for NCAA Division I men's football and basketball teams between 1953 and the present.  Docket No. 832, Third Consol. Class Action Compl. (3CAC) ¶¶ 25-233.  Four of these

_____

[1] Plaintiffs initially also filed suit against the videogame developer, Electronic Arts, Inc. (EA), and the marketing firm, Collegiate Licensing Company (CLC), but subsequently agreed to settle their claims against those parties.

Plaintiffs (Right-of-Publicity Plaintiffs) allege that the NCAA misappropriated their names, images, and likenesses in violation of their statutory and common law rights of publicity.  The other twenty-one Plaintiffs (Antitrust Plaintiffs) allege that the NCAA violated federal antitrust law by conspiring with EA and CLC to restrain competition in the market for the commercial use of their names, images, and likenesses.  In the pending motion, Antitrust Plaintiffs[2] seek class certification to pursue their claims arising under the Sherman Antitrust Act, 15 U.S.C. §§ 1 <u>et seq.</u>

Plaintiffs' antitrust claims arise from the NCAA's written and unwritten rules, which allegedly prohibit student-athletes from receiving compensation for the commercial use of their names, images, and likenesses.  3CAC ¶¶ 12-15.  According to the 3CAC, these rules preclude student-athletes from entering into group licensing arrangements with videogame developers and broadcasters for the use of their names, likenesses, and images.  Plaintiffs allege that these rules restrain competition in "two relevant markets: (a) the student-athlete Division I college education market in the United States (the 'education market'); and (b) the market for the acquisition of group licensing rights for the use of student-athletes' names, images, and likenesses in the broadcasts or rebroadcasts of Division I basketball and football games and in videogames featuring Division I basketball and football in the United States (the 'group licensing market')."  <u>Id.</u> ¶ 391.

---

[2] All subsequent references to "Plaintiffs" in this order allude specifically to the twenty-one Antitrust Plaintiffs and not to the four Right-of-Publicity Plaintiffs, whose claims are not at issue here.

United States District Court
For the Northern District of California

Plaintiffs seek monetary damages to compensate them for the financial losses they claim to have suffered as a result of the NCAA's alleged plan to fix at zero the price of student-athletes' group licensing rights in videogames and game broadcasts.   In addition, Plaintiffs seek to enjoin the NCAA from restraining competition in the group licensing market for student-athletes' name, image, and likeness rights in the future.

LEGAL STANDARD

Plaintiffs seeking to represent a class must satisfy the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). Rule 23(a) provides that a case is appropriate for certification as a class action if

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;
>
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs must also establish that one of the subsections of Rule 23(b) is met.   In the instant case, Plaintiffs seek certification under subsections (b)(2) and (b)(3).

Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."   Fed. R. Civ. Proc. 23(b)(2).

Rule 23(b)(3) permits certification where common questions of law and fact "predominate over any questions affecting only individual members" and class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are intended "to cover cases 'in which a class action would achieve economies of time, effort, and expense . . . without sacrificing procedural fairness or bringing about other undesirable results.'" Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3) Adv. Comm. Notes to 1966 Amendment).

Regardless of what type of class the plaintiff seeks to certify, it must demonstrate that each element of Rule 23 is satisfied; a district court may certify a class only if it determines that the plaintiff has borne this burden. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977). In general, the court must take the substantive allegations of the complaint as true. Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975). However, the court must conduct a "'rigorous analysis,'" which may require it "'to probe behind the pleadings before coming to rest on the certification question.'" Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting Falcon, 457 U.S. at 160-61). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." Dukes, 131 S. Ct. at 2551. To satisfy itself that class certification is proper, the court may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties. Blackie, 524

United States District Court
For the Northern District of California

F.2d at 901 n.17.  "When resolving such factual disputes in the

context of a motion for class certification, district courts must

consider 'the persuasiveness of the evidence presented.'"  <u>Aburto</u>

<u>v. Verizon Cal., Inc.</u>, 2012 WL 10381, at *2 (C.D. Cal.) (quoting

<u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 982 (9th Cir.

