GLENN D. POMERANTZ (State Bar No. 112503)
glenn.pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
carolyn.luedtke@mto.com
ROHIT K. SINGLA (State Bar No. 213057)
rohit.singla@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:      (415) 512-4077

GREGORY L. CURTNER (*Pro Hac Vice*)
gcurtner@schiffhardin.com
ROBERT J. WIERENGA (State Bar No. 183687)
rwierenga@schiffhardin.com
KIMBERLY K. KEFALAS (*Pro Hac Vice*)
kkefalas@schiffhardin.com
SCHIFF HARDIN LLP
350 Main St., Suite 210
Ann Arbor, MI  48104
Telephone:     (734) 222-1500
Facsimile:      (734) 222-1501

Attorneys for Defendant
National Collegiate Athletic Association

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME AND LIKENESS LICENSING LITIGATION | Case No. 09-CV-1967-CW<br><br>**NCAA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; OPPOSITION TO ANTITRUST PLAINTIFFS' SUMMARY JUDGMENT MOTION**<br><br>Judge:     Hon. Claudia Wilken<br>Date:      February 20, 2014, 2:00 p.m.<br>Crtrm.:   2, 4th Floor |

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENTS ................................................. 1

II.    THE RECORD DOES NOT SUPPORT APs' CORE FACTUAL ALLEGATIONS .......... 2

III.   THE NCAA IS ENTITLED TO SUMMARY JUDGMENT ............................................. 3

       A.    The First Amendment Bars APs' Live Broadcast Claims ........................................ 3

       B.    APs' Injunctive Relief Claim Regarding Videogames Is Moot ............................... 5

       C.    The Individual APs' Claims Fail in Whole or in Part ................................................ 6

IV.    GOVERNING LAW AND THE NCAA'S EVIDENCE OF PROCOMPEITIVE
       JUSTIFICATIONS PRECLUDES SUMMARY JUDGMENT FOR THE APs ................. 7

       A.    The NCAA's Amateurism Rules Are Not Subject to "Quick Look" Review,
             but Rather Can and Should Be Validated "in the Twinkling of an Eye" ................. 8

       B.    There Is Abundant Evidence That the NCAA's Amateurism Rules Are
             Procompetitive ........................................................................................ 10

             1.    There Is Overwhelming Evidence That Amateurism Increases
                   Consumer Demand ................................................................................ 12

                   a.    Abundant Survey Evidence Shows That the NCAA's
                         Amateurism Rules Increase the Popularity of Division I
                         Sports ........................................................................................ 12

                   b.    APs Distort and/or Ignore Other Evidence of Amateurism's
                         Effect on Consumer Demand .......................................................... 14

             2.    The NCAA's Amateurism Rules Help to Maintain Competitive
                   Balance Among Schools and Across Conferences ..................................... 17

             3.    The NCAA's Amateurism Rules Are Essential to Integrating
                   Education and Athletics ......................................................................... 20

             4.    The NCAA's Amateurism Rules Support Schools' Ability to Offer
                   Women's and Less Prominent Men's Sports ............................................. 22

             5.    The NCAA's Amateurism Rules Support Increased Output of FBS
                   Football and Men's Division I Basketball ................................................. 24

V.     CONCLUSION ................................................................................................ 26

**NCAA'S SUMMARY JUDGMENT BRIEF**

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Agnew v. NCAA*,
  683 F.3d 328 (7th Cir. 2012)................................................................. passim

*American Ad Management, Inc. v. GTE Corp.*,
  92 F.3d 781 (9th Cir. 1996)............................................................. 1, 2, 7, 8

*American Needle, Inc. v. NFL*,
  130 S. Ct. 2201 (2010) ................................................................. 2, 9, 10, 11

*Board of Trustees v. Fox*,
  492 U.S. 469 (1989) ................................................................................... 5

*Broad. Music, Inc. v. CBS, Inc.*,
  441 U.S. 1 (1979) ................................................................................. 9, 11

*Brown v. Entm't Merchants Ass'n*,
  131 S. Ct. 2729 (2011) ............................................................................... 4

*C.B.C. Distribution & Mktg., Inc. v. Major League Baseball*,
  505 F.3d 818 (8th Cir. 2007)...................................................................... 4

*California Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ............................................................................. 8, 11

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ................................................................. 11

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ..................................................................................... 5

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
  251 F.3d 1252 (9th Cir. 2001) ................................................................. 12

*David Orgell, Inc. v. Geary's Stores, Inc.*,
  640 F.2d 936 (9th Cir. 1981)...................................................................... 6

*Fleury v. Harper & Row, Publishers, Inc.*,
  698 F.2d 1022 (9th Cir. 1983 ..................................................................... 7

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
  618 F.3d 1025 (9th Cir. 2010)................................................................... 12

*Harris v. J.B. Robinson Jewelers*,
  627 F.3d 235 (6th Cir. 2010)..................................................................... 11

**TABLE OF AUTHORITIES**
(continued)

Page

*Hunt v. City of Los Angeles*,
   638 F.3d 703 (9th Cir. 2011)..................................................................5

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .............................................................................11

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998)........................................................9, 10

*McCormack v. NCAA*,
   845 F.2d 1338 (5th Cir. 1988)..........................................................9, 10

*Metro. Intercollegiate Basketball Ass'n v. NCAA*,
   339 F. Supp. 2d 545 (S.D.N.Y. 2004) .................................................9

*National Society of Professional Engineers v. United States*,
   435 U.S. 679 (1978) .............................................................................20

*NCAA v. Board of Regents of Univ. of Ok.*,
   468 U.S. 85 (1984) ...........................................................................9, 20

*Nichols v. Moore*,
   334 F. Supp. 2d 944 (E.D. Mich. 2004) ..............................................6

*Orr v. Bank of Am., NT & SA*,
   285 F.3d 764 (9th Cir. 2002)...............................................................10

*Pace Indus. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987)................................................................6

*Page v. Something Weird Video*,
   908 F.Supp. 714 (C.D.Cal.1995)..........................................................7

*Paladin Associates, Inc. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003)..............................................................1

*Smith v. NCAA*,
   139 F.3d 180 (3d Cir. 1998)............................................................9, 10

*Snyder v. Phelps*,
   131 S. Ct. 1207 (2011) .........................................................................4

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ..............................................................................8, 9

*United States v. Brown University*,
   5 F.3d 658 (3d Cir. 1993)........................................................20, 21, 23

**TABLE OF AUTHORITIES**
(continued)

Page

*Varner v. Peterson Farms*,
371 F.3d 1011 (8th Cir. 2004) ................................................................. 6

*Wendt v. Host Int'l Inc.*,
125 F.3d 806 (9th Cir. 1997) ................................................................ 12

STATE CASES

*Dora v. Frontline Video, Inc.*,
15 Cal. App. 4th 536 (1993) ............................................................... 4, 5

*Gionfriddo v. Major League Baseball*,
94 Cal. App. 4th 400 (2001) .............................................................. 4, 5

*Montana v. San Jose Mercury News, Inc.*,
34 Cal. App. 4th 790 (1995) ................................................................. 5

FEDERAL STATUTES

15 U.S.C. § 15b ........................................................................................ 6

FEDERAL RULES

Fed. R. Civ. P. 26(a)(2)(D)(ii) .............................................................. 13

Fed. R. Civ. P. 37(c)(1) .......................................................................... 14

Fed. R. Civ. P. 56 ..................................................................................... 2

Fed. R. Civ. P. 56(c)(2) ......................................................................... 10

CONSTITUTIONAL PROVISIONS

First Amendment ............................................................................. passim

TREATISES

7 P. Areeda & H. Hovenkamp, Antitrust Law § 1503(b) (3d ed. 2012) ...................................... 11

11 P. Areeda & H. Hovenkamp, Antitrust Law § 1901(d) (3d ed. 2012) .................................... 11

Restatement (Second) of Conflict of Laws § 153 (1971) ........................... 7

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APs | Antitrust Plaintiffs |
| APM | Antitrust Plaintiffs' Motion for Summary Judgment |
| EA | Defendant Electronic Arts Inc. |
| Luedtke Decl. | Declaration of Carolyn Hoecker Luedtke in Support of NCAA's Motion for Partial Summary Judgment and Opposition to Antitrust Plaintiffs' Motion for Summary Judgment |
| NCAA | Defendant National Collegiate Athletic Association |
| NIL | Name, image and likeness |
| ROP | Right of Publicity |
| SAs | Student-athletes |
| Scherrer Decl. | Declaration of Hilary K. Scherrer in Support of Antitrust Plaintiffs' Motion for Summary Judgment (Dkt. 898-3) |
| 3CAC | Third Consolidated Amended Complaint (Dkt. 831) |

# I.      INTRODUCTION AND SUMMARY OF ARGUMENTS

**1.**      ***The NCAA is entitled to summary judgment***. *First*, APs' claims based on the *live broadcast* of men's basketball and football games fail because the First Amendment precludes any argument that SAs (as with the audience, referees, coaches and cheerleaders) have NIL rights based on appearing in the broadcasts. Such broadcasts are entitled to full First Amendment protection because live sports events are not commercial speech, but matters of intense public interest. As the Court said in its recent dismissal Order, APs can pursue such rights only by showing that live broadcasts are commercial — *i.e.*, advertising — a showing that APs cannot make. Dkt. 876 at 20-21.

*Second*, APs' request for injunctive relief relating to videogames is moot. The NCAA has not renewed its contract with EA, and it is undisputed that such videogames require a license to the NCAA's trademarks. Plaintiffs' demand for injunctive relief therefore pertains to future "transactions" that are wholly hypothetical. Injunctions may not be issued against such speculative events or injuries.

