Richard L. Stone (Cal. Bar No. 110022)
rstone@jenner.com
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
David R. Singer (Cal. Bar No. 204699)
dsinger@jenner.com
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:   (213) 239-5100
Facsimile:   (213) 239-5199

Attorneys for *Amici Curiae*
Fox Broadcasting Company and Big Ten Network, LLC

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | Case No. 09-cv-01967 CW (NC) |
| | **BRIEF OF *AMICI CURIAE* FOX BROADCASTING COMPANY AND BIG TEN NETWORK, LLC IN SUPPORT OF DEFENDANT NCAA'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

INTEREST OF SPORTS BROADCASTERS AND RELEVANT BACKGROUND ................... 2

ARGUMENT ......................................................................................................... 3

    I.   Plaintiffs' Claims Are Barred By The First Amendment ................................. 3

          A.   Reporting On Matters Of Public Interest Is Entitled To Full First
              Amendment Protection ...................................................................... 4

          B.   The First Amendment Precludes Any Right Of Publicity Interest In Video
              Footage, Broadcasts, Or Other News Reports Of Sporting Events ............. 5

          C.   Plaintiffs' Unprecedented Position Finds No Support in *Zacchini* ................... 8

    II.   Sports Broadcasts Are Communicative, Not Commercial, Speech ........................... 10

    III.   No State Has Ever Recognized A Right of Publicity Interest In The Live
          Broadcast Of A Sporting Event ................................................................. 14

          A.   States With A Statutory Right of Publicity...................................................... 15

          B.   States With A Common-Law Right of Publicity ............................................. 15

    IV.   Allowing Plaintiffs' Claims To Proceed Will Have A Chilling Effect On
          Free Speech And Access To Matters Of Public Interest.......................................... 17

CONCLUSION.................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Abdul-Jabbar v. General Motors Corp.*,
  85 F.3d 407 (9th Cir. 1996) ...............................................................................11, 12

*Anderson v. Fisher Broad. Cos., Inc.*,
  712 P.2d 803 (Or. 1986) ..............................................................................................17

*Andrews v. Stallings*,
  892 P.2d 611 (N.M. Ct. App. 1995) ...........................................................................17

*Arenas v. Shed Media U.S. Inc.*,
  881 F. Supp. 2d 1181 (C.D. Cal. 2011) ........................................................................5

*Aronson v. Dog Eat Dog Films, Inc.*,
  738 F. Supp. 2d 1104 (W.D. Wash. 2010)...................................................................5

*Battaglieri v. Mackinac Ctr, For Pub. Policy*,
  680 N.W.2d 915 (Mich. Ct. App. 2004) ....................................................................16

*Best v. Berard*,
  776 F. Supp. 2d 752 (N.D. Ill. 2011) .............................................................................5

*Bolger v. Youngs Drug Prods Corp.*,
  463 U.S. 60 (1983).................................................................................................10, 12

*Broughton v. McClatchy Newspapers, Inc.*,
  588 S.E.2d 20 (N.C. Ct. App. 2003) ..........................................................................17

*Buller v. Pulitzer Publ'g Co.*,
  684 S.W.2d 473 (Mo. Ct. App. 1984).........................................................................16

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*,
  505 F.3d 818 (8th Cir. 2007) ....................................................................................5, 6

*Candebat v. Flanagan*,
  487 So. 2d 207 (Miss. 1986).......................................................................................17

*Capdeboscq v. Francis*,
  2004 WL 1418392 (E.D. La. June 23, 2004)..............................................................17

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
  95 F.3d 959 (10th Cir. 1996) ....................................................................................4, 13

*Carlisle v. Fawcett Publ'ns, Inc.*
  201 Cal. App. 2d 733 (1962) ........................................................................................7

*Castro v. NYT Television*,
   851 A.2d 88 (N.J. Super. Ct. App. Div. 2004)........................................................17

*CBS Interactive, Inc. v. NFL Players Ass'n*,
   259 F.R.D. 398 (D. Minn. 2009)..............................................................................6

*Cher v. Forum Int'l, Ltd.*,
   692 F.2d 634 (9th Cir. 1982) ...................................................................................13

*City of Grand Forks v. Grand Forks Herald, Inc.*,
   307 N.W.2d 572 (N.D. 1981) ...................................................................................17

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988)..................................................................................................12

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
   25 Cal. 4th 387 (Cal. 2001)......................................................................................9

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) ...................................................................................18

*Cox v. Hatch*,
   761 P.2d 556 (Utah 1988)........................................................................................15

*Crump v. Beckley Newspapers, Inc.*,
   320 S.E.2d 70 (W. Va. 1984)...................................................................................16

*Daly v. Viacom, Inc.*,
   238 F. Supp. 2d 1118 (N.D. Cal. 2002) ..................................................................13

*Danforth v. Star Tribune Holdings Corp.*,
   2010 WL 4286242 (Minn. Ct. App. Nov. 2, 2010) ................................................16

*Dex Media West, Inc. v. City of Seattle*,
   696 F.3d 952 (9th Cir. 2012) ...................................................................................12

*Doe v. Gangland Prod'ns, Inc.*,
   730 F.3d 946 (9th Cir. 2013) ...................................................................................5

*Doe v. Roe*,
   638 So.2d 826 (Ala. 1994)........................................................................................15

*Dombrowski v. Pfister*,
   380 U.S. 479 (1965)..................................................................................................17

*Dora v. Frontline Video, Inc.*,
   15 Cal. App. 4th 536 (1993) ....................................................................................7

*Dryer v. National Football League*,
   689 F. Supp. 2d 1113 (D. Minn. 2010).................................................................10, 11

*Esch v. Universal Pictures Co.*,
   2010 WL 5600989 (N.D. Ala. Nov. 2, 2010) ...............................................14

*ETW Corp. v. Jireh Publ'g, Inc.*,
   332 F.3d 915 (6th Cir. 2003) (Clay, J., dissenting) ....................................9

*Falwell v. Penthouse Int'l., Ltd.*,
   521 F. Supp. 1204 (W.D. Va. 1981) ...........................................................15

*Farah v. Esquire Magazine, Inc.*,
   863 F. Supp. 2d 29 (D.D.C. 2012) ..............................................................16

*FEC v. Wisconsin Right to Life, Inc.*,
   551 U.S. 449 (2007)......................................................................................17

*Gignilliat v. Gignilliat, Savitz & Bettis, LLP*,
   684 S.E.2d 756 (S.C. 2009) .........................................................................17

*Gilham v. Burlington Northern, Inc.*,
   514 F.2d 660 (9th Cir. 1975) .......................................................................17

*Gionfriddo v. Major League Baseball*,
   94 Cal. App. 4th 400 (2001) ...........................................................5, 6, 7, 13

*Guglielmi v. Spelling-Goldberg Prods.*,
   25 Cal. 3d 860 (1979) ..................................................................................13

*Haskell v. Stauffer Commc'ns Inc.*,
   990 P.2d 163 (Kan. App. 1999) ...............................................................5, 16

*Hilton v. Hallmark Cards*,
   599 F.3d 894 (9th Cir. 2010) ..........................................................4, 12, 13

*Hoffman v. Capital Cities/ABC*,
   255 F.3d 1180 (9th Cir. 2001) .....................................................................12

*Holt v. Cox Enters.*,
   590 F. Supp. 408 (N.D. Ga. 1984) ................................................................8

*Joe Dickerson & Assocs., LLC v. Dittmar*,
   34 P.3d 995 (Colo. 2001)..........................................................................5, 15

