REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

GLENN D. POMERANTZ (State Bar No. 112503)
glenn.pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
ROHIT K. SINGLA (State Bar No. 213057)
rohit.singla@mto.com
CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
carolyn.luedtke@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

GREGORY L. CURTNER (*Pro Hac Vice*)
gcurtner@schiffhardin.com
ROBERT J. WIERENGA (State Bar No. 183687)
rwierenga@schiffhardin.com
KIMBERLY K. KEFALAS (*Pro Hac Vice*)
kkefalas@schiffhardin.com
SCHIFF HARDIN LLP
350 Main St., Suite 210
Ann Arbor, MI  48104
Telephone:     (734) 222-1500
Facsimile:     (734) 222-1501

Attorneys for Defendant
National Collegiate Athletic Association

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME AND LIKENESS LICENSING LITIGATION, | Case No. 09-CV-1967-CW<br><br>**DECLARATION OF CAROLYN HOECKER LUEDTKE ON BEHALF OF NCAA IN OPPOSITION TO ANTITRUST PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF NCAA'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:   Hon. Claudia Wilken<br>Crtrm.:  2, 4th Floor<br><br>Hearing: February 20, 2014 at 2:00 p.m. |

22293064.4

1    I, Carolyn Hoecker Luedtke, declare that the following is true:

2    1.    I am an attorney admitted to practice before this Court and a partner in the firm of

3  Munger Tolles & Olson LLP, counsel of record for Defendant National Collegiate Athletic

4  Association ("NCAA") in this action.  I make this declaration of my own personal knowledge,

5  and, if called to do so, could and would testify competently to the facts stated herein under oath.  I

6  submit this declaration in support of the NCAA's motion for summary judgment and its

7  opposition to the Antitrust Plaintiffs' motion for summary judgment.

8    2.    In this declaration, I make reference to examples of relevant evidence in the

9  evidentiary record, with the complete evidentiary submission attached.

10  **A.    PROCOMPETITIVE JUSTIFICATION NO. 1:  AMATEURISM IS CORE TO
       COLLEGE ATHLETICS**

11    **Expert Witness Reports and Testimony**

12    3.    Attached as Exhibit 29 is a true and correct copy of excerpts of the Merits Report

13  of Daniel Rubinfeld, Ph.D., served on September 25, 2013 ("Rubinfeld Opening Expert Report").

14  At paragraphs 40-82, Dr. Rubinfeld sets forth his opinions that amateurism is essential to the core

15  product being produced by the NCAA.

16    a.    At paragraph 40, Dr. Rubinfeld opines: "The clearest and most fundamental

17  procompetitive benefit of the NCAA's amateurism rules is the creation of new and differentiated

18  products that are highly successful and that would not exist but-for those rules: amateur college

19  athletics, including amateur college football and college basketball, but also including dozens of

20  other amateur sports."

21    b.    Attached as Exhibits 30-35 are true and correct copies of public opinion

22  surveys cited by Dr. Rubinfeld in paragraphs 79-82.  Dr. Rubinfeld at paragraph 79 explains:

23  "Surveys show that consumers generally favor the amateur nature of college sports."

24    4.    Attached as Exhibit 36 is a true and correct copy of excerpts of Dr. Rubinfeld's

25  rebuttal expert report, served on November 5, 2013 ("Rubinfeld Rebuttal Expert Report").

26  Paragraphs 19 and 167-217 address the amateurism procompetitive justification, and cite to the

27  Dennis report.

28

5.      Attached as Exhibit 27 is a true and correct copy of the Declaration of Daniel Rubinfeld, dated December 12, 2013 ("Rubinfeld Declaration").  In Paragraphs 6-19, Professor Rubinfeld explains the opinions set forth in his reports regarding amateurism as a procompetitive justification.

6.      Attached as Exhibit 37 is a true and correct copy of the Rebuttal Expert Report of J. Michael Dennis, Ph.D., including attachments D (survey) and E (results), served on November 5, 2013.  At paragraph 27 of his expert report, Dennis summarizes his probability-based survey of 2,455 respondents in which 68.9% of respondents were "opposed to paying money to student-athletes on college football and men's college basketball teams in addition to covering their college expenses."  At paragraph 31, Dennis provided statistics on how payment would impact respondents' likelihood of watching college football and men's basketball.

7.      Attached as Exhibit 42 is a true and correct copy of excerpts from Dr. Dennis's November 19, 2013 deposition.  At page 15:4-23, Dr. Dennis explains that he communicated with Dr. Rubinfeld about his survey results, and performed his survey "to provide the other experts the necessary survey results that they would need for their own reports."

8.      Attached as Exhibit 39 is a true and correct copy of Neal Pilson's rebuttal expert report, served on November 5, 2013 ("Pilson Rebuttal Expert Report").

a.      At pages 21-24, Mr. Pilson gives the examples of the U.S. Golf Association amateur league, televised high school sports games, the Little League World Series, and the Olympics, and opines:  "I am not aware of any evidence that any televised amateur sporting event uses broadcast (or any other) revenue to pay, or permits participants to be paid, simply because they participated in the televised event and they appeared in the telecast.  Rather, the only athletes I am aware of who receive a portion of television revenue are professional athletes who are paid salaries indirectly derived from broadcast and other revenue earned by their teams or receive prize money from a purse that is funded indirectly in part using the revenue that the owners of their event have earned from licensing telecast rights."

b.      At page 45, Mr. Pilson opines:  "Based on my experience, I believe paying student-athletes as described in either of Dr. Rascher's models would undermine the key features

1    of college sports that make them tremendously popular even though they exhibit an inferior

2    quality of play and therefore would pose a significant risk of jeopardizing the popularity of college

3    sports."

4         9.     Attached as Exhibit 46 is a true and correct copy of excerpts from Neal Pilson's

5    November 14, 2013 deposition.  At pages 194:19-195:9, Mr. Pilson testifies that "the public's

6    perception of college sports would change dramatically if the players were to either be paid huge

7    amounts, either individually or collectively, as [plaintiffs'] economists are suggesting.  I think

8    there's a dramatic risk that the public's belief and enjoyment of college sports would change, and I

9    think it would change most heavily in the casual and [sic] fan."

10        10.    Attached as Exhibit 40 is a true and correct copy of excerpts of the Expert Rebuttal

11   Report of Lauren J. Stiroh, Ph.D., served on November 7, 2013 ("Stiroh Rebuttal Expert Report").

12   Paragraphs 81-93 discuss the differences between college and amateur sports and professional

13   sports.  In paragraph 83, Dr. Stiroh opines that "I have found no other amateur sport that allocates

14   any share of its broadcast revenues to players in compensation for the use of the players' NILs in

15   the broadcast. Even organizations such as the Olympics, that explicitly allow athletes to

16   commercialize their NILs, do not appear to allocate any part of the revenue from broadcasting the

17   Olympics to the players for the right to broadcast the Olympic athletes' NILs in connection with

18   broadcasting the Olympic events."

19        11.    Attached as Exhibit 44 is a true and correct copy of excerpts from Plaintiffs' expert

20   Roger Noll's October 4, 2013 deposition.

21        a.     At pages 851:5-852:9, Dr. Noll agrees that "probably there is a number at

22   which, if college athletes are paid that amount, it would negatively impact the popularity of the

23   sport."

24        b.     At page 1145:15-23, Dr. Noll testifies that "the university as a university is

25   not in the professional sports business.  It might be in the professional sports business, but I don't

26   – it seems to me perfectly reasonable to say, we're not going to be in the professional sports

27   business; that we're going to, instead, do something different that has attributes that differ that

28   require people to be students."

12.     Attached as Exhibit 45 is a true and correct copy of excerpts from Dr. Noll's November 12, 2013 deposition in this matter.

a.     At page 1201:15-20, Dr. Noll agrees that "if the NCAA has rules that promote or increase the popularity of its sports with fans, that can be a procompetitive effect."

b.     At page 1222:12-25, Dr. Noll testifies that he is "not aware of any organization of schools in college or high school level that has ever given student athletes a share of revenue."

c.     At page 1315:15-24, Dr. Noll agrees that "if the stars on these teams could be paid half a million dollars" this "might also reduce the procompetitive benefits, i.e., the popularity of these sports."

d.     At pages 1331:12-1332:1, Dr. Noll testifies that "[o]ther than the fact that broadcast revenues are included in the salary pools for professional athletes," he had not "seen or found or cited any other example anywhere in the world in history in any sport in which an athlete was paid for the use of their name, image and likeness in a live telecast of a regular game."

**Named Plaintiff Testimony**

13.     Attached as Exhibit 59 is a true and correct copy of excerpts from Plaintiff Edward O'Bannon's November 1, 2011 deposition.  Mr. O'Bannon testifies at page 95:17-22 that he agrees with the statement "college sports should remain amateur and that college athletes shouldn't get paid while they're in school."

14.     Attached as Exhibit 54 is a true and correct copy of excerpts from Plaintiff Alex Gilbert's November 4, 2011 deposition.  At page 103:16-24, Mr. Gilbert testifies: "I believe in amateur athletics.  I think what's fair for amateur athletics is what is being put in place right now today.  That's what I think is fair for kids in college.  Whatever's in place for them right now is what it is."  Mr. Gilbert also explains at page 104:21-24: "I was an amateur athlete, and I believe in amateur athletics.  What was in place for me at that time was a scholarship, books and tuition.  And that's what I got."

15.     Attached as Exhibit 47 is a true and correct copy of excerpts from Plaintiff Moses Alipate's October 17, 2013 deposition.  Mr. Alipate testifies at page 31:1-6 that "one of the things

1   that helps the entire student body rally around the football team is the fact that the players on the

2   football team are also students."

3        16.    Attached as Exhibit 64 is a true and correct copy of excerpts from Plaintiff Darius

4   Robinson's November 11, 2013 deposition.  At page 26:11-13, Mr. Robinson testifies that there is

5   "value" in college players being students as well as athletes, and at page 10:1-17, Mr. Robinson

6   testifies: "I would say [the fans] were more engaged with the players [in college sports] as far as

7   seeing us around and things like that" and that having a college football team gives "the [student]

8   community something to look forward to every weekend."

9        **School and Athletic Conference Declarations and Depositions**

10        17.    Attached as Exhibit 1 is a true and correct copy of the Declaration of Stan L.

11   Albrecht, dated December 11, 2013 ("Albrecht Declaration").  In this declaration, Stan Albrecht

12   identifies himself as the President of Utah State University.  President Albrecht testifies in

13   paragraphs 5 and 6 that paying "student-athletes for appearing in televised football or basketball

14   games ... would be inconsistent with the NCAA's tradition of amateurism and would destroy Utah

15   State's conception of what it means to be a student-athlete.  At Utah State, intercollegiate athletics

16   are part of our mission of educating young men and women to become difference makers in their

17   communities, our country and our world."

18        18.    Attached as Exhibit 2 is a true and correct copy of the Declaration of Britton

19   Banowsky, dated December 11, 2013 ("Banowsky Declaration").  Britton Banowsky identifies

20   himself as the Commissioner of Conference-USA.  At paragraph 7, Commissioner Banowsky

21   testifies: "Based on my knowledge and experience, if student-athletes were compensated for the

22   use of their name, image and likeness, I believe the value of athletics to a university would be

23   greatly diminished or even lost.  Currently, students contribute to the university by competing on

24   teams in their role as students, and, as with many students that participate in extra-curricular

25   activities, they receive scholarships to further their education.  However, if you were to change the

26   structure so that the players were compensated for the use of their name, image and likeness, they

27   would no longer be students first and foremost, which may undermine the unique nature of the

28   relationship between higher education and athletics."

19.     Attached as Exhibit 3 is a true and correct copy of the Declaration of Rebecca M. Blank, dated December 12, 2013.  She identifies herself as the Chancellor of the University of Wisconsin-Madison.

a.     Chancellor Blank testifies at paragraphs 7-8 that the payments proposed by Plaintiffs in this litigation "would be harmful to higher education and, if implemented at Wisconsin, would undermine Wisconsin's core academic mission."

b.     She further explains in paragraph 17: "[T]he popularity of college sports would be impacted negatively if football and men's basketball players were paid for participating, for example, in televised games.  Based on my experience, fans follow college football because of the joy of seeing players with whom the fans identify.  Fans cheer for student-athletes based in part on a perception that they are students playing for the love of the game, rather than professionals playing for payment.  Based on my conversations and observations, paying football and men's basketball players would seriously degrade interest in college athletics and break the connection that many fans feel with the players.  No doubt, some people would still remain loyal college football and basketball fans, but I would expect lower commitment to the team and less excitement about the game and the players."

20.     Attached as Exhibit 4 is a true and correct copy of the Declaration of Bob Bowlsby, dated December 11, 2013 ("Bowlsby Declaration").  Bob Bowlsby identifies himself as the Commissioner of The Big 12 Conference.

a.     At paragraph 6, Commissioner Bowlsby testifies: "Our member schools sponsor athletics programs as a way to promote the educational mission of each university — to promote the name on the front of the jersey, as opposed to promoting the names of individuals on the backs of the jerseys.  That is what makes collegiate athletics distinct from other forms of athletics."

b.     At paragraph 9, Commissioner Bowlsby testifies that "there is no question that college football and men's basketball fans and alumni donors would respond negatively to student-athletes being paid to appear on television. Based on my experience and knowledge, many fans of collegiate athletics and the vast majority of private donors to collegiate athletics programs

are people who attended those colleges and universities as students.  They hearken back to collegiate athletics because of a yearning for the time they had on campus and the experience they had as students.  Paying the student-athletes separates the student-athlete from that experience, and alumni and fans would see them differently.  Based on my experience, this altered perspective could well have a negative impact on alumni and for donations to our universities."

21.     Attached as Exhibit 5 is a true and correct copy of the Declaration of David Brandon, dated December 12, 2013 ("Brandon Declaration").  David Brandon identifies himself as the Director of Intercollegiate Athletics for the University of Michigan.  At paragraph 6, Mr. Brandon testifies: "Based on my experience in higher education and college athletics, paying student-athletes for participating in televised football or men's basketball games would fundamentally change the relationship between the fans and the student-athletes.  For example, in professional football, if a player has a bad season, the fans and media often cry out for the player to be cut or traded.  We don't cut or trade student-athletes who underperform.  We support them and continue to provide the same benefits and services whether they are star players or never leave the bench.  However, if U-M student-athletes were paid, it would dramatically increase the amount of pressure on those student-athletes to perform.  Fans would equate their investment in ticket prices, donation, etc. to 'paying for performance', and if the performance isn't there, fans would more quickly react in a similar fashion to what we see in professional sports.  The pressure to perform placed on 18-23 year-old student-athletes is already substantial and I believe increasing it in this way would be detrimental to their experience and well-being."

22.     Attached as Exhibit 6 is a true and correct copy of the Declaration of Joseph R. Castiglione, dated December 11, 2013 ("Castiglione Declaration").  In this declaration, he identifies himself as the Athletics Director of the University of Oklahoma.  He testifies in paragraph 8: "The current model of intercollegiate athletics is built around the concept of amateurism, and the principle that student-athletes are participating in athletics as one component of their academic endeavors."

23.    Attached as Exhibit 7 is a true and correct copy of the Declaration of Mary Sue Coleman, dated December 12, 2013 ("Coleman Declaration").  In this declaration she identifies herself as the President of the University of Michigan.

a.    President Coleman testifies in paragraph 8: "[A]ny invalidation of the NCAA's amateurism rules to allow for the payments Plaintiffs propose would be detrimental to higher education, to intercollegiate athletics, and to the individual student-athletes.  Plaintiffs' proposal would undermine the many positive and beneficial aspects of athletics at Michigan."

b.    President Coleman further explained in paragraph 9: "Amateurism is fundamental to athletics at Michigan and sports competition throughout the nation.  Amateurism is not broken; it is essential.  We provide opportunities for almost 900 student-athletes to compete at the highest levels in 29 different NCAA sports.  We provide these opportunities to a balanced number of men and women.  We also provide similar opportunities, for example, to talented musicians and artists.  A musician could choose to attend Julliard and focus exclusively on music, just as a talented football player could choose to play Arena Football.  However our talented students – athletes and artists -- choose to come to Michigan because they want the whole, integrated experience of a world-class academic institution that gives these students knowledge and values that provide options in life.  Combining athletics and academics has been a very successful model for student-athletes and institutions."

c.    At paragraph 14, President Coleman testified: "Because amateurism is fundamental to Michigan athletics, based on my experience, allowing payment of football and men's basketball players for participating in televised games would undermine the popularity of Michigan football and men's basketball.  Based on my experience, personal conversations, and observations, Michigan football has passionate and loyal fans who are attracted to the sport because of a special connection they feel to student-athletes who are full members of the University's community.  Our fans delight in watching true stories, often Cinderella stories, of kids playing their heart out on the field while also working hard in the classroom to get an education for their future.  For example, senior offensive lineman Quinton Washington recently gave an inspiring speech to the team's end of the year football banquet in which he explained how

1   he arrived at Michigan unable to speak due to serious speech impediments, but thanks to the

2   opportunity afforded him at Michigan, he has already graduated and is now pursuing a master's

3   degree in social work."

4          d.      She continues in paragraph 15: "I understand that Plaintiffs have argued that

5   Michigan sells so many tickets to its football games because Michigan graduates thousands of

6   students each year, who then enter adulthood with a built-in interest in Michigan sports.  I

7   understand that Plaintiffs argue that paying Michigan players would not negate this fan interest.

8   Based on my years as President of Michigan and my countless conversations with and

9   observations of Michigan fans, Michigan fans are passionate about Michigan and its mantra

10  "uncommon education for the common man."  Michigan gives its students opportunities to

11  succeed in their lives, and this is true of the student-athletes on the football field and the basketball

12  court.  Fans support Michigan because they love that young students coming out of high school

13  arrive at Michigan, work hard, and are largely successful getting college degrees.  Paying these

14  students-athletes would change the students-athletes in the eyes of the fans and, in my experience,

15  would negatively impact fan interest in Michigan sports."

