# EXHIBIT A

Michael P. Lehmann (Cal. Bar No. 77152)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
Email: mlehmann@hausfeldllp.com
        abailey@hausfeldllp.com

Michael D. Hausfeld (*pro hac vice*)
Hilary K. Scherrer (Cal. Bar No. 209451)
Sathya S. Gosselin (Cal. Bar No. 269171)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone:  (202) 540-7200
Facsimile:  (202) 540-7201
Email: mhausfeld@hausfeldllp.com
        hscherrer@hausfeldllp.com
        sgosselin@hausfeldllp.com

*Plaintiffs' Class Counsel with Principal
Responsibility for the Antitrust Claims*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | Case No.  4:09-cv-1967 CW |
| This document relates to:<br><br>ANTITRUST PLAINTIFFS' ACTIONS | **ANTITRUST PLAINTIFFS' RESPONSE TO BRIEF OF *AMICI CURIAE* FOX BROADCASTING COMPANY AND BIG TEN NETWORK, LLC IN SUPPORT OF DEFENDANT NCAA'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:      Honorable Claudia Wilken<br>Date:       February 20, 2014<br>Time:       2:00 p.m.<br>Courtroom:  2, 4th Floor |

1

## **TABLE OF CONTENTS**

2

INTRODUCTION ................................................................................................. 1

3

ARGUMENT ....................................................................................................... 3

4

I.     THE FIRST AMENDMENT DOES NOT IMMUNIZE SPORTS
       BROADCASTERS THAT AIR COLLEGE FOOTBALL AND
5      BASKETBALL GAMES IN THEIR ENTIRETY FROM RIGHT-OF-
       PUBLICITY CLAIMS............................................................................... 3

6          A.     Live Broadcasts and Rebroadcasts of Entire Sporting
                  Events Are Not "Communicative" Speech About "Matters
7                 of Public Concern."................................................................... 4

           B.     *Zacchini* Is Dispositive............................................................. 8
8
           C.     Sports Broadcasts Are Commercial Speech.............................. 12

9          D.     The Sports Broadcasters' Remaining Citations Are
                  Distinguishable......................................................................... 18
10
       II.    APs' RIGHTS OF PUBLICITY ARE RECOGNIZED
11            UNDER MOST STATUTORY AND COMMON-LAW SCHEMES. ................ 19

           A.     The Statutory Authority Favors APs' Rights of Publicity
12                in College Football and Basketball Games. .............................. 20

13         B.     The Common Law Favors APs' Rights of Publicity in
                  College Football and Basketball Game Broadcasts. ................. 22
14
       III.   EXISTING BROADCASTING PRACTICES DEMONSTRATE
              THAT APs' ANTITRUST CLAIMS WILL NOT CHILL ANY SPEECH
15            OR PREVENT NEWS REPORTING ON MATTERS OF PUBLIC
              INTEREST................................................................................................. 23
16
CONCLUSION.................................................................................................... 24

17

18

19

20

21

22

23

24

25

26

28

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

2

CASES

3

*Anderson v. Fisher Broad. Cos.*,

4

    712 P.2d 803 (Ore. 1986).........................................................................................22

5

*Blandino-Medina v. Holder*,

    712 F.3d 1338 (9th Cir. 2013)................................................................................ 21

6

*Bolger v. Youngs Drug Prods. Corp.*,

7

    463 U.S. 60 (1983) ........................................................................................ 12, 16, 19

8

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*,

9

    505 F.3d 818 (8th Cir. 2007)............................................................................. 18, 19

10

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,

    95 F.3d 959 (10th Cir. 1996)................................................................................... 6

11

*CBS Interactive Inc. v. NFL Players Ass'n, Inc.*,

12

    259 F.R.D. 398 (D. Minn. 2009).................................................................... 18, 19

13

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*,

14

    447 U.S. 557 (1980). ............................................................................................. 12

15

*Charles v. City of Los Angeles*,

    697 F.3d 1146 (9th Cir. 2012)............................................................................. 12

16

*City of Cincinnati v. Discovery Network, Inc.*,

17

    507 U.S. 410 (1993) ............................................................................................. 12

18

*Dex Media W., Inc. v. City of Seattle*,

19

    696 F.3d 952 (9th Cir. 2012)............................................................................... 16

20

*Doe v. TCI Cablevision*,

    110 S.W.3d 363 (Mo. 2003)................................................................................ 22

21

*Downing v. Abercrombie & Fitch*,

22

    265 F.3d 994 (9th Cir. 2001)............................................................................... 15

23

*Dryer v. NFL*,

    689 F. Supp. 2d 1113 (D. Minn. 2010) ............................................................. 19

24

25

*Dworkin v. Hustler Magazine Inc.*,

    867 F.2d 1188 (9th Cir. 1989)............................................................................. 12

26

27

28

*Fighting Finest, Inc. v. Bratton*,
   898 F. Supp. 192 (S.D.N.Y. 1995) ........................................................................... 5

*Giboney v. Empire Storage & Ice Co.,*
   *336 U.S. 490 (1949)* ............................................................................................... 3

*Gionfriddo v. Major League Baseball*,
   94 Cal. App. 4th 400 (2001) ............................................................................. 18, 19

*Henley v. Dillard Dep't Stores*,
   46 F. Supp. 2d 587 (N.D. Tex. 1999) ................................................................... 20

*Hilton v. Hallmark Cards*,
   599 F.3d 894 (9th Cir. 2010) ................................................................................. 6

*Hirsch v. S.C. Johnson & Son, Inc.*,
   280 N.W.2d 129 (Wis. 1979) ............................................................................... 22

*Hunt v. City of Los Angeles*,
   638 F.3d 703 (9th Cir. 2011) ............................................................................... 16

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   No. MDL 150 AWT, 1992 WL 133093 (C.D. Cal. Apr. 30, 1992) ........................ 3

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   724 F.3d 1268 (9th Cir. 2013) ............................................................................. 12

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   No. C 09-1967 CW, 2013 WL 5778233 (N.D. Cal. Oct. 25, 2013) ...................... 19

*Justice v. NCAA,*
   577 F. Supp. 356 (D. Ariz. 1983) .......................................................................... 4

*Lawrence v. A.S. Abell Co.*,
   475 A.2d 448 (Md. 1984) ..................................................................................... 20

*Minnifield v. Ashcraft*,
   903 So. 2d 818 (Ala. App. 2004) ......................................................................... 23

*Montana v. San Jose Mercury News, Inc.*,
   34 Cal. App. 4th 790 (1995) .............................................................................. 6, 7

*Murdock v. City of Jacksonville,*
   361 F. Supp. 1083 (M.D. Fla. 1973) ...................................................................... 5

*National Football League v. Alley, Inc.*,
   624 F. Supp. 6 (S.D. Fla. 1983) ..................................................................... 21, 23

ANTITRUST PLAINTIFFS' RESPONSE TO BRIEF OF *AMICI CURIAE* FOX BROADCASTING COMPANY AND BIG TEN NETWORK, LLC

*P Haskell v. Stauffer Commc'ns, Inc.*,
   990 P.2d 163 (Kan. App. 1999) ........................................................................ 23

*Pooley v. Nat'l Hole-in-One Ass'n*,
   89 F. Supp. 2d 1108 (D. Ariz. 2000)........................................................ 12, 17, 20, 23

*Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*,
   510 F. Supp. 81 (D. Conn. 1981) ........................................................................ 7

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781 (1988) ........................................................................ 16

*SEG Sports Corp. v. Patterson*,
   No. 97-civ-712 (MEC), 1998 WL 230993 (S.D.N.Y. 1998) ........................................ 5, 19

*Shulman v. Group W Prod'ns*,
   18 Cal. 4th 200 (1998) ........................................................................ 6

*Snyder v. Phelps*,
   131 S. Ct. 1207 (2011) ........................................................................ 6

*Sorrell v. IMS Health Inc.*,
   131 S.Ct. 2653 (2011) ........................................................................ 3

