Exhibit "A"

Richard L. Stone (Cal. Bar No. 110022)
rstone@jenner.com
Andrew J. Thomas (Cal. Bar No. 159533)
ajthomas@jenner.com
David R. Singer (Cal. Bar No. 204699)
dsinger@jenner.com
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:   (213) 239-5100
Facsimile:   (213) 239-5199

Attorneys for *Amici Curiae*
Fox Broadcasting Company and Big Ten Network, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | Case No. 09-cv-01967 CW (NC) |
| | **REPLY BRIEF OF *AMICI CURIAE* FOX BROADCASTING COMPANY AND BIG TEN NETWORK, LLC IN SUPPORT OF DEFENDANT NCAA'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.     Sports Broadcasts Are Communicative Speech Entitled To Full First Amendment Protection ............................................................................ 2

II.    Sports Broadcasts Are Publications On Matters of Public Interest Regardless Of Whether They Are Deemed News Reporting Or Entertainment ................ 6

III.   Neither *Zacchini* Nor *Wisconsin Interscholastic* Provides Guidance Here ............ 8

IV.   No Authority Supports Plaintiffs' Disingenuous Reading Of State Law ............. 12

CONCLUSION ............................................................................................................... 15

i

# TABLE OF AUTHORITIES

Page(s)

CASES

*Arenas v. Shed Media U.S. Inc.*,
  881 F. Supp. 2d 1181 (C.D. Cal. 2011) .................................................7

*Bi-Rite Enterprises v. Bruce Miner Poster Co.*,
  616 F. Supp. 71 (D. Mass. 1984) .......................................................10

*Board of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989)..............................................................................3

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983)......................................................................1, 3, 5

*Brown v. Entertainment Merchants Ass'n*,
  131 S. Ct. 2729 (2011)..........................................................................7

*Carson v. Here's Johnny Portable Toilets, Inc.*,
  810 F.2d 104 (6th Cir. 1987) ..............................................................10

*Cher v. Forum International*, *Ltd.*,
  692 F.2d 634 (1982)............................................................................12

*Davis v. Electronic Arts Inc.*,
  No. 10-3328, 2012 WL 3860819 (N.D. Cal. Mar. 29, 2012) ..............14

*Dex Media West, Inc. v. City of Seattle*,
  696 F.3d 952 (9th Cir. 2012) ....................................................... passim

*Dryer v. National Football League*,
  689 F. Supp. 2d 1113 (D. Minn. 2010)..................................................4

*Factors Etc., Inc. v. Pro Arts, Inc.*,
  579 F.2d 215 (2d Cir. 1978)................................................................10

*Gautier v. Pro-Football, Inc.*,
  304 N.Y. 354 (1952) .............................................................................5

*Gill v. Hearst Publ'g Co.*,
  40 Cal. 2d 224 (1953) ...........................................................................7

*Gionfriddo v. Major League Baseball*,
  94 Cal. App. 4th 400 (2001) ...............................................................14

*Gorran v. Atkins Nutritionals, Inc.*,
  464 F. Supp. 2d 315 (S.D.N.Y. 2006)...................................................5

ii

*Hoffman v. Capital Cities/ABC, Inc.*,
    255 F.3d 1180 (9th Cir. 2001) ...................................................................4, 5, 9

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ...........................................................................................1

*Ludtke v. Kuhn*,
    461 F. Supp. 86 (S.D.N.Y. 1978) ....................................................................14

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002) .............................................................................3

*Namath v. Sports Illustrated*,
    363 N.Y.S.2d 276 (N.Y. Sup. Ct. 1975) .........................................................14

*Nat'l Football League v. The Alley, Inc.*,
    624 F. Supp. 6 (S.D. Fla. 1983) ......................................................................14

*Pooley v. Nat'l Hole-In-One Ass'n*,
    89 F. Supp. 2d 1108 (D. Ariz. 2000) ..............................................................13

*Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*,
    510 F. Supp. 81 (D. Conn. 1981) ....................................................................11

*Schad v. Borough of Mount Ephraim*,
    452 U.S. 61 (1981) .............................................................................................7

*Shaw v. Dallas Cowboys Football Club, Ltd.*,
    172 F.3d 299 (3d Cir. 1999) ............................................................................13

*Shulman v. Group W Productions, Inc.*,
    18 Cal. 4th 200 (1998) .......................................................................................8

*Snyder v. Phelps*,
    131 S. Ct. 1207 (2011) ...................................................................................2, 7

*Stepien v. Franklin*,
    39 Ohio App. 3d 47 (1988) .............................................................................14

*Time, Inc. v. Johnson*,
    448 F.2d 378 (4th Cir. 1971) ..........................................................................14

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) ...........................................................................................3

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)....................................................................................3, 4, 5

*Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*,
  658 F.3d 614 (7th Cir. 2011) ........................................................................2, 10, 11

*Zacchini v. Scripps-Howard Broadcasting Co.*,
  433 U.S. 562 (1977).......................................................................................2, 8, 9

