GLENN D. POMERANTZ (State Bar No. 112503)
glenn.pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
carolyn.luedtke@mto.com
ROHIT K. SINGLA (State Bar No. 213057)
rohit.singla@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

GREGORY L. CURTNER (*Pro Hac Vice*)
gcurtner@schiffhardin.com
ROBERT J. WIERENGA (State Bar No. 183687)
rwierenga@schiffhardin.com
KIMBERLY K. KEFALAS (*Pro Hac Vice*)
kkefalas@schiffhardin.com
SCHIFF HARDIN LLP
350 Main St., Suite 210
Ann Arbor, MI  48104
Telephone:     (734) 222-1500
Facsimile:     (734) 222-1501

Attorneys for Defendant
National Collegiate Athletic Association

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

|  |  |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME AND LIKENESS LICENSING LITIGATION, | Case No. 09-CV-1967-CW <br><br> **NCAA'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Judge:    Hon. Claudia Wilken <br> Date:     February 20, 2014, 2:00 p.m. <br> Crtrm.:   2, 4th Floor |

# TABLE OF CONTENTS

Page

I. THE FIRST AMENDMENT BARS APS' LIVE BROADCAST CLAIMS ................. 1

II. THE INDIVIDUAL CLAIMS OF FORMER SAs (ALL CLAIMS) AND CURRENT SAs (LIVE BROADCAST CLAIMS) FAIL AS A MATTER OF LAW .......................................................................................................... 6

III. APS' INJUNCTIVE RELIEF CLAIM REGARDING VIDEOGAMES IS MOOT ..................................................................................................... 7

IV. THE NCAA'S AMATEURISM RULES SHOULD BE UPHELD UNDER THE ANTITRUST LAW GOVERNING JOINT VENTURES ..................... 7

    A. The NCAA's Amateurism Rules Are Presumptively Procompetitive Because the NCAA's Core Activity Is Amateur College Sports ............................ 8

    B. The Challenged Restraints Are Necessary to Amateur College Sports ................... 9

    C. The NCAA Has Not Abandoned Amateurism ........................................ 10

    D. The Challenged Restraints Should Be Upheld in the "Twinkling of an Eye" ........ 11

NCAA's SUMMARY JUDGMENT REPLY BRIEF

**Page(s)**

**FEDERAL CASES**

*Agnew v. NCAA*,
   683 F.3d 328 (7th Cir. 2012) ................................................................................. 9

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010) ................................................................................. 8, 12

*Baker v. F & F Inv.*,
   420 F.2d 1191 (7th Cir. 1970) ................................................................................. 7

*Board. of Trs. v. Fox*,
   492 U.S. 469 (1989) ................................................................................. 3

*Broad. Music, Inc. v. CBS, Inc.*,
   441 U.S. 1 (1979) ................................................................................. 8

*Brown v. Entm't Merchs. Ass'n*,
   131 S. Ct. 2729 (2011) ................................................................................. 5

*C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*,
   505 F.3d 818 (8th Cir. 2007) ................................................................................. 1

*Cardtoons L.C. v. Major League Baseball Players Ass'n*,
   95 F.3d 959 (10th Cir. 1996) ................................................................................. 4

*Dryer v. NFL*,
   689 F. Supp. 2d 1113 (D. Minn. 2010) ................................................................................. 5

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) ................................................................................. 5

*Hoffman v. Capital Cities/ABC, Inc.*,
   255 F.3d 1180 (9th Cir. 2001) ................................................................................. 1, 2, 3

*Hunt v. City of Los Angeles*,
   638 F.3d 703 (9th Cir. 2011) ................................................................................. 2

*In re Multidistrict Vehicle Air Pollution*,
   591 F.2d 68 (9th Cir. 1979) ................................................................................. 6

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952) ................................................................................. 3

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998) ................................................................................. 8, 9

*McCormack v. NCAA*,
845 F.2d 1338 (5th Cir. 1988) .................................................................... 10

*McSherry v. City of Long Beach*,
584 F.3d 1129 (9th Cir. 2009) .................................................................... 13

*NCAA v. Bd. of Regents*,
468 U.S. 85 (1984) .............................................................................. 8, 9, 12

*Polygram Holding, Inc. v. FTC*,
416 F.3d 29 (D.C. Cir. 2005) ....................................................................... 8

*Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*,
510 F. Supp. 81 (D. Conn. 1981) ................................................................. 5

*Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*,
517 F.2d 117 (5th Cir. 1975) ....................................................................... 7

*San Francisco Baykeeper v. W. Bay Sanitary Dist.*,
791 F. Supp. 2d 719 (N.D. Cal. 2011) ...................................................... 14

*Smythe v. Safeco Ins. Co. of Am.*,
33 F. App'x 303 (9th Cir. 2002) ................................................................ 13

*Snyder v. Phelps*,
131 S. Ct. 1207 (2011) ................................................................................ 2

*Sorrell v. IMS Health Inc.*,
131 S. Ct. 2653 (2011) ................................................................................ 5

*Sutherland v. Elpower Corp.*,
923 F.2d 1285 (8th Cir. 1991) ..................................................................... 3

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) ............................................................... 12, 13

*Tellado v. Time-Life Books, Inc.*,
643 F. Supp. 904 (D.N.J. 1986) ................................................................. 5

