1

2                IN THE UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5   IN RE NCAA STUDENT-ATHLETE                No. C 09-1967 CW
    NAME & LIKENESS LICENSING
6   LITIGATION                                ORDER RESOLVING
                                              CROSS-MOTIONS FOR
7                                             SUMMARY JUDGMENT;
                                              GRANTING MOTION TO
8   _____/         AMEND CLASS
                                              DEFINITION;
9                                             DENYING MOTION FOR
                                              LEAVE TO FILE
10                                            MOTION FOR
                                              RECONSIDERATION
11                                            (Docket Nos. 898,
                                              911, 933, 998)

12        Plaintiffs, a group of current and former college athletes,

13   bring this antitrust class action against Defendant National

14   Collegiate Athletic Association (NCAA).  They initially brought

15   claims against Collegiate Licensing Company (CLC) and Electronic

16   Arts Inc. (EA), as well, but agreed in September 2013 to settle

17   those claims.  Plaintiffs now move for summary judgment on all

18   antitrust class claims against the NCAA.  The NCAA opposes the

19   motion and cross-moves for summary judgment on those claims.

20   Amici curiae, Fox Broadcasting Company and Big Ten Network, LLC

21   (collectively, Networks), filed a brief supporting the NCAA's

22   summary judgment motion.  After considering the parties'

23   submissions and oral argument, the Court grants in part

24   Plaintiff's motion for summary judgment and denies it in part and

25   denies the NCAA's cross-motion for summary judgment.  In addition,

26   the Court grants Plaintiffs' motion to amend the class definition

27   and denies their motion for leave to seek reconsideration of the

28   Court's class certification order.

United States District Court
For the Northern District of California

BACKGROUND

Plaintiffs are twenty-four current and former student-athletes who played for NCAA men's football or basketball teams between 1953 and the present. All played at the Division I level, the highest level of collegiate athletic competition,[1] and many went on to play professionally, as well. In the present case, four of the Plaintiffs (Right-of-Publicity Plaintiffs) allege that the NCAA misappropriated their names, images, and likenesses in violation of their statutory and common law rights of publicity. The other twenty Plaintiffs (Antitrust Plaintiffs) allege that the NCAA violated federal antitrust law by conspiring with EA and CLC to restrain competition in the market for the commercial use of their names, images, and likenesses. The instant motions address only the latter set of claims, which arise under the Sherman Antitrust Act, 15 U.S.C. §§ 1 et seq.

Antitrust Plaintiffs[2] initiated the first of these consolidated actions in 2009 and filed the operative Third Amended Consolidated Class Action Complaint (3CAC) in July 2013. Docket No. 832. They allege that the NCAA engaged in anti-competitive conduct by conspiring to sell or license the names, images, and likenesses of Division I men's football and basketball players, without their consent, for use in live television broadcasts, archival game footage, and NCAA-branded videogames featuring

---

[1] As noted in prior orders, Division I was known as the "University Division" prior to 1973. In college football, the division now consists of two subdivisions known as the "Division I Football Bowl Subdivision" (FBS) and the "Division I Football Championship Subdivision" (FCS). For the sake of simplicity, this order refers generally to all of these divisions as "Division I."

[2] Unless otherwise noted, all subsequent references to "Plaintiffs" in this order are meant to denote the twenty Antitrust Plaintiffs.

player-avatars modeled after real student-athletes. They accuse the NCAA, EA, and CLC of engaging "in an overarching conspiracy to: (a) fix the amount current and former student-athletes are paid for the licensing, use, and sale of their names, images, and likenesses at zero; and (b) foreclose current and former student-athletes from the market for the licensing, use, and sale of their names, images, and likenesses." 3CAC ¶ 14.

In 2012, Plaintiffs moved to certify a class of current and former Division I football and basketball players to pursue declaratory and injunctive relief. In particular, they sought an injunction barring the NCAA from enforcing any rules, bylaws, or organizational policies that prohibit current and former student-athletes from seeking compensation for the commercial use of their names, images, or likenesses. According to Plaintiffs, these rules, bylaws, and policies form an integral part of the NCAA's price-fixing conspiracy and operate to restrain competition in two distinct but related markets: (1) the "college education" market, in which Division I colleges and universities compete to recruit the best student-athletes to play football or basketball; and (2) the "group licensing" market, in which broadcasters and videogame developers compete for group licenses to use the names, images and likenesses of all student-athletes on particular Division I football and basketball teams in live game broadcasts, archival footage, and videogames. Id. ¶ 391.

Plaintiffs also moved to certify a subclass of current and former student-athletes to pursue monetary damages. Specifically, they sought compensation for the unauthorized use of student-athletes' names, images, and likenesses in broadcast footage and

**United States District Court**
For the Northern District of California

videogames after July 2005, which is the earliest date on which Plaintiffs could recover damages under the Sherman Act's four-year statute of limitations.  See 15 U.S.C. § 15b.

In September 2013, while their class certification motion was pending, Plaintiffs reached a settlement in principle with EA and CLC.  The parties represented that this settlement would resolve all of Plaintiffs' pending antitrust and right-of-publicity claims against EA and CLC.  Based on this representation, the Court vacated EA and CLC's remaining discovery and dispositive motion deadlines in October 2013 so that they could finalize the terms of their agreement and Plaintiffs could move for preliminary settlement approval.  Docket No. 870.  As of this date, the parties have yet to finalize their agreement and move for preliminary approval.

In November 2013, this Court issued its class certification order.  Docket No. 893, Nov. 8, 2013 Order, at 23-24.  The Court granted Plaintiffs' request to certify the injunctive relief class but denied their request to certify a damages subclass, citing various barriers to class manageability.

On November 15, 2013, one week after the class certification order issued, Plaintiffs filed the instant motion for summary judgment.  The NCAA cross-moved for summary judgment one month later.  While these motions were pending, Plaintiffs moved for leave to seek partial reconsideration of the class certification order and moved to amend the class definition in the class certification order.

United States District Court
For the Northern District of California

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential

element of its claim or defense to carry its
ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d
1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an
absence of evidence to support an essential element of a claim or
defense, it is not required to produce evidence showing the
absence of a material fact on such issues, or to support its
motion with evidence negating the non-moving party's claim.  Id.;
see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990);
Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If
the moving party shows an absence of evidence to support the non-
moving party's case, the burden then shifts to the non-moving
party to produce "specific evidence, through affidavits or
admissible discovery material, to show that the dispute exists."
Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an
essential element of the non-moving party's claim or defense, it
must produce affirmative evidence of such negation.  Nissan, 210
F.3d at 1105.  If the moving party produces such evidence, the
burden then shifts to the non-moving party to produce specific
evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of
production by either method, the non-moving party is under no
obligation to offer any evidence in support of its opposition.
Id.  This is true even though the non-moving party bears the
ultimate burden of persuasion at trial.  Id. at 1107.

6

**United States District Court**
For the Northern District of California

DISCUSSION

I.  Cross-Motions for Summary Judgment

A.  Legal Standard under the Section 1 of the Sherman Act

Section 1 of the Sherman Act makes it illegal to form any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  To prevail on a claim under this section, a plaintiff must show "'(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'"  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir. 2001) (citing Hairston v. Pacific 10 Conference, 101 F.3d 1315, 1318 (9th Cir. 1996)).  For reasons explained in prior orders, Plaintiffs' claims in this case must be analyzed under the rule of reason rather than a per se rule of illegality. See Docket No. 151, Feb. 8, 2010 Order, at 9–10.

"A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects." Tanaka, 252 F.3d at 1063.  Courts typically rely on a burden-shifting framework to conduct this balancing.  Under that framework, the "plaintiff bears the initial burden of showing that the restraint produces 'significant anticompetitive effects' within a 'relevant market.'"  Id. (citing Hairston, 101 F.3d at 1319).  If the plaintiff satisfies this initial burden, "the defendant must come forward with evidence of the restraint's procompetitive effects."  Id.  Finally, if the defendant produces this evidence, the plaintiff must "show that 'any legitimate

objectives can be achieved in a substantially less restrictive manner.'" Id. (citing Hairston, 101 F.3d at 1319).

