1  GLENN D. POMERANTZ (SBN 112503)
   glenn.pomerantz@mto.com
2  KELLY M. KLAUS (SBN 161091)
   kelly.klaus@mto.com
3  ROHIT K. SINGLA (SBN 213057)
   rohit.singla@mto.com
4  CAROLYN HOECKER LUEDTKE (SBN 207976)
   carolyn.luedtke@mto.com
5  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
6  San Francisco, California 94105-2907
   Telephone:    (415) 512-4000
7  Facsimile:    (415) 512-4077

8  Gregory L. Curtner (*pro hac vice*)
9  Robert J. Wierenga (SBN 183687)
   Kimberly K. Kefalas (*pro hac vice*)
10 SCHIFF HARDIN LLP
   350 S. Main St., Suite 210
11 Ann Arbor, MI  48104
   Telephone:  (734) 222-1500
12 Facsimile:  (734) 222-1501

13 Attorneys for Defendant
14 National Collegiate Athletic Association

15           UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
16                OAKLAND DIVISION

17 In re NCAA Student-Athlete Name and    Case No. 09-cv-1967-CW
18 Likeness Licensing Litigation
                                          **DEFENDANT NCAA'S NOTICE OF**
19                                        **MOTION AND MOTION FOR**
                                          **SEVERANCE OR, ALTERNATIVELY, TO**
20                                        **CONTINUE TRIAL; MEMORANDUM OF**
                                          **POINTS AND AUTHORITIES IN**
21                                        **SUPPORT THEREOF**

22                                        Date:          June 5, 2014
23                                        Time:          2:00 p.m.
                                          Dept:          Courtroom 2, 4th Floor
24                                        Judge:         Hon. Claudia Wilken
                                          Complaint filed:  May 5, 2009
25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on June 5, 2014, or as soon as it may be heard,[1] in the above-referenced Court, defendant National Collegiate Athletic Association ("NCAA") will and hereby does move pursuant to Rule 42(b) of the Federal Rules of Civil Procedure for severance of the *O'Bannon* plaintiffs' videogame-related claims and allegations from the trial scheduled to commence June 9, 2014, and to consolidate those claims for trial with the *Keller* claims and any remaining claims against defendants Electronic Arts ("EA") and Collegiate Licensing Company ("CLC").

In the alternative, the currently scheduled trial should be continued until (i) the announced but as-yet-unpresented-and-unfinalized settlement of related videogame claims against defendants Electronic Arts ("EA") and Collegiate Licensing Company ("CLC") is resolved, and (ii) the pending petition for certiorari relating to the *Keller* claims is resolved and those claims are ready for trial.

---

[1] The NCAA is moving separately pursuant to Civil L.R. 6-3 for an order shortening the time for briefing and hearing on this motion, so that it may be resolved in advance of the pretrial conference and trial date.

1

# TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................3

I.     TRYING THE ANTITRUST AND ROP VIDEOGAME-RELATED CLAIMS
       TOGETHER WOULD ELIMINATE THE RISK OF INEFFICIENT AND
       PREJUDICIAL DUPLICATIVE TRIALS ..........................................................3

II.    TRIAL OF THE VIDEOGAME ALLEGATIONS SHOULD AWAIT THE
       PENDING CERTIORARI PETITION. ................................................................7

III.   ALTERNATIVELY, THE COURT SHOULD CONTINUE THE TRIAL .........8

CONCLUSION.....................................................................................................................8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Dusky v. Bellasaire Invs.*,
    2007 WL 4403985 (C.D. Cal. Dec. 4, 2007) ............................................................ 6

*Electronic Arts Inc., Petitioner, v. Samuel Michael Keller et al.*,
    No. 13-377 ................................................................................................... passim

*Ellingson Timber Co. v. Great N. Ry. Co.*,
    424 F.2d 497 (9th Cir. 1970).................................................................................. 8

*Equal Emp't Opportunity Comm'n v. HBE Corp.*,
    135 F.3d 543 (8th Cir. 1998).................................................................................. 5

*In re Rhone-Poulenc Rorer Inc.*,
    51 F.3d 1293 (7th Cir. 1995) (Posner, J.) ............................................................ 6

