IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | No. C 09-1967 CW<br><br>ORDER DENYING MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION (Docket No. 1033) |

On April 28, 2014, Defendant National Collegiate Athletic Association (NCAA) moved for leave to file a motion for partial reconsideration of this Court's summary judgment order. In particular, the NCAA seeks leave to move for reconsideration of the Court's finding that providing financial support to women's sports and less prominent men's sports is "not a legitimate procompetitive justification" for the NCAA's challenged restrictions on student-athlete pay. Docket No. 1025, April 11, 2014 Order 38. After considering the evidence and case law cited in the NCAA's motion, the Court denies the motion.

## BACKGROUND

As explained in prior orders, Antitrust Plaintiffs brought this class action under the Sherman Act, 15 U.S.C. §§ 1 et seq., to challenge the NCAA's rules restricting monetary compensation for current and former student-athletes who played for Division I men's football and basketball teams. They allege that these rules restrain competition in two distinct but related markets: (1) the "college education" market, in which Division I colleges and

universities compete to recruit the best student-athletes to play men's football or basketball; and (2) the "group licensing" market, in which broadcasters and videogame developers compete for group licenses to use the names, images and likenesses of student-athletes on Division I football and basketball teams in live game broadcasts, archival footage, and videogames.

The parties filed cross-motions for summary judgment in November and December 2013. In its motion, the NCAA asserted five procompetitive justifications for the challenged restraint: (1) the preservation of amateurism in college sports; (2) promoting competitive balance among Division I teams; (3) the integration of education and athletics; (4) providing increased support to women's sports and less prominent men's sports; and (5) generating greater output of Division I football and basketball.

In April 2014, the Court issued an order granting in part and denying in part Antitrust Plaintiffs' motion for summary judgment and denying the NCAA's motion for summary judgment. The Court found that disputes of material fact precluded it from granting summary judgment to either party with respect to the NCAA's first, second, third, and fifth asserted procompetitive justifications; however, it granted summary judgment to Antitrust Plaintiffs with respect to the NCAA's fourth justification. The Court reasoned that the market for women's sports and less prominent men's sports is separate from the market for Division I men's football and basketball and found that it would be "'improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in

2

another market.'"  April 11, 2014 Order 39 (citing <u>Sullivan v. Nat'l Football League</u>, 34 F.3d 1091, 1112 (1st Cir. 1994)); <u>see also</u> <u>United States v. Topco Associates, Inc.</u>, 405 U.S. 596, 610 (1972) (recognizing that competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy"). The Court also found that this procompetitive justification failed because the record contained undisputed evidence that "the NCAA could provide support for women's sports and less prominent men's sports through less restrictive means."  April 11, 2014 Order 39-40.

DISCUSSION

Under Civil Local Rule 7-9(b), a party seeking leave to file a motion for reconsideration must show (1) that "a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought"; (2) the "emergence of new material facts or a change of law occurring after the time of such order"; or (3) a "manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order."

Here, the NCAA seeks leave to move for reconsideration under the third justification.  It argues that the Court failed to consider controlling legal authority and material facts concerning (1) the scope of the "college education" market and (2) the non-existence of less restrictive alternatives.  These arguments are addressed separately below.

3

A. Scope of the "College Education" Market

As explained in the summary judgment order, Antitrust Plaintiffs submitted evidence suggesting that the NCAA "restrains competition in the [college education] market by preventing Division I schools from offering their recruits a portion of the revenue they receive from football- and basketball-related broadcasting and videogame licenses." April 11, 2014 Order 10-11. According to Antitrust Plaintiffs' experts, this restraint deprives Division I schools "of a tool that they could otherwise use to recruit the top student-athletes," which, in turn, deprives the top student-athletes of compensation that they would otherwise receive in an unrestrained market. Id.

The NCAA contends that the Court erred in treating Division I men's football and basketball recruits as the only consumers in this market. It asserts that the Court manifestly failed to consider evidence that the market also includes "other Division I [student-athletes] and other college-bound students." Docket No. 1033, NCAA Mot. Reconsid. 4. The NCAA points, in particular, to a declaration and a report submitted by its economic expert, Dr. Daniel Rubinfeld. In his declaration, Dr. Rubinfeld stated that "the relevant market is disputed" and that "the appropriate market definition should be broad enough to consider the full range of competitive effects at issue, including effects on students who are not men's basketball and football athletes." Docket No. 925-6, Dec. 2013 Rubinfeld Decl. ¶ 4 (emphasis added).[1] Similarly, in

---

[1] The Court assumes, for the purposes of this order, that this declaration is admissible even though it is dated December 12, 2013, which was after the deadline to exchange expert reports.

4

his report, Dr. Rubinfeld asserted that the college education market "relates to the provision of an education to college and university students, <u>some</u> of whom are, will be, or have been student-athletes."  Docket No. 925-15, Nov. 2013 Rubinfeld Report ¶ 34 (emphasis added).

