Michael P. Lehmann (Cal. Bar No. 77152)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
Email: mlehmann@hausfeldllp.com
       abailey@hausfeldllp.com

Michael D. Hausfeld (*pro hac vice*)
Hilary K. Scherrer (Cal. Bar No. 209451)
Sathya S. Gosselin (Cal. Bar No. 269171)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone:  (202) 540-7200
Facsimile:  (202) 540-7201
Email: mhausfeld@hausfeldllp.com
       hscherrer@hausfeldllp.com
       sgosselin@hausfeldllp.com

*Plaintiffs' Class Counsel with Principal Responsibility for the Antitrust Claims*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION | Case No.  4:09-cv-1967 CW |
| This document relates to:<br><br>ANTITRUST PLAINTIFFS' ACTIONS | **ANTITRUST PLAINTIFFS' SUPPLEMENTAL RESPONSE TO *AMICI CURIAE* BRIEFS IN SUPPORT OF DEFENDANT NCAA'S MOTION TO CERTIFY PURSUANT TO 28 U.S.C. §1292(B) THE COURT'S ORDER RESOLVING CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Judge:      Honorable Claudia Wilken<br>Date:        June 5, 2014<br>Time:       2:00 p.m.<br>Courtroom: 2, 4th Floor |

The Antitrust Plaintiffs ("APs") file this supplemental response to the *amici curiae* briefs submitted in support of defendant National Collegiate Athletic Association's ("NCAA") motion for certification of an interlocutory appeal under 28 U.S.C. §1292(b).

At the outset, one overarching point needs to be made. This is an antitrust case. The question presented here is whether the NCAA and its members can lawfully agree not to pay college athletes for use of their names, images, and likenesses ("NIL") during and after their eligibility years. The APs have never sought to prevent or enjoin live broadcasts of Division I men's football and basketball games. All they want is to share in the broadcast revenue, just like other performers throughout the entertainment industry, including professional athletes.

The *amici* take the position that college athletes who participate in the broadcasts at issue have no property interests in their NIL because none exist for televised college team sports or to the extent that they do exist, the athlete has waived them once he steps on the field. They further contend that recognizing such rights here will severely chill First Amendment expression by conferring on individual athletes the ability to veto broadcasts unless they first obtain favorable licensing deals. These positions are untenable. Under the *amicis*' view, any performer's demand for payment from an event organizer for participation in a broadcast would have constitutional implications. The logical extension of *amicis*' position is that David Gregory's demand for more money to host "Meet The Press" would chill NBC's First Amendment rights and that last year's game boycott by football players at Grambling State University to raise money for their program (Dkt. No. 1054 at 6 n.6) had an equally chilling effect. The *amici* point to no caselaw that dictates such perverse results. They rely on cases going as far back as nearly 80 years (many of which were decided before the United States Supreme Court's seminal decision in *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977) ("*Zacchini*")) or on *dicta* in more recent cases

involving players in professional sports teams where participating athletes already receive compensation packages that specifically cover the use of their NIL.[1]

These theoretical legal arguments are also divorced from the facts of this case. The NCAA and its members routinely enter into contracts with broadcasters that either contain promises that they possess all the needed clearance rights, or purport to convey such rights explicitly, which is contrary to the contention that such rights do not exist.[2] Moreover, the NCAA and its members have expressly recognized the NIL rights of athletes in the release forms sought to be imposed on college athletes as a condition for playing Division I men's football and basketball.[3] The issue here is *how* the NCAA and its members convey broadcast rights that include college athletes' NILs—without payment for the use of those rights—in contrast to what is done in the professional leagues, where group licenses and compensation for use of NIL are the

---

[1] For example, see the current National Football League ("NFL") collective bargaining agreement, (available at http://nfllabor.files.wordpress.com/2010/01/collective-bargaining-agreement-2011-2020.pdf), which provides details regarding group licenses for use of players' NILs (at pp. 207-08) and the contract provisions by which players authorize teams and the NFL to use their NILs (at p. 256).

