MICHAEL D. HAUSFELD (*pro hac vice*)
mhausfeld@hausfeldllp.com
HILARY K. SCHERRER (SBN 209451)
hscherrer@hausfeldllp.com
SATHYA S. GOSSELIN (SBN 269171)
sgosselin@hausfeldllp.com
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, D.C. 20006
Telephone:     (202) 540-7200
Facsimile:     (202) 540-7201

MICHAEL P. LEHMANN (SBN 77152)
mlehmann@hausfeldllp.com
BRUCE J. WECKER (SBN 78530)
bwecker@hausfeldllp.com
ARTHUR N. BAILEY, JR. (SBN 248460)
abailey@hausfeldllp.com
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone:     (415) 633-1908
Facsimile:     (415) 358-4980

Plaintiffs' Co-Lead Class Counsel
with Principal Responsibility for the Antitrust
Claims

GLENN D. POMERANTZ (SBN 112503)
glenn.pomerantz@mto.com
KELLY M. KLAUS (SBN 161091)
kelly.klaus@mto.com
ROHIT K. SINGLA (SBN 213057)
rohit.singla@mto.com
CAROLYN HOECKER LUEDTKE (SBN 207976)
carolyn.luedtke@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

GREGORY L. CURTNER (*Pro Hac Vice*)
gcurtner@schiffhardin.com
ROBERT J. WIERENGA (SBN 183687)
rwierenga@schiffhardin.com
SCHIFF HARDIN LLP
350 Main St., Suite 210
Ann Arbor, MI 48104
Telephone:     (734) 222-1500
Facsimile:     (734) 222-1501

Attorneys for Defendant
National Collegiate Athletic Association

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| In re NCAA Student-Athlete Name and Likeness Licensing Litigation | Case No. 09-cv-1967-CW |
| | **ANTITRUST PLAINTIFFS AND NCAA'S PROPOSED JURY INSTRUCTIONS** |
| | Dept:            Courtroom 2, 4th Floor<br>Judge:           Hon. Claudia Wilken<br>Complaint filed: May 5, 2009 |

Pursuant to the Court's Pretrial Order, Antitrust Plaintiffs ("APs") and Defendant National Collegiate Athletic Association ("NCAA")  hereby submit their joint proposed jury instructions, with objections or exceptions where indicated.  The parties respectfully reserve the right to amend these proposed jury instructions or submit additional proposed instructions based on evidence adduced and arguments made at trial.

Language marked in **bold** denotes deviations — agreed by both parties — from the model rules cited in the "source" section following the proposed instruction.  Instruction language proposed by APs to which Defendant NCAA objects appears in blue.   Instruction language proposed by NCAA to which APs object appears in yellow.  The parties object to all of the other parties' highlighted language unless otherwise indicated.

# GENERAL INSTRUCTIONS

**Page**

JURY INSTRUCTIONS ...................................................................................................1

JURY INSTRUCTION NO. 1:  [JOINT] DUTY OF JURY ................................................1

JURY INSTRUCTION NO. 2:  [DISPUTED, PLAINTIFFS' PROPOSED
       INSTRUCTION]  OVERVIEW AND CONTENTIONS OF THE
       PARTIES ...................................................................................................2

JURY INSTRUCTION NO. 3:  [JOINT] BURDEN OF PROOF ........................................9

JURY INSTRUCTION NO. 4  [DISPUTED, PLAINTIFFS' PROPOSED
       INSTRUCTION]   CIVIL AND CRIMINAL CASES DISTINGUISHED ...........10

JURY INSTRUCTION NO. 5:  [JOINT] WHAT IS EVIDENCE ......................................11

JURY INSTRUCTION NO. 6:  [JOINT] WHAT IS NOT EVIDENCE..............................12

JURY INSTRUCTION NO. 7:  [JOINT] EVIDENCE FOR LIMITED PURPOSE..........13

JURY INSTRUCTION NO. 8:  [JOINT] DIRECT AND CIRCUMSTANTIAL
       EVIDENCE.................................................................................................14

JURY INSTRUCTION NO. 9:  [JOINT] RULING ON OBJECTIONS...........................15

JURY INSTRUCTION NO. 10:  [JOINT] JUDGE'S QUESTIONS TO
       WITNESSES...............................................................................................16

JURY INSTRUCTION NO. 11:  [JOINT] CREDIBILITY OF WITNESSES .................17

JURY INSTRUCTION NO. 12:  [DISPUTED, PLAINTIFF'S PROPOSED
       INSTRUCTION]   INCONSISTENT STATEMENT ...........................................18

JURY INSTRUCTION NO. 13:  [JOINT] EXPERT OPINION ......................................19

JURY INSTRUCTION NO. 14:  [JOINT] CHARTS AND SUMMARIES NOT
       RECEIVED IN EVIDENCE.........................................................................20

JURY INSTRUCTION NO. 15:  [JOINT] CHARTS AND SUMMARIES IN
       EVIDENCE.................................................................................................21

JURY INSTRUCTION NO. 16:  [DISPUTED, PLAINTIFFS' PROPOSED
       INSTRUCTION]  SHERMAN ACT – PURPOSE..................................................22

[DISPUTED, NCAA'S PROPOSED INSTRUCTION]  SHERMAN ACT –
       PURPOSE ..................................................................................................22

JURY INSTRUCTION NO. 17:  [DISPUTED, PLAINTIFF'S PROPOSED
       INSTRUCTION]   SHERMAN ACT – PRICE FIXING EXPLAINED...............24

# GENERAL INSTRUCTIONS

Page

JURY INSTRUCTION NO. 18:  [DISPUTED, PLAINTIFFS' PROPOSED
INSTRUCTION]   SHERMAN ACT – GROUP BOYCOTT EXPLAINED ........26

JURY INSTRUCTION NO. 19:  [JOINT] ELEMENTS OF AN ANTITRUST
VIOLATION.........................................................................................28

JURY INSTRUCTION NO. 20:  [DISPUTED, PLAINTIFFS' PROPOSED
INSTRUCTION]  CONTRACT, COMBINATION OR CONSPIRACY .............29

[DISPUTED, NCAA'S PROPOSED INSTRUCTION]  CONTRACT,
COMBINATION OR CONSPIRACY ....................................................30

JURY INSTRUCTION NO. 21:  [DISPUTED, PLAINTIFFS' PROPOSED
INSTRUCTION]  CONTRACT, COMBINATION, OR CONSPIRACY –
ACTS AND STATEMENTS OF CO-CONSPIRATOR –
ADMISSIBILITY AND USE ...............................................................34

JURY INSTRUCTION NO. 22:  [DISPUTED, PLAINTIFFS' PROPOSED
INSTRUCTION]  CONTRACT, COMBINATION, OR CONSPIRACY –
ASSOCIATIONS – ACTS THROUGH ITS AGENTS .........................36

JURY INSTRUCTION NO. 23:  [DISPUTED, PLAINTIFFS' PROPOSED
INSTRUCTION]  CONTRACT, COMBINATION, OR CONSPIRACY –
JOINT AND SEVERAL LIABILITY – PRESENCE OF OTHER
ALLEGED CO-CONSPIRATORS NOT NECESSARY ....................37

JURY INSTRUCTION NO. 24:  [DISPUTED, PLAINTIFFS' PROPOSED
INSTRUCTION]  CONTRACT, COMBINATION, OR CONSPIRACY –
IGNORANCE OF ANTITRUST LAWS IS NO DEFENSE.................39

JURY INSTRUCTION NO. 25:  [DISPUTED, PLAINTIFFS' PROPOSED
INSTRUCTION]  COLLUSIVE EFFORTS TO RESTRICT, REDUCE,
OR LIMIT OPPORTUNITIES FOR COLLEGE ATHLETES TO
LICENSE THEIR NAMES, IMAGES OR LIKENESSES ...................41

JURY INSTRUCTION NO. 26:  [DISPUTED IN PART] RELEVANT
PRODUCT MARKET .........................................................................43

JURY INSTRUCTION NO. 27:  [DISPUTED, NCAA'S PROPOSED
INSTRUCTION]   RIGHT OF PUBLICITY – EFFECT ON PRODUCT
MARKET............................................................................................47

JURY INSTRUCTION NO. 28:  [DISPUTED, NCAA'S PROPOSED
INSTRUCTION]    RIGHT OF PUBLICITY – VARIATIONS BY STATE ........51

JURY INSTRUCTION NO. 29:  [DISPUTED, NCAA'S PROPOSED
INSTRUCTION]   FIRST AMENDMENT -- EFFECT ON PRODUCT
MARKET............................................................................................53

JURY INSTRUCTION NO. 30:  [DISPUTED, NCAA'S PROPOSED
INSTRUCTION]   MARKET POWER.................................................57

JURY INSTRUCTION NO. 31:  [DISPUTED, PLAINTIFFS' PROPOSED
INSTRUCTION]  UNREASONABLE RESTRAINT ..........................60

# GENERAL INSTRUCTIONS

**Page**

[DISPUTED, NCAA'S PROPOSED INSTRUCTION]  UNREASONABLE RESTRAINT -- OVERVIEW.................................................................61

JURY INSTRUCTION NO. 32: [PARTIALLY DISPUTED]  COMPETITIVE HARM.................................................................................................65

JURY INSTRUCTION NO. 33: [DISPUTED, NCAA'S PROPOSED INSTRUCTION]   PRODUCING A UNIQUE PRODUCT ..................................68

JURY INSTRUCTION NO. 34:  [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]   EVIDENCE OF COMPETITIVE BENEFITS ......................72

JURY INSTRUCTION NO. 35:  [DISPUTED, NCAA'S PROPOSED INSTRUCTION]   AMATEURISM.................................................79

JURY INSTRUCTION NO. 36:  [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]   UNREASONABLE RESTRAINT – PRETEXTUAL REASONS ..................................................................................................81

JURY INSTRUCTION NO. 37:  [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]   BALANCING OF COMPETITIVE EFFECTS.....................83

[DISPUTED, NCAA'S PROPOSED INSTRUCTION]  BALANCING OF COMPETITIVE EFFECTS ...............................................................83

JURY INSTRUCTION NO. 38: [DISPUTED, PLAINTIFFS' INSTRUCTION]  INTERSTATE COMMERCE.................................................86

[DISPUTED, NCAA'S INSTRUCTION]  INTERSTATE COMMERCE .......................86

JURY INSTRUCTION NO. 39: [PARTIALLY DISPUTED] INJURY AND CAUSATION.................................................................................89

JURY INSTRUCTION NO. 40:  [DISPUTED, NCAA'S PROPOSED INSTRUCTION]   ANTITRUST STANDING .....................................92

JURY INSTRUCTION NO. 41:  [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]   DAMAGES .........................................94

JURY INSTRUCTION NO. 42:  [DISPUTED, NCAA'S PROPOSED INSTRUCTION]   DAMAGES .........................................95

JURY INSTRUCTION NO. 43:  [JOINT] DAMAGES – STATUTE OF LIMITATIONS ............................................................................98

JURY INSTRUCTION NO. 44:  [JOINT] DAMAGES – SPECULATION NOT PERMITTED ...............................................................................99

JURY INSTRUCTION NO. 45:  [JOINT] DAMAGES – MULTIPLE PLAINTIFFS ..............................................................................100

JURY INSTRUCTION NO. 46:  [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]   UNJUST ENRICHMENT.....................................101

## GENERAL INSTRUCTIONS

**Page**

JURY INSTRUCTION NO. 47:  CONDUCT OF THE JURY .........................................103

JURY INSTRUCTION NO. 48:  [JOINT] NO TRANSCRIPT AVAILABLE TO JURY ................................................................................................................106

JURY INSTRUCTION NO. 49:  [JOINT] TAKING NOTES .........................................107

JURY INSTRUCTION NO. 50:  [JOINT] BENCH CONFERENCES AND RECESSES ...................................................................................................108

JURY INSTRUCTION NO. 51:  [JOINT] OUTLINE OF TRIAL .................................109

POST-TRIAL INSTRUCTIONS ...................................................................................110

JURY INSTRUCTION NO. 52:  [JOINT] DUTY TO DELIBERATE ..........................110

JURY INSTRUCTION NO. 53:  [JOINT] COMMUNICATION WITH COURT..........111

JURY INSTRUCTION NO. 54:  [JOINT] RETURN OF VERDICT .............................112

JURY INSTRUCTION NO. 55: .....................................................................................113

[JOINT] DEPOSITION IN LIEU OF LIVE TESTIMONY...........................................113

JURY INSTRUCTION NO. 56:  [JOINT] USE OF INTERROGATORIES OF A PARTY....................................................................................................113

JURY INSTRUCTION NO. 57:  [JOINT] USE OF REQUESTS FOR ADMISSION OF A PARTY ........................................................................113

JURY INSTRUCTION NO. 58:  [JOINT] STIPULATED TESTIMONY .....................114

JURY INSTRUCTION NO. 59:  [JOINT] STIPULATIONS OF FACT.......................114

JURY INSTRUCTION NO. 60:  [JOINT] JUDICIAL NOTICE....................................114

# JURY INSTRUCTIONS

## JURY INSTRUCTION NO. 1:

### [JOINT] DUTY OF JURY

Ladies and gentlemen:  You are now the jury in this case.  It is my duty to instruct you on the law.

These instructions are preliminary instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it.  You will be allowed to keep this set throughout the trial to which to refer.  This set of instructions is not to be taken home and must remain in the jury room when you leave in the evenings.  At the end of the trial I will give you a final set of instructions.  It is the final set of instructions which will govern your deliberations.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 1.1A (2007) (verbatim).

**JURY INSTRUCTION NO. 2:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**OVERVIEW AND CONTENTIONS OF THE PARTIES**

The Plaintiffs in this case are current and former college athletes who played on men's football and basketball teams between 1953 and the present under the National Collegiate Athletic Association ("NCAA"). All Plaintiffs played at the Division I level, the highest level of collegiate athletic competition.

The Defendant in this case is National Collegiate Athletics Association (also known as the "NCAA"), a nonprofit association that colleges and universities have formed to assist them in organizing and regulating athletic competition between their students. The NCAA has its headquarters in Indianapolis, Indiana.

The Plaintiffs claim that the NCAA and its member universities and conferences, restrain competition in alleged "college education" and "group licensing" markets by preventing Division I schools from offering their recruits a portion of the revenue they receive from football- and basketball-related broadcasting and videogame licenses. Plaintiffs further claim that these schools are thus deprived of a tool that they could otherwise use to recruit the top student-athletes. Plaintiffs allege that student-athletes are harmed by this restraint because it prevents them from receiving compensation—specifically, for the use of their names, images, and likenesses—that they would receive in an unrestrained market. Plaintiffs further claim that Electronic Arts (a videogame developer) and College Licensing Corporation participated in, and acted in furtherance of, this conspiracy.

Plaintiffs contend that the alleged conspiracy adversely impacts both current and former college athletes. They assert that the NCAA sells the rights to record and broadcast Division I football and basketball games while the college athletes who participate in those games are still bound by its eligibility rules, including the restrictions on compensation. As a result, Plaintiffs allege such athletes are prevented from selling or negotiating licenses for the use of their names, images, and likenesses at the exact moment when those licenses are most valuable. By the time these athletes have stopped participating in college sports—and are no longer bound by NCAA rules—Plaintiffs allege they have effectively lost whatever bargaining power they once had in the group licensing market because the NCAA has already sold the recording and broadcasting rights for the games in which they played. Thus, even if the NCAA bylaws do not prohibit former student-athletes from licensing their names, images, and likenesses, Plaintiffs allege the NCAA can still preclude these student-athletes from participating fully in the group licensing market through a combination of its compensation rules and licensing practices.

The NCAA claims that the challenged restraint: 1) increases the popularity of Division I sports by promoting a concept they refer to as amateurism; 2) promotes competitive balance among Division I football and basketball teams; 3) promotes the integration of education and athletics; and 4) increases the total 'output' of Division I football and basketball.

Plaintiffs have the initial burden of proving that the challenged restraint has had significant anticompetitive effects within a relevant product and geographic market. If you find

that the Plaintiffs have proven that the challenged restraint produces significant anticompetitive effects in a relevant market, then the burden shifts to the NCAA to come forward with evidence of the restraint's legitimate procompetitive effects in the same relevant market.

If the NCAA fails to show that the challenged restraint produces legitimate procompetitive effects in the same relevant market, then the restraint is unreasonable.

If, however, the NCAA comes forward with evidence of one or more of the alleged restraint's legitimate procompetitive effects in the same relevant market, the burden shifts to the Plaintiffs to show that these legitimate procompetitive effects could be achieved in a substantially less restrictive manner.

If you find that all of the legitimate procompetitive effects offered by the NCAA could be achieved in a substantially less restrictive manner, the challenged restraint is unreasonable.

If you find that some of the legitimate procompetitive effects in the same relevant market offered by the NCAA could be achieved in a substantially less restrictive manner while others could not, you should consider only the latter in determining whether the challenged restraint is reasonable. Specifically, you must weigh the anticompetitive and procompetitive effects not achievable in a substantially less restrictive manner to determine if the restraint is reasonable on balance. If the Plaintiffs prove that the anticompetitive effects outweigh the procompetitive effects, the challenged restraint is unreasonable.

Plaintiffs also claim that the NCAA has been unjustly enriched as the result of the use of Plaintiffs' names, images and likenesses."

**Source:** Ninth Circuit Manual of Model Civil Jury Instructions § 1.2 (2007) (modified).


**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**OVERVIEW AND CONTENTIONS OF THE PARTIES**

The Plaintiffs in this case are current and former college athletes who played on men's football and basketball teams between 1953 and the present under the National Collegiate Athletic Association ("NCAA"). All Plaintiffs played at the Division I level, the highest level of collegiate athletic competition.

The Defendant in this case is National Collegiate Athletics Association (also known as the "NCAA"), a nonprofit association that colleges and universities have formed to assist them in organizing and regulating athletic competition between their students. The NCAA has its headquarters in Indianapolis, Indiana.

[Plaintiffs' may insert their summary of their claims.]

The NCAA denies all of Plaintiffs' claims.

According to the NCAA, rules prohibiting student-athletes from being paid to play are necessary to maintain the distinctive character of collegiate athletics, and to preserve the core academic values of the colleges that compete in collegiate athletics. The NCAA argues that if colleges were permitted to offer high school students large sums of money—over and above the scholarships they already can receive—to recruit them to play at their colleges, as Plaintiffs want, this would hurt colleges and student-athletes alike. The NCAA claims that recruiting based on money would distract students from their education and undermine the community environment of the college. The NCAA also believes that if student-athletes were paid for appearing on broadcasts or could be paid by videogame companies in addition to the scholarships they receive, they would no longer be student-athletes but would instead become professionals.

The NCAA further argues that its rules support a number of positive outcomes that the law describes as "procompetitive benefits," including that the rules increase consumer demand for college sports by distinguishing them from professional sports, expand educational and athletic opportunities for student-athletes, promote the integration of academics and athletics, and ensure competitive balance among schools and conferences.

The NCAA also asserts that its rules are not what prevent student-athletes from licensing their name, image, or likeness for use in broadcasts or videogames. This is because, the NCAA believes, no license or permission is required from the athletes, cheerleaders or other participants appearing in sports broadcasts, because these are considered newsworthy events protected by the First Amendment. The NCAA contends that Plaintiffs cannot show any law requiring anyone to obtain the rights of participants before broadcasting a sports event. Nor is any license or permission required to use generic faces and images and public domain data to depict football and basketball "avatars" in videogames. The NCAA argues that because no permission is needed for these uses, licensors would not pay student-athletes for these uses even if the NCAA's rules did not exist, and thus the NCAA's rules in no way restricted or harmed student-athletes in the way that Plaintiffs contend.

The Plaintiffs have the burden of proving an antitrust violation. In determining whether Plaintiffs have established a violation of Section 1 of the Sherman Act, you are to consider whether the NCAA's rules allegedly preventing student-athletes from selling their names, images, and likenesses for appearing in live broadcasts, rebroadcasts, and videogames—and not any other rules or conduct by the NCAA—constitute an unreasonable restraint of trade. Plaintiffs must prove that the NCAA has in fact restrained trade, and that this restraint has caused anticompetitive effects that substantially outweigh any procompetitive benefits that the NCAA proves are promoted by the restraint.

**Source:** Ninth Circuit Manual of Model Civil Jury Instructions § 1.2 (2007) (modified).

**Antitrust Plaintiffs' Arguments:**

Plaintiffs' version of this instruction includes a concise statement of Plaintiffs' claims and also identifies the NCAA's four remaining alleged pro-competitive defenses in the same language used by the Court in the summary judgment order. Plaintiffs also include a brief, neutral overview of the Ninth Circuit law on the shifting burdens in rule of reason cases because it

provides a framework to assist the jury in better understanding the interplay among the parties' contentions. Plaintiffs' instruction incorporates the Supreme Court's holding in *U.S. v. Topco Associates, Inc*., 405 U.S. 596, 610 (1972) that if plaintiffs show anticompetitive effects the burden shifts to defendant to come forward with evidence showing procompetitive benefits in the same relevant market. This Court followed the *Topco* rule in *NCAA Student-Athlete Name & Likeness Licensing Litig*., No. C 09–1967 CW, 2014 WL 1410451, at *16 (Apr 11, 2014) ("*NCAA II*"). In *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir.1994), a First Circuit case on which the NCCA relies, the court held that it was "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." *Id*. at 1112. Ninth Circuit cases also require that procompetitive justifications be "legitimate". See *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

The NCAA's version omits important steps in the rule of reason analysis and misstates Ninth Circuit law by stating that Plaintiffs must prove that the "restraint has caused anticompetitive effects that **substantially** outweigh any procompetitive benefits." (Emphasis added.) Under Ninth Circuit law, harm to completion need only outweigh, not substantially outweigh legitimate procompetitive benefits. *Tanaka*, 252 F.3d at 1063. Plaintiffs' proposed language correctly reflects the Ninth Circuit standard, which was recognized and applied by this Court. *NCAA II*, 2014 WL 1410451, at *3 ("'A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects.' *Tanaka*, 252 F.3d at 1063.")

Citing *Cnty. of Tuolumne v. Sonora Cmty. Hosp*., 236 F.3d 1148, 1159 (9th Cir. 2001), the NCAA argues that the jury should be instructed that Plaintiffs must prove that a less restrictive alternative is "virtually as effective in serving the legitimate objective without significantly increased cost." The language in Plaintiffs' proposal, however, is taken directly from *Tanaka*, which is the most recent Ninth Circuit case explaining the shifting burdens in rule or reason cases. "If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects. The plaintiff must then show that "any legitimate objectives can be achieved in a substantially less restrictive manner." 252 F.3d at 1063, quoting *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1319 (9th Cir.1996). The Court quoted this language from *Tanaka* and *Hairston* in *NCAA II*, 2014 WL 1410451, at *3. The language that the NCAA seeks to include is not part of the ABA or any other model jury instructions and Plaintiffs find no case where it has ever been included in any jury instruction by any court.

The NCAA's description of its justifications in this instruction is contrary to this Court's ruling that "[t]he social justifications proffered for respondents' restraint of trade thus do not make it any less unlawful." *Id*. at *15, quoting *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990). For example, the NCAA wants the jury to be instructed that the NCAA contends that lifting the restraint "would hurt colleges and student-athletes alike" and "distract students from their education and undermine the community environment of the college." As this Court ruled:

> The NCAA contends that the integration of education and athletics not only
> improves the educational experiences of student-athletes but also advances the
> educational mission of colleges. While these may be worthwhile goals, they are

not procompetitive. The Supreme Court has made clear that antitrust defendants cannot rely on these types of social welfare benefits to justify anticompetitive conduct under the Sherman Act.

*Id.*

The NCAA's statement of contentions also ignores the Court's order granting summary judgment on the "other sports" justification by arguing that the restraint provides "athletic opportunities for student-athletes" in general. While parties are ordinarily allowed to state their own contentions in this instruction, it cannot be used as a platform to misstate the law and describe defenses that have been rejected on summary judgment as the NCAA attempts.

The NCAA's argument of the First Amendment defense and the right of publicity statutes to the jury is also improper and contrary to this Court's summary judgment order.  As the Court ruled on summary judgment, there is a national market for the use of NIL rights in the broadcast and rebroadcast of entire games, which is not barred by the First Amendment under *Zacchini v. Scripps–Howard Broadcasting Co*., 433 U.S. 562, (1977) and *Wisconsin Interscholastic Athletic Association v. Gannett Co., Inc*., 658 F.3d 614, 615 (7th Cir.2011).  *NCAA II* at *8.

With respect to the market for clips or highlight footage, the Court ruled that "[i]f Plaintiffs seek to prove that a similar market would exist for group licenses to use student-athletes' names, images, and likenesses in clips and highlight footage, they will have to prove that there would be a demand for these clips and highlight footage specifically for use in commercial speech that is not protected by the First Amendment." *Id*, at *14.  Whether Plaintiffs meet that burden at trial is a matter properly decided by the Court, not the jury.  As held in *Jordan v. Jewel Food Stores, Inc*., 851 F.Supp.2d 1102, 1105 (N.D.Ill.2012), reversed on other grounds, 743 F.3d 509  (7th Cir.2014), a case cited with approval in *In re NCAA Student-Athlete Name & Likeness Licensing Litig*., No. C 09–1967 CW, 2013 WL 5778233, at *8 (N.D.Cal. Oct. 25, 2013) ("*NCAA I*"))  "[V]arious **considerations bearing on the classification of speech as commercial or noncommercial**—whether the speech is an advertisement, whether the speech refers to specific products or services, and whether the speech has an economic motivation, see  *Youngs Drug*, 463 U.S. at 66–67, 103 S.Ct. 2875—**present issues for the court and not a jury .**" (Emphasis added).

