Hagens Berman Sobol Shapiro LLP
Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-mail:rob@hbsslaw.com
          leonard@hbsslaw.com

[Additional Counsel Listed on Signature Page]

Michael P. Lehmann (Cal. Bar No. 77152)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
Email: mlehmann@hausfeldllp.com
          abailey@hausfeldllp.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL KELLER et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; COLLEGIATE LICENSING COMPANY; and ELECTRONIC ARTS INC.,<br><br>          Defendants. | Case No. 09-cv-1967 CW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge:        Honorable Claudia Wilken<br>Date:         July 3, 2014<br>Time:         2:00 p.m.<br>Courtroom:  Fourth Floor, No. 2 |
| EDWARD O'BANNON, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; COLLEGIATE LICENSING COMPANY; and ELECTRONIC ARTS INC.,<br><br>          Defendants. | Case No. 09-cv-3329 CW |

**<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION. ....................................................................................- 1 -

II.     FACTUAL AND PROCEDURAL HISTORY OF THIS AND RELATED
        LITIGATION AND OF SETTLEMENT DISCUSSIONS. ...........................- 1 -

III.    THE TERMS OF THE SETTLEMENT .....................................................- 5 -

IV.     THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT. .........- 7 -

        A.    Class Action Settlement Procedure.................................................- 7 -

        B.    The Standard for Preliminary Approval...........................................- 7 -

        C.    The Proposed Settlement Meets the Standard for Preliminary Approval. ..........- 9 -

              1.    The Monetary Recovery Provided by the Proposed Settlement Is a
                    Highly Favorable Result. ..............................................- 9 -

              2.    The Proposed Settlement is Fair, Reasonable and Adequate and in
                    the Best Interests of the Class. ........................................- 10 -

              3.    The Settlement Was the Product of Arm's Length Negotiations..........- 11 -

              4.    The Proposed Settlement Avoids the Unnecessary Risk, Expense,
                    and Uncertainty of Continued Litigation. ...............................- 11 -

V.      THE COURT SHOULD PROVISIONALLY CERTIFY THE ANTITRUST
        SETTLEMENT CLASS. .......................................................................- 12 -

        A.    The Requirements of Rule 23 in the Context of the Settlement Class..............- 12 -

        B.    The Requirements of Rule 23(a) Are Satisfied In This Case.......................- 13 -

              1.    The Class Is So Numerous That Joinder of All Members Is
                    Impracticable............................................................- 13 -

              2.    This Case Involves Questions of Law and Fact Common to the
                    Settlement Class. .........................................................- 14 -

              3.    The Claims of the Representative Parties Are Typical of the Claims
                    of the Settlement Class...................................................- 14 -

              4.    The Representative Plaintiffs Will Fairly and Adequately Protect
                    the Interests of the Settlement Class. ...................................- 15 -

        C.    The Proposed Class Satisfies The Requirements Of Rule 23(b)(3)................- 16 -

              1.    Common Questions of Law and Fact Predominate Over Individual
                    Questions.................................................................- 16 -

              2.    A Class Action Is Superior to Other Available Methods for the Fair
                    and Efficient Adjudication of this Case. .................................- 18 -

VI.     THE COURT SHOULD PROVISIONALLY CERTIFY THE RIGHT OF
        PUBLICITY SETTLEMENT CLASSES ..................................................- 18 -

        A.    The Right Of Publicity Classes Satisfy Rule 23. ................................- 21 -

        B.    The Rule 23(a) Requirements Are Satisfied. .....................................- 21 -

              1.    The Class Is So Numerous That Joinder of All Members Is
                    Impracticable............................................................- 22 -

      2.     This Case Involves questions of Law and Fact Common to the Settlement Class. ........................................................................ - 22 -

      3.     The Claims of the Representative Parties Are Typical of the Claims of the Settlement Class. ................................................... - 23 -

      4.     The Representative Plaintiffs Will Fairly and Adequately Protect the Interest of the Settlement Class. ....................................... - 24 -

   C.     The Rule 23(b)(3) Requirements Are Satisfied. ................................. - 25 -

      1.     Common Questions of Law and Fact Predominate Over Individual Questions. ......................................................................... - 25 -

      2.     A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Case. ...................................... - 26 -

VII.    THE COURT SHOULD APPOINT HLLP, HB, LPD, AND MCK AS SETTLEMENT CLASS COUNSEL ........................................................... - 27 -

VIII.   PROPOSED PLAN OF NOTICE .............................................................. - 28 -

IX.     PROPOSED PLAN OF ALLOCATION. ..................................................... - 30 -

X.      THE COURT SHOULD SET A FINAL APPROVAL HEARING SCHEDULE ....... - 32 -

XI.     CONCLUSION ......................................................................................... - 33 -

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Abdullah v. U.S. Sec. Associates, Inc.*,
731 F.3d 952 (9th Cir. 2013) ............................................................................ 22, 25

5

*Amchem Prods., Inc. v. Windsor*,
6
521 U.S. 591 (1997) ......................................................................................... passim

7

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) ...................................................................................... 21, 25

8

*Blackie v. Barrack*,
9
524 F.2d 891 (9th Cir. 1975) .................................................................................. 14

10

*Carnegie v. Household Int'l, Inc.*,
11
376 F. 3d 656 (7th Cir. 2004) ................................................................................. 13

12

*Churchill Village, L.L.C. v. General Elec. Co.*,
361 F.3d 566 (9th Cir. 2004) ................................................................... 7, 8, 10, 29

13

*City of Detroit v. Grinnell Corp.*,
14
495 F.2d 448 (2d Cir. 1974) ..................................................................................... 9

15

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ................................................................ 7, 9, 11, 29

16

*Dryer v. Nat'l Football League*,
17
No. 09–2182, 2013 WL 1408351 (D. Minn. Apr. 18, 2013) ................................. 11

18

*Ellis v. Naval Air Rework Facility*,
19
87 F.R.D. 15 (N.D. Cal. 1980) ............................................................................... 10

20

*Estate of Jim Garrison v. Warner Bros., Inc.*,
No. CV 95–8328 RMT, 1996 WL 407849 (C.D. Cal. June 25, 2006) ............. 14, 17

21

*Evans v. Jeff D.*,
22
475 U.S. 717 (1986) ............................................................................................... 29

23

*Farley v. Baird, Patrick & Co., Inc.*
24
No. 90 Civ. 2168 (MBM), 1992 WL 321632 (S.D.N.Y. Oct. 28, 1992) ............... 27

25

*Fisher Bros. v. Mueller Brass Co.*,
630 F. Supp. 493 (E.D. Pa. 1985) ............................................................................ 9

26

27

28

iii

*Fraley v. Facebook, Inc.*,
No. CV–11–01726 RS, 2012 WL 6013427 (N.D. Cal. Dec. 3, 2012)............................... 1, 28

*g., Schulken v. Wash. Mut. Bank*,
No. 09-cv-0278-LHK, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012) .......................................... 26

*Galvan v. KDI Distrib. Inc.*,
No. SACV 08-0999-JVS, 2011 U.S. Dist. LEXIS 127602 (C.D. Cal. Oct. 25, 2011) .......... 20

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1988)......................................................................................... passim

*Harrington v. City of Albuquerque*,
222 F.R.D. 505 (D. N.M. 2004)........................................................................................... 27

*Harris v. Vector Mktg. Corp.*,
No. C-08-5198 EMC, 2011 U.S. Dist. LEXIS 48878 (N.D. Cal. Apr. 29, 2011) ................... 8

*Hart v. Electronic Arts, Inc.*,
717 F.3d 141 (3d Cir. 2013)................................................................................................... 4

*Hart v. Electronic Arts, Inc.*,
808 F.Supp.2d 757 (D. N.J. 2011) ......................................................................................... 4

*Hart v. Electronic Arts, Inc..*,
No. 3:09-cv-05990-FLW-LHG (D. N.J. ) .................................................................... 1, 4, 5, 6

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 326 (E.D. Mich. 2001) ...................................................................................... 16

*In re Cement and Concrete Antitrust Litig.*,
817 F.2d 1435 (9th Cir. 1987)............................................................................................. 29

*In re Citric Acid Antitrust Litig.*,
145 F. Supp. 2d 1152 (N.D. Cal. 2001) .............................................................................. 30

*In re Citric Acid Antitrust Litig.*,
No. 95-1092, 1996 WL 655791 (N.D. Cal. 1996) .......................................................... passim

*In re Flat Glass Antitrust Litig.*,
191 F.R.D. 472 (W.D. Pa. 1999)......................................................................................... 14

*In re Google Referrer Header Privacy Litig.*,
No. 5:10-cv-4809 EJD, 2014 WL 1266091 (N.D. Cal. Mar. 26, 2014)................................ 21

*In re Initial Public Offering Sec. Litig.*,
226 F.R.D. 186 (S.D.N.Y. 2005) ........................................................................................ 13

iv

*In re Linerboard Antitrust Litig.*,
   321 F. Supp. 2d 619 (E.D. Pa. 2004) ...................................................................... 9

*In re Lloyds' Am. Trust Fund Litig.*,
   2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ...................................................... 30

*In re Lorazepam & Clorazeopate Antitrust Litig.*,
   202 F.R.D. 12 (D. D.C. 2001) ............................................................................... 16

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ................................................................................. 11

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................................... 17

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   No. C 09-01967 CW, 2011 WL 1642256 (N.D. Cal. May 2, 2011) ......................... 3

*In re NCAA Student-Athlete Name & Likeness Litig.*,
   723 F.3d 1268 (9th Cir. 2013) ....................................................................... passim

*In re NCAA Student-Athlete Name & Likeness Litig.*,
   No. C 09-1967 CW, 2014 WL 1410451 (N.D. Cal. Apr. 11, 2014) ..................... 3, 4

*In re Northrop Grumman Corp. ERISA Litig.*,
   No. CV 06-6213, 2011 U.S. Dist. LEXIS 94451 (C.D. Cal. Mar. 29, 2011) ......... 20

*In re Pacific Enter. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ..................................................................................... 7

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995) ........................................................................... 16

*In re Relafen Antitrust Litig.*,
   231 F.R.D. 52 (D. Mass. 2005) ............................................................................. 13

*In re Rubber Chems. Antitrust Litig.*,
   232 F.R.D. 346 (N.D. Cal. 2005) ........................................................... 12, 13, 17, 22

*In re Shopping Carts Antitrust Litig.*,
   No. MDL 451-CLB, M-21-29, 1983 U.S. Dist LEXIS 11555 (S.D.N.Y. No. 18, 1983) ......... 7

