Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| SAMUEL MICHAEL KELLER, on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>ELECTRONIC ARTS, INC.; NATIONAL COLLEGIATE ATHLETICS ASSOCIATION; COLLEGIATE LICENSING COMPANY,<br><br>     Defendants. | Case No. 4:09-cv-1967 CW<br><br>**RIGHT OF PUBLICITY PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS (NCAA SETTLEMENT)**<br><br>Judge: Hon. Claudia Wilken<br>Courtroom: 2, 4th Floor<br><br>Complaint Filed: May 5, 2009 |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     THE WORK UNDERTAKEN BY ROP CLASS COUNSEL ................................. 2

   A.   ROP Plaintiffs File Their Complaint. ............................................................. 2

   B.   ROP Plaintiffs Defeat Defendants' Motions to Dismiss and EA's Anti-SLAPP Motion. ... 3

   C.   ROP Plaintiffs Prepare For Trial. ................................................................... 4

      1.   Discovery from Defendants and Third Parties ....................................... 4

      2.   Compilation of Player Database ............................................................ 6

   D.   After More Than Four Years of Litigation, the Parties Settle the Claims. ........................... 7

      1.   EA & CLC Settlement ........................................................................... 7

      2.   NCAA Settlement ................................................................................. 8

      3.   The Revised Settlement Agreement and Coordination of Settlement Procedures ........... 9

      4.   The Notice Campaign ............................................................................ 9

III.    ARGUMENT ....................................................................................................... 10

   A.   Plaintiffs Have Requested a Reasonable Amount of Attorneys' Fees. ............................. 10

      1.   ROP Plaintiffs' Fee Request Is Reasonable under the "Common Fund" Percentage of Recovery Analysis. ................................................................................... 11

      2.   Plaintiffs' Fee Request Is Reasonable Under the Lodestar Cross-Check Method. ......... 14

         a.   The Number of Hours that ROP Plaintiffs' Counsel Devoted to this Litigation Is Reasonable. ................................................................ 14

         b.   ROP Plaintiffs' Counsel's Hourly Rates Are Reasonable. .......................................... 16

         c.   ROP Plaintiffs' Fee Request Is Reasonable Considering the Results Obtained, Time and Labor Required, Novelty and Complexity of the Litigation, the Risks Involved, and Counsel's Skill and Experience. ............................................ 17

   B.   ROP Plaintiffs' Expenses Are Reasonable and Were Necessarily Incurred. ...................... 21

   C.   ROP Plaintiffs Request Incentive Awards for the Four Class Representatives. ................. 22

IV.     CONCLUSION ................................................................................................... 24

RIGHT OF PUBLICITY PLS' MOT. FOR ATTYS' FEES, EXPENSES, AND INCENTIVE AWARDS (NCAA SETTLEMENT)
Case. No. 09-CV-1967 CW

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bellinghausen v. Tractor Supply Co.*,
   No. 13-CV-02377-JSC, 2015 WL 1289342 (N.D. Cal. Mar. 20, 2015) ................................. 19

*Brailsford v. Jackson Hewitt Inc.*,
   No. C 06 00700 CW, 2007 WL 1302978 (N.D. Cal. May 3, 2007) ........................................ 11

*Burden v. SelectQuote Ins. Servs.*,
   No. C 10-5966 LB, 2013 WL 3988771 (N.D. Cal. Aug. 2, 2013) .................................... 12, 13

*Camacho v. Bridgeport Fin., Inc.*,
   523 F.3d 973 (9th Cir. 2008) .................................................................................................. 16

*Canada v. Meracord*,
   No. 3:12-cv-05657-BHS (W.D. Wash.) .................................................................................. 21

*Chaudhry v. City of Los Angeles*,
   751 F.3d 1096 (9th Cir.) *cert. denied sub nom. City of Los Angeles, Cal. v. Chaudhry*,
   135 S. Ct. 295, 190 L. Ed. 2d 141 (2014) .............................................................................. 16

*Ching v. Siemens Indus., Inc.*,
   No. 11-CV-04838-MEJ, 2014 WL 2926210 (N.D. Cal. June 27, 2014) ................................ 13

*City of Roseville Emps. Ret. Sys. v. Orloff Fam. Tr. UAD 12/31/01*,
   No. 11-35455, 2012 U.S. App. LEXIS 11512 (9th Cir. June 7, 2012) ................................... 10

*Cook v. Niedert*,
   142 F.3d 1004 (7th Cir. 1998) ............................................................................................... 24

*Cordy v. USS-POSCO Indus.*,
   No. 12-CV-00553-JST, 2014 WL 1724311 (N.D. Cal. Apr. 28, 2014) .................................. 12

*Davis v. Elec. Arts Inc.*,
   775 F.3d 1172 (9th Cir. 2015) .................................................................................................. 4

*Di Giacomo v. Plains All Am. Pipeline*,
   Nos. 99–4137 & 99–4212, 2001 WL 34633373 (S.D. Fla. Dec. 19, 2001) ........................... 17

*Dryer v. Nat'l Football League*,
   No. CIV. 09-2182 ..................................................................................................................... 4

*Garner v. State Farm Mut. Auto. Ins. Co.*,
   No. CV 08 1365 CW, 2010 WL 1687829 (N.D. Cal. Apr. 22, 2010) ......................... 11, 14, 19

ii

RIGHT OF PUBLICITY PLS' MOT. FOR ATTYS' FEES, EXPENSES, AND INCENTIVE AWARDS (NCAA SETTLEMENT)
Case. No. 09-CV-1967 CW

*Glass v. UBS Fin. Servs.*,
   331 Fed. Appx. 452 (9th Cir. 2009) ...................................................................................... 11

*Harris v. Marhoefer*,
   24 F.3d 16 (9th Cir. 1994) ...................................................................................................... 22

*Hart v. Electronic Arts, Inc.*,
   No. 3:09-cv-05990-FLW-LHG (D. N.J. ) ("*Hart*") ............................................................ 7, 8

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) .................................................................................................. 10, 11, 14

*Hernandez v. Kovacevich*,
   No. 1:04CV5515OWWDLB, 2005 WL 2435906 (E.D. Cal. Sept. 30, 2005) ....................... 11

*Hopkins v. Stryker Sales Corp.*,
   No. 11-CV-02786-LHK, 2013 WL 496358 (N.D. Cal. Feb. 6, 2013) ................................... 17

*In re Apollo Group Inc. Secs. Litig.*,
   No. CV 04-2147, 2012 U.S. Dist. LEXIS 55622 (D. Ariz. Apr. 20, 2012) ........................... 10

*In re Apple Inc. Secs. Litig.*,
   No. 5:06-CV-05208, 2011 U.S. Dist. LEXIS 52685 (N.D. Cal. May 17, 2011) ................... 16

*In re Aremissoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002) ................................................................................................ 17

*In re Bluetooth Headset Products Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .................................................................................................. 17

*In re Carrier IQ Privacy Litig.*,
   No. 12-md-2330 EMC (N.D. Cal.) .......................................................................................... 20

*In re Charles Schwab Corp. Secs. Litig.*,
   No. 08-01510-WHA (N.D. Cal. Apr. 19, 2011), ECF No. 1101 ...................................... 16, 20

*In re Conseco Life Ins. Co. Life Trend Ins. Mktg. & Sales Practice Litig.*,
   No. C 10-02124 SI, 2014 WL 186375 (N.D. Cal. Jan. 16, 2014) ................................... 16, 24

*In re Equity Funding Corp. of Am. Secs. Litig.*,
   438 F. Supp. 1303 (C.D. Cal. 1977) ...................................................................................... 21

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ............................................................................................ 13, 24

*In re NCAA Student-Athlete Name & Likeness Litig.*,
   724 F.3d 1268 (9th Cir. 2013) .................................................................................................. 4

*In re NCAA Student-Athlete Name & Likeness Litig.*,
   No. C-09-1967, 2010 WL 5644656 (N.D. Cal. Dec. 17, 2010) ............................................... 4

*In re Nuvelo, Inc. Secs. Litig.*,
    No. C 07-04056, 2011 U.S. Dist. LEXIS 72260 (N.D. Cal. July 6, 2011) ...................... 11, 12

*In re Omnivision Technologies, Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008)................................................................................. 13

*In re Online DVD-Rental Antitrust Litig.*,
    No. 12-15705, 2015 WL 846008 (9th Cir. Feb. 27, 2015)................................................. 12, 24

*In re Optical Disk Drive Prods. Antitrust Litig.*,
    No. 10-md-2143 RS (N.D. Cal. June 4, 2010), ECF No. 96 (in deciding lead counsel in
    an antitrust MDL, Judge Walker noted that each firm applying to be lead counsel
    brought "impressive skills and experience to the proposed task," but that when taking
    into account the proposed fee and analysis of the prospects for recovery, the "clear
    choice" was Hagens Berman)............................................................................................... 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ......................... 11, 13, 16, 17

*In re Toyota Motor Corp. Unintended Acceleration Mktg.*, *Sales Practices & Prods. Liab.
Litig.*,
    8:10ML2151 JVS (C.D. Cal.)............................................................................................... 19

*In re U.S. Bancorp. Litig.*,
    291 F.3d 1035 (8th Cir. 2002) .............................................................................................. 24