2011)).  Ultimately, it is in the district court's discretion

whether a class should be certified.  <u>Molski v. Gleich</u>, 318 F.3d

937, 946 (9th Cir. 2003); <u>Burkhalter Travel Agency v. MacFarms</u>

<u>Int'l, Inc.</u>, 141 F.R.D. 144, 152 (N.D. Cal. 1991).

DISCUSSION

Plaintiffs seek to certify a class to pursue injunctive

relief under Rule 23(b)(2) and a subclass to pursue monetary

damages under Rule 23(b)(3).  The proposed Injunctive Relief Class

is defined as follows:

> All current and former student-athletes
> residing in the United States who compete on,
> or competed on, an NCAA Division I (formerly
> known as "University Division" before 1973)
> college or university men's basketball team or
> on an NCAA Football Bowl Subdivision (formerly
> known as Division I-A until 2006) men's
> football team and whose images, likenesses
> and/or names may be, or have been, included in
> game footage or in videogames licensed or sold
> by Defendants, their co-conspirators, or their
> licensees after the conclusion of the
> athlete's participation in intercollegiate
> athletics.

Docket No. 651, Mot. Class Cert., at 2.  This class shall not

include any officers, directors, or employees of the NCAA nor of

any Division I colleges, universities, or athletic conferences.

<u>Id.</u>

The proposed Damages Subclass is defined as follows:

> All former student-athletes residing in the
> United States who competed on an NCAA Division

United States District Court
For the Northern District of California

I (formerly known as "University Division"
before 1973) college or university men's
basketball team or on an NCAA Football Bowl
Subdivision (formerly known as Division I-A
until 2006) men's football team whose images,
likenesses and/or names have been included in
game footage or in videogames licensed or sold
by Defendants, their co-conspirators, or their
licensees from July 21, 2005 and continuing
until a final judgment in this matter.

Id. at 1-2.  Thus, the only difference between the proposed

Injunctive Relief Class and the proposed Damages Subclass is that

the subclass excludes current student-athletes and former student-

athletes whose names, likenesses, and images were featured in

videogames or game broadcasts before July 21, 2005.

     For reasons explained more fully below, the Court certifies

the Injunctive Relief Class but declines to certify the Damages

Subclass for failure to satisfy the requirements of Rule 23(b)(3).

I.   Rule 23(a) Requirements

     A.   Numerosity

     Plaintiffs assert that the Injunctive Relief Class and the

Damages Subclass each contain several thousand potential class

members.  The NCAA does not dispute that these classes are

sufficiently large to satisfy the numerosity prerequisite.

Accordingly, Plaintiffs have met this requirement.  See In re

Citric Acid Antitrust Litig., 1996 WL 655791, at *3 (N.D. Cal.)

(finding that plaintiffs in a nationwide antitrust class action

satisfied the numerosity requirement by asserting that "the total

number of class members will be in the thousands").

     B.   Commonality

     Rule 23 contains two related commonality provisions.  Rule

23(a)(2) requires that there be "questions of law or fact common

to the class."  Rule 23(b)(3), in turn, requires that these common

United States District Court
For the Northern District of California

questions predominate over individual ones.  This section
addresses only whether Plaintiffs have satisfied Rule 23(a)(2)'s
requirements, which are "less rigorous than the companion
requirements of Rule 23(b)(3)."  Hanlon v. Chrysler Corp., 150
F.3d 1011, 1019 (9th Cir. 1998) ("Rule 23(a)(2) has been construed
permissively.").[3]

The Ninth Circuit has made clear that Rule 23(a)(2) may be
satisfied even if fewer than all legal and factual questions are
common to the class.  Meyer v. Portfolio Recovery Associates, LLC,
707 F.3d 1036, 1041 (9th Cir. 2012) ("'All questions of fact and
law need not be common to satisfy the [commonality requirement].'"
(citations omitted; alterations in original)), cert. denied, 133
S. Ct. 2361 (2013).  "'The existence of shared legal issues with
divergent factual predicates is sufficient, as is a common core of
salient facts coupled with disparate legal remedies within the
class.'"  Id. (citing Hanlon, 150 F.3d at 1019).