*Third*, many of the individual APs' claims are barred for one or more reasons: former SAs have no claim because the NCAA has never restricted SAs from licensing their NILs after their eligibility; the statute of limitations has run (in many cases by decades); and/or the live broadcast claims (even beyond the First Amendment bar) are not recognized under applicable state laws.

**2.**      ***APs cannot obtain summary judgment***. APs' motion is based on errors of law and on a quintessential fact question: whether after balancing procompetitive and anticompetitive effects, the Rule of Reason condemns the NCAA's amateurism rules, which bar payments to *current* SAs related to their participation in sports beyond the required costs of college and which do not otherwise restrict the earning power of any SAs *after* their eligibility expires. The law is clear that this balancing is reserved for the finder-of-fact, not for summary judgment. *See, e.g.*, *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996). And this Court has emphasized that in this balancing, "'*all the facts*, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice,'" would have to be reviewed. Dkt. 876 at 16 (quoting *Paladin Assocs., Inc. v. Montana Power Co.*,

328 F.3d 1145, 1156 (9th Cir. 2003)).  APs are wrong that the narrow "quick look" exception to the Rule of Reason supports their motion.  In fact, the very cases on which APs now rely, *e.g.*, *Board of Regents* and *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012), make clear that quick look review may not be applied to condemn the NCAA's amateurism rules.  *See also Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2216-17 (2010).  To the contrary, these cases establish that the NCAA's amateurism rules can be *upheld* at summary judgment in the "twinkling of an eye."

APs also cherry-pick the massive record for purported "facts" that APs say undermine each of the NCAA's five procompetitive justifications for its amateurism rules.  As to each point, APs either misstate the evidence or ignore contrary facts and opinions (both lay and expert) that, at a minimum, show hotly disputed material facts that preclude APs' motion.  APs tacitly concede that they are asking the Court to resolve conflicting evidence, repeatedly characterizing the few contrary facts that they acknowledge as not "persuasive" or "insufficient," and arguing that the evidence they like is more "suggest[ive]" of the actual facts.  APM at 10, 21, 24.  Deciding whose evidence is more persuasive is for the fact-finder, not the Court under Rule 56.

## II.   THE RECORD DOES NOT SUPPORT APs' CORE FACTUAL ALLEGATIONS

APs continue to rely on a litany of incendiary factual claims about what the NCAA supposedly does with SAs.  *See* APM at 4-5.  But these factual claims are untrue:

*First*, the NCAA does not require any SA to license his NIL for "commercial" use by the NCAA, conferences or schools; on the contrary, the NCAA *prohibits* itself, conferences and schools from making commercial uses of SAs' NIL.  Luedtke Decl. ¶¶ 163a, 164c.[1]

*Second*, the NCAA does not restrict former SAs from licensing their NIL in any way, much less "in perpetuity."  *Id.* ¶¶ 166-169.  APs do not and cannot cite any NCAA rule that restricts *former* SAs from making any use (commercial or otherwise) of their NIL.[2]  The

---

[1] Form 08-3a, on which APs have repeatedly relied, says nothing about stripping SAs of NIL rights. Luedtke Decl. ¶¶ 163c, 165.

[2] APs claim that NCAA President Emmert testified that former SAs are "foreclosed" from licensing their NIL. APM at 2:18-22.  Not so.  In reality, Dr. Emmert said that NCAA rules prohibit schools from enticing prospective or current SA performance with promises of deferred

1   experiences of the named APs in this case show that APs' characterization of the NCAA rules is

2   not correct; a number of the named APs have licensed their NIL post-eligibility without any

3   interference from the NCAA.  *Id*. ¶¶ 170-177.[3]  There is no evidence that the NCAA has conspired

4   or agreed with anyone — its members, EA, CLC, T3 Media, CBS, ESPN, or anyone else — to

5   prevent former SAs from licensing the post-eligibility commercial use of their NIL.

6   　　　*Third*, APs are wrong that SA participation in men's basketball and football is

7   "exploitation."  *E.g.*, APM at 10 n.10.  The record shows that playing college sports yields

8   numerous benefits to student-athletes, both while in school (*e.g.*, admissions, grant-in-aid

9   packages, academic support services, health insurance, and the opportunity to participate in sports

10  that are an integral part of collegiate life Luedtke Decl. ¶¶ 71-71, 92-94, 112-113) and after.  In a

11  very rigorous and thorough analysis of a massive dataset of student outcomes, Nobel Prize winner

12  James Heckman has found that basketball and football SAs are more likely to attend college and

13  have higher incomes after college, and similar graduation rates, as non-athletes with similar

14  backgrounds.  *Id*., Ex. 38 ¶¶ 31, 36, 49.  APs have no response to this study.

15  **III.   THE NCAA IS ENTITLED TO SUMMARY JUDGMENT**

16  　　　**A.   The First Amendment Bars APs' Live Broadcast Claims**

17  　　　APs challenge alleged restraints on licensing student-athletes' NILs for three types of uses:

18  live broadcast, various kinds of non-live "game footage," and videogames.  Dkt. 876 at 3-4, 21.

19  After reviewing the applicable case law in its recent ruling on the NCAA's motion to dismiss, this

20  Court found that "the central question in determining whether the First Amendment bars an

21  athlete's right-of-publicity claim is whether the defendant's use of the athlete's name, image,

22  likeness is primarily '*commercial*.'"  Dkt. 876 at 21:14-18 (emphasis added).  The Court explained

23  that this could not be decided on a motion to dismiss because "it is plausible that at least some of

24  the broadcast footage described in the complaint — particularly the promotional highlight films

―――――――――――――――――――

25  pay after they have stopped playing.  AP Decl. Ex. 3, at 31:4-21.  There is no evidence the NCAA
26  restricts SAs from licensing their NIL *after* their eligibility ends.

27  [3] The NCAA has repeatedly reminded third parties that the NCAA does not have authority to
license the use of former SAs' NIL, and that those licenses must be sought directly from the
28  individual.  Luedtke Decl. ¶¶ 179-182.

1    and the 'stock footage' sold to advertisers — was used primarily for commercial purposes." *Id.* at

2    21:19-22.  The Court concluded, however, that "at summary judgment, Plaintiffs will need to

3    submit evidence that the relevant broadcast footage on which their claims are based . . . was used

4    primarily for commercial purposes." *Id.* at 22:1-5.

5         The NCAA now moves to dismiss on First Amendment grounds only claims directed to

6    *live broadcast* (as opposed to videogames, stock footage, and highlight reels). The First

7    Amendment bars these claims because televised college sports are "non-commercial" for First

8    Amendment purposes.  They are televised because they are matters of intense public interest.

9    State intellectual property laws do not and cannot create liability for the broadcast of such events

10   without trampling on the First Amendment.  *Snyder v. Phelps*, 131 S. Ct. 1207, 1215-16 (2011)

11   ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values,

12   and is entitled to special protection" against state-law tort claims, and this includes any speech

13   regarding "a subject of general interest and of value and concern to the public") (internal

14   quotations omitted); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 542 (1993) (in the

15   context of surfing competition, explaining that "[p]ublication of matters in the public interest,

16   which rests on the right of the public to know and the freedom of the press to tell it, is not

17   ordinarily actionable.").  That the subject here is sports — as opposed to a political speech — is

18   immaterial; the First Amendment protects sports broadcasts just as much as any other speech.

19   *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) ("The Free Speech Clause exists

20   principally to protect discourse on public matters, but we have long recognized that it is difficult to

21   distinguish politics from entertainment, and dangerous to try.").

22        Every court to consider the issue has held that the First Amendment bars claims based on

23   the noncommercial use of NIL relating to sporting events.  *C.B.C. Distribution & Mktg., Inc. v.*

24   *Major League Baseball*, 505 F.3d 818, 823 (8th Cir. 2007) (First Amendment precludes ROP

25   claim by players arising from use of their "names, nicknames, likenesses, signatures, pictures,

26   playing records, and/or biographical data" in fantasy baseball game); *Gionfriddo v. Major League*

27   *Baseball*, 94 Cal. App. 4th 400, 410-11 (2001) (noncommercial use of "factual data concerning the

28   players, their performance statistics, and verbal descriptions and video depictions of their play"

was absolutely protected by First Amendment from ROP claims); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 794-96 (1995) (reproduction of athlete's image in coverage and poster of "newsworthy sports events" protected by First Amendment); *Dora*, 15 Cal. App. 4th at 542 (rejecting ROP claim arising from footage of a competitive surfer because "the public interest in the subject matter of the program gives rise to a constitutional protection against liability"). APs have never cited, and we are not aware of, any case holding that the First Amendment allows participants in a live broadcast of a sporting event to assert NIL rights over their appearance.

The "commercial" exception to First Amendment protection cannot apply to live broadcasts of a basketball or football game. Speech is "commercial" where it "propose[s] a commercial transaction," *i.e.*, where the "speech is an advertisement" for a "particular product." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011). *See also* Dkt. 876 at 22. Speech is not commercial simply because it or the underlying enterprise generates money: "Some of our most valued forms of fully protected speech are uttered for a profit." *Bd. of Trs. v. Fox*, 492 U.S. 469, 482 (1989). *See, e.g.*, *Gionfriddo*, 94 Cal. App. 4th at 411 ("Profit, alone, does not render expression 'commercial.'"). Plaintiffs cannot show that the live broadcast of basketball or football games is commercial speech under the First Amendment. College football and basketball games are not advertisements for some other product: they are broadcast because they are *themselves* matters of great public interest.

In sum, the First Amendment bars any claim that student-athletes have NIL rights for appearing in live sports broadcasts, because such speech is clearly not commercial. The NCAA is entitled to summary judgment on all damages and injunctive claims relating to live broadcast.