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952)......................................................................................12

iv

*Kannisto v. City & Cnty. of San Francisco*,
    541 F.2d 841 (9th Cir. 1976) .................................................................................18

*Koeppel v. Speirs*,
    808 N.W.2d 177 (Iowa 2011) ..............................................................................17

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
    811 F.2d 26 (1st Cir. 1987) ....................................................................................9

*Lacoff v. Buena Vista Publ'ns*,
    705 N.Y.S.2d 183 (Sup. Ct. 2000) .......................................................................14

*Lane v. Random House, Inc.*,
    985 F. Supp. 141 (D.D.C. 1995) .......................................................................5, 14

*Lawrence v. A.S. Abell Co.*,
    475 A.2d 448 (Md. 1984) .....................................................................................16

*Leddy v. Narragansett Television, L.P.*,
    843 A.2d 481 (R.I. 2004) ......................................................................................15

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006) ...................................................................................7

*Messenger ex rel. Messenger v. Gruner & Jahr Printing & Publ'g*,
    727 N.E.2d 549 (N.Y. 2000) ................................................................................15

*Montana v. San Jose Mercury News, Inc.*,
    34 Cal. App. 4th 790 (1995) ........................................................................ passim

*Montgomery v. Montgomery*,
    60 S.W.3d 524 (Ky. 2001) ...................................................................................15

*Montgomery Ward v. Shope*,
    286 N.W.2d 806 (S.D. 1979) ...............................................................................17

*Namath v. Sports Illustrated*,
    371 N.Y.S.2d 10 (App. Div. 1975) ......................................................................14

*National Football League v. Alley, Inc.*,
    624 F. Supp. 6 (S.D. Fla. 1983) ........................................................................8, 17

*Nelson v. Maine Times*,
    373 A.2d 1221 (Me. 1977).....................................................................................17

*New Kids On The Block v. News America Publ'g Inc.*,
    745 F. Supp. 1540 (C.D. Cal. 1990) .......................................................................9

v

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ....................................................................................12

*Newcombe v. Adolf Coors Co.*,
   157 F.3d 686 (9th Cir. 1998) .......................................................................12

*Nichols v. Moore*,
   334 F. Supp. 2d 944 (E.D. Mich. 2004)........................................................5

*Page v. Something Weird Video*,
   960 F. Supp. 1438 (C.D. Cal. 1996) ............................................................14

*Paulsen v. Personality Posters, Inc.*,
   299 N.Y.S.2d 501 (1968).................................................................................7

*Perkins v. Freedom of Info. Comm'n*,
   635 A.2d 783 (Conn. 1993) ..........................................................................16

*Pooley v. National Hole-In-One Ass'n*,
   89 F. Supp. 2d 1108 (D. Ariz. 2000) ..............................................10, 11, 17

*Reichenberger v. Pritchard*,
   660 F.2d 280 (7th Cir. 1981) ........................................................................18

*Remsburg v. Docusearch, Inc.*,
   816 A.2d 1001 (N.H. 2003) ..........................................................................17

*Rogers v. Grimaldi*,
   695 F. Supp. 112 (S.D.N.Y. 1988) .................................................................9

*Shulman v. Group W Prod'ns, Inc.*,
   18 Cal. 4th 200 (1998) ....................................................................................4

*Slibeck v. Union Oil Co. of Cal*,
   1986 WL 11542 (Del. Super. Ct. Sept. 18,1986)..........................................17

*Smith v. California*,
   361 U.S. 147 (1960).......................................................................................12

*Smith v. Suratt*,
   7 Alaska 416 (D. Alaska 1926)......................................................................17

*Snyder v. Phelps*,
   131 S. Ct. 1207 (2011)....................................................................................4

*Somerson v. World Wrestling Entm't, Inc.*,
   --- F. Supp. 2d ----, 2013 WL 3863891 (N.D. Ga. 2013) .............................5, 7, 11

vi

*Stanley v Gen. Media Commc'ns, Inc.*,
    149 F. Supp. 2d 701 (W.D. Ark. 2001) ........................................................17

*Staruski v. Cont'l Tele. Co. of Vt.*,
    581 A.2d 266 (Vt. 1990) ...............................................................................17

*Telemundo of Los Angeles v. City of Los Angeles*,
    283 F. Supp. 2d 1095 (C.D. Cal. 2003) .........................................................7

*Time, Inc. v. Hill*,
    385 U.S. 374 (1967) ......................................................................................4

*Torrance v. Morris Pub. Grp. LLC*,
    636 S.E.2d 740 (Ga. Ct. App. 2006) ...........................................................16

*Tropeano v. Atlantic Monthly Co.*,
    400 N.E.2d 847 (Mass. 1980) ......................................................................15

*Uranga v. Federated Publ'ns, Inc.*,
    67 P.3d 29 (Idaho 2003) ...............................................................................17

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) .......................................................................10

*Van Straten v. Milwaukee J. Newspaper-Publisher*,
    447 N.W.2d 105 (Wis. Ct. App. 1989) ........................................................16

*Washington v. Smith*,
    893 F. Supp. 60 (D.D.C. 1995) .....................................................................8

*William O'Neil & Co. v. Validea.com, Inc.*,
    202 F. Supp. 2d 1113 (C.D. Cal. 2002) ......................................................14

*Winters v. New York*,
    333 U.S. 507 (1948) ......................................................................................4

*Yeager v. Cingular Wireless, LLC*,
    673 F. Supp. 2d 1089 (E.D. Cal. 2009) ..................................................5, 11

*Zacchini v. Scripps-Howard Broad. Co.*,
    351 N.E.2d 454 (Ohio 1976) .........................................................................9

*Zacchini v. Scripps-Howard Broadcasting Co.*,
    433 U.S. 562 (1977) .......................................................................8, 9, 10, 14

STATUTES

765 Ill. Comp. Stat. 1075/35(b)(2) ........................................................................15

42 Penn. Cons. Stat. Ann. § 8316(e)(2)(ii) ...........................................................15

vii

Ariz. Rev. Stat. § 12-761(H)(2) ..................................................................15

Cal. Civil Code § 3344(d) ..........................................................................15

Fla. Stat. § 540.08(4)(a) ............................................................................15

Haw. Rev. Stat. § 482P-7(b)(2) ..................................................................15

Ind. Code § 32-36-1-1(c)(1)(B) ..................................................................15

Md. Code Ann., Bus. Reg. § 19-502(2) .....................................................15

Neb. Rev. Stat. § 20-202(1) ........................................................................15

Nev. Rev. Stat. § 597.790(2)(c) ..................................................................15

Ohio Rev. Code Ann. § 2741.02(D)(1)........................................................15

Okla. Stat. Title 12, § 1449(D) ...................................................................15

Tenn. Code Ann. § 47-25-1107(a) ..............................................................15

Tex. Prop. Code Ann. § 26.012(a)(3) ..........................................................15

Wash. Rev. Code § 63.60.070(2)(b) ...........................................................15

OTHER AUTHORITIES

2 J. Thomas McCarthy, RIGHTS OF PUBLICITY AND PRIVACY § 8:27 (2d ed. 2013)........................9

Restatement (Third) of Unfair Competition §§ 46 & 47 ............................................16

2246222.12

# INTRODUCTION

*Amici* Fox Broadcasting Company and Big Ten Network (the "Sports Broadcasters") televise some of the most popular college sporting events to audiences nationwide.  Because sports are undeniably a matter of great public interest, media coverage of sporting events – just like news reporting on any other matter of public concern – is entitled to the full scope of First Amendment protection.  Accordingly, courts consistently have held that the First Amendment bars right of publicity claims arising from the use of an athlete's name, image, or likeness in the reporting of sporting events.