16         24.     Attached as Exhibit 8 is a true and correct copy of the Declaration of James Delany,

17  dated December 11, 2013 ("Delany Declaration").  In his prior declaration, which is attached as

18  Exhibit A to the Delany Declaration, James Delany identifies himself as the Commissioner of The

19  Big 10 Conference since 1989.  In the Delany Declaration, at paragraph 5, Commissioner Delany

20  testifies: "Amateurism principles are a deep part of the history and culture of [T]he Big Ten and

21  formed the basis for the balance between academics and athletics."

22         25.     Attached as Exhibit 10 is a true and correct copy of the Declaration of Nathan

23  Hatch, dated December 12, 2013 ("Hatch Declaration").  Nathan Hatch identifies himself as the

24  President of Wake Forest.  In paragraph 18, President Hatch testifies that "if football and men's

25  basketball players were paid with a portion of broadcast revenue, it would erode the support of the

26  alumni and school community for our athletic programs.  In my time at Wake Forest, I have

27  observed that the support of our fans for our programs is not motivated by having great athletics

28  programs alone.  Support is also tied to the fact that we have real student-athletes that fans and

fellow students can get to know.  The student-athlete experience is one of the distinctive features of collegiate athletics.  If we were to build a team of athletes who were there primarily for the money, or who were perceived as being there primarily for the money, it would change substantially the relationship of those players with other students and erode some of that fan support for our athletic teams."

26.     Attached as Exhibit 11 is a true and correct copy of the Declaration of Mark Hollis, dated December 7, 2013 ("Hollis Declaration").  Mark Hollis identifies himself as the Athletics Director of Michigan State.

a.     At paragraph 5, Mr. Hollis testifies: "Like any university or institution of higher education, Michigan State's purpose is to educate young men and women for a better future.  At Michigan State, our athletic programs are part of that mission and the staff of our athletic department consider themselves to be educators."

b.     At paragraph 7, Mr. Hollis explains: "Paying student athletes for their participation in televised football or men's basketball is not consistent with our core values as an educational institution.  In my view, this is no different from students who excel at research, music, drama, or any number of other educational activities within the university.  The students benefit from their participation and the education they receive, and payment for that participation would be inappropriate."

27.     Attached as Exhibit 14 is a true and correct copy of the Declaration of Harris Pastides, dated December 12, 2013 ("Pastides Declaration").  In his declaration, he identifies himself as the President of the University of South Carolina ("USC").  In Paragraph 12, President Pastides testifies: "Based on my experience, paying student-athletes a license fee for participating in televised games would also negatively impact community spirit at those games…. I frequently attend USC football and basketball games and I talk with students, alumni, and prospective students before, during, and after those games.  Based on my experience and observations, fans of college football and men's basketball are loyal to and passionate about their team precisely because they believe they are cheering for students with USC uniforms on their backs that may have the opportunity to live [the] American dream of getting drafted one day in the future, but

1   right now are going to class, getting an education, and are not yet corrupted by money and other

2   financial influences.  In my experience, this would be undermined by paying those student-athletes

3   a portion of broadcast revenue for their participation in games."

4          28.     Attached as Exhibit 15 is a true and correct copy of the Declaration of Steve

5   Patterson, dated December 11, 2013 ("Patterson Declaration").  Mr. Patterson identifies himself as

6   Men's Athletic Director at The University of Texas at Austin.

7                  a.     Mr. Patterson testified in paragraph 5: "I understand that plaintiffs in this

8   case have argued that amateurism is not fundamental to college sports and that the popularity of

9   college sports would not decline if student-athletes in Division I football and men's basketball

10  were compensated for the use of their name, image, and likeness.  Based on my personal

11  experience in both professional and intercollegiate sports, I disagree.  College sports and

12  professional sports operate in different markets.  Based on my personal experience and

13  observations, many consumers watch and attend college sports, but don't watch or attend

14  professional sports.  For example, the Arizona State University Sun Devils college football team

15  and Arizona Cardinals professional football team play 30 minutes from one another but when I

16  was associated with the Sun Devils, there was only a 5% overlap between ticket holders of the two

17  teams.  Based on my personal experience and personal observations, fans engage differently with

18  college sports because of the emotional connection that they often have with the university.  This

19  emotional connection often arises because they attended the university; their kids, parents, or other

20  family members attended the university; they met their spouse at the university; or they are

21  otherwise a part of the community.  The energy and loyalty created by fans' emotional connection

22  to the university, its core values, and its decades old traditions is unique to college sports.

23  Compensating student athletes for the use of their name, image, and likeness would fundamentally

24  change the relationship between fans, the institution, and the student athletes.  Based on my

25  personal experience and observations, compensating Division I football and men's basketball

26  players for their name, image, and likeness would likely undermine the connection and

27  identification the fans feel with those athletes."

28

29.     Attached as Exhibit 16 is a true and correct copy of the Declaration of Christine Plonsky, dated December 10, 2013 ("Plonsky Declaration").  Ms. Plonsky identifies herself in the declaration as the Women's Athletics Director at The University of Texas at Austin.

a.      Ms. Plonsky testified in paragraph 11: "Based on my twenty years of experience, personal knowledge, and personal observations in the athletic department at UT, paying Division I football and men's basketball student athletes a portion of UT's broadcast revenue or for other commercial uses of the student-athletes' name, image, and likeness would undermine UT's overall educational mission by fundamentally changing the relationship between the student athlete and the university.  Even if the payment were negotiated prior to the athlete's participation in a season and paid after the athlete's graduation, allowing the student to negotiate with the university for a percentage of the school's broadcast revenue would change college athletics from an amateurism model in which the student athlete is first and foremost a student to a model in which money drives athletics decision making."

b.      Ms. Plonsky testified in paragraph 17: "In my decades of personal experience and personal observations working with UT and with other institutions in connection with my NCAA committee work, I've found that the educational mission at the core of our collegiate athletics model drives fans and alumni to make philanthropic contributions to UT Athletics and the University more generally.  I have observed that donors are motivated to give by the notion that their contributions will go to educating student athletes, and providing them access to and the resources to graduate from UT.  Based on my decades of experience in intercollegiate athletics and my personal knowledge and observations, these donors would feel differently about giving to support UT if the school was compensating some of its student-athletes for the use of their name, image, or likeness.

30.     Attached as Exhibit 17 is a true and correct copy of the Declaration of Larry Scott, dated December 11, 2013 ("Scott Declaration").  Larry Scott identifies himself as the Commissioner of the Pac-12 Conference.  At paragraph 23, Commissioner Scott testifies: "The Pac-12 supports the concept of amateurism reflected through NCAA rules and regulations and

1   believes that a system of amateurism is the best way to support all of our student athletes with

2   broad educational, extracurricular, health and safety, and financial aid benefits."

3       31.     Attached as Exhibit 18 is a true and correct copy of the Declaration of Michael L.

4   Slive, dated December 11, 2013 ("Slive Declaration").  He identifies himself as the Commissioner

5   of the Southeastern Conference ("SEC").  At paragraph 12, Commissioner Slive testifies that

6   "students, alumni, and members of the community watch and attend games in order to cheer for

7   the institution that is their alma mater, is their parents' alma mater, or that has a strong affiliation

8   with their town, state or community" and that "professionalizing college athletics by paying

9   salaries or similar compensation to student athletes would negatively change this environment and

10  the relationship between student-athletes and their university by putting too much emphasis on

11  individuals, and thereby distorting their experience as students of their university.

12      32.     Attached as Exhibit 19 is a true and correct copy of the Declaration of Kenneth W.

13  Starr, dated December 11, 2013 ("Starr Declaration").  Ken Starr identifies himself as the

14  President of Baylor University.

15      a.      President Starr testifies in paragraph 15 that the "nationwide prohibition of

16  such payments [for the use of name, image, and likeness] has enabled and enhanced the creation of

17  a unique product, amateur athletics."

18      b.      President Starr testifies in paragraph 17 that "the goodwill and financial

19  support for the university life that athletics help to generate would be undermined if schools and

20  universities were to enter the business of paying student-athletes for their appearance on television

21  or otherwise."  He believes "that students, parents, alumni, and other members of the broader

22  communities that support [schools and universities] would be likely to view such programs as

23  professional endeavors, undeserving of financial or fan support."

24      33.     Attached as Exhibit 21A is a true and correct copy of the Declaration of Timothy

25  White, Chancellor of California State University, dated March 13, 2013, ECF No. 695-8 ("White

26  Declaration").  At paragraphs 2 and 4, Timothy White identifies himself as the Chancellor of

27  California State University since December 31, 2012, and prior to that, the Chancellor of UC-

28  Riverside.  In paragraph 5, Chancellor White testifies: "Paying student-athletes would destroy the

1  collegiate model of college athletics which would be a serious mistake for students, universities

2  and colleges and the communities they serve.  The American collegiate athletic model is grounded

3  in the principle of amateurism … paying student athletes, or even promising to pay student-

4  athletes after graduation … is entirely contrary to the model that serves America best."

5  <u>**NCAA Witness Testimony and Documents**</u>

6  34.     Attached as Exhibit 71 is a true and correct copy of excerpts from Dr. Mark

7  Emmert's March 6, 2012 deposition ("Emmert 3/2012 Deposition").  On pages 14:23-15:9, Dr.

8  Emmert testifies: "[T]he single most important principle is that they are students who are

9  participating in their sport as an avocation; that they are not employees of the institution; that they

10  are not professional athletes; but that they are amateur athletes participating in college sport,

11  representing their institution and playing in their sport predom -- but first and foremost, that they

12  are, in fact, students who -- who engage in scholarly pursuits, that they are not there because their

13  athletic participation is their profession."  On page 83:2-9, Dr. Emmert also explains: "Because

14  there has always been, as I've said many times, a deep commitment to intercollegiate athletics as

15  amateur athletes for whom their participation is both voluntary and avocational, not professional,

16  and that -- and that that has been one of the bedrock notions of the collegiate athletic model for

17  more than 150 years now."

18  35.     Attached as Exhibit 74 is a true and correct copy of excerpts from Walter Renfro's

19  June 26, 2012 deposition.  At pages 81:11-82:6, Mr. Renfro testifies: "Well, based on 40 years of

20  – of observation and examination of what makes intercollegiate athletics popular, I hold the view

21  that if you change the collegiate model into one that attaches the student-athlete as – as a

22  professional to the model, joining those others who are professional, that in – that in – in my view,

23  that would diminish the – the way in which intercollegiate athletics is viewed, appreciated,

24  admired, loved by – by the public.  The relationship of the student, the sport, and the institution

25  constitutes a phenomenon that is held valuable by those who attend and those who help sponsor

26  the – the broadcast or – you know, or in other ways support intercollegiate athletics.  And, you

27  know, again, based on my observation over a lengthy career, I think that turning intercollegiate

28  athletics into second- or third-rate professional sports would – would diminish the interest."  At

pages 132:10-135:10, Mr. Renfro explains that he intended his statement "[t]here is a general sense that intercollegiate athletics is as thoroughly commercialized as professional sports" to suggest that the "media has incorrectly suggested that intercollegiate athletics is thoroughly commercialized as professional sports" and "[t]his was a way to, as bluntly and as provocatively as I could, sort of state the view of those who are the most critical and cynical of intercollegiate athletics."

36.    Attached as Exhibit 76 is a true and correct copy of excerpts from Greg Weitekamp's June 5, 2012, deposition.  Mr. Weitekamp identifies himself at pages 9:4-11:16 as Director of Championships and Alliances at the NCAA, and prior to that served as Director of Broadcasting at the NCAA and Assistant Director of the Horizon League.  Mr. Weitekamp testifies at pages 56:24-57:7: "Every organization has a brand.  They're identified by their brand. Our brand is based upon the fact that we are an organization of higher education that works within athletics that provides opportunities for students to compete on the playing field in athletics and earn that education in the classroom via scholarship.  That is the NCAA brand."

37.    Attached as Exhibit 22 is a true and correct copy of the Declaration of David Berst, dated December 12, 2013, paragraphs 4-17 ("Berst Declaration").  Mr. Berst identifies himself as Vice President for Division I of the NCAA.  Among other things, he testifies that "this principle of amateurism has been consistently enacted through Division I Bylaws that attempt to assure that student-athletes are treated as both students and athletes, rather than as athletic employees…."

38.    Attached as Exhibit 70 is a true and correct copy of excerpts from David Berst's May 25, 2012 deposition.  Mr. Berst testifies at page 87:6-16 that, "The whole idea is that you're a student enrolled in institutions, involved in elite competition at the highest level, but you're not doing it because you're going to get paid to do that.  You are going to get help paying educational expenses.  If it's the latter, I mean, if it's what you are suggesting, I think you undermine whatever the collegiate model is, and it becomes a semi pro program, and – and it's only as good as whatever the support is for that sort of a system."

39.    Attached as Exhibit 25 is a true and correct copy of the Declaration of Kevin Lennon, dated December 12, 2013 ("Lennon Declaration").  Attached as Exhibit A to the Lennon

1   Declaration is a true and correct copy of the NCAA 2013-14 Division I Manual.  This document

2   contains Constitution Article 2.9 which states, "Student-athletes shall be amateurs in an

3   intercollegiate sport, and their participation should be motivated primarily by education and by the

4   physical, mental and social benefits to be derived. Student participation in intercollegiate athletics

5   is an avocation, and student-athletes should be protected from exploitation by professional and

6   commercial enterprises."

7       40.     *See* the Berst Declaration, attached as Exhibit 22.

8           a.     Attached to the Berst Declaration as Exhibit A is a true and correct copy of a

9   document produced by the NCAA in this litigation with Bates number NCAAPROD00030418.

10  This document contains a section entitled "Guiding Principles for the Amateurism Cabinet" which

11  are listed as follows:

12      • "Ensure that legislation reinforces that student participation in
13          intercollegiate athletics is an avocation, and student-athletes should be
14          protected from exploitation by professional and commercial enterprises."

15      • "Student-athletes shall be an integral part of the student-body and their
16          participation should be motivated primarily by education and by the
17          physical, mental and social benefits to be derived."

18      • "Minimize missed class time, and all promotions shall be consistent with
19          the values of higher education."

20          b.     Attached to the Berst Declaration as Exhibit B is a true and correct copy of

21  the document produced by the NCAA in this litigation with Bates number NCAAPROD00038768.

22  This document is called "Final Report of the NCAA Task Force on Commercial Activity in

23  Division I Intercollegiate Athletics," and at page 6 it says: "We know from our experience with

24  media partners and their advertisers that it is not only the popularity of college sports that is

25  attractive.  It is also the values that intercollegiate athletics and higher education foster that appeal

26  to marketing and advertising interests. Indeed, if there were no constraints on commercial activity

27  – if colleges and universities were to barter their values (the avocational motivation for athletics

28  participation and the protection of the student-athlete from commercial and professional interests)

1    for a few dollars more – the appeal would be weakened.  The attraction of intercollegiate athletics

2    that allows the enterprise to compete favorably with professional sports for media attention and

3    commercial support is not the athletics superiority of the collegiate product.  Professional athletes

4    are paid for a reason; they are better at what they do than amateurs because playing sports is the

5    professional's job.  The attraction is the near visceral recognition that intercollegiate athletics and

6    higher education share common values and that the keystone to the relationship is the student-

7    athlete who resides in both worlds.  That is a value that advertisers and corporations are as

8    interested in preserving as is higher education."

9    **B.      PROCOMPETITIVE JUSTIFICATION NO. 2: COMPETITIVE BALANCE**

10          **Expert Witness Reports and Testimony**

11          41.      *See* Rubinfeld Opening Expert Report, attached as Exhibit 29.  Dr. Rubinfeld sets

12   forth his opinions on competitive balance at paragraphs 83-102.

13              a.      At paragraph 64, Dr. Rubinfeld explains: "The opportunity to watch

14   'Cinderella' teams participate is a particularly appealing aspect of the [NCAA's D-I March

15   Madness basketball] tournament."

16              b.      At paragraph 87, Dr. Rubinfeld opines that, "Amateurism rules help to

17   prevent teams with more resources from having a recruiting advantage.  Under current NCAA

18   rules, the grant-in-aid is a standardized package that is common across schools.... [I]t is basic

19   economics that providing substantial and widely varying payments to prospective recruits would

20   create strong incentives for recruits to move to high revenue schools."

21              c.      At paragraph 88, Dr. Rubinfeld explains that, "There is agreement among

22   economists that competitive balance is an important aspect of a successful sports league."

23              d.      At paragraph 97, Dr. Rubinfeld states, "While high-revenue schools may

24   have recruiting advantages in the current world (with better training facilities, coaches, etc.), the

25   ability to pay players would clearly change the recruiting landscape even more in the favor of

26   these schools."

27          42.      *See* Rubinfeld Rebuttal Expert Report, attached as Exhibit 36.

28

1              a.      At paragraph 21, Dr. Rubinfeld opines "the current state of balance of the

2   NCAA is not relevant — the relevant question is whether the current state of balance would be

3   worse in Professor Noll's but-for world."

4              b.      At paragraph 229, Dr. Rubinfeld explains that "Professor Noll's evidence

5   focuses entirely the question of current (and past) levels of competitive balance in FBS football

6   and D-I men's basketball NCAA.  His evidence does not speak to the effect of removing the

7   conduct at issue, and therefore is uninformative on the question of whether removing restrictions

8   which prevent student-athletes from receiving substantial pay above and beyond their scholarships

9   would make competitive balance worse."

10             c.      At paragraph 235, Dr. Rubinfeld reviews competitive balance among

11  professional sports and concludes "there is some evidence in the literature that NCAA FBS

12  football and Division I basketball are more balanced than professional leagues."