*Waits v. Frito-Lay, Inc.*,
   978 F.2d 1093 (9th Cir. 1992)........................................................................ 12

*Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*,
   658 F.3d 614 (7th Cir. 2011) (Wood, J.)........................................................ 10, 11

*Yeager v. Cingular Wireless LLC*,
   673 F. Supp. 2d 1089 (E.D. Cal. 2009)........................................................ 15

*Zacchini v. Scripps-Howard Broad. Co.*,
   433 U.S. 562 (1977) ........................................................................ *passim*

**STATUTES**

USCA CONST AMEND. I ........................................................................ *passim*

CAL. CIV. CODE § 3344 ........................................................................ 21

KY. REV. STAT. § 391.170 ........................................................................ 20

TEX. PROP. CODE § 26.002 ........................................................................ 20

TEX. PROP. CODE §26.012 ........................................................................ 20

ANTITRUST PLAINTIFFS' RESPONSE TO BRIEF OF
*AMICI CURIAE* FOX BROADCASTING COMPANY
AND BIG TEN NETWORK, LLC

**OTHER AUTHORITIES**

Gustavo A. Otalvora, *Alfonso Soriano Is Getting Robbed: Why the Eighth Circuit Court of Appeals Made a Bad Call in* C.B.C. Distribution and Marketing v. Major League Baseball,  2008 U. ILL. J.L. TECH. & POL'Y 383 (Fall 2008)..................................................... 19

Patrick K. Thornton & Christopher James, *Down Two Strikes, Is Major League Baseball Already Out?: How the 8th Circuit Balked to Protect the Right of Publicity in* C.B.C. v. MLB, Advanced Media, 50 S. TEX. L. REV. 173 (2008) ..................................................... 19

Timothy W. Havlir, *Is Fantasy Baseball Free Speech? Refining the Balance Between the Right of Publicity and the First Amendment*, 4 DEPAUL J. SPORTS L. & CONTEMP. PROBS. 229 (2008)..................................................................................................................... 19

1

2

3

## INTRODUCTION

In their effort to condemn the Antitrust Plaintiffs' ("APs" or "Plaintiffs") claims, Fox Broadcasting Company and the Big Ten Network, LLC (the "Sports Broadcasters") distort APs' theory of antitrust liability, misinterpret (or ignore) the operative judicial precedents concerning the First Amendment, and resort to constant hyperbole, none of which should cloud the Court's evaluation of the parties' motions for summary judgment. The APs' antitrust claims for injunctive relief and damages against the National Collegiate Athletic Association ("NCAA") (which notably lacks any First Amendment rights in the staging of its sports events) do not in any way threaten "the public's right to be informed about newsworthy matters of substantial interest to large segments of the populace"—or the First Amendment rights of "news organizations" to provide that reporting. Brief of *Amici Curiae* Fox Broadcasting Co. and Big Ten Network, LLC" at 1 (Dec. 19, 2013) (Dkt. No. 940-1) ("Amicus Br."). Ultimately, the Sports Broadcasters, like the NCAA, ignore the fact that, on behalf of the class, the APs are asking merely for summary judgment granting a *prohibitory* injunction that would preclude the NCAA and its members from agreeing to pay nothing for the use of student-athlete ("SA") class members' names, images, and likenesses ("NIL"), not a *mandatory* injunction requiring a 50/50 split of television broadcast revenues. The Sports Broadcasters' arguments that in the APs' "but for" scenario there would be no group-licensing agreements with SAs to remunerate them for use of their NILs are thus largely beside the point.

The Sports Broadcasters join the NCAA in advancing a vision of Division I intercollegiate men's basketball and football that bears no resemblance to the real world. In the Sports Broadcasters' alternate reality, the NCAA organizes men's Division I football and basketball games without regard to whether broadcasters might want to televise the game. According to the Sports Broadcasters, because enough fans are interested in a game to make its outcome "newsworthy"—much like a protest, a public parade, or a political rally—and because broadcasters elect to televise it in its entirety, the First Amendment protection to which they are entitled is therefore identical to speech made at such a protest, parade, or rally. Requiring the

consent of the SAs participating in the game, the Sports Broadcasters argue, cannot possibly be required, and any such requirement would effectively impose on them an unrealistic obligation to likewise obtain the consent of protesters, politicians, spectators at parades, and anyone else who might be present at a "newsworthy" event.

Of course, as anyone who has watched a major sporting event on television knows, the real world is quite different. The NCAA and its member schools do not throw open the doors of their stadiums and arenas to any broadcasters or individuals wishing to televise these "newsworthy" games in their entirety. Instead, the NCAA and its member schools carefully control access to those games to permit whichever broadcaster is willing to pay the highest licensing fee to obtain the "exclusive" right to televise the game. And the NCAA, its conferences, and its member schools stage their games—and even, in some cases, "realign" their conferences—with a primary goal of maximizing television revenue.

The broadcaster's role in this world in airing the complete games is *not* to report the news. It is to purchase the right to televise pre-arranged, made-for-television events, the entertainment broadcast of which is enormously profitable to the NCAA, the broadcaster, and the broadcaster's advertisers—everyone except the participating SAs, who receive nothing for the use of their NILs. The Sports Broadcasters' attempt to characterize the broadcast of a two- to four-hour sports event in its entirety, interspersed with commercial advertisements (including advertisements during game play) as "news reporting" and "noncommercial speech" defies credibility and is inconsistent with the case law. Indeed, the Sports Broadcasters cannot point to a single case that grants sports broadcasts of entire games the same First Amendment protections as news reporting. In truth, the Sports Broadcasters are attempting to revive a long-settled debate. The United States Supreme Court held nearly forty years ago in *Zacchini v. Scripps-Howard Broad. Co*., 433 U.S. 562 (1977) ("*Zacchini*")—the only Supreme Court case to ever examine the right of publicity—"that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent." *Id*. at 575. The Sports Broadcasters' efforts to distinguish *Zacchini* fall flat, and recent circuit authority further confirms *Zacchini*'s

application here.

Moreover, even if the Court felt it necessary to weigh the First Amendment protection afforded the Sports Broadcasters' commercial speech against APs' interests—not to prevent games from being televised, but to finally enjoy *the opportunity* to license their NIL—the answer is clear.  Courts have repeatedly protected the property interest in one's NIL, and have never held it subservient to the interest of sports broadcasters in televising a football or basketball game suffused with in-game advertising.  There is no reason to change course now.  That is especially true given the Supreme Court's guidance that the First Amendment cannot immunize anticompetitive conspiracies from antitrust liability.[1]

Finally, the Sports Broadcasters' inventory of the rights of publicity throughout the United States is inaccurate and actually undermines their central point.  A proper analysis of those rights demonstrates, once again, that SAs *in most states* possess a right of publicity in game broadcasts.  Like the NCAA (in its most recent motion to dismiss), the Sports Broadcasters cannot disprove the existence of a national market because they cannot establish, despite their best efforts, that the laws in every state—or even most states—preclude such a right.

## ARGUMENT

### I.   THE FIRST AMENDMENT DOES NOT IMMUNIZE SPORTS BROADCASTERS THAT AIR COLLEGE FOOTBALL AND BASKETBALL GAMES IN THEIR ENTIRETY FROM RIGHT-OF-PUBLICITY CLAIMS.

The Sports Broadcasters argue that their First Amendment right to broadcast games—in their entirety, without the consent of athletes, and bathed in in-game advertising—trumps any SA's claim for remuneration for the use of their NIL.  The Supreme Court's opinion in *Zacchini*

---

[1] "The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech. That is why . . . antitrust laws can prohibit "agreements in restraint of trade."  *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2665 (2011) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)); *see In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, No. MDL 150 AWT, 1992 WL 133093, at *1 (C.D. Cal. Apr. 30, 1992) (First Amendment cannot immunize against liability for participation in price-fixing conspiracy).

makes clear that a performer may demand to be compensated for the unauthorized broadcast of his performance in its entirety, notwithstanding any First Amendment protection that might attach to news reporting of that event.  Even if that were not the case, the broadcasts of men's Division I basketball and football games are not entitled to plenary First Amendment protection (unlike after-the-fact reporting about the results of such events) because they are commercial speech, not communicative speech about matters of public concern.  It has become impossible to separate the game play in Division I men's football and basketball from the rampant commercial advertising and sponsorship that permeates the game broadcasts, even putting to one side the game-break advertisements.  And that lesser First Amendment protection yields to the property rights of these athletes.