STATUTES

Cal. Civ. Code § 3344(d) ......................................................................................13

Ind. Code § 32-36-1-1(c)(1)(C) ...........................................................................13

N.Y. Civ. Rights Law §§ 50-51 ...........................................................................13

OTHER AUTHORITIES

2 J. Thomas McCarthy, THE RIGHTS OF PUBLICITY & PRIVACY § 11:22 (2d ed. 2013) ..................9

1

### INTRODUCTION

2         Plaintiffs ask this Court to be the first ever to hold that sports broadcasts are not entitled to full

3   First Amendment protection and that each participant in a televised athletic event can assert publicity-

4   right claims based on the broadcast of the event.  Plaintiffs' broadside to fundamental notions of free

5   speech is cloaked in an antitrust claim based on a purported national "group licensing" market for

6   their names, images, and likenesses.  As this Court has observed, "[a]lthough Plaintiffs have not

7   technically asserted any right-of-publicity claims here, their rights of publicity nevertheless remain

8   relevant because their antitrust claims depend in part on the existence of a 'group licensing' market

9   where, absent NCAA rules, student-athletes would be able to sell their publicity rights in 'broadcasts

10  or rebroadcasts of Division I basketball and football games.'"  Order Den. Mots. to Dismiss ("Order")

11  16:20-17:1, Oct. 25, 2013, ECF No. 876 (citing operative complaint ("3CAC") ¶ 391).

12        Plaintiffs' Response to the Sports Broadcasters' Amicus Brief (the "Response"), which is

13  riddled with fundamental misstatements of First Amendment law, highlights the vital importance of

14  considering the burden on free speech threatened by Plaintiffs' unprecedented claims.  Plaintiffs urge

15  the Court to adopt a redefinition of the commercial speech doctrine and the constitutional public

16  interest defense that is directly at odds with the precedents of the Supreme Court and this Circuit.

17  Their extreme argument that broadcasts of college football and basketball games are commercial

18  speech ignores "the *core notion* of commercial speech – speech which does no more than propose a

19  commercial transaction," *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (emphasis

20  added) (internal quotation marks omitted), as well as binding authority that sets forth the proper

21  analysis for determining whether a publication is fully protected by the First Amendment.  There is

22  no question that sports broadcasts do far more than propose a commercial transaction.  The fact that

23  these broadcasts are supported by advertising does not make them commercial speech.  As the

24  Supreme Court made clear more than 70 years ago, the fact "[t]hat books, newspapers, and magazines

25  are published and sold for profit does not prevent them from being a form of expression whose liberty

26  is safeguarded by the First Amendment."  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

27        Plaintiffs also misstate First Amendment law by arguing that live sports broadcasts are not

28  publications on matters of public interest because they are "entertainment broadcasts."  That is plainly

1    wrong.  For many Americans, sports is the *only* news that matters.  But more importantly, courts do

2    *not* distinguish between news reports and entertainment features when applying the First Amendment,

3    an analysis the Supreme Court has emphasized is guided by "principles that accord broad protection

4    to speech."  *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011).

5            In demanding a financial cut of the NCAA's, the conferences', and the teams' exclusive

6    licenses with broadcasters, Plaintiffs mistakenly rely on *Zacchini v. Scripps-Howard Broadcasting

7    Co.,* 433 U.S. 562 (1977), a narrowly drawn decision concerning the broadcast of a single carnival

8    performer's "entire act," and *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614

9    (7th Cir. 2011), a decision regarding a news entity's right-of-access claim, not the purported publicity

10   rights of athletes.  Neither of these cases supports the radical extension of publicity rights over the

11   protections of the First Amendment that Plaintiffs propose here, which would effectively require

12   broadcasters and news organizations to obtain publicity releases from (or offer compensation to)

13   every participant in an athletic contest or otherwise newsworthy event to avoid liability for showing

14   images or footage of the event.  The ramifications for free speech and the flow of newsworthy

15   information to the public are immense:  the Sports Broadcasters' ability to televise a game could be

16   held hostage, and thereby censored, by any athlete, referee, coach, cheerleader, team mascot, or

17   disgruntled fan who denies permission to include their image in the broadcast.

18           In addition to the First Amendment protections for sports broadcasts, state laws also bar the

19   Sports Broadcasters' liability for misappropriation claims.  Plaintiffs do not cite a single case that

20   recognizes a right of publicity claim, under the law of *any* state, arising from the use of an athlete's

21   name, image, or likeness in a sports broadcast.

22           For these reasons, the Court should reject Plaintiffs' overreaching antitrust claims predicated

23   on an alleged market for publicity rights in sports broadcasts that simply do not exist.