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006) ........................................................................................ 8

*United States v. Brown Univ.*,
5 F.3d 658 (3d Cir. 1993) .......................................................................... 14

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) .................................................................................... 2

*Vieste, LLC v. Hill Redwood Dev.*,
   2011 WL 2181200 (N.D. Cal. June 3, 2011) ........................................................ 14

*Washington v. NFL*,
   880 F. Supp. 2d 1004 (D. Minn. 2012) ................................................................. 7

*Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*,
   658 F.3d 614 (7th Cir. 2011) ................................................................................ 5

*Zacchini v. Scripps-Howard Broad. Co.*,
   433 U.S. 562 (1977) ......................................................................................... 3, 4

**STATE CASES**

*Dora v. Frontline Video, Inc.*,
   15 Cal. App. 4th 536 (1993) ................................................................................. 1

*Gionfriddo v. Major League Baseball*,
   94 Cal. App. 4th 400 (2001) ................................................................................. 1

*Montana v. San Jose Mercury News, Inc.*,
   34 Cal. App. 4th 790 (1995) ................................................................................. 1

**FEDERAL STATUTES**

15 U.S.C. § 15 .......................................................................................................... 2

15 U.S.C. § 15b ........................................................................................................ 6

**FEDERAL RULES**

Fed. R. Civ. P. 26(e)(1) .......................................................................................... 14

Fed. R. Civ. P. 37(c)(1) .......................................................................................... 14

**OTHER AUTHORITIES**

Daniel A. Rascher & Andrew D. Schwarz, *Neither Reasonable nor Necessary:*
   *'Amateurism' in Big-Time College Sports*, 14 Antitrust 51, 51 (Spring 2000) ........................ 8

Jaime Diaz, The Truth About Tiger, Golf Digest (Jan. 2005),
   http://www.golfdigest.com/magazine/2009-01/jaime_diaz_truthabouttiger_gd ................... 11

NCAA's SUMMARY JUDGMENT REPLY BRIEF

# GLOSSARY OF ABBREVIATIONS

| APs | Antitrust Plaintiffs |
|-----|----------------------|
| APM | Antitrust Plaintiffs' Motion for Summary Judgment (Dkt. No. 898-1) |
| APM Scherrer Decl. | Declaration of Hilary K. Scherrer in Support of Motion by Antitrust Plaintiffs for Summary Judgment (Dkt. No. 898-3) |
| APO | Antitrust Plaintiffs' Combined Opposition to NCAA's Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment (Dkt. No. 957) |
| APO Scherrer Decl. | Declaration of Hilary K. Scherrer in Support of Antitrust Plaintiffs' Combined Opposition to NCAA's Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment (Dkt. No. 957-2) |
| EA | Defendant Electronic Arts Inc. |
| Klaus Decl. | Declaration of Kelly M. Klaus in Support of NCAA's Reply In Support of Motion for Summary Judgment |
| Luedtke Decl. | Declaration of Carolyn Hoecker Luedtke in Support of NCAA's Motion for Summary Judgment and Opposition to Antitrust Plaintiffs' Motion for Summary Judgment (Dkt. No. 950) |
| NCAA | Defendant National Collegiate Athletic Association |
| NCAA MSJ | NCAA's Motion for Summary Judgment and Opposition to Antitrust Plaintiffs' Summary Judgment Motion (Dkt. No. 926) |
| NIL | Name, image and likeness |
| SAs | Student-athletes |
| 3CAC | Third Consolidated Amended Complaint (Dkt. No. 832) |

## I. THE FIRST AMENDMENT BARS APS' LIVE BROADCAST CLAIMS

APs are now clear about what their antitrust claim is, and what it is not: APs allege that the NCAA's amateurism rules improperly deny APs payment for the use of their NIL rights. APs do *not* allege that the rules improperly deny APs payment for their *performance*. APs are emphatic that they do *not* seek "pay to play …. That is not the case." APO at 6 n.21; APM at 1; 3CAC ¶¶ 391, 609. In other words, APs do not seek to be compensated for any alleged right— NIL or otherwise—for performing on the football field or basketball court, even in a stadium packed with thousands of fans. They seek to be compensated for NIL only if the TV cameras are turned on. Because established First Amendment law makes it clear that APs have no right to be compensated for the use of NIL in live sports broadcasts—which indisputably are matters of intense public interest—APs' antitrust claims based on those broadcasts necessarily fail.

The case law uniformly holds that the First Amendment blocks athletes from asserting NIL claims based on what is seen on the field of play. *See C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 410-11 (2001); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 796-97 (1995); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 542-43 (1993).[1] The application of the First Amendment is the same for coaches, cheerleaders, referees and fans in the stands as it is for players. None can claim, consistent with the First Amendment, that their images may be shown in live game broadcasts only when they have provided a license. The same goes for people whose images are captured in broadcasts of a marathon, a concert, a parade, a political convention, or the New Year's Eve countdown in Times Square. If the law did recognize NIL rights for people appearing in broadcasts of such events, it