Plaintiffs urge the Court to engage in a "quick look" rule of reason analysis rather than applying the more comprehensive burden-shifting framework described above. A "quick look" analysis is an abbreviated form of the rule of reason analysis which presumes that the challenged restraint is unlawful and "in effect shifts to a defendant the burden to show empirical evidence of procompetitive effects." FTC v. Actavis, Inc., 133 S. Ct. 2223, 2237 (2013) (internal citations and quotation marks omitted). The Ninth Circuit has explained that a "truncated rule of reason or 'quick look' antitrust analysis may be appropriately used where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1134 (9th Cir. 2011) (citing Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999)). However, "if an arrangement 'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,' then a 'quick look' form of analysis is inappropriate." Harris, 651 F.3d at 1134 (citing Cal. Dental, 526 U.S. at 771).

Here, the challenged restraint is the set of NCAA rules and practices which prevent student-athletes from selling group licenses for the use of their names, images, and likenesses. Because courts have found that the NCAA's general restrictions on student-athlete compensation could conceivably enhance

United States District Court
For the Northern District of California

competition,[3] a "quick look" analysis is not appropriate here.

Indeed, the parties have submitted such a large and diverse volume

of competing economic analyses that any starting presumption --

whether of legality[4] or illegality -- would do little to help

resolve the ultimate question in this case: that is, what impact

the challenged restraint has on competition in the relevant

markets.  See Board of Regents, 468 U.S. at 104 ("[W]hether the

ultimate finding is the product of a presumption or actual market

analysis, the essential inquiry remains the same -- whether or not

the challenged restraint enhances competition.").  The rule of

reason analysis here will therefore follow the traditional burden-

shifting framework rather than the "quick look" approach proposed

by Plaintiffs.

B.    Anti-Competitive Effects of Challenged Restraint

As noted above, the plaintiff bears the initial burden of

showing that the challenged restraint "produces 'significant

anticompetitive effects' within a 'relevant market.'"  Tanaka, 252

F.3d at 1063 (citing Hairston, 101 F.3d at 1319).  To meet this

burden, Plaintiffs in the present case must produce evidence to

show that the NCAA's prohibition on student-athlete compensation

---

[3] See, e.g., NCAA v. Board of Regents of Univ. of Oklahoma, 468
U.S. 85, 101-02 (1984) (noting in dicta that the NCAA's ban on student-
athlete pay helps "preserve the character and quality" of its product).
This Court has previously explained why Board of Regents -- which does
not examine the NCAA's ban on student-athlete compensation under the
rule of reason -- does not control the outcome of this case.  See Docket
No. 876, Oct. 25, 2013 Order, at 8-16.

[4] Although the NCAA contends that a "quick look" analysis is
inappropriate, it argues that the eligibility rules challenged by
Plaintiffs should nevertheless "be presumed to be procompetitive because
they are essential for the NCAA to produce a unique product."  Docket
No. 926, NCAA Cross-Mot. Summ. J., at 8.  Such a presumption is not
useful here for the same reasons that Plaintiffs' requested presumption
is not useful.

for the use of their names, images, and likenesses harms
competition in the two markets they have identified -- namely, the
"college education" market and the "group licensing" market.

     With respect to the "college education" market, Plaintiffs
rely on various expert reports to show that the NCAA undermines
Division I schools' efforts to compete freely for the best
football and basketball recruits.  See, e.g., Docket No. 898, 1st
Scherrer Decl., Ex. 12, Sept 2013 Noll Report, at 36-59
(describing competition among Division I schools for top Division
I football and basketball recruits).  Other courts in this circuit
have recognized that NCAA rules which impede Division I schools'
ability to compete for student-athletes may give rise to a Sherman
Act violation.  See, e.g., White v. NCAA, Civil Case No. 06-999,
Docket No. 72, slip op. at 3 (C.D. Cal. Sept. 20, 2006) (holding
that former college football and basketball players stated a valid
antitrust claim against the NCAA by alleging that its limits on
financial aid for student-athletes restrained competition in
markets where "colleges and universities compete to attract
student-athletes"); In re NCAA I-A Walk-On Football Players
Litig., 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005) (holding that
former college football players stated a valid antitrust claim by
alleging that NCAA restrictions on the number of full scholarships
that Division I schools may offer restrain competition in the
"market in which NCAA member schools compete for skilled amateur
football players").

     According to Plaintiffs' experts, the NCAA restrains
competition in this market by preventing Division I schools from
offering their recruits a portion of the revenue they receive from

United States District Court
For the Northern District of California

football- and basketball-related broadcasting and videogame licenses.  These schools are thus deprived of a tool that they could otherwise use to recruit the top student-athletes. Plaintiffs allege that student-athletes are harmed by this restraint because it prevents them from receiving compensation -- specifically, for the use of their names, images, and likenesses -- that they would receive in an unrestrained market. 1st Scherrer Decl., Ex. 12, Sept. 2013 Noll Report, at 113.  Thus, because Plaintiffs' evidence supports an inference that this restraint has an anticompetitive effect on the "college education" market, it is sufficient to satisfy their initial summary judgment burden.

With respect to the "group licensing" market, Plaintiffs rely on the same expert evidence to show that the NCAA prevents videogame developers and broadcasters from competing freely for group licenses to use student-athletes' names, images, and likenesses.  Plaintiffs' experts examined how broadcasters and videogame developers compete to obtain group licenses for the use of professional athletes' names, images, and likenesses and concluded that the NCAA prevents similar competition from taking place in the market for the use of college athletes' names, images, and likenesses.  See id., Sept. 2013 Noll Report, at 59-72, 84; Docket No. 651, Aug. 2012 Noll Report, at 37-45.[5]  These experts' analyses offer sufficiently plausible evidence of anticompetitive effects in the "group licensing" market and, thus,

_____

[5] While some of this expert evidence was only submitted with Plaintiffs' class certification motion, Plaintiffs' expert, Dr. Noll, has incorporated it by reference in his latest report.

United States District Court
For the Northern District of California

satisfy Plaintiffs' initial summary judgment burden to show harm
to competition in that market.

The NCAA contends that Plaintiffs have not shown harm to
competition in the market for _former_ student-athletes' group
licensing rights.  It highlights Plaintiffs' failure to identify
any NCAA bylaws that specifically prohibit former student-athletes
from licensing their names, images, and likenesses after they stop
playing Division I sports.  But Plaintiffs do not need to identify
any such bylaws to meet their summary judgment burden here.  It is
enough that they have presented evidence suggesting that the NCAA
continues to license the names, images, and likenesses of former
student-athletes, without their consent, long after they stopped
competing in college.  The record contains evidence that certain
NCAA-branded videogames depict entire teams of former Division I
basketball players who stopped competing years earlier.  The NCAA
does not dispute that most of these players were never compensated
for the use of their likenesses in those videogames nor does it
dispute that, as a practical matter, former student-athletes are
not likely to receive any money for their appearances in those
videogames or in rebroadcasts of past games.  See Docket No. 1007,
Feb. 20, 2014 Hrg. Tr. 9:4-12:21.  As discussed at the hearing,
the NCAA sells the rights to record and broadcast Division I
football and basketball games while the student-athletes who
participate in those games are still bound by its eligibility
rules, including the restrictions on compensation.  As a result,
student-athletes are prevented from selling or negotiating
licenses for the use of their names, images, and likenesses at the
exact moment when those licenses are most valuable.  By the time

United States District Court
For the Northern District of California

these student-athletes have stopped participating in college sports -- and are no longer bound by NCAA rules -- they have effectively lost whatever bargaining power they once had in the group licensing market because the NCAA has already sold the recording and broadcasting rights for the games in which they played.  Thus, even if the NCAA bylaws do not prohibit former student-athletes from licensing their names, images, and likenesses, the NCAA can still preclude these student-athletes from participating fully in the group licensing market through a combination of its compensation rules and licensing practices.

The NCAA next contends that Plaintiffs' request for an injunction to prevent the unauthorized use of their names, images, and likenesses in videogames is moot because the NCAA has not renewed its licensing agreement with EA.  Docket No. 925, C. Luedtke Decl., Ex. 24, J. Isch Decl. ¶ 19.  Even without this specific licensing agreement, however, the NCAA could still enter into licensing agreements with other videogame developers.  It could also facilitate such an agreement between a videogame developer and specific NCAA member schools and conferences. Accordingly, because the NCAA has not shown that it will never seek to enter into or facilitate another videogame licensing agreement, Plaintiffs' injunctive relief claim regarding videogames is not moot.  See Nanoexa Corp. v. Univ. of Chicago, 2010 WL 3398532, at *3 (N.D. Cal.) (Koh, J.) (finding that the termination of a licensing agreement between parties in a patent-licensing dispute was not sufficient to render moot the plaintiff's claims for injunctive relief because the defendant was still able to "partner with other companies").