*Jinro Am. Inc. v. Secure Invs., Inc.*,
    266 F.3d 993 (9th Cir. 2000), opinion amended on denial of reh'g, 272 F.3d 1289 (9th
    Cir. 2001) ................................................................................................................ 5

*Matsushita Elec. Indus. Co., Ltd. v. CMC Magnetics Corp.*,
    C 06-04538 WHA, 2007 WL 219779 (N.D. Cal. Jan. 29, 2007)............................. 8

**STATUTES AND RULES**

Fed. R. Civ. P. 42 ............................................................................................... 5, 6, 8

**OTHER AUTHORITIES**

9 Alan Wright et al., *Federal Practice and Procedure* § 2388 (3d ed.) ......................... 6

8 James Wm. Moore et al., *Moore's Federal Practice* § 42.22[4] (3d ed. 2012)........................... 6

*Manual for Complex Litigation, Fourth,* § 22.93 (2004)................................................ 6

1

## **INTRODUCTION**

2          At the plaintiffs' request, the Court consolidated the *O'Bannon* and *Keller* cases into one

3     case based on the overlapping claims regarding videogames.  There is now a single case based on

4     a single complaint.  But all of the videogame-related allegations in this case cannot currently be

5     tried together.  The claims against EA and CLC have been stayed for almost seven months based

6     on a purported settlement that has yet to materialize.  If that settlement is not finalized, for

7     whatever reason, then the videogame-related claims against them would need to be tried later.

8     More importantly, this Court has stayed the *Keller* right of publicity (ROP) claims pending

9     resolution of EA's anti-SLAPP appeal; the Ninth Circuit has stayed issuing its mandate pending

10    disposition of EA's petition for certiorari; and the Supreme Court has extended (several times) the

11    time for the *Keller* plaintiffs to respond to EA's petition.

12         All of the videogame-related claims therefore cannot possibly be tried along with the

13    largely overlapping claims of the *O'Bannon* plaintiffs against the NCAA starting June 9.  Instead,

14    the current schedule effectively bifurcates the claims so that the antitrust causes of action against

15    the NCAA are tried in June while any trial of the ROP-related causes of action against the NCAA

16    — and potentially the antitrust causes of action against CLC and EA — occurs later before

17    different juries.  This bifurcation is inappropriate.  It would be more fair and efficient to try all of

18    the videogame-related allegations in one trial, given the largely overlapping documents,

19    witnesses, and factual disputes.  Indeed, there are serious Seventh Amendment concerns raised by

20    forcing the NCAA to litigate the same factual issues in the same consolidated proceedings before

21    two separate juries.  Moreover, the Supreme Court could substantially re-define the nature of all

22    the videogame-related claims — including by eliminating the legal underpinning of those claims

23    altogether — which is all the more reason not to try the videogame-related claims now.

24         As the Court and parties recognized at the last status conference in February, the June 9

25    trial is complicated by (1) the pendency of the *Keller* certiorari petition in the Supreme Court and

26    (2) the stay of the claims against the NCAA's co-defendants, EA and CLC.  *See* Transcript of

27    February 20, 2014 Hearing and Case Management Conference ("CMC Tr."), at 89-92.  It had

28    once appeared that the supposed settlement among all plaintiffs, EA and CLC might be finalized

1   and the *Keller* appellate proceedings resolved by now. The plaintiffs, however, have sought and

2   been granted multiple continuances in the Supreme Court over the last seven months. And

3   plaintiffs, EA and CLC have failed to bring the purported settlement before this Court during that

4   time. It is now too late for either the *Keller* ROP claims to be remanded or the supposed

5   settlement to be resolved before the June trial, much less both.

6        It is undisputed that the *O'Bannon* plaintiffs' claims against CLC and EA overlap

7   substantially, if not entirely, with the claims against the NCAA. The entire basis of the plaintiffs'

8   original request to consolidate the *Keller* and *O'Bannon* cases was the overlapping evidence,

9   witnesses, and factual disputes between the two cases. *See generally* Dkt. 69. Yet both the *Keller*

10  claims and the claims against CLC and EA remain in limbo. In these circumstances, trial of just

11  the *O'Bannon* videogame-related antitrust claims against only the NCAA creates a serious risk of

12  duplicative trials and inconsistent and prejudicial results. For example, the first jury could find

13  that the videogames do not use athlete name, image and likenesses ("NIL") only to have plaintiffs

14  demand a second jury trial on that very question for the *Keller* ROP claims or the antitrust claims

15  against EA and CLC.