The Court previously reviewed these portions of Dr. Rubinfeld's declaration and report and found that they were not sufficient to support an inference that the relevant market includes consumers who are not Division I men's football and basketball recruits.  Dr. Rubinfeld's assertion that the market is broader than just football and basketball recruits is based on the fact that the NCAA's challenged rules "apply to all student-athletes in D-I, not just football and basketball players."  <u>Id.</u> ¶ 36.  But the breadth of the NCAA's challenged conduct is not evidence of the breadth of the relevant market.  Antitrust Plaintiffs' evidence and arguments make clear that they are challenging the NCAA's restrictions on student-athlete pay because of the specific impact those restrictions have on the college education market for Division I football and basketball recruits.  The possibility that the NCAA's rules may also restrain trade in other markets or affect recruits in other sports does not serve to alter the scope of the relevant market in this case.[2]

---

[2] Even if the challenged restraint did affect recruiting in other sports, it is undisputed that the restraint does not uniformly affect the recruiting market in all sports.  Indeed, the NCAA's assertion that its restrictions on student-athlete pay enable Division I schools to redistribute resources to women's sports and less prominent men's sports rests on the assumption that certain sports generate more revenue than others.  By restricting the benefits that schools may offer recruits in high-revenue sports, the challenged rules necessarily have a greater impact on certain recruits than others, even if the rules technically apply across all sports.

5

Dr. Rubinfeld also suggests that football and basketball recruits are not the only consumers in the relevant market because

> there are a range of possible substitutes for attending a school on a football or basketball scholarship. These might include attending that same school on an athletic scholarship for a different sport (e.g., baseball) or attending a different school without an athletic scholarship (either as a walk-on or not playing intercollegiate athletics at all).

Id. ¶ 34. These substitutes, however, are based on Dr. Rubinfeld's unsupported assumptions about the kinds of educational opportunities available to Division I football and basketball recruits. More importantly, as a legal matter, these substitutes are not relevant to the scope of the specific product market that the NCAA is alleged to have restrained. The Supreme Court has held that, in antitrust cases, the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Here, there is no evidence in the record to suggest that a scholarship to play for a Division I men's football or basketball team is "reasonably interchangeable" with a scholarship to play a different sport or an offer to attend college without a scholarship. The vast price difference between attending college on a scholarship and attending college without one is, by itself, likely sufficient to place Division I football and basketball recruits in a different college education market than non-recruits. See, e.g., United States v. Archer-Daniels-Midland Co., 866 F.2d 242, 246 (8th Cir. 1988) ("While sugar and [high fructose corn syrup] are functionally interchangeable, they

6

are not reasonably interchangeable because of the price differential between the two products.").

In sum, nothing in Dr. Rubinfeld's report justifies the NCAA's request for leave to seek reconsideration of the April 2014 summary judgment order.[3]  Although the NCAA notes that the scope of the relevant market is often considered a question of fact for the jury to resolve, Dr. Rubinfeld's declaration and report are not sufficient to create a material factual dispute as to the scope of that market here.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 594 (1986) (refusing to credit expert evidence on summary judgment because the expert's findings about the scope of the relevant market were based on assumptions that were "both implausible and inconsistent with record evidence"); Rebel Oil Co., Inc. v. Atl. Richfield Co., 51 F.3d 1421, 1435-36 (9th Cir. 1995) ("In the context of antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient to support a jury verdict.").

Nor are any of the declarations submitted by university administrators, athletic directors, or conference executives.  The NCAA contends that these declarations show "that university administrators understand Title IX to require treating athletic opportunities in men's and women's sports as features of an integrated college educational offering rather than as different

---

[3] The NCAA's motion appears to focus on Dr. Rubinfeld's analysis of the college education market.  However, to the extent the NCAA contends that Dr. Rubinfeld's analysis of the "group licensing" market also justifies its request for leave to seek reconsideration, that contention is also rejected.

7

products." NCAA Mot. Reconsid. 7. But these administrators' understanding of Title IX has no bearing on whether Division I men's football and basketball recruits are consumers in the same market as other college-bound students. Furthermore, the declarations articulate a questionable understanding of Title IX -- one that the NCAA itself has not endorsed in this case. For all of these reasons, the declarations are not sufficient to support an inference that the relevant market includes more than just Division I men's football and basketball players.[4]

The Court's decision to grant summary judgment to Antitrust Plaintiffs on the NCAA's fourth procompetitive justification was, therefore, not based on a manifest failure to consider material facts or controlling authority. Although the NCAA has presented evidence of a general market for higher education, Antitrust Plaintiffs' claims focus only on a specific part of that market. The Ninth Circuit has made clear that this is permissible, explaining that "an antitrust claim may, under certain circumstances, allege restraints of trade within or monopolization of a <u>small part</u> of the general market of substitutable products." <u>Newcal Indus., Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1045 (9th Cir. 2008) (emphasis added). "In order to establish the existence of a legally cognizable submarket, the plaintiff must be able to show . . . that the alleged submarket is economically

---

[4] In its motion, the NCAA highlights evidence presented at summary judgment showing that Division I schools are "required to provide a minimum amount of financial aid for [student-athletes] in sports other than football and men's basketball." NCAA Mot. Reconsid. 6. This evidence, however, does not establish that the relevant market includes student-athletes from other sports and, even if it did, the NCAA could not justify the challenged restraint in this case simply by asserting that it must follow other rules of its own creation.