[2] *See, e.g.*, Dkt. No. 651-83 at NCAAPROD00305794-96 and Dkt. No. 651-84 at NCAAPROD00296114 (1994 and 1999 March Madness contracts with CBS Sports stating NCAA has the rights to grant the needed rights to the broadcaster and that the contract will not infringe or violate the rights of other persons, including their publicity rights); Dkt. No. 749-53 at FSU000008 (2006 broadcast contract between Florida State University and Fox Broadcasting subsidiary stating "FSU agrees to provide to Fox and its sponsors the names and likenesses of FSU individual participants in the FSU Events for advertising, promotion and publicity purposes" and that Fox is to "assume" that the opposing school in such contests has also provided it with that school's "respective players' names, likenesses and other items in promoting, advertising and telecasting the FSU Events."); Dkt. No. 749-54 at TEXAS 0000030-31 (2010 broadcast agreement between University of Texas ("UT") and ESPN stating "UT hereby grants to ESPN the right to use  names and likenesses of UT individual participants in athletics events included in the Content as a function of the distribution of such Content"). Other examples are cited at Dkt. No. 819 at 3 n.4. *See also* Dkt. No. 925-18 at 12 (report of Neal Pilson, one of the NCAA's experts, noting that the contracts in the record contain "representations and warranties that the event owner has the right to convey all rights necessary to telecast the game").

[3] *See, e.g.*, Dkt. No. 921-9 Exh. A at NCAA000001 (Big Ten Conference form where college athlete must "assign[] the right" to use his "name, voice, photograph, likeness or other image or descriptors" "in any manner or media"); Dkt. No. 922-6 at Exh. A (University of Texas release form authorizing use of college athlete's NIL (including use in video and media captures) for promotional purposes). As reflected in their separately filed motions *in limine*, the APs contend that these releases are void as being against public policy.

norm, so that the event organizer can represent *truthfully* that it has all the necessary rights clearances.

Nor do the *amici* provide fresh insight on the First Amendment question.  For example, the First Amendment Coalition ("FAC") *amicus* brief proposes, much like the NCAA and previous *amici*, that college football and basketball games are distinguishable from the purportedly rote "human cannonball" performance in *Zacchini*.  Dkt. No. 1042-1, at 6.  Yet the Supreme Court did not confine its holding to performances that never differ; as this Court has noted, the Supreme Court in *Zacchini* "specifically analogized the performer's 'human cannonball' act . . . to the [unpredictable] athletic performances at issue in two earlier right-of-publicity cases decided by lower federal courts" that concerned boxing and baseball.  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, C 09-1967 CW, 2014 WL 1410451, at *7 (N.D. Cal. Apr. 11, 2014) ("*NCAA*").  The FAC likewise ignores the Seventh Circuit's application of *Zacchini* to high school *football games*.  *See id.* at *8; *Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614, 615-18, 624 (7th Cir. 2011) ("*WIAA*").  For the same reasons, the FAC's argument that college football and basketball games—*team* sports—are not "'the product of [the performer's] own talents and energy'" as envisioned by the Court in *Zacchini* falls flat.  Dkt. No. 1042-1 at 6-7.  Likewise, the FAC cannot prevail on its argument that the Antitrust Plaintiffs forfeit their rights of publicity simply because television coverage might increase "exposure, public awareness[,] and acclaim."  *Id.* at 7.

The crux of the Broadcasters' *amicus* brief, meanwhile, is that *Zacchini* and *WIAA* protect *producers*, not performers. Dkt. No. 1047-1 at 7-8. That is a strange and mistaken reading of the plain language of both opinions. The Supreme Court in *Zacchini* is unequivocal: "we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a *performer's* entire act without his consent."  433 U.S. at 575 (emphasis added). The Broadcasters

argue that *Zacchini* concerned only performers who are also "producers," suggesting further that *Zacchini* was both. Dkt. No. 1047-1 at 7-8. Putting to one side any semantic debate over what a performer "produces," the Broadcasters find no support in the Supreme Court's opinion for the proposition that Zacchini "produced" the Geauga County Fair, at which his act was featured. Indeed, contrary to the Broadcasters' assumption (*see* Dkt. No. 1047-1 at 7), Zacchini did not charge a separate admission fee. 433 U.S. at 563 ("Members of the public attending the fair were not charged a separate admission fee to observe his act.").

As for *WIAA*, the Broadcasters distort its holding to be that "exclusive rights to license sporting events for broadcast are vested in the entity that sponsors the game." Dkt. No. 1047-1 at 6. That is a far cry from the Seventh Circuit's articulation of the central issue presented: whether a state actor can "enter into exclusive contracts with a private company for the purpose of broadcasting entire events online." 658 F.3d at 616. In any event, the Seventh Circuit clearly identified the interest at stake in *Zacchini*:

> Interpreting the First Amendment to provide the media with a right to transmit an entire performance or to prohibit *performers* from charging fees would take us back centuries, to a time when *artists* or *performers* were unable to capture the economic value of a performance. Over the long run, this would harm, not help, the interests of free speech. The First Amendment requires no such folly.