The Court, not the jury, should also decide whether the right of publicity statute or common law of any state permits a claim involving sports broadcasts because it is an issue correctly resolved by the district court as "[t]he construction or interpretation of a statute is a question of law...." *U.S. v. Johnson*, 680 F.3d 1140, 1147 (9th Cir. 2012), quoting *United States v. Cabaccang*, 332 F.3d 622, 624–25 (9th Cir.2003) (en banc).

**NCAA's Arguments:**

The parties were unable to reach agreement on two things: (1) the summary of NCAA's contentions and (2) the summary of the remaining substantive instructions.

First, as to NCAA's contentions, the purpose of this instruction is to provide the "brief summary of the positions of the parties." Ninth Circuit Manual of Model Civil Jury Instructions § 1.2 (2007). The parties agreed that each side would draft its own summary of its positions. APs decided to include a lengthy, argumentative summary of their contentions. NCAA does not object, as long as the NCAA's own summary of equal length and tone is included. The APs' proposal to include a two-paragraph summary of their contentions but to reduce the NCAA's contentions to a sentence, is patently unfair. The APs' version of the NCAA's contentions is also misleading, incomplete, and biased (e.g., referring to "a concept they refer to as amateurism"). It does not even respond to the APs' alleged markets and provides no context for why the challenged rules are procompetitive. To provide guidance to the Jury as to the actual positions they will hear at trial, NCAA should be permitted to summarize its own claims, just like the Plaintiffs. *See Gulliford v. Pierce Cnty.*, 136 F3d 1345, 1348 (9th Cir. 1998); *United States v. Joetzki*, 952 F.2d 1090, 1095 (9th Cir. 1991). If the Plaintiffs believe that some specific wording in the NCAA's summary of its position is inconsistent with the Court's order, the NCAA is prepared to meet and confer to try to reach agreed upon language. But it is unfair to limit the NCAA's position to a bare sentence.

Second, with respect to the summary of the remaining substantive instructions, the APs' proposed language is quite long, repetitive of later instructions, and thus confusing. The purpose of this instruction is to state the ***contentions*** of the parties. Antitrust law and the burden of proof are addressed in subsequent Instructions. Hence, the NCAA proposes omitting any summary of law from this instruction like the analogous Ninth Circuit Model Instruction. Thus the last paragraph of the NCAA's proposed instruction could be omitted. However, if the Court believes that a summary of antitrust law belongs in this instruction, then the NCAA submits that the language it proposes (the last paragraph of its proposed instruction) is a more accurate and clear statement of the law than the language proposed by APs (the last **6** paragraphs of their proposed instruction).

The danger of the APs' approach is that this summary of the law is not complete or correct. It would be better to provide the substantive legal standard to the Jury in just one place, later in the instructions. Moreover, the APs' summary misstates the law:

(a) It is not correct—and indeed reversible error to instruct the Jury—that procompetitive effects must occur "in the same relevant market." *Sullivan v. Nat'l Football League*, 34 F. 3d 1091, 1111-13 (1st Cir. 1994) (finding error when jury was instructed to "balance the injury to competition in the relevant market with the benefits to competition in the same relevant market").

(b) APs' proposed instruction will mislead the Jury by suggesting that the NCAA bears the burden to establish each of its alleged procompetitive effects. The legal standard, however, is that if the NCAA establishes *any* procompetitive effects, the Jury proceeds to balance those effects against the anticompetitive harm. *See* Antitrust Law Developments (Seventh) at 79-80.

(c) With respect to the balancing of harms and procompetitive effects, APs must prove that the anticompetitive harms "substantially" outweigh any procompetitive benefits. APs omit the word "substantially" and thus fail to accurately state the applicable law. *See, e.g.*, Model Jury Instructions in Civil Antitrust Cases (2005) at A-12 ("If the competitive harm does not *substantially* outweigh the competitive benefits, then the challenged restraint is not

unreasonable.") (emphasis added); Antitrust Law Developments (Seventh) at 62 ("The ultimate issue [in a rule of reason case] is whether the restraint's anticompetitive effect *substantially* outweighs the procompetitive effect for which the restraint is reasonably necessary.").  The fact that some cases in discussing the issue omit the word "substantially" does not mean that it is not a recognized part of the legal test for the jury.  The single case relied on by APs for omitting the word "substantially," *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001), did not concern proper jury instructions, and indeed did not even reach the question what was the appropriate test for the reasonableness inquiry, finding instead that plaintiff's claims were precluded because plaintiff failed to identify a relevant market.  *See id.* at 1065.

(d) With respect to less restrictive alternatives, the APs' proposed instruction is incomplete in that if fails to state that APs must prove that the less restrictive alternative is "virtually as effective in serving the legitimate objective without significantly increased cost." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001).  Moreover, the existence of a less restrictive alternative is merely "a factor in determining the reasonableness of an ancillary restraint," *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1396 (9th Cir. 1984).  It is incorrect that the existence of a less restrictive alternative requires judgment in favor of APs.

<u>Finally</u>, the NCAA believes that its statement regarding the various products at issue in this case ("live broadcasts, rebroadcasts, and videogames—and not any other rules or conduct by the NCAA") should be included, to prevent Jurors from considering potential uses of student-athletes' NILs, such as on T-shirts, posters, magazines, or other items, that are of no issue to this case.  *See Gulliford v. Pierce Cnty.*, 136 F3d 1345, 1348 (9th Cir. 1998) (jury instructions should fairly and adequately cover the issues presented, correctly state the applicable law, and not be misleading).

### JURY INSTRUCTION NO. 3:

### [JOINT] BURDEN OF PROOF

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

**Source:** Ninth Circuit Manual of Model Civil Jury Instructions § 1.3 (2007) (verbatim)

### JURY INSTRUCTION NO. 4

### [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]

### CIVIL AND CRIMINAL CASES DISTINGUISHED

There are two kinds of cases that come to court, criminal cases and civil cases. Criminal cases are when the government charges a person or company with a crime. Some of you may have sat on juries in criminal cases before, and others of you may have watched movies or television shows like "Law and Order" where criminal cases brought by the government are shown. This is not a criminal case. This is a civil case. There are significant differences between criminal cases and civil cases. One significant difference is that in criminal cases, the burden of proof on the government is to prove its case "beyond a reasonable doubt." That standard – proof beyond a reasonable doubt – does not apply here. In this civil case, you should put that standard of proof out of your minds.

**Source:** Kevin O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions § 104.01 (5th ed. 2000); Pattern Crim. Jury Instructions for the 7th Cir. 2.03 (1998); 8th Cir. Civil Jury Instructions 3.04 (2008) (adapted).


**Antitrust Plaintiffs' Arguments For:**

This instruction should be given because jurors are likely to be more familiar with the burden of proof in criminal cases from television shows and movies than the civil standard, and could mistakenly apply the criminal standard of proof to this civil case unless they are told that the civil preponderance of the evidence standard is significantly different from the criminal "beyond a reasonable doubt" standard.

**NCAA's Arguments Against:**

This is not a Ninth Circuit Model Instruction. The Ninth Circuit Instructions rely instead on the "Burden of Proof" Instruction, included as Instruction No. 3, *supra*, to set forth the preponderance-of-the-evidence burden of proof in this case. APs' proposed Instruction No. 4 adds nothing to the preceding Instruction, and is likely to confuse the jury by perhaps causing them to wonder about criminal antitrust enforcement or the beyond a reasonable doubt standard. Irrelevant instructions, even if a correct statement of law, should not be given to the jury because they are likely to mislead the jury and invite speculation. *See, e.g.*, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1064 (9th Cir. 2008).

**JURY INSTRUCTION NO. 5:**

**[JOINT] WHAT IS EVIDENCE**

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits which have been received into evidence; and

(3) any facts to which the lawyers have agreed.

**Source:** Ninth Circuit Manual of Model Civil Jury Instructions § 1.6 (2007) (verbatim).

**JURY INSTRUCTION NO. 6:**

**[JOINT] WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition sometimes testimony and exhibits are received only for a limited purpose; when I give a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence. **It is important that you do not read about this case in the media, discuss the case with friends or acquaintances, or let anything you may have seen or heard outside of Court influence your decision in any way.** You are to decide the case solely on the evidence received at the trial.

**Source:** Ninth Circuit Manual of Model Civil Jury Instructions § 1.7 (2007) (modifications in bold).

**JURY INSTRUCTION NO. 7:**

**[JOINT] EVIDENCE FOR LIMITED PURPOSE**

Some evidence may be admitted for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 1.8 (2007) (verbatim)

### JURY INSTRUCTION NO. 8:

### [JOINT] DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  **For example, direct proof that it is raining could be a witness testifying that "I was outside a minute ago and I saw it was raining"; circumstantial evidence that it is raining is the sight of someone entering the courtroom carrying a wet raincoat or umbrella**.  **You are instructed that circumstantial evidence cannot, however, rest on speculation; you may draw inferences where reasonable, but such leaps of logic must be based on the evidence presented in this case, not on speculation, innuendo, or some idea of what "must have happened."**

You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

**Source:**  Ninth Circuit Manual of Model Civil Jury Instructions § 1.9 (2007) (modifications in bold).

# JURY INSTRUCTION NO. 9:

## [JOINT] RULING ON OBJECTIONS

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered, and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

**Source:**  Ninth Circuit Manual of Model Civil Jury Instructions § 1.10 (2007) (verbatim).

**JURY INSTRUCTION NO. 10:**

**[JOINT] JUDGE'S QUESTIONS TO WITNESSES**

During the trial, I may sometimes ask a witness questions. Please do not think I have any opinion about the subject matter of my questions. I may ask a question simply to clarify a matter, not to help one side of the case or harm another side. Remember at all times that you, as jurors, are the sole judges of the facts of this case.

**Source**: Federal Jury Practice & Instructions 102.72 (6th ed. 2011)

## JURY INSTRUCTION NO. 11:

## [JOINT] CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.  Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness's testimony;

(6) the reasonableness of the witness's testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

**Source:**  Ninth Circuit Manual of Model Civil Jury Instructions § 1.11 (2007) (verbatim).

**JURY INSTRUCTION NO. 12:**

**[DISPUTED, PLAINTIFF'S PROPOSED INSTRUCTION]**

**INCONSISTENT STATEMENT**

You should also ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact; or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was simply an innocent lapse of memory or an intentional falsehood; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

**Source**:  Eleventh Circuit Pattern Jury Instructions (Civil Cases) 4.1 at 12-13 (2005).


**Antitrust Plaintiffs' Arguments For:**

Federal Rule of Evidence 613 allows witnesses to be questioned about prior inconsistent statements.  Rule 801(d)(1)(A) authorizes the admission of prior inconsistent statements by testifying witnesses as substantive evidence if the prior statements were given under oath. Accordingly, an instruction informing the jury about the effect of inconsistent statements is proper and helpful to the jury.  *See Nunn v. Evans*, --- Fed.Appx. ----, 2014 WL 662168, at *1 (9th Cir.  Feb. 21, 2014 (district court's instructions on a "witness's prior consistent or inconsistent statements. . . . were correct and unambiguous) *Wood v. Stihl, Inc*., 705 F.2d 1101, 1109 (9th Cir.1983) (trial court erred by failing to allow expert to be questioned about prior inconsistent statements).

**NCAA's Arguments Against:**

This is not a Ninth Circuit Instruction.  The Ninth Circuit Instructions instead propose a "Credibility of Witnesses" Instruction, herein included as the Joint Proposed Instruction No. 11, which provides the Jury guidance in considering witness testimony and credibility, instructing the Jurors that they may consider, *inter alia*, "the witness's memory," "whether other evidence contradicted the witness's testimony," and "any other factors that bear on believability." Emphasizing an issue like this threatens to give it undue importance in the Jury's eyes.  This factor is not more important to witness credibility that the others listed by the Ninth Circuit Model Instruction (No. 11 herein) and there is no reason to specially call it out and emphasize it.

**JURY INSTRUCTION NO. 13:**

**[JOINT] EXPERT OPINION**

**You will hear testimony from persons who, because of education or experience, were permitted to state opinions and the reasons for those opinions.**

Opinion testimony should be judged just like any other testimony.  You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**Source:**  Ninth Circuit Manual of Model Civil Jury Instructions § 2.11 (2007) (modifications in bold).

**JURY INSTRUCTION NO. 14:**

**[JOINT] CHARTS AND SUMMARIES NOT RECEIVED IN EVIDENCE**

Certain charts and summaries not received in evidence may be shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.   They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 2.12 (2007) (verbatim).

**JURY INSTRUCTION NO. 15:**

**[JOINT] CHARTS AND SUMMARIES IN EVIDENCE**

Certain charts and summaries may be received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 2.13 (2007) (verbatim).

**JURY INSTRUCTION NO. 16:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**SHERMAN ACT – PURPOSE**

I will now instruct you on the law under which the Plaintiffs have brought their claims: the Sherman Act.

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace by prohibiting certain anticompetitive practices.  The goal of the Sherman Act is the prevention of restraints to free competition in business and commercial transactions.

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition) Instruction 1, Purpose, at A-2; *Columbia River People's Utility Dist. v. Portland General Elec. Co*., 217 F.3d 1187, 1190, n.4 (9th Cir 2000), quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940); *Law v. National Collegiate Athletic Ass'n*, 185 F.R.D. 324, 334 n. 12 (D.Kan.1999), *aff'd*, 134 F.3d 1010 (10th Cir. 1998).


**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**SHERMAN ACT – PURPOSE**

**I will now instruct you on the law under which the Plaintiffs have brought their claims: the Sherman Act**.

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.  The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition) Sherman Act General Instruction 1, Purpose, at A-2 (modifications in bold).


**Antitrust Plaintiffs' Arguments:**

This instruction is based on ABA Model Jury Instructions in Civil Antitrust Cases Instruction 1, Purpose, modified to better suit the claims in this case by including language from Ninth Circuit and Supreme Court decisions describing the purpose of the Sherman Act.  See *Columbia River People's Utility Dist. v. Portland General Elec. Co.*, 217 F.3d 1187, 1190, n.4 (9th Cir 2000) and *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940). That language is more appropriate for this case than the language of the ABA model instruction because this is not a case based on artificially inflated prices, and the language the NCAA proposes would likely confuse the jury.

1

**NCAA's Arguments:**

2    The NCAA's Proposed Instruction No. 16 repeats verbatim the ABA Model Instructions
3 on Civil Antitrust Cases, consistent with the Court's recognition that "the American Bar
  Association model jury instructions for civil antitrust cases should be used where an appropriate
4 model instruction from the Ninth Circuit is unavailable." *In re Static Random Access Memory
  (SRAM) Antitrust Litig.*, 07-MD-01819 CW, 2010 WL 10086747 (N.D. Cal. Dec. 16, 2010)
5 (Wilken, J.).

6    APs' proposed instruction, on the other hand, deviates significantly from the Model
  Instructions by failing to recognize that restraints may also produce procompetitive benefits, and
7 that the purpose of the antitrust laws are to enhance consumers' welfare, as reflected in lower
  prices, higher quality products, and the efficient organization of production. *See, e.g.*, *Pacific
8 Railway v. United States*, 356 U.S. 1, 4 (1958); *Chicago Prof'l Sports Ltd. P'ship v. Nat'l
9 Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996); 11 P. Areeda & H. Hovenkamp, *Antitrust
  Law* § 1503(b), at 394.  APs provide no legal support for either their rewrite of this Instruction or
10 for why the ABA Model Instruction is not appropriate here.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# JURY INSTRUCTION NO. 17:

## [DISPUTED, PLAINTIFF'S PROPOSED INSTRUCTION]

## SHERMAN ACT – PRICE FIXING EXPLAINED

Plaintiffs claim that the NCAA conspired with its member universities and conferences, EA and the Collegiate Licensing Company to restrain competition in the market for the rights to use the names images, and likenesses, of college athletes who have participated in Division 1 men's intercollegiate basketball and Division I Football Bowl Subdivision intercollegiate football, and to restrain competition in the "college education" market, in which Division I colleges and universities compete to recruit the best athletes to play football or basketball and that Plaintiffs were injured as a result. Plaintiffs claim that by agreeing to prohibit payment to current and former college athletes for the rights to use their names, likenesses and images, the NCAA and its co-conspirators fixed the compensation for use of Plaintiffs' names, likenesses and images at zero.

Under the Sherman Act, it is illegal for competitors, regardless of their size, to agree on the prices to be charged for their competing products (or inputs to such products) or to agree on the prices they will pay for services. Plaintiffs claim that the NCAA and its member universities and conferences agreed on the maximum amount of all compensation that college athletes can receive and agreed to prohibit college athletes from receiving any compensation for the use of their names, images, and likenesses. Plaintiffs claim that the NCAA and its member universities and conferences, acting in concert with EA and Collegiate Licensing Company, imposed this agreed restraint against compensation on all entities who obtained licenses to use the names, images, and likenesses of these college athletes.

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition), Horizontal Price-Fixing Instruction No. 1, at B-19-B-20 (adapted); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220 (1940); *United States v. Green*, 592 F.3d 1057, 1068 (9th Cir. 2010).

## Antitrust Plaintiffs' Arguments For:

This instruction is based on the model instruction the ABA recommends giving in price-fixing cases, modified to explain the price fixing claims in this case under Ninth Circuit and Supreme Court case law. The instruction explains basic, fundamental principles about the illegality of price fixing. Price fixing is one of the claims in this case and it is important that the jury understand the basis of the claim and the governing law.

## NCAA's Arguments Against:

The ABA Model Instructions are explicit that this instruction is designed to explain *per se violations of the antitrust laws*, and has no place in a rule of reason case: "This instruction is appropriate if a court determines that the alleged restraint is illegal per se," but "[i]f a court determines that the alleged restraint should be evaluated under the rule of reason, the jury should

be instructed in accordance with the Rule of Reason Instructions, pp. A-4 to A-11." ABA Model Instructions at B-21, Notes. That is because the one substantive sentence in the instruction (first sentence of second paragraph) is wrong and misleading in a rule of reason case. It is not true that "it is illegal for competitors . . . to agree on the prices to be charged for their competing products." The whole point of a rule of reason analysis is that sometimes such behavior is appropriate. This instruction will mislead the Jury by instructing them on law that has no application to this case, and is thus highly prejudicial.

Moreover, other than that one (legally erroneous) sentence, the rest of the instruction is just a gratuitous summary of the APs' trial themes and has nothing to do with instructing the Jury as to the law governing this case. A summary of APs' claims are included in Instruction No. 2, and the elements of a price-fixing conspiracy under the rule of reason are addressed with the jointly agreed rule of reason instructions, which track those suggested by the ABA Model Instructions, at Instructions 19 et seq. APs' repeated summary of their claims, independent of any relevant legal instruction, merely serves to bias the jurors and prejudice the NCAA. *See, e.g.*, *Howard v. Cincinnati Sheet Metal & Roofing Co.*, 234 F.2d 233, 235-36 (7th Cir. 1956) (reversing and remanding for new trial where the instructions were "unfortunately and prejudicially phrased" and "unduly emphasized" one party's view of the case).

**JURY INSTRUCTION NO. 18:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**SHERMAN ACT – GROUP BOYCOTT EXPLAINED**

Plaintiffs also claim that the NCAA conspired with its member universities and conferences, EA and the Collegiate Licensing Company to prohibit college athletes from participating in the licensing market for college athletes' names images and likenesses.  Plaintiffs claim that NCAA participated in a group boycott /concerted refusal to deal by a concerted refusal to compensate current and former college athletes for use of their names, likenesses and images and by excluding college athletes from participating in this licensing market by imposing  that restraint on licensees.   A group boycott/concerted refusal to deal is a conspiracy between two or more persons or businesses to refuse to deal or do business with another person or business or to exclude a person or business from a market by persuading or coercing third parties not to do business with that person or business.

**Source**:  ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition), Group Boycott Instruction Nos. 6 and 9 (adapted); ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition),  Horizontal Non-Price Restraints Instruction No. 6 at B50-B53 (adapted);  *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co*., 472 U.S. 284, 294-95 (1985).

**Antitrust Plaintiffs' Arguments For:**

This instruction is based on the model instruction the ABA recommends giving in cases with group boycott claims, modified to explain the group boycott claim in this case and to incorporate the  definition of group boycott in the Supreme Court's *Northwest Wholesale Stationers* decision.  The instruction explains fundamental principles about the illegality of group boycotts.  Group boycott is one of the claims in this case and it is important that the jury understand the basis of the claim and the governing law.

**NCAA's Arguments Against:**

As with the proposed price fixing instruction, No. 17, the ABA Model Instructions are explicit that this instruction is designed for *per se* cases, not rule of reason cases: "This instruction is meant to be used only where an alleged group boycott would be *per se* illegal."  Group Boycott Instruction at B-51 Notes.  In "cases in which an alleged group boycott should be evaluated under the rule of reason, the court should instruct the jury on the elements of the rule of reason inquiry as appropriate.  *See* Sherman Act-General, Instruction 3 Rule of Reason, pp. A-4 to A-11."  *Id*. at B-53.  A proposed instruction on *per se* illegality will mislead the Jury by instructing them on law that has no application to this case and is highly prejudicial.  The instruction, for example, suggests that a group boycott is itself an illegal conspiracy, which is simply false in a rule of reason case.  This instruction cannot be given in a rule of reason case.

A summary of APs' claims are already included in Instruction No. 2, and the elements of a group boycott conspiracy under the rule of reason are addressed with the jointly agreed rule of

reason instructions, which track ABA Model Instructions pp. A-4 to A-11, at Instructions 19 et seq.  APs' repeated summary of their claims, independent of any relevant legal instruction, merely serves to bias the jurors and prejudice the NCAA.  *See, e.g.*, *Howard v. Cincinnati Sheet Metal & Roofing Co.*, 234 F.2d 233, 235-36 (7th Cir. 1956) (reversing and remanding for new trial where the instructions were "unfortunately and prejudicially phrased" and "unduly emphasized" one party's view of the case).

## JURY INSTRUCTION NO. 19:

## [JOINT] ELEMENTS OF AN ANTITRUST VIOLATION

The Plaintiffs challenge the NCAA's conduct under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, the Plaintiffs must prove the following:

First, the existence of a contract, combination or conspiracy between or among at least two separate entities;

Second, that the contract, combination, or conspiracy unreasonably restrains trade **in the relevant product market**;

Third, that the restraint affects interstate or foreign commerce; and

Fourth, that the restraint caused Plaintiffs to suffer an injury to their business or property.

**I will now describe each step in more detail.**

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases, General Instruction 2, Sherman Act Section 1, at p. A-3 (2005) (modifications in bold).

**JURY INSTRUCTION NO. 20:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**CONTRACT, COMBINATION OR CONSPIRACY**

The first thing that Plaintiffs must prove is the existence of a contract, combination, or conspiracy.

Plaintiffs allege that the NCAA conspired with others to restrain competition in the market for the rights to use the names, images, and likenesses of college athletes who have participated in Division I men's intercollegiate basketball and Division I Football Bowl Subdivision intercollegiate football and to restrain competition in the "college education" market, in which Division I colleges and universities compete to recruit the best athletes to play football or basketball. Plaintiffs allege a conspiracy that has both horizontal and vertical aspects. The horizontal aspect is an agreement among colleges and conferences, which otherwise compete in recruiting college athletes, not to compete for these athletes on the basis of compensation for licensing the use of their names, images and likenesses and to exclude college athletes from the market for such licensing. The vertical aspect is that the firms that license or sell these products also agree not to compensate college athletes for the use of their names, images and likenesses and to exclude college athletes from the market for licensing the use of their names, images and likenesses.

A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means. Plaintiffs must prove by a preponderance of the evidence:

First, that the alleged conspiracy existed; and

Second, that the NCAA knowingly participated in that conspiracy. "Knowingly" means voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

A conspiracy is a kind of "partnership" in which each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy. To create such a relationship, two or more persons must enter into an agreement that they will act together for some unlawful purpose or to achieve a lawful purpose by unlawful means.

To establish the existence of a conspiracy, the evidence in the case need not show that the members of an alleged conspiracy entered into any express or formal agreement, or that they met together; or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose. The evidence need not show the agreement was written. It is the agreement to act together that constitutes the conspiracy. Whether the agreement succeeds or fails does not matter.

A conspiracy may be formed without all the parties coming to an agreement at the same time. The agreement may be shown if the proof establishes that the parties knowingly worked

together to accomplish a common purpose.  It is not essential that all persons acted exactly alike nor is it necessary that they all possessed the same motive for entering the agreement.

Direct proof of an agreement may not be available. A conspiracy may be disclosed by the circumstances or by the acts of the members. Therefore, you may infer the existence of an agreement from what you find the alleged members actually did, as well as from the words they used.

A conspiracy may vary in its membership from time to time.  It is not necessary that the evidence show that all the means or methods claimed by Plaintiffs were agreed upon to carry out the alleged conspiracy; nor that all the means or methods that were agreed upon were actually used or put into operation; nor that all persons alleged to be members of the conspiracy actually were members.  What the evidence must show is that the alleged conspiracy of two or more persons existed, that one or more means or methods alleged was used to carry out its purpose and the NCAA knowingly participated in the conspiracy.

In determining whether a conspiracy has been proved, you must view the evidence as a whole and not in fragments or piecemeal. You should consider the actions and statements of all the alleged conspirators.  The conspiracy may be inferred from all the circumstances, actions, and statements of the participants.

The evidence does not have to establish that a Defendant agreed to all the means or methods set forth in the complaint or that such means and methods were actually used.  Nor does the evidence have to show that all the persons alleged to have been members of the conspiracy actually were members.  What the evidence must show is that the conspiracy alleged existed at or about the time stated in the complaint, and that the NCAA knowingly participated in the conspiracy.