*In re Static Random Access (SRAM) Antitrust Litig.*,
   No. C 07-1819 CW, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ............... 12, 24

*In re Sugar Industry Antitrust Litig.*,
   1976 WL 1374 (N.D. Cal. 1976) ...................................................................... 13, 16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT

*In re Tableware Antitrust Litig.*,
484 F.Supp.2d 1078 (N.D. Cal. 2007) ........................................................ 1, 9, 12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010) ............................................................ 12, 14, 16

*In re Vitamins Antitrust Litig.*,
No. 99-197 TFH, 2000 WL 1737867 (D.D.C. Mar. 31, 2000) ................................ 30

*In re Vitamins Antitrust Litig.*,
No. MISC. 99–197 (TFH), 2001 WL 856292 (D. D.C. July 25, 2001) ........................ 10

*In Re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) .................................................................... 16

*Keegan v. American Honda Motor Co.*,
284 F.R.D. 504 (C.D. Cal. 2012) ............................................................... 26

*Keller v. Electronic Arts, Inc.*,
No. C-09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010) ........................... passim

*Lane v. Facebook, Inc.*,
No. C 08-3845 RS, 2010 WL 9013059 (N.D. Cal. Mar. 17, 2010) ........................ 21

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) ............................................................... 15, 18

*Linney v. Cellular Alaska Partnership*,
151 F.3d 1234 (9th Cir. 1998) ................................................................ 11

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas*,
244 F.3d 1152 (9th Cir. 2001) .......................................................... 16, 18, 24

*Marshall v. Holiday Magic, Inc.*,
550 F.2d 1173 (9th Cir. 1977) ................................................................ 29

*Mendoza v. Tucson Sch. Dist. No. 1*,
623 F.2d 1338 (9th Cir. 1980) ................................................................ 29

*Motschenbacher v. R.J. Reynolds Tobacco Co.*,
498 F.2d 821 (9th Cir. 1974) ................................................................ 19

*Nat'l Rural Telcoms. Coop. v. DIRECTV, Inc.*,
221 F.R.D. 523 (C.D. Cal. 2004) ............................................................. 10

*Nguyen v. Baxter Healthcare Corp.*,
275 F.R.D. 596 (C.D. Cal. 2011) ............................................................. 22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT

*O'Bannon v. NCAA,*
   No. 09-cv-3329-CW (N.D. Cal.) ................................................................ 2, 3, 11, 29

*Officers for Justice v. Civil Serv. Comm'n,*
   688 F.2d 615 (9th Cir. 1982) ...................................................................... 8, 10, 11

*Rodriguez v. Hayes,*
   591 F.3d 1105 (9th Cir. 2010) .......................................................................... 22, 23

*Russell v. NCAA,*
   No. C 11–4938 CW, 2012 WL 1747496 (N.D. Cal. May 16, 2012) ........................................ 3

*Stuart v. Radioshack Corp.,*
   No. C-07-4499 EMC, 2009 WL 281941 (N.D. Cal. Feb. 5, 2009) ........................................ 22

*Torrisi v. Tucson Elec. Power Co.,*
   8 F.3d 1370 (9th Cir. 1993), *cert. denied*, 512 U.S. 1220 (1994) .................................... 11, 29

*Van Bronkhorst v. Safeco Corp.,*
   529 F.2d 943 (9th Cir. 1976) ................................................................................ 7

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011) ..................................................................................... 25

*Wellman v. Dickinson,*
   497 F. Supp. 824 (S.D.N.Y. 1980) ......................................................................... 7

*West Virginia v. Chas. Pfizer & Co.,*
   314 F. Supp. 710 (S.D.N.Y. 1970) ........................................................................ 7

*Yokoyama v. Midland Nat'l Life Ins. Co.,*
   594 F.3d 1087 (9th Cir. 2010) ............................................................................ 25

STATUTES

15 U.S.C. §1 ........................................................................................... 2, 6, 17

28 U.S.C. § 1715(b) ...................................................................................... 32

Cal. Bus. & Prof. Code § 17200 ........................................................................... 2

Cal. Civ. Code § 3344 ................................................................................. 2, 25

I.C. 32-36-1-10 ......................................................................................... 25

Ind. Code § 32-36-1-1 .................................................................................... 2

N.J.S.A. § 56:82 *et seq.* ................................................................................ 4

**OTHER AUTHORITIES**

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* ........................................... passim

Federal Rule of Civil Procedure 23 ....................................................................... passim

*Manual for Complex Litigation* (4th ed. 2004) ..................................................... 1, 8, 9

*Moore's Federal Practice* (3d ed. 2003) at §23.63[8][a], §23.63[8][b] ...................................... 28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION.

Pursuant to Federal Rule of Civil Procedure 23, the Antitrust Plaintiffs[1] and the Right of Publicity Plaintiffs[2] (collectively, "Plaintiffs") move this Court for an order preliminarily approving a class Settlement Agreement ("Settlement" or "Agreement") in the amount of $40 million between Plaintiffs and Defendant Electronic Arts Inc. ("EA"), pursuant to which Defendant Collegiate Licensing Company ("CLC") is also "Released Party" (as the term is defined below).  The Agreement is attached hereto as Exhibit ("Ex.") 1.

The Settlement readily satisfies the standard for preliminary approval—it is within the range of possible approval to justify sending and publishing notice to class members and scheduling final approval proceedings.  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) ("*Tableware*"); *Fraley v. Facebook, Inc.*, No. CV–11–01726 RS, 2012 WL 6013427, at *1 (N.D. Cal. Dec. 3, 2012) ("*Fraley*"); *see also Manual for Complex Litigation* § 13.14 at 173 (4th ed. 2004) ("*Manual*").  Accordingly, Plaintiffs seek an order: (1) granting preliminary approval of the Settlement, (2) certifying a Settlement Class, (3) approving the manner and forms of giving notice to the Class, and (4) establishing a timetable for final approval of the Settlement.

## II.      FACTUAL AND PROCEDURAL HISTORY OF THIS AND RELATED LITIGATION AND OF SETTLEMENT DISCUSSIONS.

**Status of the litigation before this Court**. The litigation commenced with the filing of the *Keller* action against the NCAA, EA, and CLC in May 2009. Dkt. No. 1.[3] That complaint

---

[1] The term "Antitrust Plaintiffs" refers to the plaintiffs raising antitrust claims in the "Third Consolidated Amended Class Action Complaint" (July 18, 2013) (Dkt. No. 831) ("TCAC"): Edward C. O'Bannon Jr., Oscar Robertson, William Russell, Harry Flournoy, Alex Gilbert, Sam Jacobson, Thad Jaracz, David Lattin, Patrick Maynor, Tyrone Prothro, Damien Rhodes, Eric Riley, Bob Tallent, Danny Wimprine, Ray Ellis, Tate George, Jake Fischer, Jake Smith, Darius Robinson, Moses Alipate and Chase Garnham.

[2] The term "Right of Publicity Plaintiffs" refers to: (a) the plaintiffs named in the TCAC asserting right of publicity claims (Samuel Keller, Bryan Cummings, Lamarr Watkins, and Byron Bishop); (b) the plaintiff (Ryan Hart) in *Hart v. Electronic Arts, Inc.*, No. 3:09-cv-05990-FLW-LHG (D. N.J. ) ("*Hart*"); and (c) the plaintiff (Shawne Alston) in *Alston v. Electronic Arts, Inc.*, 3:13-cv-05157-FLW-LHG (D. N.J.) ("Alston").

[3] Unless otherwise indicated, docket references are to the docket in No. C-09-1967.

alleged the unlawful use of college athletes' names, images, and likenesses in National Collegiate Athletic Administration ("NCAA")-themed football and basketball videogames produced and sold by EA. The complaint asserted claims under California (as to EA) and Indiana (as to the NCAA) right of publicity statutes (Cal. Civ. Code § 3344, Ind. Code § 32-36-1-1), the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) (as to EA), and various common law theories. The Court denied EA's anti-SLAPP motion to strike the claims against it based on First Amendment grounds. *Keller v. Electronic Arts, Inc.*, No. C-09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010).  EA filed an interlocutory appeal and this Court stayed further proceedings as to EA in *Keller* pending that appeal. *In re NCAA Student-Athlete Name & Likeness Litig.*, No. C-09-1967, 2010 WL 5644656 (N.D. Cal. Dec. 17, 2010). The Ninth Circuit affirmed the Court's ruling in *In re NCAA Student-Athlete Name & Likeness Litig.*, 723 F.3d 1268 (9th Cir. 2013). EA's petition for *certiorari* is pending.

In July 2009, the *O'Bannon* class action was filed against the NCAA and CLC. Dkt. No. 1 in *O'Bannon v. NCAA*, No. 09-cv-3329-CW (N.D. Cal.) ("*O'Bannon*"). That complaint alleged that the NCAA and its members conspired to suppress to zero the amounts paid to Division I football and basketball players for the use of their names, images and likenesses ("NIL") in violation of the Sherman Act (15 U.S.C. §1). The Court eventually ordered consolidation of the *O'Bannon* and *Keller* cases (as well as other actions) in March 2010. *O'Bannon* Dkt. No. 139. The Court appointed Hausfeld LLP ("HLLP") as co-lead counsel in this litigation with "primary responsibility" for the claims in *O'Bannon* and Hagens Berman Sobol Shapiro LLP ("HB") as co-lead counsel with "primary responsibility" for the claims in *Keller*. Dkt. No. 146. The two firms filed a Consolidated Amended Complaint in March 2010 containing both right of publicity and antitrust claims, and EA was added as a defendant with respect to the latter. Dkt. No. 175[4].

Various efforts were made by defendants to dismiss the claims made in *O'Bannon* or related antitrust cases over the years, but none of the defendants succeeded in eliminating

---

[4] The Court deconsolidated the cases for trial on May 23, 2014. *See* Dkt. No. 147.

themselves from this litigation.[5] Plaintiffs obtained and reviewed millions of pages of documents in discovery and conducted dozens of depositions of experts and fact witnesses.  Despite the stay as to EA, counsel for the *Keller* plaintiffs participated in depositions and obtained documentary discovery from CLC and the NCAA. Discovery in *O'Bannon* closed earlier this year, although the NCAA is continuing to make supplemental productions pursuant to Court order. Dkt. No. 986.  On November 8, 2013, the Court certified in *O'Bannon* an antitrust injunction-only class of current and former college athletes whose NIL have been, or may be, included in video games, television broadcasts, and television rebroadcasts. *In re NCAA Student-Athlete Name & Likeness Litig.*, No. C 09-01967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013).