*In re Visa-MasterCard Litigation*,
    CV-96-5238 (E.D.N.Y.) ....................................................................................................... 19

*In re Wachovia Corp. "Pick-A-Payment" Mortg. Mktg. & Sales Practices Litig.*
    ("*Wachovia*"), No. 5:09- md-02105, 2011 U.S. Dist. LEXIS 55351 (N.D. Cal. May 17,
    2011)............................................................................................................................... 10, 11

*Keller v. Electronic Arts, Inc.*,
    No. C-09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010)............................................. 3, 4, 8

*Kerr v. Screen Extras Guild, Inc.*,
    526 F.2d 67 (9th Cir. 1975) .................................................................................................. 17

*Larsen v. Trader Joe's Co.*,
    No. 11-CV-05188-WHO, 2014 WL 3404531 (N.D. Cal. July 11, 2014) ............................... 19

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................................................. 17

*Milliron v. T-Mobile USA, Inc.*,
    423 F. App'x 131 (3d Cir. 2011) ......................................................................................... 17

iv

*Moreno v. City of Sacramento*,
    534 F.3d 1106 (9th Cir. 2008) ........................................................................ 15

*Morris v. Lifescan, Inc.*,
    54 Fed. Appx. 663 (9th Cir. 2003) ................................................................ 11

*O'Bannon v. NCAA*,
    No. 09-cv-3329-CW (N.D. Cal.) ("*O'Bannon*") ................................................ 1, 3

*Pecover v. Electronic Arts. Inc.*,
    No. 08-cv-02820-CW (N.D. Cal. May 30, 2013) ........................................ 17, 20

*Pierce v. Rosetta Stone, Ltd.*,
    No. C 11-01283 ........................................................................................ 23, 24

*Pokorny v. Quixtar, Inc.*,
    No. C 07-0201 SC, 2013 WL 3790896 (N.D. Cal. July 18, 2013) ................ 12, 17

*Rock v. NCAA*,
    No. 1:12-cv-1019 ............................................................................................ 21

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) .......................................................................... 22

*Ross v. Roberts*,
    222 Cal. App. 4th 677, 166 Cal. Rptr. 3d 359 (2013), *review denied* (Apr. 16, 2014) ............ 4

*Ruwe et al. v. Cellco P'ship d/b/a Verizon Wireless*,
    No. 07-03679 JSW (N.D. Cal. Nov. 16, 2012) ................................................ 16

*Sobel v. Hertz Corp.*,
    No. 306-CV-00545-LRH-RAM, 2014 WL 5063397 (D. Nev. Oct. 9, 2014) ............ 17

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) .......................................................................... 22

*Steiner v. Am. Broad. Co. Inc.*,
    248 Fed. Appx. 780 (9th Cir. 2007) ................................................................ 12

*Stuart v. RadioShack Corp.*,
    No. C-07-4499, 2010 U.S. Dist. LEXIS 92067 (N.D. Cal. Aug. 9, 2010) ............ 16

*Thieriot v. Celtic Ins. Co.*,
    No. C 10-04462, 2011 U.S. Dist. LEXIS 44852 (N.D. Cal. Apr. 21, 2011) ............ 11

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
    896 F.2d 403 (9th Cir. 1990) .......................................................................... 16

*Van Vraken v. Atl. Richfield Co.*,
    901 F. Supp. 294 (N.D. Ca. 1995) .................................................................. 23

v

*Vedachalam v. Tata Consultancy Servs., Ltd*,
  No. C 06-0963 CW, 2013 WL 3941319 (N.D. Cal. July 18, 2013) ........................................ 12

*Villegas v. J.P. Morgan Chase & Co.*,
  No. CV-09-00261-SBA-EMC, 2012 WL 5878390 (N.D. Cal. Nov. 21, 2012) ...................... 13

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ............................................................ 11, 12, 17, 19

S T A T U T E S

Cal. Bus. & Prof. Code § 17200 .................................................................. 3

Cal. Civ. Code § 3344 ..................................................................... 2, 14

Cal. Code Civ. P. § 425.16 ..................................................................... 14

Ind. Code § 32-36-1-1 ......................................................................... 2

O T H E R   A U T H O R I T I E S

Federal Rule of Appellate Procedure 12.1 ........................................................ 8

Federal Rules of Civil Procedure 23 ............................................................. 10

Federal Rules of Civil Procedure 23(h) .......................................................... 10

Federal Rule of Civil Procedure 62.1 ............................................................. 8

First Amendment ......................................................................... 3, 4, 19

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on July 16, 2015, at 2:00 P.M., before the Honorable Claudia Wilken, United States District Judge of the Northern District of California, located in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA 94612, Right of Publicity Plaintiffs and Class Representatives Samuel Keller, Bryan Cummings, LaMarr Watkins, and Bryon Bishop, by and through their counsel and Class Counsel Hagens Berman Sobol Shapiro, The Paynter Law Firm, Saltz, Mongeluzzi, Barrett, & Bendesky, and Weinstein Kitchenoff & Asher, will, and hereby do, move for an award of attorneys' fees, expenses, and incentive awards to the named plaintiffs. This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities, the declarations in support of the motion, argument by counsel at the hearing before this Court, any papers filed in reply, such oral and documentary evidence as may be presented at the hearing of this motion, and all papers and records on file in this matter.

# STATEMENT OF ISSUES

Whether this Court should approve (1) an award of attorneys' fees in the amount of $5,800,000 to Right of Publicity Plaintiffs' counsel, which equals 29 percent of the $20 million NCAA Settlement; (2) reimbursement of $224,434.20 in expenses incurred by counsel on behalf of the class, and (3) incentive awards of $5,000 each to the named plaintiffs Samuel Keller, Bryan Cummings, LaMarr Watkins, and Bryon Bishop.

RIGHT OF PUBLICITY PLS' MOT. FOR ATTYS' FEES, EXPENSES, AND INCENTIVE AWARDS (NCAA SETTLEMENT)
Case. No. 09-CV-1967 CW

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

For over a decade, Defendants Electronic Arts Inc. ("EA"), the Collegiate Licensing Company ("the CLC"), and the National Collegiate Athletic Association ("the NCAA") reaped handsome profits by blatantly and unlawfully using the names and likenesses of college student-athletes in videogames produced by EA. After extensive pre-filing investigation, counsel for the Right of Publicity Plaintiffs ("ROP Plaintiffs"[1]) were the first to file a nationwide right-of-publicity class action lawsuit in 2009 to put a stop to this illegal conduct and to compensate student-athlete class members. From the start, the suit was extremely risky. Indeed, if ROP Plaintiffs had not prevailed, they would have had to pay Defendants' fees and costs under mandatory fee-shifting provisions. Although ROP Plaintiffs' case was later consolidated with the antitrust claims filed in the *O'Bannon* lawsuit, it was the strength of the right-of-publicity claims and ROP counsel's prosecution of the case that drove settlement discussions and ultimately resulted in the highly favorable settlement that class members now enjoy.

Five years after filing this groundbreaking suit, ROP counsel[2] seek to recover the fees and costs incurred in obtaining a historic recovery for the class. The $20 million settlement reached between ROP Plaintiffs and the NCAA ("NCAA Settlement") makes monetary relief available to thousands of student-athletes. Together with the $40 million settlement reached with EA ("EA Settlement"), a gross fund of $60 million is available to compensate student-athletes for the first time for the use of their name, image, or likeness in videogames produced by EA ("Combined Settlement"). In the aggregate, the Combined Settlement fund represents a significant share of the recovery—50-75%, by counsel's estimate—that could be had at trial. The claims procedures ensure that, individually, class members who make timely claims receive close to the maximum they

---

[1] The term "Right of Publicity Plaintiffs" ("ROP Plaintiffs") refers to the plaintiffs named in the "Third Consolidated Amended Class Action Complaint" (July 18, 2013) (Dkt. No. 831) ("TCAC") asserting right of publicity claims (Samuel Keller, Bryan Cummings, LaMarr Watkins, and Bryon Bishop).

[2] Hagens Berman Sobol Shapiro, The Paynter Law Firm, Saltz, Mongeluzzi, Barrett, & Bendesky, and Weinstein Kitchenoff & Asher.

1

could achieve at trial, while remaining funds are distributed to all other class members that can be identified with additional effort (and cost), on an equitable basis.

ROP Plaintiffs' class counsel request (i) an award of $5,800,000 in attorneys' fees, representing 29% of the NCAA Settlement fund; (ii) reimbursement of $224.434.20 in expenses;[3] and (iii) incentive awards of $5,000 each for named plaintiffs Samuel Keller, Bryan Cummings, LaMarr Watkins, and Bryon Bishop. This request is reasonable given ROP class counsel's dedication to this case, their zealous advocacy on behalf of the class, the risks of bringing and proceeding with the case, and the vigorous opposition posed by Defendants represented by well-funded defense counsel with substantial experience litigating related issues.