Plaintiffs have satisfied this requirement with respect to
both the Injunctive Relief Class and Damages Subclass.  They have
identified several common questions of law and fact that must be
resolved to determine whether the NCAA violated federal antitrust
law.  These questions include: the size of the "education" and
"group licensing" markets identified in the complaint; whether
NCAA rules have harmed competition in those markets; and whether
the NCAA's procompetitive justifications for its conduct are
legitimate.  These types of questions, all of which may be

---

[3] Because Plaintiffs only need to satisfy the commonality
requirements of Rule 23(b)(3) with respect to the proposed Damages
Subclass, those requirements are addressed in a separate section of this
order.

resolved by class-wide proof and argument, are typically
sufficient to satisfy commonality in antitrust class actions.
See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D.
583, 593 (N.D. Cal. 2010) (finding questions of market size and
anticompetitive effects, among others, sufficient to satisfy
commonality), amended in part by 2011 WL 3268649 (N.D. Cal. 2011).
Indeed, commonality is "usually met in the antitrust [] context
when all class members' claims present common issues including
(1) whether the defendant's conduct was actionably anticompetitive
under antitrust standards; and (2) whether that conduct produced
anticompetitive effects within the relevant product and geographic
markets." Sullivan v. DB Investments, Inc., 667 F.3d 273, 336 (3d
Cir. 2011) (Scirica, J., concurring), cert. denied, 132 S. Ct.
1876 (2012).

     Although the NCAA notes that some of the "common" questions
that Plaintiffs identify in their brief -- such as certain damage-
related questions -- are not actually amenable to class-wide
proof, this is not sufficient to defeat commonality.  As noted
above, "all that Rule 23(a)(2) requires is 'a single significant
question of law or fact.'" Abdullah v. U.S. Sec. Associates,
Inc., 2013 WL 5383225, at *3 (9th Cir. 2013) (emphasis in
original; citing Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588
(9th Cir. 2012)).  Plaintiffs have met that burden here.  See In
re NCAA I-A Walk-On Football Players Litig., 2006 WL 1207915, at
*5 (W.D. Wash.) ("[T]he Court notes that common issues here
include: whether Bylaw 15.5.5 is a horizontal restraint of trade
in violation of the Sherman Act; whether there is a relevant
market for antitrust purposes; whether the NCAA and its members

United States District Court
For the Northern District of California

have improperly monopolized Division I-A college football; [and] whether there has been injury to competition.").

C.   Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Thus, every "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Falcon, 457 U.S. at 156 (quoting E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)) (internal quotation marks omitted).  This requirement is usually satisfied if the named plaintiffs have suffered the same or similar injuries as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs, and other class members were injured by the same course of conduct. Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). Typicality is not met, however, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Id. (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990).

In this case, the named Plaintiffs' interests are closely aligned with those of absent class members.  All of the named Plaintiffs play or played for a Division I men's football or basketball team; all were depicted, without their consent and without payment, in videogames or game broadcasts; and all complied with NCAA rules that allegedly barred them from selling or licensing the rights to their names, images, and likenesses. These characteristics are common to every putative class member

9

**United States District Court**
For the Northern District of California

and form the basis for the antitrust injuries that Plaintiffs assert in this case.  In antitrust cases, this uniformity of class members' injuries, claims, and legal theory is typically sufficient to satisfy Rule 23(a)(3).  See NCAA I-A Walk-On Football Players, 2006 WL 1207915, at *6 (finding Rule 23(a)(3) typicality satisfied where "the legal theory to be advanced by all class members -- that the NCAA and its members violated the Sherman Act -- is identical"); White v. NCAA, Case No. 06-999, Docket No. 95, slip op. at 3 (C.D. Cal. Dec. 19, 2006) (finding Rule 23(a)(3) typicality satisfied where former college athletes "allege[d] a horizontal agreement by the NCAA in violation of the Sherman Act" and asserted that "they were all affected by the [challenged NCAA rule] in the same way").

The NCAA has not identified any defense that applies uniquely to the named Plaintiffs nor any other barrier to Rule 23(a)(3) typicality.  In fact, it fails to cite, let alone discuss, Rule 23(a)(3) in either of its briefs.[4]  Thus, because Plaintiffs' claims and interests are common to the class, they have satisfied the typicality requirement here.