**B.      APs' Injunctive Relief Claim Regarding Videogames Is Moot**

APs' request for an injunction barring the NCAA from applying its amateurism rules regarding videogame licenses is moot. APs cannot show "any real or immediate threat that the plaintiff will be wronged again — a likelihood of substantial and immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (quotation omitted). The NCAA has dropped the videogame license with EA. Luedtke Decl. Ex. 24 ¶ 19. As APs' expert (Noll) has conceded, EA cannot produce collegiate videogames products without the NCAA's trademarks.

1   *Id.* Ex 45, at 1261:1-21. Nor is there any evidence the NCAA will enter into a license agreement

2   with EA or any other video game-maker in the future. APs' injunctive relief claim is moot.

3        **C.    The Individual APs' Claims Fail in Whole or in Part**

4        The claims of the named APs — 15 former SAs and five current SAs[4] — fail entirely, or in

5   part, for one the following reasons. (The table in the Appendix illustrates which arguments apply

6   to which individual APs.)

7        *First*, the claims of the former SAs for injunctive relief should be dismissed because it is

8   undisputed that the NCAA in no way restricts student-athletes from participating in any market for

9   licensing their NIL rights after their eligibility is complete. *See supra* at 2-3; *id.,* Ex. 44, at 881:16-

10  21, 884:4-19. Thus, former SAs are no longer subject to any NCAA rules and can have no claim

11  for injunctive relief.

12       *Second,* as for damages claims by former SAs, antitrust actions are subject to a four-year

13  statute of limitations, 15 U.S.C. § 15b, so APs can recover only for violations since July 21,

14  2005. Twelve of the former SAs completed their athletic eligibility prior to that date, could thus

15  freely license their NIL rights at all times during the limitations period, and thus have no damages

16  claim. Even as to the other three former SAs who graduated between 2005 and 2008, they first

17  started playing collegiate athletics and became subject to any alleged anticompetitive restraints

18  before July 21, 2005, and so their claims are also barred.[5] *See David Orgell, Inc. v. Geary's*

19  *Stores, Inc.*, 640 F.2d 936, 937-38 (9th Cir. 1981) (§ 15b runs from *first* overt act restricting

20  participation in relevant market).

21       *Third*, even setting aside the First Amendment issue, no named AP (current or former) has

---

22  [4] The former SA APs are O'Bannon, Robertson, Russell, Flournoy, Gilbert, Jacobson, Jaracz,
23  Lattin, Maynor, Prothro, Rhodes, Riley, Tallent, Wimprine and Ellis; the current SA APs are
    Fischer, Smith, Robinson, Alipate and Garnham. 3CAC ¶ 16. APs George and Keise have been
24  voluntarily dismissed. Dkt. 835 & 915.

    [5] These three former SAs do not have the evidence needed to restart the § 15b clock, *i.e.,* a "new
25  and independent act (i) that is not merely a reaffirmation of a previous act" and (ii) that "inflict[s]
    new and accumulating injury." *Pace Indus. v. Three Phx. Co.*, 813 F.2d 234, 238 (9th Cir. 1987).
26  Subsequent refusals to deal, *see Orgell*, 640 F.2d at 938, continued performance of
    anticompetitive contracts, *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004), and, in
27  the right of publicity context, television rebroadcasts, *see Nichols v. Moore*, 334 F. Supp. 2d 944,
28  953 (E.D. Mich. 2004), do not constitute such new and independent acts for § 15b purposes.

an NIL right under the applicable state law for live broadcasts of sports events. Courts generally apply the law of the plaintiff's domicile for right of publicity claims, regardless of the location of the alleged infringement. *See* Restatement (Second) of Conflict of Laws § 153 (1971). This is the approach taken, for example, under California law. *See, e.g.*, *Fleury v. Harper & Row, Publishers, Inc.*, 698 F.2d 1022, 1025 (9th Cir. 1983) (applying law of plaintiffs' domicile to ROP and defamation claims), *overruled on other grounds by In re McLinn*, 739 F.2d 1395, 1397 (9th Cir. 1984); *Page v. Something Weird Video*, 908 F.Supp. 714, 716 (C.D.Cal.1995) ("[I]t is well-established that, where defendants publish or distribute the materials in various states, the state of plaintiff's domicile usually has the most significant relationship to the action."). Thus, regardless of where games might be played or broadcast, each SA's NIL rights should be governed by his home state's law. As the Appendix demonstrates, whether we look at the APs' home state when they were in college or at the time of the complaint, the relevant state laws either have an express statutory bar on ROP claims arising from sports broadcasts, or preclude ROP claims for matters of public interest such as sports broadcasts. Two APs (Jacobson and Alipate) reside in Minnesota, which has only recently adopted a ROP tort, but there is no reason to believe that Minnesota courts will treat sports broadcasts differently than the other states to address the issue.

## IV.  GOVERNING LAW AND THE NCAA'S EVIDENCE OF PROCOMPEITIVE JUSTIFICATIONS PRECLUDES SUMMARY JUDGMENT FOR THE APs

This Court has held that the Rule of Reason governs here. Dkt. 876 at 9 n.5. Under the Rule of Reason, "the fact finder must balance the restraint and any justifications or pro-competitive effects of the restraint in order to determine whether the restraint is unreasonable." *Am. Ad Mgmt.*, 92 F.3d at 791 (quotations omitted). This cannot be done at summary judgment if there are disputed facts, of which there are many here. *See infra* section IV.B.

APs argue, however, that the Court should presume the NCAA's amateurism rules to be anticompetitive under the "quick look" standard. As explained below, the quick look standard cannot apply here, both on its own terms and under the specific case law governing joint ventures and addressing the NCAA's amateurism rules. Indeed, whereas cases like *Board of Regents*, *Agnew*, and *American Needle* say that the NCAA's amateurism rules should be presumed to be

procompetitive, no court (including this Court in its motion to dismiss ruling) has ever suggested that any NCAA rule—much less the amateurism rules at the core of the NCAA's unique product—could be presumed anticompetitive.  The NCAA seeks summary judgment based on the cases cited below.  But if this Court denies summary judgment for the NCAA, then at the very least the NCAA should be entitled to present all of its procompetitive evidence in a full Rule of Reason trial.  Much of this evidence is attached to the Luedtke Declaration and shows, at a minimum, that there are hotly disputed issues of fact with respect to APs' efforts to show that amateurism is meaningless.  The record evidence precludes summary judgment for APs.

### A.   The NCAA's Amateurism Rules Are Not Subject to "Quick Look" Review, but Rather Can and Should Be Validated "in the Twinkling of an Eye"

As noted, APs argue that the Court should presume the NCAA's amateurism rules to be anticompetitive under the "quick look" standard.  But the "so-called 'quick look' analysis is the exception, rather than the rule." *Am. Ad Mgmt.*, 92 F.3d at 789.  Quick look cannot apply to conduct that "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999).  Quick look applies only "to business activities that are so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.3 (2006).  This is not such a situation.  *First*, the evidence attached to the Luedtke Declaration, and summarized *infra* section IV.B., demonstrates that it not just "plausible" but likely that the NCAA's amateurism rules have a "net procompetitive effect."

*Second*, cases like *Board of Regents* and *Agnew* make clear that the NCAA's amateurism rules are subject to exactly the opposite analysis from "quick look":  if anything, they should be presumed to be *procompetitive* because they are essential for the NCAA to produce a unique product, amateur sports.  As the *Agnew* court explained, under *Board of Regents*, "when an NCAA bylaw is clearly meant to help maintain the 'revered tradition of amateurism in college sports' or the 'preservation of the student-athlete in higher education,' *the bylaw will be presumed procompetitive*." *Agnew* at 342-43 (emphasis added).  This is because

> [such rules] are clearly necessary to preserve amateurism and the student-athlete in college football.  Indeed, *they define what it means to be an amateur or a student-*

*athlete, and are therefore essential to the very existence of the product of college football*. There may not be such a thing as a student-athlete, for instance, if it was not for the NCAA rules requiring class attendance, and thus no 'detailed analysis,' would be necessary to deem such rules procompetitive. *The same goes for bylaws eliminating the eligibility of players who receive cash payments beyond the costs attendant to receiving an education — a rule that clearly protects amateurism.*

*Id.* at 343 (quoting *Am. Needle*, 130 S. Ct. at 2216-17) (emphasis added; citations omitted).

*Board of Regents* and *Agnew* are not isolated cases about the NCAA. They apply the well-established law relating to joint ventures. *See, e.g.*, *Dagher*, 547 U.S. at 5. If a product can be produced only by a joint venture, then agreements essential to the existence of the new product, even agreements that may be deemed anticompetitive in other cases, are upheld — without "detailed analysis." *Am. Needle*, 130 S. Ct. at 2217 (agreements among NFL teams necessary to the production of games "are not trapped by antitrust law"). Such joint venture restraints are inherently procompetitive because they make available to consumers a product that otherwise would not exist; they "widen consumer choice." *NCAA v. Bd. of Regents of Univ. of Ok.*, 468 U.S. 85, 102 (1984). *See also Broad. Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 23 (1979) (upholding joint "blanket license" because it created a "different product" with "unique characteristics"). Where an agreement is essential for a joint venture to produce its unique product, "the Rule of Reason may not require a detailed analysis; it 'can sometimes be applied in the *twinkling of an eye*'" and found to "survive the Rule of Reason." *Am. Needle*, 130 S. Ct. at 2216-17 (emphasis added).