What started as a lawsuit by former student athletes to share in the profits from t-shirts, pennants, and coffee mugs that bear their images has snowballed into a frontal assault on the Sports Broadcasters' (and other news organizations') freedom to televise sports and the public's right to be informed about newsworthy matters of substantial interest to large segments of the populace. Specifically, Plaintiffs' antitrust claims assume and depend on a "group licensing" market for the sale of their publicity rights in broadcasts and rebroadcasts of Division I basketball and football games.  In other words, Plaintiffs have now taken the extreme and unprecedented position that the Sports Broadcasters can no longer televise college basketball and football games without the express consent of each and every participant.  According to Plaintiffs, if one player, cheerleader, referee or coach withholds consent, the Sports Broadcasters may not lawfully televise the sporting event to millions of viewers waiting to watch it.

As this Court already has recognized, Plaintiffs' publicity rights in game footage are limited to the use of their names, images, or likenesses in "commercial" speech.  This brief does not address any use of stock footage or game images to advertise unrelated products or services like automobiles or restaurants.  But live broadcasts and rebroadcasts of game footage are, by definition, communicative news reporting, not commercial speech.  Plaintiffs' suggestion that sports broadcasts are commercial speech because they are for-profit is entirely without merit, and the Supreme Court has flatly rejected that argument for well over 70 years.

Not only are sports broadcasts protected from liability by the First Amendment, they also easily satisfy broader state-law exemptions designed to give newsworthy speech additional breathing

room.  A survey of states that have recognized a right of publicity confirms that no state law can support Plaintiffs' claims.  Every state either has specifically exempted sports broadcasts from liability or has more generally recognized that noncommercial uses of an individual's name, image, or likeness in connection with matters of public concern are exempt.

For these reasons, the Sports Broadcasters respectfully ask the Court to reject Plaintiffs' overreaching antitrust claims.  No market can legally exist for publicity rights in the mere reporting of sporting events in which Plaintiffs participate, including live broadcasts, rebroadcasts, and the distribution of game footage or images on television or other media.

## INTEREST OF SPORTS BROADCASTERS AND RELEVANT BACKGROUND

Non-party Fox Broadcasting Company ("FBC") operates the Fox Network, a national broadcast television network with more than 200 local affiliates that reach approximately 99 percent of all United States households.  The Fox Network and its affiliates offer a wide range of entertainment, news and sports programming, including college sports.  For example, during the 2013-14 college football season, Fox televised the weekly national broadcast of major matchups in the Pac-12 and Big 12 conferences, as well as the recent 2013 Big Ten Championship.  In January 2014, Fox will broadcast the much anticipated AT&T Cotton Bowl Classic.

Non-party Big Ten Network ("BTN") is a cable television network dedicated to televising sporting events of colleges in the Big Ten Conference, as well as related programming, news, analysis, and commentary.  BTN has the exclusive rights to televise many Big Ten football and basketball games.  BTN currently reaches more than 50 million households nationwide.

FBC and BTN (hereinafter, the "Sports Broadcasters") televise many of the college athletic events at issue in this case.  Though Plaintiffs have not sued the Sports Broadcasters, Plaintiffs allege they are legally entitled to compensation for appearing in broadcasts of college sports.  *See, e.g.*, 3d Consolidated Am. Class Action Cplt. ("3CAC") ¶¶ 442-443, 532-535, ECF No. 832.  As set forth below, Plaintiffs have no such rights under existing law.  If the Court were to depart from well-settled law and allow individuals to assert right of publicity claims against broadcasters based solely on their appearance or participation in matters of public interest, such as college sports, it could potentially eliminate the Sports Broadcasters' – and all news organizations' – ability to communicate freely with

the public, whether about a football game or a political convention, a natural disaster or any other

newsworthy event.  Accordingly, the Sports Broadcasters have a strong interest in preserving their

First Amendment right to report newsworthy events to the public, including college sports, without

the burden and prior restraint of having to first secure a release from each and every player on the

field — or, for that matter, each and every marching band member, cheerleader, coach, trainer, or fan

in the stands.

This is not the first time the Sports Broadcasters have appeared in this case.  In June 2011,

Plaintiffs sent the Sports Broadcasters cease and desist letters, warning that the Sports Broadcasters

"have no right to . . . broadcast . . . the names, images and likeness of former NCAA Division I men's

basketball players . . . without entering into appropriate license agreements with the owners of those

rights, i.e., the former college athletes themselves."[1]  Two months later, Plaintiffs served the Sports

Broadcasters with sweeping document subpoenas directed toward the Sports Broadcasters' television

broadcasts of sporting events.  A lengthy discovery dispute ensued.  At the hearing on Plaintiffs'

motion to compel, Plaintiffs' counsel apparently recognized that mere broadcasts of sporting events

are shielded from right of publicity claims and conceded that "our claims do not emanate from the

live broadcasts."  *See* Mot. to Compel Hr'g Tr. 14: 21-23, Related Case No. 4:11-mc-80300-CW,

Feb. 13, 2012, ECF No. 146.  Had Plaintiffs kept their word, the Sports Broadcasters would not be

here again today.

But, as the Court knows, Plaintiffs reversed their position in their class certification motion

and recently amended complaint.  Once again, Plaintiffs have renewed the threat that, without a

student athlete's consent, broadcasters can no longer televise games in which the athlete participates.

## ARGUMENT

**I.      Plaintiffs' Claims Are Barred By The First Amendment.**

To the extent Plaintiffs' antitrust claims are premised on the existence of a "group licensing"

market for the publicity rights of student athletes shown in broadcasts and rebroadcasts of Division I

basketball and football games, these claims must fail in the face of the First Amendment.

---

[1] Singer Decl. Ex. 1, at 4, Related Case No. 4:11-mc-80300-CW, Jan. 25, 2012, ECF No. 40-2
(exhibit in support of opposition to motion to compel).

**A.      Reporting On Matters Of Public Interest Is Entitled To Full First Amendment Protection.**

The Supreme Court has held that "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011).  "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 1216 (citation and internal quotation marks omitted).[2]  To protect such speech, "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits." *Id.* at 1215 (barring claim for intentional infliction of emotional distress based on speech concerning matters of public import).

Courts broadly construe "matters of public concern" to encompass news reports about all manner of subjects of interest to substantial portions of the public, including news about sports and entertainment.  *See*, *e.g., Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2010) (celebrity's privileged lifestyle and catch-phrase were matters of "widespread public interest"); *Shulman v. Group W Prod'ns*, 18 Cal. 4th at 220 ("[T]he constitutional guarantees of freedom of expression apply with equal force to the publication whether it be a news report or an entertainment feature . . . ."); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 969 (10th Cir. 1996) ("Speech that entertains, like speech that informs, is protected by the First Amendment because '[t]he line between the informing and the entertaining is too elusive for the protection of that basic right.'") (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)).

---

[2] As explained by the Supreme Court:  "The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government.  One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials.  Exposure of the self to others in varying degrees is a concomitant of life in a civilized community.  The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press." *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967); *see also Shulman v. Group W Prod'ns, Inc.*, 18 Cal. 4th 200, 225 (1998) (newsworthiness is not "governed by the tastes or limited interest of an individual judge or juror" but instead extends "to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published").