13             d.      At paragraph 237, Dr. Rubinfeld opines:  "In the APs' but-for world, where

14  schools would be free to pay student-athletes, these financial offers would be an additional, potent

15  recruiting tool that high-revenue schools could use to attract and retain the best student-athletes.

16  While high-revenue schools may have recruiting advantages in the current world (with better

17  training facilities, coaches, etc.), the ability to pay players would change the recruiting landscape

18  further in the favor of these schools, which would likely worsen competitive balance among

19  NCAA member colleges and universities."

20      43.      *See*  Rubinfeld Declaration, attached as Exhibit 27.  In Paragraphs 20-38, Professor

21  Rubinfeld explains the opinions set forth in his reports regarding competitive balance as a

22  procompetitive justification.

23      44.      *See* Pilson Rebuttal Expert Report, attached as Exhibit 39.

24             a.      Mr. Pilson opines at page 47 that "[b]ased on my experience in the industry,

25  competitive balance is a key element of viewer interest in sports telecasts.  Indeed, the fact that

26  sporting events are unscripted and their outcome uncertain is critically important to why viewers

27  continue to find them exciting and why they remain so popular."

28

1        b.      At page 50, Mr. Pilson explains that APs' proposal of paying student athletes

2  "would exacerbate disparities between the top conferences and other conferences" and "even

3  within conferences."  In particular, "[s]ince how much each school would be able to pay its

4  players would be a function of revenue, the schools with the most successful and established

5  reputations would be able to pay their players more.  This would make them even more attractive

6  to the best players who would have less incentive to choose schools that are closer to home,

7  promise more playing time or offer a superior education.  Thus, the best schools would get better:

8  they would recruit an even larger number of the top players, which would make them even better,

9  which would make them even more valuable, which would give them even more money to spend

10  on players, and so on."

11        45.     *See* Pilson November 14, 2013 deposition, attached as Exhibit 46.

12        a.      At pages 204:23-205:19, Mr. Pilson testifies that, if student athletes received

13  compensation in addition to their scholarships, "it would change dramatically because ... no one

14  would benefit from having to share 50 percent of their TV revenues with the athletes.  The bigger

15  schools would be hurt less significantly than the smaller schools because they have bigger budgets

16  and have more of their revenue coming from non-TV sources.  So what I think would happen is

17  the bigger schools, in order to protect now their financial risks which would have increased, would

18  fight to retain their top coaches or else, as Dr. [R]ascher and Dr. Noll suggest, if you pay your

19  coaches less, they'll even go to the pros and then that's self-defeating.  So on the one hand, I think

20  they'd end up quite possibly paying the coaches more rather than less and, on the other hand, I

21  think you'd see a have and have-not group that would be far different than what we have today."

22        b.      At page 205:20-24, Dr. Pilson agrees that "that same argument ... would

23  apply to ... cutting back on facilities, weight training, and so on."

24  **Named Plaintiff Testimony**

25        46.     Attached as Exhibit 62 is a true and correct copy of excerpts from Plaintiff Eric

26  Riley's November 11, 2011 deposition.  At page 35:13-23, Mr. Riley testifies that if other schools

27  "were offering full scholarship and [Michigan] offered half, I probably would go somewhere

28  else."

47.     Attached as Exhibit 66 is a true and correct copy of excerpts from Plaintiff Jake Smith's October 12, 2013 deposition.  At page 41:4-19, Mr. Smith testifies that if two schools "were identical schools in the identical place and somebody offered me a little more [money], maybe" that would have influenced his choice of school.

**School and Athletic Conference Declarations and Depositions**

48.     *See* Albrecht Declaration, attached as Exhibit 1.

        a.     President Albrecht testifies in paragraph 16 that "[p]ermitting schools to pay football and basketball student-athletes for appearing in live broadcasts would also seriously impact Utah State's ability to compete in FBS football and Division I basketball.  Utah State is already at a disadvantage in competing with schools in the five major conferences—the ACC, the Big Ten, the Big 12, the Pac-12 and the SEC.  Many of these schools have enormous alumni donor bases, maintain high visibility on television and can afford to pay more lucrative salaries to attract top coaches."

        b.     President Albrecht testifies in paragraph 18 that "if some schools decided to pay student-athletes 50% of broadcast revenue, Utah State would find it much more difficult to recruit student-athletes.  Schools in the major conferences earn far more revenue from broadcast license fees than schools like Utah State that play in other conferences.  As a result, if these schools chose to offer prospective student-athletes broadcast revenue, they would be able to offer more money than Utah State could if it chose to pay for participation in televised games (again, a premise I question).  Given the financial difficulties so many prospective student-athletes and their families face, the amount of broadcast revenue they could receive would become a primary consideration for many prospective student-athletes in deciding where to attend college.  Utah State simply could not match schools in bigger conferences on this dimension."

49.     *See* Banowsky Declaration, attached as Exhibit 2.

        a.     At paragraph 15, Conference USA Commissioner Banowsky testifies: "The NCAA's rules against compensation for student-athletes are especially important for the ability of mid-level resource programs to compete with high-resource programs. Because of the rules, every collegiate football program, regardless of its total revenues, offers a grant-in-aid package to

prospective football players that covers the payment of tuition, fees, room and board and books. This gives mid-resource programs a realistic chance to recruit highly sought-after prospects, even though mid-resource programs do not have as much revenue from television broadcasting as higher-profile programs.  Mid-resource programs, like those in C-USA, can currently recruit student-athletes by emphasizing a geographical, social, mission-based or educational fit with the student's interests that may make a C-USA school a better option than a major-resource school."

       b.      At paragraph 16, Commissioner Banowsky testifies: "For example, Rice University, is known for offering a world-class undergraduate education. Student-athletes often choose Rice because of the excellence of its educational offering. Even though it has one of the smallest student bodies in all of the NCAA Division I Football Bowl Subdivision, Rice has fielded a highly competitive sports programs in recent years. Based on my knowledge and experience, I believe recruiting at Rice would be significantly disrupted if other college football programs with higher television revenues were able to offer higher payments to potential student-athletes. It would make it more difficult for Rice and similarly situated schools to continue to compete at this level in college football."

       50.     *See* Bowlsby Declaration, attached as Exhibit 4.

       a.      At paragraph 18, Big Twelve Commissioner Bowlsby testifies that "the overall competitive balance in college football today is the best in history.  There are more teams that are competitive than at any time in the past, and many teams have risen to national prominence.  Kansas State, one of our member institutions, is an excellent example of a school that went quickly from being a relatively weak program to one that has been among the strongest in the nation in recent years.  Baylor, one of the Conference's smallest members, won the Big 12 Conference Football Championship for the first time last week."

       b.      At paragraph 20, Commissioner Bowlsby testifies: "Based on my knowledge and experience, the NCAA rules against compensation for student-athletes are especially important for competitive balance.  If athletes were paid for the use of their name, image and likeness, the schools that were able to pay the most money would get the best athletes.  This would

1    give those schools a significant (and unfair) advantage in recruiting and would reduce the

2    competitive balance across schools both within my conference and across other conferences."

3         51.     *See* Coleman Declaration, attached as Exhibit 7, at paragraph 18 ("Without

4    restrictions on payment of athletes, each school, or each conference, presumably could set its own

5    rules – or operate without rules.  The result would be a world where if some schools allowed

6    payment and others did not, there would be an imbalance between schools playing by different

7    rules in recruiting and paying the athletes.  Michigan wants to be competitive across all 29 of its

8    NCAA sports.  If each school plays by different rules, and some of those schools play by rules

9    with which Michigan does not agree, fair competition would be eroded, causing ultimately the

10   disintegration of rivalries and national competitions like March Madness.").

11        52.     *See* Delany Declaration, attached as Exhibit 8.  At paragraphs 17-19,

12   Commissioner Delany testifies to competitive balance within The Big Ten Conference.  At

13   paragraph 20, he concludes: "[I]f our member institutions had to pay football and men's basketball

14   student-athletes part of their broadcast revenues to remain competitive in these sports, there would

15   be less incentive for our larger members who command a larger television audience to share these

16   revenues equally.  These larger institutions could obtain an advantage by keeping more broadcast

17   revenue for themselves and using that to pay more money to prospective student-athletes.  Smaller

18   institutions—which already have more limited revenue streams—would be left with only half of

19   an even smaller amount.  Any shift toward this state of affairs would entirely change the nature of

20   our conference and would make it far more difficult for most of our members to compete as

21   successfully as they have over the last several decades.  In my experience, allowing student-

22   athletes or prospective student-athletes to negotiate with their schools for a percentage of

23   broadcast revenue would result in the strongest teams getting stronger, and a further consolidation

24   of the strongest programs in the nation."

25        53.     Attached as Exhibit 9 is a true and correct copy of the Declaration of Patrick

26   Harker In Support of the NCAA's Class Certification Opposition Brief, dated March 13, 2013,

27   ECF No. 695-5 ("Harker Declaration").  Mr. Harker identifies himself as President of University

28   of Delaware and testifies in paragraph 12: "Introduction of that kind of commercial recruiting

1   competition for and between student-athletes would harm mid-major colleges' ability to compete

2   at the Division I level and to recruit student-athletes."

3        54.     *See* Hatch Declaration, attached as Exhibit 10.  Wake Forest President Nathan

4   Hatch testifies about competitive balance at paragraphs 14-17.  Specifically, at paragraph 15, he

5   testifies that the current rules "help to create an even playing field across different institutions.

6   The system is designed so that a talented student-athlete will choose a program and a university

7   environment that is a good fit for that person's needs as both a student and an athlete, rather than

8   simply going to the highest offer."  President Hatch spoke specifically in paragraph 16 about

9   Wake Forest and its ability to compete in the ACC even though "other schools in the ACC have

10  larger student bodies and most generate more revenue through their football programs."  He

11  explained that "[i]f payments of broadcast revenues to student-athletes were permitted," this

12  "would reduce the ability of Wake Forest to compete successfully in football and men's

13  basketball.  It would be more difficult for Wake Forest to recruit student-athletes who would

14  otherwise be interested in the unique education and campus environment we offer."

15       55.     *See* Hollis Declaration, attached as Exhibit 11.  Mr. Hollis the Athletics Director of

16  Michigan State.  At paragraph 30, Mr. Hollis testifies: "There already are significant resource

17  disparities among institutions in our [Big Ten] conference who are expected to—and generally

18  do—compete at the same level, and under the plaintiffs' proposal these disparities would increase.

19  In fact, these disparities exist even in the state of Michigan.  For example, the athletic department

20  at the University of Michigan earns $140 million in revenue, which is roughly 50% more than the

21  $90 million our department at Michigan State earns.  As discussed above, given this lower revenue

22  base, if Michigan State had to pay $10 million in broadcast revenue to football and men's

23  basketball student-athletes, Michigan State would have to choose between continuing to recruit the

24  most elite student-athletes and cutting opportunities for student-athletes in other sports.  Based on

25  my experience, the same would be true for most of the other universities in The Big Ten."

26       56.     *See* Pastides Declaration, attached as Exhibit 14.  President Pastides, from the

27  University of South Carolina, testifies in paragraph 17 that if NCAA rules "were modified to

28  enable each university or conference to provide different financial compensation packages to

1  student athletes, this would greatly impair the balance of competition and lead to the decay and

2  maybe collapse of the amateur collegiate model.  Some universities inevitably would be able and

3  willing to pay their student athletes more and thus would attract the best athletes, converting the

4  teams into semi-professional or minor league enterprises with which schools would less resources

5  could not fairly compete."

6          57.     *See* Scott Declaration, attached as Exhibit 17.  At paragraph 22, Pac-12

7  Commissioner Scott testifies: "The NCAA's rules assure that non-Pac-12 universities are bound

8  by the same basic eligibility rules as the Member Universities, thus ensuring a relatively level

9  playing field that makes inter-conference play desirable and productive.  Were decisions relating

10  to compensation, recruiting, and retention of student athletes left to individual universities or

11  conferences, the uniformity currently in place which facilitates inter-conference competition

12  would be replaced with varying standards throughout the NCAA, and would greatly hamper inter-

13  conference competition and potentially deprive students, Member Universities, and their alumni of

14  the benefits of inter-conference programs."

15          58.     *See* Slive Declaration, attached as Exhibit 18, paragraphs 16-18.  SEC

16  Commissioner Slive at paragraph 18 testifies that "paying student athletes would significantly

17  disrupt the competitive balance within our Conference and across conferences because members

18  with greater resources would be able to offer higher payments to student-athletes during

19  recruiting" and that "if 50% of broadcast revenues were diverted to paying student-athletes in

20  football and men's basketball, this would have a disproportionate effect on institutions in the SEC

21  and elsewhere with smaller athletic budgets where the broadcast revenues make up a larger

22  percentage of their overall budget."

23          59.     *See* Starr Declaration, attached as Exhibit 19.  In paragraph 15, President Starr

24  testifies that "eliminating the NCAA amateurism rules will undermine these unique competitive

25  products [like March Madness] as a result of the different decisions regarding payment that will be

26  made by different schools and different conferences.  It is also my opinion that, even for the

27  schools that did decide to make payment to its student-athletes, there would be a wide variation of

28  the amount and method of these payments which would ultimately result in a destruction of

competitive balance among the paying schools.  The inevitable result would be that schools that were able and willing to pay the most money would be able to recruit the best athletes, resulting in the strongest teams getting stronger and an erosion of fair competition."

60.     Attached as Exhibit 21 is the Declaration of John D. Swofford, dated December 12, 2013 ("Swofford Declaration").  In this declaration, John Swofford identifies himself as the Commissioner of the Atlantic Coast Conference ("ACC").  At paragraph 15, Commissioner Swofford testifies that "[i]f 50% of the ACC's broadcast revenue had to be paid to student-athletes and the common foundation of our conference's athletic programs were cut in half, the differences in our member institutions—including in their ability to fund their athletic programs—would become far more significant.  Wealthier universities would have a much larger advantage over other smaller, newer, or less well-off universities than they do today."

61.     Attached as Exhibit 20 is a true and correct copy of the Declaration of John Welty, dated December 11, 2013 ("Welty Declaration").  Attached as Exhibit A to the Welty Declaration is his prior declaration from March 2013, ECF No. 695-4 ("March Welty Declaration").  In the Welty Declaration, he identifies himself as the retired President of Fresno State, now the President Emeritus of Fresno State.  In paragraph 9, President Welty testified: "An approach that involved paying broadcast revenues to football and men's basketball players would also make it more difficult for Fresno State to compete successfully with high-revenue programs.  A school like Fresno State would be placed at a disadvantage in recruiting student-athletes because the largest programs would be able to go out and offer prospective student-athletes significantly more money to compete at those institutions."  *See also* ¶¶ 10-12.

62.     Attached as Exhibit 69 is a true and correct copy of excerpts from Robert Beebe's January 8, 2013 deposition.  Mr. Beebe, formerly a director of enforcement in the NCAA and commissioner of the Ohio Valley Conference (pages 15:13-16:6), testifies at page 70:13-22 that, if some portion of broadcast royalties were provided to student athletes, that "money is so significant that it would have a material impact on either recruiting or fan interest" and that "if [this influx of money] imbalances the recruiting, then you'll have only a handful – you can – the Boise States of the world may not exist."

1

**NCAA Witness Testimony**

2       63.     *See* Emmert 3/2012 Deposition, attached as Exhibit 71.

3               a.     At page 38:5-17, Dr. Emmert testifies:  "Well, if you look at a small liberal

4   arts college who can provide an excellent educational opportunity, and their argument with the

5   student-athlete that they're trying to recruit is, we will provide you with these kind of educational

6   attributes that are highly valuable, and another large state university over here, let's say, who will

7   argue, we'll provide you with this kind of an educational experience, and oh, by the way, we'll

8   give you a hundred thousand dollars, I think most people would contend that that's a competitive

9   disadvantage for the small liberal arts college."

10              b.     At pages 48:19-49:4, Dr. Emmert states:  "I think it would be generally

11  agreed to that … if you were to allow universities to provide student-athletes after they leave their

12  institution with a payment of a hundred thousand dollars a year, and that was agreed to during the

13  recruitment process and widely known during the recruitment process, that a university that was

14  providing that level of reimbursement might have a competitive advantage over an institution that

15  didn't."

16              c.     Dr. Emmert additionally testifies at pages 138:24-139:17 that, "If you

17  watched, for example, the past … two NCAA men's championships.  You would have seen a

18  small liberal arts college in Butler University have a shot in the air to almost defeat …Duke.  You

19  would have seen last year Virginia Commonwealth University, who had, as far as I'm aware,

20  never even been in the tournament, in the Final Four.  And Butler, once again, playing one of the

21  most vaunted programs, the University of Connecticut, for a national championship.  I think one

22  of the inherent attractions that we all have to NCAA's championships is, in fact, the opportunity

23  for schools and universities of great diversity to be able to compete and … in many cases, compete

24  successfully."

25              64.     *See* Berst Declaration, attached as Exhibit 22, in which Mr. Berst, Vice President

26  for Division I at the NCAA explains in paragraph 19 that the "term 'competitive equity' has, and

27  continues to be, part of the NCAA Constitution."  He goes on to say that "[t]he NCAA, and

28  Division I, recognize that there has never been a perfectly competitive equilibrium as between the

1   wide diversity of member schools, and that schools that have more resources to devote to athletic

2   programs may have some advantages in attracting talented student-athletes.  The NCAA does not

3   seek to eliminate this variability, but rather, actively sets standards governing recruiting, team size,

4   practice schedule, and the number and amount of scholarships to enable all member institutions to

5   compete, where possible and appropriate, on an even basis off the field."

6        65.      Attached as Exhibit 24 is a true and correct copy of the Declaration of James L.