> **A.**     **Live Broadcasts and Rebroadcasts of Entire Sporting Events Are Not "Communicative" Speech About "Matters of Public Concern."**

The Sports Broadcasters' assertion that game broadcasts are "just like news reporting on any other matter of public concern," and therefore are "entitled to the full scope of First Amendment protection," is simply incorrect.  *See* Amicus Br. at 1.  In making this argument, the Sports Broadcasters conflate the "reporting" of newsworthy aspects of NCAA games, which is indeed entitled to a high level of First Amendment protection, with the broadcasts of the game itself, which is not.

As a threshold matter, there can be no dispute that the games themselves are not "speech," and therefore are not entitled to any First Amendment protection.  "In its most basic form, athletic competition does not constitute pure speech; rather, participation in athletic competition constitutes physical activity or conduct."  *Justice v. NCAA,* 577 F. Supp. 356, 374 (D. Ariz. 1983).  In *Justice*, four University of Arizona football players claimed that NCAA sanctions against the Arizona football program, which included bans on postseason play and television appearances, violated their First Amendment right to freedom of expression.  The district court soundly rejected this argument, noting that "[i]ntercollegiate football, like other sports, is primarily a conduct-oriented activity; as such, it is not entitled to the same First Amendment protection that other more 'communicative' forms of entertainment have been afforded."  *Id.*

Other courts have repeatedly held that athletic competition is not protected by the First Amendment.  *See, e.g., Fighting Finest, Inc. v. Bratton*, 898 F. Supp. 192, 195 (S.D.N.Y. 1995) ("we have grave doubts whether . . . the sport of boxing is expressive activity protected by the First Amendment"), *aff'd*, 95 F.3d 224 (2d Cir. 1996); *Murdock v. City of Jacksonville,* 361 F. Supp. 1083, 1096 (M.D. Fla. 1973) (no First Amendment right to use city coliseum to present wrestling matches); *SEG Sports Corp. v. Patterson,* No. 97-civ-712 (MEC), 1998 WL 230993, at *4 (S.D.N.Y. 1998) (no First Amendment right to exhibit Ultimate Fighting Championships).  For this reason, the NCAA cannot claim that its role in staging games implicates the First Amendment.

The Sports Broadcasters suggest that if they are unable to purchase sports broadcast rights from the NCAA without the NCAA's first obtaining the prior consent of the SAs involved, the media will henceforth be required to "chase down right of publicity releases from every firefighter shown battling a forest fire, every police officer shown at a crime scene, every soldier shown in combat footage, every protester at Occupy Wall Street, every delegate at a national political convention, every participant or attendee at the Macy's Thanksgiving Day Parade, or every Times Square reveler on New Year's Eve."  Amicus Br. at 18.  The implication is that the broadcast of NCAA football and basketball games is entitled to the same level of First Amendment protection as these other events, but the analogy is fundamentally flawed.  In none of the Sports Broadcasters' examples is media access limited by the event organizer, as the NCAA limits broadcasters' access to its football and basketball games.  Nor do the organizers of those events use that limited access to sell broadcasting rights to the highest bidder, as the NCAA does.  When a broadcaster pays for the right to televise an NCAA game in its entirety, it is not "reporting newsworthy events" (*see* Amicus Br. at 18); it is merely partnering with the NCAA to expand the game's audience exponentially—and to prevent that audience from watching the game on competing networks—in order to sell advertising time, thereby allowing the NCAA, the broadcaster, and the advertisers to profit handsomely from the SAs' participation.  *See* "Declaration of Edwin Desser" at ¶¶3-15 (Jan. 13, 2014) (Dkt. No. 957-4) ("Desser Decl.").

If a game broadcast were entitled to absolute First Amendment protection, the NCAA would not be able to enter into exclusive contracts with broadcasters, charging substantial sums for denying access to a sporting event to the broadcaster's competitors. Likewise, if the Sports Broadcasters' First Amendment interest in broadcasting an NCAA game were absolute, that interest would be violated every time one of their competitors outbid them for the exclusive broadcast rights. The exclusive access to games and the monetary value the attendant broadcasts hold are among the many characteristics that separate the NCAA Division I men's football and basketball from the "public news events." The Sports Broadcasters do not cite a single case holding that a broadcast of a sporting event *in its entirety* is entitled to the same level of First Amendment protection as news reporting. Instead, they argue that *news* about sports and entertainment constitutes a matter of public interest—a point that no one contests—and they devote almost two pages to the topic of *reporting* about sports broadcasts. Amicus Br. at 4-5. In doing so, the Sports Broadcasters are attempting to raise a "straw man" argument. *Id.* at 4. However attenuated in this antitrust action, the only question is whether the First Amendment bars college football and basketball players' right to remuneration for use of their NILs in the game *broadcasts*.

Speech on public issues is entitled to absolute First Amendment protection. *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011). Speech addresses matters of public concern when it relates to "any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 1216 (citations and quotations omitted). But no court has held that the live, real-time broadcast of an athletic competition or re-broadcasts of prior competitions (as opposed to *news* about the competition after the fact) is "speech" about a "matter of public concern." [2] As

---

[2] Many of the cases that the Sports Broadcasters cite are inapplicable here, because they address discrete types of First Amendment protection that are not at issue in this litigation. *See, e.g.*, *Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2010) (analyzing widespread public interest under California anti-SLAPP analysis where plaintiff herself agreed her antics and catch-phrase were of widespread public interest); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 969 (10th Cir. 1996) (analyzing the protections afforded to parody baseball cards and finding that such cards are "no less protected [by the First Amendment] because they provide humorous rather than serious commentary"); *Shulman v. Group W Prod'ns*, 18 Cal. 4th

*Footnote continued on next page*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

one court has noted, the presentation of an athletic event has been found to be "on the periphery of protected speech . . . as opposed, for example, to political speech, which is at the core of first amendment protection." *Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*, 510 F. Supp. 81, 86 (D. Conn. 1981).

Because broadcasts of college football and basketball games are not entitled to plenary protection under the First Amendment, cases holding that the First Amendment provides a defense to misappropriation or right-of-publicity claims *based on publication of matters of public interest* also do not apply to this case. The cases that the Sports Broadcasters cite illustrate this principle. *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790 (1995) ("*Montana*"), for instance, dealt with Joe Montana's suit against a newspaper for publishing and using an artist's rendition of his likeness on the front page of a newspaper. *See id.* at 792. The artist had rendered Montana's image in conjunction with a newspaper publication commemorating the football team's many victories over the last decade. *Id.* The court held that the likeness was protected under the First Amendment, as the likeness was used in conjunction with a news story reporting the team's victories, and the plaintiff conceded as much. *See id.* at 794. Montana's only complaint, in fact, was directed at the contemporaneous use of his likeness on posters commemorating the victories. The court determined that the posters were used in conjunction with publicizing the newsworthy event of the plaintiff leading his team to multiple victories in the past decade, and thus were deemed newsworthy and protected by the First Amendment. *See id.* at 794-95.

The First Amendment protection in *Montana* extended to the news publication of a team's multiple victories after the fact—clearly a newsworthy event, which even Montana acknowledged. Again, this case does not involve news reports of a sporting event, but rather the contemporaneous and repeated broadcasts of an *entire event*, staged for the primary purpose of selling tickets and the exclusive broadcast rights to a single media company for profit. The media

---

*Footnote continued from previous page*
200, 224-25 (1998) (discussing freedom of expression involving news reporters and publishers and explaining the "considerable deference" afforded news reporters and publishers, who are reporting on newsworthy events of public interest).

company that wins the right to broadcast the game from a closed stadium or arena simply is not the same as news reporters and publishers who report from public spaces, and the Sports Broadcasts cannot make their broadcasts of games fit into that category, no matter how hard they may try.