## ARGUMENT

24

25   **I.      Sports Broadcasts Are Communicative Speech Entitled To Full First Amendment**

26           **Protection.**

27           As this Court correctly noted, "the central question in determining whether the First

28   Amendment bars an athlete's right-of-publicity claim is whether the defendant's use of the athlete's

2

name, image, or likeness is primarily 'commercial.'" Order at 20:14-18.  At the pleading stage, the Court gave Plaintiffs the benefit of the doubt that it was "plausible that at least some of the broadcast footage described in the complaint – *particularly the promotional highlight films and the 'stock footage' sold to advertisers* – was used primarily for commercial purposes." *Id.* at 21:19-22 (emphasis added).  The Court made clear, however, that at summary judgment "Plaintiffs will need to submit evidence that the relevant broadcast footage on which their claims are based – including both the archival game footage and the live game broadcasts – was used primarily for commercial purposes." *Id.* at 22:2-5.

In their attempt to respond to this Court's admonishment, Plaintiffs awkwardly try to shoehorn sports broadcasts into the category of commercial speech by ignoring "the *core notion* of commercial speech – 'speech which does no more than propose a commercial transaction.'" *Bolger*, 463 U.S. at 66 (emphasis added) (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)); *accord United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (commercial speech is "usually defined as speech that does no more than propose a commercial transaction"); *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989) (describing this standard as "the test" for commercial speech); *Dex Media W. Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012) (describing it as the "traditional test").  As the Ninth Circuit has explained, "[i]f speech is not 'purely commercial' – that is, if it does more than propose a commercial transaction – then it is entitled to full First Amendment protection." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002).

The Ninth Circuit recently clarified the two-step analysis outlined by the Supreme Court for determining whether speech is fully protected by the First Amendment or whether it receives only limited constitutional protection as commercial speech.  *See Dex Media*, 696 F.3d at 957-58.  The first step is to determine whether a publication as a whole constitutes commercial speech "either (1) under the traditional test from *Virginia Pharmacy*, because the speech 'does no more than propose a commercial transaction'; or, (2) in 'close question[s],' because the publication reflects other characteristics, such as the factors identified by the Supreme Court in *Bolger*." *Id.* at 958 (alteration in original) (citation omitted).  Those factors include (i) whether the publication is an advertisement,

3

1 (ii) whether it refers to a specific product, and (iii) whether the speaker has an economic motive. *Id.*

2 Under the second step, even if the speech has attributes of commercial speech, courts must consider

3 "whether the speech still receives full First Amendment protection, because the commercial aspects

4 of the speech are 'inextricably intertwined' with otherwise fully protected speech, such that the

5 publication sheds its commercial character and becomes fully protected speech." *Id.*

6     Although Plaintiffs cite *Dex Media* in a footnote, they fail to follow the two-step approach it

7 mandates.  Instead, they rely entirely on part (2) of the first step – an alternate test that only applies in

8 cases that present a "close question."[1]  Whether sports broadcasts are noncommercial speech is not a

9 close question.  They depict the competition between opposing teams, the sequence of plays, the

10 points scored, the direction from coaches, calls by referees, half-time shows, cheerleading, and

11 commentary by sportscasters, just to name a few of the fundamental elements that do not propose any

12 commercial transaction.[2]

13     Even assuming that sports broadcasts posed a "close question," Plaintiffs fail to satisfy that

14 test.  *Dex Media* is instructive.  There, the Ninth Circuit held that phonebooks containing community

15 information and phone listings, as well as a "wide array" of paid advertisements that "ma[de] up less

16 than half of the content," were not commercial speech under either the "traditional" *Virginia*

17 *Pharmacy* test or the "close question" *Bolger* test.  *Dex Media*, 696 F.3d at 959.  The court found that

18 "a yellow pages directory, as a whole, does not fulfill two of the three *Bolger* factors.  Even the most

19 cursory examination of the yellow pages directory reveals that it is not concededly an advertisement

20 and it does not refer to a specific product."  *Id.* (citations, alterations and internal quotation marks

21 omitted).  The publication was "qualitatively different from an advertising leaflet put forth by an

22 *individual merchant* to tout *only its own products*."  *Id.* (emphasis in original) (citation omitted).

---

24 [1] To the extent that *Dryer v. National Football League*, 689 F. Supp. 2d 1113, 1116-1117 (D. Minn.
25 2010), stands for the proposition that courts must always apply the "close question" test to determine
whether speech is commercial or noncommercial, it is inconsistent with Supreme Court and Ninth
26 Circuit precedent.  *See Dex Media*, 696 F.3d at 957-59 (explaining that courts *either* apply the
traditional "does no more than propose a commercial transaction" test *or* the "close question" three-
27 factor approach); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185-86 (9th Cir. 2001)
(applying the traditional test in a right-of-publicity case).

28 [2] In contrast to sports broadcasts, "promotional highlight films and the 'stock footage' sold to
advertisers" might present a close question.  *See* Order at 21:19-22.

4

1    Likewise, a sports broadcast is qualitatively different from an individual merchant's advertisement for

2    its own products – *e.g.*, a television advertisement for a product that airs during a commercial break.