---

[1] APs are wrong that these courts did not follow Ninth Circuit precedent on what is "commercial" speech. APO at 1-2 n.5. *See, e.g.*, *Gionfriddo*, 94 Cal. App. 4th at 412 ("The 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'") (quoting *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001)). APs also are wrong that the Court should ignore these cases because they involved "facts" about sports that were "in the public domain," whereas game broadcasts are copyrighted and game sponsors license access to events. APO at 2 n.5. In fact, these cases turned on the "significant public interest" in what happens on the field of play, which is exactly the case here. *Gionfriddo*, 94 Cal. App. 4th at 414.

would be virtually impossible for broadcasters to obtain the licenses necessary to transmit the broadcasts to the interested public. There would be a significant chilling effect on this type of speech—exactly the result the First Amendment prevents. People who *work* to present games (coaches, referees, hot dog vendors, and the like) are paid *for their labor*, APO at 3, but APs are *not* claiming a right to negotiate pay for play. Because the First Amendment trumps any claim of NIL, SAs have not been restrained in their "business or property," 15 U.S.C. § 15, as they have no business or property right in their NIL in live broadcasts; and there is no trade in NILs that the NCAA's rules restrain. APs thus have no antitrust claim based on live broadcasts.

APs' contrary arguments are meritless. *First*, APs argue that the First Amendment is inapplicable because they do not in this case seek to enjoin any game broadcasts. APO at 1. That is a red herring. The NCAA's arguments have nothing to do with whether game broadcasts are enjoined. The First Amendment precludes APs' claimed "property" right to license their NIL in live broadcasts.[2]

*Second*, APs argue that their claim should survive because "game broadcasts are commercial speech." APO at 1. That argument is based on a misreading of binding precedent. "Commercial speech is 'defined as speech that does *no more than* propose a commercial transaction.'" *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (emphasis added) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). If—but only if—there is "a close question" whether the speech "does no more than propose a commercial transaction," can a court consider whether "the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." *Id.*

Here, there is not a close question whether live broadcasts of basketball and football games do "no more than" propose a commercial transaction. Of course such broadcasts "do more" than propose commercial transactions: the broadcasts show games to viewers. Indeed, they show

---

[2] Aside from being irrelevant, APs' premise that the First Amendment applies only to requests for injunctive relief blocking a broadcast is wrong. The law is well settled that the First Amendment applies in tort actions generally, not merely in cases seeking injunctive relief. *See Snyder v. Phelps*, 131 S. Ct. 1207, 1215-16 (2011) (First Amendment precluded state tort suit seeking damages); *Hoffman*, 255 F.3d at 1186 (same for right of publicity damages claim).

games whose undisputed popularity proves that they are newsworthy events. APs do not and cannot contend otherwise, so instead they note that live broadcasts generate revenue, that some games take place in venues with corporate logos, and that some uniforms or equipment have corporate logos. APO at 2-3. None of this changes the controlling legal question—whether the broadcast does more than propose a commercial transaction—or the answer to that question. People watch the games not for the corporate logos but to enjoy the game itself: to cheer for their favorite teams and players, to see good plays, to find out who wins and who loses, and so on.

The same holds for APs' rhetoric of "big business" and the "commercialization" of college sports. APO at 2. Speech is not commercial or unprotected just because it generates a profit; otherwise the movie, television, music, and publishing industries would not receive full First Amendment protection. *See, e.g.*, *Board. of Trs. v. Fox*, 492 U.S. 469, 482 (1989) ("While these examples consist of speech for a profit, they do not consist of speech that *proposes* a commercial transaction, which is what defines commercial speech."); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("It is urged that motion pictures do not fall within the First Amendment's aegis because their production, distribution, and exhibition is a large-scale business conducted for private profit. We cannot agree."); *Hoffman*, 255 F.3d at 1186 (photo used by for-profit magazine was not commercial speech even though it served to "increase circulation and therefore profits").[3]

*Third*, APs do not cite *any* case holding that rights for NIL captured during live broadcasts of games or other events of public interest trump First Amendment protections. They instead rely on inapposite cases, most notably *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977). In APs' telling, *Zacchini* holds "that the depiction of an entire performance, even a sports

---

[3] The Desser declaration, APO Scherrer Decl. Ex. 2, does not change any of this. Desser testified at his deposition that his only basis for characterizing the use of NIL as "commercial" is whether "it's a business activity," Klaus Decl. Ex. 8 at 39:11-40:10, which is not the relevant test. *See, e.g.*, *Sutherland v. Elpower Corp.*, 923 F.2d 1285, 1292 (8th Cir. 1991) (experts who interpreted relevant standard "in a manner inconsistent with [relevant] law" could not support plaintiff's claim). Also, Desser's efforts to distinguish game broadcasts from "news" are inherently contradictory, not least because he repeatedly acknowledges that college sports broadcasts are "newsworthy." APO Scherrer Decl. Ex. 2 ¶¶ 3, 6.

performance, *is not protected speech*, even though the performance may be of public interest." APO at 1 & n.3 (emphasis added). *Zacchini* holds no such thing.