Finally, the NCAA contends that most of the named Plaintiffs' damages claims are time-barred because they are based on alleged violations that occurred more than four years before this action was filed. See 15 U.S.C. § 15b (establishing four-year statute of limitations). This Court previously recognized that the continuing violations doctrine applied to Plaintiffs' claims in this case because Plaintiffs alleged that the NCAA committed certain overt acts after July 2005 which revived Plaintiffs' antitrust claims. See Feb. 8, 2010 Order at 11-12 (citing Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 237 (9th Cir. 1987)). Although Plaintiffs have failed to identify any evidence of those overt acts here, they may nevertheless proceed to trial on their claims. Plaintiffs have yet to notify the Court which individuals will be asserting damages claims at trial and what the basis of those claims will be. The parties agreed that Plaintiffs could disclose this information after the summary judgment hearing. Accordingly, in light of this agreement and the fact that Plaintiffs have yet to identify the specific basis for their individual damage claims, Plaintiffs will not be required to present evidence of a continuing violation until trial. At trial, however, Plaintiffs will need to establish a continuing antitrust violation by showing that the NCAA committed some overt act after July 2005 to further its unlawful conduct. Pace Indus., 813 F.2d at 237 ("[E]ven when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.").

**United States District Court**
For the Northern District of California

C.   Existence of a Relevant Market

As explained in the October 25, 2013 order, Plaintiffs' evidence of a "group licensing" market rests on the assumption that student-athletes, absent the challenged restraint, would be able to assert cognizable right-of-publicity claims against broadcasters who depict them in live game broadcasts or archival game footage without a group license or consent.  If student-athletes could not protect their publicity rights in this way, then broadcasters would have no reason to purchase group licenses from them (or otherwise obtain their consent) for the use of their names, images, or likenesses in game broadcasts.  Thus, to establish the existence of a "group licensing" market, Plaintiffs must show that, absent the NCAA's restraint on student-athlete pay, student-athletes would have cognizable rights of publicity in the use of their names, images, and likenesses in live game broadcasts and archival game footage.[6]

The NCAA and the Networks, as amici, contend that Plaintiffs cannot make this showing.  They argue that live broadcasts of college football and basketball games are a form of protected speech and that broadcasters' First Amendment right to televise these games trumps whatever rights of publicity the student-athletes might otherwise assert.  The Networks further argue that

---

[6] As previously noted, this order addresses only the Antitrust Plaintiffs' claims and not the Right-of-Publicity Plaintiffs' claims. Although the following sections discuss the scope of student-athletes' publicity rights, the discussion focuses on whether those rights could, absent the challenged restraint, give rise to a market for group licenses.  The Court does not analyze the viability of Right-of-Publicity Plaintiffs' claims, which remain stayed pending EA's petition for certiorari.

United States District Court
For the Northern District of California

archival game footage, including highlights and rebroadcasts of old games, is also protected.

The Supreme Court has never specifically considered whether or not the First Amendment prevents an athlete from asserting a right-of-publicity claim against a defendant who used footage of the athlete's entire performance without his or her consent. However, its decision in Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977), provides useful guidance in balancing a performer's right of publicity against First Amendment considerations.  In Zacchini, the Court held that a television station was not entitled to First Amendment protection for broadcasting the entire fifteen-second "human cannonball" act of a performer at an Ohio county fair.  Id. at 563-64.  The Court explained that the First Amendment did not shield the station from right-of-publicity liability because it chose to broadcast the performer's entire act without his consent and, in so doing, undermined his economic interests by reducing demand for his live show.  Id. at 574-76 ("Wherever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent.").

The Court's reasoning in Zacchini strongly suggests that the First Amendment does not guarantee media organizations an unfettered right to broadcast entire sporting events without regard for the participating athletes' rights of publicity.  In fact, the Court specifically analogized the performer's "human cannonball" act in Zacchini to the athletic performances at issue

16

in two earlier right-of-publicity cases decided by lower federal courts.  In one of those cases, Ettore v. Philco Television Broad. Corp., 229 F.2d 481 (3d Cir. 1956), the Third Circuit held that a television network had violated a professional boxer's right of publicity by broadcasting one of his old fights without his consent.  Similarly, in Pittsburgh Athletic Co. v. KQV Broad. Co., 24 F. Supp. 490 (W.D. Pa. 1938), a district court held that a radio station had violated a baseball team owner's rights to disseminate, sell, or license broadcasting rights for its games by broadcasting certain baseball games without the owner's consent. Although neither Ettore nor Pittsburgh Athletic specifically considered whether sports broadcasts constitute protected speech, the Supreme Court's reliance on these cases in Zacchini nevertheless implies that sports broadcasters are not entitled to any special First Amendment protections against right-of-publicity liability.  See 433 U.S. at 575 ("The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television than it would privilege respondent . . . to film and broadcast a prize fight or a baseball game, where the promoters or the participants had other plans for publicizing the event.").

Zacchini's logic applies in this case even though sports broadcasters are not solely responsible for depriving Division I student-athletes of compensation for their athletic performances. The NCAA's challenged rules obviously play a key role in ensuring that student-athletes are not paid for their performances in televised games.  But, absent those rules, student-athletes would have an economic interest in being able to sell group licenses for

United States District Court
For the Northern District of California

17

United States District Court
For the Northern District of California

the rights to broadcast their games.  Under those circumstances, the First Amendment would not empower broadcasters to undermine the student-athletes' economic interests by televising their games without group licenses any more than it allowed the television station in Zacchini to broadcast the county fair performer's "human cannonball" act without his consent.  The student-athletes' economic interests in this case are determined by the value their athletic performances would have in an unrestrained market -- not by their value in a market from which they have been allegedly excluded.

The Seventh Circuit recently relied on Zacchini in holding that a news organization did not have an absolute First Amendment right to stream entire high school sporting events on its website. In Wisconsin Interscholastic Athletic Association v. Gannett Co., Inc., 658 F.3d 614, 615 (7th Cir. 2011), a high school athletic association sought declaratory judgment that it had a right to grant an exclusive license to a regional television network to broadcast certain sporting events that it helped organize.  Id. at 618.  The association filed the suit against a local newspaper which had streamed four postseason football games on its website without the regional network's consent.  Id. After the district court granted summary judgment to the association,[7] the newspaper appealed, arguing that the exclusive broadcasting license was invalid because it violated the newspaper's "First Amendment right

---

[7] Although the athletic association was technically a state actor, the Seventh Circuit made clear that this fact did not change its First Amendment analysis because the association was "functioning as the creator and disseminator of content," not as a regulator.  658 F.3d at 622-24.

to broadcast entire [game] performances" and prevented it from covering high school sports.  Id. at 616.

The Seventh Circuit rejected this argument.  It held that the newspaper's "theory that coverage and broadcast are identical is both analytically flawed and foreclosed by Zacchini."  Id. Addressing the analytical flaws in the newspaper's theory, the court explained,

> Interpreting the First Amendment to provide the media with a right to transmit an entire performance or to prohibit performers from charging fees would take us back centuries, to a time when artists or performers were unable to capture the economic value of a performance.  Over the long run, this would harm, not help, the interests of free speech. The First Amendment requires no such folly.

Id. at 624.  The court then turned to Zacchini, noting that Zacchini established "two propositions" which undercut the newspaper's argument: "First, [Zacchini] distinguishes between the media's First Amendment right to 'report on' and 'cover' an event and its lack of a right to broadcast an 'entire act.'  Second, Zacchini makes clear that the producer of entertainment is entitled to charge a fee in exchange for consent to broadcast." Id.  Relying on these principles, the Wisconsin Interscholastic court concluded that the newspaper's First Amendment rights did not trump the athletic association's right to grant an exclusive license to broadcast high school sporting events.