16       The pending certiorari petition presents similar risks of duplication of effort, wasted

17  judicial resources, and prejudice. If the Supreme Court reverses the Ninth Circuit's judgment, the

18  analysis of not only the *Keller* claims, but also the videogame-related antitrust claims would be

19  drastically altered. The Supreme Court could hold, for example, that the First Amendment

20  trumps the alleged NIL rights of SAs alleged to appear in the EA videogames. Such a holding

21  would substantially impact not only the ROP but also the antitrust claims relating to videogames.

22  Thus, if the *O'Bannon* videogame-related claims are tried in June, subsequent appellate

23  proceedings could taint the entire trial and any resulting verdict, potentially requiring a retrial of

24  even the broadcast and rebroadcast-related claims. It makes no sense to proceed with a trial of

25  the videogame claims until the Supreme Court resolves the petition for certiorari.

26       The Court can avoid all of these risks by severing the antitrust claims related to

27  videogames. These claims could be tried once the *Keller* appeal is remanded and ready for trial

28  and once it becomes clear whether or not the claims against CLC and EA have really been settled.

1  That way, one jury will determine whether the videogames at issue use SAs' NIL, whether the

2  NCAA is responsible for any such use, etc.  That eliminates both the risk that a trial of the

3  antitrust claims including videogames would be nullified by a later Supreme Court decision and

4  the potential prejudice to the NCAA from duplicative and potentially unnecessary trials.

5          The plaintiffs will not be prejudiced from trying these claims together.  Indeed, they

6  obtained consolidation based in part on arguing that the claims should be tried together:

7  "Consolidating the actions will also avoid conflicting results arising out of the same set of

8  allegations . . . . *It would be highly inefficient to have litigation proceeding in multiple actions*

9  and addressing identical issues at the various stages of these matters, *including in the* . . . *trial*

10  *portions of these actions*."  Dkt. No. 69 at 5-6 (emphasis added).

11         If the Court does not believe the videogame claims can or should be severed, then the only

12  alternative that avoids prejudice to the NCAA and the risk of duplication of judicial resources is

13  to postpone the trial until the settlement and certiorari proceedings are resolved, so that the Court

14  has to try the same claims and allegations only once.

15                                      **ARGUMENT**

16  **I.      TRYING THE ANTITRUST AND ROP VIDEOGAME-RELATED CLAIMS**
    **TOGETHER WOULD ELIMINATE THE RISK OF INEFFICIENT AND**
17  **PREJUDICIAL DUPLICATIVE TRIALS**

18         Under the current schedule the claims in these proceedings have been bifurcated for trial

19  such that the Court is at risk of having to try overlapping videogame claims twice.  Absent the

20  relief requested in this motion, the Court will try the *O'Bannon* antitrust claims that the NCAA

21  unlawfully restrained SAs from licensing their NIL to EA for use in college football and

22  basketball-themed videogames in June.  The Court then faces a potential second trial on the

23  *Keller* ROP claims that the NCAA permitted EA to use SAs' NIL in the exact same EA

24  videogames.  Because of circumstances that the NCAA did nothing to create, proceeding with a

25  June 9 trial that includes the videogame claims will create a substantial risk of multiple trials on

26  the same issues, with the attendant risks of inconsistent and potentially nullified verdicts.