8

1 distinct from the general product market." Id.  Antitrust
2 Plaintiffs have presented sufficient evidence to suggest that
3 there is a specific college education market for Division I men's
4 football and basketball recruits.  See Docket No. 898-15, Sept.
5 2013 Noll Report 36-48 (explaining why "the weak substitutability
6 of student-athletes in one sport for student-athletes in the other
7 makes educational services for student-athletes in each sport a
8 distinct submarket").  Because the NCAA has not presented
9 sufficient evidence to create a factual dispute as to whether that
10 market is distinct from the general college education market,
11 reconsideration of this issue is not justified.

12     B.   Non-Existence of Less Restrictive Alternatives

13 Under the rule of reason, if an antitrust defendant presents
14 evidence of a challenged restraint's procompetitive effects, the
15 "plaintiff must then show that 'any legitimate objectives can be
16 achieved in a substantially less restrictive manner.'"  Tanaka v.
17 Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001) (citations
18 omitted).  The NCAA argues that Antitrust Plaintiffs failed to
19 meet this burden.  It further contends that the Court improperly
20 placed this burden on the NCAA, rather than Antitrust Plaintiffs,
21 in its April 2014 order.  These arguments are not persuasive.
22 As noted above, the Court previously found that the NCAA
23 could provide financial support to women's sports and less
24 prominent men's sports through less restrictive means than
25 limiting student-athlete compensation.  The summary judgment order
26 noted that the NCAA could simply require its member conferences to
27 redistribute revenue generated by Division I men's football and
28 basketball to women's sports and less prominent men's sports.  It

9

1 cited the NCAA's own expert, Dr. Rubinfeld, who acknowledged in
2 his expert report that the NCAA does not currently require its
3 member conferences to redistribute revenue generate by the
4 Division I men's basketball tournament to women's sports or less
5 prominent men's sports.  April 11, 2014 Order 40 (citing Docket
6 No. 925-8, Sept. 2013 Rubinfeld Report ¶ 127).  This portion of
7 Dr. Rubinfeld's report is undisputed and consistent with his
8 subsequent deposition testimony, which Antitrust Plaintiffs cited
9 in their summary judgment brief.  See Docket No. 898-24, Oct. 2013
10 Rubinfeld Depo. 114:15-:18 ("I think there are changes in the
11 rules that could be made that would still achieve the pro-
12 competitive purposes that the NCAA has set out, but I have not
13 seen my charge by the NCAA as advising them as to how to change
14 their regulations.").

   To show that these less restrictive alternatives were not
feasible, the NCAA cites a handful of declarations from university
administrators and athletic directors.  These declarations assert
that Title IX makes it difficult for universities and conferences
to redistribute revenue from men's sports to women's sports.  As
noted above, these declarations rest on a questionable
understanding of Title IX.[5]  Furthermore, to the extent Title IX
does prevent Division I schools and conferences from
redistributing revenue from men's football and basketball to
women's sports, it would undermine the NCAA's own argument here --
namely, that restrictions on student-athlete compensation make it

---

[5] Even if the NCAA subscribed to this questionable understanding of Title IX, it would still be able to require its member conferences to redistribute their Division I football and basketball revenue to less prominent men's sports.

10

easier for schools to redistribute funding to women's sports and less prominent men's sports. See Docket No. 926, NCAA Cross-Mot. Summ. J. 21-22 (asserting that "women's and less prominent men's sports" are "often funded in part by television revenue derived from football and men's basketball games"). Accordingly, these declarations are not sufficient to support an inference that the NCAA lacks less restrictive alternatives for promoting women's sports or less prominent men's sports.

In any event, even if there were a factual dispute as to the availability of less restrictive alternatives, Plaintiffs would still be entitled to summary judgment on the NCAA's fourth procompetitive justification. As explained above, the NCAA has not presented sufficient evidence to support an inference that the relevant market includes any consumers other than Division I men's football and basketball recruits. For this reason alone, reconsideration of the Court's prior ruling is not justified.

## CONCLUSION

For the reasons set forth above, the NCAA's motion for leave to file a motion for reconsideration (Docket No. 1033) is DENIED.

IT IS SO ORDERED.

Dated: 5/12/2014

CLAUDIA WILKEN
United States District Judge