*Id.* at 624 (emphasis added).[4] Again, who constitutes the performer was not a question before the Seventh Circuit, and its discussion of the implications of Gannett's arguments make clear that the court was not distinguishing between producers and performers; the two were aligned for purposes of evaluating Gannett's contention:

---

[4] It is true that the Seventh Circuit located in *Zacchini* the proposition that a "producer of entertainment is entitled to charge a fee in exchange for consent to broadcast," (*id*.), which it needed to analyze in connection with the particular scenario presented in *WIAA*. But the Broadcasters misrepresent that passage by merging disparate sections some four pages apart. Dkt. No. 1047-1 at 6. In the second portion, the Seventh Circuit was merely noting that "the idea that reporting and streaming are synonymous is . . . at odds with experience in the private sector." 658 F.3d at 628 (providing examples including the NFL, FIFA, and the NCAA).

> The logical implications of Gannett's argument are breathtaking. Suppose *a high-school orchestra* were to perform one of Bach's Brandenburg Concertos or *the drama club* put together a rendition of *Othello* (both of which are in the public domain). Gannett's argument would require the conclusion that *the students* have no right to engage in the common practice of packaging *their performance* and selling it to raise money for school trips.

*Id*. at 628 (emphasis added). What is more, the Broadcasters are not even quibbling with this Court's principal conclusion—that "taken together, *Zacchini* and [*WIAA*] make clear that the First Amendment does not create a right to broadcast an entire athletic performance without first obtaining a license or consent from all of the parties who hold valid ownership rights in that performance." *NCAA*, 2014 WL 1410451, at *9.

Finally, the Broadcasters revisit the well-worn argument that college football and basketball players do not possess a right of publicity in *any* state as to television broadcasts. Dkt. No. 1047-1 at 3-12. The APs have briefed this argument numerous times, including a detailed inventory of those states that recognize a right of publicity in sports broadcasts (*see* Dkt. No. 971-1, at 19-22) and the Court has rejected the very same arguments advanced by the NCAA (and prior *amici*). Even assuming that rights of publicity are of controlling significance in this antitrust case, such rights apply no less to performers in public sports events. *E.g.*, *Uhlaender v. Henricksen*, 316 F.Supp. 1277, 1281-83 (D. Minn. 1970); *Sharkey v. Nat'l Broad. Co.*, 93 F. Supp. 986, 987 (S.D.N.Y. 1950) ("*Sharkey*").[5] *See also NCAA*, 2014 WL 1410451, at *11 (N.D. Cal. Apr. 11, 2014).

For all of the foregoing reasons, the APs submit that the *amici*, like the NCAA, have not shown a controlling question of law for which there is a substantial difference of opinion.[6]

---

[5] The broadcaster *amici* rely on a 1952 decision to assert that *Sharkey* is no longer valid precedent (Dkt. No. 1057 at 4 n.2), but it was cited with approval by the Supreme Court in 1977 in *Zacchini*. 433 U.S. at 575 n.9. Parenthetically, the APs do wish to note an error in their opposition brief; the sentence at page 6, line 5 of Dkt. No. 1054 should refer to the Sixth Circuit, not the Ninth Circuit.

[6] The absence of any material advancement of the litigation has been addressed in the APs' previous filing and will not be recapitulated here. *See* Dkt. No. 1054 at 11-12.

Dated: May 14, 2014                    Respectfully submitted,


By: */s/ Michael P. Lehmann*

Michael P. Lehmann (Cal. Bar No. 77152)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
E-mail: mlehmann@hausfeldllp.com
         abailey@hausfeldllp.com

Michael D. Hausfeld (*pro hac vice*)
Hilary K. Scherrer (Cal. Bar No. 209451)
Sathya S. Gosselin (Cal. Bar No. 269171)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
E-mail: mhausfeld@hausfeldllp.com
         hscherrer@hausfeldllp.com
         sgosselin@hausfeldllp.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2014, I served the foregoing document on counsel by filing it via the Court's CM/ECF system, which will send an email notice to all registered parties.

*/s/ Sathya Gosselin*
Sathya S. Gosselin