In your consideration of the evidence you should first decide whether the alleged conspiracy existed.   If you conclude that the conspiracy did exist, you should next decide whether the NCAA knowingly participated in that conspiracy.

**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**CONTRACT, COMBINATION OR CONSPIRACY**

**The first element of an antitrust violation is a conspiracy between two or more entities to restrain trade.**

Plaintiffs allege that the NCAA participated in a conspiracy to restrain trade **by preventing them from receiving compensation for the alleged use of their names, images, and likenesses in sports broadcasts and videogames**.  A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means.

**In order to establish a conspiracy,** Plaintiffs must prove both of the following elements by a preponderance of the evidence.

First, that the alleged conspiracy existed; and

Second, that the NCAA knowingly became a member of that conspiracy; knowingly means voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

A conspiracy is a kind of "partnership" in which each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy. To create such a relationship, two or more persons must enter into an agreement that they will act together for some unlawful purpose or to achieve a lawful purpose by unlawful means.

To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement; that they met together; or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose. The agreement itself may have been entirely unspoken. What the evidence must show to prove that a conspiracy existed is that the alleged members of the conspiracy in some way came to an agreement to accomplish a common purpose. It is the agreement to act together that constitutes the conspiracy. Whether the agreement succeeds or fails does not matter.

A conspiracy may be formed without all parties coming to an agreement at the same time, such as where competitors, without previous agreement, separately accept invitations to participate in a plan to restrain trade. The agreement may be shown if the proof establishes that the parties knowingly worked together to accomplish a common purpose. It is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement.

Direct proof of an agreement may not be available. A conspiracy may be disclosed by the circumstances or by the acts of the members. Therefore, you may infer the existence of an agreement from what you find the alleged members actually did, as well as from the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together and discussed common aims and interests, does not establish the existence of a conspiracy unless the evidence tends to exclude the possibility that the persons were acting independently. If they acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy.

It is not necessary that the evidence show that all of the means or methods claimed by the plaintiff were agreed upon to carry out the alleged conspiracy; nor that all of the means or methods that were agreed upon were actually used or put into operation; nor that all the persons alleged to be members of the conspiracy actually were members. What the evidence must show is that the alleged conspiracy of two or more persons existed, that one or more of the means or methods alleged was used to carry out its purpose, and that the defendant knowingly became a member of a conspiracy.

In determining whether an agreement has been proved, you must view the evidence as a whole and not piecemeal. In considering the evidence, you first should determine whether or not the alleged conspiracy existed. If you conclude that the conspiracy did exist, you should next determine whether the NCAA knowingly became a member of that conspiracy with the intent to further its purposes.

**Source**: Model Jury Instructions in Civil Antitrust Cases, Contract, Combination or Conspiracy, Instruction 1, at pp. B-2 to B-4 (2005) (modifications in bold).

**<u>Antitrust Plaintiffs' Arguments:</u>**

In the second paragraph of this instruction, Plaintiffs explain the conspiracy they allege in a manner consistent with their pleadings, the testimony of their expert economist and this Court's rulings. Defendant's attempt to rewrite and oversimplify the conspiracy alleged by Plaintiffs is inaccurate, incomplete and should be rejected.

The NCAA argues that language regarding the "similarity of conduct among various persons" should be included in this instruction. That is irrelevant to this case, however, because Plaintiffs do not seek to prove the existence of a conspiracy through the "similarity of conduct among various persons." Irrelevant instructions, even if a correct statement of law, should not be given to the jury because they are likely to mislead the jury and invite speculation. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1064 (9th Cir. 2008).

**<u>NCAA's Arguments:</u>**

The NCAA's Proposed Instruction repeats nearly verbatim the ABA Model Jury Instructions for Civil Antitrust Cases; the only (all non-substantive) differences in the NCAA's proposal from the Model Instructions are marked in **bold**. APs' proposed instruction, on the other hand, deviates significantly from the Model Instructions (with no indication in the text) in two regards.

<u>First</u>, the bulk of the second paragraph is another gratuitous summary of APs' contentions that they seek to insert into the instructions. Such argument should be made at trial, and not in the Jury Instructions, which must instead fairly and accurately cover the issues presented. If APs' contentions are going to be inserted into instructions like this, then the NCAA's contentions will also need to be inserted — which will make the instructions longer and harder for the Jury to follow. The Model Instructions provide room from the parties to state the "alleged conduct or restraint," which should be just a phrase or sentence as the NCAA has proposed. The APs' argumentative paragraph is also duplicative of the APs' contentions set forth in Instruction No. 2 ("Contentions of the Parties," where the parties do summarize their respective positions). This repetition should be rejected as it risks causing a juror to attach undue importance or credibility to the selected matters. *See, e.g.*, *Howard v. Cincinnati Sheet Metal & Roofing Co.*, 234 F.2d 233, 235-36 (7th Cir. 1956) (reversing and remanding for new trial where the instructions were "unfortunately and prejudicially phrased" and "unduly emphasized" one party's view of the case; also noting that "needless repetition amounts to an argument on the part of the court and may mislead the jury").

<u>Second</u>, APs' instruction omits several key sentences from the Model Instructions, including that APs must establish that "the alleged members of the conspiracy in some way came to an agreement to accomplish a common purpose," and that "[m]ere similarity of conduct among various persons . . . does not establish the existence of a conspiracy unless the evidence tends to exclude the possibility that the persons were acting independently. . . ."  It is improper for APs to doctor the Model Instructions to include all statements they find to be useful while at the same time removing any language that the ABA included to fairly instruct the Jury.

The Court should adopt the language from the Model Instructions, with the minor changes proposed by the NCAA in bold.

**JURY INSTRUCTION NO. 21:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

CONTRACT, COMBINATION, OR CONSPIRACY – ACTS AND STATEMENTS OF CO-
CONSPIRATOR – ADMISSIBILITY AND USE

If you find by a preponderance of the evidence that the NCAA was a member of the alleged conspiracy, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of that conspiracy (such as the NCAA's member universities and conferences) may be considered against the NCAA. This is so even if such acts were done and statements were made in the NCAA's absence and/or without the NCAA's knowledge.

Before you may consider the statements or acts of a conspirator in deciding the issue of the NCAA's liability, you must first determine that the acts and statements were made during the existence and in furtherance of the unlawful scheme. If the acts were done or the statements made by someone whom you do not find to be a member of the conspiracy, or if they were not done or said in furtherance of the conspiracy, then they may be considered by you as evidence only against the person who did or said them.

The reason for allowing this evidence to be admitted and used against a Defendant has to do with the nature of the act of conspiracy. Conspiracy is often referred to as a partnership. Thus, as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy. Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy made in furtherance of the common purpose of the conspiracy are deemed under the law to be the acts of all of the members, and all of the members are responsible for such acts, declarations, statements, and omissions. This is so even though such statements or acts may have occurred in the absence and without the knowledge of the NCAA.

**Source:** ABA Section of Antitrust Law, Model Jury Instructions in Criminal Antitrust Cases 107 (2009); 3A Kevin F. O'Malley, Jay E. Grenig, & William C. Lee, Federal Jury Practice And Instructions – Civil §150.45 (5th ed. 2000).

**Antitrust Plaintiffs' Arguments For:**

Rule 801(d)(2)(E) allows statements "made by the party's co-conspirator during and in furtherance of the conspiracy" to be admitted under an exception to the hearsay rule. The jury will not hear any evidence concerning statements of co-conspirators unless the Court determines that the threshold requirements of Rule 801(d)(2)(E) are met. If that occurs, this instruction informs the jury of the impact of the co-conspirator's statement *vis a vis* the NCAA. This instruction is particularly important in this case because the NCAA is the only remaining Defendant and statements of the NCAA's co-conspirators will be offered in evidence. The law regarding the effect of statements of co-conspirators is the same in civil cases as criminal cases. See Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 915 (9th Cir. 2008); *Filco v. Amana*

*Refrigeration, Inc.*, 709 F.2d 1257, 1267 (9th Cir. 1983) ("The rule is not limited to criminal cases, but applies in civil cases as well.").

**NCAA's Arguments Against:**

This is an instruction from the ABA Model Instructions for *criminal* cases, not civil cases. It is a criminal law instruction that has no place in this civil trial. The ABA Model Instructions for *Civil* cases includes the following language on this subject:

> "If you find that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on all of those whom you find were members of the conspiracy. But actions or statements of any conspirator that were not done or made in furtherance of the conspiracy, or that were done or made before its existence or after its termination, may be considered as evidence only against the person who made them."

ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition), Contract, Combination, or Conspiracy Instruction No. 4, at B-14. The APs omitted this language from their version of ABA Model Instruction No. 4, at p. B-13 (*see infra* at Instruction No. 23) and are instead seeking to use a <u>criminal</u> law instruction in its place. If any instruction is to be given on this topic, it should be the model instruction for use in *civil* cases.

But even the civil instruction is unnecessarily duplicative of the comprehensive conspiracy Instruction No. 20 ("Conspiracy"), which—under either parties' proposed formulation—states that "each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy." The NCAA is concerned that the APs' *six* separate proposed instructions on conspiracy attaches undue importance and credibility to the question of conspiracy. *See, e.g.*, *Howard v. Cincinnati Sheet Metal & Roofing Co.*, 234 F.2d 233, 235-36 (7th Cir. 1956) (noting that "needless repetition amounts to an argument on the part of the court and may mislead the jury").

Finally, the APs' proposed instruction is also once again larded with the AP's contentions, such as that the NCAA conspired with "member universities and conferences." The NCAA objects to the APs' continued efforts to tell their story through the instructions.

**JURY INSTRUCTION NO. 22:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**CONTRACT, COMBINATION, OR CONSPIRACY – ASSOCIATIONS – ACTS THROUGH ITS AGENTS**

The NCAA is an association.  An association is deemed to be a person and is capable of conspiring like any other person.  An association acts through its agents.  An association's agents include its directors, officers, employees, and others acting on its behalf.

An association is legally bound by the acts and the statements of its agents or employees done or made within the scope of the agent's employment or apparent authority.

Acts done within the scope of employment are acts performed on behalf of an association and directly related to the performance of the duties the agent has general authority to perform.  Apparent authority is the authority that outsiders could reasonably believe the agent would have, judging from his position with the association; the responsibilities previously entrusted to him or his office, and the circumstances surrounding his past conduct.

The fact that an association has instructed its agents not to violate the antitrust laws does not excuse the association from responsibility for the unlawful acts of its agents done within the scope of their agency, employment or apparent authority.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition), Contract, Combination, or Conspiracy Instruction No. 3, at B-10-B-11 (adapted).

**Antitrust Plaintiffs' Arguments For:**

This instruction is based on the model instruction that the ABA recommends giving in cases with antitrust conspiracy claims.  The language of the model instruction has been modified because the NCAA is an association, not a corporation, but the same legal principles apply**.**

**NCAA's Arguments Against:**

This is yet another instruction on conspiracy that is unnecessary.  APs point to no disputed issue on which this instruction is relevant.  The ABA Model Instruction, moreover, on which this is based concerns corporations, not associations.  *See* ABA Model Instructions for Civil Antitrust Cases, Contract, Combination, or Conspiracy Instruction No. 3, at B-10 to B-11.  It is also improper for the APs to once again doctor the Model Instructions to include the language they prefer and excise the balancing language that ensures a fair instruction.  For example, the Model Instruction explains that "a corporation is not capable under the law of conspiring with its own agents or with unincorporated divisions or wholly-owned subsidiaries." *Id*.  If the instruction is to be given, the entire model instruction should be given, not just the parts plaintiffs like.

# JURY INSTRUCTION NO. 23:

## [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]

CONTRACT, COMBINATION, OR CONSPIRACY – JOINT AND SEVERAL LIABILITY –
PRESENCE OF OTHER ALLEGED CO-CONSPIRATORS NOT NECESSARY

A person who knowingly participates in an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he had been one of those who formed or began the conspiracy and participated in every part of it. Thus, a Defendant who has joined the conspiracy may be found liable for injuries caused by the conspiracy until the conspiracy has been completed or abandoned

Accordingly, it is not necessary for Plaintiffs to join as defendants in this case all persons who may have participated with the NCAA in the alleged conspiracy. A plaintiff injured by such a conspiracy may recover against one or all of those participating. A plaintiff may enforce any right of recovery against one, or some, or all, at the person's election. It is immaterial, as a matter of law, that any other members of the combination may have not been joined in this suit by the Plaintiffs.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition), Contract, Combination, or Conspiracy Instruction No. 4, at B-13-B-15 (adapted); *Texas Industries, Inc. v. Radcliff Materials, Inc*., 451 U.S. 630 (1981); *In re TFT-LCD (Flat Panel) Antitrust Litig*., No. M 07-1827 SI, MDL No. 1827, 2011 U.S. Dist. LEXIS 109186, at *10 (N.D. Cal. Sept. 26, 2011).

**Antitrust Plaintiffs' Arguments For:**

This instruction is also based on a model instruction that the ABA recommends giving in cases with antitrust conspiracy claims. The joint and several liability of antitrust defendants for injuries caused by co-conspirators is beyond dispute and the ABA model instruction therefore instructs the jury on this point. The ABA language that it is not necessary for all participants in the conspiracy to be present at trial is particularly important here because the other Defendants have settled and the NCAA's member institutions, who also participated in the conspiracy, were not named as Defendants.

**NCAA's Arguments Against:**

The first paragraph of this instruction is entirely duplicative of comprehensive conspiracy Instruction No. 20 ("Conspiracy"), which—under either parties' proposed formulation—goes over in detail the requirement that the NCAA "knowingly" participated in the conspiracy and states that "each person found to be a member of the conspiracy is liable for all acts and statements of the other members made during the existence of and in furtherance of the conspiracy."

Once again, APs have excised the balancing language from the Model Instruction. They have truncated the Model Instruction significantly, and fail to provide the necessary context set forth in the first, second, and fourth paragraphs of the relevant Model Instruction regarding

1    consideration of a defendant's knowledge or lack of knowledge, status, and participation in the
2    events, in determining whether a conspiracy existed.  If the Instruction is given, the entire model
     instruction should be given.

3        Contrary to their suggestion,  the second paragraph of APs' proposed instruction is *not*
4    included in a corresponding ABA Model Instruction and risks confusing the Jury.  APs identify
     no disputed issue to which it is relevant.

5        Finally, APs propose **six** separate instructions on conspiracy, and this repetition attaches
6    undue importance and credibility to the question of conspiracy.  *See, e.g.*, *Howard v. Cincinnati
7    Sheet Metal & Roofing Co.*, 234 F.2d 233, 235-36 (7th Cir. 1956) (noting that "needless repetition
     amounts to an argument on the part of the court and may mislead the jury").

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# JURY INSTRUCTION NO. 24:

## [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]

## CONTRACT, COMBINATION, OR CONSPIRACY – IGNORANCE OF ANTITRUST LAWS IS NO DEFENSE

The proof need not show knowledge of a Defendant that a particular act or failure to act is a violation of the federal antitrust laws. Every person is charged with knowing what the law forbids, and what the law requires to be done.

If you should find by a preponderance of the evidence in the case that the conspiracy alleged was knowingly formed, and that the NCAA knowingly became a member of the conspiracy, then the fact that the NCAA may have believed, in good faith, that what was being done was not unlawful would not be a defense in this case.

**Source:** Kevin F. O'Malley, Jay E. Grenig, & William C. Lee, Federal Jury Practice and Instructions § 150.30 (5th ed. 2000); *Law v. NCAA*, 185 F.R.D. 324, 337 (D.Kan.1999), *aff'd,* 134 F.3d 1010 (10th Cir. 1998).

**Antitrust Plaintiffs' Arguments For:**

The fundamental principle that ignorance of the law is no excuse applies in antitrust cases as recognized by the court in *Law v. NCAA*, where the NCAA was a defendant. Accordingly, this instruction, which is based on the model instruction in Federal Jury Practice and Instructions § 150.30, should be given.

The NCAA's argument that this instruction could confuse the jury is based on its example that the NCAA "did not believe that student-athlete NILs were being used in the videogames at issue." That is a claim of ignorance of the facts, however, not ignorance of the law. Because the NCAA apparently plans to present evidence that it did not believe its conduct to be anticompetitive, the jury needs to now that such a belief is not a defense to antitrust liability.

**NCAA's Arguments Against:**

The NCAA objects to APs' Proposed Instruction No. 24 because it is not necessary to inform the jury of any issue of relevance in this case, *see Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1117-18 (9th Cir. 2008), and is likely to confuse and mislead the jury. Moreover, APs intend to introduce evidence of the NCAA's alleged intent and motive as part of their proof of conspiracy. The NCAA must be able to respond with evidence negating that intent. For example, the NCAA might have evidence demonstrating that it did not believe that student-athletes' NILs were being used in the videogames at issue. The proposed instruction risks confusing the Jury and suggesting to them that such evidence is irrelevant to rebut the APs' efforts to establish an anticompetitive intent on the NCAA's part. That would be improper. At a minimum, the instruction should be amended to explain that if the APs seek to establish the NCAA's

1    anticompetitive intent, that the NCAA can respond with evidence that it did not believe its
2    conduct to be illegal.

3         Also, as noted above, this is one of **six** separate instructions on conspiracy, and this
     repetition attaches undue importance and credibility to the question of conspiracy.  *See, e.g.*,
4    *Howard v. Cincinnati Sheet Metal & Roofing Co.*, 234 F.2d 233, 235-36 (7th Cir. 1956)
     (reversing and remanding for new trial where the instructions were "unfortunately and
5    prejudicially" phrased and "unduly emphasized" one party's view of the case; also noting that
     "needless repetition amounts to an argument on the part of the court and may mislead the jury").

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION NO. 25:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**COLLUSIVE EFFORTS TO RESTRICT, REDUCE, OR LIMIT OPPORTUNITIES FOR COLLEGE ATHLETES TO LICENSE THEIR NAMES, IMAGES OR LIKENESSES**

Plaintiffs claim that one means of effectuating the antitrust conspiracy in this case was through concerted action to restrict, reduce, or limit the opportunities for college athletes to license their names, images or likenesses.  An agreement or understanding among competitors to unreasonably restrict, reduce, or limit financial opportunities of a third party is a violation of the antitrust laws.   You may consider whether the NCAA and other conspirators engaged in cooperative efforts to reduce, restrict, or limit recruiting compensation or licensing opportunities for college athletes in making your determination as to whether the NCAA participated in or was a member of a conspiracy to restrain competition for Plaintiffs as college athletes and/or fix the compensation these athletes receive for the rights to use of their names, images, and likenesses and/or engage in a group boycott by excluding them from the names, images and likenesses' licensing market.

**Source:**  Adapted from ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 edition), Instruction No. 5, B-48 to B-49 (adapted); *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990); *NCAA v. Board of Regents*, 468 U.S. 85, 101 (1984); *Hartford-Empire Co. v. U.S.*, 323 U.S. 386, 400-01 (1945); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940);  *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 660 (E.D. Pa. 2003).

**Antitrust Plaintiffs' Arguments For:**

This instruction is based on the ABA model instruction regarding anticompetitive agreements to restrict markets or reduce or limit output and is supported by well-established Supreme Court case law.  This instruction is appropriate for this case because the Court has ruled that "O'Bannon pleads that Defendants' conduct decreases the number of licenses available on the market. This allegation also supports the existence of anti-competitive effects." *O'Bannon v. National Collegiate Athletic Ass'n*, No. 09-cv-3329-CW, 2010 WL 445190, at *5 (N.D.Cal. Feb. 8, 2010).

**NCAA's Arguments Against:**

As the Model Instructions makes explicit, "[t]his instruction assumes that the agreement at issue would be illegal *per se*.  If analysis under the rule of reason would be appropriate in a particular case, the court should instruct the jury on the elements of the rule of reason inquiry. *See* Sherman Act – General, Instruction 3, Rule of Reason, pp. A-4 to A-11."  ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 edition), Horizontal Non-Price Restraint, Instruction No. 5, at pp. B-48 to B-49.  Including *per se* instructions in a rule of reason trial is reversible error.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

For example, the proposed instruction advises that an agreement among competitors to "restrict, reduce, or limit financial opportunities of a third party is a violation of the antitrust laws," which is the rule for agreements that are illegal *per se*, but not for *rule of reason* cases.  It would be fundamental error to include this proposed instruction because it directly contradicts the Court's prior orders rejecting *per se* analysis; advises the Jury on theories of law that are not supported by facts in evidence; and confuses the Jury about the applicable standard.

Further, the proposed instruction inaccurately summarizes APs' claims as the NCAA restraining student-athletes from "licens[ing] their names, images or likenesses"; the instruction should make clear that APs are only challenging restraints that allegedly limit student-athletes' use of their names, images, or likenesses with respect to **sports broadcasts and videogames**.

# JURY INSTRUCTION NO. 26:

## [DISPUTED IN PART] RELEVANT PRODUCT MARKET

**As part of the second element of an antitrust violation, it is Plaintiffs' burden to prove, by a preponderance of the evidence, the existence of a relevant product market.**  The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.  In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products would be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you should consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another.  Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors.  If you find that such switching would occur, then you may conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and sales of another, (3) the presence or absence of specialized vendors, (4) the perceptions of either industry or the public as to whether the products are in separate markets; (5) the views of the plaintiff and defendant regarding who their respective competitors are; and (6) the existence or absence of different customer groups or distribution channels.

In this case, Plaintiffs contend that the relevant product markets are ~~[state plaintiffs' contentions]:~~

**[Plaintiffs' proposed language:  the market for the rights to use the names, likenesses and images of college athletes who have participated in Division I men's intercollegiate basketball and Division I Football Bowl Subdivision intercollegiate football men's football and basketball players at NCAA Division I colleges and  the "college education" market, in which Division I colleges and universities compete to recruit the best athletes to play football or basketball.]**

**[NCAA's proposed language:**

**(i)      Market for acquisition of group licenses for the use of student-athletes' names images and likenesses in the live broadcasts of Division I basketball and football games;**

**(ii)     Market for acquisition of group licenses for the use of student-athletes' names images and likenesses in rebroadcasts or clips of Division I basketball and football games;**

     **(iii)   Market for acquisition of group licenses for the use of student-athletes' names images and likenesses in videogames featuring Division I basketball and football.**

     **(iv)   A college education market for student-athletes to play Division I football and basketball.]**

By contrast, the NCAA asserts that the Plaintiffs have failed to allege the proper relevant product market. The NCAA contends that ~~[state defendant's contention, if any, about the scope of the relevant product market and/or the plaintiff's evidence]~~   **[NCAA's proposed language: Plaintiffs' first three alleged product markets, for group licensing, do not exist because under right of publicity laws and the First Amendment athletes have no name, image, or likeness rights to assert against or license to broadcasters or videogame makers.  With respect to the Plaintiffs' fourth alleged product market, the NCAA contends that the market for college education cannot be defined so narrowly and, for example, limited only to Division I schools].**

If you find that Plaintiffs **have proven any of their alleged product markets exist**, then you should continue to evaluate the remainder of the Plaintiffs' claims **as to those markets only**. However, if you find that Plaintiffs have failed to prove such a market, then you must find in the NCAA's favor on this claim.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases, Monopolization General Instruction 4, Sherman Act Section 2 at pp. C-7 to C-10 (2005) (modifications in bold).

### Antitrust Plaintiffs' Arguments (Blue):

The NCAA's language is highly argumentative, misstates the relevant product markets alleged by Plaintiffs and ignores the Court's summary judgment ruling.  This instruction also fails to state what the NCAA contends the relevant licensing markets actually are.  The NCAA merely asserts that three of the product markets, as misstated by the NCAA, do not exist, followed by legal argument in support of the NCAA's position that is contrary to the law, including this Court's summary judgment order:  "Plaintiffs' first three product markets, for group licensing, do not exist because under right of publicity laws and the First Amendment athletes have no name, image, or likeness rights to assert against broadcasters or videogame makers."

As the Court ruled on summary judgment, there is a national market for the use of NIL rights in the broadcast and rebroadcast of entire games, which is not barred by the First Amendment under *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, (1977) and *Wisconsin Interscholastic Athletic Association v. Gannett Co., Inc.*, 658 F.3d 614, 615 (7th Cir.2011).  *NCAA II* at *8.

With respect to the market for clips or highlight footage, the Court ruled that "If Plaintiffs seek to prove that a similar market would exist for group licenses to use student-athletes' names, images, and likenesses in clips and highlight footage, they will have to prove that there would be a demand for these clips and highlight footage specifically for use in commercial speech that is not protected by the First Amendment."  *Id.* at *14.  Whether Plaintiffs meet that burden at trial is a matter properly decided by the Court not the jury.

In each of the First Amendment cases cited by the parties and the Court on summary judgment the issue of whether a sport broadcasts or other speech were subject to First Amendment protection was decided by the court. The NCAA cites no case where the issue of whether a broadcast or other speech is commercial or subject to *Zacchini* has ever been presented to or decided by a jury and Plaintiffs also have found none. As held in *Jordan v. Jewel Food Stores, Inc*., 851 F.Supp.2d 1102, 1105 (N.D.Ill.2012), reversed on other grounds, 743 F.3d 509 (7th Cir.2014), a case cited with approval in *NCAA I* , 2013 WL 5778233 at *8, "[V]arious considerations bearing on the classification of speech as commercial or noncommercial—whether the speech is an advertisement, whether the speech refers to specific products or services, and whether the speech has an economic motivation, see *Youngs Drug*, 463 U.S. at 66–67, 103 S.Ct. 2875—**present issues for the court and not a jury."** (Emphasis added)

The Court, not the jury, should also decide whether the right of publicity statute or common law of any state permits a claim involving a sports broadcast because it is an issue correctly resolved by the district court as "[t]he construction or interpretation of a statute is a question of law...." *U.S. v. Johnson*, 680 F.3d 1140, 1147 (9th Cir. 2012), quoting *United States v. Cabaccang*, 332 F.3d 622, 624–25 (9th Cir.2003) (en banc).