The Antitrust Plaintiffs and the NCAA cross-moved for summary judgment. On April 11, 2014, the Court denied the NCAA's motion in its entirety and granted the Antitrust Plaintiffs' motion as to one of the NCAA's alleged procompetitive justifications; it also limited the NCAA's proof as to certain other alleged procompetitive justifications. *In re NCAA Student-Athlete Name & Likeness Litig.*, No. C 09-1967 CW. 2014 WL 1410451 (N.D. Cal. Apr. 11, 2014). As part of that order, the Court modified the definition of the litigated injunctive class as follows:

> All current and former student-athletes residing in the United States who compete on, or competed on, an NCAA Division I (formerly known as "University Division" before 1973) college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I–A until 2006) men's football team and whose images, likenesses and/or names may be, or have been, included or could have been included (by virtue of their appearance in a team roster) in game footage or in videogames licensed or sold by Defendants, their co-conspirators, or their licensees.

---

[5] *See O'Bannon v. NCAA,* Nos. C 09-1967 CW, C 09-3329 CW, C 09-4882 CW, 2010 WL 445190 (N.D. Cal. Feb. 8, 2010); *In re NCAA Student-Athlete Name & Likeness Litig.*, No. C 09-01967 CW, 2011 WL 1642256 (N.D. Cal. May 2, 2011); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-01967 CW, 2011 WL 3240518 (N.D. Cal. July 28, 2011); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-01967 CW, 2012 WL 1745593 (N.D. Cal. May 16, 2012); *Russell v. NCAA*, No. C 11–4938 CW, 2012 WL 1747496 (N.D. Cal. May 16, 2012); and *In re NCAA Student-Athlete Name & Likeness Litig.*, No. C 09-01967 CW, 2013 WL 5778233 (N.D. Cal. Oct. 25, 2013).  EA was briefly removed from the case by the Court, but was quickly reinstated in the 2012 *O'Bannon* decision upon allegations that EA "was not merely doing business" and was instead "'actively participating to ensure that former student-athletes would not receive any compensation for use of their images, likenesses and names.'" 2012 WL 1745593, at *2.

*Id*. at *20.

The NCAA sought leave to file a motion for partial reconsideration of the Court's summary judgment ruling, which the Court denied. Dkt. No. 1059. The NCAA also sought a petition for review under Fed. R. Civ. P. 23(f) of the Court's clarification of the litigation class, which the Ninth Circuit denied on May 13, 2014. Dkt. No. 1061. The Court also denied NCAA's motion to certify certain question for interlocutory appeal (Dkt. No. 1091) and denied NCAA's motion to sever the videogame claims from the antitrust trial or, alternatively, continue the trial (Dkt. No. 1092). The trial of the Antitrust Plaintiffs' claims against the NCAA is set to commence on June 9, 2014.

**Status of the *Hart* and *Alston* cases**. The *Hart* case was filed in New Jersey Superior Court against EA in June of 2009 and was removed to federal court. The initial complaint alleged the unlawful use of college athletes' likenesses in NCAA-themed football and basketball videogames produced and sold by EA, and asserted right of publicity claims under common law and under the California statutes identified in the *Keller* complaint. It also contained a claim under the New Jersey Consumer Fraud Act (N.J.S.A. § 56:82 *et seq*.). *Hart* Dkt. No. 1, Exh. A. An amended complaint focused just on the common law claims. *Hart* Dkt. No. 25. The district court granted EA's motion for summary judgment. *Hart v. Electronic Arts, Inc*., 808 F.Supp.2d 757 (D. N.J. 2011). The Third Circuit reversed this determination. *Hart v. Electronic Arts, Inc.*, 717 F.3d 141 (3d Cir. 2013).

The *Alston* case was filed by HB in August of 2013 against EA in New Jersey federal court; it asserts right of publicity claims similar to those made in *Keller* and alleges common law claims. *Alston* Dkt. No. 1. The *Hart* and *Alston* actions have been stayed pending resolution of the present settlement and are resolved as part of this settlement. *Alston* Dkt. No. 13.

**Settlement discussions**. Settlement talks among O'Bannon, Keller, NCAA, EA and CLC took place before Judge Edward Infante (Ret.), but did not lead to a resolution. *See* November 9, 2011 ECF notation; Declaration of Michael D. Hausfeld ("Hausfeld Decl.") at ¶ 2; Declaration of Steve W. Berman ("Berman Decl.") at ¶ 2. Counsel for O'Bannon, Keller, and EA subsequently

1    agreed to mediate again in 2013, this time including then-counsel for Hart.  Hausfeld Decl. at ¶ 3;

2    Berman Decl. at ¶ 3.  The parties mediated before Randy Wulff ("Wulff") of Wulff Quinby

3    Sochynsky, a dispute resolution firm, on September 10, 2013. The basic parameters of the

4    Settlement were agreed upon at that session and the parties proceeded to draft a term sheet and

5    then a long-form agreement. Hausfeld Decl. at ¶ 3; Berman Decl. at ¶ 3.  The client in *Hart* then

6    replaced his counsel and the substitute counsel (Lum, Drasco & Positan, LLC ("LDP") and the

7    McKenna Law Firm LLC ("McK")) agreed to the settlement terms after independent

8    consideration. Hausfeld Decl. at ¶ 4; Berman Decl. at ¶ 4.  There were issues remaining about

9    how to allocate the proposed settlement fund and those were resolved in a multiple sessions with

10   Wulff in April  2014. Hausfeld Decl. at ¶ 6; Berman Decl. at ¶ 6.

11           The NCAA is not part of this settlement and the settlement does not release any liability it

12   may have for NCAA-themed videogames. The parties subsequently participated in mediation

13   efforts with the NCAA—two sessions before Magistrate Judge Cousins were held in an attempt to

14   resolve the videogame-related issues but were unsuccessful. Dkt. Nos. 1015, 1017.

15   **III.    THE TERMS OF THE SETTLEMENT**

16           The Agreement provides for payment to the Settlement Class defined therein in the

17   amount of $40 million in exchange for a complete release of all Class members' claims against

18   EA and CLC.  Exh. 1 at ¶¶ 11-12.  The entities released under the Agreement are EA and CLC

19   and all of their present, former, and future officers, directors, employees, agents, attorneys,

20   insurers, insurance agents and brokers, independent contractors, successors, assigns, parents,

21   subsidiaries, affiliates, shareholders, members, and any person or entity whose conduct in the

22   development, sale, distribution, or marketing of NCAA Branded Videogames could cause EA or

23   CLC to be held directly or indirectly liable (including but not limited to liability as an indemnitor)

24   to any such person or entity (collectively referred to as "Released Parties").  *Id*. Definition No.

25   44. No claims against the NCAA or its member schools and conferences are being released by the

26   Agreement.  *Id.*

27           The Agreement defines a Settlement Class consisting of any Antitrust Class Member,

28

*Keller* Right of Publicity Class Member, and/or *Hart* Right of Publicity Class Member, which are further defined as:

> "Antitrust Class Members" means all current and former student-athletes residing in the United States who competed on an NCAA Division I (formerly known as "University Division" before 1973) college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team and whose images, likenesses and/or names allegedly have been included or could have been included (by virtue of their appearance in a team roster) in or used in connection with NCAA Branded Videogames published or distributed from July 21, 2005 until the Preliminary Approval Date. Within the Antitrust Class Members is a subclass consisting of the "Antitrust Roster-Only Class Members," which consist of all current and former student-athletes residing in the United States who competed on an NCAA Division I (formerly known as "University Division" before 1973) college or university men's basketball team or on an NCAA Football Bowl Subdivision (formerly known as Division I-A until 2006) men's football team and whose images, likenesses and/or names allegedly could have been included (by virtue of their appearance in a team roster), but were not included in or used in connection with NCAA Branded Videogames published or distributed from July 21, 2005 until the Preliminary Approval Date.

> "*Keller* Right of Publicity Class Members" means all NCAA football and basketball players listed on the roster of a school whose team was included in an NCAA Branded Videogame published or distributed during the period May 5, 2007 to the Preliminary Approval Date and whose assigned jersey number appears on a virtual player in the software, or whose photograph was otherwise included in the software.

> "*Hart/Alston* Right of Publicity Class Members" means all NCAA football and basketball players listed on the roster of a school whose team was included in an NCAA Branded Videogame published or distributed during the period May 4, 2003 to May 4, 2007 and whose assigned jersey number appears on a virtual player in the software, or whose likeness was otherwise included in the software.

*Id*. at Definition Nos. 4, 24, and 29. Excluded from all classes are EA, CLC, the NCAA, and their officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies, class counsel and their employees, and the judicial offers, and associated court staff assigned to cases listed in Section I of the Settlement Agreement. *Id*.[6]

---

[6] The Settlement also contains a "blow" provision under which EA can rescind the Settlement if a certain number of class members opt out. For purposes of the public filing, the specific number has been redacted. An unredacted copy of the Settlement has been provided to the Court.

# IV.   THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT.

## A.   Class Action Settlement Procedure.

A class action may not be dismissed, compromised, or settled without the approval of the Court.  Judicial proceedings under Federal Rule of Civil Procedure 23 have led to a defined procedure and specific criteria for class action settlement approval. The Rule 23(e) settlement approval procedure includes three distinct steps: (1) preliminary approval of the proposed settlement; (2) dissemination of notice of the settlement to all accepted class members; and (3) a final approval hearing, at which class members may be heard regarding the settlement. This procedure safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. *See* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §§ 11.22 *et seq.* (4th ed. 2002) ("Newberg"). Plaintiffs respectfully request that the Court take the first step in the settlement approval process and certify the proposed Settlement Class, preliminarily approve the proposed Settlement, and appoint HLLP,  HB, McK, and LDP as Settlement Class Counsel for this Settlement.

## B.   The Standard for Preliminary Approval.

"[T]here is an overriding public interest in settling and quieting litigation . . . particularly . . . in class action suits." *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).[7]  It is well-recognized that "[v]oluntary out of court settlement of disputes is 'highly favored in the law' and approval of class action settlements will be generally left to the sound discretion of the trial judge." *Wellman v. Dickinson,* 497 F. Supp. 824, 830 (S.D.N.Y. 1980) (citation omitted).  Courts have particularly recognized that compromise is favored for antitrust litigation, which is notoriously difficult and unpredictable.  *See West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971); *In re Shopping Carts Antitrust Litig.,* No. MDL 451-CLB, M-21-29, 1983 U.S. Dist LEXIS 11555, at *17-18 (S.D.N.Y. Nov. 18, 1983).