## II.    THE WORK UNDERTAKEN BY ROP CLASS COUNSEL

### A.    ROP Plaintiffs File Their Complaint.

In early 2009, counsel for the ROP Plaintiffs began investigating accusations that EA was using the names, images, and likenesses of student-athletes without consent or pay in its NCAA-Branded Videogames.[4] ROP counsel investigated the case for months, reviewing and cataloguing game and real-world rosters, researching state right-of-publicity statutes and other applicable laws, researching choice of law issues, investigating potential defendants, meeting with student-athletes from across the country, and reviewing complex NCAA rules, regulations, bylaws, and constitutions. In May of that year, Plaintiff Samuel Keller filed the first nationwide class action against the NCAA, EA, and the CLC.[5] The complaint alleged the unlawful use of college athletes' names, images, and likenesses in NCAA-branded football and basketball videogames produced and sold by EA. ROP Plaintiffs asserted claims under California (as to EA) and Indiana (as to the NCAA) right of publicity statutes (Cal. Civ. Code § 3344, Ind. Code § 32-36-1-1), and the

---

[3] ROP Plaintiffs seek fees and costs in addition to costs incurred by the notice and claims administrator.

[4] *NCAA Football 2004, NCAA Football 2005, NCAA Football 2006, NCAA Football 2007, NCAA Football 08, NCAA Football 09, NCAA Football 10, NCAA Football 11, NCAA Football 12, NCAA Football 13, NCAA Football 14, NCAA March Madness 2004, NCAA March Madness 2005, NCAA March Madness 06, NCAA March Madness 07, NCAA March Madness 08, NCAA Basketball 09,* and *NCAA Basketball 10* (collectively, "NCAA-Branded Videogames").

[5] Dkt. No. 1. Unless otherwise indicated, docket references are to the docket in No. C-09-1967.

California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) (as to EA). The complaint also asserted various common law theories, including common law right-of-publicity claims and the existence of a conspiracy between EA and the NCAA to violate publicity rights. The case was unique and immediately drew national attention, but it also presented a substantial risk: The novel legal questions presented were subject to California's anti-SLAPP and right of publicity statutes' mandatory fee shifting provisions.

After Keller's groundbreaking filing challenging Defendants' exploitation of college athletes, plaintiff Edward O'Bannon filed an antitrust case against the NCAA and the CLC in July 2009.[6] The Court ordered consolidation of the *O'Bannon* and *Keller* cases (as well as other actions) in March 2010.[7] The Court appointed Hausfeld LLP as co-lead counsel in this litigation with "primary responsibility" for the claims in *O'Bannon* and Hagens Berman Sobol Shapiro LLP ("HBSS") as co-lead counsel with "primary responsibility" for the claims in *Keller*.[8] The two firms filed a Consolidated Amended Complaint in March 2010 asserting both right-of-publicity and antitrust claims.[9]

**B.     ROP Plaintiffs Defeat Defendants' Motions to Dismiss and EA's Anti-SLAPP Motion.**

Before consolidation, the NCAA, EA, and the CLC filed motions to dismiss the right-of-publicity claims.[10] EA also filed a special motion to strike under California's anti-SLAPP statute arguing that its conduct was protected by the First Amendment.[11] In February 2010, the Court issued an order denying the CLC's and EA's motions to dismiss, as well as EA's anti-SLAPP motion.[12] The Court granted the NCAA's motion to dismiss the Indiana right-of-publicity and breach of contract claims, but with leave to amend.[13] After the filing of the Consolidated Amended

---

[6] Dkt. No. 1 in *O'Bannon v. NCAA*, No. 09-cv-3329-CW (N.D. Cal.) ("*O'Bannon*").

[7] *O'Bannon* Dkt. No. 139.

[8] Dkt. No. 146.

[9] Dkt. No. 175. The Court deconsolidated the cases for trial on May 23, 2014. *See* Dkt. No. 147.

[10] Dkt. Nos. 34, 47, 48.

[11] Dkt. No. 35.

[12] *Keller v. Electronic Arts, Inc.*, No. C-09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010).

[13] *Id.*

Complaint, the NCAA and CLC moved again to dismiss certain right-of-publicity claims, but those motions were denied in full.[14]

EA filed an interlocutory appeal of its anti-SLAPP motion, and this Court stayed further proceedings as to EA in *Keller* pending that appeal.[15] Over a dozen amici participated, highlighting the national significance of the case. The amici included virtually every major professional sports players association, the Screen Actors Guild, the Motion Picture Association of America, and numerous publishing companies. In July 2013, the Ninth Circuit affirmed this Court's ruling in full.[16] The Court rejected all of EA's First Amendment defenses, including the argument that its use of Keller's likeness was protected as a transformative use.[17] EA filed a petition for *certiorari* in the United States Supreme Court, but agreed to dismissal of its petition in connection with the EA Settlement.[18] The decision has become a leading right-of-publicity case in the country, defining the law for the Ninth Circuit, California state courts, and courts across the country.[19]

## C.   ROP Plaintiffs Prepare For Trial.

Although their case was stayed as to EA pending the appeal of the Court's anti-SLAPP decision, ROP Plaintiffs pursued discovery from the NCAA, the CLC, and third parties, and monitored and processed EA discovery, to prepare for trial and minimize discovery on remand. The following is a brief summary of the discovery sought and obtained.

### 1.   Discovery from Defendants and Third Parties

ROP Plaintiffs coordinated their discovery efforts with the Antitrust Plaintiffs[20] and Defendants to minimize the burdens on all parties and to comply with the Court's order

---

[14] Dkt. No. 325.

[15] *In re NCAA Student-Athlete Name & Likeness Litig.*, No. C-09-1967, 2010 WL 5644656 (N.D. Cal. Dec. 17, 2010).

[16] *In re NCAA Student-Athlete Name & Likeness Litig.*, 724 F.3d 1268 (9th Cir. 2013).

[17] *Id.* at 1280.

[18] Carey Decl. ¶ 28, Order Dismissing Writ of Certiorari, Supreme Court Dkt. No. 13-377.

[19] The Ninth Circuit's decision in *Keller* has been cited by numerous courts including *Davis v. Elec. Arts Inc.*, 775 F.3d 1172, 1178 (9th Cir. 2015); *Dryer v. Nat'l Football League*, No. CIV. 09-2182 PAM/FLN, 2014 WL 5106738, at *12-13 (D. Minn. Oct. 10, 2014); and *Ross v. Roberts*, 222 Cal. App. 4th 677, 687, 166 Cal. Rptr. 3d 359, 367 (2013), *review denied* (Apr. 16, 2014).

[20] The term "Antitrust Plaintiffs" refers to the plaintiffs raising antitrust claims in the "Third Consolidated Amended Class Action Complaint" (July 18, 2013) (Dkt. No. 831) ("TCAC"):

consolidating the two cases and appointing co-lead counsel. With respect to Defendants CLC and NCAA, ROP Plaintiffs served discovery, negotiated and entered into ESI protocols, and obtained approximately 257,000 documents.[21] ROP Plaintiffs' counsel efficiently reviewed and analyzed the documents by coding and indexing all relevant documents, and identifying exhibits for trial.[22] ROP counsel also reviewed responses to interrogatories and RFAs relevant to ROP claims.[23] When discovery disputes arose, ROP Plaintiffs resolved their individual disputes without judicial intervention. ROP Plaintiffs' counsel also participated in almost three dozen depositions relating to Defendants' conduct, and while most depositions covered antitrust topics unrelated to ROP claims, counsel monitored each deposition to identify ROP issues and protect the interests of the putative class. When depositions were clearly focused on antitrust issues, ROP Plaintiffs' counsel participated in the deposition by internet stream and/or phone to avoid incurring unnecessary costs and travel expenses. When depositions were likely to discuss ROP issues, counsel attended in person.[24]

With respect to Defendant EA, ROP Plaintiffs were not permitted to serve discovery due to the stay, but counsel reviewed all materials produced in response to antitrust discovery requests, coded and indexed all relevant documents produced by EA, and identified exhibits for trial.[25] ROP counsel also monitored all EA depositions, and actively communicated with counsel for EA in efforts to minimize discovery on remand.[26] In addition, ROP counsel reviewed, coded, and indexed thousands of documents from third parties, and conducted substantial informal discovery from third parties before and during the litigation.[27] Indeed, ROP counsels' investigation led to the initial

---

Edward C. O'Bannon Jr., Oscar Robertson, William Russell, Harry Flournoy, Alex Gilbert, Sam Jacobson, Thad Jaracz, David Lattin, Patrick Maynor, Tyrone Prothro, Damien Rhodes, Eric Riley, Bob Tallent, Danny Wimprine, Ray Ellis, Tate George, Jake Fischer, Jake Smith, Darius Robinson, Moses Alipate, and Chase Garnham.