D.   Adequacy

Rule 23(a)(4) establishes as a prerequisite for class certification that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Rule 23(g)(2) imposes a similar adequacy requirement on

---

[4] Although the NCAA contends that "[i]ndividual defenses will predominate," Docket No. 789, NCAA Sur-Reply, at 22, it raises this argument under Rule 23(b)(3), not Rule 23(a)(3).  Accordingly, these "individual defenses" are addressed separately below, in the section discussing the requirements of Rule 23(b)(3).

**United States District Court**
For the Northern District of California

class counsel.  "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Hanlon, 150 F.3d at 1020.

The NCAA contends that there are conflicts of interest among class members that preclude class certification here.  It points specifically to the fact that, in an unrestrained market for publicity rights, some putative class members -- such as star athletes -- would command a higher price for their name, image, and likeness rights than others.  According to the NCAA, if Plaintiffs were to prevail in this case, those high-value class members would be entitled to a larger share of damages than others because they would have suffered greater economic losses from the NCAA's ban on student-athlete compensation.  Yet, Plaintiffs' proposed model for allocating damages fails to account for these differences between class members.  Instead, Plaintiffs' model proposes that damages be allocated equally among the members of every football and basketball team.  Plaintiffs' expert, Dr. Roger Noll, describes the process as follows:

> First, all revenues [from videogame and broadcast licenses] are allocated to either basketball or football at a college.  These revenues are then multiplied by the appropriate sharing formula between colleges and student-athletes.  For each college, each revenue stream is further divided between current and former teams.  Reflecting the common practice in group licenses, the revenue that is assigned to current players is divided equally among all members of the current team.

Docket No. 651-3, Expert Report of Roger Noll, at 107.  The NCAA
contends that this proposal for allocating damages benefits
lesser-known athletes at the expense of more popular athletes.
This argument is not persuasive for several reasons.

First, the supposed intra-class conflict that the NCAA has
identified here is illusory.  Although it is true that class
members' publicity rights vary widely in value, it does not
necessarily follow that a model of equal sharing among team
members would inevitably create a conflict of interest.  As noted
above, Plaintiffs allege harm to competition within a <u>group</u>
licensing market, not an individual licensing market.  This
distinction is important because it renders irrelevant any
differences in the value of each class member's individual
publicity rights.  After all, even if some class members suffered
greater economic losses than others because the NCAA prevented
them from licensing their <u>individual</u> publicity rights, those
losses would have no bearing on this case, where Plaintiffs seek
compensation only for losses suffered in the <u>group</u> licensing
market.

Courts have highlighted this distinction in other cases where
plaintiffs sought class certification to pursue claims based on
group licensing rights.  In <u>Parrish v. NFL</u>, for instance, another
court in this district certified a class of retired professional
football players who charged the NFL with breaching a series of
group licensing agreements that the players had previously signed.
2008 WL 1925208, at *9 (N.D. Cal.).  The court expressly rejected
the NFL's argument that class certification was inappropriate
because the players' publicity rights varied in value.  <u>Id.</u> at *3

United States District Court
For the Northern District of California

("Despite the varying celebrity of retired players, the proposed class as a whole has a common interest in determining what, if any, rights they have under the [group licensing agreements].") The court reasoned that, because the players' claims were not based on individual licensing rights, the "star athletes of the class would [] still be able to license their celebrity on an individual basis for whatever amount they choose.  Such licensing would have no effect on the class.  What is at stake here is the group license." <u>Id.</u> at *6 (emphasis in original); <u>accord</u> <u>Brown v. NFL Players Ass'n</u>, 281 F.R.D. 437, 442-43 (C.D. Cal. 2012).[5]  The same principle applies here and illustrates that Plaintiffs' proposed model for allocating damages does not create a real conflict of interest among class members.

Even if Plaintiffs' method of allocating damages did create such a conflict, this would not be sufficient to prevent class certification.  The Ninth Circuit has made clear that "damage calculations alone cannot defeat certification" and the "potential

---

[5] Like <u>Parrish</u>, <u>Brown</u> involved claims by a group of retired football players seeking to assert their group licensing rights under a series of agreements with the NFL.  In considering the plaintiffs' class certification motion, the <u>Brown</u> court explained,

> Contrary to Defendants' assertions, [the named plaintiff]'s relative lack of celebrity does not cause his damages claim to conflict with the claims of absent class members.  In their Complaint, Plaintiffs do not allege that Defendants failed to honor individual licensing agreements, where the players' relative celebrity would likely affect how much Defendants owed each retired NFLPA member.  Instead, Plaintiffs allege that Defendants failed to license the group of retired NFLPA members in the proposed class and to distribute group licensing revenue to them.