Of course, not every NCAA rule is within this procompetitive presumption, because not every rule is necessary to preserve a system of amateur athletics. But every court at every level to consider the NCAA's ***amateurism rules***, which preclude payments to athletes based on their performance, has applied the "twinkling of an eye" approach.[6] This Court should grant summary

---

[6] In addition to *Board of Regents* and *Agnew*, *see Smith v. NCAA*, 139 F.3d 180, 187 (3d Cir. 1998) ("in general, the NCAA's eligibility rules allow for the survival of the product, amateur sports, and allow for an even playing field."), *vacated on other grounds*, 525 U.S. 459 (1999); *Law v. NCAA*, 134 F.3d 1010, 1018 (10th Cir. 1998) ("The 'product' made available by the NCAA in this case is college basketball; the horizontal restraints necessary for the product to exist include rules such as those forbidding payments to athletes and those requiring that athletes attend class, etc."); *McCormack v. NCAA*, 845 F.2d 1338, 1344-45 (5th Cir. 1988) ("The NCAA markets college football as a product distinct from professional football. The eligibility rules create the

judgment for the NCAA under the "twinkling of an eye" standard because the amateurism rules

being challenged are necessary for there to be amateur college football and basketball games.

In any case, no court has ever suggested a "quick look" analysis could apply to condemn

the NCAA's amateurism rules.  That would fly in the face of cases like *Board of Regents*, *Agnew*,

*Smith*, *Law*, and *McCormack*, which all found the amateurism rules presumptively procompetitive.

This Court has held that under *Board of Regents* "the NCAA must be given some leeway to adopt

anticompetitive rules without running afoul of the Sherman Act.  [The Supreme Court] reasoned

that intercollegiate athletics is 'an industry in which horizontal restraints on competition are

essential if the product is to be available at all.'"  Dkt. 876 at 10.  Even if this Court were to find

enough in the record to require a full assessment of the NCAA's amateurism rules, there is nothing

in the record or in the case law to suggest this assessment should begin with a presumption that the

NCAA's rules are anticompetitive, which is precisely what APs are seeking in a "quick look"

standard.  A quick look analysis is no more appropriate here than *per se* condemnation.

### B.     There Is Abundant Evidence That the NCAA's Amateurism Rules Are Procompetitive

Even putting aside the "twinkling of an eye" standard, the NCAA has asserted five

procompetitive justifications for the amateurism rules.  APs argue that no evidence supports any of

these justifications.  APs' arguments, however, improperly (1) rely on inadmissible and irrelevant

evidence, *see, e.g.*, APM at 9 (quoting hearsay from Walter Byers' book); *id*. at 10 n.10 (double-

hearsay quotation of former university president in news article); *id*. at 18 (relying on collection of

articles expressing hearsay opinions)[7]; (2)  truncate, mischaracterize or simply ignore the NCAA's

evidence, *see, e.g.*, *id*. at 10 (quoting out of context statements by Wallace Renfro and ignoring

_____

product and allow its survival in the face of commercializing pressures."); *Walk-On*, 398 F. Supp.
2d at 1148 (W.D. Wash. 2005) ("The law is clear that athletes may not be 'paid to play.'"); *Metro.
Intercollegiate Basketball Ass'n v. NCAA*, 339 F. Supp. 2d 545, 550 (S.D.N.Y. 2004) ("As the
Supreme Court noted in *Board of Regents*, college athletics is a unique product, whose amateur
rules distinguish it from professional sports and widen consumer choice.").

[7] "A trial court can only consider admissible evidence in ruling on a motion for summary
judgment."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  The NCAA has
filed separately objections to all of APs' inadmissible evidence, which should be stricken from the
record. Fed. R. Civ. P. 56(c)(2).

1  deposition testimony regarding same); and (3) present the opinions of APs' experts as

2  unchallenged gospel, *see, e.g.*, *id.* at 12 (Poret); *id.* at 15, 17 (citing Noll).[8]

3      The evidence, including declarations, attached to the Luedtke Declaration submitted with

4  this brief contains abundant support for the procompetitive effects of the NCAA rules.  The

5  Declaration sets forth which particular declarations, deposition testimony, and documents apply to

6  each of the five justifications.  Even if quick look review were applicable (which it is not), it

7  would merely shift the burden to the NCAA "to show empirical evidence of procompetitive

8  effects."  *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1160 (9th Cir. 2011) (quoting *Cal.*

9  *Dental*, 526 U.S. at 775 n.12).  Again, as demonstrated below, the NCAA has more than

10  discharged any such burden.

11      A critical measure of competitive effect in a case like this is the impact on ***output***, whether

12  measured in the number of games, the number of viewers, the number of teams participating, the

13  number of sports sponsored, or the number of scholarships.  As the Areeda treatise explains, "a

14  useful criterion for determining whether the naturally anticipated effects of an agreement are anti-

15  or procompetitive is output."  11 P. Areeda & H. Hovenkamp, Antitrust Law § 1901(d), at 227 (3d

16  ed. 2012) ("Areeda").  While "a market can be said to become increasingly competitive when its

17  output increases," *id.* § 1901(a), at 225, reduced "output is a sound general measure of anti-

18  competitive effect, and several Supreme Court decisions have emphasized it."  7 Areeda

19  § 1503(b), at 394.  *See also Broad. Music*, 441 U.S. at 18-23 (joint venture that increases output is

20  procompetitive); *Cal. Dental*, 526 U.S. at 776 (key question in rule of reason analysis is whether

21  the restraint "obviously tends to limit the total delivery of [relevant] services").  APs have not

22  even tried to argue that the number of viewers, sports, scholarships or competing schools has gone

23  down because of the NCAA's rules.  Rather, as discussed below, there is abundant evidence in the

24

---

25  [8] Contrary to APs' arguments, the Court may not weigh the opinions of APs' and the NCAA's experts and decide which to believe.  Particularly where APs have filed no *Daubert* challenge,

26  "the jury must decide among the conflicting views of different experts." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).  Moreover, lay opinion testimony by NCAA witnesses

27  also suffices to contest APs' factual contentions and preclude summary judgment for APs.  *See, e.g.*, *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 240-41 (6th Cir. 2010).

28

1    record that the number of viewers, sports, scholarships and competing schools would decline if the

2    NCAA's rules were eliminated.  That is powerful evidence that the NCAA's rules produce more

3    output and are therefore procompetitive.

### 1.    There Is Overwhelming Evidence That Amateurism Increases Consumer Demand

6    APs ask the Court to find as a matter of law that there is no evidence — none — "that

7    college athletics are popular *because of the NCAA's definition of amateurism*, or that their

     popularity would decrease were SAs paid for commercial use of their NILs."  APM at 10-11.  But

8    there is substantial evidence that amateurism makes NCAA sports more popular, increasing

9    output, consumer demand and consumer value.  It is APs who have little evidence on point.

### a.    Abundant Survey Evidence Shows That the NCAA's Amateurism Rules Increase the Popularity of Division I Sports

12   As even APs grudgingly concede, NCAA expert Professor Daniel Rubinfeld — a former

13   Chief Economist of the Antitrust Division of the United States Department of Justice — has

14   pointed to multiple surveys showing that the public regards NCAA men's basketball and football

15   as a unique product because of amateurism, and that this differentiation is a source of consumer

16   interest in college men's basketball and football.  Luedtke Decl. Ex. 29 ¶¶ 79-82 ¶¶ 167-217; Ex.

17   27 (Rubinfeld Decl.) ¶¶ 10-12 .  *APs do not cite a single contrary survey (or other evidence) of*

18   *their own*.  APs instead point to their expert witness's critique of the surveys, APM at 11-12, but

19   such critiques do no more than create issues for the fact-finder.  *See Fortune Dynamic, Inc. v.*

20   *Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (holding that

21   district court erred by excluding survey evidence and reversing grant of summary judgment).[9]

22   Perhaps most compelling is the Dennis survey, by an expert with more than 20 years of

23   survey experience.  Luedtke Decl. Ex. 37 ¶ 27 and Ex. E.  The survey of 2,455 respondents was

_____

25   [9] *See also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)
     ("deciding what weight to accord the survey" is "not the role of a district court at the summary
26   judgment stage where the issue is whether a triable issue of fact even exists") (reversing grant of
     summary judgment where district court "analyze[d] what it considered" survey's "deficiencies");
27   *Wendt v. Host Int'l Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology
28   go to the weight given the survey, not its admissibility.").

1  conducted this Fall to respond to the opinions of APs' experts that paying SAs for their

2  appearance on television would not affect demand.  The Dennis survey destroys APs' arguments

3  against amateurism.  The Dennis survey found that 68.9% of all respondents were "opposed to

4  paying money to student-athletes on college football and men's college basketball teams in

5  addition to covering their college expenses"; while the specific percentages varied somewhat

6  across groups depending on the level of their consumption of sports viewing, across all levels a

7  majority were opposed to such payments.  In other words, the survey shows that consumers would

8  have less interest in and benefit less if college athletes were paid.

9       The survey shows that 38% of respondents were less likely to watch, listen to, or attend

10  games if football or men's basketball players were paid $20,000 per year; 47% if athletes were

11  paid $50,000 per year; and 53% if athletes were paid $200,000 per year.  *Id.* ¶ 31.  These amounts

12  are all within the range of payments that APs are seeking.  This survey, like others, confirms that

13  amateurism is a procompetitive source of product differentiation and demand for the NCAA, as

14  the Supreme Court found in *Board of Regents*.  The survey confirms that the amateurism rules

15  increase consumer demand: the touchstone for competitive analysis.  Although the NCAA

16  believes this survey evidence should be dispositive as to the competitive analysis, at a minimum it

17  precludes a finding that amateurism is without a procompetitive effect to be balanced against the

18  alleged anticompetitive harms.

19       APs do not move to strike the Dennis survey on *Daubert* grounds but argue that the survey

20  was not proper expert rebuttal.  *See* APM at 12-13.  APs are wrong.  The Dennis Report and its

21  survey qualify as proper rebuttal testimony because they were "intended solely to contradict or

22  rebut evidence on the same subject matter identified by" APs.  Fed. R. Civ. P. 26(a)(2)(D)(ii).