4

1    Courts across the country – including this one – have routinely held that the First Amendment

2    provides a defense to misappropriation or right of publicity claims based on the publication of matters

3    of public interest.  *See, e.g.*, *Montana v. San Jose Mercury News, Inc.,* 34 Cal. App. 4th 790, 797

4    (1995) ("[N]o cause of action will lie for the publication of matters in the public interest . . . ."

5    (citations, alterations and internal quotation marks omitted)); *Joe Dickerson & Assocs., LLC v.*

6    *Dittmar*, 34 P.3d 995, 1003 (Colo. 2001) (the First Amendment "permits the use of a plaintiff's name

7    or likeness when that use is made in the context of, and reasonably relates to, a publication

8    concerning a matter that is newsworthy or of legitimate public concern"); *see also Best v. Berard*, 776

9    F. Supp. 2d 752, 757 (N.D. Ill. 2011); *Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104,

10   1113 (W.D. Wash. 2010); *Lane v. Random House, Inc.*, 985 F. Supp. 141, 146 (D.D.C. 1995);

11   *Haskell v. Stauffer Commc'ns Inc.*, 990 P.2d 163, 166 (Kan. App. 1999); *see generally* Order Den.

12   Mots. to Dismiss ("Order") 18:8-9, Oct. 25, 2013, ECF No. 876 (recognizing that First Amendment

13   "impose[s] certain limits on the right of publicity in every state").

14      **B.      The First Amendment Precludes Any Right Of Publicity Interest In Video**

15              **Footage, Broadcasts, Or Other News Reports Of Sporting Events.**

16      Communicating to the public information and video footage of sporting events and athletes is

17   fully protected by the First Amendment.  *See Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th

18   400, 410 (2001).  In *Gionfriddo* – a case that has been cited with approval by numerous courts

19   including the Ninth Circuit[3] – a group of retired baseball players sued Major League Baseball and its

20   licensee seeking, among other things, to enjoin the use of video footage and photographs from their

21

22

23      [3] *See Doe v. Gangland Prod'ns, Inc.*, 730 F.3d 946, 961 (9th Cir. 2013) (citing *Gionfriddo* for scope of California state-law exemptions to liability); *Arenas v. Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181, 1191 (C.D. Cal. 2011) (quoting *Gionfriddo*: "[T]he accomplishments . . . of those who have achieved a

24   marked reputation or notoriety by appearing before the public such as . . . *professional athletes . . .* may legitimately be mentioned and discussed in print or on radio and television."); *Yeager v. Cingular*

25   *Wireless, LLC*, 673 F. Supp. 2d 1089, 1098 (E.D. Cal. 2009) (citing *Gionfriddo* for First Amendment standard in right of publicity cases); *see also C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball*

26   *Advanced Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007) (citing *Gionfriddo* for its recognition of "the public value of information about the game of baseball and its players"); *Somerson v. World*

27   *Wrestling Entm't, Inc.*, --- F. Supp. 2d ----, 2013 WL 3863891, at *7 (N.D. Ga. 2013) (citing *Gionfriddo* as "instructive" with regard to athletes' right of publicity claims); *Nichols v. Moore*, 334 F.

28   Supp. 2d 944, 957 (E.D. Mich. 2004) (following *Gionfriddo*'s finding that advertising a documentary containing a protected use of a person's likeness is permissible).

5

1  playing days that appeared on the defendants' websites without the athletes' permission.  *Id.* at 406,

2  410.  Applying state law as well as First Amendment principles, the court held that the information,

3  photos and "video depictions" of classic baseball games were all matters of public interest entitled to

4  First Amendment protection against right of publicity claims.  *Id.* at 410.   The court reasoned that

5  recounting and reporting sporting events "command[s] a substantial public interest, and, therefore, is

6  a form of expression due substantial constitutional protection."  *Id.* at 411.  The court further held that

7  "the public interest favoring the free dissemination of information regarding baseball's history *far*

8  *outweigh*[*ed*] any proprietary interests at stake," and that the First Amendment thus barred the

9  plaintiffs' right-of-publicity claims.  *Id.* at 415 (emphasis added)*.*

10      In *C.B.C. Distribution v. Major League Baseball Advanced Media*, 505 F.3d 818, 824 (8th

11  Cir. 2007), the Eight Circuit relied extensively on *Gionfriddo*, finding it "persuasive."  The plaintiff

12  in *C.B.C.* offered online fantasy-baseball games incorporating Major League Baseball players' actual

13  names, nicknames, likenesses, signatures, pictures, statistics, and other biographical information.  *Id.*

14  at 823.  The plaintiff initially licensed this information from the Major League Baseball Players

15  Association.  *Id.* at 821.  But when the Players Association declined to renew the license, the plaintiff

16  sought a judicial declaration that it had a First Amendment right to use the information without a

17  license.  *Id.*  The Eighth Circuit agreed, holding that the First Amendment protected the plaintiff's

18  right to use athletes' names, likenesses, and biographical information in an online game.  As the court

19  declared, "the information used in CBC's fantasy baseball games is all readily available in the public

20  domain, and it would be strange law that a person would not have a first amendment right to use

21  information that is available to everyone."  *Id.* at 823.  On those grounds, the court held that the First

22  Amendment "trump[ed]" the players' right of publicity.  *Id.* at 823-24.[4]

23      The California Court of Appeal reached the same result in *Montana*, where a newspaper

24  commemorated the San Francisco 49ers' Super Bowl victories by selling poster-sized copies of the

25  newspaper's front page stories that included photographs of quarterback Joe Montana.  *See* 34 Cal.

26

27      [4] *See also CBS Interactive, Inc. v. NFL Players Ass'n*, 259 F.R.D. 398, 417-18 (D. Minn. 2009)
   (granting judgment as a matter of law against right of publicity claim because use of professional
28  athletes' names, statistics, pictures, images, and biographical information in an online fantasy game
   "comes within the ambit of the First Amendment").

App. 4th at 795-98.  Although the newspaper sold copies of the posters, the court concluded that it was a "form of public interest presentation to which [First Amendment] protection must be extended." 34 Cal. App. 4th at 795 (quoting *Paulsen v. Personality Posters, Inc.*, 299 N.Y.S.2d 501, 507 (1968)); *see also Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 544-46 (1993) (dismissing statutory and common law claims by surfer against film production company and holding that production company did not need surfer's consent because sport of surfing was a matter of public interest).  More recently, in *Somerson v. World Wrestling Entertainment, Inc.*, --- F. Supp. 2d ----, 2013 WL 3863891 (N.D. Ga. Mar. 7, 2013), the district court dismissed a professional wrestler's right of publicity claim against a wrestling promoter whose website contained images of the plaintiff's wrestling matches.  Citing *Gionfriddo* with approval, the *Somerson* court held that the images and other truthful reporting on the website were "a matter of public interest and protected by the First Amendment." *Id.* *7-8.

It goes without saying that if video footage and images of *past* games are shielded from right of publicity claims, footage or broadcasts of *current* games also must be protected.  Obviously, more sports fans are interested in news and broadcasts of the *current* season.  If anything, broadcasts and footage of *live* sporting events are entitled to even greater First Amendment protection than historical video and images because matters of public interest are especially newsworthy at the time of their occurrence.  *See Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1104 (C.D. Cal. 2003) ("[t]he public has a [ First Amendment] interest in viewing live coverage of the event"); *see also Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 127 (2d Cir. 2006) (recognizing that the "newsworthiness of a particular story is often fleeting").