7   Isch, dated December 12, 2013 ("Isch Declaration").  At paragraph 15, Mr. Isch testifies that

8   NCAA distributions "allow smaller conferences with limited resources to participate in Division I

9   intercollegiate athletics and allow participation opportunities for their student-athletes."

10       66.      Attached as Exhibit 26 is a true and correct copy of the Declaration of Todd Petr,

11  dated December 12, 2013 ("Petr Decl.") (providing history of schools competing in Final Four and

12  Bowl Games).

13  **C.    PROCOMPETITIVE JUSTIFICATION NO. 3: INTEGRATION OF ATHLETICS
          AND ACADEMICS**

14
        **Expert Witness Reports and Testimony**

15
16       67.      *See* Rubinfeld Opening Expert Report, attached as Exhibit 29.  Paragraphs 103-123

17  discuss the integration of athletics and academics.

18            a.      At paragraph 103, Dr. Rubinfeld explains "In economic terms, athletics and

19  academics are complements; academic opportunities benefit student-athletes, while both the

20  opportunity to participate in collegiate athletics (including, but not limited to men's football and

    basketball) and the presence of athletics on campus helps to create a rich and diverse student body
21
    and can help student-athletes learn important life skills like teamwork and leadership."
22
23            b.      At paragraph 104, Dr. Rubinfeld states: "Colleges and universities do not

24  simply maximize profits; rather, they have more complicated educational objectives that include a

    diverse range of student classroom and non-classroom activities."
25
26       68.      *See*  Rubinfeld Declaration, attached as Exhibit 27.  In Paragraphs 39-50, Professor

27  Rubinfeld explains the opinions set forth in his reports regarding integration of athletics and

28  academics as a procompetitive justification.

69.     Attached as Exhibit 38 is a true and correct copy of the Rebuttal Expert Report of James Heckman, dated November 7, 2013.  In paragraph 63, Dr. Heckman summarizes his conclusions as follows:  "participation in varsity intercollegiate sports appears to provide substantial benefits to various groups, with an especially large effect on students from disadvantaged backgrounds.  To the extent opportunities to participate in college athletics are reduced for these groups, they would be harmed by this action."

70.     *See* Stiroh Expert Rebuttal Report, attached as Exhibit 40.  Paragraphs 42-55 discuss the value of the benefits student-athletes receive from scholarships and other services.  In paragraph 55, Dr. Stiroh opines:  "In total, the range of direct and indirect benefits received by student-athletes in the proposed class—including athletic aid, access to coaching and facilities, and the future earnings premiums of college education—far exceeds the allegedly foregone revenue that Plaintiffs' experts assert should have been paid in cash for the alleged uses of their NILs.  In other words, student-athletes are already receiving the money that Plaintiffs allege they have been denied."

**Named Plaintiff Witness Testimony**

71.     Attached as Exhibit 52 is a true and correct copy of excerpts from Plaintiff Chase Garnham's October 11, 2013 deposition.

a.     At page 16:17-21, Mr. Garnham testifies that he chose to attend Vanderbilt because he wanted to "compete in the SEC and also get a great education.  At pages 28:14-15 and 140:8-12, Mr. Garnham explains that he is majoring in Human and Organizational Development at Vanderbilt and plans to graduate in Fall 2013.  Mr. Garnham states at pages 31:2-35:15 that he received tutoring in calculus and statistics and other academic assistance available to student athletes.

b.     Mr. Garnham agrees, at page 76:10-15, that getting a college education is "important for job opportunities after I graduate."  At pages 77:22-78:4, Mr. Garnham testifies that he wrote on Twitter that "I'm extremely thankful for the opportunity to represent and receive an education from a world-class university."

1          c.     At pages 197:18-198:4, Mr. Garnham testifies that Vanderbilt's coaches tell

2  their players to attend class because "your education's important, that it will help you down the

3  road."

4      72.    Attached as Exhibit 50 is a true and correct copy of excerpts from Plaintiff Jake

5  Fischer's October 12, 2013 deposition.

6          a.     At page 22:12-18, Mr. Fischer stated that the discipline he learned from

7  football translated into other parts of his life, including time management.  At pages 22:23-23:5,

8  he testifies that coach Rodriguez "helped me mature a little more ... helped me grow more as a

9  person."

10          b.     At page 31:19-24, Mr. Fischer explains that he thinks the "majority" of his

11  football teammates "take school seriously" and "came to school both for football and for an

12  education."

13          c.     Mr. Fischer explains at pages 39:22-42:1 that the University of Arizona

14  provides academic assistance to student athletes, including tutoring and a special computer lab.

15          d.     At page 45:13-23, Mr. Fischer stated that he intends to graduate with a

16  degree in marketing in December 2013 and then return and complete a second major in

17  management.

18      73.    *See* Smith October 12, 2013 deposition, attached as Exhibit 66.

19          a.     At page 30:5-13, Mr. Smith testifies that, when looking to apply to college,

20  he wanted a "well-respected institution where I would be challenged and – and able to succeed

21  after I was done in school."  He states at page 40:14-17 that he is "happy with the academic

22  opportunity" he's been afforded at the University of Arizona.

23          b.     Mr. Smith explains at pages 55:14-56:1 that University of Arizona's head

24  coach, Rodriguez, encourages student athletes to "succeed off the field as well as on the field" and

25  to pursue academics.

26          c.     At page 65:6-9, Mr. Smith testifies that he intends to graduate from the

27  University of Arizona in December 2013 or spring of 2014.

28

d.      At page 68:13-23, Mr. Smith testifies he is an economics major and does not take only easy classes, and "the guy next to me in the locker room is … [a] mechanical engineering major, so I don't think that he just takes the easy classes."

74.     *See* Alipate October 17, 2013 deposition, attached as Exhibit 47.

a.      At pages 26:20-27:6, Mr. Alipate testifies that "the academic opportunities at the University of Minnesota" played a role in his decision to attend the school and that University of Minnesota "was a great place to get your degree, and there's a lot of opportunities here."

b.      At pages 25:5-26:5, Mr. Alipate explains that coaches were "mentor[s] in life" and taught him "really how to grow up, learn how to take responsibility for myself."  At page 31:17-23, he goes on that being a football player taught him "things like teamwork, learn how to balance a busy schedule, learning how to cooperate with others if you disagree on something."

c.      Mr. Alipate explains at pages 44:8-45:2 that he graduated from the University of Minnesota in the summer of 2013 with a double major in business marketing and youth studies, and that he is continuing to take classes to receive an additional degree in sociology.

d.      Mr. Alipate further explains at page 48:6-21 that it's a "common theme" among the coaching staff that "education is the first thing, that when you come to Minnesota that's the first thing that you're going to do is get your education" and that Minnesota's head coach in particular said "[t]hat it's very important to be successful in life is to have your college degree."

e.      At pages 52:21-55:6, Mr. Alipate explains that the University of Minnesota offers academic services and tutoring to student athletes, including an academic advisor who works with the students to help them prioritize their class schedule.

75.     *See* Robinson November 11, 2013, deposition, attached as Exhibit 64.

a.      At page 30:19-21, when asked whether "education is an important part of being a student-athlete," Mr. Robinson responds, "Absolutely."

b.      Mr. Robinson testifies at pages 30:22-31:4 that he has coaches that emphasize the importance of education, including by telling players to "make sure we go to class, and do what we're supposed to do.  In order to play, we have to make sure that we keep up with our grades."

1           c.       At pages 31:15-32:2, Mr. Robinson testifies that he is expecting to graduate

2    with a degree in sports management.

3           d.       At page 34:4-12, Mr. Robinson testifies that he studies at a Clemson

4    academic building accessible only to student athletes that includes study rooms and technology

5    assistance.  He further testifies at pages 53:22-56:6 that Clemson provides tutoring and academic

6    counseling to student athletes; that tutoring is mandatory for student athletes who have a GPA

7    below a certain level; and that tutoring and the academic counselor he meets with "a couple times

8    a week" has been "helpful" to him.

9           e.       At page 32:10-19, Mr. Robinson states that what he likes most about class is

10   engaging with his fellow classmates, including both students who are and are not athletes, and

11   agrees that "having students that aren't athletes contributes to [his] experience here at college."  At

12   page 38:13-17, he explains he has friends both on and off the football team.

13          f.       At pages 57:23-58:15, Mr. Robinson testifies that he has learned life lessons

14   from his football coaches such as how to concentrate and "keep going" despite "losing a game" or

15   "bumps in the road"; in addition, at page 57:17-19, he explains that coaches provide "instruction

16   both on and off the field."

17   76.     *See* O'Bannon November 1, 2011 deposition, attached as Exhibit 59.  At page

18   28:23-29:4, Mr. O'Bannon testifies that he expects to graduate from UCLA in December 2011.

19   77.     Attached as Exhibit 49 is a true and correct copy of excerpts from Plaintiff Ray

20   Ellis's November 3, 2011 deposition.  At page 215:16-21, Mr. Ellis agrees that "opportunities that

21   student-athletes get at schools like Ohio State and Michigan, when they are big-time football

22   players or basketball players, include the opportunity to get a fine education."  Mr. Ellis also

23   testifies at pages 222:18-223:5 that university alumni "help players [in contracts and jobs] upon

24   graduation."

25   78.     *See* Gilbert November 4, 2011 deposition, attached as Exhibit 54.  At page 11:2-6,

26   Mr. Gilbert, who played basketball in college, testifies that he graduated from Indiana State  in

27   1981 with a degree in criminology.  At page 16:8-14, Mr. Gilbert testifies that in deciding which

28

1  college to attend he was looking for a "place where I could get the education that I was looking for

2  at that time.  I thought I wanted to be a police officer."

3      79.    Attached as Exhibit 56 is a true and correct copy of excerpts from Plaintiff Sam

4  Jacobson's November 7, 2011 deposition.  At pages 52:25-53:4, Mr. Jacobson explains that he

5  graduated from the University of Minnesota.

6      80.    Attached as Exhibit 51 is a true and correct copy of excerpts from Plaintiff Harry

7  Flournoy's November 8, 2011 deposition.  At pages 257:16-258:9, Mr. Flournoy testifies that "I

8  discovered that my education coupled with my athletics were developing more than [my] intellect

9  and basketball skills.  I discovered that this experience was going to develop my character.

10  Interacting with students of different ethnic, racial and social backgrounds helped me to be

11  successful in today's diverse social environment."  Mr. Flournoy testifies at page 204:14-25 that

12  he graduated from Texas Western University in 1969 with a B.A. in education.

13     81.    Attached as Exhibit 60 is a true and correct copy of excerpts from Plaintiff Tyrone

14  Prothro's November 9, 2011 deposition.  At page 17:20-24, Mr. Prothro testifies that he graduated

15  from the University of Alabama, where he played college football, in August 2008.

16     82.    Attached as Exhibit 57 is a true and correct copy of excerpts from Plaintiff David

17  Lattin's November 10, 2011 deposition.  At page 59:7-25, Mr. Lattin testifies that "it was

18  important for [him] to get an education"; he felt "got a good education at Texas Western"; and

19  "[a]ttending Texas Western though was for me, for all the team, about more than playing

20  basketball.  We intended to get an education."

21     83.    *See* Riley November 11, 2011 deposition, attached as Exhibit 62.  At page 67:18-

22  25, Mr. Riley testifies that he graduated from University of Michigan, where he played basketball,

23  and agrees that "it was more important for [him] to finish up and get [his] degree than maybe be

24  drafted."  At page 124:12-22, Mr. Riley agrees "it's important in general that college athletes

25  approach what they are doing as being both students and athletes" and further testifies that "I feel

26  a certain amount of money up to a certain point might distract from that, but I mean, I think four

27  or five thousand, ten thousand a year wouldn't district (sic) that.  But if you got two or three

28  hundred thousand a year that might distract them from wanting to stay in school."

84.     Attached as Exhibit 58 is a true and correct copy of excerpts from Plaintiff Patrick Maynor's November 14, 2011 deposition.  At pages 14:21-15:20, Mr. Maynor explains that he played football at Stanford University and graduated in 2009, and subsequently enrolled in business school at the University of Georgia.  At page 272:14-17, Mr. Maynor testifies that he received "a very good education" from Stanford because of his scholarship.

85.     Attached as Exhibit 61 is a true and correct copy of excerpts from Plaintiff Damien Rhodes's November 15, 2011 deposition.  At pages 30:16-31:22, 33:3-8, Mr. Rhodes testifies that he received a good education from Syracuse, graduated without any debt because of his scholarship, and believes Syracuse held up its "end of the bargain."

86.     Attached as Exhibit 55 is a true and correct copy of excerpts from Plaintiff Thad Jaracz's November 30, 2011 deposition.  At pages 9:21-10:4, Mr. Jaracz testifies that he graduated from the University of Kentucky in 1976 with a degree in political science.

87.     Attached as Exhibit 67 is a true and correct copy of excerpts from Plaintiff Bob Tallent's December 1, 2011 deposition.  At pages 79:6-81:3, Mr. Tallent testifies that the grant-in-aid scholarship he received was "a fair deal"; that he's had a "pretty successful life and career as a result of the education" he received.  It appears Mr. Tallent graduated with a bachelor's degree in civil engineering.  *See* Exhibit 86, which is a true and correct copy of the GW Sports website, available at http://www.gwsports.com/genrel/tallent_bob00.html and last accessed at December 12, 2013.

88.     Attached as Exhibit 68 is a true and correct copy of excerpts from Plaintiff Danny Wimprine's December 2, 2011 deposition.  At pages 23:21-24:24, Mr. Wimprine testifies that he played football at the University of Memphis and graduated in the spring of 2005 with a degree in sports broadcasting and communications.  At pages 46:25-47:2 and 48:2-5, Mr. Wimprine testifies he was "happy" with the education he received at Memphis and agrees that he received a "pretty good" "education in exchange for playing football at Memphis."

89.     Attached as Exhibit 53 is a true and correct copy of excerpts from former Tate George's March 9, 2012 deposition.  At page 13:19-24, Mr. George testifies that he graduated from the University of Connecticut with a degree in business administration in 1990.  At pages

42:6-43:23, Mr. George testifies that "what was most important to me was graduating from college"; that getting a degree was "a great thing" for him; that he's given speeches on the value of education; that his "ability to play basketball enabled [him] to get a fine education at a fine school"; and that the "athletic scholarship has been a good thing for allowing people from limited means to get educated."

90.   Attached as Exhibit 63 is a true and correct copy of excerpts from Plaintiff Oscar Robertson's July 26, 2011 deposition.  At page 24:9-14, Mr. Robertson testifies at page 320:23-25 that he graduated from college in four years with a degree in business.

91.   Attached as Exhibit 65 is a true and correct copy of excerpts from Plaintiff Bill Russell's December 7, 2012 deposition.  At page 96:9-11, Mr. Russell agrees that he is "a big believer in the importance of education."  He further testifies at page 105:7-16, that he has given speeches "emphasiz[ing] the importance of educated citizenship; that you can't be a good citizen unless you know how to be a good citizen; and that we're all in this thing together."

**School and Athletic Conference Witness Testimony**

92.   *See* Albrecht Declaration, attached as Exhibit 1.  President Albrecht testifies in paragraph 9 that "we provide a wide array of resources and facilities for student-athletes to help them achieve both their athletic and academic goals," including "a large Student-Athlete Services staff that provides tutoring, mentoring, academic advising and career services."

93.   *See* Banowsky Declaration, attached as Exhibit 2.

a.   Conference-USA Commissioner Banowsky testifies at paragraph 5 that "participation in intercollegiate athletics provides an array of educational benefits for student-athletes.  It teaches discipline and how to function as an integral part of a team.  Student-athletes learn to balance academics and athletics and to practice time management."

b.   Commissioner Banowsky further explains at paragraph 9: "The coach-student relationship is another important and unique aspect of intercollegiate athletics.  The coaches are considered educators first and foremost, and they prioritize the personal, educational, and athletic growth and development of the individual student-athletes as well as their integration into the broader university community.  This is in contrast to coaches in professional leagues,

1  where the priority is to ensure that the players perform for the team and compete well, and all

2  other priorities are secondary."

3         94.     *See* Brandon Declaration, attached as Exhibit 5, paragraphs 8-13.  At paragraph 10,

4  Michigan's Athletics director Brandon testifies: "At U-M, we devote enormous resources to

5  giving our student-athletes the support they need to enjoy the educational benefits of participating

6  in athletics while pursuing a degree in their chosen field of study.  To insure that U-M student-

7  athletes graduate from college, the athletics department sponsors the Academic Success Program,

8  through which every student-athlete may access academic advising, tutoring, computer labs, study

9  tables, and career services.  Annually, the athletic department spends $1.7 million on academic

10  services to support its student-athletes.  The amount our athletic department spends on academic

11  services for its student-athletes has steadily increased over the last five years."

12         95.     *See* Bowlsby Declaration, attached as Exhibit 4.

13            a.     Big Twelve Commissioner Bowlsby testifies at paragraph 7: "The vast

14  majority of student-athletes on college campuses are there to get an education, to go through a

15  period of exploration, to prepare themselves for careers of all sorts after college.… The ideal of

16  making the athletic experience a component of the academic experience has remained intact as the

17  cornerstone of intercollegiate athletics over many decades."

18            b.     Commissioner Bowlsby testifies at paragraph 8: "Based on my experience

19  and knowledge, compensating athletes for the use of their name, image, or likeness would

20  adversely change the athletes' relationship with the university community they represent, would

21  change many athletes' motivation for being on campus, and would irretrievably and negatively

22  change collegiate athletics. It would shift the focus away from the role of athletes as students who

23  are part of the university.  This would be untenable for institutions of higher education."