**B.    *Zacchini* Is Dispositive.**

The Sports Broadcasters are dismissive of *Zacchini*, but that Supreme Court case is paramount in this debate.  "Human cannonball" Hugo Zacchini entertained fairgoers at the Geauga County Fair.  *Id*. at 563.  In the summer of 1972, Zacchini spied a freelance reporter carrying a movie camera at the fair and asked the reporter not to film his performance.  *Id*. at 564. The reporter complied but returned the following day and filmed the entire act, which was later broadcast on an evening news program in its entirety, joined by commentary.  *Id*.  Zacchini sued for damages in Ohio state court, claiming a violation of his right of publicity among other causes of action.  *Id*. at 564-65.  Ultimately, the Supreme Court granted certiorari to determine "whether the First and Fourteenth Amendments immunized [the broadcaster] from damages for its alleged infringement of [Zacchini's] statelaw 'right of publicity.'"  *Id*. at 565.

At the outset, the Supreme Court observed that Zacchini was not challenging any news report or commentary or description of his performance; his complaint was that the broadcaster had "filmed his entire act and displayed that film on television for the public to see and enjoy." *Id*. at 569.  After plumbing Supreme Court precedent, the Court held that "we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent."  *Id*. at 575.  That holding, the Court observed, did not interfere with anyone's ability to report "the newsworthy facts" about the act, nor did it cast doubt on whether entertainment warrants First Amendment protection generally.  *Id*. at 574-77.  Rather, it acknowledged the import of Ohio's right-of-publicity law, which, much like federal patent and copyright laws, "provides an economic incentive for [the performer] to make the investment required to produce a performance of interest to the public"—a product of Zacchini's "own talents and energy, the end result of much time, effort, and expense."  *Id*. at 575-76.  The Court noted as well that "[a]n entertainer usually has no objection to the widespread publication of his

act so long as he gets the commercial benefit of such publication." *Id*. at 573.  The same was true of Zacchini, who did not "seek to enjoin the broadcast of his performance; he simply want[ed] to be paid for it." *Id*. at 578.

*Zacchini* describes precisely the situation of class members.  These SAs have trained for years to be able to play at the highest levels of intercollegiate football and basketball and produce competition of the quality that commands such intense interest (and profit).  And anyone—from the Sports Broadcasters to the casual fan—can report on the results of this competition as they see fit.  But the First Amendment is no shield to sports broadcasters who broadcast basketball and football games in their entirety without the consent of the players, who, like Zacchini, have no desire to enjoin the broadcasts, but instead wish to be included in the massive revenues generated by the use of their NILs.

The Sports Broadcasters' attempt to quarantine *Zacchini* as "based on a highly unusual set of facts" is unpersuasive.  To begin with, the Sports Broadcasters emphasize that *Zacchini* addressed only the broadcasting of an entire act, but that is obviously the case with a basketball or football game too.  Today's Division I men's basketball and football broadcasts span well beyond the start of the first half and the end of the second.  *See*, *e.g*., Exhibits 71-72 to the "Declaration of Hilary K. Scherrer" (Jan. 13, 2014) (Dkt. Nos. 957-71 & 957-72) ("Scherrer Decl.").  Next, the Sports Broadcasters insist that *Zacchini* turned on the notion that once witnessed, "little interest would remain in turning out to see [Zacchini's performance] a second time."  Amicus Br. at 9.  Yet that reasoning is missing entirely from the Supreme Court's opinion.  On the contrary, the Court observed that the broadcast might have actually "stimulat[ed] the public's interest in seeing the act live," in which case there would be no damages, but that was a matter for trial.  *Zacchini*, 433 U.S. at 575 n.12 ("petitioner has alleged that the broadcast injured him to the extent of $25,000, . . . and we think the State should be allowed to authorize compensation of this injury if proved").  Regardless of the effect of the broadcast, one can imagine a repeat audience member who wants to witness the spectacle anew with friends or family or who returns curious to see if Zacchini can prevail over danger a second time.  Grasping at straws, the Sports Broadcasters also

contend that *Zacchini* is somehow limited to *predictable* performances.  Amicus Br. at 10.  That, too, is absent from the Supreme Court's exposition.  *See Zacchini*, 433 U.S. at 575-77.  And, again, it ignores the thrill of witnessing a human cannonball—a highly dangerous stunt that is not always successful.[3]

There is, however, one critical difference between this case and *Zacchini*, which the Sports Broadcasters elide.  In *Zacchini*, the act was broadcast in connection with a news report and was unquestionably noncommercial speech.  As shown below, the same cannot be said of the broadcast of men's Division I basketball and football games.

The Sports Broadcasters also neglect to mention that the Seventh Circuit recently reaffirmed *Zacchini in a case involving the broadcasts of sporting events over the internet*.  In *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co*., 658 F.3d 614 (7th Cir. 2011) (Wood, J.) ("*Wisconsin Interscholastic*"), the court considered whether the First Amendment permits Wisconsin Interscholastic Athletic Association ("WIAA"), a governing body for middle and high school athletics and a state actor, to contract with a private company, American HiFi, for the exclusive rights to broadcast entire athletic events online.  *Id*. at 616.  Gannett had broadcast four such games in their entirety without authorization, in a "First Amendment" protest of WIAA's requirement of consent and payment for any third-party broadcasts of WIAA games in full.  *Id*.  After determining that WIAA was a creator and disseminator of content for First Amendment purposes, the court identified *Zacchini* as the only governing authority, which extinguished Gannett's First Amendment argument.  *Id*. at 624, 629.  After all, this was a situation involving a broadcaster[4] that aired the *entire* act of certain performers—instead of merely reporting on the act—without first obtaining consent.  *Id*.  The court followed *Zacchini*'s reasoning and distilled its teachings as follows:

Interpreting the First Amendment to provide the media with a right to transmit an

---

[3] *E.g*., http://www.cnn.com/2011/WORLD/europe/04/25/england.human.cannonball/ (news report detailing 2011 human cannonball fatality and quoting a second performer who has suffered "broken bones and stuff" during his act).

[4] "Though WIAA is not the broadcaster of a television show in the traditional sense, we find no meaningful distinction between the online setting and more traditional media."  *Id*. at 623.

entire performance or to prohibit performers from charging fees would take us back centuries, to a time when artists or performers were unable to capture the economic value of a performance.  Over the long run, this would harm, not help, the interests of free speech.  The First Amendment requires no such folly.

In short, *Zacchini* establishes two propositions that guide our resolution of this case.  First, it distinguishes between the media's First Amendment right to "report on" and "cover" an event and its lack of a right to broadcast an "entire act." Second, *Zacchini* makes clear that the producer of entertainment is entitled to charge a fee in exchange for consent to broadcast; the First Amendment does not give the media the right to appropriate, without consent or remuneration, the products of others.

*Id.* at 624.  Thus, the fears of *amici* newspapers in *Wisconsin Interscholastic* (similar to

the concerns of the *amici* here) of a grave threat to "the fundamental right of the press to

comment on and cover school sporting events" were unfounded.  *Id.* at 621.

Moreover, the Seventh Circuit continued, Gannett's proposal "that reporting and

streaming are synonymous is also at odds with experience in the private sector."  *Id.* at

628.  The court explained:

> *There, everyone understands that there is a difference between a description of an event like the Super Bowl, Women's World Cup, or the College World Series and the right both to videotape that entertainment and then to publish it as one sees fit.* In each of these situations the producer of the entertainment—the NFL, FIFA, or *the NCAA*—normally signs a lucrative contract for exclusive, or semi-exclusive, broadcast rights for the performance.  Meanwhile, all media report on the events.