3           Plaintiffs do not bother to address individually the so-called "[i]ndicia of commercial speech"

4    identified in *Bolger*, but instead nakedly assert that "[a]ll three are found in abundance in men's

5    Division I basketball and football games" and recite a hodgepodge of facts about the

6    "commercialization" of college sports.  Response at 12:24-27, 13:7-17:6.  They do not cite a single

7    case to support their contention that logos of corporate sponsors and sideline banners captured in a

8    sports broadcast make the broadcast as a whole commercial speech.  Under Plaintiffs' overreaching

9    view of the commercial speech doctrine, "Masterpiece Theater" is commercial speech because it is

10   sponsored by Ralph Lauren, and a New Years' Eve television special or documentary about New

11   York that shows billboards in Times Square would constitute commercial speech.  The case law flatly

12   rejects such an all-encompassing rule.  *See Hoffman*, 255 F.3d at 1183, 1185-86 (magazine's use of

13   altered image of Dustin Hoffman's "Tootsie" character wearing Ralph Lauren shoes and a Richard

14   Tyler gown was not commercial speech, even though the magazine featured a Ralph Lauren ad and a

15   "Shopper's Guide" in the back of the magazine that provided stores and prices for the shoes and

16   gown); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326-28 (S.D.N.Y. 2006) (book and

17   website with commercial references to products and services was not commercial speech), *aff'd*, 279

18   F. App'x 40 (2d Cir. 2008); *see also Gautier v. Pro-Football, Inc.*, 304 N.Y. 354, 358 (1952)

19   ("Although the telecast [of a football game] was paid for by defendant Liggett & Myers Tobacco Co.,

20   the entire program was not thereby constituted a solicitation for patronage.").

21          Finally, even assuming Plaintiffs could establish that sports broadcasts are commercial under

22   the *Virginia Pharmacy* or *Bolger* tests, because the commercial portions of sports broadcasts are

23   "inextricably intertwined" with the noncommercial portions, the broadcasts nonetheless would be

24   fully protected by the First Amendment.  *See Dex Media*, 696 F.3d at 962.  Tellingly, Plaintiffs ignore

25   the Ninth Circuit's extensive discussion in *Dex Media* of television broadcasts as a paradigmatic

26   example of works accorded full First Amendment protection, which the Court found should also

27   apply to telephone directories.  *Id.* at 965.  As the Ninth Circuit explained:

28          The full First Amendment protection of newspapers, magazines, television shows, radio
            programs, and the like demonstrates that the inclusion of commercial material does not

5

support treating those publications and broadcasts as commercial speech entitled to less First Amendment protection.  A newspaper or magazine could be subscription-only and contain no advertisements, and broadcasters could similarly forego commercials and rely upon other sources of income.  There is no legal requirement that these publications defray costs – or make profits – with advertising.  But public broadcasting and *Consumer Reports* are the very limited exceptions, not the rule.  The *Seattle Times* is owned by a private corporation and operated as a commercial enterprise, like the *New York Times*, the *Wall Street Journal*, and virtually all major American newspapers.  So, too, are the commercial television and radio networks, their affiliates in Seattle, and the substantial majority of television and radio stations across the nation.

*Id.* at 963.  The Ninth Circuit found that the inclusion of advertising in a phonebook to finance its publication  – like the inclusion of ads in a newspaper or a television broadcast – was inextricably intertwined with the noncommercial speech and did not transform the phonebook into "commercial speech.  *Id.* at 964-65.

Here, too, the inclusion of advertising in sports broadcasts is inextricably intertwined with noncommercial speech.  Indeed, Plaintiffs' Response repeatedly asserts that the advertising is "integrated" into game broadcasts and that the commercial and noncommercial elements are not "readily separable."  *E.g.*, Response at 16 n.10.  They nevertheless contend that the those elements are not "inextricably intertwined" because broadcasters have chosen to integrate those elements.  *Id.*  As the Ninth Circuit recognized, however, newspapers and other fully protected publications predominantly *choose* to make a profit by selling advertising that is interspersed with protected speech.  *See Dex Media*, 696 F.3d at 963 ("public broadcasting and *Consumer Reports* are the very limited exceptions, not the rule").

Thus, applying the correct standards for commercial speech, there is no question that the sports broadcasts at issue are communicative, not commercial, speech.

## II.    Sports Broadcasts Are Publications On Matters of Public Interest Regardless Of Whether They Are Deemed News Reporting Or Entertainment.

Plaintiffs contend that the constitutional privilege for speech on matters of public concern does not apply here because sports broadcasts are not news reporting.   Although sports broadcasts, which communicate to the public information, commentary, and video images of sporting events, indeed constitute "news reporting," Plaintiffs' characterization of televised games as an

6

1  "entertainment broadcast" is beside the point.  The scope of the constitutional public interest defense

2  is not limited to news reporting.[3]

3      As an initial matter, the Supreme Court has long recognized that "[e]ntertainment, as well as

4  political and ideological speech, is protected; motion pictures, programs broadcast by radio and

5  television, and live entertainment, such as musical and dramatic works fall within the First

6  Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65-66 (1981) (collecting

7  cases); *see also Gill v. Hearst Publ'g Co.*, 40 Cal. 2d 224, 229-30 (1953) ("the constitutional

8  guaranties of freedom of expression apply with equal force to the publication whether it be a news

9  report or an entertainment feature").  As the Supreme Court recently explained, "[t]he Free Speech

10  Clause exists principally to protect discourse on public matters, but we have long recognized that it is

11  difficult to distinguish politics from entertainment, and dangerous to try." *Brown v. Entertainment*

12  *Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011).