As this Court has already noted, "*Zacchini* does not provide a clear test for balancing the right of publicity against free speech concerns." ECF No. 876 at 19. The case does not help APs for many reasons, not least because *Zacchini* was about an entertainer's claim for "appropriation of his *professional* property," 433 U.S. at 564, 569 (emphasis added), namely, the economic value of the "entire act for which the performer *ordinarily gets paid*." *Id.* at 574 (emphasis added). Because broadcasting Zacchini's performance went "to the heart of [his] ability to *earn a living* as an entertainer," the Court held only that the state's interest in preserving his incentive *to perform* was not precluded by the First Amendment's protections for disseminating events of public interest. *Id.* at 576 (emphasis added).[4] That is *not* APs' case: they have repeatedly disavowed any claim that they should be paid, as professionals are, as an incentive to perform, *i.e.*, to play. In other words, there are not First Amendment interests on both sides here, as there were in *Zacchini*. Thus, APs cannot now rely on *Zacchini*, a case about the appropriation of "professional property," to support a claim of some right to be paid because their NIL appears on television. Indeed, the Court in *Zacchini* made clear it was *not* addressing a claim to be compensated for the use of one's "name or likeness," but rather that its holding was limited to the "narrower claim that respondent televised an entire act that [plaintiff] ordinarily gets paid to perform." 433 U.S. at 573 n. 10; *see also Cardtoons L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 973 (10th Cir. 1996) ("This distinction between the value of a person's identity and the value of his performance explains why [*Zacchini*], the Supreme Court's sole case involving a right of publicity claim, is a red herring" in a claim asserting NIL rights).

---

[4] The Court's emphasis on the concept of *Zacchini's* "entire act" underscores the difference between the right asserted by Zacchini and the right asserted by APs. Zacchini's claim was that, once his entire scripted act had been broadcast, this would diminish the "public's interest in seeing the act live." 433 U.S. at 575 n.12. By contrast, sporting events are unscripted and unpredictable from one game to the next, and the broadcast of one game does not diminish the interest in seeing the next game live. Each sporting event is unique and newsworthy in its own right. A broadcast of a scripted performance appropriates the economic value of that performance in a way that a broadcast of an unscripted performance, such as a sporting event or a parade, does not.

APs' remaining authority likewise fails to save their live broadcast claim. APs cite two cases that did not involve NIL claims at all, but instead held only that an event organizer can enter into an exclusive broadcasting contract. *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614, 622 (7th Cir. 2011); *Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*, 510 F. Supp. 81, 84 (D. Conn. 1981). APs' remaining cases support the NCAA's motion, because they hold (like the cases the NCAA relies on) that a plaintiff must show the speech is commercial in order to defeat a First Amendment defense to a claim for use of player images—something APs cannot do. *See Dryer v. NFL*, 689 F. Supp. 2d 1113, 1121 (D. Minn. 2010) (claim would be barred unless plaintiffs showed that the use of archival footage was commercial speech); *Tellado v. Time-Life Books, Inc.*, 643 F. Supp. 904, 914 (D.N.J. 1986) (First Amendment would bar claim based on the use of a photograph to depict historical events, but did not bar claim for the defendant's use of a photograph "solely to hype its product").

*Fourth*, APs argue that sports broadcasts are "'on the periphery'" of First Amendment protection, because they are mere entertainment. APO at 1 n.3 (quoting *Post Newsweek*, 510 F. Supp. at 86). Supreme Court precedent squarely rejects that proposition: "The Free Speech Clause exists principally to protect discourse on public matters, but *we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try*." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011) (emphasis added).

*Finally*, APs argue that enforcement of the Sherman Act can impose incidental restrictions on speech. APO at 1 n.2. But APs' cases stand only for the unremarkable proposition that the First Amendment does not protect speech whose "sole, unlawful immediate objective" is to carry out an unlawful agreement in restraint of trade. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *see Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2665 (2011) (citing *Giboney* for proposition that "antitrust laws can prohibit 'agreements in restraint of trade'"). Here, the speech at issue is the live broadcast of football and basketball games. APs cannot and do not contend that the sole objective of that speech is to carry out an unlawful antitrust agreement. The obvious objective of that speech is to show popular games to viewers who are interested in those games.

Because APs have no right consistent with the First Amendment to be compensated for the use of their NIL in those games, APs' claims based on live broadcasts fail.

## II. THE INDIVIDUAL CLAIMS OF FORMER SAs (ALL CLAIMS) AND CURRENT SAs (LIVE BROADCAST CLAIMS) FAIL AS A MATTER OF LAW

APs' individual claims fail for a number of reasons in addition to the First Amendment. *First*, while APs assert that it "is disputed" whether "there is no restraint after SAs" stop playing, APO at 4:14, APs in fact have *no evidence* to support this. The only evidence that APs cite is the report of an interview with a conference commissioner, *id.* at 4 n.11, but that interview does not even mention former SAs or any supposed rule creating any type of antitrust restraint.[5] APs' paltry showing concedes that their unsubstantiated claim (made throughout the case) of a lifelong restraint on SAs was entirely specious. The former SA APs *uniformly* testified there has been no such restriction. Luedtke Decl. ¶¶ 169-75. And APs' own expert admitted that any former SA can

> [D]o whatever you want. You can hire an agent. You can go to the NFL combines, you can do whatever you want once your eligibility is up ….

Klaus Decl. ¶ 4 & Ex. 2; *see also id.* ¶ 3 & Ex. 1 ("for former players" the "*restriction doesn't exist*") (emphasis added). It is remarkable that APs continue to peddle their false assertion on this undisputed record. The former SAs' claim for injunctive relief fails.