These principles compel a similar conclusion here: the First Amendment does not guarantee media organizations an unlimited right to broadcast entire college football and basketball games. Indeed, if the First Amendment did guarantee such a right, then it

19

would cast doubt on the NCAA's ability to issue exclusive licenses to specific broadcasters.  There is no principled reason why the First Amendment would allow the NCAA to restrict press access to college football and basketball games (via exclusive licensing agreements) but, at the same time, prohibit student-athletes from doing the same (via right-of-publicity actions).  This is precisely why the court in Wisconsin Interscholastic equated the athletic association's right to issue exclusive broadcasting licenses with the "human cannonball" performer's right of publicity in Zacchini.  Zacchini itself also appeared to equate the publicity rights of "promoters" and "participants" in sporting events.  433 U.S. at 575 (stating that the First Amendment did not immunize media from right-of-publicity liability for broadcasting a sporting event "where the promoters or the participants had other plans for publicizing the event").  As far as the First Amendment is concerned, these rights stand on equal footing.

Thus, taken together, Zacchini and Wisconsin Interscholastic make clear that the First Amendment does not create a right to broadcast an entire athletic performance without first obtaining a license or consent from all of the parties who hold valid

ownership rights in that performance.[8]  Whether Division I student-athletes hold any ownership rights in their athletic performances does not depend on the scope of broadcasters' First Amendment rights but, rather, on whether the student-athletes themselves validly transferred their rights of publicity to another party.  Because the current record does not demonstrate that all Division I student-athletes validly transferred all of these rights, the First Amendment does not preclude student-athletes from asserting rights of publicity in live broadcasts or re-broadcasts of entire games.  Accordingly, the First Amendment does not preclude the existence of a market for group licenses to use student-athletes' names, images, and likenesses in those broadcasts.

The NCAA and the Networks contend that Zacchini and Wisconsin Interscholastic are not applicable here and urge the Court to rely instead on several other cases, which rejected athletes' rights-of-publicity claims on First Amendment grounds.  All of the cases they cite, however, are inapposite because they do not address claims based on footage of the athletes' entire athletic

---

[8] In its reply brief, the NCAA cites Washington v. Nat'l Football League, 880 F. Supp. 2d 1004, 1008 (D. Minn. 2012), to argue that any dispute between the NCAA and the student-athletes regarding profits from game rebroadcasts is a dispute over performance ownership rights and, thus, "is a royalties issue, not an antitrust issue."  This statement, however, is only partially true.  While some student-athletes may be entitled to recover royalties from the NCAA based on their appearances in certain game re-broadcasts, those royalty claims would not preclude student-athletes from challenging the alleged price-fixing plan that excluded them from the group licensing market in the first place. Whatever individual harms might be redressed through royalties claims, antitrust law remains a vehicle for challenging harms to competition more broadly.

performance, that is, entire games.[9]  What's more, many of the
cases they cite were decided based on First Amendment
considerations that are not relevant to full-game broadcasts.  For
instance, in Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95
F.3d 959, 972 (10th Cir. 1996), the Tenth Circuit rejected a group of
professional baseball players' right-of-publicity claims based on
"cartoons and caricatures" of their likenesses in "parody trading
cards."  Id. at 969.  The court held that the card company's use of
the players' likenesses was protected because its "interest in
publishing its parody trading cards implicates some of the core
concerns of the First Amendment."  Id. at 969, 972 (explaining
that "parody, both as social criticism and a means of self-
expression, is a vital commodity in the marketplace of ideas").
Game broadcasts are not a form of parody and, thus, do not raise
the same concerns.

    The Eighth Circuit's decision in C.B.C. Distribution &
Marketing, Inc. v. Major League Baseball Advanced Media, L.P., 505
F.3d 818, 823 (8th Cir. 2007), was also based on First Amendment
concerns that do not apply to full-game broadcasts.  In that case,
a group of professional baseball players alleged that a website
had misappropriated their publicity rights by using their names

---

[9] See, e.g., Gionfriddo v. Major League Baseball, 94 Cal. App. 4th
400 (2001) (holding that professional baseball league's use of retired
players' "names, voices, signatures, photographs and/or likenesses" in
websites and video clips was protected under the First Amendment);
Montana v. San Jose Mercury News, Inc., 34 Cal. App. 4th 790, 794 (1995)
(holding that "full page newspaper accounts of Super Bowls XXIII and
XXIV" featuring photographs of the 49ers' star quarterback, Joe Montana,
were "entitled to First Amendment protection"); Dora v. Frontline Video,
Inc., 15 Cal. App. 4th 536 (1993) (holding that a documentary featuring
audio interview, photographs, and video clips of a retired surfer was
constitutionally protected).

United States District Court
For the Northern District of California

and playing statistics in a fantasy baseball game without their consent.  The Eighth Circuit held that the website's use of the players' names and statistics was protected because, among other reasons, the information was "readily available in the public domain, and it would be strange law that a person would not have a first amendment right to use information that is available to everyone."  Id. at 823.  This rationale does not justify a First Amendment right to broadcast entire Division I football and basketball games, which are not available in the public domain.

Plaintiffs argue that, in addition to the reasons discussed above, full-game broadcasts are not protected by the First Amendment because they constitute commercial speech.  As previously explained, Oct. 25, 2013 Order at 19-20, footage of athletic performances is not protected by the First Amendment if it is used for "strictly commercial" purposes.  Pooley v. Nat'l Hole-In-One Ass'n, 89 F. Supp. 2d 1108, 1113-14 (D. Ariz. 2000) ("[W]hen the purpose of using a person's identity is strictly to advertise a product or a service, as it is here, the use is not protected by the First Amendment."); see also Dryer, 689 F. Supp. 2d at 1116 ("The threshold inquiry is whether the films are, as the NFL argues, expressive works entitled to the highest protection under the First Amendment, or commercial speech entitled to less protection, as Plaintiffs contend.").  The Ninth Circuit defines commercial speech as "'speech that does no more than propose a commercial transaction.'"  Hunt v. City of Los Angeles, 638 F.3d 703, 715 (9th Cir. 2011) (citing United States v. United Foods, Inc., 533 U.S. 405, 409 (2001)).

United States District Court
For the Northern District of California

Applying this test to the present case, it is clear that broadcasts of entire Division I football and basketball games do not constitute commercial speech.  To the extent that these broadcasts propose commercial transactions, they do so largely during commercial breaks or other stoppages in game play.  This is analogous to a newspaper or magazine setting aside certain pages for advertisements and is not sufficient to render the entire broadcast commercial.  See Ad World, Inc. v. Township of Doylestown, 672 F.2d 1136, 1139 (3d Cir. 1982) ("The fact that a publication carries advertisements . . . does not render its speech commercial for first amendment purposes.").  Although many game broadcasts also feature corporate logos and slogans during the course of play, these elements of the broadcast are not sufficient to convert the entire broadcast into commercial speech. See Transp. Alternatives, Inc. v. City of New York, 340 F.3d 72, 78 (2d Cir. 2003) ("Notwithstanding the presence of minor commercial elements, such as display of corporate logos, this speech [i.e., a city-sponsored biking tour] was a far distance from commercial speech undertaken to solicit a commercial transaction.").  Furthermore, the fact that some of the game broadcasters' programming decisions are motivated by a desire for profit does not establish that the rest of the broadcast is commercial.  See Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 960 (9th Cir. 2012) ("[E]conomic motive in itself is insufficient to characterize a publication as commercial.").  Plaintiffs' assertion that broadcasts of entire college football and basketball games are commercial must therefore be rejected.

With respect to broadcasts or recordings that feature only clips or highlight footage of games -- that is, <u>partial</u> athletic performances -- neither <u>Zacchini</u> nor <u>Wisconsin Interscholastic</u> is directly on point.  The handful of federal district courts to address whether the First Amendment precludes athletes from asserting rights of publicity in clips or highlights of their athletic performances have relied on the commercial speech test outlined above to decide the issue.  <u>See</u> <u>Dryer</u>, 689 F. Supp. 2d at 1116; <u>Pooley</u>, 89 F. Supp. 2d at 1113-14.  Some state courts have taken a similar approach.  <u>See, e.g.</u>, <u>Gionfriddo</u>, 94 Cal. App. 4th at 412 (concluding that "minor historical references to plaintiffs within game programs and Web sites and in videos documenting baseball's past" were protected by the First Amendment because they did not constitute commercial speech).