27         The *Keller* ROP claims focus on the same allegations regarding the same alleged uses of

28

1  SAs' NIL rights in the same EA videogames that are at issue in the *O'Bannon* antitrust claims.

2  As plaintiffs themselves have explained, the claims "contain overlapping factual allegations.

3  Consequently, the litigation of the cases will undoubtedly involve common witnesses, experts,

4  and discovery."  Dkt. No. 69 at 2 (plaintiffs' motion to consolidate arguing that the two cases

5  concerned the same facts, occurrences, witnesses, evidence, etc.)  At the last status conference,

6  the *O'Bannon* counsel flatly asserted that the *Keller* allegations "overlap the antitrust claims and

7  the damage would be the same."  CMC Tr. at 90.  Given that the *Keller* claims have not even

8  been subject to a motion for class certification, it is difficult to go that far, but there is no dispute

9  that the allegations on both sets of claims concern substantially the same underlying events and

10  occurrences.  The *Keller* claims, however, remain on interlocutory appeal based on EA's appeal

11  of the denial of its anti-SLAPP motion.  Over the past six months, the plaintiffs have asked for

12  and obtained four separate extensions of time within which to respond to the petition.[2]  The

13  current extension of time expires May 9, 2014.  When the *Keller* appeal is finally remanded, any

14  trial will be largely duplicative of the currently scheduled trial of the *O'Bannon* claims.

15      Last September, plaintiffs, CLC and EA told the Court that they had reached a preliminary

16  settlement.  Dkt. No. 861.  Based on that representation, expert discovery, summary judgment

17  motions, and pre-trial proceedings have been stayed with respect to CLC and EA.  In the ensuing

18  seven months, however, no settlement agreement has been presented to the Court.  Even if there

19  is still an actual settlement between these parties, it is now impossible to determine whether the

20  settlement will become final before the June 9, 2014 trial date.  Because the settlement terms have

21  not been disclosed, neither the NCAA nor putative class members have had an opportunity to

22  evaluate or present any grounds for objection.  But there is certainly a significant risk that the

23  alleged settlement will not be finalized, because the parties' settlement has unraveled, because

24  objections are raised to the settlement, because the Court does not approve the settlement,

25  because there are significant opt outs, or for other reasons.  And if the settlement is not finalized

26  as to all claims and parties, for whatever reason, the claims against CLC and EA — which

27

28  [2] See http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/13-377.htm.

1    overlap substantially with the videogame claims against the NCAA — will proceed to trial.

2          Because of these two pending issues, trial of just the *O'Bannon* videogame claims against

3    the NCAA in June creates a serious — and unnecessary — risk of duplicative trials that is unfair

4    to the parties and not in the interest of judicial economy.  Courts are empowered to sever or

5    consolidate claims to avoid duplicative trials involving related parties, witnesses, and evidence.

6    *See* Fed. R. Civ. P. 42(a) (the court may join for trial, or consolidate, actions that involve a

7    common question of law or fact); Fed. R. Civ. P. 42(b) (the court may order a separate trial of one

8    or more separate issues or claims for "convenience, to avoid prejudice, or to expedite and

9    economize"); *see also Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 998 (9th Cir. 2000),

10   *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) (relief under Rule 42(b)

11   justified to "permit deferral of costly and possibly unnecessary proceedings"); *Equal Emp't*

12   *Opportunity Comm'n v. HBE Corp.*, 135 F.3d 543, 550-51 (8th Cir. 1998) (finding consolidation

13   appropriate because it would "avoid the inefficiency of separate trials involving related parties,

14   witnesses and evidence").

15         It makes little sense to proceed with a trial of the videogame-related allegations against

16   the NCAA, when there is a serious risk that the same factual disputes will need to be tried in a

17   few months with respect to the NCAA itself or the NCAA's co-defendants.  Doing so would

18   place an additional and unnecessary burden on witnesses, the parties, the Court, and the jury

19   panels on overlapping trials of the same issue, involving the same claimed underlying NIL rights,

20   and the same videogames.  It is fundamentally unfair to subject the NCAA to the risk of

21   duplicative trials on slightly different legal theories with respect to the same alleged wrongdoing.

22         Moreover, multiple trials creates a risk of inconsistent factual findings and verdicts —

23   precisely the opposite of the goals of Federal Rules of Civil Procedure 42.  *See, e.g., Dusky v.*

24   *Bellasaire Invs.*, 2007 WL 4403985, at *1 (C.D. Cal. Dec. 4, 2007) ("The purpose of

25   consolidation is to enhance court efficiency and to avoid substantial danger of inconsistent

26   adjudications."); *cf.* 9 Alan Wright et al., *Federal Practice and Procedure* § 2388 (3d ed.)