Defendant's claim that the college education market "cannot be defined so narrowly and limited only to Division I schools" ignores this Court's ruling granting summary judgment on the NCAA's alleged procompetitive justification based on other collegiate sports on the grounds that they were not in the same relevant market. *NCAA II*, 2014 WL 1410451 at *16-*17. The Court denied the NCAA's motion for reconsideration of this ruling on May 12, 2014. Dkt. No. 1033.

## NCAA's Arguments (Yellow):

With respect to the description of the Plaintiffs' proposed markets, at trial, the jury must decide whether APs have proved a market for the acquisition of group licenses to use student-athletes' NILs in three products: (a) game broadcasts; (b) highlight footage or clips from game broadcasts; and (c) NCAA-themed videogames. APs' formulation of the proposed market is misleading in that it fails to identify these three products. For one, each of these products is likely a separate submarket. According to APs' expert on market definition, "the types of products that use college identifiers and the NILs [of] student-athletes are diverse and largely not competitive substitutes," and thus each "type of license (defined in part by the type of product for which it will be used) is likely to be a submarket." *See* Dkt. No. 896-5 (Noll 9/25/13 Liability Report) at 62. Moreover, if the three relevant products (broadcasts, clips, and videogames) are not mentioned, there is a serious risk that jurors will consider other products, such as posters, magazines, and commercial uses of NILs to advertise a product, that are not at issue in this case, when determining the reasonableness of the restraint. The class definition is limited to the three products as well, including student-athletes whose NILs could have been used "in game footage or in videogames," and not any other potential products. Dkt. No. 1025 at 48.

With respect to the NCAA's contentions on relevant market, defendants have no obligation to allege or prove a relevant market. A defendant's obligation is only to contest the correctness of the plaintiff's alleged market. *See, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 346 (7th Cir. 2012) (dismissing antitrust claims where plaintiffs failed to meet their burden of describing a cognizable market under the Sherman Act). The NCAA has provided a

short two-sentence summary of its position.  The Model Instruction requires that defendant be able to state its contention "about the scope of the relevant product market *and/or the plaintiff's evidence*."  *See* ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 edition), Monopolization-General, Instruction 4, at p. C-8 (emphasis added).  This is essential to achieve a neutral presentation of the law and facts.  *See, e.g.*, *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1329 (9th Cir. 1995) (defendant is entitled to an instruction concerning his theory of the case).  Nothing in the NCAA's summary is inconsistent with the Court's summary judgment order.  The NCAA does not even reference, for example, women's or other men's sports.

With respect to the right of publicity and First Amendment issues, Plaintiffs now argue the Court must decide whether sports broadcasts are non-commercial speech.  The NCAA agrees, but notes that the Court has already found that sports broadcasts are non-commercial speech.  *See* Dkt. No. 1025 (SJ Order) at 24.  And the Court did not find that a "there was a national market for the use of NIL rights in the broadcast and rebroadcast of entire games."  No one even moved for summary judgment on market definition; the parties did not even submit evidence on that issue.

**JURY INSTRUCTION NO. 27:**

**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**RIGHT OF PUBLICITY – EFFECT ON PRODUCT MARKET**

As noted in the prior instruction, the Plaintiffs in this case contend that there is a national market for group licenses for the use of student-athletes' name, image, and, likeness in:

     (i)      live broadcasts of Division I basketball and football games;

     (ii)     rebroadcasts or clips of Division I basketball and football games; and

     (iii)    videogames featuring Division I basketball and football.

To establish the existence of these alleged group licensing markets, Plaintiffs must show that, absent the alleged conspiracy, student-athletes could assert right of publicity claims against broadcasters and videogame producers for using their names, images, or likenesses in live broadcasts, rebroadcasts, and videogames without consent. If these name, image, and likeness rights do not exist, then others would have no reason to purchase group licenses from the student-athletes.

Whether a student-athlete has a legally recognized right of publicity in the use of his name, image, and likeness is a question of state law. Under most state laws, in order to prove a violation of publicity rights, a plaintiff must show the following:

<u>First</u>, the defendant knowingly used the plaintiff's name, image, or likeness for the purposes of advertising or selling goods or services. The mere use of a plaintiff's name, image or likeness in a commercial medium (such as on television or in a book) is not a violation of a plaintiffs' rights merely because the material containing such use is commercially sponsored or contains paid advertising. Rather, the plaintiff must show that the name, image, or likeness was itself used to advertise some other good or service.

<u>Second</u>, the plaintiff did not consent to the use. Conduct that would otherwise infringe the personal or commercial interests protected by the right of publicity is not actionable if the conduct is within the scope of consent given by the holder of the right. Consent can be communicated through a formal agreement such as a license or assignment or can also be implied from conduct or inaction reasonably interpreted as manifesting consent..

<u>Third</u>, the use did not occur in connection with news, matters of public interest, or sports broadcast or account, or with a political campaign. Under most state publicity laws, the use of a name, image, or likeness in connection with any news, public affairs, or any political campaign, does not constitute a use for which consent is required.

<u>Fourth</u>, the use caused the plaintiff to sustain injury, damage, loss or harm.

**Source**: Restatement (Third) of Unfair Competition § 46, § 49 (1995); Cal. Civ. Code §§ 3344, 3344.1; Fla. Stat. § 540.08(4); Haw. Rev. Stat. § 482P-7(b)(2); 765 Ill. Comp. Stat.

1075/35(b)(2); Ind. Code Ann. § 32-36-1-1(c); Neb. Rev. Stat. § 20-202(1); Nev. Rev. Stat. § 597.790(2); Ohio Rev. Code Ann. § 2741.02(D)(1); Okla. Stat. tit. 12, § 1449(D); 42 Pa. Cons. Stat. Ann. § 8316(e)(2)(ii); Tenn. Code Ann. § 47-25-1107(a); Tex. Prop. Code Ann. § 26.012(a)(3); Wash. Rev. Code. Ann. § 63.60.070(2); *Toffoloni v. LFP Publ'g Grp.*, LLC, 572 F.3d 1201, 1208 (11th Cir. 2009) (Georgia); *C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007) (Missouri); *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1446 (11th Cir. 1998) (Alabama); *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) (Texas); *Pooley v. Nat'l Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1113 (D. Ariz. 2000); *Nat'l Football League v. Alley, Inc.*, 624 F. Supp. 6, 9-10 (S.D. Fla. 1983) (live broadcasts of Miami Dolphins football games were matters of "legitimate public interest" under the Florida's right of publicity statute, Fla. Stat. § 540.08(4)); *Mahaffey v. Official Detective Stories, Inc.*, 210 F. Supp. 251, 253 (W.D. La. 1962); *WJLA-TV v. Levin*, 564 S.E.2d 383, 394-95 (Va. 2002); *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001); *Messenger v. Gruner + Jahr Printing & Publ'g*, 706 N.Y.S.2d 52, 54-55 (N.Y. 2000); *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235-36 (Minn. 1998); *J.C. v. WALA-TV, Inc.*, 675 So. 2d 360, 362 (Ala. 1996); *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386, 1388-90 (La. 1979); *Battaglieri v. Mackinac Ctr. For Pub. Policy*, 680 N.W.2d 915, 919 (Mich. Ct. App. 2004); Judicial Council of Cal. Civil Jury Instructions ("CACI") 2013, No.1804 (A).

### NCAA's Argument For:

APs have described their claim as challenging alleged restraints on the licensing of NIL rights by student-athletes for use in broadcasts and videogames. *See, e.g.*, Dkt. No. 898-001 (APs' Mot. For Summ. J.) at 1, 8:14-16; Dkt. No. 957 (APs' Opp'n to Mot. For Summ. J.) at 1, 6 n.21; Dkt. No. 832 (Third Consol. Am. Compl.) at ¶¶ 391, 609. And APs intend to try to prove to the jury the existence of contractual NIL rights and a market for NIL group licenses. *See, e.g.*, Dkt. No. 748 (APs' Reply ISO Class Cert.) at 23; Dkt. No. 957-004 (AP's Opp'n, Scherrer Decl. Ex. 2 (Desser Decl.)), at ¶ 20. Put simply, APs' have chosen to structure their case on NIL rights: whether a market for NILs would exist absent NCAA's rules, and what amount APs should have been paid for their NILs.

The first part of the NCAA's proposed instruction explains the Court's holding that plaintiffs must provide the existence of "cognizable right-of-publicity claims" that they could assert against broadcasters. This Court held that APs must prove that, "*absent the challenged restraint, [they] would be able to assert cognizable right-of-publicity claims against broadcasters who depict them in live game broadcasts or archival game footage without a group license or consent*," because, without cognizable publicity rights, the "broadcasters would have no reason to purchase group licenses" from the student-athletes for their NILs. Dkt. No. 1025 at 15 (emphasis added). Further, the Court found a factual dispute as to "whether the student-athletes themselves validly transferred their rights of publicity to another party." Dkt. No. 1025 at 21.

The second part of the NCAA's proposed instruction is a fair and minimalist summary of all state law rights of publicity, listing only those elements common to all states that recognize publicity torts. The instruction tracks the Restatement. APs have identified no state that recognizes a right of publicity claim yet does not require the elements set forth in the NCAA's proposed instruction: commercial use, no consent, not a newsworthy purpose, and injury and

1   damages.  NCAA believes that jury needs to be instructed on the right of publicity laws of all 50
2   states, but understand the Court's prior orders to preclude that.

3          By contrast, APs propose that the term "name, image or likeness" never be defined for the
4   jury, and that no instructions be provided to the jury as to the state law governing name, image,
    and likeness rights. It would be reversible error to try disputes over the existence of NIL rights
5   without instructing the jury on the applicable law.  *Cf. Gauthier v. AMF, Inc*., 788 F.2d 634, 636
    (9th Cir. 1986) (holding that "since the legal effect of adequate warnings was an important issue
6   of law in this case, the court had a duty to charge the jury on that issue").   Under the law of this
    Circuit, "[a] defendant is entitled to an instruction concerning his theory of the case if it is
7   supported by law and has some foundation in the evidence."  *Home Indem. Co. v. Lane Powell
    Moss & Miller*, 43 F.3d 1322, 1329 (9th Cir. 1995).

8
9          APs also argue that they need to prove the existence of a cognizable state law right of
    publicity in *one* state to establish the existence of a *national* market for NIL rights.  Putting aside
10  that they have not even demonstrated a single state recognizing NIL rights in sports broadcasts,
    this is at a minimum a *disputed factual issue* for the Jury.  The NCAA can persuasively argue that
11  even if athletes in one state have a cognizable NIL right in a sports broadcast, that would not
12  mean that colleges across the country would join a national market to pay student-athletes for
    their NILs.

13         APs avail themselves of California law in proposing a state law instruction on unjust
14  enrichment.  With respect to publicity rights, California law, and the laws of many states,
    expressly preclude right of publicity claims in sports broadcasts.  *See* Cal. Civ. Code § 3344 ;
15  Judicial Council of Cal. Civil Jury Instructions ("CACI") 2013, No.1804 (A).  The NCAA
    believes that the jury should also be instructed that numerous states explicitly exclude sports
16  broadcasts from NIL claims, with the remaining states not explicitly discussing sports broadcasts.
    We have included such language in the next instruction, but it could be alternatively included in
17  this instruction.

18         Finally, APs argue that it would be wrong for the instructions to state that the NCAA
19  contends that the market "cannot be defined so narrowly and limited only to men's basketball and
    football in Division I schools".  But the NCAA proposes no such language in this instruction.

20
    **Antitrust Plaintiffs' Argument Against:**
21
22         This instruction should not be given because it is not supported by any Ninth Circuit
    precedent, would be a radical departure from the ABA model instructions on relevant product
23  markets in rule of reason cases,  ignores the Court's summary judgment ruling, and improperly
    seeks to have the jury decide issues of statutory construction that are properly decided by the
24  Court.  As the Court ruled, because the market for group licenses is national, the market for live
    broadcast group licenses would exist unless state law "precludes student-athletes from asserting
25  publicity rights to game broadcasts in every state."  *NCAA II*, 2014 WL 1410451 at *16-*17,
    quoting *NCAA I,* 2013 WL 5778233, at *7.
26
27         The NCAA's instruction flouts the Court's ruling by instructing the jury on the elements
28  of right of publicity claims under the statutes of "most states" which the NCAA claims do not

recognize the right of publicity in live sports broadcasts.  Giving this instruction would certainly confuse the jury because it does not address the relevant issue identified by the Court -- whether the laws of any state allow a right of publicity claim involving sport broadcasts.   That issue is properly decided by the Court, not the jury, because "[t]he construction or interpretation of a statute is a question of law...." *U.S. v. Johnson*, 680 F.3d 1140, 1147 (9th Cir. 2012), quoting *United States v. Cabaccang*, 332 F.3d 622, 624–25 (9th Cir.2003) (en banc).  The jury clearly should not be asked to analyze and construe the statutory and common law of all fifty states and to determine the scope of right of publicity claims under each state's law.

**JURY INSTRUCTION NO. 28:**

**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**RIGHT OF PUBLICITY – VARIATIONS BY STATE**

You must also consider the geographic scope of the market that Plaintiffs have alleged. As I have explained, for there to exist a market for group licenses in live sports broadcasts, rebroadcasts, or videogames, Plaintiffs must have the right to stop others from using their names, images, or likenesses in connection with those uses. Plaintiffs must show the existence of such a legal right in each state in which they allege the existence of a market for group licenses in live broadcasts or rebroadcasts of Division I football and basketball games.

In many states, the law specifically precludes a person from asserting claims against others for using his or her name, image or likeness in the broadcast or rebroadcast of a sporting event. Such states may not, thus, be included in the relevant market. The burden is on Plaintiffs to show whether any other state or states would permit an athlete to bring such a legal claim. If you find that Plaintiffs have shown that any state or states would permit such a claim, you may consider whether Plaintiffs have shown any antitrust injury arising from live broadcasts or rebroadcasts in those states only. If you find that the Plaintiffs have not shown that any state or states would permit such a claim, then you should find that there is not a relevant market in group licenses for live sports broadcasts or rebroadcasts and rule for the NCAA on those claims.

**Source**: Cal. Civ. Code §§ 3344, 3344.1; Fla. Stat. § 540.08(4); Haw. Rev. Stat. § 482P-7(b)(2); 765 Ill. Comp. Stat. 1075/35(b)(2); Ind. Code Ann. § 32-36-1-1(c); Neb. Rev. Stat. § 20-202(1); Nev. Rev. Stat. § 597.790(2); Ohio Rev. Code Ann. § 2741.02(D)(1); Okla. Stat. tit. 12, § 1449(D); 42 Pa. Cons. Stat. Ann. § 8316(e)(2)(ii); Tenn. Code Ann. § 47-25-1107(a); Tex. Prop. Code Ann. § 26.012(a)(3); Wash. Rev. Code. Ann § 63.60.070(2); *Toffoloni v. LFP Publ'g Grp.*, LLC, 572 F.3d 1201, 1208 (11th Cir. 2009) (Georgia); *C.B.C. Distribution & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823-24 (8th Cir. 2007) (Missouri); *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1446 (11th Cir. 1998) (Alabama); *Matthews v. Wozencraft*, 15 F.3d 432, 439 (5th Cir. 1994) (Texas); *Pooley v. Nat'l Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1113 (D. Ariz. 2000); *Nat'l Football League v. Alley, Inc*., 624 F. Supp. 6, 9-10 (S.D. Fla. 1983) (live broadcasts of Miami Dolphins football games were matters of "legitimate public interest" under the Florida's right of publicity statute, Fla. Stat. § 540.08(4)); *Mahaffey v. Official Detective Stories, Inc.*, 210 F. Supp. 251, 253 (W.D. La. 1962); *WJLA-TV v. Levin*, 564 S.E.2d 383, 394-95 (Va. 2002); *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001); *Messenger v. Gruner + Jahr Printing & Publ'g*, 706 N.Y.S.2d 52, 54-55 (N.Y. 2000); *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235-36 (Minn. 1998); *J.C. v. WALA-TV, Inc.*, 675 So. 2d 360, 362 (Ala. 1996); *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386, 1388-90 (La. 1979); *Battaglieri v. Mackinac Ctr. For Pub. Policy*, 680 N.W.2d 915, 919 (Mich. Ct. App. 2004); Judicial Council of Cal. Civil Jury Instructions ("CACI") 2013, No.1804 (A).

**NCAA's Argument For:**

The Court found a genuine issue of material fact as to whether APs "could conceivably assert a right-of-publicity claim" in any jurisdiction, Dkt. No. 1025 at 29, a prerequisite for

establishing the group licensing market alleged by APs.  *Id*. at 15.  The Court also held that APs must prove that, "absent the challenged restraint, [they] would be able to assert cognizable right-of-publicity claims against broadcasters who depict them in live game broadcasts or archival game footage without a group license or consent," because, without cognizable publicity rights, the "broadcasters would have no reason to purchase group licenses" from the student-athletes for their NILs.  Dkt. No. 1025 at 15.

Thus, at trial, APs bear the burden of proving that some jurisdictions recognize publicity rights in the use of student-athletes' NILs in game broadcasts and videogames.  But if they prove that NILs exist in just some jurisdictions, the jury must be instructed on the implications for the appropriate geographic market.  Again, it is improper for APs to argue to the jury a "national" market for licensing NIL rights in broadcast or videogames without instructing the jury as to the variations in state law on the very existence of such NIL rights.

APs argue that they need to prove the existence of a cognizable state law right of publicity in *one* state to establish the existence of a *national* market for NIL rights.  Putting aside that they have not even demonstrated a single state recognizing NIL rights in sports broadcasts, this is at a minimum a *disputed factual issue* for the Jury.  The NCAA can persuasively argue that even if athletes in one state have a cognizable NIL right in a sports broadcast, that would not mean that colleges across the country would join a national market to pay student-athletes for their NILs.

**Antitrust Plaintiffs' Argument Against:**

This instruction is contrary to the Court's summary judgment order, as exemplified by the NCAA's erroneous statement "If you find that Plaintiffs have shown that any state or states would permit such a claim, you may consider whether Plaintiffs have shown any antitrust injury arising from live broadcasts or rebroadcasts in those states only."   Instructing the jury that the statutes of "many states" do not recognize the right of publicity in sports broadcasts would certainly confuse the jury because the relevant issue identified by the Court is whether the laws of any state allow a right of publicity claim involving sport broadcasts and that is an issue properly decided by the Court not the jury.  *U.S. v. Johnson*, 680 F.3d 1140, 1147 (9th Cir. 2012). Contrary, to the NCAA's instruction and argument this Court ruled that the national market for group licensing exists unless the right of publicity law of every state excluded sport broadcasts.

**JURY INSTRUCTION NO. 29:**

**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**FIRST AMENDMENT -- EFFECT ON PRODUCT MARKET**

In determining whether Plaintiffs have carried their burden of proving a national group licensing market for live broadcasts or rebroadcasts of Division I men's basketball or football games, you must also consider whether these uses are a form of protected speech under the First Amendment.  Even if a student-athlete's name, image, or likeness has been used, the First Amendment to the United States Constitution does not always permit a person to assert claims against others who depict the individual or use the individual's name.

**Clips and Highlight Footage.**  The First Amendment permits name, image, and likeness claims to be asserted with respect to commercial speech.  Thus, to prove that a market exists for group licenses to use student-athletes' names, images or likenesses in clips or highlight footage, Plaintiffs must prove that such clips and highlight footage are used for commercial purposes that are not protected by the First Amendment.  Speech is commercial speech if it constitutes an advertisement for another specific product.  A broadcast or other speech is not commercial simply because it or the underlying enterprise generates money.  A broadcast is commercial speech only if it does no more than propose an actual commercial transaction, like the purchase of a specific other product.

**Broadcasts and Rebroadcasts.**  Broadcasts and rebroadcasts of NCAA football and basketball games are not commercial speech, but are instead events of public interest subject to heightened First Amendment protection.  With respect to noncommercial speech like broadcasts and rebroadcasts of NCAA football and basketball games, the First Amendment allows a person to assert claims against the broadcaster only if that person has ownership rights in the performance of the event.  A person has ownership rights in the performance of a sporting event if that person has produced the event, controls the arena, and has the power to restrict access by the media.

**Videogames.**  Video games are entitled to the full protections of the First Amendment, like the books, plays, and movies because they all communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world).  If you find that a student-athlete's name, image, or likeness was used in a videogame, you must consider the following factors in determining whether the First Amendment would prevent the student-athlete from asserting a claim relating to the videogame:

First, if the celebrity likeness is one of the "raw materials" from which an original work is synthesized," it is more likely to be protected than if the depiction or imitation of the celebrity is the very sum and substance of the work in question.

Second, the videogame is protected if the game represents primarily the videogame maker's own expression, as long as that expression is something other than the likeness of the celebrity.  This factor requires an examination of whether a likely purchaser's primary motivation is to buy a reproduction of the celebrity, or to buy the expressive work of the videogame maker.

Third, you must avoid making judgments concerning the quality of the artistic contribution and focus instead on whether the amount of creative elements predominate over the literal and imitative use of the student-athlete's name, image, and likeness.

Fourth, a subsidiary inquiry can be useful: whether the marketability and economic value of the videogame derive primarily from the fame of the celebrity depicted.

Fifth, when an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame, the work is not protected.

**Source (broadcasts):** *Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 492 (W.D. Pa. 1938) ("For it is our opinion that the Pittsburgh Athletic Company, by reason of its creation of the game, its control of the park, and its restriction of the dissemination of news therefrom, has a property right in such news, and the right to control the use thereof for a reasonable time following the games."); *Ettore v. Philco Television Broad. Corp.*, 229 F.2d 481, 487 (3d Cir. 1956) ("Where a professional performer is involved, there seems to be a recognition of a kind of property right in the performer to the product of his services. The theory may be summed up as follows: The performer, as a means of livelihood, contracts for his services with an entrepreneur."); *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 575 & n.10 (1977); *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 658 F.3d 614, 624 & 626-30 (2011); *Snyder v. Phelps*, 131 S. Ct. 1207, 1215-16 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection" against state-law tort claims, and this includes any speech regarding "a subject of general interest and of value and concern to the public") (internal quotations omitted); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 542 (1993) ("Publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it, is not ordinarily actionable."); *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters, but we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try."); *C.B.C. Distribution & Mktg., Inc. v. Major League Baseball*, 505 F.3d 818, 823 (8th Cir. 2007) (First Amendment precludes right of publicity claim by players arising from use of their "names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data" in fantasy baseball game); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 410-11 (2001) (noncommercial use of "factual data concerning the players, their performance statistics, and verbal descriptions and video depictions of their play" was absolutely protected by First Amendment from right of publicity claims); *id.* at 411 ("Profit, alone, does not render expression 'commercial.'"); *Bd. of Trs. v. Fox*, 492 U.S. 469, 482 (1989) ("Some of our most valued forms of fully protected speech are uttered for a profit."); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 794-96 (1995) (reproduction of athlete's image in coverage and poster of "newsworthy sports events" protected by First Amendment).

**Source (clips):** *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball*, 505 F.3d 818, 823 (8th Cir. 2007) (First Amendment precludes right of publicity claim by players arising from use of their "names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data" in fantasy baseball game); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 410-11 (2001) (noncommercial use of "factual data concerning the players, their performance

statistics, and verbal descriptions and video depictions of their play" was absolutely protected by First Amendment from right of publicity claims); *id.* at 411 ("Profit, alone, does not render expression 'commercial.'"); *id.* at 414 ("Thus, even if Baseball used depictions of players playing the game or recited statistics or historical facts about the game to advertise the game and promote attendance, the commercial speech cases relied on by plaintiffs would be inapposite. The owner of a product is entitled to show that product to entice customers to buy it."); *Bd. of Trs. v. Fox*, 492 U.S. 469, 482 (1989) ("Some of our most valued forms of fully protected speech are uttered for a profit."); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 794-96 (1995) (reproduction of athlete's image in coverage and poster of "newsworthy sports events" protected by First Amendment); *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (Speech is "commercial" where it "propose[s] a commercial transaction," i.e., where the "speech is an advertisement" for a "particular product").

**Source (videogames):** *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1273-81 (9th Cir. 2013)

## NCAA's Argument For:

At trial, the jury must decide whether APs have proved markets for group licenses to use student-athletes' NILs in (a) game broadcasts; (b) highlight footage and clips; and (c) videogames. The proposed instruction informs the jury regarding the potential scope of these alleged markets.

With respect to the alleged market for NILs in game broadcasts, the Court has held that full-game sports broadcasts are not commercial speech and that, under *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 562 (1977), and *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 658 F.3d 614, 615 (7th Cir. 2011), the First Amendment does not prevent "the producer of entertainment" from asserting a right of publicity claim against a defendant who used footage of the producer's entire performance without the producer's consent. *See* Dkt. No. 1025 at 16-19. The proposed instruction recites this law such that the jury can decide, as a factual issue left open by the Court, whether student-athletes who play in games are "the producer of entertainment" under *Zacchini* and *Wisconsin Interscholastic* such that the First Amendment does not preclude their claims.

As to the alleged market for highlight footage and clips, the Court found a question of material fact as to whether the alleged clips and highlight footage were "used exclusively to produce protected, non-commercial speech." Dkt. No. 1025 at 25. At trial, APs intend to present evidence of the use of game footage, *see* Exs. 2456-66 (video footage), and NCAA will contend that such use was not commercial and thus protected by the First Amendment. The proposed instruction provides the jury with the legal framework for making its determination whether the clips and game footage at issue were used for a commercial purpose, and thus whether the market alleged by APs exists.