---

[7] *See Churchill Village, L.L.C. v. General Elec. Co.*, 361 F.3d 566, 576 (9th Cir. 2004), *cert. denied*, 543 U.S. 818 (2004) ("*Churchill*"); *In re Pacific Enter. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992), *cert. denied*, 506 U.S. 953 (1992) ("*Seattle*").

The purpose of the Court's preliminary evaluation of the proposed Settlement is to determine whether it is within "the range of reasonableness," and thus whether notice to the Settlement Class of the terms and conditions of the settlement, and the scheduling of a formal fairness hearing, are worthwhile.  "At the preliminary approval stage, the Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval…. Closer scrutiny is reserved for the final approval hearing." *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 U.S. Dist. LEXIS 48878, at *23-24 (N.D. Cal. Apr. 29, 2011) (citing cases and treatises). Application of these factors here supports an order granting the motion for preliminary approval.

The approval of a proposed settlement of a class action is a matter of discretion for the trial court. *Churchill,* 361 F.3d at 575.  In exercising that discretion, however, courts recognize that as a matter of sound policy, settlements of disputed claims are encouraged and a settlement approval hearing should "not be turned into a trial or rehearsal for trial on the merits." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied sub nom. Byrd v. Civil Serv. Comm'n*, 459 U.S. 1217 (1983) ("*OFJ*").  Furthermore, courts must give "proper deference" to the settlement agreement, because "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1988) ("*Hanlon*") (quotations omitted).

To grant preliminary approval of this class action settlement, the Court need only find that the settlement falls within "the range of reasonableness." *Newberg* § 11.25. The *Manual* characterizes the preliminary approval stage as an "initial evaluation" of the fairness of the proposed settlement made by the court on the basis of written submissions and informal

presentation from the settling parties. *Manual* § 21.632. The *Manual* summarizes the preliminary

approval criteria as follows:

> Fairness calls for a comparative analysis of the treatment of the class
> members vis-à-vis each other and vis-à-vis similar individuals with
> similar claims who are not in the class. Reasonableness depends on an
> analysis of the class allegations and claims and the responsiveness of the
> settlement to those claims. Adequacy of the settlement involves a
> comparison of the relief granted to what class members might have
> obtained without using the class action process.

*Manual* § 21.62.

A proposed settlement may be finally approved by the trial court if it is determined to be

"fundamentally fair, adequate, and reasonable." *Seattle*, 955 F.2d at 1276. Preliminary approval

requires only that the terms of the proposed settlement fall within the "range of possible

approval." *Tableware*, 484 F. Supp. 2d at 1079.  It amounts to a determination that the terms of

the proposed settlement warrant consideration by members of the class and a full examination at a

final approval hearing. *Manual* § 13.14, at 173.  While consideration of the requirements for *final*

approval is unnecessary at this stage, all of the relevant factors weigh in favor of approval of the

Settlement proposed here.  As shown below, the proposed Settlement is fair, adequate, and

reasonable. Therefore, the Court should allow notice of the Settlement to be disseminated to the

proposed Settlement Class.

     **C.**    **The Proposed Settlement Meets the Standard for Preliminary Approval.**

The proposed Settlement is within the range of reasonableness and thereby meets the

standard for preliminary approval.

          **1.**    **The Monetary Recovery Provided by the Proposed Settlement Is a Highly Favorable Result.**

Plaintiffs believe the monetary recovery from the Settlement Agreement represents a

significant percentage of EA's relevant sales of videogames during the Class Period.  The

Settlement, therefore, compares favorably to settlements finally approved in other class cases.

*See, e.g., Fisher Bros. v. Mueller Brass Co.,* 630 F. Supp. 493, 499 (E.D. Pa. 1985) (recoveries

equal to .1%, .2%, 2%, .3%, .65%, .88%, and 2.4% of defendants' total sales); *In re Linerboard*

*Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (granting final approval to settlement where recovery was 1.62% of sales). *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery"). Moreover, Plaintiffs believe that the recovery is similar to the amount settlement class members would have received in an arm's length negotiations with EA had the NCAA not prohibited student-athletes from licensing their names, images, and likenesses. The settlement also provides a means for Antitrust Class Members to receive a monetary recovery notwithstanding the Court's denial of certification of the damages class. Additionally, the *Keller* Right of Publicity Class Members retain the right to pursue additional damages—including substantial statutory damages—from the NCAA. Thus, the settlement is economically advantageous for all Settlement Class Members.

### 2. The Proposed Settlement is Fair, Reasonable and Adequate and in the Best Interests of the Class.

Counsel's judgment that the Settlement is fair and reasonable is entitled to great weight. *See Churchill*, 361 F.3d at 576-77 (Ninth Circuit took into account the views of class counsel and defendants' counsel in support of the settlement); *OFJ*, 688 F.2d at 625 (same); *Nat'l Rural Telcoms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("*NRTC*") ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation."); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

In fact, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *NRTC*, 221 F.R.D. at 528 (*quoting Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). Indeed, there is generally "an initial presumption of fairness when a proposed class settlement, which was negotiated at arms' length by counsel for the class, is presented for court approval." *Newberg* § 11.41.

**3.      The Settlement Was the Product of Arm's Length Negotiations.**

The Settlement is entitled to "an initial presumption of fairness" because both were the result of arm's length negotiations among experienced counsel. Newberg § 11.4.  Because it is provisional, courts grant preliminary approval where the proposed settlement lacks "obvious deficiencies" raising doubts about the fairness of the settlement.  *See, e.g., In re Vitamins Antitrust Litig.*, No. MISC. 99–197 (TFH), 2001 WL 856292, at *4 (D. D.C. July 25, 2001) (quoting Manual for Complex Litigation (Third) §30.41).

This was not a rushed, haphazard settlement. The parties tried to negotiate their differences in early 2011, but did not succeed. Hausfeld Decl. at ¶ 2; Berman Decl. at ¶ 2.  They tried again in 2013 and succeeded after a day-long mediation before Wulff.  Hausfeld  Decl. at ¶ 3; Berman Decl. at ¶ 3.  The settlement terms were drafted and were later memorialized as the proposed Settlement that is the subject of this motion. Hausfeld  Decl. at ¶ 3-6; Berman Decl. at ¶ 3-6.  Areas of dispute required several additional mediation sessions with Wulff in April of this year. Hausfeld  Decl. at ¶ 6; Berman Decl. at ¶ 6.  All negotiations were adversarial and conducted in the utmost good faith.  Hausfeld  Decl. at ¶ 7; Berman Decl. at ¶ 7.  Plaintiffs' counsel zealously advanced Plaintiffs' positions and were fully prepared to continue to litigate rather than to accept a settlement that was not in the best interests of the Class.  *Id.*

**4.      The Proposed Settlement Avoids the Unnecessary Risk, Expense, and Uncertainty of Continued Litigation.**

Although Plaintiffs and their counsel believe that the Class's claims have substantial merit, they recognize the risk and expense necessary to prosecute their claims through trial, and subsequent appeals, as well as the inherent difficulties and delays that litigation like this entails.[8]

---

[8] *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458-59 (9th Cir. 2000) (assessing risk of inability to prove fraudulent scheme in affirming settlement); *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1240-41 (9th Cir. 1998) ("*Linney*") (assessing risks involving fraudulent concealment and ability to obtain damages in affirming settlement); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993), *cert. denied*, 512 U.S. 1220 (1994) ("*Torrisi*") (approving settlement based in part on "inherent risks of litigation"); *Seattle*, 955 F.2d at 1292 (approving settlement based on uncertainty of claims and avoidance of summary judgment); *OFJ*, 688 F.2d at 625 (approving settlement based in part on the possibility that a judgment after a trial, when discounted, might not reward class members for their patience and the likely delay reflected in the "track record" for large class actions).

*See Dryer v. Nat'l Football League*, No. 09–2182 (PAM/AJB), 2013 WL 1408351, at *2 (D. Minn. Apr. 18, 2013) (preliminarily approving right of publicity class settlement in light of risks of certification of a litigated class). Here, the risk is self-evident; the Court refused to certify a litigated damage class in *O'Bannon* after the terms of the proposed Settlement were initially agreed upon. *NCAA*, 2013 WL 5979327, at *33-39. It recently declined to revisit that ruling. Dkt. No. 1025 at 43-47. The proposed Settlement provides an excellent recovery for the Class while eliminating the risk, expense, delay, and uncertainty of continued litigation.

For all of the aforementioned reasons, the proposed Settlement is within the range of obtaining final approval as it is fair, reasonable, and adequate.

## V.    THE COURT SHOULD PROVISIONALLY CERTIFY THE ANTITRUST SETTLEMENT CLASS.

The Court should provisionally certify the settlement class set forth in the Settlement. Ex. 1 at Definition No. 4. It is well-established that price-fixing actions like that brought by the Antitrust Plaintiffs are appropriate for class certification and many courts have so held.[9]

### A.    The Requirements of Rule 23 in the Context of the Settlement Class.

Rule 23 provides that a court must certify an action as a class action where, as here, plaintiffs satisfy the four prerequisites of Rule 23(a), and one of the three criteria set forth in Rule 23(b). Rule 23(a) provides that a class may be certified if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(b)(3) provides that "an action may be maintained as a class action" if the Court finds that the questions of law or fact common to the members of the Settlement Class

---

[9] *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010) ("*LCD*"); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005) ("*Rubber Chemicals*"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C 07-1819 CW, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ("*SRAM*"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006); *In re Citric Acid Antitrust Litig.*, No. 95-1092, 1996 WL 655791 (N.D. Cal. 1996) ("*Citric Acid*").

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Approving preliminarily a Settlement Class here will not be inconsistent with the Court's order denying certification of a litigated antitrust damage class. In its order denying such certification, the Court ruled that such a class posed manageability problems. *NCAA*, 2013 WL 5979327, at *39. The Rule 23(b)(3) manageability requirements, however, need not be satisfied in order to certify a class in the settlement context: "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("*Amchem*"), *In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 68 (D. Mass. 2005) (same).  As Circuit Judge Posner has explained, manageability concerns that might preclude certification of a litigated class may be disregarded with a settlement class "because the settlement might eliminate all the thorny issues that the court would have to resolve if the parties fought out the case." *Carnegie v. Household Int'l, Inc.,* 376 F. 3d 656, 660 (7th Cir. 2004) ("*Carnegie*") (citing *Amchem,* 521 U.S. at 620). *See also In re Initial Public Offering Sec. Litig.,* 226 F.R.D. 186, 190, 195 (S.D.N.Y. 2005) (settlement class may be broader than litigated class because settlement resolves manageability/predominance concerns).