[21] Carey Decl. ¶ 29.
[22] Carey Decl. ¶ 30.
[23] Carey Decl. ¶ 31.
[24] Carey Decl. ¶ 32.
[25] Carey Decl. ¶ 33.
[26] Carey Decl. ¶ 34.
[27] Carey Decl. ¶ 35.

complaint that started this entire process. Despite the stay, ROP Plaintiffs had sufficient documentary evidence to move for class certification and proceed to trial against the NCAA by March 23, 2015, as ordered by this Court.[28]

### 2. Compilation of Player Database

The antitrust motion to certify a damages class was denied, in part, because the "[Antitrust] Plaintiffs have not offered a feasible method for determining on a class-wide basis which student-athletes are depicted in these videogames and which are not."[29] By contrast, ROP Plaintiffs identified this issue early in the case and began preparing a comprehensive interactive database of all student-athletes in real-world rosters and videogame rosters.[30] This was a massive undertaking given that the NCAA-Branded Videogames had approximately 3,900 teams and 75,000 students.[31] To create the databases for use at class certification, ROP counsel collected Division I football and men's basketball rosters for the ROP class period.[32] Using this information, ROP counsel created a database containing roster information—including, among other things, school, assigned uniform number, position, sport/division, and home state—for each student-athlete.[33] The database is referred to as the Real Roster Database. ROP counsel created a second database with the same roster information pulled from the virtual rosters in EA's NCAA-Branded Videogames—the Virtual Roster Database.[34] ROP counsel then merged the Real Roster Database and Virtual Roster Database (together the "Player Database") to allow the creation of queries based on the virtual and real-world roster information.[35] This allows anyone to quickly and objectively match student-athletes from the real world with their virtual counterpart using uniform number, school, division, sport, position and home state.[36] The parameters can be adjusted based on the desired comparison,

---

[28] Dkt. No. 1092 at 10-11.
[29] Dkt. No. 893 at 21.
[30] Carey Decl. ¶ 36.
[31] Carey Decl. ¶ 37.
[32] Carey Decl. ¶ 38.
[33] Carey Decl. ¶ 39.
[34] Carey Decl. ¶ 40.
[35] Carey Decl. ¶ 41.
[36] Carey Decl. ¶ 42.

but in all cases the resulting queries are consistent, accurate, and easily verified.[37] To confirm the reliability of the Player Database, ROP Plaintiffs hired expert consultants OSKR—experts in sports and entertainment cases with institutional knowledge about the issues that allowed them to quickly and efficiently complete their work.[38]

Once the EA/CLC case was settled, ROP Plaintiffs conducted confirmatory discovery with EA regarding its virtual player database.[39] Even though the information from EA was incomplete, the data allowed ROP Plaintiffs to confirm the accuracy of the Virtual Roster Database.[40] ROP Plaintiffs also confirmed that the Virtual Roster Database contains more information about virtual players in NCAA-Branded Videogames games than EA's own records and is equally accurate.[41] Likewise, the NCAA did not maintain rosters with corresponding information regarding student-athletes' likeness for the entire class period.[42] ROP Plaintiffs' Real Roster Database resolved this issue by locating and incorporating relevant data for all schools over the entire ROP class period.[43] To assist the Antitrust Plaintiffs and Plaintiff in *Hart*,[44] ROP Plaintiffs updated the database to include class members from their respective classes who were not included in the original database.[45] This was a substantial task because the longer limitations period required collection of much older real-world data. The final Player Database, however, contains all relevant information for the California right of publicity, Antitrust, and New Jersey right of publicity class periods.

## D.     After More Than Four Years of Litigation, the Parties Settle the Claims.

### 1.    EA & CLC Settlement

Settlement talks among ROP Plaintiffs, Antitrust Plaintiffs, NCAA, EA, and the CLC took place before Judge Edward Infante (Ret.) in 2011, but did not lead to a resolution.[46] Following the

---

[37] Carey Decl. ¶ 43.
[38] Carey Decl. ¶ 44; *see also* www.OSKR.com (last visited April 11, 2015).
[39] Carey Decl. ¶ 45.
[40] Carey Decl. ¶ 46.
[41] Carey Decl. ¶ 47.
[42] Carey Decl. ¶ 48.
[43] Carey Decl. ¶ 49.
[44] *Hart v. Electronic Arts, Inc.*, No. 3:09-cv-05990-FLW-LHG (D. N.J. ) ("*Hart*").
[45] Carey Decl. ¶ 49.
[46] Carey Decl. ¶ 50.

1    Ninth Circuit's *Keller* decision on July 31, 2013, which rejected the Defendants' primary defense

2    to a publicity rights claim, counsel for ROP Plaintiffs, Antitrust Plaintiffs, and EA scheduled

3    another mediation before Randy Wulff on September 10, 2013. This time the mediation included

4    then-counsel for *Hart*. The basic parameters of the settlement were agreed upon at that session and

5    the parties proceeded to draft a term sheet and then a long-form agreement.[47] The client in *Hart*

6    then rejected the settlement and replaced his counsel. The substitute counsel, Lum, Drasco &

7    Positan, LLC and the McKenna Law Firm LLC, continued negotiations and agreed to substantively

8    analogous settlement terms after consulting with counsel for ROP Plaintiffs.[48] There were issues

9    remaining about how to allocate the proposed settlement fund and those were resolved in multiple

10   sessions with Wulff in April 2014.[49] The settling parties spent the next month finalizing the

11   settlement agreement and filed the proposed settlement papers on May 30, 2014.[50] ROP Plaintiffs

12   and EA also filed a joint motion under Federal Rule of Civil Procedure 62.1 and Federal Rule of

13   Appellate Procedure 12.1 for an indicative ruling.[51] The Court granted the Joint Motion and

14   indicated that it would preliminarily approve the settlement on July 16, 2014, allowing for a limited

15   remand to the District Court from the Court of Appeals.[52] The Court of Appeals granted the limited

16   remand on July 24, 2014.[53]

17       **2.   NCAA Settlement**

18           In 2014, the ROP Plaintiffs, Antitrust Plaintiffs, and the NCAA participated in two

19   mediation efforts with Magistrate Judge Cousins to settle the NCAA issues, but were

20

21       [47] Carey Decl. ¶ 51.

22       [48] Carey Decl. ¶ 52.

23       [49] Carey Decl. ¶ 53.

         [50] Dkt. No. 1108. A fee dispute arose between the *Hart* Plaintiffs and the ROP Plaintiffs and
24   was resolved with the assistance of a mediator. Hagens Berman agreed to give the *Hart* Plaintiffs'
     attorneys $300,000 of any fee received in this case to resolve the fee dispute. This money is in
25   addition to fees awarded to counsel for the *Hart* Plaintiffs and will be paid for by counsel for the
     ROP Plaintiffs. The parties also agreed that counsel for the ROP Plaintiffs would not raise any
26   issues with the lodestar submitted by *Hart* Plaintiffs' counsel, but may respond to Court questions
     regarding contributions to the settlement.

27       [51] Carey Decl. ¶ 54.
         [52] Carey Decl. ¶ 55.
28       [53] Dkt. No. 179.

8

unsuccessful.[54] ROP Plaintiffs continued to negotiate with the NCAA on their own and reached an agreement in principle with the NCAA on or about June 9, 2014.[55] The resulting settlement agreement was signed on June 30, 2014.[56] The historic settlement represented the first time student-athletes would be compensated for the use of their names, images, and likenesses—a sea change in NCAA dogma. ROP Plaintiffs and the NCAA filed their settlement papers on June 30, 2014.[57]

### 3.   The Revised Settlement Agreement and Coordination of Settlement Procedures

On July 3, 2104, the Court held a telephonic status conference and provided comments on the parties' proposed class notices and claim form for each settlement. The Court also requested that the parties submit revised settlement papers, and rescheduled the Preliminary Approval Hearing for both settlements to July 24, 2014.[58] In response, the parties to each settlement revised their agreements to allow for a single notice, allocation plan, preliminary and final approval schedule, objection and opt-out plan, and claims process. The parties also reached consensus regarding several ancillary issues, such as defined terms and deadlines, to ensure consistency between the two settlements. The new settlements also completely altered the plans of allocations by moving to a point-based system, although the settlement amounts and proportional distribution to each settlement class was substantively the same. The entire process was designed to reduce administrative costs, increase the claims rate, and avoid confusion. The streamlining process was contentious and time consuming, but ultimately fruitful.[59]

### 4.   The Notice Campaign

A major component of the notice campaign was a requirement that the settling parties make a good faith effort to collect last known contact information for class members.[60] Counsel for ROP

---

[54] Dkt Nos. 1015, 1017.
[55] Carey Decl. ¶ 57.
[56] Carey Decl. ¶ 58.
[57] Dkt. No. 1138.
[58] Dkt. No. 1145.
[59] Carey Decl. ¶ 59.
[60] Dkt. No. 312.

9

Plaintiffs led the coordination efforts, assisted primarily by the NCAA. ROP counsel subpoenaed over 135 NCAA member institutions, and spoke directly to hundreds of students, school-officials, attorneys, agents, and other staff members representing NCAA member institutions and their affiliates, ultimately collecting contact information for approximately 87,406 student athletes.[61] The notice campaign is still ongoing but has been hugely successful. To date, there have been 8,273 claims; only three putative class members have requested exclusion and only one person has filed an objection.[62] The single objection has nothing to do with ROP Plaintiffs' claims and is based on a dispute between counsel for the Antitrust Plaintiffs and a former class representative.[63]

### III.   ARGUMENT

**A.   Plaintiffs Have Requested a Reasonable Amount of Attorneys' Fees.**

Rule 23 of the Federal Rules of Civil Procedure provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."[64] "[A]wards of attorneys' fees serve the dual purpose of encouraging persons to seek redress for damages caused to an entire class of persons and discouraging future misconduct."[65] The U.S. Supreme Court has opined that consensual resolution of attorneys' fees, as was achieved here, is the ideal.[66] In "common fund" cases, such as this, the district court has the discretion to award attorneys' fees as either a percentage of the common fund, or by using the lodestar method.[67] The district court's decision in awarding attorneys' fees and expenses to the plaintiffs is reviewed for abuse of discretion.[68] Importantly, "the question on appeal is not whether

---

[61] Carey Decl. ¶ 60.