281 F.R.D. at 442-43.

13

**United States District Court**
For the Northern District of California

existence of individualized damage assessments . . . does not detract from the action's suitability for class certification." Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1089, 1094 (9th Cir. 2010).  This is especially true here, where the potential for intra-class conflicts would arise only at the final stage of damage allocation, when damages would be divided among the members of each team.  No matter how damages were divided at that stage, the entire class would still share an interest in establishing that the NCAA restrained competition in the relevant markets and that it lacked a procompetitive justification for doing so.  Because Plaintiffs' underlying theory of liability is not tied to their expert's proposed method for dividing damages among team members,[6] their expert's proposed method will not prevent them from adequately representing the class's most important interest: to wit, establishing the NCAA's liability.

Finally, to the extent that Plaintiffs' damages model did create the potential for any conflicts of interest, those conflicts would only affect class members seeking monetary relief -- that is, members of the Damages Subclass.  The interests of the broader Injunctive Relief Class would not be affected by any conflicts that could arise at the damages stage of the

---

[6] Indeed, Plaintiffs' expert could propose a different model for allocating damages among team members without altering his substantive analysis of the NCAA's impact on the relevant markets.  This is one reason why Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013), which the NCAA cites for support, is inapposite here.  In Comcast, the Supreme Court decertified a class of antitrust plaintiffs because their expert's damages model was based, in part, on a theory of antitrust liability that the trial court had rejected.  Id. at 1433.  Here, in contrast, not only is Plaintiffs' damages model based on a permissible theory of antitrust liability but, what's more, the NCAA has attacked an aspect of Plaintiffs' damages model that could be altered without changing their underlying theory of antitrust liability.

United States District Court
For the Northern District of California

litigation.  Thus, Plaintiffs' proposed damages model does not

defeat certification here under Rule 23(a)(4).

Plaintiffs have therefore satisfied all of the Rule 23(a)

requirements with respect to both the Injunctive Relief Class and

the Damages Subclass.

II.   Rule 23(b) Requirements

A.   Rule 23(b)(2): Injunctive Relief Class

A court may grant certification under Rule 23(b)(2) "if class

members complain of a pattern or practice that is generally

applicable to the class as a whole.  Even if some class members

have not been injured by the challenged practice, a class may

nevertheless be appropriate." Walters v. Reno, 145 F.3d 1032,

1047 (9th Cir. 1998); see also 7A Wright, Miller & Kane, Federal

Practice & Procedure § 1775 (2d ed. 1986) ("All the class members

need not be aggrieved by or desire to challenge the defendant's

conduct in order for some of them to seek relief under Rule

23(b)(2)."). Rule 23(b)(2) does not require a court "to examine

the viability or bases of class members' claims for declaratory

and injunctive relief, but only to look at whether class members

seek uniform relief from a practice applicable to all of them."

Rodriguez v. Hayes, 591 F.3d 1105, 1125 (9th Cir. 2010).

Here, the NCAA contends that certification under Rule

23(b)(2) is inappropriate because Plaintiffs' "demand for damages

predominates over any request for injunctive relief" and

"'individualized monetary claims belong in Rule 23(b)(3)'" rather

than Rule 23(b)(2). Docket No. 677, NCAA Opp. Class Cert., at 21-

22 (citing Dukes, 131 S. Ct. at 2558).  This argument misstates

the nature of the relief that Plaintiffs seek.  As previously

explained, Plaintiffs seek to certify one class under Rule

23(b)(2) to pursue declaratory and injunctive relief and another

class under Rule 23(b)(3) to pursue monetary relief.  Nothing in

the federal rules or existing case law prevents them from seeking

certification under both of these provisions.  See In re Apple,

AT&T iPad Unlimited Data Plan Litig., 2012 WL 2428248 (N.D. Cal.)