23  APs' experts, Noll and Rascher, opined that paying SAs would not affect the demand for college

24  sports.  NCAA experts Pilson and Rubinfeld rely on the Dennis survey to rebut those opinions.

25  *See* Luedtke Decl. Exs. 39, at 39, 46-49, Ex. 36 ¶¶ 19, 173-78; Ex. 27 (Rubinfeld Decl.) ¶¶ 10-11.

26  Specifically, the Dennis survey tested the effect that APs' damages model (first disclosed in

27  Rascher's merits expert report) would have on consumer demand by asking respondents about

28  paying college football and men's basketball players the amounts identified in Rascher's damages

model.  *See id.*, Ex. 37 ¶ 30 (explaining that survey's payment ranges of $20,000 to $200,000 were based on what "average college football players in the major conferences would be paid" under "Rascher's damages model").[10]

### b. APs Distort and/or Ignore Other Evidence of Amateurism's Effect on Consumer Demand

The survey evidence discussed above suffices to doom APs' arguments about the effects of amateurism and their entire motion.  But there is much more that justifies denial.  Neal Pilson, sports media expert and former President of CBS Sports, opined that based on his experience, paying student-athletes as APs propose "would undermine the key features of college sports that make them tremendously popular."  Luedtke Decl. Ex. 37 at 45.  Even APs' own expert, Noll admitted that paying athletes large sums was likely to "negatively impact the popularity of the sport."  *Id.*, Ex. 44 at 851:5-852:9; *see also id.* Ex. 45 at 1315:15-24.  Further, there is testimony in numerous declarations and deposition transcripts (including from named APs themselves) attesting to the importance of amateurism to NCAA sports.  Luedtke Decl. ¶¶ 13-40.  For example, University of Michigan President Mary Sue Coleman testified that in her experience, "amateurism is fundamental to Michigan athletics," and for that reason, paying players for their NIL "would undermine the popularity of Michigan football and men's basketball."  *Id.*, Ex. 7 ¶¶ 14-15 (disagreeing with APs' argument, APM at 11, that Michigan fans would be blindly loyal to Michigan's teams even with payment of the athletes).  University of Wisconsin – Madison Chancellor Rebecca Blank agrees.  She testified that in her experience, "the popularity of college sports would be impacted negatively if football and men's basketball players were paid for participating, for example, in televised games. *Id.*, Ex. 3 ¶ 17

APs ask the Court to ignore all of this evidence and testimony and rely instead on irrelevant lay opinions in a book by a *former* NCAA Executive Director (Byers).  APM at 9.  The book, however, is inadmissible hearsay and in any event does not contradict the survey evidence

---

[10] In any event, APs cannot show prejudice, as is required for exclusion.  *See* Fed. R. Civ. P. 37(c)(1).  APs deposed Dennis, Luedtke Decl. Ex. 42, critiqued his survey through their own expert (Poret), *see* APM at 12-13, and elected not to conduct a survey of their own.  There is no prejudice.

1   discussed above (and even as to non-survey would create no more than a factual dispute).  APs

2   also assert that a former NCAA executive (Wallace Renfro) purportedly discounted the continuing

3   relevance of amateurism in an email.  *Id*. at 10.  In fact, at his deposition, Renfro explained that

4   APs had misread his email, and that he was, "as bluntly and as provocatively as I could, sort of

5   stat[ing] the view of those who are the most critical and cynical of intercollegiate athletics."

6   Luedtke Decl. Ex. 74 at 135:6-10.  At most, APs have established a credibility dispute, which

7   cannot be the basis for summary judgment.[11]

8        APs also urge the Court to conclude that paying SAs for licensing NILs is compatible with

9   the NCAA's definition of amateurism.  APM at 14-16.  APs' "evidence" on this point, however,

10   consists solely of the musings of their expert, Noll, that he personally sees no necessary

11   relationship between paying athletes 50% of broadcast revenues and the principle of amateurism.

12   The record contains abundant evidence to the contrary, *including admissions by the individual APs*

13   *themselves*.  For example, Plaintiff O'Bannon testified that he agrees that "college sports should

14   remain amateur and that college athletes shouldn't get paid while they're in school."  Luedtke

15   Decl. Ex. 59 (O'Bannon Dep. at 95:17-22 ).  *See also id.* ¶¶ 13-16.  University and conference

16   witnesses concur.  *See, e.g.*, *id.* ¶¶ 17-33.

17        Moreover, *neither APs nor any of their experts have identified a single amateur sport that*

18   *permits athletes to be paid any amount of broadcast revenue*, let alone any amateur sport in which

19   athletes actually receive such payments.  *See* Luedtke Decl. Ex. 27 at ¶¶ 15-19.  APs' expert, Noll,

20   concedes as much.  *Id.,* Ex. 45 at 1331:12-1332:1.  ESPN will pay $60 million to telecast the Little

21   League World Series over the next eight years.  *Id.*, Ex. 39 at 23.  Earlier this year, Fox Sports

---

[11] APs similarly take out of context a fragment from another email in which Renfro wrote that "that competitive advantage or disadvantage doesn't appear to have any rational connection to the principle of amateurism."  APM at 17 (quoting AP Ex. 11).  Renfro was referring to whether athletes who have played on international teams alongside professional players could retain their NCAA eligibility as long as they were not paid themselves.  Renfro said that some people thought playing alongside professionals gave those athletes a "competitive advantage," but he, Renfro, did not see a problem because that particular type of "competitive advantage" — playing alongside pros — did not "appear to have any rational connection to the principle of amateurism."  AP Ex. 11.  APs can try to use these kinds of mischaracterized emails during cross-examination at trial, but they cannot obtain summary judgment based on them.

agreed to pay the United States Golf Association ("USGA") $1.2 billion, or approximately $100 million per year, to televise all USGA championships, including 10 amateur championships. *Id.* at 21.  In 2011, Time Warner Cable agreed to pay $1.5 million per year for the rights to telecast California Interscholastic Federation ("CIF") regional and state high school championship events for 15 years. *Id.* at 22.  There is no evidence that any of these athletes are paid any portion of broadcast revenues.  And the *reason* that the Little Leaguers, the amateur golfers and the high school athletes are not paid for appearing on television is that they are amateurs.[12]  Even when the Olympics was restricted to amateurs (between 1896 and the late 1980s) and the Olympics produced billions of dollars in television revenues, the athletes were paid no portion of the revenues *because they were amateurs.  Id.,* Ex. 44 at 1157:2-1159:8.

APs argue that the fact that certain football and men's basketball teams generate significant revenues, and that some coaches earn significant salaries, shows that amateurism has no meaning. APM at 13-14.  APs ignore the fact that under the NCAA's definition, and the public's perception, of amateurism, it is the *athletes* who participate in their sports as an avocation, not the coaches. Luedtke Decl. ¶¶ 34-40.  APs can argue to the fact-finder that the increase in coaches' salaries makes it "highly unlikely" that consumers will care about paying SAs, APM at 14, but they have no evidence to that effect and the issue cannot be resolved in APs' favor on summary judgment.

Finally, it should be recognized that APs' approach to amateurism would outlaw all popular amateur sports.  The exact same arguments and analysis would condemn the USGA rules precluding payments to amateur golfers, the failure to pay Little League baseball players, or the rules that governed Olympic amateurism for almost a century.  In each case, there can be significant television revenues, professional coaches, expensive facilities — along with a restraint on paying athletes, whether from television revenues or otherwise.  Not surprisingly, Noll testified that his analysis leads him to conclude that the amateur Olympics were an antitrust violation for 90 years.  Luedtke Decl. Ex. 44, at 1159:9-15.  The APs' other economist Rascher was also unable to identify any reason that every amateur sport would not violate the antitrust laws if the NCAA's

---

[12] *See, e.g.*, California Interscholastic Federation, Constitution and Bylaws, http://www.cifstate.org/images/PDF/State_Constitution_and_Bylaws/200_Series.pdf.

amateurism rules are outlawed.  *Id.* Ex. 46A, at 1002:8-1003:3.  Indeed, if APs' theories are taken seriously, the more popular an amateur sport and the greater its television revenues — and thus the greater the consumer demand and procompetitive consumer benefits — the more "anticompetitive" it would be not to pay athletes for appearing on television.  *Id.,* Ex. 27 (Rubinfeld Decl.) at ¶¶ 6-8.  This turns antitrust law on its head.

### 2. The NCAA's Amateurism Rules Help to Maintain Competitive Balance Among Schools and Across Conferences

The concept of competitive balance is grounded in fundamental economic principles.  As Rubinfeld explains:  "Amateurism rules help to prevent teams with more resources from having a recruiting advantage.  Under current NCAA rules, the grant-in-aid is a standardized package that is common across schools. . . . [I]t is basic economics that providing substantial and widely varying payments to prospective recruits would create strong incentives for recruits to move to high revenue schools."  Luedtke Decl. Ex. 29 ¶ 87; *see also id.* Ex. 27 at ¶¶ 33-38.  There is substantial evidence from Conference Commissioners, University Presidents and Athletics Directors confirming exactly this point.  *Id.* ¶¶ 41-66.  Patrick Harker, President of the University of Delaware, testified that in a world where SAs are paid, "[s]tudent-athletes would likely gravitate toward schools that would 'pay' them the most amount of money, without regard to whether they would be able to play or what the best educational opportunity might be for that particular student."  *Id.,* Ex. 9 ¶ 12.  Similarly, Commissioner James Delany of the Big Ten Conference testified that "allowing student-athletes or prospective student-athletes to negotiate with their schools for a percentage of broadcast revenue would result in the strongest teams getting stronger, and a further consolidation of the strongest programs in the nation."  *Id.*, Ex. 8 ¶ 20.