The *Gionfriddo* court expressly recognized that current reporting on sports is protected speech:

> It is manifest that *as news occurs, or as a baseball season unfolds, the First Amendment will protect mere recitations of the players' accomplishments.*  "The freedom of the press is constitutionally guaranteed, and the publication of daily news is an acceptable and necessary function in the life of the community."

94 Cal. App. 4th at 410 (emphasis added) (quoting *Carlisle v. Fawcett Publ'ns, Inc.* 201 Cal. App. 2d 733, 746 (1962)).  The *Montana* court made the same assumption when explaining that the public-

7

1   interest test "is not restricted to *current* events but may extend to the reproduction of past events."  34

2   Cal. App. 4th at 793 (emphasis added); *see National Football League v. Alley, Inc.*, 624 F. Supp. 6, 9-

3   10 (S.D. Fla. 1983) (holding that live broadcasts of Miami Dolphins football games were matters of

4   "legitimate public interest" and therefore exempt from Florida right of publicity claims); *see also*

5   *Washington v. Smith*, 893 F. Supp. 60, 63 (D.D.C. 1995) (the success of a Division I women's college

6   basketball team was a "matter of public concern"); *Holt v. Cox Enters.*, 590 F. Supp. 408, 412 (N.D.

7   Ga. 1984) (public concern in traditional rivalry between two college teams).

8   Journalism, as Washington Post publisher Philip Graham famously stated, is the first rough

9   draft of history.  Live broadcasts of NCAA football and basketball games, however, are much more

10   than rough drafts – they are actual records of newsworthy events, provided in real time to the public.

11   Plaintiffs' antitrust claims are predicated on the assertion that each individual participant in these

12   newsworthy events should have a personal veto, an idiosyncratic right to control what is reported

13   about them.  Giving participants in newsworthy events the right to control how they are depicted in

14   the media effectively allows them either to censor history altogether by squelching the accurate,

15   timely reporting of matters of substantial interest to the public, or to censor the manner in which

16   historical facts are presented to the public by requiring the Sports Broadcasters and other news

17   organizations to bargain, for example, over how favorably or critically their reporters and

18   commentators may treat prominent players and coaches.  Such a rule cannot be squared with the First

19   Amendment.

20   **C.      Plaintiffs' Unprecedented Position Finds No Support in *Zacchini*.**

21   The Supreme Court's only right of publicity decision, *Zacchini v. Scripps-Howard*

22   *Broadcasting Co.*, 433 U.S. 562 (1977), was based on a highly unusual set of facts that finds no

23   analogue here.  The Court considered the 15-second carnival act of "human cannonball" Hugo

24   Zacchini and addressed whether showing Zacchini's entire act on the evening news could support a

25   right of publicity claim.  *Id.* at 564.  As the Court acknowledged, "the case before us is more limited

26   than the broad category of lawsuits that may arise under the heading of 'appropriation.'  Petitioner

27   does not merely assert that some general use, such as advertising, was made of his name or likeness;

28   he relies on the *much narrower claim* that respondent televised an *entire act* that he *ordinarily gets*

1 *paid to perform.*"  *Id.* at 573 n.10 (emphases added).[5]

2      Courts nationwide have read *Zacchini* as limited to these unique facts.  *See*, *e.g.*, *Rogers v.*

3 *Grimaldi*, 695 F. Supp. 112, 124 (S.D.N.Y. 1988) (characterizing *Zacchini* as "a narrowly drawn

4 opinion effectively limited to its facts"), *aff'd*, 875 F.2d 994 (2d Cir. 1989); *see also ETW Corp. v.*

5 *Jireh Publ'g, Inc.*, 332 F.3d 915, 956 (6th Cir. 2003) (Clay, J., dissenting) ("*Zacchini* has been

6 criticized as being very 'narrowly drawn' in that it involved the wholesale reproduction of a live

7 'entire act,' which is quite distinguishable from the unauthorized use of a person's identity . . . .");

8 *Comedy III Prods., Inc. v. Gary Saderup, Inc.,* 25 Cal. 4th 387, 401 (Cal. 2001) ("To be sure,

9 *Zacchini* was not an ordinary right of publicity case: the defendant television station had appropriated

10 the plaintiff's entire act, a species of common law copyright violation."); *L.L. Bean, Inc. v. Drake*

11 *Publishers, Inc.*, 811 F.2d 26, 30 n.2 (1st Cir. 1987) (describing *Zacchini*'s holding as limited to

12 broadcasting "plaintiff's *entire* act"); *New Kids On The Block v. News America Publ'g Inc.*, 745 F.

13 Supp. 1540, 1547 (C.D. Cal. 1990) (same), *aff'd*, 971 F.2d 302 (9th Cir. 1992).  *See generally* 2 J.

14 Thomas McCarthy, Rights of Publicity and Privacy § 8:27 (2d ed. 2013) ("The *Zacchini* majority

15 opinion has proved unsatisfying to both commentators and courts because it is so narrowly drawn.").

16      The differences between the scenario presented by *Zacchini*'s carnival performer and college

17 football and basketball athletes are manifold.  Fundamentally, the Court in *Zacchini* was concerned

18 that because the plaintiff's livelihood depended entirely on crowds showing up at the local

19 fairgrounds to watch him be shot out of a cannon into a net (the same performance, over and over),

20 once the minor spectacle of a "human cannonball" had been witnessed, whether in person or on the

21 local news, little interest would remain in turning out to see it a second time.  *See* 433 U.S. at 575-76.

22      Nowhere in Plaintiffs' 630-paragraph complaint do they make any such claims with respect to

23 college football and basketball games.  Football and basketball games are inherently different from a

24 carnival act.  Each game is unique, with different plays unfolding in different sequences, often with

25 different players involved, different scores and different outcomes, and almost always with different

26

27  [5] Underscoring the aberrant nature of the *Zacchini* holding, the Ohio courts that considered the case
on its way to the Supreme Court disagreed about whether *Zacchini*'s claim should even be categorized

28 as a right of publicity claim, as opposed to a claim for conversion or common law copyright.  *See*
*Zacchini v. Scripps-Howard Broad. Co.*, 351 N.E.2d 454, 456 (Ohio 1976).

9

critical plays and highlights.  That is why people buy season tickets and why, as Plaintiffs themselves allege, there is high demand for rebroadcasts of games even after they take place, along with footage, images, and DVD compilations of past games.  *See*, *e.g.*, 3CAC ¶¶ 440, 445, 447-453.  Each game is a unique, newsworthy event that unfolds in real time; for some fans, every single play is newsworthy.

Slogans like "March Madness" and "Game of the Century" attempt to capture the unique unpredictability of athletic competition, particularly at the collegiate level.  Unlike viewing Hugo Zacchini's human cannonball routine, watching one's alma mater play a football or basketball game hardly eliminates interest in watching the next game.  Rather, watching a team win (or even lose) on any given day *builds* interest in showing up in person to cheer them on.  Far from killing off the product, showing games on television *creates* enthusiasm and public interest in the particular student athletes and teams shown, as well as in the sport as a whole.  In this way, college sports presents the exact inverse of the scenario considered in *Zacchini*.  As this Court correctly observed, *Zacchini*'s fact-specific holding "does not provide a clear test for balancing the right of publicity against free speech concerns" (Order 19:1-2).  For the foregoing reasons, it can present no obstacle to the Sports Broadcasters' First Amendment interest in protecting the free and full dissemination of sports on television or other news reporting.