24         96.     *See* Blank Declaration, attached as Exhibit 3.  *See* paragraphs 9-12.  In paragraph

25  18, Chancellor Blank testifies: "Based on my experience, paying football and men's basketball

26  student-athletes would also negatively influence their integration into the University, something

27  that would be detrimental for the student-athlete and his peers.  If you pay a student athlete, you

28  are likely to set that athlete apart from his classmates.  You send a message that the institution

cares about and rewards performance on the field and not performance in the classroom  Other students are likely to view the football and men's basketball players differently if they are paid.  Right now, there is a sense that student-athletes are part of the student body and peers with the non-athletes.  It will be a loss to the student-athlete and his peers if he is seen, due to payment beyond his educational expenses, as a professional who is at the institution to play a sport, not get an education."

97.     *See* Castiglione Declaration, attached as Exhibit 6.

a.     Mr. Castiglione, Athletic Director at University of Oklahoma, testifies in paragraph 9: "Based on the more than thirty years I have spent working in intercollegiate athletics, universities' educational missions are not compatible with student-athletes receiving direct monetary compensation for appearing in games that may be broadcast.  In my experience, if athletes were being paid a license fee or otherwise for their participation in televised games, the importance of the academic aspect of their university attendance would be diminished and they would be less likely to continue to accept the responsibility to engage in their role as students."

b.     Mr. Castiglione further said at paragraph 10: "The principle that athletics excellence … must be matched with success in the classroom is a core value of the OU athletics department.  Compensation for student-athletes, above and beyond providing for the costs of their college education and associated academic services, would undermine those values.  It would lead to a feeling of 'win or else,' and would shift the athletes' focus toward their performance as athletes and away from their educational endeavors."

98.     *See* Coleman Declaration, attached as Exhibit 7.  University of Michigan President, Mary Sue Coleman, testifies in paragraph 13 as follows: "The NCAA's amateurism restrictions promote integration between education and athletics.  Based on my experience for several decades in higher education, if amateurism restrictions were changed and schools paid football and men's basketball student-athletes for their participation in televised games, this would be detrimental to the educational experience of those student-athletes.  Based on my experience, paying student-athletes would distort the existing balance between academics and athletics.  As a paid football or basketball employee the athletes would be focused on maximizing the money they can earn

1   playing their sport to the detriment of their education.  In my experience, money can influence

2   people's thoughts and priorities mightily.  A good example of this influence involves

3   pharmaceutical representatives in hospitals.  As President of Michigan, I was involved in

4   discussions and analysis of the influence pharmaceutical representatives had on medical decisions

5   at our University hospital.  In connection with that, I read a variety of literature about conflicts of

6   interest and had numerous conversations from which I learned that even small amounts of money,

7   or small gifts like a lunch paid for by a pharmaceutical company, could influence decision making.

8   Based on my experience as a professor for nearly twenty years and as an administrator, payment

9   of student-athletes for the use of their name, image, and likeness would likely have a similar

10  impact on decision-making and would likely divert those students' attention away from their

11  education toward their athletic pursuits."

12       99.    *See* Delany Declaration, attached as Exhibit 8.

13            a.    Big Ten Commissioner James Delany testifies in paragraph 3 that "I

14  understand that the NCAA in this case has advanced the importance of the integration of Division

15  I intercollegiate athletic programs with their institutions' wider academic missions and activities.

16  This is consistent with The Big Ten's history and mission since it was founded over 100 years

17  ago."

18            b.    In paragraph 7, Commissioner Delany explains: "Based on my decades of

19  experience in intercollegiate athletics and with The Big Ten, permitting payments to student-

20  athletes in connection with their participation in college athletics or for licensing their name,

21  image and likeness for commercial purposes would undercut our efforts to balance athletics and

22  academics.  Based on my experience, I believe that such payments, even if deferred until after the

23  individual left school, would change the mindset of many if not most of the student-athletes in

24  football and men's basketball upon entering college.  Such payments would send the message to

25  student-athletes that they are in college to maximize their commercial opportunities rather than to

26  maximize their educational opportunities—exactly the opposite of the message The Big Ten has

27  tried to send for over 100 years.  Based on my experience in education and athletics, it seems

28  likely that payments for the use of name, image, and likeness of a student-athlete playing in a

game would shift at least some student-athletes' focus away from their academic work and the educational benefits of their athletic participation. Primarily, we strive to encourage students to enroll to get an education.  If there were tens or hundreds of thousands of dollars being offered to those students to appear in televised games, I am concerned that athletics would become primary and the whole attempt to achieve a balance of academics and athletics would become more difficult."

100.    *See* Hatch Declaration, attached as Exhibit 10.  President Hatch from Wake Forest testifies in paragraph 8 that "payments from broadcast revenue would interfere with Wake Forest's ability to integrate its athletics program into the school's overall educational mission."  *See also* paragraphs 9-10 (payment would "send the message that such athletes are at the university only to be athletes and would interfere with Wake Forest's efforts to place a priority on education" and "[i]f a small class of student-athletes were being paid for appearing on television and were set apart as 'hired guns,' that circumstance would erode some of the best features of intercollegiate athletics that I have observed and worked to promote throughout my career").

101.    *See* Hollis Declaration, attached as Exhibit 11.

a.    Mr. Hollis, Michigan State Athletics Director, testifies in paragraph 9: "Our student-athletes also learn important leadership and personal skills from participating in intercollegiate athletics, which is another reason why athletics provide important educational opportunities."  He goes on to explain the Carrier Classic experience for Michigan State basketball players.

b.    Mr. Hollis testifies in paragraph 10: "Learning to appreciate this privilege and how to represent their community, win or lose, are some of the most important lessons our student-athletes learn.  Based on my more than twenty years of experience in the Michigan State athletic department and my observations of intercollegiate athletics over the years, including on NCAA committees, paying student-athletes for their participation in televised events instead of or in addition to providing them with the resources to pursue their education would undermine this key learning opportunity for our student-athletes.  While our student-athletes have unique talents, their purpose on campus and our purpose in giving them the opportunity to join our university is

the same as with any other student:  to use the resources of our university, including each other, to learn and grow as much as possible.  Paying student-athletes for participating in televised games would send the message that they are on campus for an entirely different purpose than the rest of our students:  to make money.  This would set our student-athletes apart from their community and their fellow students in dining halls, community service, social events and other forums.  In my experience, that would have a negative impact on the student-athletes and the university community at large."

c.       Mr. Hollis sets out the various resources Michigan State provides its student-athletes and its sources of expenditures.  *See* paragraphs 11-22.  Mr. Hollis highlights in paragraph 14 the academic support services available through the Clara Bell Smith Center.

102.     Attached as Exhibit 13 is a true and correct copy of the Declaration of Bernard Muir, dated December 12, 2013.  Mr. Muir identifies himself as the Jaquish & Kenniger Director of Athletics at Stanford University.  Mr. Muir testifies about the integration of student-athletes into the broader Stanford community.  *See* paragraphs 3-4, 7.  He testifies that "support and camaraderie fostered in the Stanford culture greatly enhance the student-athlete experience and this culture will be dealt a serious blow if football and men's basketball student-athletes are paid. I believe it would be difficult, if not impossible to maintain the type of cross-sport support and camaraderie with the type of caste system that would be created if some student athletes are paid."

103.     *See* Pastides Declaration, attached as Exhibit 14.  University of South Carolina President Pastides testifies at paragraph 11: "In my years of experience as an educator and now as a University president, [Plaintiffs'] proposal would…harm the integration between college athletics and academics.  Based on my experience and observations, university students would view their student-athlete classmates differently, for example as not being invested in their classes or as already having one foot in the professional world, if they knew their classmates were being compensated for their athletics participation.  This would negatively impact both the student athlete, who benefits socially and academically from being integrated within the student body, and the students around them."

104.     *See* Patterson Declaration, attached as Exhibit 15.  Mr. Patterson is the Men's Athletics Director at the University of Texas-Austin.  He testifies in paragraph 6: "Based on my experience in intercollegiate and professional athletics and my personal knowledge and personal observations, if some student athletes received compensation for the use of their name, image, and likeness, those students would be perceived and treated differently.  This would most likely negatively impact their educational and athletic experience.  If a student-athlete is compensated for the use of their name, image, and likeness, in my experience and based on my personal knowledge and observations, coaches and university administrators will be less concerned about prioritizing student athletes' educational development.  Coaches and university administrators will be more concerned about how the athlete plays, and will be more likely to cut an athlete who is not performing.  If a student-athlete who sits on the bench or gets minimal playing time must still be paid a portion of the television revenue, then it is natural that a coach or administrator is going to reconsider whether there is value to having that athlete continue to participate in the team.  The same would be true for injured athletes or athletes struggling with personal or health problems.  The focus will shift from helping those students grow and develop to focusing on monetary issues."

105.     *See* Plonsky Declaration, attached as Exhibit 16.  Ms. Plonsky is the Women's Athletics Director at the University of Texas – Austin.  Ms. Plonsky testifies at paragraphs 7-10: "UT supports the academic development of all student athletes in numerous ways" – providing examples.

106.     *See* Slive Declaration, attached as Exhibit 18, paragraphs 7-11 ("[r]ecognizing that athletics and academics are both components of a well-rounded college education").

107.     *See* Starr Declaration, attached as Exhibit 19.

a.     Baylor University's President Starr at paragraph 7 testifies: "[P]aying student-athletes in men's basketball and football would have a corrosive effect on University culture at Baylor and elsewhere, would be demoralizing to numerous other students, and would create an elitist group of paid athletes whose separateness from other students could interfere with their relationships with other students and faculty.  Baylor does not pay students who participate in

1    other extracurricular activities, such as music, theater, and debate, nor under plaintiffs' model

2    would Baylor pay other student-athletes outside of football and men's basketball.  It would be

3    detrimental and inappropriate to elevate football and men's basketball players above other student

4    athletes for special treatment and benefits.  To do so would directly undermine the core principle

5    that student-athletes are, as we say, 'all in for Baylor,' and playing for the pride of the School

6    rather than for profit."

7                b.      At paragraph 9, President Starr testifies: "[T]he principle that student-

8    athletes at Baylor are first and foremost students is a critical component of Baylor's educational

9    mission."

10               c.      At paragraph 10, President Starr describes the "robust academic support"

11   provided to student-athletes at Baylor.

12               d.      At paragraph 14, President Starr describes the "important leadership skills

13   [athletes learn] from participating in intercollegiate athletics."

14       108.    *See* Swofford Declaration, attached as Exhibit 21, paragraphs 5-11.  In paragraph 9,

15   ACC Commissioner Swofford testifies that "student-athletes across all sports work extremely hard

16   to get the most out of their educational experience and our conference and our member institutions

17   consider it our responsibility to prepare all of these young men and women for future success in

18   their careers, in their relationships and in their communities.  That is why we spend enormous

19   amounts of time and money to give all of these student-athletes the best possible resources,

20   facilities and advice."

21       109.    Attached as Exhibit 73 is a true and correct copy of excerpts from Christine

22   Plonsky's December 12, 2012 deposition.

23               a.      Ms. Plonsky, the Women's Athletics Director at University of Texas, Austin,

24   testifies at page 134:4-15: "We are not pay-for-play, paid-for-participation organization. I feel

25   strongly about it, I always have.  It's the main difference between college sports and professional

26   sports.  We're in a university educational environment, our students are part of campuses.  And if

27   they choose to come into this system, they are acknowledging by their participation that they

28

1  acknowledge our rules.  And I fully support our platform and premise with our rules regarding

2  financial aid and non-pay-for-play."

3          b.      At pages 137:9-138:12, Ms. Plonsky stated "I'm fully against [pay for play],

4  I believe that our system on our college campuses are not built for that. And the more we

5  encourage entitlement thinking among young people who are 17- to 23-year-olds who have an

6  opportunity to take an admission slot on our campuses, I think we're on dangerous ground.  I

7  would rather encourage them look at the activity and the participation in NCAA sports for what it

8  is. We don't apologize for the system.  The system is rigorous, the system is tough, they're held to

9  higher standards, they're on accelerated degree tracks in order to maintain eligibility. We can list

10 for you many reasons why it's not for everybody, but if you choose to engage in it, we will

11 support you in it, but it is what it is. And pay-for-play, in my opinion, will never happen and

12 shouldn't happen, because it will absolutely skew the meaningful core values that the NCAA's

13 strategic plan and our strategic plan for our own athletics program espoused.  So I am not ever

14 going to apologize for what NCAA athletics is.  I believe in it, participated in it myself before

15 NCAA offered championships.  I was an intercollegiate athlete, did it for the love of it, and

16 appreciated anything that it did for me and continues to do for me."

17     110.    Attached as Exhibit 12 is a true and correct copy of the Declaration of Jonathan

18 LeCrone in Support of Class Certification Opposition Brief, dated March 12, 2013, ECF No. 695-

19 11 ("LeCrone Declaration").  Mr. LeCrone states in paragraph 2 that he has served as

20 Commissioner of the Horizon League since 1992, and, at paragraph 15, explains that "Athletics

21 adds value to earning a college degree.  Student-athletes learn the value of leadership, competition,

22 education, and service.  In turn, the athletic programs support the educational mission of the

23 university."

24     111.    Attached as Exhibit 72 is a true and correct copy of excerpts from Jonathan

25 LeCrone's May 30, 2013 deposition.

26         a.      Mr. LeCrone testifies at pages 38:16-39:7 that "we believe in the

27 fundamental values of our enterprise.  Fundamental values are, this is an educational enterprise as

28 its core; young people come, as I came to Wake Forest, as a student-athlete, to get a great college

education, to participate in competition, to learn, to grow socially, to grow emotionally.  So the fundamental activity we're involved in is the promotion of the value of a college education.  And that has a lifelong value and a meaningful value.  So we consider our activity in television a real opportunity to promote those values that I think many of us learn in college, those of leadership and service and learning."

              b.     At page 61:9-22, Commissioner LeCrone testifies as follows:  "Again, 35 years of experience in our industry, in values of what athletics participation is all about, it's all about an added value notion in higher education, extracurricular.  So any rule, either describing or mandating payments to any individual student-athletes or group of student-athletes just runs contrary to the fundamental purpose of our business.  The fundamental purpose of our business is to educate young people, and through athletics competition, add value to the college experience.  That's our fundamental mission.  Our fundamental mission is not to try to get money to either teams or individuals."

              c.     At page 76:6-14, Commissioner LeCrone testifies regarding the differences between professional and collegiate sports:  "The professional model is that players are paid to participate.  Our players come to our member schools to engage in the ultimate outcome, which is to earn a college degree.  So it's just – it's absolutely, you know, different, different model, a different model.  And that's what we engage in.  We engage in adding value to the college experience through athletics."

**NCAA Witness Testimony and Documents**

112.    Attached as Exhibit 23 is a true and correct copy of the Declaration of Diane Dickman, dated December 12, 2013.  Ms. Dickman identifies herself as Managing Director of Academic and Membership Affairs for the NCAA.  As summarized in paragraph 2, her declaration describes "the NCAA's efforts to support its members' efforts to improve the academic success of their student-athletes."

113.    *See* the Berst Declaration, attached as Exhibit 22.  Attached to the Berst Declaration as Exhibit C is a true and correct copy of a document produced by the NCAA in this litigation with Bates number NCAAPROD00030914.  This document is titled "State of the

1   Association 2009: The Challenges of Commercial Activity" and authored by Dr. Myles Brand,

2   NCAA President, who reports (at NCAAPROD00030920): "That is, the underlying reason why

3   universities support intercollegiate athletics is that it provides educational value for those students

4   who participate.  There are other reasons why universities sponsor intercollegiate athletics, such as

5   morale building for the campus community, and contributing to local economic development.

6   But, in the end, the baseline reason for intercollegiate athletics is the value it brings to the

7   education of student-athletes."

8   **D.    PROCOMPETITIVE JUSTIFICATION NO. 4: VIABILITY OF OTHER SPORTS**

9          <u>**Expert Witness Reports and Testimony**</u>

10          114.    *See* Rubinfeld Opening Expert Report, attached as Exhibit 29.  Paragraphs 124-141

11   discuss the viability of other sports justification.

12                 a.    At paragraph 124, Dr. Rubinfeld opines:  "The NCAA's amateurism rules

13   help ensure that sports other than football and men's basketball are played at a high level at

14   colleges and universities, with substantial scholarships and financial support.  In this section, I

15   discuss how the NCAA rules and revenue distribution mechanisms help make it possible for

16   schools to offer a variety of sports, even if many or most of those sports generate little if any net

17   revenue."

18                 b.    In paragraph 137, Dr. Rubinfeld discusses a Knight Commission Opinion

19   poll from January 2006, and describes: "[A]mong 502 surveyed adults, 75% of Americans

20   believe that colleges should spend more of their athletics budgets to support other men's and

21   women's sports, other than football and men's basketball."

22          115.    *See*  Rubinfeld Declaration, attached as Exhibit 27.  In paragraphs 51-54, Professor

23   Rubinfeld explains the opinions set forth in his reports regarding the viability of other sports as a

24   procompetitive justification.

25          116.    Attached as Exhibit 41 is a true and correct copy of the Rebuttal Expert Report for

26   Judith Sweet, dated November 5, 2013.  Ms. Sweet testifies that she was one of the first female

27   athletics directors in the nation, acting as athletics director of University of California, San Diego

28

1    from 1975 to 1999.  In addition, Ms. Sweet testifies that she was the first female Membership

2    President of the NCAA, serving in that role starting in 1991.

3              a.    Ms. Sweet describes at pages 5-9 the background of Title IX and the rise of

4    women's sports.

5              b.    She explains on page 10 that the plaintiffs' proposal in this litigation needs to

6    take "into account the disparate and damaging impact such a payment would have on women's

7    athletic programs."