*Id.* (emphasis added).[5]

---

[5] The court in *Wisconsin Interscholastic* puts the producer of athletic events in the shoes of a performer.  But who constitutes the performer was not a question before the Seventh Circuit, and its discussion of the implications of Gannett's arguments make clear that the court was not distinguishing between producers and performers; the two were aligned for purposes of evaluating Gannett's contention:

> The logical implications of Gannett's argument are breathtaking.  Suppose *a high-school orchestra* were to perform one of Bach's Brandenburg Concertos or *the drama club* put together a rendition of *Othello* (both of which are in the public domain).  Gannett's argument would require the conclusion that *the students* have no right to engage in the common practice of packaging *their performance* and selling it to raise money for school trips.

*Footnote continued on next page*

1

2   Finally, the Sports Broadcasters attempt to cast doubt on the continuing viability of

3   *Zacchini*, although the Ninth Circuit has repeatedly cited *Zacchini* with approval—and the

4   Supreme Court has never overturned it.  *See, e.g., In re NCAA Student-Athlete Name & Likeness*

5   *Licensing Litig.*, 724 F.3d 1268, 1271 (9th Cir. 2013); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093,

6   1099 (9th Cir. 1992); *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1198 (9th Cir. 1989).

7   *Zacchini* remains good law and governs this dispute.

8

9   ### C.   Sports Broadcasts Are Commercial Speech.

10   Even if *Zacchini* were not dispositive, any First Amendment interest held by the Sports

11   Broadcasters and their competitors would yield to the SAs' right to be compensated for use of

12   their NIL because broadcasts of men's Division I basketball and football games are commercial

13   speech: thoroughly imbued with advertising, product placement, and corporate sponsor logos

14   *during the broadcasts* that complement the advertisements shown during commercial breaks.

15   "Generally, unauthorized use of a person's identity falls within one of two categories—

16   'communicative' or 'commercial.'"  *Pooley v. Nat'l Hole-in-One Ass'n*, 89 F. Supp. 2d 1108,

17   1113 (D. Ariz. 2000) ("*Pooley*").  While communicative use "is entitled to the highest level of

18   First Amendment protection," commercial use is not afforded the same level of protection.  *Id.*

19   The lesser protection granted to commercial speech is "appropriate for a somewhat larger

20   category of commercial speech—'that is, expression related solely to the economic interests of

21   the speaker and its audience.'"  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422

22   (1993) (quoting *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447

23   U.S. 557, 561 (1980)).

24   Indicia of commercial speech include an economic motivation; references to a particular

25   product; and speech that amounts to advertising.  *See Bolger v. Youngs Drug Prods. Corp.*, 463

26   U.S. 60, 67 (1983) ("*Bolger*"); *Charles v. City of Los Angeles*, 697 F.3d 1146, 1151 (9th Cir.

27   2012).  All three are found in abundance in men's Division I basketball and football games.  The

28
_____

*Footnote continued from previous page*
*Id.* at 628 (emphasis added).

- 12 -

Declaration of Edwin Desser (Dkt. No. 957-4)—a former 23-year senior executive with the National Basketball Association ("NBA") who rose to the post of President of NBA Television and New Media, and Executive Vice President, Strategic Planning and Business Development, and was the chief negotiator for all NBA national media agreements, including with every major sports broadcaster—details the product references and advertising that course throughout college football and basketball broadcasts.  "[J]ust like professional basketball and football games," Desser observes, college basketball and football games "[i]ntegrate advertising messages into the programming, including through product placement, on-field and court signage, sponsored program segments, vignettes, logo bugs and burn-ins, virtual advertising insertion, and a host of other techniques designed to make messages unavoidable and blur the line between content and advertising."  Desser Decl., ¶21j.  Likewise, college basketball and football games "[p]romote viewership of other network programming through recorded promotional announcements, live announcer-read drop-ins, pop-ups, and other on-air devices."  *Id*.  ¶21m.  Desser further states:

> NCAA telecasts contain large amounts of commercial materials, well beyond just the heavy load of actual ads inserted during time-out breaks.  Advertising signage is attached to the scoreboard and façade of the arena or stadium, it is physically painted on the field and court, and it is digitally embedded into the telecasts.  Some of these company logos are just on the TV screen.  Others are "virtual," inserted into the telecast, but made to look like they are part of the stadium or in the field of play.  And the game announcers often read promotional messages and "billboards" that acknowledge and thank[] corporate sponsors.  This practice is so pervasive, the advertising in sports telecasts is almost impossible to avoid.

*Id*. ¶23.  The January 3, 2014 Allstate Sugar Bowl (ESPN), in which Oklahoma beat Alabama, provides just one example:

> [T]he Allstate Insurance Company was the "Title Sponsor" of the event.  In addition to inclusion in the extensive pre-promotion, it received constant name exposure on the superimposed graphic scoreboard throughout the game action of the telecast.  It also had several large company logos on the actual field of play (something even the NFL doesn't permit).  Each Student Athlete in uniform had an event logo on his uniform (including the Allstate brand), Allstate also received end zone signage, goalposts, and the event logo on the safety net behind the goalposts.  It also received logos on the first down markers, and the company president was featured during the trophy presentation ceremony following the game.  There was also a several minute in duration Allstate-branded feature at halftime integrating the sponsor with mentions of the names, likenesses, video footage, and

background of about 20 Student Athletes and their respective charity works "honored" by Allstate . . . a clear example of commercializing the names and images of SAs.

The Allstate Sugar Bowl telecast also featured ample "product placement" on the field, designed to enhance the association between brands and the event.  This advertising is an embedded part of the telecast itself, fully integrated with the content, and essentially DVR proof.  For example, large AT&T's logos were on the coaches' headsets and Gatorade cups, coolers, and towels were placed in camera range on both team sidelines, where Student Athletes were seen using them during the game—essentially a product endorsement by the SAs.

In addition to the Allstate logo on each Student Athlete's team uniform, there were the logos for the uniform manufacturer (Nike), the helmet manufacturer (Riddell), the NCAA, the Conferences (SEC and Big 10 respectively), and the Bowl Championship Series logo (with sponsor).  Since these areas were those most often included in television close-ups shots, the SA's had the appearance of being like walking billboards during the game. . . .

Other advertising messages integrated within the fabric of the Allstate Sugar Bowl game telecast included multiple messages for Goodyear relating to the use of its blimp for aerial shots of the stadium and field of play, upcoming segment promos, studio desk signage, and onscreen graphics for halftime sponsor Buick, promotions for the upcoming "Discover Card" Orange Bowl, including event logos, on screen signage, and a lengthy promotion for the game from the stadium in Miami by the announcers on the field, on an event-logoed set.  Other major sponsors received mentions, enhancements, and features integrating game information and SAs within the body of the TV production, further blurring the lines between advertising and content.

*Id*. ¶¶24-27; *see also id*. ¶30  (demonstrating the corporate logos featured in bowl game insignia and detailing the purchase prices for bowl naming rights), ¶33 (noting a study of five BCS telecasts that revealed an average of 38 minutes of in-game sponsored graphics and sponsored graphics with verbal references); *id*., Ex. 2 (2014 BCS National Championship Football Commercial In Program Sponsor Enhancement Log).