13      With respect to the public concern test, the Supreme Court has articulated "guiding principles

14  . . . that accord broad protection to speech." *Snyder*, 131 S. Ct. at 1216.  "Speech deals with matters

15  of public concern when it can be fairly considered as relating to any matter of political, social, or

16  other concern to the community, or when it is a subject of legitimate news interest; that is, a subject

17  of general interest and of value and concern to the public." *Id.* (citations and internal quotation marks

18  omitted).  Although the Supreme Court recognized that speech on a matter of public concern may

19  relate to "a subject of legitimate news interest," it has never limited the doctrine to "news reporting"

20  as Plaintiffs suggest.  Lower courts have routinely recognized that any publication on a matter of

21  public concern, whether it is a traditional news report or an entertainment broadcast, is protected by

22  the First Amendment.  *See*, *e.g.*, *Arenas v. Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181, 1191-92

23  (C.D. Cal. 2011) ("First Amendment protection is not limited to news stories on current events:

24  Entertainment features receive the same constitutional protection as factual news reports." (citation

25

26

---

27  [3] Plaintiffs' argument that the *games* themselves are not "speech" is a red herring.  *See* Response at
   4:20-5:10.  At issue are the *television broadcasts* of games, which contain video footage of the games

28  from multiple camera angles, play-by-play commentary, sideline reports, interviews, and other
   analysis.  As discussed above, these television programs are clearly "speech."

7

and internal quotation marks omitted)); *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 225 (1998) ("[N]ewsworthiness is not limited to 'news' in the narrow sense of reports of current events.  It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published." (citation and internal quotation marks omitted)).

This broad definition plainly encompasses sports broadcasts – speech of paramount concern to large segments of the American public.  Plaintiffs themselves acknowledge (and could not possibly deny) that intercollegiate football and basketball "command[] . . . intense interest."  Response at 9:7; *see also* 3CAC ¶ 189 (acknowledging "continuing tremendous interest in college football powerhouses"), ¶¶ 194 & 210 (admitting "continuing tremendous interest" in college basketball players and plays), ¶ 437 (quoting claim that "[c]onsumer devotion to college institutions is unrivaled").  They do not and cannot cite a single case that limits the public concern test to news reports.

## III.   Neither *Zacchini* Nor *Wisconsin Interscholastic* Provides Guidance Here.

This Court has previously recognized that "*Zacchini* does not provide a clear test for balancing the right of publicity against free speech concerns."  Order at 19:1-2.  As the Sports Broadcasters explained in their Amicus Brief, the Supreme Court's 5-to-4 decision in *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562 (1977), was based on a highly unusual set of facts that finds no analogue here.  The plaintiff in *Zacchini* depended for his livelihood on crowds showing up at the local fairgrounds to watch the spectacle of his "human cannonball" routine.  433 U.S. at 563-65.  Under those narrow facts, the Court found that the unauthorized broadcast of his "entire act" would diminish the public's interest in paying for a ticket to see the very same performance over again.  *Id.* at 575-76.  The Court reasoned, "if the public can see the act free on television, it will be less willing to pay to see it at the fair.  The effect of a public broadcast of the performance is similar to preventing petitioner from charging an admission fee."  *Id.*; *see* Order at 18:21-25.

Plaintiffs' Response incorrectly states that this "reasoning is missing entirely from the Supreme Court's opinion."  Response at 9:21.  Plaintiffs also misleadingly quote a footnote in which the Court speculated on the possibility "that respondent's news broadcast increased the value of

8

petitioner's performance by stimulating the public's interest in seeing the act live." *Id.* at 9:22-23.  In its footnote, the Court made clear that Zacchini would not be entitled to any recovery if the broadcast in fact increased the economic value of Zacchini's cannonball act, rather than destroying the value of the act as hypothesized in the body of the Court's opinion. *See Zacchini*, 433 U.S. at 575 n.12.  The Court never suggested that Zacchini would be entitled to any licensing fees under circumstances where the television broadcast did not destroy the economic viability of his act.  Here, in contrast, Plaintiffs do not contend that the game broadcasts in any way prevent charging an admission fee to attend a live game or otherwise make the existence of live sporting contests untenable.   To the contrary, they contend that live broadcasts "expand the game's audience exponentially."  Response at 5:25.

Plaintiffs dismiss the vast differences between Zacchini's cannonball routine, the same act repeated over and over at the county fair, from college football and basketball games, which are inherently unique, with different plays unfolding in different sequences, different highlights and critical moments, different players, different scores, and different outcomes. *See* Response at 10:3-5. But this distinction is fundamental to the Supreme Court's reasoning that the broadcast of Zacchini's unvarying "entire act" would substantially harm the economic value of his act, *i.e.*, would function as a substitute for "pay[ing] to see it at the fair." *Zacchini,* 433 U.S. at 575.