*Second*, it follows from APs' failure to identify a post-eligibility restraint that the former SAs' damages claims are barred because they are outside the four-year limitations period. *See* 15 U.S.C. § 15b. Citing this Court's 12(b)(6) rulings, APs say that the continuing violation doctrine could apply in this case. APO at 4. However, APs' allegations of an ongoing conspiracy have not been borne out in discovery. APs claim that the sole agreement in restraint of trade is the NCAA's bylaws/rules, which in no way limit SAs after their eligibility ends. *See* APM at 2-5. Hence, the limitations period runs from the time SAs' eligibility ended. *See In re Multidistrict Vehicle Air*

---

[5] In fact, the text of the NCAA bylaw that APs claimed gave the NCAA a license to use SA NILs "in perpetuity," *see* APM at 4, makes clear by its plain language that it does not apply to former SAs who are no longer "enrolled" and does not confer an exclusive license to NCAA. *See* APM Scherrer Decl. Ex. 10, Bylaw 12.5.1.1.1 ("The NCAA ... may use the name or picture of an *enrolled* student-athlete to generally promote NCAA championships or other NCAA events, activities or programs.") (emphasis added).

*Pollution*, 591 F.2d 68, 72 (9th Cir. 1979); *Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975); *Baker v. F & F Inv.*, 420 F.2d 1191, 1200 (7th Cir. 1970). APs' claim that they have not been paid for any rebroadcasts or use of game footage does not reflect any new alleged antitrust restraint.[6]

 *Third*, even if the live broadcast claims of all APs were consistent with the First Amendment, they would fail because APs have not cited a single state's law that could apply to any of their claims that recognizes a claim for NIL in live broadcasts. APs rely exclusively on the Court's dismissal ruling that the NCAA had to negate the existence of the claimed right for all 50 states to defeat the claims of the entire class. APO at 4. But that ruling was a 12(b)(6) ruling; this is summary judgment. That ruling, moreover, dealt with an *entire class*. This part of the NCAA's motion is directed at the *individual named APs*. The NCAA showed, and APs do not dispute, that the law of each named APs' domicile governs his NIL rights. APs fail to show that any of the state laws the NCAA cited support any APs' claim. The NCAA's argument stands unrebutted, and the individual APs' claims based on live broadcast fail independently for this reason.

## III. APs' INJUNCTIVE RELIEF CLAIM REGARDING VIDEOGAMES IS MOOT

 APs cite no evidence showing any reasonable likelihood that the NCAA will enter into a license agreement with EA or any other video game-maker in future, and they do not dispute that EA has announced it will stop publishing its college-themed basketball and football games. APs' injunctive relief claim is moot.

## IV. THE NCAA'S AMATEURISM RULES SHOULD BE UPHELD UNDER THE ANTITRUST LAW GOVERNING JOINT VENTURES

 APs agree that core joint venture activity is presumptively procompetitive if it is necessary to create a unique product. They concede that amateur sports are the NCAA's core activity. And

---

[6] To the extent APs are saying that *rebroadcasts* are themselves new antitrust restraints, that claim fails for the reasons stated by the court in *Washington v. NFL*, 880 F. Supp. 2d 1004 (D. Minn. 2012). The court there dismissed a claim by former pro football players that the NFL and others violated "the antitrust laws by allegedly constraining the sale of their images and likenesses" and "by not allowing them the rights to game films and images from the games." *Id.* at 1005. The court held that the licensing of game broadcasts "is a royalties issue, not an antitrust issue" and "no amount of legal tongue twisting will turn their claims into antitrust claims." *Id.* at 1007-08.

the courts universally agree that if an NCAA rule is necessary to amateurism, the rule is presumptively procompetitive and should be upheld. Since there can be no dispute on this record that a rule prohibiting SAs from being paid for appearing on television is necessary to amateurism, that rule should be upheld.

### A. The NCAA's Amateurism Rules Are Presumptively Procompetitive Because the NCAA's Core Activity Is Amateur College Sports

APs' responses to the NCAA's motion that the amateurism rules be sustained in the "twinkling of an eye" are meritless. Before turning to those responses, it is useful to review the points of law that APs cannot, and therefore do not, dispute. An otherwise anticompetitive restraint is lawful if it is necessary for a joint venture to create a unique product. NCAA MSJ at 9. Restraints that "involve[] the core activity of the joint venture itself," *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006), are lawful because they *increase* consumer choice—the antitrust laws' central goal: "When restraints on competition are essential if the product is to be available at all," these restraints can be upheld without "detailed analysis" in the "twinkling of an eye." *Am. Needle*, *Inc. v. NFL*, 560 U.S. 183, 203 (2010) (citations and internal quotation marks omitted); *see also Broad. Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 22-23 (1979) ("blanket license" upheld because necessary to create a "different product").[7]

APs also do not dispute that the NCAA's "core activity" is to organize, promote, and enable *amateur*, collegiate athletics. *See, e.g.*, *Law v. NCAA*, 134 F.3d 1010, 1018 n.14 (10th Cir.