Here, the NCAA has not presented evidence to show that there can be no market for clips and highlight footage of Division I football and basketball players because such clips are used exclusively to produce protected, non-commercial speech.  Plaintiffs, likewise, have not presented evidence to define a clear market for clips and highlight footage of these student-athletes to produce unprotected, commercial speech.  Thus, the Court can neither summarily adjudicate that the First Amendment precludes a market for clips and highlight footage nor can it conclude that, absent the challenged restraint, such a market would actually exist.  Accordingly, neither party is entitled to summary judgment on the question of whether the group licensing market includes a market for clips and highlight footage.

**United States District Court**
For the Northern District of California

In sum, <u>Zacchini</u> and <u>Wisconsin Interscholastic</u> make clear that the First Amendment does not bar Division I student-athletes from selling group licenses to use their names, images, and likenesses in live or recorded broadcasts of entire college football and basketball games.[10]  Plaintiffs' evidence is therefore sufficient to support an inference that, in the absence of the NCAA's restrictions on student-athlete pay, a market would exist for these group licenses.  If Plaintiffs seek to prove that a similar market would exist for group licenses to use student-athletes' names, images, and likenesses in clips and highlight footage, they will have to prove that there would be a demand for these clips and highlight footage specifically for use in commercial speech that is not protected by the First Amendment.

D.   Scope of Relevant Market

The NCAA contends that, even if a group licensing market would exist absent the challenged restraint, the named Plaintiffs could not participate in that market because their rights of publicity would not be cognizable in the states where they are currently domiciled.  This argument is not persuasive for two reasons.

---

[10] This is not to suggest that any individual student-athlete would be able to prevent a broadcaster from televising his team's games merely by withholding his consent.  To create a group licensing market such as the one that Plaintiffs have identified, individual student-athletes would have to transfer their rights of publicity to some representative entity -- such as their school or conference -- as a condition of their participation in Division I athletics so that the representative entity could license the right to televise their games.  Thus, broadcasters would obtain group licenses to use every participating student-athlete's name, image, and likeness as part of the general licenses they would acquire from every school or conference whose games they wished to broadcast.

United States District Court

For the Northern District of California

First, the NCAA has not shown that each of the named Plaintiffs is, in fact, domiciled in a state that refuses to recognize an athlete's right of publicity in live broadcasts of sporting events.  Two of the named Plaintiffs, for instance, are domiciled in Minnesota, where the scope of the common law right of publicity remains unsettled.  See generally Hillerich & Bradsby Co. v. Christian Bros., Inc., 943 F. Supp. 1136, 1141 (D. Minn. 1996) ("Although the Minnesota state courts have not explicitly recognized (or rejected) this cause of action, the federal courts in this circuit and district have concluded that it exists in Minnesota.").  The NCAA has not cited any cases that preclude athletes from asserting right-of-publicity claims in Minnesota[11] and recent case law suggests that athletes may bring such claims under Minnesota law to recover for the unauthorized use of their names and images in at least certain kinds of broadcast footage. See Dryer, 689 F. Supp. 2d at 1123.

Second, even if the named Plaintiffs were precluded from bringing right-of-publicity claims in their states of domicile, the NCAA has not adequately explained why they could not bring these claims in other states.  As the Court previously explained in its order denying the NCAA's motion to dismiss,

> Plaintiffs allege harm to a national market for the licensing rights to their names, images, and likenesses in game broadcasts.  To disprove the existence of this market at the pleading stage, the NCAA would have to identify a law or set of laws that precludes

---

[11] The NCAA cites only one Minnesota case, Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231, 235-36 (Minn. 1998), which does not include any discussion of athletes' publicity rights.  Moreover, the NCAA only cited this case in a footnote to an improperly filed appendix to its brief.

United States District Court
For the Northern District of California

> student-athletes from asserting publicity
> rights to game broadcasts in every state.

Oct. 25, 2013 Order at 17-18 (emphasis in original).  Although the NCAA argues that states "generally apply the law of the plaintiff's domicile for right of publicity claims, regardless of the location of the alleged infringement," NCAA Cross-Mot. Summ. J. at 7, it provides scant support for that assertion.  Its only support comes from section 153 of the <u>Restatement (Second) of Conflict of Laws</u>, which describes how courts typically resolve choice-of-law disputes regarding invasion-of-privacy claims.  Even assuming that most courts would apply section 153 to the named Plaintiffs' right-of-publicity claims -- and there is good reason to believe many would not[12] -- this <u>Restatement</u> provision still would not justify finding that the named Plaintiffs are excluded from the national group licensing market because the provision does not represent a <u>universal</u> rule.  Rather, it represents the approach that courts "usually" take when resolving choice-of-law disputes.  <u>Id.</u>  Not every jurisdiction follows this approach. <u>See, e.g.</u>, <u>Donovan v. Bishop</u>, 2010 WL 4062370, at *5 (S.D. Ind.) ("The Indiana Rights of Publicity Statute . . . 'applies to an act or event that occurs within Indiana, regardless of a personality's domicile, residence, or citizenship.'" (citing Ind. Code § 32-36-1-1)); <u>Bi-Rite Enterprises, Inc. v. Bruce Miner Poster Co., Inc.</u>, 616 F. Supp. 71, 74 (D. Mass. 1984) (finding that "the situs of the right of publicity is where the 'commercial value' of one's persona is exploited" and that, while "the plaintiff's domicile

---

[12] <u>See</u> <u>Zacchini</u>, 433 U.S. at 571 (noting that the tort of invasion of privacy is an "entirely different tort from the 'right of publicity'" under Ohio state law).

may be a relevant factor," it is not determinative), <u>aff'd</u>, 757 F.2d 440 (1st Cir. 1985).  Thus, section 153 does not govern choice-of-law disputes in <u>every</u> jurisdiction where the named Plaintiffs could conceivably assert a right-of-publicity claim. As such, it does not preclude them from participating in the "group licensing" market that they have alleged.

> E.   Procompetitive Justifications for the Challenged Restraint

The NCAA has identified five potential procompetitive justifications for its rules prohibiting student-athletes from receiving compensation for the use of their names, images, and likenesses.  These justifications include (1) the preservation of amateurism in college sports; (2) promoting competitive balance among Division I teams; (3) the integration of education and athletics; (4) increased support for women's sports and less prominent men's sports; and (5) greater output of Division I football and basketball.  Each of these justifications is examined below.

> 1.   Amateurism

The NCAA asserts that the challenged restraint increases the popularity of Division I sports by promoting amateurism.  For support, it relies on the expert reports of Dr. Daniel Rubinfeld, an economist, and Dr. J. Michael Dennis, a public opinion researcher.  Dr. Rubinfeld analyzed several consumer surveys conducted over the past twelve years and concluded that "consumers generally favor the amateur nature of college sports."  Luedtke Decl., Ex. 29, Sept. 2013 Rubinfeld Report ¶ 79.  Dr. Dennis conducted his own consumer survey and reached the same conclusion.

**United States District Court**
For the Northern District of California

He observed that 68.9% of survey respondents were opposed to paying college football and basketball players.[13]  <u>Id.</u>, Ex. 37, Nov. 2013 Dennis Report ¶ 28.  Among respondents who identified themselves as college football or basketball fans (i.e., those who watched, listened to, or attended more than thirty games over the previous twelve months), fifty-one percent were opposed to paying college athletes.  <u>Id.</u>  Dr. Dennis also noted that thirty-eight percent of all survey respondents stated that they would be less likely to watch, listen to, or attend college football and basketball games if student-athletes were paid $20,000 per year; forty-seven percent stated that they would be less likely to watch, listen to, or attend games if student-athletes were paid $50,000 per year; and fifty-three percent stated that they would be less likely to watch, listen to, or attend games if student-athletes were paid $200,000 per year.  <u>Id.</u> ¶ 31.  In contrast, fewer than five percent stated that they would be more likely to watch, listen to, or attend games if student-athletes were paid these amounts.  <u>Id.</u> ¶ 32.

Plaintiffs highlight several deficiencies in the NCAA's survey evidence.  For instance, they note that Dr. Dennis's survey questions failed to distinguish between pay-for-play compensation and compensation for the use of student-athletes' names, images,

---

[13] Plaintiffs move to strike Dr. Dennis's report (and any portions of Dr. Rubinfeld's rebuttal report which rely on it) because the NCAA failed to make timely expert disclosures under Rule 26(a).  Because this Rule 26 violation was ultimately harmless, Plaintiffs' motion is denied.  <u>See</u> Fed. R. Civ. P. 37(c)(1) (providing that a Rule 26 violation should not result in the exclusion of evidence if the violation was harmless).  Plaintiffs not only deposed Dr. Dennis but also submitted their own expert report criticizing his survey results.  Accordingly, they will not be prejudiced by the admission of this evidence.