27   (explaining piecemeal trial of separate issues in a single lawsuit or the repetitive trial of the same

28   issue in severed claims is not to be the usual).

1        This Court has explained that the antitrust videogame claims depend upon SAs having

2   "cognizable rights of publicity in the use of their names, images, and likenesses" in videogames.

3   *See* Dkt. No. 1025 at 15.  But the Court's Order made clear that it "did not analyze the viability of

4   Right-of-Publicity Plaintiffs' claims, which remain stayed pending EA's petition for certiorari."

5   *Id.* at 15 n. 6.  If the jury in *O'Bannon* finds for the plaintiffs and the jury in *Keller* finds for the

6   NCAA, the NCAA will have been found to have restrained the use of something that another jury

7   has found does not exist.

8        Multiple trials on the same factual disputes also threatens the NCAA's Seventh

9   Amendment rights.  It is axiomatic that the Seventh Amendment requires a court to "divide the

10   issues between the two juries in such a way that *the same issue is not decided by both juries*."  8

11   James Wm. Moore et al., *Moore's Federal Practice* § 42.22[4] (3d ed. 2012) (emphasis added).

12   Or as the *Manual for Complex Litigation* puts it, "the Seventh Amendment entitles parties to have

13   facts decided by one jury and *prohibits a second jury from reexamining those facts*."  *Manual for*

14   *Complex Litigation, Fourth*, § 22.93 (2004) (emphasis added).  Courts have repeatedly — and to

15   the NCAA's knowledge uniformly — held that the Seventh Amendment prohibits one jury from

16   reconsidering the same fact or issue decided by an earlier jury.  *See, e.g.*, *In re Rhone-Poulenc*

17   *Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (Posner, J.) ("[T]he judge must not divide issues

18   between separate trials in such a way that the same issue is reexamined by different juries. . . .

19   The plan of the district judge in this case is inconsistent with the principle that the findings of one

20   jury are not to be reexamined by a second, or third, or *n*th jury.").

21        The current schedule assumes that the shared factual issues between the antitrust and ROP

22   claims — involving the same defendant and overlapping plaintiff classes in the same consolidated

23   proceedings — will be tried to two separate juries.  This is inconsistent with Seventh Amendment

24   principles.

25        All of these risks, burdens and unfairness are entirely unnecessary and would be

26   eliminated by severing the videogame-related claims from the *O'Bannon* trial currently scheduled

27   for June and consolidating all of the various videogame-related claims into a future trial.

28   Although the courts have warned that severance in antitrust cases must be carefully scrutinized,

1    the broadcast and rebroadcast-related claims here can be segregated out and tried separately.  The

2    documents, evidence and damages calculations on the broadcast and re-broadcast claims are

3    entirely independent from the videogame-related claims.  That is why the *O'Bannon* plaintiffs

4    have represented to the Court that they are not seeking damages from EA for broadcasts,

5    rebroadcasts and other uses of game footage.  Dkt. No. 860 at 10.

6         The claims could thus be entirely severed, without any mention of the videogame issues at

7    the trial on broadcast and rebroadcast claims.  Indeed, an important requirement for severance

8    would be that neither side references the videogame dispute in the June trial.  Otherwise, the other

9    side will legitimately need to respond, resulting in the very litigation of the factual disputes over

10   videogames that severance seeks to avoid.  If such a restriction cannot be imposed, then the

11   NCAA believes that a continuance of the entire trial would be a better option.

12        There is little risk of prejudice to the plaintiffs from severance.  The videogames are not

13   even currently being produced, so the injunctive relief sought is not time sensitive.  Dkt. No. 922-

14   15 at ¶ 24.  The plaintiffs will not lose their day in Court on these claims, and they will gain

15   certainty.  They will be able to try these claims — and if successful, to a damages recovery —

16   free of the cloud of potential nullification by subsequent appellate proceedings.