Finally, the instruction takes, almost verbatim, the First Amendment test adopted in this case by the Ninth Circuit with respect to the videogames at issue here. The Ninth Circuit held that whether the videogames are protected by the First Amendment against the assertion of NIL

claims could not be decided on the pleadings in EA's favor.  The Ninth Circuit certainly did not, and could not have, held that the First Amendment does not protect the videogames.

**Antitrust Plaintiffs' Argument Against:**

This Court has ruled as a matter of law that the market for the use of rights to names likeness and images in the broadcast and rebroadcast of entire games is not barred by the First Amendment protection under *Zacchini* and *Wisconsin Interscholastic*.  *NCAA II*, 2014 WL 1410451 at *8.  The NCAA ignores that ruling and seeks to instruct the jury to exclude broadcasts from the relevant market on the grounds that they do not meet the traditional test for commercial speech.  Contrary to the NCAA's artful assertion, the Court did not rule that whether Plaintiffs were the "producers" of the games was an open question for the jury to decide.

With respect to the market for clips or highlight footage, the Court ruled that  "If Plaintiffs seek to prove that a similar market would exist for group licenses to use student-athletes' names, images, and likenesses in clips and highlight footage, they will have to prove that there would be a demand for these clips and highlight footage specifically for use in commercial speech that is not protected by the First Amendment." *NCAA II*,  2014 WL 1410451 at *14.  Whether Plaintiffs meet that burden at trial is a matter properly decided by the Court not the jury.  As held in *Jordan v. Jewel Food Stores, Inc*., 851 F.Supp.2d 1102, 1105 (N.D.Ill. 2012), reversed on other grounds, 743 F.3d 509  (7th Cir.2014), a case cited with approval in *NCAA I* , 2013 WL 5778233 at *8, **"[t]he classification of speech as commercial or noncommercial… present[s] issues for the court and not a jury**."   *Id*. at 1105. (Emphasis added).

Early this morning of May 14, 2014, the day the joint instructions are due, the NCAA added an additional six paragraphs to this proposed instruction directing the jury to decide the issue of whether the EA/NCAA videogames are protected by the First Amendment.  That tardy addition ignores the fact that the Ninth Circuit ruled that these video games are not protected by the First Amendment as a matter of law. *In re NCAA Student-Athlete Name & Likeness Licensing Litig*., 724 F.3d 1268 (9th Cir. 2013).  The NCAA argues that its proposal uses the same criteria identified by the Ninth Circuit in its decision, but fails to acknowledge that the Ninth Circuit has applied those criteria and rejected the NCAA's First Amendment arguments. The Ninth Circuit's decision must be followed as the law of the case. *CRS Recovery, Inc. v. Laxton*, No. C 06–7093 CW, 2013 WL 140084, at *9 (N.D. Cal. Jan. 10, 2013) ("This Court is bound to follow the Ninth Circuit's contrary determination as law of the case…").  Asking the jury to second guess the Ninth Circuit's decision on this legal issue would be reversible error, which the NCAA apparently invites.  Like the other First Amendment issues in this case, the applicability of the First Amendment to the video games presents a question to be decided by the Court, not the jury, and that question has already been answered by the Ninth Circuit.

## JURY INSTRUCTION NO. 30:

## [DISPUTED, NCAA'S PROPOSED INSTRUCTION]

## MARKET POWER

**Once you determine the correct relevant product market, you must determine whether the NCAA has market power in the relevant markets**.  Market power is defined as an ability profitably to raise prices above those that would be charged in a competitive market for a sustained period of time.  A firm that possess market power generally can charge higher prices for the same products or services than a firm in the same market that does not possess market power.  An important factor in determining whether a defendant possesses market power is the defendant's market share; that is, its percentage of the products or services sold in the relevant market by all competitors.  **A higher market share, however, does not necessarily prove the existence of market power.  For example, the absence of barriers to entry by new firms or expansion by existing firms or direct evidence that competition is vigorous may establish that a defendant lacks market power even if its market share is substantial**.  Other factors you may consider in determining whether the defendant has market power include barriers to entry, **entry and exit by other competitors, number and size of competitors, and the power of the buyers in the industry**.

**If you find that the NCAA does not possess market power in the relevant antitrust product markets, then you should find for the NCAA with respect to the alleged restraints in those markets.**

**Source**:  ABA Model Jury Instructions in Civil Antitrust Cases (2005), Instruction 3B, Rule of Reason, Proof of Competitive Harm, at p. A-6 to A-9 (2005) (modifications in bold); ABA Section of Antitrust Law, Antitrust Law Developments (7th ed. 2012); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir. 1978) (in rule of reason cases, plaintiffs must prove a relevant market and market power); *L.A.P.D. Inc. v. General Elec. Corp.*, 132 F.3d 402, 405 (7th Cir. 1997) ("proof of market power is essential; without it, any case under the Rule of Reason collapses").

### NCAA's Argument For:

It is black-letter law in this Circuit that proof of defendant's market power is an essential element of an antitrust violation, and necessary to establish anticompetitive harm under the rule of reason.  *See Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir. 1978) (in rule of reason cases, plaintiffs must prove a relevant market and market power).  Other circuits are in accord.  *See, e.g.*, *E. Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 5 (1st Cir. 2004) ("Virtually always, anticompetitive effects under the rule of reason require that the arrangement or action in question create or enhance market power."); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) (plaintiff "must demonstrate that the defendant conspirators have 'market power' in a particular market for goods or services"); *L.A.P.D. Inc. v. Gen. Elec. Corp.*, 132 F.3d 402, 405 (7th Cir. 1997) ("proof of market power is essential; without it, any case under the Rule of Reason collapses").

Plaintiffs cite to *Indiana Federation of Dentists*, but that is a "quick look" case. The Court has rejected application of the quick look analysis here. Because this is a full rule of reason case, the Plaintiffs must show market power as the authorities cited above indicate. Plaintiffs say these authorities are limited to "vertical restraints" but that is not correct. *See, e.g.,* ABA Section of Antitrust Law, 1 Antitrust Law Developments at 72 (7th ed. 2012) ("Courts generally have held that proof of a defendant's market power is a prerequisite for a plaintiff seeking to satisfy its burden of providing likely anticompetitive effect."). In any case, Plaintiffs are themselves claiming to allege vertical restraints.

The NCAA's proposed instruction closely tracks the relevant ABA model instruction with respect to the meaning of market power. *See* ABA Model Jury Instructions in Civil Antitrust Cases (2005), Instruction 3B, Rule of Reason—Proof of Competitive Harm, at p. A-6 to A-8 (2005). The instruction is also consistent with the ABA Section of Antitrust Law, Antitrust Law Developments (7th ed. 2012), which explains that "market power" is typically defined as the "the ability to raise prices above those that would be changed in a competitive market," and that the "usual starting point for appraising whether a defendant has market power is its market share," with a low market share usually precluding a finding of market power, whereas a high market share indicating the possibility that market power exists. *Id.* at 71-72. These sources further explain that a higher market share does not necessarily prove the existence of market power, and "the absence of barriers to entry by new firms or expansion by existing firms" or "direct evidence that competition is vigorous" may establish that defendant lacks market power even if its market share is substantial. ABA Section of Antitrust Law, 1 Antitrust Law Developments at 73 (citing cases). Finally, there must be some connection between market share the alleged restraint such that the restraint is likely to impair competition by creating, increasing, or maintaining that market power or by facilitating its exercise. *See id.* at 72-73. If Plaintiffs fail to prove market power, then their antitrust claims must be dismissed. *See Gough*, 585 F.2d at 390; *see also K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F. 3d 123, 129-30 (2d Cir. 1995) (proof of market power is necessary but not sufficient to show anticompetitive harm).

### Antitrust Plaintiffs' Argument Against:

The NCAA's proposed instruction is inconsistent with the ABA model instructions, misstates the law, and is prejudicial and misleading. The Model Instructions do not purport to require a plaintiff in a rule of reason case to prove market power. Rather, in the Model Instruction regarding Competitive Harm (which the parties have agreed to in relevant part; *see* Instruction No. 32 below), the question whether the defendant possesses "market power" is just one factor to be considered.

The proposed instruction also misstates the law. As recognized by the Supreme Court in *F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), Plaintiffs can meet their burden of proving that the challenged restraint causes anticompetitive harm either by showing that the NCAA has market power in a relevant market, or by showing that the challenged conduct has had actual detrimental effects on competition. 476 U.S. at 460-61 ("[s]ince the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction ·of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.").

And while some Circuits have departed from that rule in vertical restraint cases, the Ninth Circuit is not among them.  The only Ninth Circuit case cited by the NCAA (a vertical restraint case) does not hold or even imply that, in a rule of reason case. plaintiffs must prove market power.  *Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir. 1978).  Further, the NCAA has not cited any horizontal restraint case that has departed from the *Indiana Federation of Dentists* rule.  *See L.A.P.D. Inc. v. General Elec. Corp.*, 132 F.3d 402, 405 (7th Cir. 1997) (vertical restraint).

# JURY INSTRUCTION NO. 31:

## [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]

## UNREASONABLE RESTRAINT

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable. You must determine, therefore, whether the restraint challenged here—the agreement to prohibit compensation of college athletes for use of their names, images and likenesses—is unreasonable. In making this determination, you must first determine whether the Plaintiffs have proven that the challenged restraint has had significant anticompetitive effects within a relevant product and geographic market. If you find that the Plaintiffs have proven that the challenged restraint produces significant anticompetitive effects in a relevant market, then the burden shifts to the NCAA to come forward with evidence of the restraint's legitimate procompetitive effects in the same relevant market.

If the NCAA fails to show that the challenged restraint produces legitimate procompetitive effects in the same relevant market, then the restraint is unreasonable.

If, however, the NCAA comes forward with evidence of one or more of the alleged restraint's legitimate procompetitive effects in the same relevant market, the burden shifts to the Plaintiffs to show that these legitimate procompetitive effects could be achieved in a substantially less restrictive manner.

If you find that all of the legitimate procompetitive effects offered by the NCAA could be achieved in a substantially less restrictive manner, the challenged restraint is unreasonable.

If you find that some of the legitimate procompetitive effects in the same relevant market offered by the NCAA could be achieved in a substantially less restrictive manner while others could not, you should consider only the latter in determining whether the challenged restraint is reasonable. Specifically, you must weigh the anticompetitive and procompetitive effects not achievable in a substantially less restrictive manner to determine if the restraint is reasonable on balance. If the Plaintiffs prove that the anticompetitive effects outweigh the procompetitive effects, the challenged restraint is unreasonable.

**Source**: ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition), Sherman Act General, Rule of Reason Instruction 3A (adapted); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001); *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1318-1319 (9thCir. 1996); *Bhan v. NME Hospitals, Inc*., 929 F.2d 1404, 1413 (9th Cir. 1991); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1390, 1396 (9th Cir. 1984), cert. denied, 469 U.S. 990 (1984); *United States v. Topco Assocs., Inc*., 405 U.S. 596, 610 (1972); *Paladin Assocs., Inc. v. Montana Power Co*., 328 F.3d 1145, 1157 n.11 (9th Cir. 2003).

## [DISPUTED, NCAA'S PROPOSED INSTRUCTION]

## UNREASONABLE RESTRAINT -- OVERVIEW

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable.  You must determine, therefore, whether the restraint challenged here— **[*describe it*] the agreement to prohibit compensation of college athletes for use of their names, images and likenesses in broadcasts and videogames**—is unreasonable.

In making this determination, you must first determine whether the Plaintiffs have proven that the challenged restraint has resulted in a substantial harm to competition in a relevant product and geographic market.  If you find that the Plaintiffs have proven that the challenged restraint results in a substantial harm to competition in a relevant market, then you must consider whether the restraint produces countervailing competitive benefits.  If you find that it does, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the **unreasonableness** analysis in more detail.

**Source**:  ABA Model Jury Instructions in Civil Antitrust Cases Rule of Reason Instruction 3A at p. A-4 (2005) (modifications in bold)


**Antitrust Plaintiffs' Argument:**

It is appropriate to modify ABA model instructions, where, as here, Ninth Circuit law requires the use of different language. Unlike the ABA instruction, which states that a restraint is illegal only if "the competitive harm substantially outweighs the competitive benefit",  under Ninth Circuit law, harm to competition need only substantially outweigh, not substantially outweigh, procompetitive benefits. *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir.  2001). Plaintiffs' proposed language correctly reflects the Ninth Circuit standard, which was recognized and applied by this Court.  *NCAA II*, 2014 WL 1410451, at *3 ("'A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects.' *Tanaka*, 252 F.3d at 1063.")

Plaintiffs' instruction also incorporates the Supreme Court's holding in. *U.S. v. Topco Associates, Inc*., 405 U.S. 596, 610 (1972) that if plaintiffs show anticompetitive effects, the burden shifts to Defendant to come forward with evidence showing procompetitive benefits in the same relevant market as held by This Court followed the *Topco* rule in *NCAA II*,  2014 WL 1410451, at *16. ("The Supreme Court has explained that competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy."). The Ninth Circuit's ruling in *LAMCC*, 726 F.2d at 1392 that ("[t]he relevant market provides the basis on which to balance competitive harms and benefits of the restraint at issue." also supports this rule.  The NCAA's reliance on *Sullivan v. National Football League*, 34 F. 3d 1091, 1111-13 (1st Cir. 1994) is misplaced.  In *Sullivan*, the First Circuit agreed that it was "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market."  *Id*. at 1112.  The First Circuit's disapproval of one of the jury instructions in that case is factually distinguishable and certainly not binding on this Court in light of the Ninth Circuit's adoption of the *Topco* rule.

Ninth Circuit cases also require that procompetitive justifications be "legitimate".  See *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir.  2001).  The ABA instruction also fails to instruct the jury that only legitimate procompetitive benefits in the same relevant market can justify an anticompetitive restraint.

Plaintiffs also added language from *Tanaka* to address less restrictive alternatives, which this ABA model instruction does not mention, although they are an important step in the rule of reason analysis.  The NCAA's argument that a justification can still be considered in weighing anticompetitive effects against competitive benefits, even if Plaintiffs prove a substantially less restrictive alternative, is incorrect.  As the ABA model instruction on Competitive Benefits states: "If the Plaintiffs prove that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, **then they cannot be used to justify the restraint**."  (emphasis added).   The NCAA's proposal for Instruction No. 34 uses the same highlighted phrase.

Citing *Cnty. of Tuolumne v. Sonora Cmty. Hosp*., 236 F.3d 1148, 1159 (9th Cir. 2001), The NCAA argues that the jury should be instructed that Plaintiffs must prove that a  less restrictive alternative is "virtually as effective in serving the legitimate objective without significantly increased cost."  The language in Plaintiffs' proposal, however, is taken directly from *Tanaka*, which is the most recent Ninth Circuit case explaining the shifting burdens in Rule or Reason Cases.   "If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects. The plaintiff must then show that "any legitimate objectives can be achieved in a substantially less restrictive manner."  252 F.3d at 1063, quoting  *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1319 (9th Cir.1996).  The Court quoted this language from *Tanaka*  and *Hairston* in  *NCAA II*, 2014 WL 1410451, at *3.  The language that the NCAA seeks to include is not part of the ABA or any other model jury instructions and Plaintiffs find no case where it has ever been included in any jury instruction by any court.

The Court should therefore give Plaintiffs' version of this instruction which is consistent with Ninth Circuit law and this Court's summary judgment order, rather than the NCAA's proposal which includes language from the ABA model instruction that is contrary to Ninth Circuit law.

**NCAA's Argument:**

The NCAA believes the ABA Model Instruction is a concise and accurate description of the relevant law, and proposes an Instruction that near-verbatim tracks the Model Instruction.

APs' instruction, on the hand, is a significant departure from the Model Instruction, and its adoption would constitute reversible error in that it incorrectly states the law and is likely to mislead a jury.

Specifically, APs' instruction contains the following errors:

First, it would be reversible error to instruct the Jury, as APs propose, that any procompetitive effects must occur "in the same relevant market."  They cite *Topco* but that was a

case of *per se* illegality, and the Supreme Court was specifically addressing the reasons for *per se* analysis. Even if some courts reject general "social welfare" as a procompetitive benefit, the NCAA is not asserting general "social welfare." Instead, the NCAA is asserting specific benefits to products in the alleged markets at issue and closely related markets: improved education, additional sports teams, better sports games and broadcasts, etc. In a similar case involving the NFL sports league, the First Circuit held that it was error to instruct the jury to "balance the injury to competition in the relevant market with the benefits to competition in that same relevant market." *Sullivan v. NFL*, 34 F.3d 1091, 1111-13 (1st Cir. 1994). Specifically, in determining whether the NFL violated the antitrust laws by restricting owners of member football clubs from selling shares in their teams to the public, the court held that the jury must weigh harms in the market for the sale of NFL ownership interests with procompetitive justifications such as whether "the policy enhanced the NFL's ability to effectively produce and present a popular entertainment product unimpaired by the conflicting interests that public ownership would cause." *Id.* at 1112-13. The *Sullivan* court reasoned that "courts should generally give a measure of latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their policies and practices." *Id.* at 1112. As in *Sullivan*, the Supreme Court and Ninth Circuit have found it appropriate to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets. *See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 115-20 (1984) (considering the NCAA's interest in protecting live attendance at untelevised games and the NCAA's "legitimate and important" interest in maintaining competitive balance between amateur athletic teams as a justification for a restraint that operated in a completely different market, the market for the telecasting of collegiate football games); *LA Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1392-97 (9th Cir. 1984) (stating that the "relevant market provides the basis on which to balance competitive harms and benefits of the restraint at issue" but then considering a wide variety of alleged benefits, and then directing the finder of fact to "balance the gain to interbrand competition against the loss of intrabrand competition", where the two types of competition operated in different markets).

Second, APs' proposed instruction erroneously suggests that if the NCAA fails to show that the challenged restraint produces legitimate procompetitive effects the restraint is unreasonable. Rather, the instruction should make clear that as long as the NCAA proves <u>any</u> of its procompetitive justifications, the Jury proceeds to balance the procompetitive benefits against the anticompetitive harm. *See* Antitrust Law Developments (Seventh) at 79-80.

Third, APs' proposed instruction omits the word "substantially" from its final sentence, which should read "If the Plaintiffs prove that the anticompetitive effects <u>substantially</u> outweigh the procompetitive effects, the challenged restraint is unreasonable." The word substantially is included in the Model Instructions. *See* ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 edition), Sherman Act – General, Instruction No. 3D, at p. A-12 ("If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable."); *see also* Antitrust Law Developments (Seventh) at 62 ("The ultimate issue [in a rule of reason case] is whether the restraint's anticompetitive effect substantially outweighs the procompetitive effect for which the restraint is reasonably necessary.").

Fourth, APs' proposed instruction incorrectly states the law with respect to less restrictive alternatives. Any instruction concerning less restrictive alternatives must make clear that, to be

considered, the alternative must be "virtually as effective in serving the legitimate objective without significantly increased cost."  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001).  Moreover, the existence of a less restrictive alternative is "a factor in determining the reasonableness of an ancillary restraint," *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1396 (9th Cir. 1984), and there is no legal support for APs' position that if the Jury finds a less restrictive alternative it should enter judgment in favor of APs and need not proceed to balance the reasonableness of the restraint, considering the anticompetitive and legitimate procompetitive effects.

**JURY INSTRUCTION NO. 32:**

**[PARTIALLY DISPUTED]**

**COMPETITIVE HARM**

As I mentioned, in order to prove that the challenged restraint is unreasonable, Plaintiffs first must demonstrate that the restraint has resulted in a substantial harm to competition, **in other words, an anticompetitive effect**.  Although it may be relevant to the inquiry, harm that occurs merely to the ~~individual business of the~~ plaintiff is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, the Plaintiffs must show that the harm to competition occurred in an identified market, known as a "relevant market."  There are two aspects to a relevant market.  The first aspect is known as the relevant product market.  The second aspect is known as the relevant geographic market.

It is the plaintiff's burden to prove the existence of a relevant market, **as explained in prior instruction No. __.**

~~[Insert Sherman Act § 2 relevant market instruction, pp, C-7 to C-14, infra.]~~

If you find that the plaintiff has proven the existence of a relevant market, then you must determine whether the plaintiff also has proven that the challenged restraint has a substantial harmful effect on competition in that market.  A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, and higher product quality.  If the challenged conduct has not resulted in higher prices, decreased output, or lower quality, or the loss of some other competitive benefit, then there has been no competitive harm and you should find that the challenged conduct was not unreasonable.  **[Plaintiffs' proposed language:  A reduction in the number of licenses for Plaintiffs' names, likenesses and images available on the market as a result of the restraint supports the existence of a harmful effect on competition in the relevant market.]**

**[NCAA's proposed language: The core question in antitrust is output.   Unless a conspiracy reduces output in some market, to the detriment of consumers, there is no antitrust problem.]**

In determining whether the challenged restraint has produced competitive harm, you may look at the following factors: (**a**) the effect of the restraint on prices, output, product quality and service; (**b**) the purpose and nature of the restraint; (**c**) the nature and structure of the relevant market, both before and after the restraint was imposed; (**d**) the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and (**e**) whether the defendant possesses "market power."

The last factor mentioned, market power, has been defined as an ability profitably to raise prices above those that would be charged in a competitive market for a sustained period of time.

A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power . The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether the defendant possesses market power is the defendant's market share; that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether the defendant has market power include [list factors relevant to the facts of the case, such as the existence of barriers to entry or potential competitors]. If the defendant does not possess a substantial market share, it is less likely that it possesses market power. If the defendant does not possess this kind of power, then it is less likely that the challenged restraint has resulted in a substantial harmful effect on competition in the market.

**Source**: Model Jury Instructions in Civil Antitrust Cases Rule of Reason Instruction 3B at p. A-6 to A-8 (2005) (modifications in bold); *O'Bannon v. National Collegiate Athletic Ass'n*,, Nos. C 09–1967 CW, C 09–3329 CW, C 09–4882 CW, 2010 WL 445190, at *5 (N.D.Cal., Feb. 28, 2010).

**Antitrust Plaintiffs' Argument (Blue):**

This Court has ruled in this case that the alleged reduction in the number of licenses for Plaintiffs' names, likenesses and images available on the market as a result of the restraint supports the existence of a harmful effect on competition in the relevant market. *O'Bannon v. National Collegiate Athletic Ass'n*,, Nos. C 09–1967 CW, C 09–3329 CW, C 09–4882 CW, 2010 WL 445190, at *5 (N.D.Cal., Feb. 28, 2010). Accordingly, Plaintiffs have added that statement to the ABA model instruction.

The NCAA's proposed language that unless a conspiracy reduces output "there is no antitrust problem" is contrary to ABA model instruction and contrary to settled law that antitrust violations include, but is not limited to, restraints reducing output. The NCAA cites no Ninth Circuit case in support of its overly-narrow view of the antitrust law. As evidenced by the language the NCAA quotes from *Board of Regents*, restrictions on price and output are just two "examples" of restraints of trade. 468 U.S. at 107-108.

**NCAA's Argument (Yellow):**

APs provide no support for their proposed language (in blue) that a reduction in licenses supports the existence of harmful effect on competition. It is instead another effort to place their disputed contentions in the jury instructions, by instructing the jury that hotly disputed issues should be decided in their favor.

NCAA's proposed language regarding output finds support in the following authorities: 11 P. Areeda & H. Hovenkamp, *Antitrust Law* § 1503(b), at 394 (1991) (stating that "output is a sound general measure of anti-competitive effect, and several Supreme Court decisions have emphasized it"); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 776 (1999) (stating that key question in rule of reason analysis as "whether the limitation on advertisements obviously tends to limit the total delivery of dental services"); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433-1434 & n.4 (9th Cir. 1995) (noting that consumer welfare is harmed only when output is affected:

"When a firm with market power cuts output to increase prices, price exceeds marginal cost.  This causes a loss to society of all that additional output which the firm could produce by lowering its price to marginal cost."); *LucasArts Entm't Co. v. Humongous Entm't Co.*, 870 F. Supp. 285, 289 (N.D. Cal. 1993) ("Limitations imposed by the antitrust laws are thought to improve consumer welfare because they force firms to increase output from monopolistic to competitive levels."); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (stating that "lower output and the associated welfare losses" are what "matter under the federal antitrust laws"); *L.A.P.D., Inc. v. Gen. Elec. Corp.*, 132 F.3d 402, 404 (7th Cir. 1997) ("Antitrust law is designed to protect consumers from the higher prices-and society from the reduction in allocative efficiency-that occurs when firms with market power curtail output."); *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.  Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem.").

A price differential without an output effect is simply not anticompetitive harm.  Otherwise many business torts between competitors could be recast as an antitrust violation.  The hallmark of an *anticompetitive* harm is that allocative efficiency is affected and the quality or quantity of output is lowered in the marketplace.  This is normally accompanied by a price increase, but the reverse is not true: a price change does not necessarily mean there is an output effect implicating the antitrust laws.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY INSTRUCTION NO. 33:

## [DISPUTED, NCAA'S PROPOSED INSTRUCTION]

## PRODUCING A UNIQUE PRODUCT

In deciding whether the NCAA has engaged in an unreasonable restraint of trade, you must decide whether the challenged rules are reasonably necessary for the NCAA and its member institutions to provide a unique product.   In determining whether the challenged rules are reasonably necessary to produce a unique product, you may consider if the rules preserve a tradition of amateurism in college sports, a special atmosphere of competition between student-athletes, the identification of college sports with academics, or maintain a meaningful distinction between intercollegiate athletics and professional sports.   You should presume that the NCAA's eligibility rules are reasonably necessary to preserve the distinctive character of college sports as a unique product.   Plaintiffs have the burden of showing that the alleged restraints do not serve this legitimate purpose.   In considering whether the Plaintiffs have done so, you are instructed that whether the NCAA's rules do not implement amateurism in its purest form does not mean its attempts to produce college sports with some amateur elements are unreasonable.   If you find that the amateurism rules challenged by Plaintiffs are reasonably necessary to provide a unique product, then you must find that the alleged restraint of trade is not unreasonable.