**B.      The Requirements of Rule 23(a) Are Satisfied In This Case.**

**1.      The Class Is So Numerous That Joinder of All Members Is Impracticable.**

The first requirement for maintaining a class action under Rule 23 is that the class be so numerous that joinder of all members would be "impracticable." Fed. R. Civ. P. 23(a)(1).  To satisfy this prerequisite, a plaintiff need not allege the precise number or identity of class members. *Rubber Chemicals,* 232 F.R.D. at 350 ("[p]laintiffs do not need to state the exact number of potential class members, nor is a specific number of class members required for numerosity."); *In re Sugar Industry Antitrust Litig.,* MDL No. 201, 1976 WL 1374, at *12 (N.D. Cal. 1976) ("*Sugar*") (same).  Rather, a finding of numerosity may be supported by common sense assumptions. *Rubber Chemicals,* 232 F.R.D. at 350; *Citric Acid,* 1996 WL 655791, at *3.

1    In this case, it is undisputed that the proposed Class contains thousands of members.

2    *NCAA*, 2013 WL 5979327, at *13. Thus, the proposed Settlement Class readily satisfies the

3    numerosity requirement of Rule 23.

4                    **2.    This Case Involves Questions of Law and Fact Common to the
                            Settlement Class.**
5

6        The second requirement for class certification under Rule 23 is that "there are questions of

7    law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The Ninth Circuit has ruled that the

8    commonality requirement is to be "construed permissively." *Hanlon*, 150 F.3d at 1019.  A court

9    must assess if "the class is united by a common interest in determining whether a defendant's

10   course of conduct is in its broad outlines actionable." *Blackie v. Barrack*, 524 F.2d 891, 902 (9th

11   Cir. 1975).  This requirement, however, is easily met: it is satisfied by the existence of a single

12   common issue. *In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 478 (W.D. Pa. 1999) ("*Flat*

13   *Glass*").

14       The commonality requirement is readily satisfied here, as this Court has already ruled in

15   the context of the litigated class. *NCAA*, 2013 WL 5979327, at *17-20. The common questions

16   here include whether there was a conspiracy to not pay college athletes for use of their NIL in

17   EA's videogames, whether that conduct violated the Sherman Act and common law and statutory

18   publicity rights, the duration of the challenged practices, and whether those practices caused harm

19   to proposed Settlement Class members.

20       These issues constitute a common core of questions focusing on the central issue of the

21   existence and effect of the alleged conspiracy and plainly satisfy the commonality requirement of

22   Rule 23(a)(2). *In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 479 (W.D. Pa. 1999) ("*Flat*

23   *Glass*"); *Estate of Jim Garrison v. Warner Bros., Inc.*, No. CV 95–8328 RMT, 1996 WL 407849,

24   at *2 (C.D. Cal. June 25, 2006).

25                   **3.    The Claims of the Representative Parties Are Typical of the Claims of
                            the Settlement Class.**

26       The third requirement for maintaining a class action under Rule 23(a) is that "the claims

27   or defenses of the representative parties [be] typical of the claims or defenses of the class."

28

- 14 -

"[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon,* 150 F.3d at 1020. "Generally, the class representatives 'must be part of the class and possess the same interest and suffer the same injury as the class members.'" *LCD*, 267 F.R.D. at 300. Here, the Court, in the context of the litigated class, has already found that the named parties' claims were "closely aligned" with those of class members and no unique defenses existed. *NCAA*, 2013 WL 5979327, at *21-*22. The same is true of the proposed Settlement Class.

### 4.   The Representative Plaintiffs Will Fairly and Adequately Protect the Interests of the Settlement Class.

The fourth requirement of Rule 23 mandates that the representative plaintiffs fairly and adequately represent the class. Fed. R. Civ. P. 23(a)(4). The adequacy requirement consists of two separate inquiries. First, the representative plaintiff must not possess interests which are antagonistic to the interests of the class. Second, the plaintiff must be represented by counsel of sufficient diligence and competence to fully litigate the claim. *Hanlon*, 150 F.3d at 1020; *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) ("*Lerwill*").

The representative Antitrust Plaintiffs here meet both aspects of the adequacy test. There are no actual or potential conflicts of interest between the representative plaintiffs and the members of the class. Plaintiffs, as well as each member of the proposed Settlement Class, were denied payment for the use of their NIL and have a mutual interest in establishing liability and recovering damages. The claims against EA and CLC are based on common antitrust theories. EA and CLC, therefore, allegedly injured plaintiffs and the Settlement Class members in the same manner. Plaintiffs seek relief substantially identical to that sought by every other proposed Settlement Class member. Accordingly, the interests of the representative plaintiffs and the putative class members are the same.

Moreover, Antitrust Plaintiffs have retained highly capable and well-recognized. They have undertaken the responsibilities assigned to them by the Court and have directed the efforts of other Plaintiffs' counsel in vigorously prosecuting this action. Plaintiffs' counsel are capable of, and committed to, prosecuting this action vigorously on behalf of the Settlement Class.

Plaintiffs' counsel's prosecution of this case, and, indeed, the Settlement, amply demonstrates their diligence and competence.  Therefore, the named Plaintiffs satisfy the requirements of Rule 23(a)(4). This Court reached a similar conclusion in the context of the litigated class. *NCAA*, 2013 WL 5979327, at *23-28.

### C.   The Proposed Class Satisfies The Requirements Of Rule 23(b)(3).

Once it is determined that the proposed class satisfies the requirements of Rule 23(a), a settlement class must be certified under Rule 23(b)(3) if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  "Judicial economy and fairness are the focus of the predominance and superiority requirements."  *Oregon Laborers-Employers*, 188 F.R.D. at 375. Plaintiffs' claims meet these requirements.

### 1.   Common Questions of Law and Fact Predominate Over Individual Questions.

As the United States Supreme Court has noted, predominance is a test that is "readily met" in antitrust cases.  *Amchem Prods.,* 521 U.S. at 625; *see also In Re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004).  The overwhelming weight of authority holds that in horizontal price-fixing cases, the predominance requirement is readily satisfied. *LCD,* 267 F.R.D. at 310 ("Courts have frequently found that whether a price-fixing conspiracy exists is a common question that predominates over other issues because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members.") The same logic should apply in a case involving an agreement not to recognize the publicity rights of college athletes.

In determining whether common questions predominate, "the focus of this court should be principally on issues of liability." *Sugar,* 1976 WL 1374, at *22; *Citric Acid*, 1996 WL 655791 at *6. *See also Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("*CBTF*"); *Hanlon*, 150 F.3d at 1022 ("common nucleus of facts and potential legal remedies dominates this litigation"). Common questions need only predominate;

they do not need to be dispositive of the litigation as a whole.  *In re Lorazepam & Clorazeopate Antitrust Litig.*, 202 F.R.D. 12, 29 (D. D.C. 2001); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 339 (E.D. Mich. 2001); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995).  The predominance standard is met "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996) ("*NASDAQ*").

In class cases brought under Section 1 of the Sherman Act (and, by analogy, cases based on agreements to deny plaintiffs payment for their right of publicity), the existence of a conspiracy has been recognized as the overriding issue common to all plaintiffs.  As the court acknowledged in *Rubber Chemicals*:  "the great weight of authority suggests that the dominant issues in cases like this are whether the charged conspiracy existed …." 232 F.R.D. at 353.  Courts in this district and elsewhere have held that this issue alone is sufficient to satisfy the Rule 23(b)(3) predominance requirement.  *See, e.g., Rubber Chemicals*, 232 F.R.D. at 353; *Citric Acid*, 1996 WL 655791, at *8.

Furthermore, courts have uniformly found predominant common questions of law or fact with respect to the existence, scope, and effect of the alleged conspiracy.  *See Citric Acid*, 1996 WL 655791, at *6 (common questions include whether there was a conspiracy, whether prices were fixed pursuant to the conspiracy, and whether the prices plaintiffs' paid were higher than they should have been); *Estate of Jim Garrison*, 1996 WL 407849, at *3 ("price fixing conspiracy cases by their nature deal with common legal and factual questions of the existence, scope and effect of the alleged conspiracy." (citation omitted)); *see also NASDAQ.*, 169 F.R.D. at 518.

Here, common issues relating to the existence of the agreement not to pay college athletes for use of their NIL predominate.  If separate actions were to be filed by each class member in the instant case, each would have to establish the existence of the same conspiracy and would depend on identical evidence, and each would prove damages using identical economic models.  The evidence needed to prove how the defendants implemented and enforced their agreement will be common for all class members. These issues pose predominant common questions of law and

- 17 -

fact.

### 2.  A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Case.

Rule 23(b)(3) provides that certification of a case is appropriate if class treatment "is superior to other available methods for the fair and efficient adjudication of the controversy." It sets forth four factors to be considered:  (1) the interest of members of the class in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by members of the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).  Prosecuting this action as a class action is clearly superior to other methods of adjudicating this matter.

The alternative to a class action—many duplicative individual actions—would be inefficient and unfair.  "Numerous individual actions would be expensive and time-consuming and would create the danger of conflicting decisions as to persons similarly situated." *Lerwill*, 582 F.2d at 512.  Further, it would deprive many class members of any practical means of redress. Because prosecution of an antitrust conspiracy case against economically powerful defendants is difficult and expensive, class members with all but the largest claims would likely choose not to pursue their claims.  *See CBTF*, 244 F.3d at 1163.  Most class members would be effectively foreclosed from pursuing their claims absent class certification.  *Hanlon*, 150 F.3d at 1023 ("many claims [that] could not be successfully asserted individually … would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs").  The proposed Settlement Class satisfies the requirements of Rule 23(b)(3).

## VI.  THE COURT SHOULD PROVISIONALLY CERTIFY THE RIGHT OF PUBLICITY SETTLEMENT CLASSES

The Right of Publicity Plaintiffs seek conditional certification of two classes: the *Keller* Right of Publicity Class and the *Hart/Alston* Right of Publicity Class (collectively "ROP Classes").  The two classes are substantively similar, the primary difference is that one arises out of the New Jersey law and the other arises out of California and Indiana law.