[62] *See* Ex. A, Decl. of Kenneth Jue on Behalf of Settlement Administrator.

[63] Carey Decl. ¶ 61.

[64] Fed. R. Civ. P. 23(h).

[65] *In re Apollo Group Inc. Secs. Litig.*, No. CV 04-2147, 2012 U.S. Dist. LEXIS 55622, at *19 (D. Ariz. Apr. 20, 2012). All internal citations and quotations omitted and all emphasis added, unless otherwise indicated.

[66] *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

[67] *Id.* at 457; *see In re Wachovia Corp. "Pick-A-Payment" Mortg. Mktg. & Sales Practices Litig.* ("*Wachovia*"), No. 5:09- md-02105, 2011 U.S. Dist. LEXIS 55351, at *23-24 (N.D. Cal. May 17, 2011).

[68] *See City of Roseville Emps. Ret. Sys. v. Orloff Fam. Tr. UAD 12/31/01*, No. 11-35455, 2012 U.S. App. LEXIS 11512, at *4 (9th Cir. June 7, 2012).

10

the district court should have applied some other percentage, but whether in arriving at its percentage it considered all the circumstances of the case and reached a reasonable percentage."[69]

In the Ninth Circuit, the "benchmark" award in common fund cases is 25 percent of the recovery obtained, while awards of 30 percent or more of the common fund are not uncommon.[70] The court may also apply the lodestar method to determine a reasonable attorney's fee by multiplying the number of hours reasonably expended by a reasonable hourly rate.[71] In common fund cases, the lodestar method may also be used as a cross-check of the percentage-of-fund method.[72]

ROP class counsel seek $5,800,000 in attorneys' fees. This represents 29 percent of the $20 million NCAA Settlement fund, which is within the range approved by the Ninth Circuit. The NCAA has agreed not to oppose this request.[73] Further, the reasonableness of this fee request is confirmed when cross-checked against the lodestar. Accordingly, under either the percentage of the common fund or lodestar approach, ROP Plaintiffs' requested fee award is reasonable.

### 1. ROP Plaintiffs' Fee Request Is Reasonable under the "Common Fund" Percentage of Recovery Analysis.

ROP class counsel seek an award of 29 percent of the NCAA Settlement fund.[74] Courts routinely award attorneys' fees and expenses totaling 25 percent or more of the common fund provided under the settlement.[75] Indeed, "in most common fund cases, the award exceeds that

---

[69] *Glass v. UBS Fin. Servs.*, 331 Fed. Appx. 452, 456 (9th Cir. 2009).

[70] *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).

[71] *See Hensley*, 461 U.S. at 433.

[72] *See Wachovia*, 2011 U.S. Dist. LEXIS 55351, at *24.

[73] Dkt. No. 1158, Ex. 2, ¶ 58.

[74] *Id.*

[75] *See, e.g.*, *Morris v. Lifescan, Inc.*, 54 Fed. Appx. 663, 664 (9th Cir. 2003) (fee award of 33% of settlement fund); *Hernandez v. Kovacevich*, No. 1:04CV5515OWWDLB, 2005 WL 2435906, at *8 (E.D. Cal. Sept. 30, 2005) (fee award of 33% of settlement fund); *Brailsford v. Jackson Hewitt Inc.*, No. C 06 00700 CW, 2007 WL 1302978, at *5-7 (N.D. Cal. May 3, 2007) (fee award of 30% of settlement fund); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW, 2010 WL 1687829, at *2-3 (N.D. Cal. Apr. 22, 2010) (fee award of 30% of settlement fund); *Wachovia*, 2011 U.S. Dist. LEXIS 55351, at *24 (fee award of one-third of settlement fund); *In re Nuvelo, Inc. Secs. Litig.*, No. C 07-04056, 2011 U.S. Dist. LEXIS 72260, at *10 (N.D. Cal. July 6, 2011) (fee award of 30% of settlement fund); *Thieriot v. Celtic Ins. Co.*, No. C 10-04462, 2011 U.S. Dist. LEXIS 44852, at *15 (N.D. Cal. Apr. 21, 2011) (fee award of 33% of settlement fund); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *8 (N.D. Cal. Apr. 3,

11

benchmark, with a 30% award the norm absent extraordinary circumstances that suggest reasons to lower or increase the percentage."[76] In *Vizcaino*, the Ninth Circuit outlined a number of factors that courts may consider in setting an appropriate fee, including whether counsel achieved exceptional results and the degree of risk assumed by counsel.[77] The Ninth Circuit has clarified that these are not the only factors that the district courts may consider in awarding fees and expenses; rather, "in selecting a reasonable percentage fee award in a common fund case the district court must consider all relevant circumstances."[78] Taking all the relevant circumstances into account, ROP Plaintiffs' fee request of 29% of the NCAA Settlement fund is fully supported by the particular circumstances of this case.

*First*, there is no question that ROP class counsel achieved an exceptional result on behalf of plaintiffs and the class. The Combined Settlement negotiated by class counsel provides, for the first time, compensation to thousands of student-athletes for the use of their name, image, or likeness. The Combined Settlement produces a cash fund collectively valued at $60 million, before fees, expenses, and costs of notice. A victory at trial would, in counsel's opinion, result in a median verdict of $80 million to $120 million.[79] Plaintiffs, then, will recover in the Combined Settlement

---

2013) (fee award of 28.6% of settlement fund); *Vedachalam v. Tata Consultancy Servs., Ltd*, No. C 06-0963 CW, 2013 WL 3941319, at *2 (N.D. Cal. July 18, 2013) (fee award of 30% of settlement fund); *Pokorny v. Quixtar, Inc.*, No. C 07-0201 SC, 2013 WL 3790896, at *1 (N.D. Cal. July 18, 2013) (fee award of 29.5% of settlement fund); *Burden v. SelectQuote Ins. Servs.*, No. C 10-5966 LB, 2013 WL 3988771, at *4 (N.D. Cal. Aug. 2, 2013) (fee award of 33% of gross settlement fund); *Cordy v. USS-POSCO Indus.*, No. 12-CV-00553-JST, 2014 WL 1724311, at *2 (N.D. Cal. Apr. 28, 2014) (fee award of 30% of settlement fund); *see also In re Online DVD-Rental Antitrust Litig.*, No. 12-15705, 2015 WL 846008, at *13 (9th Cir. Feb. 27, 2015) (district court did not abuse its discretion in calculating fee award as a percentage of the total settlement fund, including notice and administrative costs, and litigation expenses).

[76] *Pokorny*, 2013 WL 3790896, at *1.

[77] *See Vizcaino*, 290 F.3d at 1048-50; *see also Nuvelo*, 2011 U.S. Dist. LEXIS 72260, at *5.

[78] *Steiner v. Am. Broad. Co. Inc.*, 248 Fed. Appx. 780, 782 (9th Cir. 2007). In determining a reasonable award under the common fund method, courts may also consider other factors, including: plaintiffs' counsel's hourly rate, counsel's experience and skill, the complexity of the issues, and a comparison with counsel's lodestar. *Nuvelo*, 2011 U.S. Dist. LEXIS 72260, at *5. These factors are examined below in section III.A.2., *infra*, which addresses the lodestar analysis.

[79] Carey Decl. ¶ 63.

1    the significant sum of 50-75% of the amount success at trial would produce—an exceptional result

2    which merits an upward adjustment of the benchmark in this case.[80]

3        Looking at the estimated potential recovery per individual publicity rights class member

4    further illustrates the stellar results achieved by ROP class counsel. Even assuming a claims rate of

5    100%, ROP class members would recover $270 for each year his avatar appeared in an NCAA-

6    Branded Videogame between 2006-2014, and $74 for each year his avatar appeared in a game

7    between 2003-2005 games. Assuming a much more realistic claims rate of 25%, that recovery

8    jumps to $1,081 for each 2006-2014 appearance, and $295 for each 2003-2005 appearance. Thus,

9    to use an example on the higher end of the recovery scale, a publicity rights class member who has

10   appeared in the videogame for four seasons from 2007-2011, assuming a 25% claim rate, could

11   recover $4,324.00.[81] Such an exceptional individual recovery further justifies an award of 29% of

12   the NCAA Settlement fund.[82]

13       Moreover, the comparison between the NCAA Settlement of $20 million and the EA

14   Settlement of $40 million is notable, considering funds in the NCAA Settlement will come from a

15   Defendant that, it is alleged, did not directly use player likenesses, and is instead sued as a

16   conspirator. This recovery represents multiple times the amount the NCAA received as

17   compensation under the licensing contracts for the NCAA-Branded Videogames.[83] Thus, the

18   NCAA Settlement alone also compares favorably to settlements approved in other class cases.[84]

19
20       [80] *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7 (approving
         upward adjustment to benchmark where settlement amount represented approximately 50% of
21       potential recovery); *Burden*, 2013 WL 3988771, at *4 (approving upward adjustment to benchmark
         based on factors including exceptional result equivalent to 75% of maximum damages available).

22       [81] *See* ROP Plaintiffs' Mot. for Preliminary Approval of Class Action Settlement, Dkt. 1138-1,
         at 23-24, for an explanation of the methodology underlying these estimates.