(explaining that "a court may certify a Rule 23(b)(2) class for

injunctive relief and a separate class for individual damages or,

if the damage claims do not meet Rule 23(b)(3) standards, certify

the Rule 23(b)(2) class alone" (citing Schwarzer, Tashima &

Wagstaffe, Cal. Practice Guide: Federal Civil Procedure Before

Trial § 10:404 (2011))).

With respect to the Rule 23(b)(2) class, Plaintiffs seek

certification to pursue an injunction barring the NCAA from

prohibiting current and former student-athletes from entering into

group licensing deals for the use of their names, images, and

likenesses in videogames and game broadcasts.  Their request for

this injunction is not merely ancillary to their demand for

damages.  Rather, it is deemed necessary to eliminate the

restraints that the NCAA has allegedly imposed on competition in

the relevant markets.  Without the requested injunctive relief,

all class members -- including both current and former student-

athletes -- would potentially be subject to ongoing antitrust

harms resulting from the continued unauthorized use of their

names, images, and likenesses.  Because an injunction would offer

all class members "uniform relief" from this harm, Rodriguez, 591

F.3d at 1125, class certification is appropriate under Rule

23(b)(2).

United States District Court
For the Northern District of California

B.   Rule 23(b)(3): Damages Subclass

To qualify for certification under Rule 23(b)(3), "a class must satisfy two conditions in addition to the Rule 23(a) prerequisites: common questions must 'predominate over any questions affecting only individual members,' and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  Hanlon, 150 F.3d at 1022 (quoting Fed. R. Civ. P. 23(b)(3)).  The rule also requires the court to take into account the "likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  Taken together, these requirements impose "an obligation on the court to make findings that will demonstrate the utility and propriety of employing the class-action device in the case before it."  7AA Wright, Miller & Kane, Federal Practice & Procedure § 1777 (3d ed. 2013).

Plaintiffs have not presented sufficient evidence here to establish that certification is appropriate under Rule 23(b)(3). In particular, they have failed to satisfy the manageability requirement because they have not identified a feasible way to determine which members of the Damages Subclass were actually harmed by the NCAA's allegedly anticompetitive conduct.  Courts have recognized that, in price-fixing cases such as this one, where the "fact of injury" cannot be determined by a "virtually mechanical task," class manageability problems frequently arise. See, e.g., Windham v. Am. Brands, Inc., 565 F.2d 59, 67-68 (4th Cir. 1977) (recognizing "respectable authorities in which certification of an anti-trust action was denied because of the complexity of, and the difficulties connected with, the proof of

United States District Court
For the Northern District of California

individual injury"); <u>In re Graphics Processing Units Antitrust Litig.</u>, 253 F.R.D. 478, 489 (N.D. Cal. 2008) ("Direct-purchaser plaintiffs have failed to supply a class-wide method for proving 'impact' on a class-wide basis.").

The first barrier to manageability here is the so-called "substitution effect," which stems from Dr. Noll's opening expert report on the economic impact of the NCAA's rules.  As is customary in antitrust cases, Dr. Noll's report described how the relevant markets would be expected to function in the absence of the challenged restraints on competition -- in this case, without the ban on student-athlete compensation.  <u>See generally</u> <u>ZF Meritor, LLC v. Eaton Corp.</u>, 696 F.3d 254, 292 (3d Cir. 2012) (noting that, in antitrust cases, "an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities" (citations omitted)).  Dr. Noll explained that, because student-athletes are often motivated by financial concerns when choosing whether and where to attend college, "the expected effect [of the ban on student-athlete pay] is to change the identities of the students who accept an athletic scholarship."  Docket No. 651-3, Noll Expert Report, at 58-59.  To illustrate this point, Dr. Noll examined the experiences of more than one hundred Division I basketball players who left college early between 2008 and 2010 to seek out opportunities to play professionally.  <u>Id.</u> at 61-63, Ex. 9B.  He concluded that many of these players "plausibly would have stayed in college" if they had been permitted to participate in a competitive group licensing

market, because the financial costs of staying in school would
have been lower.  Id. at 62.