There is a significant risk that smaller schools could not compete against larger schools if the rules restricting payment for NIL were modified.  Stan Albrecht, President of Utah State, explains the benefits to competitive balance that restrictions on payments above the cost of education would create.  He notes that Utah State has achieved national success in recent years by hiring highly talented young coaches and offering world class education to talented student athletes.  He notes, however, that "Utah State would find it much more difficult to recruit student-

athletes" if schools that earn more revenue from broadcast license fees decided to pay student-athletes 50% of broadcast revenue. *Id.,* Ex. 1 ¶¶ 17-18. Albrecht notes that the amount of broadcast money "would become a primary consideration for many prospective student-athletes in deciding where to attend college" and "Utah State simply could not match schools in bigger conferences on this dimension." *Id.* ¶ 18. Similarly, Britton Banowsky, Commissioner of Conference USA, testified that the NCAA rules against compensation for students do serve to promote the competitive balance of intercollegiate athletics. *Id.,* Ex. 2 ¶ 14. He, like President Albrecht, explained that these rules "are especially important for the ability of mid-level resource programs to compete with high-resource programs." *Id.* ¶ 15. Banowsky notes the success of Rice University, a Conference-USA member, and notes that in his experience, recruiting for a school like Rice would be "significantly disrupted" if other schools could offer large payments to student-athletes. *Id.* ¶ 16. *See also id.,* Ex. 20 ¶¶ 7-11 (testimony about impact on Fresno State).

Even those in larger conferences see the negative impact on competitive balance without the rules against compensation.[13] *See id.,* Ex. 4 ¶¶ 16-20; Ex. 19 ¶ 15; Ex. 14 ¶ 17. For example, witnesses explain there is competitive balance within conferences now and that balance could be disturbed if schools could use a substantial percentage of broadcast revenue to recruit football and men's basketball players. *See id.,* Ex. 11 ¶ 30; Ex. 8 ¶¶ 18-20; Ex. 10 ¶¶ 14-17.

APs ask the Court to conclude there is no evidence that the NCAA's amateurism rules promote competitive balance because there is no competitive balance today. APs' evidence consists primarily of the fact that 13 schools have accounted for 50% of the appearances in the Final Four basketball championship since 1950. APM at 17. But this tells us nothing. Luedtke Decl. Ex. 27 (Rubinfeld Decl.) at ¶¶ 31-32. *First*, every sport has perennial favorites. Indeed, sports would lose their appeal if there were no Yankees, Cowboys, or Lakers. *See id.,* Ex. 27 ¶ 36. One could just as easily, and just as erroneously, say that professional sports have no competitive

---

[13] Citing the fact that the NCAA Constitution uses the phrase "commitment to fair competition," APs erroneously assert that the NCAA "has . . . abandoned as a goal the notion of competitive balance." APM at 18. David Berst, Division I Vice President, explains that the phrase APs seize on maintains the NCAA's longstanding support for competitive balance and "competitive equity," which continues to be part of the NCAA Constitution. Luedtke Decl. Ex. 22 ¶¶ 18-22.

balance because nearly 40% of the NBA championship appearances since 1950 have been by just *two* teams (the Celtics and the Lakers), 50% of World Series appearances since 1903 were by just five teams, and 50% of Superbowl appearances were by just 8 teams.[14]  Indeed, looking at FBS football, the record of NCAA competitive balance is extraordinary: 21 different schools have been named national champion in the 35 years since the FBS was created in 1978, and more than 70 percent of FBS schools have been ranked in the final AP poll of the top 25 teams in the country at least once.  *Id.*, Ex. 26 ¶¶ 48, 51.  And regarding the Final Four, APs ignore the remarkable fact that *more than 80 schools* have reached the Final Four since 1950.  *Id.* ¶ 38.

*Second*, college sports provide opportunities for many more teams to succeed than do professional sports.  The March Madness basketball tournament is famous and popular in large part because smaller schools are able to succeed.  *See, e.g., id.,* Ex. 71 at 138:24-139:7 ("If you watched, for example, the past — let's just — let's use the past two NCAA men's championships.  You would have seen a small liberal arts college in Butler University have a shot in the air to almost defeat" top ranked programs.).

Third, competitive balance is a matter of degree.  The issue is thus not whether there "is" competitive balance but whether permitting schools to use broadcast revenues to recruit athletes will *decrease* the level of balance.  *Id.,* Ex. 27 (Rubinfeld Decl.) at ¶ 22.  All APs can cite on this point is their expert Noll's speculation that payments to athletes might improve competitive balance because "a school with less revenue might be willing to pay more for a single better athlete than higher-revenue schools would for multiple top athletes."  APM at 19 n.18; *see also* Luedtke Decl. Ex. 27 (Rubinfeld Decl.) at ¶¶ 23-30.  That is entirely inconsistent, of course, with the premise of APs' theory: that all athletes on a team should be paid the same amount under a "group license."  More important, as discussed above, the witnesses who live in the world of running universities and athletic departments have a different experience.  They explain that allowing schools to pay the kind of money APs seek would eliminate recruiting equity, dramatically worsening competitive balance.  Luedtke Decl. ¶¶ 48-62.  Even if Noll's speculations

---

[14] *See* http://en.wikipedia.org/wiki/List_of_Super_Bowl_champions; http://en.wikipedia.org/wiki/World_Series; http://en.wikipedia.org/wiki/List_of_NBA_champions.

1    are credited, weighing the competing evidence is a task for trial.

2          **3.**    **The NCAA's Amateurism Rules Are Essential to Integrating Education and Athletics**

APs argue that, as a matter of law, integrating education and athletics may not be a procompetitive justification because education is purportedly in "some other market" than the one APs say is restrained.  APM at 20.  But APs themselves define one of the relevant markets as "the SA Division I college education market in the United States."  *Id*. at 8.

APs are also wrong to denigrate the antitrust importance of improving the educational experience for student-athletes and advancing the educational mission of colleges.  APs misconstrue the import of *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978) (*NSPE*).  In *United States v. Brown University*, 5 F.3d 658, (3d Cir. 1993), for example, MIT had agreed with the Ivy League schools to determine financial aid exclusively on the basis of need, and the schools collectively agreed on the amount of financial aid each would offer to admitted students, to avoid a bidding war among the colleges for admitted students.  *Id*. at 661-64.  MIT defended the agreement as "providing needy students with the ability to enroll if accepted," which "increased consumer choice and enhanced the quality of education provided to all students by opening the doors of the most elite colleges in the nation to diversely gifted students of varied socio-economic backgrounds." *Id*. at 664.  Citing *NSPE*, the district court rejected MIT's arguments as "social welfare justifications" and condemned the agreement under "quick look."  *Id.*  The Third Circuit reversed, concluding that it was procompetitive to "promot[e] socio-economic diversity at member institutions," and thus "improve[] the quality of the education offered by the schools and therefore enhance[] the consumer appeal" of an MIT education.  *Id.* at 674.  The Third Circuit distinguished *NSPE* and relied instead on the recognition of such procompetitive benefits in the university context in *Board of Regents*. *Id.*  (citing *Board of Regents*, 468 U.S. at 114-15).  As in *Brown University*, it is essential to consider the benefits of amateurism to the student-athlete's educational experience and a university's educational mission.

APs belittle the relationship between amateurism and effective integration of athletics and academics, claiming that NCAA has only "concerns" and no evidence.  APM at 21.  Numerous

college officials have testified, however, to the very real effects on campus life, student morale, and their schools' educational mission if some student athletes were highly compensated.  Luedtke Decl. Exs. ¶¶ 95-111.  Payments will set SAs apart from other students and student-athletes.

For example, Michigan State Athletics Director Mark Hollis testified: "Paying student-athletes for participating in televised games would send the message that they are on campus for an entirely different purpose than the rest of our students:  to make money.  This would set our student-athletes apart from their community and their fellow students in dining halls, community service, social events and other forums.  In my experience, that would have a negative impact on the student-athletes and the university community at large."  *Id.*, Ex. 11 ¶ 10. Joe Castiglione, Athletics Director at the University of Oklahoma, testified that compensating student-athletes beyond the cost of their college education would undermine the value of academic excellence and "lead to a feeling of 'win or else' and would shift the athletes' focus toward their performance as athletes and away from their educational endeavors."  *Id.*, Ex. 6 ¶ 10.  Christine Plonsky, Women's Athletics Director at the University of Texas-Austin, concurs it "would upset the balance within our education system by paying some but not all students for extracurricular activities."  *Id.*, Ex. 16 ¶¶ 11, 15.  Ken Starr, President of Baylor University, observed that payment would create an "elitist group of paid athletes whose separateness from other students could interfere with their relationships with other students and faculty."  *Id.*, Ex. 19 ¶ 7 (noting that Baylor does not pay other students who participate in extracurriculars like music and debate). The potential impact on education presents, at a minimum, a disputed fact question.

APs suggest also that colleges systematically fail to support men's basketball and football players academically, supposedly belying the genuineness of the focus on education.  APM at 20 n.19.  Again, the record evidence tells a different story.  A 2010 NCAA study surveyed nearly 20,000 student-athletes, including 363 Division I men's basketball players and 799 FBS football players.  The study found that the majority of Division I student-athletes surveyed reported a high academic self-identity (an average score of 5 or higher on 6-point scale).  It also found that the great majority of Division I student-athletes surveyed agreed or strongly agreed with the statements "I see myself as part of the campus community" and "I have a sense of belonging to

1   this campus." Overall, more than 80% of student-athletes surveyed reported being "satisfied" or

2   "completely satisfied" with their overall collegiate experience. Luedtke Decl. Ex. 26 ¶¶ 16-21.