## II.    Sports Broadcasts Are Communicative, Not Commercial, Speech.

This court has already found that "the central question in determining whether the First Amendment bars an athlete's right-of-publicity claim is whether the defendant's use of the athlete's name, image, or likeness is primarily 'commercial.'"  Order 20:14-18.  Commercial speech is speech that "does no more than propose a commercial transaction."  *Bolger v. Youngs Drug Prods Corp..*, 463 U.S. 60, 66 (1983) (citation and internal quotation marks omitted); *accord Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013) (same).

To the extent Plaintiffs' claims encompass broadcasts and video footage of sporting events, this Court correctly observed that a distinction must be drawn between merely televising (*i.e.*, reporting) the sporting event itself and using footage or images of the student athletes to sell or promote an unrelated product or service.  Order 19:3–20:13 (citing *Pooley v. National Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1110-14 (D. Ariz. 2000) and *Dryer v. National Football League*, 689 F.

1  Supp. 2d 1113, 1115-21 (D. Minn. 2010)).

2      In *Pooley*, a professional golfer sued a company that used footage of him making a historic

3  hole-in-one to promote its business.  89 F. Supp. 2d at 1110.  The company moved to dismiss,

4  claiming the First Amendment precluded a right of publicity claim.  The court denied the motion on

5  the grounds that the footage was for "strictly commercial" purposes.  *Id.* at 1114.  The court

6  explained that "when the purpose of using a person's identity is *strictly to advertise a product or a*

7  *service*, as it is here, the use is *not* protected by the First Amendment."  *Id.* at 1113 (first emphasis

8  added).  Importantly, as part of its well-reasoned analysis, the *Pooley* court contrasted unprotected

9  commercial use with the broadcast or communication of the event for news reporting purposes:

10          [U]nauthorized use of a person's identity falls within one of two
        categories – "communicative" or "commercial."  In communicative use,

11          the policy of free speech wins over the right of publicity; it is entitled to
        the highest level of First Amendment protection.  In commercial use, the

12          right of publicity generally wins because, while, there are overtones of
        ideas being communicated, the use is primarily commercial.

13

14  *Pooley*, 689 F. Supp. 2d at 1113 (citations omitted).  Thus, as this Court recently observed, *Pooley*

15  made a critical distinction between the "original broadcast" of the golfer's hole-in-one and the

16  subsequent commercial use of that footage to promote the defendant's services.  Order 19:16; *see*

17  *also Dryer*, 689 F. Supp. 2d at 1120 (D. Minn. 2010) (distinguishing between protected speech that

18  communicates the sporting event and the defendant's use of films in "advertisements"); *Abdul-Jabbar*

19  *v. General Motors Corp.*, 85 F.3d 407, 416 (9th Cir. 1996) (analyzing basketball player's right of

20  publicity claim under California law and distinguishing between a "news or sports account" about the

21  player and a car maker using the athlete's identity "in the context of an automobile advertisement");

22  *Somerson*, 2013 WL 3863891, at *9 (finding no commercial use of professional wrestler's image and

23  explaining that the "[p]laintiff's identity is not being used to sell a product in an advertisement, but

24  instead, is referred to as part of the historical events of professional wrestling"); *Yeager* 673 F. Supp.

25  2d at 1095 (use of plaintiff's name and historical information to sell mobile phone service not

26  protected).

27      In the context of right of publicity claims, the Ninth Circuit has expressly identified examples

28  of "clearly commercial speech" as those in which an individual's name, image, or likeness is used to

advertise an unrelated product or service. *See Hoffman v. Capital Cities/ABC*, 255 F.3d 1180, 1185 (9th Cir. 2001) (citing *Abdul-Jabbar*, 85 F.3d at 409 (use of basketball star's name in television car commercial)); *Newcombe v. Adolf Coors Co.,* 157 F.3d 686, 692-93 (9th Cir. 1998) (use of pitcher's image in printed beer advertisement). Here, the broadcasts of live sporting events, or rebroadcasts of those events or game footage by the Sports Broadcasters, serve only one purpose: to communicate the game to the public. The Sports Broadcasters are not using footage or images of the broadcasts in commercial advertisements or on billboards to sell cars or propose any other type of commercial transaction.

Plaintiffs also cannot characterize the Sports Broadcasters' news reporting as "commercial" merely because televising sports is a for-profit business.[6] As the Supreme Court made clear more than 70 years ago, the fact "[t]hat books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).[7] The Ninth Circuit recently reaffirmed this principle, holding that "under *Bolger* and other Supreme Court precedent, economic motive in itself is insufficient to characterize a publication as commercial." *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) (citing *Bolger*, 463 U.S. at 67). In *Dex Media West*, the Ninth Circuit held that Yellow Pages phone directories, like "newspapers, magazines, television programs, radio shows, and similar media," were entitled to full First Amendment protection regardless of any profit motive. *Id.* at 963-65 (noting that virtually all major American newspapers and television networks are "owned by a private corporation and operated as a commercial enterprise"). A similar issue arose in *Hilton v. Hallmark Cards*, *supra*, where the plaintiff argued that a greeting card featuring her likeness was "commercial speech." The Ninth Circuit flatly rejected that

---

[6] *See* Pls.'Mem. P. & A. Supp. Summ. J. 13 n.12, Nov. 15, 2013, ECF No. 898-1 (referring to "the lucrative commercial nature" of broadcasting").

[7] *See also City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 756 n.5 (1988) ("Of course, the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold."); *Smith v. California*, 361 U.S. 147, 150 (1960) ("It is of course no matter that the dissemination takes place under commercial auspices.").

1  view, holding that "Hallmark's card is not advertising the product; it *is* the product.  It is sold for a

2  profit, but that does not make it commercial speech for First Amendment purposes."  599 F.3d at 905

3  n.7;  *see also Montana*, 34 Cal. App. 4th at 797 n.2 (the fact that newspaper sold posters promoting

4  its own front page stories, including photographs of Joe Montana, was "without significance" because

5  "First Amendment is not limited to those who publish without charge").

6      In *Cardtoons*, *supra*, the Tenth Circuit likewise concluded that parody trading cards featuring

7  the names and likenesses of major league baseball players were not commercial speech because "they

8  do not merely advertise another unrelated product."  95 F.3d at 970.  "Although the cards are sold in

9  the marketplace," the court explained, "they are not transformed into commercial speech merely

10  because they are sold for profit."  *Id.*  Similarly, in *Gionfriddo*, the defendant used retired baseball

11  players' names, photographs, video clips, and "descriptions of [their] memorable performances" in its

12  game programs and on websites.  94 Cal. App. 4th at 410.  The plaintiffs claimed these uses were

13  commercial, as they "help baseball owners make a profit, and . . . promote the product of baseball."

14  *Id.* at 411. The California Court of Appeal rejected that argument because "[p]rofit, alone, does not

15  render expression 'commercial.'"  *Id.*

16      The Sports Broadcasters also are entitled to freely promote and advertise their own broadcasts

17  without transforming their communicative speech into commercial speech.  Courts have long held

18  that using the content of a protected work to advertise or promote that work is itself protected by the

19  First Amendment.  *See Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 639 (9th Cir. 1982) ("Constitutional

20  protection extends to the truthful use of a public figure's name and likeness in advertising which is

21  merely an adjunct of the protected publication."); *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d

22  860, 868 (1979) ("Since the use of Valentino's name and likeness in the film was not an actionable

23  infringement of [his] right of publicity, the use of his identity in advertisements for the film is

24  similarly not actionable.").  As the California Supreme Court has explained, "[i]t would be illogical to

25  allow respondents to [engage in protected activity] but effectively preclude any advance discussion or

26  promotion of their lawful enterprise."  *Guglielmi*, 25 Cal. 3d at 873.