8              c.    At pages 10-11, she concludes "In my experience, athletic departments

9    facing the need to make dramatic budget adjustments often cut sports teams for men and/or

10   women, thereby reducing the number of athletic opportunities for students.  Drastic cuts could be

11   the outcome caused by plaintiffs' proposal, risking unraveling much of the progress and expansion

12   in women's athletics that has been achieved in the past four decades."

13             d.    Ms. Sweet observes on page 14: "Men's sports have a seventy-five year head

14   start (1906 for men versus 1981 for women) in the NCAA.  As a result, the men's sports have

15   more established athletic programs, a more established fan base, a longer time to build popularity

16   and participation, traditional media and broadcast coverage, and more established alumni

17   supporters. This uneven playing field is a legacy of a society that used to exclude women from

18   athletic opportunities."  She goes on to say on page 15: "Paying men more because their sports are

19   already popular will lock in gender differentials that are based and built on historical inequities."

20             e.    At page 17, Ms. Sweet explains: "If Plaintiffs' theory is that men's football

21   and basketball players should be treated differently and pulled out of the athletic department and

22   Title IX's requirements, this would be damaging to the progress women's athletics has made since

23   Title IX became law 41 years ago.  When Title IX was first enacted, there were detractors who

24   wanted to pull football out of the Title IX analysis and treat it as a 'third gender'…. Many men

25   and women who supported women's athletic opportunities successfully fought these efforts by

26   Senator Tower and others.  To now treat football and men's basketball as somehow separate and

27   apart from the university athletic system would be to turn back the clock, conflict with the intent

28   of Title IX, and undermine all the positive influences on athletics for women."

f.      At page 17, Ms. Sweet further elaborates: "Intercollegiate athletes – male and female – devote considerable time and energy to their sports. Women's sports do not draw fewer fans and less television coverage because the female athletes don't work hard. Instead, women's sports have a shorter tradition of athletics opportunities and our society is not as conditioned to watching and supporting women's sports."

g.      At page 18, Ms. Sweet concludes: "Football and men's basketball players already receive disproportionate support from university athletic departments. To allow for the payment proposal set forth in Noll and Rascher's reports and further compensate players in football and men's basketball programs would create further disparity in those athletes, and it would come at the expense of the fifteen to twenty-five other teams on campus, many of which are comprised of women."

117.   *See* Pilson Rebuttal Expert Report, attached as Exhibit 39.

a.      At page 41, Mr. Pilson gives examples to show that "many of the most elite and popular athletic programs are synonymous with their coaches, who decide what style of football or basketball the team will play; who recruit who will play on the team; who direct what plays the team will execute; and who speak for the team before and after the game," leading him to conclude at page 42, that "a major college football or basketball coach is the single most valuable person for a school's athletic brand and the single most identifiable person to a television viewer.  For this reason, I believe Dr. Noll and Dr. Rascher are incorrect that schools would cut coaching salaries to cover losses in revenue if they had to pay broadcast revenue to student-athletes."

b.      At pages 42 to 43, Mr. Pilson explains "schools and professional teams compete against each other for coaches"; "[n]one of APs' experts provides any reason why this competition would not continue"; and "it is widely understood in the sports industry that both professional football and basketball are far more physical, and the players are far more athletic, than their college equivalents.... There is no reason-and Dr. Noll does not provide any-why these and other facilities would not continue to be important for student-athletes and therefore there is

1    no reason to believe that schools competing for student-athletes would reduce spending on these

2    facilities if they had to pay student-athletes."

3         118.    *See* Stiroh Expert Rebuttal Report, attached as Exhibit 40.  Paragraphs 108-118

4    discuss Dr. Stiroh's opinions about the effect of paying student-athletes on college athletic

5    departments.

6              a.    At paragraph 109, Dr. Stiroh opines:  "Far from the profit-maximizing

7    professional sports leagues to which Plaintiffs' experts seek to draw comparison, NCAA athletic

8    departments generate and reinvest revenue to fund a range of sports in accordance with their

9    broader educational and social missions."

10             b.    At paragraph 113, Dr. Stiroh concludes:  "There is evidence, though, that,

11   even if required to pay football and basketball student-athletes in the manner proposed by Dr.

12   Rascher, some schools would focus budget cuts not on football and basketball, but on the

13   department's non-revenue-generating sports."

14             c.    At paragraph 118, Dr. Stiroh opines that "there is no reasonable basis to

15   assume that the entire value of damages for individual schools could be funded by reductions in

16   football and basketball coaches' salaries or even by reduced spending on facilities."

17   **School and Conference Witness Testimony**

18        119.    *See* Albrecht Declaration, attached as Exhibit 1.  President Albrecht testifies in

19   Paragraph 13 that "if Utah State were to pay student-athletes 50% of the revenue we earn from

20   broadcast license fees, it would have a devastating effect on our ability to support our student-

21   athletes both academically and athletically."  President Albrecht testifies in Paragraph 15 that

22   "[c]utting sports to cover a revenue shortfall from paying student-athletes in football and men's

23   basketball would also eliminate opportunities for student-athletes to obtain a college education In

24   the first place.  This would be particularly painful for Utah State because one of our core missions

25   as a land-grant university is to expand access to education and educational opportunity to as many

26   young people as possible.  Providing $4.3 million in athletic scholarships is a key part of this

27   mission because without these scholarships, many of our student-athletes would be unable to have

28   a college experience."

120.   *See* Banowsky Declaration, attached as Exhibit 2.  Conference-USA Commissioner Banowsky testifies at paragraph 13: "Broadcast revenues from C-USA are used by member institutions for services for student-athletes, athletics department travel budgets, and other athletics program costs and is not limited to football and men's basketball.  If a significant percentage of these revenues were allocated to compensation for student-athletes in football and men's basketball, they would necessarily be diverted away from other program costs.  Athletics departments in CUSA would either have to draw more subsidy from the university, which would divert university resources from other educational areas, or they would have to cut athletics budgets.  These budgets fund football and men's basketball and other sports.  Based on my knowledge and experience, if additional university resources could not be reallocated to athletics to make up for the shortfall, it is likely that C-USA programs would need to eliminate competition in intercollegiate non-revenue sports, reduce the number and amount of scholarships, change travel arrangements (for example, switch from taking flights to games to taking ten-hour bus rides), or reduce or eliminate services to all student-athletes. Based in my knowledge and experience, I doubt that schools would cut coaching salaries because coaching salaries are market-driven (including competition for candidates with professional teams), and it is important to have the highest quality coaches to teach the student-athletes."

121.   *See* Blank Declaration, attached as Exhibit 3.

a.   University of Wisconsin-Madison Chancellor Blank testifies at paragraph 13 that Wisconsin is "committed to offering a broad list of sports, not just a few sports like football or men's basketball that generate positive revenue.  We offer multiple sports teams because our students have a broad range of interests and we want to serve those interests.  Because athletics has an important role in our educational mission, as I describe above, we want to provide as many opportunities to participate in athletics as we can."

b.   She further explained in paragraph 14: "Wisconsin is fortunate to have revenue, including from its football and basketball contracts, that Wisconsin can share across all of its sports to support and maintain a strong athletic program across the board.  If Wisconsin were required to pay fifty percent of its broadcast revenue to a subset of its student athletes, this would

1  have a damaging impact on the finances of Wisconsin's athletic program.  This would reduce the

2  overall revenue available to Wisconsin to spend on athletics.  As a result, we would need to reduce

3  the total number of teams and /or reduce the support provided to existing teams.  We would need

4  to respect gender equity, as required by Title IX, but in a world where we paid football and men's

5  basketball players fifty percent of broadcast revenue, the athletic opportunities at Wisconsin would

6  shrink substantially."

7           c.      Chancellor Blank explained in paragraph 16: "It is not appropriate to talk

8  about the Wisconsin athletics department as a business.  If it were a business, our long-term results

9  would show three units that operate at a profit and 20 units that operate at a loss.  Under these

10  circumstances, almost any business would eliminate the 20 units that generate long-term losses

11  and maintain only the profitable units.  This is not, however, how we think about or operate our

12  athletics program at Wisconsin.  We share our revenue across the entire athletic enterprise and

13  support many teams that we know will never generate positive revenues."

14      122.  *See* Bowlsby Declaration, attached as Exhibit 4.

15           a.      At paragraph 11, Big Twelve Commissioner Bowlsby testifies:

16  "Compensating athletes from just one or two sports would have detrimental effects on the morale

17  of other students that participate in co-curricular activities, including athletes across different

18  sports."

19           b.      At paragraph 13, Commissioner Bowlsby testifies that "if each school was

20  required to give 50% of its broadcast revenue to its football and men's basketball players, it is

21  likely that some sports and support programs at Big 12 schools would be discontinued, especially

22  at universities in rural areas.  How each university would make a budget work with a loss of 50%

23  of its broadcast revenue would vary by institution, but there is no question based on my experience

24  and knowledge that the loss of this money would have a negative impact on most if not all of our

25  member institution, both financially and on the number of sports offered on an intercollegiate

26  basis."

27      123.  *See* Brandon Declaration, attached as Exhibit 5.  At paragraph 11, Mr. Brandon

28  testifies: "Paying student-athletes who participate in televised football or mens' basketball games

1   would greatly reduce the educational and athletic opportunities that U-M could offer its student-

2   athletes. U-M would not be able to fund the broad-based athletic program we currently administer.

3   U-M would have to make hard choices about cutting sports, eliminating athlete support services

4   that we could no longer afford, and serious thought would have to be given to how such actions

5   could affect U-M's ability to maintain its commitment to gender diversity in sports and our Title

6   IX obligations." *See also* paragraphs 14-15.

7          124.   *See* Castiglione Declaration, attached as Exhibit 6.

8                 a.   OU Athletic Director Castiglione testifies in paragraph 11: "An additional

9   problem with compensating football and men's basketball players from broadcast revenue is that it

10  would put pressure on the resources of the athletics department and our ability to offer a wide

11  range of programs to a diverse array of student athletes."

12                b.   Mr. Castiglione at paragraph 12 says, "I think of the OU athletics department

13  as an integrated enterprise.  Part of our role within the overall mission of the university is to

14  provide a broad base of athletic teams that appeal to and are representative of the broad base of

15  interests in the State of Oklahoma.  In particular, we prioritize sponsoring a range of both men and

16  women's sports and treating both men and women's sports fairly and equally.  Revenue from

17  football and men's basketball broadcast contracts helps to support these important other sports

18  programs.  Losing a portion of this revenue would put pressure on the budgets of other sports."

19                c.   Mr. Castiglione at paragraph 17 testifies: "I understand that plaintiffs have

20  argued that any shortfall created by paying broadcast revenue to the football and men's basketball

21  players could be offset by reductions in coaching salaries and expenditures on facilities.  Based on

22  my experience over the past several decades in intercollegiate athletics, I disagree."

23         125.   *See* Coleman Declaration, attached as Exhibit 7.  Michigan President Mary Sue

24  Coleman testifies in paragraph 16: "Plaintiffs' proposal to pay football and men's basketball

25  student-athletes fifty percent of the school's broadcast revenue would have far-reaching,

26  detrimental financial implications.  Michigan supports 29 different NCAA sports.  Only two of

27  those sports, football and men's basketball, net any significant revenue.  We use revenue from

28  football and men's basketball to expand opportunities for female athletes and male athletes in

1    sports that do not make money.  If fifty percent of the school's broadcast revenue for football and

2    men's basketball went to the student-athletes in football and men's basketball, that money would

3    no longer be able to support Michigan's other twenty-nine sports.  Over time, under the Plaintiffs'

4    proposal, other sports would likely have to be cut.  The end result would be reduced opportunities

5    for young female and male student-athletes to experience and obtain a Michigan education, since

6    we would have fewer student-athletes, and fewer associated scholarships.  The result would also

7    be reduced opportunities for students to participate in athletics, and fewer sports for Michigan fans

8    and alumni to enjoy."

9          126.    *See* Delany Declaration, attached as Exhibit 8.  At paragraph 14, Commissioner

10    Delany states, "The Big Ten schools fund these women's athletics programs through their athletics

11    departments, including from revenue received from football and men's basketball television

12    contracts."  At paragraph 15, he states, "In the Big 10, we have more than 300 teams with

13    approximately 8,500 student-athletes working hard every season to put time into their sports and

14    juggle the demands of athletics and academics."

15          127.    *See* Hatch Declaration, attached as Exhibit 10.

16          a.    Wake Forest President Hatch testifies at paragraph 11 that "such payments

17    would curtail the ability of Wake Forest to offer an array of sports programs.  It is part of Wake

18    Forest's philosophy…to offer an array of sports offerings.  The purpose is to offer a variety of

19    athletes the opportunity to compete and succeed at the highest level, and to offer multiple types of

20    engagement with athletics at Wake Forest."

21          b.    President Hatch testifies at paragraph 12: "The principle revenue in

22    intercollegiate athletics at Wake Forest comes from the football and men's basketball programs.

23    Revenue from football and men's basketball supports the whole range of other sports, which do

24    not generate the revenue to pay for themselves."

25          c.    He further testifies at paragraph 13: "Payments from broadcast revenue

26    given to football and men's basketball players would curtail the revenue available for other sports

27    and would cause other sports to suffer.  This would have a profound impact on our athletics

28

1  programs.  We simply could not offer the range of scholarship opportunities in other sports that we

2  now offer."

3      128.    *See* Hollis Declaration, attached as Exhibit 11.

4          a.    Mr. Hollis, Athletic Director of Michigan State, testifies at paragraph 5:

5  "Because Michigan State wants to offer as many opportunities for student-athletes as possible to

6  further its educational mission, Michigan State is committed to a broad-based athletics program.

7  This commitment to a broad-based athletics program has been a core value of our institution and

8  of The Big Ten throughout its history and this is why we support nearly 800 student-athletes at

9  Michigan State, regardless of whether their sports earn revenue for our university."

10          b.    Mr. Hollis explains at paragraph 6: "When I think about my athletic

11  department at Michigan State and the opportunities and resources available to further students'

12  education on and off the field, I think about all 800 student-athletes as a group."

13          c.    Mr. Hollis concludes at paragraph 24: "However, it is highly unlikely that

14  Michigan State could offset a $10 million shortfall [created by paying certain student-athletes fifty

15  percent of broadcast revenue] without cutting between 4 and 8 sports, each of which costs between

16  $500,000 and $4.2 million to sponsor.  The effect of such cuts on the student-athletes, coaches,

17  administrators, alumni, fans, and others would be very painful and would diminish the educational

18  and athletic opportunities our university can provide to student-athletes…."

19          d.    Mr. Hollis further explains in paragraph 25: "In my experience, the 800

20  student athletes at Michigan State, spanning 25 different sports, all work very hard at their sport

21  and have to learn how to balance the demands of Division I athletics with the academic demands

22  of a college student.  In my experience as an athletics administrator, football and men's basketball

23  players do not work harder at their sport than athletes in other sports.  If Michigan State paid some

24  but not all of its athletes, it would be devastating to the athletic program in general, to the values

25  and mission of the institution, to the support services provided by Michigan State for its athletes,

26  and to those 800 athletes who were not among the athletes paid."

27

28

1          e.      Mr. Hollis explains that Michigan State could not make up the budget

2    shortfall created by paying players 50% of broadcast revenue through cuts to coaching salaries

3    (paragraph 26-27) or through cuts to facilities (paragraphs 17-22, 28).

4          129.    *See* Muir Declaration, attached as Exhibit 13.  Bernard Muir, Stanford Athletics

5    Director, testifies in paragraph 8 that the "revenue generated by football and men's basketball help

6    to create opportunities for student-athletes in the other 34 sports that do not generate significant

7    revenue or, as is the case with most sports, generate no revenue at all.  Stanford does not consider

8    each sport a stand alone economic unit, but instead, each sport is part of an integrated unit and

9    contributes to the unique fabric that makes up Stanford Athletics."  *See also* paragraphs 7-10.

10         130.    *See* Pastides Declaration, attached as Exhibit 14.  President Pastides from

11   University of South Carolina testifies in paragraph 13 that at University of South Carolina, "[w]e

12   use broadcast revenue generated by men's football to fund our 16 sports that do not generate net

13   revenue.")  He continues: "If we paid student-athletes a portion of television broadcast revenues,

14   this would put great financial pressure on the athletics department with the likely result that we

15   would hve to cut back on travel, training, or services, and possibly cut certain teams entirely.  As a

16   state-funded school, and in a state that has recently made deep cuts to higher education funding,

17   our institution is not in a position to transfer funds otherwise earmarked for academics and

18   research to support athletics.  As a result, any athletics department funds used to pay student-

19   athletes must be offset by cuts within the athletics department.  Cutting coaches' salaries is not a

20   viable option.  Not only is the University bound by contract to provide its coaches with an agreed

21   upon salary, and that salary is set at a competitive rate, but very few coaches make enough money

22   to meaningfully offset the revenues that would be lost under plaintiffs' proposal."

23         131.    *See* Plonsky Declaration, attached as Exhibit 16.

24          a.      Ms. Plonsky, Women's Athletics Director at the University of Texas,

25   testifies at paragraph 12: "As I stated in my prior declaration, based on my personal experience, I

26   do not believe that schools like UT would agree to pay football and men's basketball student-

27   athletes 50% of broadcast revenue, even absent the NCAA's amateurism rules.  However, if they

28   did, based on my twenty years of experience, personal knowledge and personal observations, over

1   time as half of the funds from broadcast revenue were not available to UT, UT would have to

2   consider cuts to its athletics programs to fund such a payment to the football and men's basketball

3   players. These cuts could be in the form of cutting sports, cutting support services, or both.  Such

4   cuts would hurt our athletic department and could deprive many student-athletes of the

5   opportunity to obtain a scholarship, attend college, and participate in valuable athletic endeavors."