The economic motivation of the Sports Broadcasters and their competitors is uncontroversial.  College basketball and football are big business, and broadcasters spend lavish sums on exclusive broadcast rights because more money yet is available to them from advertisers and corporate sponsors.  And, as Desser and the broadcasts submitted to the Court amply demonstrate, the broadcasts are rife with references to specific products.  *See supra* at 12-14; Scherrer Decl., Ex. 71 (*e.g.*, 4:27 ("The Taxslayer.com BCS pregame show is brought to you by

Taxslayer.com: File your federal return for only $9.95 with Taxslayer.com."), 27:50 ("Aerial

coverage brought to you by DirectTV: If you call yourself a sports fan, you've got to get

DirectTV."), 32:00 ("The Discover BCS National Championship is brought to you by the new

Discover IT card: Finally a credit card that is changing the game; Taco Bell: Sometimes you've

got to live *mas*; the new 2013 Ford F-150 with Eco-Boost; Allstate: Are you in good hands?; and

DirectTV: If you call yourself a sports fan, you've got to get DirectTV.  Call 1-800-

DIRECTTV."), 1:05:01 ("The Discover BCS National Championship is brought to you by

Cadillac: The Standard of the World; AT&T: Official sponsor of the Bowl Championship Series;

Coca-Cola Zero: Real coke taste with zero calories; and Tostitos: Where there's Tostitos, there's

a Party."), Scherrer Decl., Ex. 72 (dozens of NCAA, school, and conference logos interspersed

throughout the broadcast and stadium and constant ESPN 'bug'; Adidas and Final Four NCAA

logos sewn on to each player's jersey; rotating digital banner facing cameras highlighting

corporate sponsors, including, *e.g.*, Capital One (10:22), AT&T (24:28), and Coca-Cola (57:32);

and invitations to shop at "NCAA.COM/SHOP" (31:06) and to "BE A VIP" by purchasing

tickets and hospitality packages at "NCAA.COM/HOSPITALITY" (54:23), a web address that

forwards users to third-party vendor PrimeSport's e-commerce website).  Contrast that evidence

with the Sports Broadcasters' assertion—derided even by their viewers[6]—that game broadcasts

"serve only one purpose: to communicate the games to the public."  Amicus Br. at 12 ("The

Sports Broadcasters are not using footage or images of the broadcasts in commercial

advertisements or on billboards to sell cars *or propose any other type of commercial*

*transaction*.") (emphasis added).  That any given broadcast integrates references to dozens of

products,[7] as opposed to a single product, does not make the speech any less commercial.[8]

---

[6] http://deadspin.com/how-many-ads-are-in-your-college-sports-broadcast-
1501942406?webchats=on#replies (popular sports website posing the question "How Many Ads
Are In Your College Sports Broadcast?" and opining that the NCAA's position that game
broadcasts are [like] news programs and are not commercial broadcasts is "patently insane").

[7] *See, e.g.*, Desser Decl., Ex. 2 (2014 BCS National Championship Football Commercial In
Program Sponsor Enhancement Log).

[8] *See, e.g.*, *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001-03 (9th Cir. 2001) (use of
surfers' image in 250-page catalogue that included numerous items for sale as well as stories,
news and other editorial pieces constituted commercial speech); *Yeager v. Cingular Wireless*

*Footnote continued on next page*

ANTITRUST PLAINTIFFS' RESPONSE TO BRIEF OF *AMICI*
*CURIAE* FOX BROADCASTING COMPANY
AND BIG TEN NETWORK, LLC

1

2   Finally, the sum total of the viewing experience is undoubtedly advertising: advertising for the

3   "corporate partners," advertising for the equipment manufacturers, advertising for the schools at

4   hand,[9] and advertising for whichever businesses purchase the opportunity to be featured

5   throughout the stadium (or miles above it), digitally painted in the broadcast, or even physically

6   sewn onto the players' uniforms.  The invitations to purchase goods and services tied to athletics

7   (such as Gatorade drinks and Nike shoes) and having nothing to do with athletics (such as Vizio

8   televisions and Allstate insurance) are ubiquitous.[10]

9          The NCAA's own leadership has acknowledged the central function of the NCAA's

10  commercial character, particularly with respect to the broadcasting of NCAA events.  The

11  NCAA's immediate past president, the late Myles Brand, acknowledged that "[t]he NCAA has an

12  obligation, derived from its members, to maximize the revenue from [broadcast media] contracts

13  and to manage them following the best business practices." [11]  And according to the NCAA's

14  _____

15  *Footnote continued from previous page*
    *LLC*, 673 F. Supp. 2d 1089, 1097 (E.D. Cal. 2009) (finding commercial speech where Cingular

16  issued a press release concerning its mobile network's general preparedness for disasters, such as
    hurricanes, that incorporated Chuck Yeager's name and accomplishments).  *Cf. Bolger*, 463 U.S.

17  at 68 n.14 ("Nor do we mean to suggest that each of the characteristics present in this case must
    necessarily be present in order for speech to be commercial.  For example, we express no opinion

18  as to whether reference to any particular product or service is a necessary element of commercial
    speech.").

19  [9] Athletic achievements also provide effective marketing for NCAA member institutions, as
    confirmed by, *e.g.*, research showing a strong correlation between an institution's athletic success

20  and the quantity and quality of its admissions applications.  Doug J. Chung, *The Dynamic Effect
    of Advertising in College Athletics*, MARKETING SCIENCE, Oct. 2013, at 679.

21  [10] Nor are college football and basketball broadcasts mixed-content publications where
    commercial speech and non-commercial speech are readily separable, as with, say, a newspaper.

22  *See, e.g., Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012) ("*Dex*").  That
    would be the case perhaps if commercial advertising was confined to the advertisements between

23  game breaks.  But broadcasters have integrated advertising and commercial sponsorship into the
    game play and broadcasts, and there is no such division.  That is a choice, of course; the game

24  play and advertising are not "inextricably intertwined," as in the case of an address from a
    charitable organization on the challenges faced by the blind that ends with an invitation to support

25  the organization's efforts with a donation.  *See Riley v. Nat'l Fed'n of the Blind of N. Carolina,
    Inc.*, 487 U.S. 781, 795-96 (1988); *Dex*, 696 F.3d at 958-59.  As in *Hunt v. City of Los Angeles*,

26  638 F.3d 703, 715–16 (9th Cir. 2011)—where beach boardwalk vendors could "could easily sell
    their wares without reference to any religious, philosophical, and/or ideological element . . . and .

27  . . could also express any noncommercial message without selling these wares"—so too is it
    possible to broadcast a college football or basketball game shorn of advertising and commercial
    sponsorship.

28  [11] Myles A. Brand, State of the Association Speech, Jan. 16, 2006 (transcript available at
    http://fs.ncaa.org/Docs/NCAANewsArchive/2006/Association-

*Footnote continued on next page*

- 16 -        ANTITRUST PLAINTIFFS' RESPONSE TO BRIEF OF *AMICI
                                                             CURIAE* FOX BROADCASTING COMPANY
                                                             AND BIG TEN NETWORK, LLC

website, 90 percent of its revenue—a whopping $797 million in 2012-13—is derived from media

rights contracts.[12]  That profit motive alone does not transform the First Amendment analysis (or

render the resulting speech automatically commercial), *contra* Amicus Br. at 12, but it does

explain the NCAA and the Sports Broadcasters' relentless integration of advertising in the

broadcasts themselves.

Meanwhile, the Sports Broadcasters rely on *Pooley* for the proposition that all original

broadcasts are necessarily noncommercial speech.  That is not the case.  In *Pooley,* the district

court held that the First Amendment did not bar a professional golfer's right of publicity claim

against a company that used footage of him to promote its tournament events.  The court held that

the company's use of the footage—which showed the golfer making a hole-in-one at a

professional tournament more than a decade earlier—was not protected because the company

used it for "strictly commercial" purposes.  89 F. Supp. 2d at 1114.  The court contrasted the

original six-second achievement, in a public space "open to national observation and public

videotaping"—a far cry from the situation in this case—with the "strictly commercial" use of that

footage in an advertisement.  *Id.*; *see* Amicus Br. at 11 ("Importantly, as part of its well-reasoned

analysis, the *Pooley* court contrasted unprotected commercial use with the broadcast or

communication of the event *for news reporting purposes*.") (emphasis added).  Moreover,

*Pooley*'s suggestion that airing six seconds of footage highlighting the hole-in-one in the first

instance might receive First Amendment protection is consonant with the case law: just as a news

program can broadcast discrete clips of the winning touchdown pass, so too can a broadcaster

display short and unadorned footage of the hole-in-one, well short of the entire tournament.

Neither *Pooley* nor any other case has held that the broadcast of an entire event is automatically

noncommercial speech.