Plaintiffs also contend that "the players, . . . like Zacchini, have no desire to enjoin the broadcasts, but instead wish to be included in the massive revenues generated by the use of their NILs." Response at 9:10-12.  Plaintiffs misread *Zacchini* in arguing that the First Amendment is not implicated unless a plaintiff seeks injunctive relief.  In the narrow factual context presented in that case, the First Amendment did not bar an award of damages against a television station that aired the plaintiff's *entire act*. *Zacchini*, 433 U.S. at 576.  The Court suggested, however, that the First Amendment might bar injunctive relief under those circumstances. *Id.* at 578.  In any event, courts subsequently have made clear that the First Amendment also provides a defense to right of publicity claims where a plaintiff only seeks damages. *See*, *e.g.*, *Hoffman*, 255 F.3d at 1189.

Moreover, Plaintiffs ignore the fact that *any plaintiff* can generally obtain injunctive relief in right of publicity actions. *See* 2 J. Thomas McCarthy, THE RIGHTS OF PUBLICITY & PRIVACY § 11:22

9

(2d ed. 2013) (explaining that injunctive relief is the usual remedy under state right of publicity statutes); *see, e.g.*, *Carson v. Here's Johnny Portable Toilets, Inc.*, 810 F.2d 104, 105 (6th Cir. 1987) (affirming injunction); *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 222 (2d Cir. 1978) (same), *abrogated in part on other grounds by Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990); *Bi-Rite Enters. v. Bruce Miner Poster Co.*, 616 F. Supp. 71, 76 (D. Mass. 1984) (granting injunction), *aff'd*, 757 F.2d 440 (1st Cir. 1985).  Here, Plaintiffs already have sent cease and desist letters to the Sports Broadcasters, warning that Sports Broadcasters "have no right to … broadcast … the names, images and likeness of former NCAA Division I men's basketball players … without entering into appropriate license agreements with the owners of those rights, the former college athletes themselves."  *See* Related Case 4:12-mc-80020-CW, ECF No. 2-2 at 2; Related Case 4:11-mc-80300-CW, ECF No. 40-2 at 2.[4]

The Seventh Circuit's decision in *Wisconsin Interscholastic* likewise provides no support for Plaintiffs' antitrust claim based on a purported "group licensing" market.  *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614 (7th Cir. 2011).  That case did not even concern a right of publicity claim, and it did not consider the level of First Amendment protection to be accorded to broadcasts of the sporting events in question.  The court instead considered an entirely different issue – whether the First Amendment barred a state actor, the Wisconsin Interscholastic Athletic Association ("WIAA"), from entering into exclusive licensing agreements for Internet streaming of middle and high school athletic events.  The case concerned a newspaper that streamed four playoff football games online without the consent of the WIAA's exclusive licensee and then refused to pay any fee.  *Id.* at 618.  The WIAA brought an action for a declaratory judgment that its Media Policies were compatible with the First Amendment, and the newspaper company (Gannett) asserted a counterclaim under section 1983 "charging that a state actor (WIAA) is unlawfully censoring their speech through its Media Policies."  *Id.* at 621.  The Seventh Circuit held that the WIAA, as the

---

[4] Whether Plaintiffs are seeking to enjoin sports broadcasts at this time is irrelevant.  Earlier in this case, they stated unequivocally that "our claims do not emanate from the live broadcasts."  *See* Mot. to Compel Hr'g Tr. 14: 21-23, Related Case No. 4:11-mc-80300-CW, Feb. 13, 2012, ECF No. 146. However, they subsequently amended the complaint to assert claims based on live broadcasts and could just as easily change their minds about seeking an injunction against such broadcasts.

1  organizer of the athletic events and the "creator and disseminator of content," was acting in a state-as-

2  proprietor role, not a state-as-regulator role, and therefore could enter into exclusive licensing

3  arrangements with broadcasters.  *Id.* at 623-24.[5]

4          In short, Plaintiffs confuse the First Amendment right of access asserted by Gannett in

5  *Wisconsin Interscholastic* with the First Amendment protections afforded to speech about matters of

6  public interest – an issue that was not addressed by the Seventh Circuit.  If anything, *Wisconsin*

7  *Interscholastic* undermines Plaintiffs' arguments.  Plaintiffs argue that "[i]f a game broadcast were

8  entitled to absolute First Amendment protection, the NCAA would not be able to enter into exclusive

9  contracts with broadcasters."  Response at 6:2-3.  But *Wisconsin Interscholastic* reached the opposite

10  conclusion.  The Seventh Circuit compared the WIAA to a "broadcaster of television," *id.* at 623, and

11  found there was no reason grounded in the First Amendment that would prohibit exclusive broadcast

12  agreements, *id.* at 626 ("[Plaintiff] has shown us no case where an exclusive broadcast agreement has

13  been invalidated on First Amendment grounds").