---

[7] *Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005), which APs cite, does not undermine these principles at all. *Polygram* involved restraints that were held *not* to be needed to create the joint venture's product, *i.e.*, an "agreement between joint venturers to restrain price cutting and advertising with respect to products not part of the joint venture." *Id.* at 37. APs also are wrong that the NCAA is not a joint venture because "schools recruit SAs separately." APO at 5. Joint ventures are typically comprised of competitors who agree to limit their competition in certain areas, like the NFL teams in *American Needle*. Indeed, the Supreme Court has explained that "[p]erhaps the leading example" of a legitimate joint venture "is league sports" because "contests between competing institutions" requires "rules on which the competitors agreed to create and define the competition to be marketed." *NCAA v. Bd. of Regents*, 468 U.S. 85, 101 (1984). That is why APs' expert has stated that "[t]he NCAA is more appropriately described as a joint venture that has, like other joint ventures, certain aspects that must be agreed upon." Daniel A. Rascher & Andrew D. Schwarz, *Neither Reasonable nor Necessary: 'Amateurism' in Big-Time College Sports*, 14 Antitrust 51, 51 (Spring 2000).

1998) (recognizing the "amateurism that serves as the hallmark of NCAA competition"). APs open their motion by emphasizing that they "are not advocating an end to the principle of amateurism." APM at 1. And APs' expert agreed that APs' claim and his opinions assume that NCAA sports would remain amateur. Klaus Decl. Ex. 3 at 1354:19-1357:14.

APs also do not contest that the Supreme Court and appellate courts are unanimous that the NCAA's amateurism rules are procompetitive because they make possible a unique product: amateur, collegiate athletics.

- *Board of Regents*: the rule that "athletes must not be paid" serves to "widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive," *NCAA v. Board of Regents*, 468 U.S. 85, 102 (1984).

- *Agnew*: "when an NCAA bylaw is clearly meant to help maintain the 'revered tradition of amateurism in college sports' or the 'preservation of the student-athlete in higher education,' *the bylaw will be presumed procompetitive*," *Agnew v. NCAA*, 683 F.3d 328, 342-43 (7th Cir. 2012) (emphasis added) (citation omitted).

- *Law*: "[T]he horizontal restraints necessary for the product to exist include *rules such as those forbidding payments to athletes* and those requiring that athletes attend class, etc.," *Law*, 134 F.3d at 1018 (emphasis added).

*See also* NCAA MSJ at 8-9 & n.6 (collecting cases). The restraints in these cases—restricting the number of televised games or capping coach salaries—did not survive antitrust scrutiny because the courts found they did not promote student amateurism. But all these cases agree that the *amateurism* rules—which indisputably *do* promote amateurism—survive antitrust scrutiny.

**B.    The Challenged Restraints Are Necessary to Amateur College Sports**

Under these clear principles, the alleged restraints here should be upheld because there can be no dispute that they are amateurism rules. APs' primary response is that the NCAA's rules prohibit them from negotiating payments for the use of their NIL. Even if state law created NIL rights in live broadcast, precluding payments to SAs for playing their sport on television would still be necessary to amateurism. APs, after all, insist that if colleges could pay SAs for competing on television, many SAs would receive hundreds of thousands of dollars, or in some cases *millions*

of dollars, annually—simply because they were on the roster for a televised game.[8]  Klaus Decl. Ex. 5 at 684:6-685:10, Ex. 7 ¶¶ 177-178.  APs cite no authority for "amateurism" consistent with such payments.  The NCAA rules are fully consistent with other amateur sports leagues in not permitting payments for playing on TV.  NCAA MSJ at 15-16.

APs' economic experts Noll and Rascher admitted they could find no amateur sport in history where athletes were paid a share of broadcast revenues.  Klaus Decl. Ex. 5 at 449:6-10; *id.* Ex. 3 at 1329:13-22.  Noll in fact admitted that broadcast revenues are shared with athletes only in *professional sports*—and even then as part of their "salary pools" rather than directly for the supposed use of their NILs.  *Id.* Ex. 3 at 1329:13-22.  Thus, if college athletes were paid for appearing on television, they would become professionals paid for their labor, like NFL and NBA athletes, and the NCAA would no longer be promoting its unique, core activity:  amateur, collegiate athletics.  The NCAA's rules against these payments are procompetitive and should be upheld.

## C. The NCAA Has Not Abandoned Amateurism

APs cannot avoid this conclusion by arguing that NCAA sports are no longer amateur.  To begin with, this argument is foreclosed by APs' assurances that they "are not advocating an end to the principle of amateurism."  APM at 1.  In any event, APs' "evidence" on this point cannot be relied on at summary judgment, as it is inadmissible hearsay opinion from, *e.g.*, sports commentators and other third parties.