**United States District Court**
For the Northern District of California

and likenesses.  See Docket No. 898, 1st Scherrer Decl., Ex. 19, Nov. 2013 Poret Report ¶¶ 11-32 (criticizing survey evidence submitted by the NCAA).  They also note that Dr. Dennis's results summary focused more heavily on the opinions of the general population rather than actual college sports fans.  In this regard, Dr. Dennis's failure to specify how many college sports fans would be less likely to watch college sports if student-athletes were paid is especially noteworthy.

Still, despite these shortcomings in Dr. Dennis's report, a reasonable fact-finder could conclude from his survey results that the NCAA's ban on student-athlete compensation serves a procompetitive purpose.  Accordingly, Plaintiffs are not entitled to summary judgment on this issue.  See Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001) (noting that "considering conflicting evidence and deciding what weight to accord the survey [evidence]" is "the proper role for a trier of fact" and "not the role of a district court at the summary judgment stage").

Nor is the NCAA entitled to summary judgment on this issue. Plaintiffs have presented sufficient evidence to support an inference that the preservation of the NCAA's definition of amateurism serves no procompetitive purpose.  They have submitted several expert reports attacking the NCAA's survey evidence and highlighting other evidence which suggests that the popularity of college sports is not tied to the NCAA's efforts to promote amateurism.  One of Plaintiffs' experts, economist Dr. Roger Noll, notes in his report that the NCAA has changed its definition of amateurism several times over the years without significantly

affecting consumer demand for its product.  1st Scherrer Decl.,
Ex. 12, Sept. 2013 Noll Report, Exs. 1A, 1B, 1C (documenting
various changes between 1967 and 2005 to NCAA rules governing
athletic scholarships, financial aid grants, athletic performance
awards, travel expenses, non-athletic employment pay, and other
forms of student-athlete compensation).  Dr. Noll also observes
that other popular sporting event sponsors which once restricted
participation to unpaid amateurs, such as the Olympics, eliminated
these restrictions without undermining their popularity or
marketability.  Id., Sept. 2013 Noll Report, at 129-33.  Finally,
Dr. Noll notes in his report that, in recent years, national
television ratings for popular FBS football teams did not suffer
when the NCAA sanctioned them for violating its amateurism rules.
1st Scherrer Decl., Ex. 12, Sept. 2013 Noll Report at 127-29.
Another one of Plaintiffs' experts, Dr. Daniel Rascher, a
professor of sports management, reached the same conclusions as
Dr. Noll after examining similar developments in other sports.
Docket No. 957, 2d Scherrer Decl., Ex. 8, Nov. 2013 Rascher
Report, at 66-70.  Taken together, this evidence could lead a
reasonable fact-finder to conclude that amateurism, as defined by
the NCAA, does not contribute to the popularity of Division I
football and basketball.

Thus, in light of the conflicting expert evidence regarding
the alleged procompetitive benefits of the NCAA's definition of
amateurism, neither party is entitled to summary judgment on this
issue.

United States District Court
For the Northern District of California

2.   Competitive Balance

The NCAA's second asserted justification for the challenged restraint is that it promotes competitive balance among Division I football and basketball teams and, thus, makes these sports more marketable.  Numerous courts, including the Supreme Court, have recognized that promoting competitive balance among sports teams serves a "legitimate" procompetitive purpose and may justify the imposition by sports leagues of certain restraints on competition. See Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 204 (2010) ("We have recognized, for example, 'that the interest in maintaining a competitive balance' among 'athletic teams is legitimate and important.'" (citing Board of Regents, 468 U.S. at 117)).

Here, the NCAA contends that its rules restricting student-athlete pay enhance competitive balance by preventing teams with greater financial resources from using those resources to gain an advantage in recruiting.  It has submitted declarations from various Division I conference commissioners and university administrators who assert that providing student-athletes with a share of schools' broadcast and other licensing revenue would jeopardize competitive balance between large schools and small schools.  See Luedtke Decl., Exs. 1-21A.  The NCAA also submitted a declaration from Dr. Rubinfeld asserting the same thing.  Id., Ex. 27, D. Rubinfeld Decl. ¶¶ 33-38.

This evidence does not establish that the NCAA's restrictions on student-athlete compensation promote competitive balance among Division I football and basketball teams.  As an initial matter, none of the declarations from conference commissioners and

United States District Court
For the Northern District of California

university administrators is based on empirical evidence, factual data, or expertise in economic analysis. Furthermore, all of these declarations are self-serving because Division I conferences and universities stand to lose a significant portion of their current licensing revenue should Plaintiffs ultimately prevail in this suit. See FTC v. Publishing Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Most importantly, none of these witnesses has even attempted to identify what level of competitive balance is actually necessary to maintain existing consumer demand for Division I football and basketball. And, even if they had, they have not cited any evidence to suggest that the NCAA's restrictions on student-athlete compensation -- the specific restraint challenged in this case -- actually help the NCAA achieve that level of competitive balance.[14]

While Dr. Rubinfeld has asserted generally that allowing Division I schools to pay student-athletes would lead to

_____

[14] The Court notes that both parties have failed to submit any meaningful statistical analyses of competitive balance here. Statisticians and sports economists have developed numerous methods for measuring competitive balance among sports teams. See generally Rodney Fort, "Competitive Balance in North American Professional Sports," in Handbook of Sports Economics Research 190, 194 (John Fizel ed., 2006) (noting that there are "many measures [of competitive balance] to choose from"). Given the wealth of publicly available historical data regarding Division I teams' win-loss records, national rankings, recruiting class quality, box scores (which document game-by-game point differentials), and betting lines, the parties could have used any number of methods to examine competitive balance among Division I teams and to evaluate its impact on consumer demand. While no method for measuring competitive balance is perfect, almost any statistically based measure would have been superior to the collection of selectively culled facts, figures, and non-expert opinions that the parties rely on here.

recruiting disparities between high-revenue and low-revenue
schools, he has not provided any statistical support for that
claim.  Moreover, he specifically admitted that such disparities
already exist.  1st Scherrer Decl., Ex. 1, Sept. 2013 Rubinfeld
Report ¶ 97 (acknowledging that "high-revenue schools may have
recruiting advantages in the current world (better training
facilities, coaches, etc)").  The NCAA's own staff has likewise
acknowledged that the current "disparity in expense budgets" among
Division I schools has likely contributed to "a significant
disparity in competition" among Division I football and basketball
teams.  Id., Ex. 27, Aug. 2011 NCAA Presidential Retreat, Paper on
"Division I Financial Sustainability," at 911-12.  Although it is
possible that the NCAA's restrictions on student-athlete
compensation prevents these disparities from growing even larger,
the NCAA has not provided any evidence to suggest that this is the
case.  It has not explained, for instance, why the restriction on
student-athlete compensation would deter high-revenue schools from
using their resources to gain a recruiting advantage in other
ways, such as by building superior athletic facilities or hiring
better coaches.  Nor has the NCAA explained why it could not use
less restrictive means of maintaining competitive balance, such as
those used by professional sports leagues.

     Nevertheless, because the NCAA has presented some evidence
that the challenged restraint promotes competitive balance,
Plaintiffs are not entitled to summary judgment on this issue.  In
order to prevail on this issue at trial, however, the NCAA will
have to present evidence that the challenged restraint promotes a
level of competitive balance that (1) contributes to consumer

demand for Division I football and basketball and (2) could not be
achieved through less restrictive means.  See Tanaka, 252 F.3d at
1063.

### 3.   Integration of Education and Athletics

The NCAA's third stated justification for the challenged
restraint is that it promotes the integration of education and
athletics.  The NCAA contends that the integration of education
and athletics not only improves the educational experiences of
student-athletes but also advances the educational mission of
colleges.

While these may be worthwhile goals, they are not
procompetitive.  The Supreme Court has made clear that antitrust
defendants cannot rely on these types of social welfare benefits
to justify anticompetitive conduct under the Sherman Act.  FTC v.
Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 424 (1990) ("The
social justifications proffered for respondents' restraint of
trade thus do not make it any less unlawful." (citing National
Society of Professional Engineers v. United States, 435 U.S. 679,
695 (1978))).  Rather, to justify a challenged restraint under the
rule of reason, an antitrust defendant must show that it actually
promotes competition in a relevant market.  Here, the NCAA has not
provided evidence that improving the educational experiences of
student-athletes or advancing the educational mission of colleges
ultimately promotes its product: namely, college sports.