17        In short, severing the videogame-related claims from the upcoming June trial eliminates

18   all of the risks, prejudice and inefficiency of duplicative trials without any cost to efficiency or

19   plaintiffs' ability to pursue their claims.  If the *Keller* case is to be tried, it makes far more sense

20   to try all of the videogame-related claims together than to try them separately.  Accordingly, the

21   Court should sever the videogame-related claims from the upcoming trial.

22   **II.    TRIAL OF THE VIDEOGAME ALLEGATIONS SHOULD AWAIT THE
             PENDING CERTIORARI PETITION.**

23

24        The *Keller* certiorari petition presents a similar risk.  *See Electronic Arts Inc., Petitioner,*

25   *v. Samuel Michael Keller et al.*, No. 13-377.  Should the Supreme Court grant *certiorari* and

26   determine that the First Amendment bars ROP claims by SAs allegedly appearing in videogames,

27   then not only the *Keller* claims but also the *O'Bannon* videogame-related claims must be

28   dismissed.  In that case, plaintiffs could not demonstrate a relevant market, antitrust injury, or a

---

1  cognizable right that has been damaged by the alleged wrongful conduct.  It makes sense to wait

2  on the videogame claims until the Supreme Court rules.

3         To allow a jury trial to proceed, when the crucial issue of law that determines the viability

4  of plaintiffs' claim is on interlocutory appeal, creates a substantial risk of judicial inefficiency.

5  There would be a substantial risk that a jury verdict in favor of the *O'Bannon* plaintiffs would be

6  vulnerable to nullification if subsequent appellate rulings in *Keller* contradict the jury's findings.

7  This is precisely the kind of thing that Rule 42 was designed to avoid.  *See Ellingson Timber Co.*

8  *v. Great N. Ry. Co.*, 424 F.2d 497, 499 (9th Cir. 1970) ("One of the purposes of Rule 42(b) is to

9  permit deferral of costly and possibly unnecessary discovery proceedings pending resolution of

10 potentially dispositive preliminary issues."); *see also Matsushita Elec. Indus. Co., Ltd. v. CMC*

11 *Magnetics Corp.*, C 06-04538 WHA, 2007 WL 219779, at *2 (N.D. Cal. Jan. 29, 2007) ("It is the

12 interest of efficient judicial administration that is to be controlling under [Rule 42(b)], rather than

13 the wishes of the parties.") (quoting Wright & Miller, Federal Practice and Procedure, § 2388 (2d

14 ed. pocket part 2006)).

15 **III.**    **ALTERNATIVELY, THE COURT SHOULD CONTINUE THE TRIAL**

16        If the Court believes that severance of the videogame-related claims from the broadcast

17 and rebroadcast claims would be inefficient, then the NCAA respectfully suggests that the most

18 practical alternative is to delay the entire trial until (1) the *Keller* claims are ready for trial and

19 (2) the CLC/EA settlement has either been finalized or the claims against those defendants are

20 ready for trial.  Again, the plaintiffs cannot legitimately claim prejudice from a continuance

21 caused by their inability to finalize their settlement with EA and CLC or by continued

22 continuances sought in the Supreme Court.  Moreover, the videogames are no longer even being

23 produced and the live broadcast claims were not even pled until last year.

24                                **CONCLUSION**

25        Therefore, for the reasons sets forth above, the NCAA respectfully requests that the Court

26 sever the live broadcast and archival footage claims from their videogame claims, for trial

27 purposes, so that the scheduled antitrust trial can proceed without the serious risk of prejudice to

28 the NCAA, inefficient and duplicative proceedings before this Court, jury confusion, and a

1  potentially reversible verdict, depending on the outcome of the certiorari petition in *Keller*.

2      In the alternative, the NCAA respectfully moves this court to continue the scheduled trial

3  date for all of the *O'Bannon* plaintiffs' antitrust claims until the *Keller* case and the claims against

4  CLC/EA are either ready for trial or have been resolved.

5

6                          Respectfully submitted,

7  Dated: April 25, 2014              MUNGER, TOLLES & OLSON LLP

8                        By: */s/ Rohit K. Singla*

9                           ROHIT K. SINGLA

10                  Attorneys for Defendant NCAA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23356427.1

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on April 25, 2014, I electronically filed the foregoing document with

3

the Clerk of the Court using the CM/ECF system which will send notification to the e-mail

4

addresses registered.

5

6

7
By: _/s/ Rohit K. Singla_____
    ROHIT K. SINGLA

8
    MUNGER, TOLLES & OLSON LLP

9
    Attorneys for Defendant NCAA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23356427.1