**Source**:   *Am. Needle*, *Inc. v. NFL*, 560 U.S. 183, 203 (2010) ("When restraints on competition are essential if the product is to be available at all," these restraints can be upheld without "detailed analysis" in the "twinkling of an eye." (citations and internal quotation marks omitted)); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101-102 (1984) (NCAA amateurism rules valid as means to preserve special nature of college sports); *see id.* at 120 ("The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports.   There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act"); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are . . . not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all"); *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 13-30568, 2014 WL 1796643 (5th Cir. May 6, 2014) (stating that "rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture" are "presumptively procompetitive and are not generally deemed unlawful restraints on trade") (internal quotation marks omitted); *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996) (relying on *Bd. of Regents* to uphold summary judgment against challenge to NCAA amateurism rules); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 342-44 (7th Cir. 2012) ("[T]he NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable."); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1018 n.14 (10th Cir. 1998) (recognizing that "amateurism that serves as the hallmark of NCAA competition" and "the horizontal restraints necessary for the product to exist include rules such as those forbidding payments to athletes and those requiring that athletes attend class, etc."); *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1089-90 (7th Cir. 1992) ("[T]he no-draft rule and other like NCAA regulations preserve the bright line of demarcation between college and 'pay for play' football."); *McCormack v. Nat'l*

*Collegiate Athletic Ass'n*, 845 F.2d 1338, 1344-45 (5th Cir. 1988) ("The NCAA markets college football as a product distinct from professional football. The eligibility rules create the product and allow its survival in the face of commercializing pressures."); *Intercollegiate Basketball Ass'n v. Nat'l Collegiate Athletic Ass'n*, 339 F. Supp. 2d 545, 550 (S.D.N.Y. 2004) ("As the Supreme Court noted in *Board of Regents*, college athletics is a unique product, whose amateur rules distinguish it from professional sports and widen consumer choice."); *Gaines v. Nat'l Collegiate Athletic Ass'n*, 746 F. Supp. 738, 743–45 (M.D. Tenn. 1990); *Justice v. Nat'l Collegiate Athletic Ass'n*, 577 F. Supp. 356, 383 (D. Ariz. 1983).

**NCAA's Argument For:**

The jury in this case will be asked to apply the rule of reason. There is a long line of Supreme Court and Court of Appeals precedent applying the rule of reason to joint ventures generally and, specifically, to the NCAA's eligibility rules, which are at issue in this case. This case law explains why such agreements and eligibility rules are procompetitive. In light of this Court's rulings, it will be for the jury to decide whether the NCAA eligibility rules at issue here meet the criteria for procompetitiveness set forth in this case law. The jury must be instructed to decide this case according to the standards set forth in this uniform body of precedent. Although the Court rejected the NCAA's showing on this issue at summary judgment, Plaintiffs confuse a denial of summary judgment for a grant of summary judgment in their favor. There was no grant of summary judgment for Plaintiffs on this issue, and the issue remains one for trial. Plaintiffs are obviously free to argue to the Jury that the NCAA's amateurism rules are not necessary for its product.

This case law is based on three principles identified by the Supreme Court:

First, "[j]oint ventures and other cooperative arrangements are . . . not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc*., 441 U.S. 1, 23 (1979). They are "likely to survive the Rule of Reason" and can be upheld without "detailed analysis" in the "twinkling of an eye." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 203 (2010) (citations and internal quotation marks omitted). The less restrictive alternative framework does not apply "where the business practice being challenged involves the core activity of the joint venture itself." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006).

Second, the NCAA and other sports organizations are the "leading example[s]" of "activities [that] can only be carried out jointly" because sports require "rules on which the competitors agreed to create and define the competition to be marketed." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984) (quotations omitted).

Third, for this reason, as this Court has recognized, the NCAA needs 'ample latitude" for the maintenance of a 'revered tradition of amateurism in college sports" and the preservation of the student-athlete in higher education. Dkt. No. 876 at 15 (citing *Bd. of Regents*, 468 U.S. at 120).

Based on these three principles, courts have uniformly, without exception, held that if an NCAA rule is an eligibility rule that preserves the unique character of college sports, that rule is

presumptively procompetitive.  *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 342-44 (7th Cir. 2012); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1021 n.14 (10th Cir. 1998); *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1089-90 (7th Cir. 1992); *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1344-45 (5th Cir. 1988); *Metro. Intercollegiate Basketball Ass'n v. Nat'l Collegiate Athletic Ass'n*, 339 F. Supp. 2d 545, 550 (S.D.N.Y. 2004); *Gaines v. Nat'l Collegiate Athletic Ass'n*, 746 F. Supp. 738, 743–45 (M.D. Tenn. 1990); *Justice v. Nat'l Collegiate Athletic Ass'n*, 577 F. Supp. 356, 383 (D. Ariz. 1983).

Again, under the Court's rulings, it will be for the jury to decide whether the NCAA's eligibility rules at issue here do, in fact, preserve the unique character of college sports, and thus are procompetitive (or are procompetitive for other reasons).  But the jury should be instructed to apply this standard, which has been adopted by which every court to address the issue.

## Antitrust Plaintiffs' Argument Against:

In its motion for summary judgment the NCAA argued that the restraint in this case is inherently procompetitive under *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101-102 (1984) because the NCAA members' mutual agreement to prohibit compensation to Division 1 football and men's basketball college athletes for the use of the rights to their names likenesses and images is necessary to produce the unique product of amateur college athletics.  The Court rejected that argument, and ruled that the competitive harm caused by the restraint must be weighed against any procompetitive benefits of the NCAA's amateurism justification in the same relevant markets.  *NCAA II*, 2014 WL 1410451 at *3, n.4 and *12-*13.  Ignoring the Court's ruling, the NCAA now seeks to have the jury instructed on the same erroneous legal assertion, repackaged under the label of *Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010).

As this Court recognized in its summary judgment, the restraint is not necessary to the continued existence of collegiate athletics.  The NCAA's argument that the restraint is immune from the antitrust law because amateur collegiate football and basketball are a unique product that could not exist without the restraint is a sophistry that misstates the law.  Moreover, it would confuse the jury in its task of weighing any procompetitive benefits produced by amateurism against the competitive harm caused by the restraint as required under the ABA model rule of reason instructions.

In *Am. Needle*, the Supreme Court held that although the NFL teams comprised a lawful joint venture, when it comes to "marketing property owned by the separate teams," individual sports teams that together comprise a league "do not possess either the unitary decision making quality or the single aggregation of economic power" of a single entity and "'[t]heir objectives' are not 'common." 560 U.S at 196.  Like the intellectual property discussed in *Am. Needle*, which is owned by the individual teams not by the NFL, the broadcast and videogame rights here are licensed by individual NCAA member colleges, and not by the NCAA.   Accordingly, the restraint is not inherently procompetitive under *Am. Needle*.  See *Laumann v. National Hockey League*, 907 F.Supp.2d 465, 485 (S.D.N.Y. 2012) ("Like the intellectual property at issue in American Needle, the [television broadcast] rights at issue here belong initially to the individual clubs"); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 834-37 (3rd Cir. 2010) ("individual tennis tournaments traditionally compete for player talent. An agreement restricting

this competition should not necessarily be immune from § 1 scrutiny merely because the tournaments cooperate in various aspects of producing the ATP Tour.").

Moreover, the NFL's reliance on *Am. Needle* is also misplaced because, unlike the NFL and the NHL, the NCAA is not a lawful joint venture as its member schools are independent economic entities that compete for and make individual decisions about the athletes they recruit and the licenses they grant. Accordingly, this instruction, which is contrary to the Court's summary judgment order, the ABA model Rule of Reason instructions and the *Am. Needle* decision itself should not be given.

**JURY INSTRUCTION NO. 34:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**EVIDENCE OF COMPETITIVE BENEFITS**

If you find that the Plaintiffs have proven that the challenged restraint produces significant anticompetitive effects in the relevant markets, then you must decide whether the restraint produces one or more procompetitive effects in the same relevant markets in other ways. The NCAA has the burden of coming forward with evidence of such procompetitive effects. Conduct that restrains trade can only be justified if it produces procompetitive effects in the same relevant markets that outweigh, on balance, the anticompetitive effects in the market. Under the Sherman Act, a practice that restrains trade cannot be justified by showing that it serves some other social goal. In deciding whether the NCAA has come forward with evidence showing that the challenged restraint produces procompetitive benefits, you should only consider whether the restraint produces procompetitive effects in the same relevant markets and should not consider whether the restraint serves any other social goals.

Procompetitive effects in markets other than the relevant market cannot justify anticompetitive effects in the relevant market.

If the NCAA fails to show that the challenged restraint produces legitimate procompetitive effects in the same relevant market, then the restraint is unreasonable.

If, however, the NCAA comes forward with evidence of one or more of the alleged restraint's legitimate procompetitive effects in the same relevant market, the burden shifts to the Plaintiffs to show that these legitimate procompetitive effects could be achieved in a substantially less restrictive manner.

If you find that all of the legitimate procompetitive effects offered by the NCAA could be achieved in a substantially less restrictive manner, the challenged restraint is unreasonable.

If you find that some of the legitimate procompetitive effects in the same relevant market offered by the NCAA could be achieved in a substantially less restrictive manner while others could not, you should consider only the latter in determining whether the challenged restraint is reasonable. Specifically, you must weigh the anticompetitive and procompetitive effects not achievable in a substantially less restrictive manner to determine if the restraint is reasonable on balance. If the Plaintiffs prove that the anticompetitive effects outweigh the procompetitive effects, the challenged restraint is unreasonable.

**Source**: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases (2005 Edition), Sherman Act – General – Rule of Reason Instruction 3C at A-10; instructions approved by Ninth *Circuit in Nestle Food Co. v. Abbott Laboratories*, 105 F.3d 665 (9th Cir. 1997) *and Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1392 1398 (9th Cir. 1984), *cert. denied*, 469 U.S. 990 (1984); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 689 (1978); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001; *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1318-19 (9th Cir. 1996); *Bhan v. NME Hosps.,*

*Inc.*, 929 F.2d 1404, 1410 n. 4 (9th Cir. 1991); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 n.11 (9th Cir. 2003).

### [DISPUTED, NCAA'S PROPOSED INSTRUCTION]

### EVIDENCE OF COMPETITIVE BENEFITS

If you find that the Plaintiffs have proved that the challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways.

In this case, the NCAA contends that the challenged restraint benefits competition in the following way(s): **[insert description of defendant's contentions]**

**(a) Increasing consumer demand for Division I sports by enabling a product of amateur college sports that is distinct from professional sports**

**(b) Increasing the output of Division I sports, whether measured in the number of games, the number of teams participating, the number of sports a school offers, or the number of scholarships, because a market can be said to become increasingly competitive when its output increases;**

**(c) Expanding educational opportunities for student-athletes, and promoting the integration of athletics and academics;**

**(d) Improving quality of a product or service that enhances the product or service, for example improving the quality of the educational programs at Division I schools or improving the quality of the sports fan experience;**

**(e) Maintaining competitive balance among colleges and across conferences;**

**You may find that the alleged restraints benefit competition, whether or not you find that the alleged restraints benefit competition in any specific product market that you might find Plaintiffs have proven.**

If you find that the challenged restraint does result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits. If the Plaintiffs prove that the same benefits could have been ~~readily~~ achieved **just as effectively and without significantly increased cost** by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint. **A restraint on competition is not unlawful simply because there is some alternative that would be less restrictive of competition no matter how small a degree. The Plaintiffs must show that any less restrictive alternative serves the same procompetitive purpose and achieves the same procompetitive benefits just as effectively as the challenged NCAA rules do without significantly increased cost. Even if there is some less restrictive alternative available, the challenged rules are lawful if they are reasonably necessary to achieve the NCAA's procompetitive purposes.**

**Source**: Model Jury Instructions in Civil Antitrust Cases Rule of Reason Instruction 3C at p. A-10 (2005) (modifications in bold). **Pro-competitive justifications**: *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 204 (2010) (recognizing "that the interest in maintaining a competitive balance" among "athletic teams is legitimate and important" (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 117 (1984)); *Sullivan v. National Football League*, 34 F. 3d 1091, 1111-13 (1st Cir. 1994) (finding error when jury was instructed to "balance the injury to competition in the relevant market with the benefits to competition in the same relevant market"); *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993) (recognizing that NCAA's rules have procompetitive effects if they "improved the quality of the educational program" and made "education more accessible to a greater number of students"); *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1345 (5th Cir. 1988) (recognizing the integration of athletics and academics as a procompetitive goal). **Less restrictive alternatives:** *Anderson v. Am. Auto. Ass'n*, 454 F.2d 1240, 1246 (9th Cir. 1972) ("To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties, and that it is limited to what is fairly necessary, in the circumstances of the particular case . . . .") (quoting *Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U.S. 373, 406 (1911)); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975) ("In its descriptions of the rule of reason inquiry, the Supreme Court has never indicated that, regardless of the other circumstances present, the availability of an alternative means of achieving the asserted business purpose renders the existing arrangement unlawful if that alternative would be less restrictive of competition no matter to how small a degree. In Schwinn, for instance, in applying the rule of reason to the manufacturer's territorial and customer restraints on its agent-dealers, the Court did not inquire whether there was some substitute method by which Schwinn could compete with the chain stores that would result in a lesser restriction on competition between its dealers. Rather, the Supreme Court was satisfied that the Schwinn program of territorial and dealer restrictions was lawful once it concluded the restraints did not exceed 'the limits Reasonably necessary to meet the competitive problems.'"); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 303 (2d Cir. 1979) ("We agree with the Third Circuit that a better charge would be to require that 'the restraints . . . not exceed the limits reasonably necessary to meet the competitive problems.") (citation and internal quotation marks omitted); *Nat'l Football League v. N. Am. Soccer League*, 459 U.S. 1074, 1079-80 (1982) (Rehnquist, J., dissenting from denial of certiorari) ("The Court of Appeals has taken this statement too far by adopting the least restrictive alternative analysis that is sometimes used in constitutional law. The antitrust laws impose a standard of reasonableness, not a standard of absolute necessity. The Court of Appeals ignored its own holding that the proper standard is that the constraint be reasonably necessary.") (internal quotation marks omitted)).

## Antitrust Plaintiffs' Arguments:

Plaintiffs have modified the ABA model instruction in conformance with the Ninth Circuit case law governing procompetitive benefits in rule of reason cases. The language that the jury "should only consider whether the restraint produces procompetitive effects in the same relevant markets and should not consider whether the restraint serves any other social goals." is based on jury instructions approved by the Ninth Circuit in in *Nestle Food Co. v. Abbott Laboratories*, 105 F.3d 665 (9th Cir. 1997) and *Los Angeles Memorial Coliseum Comm'n v.*

*National Football League*, 726 F.2d 1381, 1392 1398 (9th Cir. 1984), cert. denied, 469 U.S. 990 (1984) ("*LAMCC*") ("The NFL next argues that the trial court should have charged the jury that it could consider the procompetitive significance of public service and similar benefits, if any, that inure to Rule 4.3. We again find no error.") A "'social justifications'" cannot support an otherwise unlawful restraint of trade." *NCAA II*, 2014 WL 1410451 at *16, quoting *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990).

Plaintiffs also added the sentence "Procompetitive effects in markets other than the relevant market cannot justify anticompetitive effects in the relevant market." which is supported by *U.S. v. Topco Associates, Inc*., 405 U.S. 596, 610 (1972); *LAMCC*, 726 F.2d at 1392 ("[t]he relevant market provides the basis on which to balance competitive harms and benefits of the restraint at issue.") and *NCAA II*, 2014 WL 1410451 at *16. In *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir.1994), a First Circuit case on which the NCCA relies, the court recognized that it was "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." *Id*. at 1112.

Plaintiffs' statements regarding less restrictive alternatives track the language of the ABA model instruction language and the Ninth Circuit cases. Defendant's proposed less restrictive alternative language, on the other hand, is argumentative and contrary to the ABA model instruction and Ninth Circuit law. Defendant cites older cases from other circuits and a dissenting opinion by Justice Rehnquist.  The NCAA also cites *Cnty. of Tuolumne v. Sonora Cmty. Hosp*., 236 F.3d 1148, 1159 (9th Cir. 2001) to argue that the jury should be instructed that Plaintiffs must prove that a  less restrictive alternative is "virtually as effective in serving the legitimate objective without significantly increased cost."  The language in Plaintiffs' proposal, however, is taken directly from *Tanaka*, which is the most recent Ninth Circuit case explaining the shifting burdens in Rule or Reason Cases.   "If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects. The plaintiff must then show that "any legitimate objectives can be achieved in a substantially less restrictive manner."  252 F.3d at 1063, quoting  *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1319 (9th Cir.1996).  The Court quoted this language from *Tanaka*  and *Hairston* in  NCAA II, 2014 WL 1410451, at *3. The language that the NCAA seeks to include is not part of the ABA or any other model jury instructions and Plaintiffs find no case where it has ever been included in any jury instruction by any court.

Plaintiffs also added language to address the possibility that the jury finds a less restrictive alternative for one justification but not another instructing the jury that they should only consider only the latter in determining whether the challenged restraint is reasonable.  This is needed because the ABA model instruction was apparently drafted to accommodate cases with multiple purported procompetitive justifications.

The NCAA again attempts to recast its alleged procompetitive justifications to evade this Court's summary judgment order.  Despite this Court's ruling that social justifications cannot support an otherwise unlawful restraint of trade, the NCAA now tries to argue social justifications to the jury including "[e]xpanding educational opportunities for student athletes" and "[i]mproving quality of a product or service that enhances the product or service, for example

improving the quality of the educational programs at Division I schools or improving the quality of the sports fan experience."

Moreover, although the Court granted summary judgment on one of the NCAA's five alleged justifications, the NCAA still lists five procompetive defenses.  These reformulated justifications refer to Division I sports and schools generally rather than football and men's basketball contrary to this Court's rejection of the NCCA's claim that the restraint was justified by benefits to other college sports.

The language that the NCAA seeks to add concerning less restrictive alternatives is not based on any Ninth Circuit case and is legally incorrect. The ABA model instruction clearly states that if Plaintiffs prove "a reasonably available alternative means that create substantially less harm to competition, then [the alleged justifications] cannot be used to justify the restraint."  The NCAA includes this language, but then adds language that flatly contradicts  the ABA instruction, by instructing that a justification can still justify a restraint despite evidence of an alternative that creates substantially less harm to competition.

## NCAA's Arguments:

APs' proposed instruction deviates significantly from the Model Instruction and mischaracterizes the applicable law.  Specifically, APs' instructions include the following inaccuracies:

First, as with Instruction No. 31, APs' instruction incorrectly charges the jury that they may not consider procompetitive effects in related markets.   Once again, Plaintiffs rely on *Topco* which is a *per se* case, not a rule of reason case.  *See Sullivan v. NFL*, 34 F.3d 1091, 1111-13 (1st Cir. 1994) (holding trial court erred in instructing the jury to "balance the injury to competition in the relevant market with the benefits to competition in that same relevant market."); *see also* NCAA's argument in Instruction No. 31, *supra*.  The NCAA is not asserting "social justification like public service" but specific improvements to products at issue in the alleged markets or related markets, such as improved education, better athletic experiences for athletes, superior games and broadcasts, etc.

Second, APs' proposed language that "[u]nder the Sherman Act, a practice that restrains trade cannot be justified by showing that it serves some other social goal" and instructing the jury that they "should not consider whether the restraint serves any other social goals" is flatly wrong and likely to mislead the jury.  Many restraints serve both social and economic ends, and so it is not correct that simply because an alleged restraint serves a social goal that it cannot also be procompetitive.  For example, in *United States v. Brown Univ.*, 5 F.3d 658 (3d Cir. 1993), the Third Circuit found certain "social" justifications relevant to a rule of reason analysis, in part because they could be cast in competitive terms.  In *Brown*, the defendant universities maintained that agreements on financial aid, although potentially restraining trade, were designed to enable the universities to make more money available for needy students by eliminating a bidding war for the top students.  The district court rejected the universities' justification as the sort of noneconomic social justification that cannot be considered in the rule of reason context.  The Court of Appeals disagreed, concluding that collegiate financial aid rules have procompetitive effects if they "improved the quality of the educational program" (by providing socioeconomic diversity on campus) or  made "education more accessible to a greater number of students."  *Id*. at

674-75.  Similarly, in *Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010), the Supreme Court recognized "'that the interest in maintaining a competitive balance'" among "'athletic teams is legitimate and important.'"  *Id.* at 204 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 117 (1984)).  And, in *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338 (5th Cir. 1988), the court recognized the integration of athletics and academics constituted a procompetitive goal.  *Id.* at 1345; *see also* 11 P. Areeda & H. Hovenkamp, Antitrust Law § 1901(a), at 225.  In each of these cases, the procompetitive justifications—which are the same justifications alleged here—were found to be legitimate considerations because they achieved both competitive benefit and social benefit.  Far from these social benefits being irrelevant, the antitrust laws were designed to promote unfettered competition while at the same time preserving the value of democratic political and social institutions.  *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958) ("The Sherman Act . . . rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conductive to the preservation of our democratic political and social institutions.").  In sum, the proposed instruction would mislead the jury and constitute reversible error, by instructing the jury to not consider any procompetitive benefit that serves both social and economic ends.

Third, as with Instruction Nos. 2 and 31, APs' proposed instruction wrongly suggests that if the NCAA fails to show that the challenged restraint produces legitimate procompetitive effects, the restraint is unreasonable.  See NCAA's argument in Instruction Nos. 2 and 31, *supra*.

Fourth, as with Instruction Nos. 2 and 31, APs' proposed instruction provides that the anticompetitive harms need only outweigh, as opposed to "substantially" outweigh, the procompetitive effects for the challenged restraint to be unreasonable.  *See* ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 edition), Sherman Act – General, Instruction No. 3D, at p. A-12 ("If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable."); NCAA's argument in Instruction Nos. 2 and 31, *supra*.

Fifth, APs' proposed instruction incorrectly states the law with respect to less restrictive alternatives.  Any instruction concerning less restrictive alternatives must make clear that, to be considered, the alternative must be "virtually as effective in serving the legitimate objective without significantly increased cost."  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001).  Moreover, the existence of a less restrictive alternative is "a factor in determining the reasonableness of an ancillary restraint," *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1396 (9th Cir. 1984), and there is no legal support for APs' position that if the Jury finds a less restrictive alternative it should enter judgment in favor of APs and need not proceed to balance the reasonableness of the restraint, considering the anticompetitive and legitimate procompetitive effects.

The NCAA's proposed Instruction, on the other hand, closely tracks the ABA Model Instruction.  The only substantive change to the Model Instruction is to clarify the sentence of less restrictive alternatives to more accurately reflect the law.  *See Anderson v. Am. Auto. Ass'n*, 454 F.2d 1240, 1246 (9th Cir. 1972) ("'To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties, and that it is limited to what is fairly necessary, in the circumstances of the particular case . . . .'") (quoting *Dr. Miles Medical Co. v. Park & Sons Co.*,

220 U.S. 373, 406 (1911)); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975) ("In its descriptions of the rule of reason inquiry, the Supreme Court has never indicated that, regardless of the other circumstances present, the availability of an alternative means of achieving the asserted business purpose renders the existing arrangement unlawful if that alternative would be less restrictive of competition no matter to how small a degree."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 303 (2d Cir. 1979) ("We agree with the Third Circuit that a better charge would be to require that the restraints . . . not exceed the limits reasonably necessary to meet the competitive problems.") (citation and internal quotation marks omitted); *NFL v. N. Am. Soccer League*, 459 U.S. 1074, 1079-80 (1982) (Rehnquist, J., dissenting from denial of certiorari) ("The Court of Appeals has taken this statement too far by adopting the least restrictive alternative analysis that is sometimes used in constitutional law. The antitrust laws impose a standard of reasonableness, not a standard of absolute necessity. The Court of Appeals ignored its own holding that the proper standard is that the constraint be reasonably necessary.") (citations and internal quotation marks omitted). Indeed, courts have found that, where a restraint is reasonably necessary to produce a unique product, the court need not consider less restrictive alternatives. *Texaco Inc. v. Dagher,* 547 U.S. 1, 7 (2006) (the less restrictive alternative framework does not apply "where the business practice being challenged involves the core activity of the joint venture itself"); *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful . . . where the agreement . . . is necessary to market the product at all.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION NO. 35:**

**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**AMATEURISM**

In deciding whether the NCAA has engaged in an unreasonable restraint of trade, you may consider that the NCAA needs ample latitude to maintain the revered tradition of amateurism in college sports. The preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act.

**Source:** *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 120 (1984) ("The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act." ); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 342-44 (7th Cir. 2012) ("[T]he NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable."); *Law v. NCAA*, 134 F.3d 1010, 1018 n.14 (10th Cir. 1998) (recognizing that "amateurism that serves as the hallmark of NCAA competition" and "the horizontal restraints necessary for the product to exist include rules such as those forbidding payments to athletes and those requiring that athletes attend class, etc."); *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1344-45 (5th Cir. 1988) ("The NCAA markets college football as a product distinct from professional football. The eligibility rules create the product and allow its survival in the face of commercializing pressures."); *Intercollegiate Basketball Ass'n v. NCAA*, 339 F. Supp. 2d 545, 550 (S.D.N.Y. 2004) ("As the Supreme Court noted in *Board of Regents*, college athletics is a unique product, whose amateur rules distinguish it from professional sports and widen consumer choice.").

## NCAA's Argument For:

The Jury will be asked to decide whether NCAA's "amateurism" rules—including the rules allegedly preventing student-athletes from profiting from their NILs—are unreasonable.