Current or former student-athletes are members of the ROP Classes if, during the respective class periods, a student-athlete's name is listed on a roster of a school whose team was included in an NCAA-Branded Videogame and his assigned uniform number appears on a virtual avatar from the same team.  The virtual avatars referred to in the preceding sentence are all depicted in EA's NCAA-Branded Videogames wearing uniforms with the same school name, logos, and unique colors as their real-world counterparts, all of which contribute to the likeness of the particular student-athletes.[10]  Some real-life NCAA football teams assign the same uniform number to more than one player.  EA's NCAA-Branded Videogames, however, never assign the same uniform number to two student-athletes who each play defense or offense.  Therefore, in situations where more than one student-athlete is assigned the same uniform number, the class administrator will determine which student-athlete appears in the game by reviewing which position the player is depicted as playing and/or what home-state  he is identified as hailing from on the school roster.  This methodology allows the administrator to mechanically identify ROP Class Members using objective criteria.

For example, the Arizona State University football roster for 2005-2006 season and the EA videogame for the 2005-2006 season (NCAA Football 2006) have the following information for Plaintiff Sam Keller.

| | OBJECTIVE CRITERIA | 2005-2006 ROSTER | 2006 NCAA FOOTBALL |
|---|---|---|---|
| 1. | Academic Institution | Arizona State | Arizona State |
| 2. | Assigned Jersey Number | 9 | 9 |
| 3. | Position | Quarterback | Quarterback |
| 4. | Sport/Division | Football/Div. I | Football/Div. I |
| 5. | Home State | California | California |

Keller's real-world school, assigned uniform number, sport, and division all match his virtual counterpart for the 2005 season and therefore he is in the *Keller* Right of Publicity Class.

---

[10] *See, e.g., Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821 (9th Cir. 1974) (holding that logo, markings, and colors attributable to plaintiff may constitute a likeness).

As with all other avatars on that team, Keller is depicted wearing an Arizona State uniform with Arizona state logos and colors, which contributes to his likeness.  To the extent there are additional players identified as wearing jersey number nine on the Arizona State University roster for the 2005 season (there are not), the class action administrator would look to his position (quarterback) to match the virtual player to his real-world counterpart.  Because EA never assigns the same uniform number to two student-athletes who each play defense or offense, there can only be two possible candidates for inclusion in the class if the administrator considers the players' positions.  To the extent there are multiple quarterbacks wearing jersey number nine on the Arizona State roster for the 2004 season, the administrator will look to the student-athlete's home state to distinguish between student-athletes.

This approach can easily be applied to the class. EA is disclosing, as part of confirmatory discovery, electronic spreadsheets containing the criteria described above that the claims administrator can use to identify virtual players in NCAA-branded videogames. To the extent the electronic data is missing or incomplete, ROP Plaintiffs pulled the school, assigned uniform number, position, sport/division, and home state directly from the roster files stored on each NCAA-branded videogame. ROP Plaintiffs used this data to create a database containing the objective criteria used by EA and the same objective criteria pulled directly from NCAA football and basketball rosters. This information, along with the fact that all avatars in EA's games are depicted in uniforms with school names, logos and unique colors, allows the administrator to easily match actual student-athletes to their virtual counterparts using the same objective criteria used by EA to misappropriate student-athletes' likenesses. By creating an administratively feasible methodology for the court to determine whether a particular individual is a member of the class, the ROP Plaintiffs have satisfied the prerequisite that the proposed class be ascertainable. *Galvan v. KDI Distrib. Inc.*, No. SACV 08-0999-JVS, 2011 U.S. Dist. LEXIS 127602, at *7 (C.D. Cal. Oct. 25, 2011) (recognizing that, although not explicit in Rule 23, courts imply a prerequisite that the proposed class be ascertainable); *In re Northrop Grumman Corp. ERISA Litig.*, No. CV 06-6213, 2011 U.S. Dist. LEXIS 94451, at *26 n.61 (C.D. Cal. Mar. 29,

2011) (Ascertainability is satisfied when it is "administratively feasible for the court to determine whether a particular individual is a member.").

### A.    The Right Of Publicity Classes Satisfy Rule 23.

For a settlement class to be certified, the requirements of Rule 23 of the Federal Rules of Civil Procedure must be satisfied. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (*citing Amchem*, 521 U.S. at 613). Trial manageability, however, is not a factor to consider when deciding whether to certify a settlement class because there will not be a trial. *Amchem*, 521 U.S. at 620. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).

As discussed below, both the *Keller* Right of Publicity Class and the *Hart/Alston* Right of Publicity Class satisfy the requirements for certification pursuant to Rule 23(a) and (b)(3). And although ROP Plaintiffs are not aware of any certified class action involving the specific right of publicity claims alleged here, courts in this district have certified Rule 23(b)(3) class actions involving analogous privacy rights. *See, e.g., Lane v. Facebook, Inc.*, No. C 08-3845 RS, 2010 WL 9013059 (N.D. Cal. Mar. 17, 2010), *aff'd*, 696 F.3d 811 (9th Cir. 2012) (alleging *inter alia* violations of the Electronic Communications Privacy Act (ECPA)); *In re Google Referrer Header Privacy Litig.*, No. 5:10-cv-4809 EJD, 2014 WL 1266091 (N.D. Cal. Mar. 26, 2014) (alleging violations of various Internet privacy rights). The Court should therefore conditionally certify the Right of Publicity Classes for settlement purposes.

### B.    The Rule 23(a) Requirements Are Satisfied.

Rule 23(a) provides four prerequisites that must be satisfied before a class can be certified: (1) the class must be so numerous that joinder of all members is impracticable; (2) questions of law or fact exist that are common to the class; (3) the claims of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and

adequately protect the interests of the class.  Fed. R. Civ. P. 23(a). All four requirements are satisfied here.

### 1. The Class Is So Numerous That Joinder of All Members Is Impracticable.

Rule 23(a)(1) requires the class be so numerous that joinder of all members is "impracticable." *Hanlon*, 150 F.3d at 1019 (*quoting* Fed. R. Civ. P. 23(a)(1)). "Plaintiffs do not need to state the exact number of potential class members, nor is a specific number of class members required for numerosity," *Rubber Chemicals*, 232 F.R.D. at 350, but courts have found as few as forty members sufficient. *Stuart v. Radioshack Corp.*, No. C-07-4499 EMC, 2009 WL 281941, at *5 (N.D. Cal. Feb. 5, 2009); *see also, e.g., Nguyen v. Baxter Healthcare Corp.*, 275 F.R.D. 596, 600 (C.D. Cal. 2011) (270-280 class members); *In re Citric Acid Antitrust Litig.,* No. 95-1092, C-95-2963 FMS, 1996 WL 655791, at *3 (N.D. Cal. Oct. 2, 1996) (class members "in the thousands").

EA is disclosing, as part of confirmatory discovery, spreadsheets that will allow ROP Plaintiffs to determine the exact number of ROP Class Members.  Based on discovery to date, it is estimated that there are approximately 77,550 appearances by ROP Class Members in NCAA Branded football videogames and 18,400 appearances by ROP Class Members in NCAA Branded men's basketball games. *See* Declaration of Leonard W. Aragon, ¶ 6. The numerosity requirement set forth of Rule 23(a)(1) is therefore satisfied.

### 2. This Case Involves questions of Law and Fact Common to the Settlement Class.

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality requirement serves chiefly two purposes: (1) ensuring that absentee members are fairly and adequately represented; and (2) ensuring practical and efficient case management." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010). The class members' claims must "depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (internal quotations and citations omitted).

1   Rule 23(a)(2) is "construed permissively." *Hanlon*, 150 F.3d at 1019. All that it requires is "a

2   single *significant* question of law or fact." *Abdullah*, 731 F.3d at 957 (emphasis in original).

3       Here there are multiple common issues of law and fact including: whether EA modeled its

4   avatars on the actual players on collegiate rosters; whether EA used player likenesses in its

5   videogames; whether EA's use of the images in the game was lawful; whether the CLC conspired

6   with EA to use player likenesses; whether EA's conduct violates California, Indiana, and New

7   Jersey state right of publicity laws; and whether class members have been injured by the Settling

8   Defendants' conduct and, if so, the amount of such damages. Any one of these material, common

9   questions satisfies the minimal requirements of Rule 23(a)(2).

10          **3.      The Claims of the Representative Parties Are Typical of the Claims of the Settlement Class.**

11

12      Typicality requires a determination of whether the named plaintiffs' claims are typical of

13   those of the proposed class they seek to represent.  Fed. R. Civ. P. 23(a)(3). The typicality

14   requirement is "satisfied when each class member's claim arises from the same course of events,

15   and each class member makes similar legal arguments to prove the defendant's liability."

16   *Rodriguez*, 591 F.3d at 1124. Like commonality, the typicality standard is permissive, requiring

17   "only that the representative's claims are 'reasonably co-extensive with those of absent class

18   members; they need not be substantially identical.'" *Id.* (quoting *Hanlon*, 150 F.3d at 1020). "The

19   requirement is usually met if the named plaintiffs have suffered the same or similar injuries as the

20   unnamed class members, the action is based on conduct which is not unique to the named

21   plaintiffs, and other class members were injured by the same course of conduct." *NCAA*, 2013

22   WL 5979327, at *4.

23      The proposed class representatives' interests are closely aligned with those of the absent

24   class. Like the class, all named plaintiffs were injured in the same way and by the same

25   conduct—all currently play or previously played for a Division I or II[11] men's football or

───────────────

26   [11] During the course of this litigation, the NCAA changed the titles of college football's Division I and Division II to Football Bowl Subdivision (FBS) and Football Championship Subdivision (FCS) respectively. When used here, Division I and Division II includes academic institutions

27   belonging to both FBS and FCS subdivisions, as well as to the traditional divisional splits for

28   collegiate basketball.

basketball team and all were injured by EA's use of their image or likenesses in an NCAA-branded videogame without their permission or compensation. *See* Third Am. Class Action Compl., ¶¶ 179-267. Nor are there any defenses that apply uniquely to the named plaintiffs. Because the proposed class representatives' claims rely on facts and legal theories identical to those of the class, the typicality requirement is satisfied.

### 4. The Representative Plaintiffs Will Fairly and Adequately Protect the Interest of the Settlement Class.

The fourth requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This final requirement is satisfied "as long as one of the class representatives is an adequate class representative." *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 n.2 (9th Cir. 2001), *cert. denied,* 534 U.S. 973 (2001). Adequacy under Rule 23(a)(4) turns on two basic questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously for the class?" *Hanlon*, 150 F.3d at 1020. "The mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical." *In re Static Random Access (SRAM) Antitrust Litig.*, No. C 07-1819 CW, 2008 WL 4447592, at *4 (N.D. Cal. Sept. 29, 2008).