23       [82] *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7 (awarding
         upward adjustment to benchmark where claimants would receive $64 per monitor or laptop and
24       $128 per TV); *Ching v. Siemens Indus., Inc.*, No. 11-CV-04838-MEJ, 2014 WL 2926210, at *7
         (N.D. Cal. June 27, 2014) (awarding upward adjustment to benchmark where claimants would
25       receive on average $2672.56).

         [83] Carey Decl. ¶ 64.
26
         [84] *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (one-sixth of
27       potential recovery was fair and adequate); *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d
         1036, 1042 (N.D. Cal. 2008) (6–9% of potential recovery was fair and adequate); *Villegas v. J.P.
28       Morgan Chase & Co.*, No. CV-09-00261-SBA-EMC, 2012 WL 5878390 at *6 (N.D. Cal. Nov. 21,
         2012) (15% of potential recovery approved).

13

RIGHT OF PUBLICITY PLS' MOT. FOR ATTYS' FEES, EXPENSES, AND INCENTIVE AWARDS (NCAA SETTLEMENT)
Case. No. 09-CV-1967 CW

*Second*, ROP Plaintiffs' class counsel assumed a high degree of risk in bringing and pursuing this action to a successful conclusion. This was a novel case alleging class-wide theories against Defendants who are not known to shy away from litigation. Had ROP class counsel not prevailed, not only would they have received no fees but they would have had to pay the Defendants' fees pursuant to the fee-shifting provisions of California's publicity rights statute, Cal. Civ. Code § 3344, and California's Anti-SLAPP statute, Cal. Code Civ. P. § 425.16.

*Third,* the case also presented unique legal issues involving, among other things, choice of law, copyright, the single publication rule, and ascertainability of the class. ROP Plaintiffs' counsel exhaustively researched these issues before filing the complaint to avoid the unnecessary costs and time associated with litigating poorly pled claims and to avoid these fee-shifting provisions.[85]

### 2.   Plaintiffs' Fee Request Is Reasonable Under the Lodestar Cross-Check Method.

ROP Plaintiffs' fee request of $5,800,000 is also reasonable when cross-checked using the lodestar method. Under the lodestar method, a presumptively reasonable fee award can be determined by multiplying the number of hours reasonably expended by plaintiffs' counsel by their reasonable hourly rate.[86]

### a.   The Number of Hours that ROP Plaintiffs' Counsel Devoted to this Litigation Is Reasonable.

Under the lodestar method, courts first look at the number of hours spent by counsel on the case.[87] Here, in support of the lodestar determination, ROP Plaintiffs submit the declarations of class counsel attesting to their total hours, hourly rates, experience, and efforts to prosecute this action.[88]

As set forth in the supporting declarations, ROP Plaintiffs' counsel have collectively spent more than 20,061.3 hours of attorney and litigation support time on this action.[89] The number of

---

[85] *See, e.g., Garner,* 2010 WL 1687829, at *2 (awarding upward adjustment of benchmark where case was "wholly without precedent, raised numerous novel and complex issues of both law and fact, and required a considerable effort from Class Counsel simply to be in a position to file suit, let alone to litigate this case successfully").

[86] *See Hensley*, 461 U.S. at 433.

[87] *Id.*

[88] Carey Decl. ¶ 66.

[89] Carey Decl. ¶¶ 14, 67.

hours that ROP counsel have devoted to pursuing this litigation is appropriate and reasonable, given: (1) the extensive pre-filing investigation required to file the first nationwide right-of-publicity class action; (2) the extensive briefing at the motion to dismiss stage and the appeal of EA's anti-SLAPP motion to the Ninth Circuit; (3) the depositions of dozens of witnesses; (4) the coding and indexing of hundreds of thousands of documents; (5) the creation of a comprehensive working database of student-athletes featured in the NCAA-Branded Videogames, which has over 3,900 teams and 75,000 students; (6) the parties' preparation for class certification motions; (7) the extensive and contentious arm's-length negotiations regarding the settlement; and (8) the efforts to locate the last-known contact information for over 87,000 class members. Class counsel have spent numerous hours working with the notice and claims administrator to answer the questions of class members, to launch the settlement website, to prepare the electronic claims form, and address issues regarding notice.

ROP class counsel's responsibilities will not end with final approval. Class counsel will assist class members with inquiries and work with the notice and claims administrator and the NCAA to resolve them. Class counsel may also have to expend further time and effort to resolve any objections that are lodged and litigate any appeals that result therefrom. Past experience shows that this ongoing work will add significant time to the work already undertaken. In addition to the hours already billed, counsel anticipates incurring at least 400 additional hours finalizing materials for the final fairness hearing, appearing at the final fairness hearing, continuing outreach to class members, coordinating efforts to increase the claims rate, distributing funds to class members, resolving any appeals and/or objections, and filing a reply in support of this motion.

In sum, the hours that ROP Plaintiffs' counsel devoted to this action were reasonable and necessary, particularly given the contentious nature of the settlement negotiations with the NCAA. The hard work and commitment ultimately paid off, resulting in a comprehensive settlement that provides substantial relief to class members.[90]

---

[90] *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case.").

1          **b.      ROP Plaintiffs' Counsel's Hourly Rates Are Reasonable.**

2          The hourly rates of class counsel and other ROP Plaintiffs' counsel, as detailed in their

3   declarations, are also fair and reasonable. Under the lodestar method, counsel's reasonable hourly

4   rates are determined by the prevailing market rates that a lawyer of comparable skill, experience,

5   and reputation could command in the relevant community.[91] "Affidavits of the plaintiffs' attorney

6   and other attorneys regarding prevailing fees in the community, and rate determinations in other

7   cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the

8   prevailing market rate."[92]

9          ROP counsel's hourly rates in this action range from $900 to $215, with the high-end

10  reserved only for the most senior attorney working on the case, Steve Berman, the managing

11  partner of Hagens Berman Sobol Shapiro LLP ("Hagens Berman").[93] Hourly rates for paralegals

12  are $250 or lower.[94] Class counsel are highly-respected members of the bar with extensive

13  experience in prosecuting high-stakes complex litigation, including consumer class actions.[95] Class

14  counsel's hourly rates are comparable to those approved in courts in this district,[96] and counsel's

15  customary rates have been previously approved by courts across the country.[97] Indeed, this Court

16

17

18      [91] *See, e.g., Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).

19      [92] *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990);
    *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1110 (9th Cir.) *cert. denied sub nom. City of Los
20  Angeles, Cal. v. Chaudhry*, 135 S. Ct. 295, 190 L. Ed. 2d 141 (2014).

21      [93] Carey Decl. ¶ 68.
        [94] Carey Decl. ¶ 69.
        [95] Carey Decl. ¶ 70.
22
        [96]   *See, e.g., Stuart v. RadioShack Corp.*, No. C-07-4499, 2010 U.S. Dist. LEXIS 92067, at *16
23  (N.D. Cal. Aug. 9, 2010) (finding rates ranging between $600 and $1,000 reasonable); *In re Apple
    Inc. Secs. Litig.*, No. 5:06-CV-05208, 2011 U.S. Dist. LEXIS 52685, at *16 (N.D. Cal. May 17,
24  2011) (approving hourly rate of $836); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL
    1365900, at *9 (approving hourly rates up to $1,000); *In re Conseco Life Ins. Co. Life Trend Ins.
25  Mktg. & Sales Practice Litig.*, No. C 10-02124 SI, 2014 WL 186375, at *2 (N.D. Cal. Jan. 16,
    2014) (approving hourly rates up to $850).

26      [97] *See* Final Judgment and Order of Dismissal with Prejudice, *Ruwe et al. v. Cellco P'ship d/b/a
    Verizon Wireless*, No. 07-03679 JSW (N.D. Cal. Nov. 16, 2012); Order Granting Motions for Final
27  Approval of Class Settlement Agreements (Dkt. Nos. 837 and 841) and Granting in Part Motion for
    Attorney's Fees and Expenses (Dkt No. 844), *In re Charles Schwab Corp. Secs. Litig.*, No. 08-
28  01510-WHA (N.D. Cal. Apr. 19, 2011), ECF No. 1101.

1    approved almost identical rates for Hagens Berman and The Paynter Law Firm two years ago in the

2    *Pecover* case.[98]

3            c.      **ROP Plaintiffs' Fee Request Is Reasonable Considering the Results Obtained, Time and Labor Required, Novelty and Complexity of the Litigation, the Risks Involved, and Counsel's Skill and Experience.**

4

5            Multiplying the hours spent by ROP Plaintiffs' counsel on the litigation by their respective

6    hourly rates yields a lodestar calculation of $6,771,390.75. "Though the lodestar figure is

7    presumptively reasonable, the court may adjust it upward or downward by an appropriate positive

8    or negative multiplier reflecting a host of reasonableness factors, including the quality of

9    representation, the benefit obtained for the class, the complexity and novelty of the issues

10   presented, and the risk of nonpayment."[99] The fee award of $5,800,000 requested here—combined

11   with the requested fee of $8,580,000 in connection with the EA Settlement—amounts to a total of

12   $14,380,000 in attorneys' fees, which represents a multiplier of two on ROP Plaintiffs' lodestar.