Critically, however, Dr. Noll also notes that if these
athletes had stayed in college -- as they might have done if not
for the alleged restraints on competition in the group licensing
market -- they would have displaced other student-athletes on
their respective teams.  Docket No. 683, Wierenga Decl., Ex. 4,
Feb. 2013 R. Noll Depo., at 364:13-:24.  Those displaced student-
athletes would have either been forced to play for other Division
I teams or simply lost the opportunity to play Division I
basketball altogether.  In either case, they would not have
suffered injuries as members of the teams for which they actually
played because, as Dr. Noll suggests, they would never have been
able to play for those teams in the absence of the challenged
restraints.  See Docket No. 651-3, Noll Expert Report, at 59
("[T]he NCAA rules simultaneously caused dead-weight loss for
students who decided not to accept a scholarship for Division IA
football or Division I basketball because of the price increase
[in the cost of attendance] and an inefficient substitution
because students of lesser athletic ability substituted for
students of greater athletic ability.").  Indeed, many of these
individuals -- all of whom are putative members of the Damages
Subclass -- may have even benefitted from the challenged
restraints by earning roster spots that would have otherwise gone
to more talented student-athletes.

Plaintiffs have not proposed any method for addressing this
substitution effect among individual student-athletes.  Nor have
they proposed any method for addressing the related substitution

19

United States District Court
For the Northern District of California

effect among Division I schools.  One of Plaintiffs' central

contentions in this case is that, without the ban on student-

athlete pay, competition among Division I schools for student-

athletes would increase substantially.  That increased competition

for student-athletes, combined with the potentially higher costs

of recruiting and retaining those student-athletes, would have

likely driven some schools into less competitive divisions,

thereby insulating entire teams from the specific harms that

Plaintiffs allege in this suit.  Wierenga Decl., Ex. 2, Expert

Report of Daniel L. Rubinfeld, at ¶¶ 185-86.  Plaintiffs have not

provided a feasible method for determining which members of the

Damages Subclass would still have played for Division I teams --

and, thus, suffered the injuries alleged here -- in the absence of

the challenged restraints.  This shortcoming likewise contributes

to the impossibility of determining which class members were

actually injured by the NCAA's alleged restraints on competition

and, as such, precludes certification under Rule 23(b)(3).  See

NCAA I-A Walk-On Football Players, 2006 WL 1207915, at *8-*9

(denying class certification to a group of student-athletes who

challenged the NCAA's cap on team scholarships because raising the

scholarship cap would increase the level of competition for those

scholarships and thus require every putative class member to prove

individually that he would have obtained a scholarship and others

would not).

Another barrier to manageability here is determining which

student-athletes were actually depicted in videogames during the

relevant class period and, thus, members of the Damages Subclass.

See Rowden v. Pac. Parking Sys., Inc., 282 F.R.D. 581, 585 (C.D.

**United States District Court**
For the Northern District of California

Cal. 2012) ("A class action is not manageable if membership of the class cannot be sufficiently well-defined at the outset."); <u>Chavez v. Blue Sky Natural Beverage Co.</u>, 268 F.R.D. 365, 376 (N.D. Cal. 2010) (stating that class certification is not appropriate unless it is "administratively feasible to determine whether a particular person is a class member"). Every team in the NCAA's Football Bowl Subdivision (formerly known as Division I-A) is allowed up to 105 players -- eighty-five scholarship players and twenty non-scholarship players. Wierenga Decl., Ex. 4, Feb. 2013 R. Noll Depo., at 102:18-103:2. In contrast, the football teams depicted in NCAA-licensed videogames have only sixty-eight players each. Docket No. 703, Slaughter Decl., Ex. 69, R. Harvey Depo. 24:15-:21. As a result, the number of student-athletes depicted in NCAA-licensed videogames is considerably smaller than the number of student-athletes who actually played for a Division I football team during the class period. Plaintiffs have not offered a feasible method for determining on a class-wide basis which student-athletes are depicted in these videogames and which are not.[7] This makes it impossible to determine who is a member of the Damages Subclass without conducting thousands of individualized comparisons between real-life college football players and their potential videogame counterparts.

Plaintiffs have also failed to present a feasible method for determining on a class-wide basis which student-athletes appeared in game footage during the relevant period. Under Plaintiffs' proposed class definition, the only student-athletes who belong in

---

[7] Using players' jersey numbers is not an option because NCAA teams frequently allow multiple players to wear the same jersey number.