3   These findings resonate with the experiences of the actual SAs who are plaintiffs in this case: All

4   but two of the former-SA plaintiffs graduated from college, including those who went on to have

5   significant professional sports careers. *Id.* ¶¶ 76, 78-90. All of the current-SA plaintiffs testified

6   they intend to graduate. *Id*. ¶¶ 71-75. And every one of the named plaintiffs — current and

7   former — testified about the value of the education they received and the importance of being a

8   student as well as an athlete in their college experience. *Id.*

9        The named SAs' experiences are neither atypical nor the result of happenstance. The

10  record shows that schools make substantial efforts to ensure their SAs are integrated into the

11  educational life and mission of the school. *Id.* ¶¶ 92-111. All of the current SA plaintiffs testified

12  to the academic resources their schools have provided them. *Id.* ¶¶ 71-75. And, as set forth in the

13  accompanying declaration of Diane Dickman, Division I schools spend tremendous resources on

14  integrating education with athletics and they are increasingly successful in these efforts. *Id*., Ex.

15  23 ; *see also id.* ¶¶ 92, 94, 101c, 105, and 107c (outlining schools' and conferences' academic

16  support services for student-athletes at schools like University of Oklahoma, Michigan State,

17  Baylor, Utah State, University of Texas, and Michigan). And, as already noted, Professor James

18  Heckman, a Nobel Laureate famous for his work on education and human capital, conducted a

19  detailed econometric analysis of a large public dataset of student outcomes. He found that

20  basketball and football players are more likely to attend college and to have higher incomes after

21  college than, and similar graduations to, non-athletes with similar backgrounds. *Id*., Ex. 38. ¶¶ 31,

22  36, 49. The only record *evidence* (as opposed to anecdotes and allegations) is that education is a

23  critical component of college athletics, in which amateurism plays an important part. *Id.,* Ex. 27

24  (Rubinfeld Decl.) at ¶¶ 39-44.

25        **4.      The NCAA's Amateurism Rules Support Schools' Ability to Offer
                    Women's and Less Prominent Men's Sports**

26

27        APs argue that it does not matter if their but-for world results in the decimation of

28  women's and less prominent men's sports (which are often funded in part by television revenue

---

                        **NCAA'S SUMMARY JUDGMENT BRIEF**

derived from football and men's basketball games), because all that should matter is impact on men's basketball and football.  That argument flies in the face of *Brown University*, which held in similar circumstances that it was both procompetitive and a "common good" for MIT to limit financial aid to some students in an effort to "extend" the benefits of higher education "to as wide a range of individuals from as broad a range of socio-economic backgrounds as possible."  5 F.3d at 678.  The analysis here should also consider the procompetitive benefits and "common good" of extending the benefits of college athletes to as wide a range of students as possible.

Moreover, APs ignore that their but-for world would lower *output* of women's and other collegiate sports.  Luedtke Decl. Ex. 27 (Rubinfeld Decl.) at ¶¶ 39-54.  As noted above, reducing output is the essence of an anticompetitive effect. Numerous witnesses, from the NCAA, the conferences, and the schools themselves, have testified to the critical support that revenue from television broadcasts of men's basketball and football provides to other sports.[15]  A rule that the antitrust laws require the schools to provide as much as 50% of this revenue to a relatively small group of the total student-athlete population would have devastating effects on the schools' budgets, their abilities to offer a broad array of other sports, and their overall educational missions. *Id.* ¶¶ 114-147.  APs focus their attention on one pool of revenue — the NCAA Basketball Fund from March Madness revenue — and insist there is no evidence that this money goes to support student athletics.  APM at 23.  The record evidence, however, shows that almost 96% of the NCAA's revenue is distributed to Division I schools or to support championships or programs that benefit SAs, including an Academic Enhancement Fund, Grants-in-Aid and other student assistance.  Luedtke Decl. Ex. 24 ¶¶ 3-18.

Plaintiffs argue that cuts in spending to allow for payment of football and men's basketball players would come from coaching salaries and facilities.  Plaintiffs present no evidence in support of this argument, and it is contrary to the facts.  Luedtke Decl. Ex. 27 (Rubinfeld Decl.) ¶¶ 45-50.  Coaching salaries are, in most schools, not adequate to offset the loss of revenue that

---

[15] *See, e.g.*, Luedtke Decl. Ex. 1 ¶ 13; Ex. 6 ¶ 12 (Castiglione Decl.) ("Revenue from football and men's basketball broadcast contracts helps to support these important other sports programs."); Ex. 7 ¶ 16; Ex. 8 ¶ 14; Ex. 14 ¶¶ 13-14; Ex. 19 ¶ 6 .

APs propose.  Moreover, schools pay coaches market rates and view the procurement of top quality coaches to teach and train their student-athletes as a priority.  Thus, there is no evidence that cutting coaching salaries would account for the reallocation of revenue APs propose.  *See* Ex. 2 ¶ 13; Ex. 6 ¶ 17; Ex. 11 ¶¶ 26-27; Ex. 14 ¶ 13.  The same is true for facilities, where private donations and borrowing account for the majority of money spent on facility upgrades in intercollegiate athletics.  *See* Ex. 6 ¶ 17; Ex. 11 ¶¶ 17-21, 28.

APs' requested payment would hit women's athletics particularly hard.  Judy Sweet, an expert in gender equity issues in sports, testified that "[d]rastic cuts could be the outcome caused by plaintiffs' proposal, risking unraveling much of the progress and expansion in women's athletics that has been achieved in the past four decades."  *Id.*, Ex. 41 at 11.  Sweet also explains that APs' proposed but-for world would increase gender inequities.  After all, APs are suing on behalf of men's basketball and football players not because the men train harder, practice more, are better athletes, or deserve more than the women.  It is solely because those sports happened to become popular at a time when women's sports were not supported.  As Sweet explained, "[p]aying men more because their sports are already popular will lock in gender differentials that are based and built on historical inequities."  *Id.* at 14-15.

### 5. The NCAA's Amateurism Rules Support Increased Output of FBS Football and Men's Division I Basketball.

As explained above, output is a critical measure of competitive effects in a case like this.  *See supra* at 11.  Already discussed above is the evidence of the negative output impact of APs' but-for world on the audience for these sports and on the output of women's and other men's sports.  This evidence demonstrates that the NCAA's rules are more procompetitive than APs' proposed alternatives.

The fact is that Division-I and FBS have been extraordinarily successful in increasing output—by every measure—for many decades.  The size of the division has increased as schools have joined FBS and/or Division I , resulting in an increased output in the number of games played, the number of scholarships awarded, and consumer demand for televised games.  Joining Division I is not only a matter of increasing the number of men's basketball and football teams,

but joining Division I also requires a school to sponsor at least 16 sports, and generally results in hundreds of associated scholarships.  Luedtke Decl. Ex. 1 ¶ 7.[16]  This entry and increased output likely would not have occurred absent the NCAA' success in preserving the collegiate amateurism model, a "product" that is both attractive to consumers and consistent with NCAA member schools' missions.  *See, e.g.,* Luedtke Decl. Ex. 26  at 40, 52-56; *id.* Ex. 22 at 24-27.

There is unrebutted evidence that eliminating the NCAA's amateurism rules and forcing schools to recruit SAs with cash large payments will lead colleges to exit Division I or FBS, reducing output and opportunities for the very athletes that APs claim to represent.  The exit of schools will reduce the number of teams competing at the highest level of college athletics, the output of games played, the number of scholarships awarded, and the viewership of college sports—— not to mention the loss of sports and scholarships sponsored for women's and other men's sports.  Luedtke Decl. ¶¶ 148-149;  Ex. 27 (Rubinfeld Decl.) ¶¶ 55-59.  APs deride the evidence the NCAA provided at class certification of this significant output effect, claiming the NCAA's evidence was "conclusory" and "anecdotal." APM at 24-25.  But the evidence is well-supported in the record and *this Court has already credited and relied on the NCAA's evidence*. *See* Dkt. 893 at 20:2-9 (relying on evidence that "potentially higher costs of recruiting" SAs "would have likely driven some schools into less competitive divisions").  Indeed, the APs have no persuasive contrary evidence.  And the NCAA has submitted additional testimony from numerous witnesses from a variety of conferences and schools that the remedy APs seek would have a devastating effect on the output of amateur collegiate sports.  Luedtke Decl. ¶¶ 150-162.[17]

Again, this alone is enough to defeat APs' summary judgment motion: credible (and unrebutted) evidence that APs' but-for world would have a lower output of teams, scholarships, games, and student-athletes than the current world.

---

[16]  *See also* 2013-14 NCAA Division I Manual, at Bylaw 20.9, available at http://www.ncaapublications.com/p-4322-2013-14-ncaa-division-I-manual.aspx; 2013-14 NCAA Division II Manual, at Bylaw 20.10,  available at http://www.ncaapublications.com/p-4323-2013-2014-ncaa-division-ii-manual.aspx.

[17] *See, e.g.*, Luedtke Decl. Ex. 1 ¶ 14; Ex. 2 ¶ 11; Ex. 3 ¶ 14; Ex. 4 ¶¶ 13-14; Ex. 6 ¶ 18; Ex. 7 ¶ 16; Ex. 10A ¶ 13; Ex. 9 ¶¶ 16-18; Ex. 11 ¶ 24 (Hollis Decl.); Ex. 15 ¶ 7; Ex. 16 ¶ 12; Ex. 20 ¶ 5.

**V.      CONCLUSION**

The NCAA's motion should be granted, and APs' motion denied.