27      District courts in the Ninth Circuit have repeatedly applied this rule.  *See, e.g.*, *Daly v.*

28  *Viacom, Inc.*, 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (promotions for TV show were protected

13

to the same extent as the show); *William O'Neil & Co. v. Validea.com, Inc.*, 202 F. Supp. 2d 1113, 1119 (C.D. Cal. 2002) (defendants' use of plaintiff's name on a "book cover, flyleaf, and other material" promoting book was "protected to the same extent as the book itself"); *Page v. Something Weird Video*, 960 F. Supp. 1438, 1444 (C.D. Cal. 1996) (use of a drawing of actress on video box covers and in catalog advertising her films held protected as "incidental to the protected publication of the videos").[8]

In short, under no circumstance can the live broadcasts, rebroadcasts or use of game footage by Sports Broadcasters to report on the events or promote the broadcasts be construed as commercial speech because such uses are merely communicating the sporting event itself rather than advertising an unrelated product or service.

**III.    No State Has Ever Recognized A Right of Publicity Interest In The Live Broadcast Of A Sporting Event.**

A majority of states have, either by statute or by judicial decision, recognized either a right of publicity or a cause of action for misappropriation (a category of invasion of privacy).  Not one of these states, however, has permitted an athlete to recover for the use of his or her name, image, or likeness in the broadcast, rebroadcast, or promotion of a broadcast for a sporting event.  To the contrary, nearly half the states with a codified right of publicity have *expressly exempted* sports broadcasts from right of publicity or similar claims.  In the absence of a statutory exemption, the privilege afforded to noncommercial communications and/or communications in the public interest bars publicity or privacy claims against sports broadcasts in every other state that has recognized the right of publicity or misappropriation tort.  Plaintiffs' broadcast-related right of publicity claims thus fail under the law of every state that recognizes such a right.[9]

---

[8] *Accord Esch v. Universal Pictures Co.*, 2010 WL 5600989, at *6 (N.D. Ala. Nov. 2, 2010) (movie trailer); *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995) (ads for book); *see also Lacoff v. Buena Vista Publ'ns*, 705 N.Y.S.2d 183, 190-91 (Sup. Ct. 2000) (statements on cover and flyleaf of book); *Namath v. Sports Illustrated*, 371 N.Y.S.2d 10, 11 (App. Div. 1975) (subscription advertisement with the heading "How to Get Close to Joe Namath"), *aff'd*, 39 N.Y.2d 897 (1976).

[9] Distinct from and alternative to the First Amendment protections addressed in Section I, a state may "as a matter of its own law privilege the press" to a greater extent than the constitutional minimum. *Zacchini*, 433 U.S. at 578-79.

**A.      States With A Statutory Right of Publicity.**

Among the states with a statutory right of publicity, ten have specifically exempted sports broadcasts from liability.  *See* Cal. Civil Code § 3344(d); Haw. Rev. Stat. § 482P-7(b)(2); 765 Ill. Comp. Stat. 1075/35(b)(2); Nev. Rev. Stat. § 597.790(2)(c); Ohio Rev. Code Ann. § 2741.02(D)(1); Okla. Stat. tit. 12, § 1449(D); Tenn. Code Ann. § 47-25-1107(a); Wash. Rev. Code § 63.60.070(2)(b); *see also* Ariz. Rev. Stat. § 12-761(H)(2) (limited to right of publicity of soldiers); Md. Code Ann., Bus. Reg. § 19-502(2) (same).  Five other states more broadly exempt from liability *any* newsworthy presentation or presentation in the public interest.  *See* Fla. Stat. § 540.08(4)(a); Ind. Code § 32-36-1-1(c)(1)(B); Neb. Rev. Stat. § 20-202(1); 42 Penn. Cons. Stat. Ann. § 8316(e)(2)(ii); Tex. Prop. Code Ann. § 26.012(a)(3).

All remaining states with a statutory cause of action have judicially recognized that a publicity or privacy claim cannot reach noncommercial speech such as news and sports reporting.  *See Montgomery v. Montgomery*, 60 S.W.3d 524, 529-30 (Ky. 2001) (noncommercial uses of a name or likeness cannot support a claim); *Tropeano v. Atlantic Monthly Co.*, 400 N.E.2d 847, 851 (Mass. 1980) (no privacy cause of action for publication of photograph that, "whether it be viewed as an effort to inform or entertain the readership, is a legitimate, noncommercial use"); *Messenger ex rel. Messenger v. Gruner & Jahr Printing & Publ'g*, 727 N.E.2d 549, 552 (N.Y. 2000) (right of privacy statue "do[es] not apply to reports of newsworthy events or matters of public interest"); *Leddy v. Narragansett Television, L.P.*, 843 A.2d 481, 490 (R.I. 2004) (misappropriation claims allowed only where likeness used for "trade or advertising purposes"); *Cox v. Hatch*, 761 P.2d 556, 563 (Utah 1988) (privacy claim balanced against "First Amendment informational interest"); *Falwell v. Penthouse Int'l., Ltd.*, 521 F. Supp. 1204, 1210 (W.D. Va. 1981) (Virginia law) (invasion of privacy claim subject to "purposes of trade" requirement).

**B.      States With A Common-Law Right of Publicity.**

In nearly every case, states that have recognized name, image, and likeness rights under the common law have likewise recognized a public interest exception to misappropriation or publicity claims.  *See Doe v. Roe*, 638 So.2d 826, 829 (Ala. 1994) (no misappropriation claim based on "communication of . . . ideas about an event in which society has an interest"); *Joe Dickerson &*

*Assoc., LLC v. Dittmar*, 34 P.3d 995, 1003 (Colo. 2001) (recognizing "a First Amendment privilege [for] a publication concerning a matter that is newsworthy or of legitimate public concern"); *Perkins v. Freedom of Info. Comm'n*, 635 A.2d 783, 790 (Conn. 1993) ("[T]here is no invasion of a right to privacy when the subject matter of the publicity is of legitimate public concern . . . ."); *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 39-40 (D.D.C. 2012) (no misappropriation claim for "matter that is newsworthy or of legitimate public concern"); *Haskell v. Stauffer Communications, Inc.*, 990 P.2d 163, 166 (Kan. Ct. App. 1999) (recognizing "newsworthiness" privilege); *Lawrence v. A.S. Abell Co.*, 475 A.2d 448, 453 (Md. 1984) ("[P]ublication of . . . news is not appropriation of a likeness . . . ."); *see also Battaglieri v. Mackinac Ctr, For Pub. Policy*, 680 N.W.2d 915, 919-20 (Mich. Ct. App. 2004) ("[T]he First Amendment bars appropriation liability for the use of a name or likeness in a publication that concerns matters that are newsworthy or of legitimate public concern.").

Recognizing this pervasive rule, Section 46 of the Restatement (Third) of Unfair Competition limits appropriation claims to uses of a "person's name, likeness, or other indicia of identity *for purposes of trade*" (emphasis added).  The Restatement further explains that "use 'for purposes of trade' does not ordinarily include the use of a person's identity in news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses." *Id.* § 47.