6          b.     Ms. Plonsky continued at paragraph 13: "At UT we refer to ourselves always

7   in the plural, as 'UT athletics'; the focus is on the opportunities for student athletes in all sports,

8   and not just the sports that happen to generate net revenue for the university.  For example, our

9   women's volleyball team is one of the top programs in the country.  Even though women's

10  volleyball does not generate net revenue, by funding volleyball we provide our female volleyball

11  players with the formative experience of being on a team and competing on a national stage while

12  also receiving a first class education."

13         c.     Ms. Plonsky testified at paragraph 14: "The current amateurism model also

14  positively impacts America's Olympic program.  At schools like UT, funds received from the

15  broadcast of football and men's basketball are used to support other Olympic sports at UT, like

16  swimming, diving, and track and field.  Those programs at UT have generated a number of

17  Olympians, including UT athletes who received 5 gold medals, 5 silver medals, and 2 bronze

18  medals in the recent London Olympics in the sports of swimming, diving, track and field, and

19  indoor volleyball.  This Olympic pipeline and our nation's presence on this international stage

20  would be impacted if UT had to cut back on funding for Olympic sports in order to compensate

21  football and men's basketball players for use of their name, image, and likeness."

22         d.     Finally, Ms. Plonsky explained at paragraph 15: "Currently, based on my

23  personal experience and knowledge, our more than 500 student athletes all have to abide by the

24  same rules – they all must meet the same eligibility standards, the same compliance rules, and the

25  same academic rigors set by the University.  If that changed and certain student athletes received

26  payments unrelated to their educational expenses, it would undermine the entire mission of UT

27  and all the students who receive aid, whether they are student-athletes or not.  Paying any student

28

1    athlete for the use of their name, image, and likeness would upset the balance within our education

2    system by paying some but not all students for extracurricular activities."

3           132.    *See* Plonsky December 10, 2012 deposition, attached as Exhibit 73.  On page

4    48:14-18, Ms. Plonsky is asked, "Does Division I football at the University of Texas help pay for

5    the overall athletic department?" and she answers, "Yes."

6           133.    *See* Patterson Declaration, attached as Exhibit 15.

7                   a.      In the declaration, Mr. Patterson at paragraph 7 testifies: "UT would not be

8    able to redirect 50% of its broadcast revenue to pay football and men's basketball student athletes

9    without having to cut athletics programming or services to all student athletes."

10                  b.      Mr. Patterson at paragraph 8 testifies: "If we were strictly a money making

11   enterprise at UT, there would be no reason to invest in sports like swimming, track and field,

12   soccer, and golf that do not generate net revenue for the school; we offer these sports because we

13   believe they contribute to the diversity of the University, provide opportunities to the students

14   involved, and build community and school spirit.  Although programs other than football and

15   men's basketball may not generate revenue for the University, these programs provide

16   unparalleled opportunities for the young men and women who have the opportunity to compete,

17   represent their university, learn critical skills such as discipline and focus, and receive an

18   education."

19          134.    *See* Scott Declaration, attached as Exhibit 17.

20                  a.      Pac-12 Commissioner Scott testifies at paragraph 16: "If enforcement of the

21   NCAA's amateurism and related rules was prohibited as Plaintiffs seek, and a market was created

22   in which universities would be expected to negotiate to pay student athletes participating in

23   football and men's basketball a percentage of the university's broadcast revenues, that would

24   necessarily decrease the funds currently used to support the other athletic and academic programs.

25   Each of our Member Universities would have very different choices and constraints in how they

26   could respond, by the reduction in available funds would, at a minimum, produce a wide range of

27   impacts on the quality and number of academic, extracurricular, and athletic programs at each of

28   the Member Universities."

1          b.      Commissioner Scott further testifies at paragraph 17 about the "potential

2   impact Title IX might have on the abilities of universities and colleges to agree to make monetary

3   payments to student athletes participating in football and men's basketball.  It is far from clear that

4   making such payments only to male athletes for those sports would be permissible.  Even if it

5   would be, doing so would run counter to the enormous strides that have been made in the

6   increased emphasis on the equal availability of athletic participation by female student athletes

7   under Title IX by reducing the funds available to support current non-football and men's

8   basketball sports and, as a result, reducing the total number of both female and male student

9   athletes."

10         135.    *See* Slive Declaration, attached as Exhibit 18, paragraphs 13-15.  At paragraph 13,

11  SEC Commissioner Slive testifies that the argument that "compensating college football and

12  men's basketball players from an institution's broadcast revenue would not harm other sports

13  programs" is "contrary to my experience and observations over the course of over four decades

14  working in intercollegiate athletics."

15         136.    *See* Starr Declaration, attached as Exhibit 19.

16         a.      President Starr at paragraph 6 testifies: "A significant restructuring of our

17  budget would be required.  That would result in wide-ranging negative consequences for multiple

18  aspects of the institution.  Baylor uses the revenues that its men's basketball and football programs

19  generate for a number of important purposes.  Among these is the cross-subsidization of Baylor's

20  17 other sports teams, none of which generate sufficient revenue to cover costs and many of which

21  generate no revenue at all.  All of our teams, including those that do not generate net revenue, are

22  a source of pride and community-building for the University."

23         b.      President Starr at paragraph 6 went on: "Student-athletes who participate in

24  each of these programs devote significant time to their teams as well as their academic pursuits.

25  All of these sports are an integral part of the fabric of college life at Baylor.  The money that

26  Baylor receives from its revenue-generating athletic programs helps to support and sustain the

27  wide array of non-revenue generating sports."

28

137.    *See* Harker Declaration, attached as Exibit 9.  President Harker of the University of Delaware ("UD") testifies in paragraph 11 that "UD does not make money on any of its athletic programs."  He goes on in paragraph 13: "If 'pay for play' were to become the norm, UD would likely have to stop sponsoring as many sports as it does now."  In paragraph 19 he explains that "Paying male athletes for their participation in sports" would "likely result in UD's being required to cut additional men's sports and participation opportunities."

138.    *See* Welty Declaration, attached as Exhibit 20.  John Welty, the President Emeritus of Fresno State, testifies in paragraph 7: "Fresno State could not afford to compensate football and college basketball players without sacrificing other aspects of the university or athletics department budget.  There is a limited amount of money available, and much of it is currently being used to support other sports at Fresno State.  Fresno State would have to eliminate portions of its sports programs and dip into the operating budget of the institution even further than it already does.  As I stated in paragraph 20 of my March 2013 declaration, Fresno State would have difficulty continuing to compete in Division I men's basketball and football and might be forced to drop out of Division I in these sports altogether."

139.    *See* March Welty Declaration, attached as Exhibit 20.  In this declaration at paragraph 16, President Welty testifies that it would be "a disaster for intercollegiate athletics and higher education" to pay football and men's basketball players 50% of all broadcast revenues, and he testifies "I know of no college or university president who would support such an approach."

140.    *See* LeCrone Declaration, attached as Exhibit 12.  Commissioner LeCrone of the Horizon League testifies at paragraph 8 that "[t]he Horizon League spends more money each year to produce the broadcast of its games on ESPN than it receives in revenue from that contract."  At paragraph 19, he explains: "Paying male athletes for their participation in sports would seriously undermine the objectives of Title IX and Horizon League member schools' ability to remain in Title IX compliance, and/or could result in Horizon League members reducing additional men's sports and participation opportunities."

141.    Attached as Exhibit 28 is a true and correct copy of the Declaration of Peter Ueberroth, former Chairman of the U.S. Olympic Committee, dated December 12, 2013.  *See*

paragraphs 6 - 11.  For example, in paragraph 7, Mr. Ueberroth testifies: "Based on my extensive experience in the Olympic movement in the United States, including as a student-athlete who participated in the Olympic trials, reducing support for sports other than football and men's basketball would severely damage American athletes' ability to compete in the Olympic Games and could mean the death of the Olympic movement in the United States.  This is because in many Olympic sports, the potential for American athletes to succeed at the Olympic level is dependent upon robust programs and support for student-athletes at colleges and universities.  These sports include:  swimming, track and field, men's gymnastics, softball, soccer, rowing, field hockey, fencing, volleyball, water polo, and wrestling."

**NCAA Witness Testimony**

142.    *See* Renfro June 26, 2012 deposition, attached as Exhibit 74.  On page 50:22-51:6, Mr. Renfro testifies:  "Intercollegiate athletics is, I think, in the minds of most who would examine this, not the same as a professional sports organization. But that does not mean that it does not seek revenue, for example, to cover the costs of a particular sport, and in some cases, most cases, to cover the costs of – of the university providing participation opportunities in other sports and over a broad number of men and – and women students."

143.    *See* Petr Declaration, attached as Exhibit 26.  Mr. Petr identifies himself in the declaration as the Managing Director of Research at the NCAA.

144.    Attached as Exhibit 26A is a true and correct copy of Todd Petr's Declaration In Support of the NCAA's Class Certification Opposition Brief, dated March 12, 2013, including Exhibits A-C attached thereto.  In that declaration, paragraph 3, Mr. Petr summarizes spending patterns at NCAA Division I schools.  In paragraph 4, Mr. Petr testifies that "only 23 NCAA member institutions generated positive net revenue for their athletic programs, and no more than 25 institutions and no less than 14 institutions have generated positive net revenue for their athletic programs in the past five years."

145.    *See* Berst May 25, 2012 deposition, attached as Exhibit 70.  On page 28:22-25, Mr. Berst testifies:  "Without successful football, basketball at some institutions, you probably would

1  not have lacrosse programs and swimming programs and the broader set of intercollegiate athletic

2  sports."

3      146.   *See* Emmert 3/2012 Deposition, attached as Exhibit 71.

4      a.   At page 28:7-25, Dr. Emmert testifies that "the revenue that's generated

5  through all of our revenue streams, whether they're media rights or any other — or any other

6  revenue stream are, in fact, shared with the student-athletes very (sic) widely.  The NCAA

7  provides in aggregate with our institutional members $2 billion a year in scholarship support.  We

8  have a very large, somewhere around $60 million a year, student opportunity fund that provides

9  resources directly to student-athletes.  We provide the revenue stream that allows universities and

10  colleges to conduct intercollegiate athletics at all.  So both directly and indirectly, it is those

11  revenues that — that allows intercollegiate athletic competition to occur and for hundreds of

12  thousands of students to go to college."

13      b.   On page 124:7-17, Dr. Emmert testifies: "Well, the revenues that are

14  generated by universities around NCAA athletics and by the association itself through its

15  championships are used at every university to support all of the what are often called nonrevenue

16  sports, which are largely, of course, the Olympic sports; women's sports; the participation of those

17  student-athletes in their sports, their scholarships; the coaching staff; training staff; academic

18  support staff of all of those other sports."

19      c.   On page 127:9-16, Dr. Emmert testifies: "And the aggregate data show

20  unequivocally — I'm not quite sure what your question is now, but if — if it is about — I believe

21  you started with this bullet, saying that this supports sports other than football and men's

22  basketball. That is unequivocally the case and can be demonstrated with a mountain of data, if

23  that's what you're searching for."

24      d.   On page 163:25-164:6, Dr. Emmert testifies: "I've been asked a hundred

25  times, why are universities making so much money on college sport when, in fact, they don't

26  make money on college sport. They have positive cash flow on football, but they spend all that

27  money on all their other sports. And that part is not perceived outside, but it is perceived inside."

28

147.   *See* the Berst Declaration, attached as Exhibit 22.  Attached to the Berst Declaration as Exhibit B is a true and correct copy of the "Final Report of the NCAA Task Force on Commercial Activity in Division I Intercollegiate Athletics," labeled with Bates Stamp NCAAPROD00038768.  On page 8, it reads: "Most college and university athletics programs do not result in revenues that exceed expenses and require institutional subsidies to make up the difference. For those specific sports programs that have revenues above expenses, the revenues are distributed broadly to fund participation opportunities in sports with little or no revenues."

**E.      PROCOMPETITIVE JUSTIFICATION NO. 5: INCREASED OUTPUT**

**Expert Witness Testimony**

148.   *See* Rubinfeld Opening Expert Report, attached as Exhibit 29.  Dr. Rubinfeld, at paragraph 142-154, discusses the procompetitive justification of increased output.  At paragraph 143, he summarizes: "The NCAA's challenged conduct sustains the NCAA's approach of promoting a broad range of intercollegiate sports at a large number of member schools and thus leads to increased output on several dimensions, including increases in the number of participating schools and teams; increases in the number of participating student athletes, including those who benefit economically from grants-in-aid; and increases in the number of games and competitions available for the enjoyment of the public to attend or watch on television or other media."

149.   *See* Rubinfeld Declaration, attached as Exhibit 27.  In paragraphs 55-59, Professor Rubinfeld explains the opinions set forth in his reports regarding increased output as a procompetitive justification.

**School and Athletic Conference Witness Testimony**

150.   *See* Albrecht Declaration, attached as Exhibit 1.   President Albrecht testifies in Paragraph 14 that "it would be very difficult if not impossible for Utah State to fund many of the sports we do today if we lost 50% of the revenue our athletic department earns from broadcast license fees.  Our university funds the minimum number of sports necessary to compete in Division I.  If we lacked the resources to fund even one of these sports, we could not compete in Division I."  President Albrecht further testifies in Paragraph 7 that "Utah State would have

difficulty participating in football and men's basketball at the Division I level if paying student-athletes became necessary to remain competitive."

151.    Stan Albrecht submitted a prior declaration in support of NCAA's Class Certification Opposition Brief, signed March 12, 2013, ECF No. 695-3 and it is attached to the Albrecht Declaration as Exhibit A.  In this prior declaration, Albrecht testifies at paragraph 12 that if "pay-for-play became a reality in the way that the Antitrust Plaintiffs propose, it is likely that USU would not be able to fund the 16 sports that the NCAA requires to qualify for Division I, it would not be able to continue to implement its plans for greater gender equality in its athletics programs, and the number of athletic opportunities for men and women would decrease."

152.    *See* Banowsky Declaration, attached as Exhibit 2.  Conference-USA Commissioner Banowsky testifies at paragraph 8: "Based on my knowledge and experience as Commissioner of C-USA, I believe some universities in C-USA would question the intrinsic value of athletics to the university if it involved compensating Division I football and men's basketball student-athletes for the use of their name, image and likeness. As a result, they might well either drop Division 1 football and men's basketball altogether or they would switch out of Division I to a structure and association that was more in line with the principles they believe are important today in intercollegiate sports, which does not include compensating student-athletes for the use of their name, image and likeness."

153.    *See* Blank Declaration, attached as Exhibit 3, paragraph 14 ("…in a world where we paid football and men's basketball players fifty percent of broadcast revenue, the athletic opportunities at Wisconsin would shrink substantially").

154.    *See* Bowlsby Declaration, attached as Exhibit 4.  At paragraph 13, Big Twelve Commissioner Bowlsby testifies that "if each school was required to give 50% of its broadcast revenue to its football and men's basketball players, it is likely that some sports and support programs at Big 12 schools would be discontinued, especially at universities in rural areas.  How each university would make a budget work with a loss of 50% of its broadcast revenue would vary by institution, but there is no question based on my experience and knowledge that the loss of this

1  money would have a negative impact on most if not all of our member institution, both financially

2  and on the number of sports offered on an intercollegiate basis."

3       155.    *See* Castiglione Declaration, attached as Exhibit 6.  Mr. Castiglione at paragraph 18

4  explaines: "[T]he loss of a significant portion of our broadcast revenue would have far-reaching

5  implications on our entire athletics department at OU, possibly including a reduction in services

6  for student-athletes, the elimination or reduction of part of our sports programs, or the elimination

7  or reduction in the amount of revenue the athletic department could contribute to other areas of the

8  University of Oklahoma."

9       156.    *See* Delany Declaration, attached as Exhibit 8.  At paragraph 16, Commissioner

10  Delany of the Big Ten Conference states: "Unfortunately, funding for intercollegiate athletics at

11  our member institutions, like  funding for higher education generally, is limited.  This has been

12  especially true in recent years as state budgets have come under significant pressure, since all but

13  one of our member institutions are state universities.  With the majority of our member

14  institutions' programs already under financial strain, if these institutions had to pay half of their

15  broadcast revenue to football and men's basketball student-athletes, as claimed by the plaintiffs,

16  they likely could not afford to continue supporting the broad-based athletic programs that are the

17  bedrock of our conference.  The loss of the broad-based athletic programs would mean the

18  reduction in the valuable educational opportunities available to student-athletes – opportunities to

19  get an education in the classroom and on the field.  It would also mean a loss of the valuable

20  diversity that we have built over the years in the Big Ten."

21       157.    *See* Coleman Declaration, attached as Exhibit 7, at ¶ 16 ("The result would also be

22  reduced opportunities for students to participate in athletics, and fewer sports for Michigan fans

23  and alumni to enjoy.")

24       158.    *See* Exhibit A to Hatch Declaration, attached as Exhibit 10, which is a true and

25  correct copy of the Declaration of Nathan Hatch in Support of Class Certification Opposition

26  Brief, dated March 14, 2013, ECF No. 695-14, ("March Hatch Declaration").  President Hatch of

27  Wake Forest University testifies in paragraph 13 as follows: "Wake Forest absolutely depends

28  upon the revenues that Antitrust Plaintiffs believe would be simply assigned to football and men's

1   basketball players if NCAA rules precluding pay-for-play were eliminated.  It is possible that

2   Wake Forest might cease playing Division I or Football Bowl Subdivision sports entirely if pay-

3   for-play became a reality.  Wake Forest operates a full and robust athletics program as a part of its

4   educational mission, and the athletics department's revenues (which are significantly subsidized

5   with institutional support) are used to operate that program for the educational benefit of student-

6   athletes.  Instituting a pay-for-play model, even if the payments are deferred to after graduation,

7   would change the nature of the relationship Wake Forest has with its football and men's basketball

8   student-athletes.  It would, essentially, turn those teams into professional squads.  This would not

9   be acceptable to Wake Forest."