*Footnote continued from previous page*
wide/brand%2Bcharts%2Bcourse%2Bfor%2Bcollegiate%2Bmodel_s%2Bnext%2Bcentury%2B-%2B1-16-06%2Bncaa%2Bnews.html).  *See also*
http://www.nytimes.com/2013/08/25/sports/ncaafootball/college-footballs-most-dominant-player-its-espn.html?_r=0 (noting the increasing control that ESPN has over the scheduling of college football and basketball contests—and both college sports in general)
[12] *See* http://www.ncaa.org/wps/wcm/connect/public/ncaa/finances/index.html.

### D.     The Sports Broadcasters' Remaining Citations Are Distinguishable.

The Sports Broadcasters' remaining case citations do not inform the issue because they addressed very different scenarios.  For example, the Sports Broadcasters point to *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001) ("*Gionfriddo*"), as controlling for its holding that the use of former baseball players' names, statistics, and images on Major League Baseball's website and in game programs was protected by the First Amendment.  The court's focus there, however, was on the public interest in that factual background information, which the court characterized as baseball "history."  *Id.* at 410 ("they are fragments from baseball's mosaic"; "In the uses challenged, Baseball is simply making historical facts available to the public through game programs, Web sites and video clips."), 415.  *Gionfriddo* had nothing to do with the broadcast of games in their entirety.  Furthermore, the *Gionfriddo* plaintiffs' assertion of commercial speech rested merely on the idea that the use of their histories "help[ed] baseball owners [ultimately] make a profit."  *Id*. at 411 ("Profit, alone does not render expression 'commercial,' however.").  Nor did the *Gionfriddo* plaintiffs bother to explain "how Baseball's actions impair their economic interests."  *Id*. at 415.  In the end, "[b]alancing plaintiffs' *negligible economic interests* against the public's enduring fascination with baseball's past, we conclude that the public interest favoring the free dissemination of information regarding baseball's history far outweighs any proprietary interests at stake."  *Id*. (emphasis added).  APs differ in every respect.

Similarly, *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818 (8th Cir. 2007) ("*CBC*"), involved a fantasy sports website's use of names and statistics of major league baseball players.  As in *Gionfriddo*, this information was "all readily available in the public domain" and important to the history and understanding of the sport.  *See id.* at 823.  What is more, the uses did not affect the players' economic interests in any way.  *Id*. at 824.[13]  The court reached the same conclusion in *CBS Interactive Inc. v. NFL Players Ass'n, Inc.*,

---

[13] Note, too, that the Eighth Circuit appeared to consider the baseball players' performance salaries and endorsement opportunities elsewhere in determining whether the First Amendment barred their right-of-publicity claims in this particular instance.  *Id*.  That reasoning has proved

*Footnote continued on next page*

ANTITRUST PLAINTIFFS' RESPONSE TO BRIEF OF *AMICI CURIAE* FOX BROADCASTING COMPANY AND BIG TEN NETWORK, LLC

259 F.R.D. 398 (D. Minn. 2009) ("*CBS*"), with respect to a fantasy sports website's use of the names and statistics of professional football players. *Id.* at 417-18.

The district court's decision in *Dryer v. NFL*, 689 F. Supp. 2d 1113, 1117-18 (D. Minn. 2010), which this Court has cited approvingly (*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5778233, at *8 (N.D. Cal. Oct. 25, 2013) ("*NCAA*")), distinguished *Gionfriddo* because it applied a different legal standard than the one set forth in *Bolger* and distinguished *CBC* and *CBS* because they involved facts that were in the public domain. Here, in contrast, it is undisputed that telecasts of the NCAA's Division I men's football and basketball games are not in the public domain. They are licensed exclusively to specific networks under strict terms, and their copyrights are jealously guarded by the NCAA and its members.

## II.   APs' RIGHTS OF PUBLICITY ARE RECOGNIZED UNDER MOST STATUTORY AND COMMON-LAW SCHEMES.

This Court has already held that the anticompetitive restraint at issue is national in character, and accordingly any particular state-law preclusions do not undermine the national group-licensing market unless "*every* state" prevents SAs from asserting publicity rights to game broadcasts. *NCAA*, 2013 WL 5778233, at *7 (emphasis in original). Notwithstanding the Sports Broadcasters' assertion that right-of-publicity laws somehow do not apply to sports broadcasts, the law governing the publicity rights across the fifty states is overwhelmingly favorable to class members' rights of publicity in live games and rebroadcasts. The Sports Broadcasters' arguments regarding the scope of publicity laws largely rehash the same arguments: that the multibillion sports broadcasting industry presents only noncommercial, "public interest" speech. APs have

---

*Footnote continued from previous page*
highly controversial, *see, e.g.*, Timothy W. Havlir, *Is Fantasy Baseball Free Speech? Refining the Balance Between the Right of Publicity and the First Amendment*, 4 DePaul J. Sports L. & Contemp. Probs. 229, 249-50 (2008); Patrick K. Thornton & Christopher James, *Down Two Strikes, Is Major League Baseball Already Out?: How the 8th Circuit Balked to Protect the Right of Publicity in* C.B.C. v. MLB, Advanced Media, 50 S. Tex. L. Rev. 173, 187-88 (2008); Gustavo A. Otalvora, *Alfonso Soriano Is Getting Robbed: Why the Eighth Circuit Court of Appeals Made A Bad Call in* C.B.C. Distribution and Marketing v. Major League Baseball, 2008 U. Ill. J.L. Tech. & Pol'y, 383, 402 (Fall 2008), but there is no such obstacle to the college athletes here in any event: they have no other economic avenues because of the anticompetitive restraint.

already responded to these claims above.  In this section, APs address the Sports Broadcasters' "summary" of the law separately because it simply misreports and misrepresents the state of the law governing plaintiffs' claims.

While acknowledging that "a majority of states have recognized . . . either a right of publicity or a cause of action for misappropriation," the Sports Broadcasters paint a bleak picture for right-of-publicity claims arising from sports broadcasts, with plaintiffs swimming helplessly upstream.  Amicus Br. at 14.  Yet the Sports Broadcasters acknowledge that *nearly forty states* permit liability for a violation of the right of publicity, while identifying only eight that actually exempt sports broadcasts.  In truth, the vast majority of states have *not* exempted sports broadcasts from right-of-publicity claims.

**A.     The Statutory Authority Favors APs' Rights of Publicity in College Football and Basketball Games.**

The Sports Broadcasters claim that there are twenty-one states with statutory right-of-publicity causes of action, but they identify only eight states that explicitly exempt sports broadcasting:  California, Hawaii, Illinois, Nevada, Ohio, Oklahoma, Tennessee, and Washington.  The Sports Broadcasters erroneously place *ten* states on this second list, incorrectly including Arizona and Maryland.  These two states, however, do not have full statutory right-of-publicity causes of action, but instead have special statutory provisions *for soldiers* to complement broader common law principles.  *See Pooley,* 89 F. Supp. 2d at 1111-12 (recognizing common law tort under Arizona law for violations of the right of publicity); *Lawrence v. A.S. Abell Co.*, 475 A.2d 448, 449-51 (Md. 1984) (recognizing common law privacy-appropriation principles).   The Sports Broadcasters also incorrectly include Texas and Kentucky as statutory scheme right-of-publicity states; both states recognize a statutory right of publicity only for the *deceased* in addition to common law rights of publicity.  *See* KY. REV. STAT. § 391.170; TEX. PROP. CODE §§ 26.002, 26.012 (defining property rights of the deceased and excluding sporting events); *Henley v. Dillard Dep't Stores*, 46 F. Supp. 587 (N.D. Tex. 1999) (recognizing common law right-of-publicity tort arising from privacy torts).  In short, only eight of the twenty-

one statutory states identified by the Sports Broadcasters actually exempt sports broadcasts; the remaining thirteen states either address publicity claims through the common law or do not include sports broadcasts in their list of exemptions in the statute.  The weight of authority is *against* the Sports Broadcasters on this issue.