14          It goes without saying that speech can be both exclusive and protected by the First

15  Amendment.  Books and movies are fully protected by the First Amendment yet frequently are

16  distributed to the public through exclusive licensing arrangements – only Simon & Schuster has the

17  right to distribute Doris Kearns Goodwin's book *The Bully Pulpit*, and only Warner Bros. has the

18  right to distribute the film *Gravity* in theaters.  But according to Plaintiffs, any copyrighted work that

19  is exclusively licensed would not be fully protected by the First Amendment.  That is absurd.  The

20  performance of an exclusively licensed Tony Kushner play is entitled to no less protection than the

21  performance of a public-domain Shakespeare play.  And an "exclusive" interview secured by an

22  investigative journalist is entitled to no less First Amendment protection than statements made at a

23

24  ───────────────────────

25  [5] *Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*, 510 F. Supp. 81 (D. Conn. 1981),
    similarly concerned a government actor's ability to exclusively license the broadcast of an athletic

26  event.  To the extent that 30-year-old case suggests that the presentation of an athletic event is "on the
    periphery of protected speech," *Post Newsweek*, 510 F. Supp. at 86, it conflicts with Ninth Circuit

27  authority, *see Dex Media*, 696 F.3d at 964 ("The First Amendment does not make protection
    contingent on the perceived value of certain speech."); *see also Wisconsin Interscholastic*, 658 F.3d at

28  625 (rejecting the argument that "sports reporting lies on the periphery of protected speech or . . . that
    reporting on sports events deserves less protection than reporting on political events").

1    press conference.  Whether speech is "exclusive" or not has no bearing on the First Amendment

2    protection it receives.  *E.g.*, *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 637-38 (1982) (publishing an

3    article that had not appeared in any other publication – and which was promoted as an "exclusive"

4    interview – was plainly "protected by the First and Fourteenth Amendments in the absence of a

5    showing that the publishers knew that their statements were false or published them in reckless

6    disregard of the truth").

7    **IV.    No Authority Supports Plaintiffs' Disingenuous Reading Of State Law.**

8             As set forth above, the First Amendment protections afforded to sports broadcasts preclude

9    Plaintiffs from asserting any right of publicity entitlement to compensation for appearing in live

10   broadcasts of sporting events.  But the Court need not even reach the First Amendment analysis

11   because Plaintiffs have failed to identify any state law or statute to assert in the first instance.  It is

12   undisputed that:

13
14   • No state law has ever recognized a right of publicity claim arising from the use of an athlete's
         name, image, or likeness in a sports broadcast.  Amicus Br. at 14:13-22.

15
     • No state court has ever recognized a right of publicity claim arising from the use of an
16       athlete's name, image, or likeness in a sports broadcast.  *See id.*

17   • Twenty-one states have recognized by statute some form of a right of publicity.  Ten of these
         state statutes specifically exempt sports broadcasts from liability.  *See id.* at 15:2-7.
18
19   • All states that do not enumerate sports broadcasts as a distinct protected category of speech
         have more broadly exempted from statutory or common law liability – either by statue or
20       judicial decree – newsworthy speech, noncommercial speech, and/or speech in the public
         interest, categories that easily encompass this country's historic fascination with amateur and
21       professional sports.  *See id*. at 15:7-17:13.

22           Against this backdrop, Plaintiffs make the remarkable assertion that state laws are

23   "overwhelmingly favorable" to their purported right of publicity interest in live sports broadcasts.

24   Response at 19:20-21.  Yet, amidst all of their bluster, Plaintiffs cannot identify *a single state* that

25   vests athletes, coaches, referees, cheerleaders, or any of the other participants in a live public sporting

26   event with the legal right to demand financial compensation from a broadcaster that televises the

27   event.  If this Court allows Plaintiffs' antitrust claims to proceed on the theory that Plaintiffs are

28   being deprived of compensation which they purportedly have a right to demand for appearing in live,

                                                      12

1  televised  sportscasts, it would be the first time any court has ever recognized such a right in the face

2  of the First Amendment.

3  　　　Without any supporting case law, statutory authority, or even a footnote in a legal treatise,

4  Plaintiffs desperately try to invent a new rule of statutory construction as far-fetched as the claim

5  itself.   Plaintiffs assert that, because some state legislatures have expressly exempted sports

6  broadcasts from the reach of right of publicity claims, the right of publicity statutes of all *other* states

7  must be read to *include* sports broadcasts giving rise to a publicity claim.   There is no such rule of

8  statutory construction.  Plaintiffs' illogical assumption is that every state drafts its legislation with an

9  eye to the enumerated exemptions that appear in all similar statutes in all other states.  Applying this

10  method of statutory construction would mean that California's express exemption for "news" and

11  Indiana's express exemption for "original works of fine art" operate to create *de facto* publicity-right

12  *liability* for news and art in New York, which has a right of publicity statute that does not contain

13  those express exemptions.  *Compare* Cal. Civ. Code § 3344(d) and Ind. Code § 32-36-1-1(c)(1)(C)

14  *with* N.Y. Civ. Rights Law §§ 50-51.