APs point out that the NCAA's rules have changed over time, APO at 8, but this gets them nowhere.  Courts have long rejected the notion that the NCAA's rules must be perfect and unchanging to survive antitrust attack.  *See McCormack v. NCAA*, 845 F.2d 1338, 1345 (5th Cir. 1988) ("That the NCAA has not distilled amateurism to its purest form does not mean its attempts to maintain a mixture containing some amateur elements are unreasonable.").  Moreover, APs

---

[8] APs now run away from their own experts' opinions.  They say that the NCAA is wrong to "assume that the entry of an injunction would promptly lead to a 50/50 split of revenue for live broadcasts."  APO at 6.  But that is exactly what APs' experts testified to.  *See* Klaus Decl. Ex. 2 at 1074:9-13; *id.* Ex. 6 at 1034:19-1035:1,1088:7-14; *id.* Ex. 5 at 707:23-708:2.

ignore that, as their expert admits, at no time did the NCAA—or any other interscholastic sports organization in history—permit what APs seek: paying SAs for playing on television. Klaus Decl. Ex. 3 at 1218:16-25, 1222:12-1223:3. Similarly, APs point to no definition or concept of amateurism that focuses on whether coaches are paid or competition is televised. Little League players are not professionals just because the League earns substantial broadcasting licensing revenues. NCAA MSJ at 15-16. Tiger Woods won three U.S. Amateur golf championships (1994-1996) coached by Butch Harmon, one of the world's most well-paid professionals.[9]

APs argue that NCAA sports are not amateur because athletes are, in certain circumstances, permitted to accept small "participation awards" or a few hundred dollars in gifts such as iPads, bikes, or watches. But Dr. Noll himself admitted that many amateur sports permit such benefits.[10] Again, APs have no basis to insist that the NCAA must either prohibit any gift or prize, no matter how small, or abandon amateurism altogether by allowing hundreds of thousands if not millions of dollars in payments. APs note that SAs at the military academies are paid, but all students at the academies are paid *for their military service*; none are paid for being SAs. Klaus Decl. Ex. 3 at 1217:3-1218:15.

Finally, APs note that there have been numerous violations ("scandals") of the NCAA's amateurism rules, as if that were proof that amateurism no longer exists. APO at 8. To the contrary, the NCAA's consistent enforcement of its amateurism rules demonstrates that amateurism remains critically important to the NCAA and its member institutions. Luedtke Decl. Ex. 22 ¶¶ 1-17; *id.* Ex. 71 at 12:11-13:13.

**D.     The Challenged Restraints Should Be Upheld in the "Twinkling of an Eye"**

APs also have no evidence to rebut the other ways that NCAA rules promote competition.

**Output.**  As the NCAA has explained, output is the lodestar for an alleged restraint's effect on competition. NCAA MSJ at 11. And APs cannot dispute either that the number of

---

[9] Jaime Diaz, The Truth About Tiger, Golf Digest (Jan. 2005), http://www.golfdigest.com/magazine/2009-01/jaime_diaz_truthabouttiger_gd 0501.

[10] *See* Klaus Decl. Ex. 3 at 1384:22-1385:17; *see also id.* Ex. 2 at 1046:1-1047:3; *id.* Ex. 4 at 129-134.

schools participating in Division I as well as the number of games, players, viewers, and scholarships in these and other sports have continued to increase under the challenged rules or that, without those rules, all will decline. *Id.* at 11-14, 22-25. The output effect thus entirely favors the NCAA.[11]

APs argue also that "from the perspective of the *labor* input market, the undisputed evidence is that output has decreased." *Id.* (emphasis added). But they never explain what that means. They have no evidence to say that more SAs would be playing Division I basketball or FBS football if SAs were paid a portion of broadcast revenues. The number of SAs is a function of the number of schools and the size of their rosters, and payments are likely to lead schools to exit and/or reduce their roster sizes, reducing the supposed "labor input market." Moreover, APs have never alleged any "labor" market, *see* 3CAC ¶ 391, but rather disavowed it by assuring the Court that they are not "advocating salaries for SAs." APM at 1. Indeed, Dr. Noll testified that we should not "consider student[-]athletes to be labor" and that he did not "consider the labor market." Klaus Decl. Ex. 2 at 1083:2-4.

With respect to viewership, APs again critique the NCAA's consumer survey, which shows that paying SAs would reduce consumer interest in college sports. NCAA MSJ at 12-13. But APs ignore the Ninth Circuit authority that requires plaintiffs to do more at summary judgment than call a survey "riddled with flaws" or "counterintuitive." *See* NCAA MSJ at 12 & n.9; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Moreover, APs' core argument, that "surveys about what consumers might do if SAs were paid are of little value," APO at 10, contradicts their own expert's testimony that networks use this kind of polling to gauge viewer interest, "especially if it's a new product or a significant change to a product," which paying SAs undoubtedly would be. Klaus Decl. Ex. 8 at 161:22-162:10.

**Competitive Balance.** The Supreme Court has held "that the interest in maintaining a 'competitive balance' among 'athletic teams is legitimate and important.'" *Am. Needle*, 560 U.S.

---

[11] APs insist that NCAA rules limit the number of videogames and numbered jerseys being sold. APO at 15. But even if that was true—and there is no evidence that the number of videogames or jerseys has anything to do with live broadcasts—it would be immaterial to this motion.

at 204 (quoting *Bd. of Regents*, 468 U.S. at 117). On that issue, the NCAA adduced sworn declarations and other evidence of what is, frankly, logical: schools with large stadiums, expansive alumni networks and long traditions earn far more broadcast and other revenue and could use this advantage to offer recruits larger payments and more easily absorb the costs of doing so. NCAA MSJ at 17-19.