The NCAA argues that "improv[ing] the quality of education"
and "promoting socio-economic diversity" at institutions of higher
education are legitimate procompetitive justifications under
United States v. Brown University, 5 F.3d 658, 669 (3d Cir. 1993).

In <u>Brown University</u>, the Third Circuit held that an agreement among several selective colleges to adopt a need-blind financial aid system and to match each other's financial aid grants did not violate the Sherman Act. The court rejected the plaintiff's argument that the agreement created a purely social good, reasoning that the agreement "not only serves a social benefit, but actually <u>enhances consumer choice</u>" by expanding educational opportunities for "qualified students who are financially 'needy' and would not otherwise be able to afford the high cost of education." <u>Id.</u> at 677 (emphasis added) ("Thus, rather than suppress competition, [the agreement] may in fact merely regulate competition in order to enhance it, while also deriving certain social benefits.").

Unlike the colleges in <u>Brown University</u>, the NCAA has not explained how the challenged restraint in this case -- which limits, rather than increases, the financial benefits provided to college students -- would enhance consumer choice in the markets Plaintiffs have identified. It has also failed to present any evidence showing that the integration of athletics and education actually benefits Division I college sports fans or student-athletes. Instead, it has submitted a collection of declarations from university administrators describing how the challenged restraint benefits <u>other</u> college students. <u>See, e.g.</u>, Luedtke Decl., Ex. 19, K. Starr Decl. ¶ 7 (asserting that "paying student-athletes in men's basketball and football would have a corrosive effect on University culture at Baylor and elsewhere, would be demoralizing to numerous <u>other</u> students, and would create an elitist group of paid athletes whose separateness from other

United States District Court
For the Northern District of California

students could interfere with their relationships with other students and faculty" (emphasis added)); id., Ex. 16, C. Plonsky Decl. ¶ 15 ("Paying any student athlete for the use of their name, image, and likeness would upset the balance within our education system by paying some but not all students for extracurricular activities."). These declarations do not support an inference that the NCAA's restriction on student-athlete compensation contributes to the integration of education and athletics or that such integration actually serves a procompetitive purpose.

Thus, if the NCAA seeks to argue at trial that the challenged restraint promotes the integration of education and athletics, it must present evidence to show that (1) the ban on student-athlete compensation actually contributes to the integration of education and athletics and (2) the integration of education and athletics enhances competition in the "college education" or "group licensing" market.

4.    Viability of Other Sports

The NCAA's fourth asserted justification for the challenged restraint is that it increases NCAA member schools' athletic budgets and, therefore, enables them to provide greater financial support to women's sports and less prominent men's sports.

This is not a legitimate procompetitive justification. The Supreme Court has explained that competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy." United States v. Topco Associates, Inc., 405 U.S. 596, 610

(1972).[15]  It is "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." Sullivan v. Nat'l Football League, 34 F.3d 1091, 1112 (1st Cir. 1994).  Thus, the NCAA cannot restrain competition in the "college education" market for Division I football and basketball recruits or in the "group licensing" market for Division I football and basketball teams' publicity rights in order to promote competition in those markets for women's sports or less prominent men's sports.  To the extent that the NCAA contends that supporting women's sports and less prominent men's sports serves a broader social purpose -- beyond merely increasing output in those markets -- this justification is precluded for reasons outlined in the previous section of this order.  See Trial Lawyers Ass'n, 493 U.S. at 424 (holding that "social justifications" cannot support an otherwise unlawful restraint of trade).

This justification also fails because the NCAA could provide support for women's sports and less prominent men's sports through less restrictive means.  See Tanaka, 252 F.3d at 1063 (stating that, if a defendant meets its burden to identify a procompetitive

---

[15] The Ninth Circuit has questioned whether Topco would preclude an antitrust defendant from justifying a challenged restraint with evidence that the restraint enhances competition in a "closely related" market. Paladin Associates, Inc. v. Montana Power Co., 328 F.3d 1145, 1157 (9th Cir. 2003) ("[P]erhaps that language from Topco is not controlling because it is a dictum or incomplete or obsolete or because the case of such closely related markets as those for transport of natural gas and the natural gas itself might be distinguished.  In any event, we need not and do not reach this issue on the permissible bounds of rule of reason inquiry.").  Nevertheless, it has never expressly distinguished Topco on this ground and, even if it had, the NCAA has not presented any evidence here to suggest that the market for Division I football and basketball is "closely related" to the market for women's sports or less prominent men's sports.

United States District Court
For the Northern District of California

justification for a restraint, the "plaintiff must then show that 'any legitimate objectives can be achieved in a substantially less restrictive manner'"). For instance, the NCAA could mandate that Division I schools and conferences redirect a greater portion of the licensing revenue generated by football and basketball to these other sports. Dr. Rubinfeld acknowledges in his report that the NCAA already encourages, but does not require, its member conferences to redistribute the revenue generated from the NCAA Division I men's basketball tournament to sports other than football and basketball. Luedtke Decl., Ex. 29, Sept. 2013 Rubinfeld Report ¶ 127. The NCAA has not explained why it could not adopt more stringent revenue-sharing rules.

Accordingly, the challenged restraint is not justified by the NCAA's claimed desire to support women's sports or less prominent men's sports. Plaintiffs are entitled to summary adjudication of this issue.

### 5. Increased Output Benefits

The NCAA's fifth asserted justification for the challenged restraint is that it increases the total "output" of Division I football and basketball, as measured by the total number of teams, players, scholarships, and games. According to Dr. Rubinfeld, the NCAA's restraint on student-athlete compensation generates additional revenue for NCAA member schools to spend on more scholarships and other costs associated with competing at the Division I level. Dr. Rubinfeld asserts that this revenue-sharing plan provides support to low-revenue schools which might not otherwise be able to compete in Division I. Luedtke Decl., Ex. 29, Sept. 2013 Rubinfeld Report ¶ 143 ("By increasing the number

of schools participating, the NCAA helps to increase the total
number of student-athletes and the number of scholarships
available for men's FBS football and Division I men's basketball
student-athletes.").

Unlike the financial support provided to women's sports or
less prominent sports, the revenue provided to football and
basketball teams at low-revenue schools is potentially
procompetitive because it increases output in the relevant market.
Thus, a reasonable fact-finder could conclude from Dr. Rubinfeld's
report that the challenged restraint enhances consumer demand for
Division I football and basketball.

Plaintiffs dispute that the challenged restraint actually
increases the amount of revenue that is shared among Division I
football and basketball teams.  They cite Dr. Noll's opening
expert report, in which he asserts that the NCAA's revenue-sharing
system may hurt demand for its product by increasing the number of
Division I teams and players and thereby decreasing the overall
quality of play or reducing competitive balance.  1st Scherrer
Decl., Ex. 12, Sept. 2013 Noll Report, at 44-45 ("Revenue sharing
redistributes wealth from players to teams, at a cost in terms of
lower quality of play and, perhaps, less competitive balance.").
This evidence is sufficient to create a material factual dispute
as to whether or not the increased output benefits the NCAA has
identified are legitimately procompetitive.  In light of this
factual dispute, neither Plaintiffs nor the NCAA is entitled to
summary adjudication of this issue.

II.   Motion to Amend the Class Definition

     After the summary judgment hearing, Plaintiffs moved to amend
the current class definition to bring it into conformity with the
class definition that they proposed in their 3CAC.  They note that
the current class definition is that which they requested in their
class certification motion rather than the one that they requested
in their 3CAC.

     The discrepancy between the two class definitions stems from
the unique procedural history of this case.  As explained in prior
orders, Plaintiffs were granted leave to amend their complaint in
July 2013 -- after they moved for class certification -- because
their class certification motion made clear that they intended to
pursue a theory of antitrust liability which they had not clearly
plead in their prior complaint.  Rather than forcing Plaintiffs to
withdraw their class certification motion, which had already been
briefed and argued, the Court directed Plaintiffs to file an
amended complaint articulating their new theory of antitrust
liability.  Defendants were then given an opportunity to challenge
Plaintiffs' new theory with another round of motions to dismiss.[16]
See Docket Nos. 856, 857, 858.  After the Court denied Defendants'
motions to dismiss in October 2013, it turned back to Plaintiffs'
pending class certification motion.  In November 2013, it granted
that motion in part and denied it in part.  The class
certification order adopted the class definition set forth in
Plaintiffs' motion.