This instruction provides the legal context for the jury to assess the NCAA's principle of amateurism. The instruction tracks the Supreme Court's holding that "[t]he NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 120 (1984). Similarly, Courts of Appeal have cited *Board of Regents* in giving great deference to the NCAA's development and enforcement of its amateurism and eligibility rules in the antitrust context. *See Law v. NCAA*, 134 F.3d 1010, 1018, 1021 n.14 (10th Cir. 1998) ("amateurism [] serves as the hallmark of NCAA competition" and "the horizontal restraints necessary for the product to exist include rules such as those forbidding payments to athletes and those requiring that athletes attend class, etc."); *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1344-45 (5th Cir. 1988) ("The NCAA markets college football as a product

distinct from professional football. The eligibility rules create the product and allow its survival in the face of commercializing pressures.").

**Antitrust Plaintiffs' Argument Against:**

The instructions that should be given to a jury regarding the proper treatment of alleged pro-competitive defenses in rule of reason cases are covered by the ABA rule of reason instructions. The NCAA's proposal, which is not based on any jury instruction, is contrary to the ABA instructions.  It also flouts this Court's summary judgment ruling that the NCAA's amateurism defense is subject to the same rule of reason analysis as any other alleged pro-completive justification.  *NCAA II*, 2014 WL 1410451 at *3, n.4 and *12-*13; see also *NCAA I*, 2013 WL 5778233 at *4-*6.

**JURY INSTRUCTION NO. 36:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**UNREASONABLE RESTRAINT – PRETEXTUAL REASONS**

If you find that any of the justifications asserted by the NCAA for the challenged restraint was pretextual or a camouflage for conduct which was otherwise anticompetitive, you may infer that the NCAA acted with anticompetitive intent and consider this intent as a factor in deciding whether the restraint is unreasonable.

**Source**:  *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 297 n. 7 (1985); *Board of Trade of City of Chicago v. U.S.*, 246 U.S. 231, 244 (1918); *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 n. 10 (10th Cir. 2006).

**Antitrust Plaintiffs' Arguments For:**

In *Northwest Wholesale Stationers* the Supreme Court states that where a defendant's justification for an anticompetitive restraint is pretextual because the anticompetitive conduct was not "substantially related to the efficiency-enhancing or procompetitive purposes that otherwise justify the cooperative's practices" an "inference of anticompetitive animus might be appropriate…." 472 U.S. at 297, n. 7.  That inference "is appropriately evaluated under the rule-of-reason analysis." *Id.*  This instruction uses the word "intent" rather than animus because some jurors may not know what "animus" means.  The instruction should be given because it is supported by Supreme Court precedent and there is no Ninth Circuit or ABA model instruction addressing the issue.

**NCAA's Arguments Against:**

The NCAA objects to Instruction No. 36, which is misleading, inaccurate, and incomplete. The cases on which APs' rely do not support the Instruction.  *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231 (1918), for example, says nothing about pretext and instead explains that, under the antitrust laws, the "true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."  *Id.* at 238.  This test is strikingly similar to the considerations that NCAA proposes in the following instruction No. 37 ("Balancing of Competitive Effects") that in applying the rule of reason the jury may consider the nature, history, or effect of the restraint.  Similarly, the other two cases—*Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 296 n.7 (1985) and *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 n.10 (10th Cir. 2006)—do not stand for the proposition for which they are cited, namely that if the jury finds a procompetitive justification is pretextual the jury can then infer anticompetitive intent.

1

2

In sum, this Instruction is not supported by case law and, in fact, to the extent APs seek to instruct the jury on the factors they may consider in applying the rule of reason, the factors set forth in NCAA's proposed Instruction No. 37 are supported by the case law APs cite here.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION NO. 37:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**BALANCING OF COMPETITIVE EFFECTS**

If you find that the restraint produces significant anticompetitive effects and legitimate procompetitive effects in the same market, and that these procompetitive effects could not be achieved in a substantially less restrictive manner, you must weigh the anticompetitive and procompetitive effects to determine if the restraint is reasonable on balance. If the Plaintiffs prove that the anticompetitive effects outweigh the procompetitive effects, the challenged restraint is unreasonable. If the Plaintiffs prove that any procompetitive effects offered by the NCAA could be achieved in a manner substantially less restrictive of competition you should not consider such procompetitive effects in deciding whether the restraint is reasonable.

**Source**:  Model Jury Instructions in Civil Antitrust Cases Rule of Reason Instruction 3D at p. A-12 (2005) (modified).

**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**BALANCING OF COMPETITIVE EFFECTS**

If you find that the challenged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.  If the competitive harm substantially outweigh the competitive benefits, then the challenged restraint is unreasonable.  If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable.  In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors.

In determining whether or not a particular restraint is reasonable or unreasonable, you may consider the following factors:

(a) the nature of the industry involved;

(b) any facts that are peculiar to the particular industry involved;

(c)  the nature of the alleged agreement and restraint, and its actual and probable effect;

(d) the history of the alleged restraint; and

(e) the reasons for adopting the particular practice which is alleged to be a restraint.

In considering these factors, you may also consider whether institutions of higher education require that a particular practice, which could be unreasonable in another context, be treated differently because enhancing the quality of our educational system redounds to the general good and should be extended to as wide a range of individuals from

**as broad a range of socio-economic backgrounds as possible.  You also may consider whether the alleged restraint was intended to obtain an economic profit in the form of greater revenue for the participating schools or to benefit talented but needy prospective students who otherwise would have fewer choices in educational or athletic opportunities.**

**Source**:  Model Jury Instructions in Civil Antitrust Cases Rule of Reason Instruction 3D at p. A-12 (2005) (modifications in bold); Federal Jury Practice And Instructions § 150.21; *United States v. Brown Univ.*, 5 F.3d 658, 678 (3d Cir. 1993) ("In the case sub judice, the quest for economic self-interest is professed to be absent, as it is alleged that the Overlap agreement was intended, not to obtain an economic profit in the form of greater revenue for the participating schools, but rather to benefit talented but needy prospective students who otherwise could not attend the school of their choice. . . . It may be that institutions of higher education require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. . . . There is no doubt, too, that enhancing the quality of our educational system redounds to the general good . . . that should be extended to as wide a range of individuals from as broad a range of socio-economic backgrounds as possible. It is with this in mind that the Overlap Agreement should be submitted to the rule of reason scrutiny under the Sherman Act." (quotations omitted)).


**Antitrust Plaintiffs' Arguments:**

Plaintiffs revised the ABA model instruction to conform with Ninth Circuit case law governing rule of reason cases. Significantly, Ninth Circuit law differs from the ABA model in that the former requires only that anticompetitive effects outweigh the procompetitive effects (See *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001); *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1318-19 (9th Cir. 1996); and *Bhan v. NME Hosps., Inc*., 929 F.2d 1404, 1410 n. 4 (9th Cir. 1991)), while the ABA instruction requires that "competitive harm substantially outweighs the competitive benefits." Plaintiffs also added language instructing the jury to only consider procompetitive effects that Plaintiff has failed to prove could  be achieved in a substantially less restrictive manner in deciding whether the restraint is unreasonable because the ABA instruction does tell the jury how to deal with multiple alleged justifications.

The language that Defendant seeks to add should be rejected because it does not belong in the balancing instruction and is based on Third Circuit case that was soundly distinguished by this Court in its summary judgment order  *NCAA II*, 2014 WL 1410451 at *15 ("Unlike the colleges in *Brown University*, the NCAA has not explained how the challenged restraint in this case— which limits, rather than increases, the financial benefits provided to college students—would enhance consumer choice in the markets Plaintiffs have identified.")  The five factors that the NCAA seeks to add are factors to be considered under the ABA model instruction for Competitive Harm (Instruction No. 34), where they are already included; they are not factors for the jury to again consider in deciding whether competitive harm outweighs procompetitive benefits.

**NCAA's Arguments:**

The NCAA opposes APs' Instruction No. 37 for the same reasons set forth in Instruction

Nos. 2 and 31.  Specifically the instruction:

(1) incorrectly charges the jury that they may not consider procompetitive effects in related markets, *see Sullivan v. NFL*, 34 F.3d 1091, 1111-13 (1st Cir. 1994) (holding trial court erred in instructing the jury to "balance the injury to competition in the relevant market with the benefits to competition in that same relevant market.");

(2) wrongly suggests that if the NCAA fails to show that the challenged restraint produces legitimate procompetitive effects, the restraint is unreasonable;

(3) provides that the anticompetitive harms need only outweigh, as opposed to "substantially" outweigh, the procompetitive effects for the challenged restraint to be unreasonable, *see* ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 edition), Sherman Act – General, Instruction 3D, at p. A-12 ("If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable."); and

(4) incorrectly states the law with respect to less restrictive alternatives.  Any instruction concerning less restrictive alternatives must make clear that, to be considered, the alternative must be "virtually as effective in serving the legitimate objective without significantly increased cost." *Cnty. of Tuolumne v. Sonora Cmty. Hosp*., 236 F.3d 1148, 1159 (9th Cir. 2001).  Moreover, the existence of a less restrictive alternative is "a factor in determining the reasonableness of an ancillary restraint," *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1396 (9th Cir. 1984), and there is no legal support for APs' position that if the Jury finds a less restrictive alternative it should enter judgment in favor of APs and need not proceed to balance the reasonableness of the restraint, considering the anticompetitive and legitimate procompetitive effects.

The NCAA's proposed Instruction, on the other hand, tracks the ABA Model Antitrust Instruction with a single addition.  In order to provide simple and neutral guidance to the Jury in determining the reasonableness of the alleged reatraint, the NCAA proposes a list of factors to consider from Federal Jury Practice And Instructions § 150.21.  These five factors find abundant support in case law.  *See Leegin Creative Leather Products, Inc. v. PSKS, Inc*., 551 U.S. 877, 885, (2007) ("Appropriate factors to take into account include specific information about the relevant business and the restraint's history, nature, and effect.") (internal quotation marks omitted); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (under rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect"); *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918).

The final paragraph of the NCAA's proposed Instruction derives from *United States v. Brown Univ.*, 5 F.3d 658 (3d Cir. 1993), which explained that universities may be given greater latitude that other businesses under the Sherman Act because "enhancing the quality of our educational system redounds to the general good . . . that should be extended to as wide a range of individuals from as broad a range of socio-economic backgrounds as possible."  *Id*. at 678.

**JURY INSTRUCTION NO. 38:**

**[DISPUTED, PLAINTIFFS' INSTRUCTION]**

**INTERSTATE COMMERCE**

The Sherman Act applies only to conduct or restraints that affect interstate commerce.  In this case, Plaintiffs contend that the NCAA's conduct affects interstate commerce.  Interstate commerce refers to transactions in goods or services between one or more persons in one state and one or more persons in another state.

To affect interstate commerce, it is not necessary that the NCAA's conduct itself occurs in multiple states or directly affect transactions that span across multiple states.  It is enough if some activities of the NCAA that were affected by the conduct had some effect on interstate commerce.

**Source:**  Model Jury Instructions in Civil Antitrust Cases Interstate Commerce Instruction 4 at p. A-13 (2005).

**[DISPUTED, NCAA'S INSTRUCTION]**

**INTERSTATE COMMERCE**

The third requirement of an antitrust violation is that the alleged restraint affects interstate commerce in a substantial way.  The Sherman Act applies only to restraints of trade relating to business and commercial activities.  Business and commercial activities are those that involve the sale of goods and services.  The Sherman Act does not apply to  practices that are intended to serve non-commercial goals.

If you find that Plaintiffs have established by a preponderance of the evidence that the alleged conspiracy relates to business and commercial activities, then you must proceed to apply the remainder of these Instructions.  If you find that Plaintiffs have failed to carry their burden to show the alleged conspiracy relates to business and commercial activities, for example, if you conclude that the challenged rules have purely or primarily noncommercial objectives, you must find that the NCAA has not engaged in an unreasonable restraint of trade.

**Source:** Model Jury Instructions in Civil Antitrust Cases Interstate Commerce Instruction 4 at p. A-13 (2005) (adapted); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 492-93 (1940) (Sherman Act limited to commercial and business activities); *Smith v. Nat'l Collegiate Athletic Ass'n*, 139 F.3d 180, 184-85 (Sherman Act does not apply to NCAA eligibility rules because they are not commercial and business activities), *vacated on other grounds by* 525 U.S. 459 (1999); *Gaines v. Nat'l Collegiate Athletic Ass'n*, 746 F. Supp. 738, 744-46 (M.D. Tenn. 1990) (Sherman Act does not apply to NCAA eligibility rules); *Jones v. Nat'l Collegiate Athletic Ass'n*, 392 F. Supp. 295, 303 (D. Mass. 1975) (same).

**Antitrust Plaintiffs' Arguments:**

Plaintiff's' version of this instruction adopts the language of the ABA model instruction governing the interstate commerce requirement.  The NCAA seeks to change the ABA model instruction to require that the restraint affect interstate commerce "in a substantial way" which is contrary to settled law that even a slight impact on interstate commerce is sufficient.   The NCAA also improperly includes argument that its conduct does not involve business or commercial activity.  That argument does not belong in this instruction and  is not supported by any ABA or Ninth Circuit model instruction or case law

The NCAA is attempting to have the jury decide a legal issue that has already been consistently decided against the NCAA by the Supreme Court and the other courts that have addressed it. See   *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 98-100 (1984) (Sherman Act applies to the NCAA restraint on broadcasts);  *U.S. v. Brown Univ.*, 5 F.3d 658, 667 (3d Cir.1993) (citing Board of Regents, 468 U.S. at 100 n. 22, 104 S.Ct. 2948) (holding that "payment of tuition in return for educational services constitutes commerce"); *Metro. Intercollegiate Basketball Ass'n v. NCAA*, 339 F.Supp.2d 545, 550–52 (S.D.N.Y.2004) (rules that affected Division I men's college basketball post-season tournaments*); Law v. NCAA*, 902 F. Supp. 1394, 1410 (D.Kan.1995) (rule that limited the maximum compensation Division I members paid to one category of basketball coaches).  The older district court cases Defendant cites are of dubious validity and involved non-monetary eligibility rules which the courts distinguished from restraints like the one in this case that address compensation.

**NCAA's Arguments:**

The NCAA's proposed instruction best captures the state of the law, which requires "a 'substantial' volume of interstate commerce" is involved in the transaction to constitute a restraint of trade.  *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 244 (1980) (citation omitted); *see also id*. at 242 ("To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. . . . Although the cases demonstrate the breadth of Sherman Act prohibitions, jurisdiction may not be invoked under that statute unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce."); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 495-97 (1940) ("[T]his Court has never applied the Sherman Act in any case . . . unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of goods or services  and finally this Court has refused to apply the Sherman Act in cases like the present in which local strikes conducted by illegal means in a production industry prevented interstate shipment of substantial amounts of the product but in which it was not shown that the restrictions on shipments had operated to restrain commercial competition in some substantial way.").

In addition, the language proposed by the NCAA makes clear that the alleged restraint must be related to the commercial or business activities.  Applying this requirement, a series of courts have found that the NCAA's eligibility rules are not subject to antitrust analysis because they are not designed to generate profits in a commercial activity but to preserve amateurism by assuring that the recruitment of student-athletes does not become a commercial activity.  *See Smith v. Nat'l Collegiate Athletic Ass'n*, 139 F.3d 180, 185-86 (3d Cir. 1998) (finding the

Sherman Act does not apply to the NCAA's promulgation of eligibility requirements because the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics and are not related to the NCAA's commercial or business activities) *vacated*, 525 U.S. 459 (1999); *Gaines v. Nat'l Collegiate Athletic Ass'n*, 746 F. Supp. 738, 743-44 (M.D. Tenn. 1990) (noting "there is a clear difference between the NCAA's efforts to restrict the televising of college football games," which does not concern students and is purely commercial in nature, "and the NCAA's efforts to maintain a discernible line between amateurism and professionalism and protect the amateur objectives of NCAA college football by enforcing the eligibility Rules"); *Bd. of Regents,* 468 U.S. at 117 ("The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, *the eligibility of participants,* or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.") (emphasis added); *Jones v. NCAA,* 392 F. Supp. 295, 303-04 (D. Mass. 1975) (upholding eligibility rules precluding student-athlete compensation under the antitrust laws and reasoning that the plaintiff had "not shown how the action of the N.C.A.A. in setting eligibility guidelines ha[d] any nexus to commercial or business activities in which the defendant might engage, and that the "N.C.A.A. eligibility rules were not designed to coerce students into staying away from intercollegiate athletics, but to implement the N.C.A.A. basic principles of amateurism."); *Justice v. NCAA,* 577 F. Supp. 356, 383 (D. Ariz. 1983) (court pointed out that the NCAA now engages in two types of rule-making—"[o]ne type, exemplified by the rules in *Hennessey* [rule limiting number of assistant coaches employable at any one time by certain member institutions] and *Jones* [eligibility rule], is rooted in the NCAA's concern for the protection of amateurism; the other type is increasingly accompanied by a discernible economic purpose [citing *Board of Regents* ]."—and the court upheld the rules at issue (NCAA sanctions rendering the University of Arizona football team ineligible to participate in postseason competition as being of the former type).

**JURY INSTRUCTION NO. 39:**

**[PARTIALLY DISPUTED] INJURY AND CAUSATION**

[APs' proposed language:  If you find that the NCAA has violated Section 1 of the Sherman Act as alleged by Plaintiffs, then you must decide if the individual Plaintiffs are entitled to recover damages from the NCAA.

Plaintiffs are entitled to recover damages if they can establish three elements of injury and causation:]

[NCAA's proposed language:  The fourth element of an antitrust violation that the Plaintiffs must prove is whether Plaintiffs have proven a competitive injury to them caused by the alleged restraint.

To establish injury and causation, the Plaintiffs must prove the following three elements:]

**First**, that the plaintiff was in fact injured as a result of the defendant's alleged violation of the antitrust laws;

**Second**, that the defendant's alleged illegal conduct was a material cause of Plaintiffs' injuries; and

**Third**, that Plaintiffs' injuries are injuries of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage".  For Plaintiffs to establish that they are entitled to recover damages, they must prove that they were injured as a result of the alleged violation of the antitrust laws.   Proving the fact of damage does not require Plaintiffs to prove the dollar value of its injury.  It requires only that they prove that they were in fact injured by the alleged antitrust violation.  If you find that Plaintiffs have established that they were in fact injured, you may then consider the amount of their damages.  It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Plaintiffs have established that they were in fact injured.

**As to the second element,** Plaintiffs must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that the alleged illegal conduct was a material cause of their injury. This means that Plaintiffs must prove that some damage occurred to them as a result of the alleged antitrust violation, and not some other cause.  Plaintiffs are not required to prove that the alleged antitrust violation was the sole cause of its injury; nor do Plaintiffs need eliminate all other possible causes of injury. It is enough if Plaintiffs have proved that the alleged antitrust violation was a material cause of its injury.  However, if you find that Plaintiffs' injury was caused primarily by something other than the alleged antitrust violation, then you must find that Plaintiffs have failed to prove that they are entitled to recover damages from defendant.

**To prove the final element,** Plaintiffs must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury."

If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Plaintiffs' injuries are antitrust injuries. On the other hand, if Plaintiffs' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Plaintiffs' injuries are not antitrust injuries and Plaintiffs may not recover damages for those injuries under the antitrust laws.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit—and the antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

However, if Plaintiffs can establish that they were in fact injured by **the alleged conspiracy, that the allegedly illegal conduct** was a material cause of Plaintiffs' injuries, and that their injury was the type that the antitrust laws were intended to prevent, then Plaintiffs are entitled to recover damages for the injury to their business or property.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases Causation and Damages Instruction 1 at F-2 to F-4 (2005) (modifications in bold); Clayton Act, § 4, 15 U.S.C. § 15.

### Antitrust Plaintiffs' Arguments (Blue):

The language that the NCAA disputes comes directly from the ABA model Causation and Damages Instruction 1. The NCAA cites no authority to support its assertion that this language should not be included. The NCAA is also unable to cite any authority supporting its claim that the additional language the NCAA proposes should be included. The NCAA has argued that the model instruction needs to be modified because Plaintiffs were seeking injunctive relief in addition to damages. The NCAA is wrong because the standard for showing antitrust injury is the same for both damages and injunction and injunctive relief will be awarded by the Court, not the jury. The NCAA's proposed language is also duplicative and unnecessary as the issues of antitrust injury and causation are already covered in the ABA model instruction.

### NCAA's Arguments (Yellow):

The NCAA's and AP's proposed language differ in a slight but critical way: APs' instruction suggests that injury should be considered in the context of damages whereas the NCAA's instruction provides that injury is a distinct element of antitrust liability. This distinction is highly important in this case where there is an injunctive class but no damages class because injury—which is an element of liability—can be proven on a classwide basis whereas damages must be determined individually. *See, e.g.*, *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981) (for antitrust liability, "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent"); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008) (class action can be limited to liability, leaving the amount of damages for later individual determination, but

1  "establishing liability ... still requires showing that class members were injured at the consumer
2  level.").

**JURY INSTRUCTION NO. 40:**

**[DISPUTED, NCAA'S PROPOSED INSTRUCTION]**

**ANTITRUST STANDING**

In order to recover damages, each Plaintiff must also demonstrate the following elements of "standing":

<u>First</u>, that he was prepared, during the time period relevant to his claim, to enter into the business of selling or licensing his name, image or likeness in broadcasts or rebroadcasts of the college football or basketball games in which he appeared, or in videogames; and

<u>Second</u>, that during the time period relevant to this case, he had a genuine intention to enter into the business of selling or licensing his name, image or likeness.

When considering whether each of these Plaintiffs was prepared, and had a genuine intention, to enter into the business of selling or licensing the use of his name, image or likeness in broadcasts or rebroadcasts of college football or basketball games in which he appeared, or in videogames, you should consider the following:

(a)  Whether the plaintiff has provided evidence that he lived in a state that requires broadcasters to acquire licenses from athletes who may appear in game rebroadcasts;

(b) Whether the plaintiff has provided evidence that he lived in a state that requires videogame makers to acquire licenses from athletes who may appear in videogames, to the extent the plaintiff has proved that he did so;

(c) Whether the plaintiff had any background or experience in selling or licensing his name, image or likeness rights;

(d) Whether the plaintiff took any affirmative action to sell or license, or attempt to sell or license, his name, image or likeness rights;

(e) The ability of the plaintiff to engage in the business of selling or licensing his name, image or likeness rights; and

(f) The consummation of any contracts by the plaintiff related to the sale or licensing of his name, image or likeness rights.

You must consider these factors separately for each Plaintiff.  If, after considering the above factors, you find that a Plaintiff has failed to demonstrate that he took substantial and demonstrable steps to enter the business of selling or licensing his name, image or likeness rights, you must find against that Plaintiff, and in favor of the NCAA, on this element.

**Source:** *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445 (9th Cir. 1985); *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460 (9th Cir. 1993); *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003); Clayton Act, § 4, 15 U.S.C. § 15.

**NCAA's Argument For:**

The NCAA's proposed instruction sets forth the appropriate standard for proving the antitrust injury necessary to confer standing.  *See Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 712 (9th Cir. 2003)  ("Standing to bring an antitrust action is a requirement because antitrust injury is a necessary element of an antitrust suit.").

Section 4 of the Clayton Act allows recovery of treble damages by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a).  Courts have limited the ability of injured parties to recover under the Clayton Act through the creation of restrictions on standing.  This doctrine of antitrust standing requires an inquiry beyond that performed to determine standing in a constitutional sense.  "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."  *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 537 n.31 (1983).  To separate those who have suffered antitrust injury from those who have not, courts consider "(1) the plaintiff's background and experience in the prospective business, (2) [a]ffirmative action on the part of [the] plaintiff to engage in the proposed business, (3) the plaintiff's ability to finance entry, and (4) consummation of contracts." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1465 (9th Cir. 1993) (quotations omitted).  The proposed instruction tracks this law on the required elements for antitrust injury and standing.  Because damages may not be awarded absent proof of an antitrust injury and standing, 15 U.S.C. § 15(a), the Court had a duty to charge the jury on that issue.  *See Gauthier v. AMF, Inc.*, 788 F.2d 634, 636 (9th Cir. 1986) (holding that "since the legal effect of adequate warnings was an important issue of law in this case, the court had a duty to charge the jury on that issue").

Although antitrust standing can be a legal issue for the Court, where there are underlying factual disputes, those disputed issues will presumably need to go to the Jury.

**Antitrust Plaintiffs' Argument Against:**

The NCAA is unable to cite any Ninth Circuit, ABA or any other  jury instruction on antitrust standing because antitrust standing is a legal issue properly decided by the Court not the jury.  *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 539 (9th Cir.1987) ("The issue of status as a proper party in an antitrust suit is a pure question of law."); *In re Air Passenger Computer Reservation Systems*, 727 F.Supp. 564, 567 (C.D. Cal. 1989) (rejecting argument that antitrust "standing is a factual issue for the jury, and should not be resolved by the Court."   This instruction also seeks to have the jury second guess this Court's ruling in this case that Plaintiffs have antitrust standing. See *O'Bannon v. National Collegiate Athletic Ass'n*,, No. 09-cv-3329-CW, 2010 WL 445190, at *7 (N.D.Cal. Feb. 8, 2010) ("O'Bannon has similarly established antitrust standing.").

# JURY INSTRUCTION NO. 41:

## [DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]

## DAMAGES

If you find that the NCAA violated the antitrust laws and that this violation caused injury to Plaintiffs, then you must determine the amount of damages for the individual Plaintiffs. The law provides that Plaintiffs should be fairly compensated for all damages to their business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful. The fact that I am giving you instruction concerning the issue of Plaintiffs' damages does not mean that I believe Plaintiffs should, or should not, prevail in the case. That is an issue for your sole determination. If, for any reason, you reach a verdict for the NCAA on liability, you should not consider the issue of damages and disregard the instructions I am about to give on damages.