The proposed class representatives are committed to the action and have devoted substantial time to assisting counsel with this action, reviewing and contributing to pleadings, responding to discovery, conducting interviews, and participating in mediations. Proposed class representatives have no interests that are antagonistic to other class members. To the contrary, the proposed class representatives and class members share a strong and identical interest in establishing liability and being compensated for the violation of their rights of publicity.

Likewise, Plaintiffs' Class Counsel satisfy the adequacy requirement. In retaining Hagens Berman Sobol Shapiro, The McKenna Law Firm, and Lum, Drasco and Positan, Plaintiffs have employed counsel with the necessary qualifications, experience, and resources. Based on the

substantial experience in class action and other complex litigation that ROP Class Counsel bring, coupled with their zealous prosecution of ROP Plaintiffs' claims, they are adequate.

### C.     The Rule 23(b)(3) Requirements Are Satisfied.

For certification under Rule 23(b)(3), common questions of law or fact must predominate over questions that affect only individual members of the class, and a class action must be found to be superior to other available methods of adjudication.  Fed. R. Civ. P. 23(b)(3). Both elements are satisfied here.

### 1.     Common Questions of Law and Fact Predominate Over Individual Questions.

The predominance inquiry is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2566 (2011) (*quoting Amchem*, 521 U.S. at 623). It "does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof. . . [only] that common questions *predominate* over any questions affecting only individual [class] members." *Amgen Inc.*, 133 S. Ct. at 1196 (internal quotations and citations omitted) (emphasis in original). Nor must a plaintiff show, at the class certification stage, that those "questions will be answered, on the merits, in favor of the class." *Abdullah*, 731 F.3d at 964.

Common issues predominate here. The salient evidence necessary to establish Plaintiffs' claims is common to both the ROP Class Representatives and all members of the ROP Class—they seek to prove that Defendants agreed to use student-athlete likenesses in NCAA-branded videogames, and that the EA used their names, images, and likenesses for a commercial purpose in NCAA-branded videogames. ROP Plaintiffs believe that the evidentiary presentation changes little if there are 100 Class members or 16,000,000:  in either instance, Plaintiffs would present the *same* admissions by Defendants that they agreed to use student-athlete likenesses in NCAA-branded videogames, and the *same* evidence that EA used student-athletes names, images, and likenesses in NCAA-branded videogames. In the words of the Ninth Circuit, these common questions – and more – "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication."  *Hanlon*, 150 F.3d at 1022.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"The potential existence of individualized damage assessments . . . does not detract from the action's suitability for class certification," *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010), but even if it did, there is no risk of that here. First, the relevant publicity rights laws uniformly provide for statutory damages, per publication. Cal. Civ. Code § 3344(g); I.C. 32-36-1-10. Courts routinely certify class actions under such circumstances. *See, e,g., Schulken v. Wash. Mut. Bank*, No. 09-cv-0278-LHK, 2012 WL 28099, at *14 (N.D. Cal. Jan. 5, 2012) (noting that "because Plaintiffs seek statutory damages, individual damage issues will not predominate"). Second, because videogame manufacturers do not separately license individual likenesses, but instead uniformly use group licenses, under no circumstances do ROP Plaintiffs anticipate being required to prove the precise value of individual likenesses. *See NCAA*, 2013 WL 5979327, at *6 ("Plaintiffs allege harm to competition within a *group* licensing market, not an individual licensing market. This distinction is important because it renders irrelevant any differences in the value of each class member's individual publicity rights.") (*citing Brown v. NFL Players Ass'n*, 281 F.R.D. 437, 442-43 (C.D. Cal. 2012); *Parrish v. NFL*, No. C 07-0943 WHA, 2008 WL 1925208, at *3 (N.D. Cal. Apr. 29, 2008)). For these reasons, common issues predominate over any relevant individual issues.

### 2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Case.

Rule 23(b)(3) requires a class action be superior to other methods of adjudicating the controversy. It enumerates certain factors that should be considered in this assessment including: (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum.  Fed. R. Civ. P. 23(b)(3).[12]

Regarding factors (i) and (iii), the cost to litigation in comparison to the damages sustained by the class is too low to incentivize Class Members to litigate their claims individually

---

[12] The fourth factor, trial manageability, is not relevant when deciding whether to certify a settlement class. *Amchem*, 521 U.S. at 620.

and weighs in favor of concentrating the claims in a single forum. This is especially true here given the high cost of marshaling the evidence necessary to litigate the claims and the disparity in resources between the typical ROP Class Member and the well-funded, litigation-savvy Defendants. *See, e.g., Keegan v. American Honda Motor Co*., 284 F.R.D. 504, 522 (C.D. Cal. 2012). Certification thus conserves both individual and already-strapped judicial resources.

ROP Plaintiffs' counsel have already devoted significant resources to this class litigation, including litigation in the Ninth Circuit, Third Circuit, Judicial Panel on Multidistrict Litigation, multiple motions to dismiss, managing a labor-intensive discovery and document-review effort, multiple mediations, creating a massive database of class members, and engaging in significant motion practice on various issues. It is folly to suggest that an individual litigant pursuing a case could invest the same resources.

Factor (ii) – the extent and nature of any similar litigation – also favors class certification. ROP Plaintiffs are not aware of any other litigation in the country involving similar ROP claims against the Settling Defendants. The New Jersey class action has been stayed so the case can be settled in this forum. Thus, all factors support a finding that the class action device is the most efficient and effective means of resolving this controversy.

For these reasons, the ROP Plaintiffs respectfully request that the Court certify the Right of Publicity Classes.

## VII.  THE COURT SHOULD APPOINT HLLP, HB, LPD, AND MCK AS SETTLEMENT CLASS COUNSEL

Fed. R. Civ. P. 23(c)(1)(B) states that "[a]n order certifying a class action … must appoint class counsel under Rule 23(g)."  Rule 23(g)(1)(C) states that "[i]n appointing class counsel, the court (i) must consider:  [1] the work counsel has done in identifying or investigating potential claims in the action, [2] counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, [3] counsel's knowledge of the applicable law, [4] the resources counsel will commit to representing the class."

1    The law firms of HLLP, HB, LPD and McK seek to be appointed as Settlement Class

2    Counsel.  The firms are willing and able to vigorously prosecute this action and to devote all

3    necessary resources to obtain the best possible result.  The work done to date supports the

4    conclusion that they should be appointed as Class Counsel for purposes of the Settlement.  *See,*

5    *e.g., Harrington v. City of Albuquerque*, 222 F.R.D. 505, 520 (D. N.M. 2004).  The firms meet

6    the criteria of Rule 23(g)(1)(C)(i). *Cf. Farley v. Baird, Patrick & Co., Inc.* No. 90 Civ. 2168

7    (MBM), 1992 WL 321632, at *5 (S.D.N.Y. Oct. 28, 1992) ("[c]lass counsel's competency is

8    presumed absent specific proof to the contrary by defendants").

9    **VIII.    PROPOSED PLAN OF NOTICE**

10    Rule 23(e)(1) states that, "[t]he court must direct notice in a reasonable manner to all class

11    members who would be bound by a proposed settlement, voluntary dismissal, or compromise."

12    Class members are entitled to the "best notice practicable under the circumstances" of any

13    proposed settlement before it is finally approved by the Court.  Fed. R. Civ. P. 23(c)(2)(b).  The

14    notice must state in plain, easily understood language the nature of the action, the definition of the

15    class certified, the class claims, issues, or defenses, that a class member may enter an appearance

16    through counsel if the member so desires, that the Court will exclude from the class any member

17    who requests exclusion, stating when and how members may elect to be excluded, and  the

18    binding effect of a class judgment on class members under Rule 23(c)(3). *Id.* Notice to the class

19    must be "the best notice practicable under the circumstances, including individual notice to all

20    members who can be identified through reasonable effort." *Amchem*, 521 U.S. at 617.

21    Plaintiffs propose that the notice be given to Settlement Class members through both

22    direct mailed notice and published notice in the forms attached as Exhibits B and C to the

23    Settlement Agreement.[13]  Such notice plans are commonly used in class actions like this one and

24    constitute valid, due and sufficient notice to class members, and constitute the best notice

25

---

26   [13]   Class Counsel have not yet selected a settlement notice and administration provider, but are in
       the process of reviewing bids from ten nationally-recognized class action administrators solicited
27    as part of a competitive process to insure the best practicable and most cost effective notice to the
       Class.  Class Counsel will advise the Court of the selected provider as soon as that determination
28    is made.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT

1  practicable under the circumstances. *See Moore's Federal Practice* (3d ed. 2003) at §23.63[8][a],

2  §23.63[8][b]; *Fraley*, 2012 WL 6013427, at *2*. The content of the proposed notice complies with

3  the requirements of Rule 23(c)(2)(B) as well as the Court's Procedural Guidance for Class Action

4  Settlements ("Procedural Guidance"). The form of notice is "adequate if it may be understood by

5  the average class member." *Newberg* § 11.53. The Notice clearly and concisely explains the

6  nature of the action and the terms of the Settlement. *See* Ex. 1B. It provides a clear description

7  of who is a member of the class and the binding effects of class membership. *Id.* It explains how

8  to exclude oneself from the Class, how to object to the Settlement, how to obtain copies of papers

9  filed in the case and how to contact class counsel. *Id.* It advises Class members that Class

10  Counsel will seek payment of attorneys' fees not to exceed 33% and expenses not to exceed

11  $2,500,000 as stipulated in the Settlement Agreement.[14] *Id.* It also advises Class members that

12  Class Counsel will seek incentive payments for the Class Representatives and the amount of each

13  payment.[15] *Id.*

14        This notice program fulfills the requirements of Federal Rule of Civil Procedure 23 and

15  due process. All Rule 23 requires is notice of the proposed settlement and an opportunity to

16  object. *Seattle*, 955 F.2d at 1289; *In re Cement and Concrete Antitrust Litig.*, 817 F.2d 1435,

17  1440 (9th Cir. 1987), *rev'd on other grounds*, 490 U.S. 93 (1989) ("*Cement*"). A "very general

18  description of the proposed settlement" will suffice. *Mendoza v. Tucson Sch. Dist. No. 1*,

19  623 F.2d 1338, 1352 (9th Cir. 1980), *cert. denied*, 450 U.S. 912 (1981), *disapproved of on other*

20  *grounds by Evans v. Jeff D.*, 475 U.S. 717 (1986); *accord Churchill Village*, 361 F.3d at 575. A

21  notice will not be faulted for failure to provide an estimate of recovery.[16] *Torrisi*, 8 F.3d at 1374;

22

23     [14]  A request for attorneys' fees not to exceed 33% ($13.2 million) and expenses not to exceed

24  $2,500,000 is particularly reasonable in light of the advanced stage of litigation in the *O'Bannon* case. In that case alone, lodestar exceeds $30 million and expenses exceed $4 million.