13   This falls on the low end of the range of multipliers accepted by courts in this district and across

14   the country.[100] As discussed below, the reasonableness factors weigh heavily in favor of granting

15   the total requested fee award of $14,380,000.

16           "Foremost among these considerations . . . is the benefit obtained for the class."[101] Here,

17   ROP class counsel obtained an outstanding settlement result for class members nationwide. In light

18

19           [98] Final Judgment and Order of Dismissal with Prejudice, *Pecover v. Electronic Arts. Inc.*, No. 08-cv-02820-CW (N.D. Cal. May 30, 2013). In fact, the rates are generally lower than in *Pecover*, with the exception of Mr. Berman, whose rate increased from $800 to $900.

20

21           [99]   *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011); *see also Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

22           [100]   *See, e.g., Vizcaino*, 290 F.3d at 1051 n.6 (surveying class actions settlements nationwide, and noting 54 percent of lodestar multipliers fell within the 1.5 to 3.0 range, and that 83 percent of multipliers fell within the 1.0 to 4.0 range); *Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358, at *5 (N.D. Cal. Feb. 6, 2013) (multiplier of 2.86); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *8 (multipliers ranging on average between 2.4 – 2.6); *Pokorny*, 2013 WL 3790896, at *2 (multiplier of 2.2); *see also Milliron v. T-Mobile USA, Inc.*, 423 F. App'x 131, 135 (3d Cir. 2011) (approving district court's use of 2.2 multiplier); *Di Giacomo v. Plains All Am. Pipeline*, Nos. 99–4137 & 99–4212, 2001 WL 34633373, at *10–11 (S.D. Fla. Dec. 19, 2001) (5.3 multiplier); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (4.65 multiplier); *In re Aremissoft Corp. Sec. Litig.*, 210 F.R.D. 109, 134–35 (D.N.J. 2002) (4.3 multiplier); *Sobel v. Hertz Corp.*, No. 306-CV-00545-LRH-RAM, 2014 WL 5063397, at *10 (D. Nev. Oct. 9, 2014) (multiplier of 2.0).

23

24

25

26

27

28           [101]   *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d at 942.

17

of the looming risks and uncertain outcome of the litigation, the results obtained for the class are exceptional. Class counsel have negotiated and achieved a meaningful settlement that provides student-athlete class members the opportunity to obtain compensation for the first time for the use of their names and likenesses. *See supra* pp. 7-9. Although the claims period has not expired, to date over 8,200 class members have submitted claims. Only 3 class members have requested to be excluded and only one objection has been filed (although the deadline for exclusions has not expired).[102] As demonstrated by the claims to date, this settlement provides economic relief to thousands of class members. ROP class counsel has achieved an excellent result for the class in light of all of the circumstances of the case.

     *Second*, ROP Plaintiffs' counsel have expended a significant amount of time and resources on the case. To date, counsel have expended more than 20,061.3 hours, totaling more than $6,771,390.75 in lodestar, and have incurred more than $448,868.40 in expenses in prosecuting this action for the benefit of the class.[103] Class counsel vigorously litigated this action and were challenged by aggressive, skilled, and well-funded defense counsel every step of the way. To effectively prosecute this very large and complex class action, ROP class counsel had to commit a significant amount of time, personnel, and expenses to this litigation on a contingency basis with absolutely no guarantee of being compensated in the end. Such efforts included, but were certainly not limited to: (1) investigating the factual and legal claims and filing this action; (2) successfully defeating motions to dismiss filed by all three defendants; (3) actively engaging in discovery, including the taking and defending of depositions, written discovery, and reviewing documents from both the NCAA and 150 third parties; (4) developing a database to identify class members for all parties; (5) disseminating notice after preliminary approval to tens of thousands of class members; (6) answering hundreds of inquiries from class members regarding the litigation, settlement, claim forms, and other matters concerning their claims; (7) engaging in numerous hard-fought mediations and informal settlement negotiations before settling this matter; and (8) assisting the claims administrator with the settlement website, electronic claim form and notice issues.

---

[102]  *See* Ex.A, Decl. of Kenneth Jue on Behalf of Settlement Administrator.
[103]  Carey Decl. ¶ 71.

*Third*, ROP Plaintiffs faced a number of novel and complex legal and factual issues in this litigation, including but not limited to right of publicity, choice of law, ascertainability, copyright, the First Amendment, and agency law. And although the ROP Plaintiffs prevailed in the Ninth Circuit, a Petition for Certiorari was still pending before the United States Supreme Court when the settlement was signed. ROP Plaintiffs would have continued to litigate these complicated issues and, in particular, would have faced a complex and time-consuming Opposition to the Petition for Certiorari, as well as a motion to certify the class, a motion for summary judgment, and cross-motions to exclude the testimony of each side's proposed experts, combined with the near certainty that no matter the outcome of the litigation, an appeal would have followed.

*Fourth*, given that ROP class counsel undertook this case on a contingency basis, they faced a considerable risk of non-payment, in particular because the case was the first nationwide class action of its kind and thus untested. In addition, ROP class counsel faced the risk of paying Defendants' fees pursuant to statutory fee-shifting provisions. *See supra* p. 14. Courts have "routinely" awarded an enhanced lodestar in cases involving similar risks.[104]

*Fifth*, class counsel Hagens Berman is one of the most well-respected class action litigation firms in the country and has litigated some of the largest class actions in history,[105] including the tobacco litigation,[106] *In re Visa MasterCard Litigation,*[107] and the *Toyota Motor Corporation Unintended Acceleration Litigation*.[108] Hagens Berman is a fifty-five lawyer firm, with offices

---

[104] *See Vizcaino*, 290 F.3d at 1051 ("[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases . . . . This mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases."); *see also e.g., Garner,* 2010 WL 1687829, at *2; *Larsen v. Trader Joe's Co.*, No. 11-CV-05188-WHO, 2014 WL 3404531, at *9 (N.D. Cal. July 11, 2014); *Bellinghausen v. Tractor Supply Co.*, No. 13-CV-02377-JSC, 2015 WL 1289342, at *11 (N.D. Cal. Mar. 20, 2015).

[105] Carey Decl. ¶¶ 5-6, 72; Ex. A, Firm Resume.

[106] In the historic litigation against Big Tobacco, Hagens Berman represented 13 states and advanced groundbreaking legal claims to secure a global settlement worth $260 billion, the largest recovery in history. Only two firms went to trial, and Hagens Berman served as co-lead trial counsel.

[107] *In re Visa-MasterCard Litigation,* CV-96-5238 (E.D.N.Y.). Hagens Berman was co-lead counsel in a case alleging antitrust violations by Visa and MasterCard. The case settled for $3 billion in cash and changes in practices valued at $20 billion.

[108] *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, *Sales Practices & Prods. Liab. Litig.*, 8:10ML2151 JVS (C.D. Cal.). Hagens Berman recovered $1.6 billion for the class.

19

across the country.[109] Since its founding in 1993, the firm has been recognized in courts throughout the United States for its ability and experience in handling major class litigation efficiently and obtaining outstanding results for its clients. [110] Courts in the Northern District of California have repeatedly appointed Hagens Berman as lead or co-lead counsel in large multidistrict litigation proceedings, including the *Pecover* case; *In re Carrier IQ Privacy Litig.*, an MDL currently pending before Judge Chen;[111] *In re Optical Disk Drives Prods. Antitrust Litig.*, currently pending before Judge Seeborg where Hagens Berman acts as sole lead counsel on behalf of the indirect purchaser class;[112] and *Schwab*, where Hagens Berman acted as lead counsel on behalf of a class of purchasers of securities.[113] In addition, this Court recently appointed Hagens Berman as co-lead class counsel in *In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Litigation* over other firms with experience litigating against the NCAA.[114]

The Paynter Law Firm, a boutique litigation firm based in Washington, D.C., likewise has extensive experience in complex class action lawsuits. Prior to founding the firm, Mr. Paynter was a litigator at Sullivan & Cromwell LLP, where he represented Microsoft in a series of antitrust actions filed by private plaintiffs around the country.[115] In addition to extensive experience in the prosecution and management of complex class actions, Mr. Paynter has expertise in antitrust issues

---

[109] Carey Decl. ¶ 73.

[110] Carey Decl. ¶ 5, Ex. 1. In addition, ROP Plaintiffs' co-counsel, The Paynter Law Firm, Saltz, Mongeluzzi, Barrett, & Bendesky, P.C., and Weinstein Kitchenoff & Asher LLC have extensive experience in prosecuting and managing complex class actions. *See* Carey Decl. Exs. B (Paynter declaration); D (Howard declaration); E (firm resume for Salt Mongeluzzi); G (Asher declaration); H (firm resume for Weinstein Kitchenoff).

[111] *In re Carrier IQ Privacy Litig.*, No. 12-md-2330 EMC (N.D. Cal.).

[112] Order at 4-5, *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 10-md-2143 RS (N.D. Cal. June 4, 2010), ECF No. 96 (in deciding lead counsel in an antitrust MDL, Judge Walker noted that each firm applying to be lead counsel brought "impressive skills and experience to the proposed task," but that when taking into account the proposed fee and analysis of the prospects for recovery, the "clear choice" was Hagens Berman).

[113] *Schwab*, No. 08-01510-WHA (N.D. Cal.).