**United States District Court**
For the Northern District of California

the Damages Subclass are those who appeared in game footage
licensed after July 21, 2005.  Plaintiffs have not proposed a
straightforward method for identifying this subset of student-
athletes.  Although they point to various third-party resources
containing information such as team rosters, game summaries,
televised game schedules, and broadcast licenses, they have not
provided any formula for extracting the relevant information from
each of these resources and using that information to identify
putative subclass members.  In particular, Plaintiffs have not
explained how they would determine which of the student-athletes
listed on team rosters actually appeared in televised games.  Nor
have they explained how they would determine which games were
broadcast pursuant to licenses issued after July 21, 2005.
Without a means of accomplishing these tasks on a class-wide
basis, Plaintiffs would have to cross-check thousands of team
rosters against thousands of game summaries and compare dozens of
game schedules to dozens of broadcast licenses simply to determine
who belongs in the Damages Subclass.  This is not a workable
system for identifying class members.

     In light of these obstacles to manageability, class
resolution does not provide a superior method for adjudicating
this controversy.  Accordingly, certification of the Damages
Subclass under Rule 23(b)(3) is denied.

III. Evidentiary Objections

     The NCAA's objections to the testimony of Plaintiffs'
experts, Dr. Noll and Larry Gerbrandt, are overruled.  Each of
these witnesses offered relevant testimony regarding whether the
question of antitrust liability can be resolved through class-wide

proof and analysis and each witness based his opinions on a
sufficiently reliable methodology.  This is enough to satisfy
Federal Rule of Evidence 702.  <u>Primiano v. Cook</u>, 598 F.3d 558, 564
(9th Cir. 2010) (requiring the trial court to "assure that the
expert testimony 'both rests on a reliable foundation and is
relevant to the task at hand'" (citations omitted)).  While the
NCAA may question the strength of their analyses, the Ninth
Circuit has made clear that, under Rule 702, "Shaky but admissible
evidence is to be attacked by cross examination, contrary
evidence, and attention to the burden of proof, not exclusion."
<u>Id.</u>

CONCLUSION

     For the reasons set forth above, Plaintiffs' motion for class
certification (Docket No. 651) is GRANTED in part and DENIED in
part.  The Court certifies the following class under Rule
23(b)(2):

> All current and former student-athletes
> residing in the United States who compete on,
> or competed on, an NCAA Division I (formerly
> known as "University Division" before 1973)
> college or university men's basketball team or
> on an NCAA Football Bowl Subdivision (formerly
> known as Division I-A until 2006) men's
> football team and whose images, likenesses
> and/or names may be, or have been, included in
> game footage or in videogames licensed or sold
> by Defendants, their co-conspirators, or their
> licensees after the conclusion of the
> athlete's participation in intercollegiate
> athletics.

Further, Antitrust Plaintiffs' attorneys are certified as class
counsel.

     The NCAA's motion for leave to file a supplemental memorandum
regarding new evidence (Docket No. 881) is DENIED.  The NCAA has

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  not explained why it was unable to obtain and present this

2  evidence during the extensive briefing on class certification.  In

3  addition, the NCAA's request to present this evidence is moot

4  because the evidence pertains to the calculation and allocation of

5  damages, which is no longer relevant in light of the Court's

6  denial of class certification under Rule 23(b)(3).

7        Plaintiffs shall submit any dispositive motions, including

8  any Daubert motions, in a single twenty-five page brief within one

9  week of this order.  The NCAA shall file its opposition and any

10 cross-motions in a single twenty-five page brief, including any

11 evidentiary objections it intends to raise, on or before December

12 5, 2013.  Plaintiffs shall file their reply and opposition in a

13 single fifteen-page brief on or before January 6, 2014.  The NCAA

14 shall file its reply in a single fifteen-page brief on or before

15 February 3, 2014.  The Court shall hear all dispositive motions,

16 including all evidentiary objections, and hold a case management

17 conference at 2:00 p.m. on February 20, 2014.

18        IT IS SO ORDERED.

19

20 Dated:   11/8/2013

                                       CLAUDIA WILKEN
                                       United States District Judge