DATED:  December 12, 2013                    Respectfully submitted,

MUNGER, TOLLES & OLSON LLP


By:      _/ s / Glenn Pomerantz_
         GLENN D. POMERANTZ

Attorneys for Defendant NCAA

NCAA'S SUMMARY JUDGMENT BRIEF

**APPENDIX: Chart of Individual Antitrust Plaintiffs' Claims**

| | Plaintiff | State of College (College) | Current Residence | Years of Play | Free from NIL restrictions in statutory period? | Statute of Limitations Bar? | State Publicity Law Bar? |
|---|---|---|---|---|---|---|---|
| Former Student-Athlete Plaintiffs | Bill Russell (3CAC ¶ 58)[1] | California (USF) | Washington | 1953-1956 | Yes | Yes | Yes: Cal.[2], Wa.[3] |
| | Oscar Robertson (3CAC ¶¶ 41-42) | Ohio (Cincinnati) | Ohio | 1957-1960 | Yes | Yes | Yes[4] |
| | Harry Flournoy (3CAC ¶ 68) | Texas (Tex. Western) | Georgia | 1963-1966 | Yes | Yes | Yes: Tex[5], Ga.[6] |
| | David Lattin (3CAC ¶ 92) | Texas (Tex. Western) | Texas | 1965-1967 | Yes | Yes | Yes[5] |
| | Bob Tallent (3CAC ¶¶ 102-103) | Kentucky, Virginia (Kentucky, GWU) | Virginia | 1965-1967 | Yes | Yes | Yes: Ky.[7], Va.[8] |
| | Thad Jaracz (3CAC ¶ 82) | Kentucky (UK) | Kentucky | 1965-1968 | Yes | Yes | Yes[7] |
| | Ray Ellis (3CAC ¶ 180) | Ohio (OSU) | Arizona | 1976-1980 | Yes | Yes | Yes: OH,[4] AZ[9] |
| | Alex Gilbert (3CAC ¶ 110) | Indiana (ISU) | Missouri | 1978-1980 | Yes | Yes | Yes: Ind,[10] Mo.[11] |
| | Eric Riley (3CAC ¶ 123) | Michigan (Michigan) | Ohio | 1989-1993 | Yes | Yes | Yes: MI,[12] OH[4] |
| | Ed O'Bannon (3CAC ¶ 30) | California (UCLA) | Nevada | 1991-1995 | Yes | Yes | Yes: Cal.[2], Nev.[13] |
| | Sam Jacobson (3CAC ¶¶ 153-154) | Minnesota (Minnesota) | Minnesota | 1994-1998 | Yes | Yes | Likely[14] |
| | Danny Wimprine (3CAC ¶ 171) | Tennessee (Memphis) | Louisiana | 2001-2004 | Yes | Yes | Yes: Tenn,[15] La.[16] |
| | Damien Rhodes (3CAC ¶ 164) | New York (Syracuse) | New York | 2002-2005 | | Yes | Yes[17] |
| | Tyrone Prothro (3CAC ¶ 143) | Alabama (Alabama) | Alabama | 2003-2005 | | Yes | Yes[18] |
| | Patrick Maynor (3CAC ¶ 135) | California (Stanford) | Florida | 2004-2008 | | Yes | Yes: Cal.[2], Fla.[19] |
| Current Student-Athletes | Jake Fischer (3CAC ¶212) | Arizona (Arizona) | Arizona | 2009-2013 | | | Yes[9] |
| | Jake Smith (3CAC ¶ 217) | Arizona, Ohio, NY (Arizona, Youngstown St., Syracuse) | Arizona | 2009-2013 | | | Yes: Az[9], OH[4], NY[17] |
| | Darius Robinson (3CAC ¶ 221) | Georgia (Clemson) | Georgia | 2010-2013 | | | Yes[6] |
| | Moses Alipate (3CAC ¶ 226) | Minnesota (Minnesota) | Minnesota | 2009-2013 | | | Likely[14] |
| | Chase Garnham (3CAC ¶ 229) | Tennessee (Vanderbilt) | Tennessee | 2010-2013 | | | Yes[15] |

<hr>

[1] APs' college, residence, and years of play taken from the Third Consolidated Amended Class Action Complaint (Dkt. No. 832).

[2] *See* Cal. Civ. Code § 3344(d) ("For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, *or sports broadcast or account*, or any political campaign, shall not constitute a use for which consent is required ....") (emphasis added).

[3] Wash. Rev. Code. Ann. § 63.60.070(2) ("This chapter does not apply to the use or authorization of use of an individual's or personality's name, voice, signature, photograph, or likeness, in any of the following: . . . (b) A literary work, theatrical work, musical composition, film, radio, online or television program, magazine article, news story, public affairs report, *or sports broadcast or account*, or with any political campaign when the use does not inaccurately claim or state an endorsement by the individual or personality.") (emphasis added).

[4] Ohio Rev. Code Ann. § 2741.02(D)(1) ("For purposes of this section: (1) A use of an aspect of an individual's persona in connection with any news, public affairs, *sports broadcast, or account* does not constitute a use for which consent is required under division (A) of this section.") (emphasis added).

[5] *See, e.g.*, *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) (no violation of right of publicity because "a name cannot be appropriated by reference to it in connection with the legitimate mention of public activities").

[6] *See, e.g.*, *Toffoloni v. LFP Pub'g Grp., LLC*, 572 F.3d 1201, 1208 (11th Cir. 2009) (setting forth newsworthiness exception to right of publicity claims under Georgia law).

[7] *See, e.g.*, *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001) (First Amendment protection extends to "programs broadcast by radio and television, and live entertainment").

[8] *WJLA-TV v. Levin*, 564 S.E.2d 383, 394-95 (Va. 2002) (recognizing newsworthiness exception to claim for unauthorized use of name or picture under Va. Code Ann. § 8.01-40(A)); *see also Booker v. Dominion Va. Power*, No. 3:09cv759, 2010 WL 1848474, at *11 (E.D. Va. May 7, 2010) ("Virginia only recognizes one tort for invasion of privacy—the misappropriation of a person's name or likeness for commercial use.").

[9] *See, e.g.*, *Pooley v. Nat'l Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1113 (D. Ariz. 2000) (where speech is for "communicative use, the policy of free speech wins over right of publicity").

[10] Ind. Code Ann. § 32-36-1-1(c) ("This chapter does not apply to the following: (1) The use of a personality's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures, or mannerisms in any of the following: (A) Literary works, theatrical works, musical compositions, *film, radio, or television programs*. (B) Material that has political or newsworthy value. . . . [or] (3) The use of a personality's: (A) name; (B) voice; (C) signature; (D) photograph; (E) image; (F) likeness; (G) distinctive appearance; (H) gestures; or (I) mannerisms; *in connection with the broadcast or reporting of an event or a topic of general or public interest*.") (emphasis added).

[11] *See, e.g.*, *C.B.C. Distribution & Mktg. , Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007) (holding under Missouri law that "CBC's first amendment rights in offering its fantasy baseball products supersede the players' rights of publicity").

[12] *See Battaglieri v. Mackinac Ctr. For Pub. Policy*, 680 N.W.2d 915, 919 (Mich. Ct. App. 2004) (First Amendment precludes tort liability for use of likeness in a publication that concerns matters that are newsworthy or of legitimate public concern).

[13] Nev. Rev. Stat. § 597.790(2) ("Any commercial use by another of the name, voice, signature, photograph or likeness of a person requires the written consent of that person or his or her successor in interest unless: ... (c) The use is in connection with a news, public affairs *or sports broadcast or publication*") (emphasis added).

[14] *See Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235-36 (Minn. 1998) (first recognizing, in 1998, a common law privacy tort).

[15] Tenn. Code Ann. § 47-25-1107(a) ("It is deemed a fair use and no violation of an individual's rights shall be found, for purposes of this part, if the use of a name, photograph, or likeness is in connection with any news, public affairs, *or sports broadcast or account*.") (emphasis added).

[16] *See Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386, 1388-90 (La. 1979) (explaining that right of privacy embraces four different interests, including appropriation of name or likeness, and citing cases recognizing newsworthiness exception in right of privacy cases); *Mahaffey v. Official Detective Stories, Inc.*, 210 F. Supp. 251, 253 (W.D. La. 1962) (recognizing newsworthiness exception in right of privacy context); *see also Prudhomme v. Procter & Gamble Co.,* 800 F. Supp. 390, 395-96 (E.D. La. 1992) ("With regard to infringement of the right to publicity, defendants claim that this right has not been recognized in Louisiana. . . . While Louisiana courts have not explicitly adopted this right, they have not specifically precluded it, either. Plaintiffs have made a good faith argument for extension of the law in Louisiana on this topic, and should not be prevented from presenting an argument on this issue at this early stage in the proceedings.").

[17] *See Messenger v. Gruner + Jahr Printing & Pub'g*, 706 N.Y.S.2d 52, 54-55 (N.Y. 2000) (setting forth newsworthiness exception to statutory right of privacy).

[18] *See Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1446 (11th Cir. 1998) ("Although it does not appear that Alabama courts ever have recognized a right denominated as 'publicity,' we conclude that the Alabama right of privacy contains an analogous right."); *J.C. v. WALA-TV, Inc.*, 675 So. 2d 360, 362 (Ala. 1996) (in right of privacy context, recognizing "privilege to publish or broadcast news or other matters of legitimate public interest").

[19] Fla. Stat. § 540.08(4) ("The provisions of this section shall not apply to: (a) The publication, printing, display, or use of the name or likeness of any person in any newspaper, magazine, book, *news broadcast or telecast*, or other news medium or publication *as part of any bona fide news report or presentation having a current and legitimate public interest* and where such name or likeness is not used for advertising purposes") (emphasis added).