In many states, the public interest privilege applies to all privacy torts.  *See Torrance v. Morris Pub. Grp. LLC*, 636 S.E.2d 740, 747 (Ga. Ct. App. 2006) ("Where an incident is a matter of public interest, or the subject matter of a public investigation, a publication in connection therewith can be a violation of no one's legal right of privacy."); *Danforth v. Star Tribune Holdings Corp.*, No. A10-128, 2010 WL 4286242, at *4-5 (Minn. Ct. App. Nov. 2, 2010) (reporting on matters of public interest privileged against all privacy claims); *Buller v. Pulitzer Publ'g Co.*, 684 S.W.2d 473, 481 (Mo. Ct. App. 1984) ("The threshold decision [in privacy cases] is whether the matter in question is outside the scope of a proper or legitimate public interest . . . ."); *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 85 (W. Va. 1984) (recognizing public interest privilege for privacy torts); *Van Straten v. Milwaukee J. Newspaper-Publisher*, 447 N.W.2d 105, 112 (Wis. Ct. App. 1989) (same).

A few states have limited common law publicity or privacy actions to "commercial" uses of an individual's name, image or likeness, thereby excluding any claims based on news reports or broadcasts of sporting events. *See Stanley v Gen. Media Commc'ns, Inc.*, 149 F. Supp. 2d 701, 706 (W.D. Ark. 2001) (Arkansas law) ("The tort of invasion of privacy-appropriation requires *commercial* use of a person's name or likeness."); *Pooley*, 89 F. Supp. 2d at 1114 (Arizona law) (distinguishing "news account[s]" protected under the First Amendment from unprotected commercial speech); *Nat'l Football League v. Alley, Inc.*, 624 F. Supp. 6, 10 (S.D. Fla. 1983) (Florida law) (professional football players had no right of publicity claim against live telecast of football game because it "was not a trade or advertising use that promoted defendants' bar/restaurant services or any product"); *Castro v. NYT Television*, 851 A.2d 88, 97-98 (N.J. Super. Ct. App. Div. 2004) (appropriation must be commercial to be actionable).  Reporting on matters in the public interest – archetypal noncommercial speech – is accordingly exempt.  The remaining states have addressed right of publicity and misappropriation claims either minimally[10] or not at all.[11]

## IV.    Allowing Plaintiffs' Claims To Proceed Will Have A Chilling Effect On Free Speech And Access To Matters Of Public Interest.

The Supreme Court has long recognized that First Amendment concerns are implicated when a law or regulation has chilling effects on free speech. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) (mere threat of a lawsuit can have chilling effects); *see also FEC v. Wisconsin Right to Life,*

---

[10] *See Slibeck v. Union Oil Co. of Cal*, 1986 WL 11542, at *2 (Del. Super. Ct. Sept. 18,1986); *Uranga v. Federated Publ'ns, Inc.*, 67 P.3d 29, 35 (Idaho 2003); *Koeppel v. Speirs*, 808 N.W.2d 177, 180-81 (Iowa 2011); *Capdeboscq v. Francis*, 2004 WL 1418392, at *1 n.2 (E.D. La. June 23, 2004); *Nelson v. Maine Times*, 373 A.2d 1221, 1224 (Me. 1977); *Candebat v. Flanagan*, 487 So. 2d 207, 209 (Miss. 1986); *Gilham v. Burlington Northern, Inc.*, 514 F.2d 660, 662-63 (9th Cir. 1975) (Montana law); *Remsburg v. Docusearch, Inc.*, 816 A.2d 1001, 1009-10 (N.H. 2003); *Andrews v. Stallings*, 892 P.2d 611, 625-26 (N.M. Ct. App. 1995); *Broughton v. McClatchy Newspapers, Inc.*, 588 S.E.2d 20, 27 (N.C. Ct. App. 2003); *Anderson v. Fisher Broad. Cos., Inc.*, 712 P.2d 803, 808 (Or. 1986); *Gignilliat v. Gignilliat, Savitz & Bettis, LLP*, 684 S.E.2d 756, 762 (S.C. 2009); *Montgomery Ward v. Shope*, 286 N.W.2d 806, 808 (S.D. 1979); *Staruski v. Cont'l Tele. Co. of Vt.*, 581 A.2d 266, 268 (Vt. 1990).

[11] Even states that have not recognized right of publicity or misappropriation claims have upheld the First Amendment right to report on matters in the public interest.  *See Smith v. Suratt*, 7 Alaska 416, 426 (D. Alaska 1926) (denying injunction against photographing of "a matter of great public interest"); *City of Grand Forks v. Grand Forks Herald, Inc.*, 307 N.W.2d 572, 578 n.3 (N.D. 1981) (recognizing newsworthiness privilege without determining existence of invasion of privacy tort under state law).

17

*Inc.*, 551 U.S. 449, 469 (2007); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011); *Reichenberger v. Pritchard*, 660 F.2d 280, 288-89 (7th Cir. 1981). If Plaintiffs' antitrust claims – predicated on a supposed right of publicity in mere broadcasts of sporting events – survive summary judgment, it will have a substantial chilling effect on the Sports Broadcasters' and other news media's freedom to televise and report on sporting events and other matters of public interest.

No court has ever suggested that newspapers, magazines, or broadcasters need to get permission from every participant in a public news event in order to avoid liability for showing images of the event.  News organizations are not required to delay their coverage while they chase down right of publicity releases from every firefighter shown battling a forest fire, every police officer shown at a crime scene, every soldier shown in combat footage, every protester at Occupy Wall Street, every delegate at a national political convention, every participant or attendee at the Macy's Thanksgiving Day Parade, or every Times Square reveler on New Year's Eve.

Similarly, no decision of any court has ever held that newspapers, magazines or television broadcasters must obtain a release from every participant in a sporting event.  If this Court takes the unprecedented step of conferring on college athletes the power to restrain broadcasts of sporting events in which they participate, other participants – such as referees, coaches, cheerleaders, team mascots, or even fans – will probably demand the same rights.  A small group of "hold-outs" or even one disgruntled participant conceivably could block the Sports Broadcasters from televising the most popular sporting events in the United States, cutting off millions of citizens from matters of great public interest.  Before long, participants in all sorts of newsworthy events could demand compensation for the use of their name, image and likeness in broadcasts or footage of those events.

The right of a television network or newspaper to televise or report on matters of public interest – whether a basketball game, a parade, a natural disaster, a March on Washington, or a government shutdown – are fundamental to the existence of a free press.  If Plaintiffs are allowed to proceed with their claims in this case, the news media will be substantially constrained from televising and reporting newsworthy events, and the public will be deprived of vital, necessary, constitutionally-protected news reporting.  *See Kannisto v. City & Cnty. of San Francisc*o, 541 F.2d

841, 843 (9th Cir. 1976) ( "the right of the public to be informed" is relevant to First Amendment analysis).

**CONCLUSION**

Plaintiffs' antitrust claims are without merit because no underlying right of publicity exists in the use of Plaintiffs' names, images, or likenesses in the communication of sporting events to the public through live broadcasts, rebroadcast, or other reports.  The First Amendment – as well as the laws of every state to have addressed the issue – broadly protect this type of communicative, non-commercial speech about matters of public interest.

Dated:  December 19, 2013                                    JENNER & BLOCK LLP


                                                   By:  ____/s/ Richard L. Stone____
                                                        Richard L. Stone
                                                        Andrew J. Thomas
                                                        David R. Singer

                                                        Attorneys for *Amici Curiae*
                                                        Fox Broadcasting Company and
                                                        Big Ten Network, LLC