10          159.    *See* Harker Declaration, attached as Exhibit 9.

11             a.    President Harker of the University of Delaware testifies in paragraph 16: "It

12   is certainly a possibility that UD, and, based on my experience in intercollegiate athletics, other

13   schools or even whole conferences might cease playing Division I sports entirely.  UD would not

14   participate in an intercollegiate athletics model that would require the professionalization of one

15   sport to the detriment of the athletics department's many other sports, fitness and educational

16   programs."

17             b.    He goes on in paragraph 17: "UD would not prefer to compete, however, at

18   the Division II or Division III level.... UD desires to be able to offer opportunities to compete at

19   the highest levels to its student-athletes in all sports...."

20             c.    In paragraph 18, President Harker testifies: "If UD were to move to Division

21   II in its NCAA sports, the number of grants-in-aid that would be awarded to student-athletes

22   would be roughly half of what are awarded today.  If UD were to move to Division III, all athletics

23   grants-in-aid would be eliminated."

24          160.    *See* Hollis Declaration, attached as Exhibit 11.  At paragraph 24, Athletics Director

25   Hollis testifies that if Michigan State was forced to pay its football and men's basketball players

26   fifty-percent of the television revenue, it is "highly unlikely that Michigan State could offset a $10

27   million shortfall without cutting between 4 and 8 sports."

28

161.   *See* Plonsky Declaration, attached as Exhibit 16.  At paragraph 12, Ms. Plonsky, University of Texas-Austin's Women's Athletic Director, testifies that "over time as half of the funds from broadcast revenue were not available to UT, UT would have to consider cuts to its athletics programs to fund such a payment to the football and men's basketball players. These cuts could be in the form of cutting sports, cutting support services, or both.  Such cuts would hurt our athletic department and could deprive many student-athletes of the opportunity to obtain a scholarship, attend college, and participate in valuable athletic endeavors."

162.   *See* March Welty Declaration, attached as Exhibit 20.  Welty, who identifies himself as the former President of Fresno State, testified at paragraphs 20-21: "It is a possibility that Fresno State … might cease playing Division I or Football Bowl Subdivision sports entirely. It may very well be the case that Fresno State would eliminate football rather than be forced to eliminate the balance of its athletics programs to keep football."

## F.     NCAA RULES AND RESTRICTIONS

163.   *See* Lennon Declaration, attached as Exhibit 25  In this declaration, Kevin Lennon identifies himself as Vice President of Academic and Membership Affairs for the NCAA.  He explains in paragraph 2 that he is "responsible for overseeing the Academic and Membership Affairs department, which (among other things) provides guidance to NCAA member institutions, student-athletes and the public on NCAA rules and rules interpretations."

a.     Mr. Lennon testifies in paragraph 4 that "Division I Bylaws ***prohibit*** – rather than permit – schools, conferences and the NCAA from using the name or picture of current student-athletes to advertise or promote commercial products" (emphasis added).

b.     Mr. Lennon testifies in paragraph 5 that "Division I Bylaw 12.5.2 provides that NCAA member institutions may not use, or permit the use, of a student-athlete's name or picture 'to advertise, recommend or promote directly the sale or use of a commercial product or service of any kind.'"

c.     Mr. Lennon explains in paragraph 8 that, "Neither Bylaw 12.5.1.1.1, nor the portion of the Student-Athlete Statements that I understand plaintiffs call 'Form 08-3a', permits the NCAA to use of the name or picture of current (or former) student-athletes for any purpose

1  other than promoting NCAA championships, events, activities or programs.  Neither Bylaw

2  12.5.1.1, nor 'Form 08-3a', results in any legal rights being transferred from student-athletes to the

3  NCAA."

4          d.      Mr. Lennon testifies in paragraph 9 that "neither Bylaw 12.5.1, nor any other

5  NCAA rule, requires a student-athlete to consent to his school, conference or the NCAA making

6  use of his name or likeness in any manner, including in promotions that are permitted under Bylaw

7  12.5.1."

8          e.      He goes on to explain in paragraph 10: "Bylaw 12.5.1 requires only that

9  NCAA members (and the NCAA itself) request consent from student-athletes to use their name or

10  likeness in permitted promotional uses; it does not require that student-athletes provide the

11  consent.  A student-athlete who declined to sign a consent form provided by his or her school, or

12  by the NCAA, would not lose his or her eligibility to play NCAA sports."

13      164.    Attached as Exhibit 25A is a true and correct copy of the Declaration of Kevin

14  Lennon In Support of the NCAA's Opposition to Class Certification, dated March 14, 2013, ECF

15  No. 695-13.

16          a.      At paragraph 4, he testifies that "NCAA eligibility rules *do not apply to*

17  *former student-athletes*" (emphasis added).  At paragraph 5, he testifies that "The NCAA has

18  never taken the position that a former student-athlete is, or should be, prevented from engaging in

19  commercial behavior because he played sports subject to NCAA rules.  Nor has the NCAA ever

20  taken the position that a former student-athlete had forfeited his right or ability to engage in, or

21  benefit from, commercial behavior because he agreed to play intercollegiate athletics subject to

22  NCAA rules."  He concludes in paragraph 6: "NCAA rules have no application to, or effect on,

23  former student-athletes' attempts or ability to sell, license or otherwise benefit from their 'name,

24  image or likeness.'"

25          b.      In paragraph 7, Mr. Lennon explains "Nor do NCAA rules require student-

26  athletes to transfer their 'name, image or likeness' rights to the NCAA, or to their school or

27  conference, as a condition of NCAA eligibility.  NCAA rules have no effect on the legal rights

28  that student-athletes may have in the sale, licensing or use of their name, image or likeness."  In

paragraph 14, Mr. Lennon states, "Neither Bylaw 12.5.1, nor any other NCAA rule, requires a student-athlete to consent to the use of his or her name or likeness in a promotion that is permissible under Bylaw 12.5.1.  A student-athlete who declined to give consent to his school, conference or the NCAA would not be risking his or her NCAA eligibility in any way."

   c.   In paragraph 18, he states, "Bylaw 12.5.1 generally prohibits NCAA member institutions from selling commercial products that utilize the name, image or likeness of a current student-athlete.  For example, schools may not sell t-shirts or posters that feature current student-athletes, nor may they sell replica jerseys with the names of current student-athletes."

   d.   He explains in paragraph 21 that, "The NCAA has never ruled a student-athlete ineligible because he or she has declined to sign a release form requested by a school or conference related to live broadcast or rebroadcast of a NCAA sporting event, or has otherwise refused to give his or her school or conference permission to use the student-athlete's name, image or likeness in a live broadcast or rebroadcast.  There is no basis in NCAA rules for withholding a student-athlete's eligibility because he or she has declined to provide a NCAA member with legal permission to make a live broadcast or rebroadcast of a sporting event."

165.   *See* Berst May 25, 2012 deposition, attached as Exhibit 70.  At pages 69:25-76:11, Mr. Best testifies that consent form regarding use of student athletes' name or picture to promote NCAA championships and other NCAA events is "voluntary" and does not require student athletes to "relinquish[] anything that's theirs, then or in the future" (pages 77:13-81:3).

166.   Attached as Exhibit 75 is a true and correct copy of excerpts from Greg Shaheen's June 25, 2012 deposition.  At pages 16:23-18:24, Mr. Shaheen states that he worked for the NCAA for 11½ years, as director and managing director of the Division I men's basketball championship and as vice president of basketball and business strategies.  At pages 267:15- 270:4, Mr. Shaheen testifies that the student-athletes statement (Form 08-3A) did not "have any significance with regard to former student-athletes who have renounced or exhausted their eligibility"; that there are no "bylaws, rules, regulations, practices, customs in place that regulates what conferences do or don't do" "with regard to obtaining additional consents or releases from

1  student-athletes"; and that conferences may have their own releases and "practices vary across the

2  conferences."

3       167.   *See* the Lennon Declaration, attached as Exhibit 25.

4            a.     Attached to the Lennon Declaration as Exhibit C is a true and correct copy of

5  a document produced by the NCAA with Bates number NCAAPROD00228565, labeled as

6  "NCAA Corporate Champion and Corporate Partner (CC/P) Marketing Guidelines," dated July

7  13, 2010.  As explained at page NCAAPROD00228570, this document sets forth guidelines for

8  corporate marketing partners of NCAA and CBS.  Page NCAAPROD00228590 provides "Current

9  NCAA student-athletes with athletics eligibility remaining (or their names, pictures or likenesses)

10 may not be used in any advertising, marketing or communications activities."  In addition,

11 "Personalities retired from any sport may appear in advertising, marketing or communications

12 activities, provided that the CC/P obtains the individuals' consent."

13           b.     Attached to the Lennon Declaration as Exhibit B is a true and correct copy of

14 a document produced by the NCAA with Bates number NCAAPROD00496421.  It is an NCAA

15 email that attaches an April 24, 2008 letter from Kris Richardson, NCAA Associate Director of

16 Membership Services, with Bates number NCAAPROD0049624.  The letter states that "there is

17 no NCAA legislation that would preclude a member institution from having a Gridiron Bash event

18 on its campus.  Further, the NCAA legislation does not preclude the involvement of individuals

19 who are not student-athletes with remaining eligibility.  Examples of such individuals include

20 coaches, institutional administrators, alumni, ***former student-athletes***, band members and

21 members of the cheerleading squad." (Emphasis added.)

22      168.   Attached as Exhibit 84 is a true and correct copy of the NCAA's Responses to

23 Antitrust Plaintiffs' First Set of Interrogatories to Defendant NCAA, dated February 16, 2011, No.

24 7, and verified on February 17, 2011 by Scott Bearby.  The NCAA's response provides: "NCAA

25 rules do not address, and have no effect on, whatever rights former NCAA student-athletes may

26 'possess to license, sell, use, display or monetize their Names, Images or Likenesses in connection

27 with participation in intercollegiate athletics.'"

28

169.     *See* Garnham October 11, 2013 deposition, attached as Exhibit 52.  On page 176:6-11, when asked if "[a]fter you graduate from college, do you believe that there will be any restrictions on your ability to sell your name, image, and likeness," named plaintiff Mr. Garnham answered, "No."

170.     Attached as Exhibit 48 is a true and correct coy of excerpts from Jay Bilas's February 2, 2012 deposition.  At pages 294:3-298:2, Mr. Bilas, a former student athlete, explains that he has been paid "for the appearance of your name, image, likeness in a commercial purpose," for example advertisements he did for State Farm and KFC, and that "nothing in [his] prior status as a student-athlete at Duke [] interfered with [his] ability to accept and profit from that opportunity."

171.     *See* O'Bannon November 11, 2011 deposition, attached as Exhibit 59.  At pages 282:1-283:6, Plaintiff Mr. O'Bannon, a named plaintiff in this case, agrees that he received and profited from opportunities "to exploit your name, image, likeness after you left college" and that "there was nothing that [he was] aware of about any NCAA rules that restricted [him] in any way from doing this."

172.     *See* Ellis November 3, 2011 deposition, attached as Exhibit 49.  At pages 271:23-272:15, Plaintiff Mr. Ellis explains that, after graduating college, he "did a car deal with a dealership in Canton, Ohio" in which he was paid by being able to use a Porsche "in exchange for me coming in and maybe signing autographs or making appearances, and tickets to the games."

173.     *See* Riley November 11, 2011 deposition, attached as Exhibit 62.  At pages 200:25-202:2, Mr. Riley, a named plaintiff in this case, testifies that since graduating from college he hired an agent who "made calls on [his] behalf or trying to sell my likeness" and has "licensed other companies to use [his] college image for a commercial product," and "none of the defendants here prevented [him] from doing that."

174.     *See* George March 9, 2012 deposition, attached as Exhibit 53.  At page 123:19-124:1, Plaintiff Mr. George agrees that NCAA or Electronic Arts ("EA") or the Collegiate Licensing Company ("CLC") never did anything "that interfered with [his] ability to engage in

1  that kind of [promotional] activity" and that "there's nothing about the NCAA's rules, regulations,

2  or forms that prevents [him] from doing this kind of thing to make money now."

3        175.    *See* Russell December 7, 2012 deposition, attached as Exhibit 65.  At pages 61:24-

4  74:12, Plaintiff Mr. Russell testifies that after playing college basketball he received pay from

5  General Mills "for the golf event ... and for [appearing on] the Wheaties box and autographing 100

6  of the special edition package flaps"; for appearing at a "Safeway promotional event"; for

7  marketing Coors Light; and for "the right to put [his] name on the [NBA] Most Valuable Player

8  trophy."

9        176.    Attached as Exhibit 87, is a true and correct reproduction of selected webpages

10  from the website "Jay Bilas," accessible at http://www.jaybilas.com,

11  http://www.jaybilas.com/toughness.html, and http://www.jaybilas.com/speaking.html and last

12  accessed on February 25, 2013, and also at Dkt. No. 688-24.  The website at page 1 lists the

13  former student-athlete Jay Bilas as the site's copyright holder and states it is Bilas's "official

14  website."  At page 2, the website advertises the sale of the book Toughness, written by Jay Bilas,

15  and at page 4 advertises Bilas's availability for speaking engagements.

16        177.    Attached as Exhibit 85 is a true and correct copy of an example of an agreement

17  that CLC received from 29/34 in connection with the production and sale of a line of replica

18  collegiate jerseys bearing the names of various former student-athletes, which was produced in

19  this action by CLC at Bates Numbers CLC174486-CLC174511.  Michael Drucker, the Vice

20  President and Associate General Counsel of CLC, testified that the license embodied in Exhibit 85

21  has been maintained as a business record in the ordinary course of business and "were produced in

22  the condition they were received from the licensee – in some cases the licensee redacted the

23  payment and financial terms before sending the document to CLC."  *See* Declaration of Michael S.

24  Drucker in Support of EA's and CLC's Opposition to Plaintiffs' Motion for Class Certification,

25  ECF No. 685, ¶ 12.

26        178.    Attached as Exhibit 78 is a true and correct excerpt of a document bearing the

27  Bates number NCAAPROD00292647, titled "Multi-Media Agreement" between Turner

28  Broadcasting System, Inc., CBS Broadcasting Inc. and The National Collegiate Athletic

1   Association, dated April 22, 2010, which was previously filed in redacted form in this case as Dkt.

2   No. 652 and Dkt. No. 696-1, pursuant to the Court's order at Dkt. 626.  The document states in

3   relevant part at ¶ 12.2:

4   ████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ██████████████████████

20          179.    Attached as Exhibit 79 is a true and correct copy of a document produced by the

21  NCAA with Bates number NCAAPROD00195080.  It is an email from Peter Davis, dated

22  December 17, 2009:  "For all photography and footage requests, DirecTV is responsible for

23  securing rights to individuals and individual school trademarks within the image(s) or footage….

24  Please note that neither CBS nor the NCAA obtains releases from neither the individuals nor the

25  schools who appear in the photographic images.  This is the responsibility of DirecTV."

26          180.    Attached as Exhibit 80 is a true and correct copy of a document produced by the

27  NCAA with Bates number NCAAPROD00213181.  It is an email from Jim Haynes, dated March

28  13, 2006 to Leo Burnett agency:  "You will need to seek permission for individual likenesses as

1   you are doing as the NCAA cannot provide this authorization."  Agency responds, "We're

2   contacting agents of all recognizable players, so that should not be an issue."

3       181.    Attached as Exhibit 81 is a true and correct copy of a document produced by the

4   NCAA with Bates number NCAAPROD00216467.  It is a letter from Greg Shaheen, dated

5   October 27, 2005 to Aresco (CBS):  "Cingular shall be responsible for clearing any use of non-

6   NCAA marks, graphics, announcer calls, and likenesses contained within the archive footage, if

7   applicable."

8       182.    Attached as Exhibit 82 is a true and correct copy of a document produced by the

9   NCAA with Bates number NCAAPROD00219393.  It is an email from Greg Weitekamp, dated

10  August 10, 2005 to EA (Brinkman):  "The NCAA cannot provide clearance for individual

11  likenesses.  To be completely safe from a legal standpoint, we recommend that you obtain

12  clearance from everyone that is recognized.  However, if you want to roll the dice and only clear

13  the primary athletes that are featured, then the liability falls on you."

14      183.    *See* the Lennon Declaration, attached as Exhibit 25.  Attached to the Lennon

15  Declaration as Exhibit D is a true and correct copy of a document produced by the NCAA with

16  Bates number NCAAPROD00463259.  It is an email from Leeland Zeller regarding a question

17  from a Texas A&M student athlete:  "The student-athlete does not need to sign in order to be

18  eligible.  You can send me the name and I'll pass it along."

19      184.    Attached as Exhibit 83 is a true and correct copy of Exhibit 1022 to the deposition

20  of Plaintiff Chase Garnham, marked with Bates number GARNHAM000259.  In his deposition, at

21  pages 116:3-10, Mr. Garnham identifies an email he received from the Associate Director of

22  Athletics  at Vanderbilt.  The email reads: "Chase, I wanted to send this e-mail because I believe

23  you may be confused about the forms you were asked to sign yesterday.  When we met yesterday,

24  you indicated that you wanted to talk with your attorney before signing the portion of the forms

25  that relate to the use of your name and likeness.  I said that was fine, and as I explained, you were

26  not required to sign these portions of the forms to be eligible to play on the Vanderbilt football

27  team."

28

1        I declare under the penalty of perjury of the laws of the United States of America that the

2    foregoing is true and correct and that this declaration was executed on December 12, 2013 in San

3    Francisco, California.

4                                              _____

5                                              Carolyn Hoecker Luedtke

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22293064.4

-72-      DECL. OF CAROLYN HOECKER LUEDTKE RE:
NCAA'S OPP. TO MOT. FOR SUM. JUDG'T AND MOT. FOR SUM. JUDG'T.
CASE NO. 09-CV-1967-CW