The proper inference from the state statutory schemes that do not exempt sports broadcasting is that these states intended to include liability for sports broadcasts within their right of publicity and thus omitted it from their exemptions.  When a state enumerates certain exempt uses of NILs and does not include sports broadcasts among them, as other states have done, basic principles of statutory construction dictate that sports broadcasts are not exempt.  *See Blandino-Medina v. Holder*, 712 F.3d 1338, 1345 (9th Cir. 2013) ("presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions").  Some states designate sports broadcasting as exempt, but most do not.  This should be the end of the Court's inquiry into statutory right-of-publicity schemes.

Instead of conceding this point, the Sports Broadcasters rely on the same fallacy addressed earlier: that the term "news" in every state statute must include sports broadcasts in their entirety.  As explained above, however, the Sports Broadcasters are wrong.  The Sports Broadcasters present no legislative history or statutory interpretation from the remaining statutory-scheme states suggesting that a news report or news presentation means "sports broadcasting" other than a lone barely relevant federal court case from Florida.[14]  To the contrary, the evidence presented by the Sports Broadcasters demonstrates that legislatures by and large have determined that sports broadcasting is separate and apart from news, and thus requires its own statutory exemption.  *See, e.g.*, CAL. CIV. CODE § 3344 (excepting "news, public affairs, or sports broadcast or account").[15]

---

[14]The court in *National Football League v. Alley, Inc.*, 624 F. Supp. 6 (S.D. Fla. 1983) ("*Alley*"), a case involving the broadcast of intercepted private transmissions of football games, did conclude—without any analysis—that for purposes of Florida's statutory right of publicity those broadcasts were a matter of public interest.  The court did not conclude that such an exemption would apply to any common-law right of publicity and, in fact, did not reach the common-law question because the plaintiff lacked standing to assert common law claims of the individual athletes in the broadcasts.  *Id*. at 10.

[15] California's law is illustrative of how news reporting, matters of public interest, sports broadcasts, and accounts relaying the outcome and highlights of sporting events are all separate

*Footnote continued on next page*

In a further attempt to overcome the obvious limits of their statutory claims, the Sports Broadcasters fall back on their familiar argument that college sports broadcasts are judicially exempted as arising from "noncommercial speech." The Sports Broadcasters do not establish that broadcasting a sporting event in its entirety is noncommercial speech and, as discussed above, broadcasts of NCAA football and men's basketball games are commercial speech. Without any evidence to overcome the unambiguous statutory language excluding sports broadcasting from the list of permissible uses of NILs, the Sports Broadcasters add nothing to this Court's analysis of statutory right-of-publicity schemes.

## B. The Common Law Favors APs' Rights of Publicity in College Football and Basketball Game Broadcasts.

The common-law right of publicity is distinct from ordinary invasion of privacy claims and is not necessarily subject to the same exceptions and privileges as privacy-appropriation torts, contrary to the Sports Broadcasters' suggestion. *See Doe v. TCI Cablevision*, 110 S.W.3d 363, 368 (Mo. 2003) (privacy tort focuses on mental distress while publicity tort focuses on unjust gain to defendant, even where elements are the same). Importantly, "the right of publicity is not always trumped by the right of free speech." *Id.* at 372. Similarly, "[w]hen actors, athletes or other performers object, not to a loss of anonymity, but to unauthorized exploitation of their valuable public identities, the remedy should reflect the wrongful appropriation of a 'right to publicity' that has economic value to the plaintiff as well as to the defendant, rather than damages for psychic distress at a loss of 'privacy.'" *Anderson v. Fisher Broad. Cos.*, 712 P.2d 803, 812 (Ore. 1986); *see also Hirsch v. S.C. Johnson & Son, Inc.*, 280 N.W.2d 129, 134 (Wis. 1979) ("Because the right of publicity - the right to control the commercial exploitation of aspects of a person's identity - differs from other privacy rights, it is appropriate for this court to recognize a cause of action to protect this right, although other privacy rights were rejected in prior decisions of this court.").

---

*Footnote continued from previous page*
concepts under publicity law.

- 22 -

Even if the same exceptions and privileges did apply, the Sports Broadcasters fail to establish that common-law right-of-publicity claims exempt sports broadcasts.  Yet again, the exemptions on which the Sports Broadcasters rely protect the reporting of facts and information—news, in other words—not the exclusive broadcast of an entire sporting event.  *See, e.g., Pooley,* 89 F. Supp. 2d  at 1111-12 (exception for, *inter alia,* news reporting [and] commentary); *Minnifield v. Ashcraft,* 903 So. 2d 818, 822-23 (Ala. App. 2004) (exception applies "because of the interest of the public in being informed") (citing *Smith v. Doss,* 37 So. 2d 118, 121 (1948)); *P Haskell v. Stauffer Commc'ns, Inc.,* 990 P.2d 163, 166 (Kan. App. 1999) (exception for "legitimate mention of public activities"); *see also Zacchini,* 433 U.S. at 575 (no First Amendment protection for appropriating performance in its entirety).[16]  In short, the Sports Broadcasters need not broadcast the sporting event in its entirety to report the news arising from the event  – *i.e.,* mentioning, relaying, and reporting the scores and highlights that are of interest to the public – that is exempted from the right of publicity.

**III.   EXISTING BROADCASTING PRACTICES DEMONSTRATE THAT APs' ANTITRUST CLAIMS WILL NOT CHILL ANY SPEECH OR PREVENT NEWS REPORTING ON MATTERS OF PUBLIC INTEREST.**

APs' claims will not chill speech nor will they prevent news reporting on matters of public interest.  As explained throughout this brief, news and news reporting are distinct from sports broadcasts of college football and basketball games in their entirety.  Acknowledging any right of publicity here will have absolutely no bearing on the law's treatment of news and news reporting. The Court can safely ignore the "parade of  horribles" offered by the Sports Broadcasters, because the question before the Court is not whether news organizations need to delay coverage while obtaining releases from those involved but merely whether the NCAA can sell the right to broadcast APs' images intertwined with advertising without obtaining their consent.

---

[16] *Alley* does not change this analysis.  The court expressly avoided a common-law analysis, as the plaintiff National Football League did not have standing to assert common-law right-of-publicity claims that may have accrued to the individual players.  *Alley,* 624 F. Supp. at 10.

1

2

<u>**CONCLUSION**</u>

3

For the foregoing reasons, the First Amendment is no bar to the APs' antitrust claims.

4

The Sports Broadcasters' novel argument that game broadcasts are merely news reporting on

5

matters of public interest is meritless and cannot defeat APs' antitrust claims.

6

7

Dated: January 23, 2014                    Respectfully submitted,

8

9

By:  */s/ Michael P. Lehmann*

10

Michael P. Lehmann (Cal. Bar No. 77152)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)

11

HAUSFELD LLP
44 Montgomery St., 34th Floor

12

San Francisco, CA 94104
Telephone:  (415) 633-1908

13

Facsimile:  (415) 358-4980
E-mail: mlehmann@hausfeldllp.com

14

          abailey@hausfeldllp.com

15

Michael D. Hausfeld (*pro hac vice*)
Hilary K. Scherrer (Cal. Bar No. 209451)

16

Sathya S. Gosselin (Cal. Bar. No. 269171)
HAUSFELD LLP

17

1700 K Street, NW, Suite 650
Washington, DC 20006

18

Telephone:  (202) 540-7200
Facsimile:  (202) 540-7201

19

E-mail: mhausfeld@hausfeldllp.com
          hscherrer@hausfeldllp.com

20

          sgosselin@hausfeldllp.com

21

*Plaintiffs' Class Counsel with Principal
Responsibility for the Antitrust Claims*

22

23

Melissa H. Maxman
Ronald F. Wick

24

COZEN O'CONNOR
The Army and Navy Building

25

1627 I Street, NW
Suite 1100

26

Washington, D.C. 20006
Telephone: (202) 912-4873

27

Facsimile:  (202) 640-5520
E-mail: mmaxman@cozen.com

28

          rwick@cozen.com

*Additional Counsel for Antitrust Plaintiffs*