15  　　　Unsurprisingly, Plaintiffs cannot point to any actual examples of this type of cross-border

16  statutory interpretation.   Indeed, it is far more reasonable to conclude that many state legislatures

17  simply found it unnecessary to enact a statutory exemption for news and sports broadcasts because

18  such uses of individuals' names and likenesses are unquestionably protected under the First

19  Amendment and common law.

20  　　　Plaintiffs also cannot rebut the well-recognized  public interest exemption to any state-law

21  right publicity claims, whether under statute or common law.  As this Court has already recognized,

22  sports broadcasts are matters of public interest protected by the First Amendment.  *See* Order at

23  19:16-21 (citing *Pooley v. Nat'l Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1114 (D. Ariz. 2000) for

24  the proposition that the "original broadcast" of a golfer's hole-in-one "was entitled to First

25  Amendment protection").  Plaintiffs fail to cite a single case to the contrary because none exists.

26  Instead, courts across the nation have recognized that sports and sports broadcasts are matters of

27  public interest. *See, e.g.*, *Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 301 & n.7 (3d

28  Cir. 1999) (Congress has preserved "the availability of NFL games on free broadcast television" out

of concern for "the public interest in viewing . . . sports"); *Time, Inc. v. Johnson*, 448 F.2d 378, 373 (4th Cir. 1971) (First Amendment public interest standard "clearly is sufficient to cover sports and sports figures, whose 'public interest' character is amply demonstrated by the elaborate sports section in every daily newspaper published in this nation"); *Davis v. Electronic Arts Inc.*, No. 10-3328, 2012 WL 3860819, at *6 (N.D. Cal. Mar. 29, 2012) ("[i]t is true that the reporting and discussion of factual information about professional sports implicates the public interest"); *Nat'l Football League v. The Alley, Inc.*, 624 F. Supp. 6, 10 (S.D. Fla. 1983) ("intercepted telecast" of professional football game was a "presentation having a current or legitimate public interest"); *Ludtke v. Kuhn*, 461 F. Supp. 86, 96 (S.D.N.Y. 1978) (noting "the exceedingly high level of public interest in sporting events"); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 413 (2001) ("significant public interest" exists in major league baseball game programs, web sites, and video clips); *Stepien v. Franklin*, 39 Ohio App. 3d 47, 48 (1988) (radio sports talk show "designed to encourage and capitalize on the considerable public interest in professional sports"); *Namath v. Sports Illustrated*, 363 N.Y.S.2d 276, 279 (N.Y. Sup. Ct. 1975) ("newsworthiness" of football star's name, image, and likeness undisputed).

Plaintiffs' attempt to distinguish *National Football League v. The Alley, Inc.* only serves to highlight how far from established First Amendment precedent this Court has been asked to stray. First, Plaintiffs describe *Alley* – which directly considered whether or not professional football game broadcasts were in the public interest, for purposes of common law and statutory right of publicity claims – as "barely relevant" without offering any explanation why. *See* Response at 21:20 & n.14. The *Alley* court expressly found that the unauthorized presentation of full game broadcasts "falls within [the] statutory exemption" for "a 'presentation having a current or legitimate public interest.'" *Alley*, 624 F. Supp. at 10 (quoting Florida right of publicity statute). And contrary to Plaintiffs' statement that "the court did not conclude that [a public interest] exemption would apply to any common-law right of publicity," Response at 21 n.14, the court did just that. The court held that a broadcast incorporating players' images "has not been shown to be an advertising use" that could infringe common law rights of publicity, and "[w]hatever commercial benefit defendants derived, *it was not sufficient to recover under the common law* doctrine." *Id.* (emphasis added).

In sum, Plaintiffs offer nothing to counter the plain fact that if this Court were to recognize a right of publicity claim under the law of *any* state, arising from the use of an athlete's name, image, or likeness in a sports broadcast protected by the First Amendment, it will be the first and only court in the country to have done so.  No state recognizes a publicity right emanating from sports broadcasts, and a number expressly exempt such broadcasts from any right of publicity liability. Despite Plaintiffs' insinuations to the contrary, the First Amendment protects more than just "news"; no state law publicity claim can proceed against the Sports Broadcasters noncommercial, newsworthy speech.

## CONCLUSION

Because the First Amendment and state laws broadly protect communicative, noncommercial speech about matters of public interest such as sports broadcasts, Plaintiffs' cannot assert valid antitrust claims based on a non-existent right of publicity to bar the use of their names, images, or likenesses in the communication of sporting events to the public through live broadcasts, rebroadcasts, or other reports.


Dated:  January 30, 2014                                          JENNER & BLOCK LLP


                                                             By:  ____/s/ Richard L. Stone_____
                                                                    Richard L. Stone
                                                                    Andrew J. Thomas
                                                                    David R. Singer

                                                                    Attorneys for *Amici Curiae*
                                                                    Fox Broadcasting Company and
                                                                    Big Ten Network, LLC

15