APs criticize this evidence, but they have none of their own. In particular, APs have no support for their claim that "the challenged restraint has perpetuated a competitive *imbalance*." APO at 12 (emphasis added). They cite only to inadmissible hearsay articles by commentators like the "Drake Group" and professors who are not testifying in this case. Moreover, both professors conclude that they do not know how eliminating the NCAA's amateurism rules would affect competitive balance. Luedtke Decl. Ex. 27 ¶¶ 24, 27. APs also ignore the evidence that a wide swath of schools in football and men's basketball have had national success. NCAA MSJ at 19.[12]

**Support for Other Sports.** The NCAA also adduced extensive evidence, including sworn declarations from athletics administrators, that they could not afford to support SAs in other sports if they paid football and men's basketball SAs 50% of broadcast revenue. NCAA MSJ at 22-24. APs have no contrary evidence. All they can say is that "*some* cost-cutting and reallocation of saved money is entirely *possible*." APO at 14 (emphasis added). Such speculation cannot take the place of evidence on summary judgment. *See McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009).

Nor can critiques of the NCAA's evidence (*see supra*), especially when they make no sense. APs say that the NCAA's witnesses "wrongly assume[] a 50/50 revenue split is dictated by any injunction." APO at 14. But again, this 50/50 split is based on the testimony of APs' own experts. If APs are now asking this Court to disregard this "evidence," it only makes the NCAA's

---

[12] *See*, *e.g.*, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (stating that "the nonmoving party may not merely state that it will discredit the moving party's evidence at trial"). Nor would doing so entitle APs to summary judgment even if the NCAA had the burden on quick look. *Smythe v. Safeco Ins. Co. of Am.*, 33 F. App'x 303, 305 (9th Cir. 2002) ("The alleged implausibility of Smythe's declaration cannot support the grant of summary judgment.").

1  motion stronger—because APs have no other evidence of the "injury" that the NCAA's rules have

2  supposedly caused to competition in the "market."[13]

3       APs argue that supporting SAs in other sports involves a market other than those allegedly

4  restrained. However, in their complaint and summary judgment papers, APs identified "the

5  student-athlete Division I college education market in the United States" as a relevant market.

6  3CAC ¶ 391; APM at 8. Both markets include all NCAA SAs, not just football and men's

7  basketball players. Regardless, it would be error not to consider that the NCAA's policies

8  "improved the quality of the educational program" and made "education more accessible to a

9  greater number of students." *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993).[14]

10       Finally, APs argue that schools would not cut other sports based on a few anecdotes of

11  schools already cutting other sports. APO at 14. That makes no sense, especially because APs

12  argue that schools are already *overspending* on football and men's basketball. *Id.* If that is the

13  case today, then diverting 50% of revenues to pay the student-athletes would just make matters

14  worse.

15  **Integration of Athletics and Education.** The NCAA pointed to sworn testimony of every

16  named AP about the value of his education and the importance of being a student. NCAA MSJ at

17  ───────────────────

18  [13] In a footnote, APs assert that the testimony of 22 conference and university personnel should be stricken under Fed. R. Civ. P. 37(c)(1). APO at 5 n.14. *First*, the NCAA's Rule 26(a)(1)

19  disclosures adequately disclosed each of these declarants by virtue of their position. *Second*, the identity of almost all of these declarants has "otherwise been made known" to APs in the course of

20  this litigation, Fed. R. Civ. P. 26(e)(1), which "discharged Defendants' duty to supplement their disclosures with respect to these [witnesses]." *Vieste, LLC v. Hill Redwood Dev.*, 2011 WL

21  2181200, at *3 (N.D. Cal. June 3, 2011). Of the 22 declarants, 11 previously filed declarations at

22  the class certification stage. Seven of the remaining 11 (along with most of the prior declarants) are referred to by name in exhibits to APs' own court filings, and many other times in documents,

23  depositions, and expert reports. *Third*, APs do not suggest that they have been prejudiced, and the testimony of these witnesses should come as no surprise, as it is entirely consistent with evidence

24  that the NCAA has introduced throughout this litigation. *See* Fed. R. Civ. P. 37(c)(1); *San*

25  *Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 733 (N.D. Cal. 2011). If the Court is considering striking any declaration, the NCAA should be given an opportunity to fully

26  brief these issues.

27  [14] APs argue that *Brown* is distinguishable because the court "noted the absence of any profit-maximizing purpose." APO at 6 n.18. But they do not explain how the NCAA could have a

28  "profit-maximizing purpose" in supporting scholarships in dozens of sports that earn no "profit."

22. The NCAA also noted that the only survey of SAs in the record shows strong evidence of integration into academic life. *Id.* at 21-22. The NCAA pointed to educators' sworn declarations that paying SAs would compromise universities' educational mission and harm the educational process. *Id.* And James Heckman, a Nobel Prize-winning economist, demonstrated the enormous benefits of the education that football and men's basketball players get for free or at a reduced (often greatly reduced) cost.

Against this evidence, APs offer nothing more than hearsay anecdotes and references to two supposed "scandals." APO at 12-13. These anecdotes do not show that any "corruption of academics" is "widespread," and in any event, APs provide no evidence (or argument) that permitting payments to student-athletes would improve anyone's educational experience.

DATED: February 3, 2014

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By:  *Glenn D. Pomerantz*
      GLENN D. POMERANTZ

Attorneys for Defendant NCAA