---

[16] Defendants had previously sought to challenge Plaintiffs' new
theory in a joint motion to strike the motion for class certification.
See Docket No. 639.  The Court denied the motion to strike in January
2013.  Docket No. 673.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

The slight differences between that class definition and the class definition in the 3CAC are a product of the recent changes in Plaintiffs' theory of the case.  The NCAA received ample notice of these changes and had an opportunity to challenge Plaintiffs' new theory after the 3CAC was filed.  Thus, it will not be prejudiced by the adoption of the class definition proposed in the 3CAC.  Indeed, the NCAA itself noted at the summary judgment hearing that the class definition Plaintiffs seek was "stated in their complaint crystal clear."  Feb. 20, 2014 Hrg. Tr. 97:16–:18.

Accordingly, the current class definition shall be amended to reflect the class definition set forth in the 3CAC, the text of which is reproduced in the conclusion of this order.

III. Plaintiffs' Motion for Leave to File Motion for Reconsideration

Plaintiffs seek leave to file a motion for reconsideration of part of the November 2013 class certification order. Specifically, they seek reconsideration of the Court's decision not to certify the damages subclass.

Under Civil Local Rule 7-9(b), a party seeking leave to file a motion for reconsideration must show (1) that "a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought"; (2) the "emergence of new material facts or a change of law occurring after the time of such order"; or (3) a "manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order."  Here, Plaintiffs' motion is based on the emergence of new material facts and the Court's

43

purported failure to consider dispositive legal arguments and material facts presented with their class certification motion. None of these grounds provides justification for reconsidering the class certification order.

The new material facts which Plaintiffs cite come from Dr. Rubinfeld's November 2013 expert report, which was produced four months after the class certification hearing.  Plaintiffs contend that this report shows that the "substitution effect" among Division I athletes -- which the Court identified as one of the barriers to class manageability -- is de minimis.  This evidence, however, had already been presented to the Court before the class certification hearing.  As Plaintiffs themselves concede in their brief, the analysis of substitution effects in Dr. Rubinfeld's November 2013 report is essentially the same as the analysis in his earlier report.  See Docket No. 911, Mot. Leave File Mot. Reconsid., at 2 (noting that "Rubinfeld reached the same conclusion" in both of his expert reports regarding student-athletes who left college early for the NBA).  It therefore does not justify reconsideration of the prior order.

Further, even if Dr. Rubinfeld's latest report did contain new information about the substitution effect among student-athletes, it would still be insufficient to justify reconsideration.  The substitution effect among Division I student-athletes was only one of the barriers to class manageability that the Court identified in the class certification order.  Another barrier was the "related substitution effect among Division I schools." Nov. 8, 2013 Order at 19-20 (emphasis added).  The Court specifically noted that, in Plaintiffs' but-for

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

scenario, "increased competition for student-athletes, combined with the potentially higher costs of recruiting and retaining those student-athletes, would have likely driven some schools into less competitive divisions, thereby insulating entire teams from the specific harms that Plaintiffs allege in this suit." Id. at 20.  Plaintiffs have not cited any new evidence to justify reconsideration of this part of the Court's prior ruling.

With respect to Plaintiffs' second ground for seeking reconsideration -- a manifest failure to consider dispositive legal arguments previously presented to the Court -- Plaintiffs rely on two Seventh Circuit cases and one case decided by another court in this district: Butler v. Sears, Roebuck & Co., 727 F.3d 796 (7th Cir. 2013); Messner v. Northshore Univ. HealthSystem, 669 F.3d 802 (7th Cir. 2012); and In re Cathode Ray Tube (CRT) Antitrust Litig., MDL 1917, 2013 WL 5391159 (N.D. Cal.).  None of these cases is binding on this Court.  Furthermore, Plaintiffs only cited one of these cases, Messner, in their class certification briefs.[17]  The Court considered Messner and concluded that it was not analogous to this case.

Plaintiffs' newly cited cases are, like Messner, inapposite.  These cases stand for the general proposition that class certification should not be denied based on minor flaws in the plaintiff's proposed methodology for calculating damages.  But this principle has no bearing on the present case because

---

[17] What's more, Plaintiffs cited Messner without discussion in a footnote listing other out-of-circuit precedents.  The other two cases Plaintiffs cite here -- Butler and In re CRT Antitrust Litig. -- were decided after class certification briefing was completed but Plaintiffs did not submit a statement of recent decision concerning either of them.

**United States District Court**
For the Northern District of California

Plaintiffs did not simply propose a flawed method for calculating damages; rather, they failed to propose any method whatsoever for dealing with problems -- namely, substitution effects -- which their own expert identified in his report. See Nov. 8, 2013 Order at 19-20 ("Plaintiffs have not proposed any method for addressing this substitution effect among individual student-athletes. Nor have they proposed any method for addressing the related substitution effect among Division I schools."). The cases Plaintiffs cite do not provide any compelling reasons to reconsider this aspect of the class certification order.

Finally, Plaintiffs argue that the Court failed to consider certain material facts in issuing its class certification order. In particular, they point to certain EA company documents which, they contend, provide a means for determining on a class-wide basis which student-athletes were actually depicted in EA's videogames. They assert that the Court overlooked this evidence when it found that the discrepancy between the size of football team rosters in EA's videogames and the size of actual Division I football rosters posed a significant barrier to class manageability. See Class Cert. Order 21 ("[T]he number of student-athletes depicted in NCAA-licensed videogames is considerably smaller than the number of student-athletes who actually played for a Division I football team during the class period. Plaintiffs have not offered a feasible method for determining on a class-wide basis which student-athletes are depicted in these videogames and which are not.").

The documents Plaintiffs have identified -- a collection of unlabeled and undated spreadsheets listing the physical attributes

of certain football players -- do not solve the problem the Court
highlighted in its order.  See Docket No. 749, S. Gosselin Supp.
Decl., Ex. 4.  The spreadsheets contain the names of fewer than
forty student-athletes out of the many thousands who played
Division I football during the proposed class period; as such,
they cannot identify every class member depicted in the
videogames.  Furthermore, Plaintiffs have not presented any
evidence to suggest that EA actually used the names, images, and
likenesses of the student-athletes listed in the spreadsheets to
create the player avatars in its videogames.  Without this
evidence, the spreadsheets are not probative of anything.

     Thus, because Plaintiffs have failed to identify any evidence
or case law that would justify reconsideration of the class
certification order, their motion must be denied.

                          CONCLUSION

     For the reasons set forth above, Plaintiffs' motion for
summary judgment (Docket No. 898) is GRANTED in part and DENIED in
part and Defendant's cross-motion for summary judgment (Docket No.
933) is DENIED.  Plaintiffs are entitled to summary judgment that
the NCAA's fourth asserted justification for the challenged
restraint -- increased support for women's sports and less
prominent men's sports -- is not legitimately procompetitive.
Accordingly, the NCAA may not rely on this justification at trial.

     Plaintiffs' motion to amend the class definition (Docket No.
998) is GRANTED.  The class definition is hereby amended to read
as follows:

               All current and former student-athletes
               residing in the United States who compete on,
               or competed on, an NCAA Division I (formerly

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

known as "University Division" before 1973)
college or university men's basketball team or
on an NCAA Football Bowl Subdivision (formerly
known as Division I-A until 2006) men's
football team and whose images, likenesses
and/or names may be, or have been, included or
could have been included (by virtue of their
appearance in a team roster) in game footage
or in videogames licensed or sold by
Defendants, their co-conspirators, or their
licensees.

Plaintiffs' motion for leave to file a motion for partial

reconsideration (Docket No. 911) is DENIED.

A final pretrial conference will be held at 2:00 p.m. on May

28, 2014 and a jury trial will commence at 8:30 a.m. on June 9,

2014.  In the joint pretrial statement, Plaintiffs must identify

which Antitrust Plaintiffs intend to proceed to trial on their

individual damages claims and which specific uses of their names,

images, and likenesses will serve as the basis for their damages

claims.

IT IS SO ORDERED.

Dated: 4/11/2014                              _____

                                             CLAUDIA WILKEN
                                             United States District Judge