The purpose of awarding damages in an antitrust action is to put an injured Plaintiff as near as possible in the position in which they would have been if the alleged antitrust violation had not occurred.

So long as there is a reasonable basis in the evidence for a damages award, Plaintiffs should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty. The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates.

Plaintiffs claim the following item of damages: underpayment for the use of their names, images and likenesses. Underpayment is the difference between the price that Plaintiffs were paid and the price that they would have been paid absent the unlawful conduct.

I instruct you not to consider whether these Plaintiffs received benefits that did not result from the allegedly illegal conduct in determining the amount of Plaintiffs' underpayment damages.

To compute the amount of the underpayment, Plaintiffs have proposed to show the compensation they would have received in the absence of the allegedly unlawful agreement by showing evidence of the compensation that would have occurred but for the alleged agreement from benchmarks based on compensation received by athletes in similar situations. If you find that these benchmarks provide a reliable guide to estimate what Plaintiffs' compensation would have been in the absence of the antitrust violation, then you may calculate Plaintiffs' damages by comparing (a) the compensation Plaintiffs actually received during the alleged damages period with (b) the compensation Plaintiffs would have received if the compensation had been those predicted by the statistical analysis. If you find, however, that compensation in the other sports leagues are not representative of what compensation would have been in the league in which the antitrust violation is alleged to have occurred and that what compensation would have been may only be calculated using speculation or guesswork, then you may not award damages based on the evidence of different compensation predicted by the benchmark analysis.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases Damages Instruction 1, 2, 3, & 5 at F-11, F-12, F-14, F-15, F-16 & F-22-F23 (2005) (modified); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986).

## JURY INSTRUCTION NO. 42:

### [DISPUTED, NCAA'S PROPOSED INSTRUCTION]

### DAMAGES

If you find that the NCAA violated the antitrust laws and that Plaintiffs were injured by that violation, Plaintiffs are entitled to recover for such injury that was the direct and proximate result of the unlawful acts of defendant. Plaintiffs are not entitled to recover for injury that resulted from other causes.

The fact that I am giving you instructions concerning the issue of Plaintiffs' damages does not mean that I believe Plaintiffs should, or should not, prevail in this case. That is an issue for your sole determination. If, for any reason, you reach a verdict for the NCAA on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instructions that I am about to give.

The purpose of awarding damages in an antitrust action is to put an injured plaintiff as near as possible to the position in which it would have been if the alleged antitrust violation had not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to provide a windfall (a greater award than necessary) to someone who has been the victim of an antitrust violation.

**A proper method of calculating those damages is to award each Plaintiff the difference between the profits the Plaintiff realized under the restraint and the profits the Plaintiff would have received but for the agreement to restrain trade.**

Plaintiffs claim that they suffered injury because they lost sales and profits as a result of the NCAA's antitrust violation. In the normal course of competitive business activity, competitors will lose sales to each other, and to third parties, for various causes that have nothing to do with antitrust law violations; and businesses can be unprofitable for causes that have nothing to do with the antitrust laws. Plaintiffs may not recover for lost sales if they lost those sales because of the superior business acumen or salesmanship of a competitor, because a competitor offered a superior product, or because of lawful competition from the NCAA or other competitors. Plaintiffs also may not recover if they lost profits as a result of causes that had nothing to do with the NCAA's alleged unlawful conduct, such as changes in demand, increased competition from new competitors, changes in product technology, changes in market conditions, poor management or missed opportunities by Plaintiffs, or other factors.

**Each** Plaintiff bears the burden of showing that his injuries were caused by the NCAA's alleged antitrust violation—as opposed to any other factors, such as those that I just described to you. If you find that a Plaintiff's alleged injuries were caused by factors other than the NCAA's

alleged antitrust violation, then you must return a verdict for the NCAA **as to that Plaintiff**.  If you find that a Plaintiff's alleged injuries were caused in part by the NCAA's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of the Plaintiff's alleged injuries that were caused by the NCAA's alleged antitrust violation.  Plaintiffs bear the burden of proving damages with reasonable certainty, including apportioning damages between lawful and unlawful causes. If you find that there is no reasonable basis to apportion a Plaintiff's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.  If you find that a Plaintiff has proven with reasonable certainty the amount of damage caused by the NCAA's alleged antitrust violation, then you must return a verdict for that Plaintiff.

Plaintiffs have proposed to calculate the net profits they would have earned if there had been no antitrust violation by showing evidence of other businesses that were not affected by the antitrust violation**, specifically, the National Football League, the National Basketball Association, and other professional sports leagues**.  If you find that the other businesses whose performance is compared to Plaintiffs' business are a reliable guide to estimate what Plaintiffs' actual net profits would have been in the absence of the antitrust violation, then you may calculate **each** Plaintiff's lost profits by comparing (a) the actual profit performance of Plaintiff with (b) the profit performance of the comparable businesses.  You may find, however, that the businesses proposed by Plaintiffs as a yardstick for its performance are not representative of what Plaintiffs' profits would have been in the absence of the antitrust violation, such as if Plaintiffs' profits were impacted by different economic conditions, mismanagement, different levels of competition, or other factors.  The two businesses do not have to be identical; they need only be sufficiently similar that conclusions may be drawn within the bounds of reasonableness.  However, if you find that the businesses proposed by Plaintiffs as a yardstick for its performance are not representative of what Plaintiffs' profits would have been, and that Plaintiffs' lost profits may only be calculated using speculation or guesswork, you may not award damages for lost profits based on this yardstick measure.

**Source**:  ABA Model Jury Instructions in Civil Antitrust Cases, Damages, Instruction 4, at F-18 to F-20; Damages, Instruction 8, at F-14, F-27 to F-30 (2005) (modifications in bold)

**Antitrust Plaintiffs' Argument:**

Plaintiffs do not seek lost profit damages. Lost profits refers to losses by a business with overhead, costs and prospective revenue; it does not include failure to compensate individual plaintiffs. The damages incurred by Plaintiffs are the underpayment of compensation to them resulting from the conspiracy to fix their compensation for the use of the rights to their names, likenesses and images at zero.  Plaintiffs have therefore modified the ABA model instruction to conform with the damages actually sought in this case.  The language instructing the jury not to consider benefits to Plaintiffs that did not result from the allegedly illegal conduct in determining the amount of damages should also be included to prevent the jury from applying an improper offset – such as deducting the value of scholarships from Plaintiffs' damages. *See LAM CC*, 791 F.2d at 1370 (Defendants are only entitled to offsets for damages in the amount equal to "benefits that would not have been received by the plaintiff had there been no violation, or amounts which represent a recovery beyond the scope of the adjudicated antitrust liability."); *Texas v. Penguin Group (USA) Inc*. (*In re Elec. Books Antitrust Litig*.), No. 11 MD 2293 (DLC), 2014 WL

1282298, at *15 (S.D.N.Y. Mar. 28, 2014) ("E-Books") (granting motion to exclude offsets to damages). As the court explained in *E-Books*, a defendant "may not seek to reduce that amount of damages by resort to phenomena outside those transactions or by speculation over how the world may have been different if it had not chosen to engage in a scheme to fix . . . prices.").

**NCAA's Argument:**

The NCAA's proposed damages instruction more closely tracks the ABA Model Instructions. In particular, the NCAA takes issue with two aspects of the APs' instruction.

<u>First</u>, the damages measure here is best categorized as "lost profits" as opposed to "underpayment." It is unclear what APs mean by "underpayment" and if underpayment is a valid economic loss under the antitrust laws. *See, e.g., Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1125 (10th Cir. 2005) (rejecting antitrust claim based on "underpayment of royalties" as a result of the 39% fee charged by Appellees to process gas because plaintiff could not show an adverse effect on competition or consumers). Plaintiffs cite not case approving of "underpayment" as a measure of antitrust damages, much less as an appropriate jury instruction.

<u>Second</u>, APs' proposed instruction in the second to last paragraph that "I instruct you not to consider whether these Plaintiffs benefited by the allegedly illegal conduct in determining the amount of Plaintiffs' underpayment damages" is misleading and inaccurately states the law. If the Plaintiffs did indeed benefit from the alleged restraints then that should be taken into account in putting them into the same position they would have been but for the alleged antitrust violation. The cases Plaintiffs cite stand at most for the proposition that offsets cannot be based on "speculation speculation over how the world may have been different." They do not stand for the proposition that benefits Plaintiffs receive as a direct result of the challenged restraint are irrelevant to damages.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION NO. 43:**

**[JOINT] DAMAGES – STATUTE OF LIMITATIONS**

   **Although Plaintiffs may present evidence about events that happened earlier**, the antitrust laws do not permit recovery of damages for any injuries sustained by Plaintiffs before July 21, 2005, **which is more than four years prior to the filing of the Complaint in this action.** If you find that a Plaintiff suffered injuries spanning both before and after July 21, 2005 then you must apportion the damages between the two periods and you may award damages only for the portion of the injuries suffered after July 21, 2005.  If you find that you cannot apportion the damages between the two periods, or that such apportionment can only be accomplished through guesswork or speculation, then you may not award damages at all.

   **In order to recover damages, Plaintiffs must show by a preponderance of the evidence that the NCAA or any co-conspirators that you have found to have participated in the alleged conspiracy engaged in a continuing violation of the antitrust laws after July 21, 2005 by committing at least one new and independent act in furtherance of the unlawful conduct that caused new and accumulating injury to Plaintiffs.**

**Source**:   ABA Model Jury Instructions in Civil Antitrust Cases, Certain Defenses and Exemptions, Instruction 1 at G-2 (2005) (modifications in bold); *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, No. 12-15185,  ___ F.3d___, 2014 WL 1328318, *3 (9th  Cir. April 4, 2014); In re *NCAA Student-Athlete Name & Likeness Litig.*, No. C 09-1967 CW. 2014 WL 1410451, at *6 (N.D. Cal. April 11, 2014).

**JURY INSTRUCTION NO. 44:**

**[JOINT] DAMAGES – SPECULATION NOT PERMITTED**

Damages may not be based on guesswork or speculation.  If you find that a damages calculation cannot be based on evidence and reasonable inferences, and instead can only be reached through guesswork or speculation, then you may not award damages.  If the amount of damages attributable to an antitrust violation cannot be separated from the amount of harm caused by factors other than the antitrust violation except through guesswork or speculation, then you may not award damages.  You are permitted to make reasonable estimates in calculating damages.  It may be difficult for you to determine the precise amount of damage suffered by the Plaintiff.  If Plaintiffs establish with reasonable probability the existence of an injury proximately caused by **what Plaintiffs contend was the NCAA's** antitrust violation, you are permitted to make a just and reasonable estimate of the damages.  So long as there is a reasonable basis in the evidence for a damages award, a Plaintiff should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.  The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates.

Plaintiffs must prove **by a preponderance of the evidence** the reasonableness of each of the assumptions upon which the damages calculation is based.  If you find that Plaintiffs have failed to carry their burden of providing a reasonable basis for determining damages, then your verdict must be for the NCAA.  If you find that Plaintiffs have provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases, Damages, Instruction 3, at F-15-16 (2005) (modifications in bold)

**JURY INSTRUCTION NO. 45:**

**[JOINT] DAMAGES – MULTIPLE PLAINTIFFS**

In awarding damages, if any, you will be asked what sum of money would fairly and reasonably compensate each Plaintiff for any injury sustained by that Plaintiff. Once a particular Plaintiff establishes that he is entitled to recover damages, the law permits that Plaintiff to recover only for those injuries he has sustained. Therefore, if you find that two or more of the Plaintiffs are entitled to recover damages, caution should be exercised to be sure that each Plaintiff is awarded only damages for injuries he sustained.

**Source:** ABA Model Jury Instructions in Civil Antitrust Cases, Damages, Instruction 15 at F-49 (verbatim)

**JURY INSTRUCTION NO. 46:**

**[DISPUTED, PLAINTIFFS' PROPOSED INSTRUCTION]**

**UNJUST ENRICHMENT**

Plaintiffs allege that the NCAAA has been unjustly enriched at their expense.  In order to prove a claim for unjust enrichment against the NCAA, Plaintiffs must establish two elements:

1.      The receipt of a benefit from another; and

2.      The unjust retention of the benefit at the expense of another.

If you find that the NCAA was unjustly enriched at Plaintiffs' expense, you should award Plaintiffs the amount by which the NCAA has been unjustly enriched from its use of Plaintiffs' names, images and likenesses, to the extent the unjust enrichment is not taken into account in computing antitrust damages.

**Source:**  *Ellis v. J.P. Morgan Chase & Co.*, 950 F.Supp.2d 1062, 1090 (N.D.Cal. 2013);  jury instruction given in *02 Micro Intern. Ltd. v. Monolithic Power Systems, Inc*, No. C00-471 CW, Dkt. 1145 (N.D. Cal.  Jan. 14, 2005); jury instruction given in *Lopez v. Musinorte Entertainment Corp.*, No, CV 03-167-TUC-JMR, Dkt. 188 (D. Ariz. Jan 15 2008) and approved by Ninth Circuit, 434 Fed.Appx. 696, 699 2011 WL 2076492, at *1  (9th Cir. May 26, 2011); *In re Abbott Laboratories Norvir Anti-Trust Litig.*, 2007 WL 1689899 (N.D.Cal. June 11, 2007).

**Antitrust Plaintiffs' Argument For:**

Unjust enrichment is one of the claims in this case and can properly be decided by the jury.  Examples of unjust enrichment jury instructions include the instruction approved by the Ninth Circuit in *Lopez v. Musinorte Entertainment Corp*. and the instruction given by this Court in  *02 Micro Intern. Ltd. v. Monolithic Power Systems, Inc*,, No. C00-471 CW,  Dkt. 1145 (N.D. Cal.  Jan. 14, 2005).  This instruction adopts language from the *02 Micro* instruction to prevent the jury from awarding unjust enrichment damages that are duplicative of antitrust damages.  The elements of unjust enrichment are from California law.  As this Court explained in *In re Abbott Laboratories Norvir Anti-Trust Litig,* California and many other states follow the Restatement definition of unjust enrichment and there are no significant differences in the  unjust enrichment laws of states that do not follow the Restatement. 2007 WL 1689899 at *8-*9 ("variations among some States' unjust enrichment laws do not significantly alter the central issue or the manner of proof.")

**NCAA's Argument Against:**

It is not proper to instruct the Jury on unjust enrichment for two reasons.

First, APs propose an unjust enrichment instruction based on California law, but there is no such stand-alone cause of action in California: "Courts consistently have held that unjust enrichment is not a proper cause of action under California law." *In re Toyota Motor Corp. Unintended Acceleration, Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1194 (C.D. Cal. 2010) (dismissing unjust enrichment action for failure to state a claim). As one California court explained, "[t]he phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so," and unjust enrichment "is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself." *Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347, 357 (2003) (quotations omitted). The courts in California that have allowed an independent claim of unjust enrichment to stand generally do so as an alternate measure for restitution, a remedy that is not sought here. *See, e.g.*, *Lectodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726 (2000). For example, in *In re Abbott Laboratories Norvir Anti-Trust Litig.*, No. C 04-1511 CW, 2007 WL 1689899 (N.D. Cal. June 11, 2007), plaintiffs sought unjust enrichment to "measure the restitution to which the class members would be entitled," and asserted their state law claims for unjust enrichment in conjunction with claims for restitution under the California Business and Professions Code section 17200. *See id.* at *8. The other cases upon which APs rely similarly involved unjust enrichment in conjunction with claims for restitution or breach of contract. *See Lopez v. Musinorte Entm't Corp.*, 434 F. App'x 696, 699 (9th Cir. 2011) (noting that, under Arizona law, a plaintiff can pursue an unjust enrichment claim as an alternative theory of recovery in conjunction with a breach of contract claim). APs have not alleged any claims based on a theory of restitution here.

Second, substantial variation among state unjust enrichment laws precludes the single, California-law instruction proposed by APs. State law requirements under unjust enrichment law vary widely. *See, e.g.*, *In re Potash,* 667 F. Supp. 2d at 948 (holding that unjust enrichment laws of Michigan, Kansas or Florida require that plaintiff establish that it conferred a direct benefit on the defendant). Indeed, courts have denied class certification where the plaintiffs "fail[] to recognize the differences in state [unjust enrichment] laws . . . [and the fact that] the actual definition of 'unjust enrichment' varies from state to state." *In re Prempro*, 230 F.R.D. 555, 563 (E.D. Ark. 2005); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 591 (9th Cir. 2012) ("[t]he elements necessary to establish a claim for unjust enrichment [] vary materially from state to state") (denying class certification); *see also Vega v. T-Mobile USA, Inc*., 564 F.3d 1256, 1274 (11th Cir. 2009) ("common question will rarely, if ever, predominate [for] an unjust enrichment claim, the resolution of which turns on individualized facts"). APs bear the burden to analyze the applicable choice of law principles and explain the choice of law analysis underlying the claims asserted by each named plaintiff. *See, e.g.*, *Spence v. Glock, Ges.m.b.H*., 227 F.3d 308, 313 (5th Cir. 2000) ("The burden of proof lies with the plaintiffs; in not presenting a sufficient choice of law analysis they have failed to meet their burden of showing that common questions of law predominate"); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 (N.D. Cal. 2007) (dismissing unjust enrichment claim asserted in antitrust class action where plaintiff clarified that its unjust enrichment claim was based on state law, but did not plead on which state or states' laws it was based). Moreover, courts have noted that "[e]ven if the basic elements of an unjust enrichment claim are similar in many states, there may be (and very likely are) differences from state to state regarding issues such as the applicable statute of limitations and various equitable defenses." *In re Bank of Am. Credit Prot. Mktg. & Sales Practices Litig.*, MD 11-2269 TEH, 2012 WL 1123863 (N.D. Cal. Apr. 3, 2012). Given these differences, APs' unitary instruction

1    misstates the applicable law.  To the extent that it is appropriate to instruct the Jury at all on
2    unjust enrichment, the Jury should be instructed as to all of the applicable state law with all of its
     variations.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# JURY INSTRUCTION NO. 47:

## CONDUCT OF THE JURY

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or unless I tell you otherwise:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, or any Internet chat room, blog, Web site or other feature. You may not "blog," "tweet," or use Facebook or any other social networking site to communicate anything to do with the case or your jury service. This applies to communicating with your fellow jurors, and it applies to communicating with everyone else including your family members, your employer, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case. [NCAA's proposed language: Information contained in media is not "evidence" that you can consider in rendering your verdict, because, for example, newspapers, blogs, and reporters do not make their statements under oath or based on personal experience, as do the witnesses in this Court. If you do encounter something about this case in the news media during the trial, end your exposure to it immediately and report it to me as soon as you can.] In the jury room, you are not to use your cellphones at recesses or lunch to call anyone to ask questions about the case. But, if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, "Googling" any party or lawyer or court personnel, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

[NCAA's proposed language:  Third, do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

Fourth, if you need to communicate with me simply give a signed note to the bailiff to give to me.

Fifth, do not make up your mind about what the verdict should be until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence. Keep an open mind until then.

Finally, until this case is given to you for your deliberation and verdict, you are not to discuss the case with your fellow jurors.]

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 1.12 (2007) (modified)

**NCAA's Arguments For Additional Language (Yellow):**

This case will likely be highly publicized and how the court handles pretrial and trial publicity will be critical to prevent a mistrial.  To this end, the NCAA proposes robust instructions to ensure the jurors follow the law and are not influenced by publicity.  For example, the Ninth Circuit approved of a judge who ensured a fair trial despite widespread publicity with a thorough voir dire process that ensured no jury panel members were influenced by the publicity prior to trial, including administering a 48-page questionnaire to all prospective jurors, giving each side ten peremptory challenges instead of the normal three, and dismissing jurors for cause if even the slightest doubt of prejudice was raised.  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1400 (9th Cir. 1984).  The Ninth Circuit also looked favoarably on daily admonishments to the jurors to refrain from exposure to any type of media coverage of the trial and excusing one juror because he admitted reading an unscreened newspaper.  *Id.*  Trial courts have broad discretion in deciding whether to give cautionary instructions, such as the one proposed here.  *See, e.g.*, *United States v. Criden*, 648 F.2d 814, 827 (3d Cir. 1981) ("Considerations of the effect of publicity on a jury are ordinarily matters on which the trial court's judgment is entitled to considerable deference by an appellate court.").

**Plaintiffs' Arguments Against Additional Language:**

Defendant's modifications to the Ninth Circuit model instruction are not supported by any Ninth Circuit decision or any other authority.  Moreover, none of the modifications are necessary or appropriate.  The Ninth Circuit model instructions already instruct jurors not to read about this case in the media.  Defendant's addition of language stating that "[i]nformation contained in the media is not evidence" is already covered by Joint Instruction No. 6,  "What Is Not Evidence" which Plaintiffs agreed at Defendant's request to modify to include the following language: "It is important that you do not read about this case in the media, discuss the case with friends or acquaintances, or let anything you may have seen or heard outside of Court influence your decision in any way.  You are to decide the case solely on the evidence received at the trial."

1   |   The four paragraphs Defendants seek to add to the end of the Ninth Circuit model
2   | instruction are also unnecessary and duplicative because each of those points is already addressed
    | in the ABA instruction itself.

### JURY INSTRUCTION NO. 48:

### [JOINT] NO TRANSCRIPT AVAILABLE TO JURY

During deliberations, you will have to make your decision based on what you recall of the evidence.  You will not have a transcript of the trial.  I urge you to pay close attention to the testimony as it is given.

If at any time you cannot hear or see the testimony, evidence, questions or arguments, let me know so that I can correct the problem.

**Source**:  Ninth Circuit Model Civil Jury Instruction 1.13 (2007) (verbatim).

**JURY INSTRUCTION NO. 49:**

**[JOINT] TAKING NOTES**

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let note-taking distract you. **Whenever** you leave **the courtroom**, your notes should be left in the jury room.  No one will read your notes.  They will be destroyed at the conclusion of the case.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 1.14 (2007) (modifications in bold)

**JURY INSTRUCTION NO. 50:**

**[JOINT] BENCH CONFERENCES AND RECESSES**

From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom, or by calling a recess.  Please understand that while you are waiting, we are working.  The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we will do what we can to keep the number and length of these conferences to a minimum.  I may not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 1.18 (2007) (verbatim)

**JURY INSTRUCTION NO. 51:**

**[JOINT] OUTLINE OF TRIAL**

Trials proceed in the following way:  First, each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.

Plaintiffs will then present evidence, and counsel for defendant may cross-examine.  Then defendant may present evidence, and counsel for the plaintiffs may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case and the attorneys will make closing arguments.

After that, you will go to the jury room to deliberate on your verdict.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 1.19 (2007) (verbatim)

**POST-TRIAL INSTRUCTIONS**

**JURY INSTRUCTION NO. 52:**

**[JOINT] DUTY TO DELIBERATE**

When you begin your deliberations, you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 3.1 (2007) (verbatim)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION NO. 53:**

**[JOINT] COMMUNICATION WITH COURT**

     If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the court.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 3.2 (2007) (verbatim)

**JURY INSTRUCTION NO. 54:**

**[JOINT] RETURN OF VERDICT**

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 3.3 (2007) (verbatim)

**INSTRUCTIONS TO BE GIVEN PRIOR TO INTRODUCING DEPOSITIONS, WRITTEN DISCOVERY, OR STIPULATIONS**

## JURY INSTRUCTION NO. 55:

### [JOINT] DEPOSITION IN LIEU OF LIVE TESTIMONY

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded.

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

**Source:** Ninth Circuit Manual of Model Civil Jury Instructions § 2.4 (2007) (verbatim).

## JURY INSTRUCTION NO. 56:

### [JOINT] USE OF INTERROGATORIES OF A PARTY

Evidence will be presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side. These answers have been given in writing and under oath, before the actual trial, in response to questions that were submitted in writing under established court procedures. You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

**Source:** Ninth Circuit Manual of Model Civil Jury Instructions § 2.10 (2007) (verbatim).

## JURY INSTRUCTION NO. 57:

### [JOINT] USE OF REQUESTS FOR ADMISSION OF A PARTY

Evidence will be presented to you in the form of answers of one of the parties to written requests for admission submitted by the other side. These answers were given in writing and under oath, before the actual trial, in response to requests for admission that were submitted in writing under established court procedures. You should consider the admissions as conclusively establishing the matters admitted. However, you should only consider the admissions as against the party that provided the admissions. You should not consider the admissions as against another party.

**Source**: Ninth Circuit Model Jury Instruction 2.10 (2007) (adapted); Fed. R. Civ. P. 36.

**JURY INSTRUCTION NO. 58:**

**[JOINT] STIPULATED TESTIMONY**

The parties have agreed what [*witness*]'s testimony would be if called as a witness. You should consider that testimony in the same way as if it had been given here in court.

**Source**:  Ninth Circuit Manual of Model Civil Jury Instructions § 2.1 (2007) (verbatim)


**JURY INSTRUCTION NO. 59:**

**[JOINT] STIPULATIONS OF FACT**

The parties have agreed to certain facts [to be placed in evidence as Exhibit __] [that will be read to you]. You should therefore treat these facts as having been proved.

**Source**:  Ninth Circuit Manual of Model Civil Jury Instructions § 2.2 (2007) (verbatim)


**JURY INSTRUCTION NO. 60:**

**[JOINT] JUDICIAL NOTICE**

The court has decided to accept as proved the fact that [state fact], even though no evidence has been introduced on the subject. You must accept this fact as true.

**Source**:  Ninth Circuit Manual of Model Civil Jury Instructions § 2.3 (2007) (verbatim)