25  [15]  Class Counsel propose incentive payments ranging from $2,500 to $15,000 for the Class Representatives, all of whom have dedicated significant time assisting in the prosecution of their

26  respective cases, including providing factual information and assistance to Class Counsel, producing documents, and sitting for depositions.

27  [16]  Per the Court's Procedural Guidance, Plaintiffs have nevertheless included an estimated range of recovery grid, which is set forth below, that class members can use to calculate their individual

28  estimated recovery.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENT

*Cement*, 817 F.2d at 1441; *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1177-78 (9th Cir. 1977).

The contents of the notice fulfill the requirements of Rule 23 and due process. Accordingly, the Court should approve both.

## IX.     PROPOSED PLAN OF ALLOCATION.

A plan of allocation of class settlement funds is subject to the "fair, reasonable and adequate" standard that applies to approval of class settlements.  *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).  Under the Plan of Allocation set forth in the Agreement, the Settlement Fund will first be used to pay attorneys' fees and expenses approved by the Court, and the entire balance (the "Net Settlement Fund") will be distributed to class members that submit valid and timely claims as follows:

- 12.5% of the Net Settlement Fund will be allocated, *pro rata* per season roster appearance, to Antitrust Roster-Only Subclass Members;

- 10% of the Net Settlement Fund will be allocated, *pro rata* per season roster appearance, to *Hart/Alston* Right of Publicity Class Members; and

- 77.5% of the Net Settlement Fund will be allocated, *pro rata* per season roster appearance, to Antitrust Class Members other than Antitrust Roster-Only Subclass Members and *Keller* Right of Publicity Class Members.[17]

A plan of allocation that compensates class members based on the type and extent of their injuries is generally considered reasonable.  *In re Vitamins Antitrust Litig.,* No. 99-197 TFH, 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000). Here the proposed distribution will be on a *pro rata* basis within each grouping, with no similarly situated class member being favored over others. This type of distribution has frequently been determined to be fair, adequate, and reasonable. *See DRAM,* Dkt. No. 2093 at 2 (order approving *pro rata* distribution); *In re Lloyds' Am. Trust Fund*

---

[17]  In other words, class members who appear on the same number of season rosters within each allocation group will receive the same amount.  For example, all Roster-Only Sublcass Members who appeared on a roster for four seasons will be allocated the same amount as all other Roster-Only Subclass Members who appeared on a roster for four seasons.  Conversely, a Roster-Only Subclass Member who appeared on a roster for four seasons will be allocated four times as much as a Roster-Only Subclass Member who appeared on a roster in only one season.

*Litig.*, 2002 WL 31663577, at *19  (S.D.N.Y. Nov. 26, 2002) ("*pro rata* allocations provided in the Stipulation are not only reasonable and rational, but appear to be the fairest method of allocating the settlement benefits.").

Under the proposed plan of allocation, Class Counsel estimate the following ranges of recovery for each season's roster appearance using various claims rates[18]:

| | Amount Per Roster Year Appearance at Various Claims Rates | | | |
|---|---|---|---|---|
| | 100% | 75% | 50% | 25% |
| In Game 2003-2005 | $96-129 | $129-172 | $193-259 | $386-517 |
| In Game 2005-2014 | $166-238 | $222-317 | $332-476 | $665-951 |
| Roster Only 2005-2014 | $48-69 | $64-92 | $96-138 | $193-276 |

The following examples illustrate how the chart can be used by class members to estimate their own individual potential recoveries:

**Example 1**:  Player 1 was on the roster at the University of California and appeared in the videogame for four seasons from 2007 through 2011.  Assuming a 50% claims rate, Player 1's estimated recovery would be $1328-1904.

| Season/Version of Game | 2007/08 | 2008/09 | 2009/10 | 2010/11 | Total |
|---|---|---|---|---|---|
| Estimated Recovery | $332-476 | $332-476 | $332-476 | $332-476 | $1328-1904 |

**Example 2**:  Player 2 was on the roster at the University of California for four seasons from 2005 through 2009 but did not appear in the videogame.  Assuming a 25% claims rate, Player 2's estimated recovery would be $772-1104.

| Season/Version of Game | 2005/06 | 2006/07 | 2007/08 | 2008/09 | Total |
|---|---|---|---|---|---|
| Estimated Recovery | $193-276 | $193-276 | $193-276 | $193-276 | $772-1104 |

---

[18]  Based upon their own research, the work of their experts, and consultation with EA's counsel, Class Counsel estimate that there are approximately 140,000 to 200,000 roster appearances in the class.  To calculate estimated recovery amounts, Class Counsel first deducted from the $40 million settlement amount the maximum amount that could be awarded for attorneys' fees and costs, as well as estimated notice costs, to determine the net settlement amount.  The net settlement amount was then allocated between the three respective groups—the Roster-Only Subclass, the *Hart/Alston* Right of Publicity Class, and the overlapping group that includes the Antitrust Class Members other than Antitrust Roster-Only Subclass Members and *Keller* Right of Publicity Class Members—in the amount set forth above.  Class Counsel then calculated an amount per roster appearance in each of the groups, which is set forth in the chart above.  Class Counsel can provide the Court with additional detail regarding these calculations upon request.

**Example 3**:  Player 3 was on the roster at the University of California for four seasons from 2003 through 2007.  He did not appear in the videogame his first seasons, but did appear in the videogame in his other three seasons.  Assuming a 75% claims rate, Player 3's estimated recovery would be $573-806.

| Season/Version of Game | 2003/04 | 2004/05 | 2005/06 | 2006/07 | Total |
|---|---|---|---|---|---|
| Estimated Recovery | $0 | $129-172 | $222-317 | $222-317 | $573-806 |

**Example 4**:  Player 4 was on the roster at the University of California for four seasons from 1991 through 1995.  He appeared in the videogame as part of a classic team in 2003, 2007, and 2009. Assuming a 25% claims rate, Player 4's estimated recovery would be $1716-2419.

| Season/Version of Game | 2003/04 | 2007/08 | 2009/10 | Total |
|---|---|---|---|---|
| Estimated Recovery | $386-517 | $665-951 | $665-951 | $1716-2419 |

## X.     THE COURT SHOULD SET A FINAL APPROVAL HEARING SCHEDULE

The last step in the settlement approval process is the final approval hearing, at which the Court may hear all evidence and argument necessary to evaluate the proposed settlement. At that hearing, proponents of the settlement may explain and describe the terms and conditions and offer argument in support of settlement approval. Members of the settlement class, or their counsel, may be heard in support of or in opposition to the settlement. Plaintiffs propose the following schedule for final approval of the Settlement.  If preliminary approval is granted, the proposed Settlement Class members will be notified of the terms of the Settlement and informed of their rights in connection therewith, including their right to appear and be heard at the final approval hearing.[19]  The following is a proposed schedule:

Date                          Event

September 3, 2014[20]   Mailed notice sent to class members;

_____

[19] In addition to notice provided under the proposed schedule, within 10 days of the filing of this Motion for Preliminary Approval, EA shall cause notice of the proposed settlement to be provided to the Attorney General of the United States, and the attorneys general of the states in which any Class Member resides, in compliance with 28 U.S.C. § 1715(b). Ex. 1 at ¶ 2.

[20] The Court's Order, dated May 23, 2014 proposes September 3, 2014 as the date for mailing notice, followed by an opt-out deadline in early October and a final approval hearing in early December.  Plaintiffs additionally request that the Court set dates for the filing of fee and cost applications and final approval briefing.

| | |
|---|---|
| TBD | Filing of Plaintiffs' application for fees and costs; |
| TBD | Deadlines for opting out of the Settlement Class, objecting to the Settlement; |
| TBD | Deadline for filing list of any opt-outs with the Court; |
| TBD | Deadline for filing briefing in support of final approval of Settlement, and; |
| TBD | Hearing on final approval of Settlement. |

**XI.     CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit that the Court should enter an order granting the relief requested by this motion: (i) granting preliminary approval of the proposed Settlement and the related plan of allocation; (ii) appointing law firms of HLLP, HB, LPD and McK as Settlement Class Counsel; (iii) approving the manner and form of giving notice to Settlement Class members of the matters in this motion, (iv) establishing a timetable for issuing such notice, filing objections and briefs; and (v) conducting a hearing on final approval of the Settlement.

Dated: May 30, 2014

Respectfully submitted,

By: ___/s/ Leonard W. Aragon_____
Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonard@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Stuart M. Paynter (226147)
Celeste H.G. Boyd (*Pro Hac Vice*)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
Email: stuart@smplegal.com
        cboyd@smplegal.com

*Counsel for the Keller Right of Publicity Plaintiffs*

By: ___/s/ Hilary K. Scherrer_____
Michael D. Hausfeld (*pro hac vice*)
Hilary K. Scherrer (Cal. Bar No. 209451)
Sathya S. Gosselin (Cal. Bar. No. 269171)
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
E-mail: mhausfeld@hausfeldllp.com
        hscherrer@hausfeldllp.com
        sgosselin@hausfeldllp.com

Michael P. Lehmann (Cal. Bar No. 77152)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery St., 34th Floor
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
E-mail: mlehmann@hausfeldllp.com
        abailey@hausfeldllp.com

*Counsel for the Antitrust Plaintiffs*

By: ___/s/ Keith McKenna_____
Keith McKenna
THE MCKENNA LAW FIRM, LLC
96 Park Street
Montclair, NJ 07042
Telephone: 973-509-0050
Facsimile: 973-509-3580
Email: keith.mckenna@mcklaw.net

Dennis J. Drasco
Arthur M. Owens
LUM, DRASCO & POSITAN LLC
103 Eisenhower Pkwy.
Roseland, NJ 07068
Telephone: 973-403-900
Facsimile: 973-403-9021
Email: ddrasco@lumlaw.com
        aowens@lumlaw.com

*Counsel for the Hart Right of Publicity Plaintiffs*