[114] Case No. 4:14-md-02541-CW, Dkt. No. 82 (August 22, 2014 Order Denying the Floyd Plaintiff's Motion to Appoint Hausfeld LLP and Zelle Hofmann Voelbel & Mason LLP as Co-Lead Counsel; Denying the Application to Appoint the Dugan Law Firm as Col-Lead Counsel; and Appointing Plaintiffs Interim Co-Lead Counsel.)

[115] Paynter Decl. ¶ 4.

and, in particular, the intersection of antitrust law and technology.[116] The Paynter Law Firm is currently counsel in a number of complex class actions including *Rock v. NCAA*, No. 1:12-cv-1019 TWP-DKL (S.D. Ind.); and *Canada v. Meracord*, No. 3:12-cv-05657-BHS (W.D. Wash.).[117]

The reputation, experience and skill of ROP class counsel were essential to the success in this litigation. From the outset, class counsel used their expertise and skill to obtain maximum recovery for the class, given the particular factual and legal complexities of this litigation. At no time have the Defendants ever conceded liability, the appropriateness of certification other than for settlement purposes, or the existence of damages. Given the significant risks and uncertainty associated with this complex class action, it is a testament to class counsel's skill, creativity, and determination that they were able to negotiate an excellent Combined Settlement providing substantial economic relief.

The quality of opposing counsel should also be considered.[118] Counsel for Defendants—Keker & Van Vest LLP, Schiff Hardin LLP, Kilpatrick Townsend & Stockton LLP, and others—are nationally recognized law firms in the defense of class actions. Class counsel vigorously litigated, and defense counsel vigorously defended against, the class-wide claims asserted by ROP Plaintiffs. Virtually every point in this litigation and in the settlement negotiations process was relentlessly disputed by the Defendants.

*Sixth*, the fee request is reasonable in light of the future work and expenses that will be incurred by class counsel under the settlement, beyond the current lodestar. This includes all pre- and post-approval work such as overseeing claims administration, communications with class members, disputes over claims, appeals, and any other issues that may arise under the settlement. This future work is substantial and could last for many months.

**B.      ROP Plaintiffs' Expenses Are Reasonable and Were Necessarily Incurred.**

In addition to the $5,800,000 sought in attorneys' fees, ROP Plaintiffs seek an award of 224,434.20, representing half of the expenses necessarily incurred in connection with the

---

[116] Paynter Decl. ¶ 4.
[117] Paynter Decl. ¶ 4.
[118] *See, e.g.*, *In re Equity Funding Corp. of Am. Secs. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977).

21

prosecution of this action. The other half of the expenses will be sought by ROP Plaintiffs in connection with the EA Settlement. The Ninth Circuit allows recovery of pre-settlement litigation costs in the context of class action settlements.[119] All expenses that are typically billed by attorneys to paying clients in the marketplace are compensable.[120] With this Motion, class counsel provide an accounting of the $448,868.40 in expenses incurred by ROP Plaintiffs' counsel.[121] Several categories account for the bulk of these expenses: filing fees, e-Discovery, travel expenses, costs of court and deposition transcripts, experts, and computer research expenses. The request for reimbursement of half of these expenses is in addition to costs associated with notice and claims administration, also to be split evenly between this settlement and the EA settlement.[122] All of these costs were necessarily and reasonably incurred to bring this case to a successful conclusion, and they reflect market rates for the various categories of expenses incurred. Further, counsel advanced these necessary expenses without assurance that they would even be recouped. ROP Plaintiffs' request for expenses is reasonable.

**C.      ROP Plaintiffs Request Incentive Awards for the Four Class Representatives.**

ROP Plaintiffs also request that the Court approve incentive awards for the four named plaintiffs, to be deducted from the NCAA Settlement fund. Incentive awards for class representatives are routinely provided to encourage individuals to undertake the responsibilities of representing the class and recognize the time and effort spent in the case.[123] Incentive awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."[124] Courts have discretion to approve incentive awards based on, *inter alia,* the risk (financial or otherwise) of commencing suit, the notoriety and personal

---

[119]  *See Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003).

[120]  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

[121]  Carey Decl. ¶ 74.

[122]  Carey Decl. ¶ 75.

[123]  *See Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 958 (9th Cir. 2009) ("Incentive **awards** are fairly typical in class action cases.") (emphasis in original).

[124]  *Id.* at 958-59.

1   difficulties encountered, the amount of time and effort spent, and the duration of the litigation.[125] In

2   this district, a $5,000 incentive payment is "presumptively reasonable."[126]

3          ROP Plaintiffs recommend $5,000 for named plaintiffs Samuel Keller, Bryan Cummings,

4   LaMarr Watkins, and Bryon Bishop. Mr. Keller has been actively involved since the inception of

5   this five-year old case, assisting counsel in all phases of the case, including gathering evidence to

6   file the pleadings.[127] As the first named plaintiff, Mr. Keller was subject to intense media scrutiny

7   and experienced personal and professional criticism for filing the complaint. He was unfairly used

8   as a poster-child for people who believed that student-athletes were being ungrateful to their

9   schools by not letting private corporations profit from their names, images, and likenesses. Mr.

10  Keller defended himself and his fellow class members in numerous television, print, and radio

11  interviews, and ultimately helped change the public perception of the NCAA and this litigation.

12  ROP class counsel has spoken to hundreds of student athletes, and cannot recall a single athlete

13  who does not support the litigation and this settlement; this change in public perception is largely

14  attributable to Mr. Keller and his fellow class representatives.[128] Mr. Keller took unpaid leave from

15  his job to meet with counsel and attend hearings and mediation sessions.[129] Messers. Cummings,

16  Watkins, and Bishop were added as class representatives when the Consolidated Class Action

17  Complaint was filed. All four named plaintiffs responded to voluminous discovery requests,

18  including over 203 Requests for Production, 23 Interrogatories, and 189 Requests for

19  Admission.[130] They also actively participated in the settlement of this action, including reviewing

20  and approving the NCAA Settlement agreement.[131] The time and effort expended by these named

---

[125] *See Van Vraken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Ca. 1995).

[126] *Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 5402120, at *6 (N.D. Cal. Sept. 26, 2013).

[127] Carey Decl. ¶ 76.

[128] Carey Decl. ¶ 77.

[129] Carey Decl. ¶ 78.

[130] Carey Decl. ¶ 79.

[131] Carey Decl. ¶ 80.

23

1   plaintiffs resulted in a significant recovery for the class. The incentive awards of $5,000 are

2   reasonable and compare favorably to incentive awards in other cases.[132]

3        Including the incentive awards requested in connection with the EA Settlement, ROP

4   Plaintiffs request of total of $62,500, a sum that comprises only .104% of the Combined Settlement

5   of $60 million. This sum is modest in comparison to awards in other cases.[133] The class

6   representatives' efforts and dedication to the case should not go unrecognized. Thus, ROP

7   Plaintiffs and class counsel respectfully request that the Court approve the $5,000 incentive awards

8   for Plaintiffs Keller, Cummings, Watkins, and Bishop.

9                    **IV.    CONCLUSION**

10        For the foregoing reasons, ROP Plaintiffs request an award of $5,800,000 in attorneys' fees,

11  $224,443.20 in expenses,  and incentive awards of $5,000 each for named plaintiffs Keller,

12  Cummings, Watkins, and Bishop.

13

14  Dated: April 13, 2015                     HAGENS BERMAN SOBOL SHAPIRO LLP

15

16                                           By     /s/ Robert B. Carey
                                             Robert B. Carey (*Pro Hac Vice*)
17                                           Leonard W. Aragon (*Pro Hac Vice*)
                                             11 West Jefferson Street, Suite 1000
18                                           Phoenix, Arizona 85003
                                             Telephone: (602) 840-5900
19                                           Facsimile: (602) 840-3012
                                             rob@hbsslaw.com
20                                           leonard@hbsslaw.com

21

22

23        ───────────────
          [132] *See e.g., In re Online DVD-Rental Antitrust Litig.*, 2015 WL 846008, at *8 (incentive
24  awards of $5,000); *Pierce*, 2013 WL 5402120, at *6-7 (incentive awards of $5,000); *In re Conseco
    Life Ins. Co. Life Trend Ins. Mktg. & Sales Practice Litig.*, 2014 WL 186375, at *3 (incentive
25  awards of $5,000).
          [133] *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463 (approving incentive awards
26  constituting .56% of settlement fund); *In re Online DVD-Rental Antitrust Litig.*, 2015 WL 846008,
    at *8 (approving incentive awards totaling .17% of total settlement fund); *see also In re U.S.
27  Bancorp. Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (total incentive payments did not exceed
    0.35% of total settlement); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (incentive
28  payment did not exceed 0.17% of total settlement).

Stuart M. Paynter (226147)
Jennifer L. Murray
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@smplegal.com

Steve Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Celeste H.G. Boyd (*Pro Hac Vice*)
THE PAYNTER LAW FIRM PLLC
1340 Environ Way
Chapel Hill, NC 27517
Telephone: (919) 307-9991
Facsimile: (866) 734-0622
cboyd@smplegal.com

RIGHT OF PUBLICITY PLS' MOT. FOR ATTYS' FEES, EXPENSES, AND INCENTIVE AWARDS (NCAA SETTLEMENT)
Case. No. 09-CV-1967 CW