Steve W. Berman (*Pro Hac Vice)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

SAMUEL MICHAEL KELLER, on behalf of himself and all others similarly situated,

Plaintiff,

v.

ELECTRONIC ARTS, INC.; NATIONAL COLLEGIATE ATHLETICS ASSOCIATION; COLLEGIATE LICENSING COMPANY,

Defendants.

Case No. 4:09-cv-1967 CW

**RIGHT OF PUBLICITY PLAINTIFFS' CONSOLIDATED OPPOSITION TO THE MOTIONS FOR ATTORNEYS' FEES AND COSTS BY PLAINTIFF HART'S CURRENT AND FORMER ATTORNEYS**

Judge: Hon. Claudia Wilken
Courtroom: 2, 4th Floor
Fairness Hearing: July 16, 2015 at 2 p.m.
Complaint Filed: May 5, 2009

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....................1

II. BACKGROUND ....................2

A. The Hart Action ....................2

1. Initial Filing and Transfer to Federal Court. ....................2

2. District Court Proceedings. ....................3

3. Proceedings before the Judicial Panel on Multidistrict Litigation. ....................5

4. Third Circuit Appeal. ....................6

B. The *Alston* Action ....................6

C. Settlement Negotiations ....................6

D. McIlwain Resume and McIlwain Attorneys' Lodestar ....................9

1. McIlwain Resume. ....................9

2. McIlwain Lodestar. ....................10

III. ARGUMENT ....................12

A. The Court Should Disregard the McIlwain Attorneys' Lodestar ....................13

B. The McIlwain Attorneys' Actions Did Little to Benefit the Fund ....................14

C. At Most, Hart's Counsel Collectively Should Be Awarded Fees of No More than $1 Million ....................15

IV. CONCLUSION ....................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. Electronic Arts*,
No. 3:13-cv-05157-FLW-LHG (D. N.J. Filed Aug. 27, 2013)....6, 15

*Babych v. Comcast Corporation & Philadelphia Flyers*,
No. ATL-L-1365-00 (N.J. Super. Ct. Filed April 20, 2000)....10

*Brown v. Electronic Arts*,
BC520019 (C.D. Cal.) ....10

*Brown v. Electronic Arts, Inc.*,
724 F.3d 1235 (9th Cir. 2013) ....10

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*,
109 F.3d 602 (9th Cir. 1997) ....13, 14

*Ellis v. Toshiba Am. Info. Sys., Inc.*,
218 Cal. App. 4th 853 (2013), *as modified* (Aug. 14, 2013), *as modified on denial of reh'g* (Sept. 10, 2013), *review denied* (Nov. 26, 2013), *cert. denied sub nom. Sklar v. Toshiba Am. Info. Sys., Inc.*, 134 S. Ct. 2692 (2014) *reh'g denied*, 135 S. Ct. 25 (2014) ....13

*Free v. Nike*,
No. ATL--L-2105-09 (N.J. Super. Ct. Filed April 27, 2009) ....10

*Hart v. EA*,
Case No. SOM-L-1094-09 (N.J.Super. Ct. Filed Jul. 28, 2009)....3

*Hart v. Electronic Arts*,
717 F.3d 141 (3d Cir. 2013)....6

*Hart v. Electronic Arts*,
Case No. 3:09-cv-05990-FLW-LHG (D. N.J. Filed Nov. 24, 2009).... *passim*

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)....12

*Jacobs v. California State Auto. Ass'n Inter-Ins. Bureau*,
2009 WL 3562871 (N.D. Cal. Oct. 27, 2009)....12

*Pederson, et al v. National Collegiate Athletics Association, et. al.*,
Case No. 2:14-cv-02544-MCA-MAH (D. N.J., Filed April 21, 2014)....9

*Rodriguez v. Disner*,
688 F.3d 645 (9th Cir. 2012) ....12

*Schwarzenegger et al. v. Entertainment Merchants Association*, Case No. 08-1448, *decided sub nom Brown v. Entertainment Merchants Ass'n*, 131 S.Ct. 2729 (June 27, 2011)....................4

*Synapsis, LLC v. Evergreen Data Sys., Inc.*, 2006 WL 3302432 (N.D. Cal. Nov. 14, 2006) ....................13

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) ....................15

**Statutes**

28 U.S.C. § 1446(b)(2)(B) ....................3

**Other Authorities**

Federal Rules of Civil Procedure 24....................2

# I. INTRODUCTION

Plaintiff Ryan Hart filed, and then promptly lost, his right of publicity case in the District of New Jersey (Freda L. Wolfson, J.). No discovery occurred in the *Hart* action and the bulk of the work performed by Hart's former counsel, Timothy McIlwain and the Lanier Firm (collectively "McIlwain Attorneys"), reflected self-imposed costs inflicted by their handling of the litigation. On appeal, the professional players' associations diplomatically intervened behind the scenes and paid qualified attorneys to write the appellate briefs and argue before the Third Circuit. The McIlwain Attorneys played no role in the litigation of either the *Keller* or *O'Bannon* actions. In settlement negotiations, they persistently threatened to settle for less than what the *Keller* Plaintiffs believed to be a reasonable amount, and, despite only having been active in the case for a short time, their desire to settle was so strong it created a "reverse auction" that harmed the Class. Decl. of Robert B. Carey ("Carey Decl.") ¶ 3. At no point during those negotiations did the McIlwain Attorneys look to the class's strongest claims to value the settlement, which left their proposed settlement figure markedly lower than *Keller* Plaintiffs'—effectively requiring the *Keller* Plaintiffs to negotiate against both the defendants *and* Hart's counsel. *Id*. Once the settlement was finalized, Ryan Hart refused to sign and instead fired the McIlwain Attorneys. Only after this occurred did the remaining parties to the negotiation appreciate that the McIlwain Attorneys had, according to their client, been negotiating *ultra vires* and agreed to a settlement with no authorization from their client.[1] Hart then retained the McKenna Attorneys[2] to finalize the settlement.

The only benefit arguably conferred upon class members by the inclusion of the *Hart* action in the settlement was that New Jersey's longer statute of limitations will result in a small portion of the EA Settlement fund—$1.79 million dollars—being allocated to NCAA student-athletes for appearances in EA's videogames from 2003–2007.[3] For their part in the *Hart* action, the McIlwain

---

[1] *See* Carey Decl. ¶ 4, Ex. 1, Decl. of Ryan Hart in Supp. of Pls' Brief in Opp'n to Former Counsel's Purported Mot. for Leave to Replace Class Rep. and in Supp. of the Cross-Mot. to Remove and Disqualify Former Counsel (Oct. 21, 2013).

[2] "McKenna Attorneys" refers to The McKenna Law Firm, LLC, and Lum, Drasco & Positan LLC. McKenna had previously represented Hart along with McIlwain, when the McIlwain and McKenna were partners. *See e.g.*, Ex. 3 (listing "McKenna McIlwain, LLP" as Hart's counsel).

[3] *See* discussion *infra*, Sections II.B & III.C.

Attorneys, who were fired by their client, seek $4.62 million.[4] This figure represents a 1.5 multiplier of their already grossly inflated lodestar, which, among other things, seeks compensation for "watch[ing] [the movie] *Oceans 13*" and "researching Matt Damon; George Clooney; [and other actors]." Decl. of Timothy J. McIlwain in Support of McIlwain Mot. ("McIlwain Decl."), Dkt. 1193-10, Ex. A at 25. Such a result is grossly disproportionate to the minimal role that the McIlwain Attorneys played in this litigation.

*Keller* Plaintiffs submit that Hart's current and former counsel, collectively—that is, the McIlwain and McKenna Attorneys together—should be awarded no more than $700,000, which, together with the additional $300,000 received by the McKenna Attorneys from Keller's counsel,[5] would total $1,000,000. *Keller* Plaintiffs have no position on how that amount should be allocated between the McKenna and McIlwain Attorneys. In light of Mr. McIlwain's suggestion that the fee dispute between himself and the McKenna Attorneys has been previously raised before the New Jersey District Court, *see* McIlwain Mot. at 11–12, it may be appropriate to award the entire fee to the McKenna Attorneys—Hart's current counsel—without prejudice to Mr. McIlwain's ability to recover *quantum meruit* in a proceeding before the Honorable Freda L. Wolfson in the New Jersey proceeding.[6]

## II. BACKGROUND

### A. The Hart Action

#### 1. Initial Filing and Transfer to Federal Court.

Over a month following the filing of *Keller*, Plaintiff Hart filed his lawsuit in New Jersey state court. The complaint alleged that EA violated Hart's right to privacy by "incorporating Plaintiff

[4] *See* Timothy J. McIlwain's Not. of Mot. and Mot. for Attys.' Fees and Costs and Conditionally to Intervene Pursuant to Fed. R. Civ. P. 24; Mem. of Pts. and Authorities, Dkt. No. 1193 ("McIlwain Mot.").

[5] In order to resolve a fee dispute with the McKenna Attorneys, counsel for the *Keller* Plaintiffs agreed to pay the McKenna firm $300,000 from *Keller* counsel's share of the attorney fees in this action. *Keller* counsel also agreed not to raise any issues specific to the McKenna Attorneys' lodestar, but *Keller* counsel may still respond to Court questions regarding the contributions of the McKenna Attorneys to the Settlement. Carey Decl. ¶ 5.

[6] New Jersey case has been administratively terminated in light of the settlement pending in this Court, but has not been dismissed. Dkt. No. 102, *Hart v. Electronic Arts*, Case No. 3:09-cv-05990-FLW-LHG (D. N.J. Filed Nov. 24, 2009).

Hart's identify [sic] and likeness into its video games." Ex. 2, Hart Compl. ¶ 16.[7] Plaintiff Hart purported to bring the action on behalf of himself and "all others similarly situated" and requested "disgorgement" of EA's NCAA-branded videogame profits, *Id*. ¶ 63(d); yet the complaint contained no class definition or class allegations. Indeed, despite the McIlwain Attorneys' claims of extensive pre-filing research, *see* McIlwain Mot. at 2–3, the *Hart* complaint contained only nine paragraphs of "factual allegations." Ex. 2, Hart Compl. ¶¶ 6-14. The complaint failed to specify how Hart's likeness was used or even the versions of the videogame at issue.

Following a motion for a more definite statement,[8] Hart agreed to file an amended complaint. Ex. 3, *Hart* First Amended Compl. ("FAC"). This first amended complaint added the versions of the videogames in which Hart allegedly appeared and expanded on the class allegations, defining the class as: "All athletes whose unauthorized images were used by defendant for products bearing the identity and likeness of Plaintiff in disregard of the rights of Plaintiff." FAC ¶¶ 22 & 12. Among other obvious defects, this definition is a classic "fail safe" class, which impermissibly requires a determination in the class members' favor on the merits in order to ascertain who is in the class. Incredibly, the FAC *eliminated* the already sparse section of "factual allegations" contained in the original complaint. Instead, the FAC stated without elaboration that Hart's "indentify [sic] and likeness" was incorporated into EA videogames. FAC ¶ 20.

On November 24, 2009, Electronic Arts removed the complaint to the District of New Jersey. Although this removal clearly violated the thirty-day removal period required in 28 U.S.C. § 1446(b)(2)(B), Hart's counsel never filed a remand motion.

**2. District Court Proceedings.**

Once removed to federal court, EA again moved to dismiss Hart's complaint, arguing in part that Hart's factual allegations were inadequate to establish the violation of his publicity rights. The New Jersey District Court agreed and dismissed the complaint with leave to amend in light of Hart's

---

[7] All Exhibits, unless otherwise noted, are attached to the Declaration of Robert B. Carey in Support of this response ("Carey Decl.").

[8] *Hart v. EA*, Case No. SOM-L-1094-09 (N.J.Super. Ct. Filed Jul. 28, 2009).

counsel's continued failure to allege "what attributes of Plaintiff appear[ed]" in EA's videogames. Ex. 4, Order Granting Motion to Dismiss (Sept. 22, 2010).

On October 12, 2010, Plaintiff Hart filed his third complaint. *See* Ex. 5, *Hart* Second Amended Compl. ("SAC"). The new complaint retained Hart's defective class allegations but finally, for the first time, alleged which of Hart's attributes appeared in the videogame. SAC ¶¶ 34-48. EA then moved to dismiss or, in the alternative, for summary judgment, on the ground that it had a First Amendment right to utilize Plaintiff's likeness in its videogames. Ex. 6. Hart's opposition consisted of (i) a series of irrelevant rhetorical questions;[9] (ii) a lengthy discussion of why EA's use of his likeness was "commercial" within the meaning of New Jersey publicity rights law, a point not disputed;[10] and (iii) a summary of this Court's decision denying EA's anti-SLAPP motion, which Hart's counsel repeatedly and incorrectly referred to in his opposition as the "Ninth Circuit's analysis." Ex. 7 at 6-12. The opposition also contained a single paragraph stating that the motion should be denied because discovery was still "in its infancy," but which failed to specify any needed discovery. *Id.* at 9.

Following briefing, the District Court requested supplemental letter briefs in light of the Supreme Court's decision in *Schwarzenegger et al. v. Entertainment Merchants Association.*[11] Hart's counsel's letter brief failed to discuss or even cite any of the language of the *Schwarzenegger* case. Instead, the bulk of the letter was devoted to arguing the nonsensical proposition that the "simplicity of our case has been significantly aided by two current events:

---

[9] "If defendant EA has a first amendment right to make videogames; (1) why do they pay some players for their image and not others? (2) why do they scramble the images of some player and not others? (3) why do they have no competitors making videogames with college and NFL players?; (4) why did the executive officers of defendant EA explain at a Law School seminar that they have the right to use players images in videogames because of written authorization not, as they disingenuously assert now, that their rights come from the first amendment?; (5) why do consumers, or as they assert "art appreciators", need to buy and use a DVD disc, television, computer console and game controllers, to even see the alleged "artwork", if it is not for a commercial purpose?" Ex. 7, Hart Opp'n to EA Mot. to Dismiss, at 1 (internal citations omitted).

[10] EA's motion "assum[ed]" that Hart stated a publicity rights claim under New Jersey law; however, it argued that the First Amendment nevertheless barred the claim. Ex. 6. As part of this argument, EA argued that a profit motive alone does not transform speech into "commercial speech," a term of art in constitutional law that is not co-extensive with New Jersey's definition of commercial use.

[11] Case No. 08-1448, *decided sub nom Brown v. Entertainment Merchants Ass'n*, 131 S.Ct. 2729 (June 27, 2011).

> (1) since there is a collective bargaining lockout between the players and the teams, the new video games do not show the players faces, numbers, statistics or any of the players' likenesses because of their rights to receive compensation for their images. This is not limited to any one sport. Instead, it is applicable to all revenue generating sports (football-NFL, baseball-MLB, basketball-NBA and hockey NHL) and
>
> (2) Derek Jeter becoming the first New York Yankee of all time to produce 3,000 hits as a batter. The relevant legal issues have obtained significant media coverage, wherein, Derek Jeter's legal representatives announced very clearly that any attempts by a corporation to use his image or likeness would be sued civilly for money damages. For instance, the example used that if Coca-Cola or McDonalds sent out even an innocent announcement that says "McDonalds wants to congratulate Derek Jeter for his milestone 3000th hit" they would pay money damages for this advertisement.

Ex. 8, Letter from T. McIlwain to Hon. Freda L. Wolfson (July 14, 2011). The letter concluded with the nonsensical assertion that "there has been lobbying and/or legislative efforts in the process in Washington, DC to create an ***exception to the constitution*** for video games ending any future rights of players being compensated for their likeness (*i.e.* eliminating there [sic] day in court)." *Id.* (emphasis added).

In light of Hart's failure to specify what discovery he supposedly needed, the District Court denied Hart's request for additional discovery and granted summary judgment to EA on the ground that the First Amendment protected EA's use of Hart's likeness in its videogames.

**3. Proceedings before the Judicial Panel on Multidistrict Litigation.**

As the *Hart* case progressed, *Keller* Plaintiffs had several discussions with Hart's counsel, Timothy McIlwain, in an attempt to consolidate and coordinate litigation. Carey Decl. ¶ 13. Mr. McIlwain, however, continued to demand a large role in the litigation, which he was not qualified to perform. *Id*. Based on their review of Hart's briefs and conversations with Mr. McIlwain, *Keller* counsel became increasingly concerned with the competence and ability of Hart's counsel to successfully prosecute the action, and the potential adverse effects that Hart's loss might have on the *Keller* action. *Id*. *Keller* counsel was also deeply concerned that the existence of two pending cases would permit EA to settle through a "reverse auction" that would take advantage of Hart's counsel's limited experience, abilities, and resources. *Id*. As a result, in October 2010, *Keller* Plaintiffs requested that the Judicial Panel for Multidistrict Litigation consolidate the *Hart* action (together with another action pending in Tennessee) with the bulk of actions that had been filed in the

Northern District of California. *Id.*; *see* MDL No. 2212. Hart opposed the request, as did EA. *Id.* The JPML denied the request to transfer because Hart was only alleging state law claims. *Id.*

**4. Third Circuit Appeal.**

Hart appealed the District Court's grant of summary judgment, increasing *Keller* counsel's concerns about the effects of McIlwain Attorneys' limited experience on the litigation, and especially the possibility of an unfavorable appellate opinion. Carey Decl. ¶ 14. Up to this point, attorneys for the NFL Players Association and other professional unions had been monitoring the *Hart* case, and presumably due to similar concerns, the players unions hired and paid an experienced litigator, Michael Rubin of Altshuler Berzon, to assist Hart and eventually argue the appeal. *Id*. The Third Circuit issued its opinion in favor of Hart on May 21, 2013. *Hart v. Electronic Arts*, 717 F.3d 141 (3d Cir. 2013).

**B. The *Alston* Action**

Despite the Third Circuit win, for which *Keller* counsel credited the intervention of the NFL Players Association, *Keller* counsel continued to have concerns about the ability of Hart's counsel to successfully prosecute the *Hart* action, and about EA's ability to capitalize on the existence of the *Hart* action by reverse auctioning the *Hart* and *Keller* actions. Carey Decl. ¶ 15. On August 27, 2013, in an attempt to protect the *Keller* class from such an outcome, *Keller* counsel filed an action in the District of New Jersey on behalf of former student-athlete Shawne Alston, alleging class claims on behalf of NCAA student-athletes under New Jersey's common law right of publicity. *Id*.; *Alston v. Electronic Arts*, No. 3:13-cv-05157-FLW-LHG (D. N.J. Filed Aug. 27, 2013).

**C. Settlement Negotiations**

Counsel for the *Keller* Plaintiffs, along with counsel for the Antitrust Plaintiffs,[12] first began engaging with EA and CLC in settlement discussions in November 2011; those discussions did not lead to a resolution. Carey Decl. ¶ 16. Then again in the fall of 2013, the parties again agreed to

[12] "Antitrust Plaintiffs" refers to the Plaintiffs in *O'Bannon, Jr. v. National Collegiate Athletic Association et al.*, 4:09-cv-03329-CW: Edward C. O'Bannon Jr., Oscar Robertson, William Russell, Harry Flournoy, Alex Gilbert, Sam Jacobson, Thad Jaracz, David Lattin, Patrick Maynor, Tyrone Prothro, Damien Rhodes, Eric Riley, Bob Tallent, Danny Wimprine, Ray Ellis, Tate George, Jake Fischer, Jake Smith, Darius Robinson, Moses Alipate and Chase Garnham.

engage in settlement discussions, this time including the McIlwain Attorneys, who at that point were still representing Plaintiff Hart. *Id.*[13] On September 10, 2013, the parties participated in a mediation in which the basic parameters of a settlement were agreed upon, and a term sheet was executed on September 26, 2013. *Id.* Unknown to the other parties to the mediation, however, the McIlwain Attorneys had, according to their client, been negotiating *ultra vires*, and had signed the term sheet without permission from their client, Plaintiff Hart. Ex. 1 at ¶¶ 6-10. Even after Hart learned of the settlement via the Wall Street Journal, the McIlwain Attorneys failed to provide him with any information concerning the terms of the settlement. *Id.*

Shortly thereafter, in October 2013, Hart replaced the McIlwain Attorneys with the McKenna Attorneys, *Id*. ¶ 14, who ultimately consented to terms on Hart's behalf. Carey Decl. ¶ 18. The resulting agreement provided for a $40,000,000 settlement fund, to be allocated *pro rata* into three subclasses: (1) the "Antitrust Roster-Only Class," which was allocated $5,000,000 of the settlement fund; (2) the "*Hart/Alston* Right of Publicity Class," which was allocated $4,000,000 of the settlement fund; and (3) a subclass consisting of "*Keller* Right of Publicity Class Members" and "Antitrust Class Members other than Roster-Only Subclass Members," which was allocated the remainder of the fund, or $31,000,000. *See* Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Ex. 1 (May 30, 2014), Dkt. No. 1108-2 at 8–9, 19–20 ("Original EA Settlement Agreement").

The *Keller* Plaintiffs also continued to negotiate with the NCAA, and ultimately reached a Settlement Agreement for right-of-publicity claims against the NCAA on June 29, 2014.[14] Carey

[13] Mr. McIlwain's Motion misleadingly suggests that EA had entered into serious settlement discussions after the Third Circuit opinion was issued in the *Hart* action, and that "[i]t was only later, after the Ninth Circuit issued its opinion in *Keller*, that *Keller* was invited to participate in the mediation." Mot. at 14-15. In fact, the mediation that Mr. McIlwain refers to was an apparent attempt on the part of EA to take advantage of the weaker claims in the *Hart* action to negotiate a settlement that would eliminate their greater exposure to the Keller claims. Carey Decl. ¶ 17. Counsel for the *Keller* Plaintiffs made it clear that they would object to any settlement negotiated without them, and ultimately, meaningful settlement negotiations did not take place until after the *Keller* Plaintiffs successfully defended this Court's decision in the Ninth Circuit. *Id*. The Ninth Circuit issued its decision on July 31, 2013. No. 10-15387, Dkt. No. 167-1. A little more than a month later, on September 10, 2013, EA and the CLC were settling the claims. Dkt. No. 1195.

[14] The *Hart* action did not name the NCAA as a defendant, and Plaintiff Hart was not a party to the NCAA Settlement Agreement.

Decl. ¶ 19. That Agreement provided for a $20,000,000 settlement fund, to be allocated on the basis of a point system. *See* Plaintiffs' Mot. for Preliminary Approval of Class Action Settlement, Ex. 2 (June 30, 2014), Dkt. No. 1138-2 ("Original NCAA Settlement Agreement").

After the Court requested that the parties work to consolidate notice and claims processes between the two settlements, both the Original EA and NCAA Settlement Agreements were modified to use a point-based allocation. Carey Decl. ¶ 20.[15] Under this allocation, a claimant could be awarded a "Season Roster Appearance" for each season in which (1) his likeness was used as an avatar in an EA videogame, (2) his photograph was used in an EA videogame, or (3) his name appeared on a school roster, even though his likeness was not used in an EA videogame. *Id*. Those Season Roster Appearances, in turn, were awarded "Points," the ratio of which was intended to reflect the relative strengths of the various claims at issue in the litigation. *Id*. Claims based on appearances in NCAA-branded videogames from 2005-2014 ("Post-2005 Videogame Appearances") were awarded 6.6 points. *Id*. In contrast, the claims which could only have been brought as part of the New Jersey right of publicity claims—because they fell outside the statute of limitations period for either the Keller or Antitrust claims—("Pre-2005 Videogame Appearances") were awarded only 1.8 points. *Id*. Assuming a 100% claims rate, these points would result in a recovery of $1,793,848 for claims that could only be brought under New Jersey law. *Id*. ¶ 23.[16]

On an individual level, as illustrated in the table below, this allocation results in a student-athlete receiving $82.59 for each Pre-2005 Videogame Appearance (*i.e.*, "New Jersey-Only" claim) under the EA Settlement, compared with $474.23 for each Post-2005 Videogame Appearance under the Combined Settlements. Moreover, a student-athlete would also receive $46.75 for each Pre-2005 Videogame Appearance under the NCAA Settlement—which counsel for the *Keller* Plaintiffs achieved in a negotiation to which Plaintiff Hart was not a party. Carey Decl. ¶¶ 21-22.

---

[15] *See also* Joint Filing of Am. Settlement Agmts. and Exs. Thereto, Dkt. No. 1158 (July 23, 2014), Ex. 1 at 21 ("Amended EA Settlement Agreement") and Ex. 2 at 19 ("Amended NCAA Settlement Agreement") (together "Amended Settlement Agreements").

[16] These recovery amounts are based on estimates of Roster Appearances provided to *Keller* counsel by the firm they retained to assist in the collection and compilation of information regarding NCAA student-athletes appearing in EA's videogames. More detail on those numbers is provided in the Carey Decl. ¶¶ 21-23.

| **Estimated Recovery Table**[17] (Assuming 100% Claims Rate) | | | | | |
|---|---|---|---|---|---|
| **Category** | **Description** | **Time Period** | **Per-Season Recovery Amount**[18] | | |
| | | | **EA Settlement** | **NCAA Settlement** | **Combined Settlements** |
| B | Avatar Match or Photograph Use *(New Jersey-Only Right of Publicity Claims)* | 2005–2014 | $82.59 | $46.75 | $129.33 |
| C | Avatar Match or Photograph Use (New Jersey PLUS California Right of Publicity Claims and Antitrust Claims) | 2005–2014 | $302.83 | $171.40 | $474.23 |

### D. McIlwain Resume and McIlwain Attorneys' Lodestar

#### 1. McIlwain Resume.

Mr. McIlwain purports to bill at a rate of $850 per hour, slightly less than Steve Berman's and Michael Hausfeld's rates—the managing partners of two of the largest, most well-respected plaintiffs' firms in the country and hundreds of dollars more than the partners who handled the daily litigation for those firms. To justify this rate, Mr. McIlwain submits to the Court an inflated and misleading description of his qualifications. For example, Mr. McIlwain cites as evidence of his significant "sports related litigation experience" a series of cases that in fact demonstrate the exact opposite:

- *Pedersen et al v. NCAA*. Mr. McIlwain filed a purported class action in 2014 against the NCAA for sex discrimination, which is currently pending in the U.S. District Court for the District of New Jersey. The docket demonstrates that Mr. McIlwain spent most of his time unsuccessfully trying to consolidate that case with another action pending in *state* court—an obviously futile motion. Carey Decl. ¶ 24. The case remains at the pleading stage with the NCAA's motion to dismiss pending. *See Pederson, et al v. National Collegiate Athletics Association, et. al.*, Case No. 2:14-cv-02544-MCA-MAH (D. N.J., Filed April 21, 2014).
- *Jim Brown Litigation*. Mr. McIlwain frequently invokes his representation of Jim Brown in litigation involving Brown's publicity rights. In that action, the District Court dismissed

---

[17] Carey Decl. ¶ 22.

[18] This is the amount an athlete would receive for each season that falls within the relevant Category and Time Period.

Brown's federal claims and the Ninth Circuit affirmed the dismissal. *See Brown v. Electronic Arts, Inc.*, 724 F.3d 1235 (9th Cir. 2013). After dismissal, Brown hired Hagens Berman to continue litigating his state law right of publicity claims in California state court.[19] Hagens Berman recently defeated EA's Anti-SLAPP motion, and EA appealed to the California Court of Appeals.[20]

- *Babych v. Comcast Corporation & Philadelphia Flyers*. Mr. McIlwain purports to have obtained a "Multi-Million Dollar Verdict" in favor of professional hockey player David Babych. Mr. McIlwain fails to mention that the verdict was actually $1.37 million, and that lead counsel in the trial was not Mr. McIlwain, but an experienced medical malpractice attorney, Patrick T. D'Arcy. *See Babych v. Comcast Corporation & Philadelphia Flyers,* No. ATL-L-1365-00 (N.J. Super. Ct. Filed April 20, 2000); Carey Decl. ¶ 25.
- *World B. Free v. Nike*. The complaint was filed in April 2009 and dismissed in November 2009. Carey Decl. ¶ 26. The docket reveals no other activity in that case. *Id.*; *see also Free v. Nike,* No. ATL--L-2105-09 (N.J. Super. Ct. Filed April 27, 2009).

In addition, Mr. McIlwain makes implausible claim that he at one time "served as Walmart's exclusive counsel on work related injuries." McIlwain Decl. ¶ 13.

**2. McIlwain Lodestar.**

The McIlwain Attorneys claim a combined lodestar of over $3 million. This amount does *not* include the time of the Altshuler Berzon attorneys who were, in *Keller* counsel's opinion, responsible for Plaintiff Hart's sole success—the Third Circuit victory. Upon information and belief, Altshuler Berzon was paid directly by the player associations. Carey Decl. ¶ 14.

**a. McIlwain Time**

Mr. McIlwain claims that he personally spent 2,453 hours on the Hart litigation for a total lodestar of $2,070,175. According to his time records, 332 of these hours, representing $282,203 in fees, were incurred before he even filed the Hart Complaint. McIlwain Decl., Ex A at 2-9. Indeed, even though the *Hart* complaint was not filed until June 2009, Mr. McIlwain's lodestar includes time

[19] *Brown v. Electronic Arts*, BC520019 (C.D. Cal.).
[20] *Id.*

entries dating back to August 2007—nearly two years before litigation even commenced. *Id.* Much of this time appears to relate to his unsuccessful efforts on behalf of Jim Brown—*e.g.* his January 11, 2008 entry, "edits to complaint with Jim Brown story & value of likeness." McIlwain Decl., Ex. A at 2. He candidly admits this in his declaration, in which he claims to have "originated the right of publicity theory of liability for athletes against video game maker Electronic Arts starting with Jim Brown, which eventually evolved into multiply [sic] federal class action complaints." *See* McIlwain Decl. ¶ 1.

Another 179.05 hours, representing $152,194, consist of time entries that say nothing more than "Researching and discussing [insert case name]." Many of the cases, for example the Supreme Court's decision in *Feist Publications, Inc. v. Rural Telephone Service Co.*, appear to have no conceivable relevancy to Hart's claims.

The rest of Mr. McIlwain's lodestar is littered with improper and nonsensical time entries. Some examples are below:

- **.80 hours**: WA email legal status of MMA fighter terminated for not refusing to give up ROP in perpetuity. No first amendment analysis re: employee giving up rights.
- **6.20 hours**: Research games that are similar to movies; analysis films that could become video games; research the sales of war video games like "Call of Duty"; Watch Oceans 13; imdb actors in Oceans 13 movie
- **3.40 hours:** Research Matt Damon; George Clooney; Don Cheatle; Bernie Mack; Ellen Barkin; Andy Garcia; Al Pacino; Brad Pitt background
- **.70 hours:** Conference call with Kevin Volchak re: Don Cheadle
- **4.20 hours:** Analysis biographical information for Matt Damon; George Clooney; Don Cheatle; Bernie Mack; Ellen Barkin; Andy Garcia; Al Pacino; Brad Pitt; image in Oceans 13 movie and correlate likeness to new video game
- **3.30 hours:** Conference call between Michael Rubin, KM and AJ; Edit letter to Ken Howard; research history of motion pictures and Thomas Edison's New Jersey invention and the history of it moving to California

- **2.20 hours:** Analysis biographical information for Matt Damon; George Clooney; Don Cheatle; Bernie Mack; Ellen Barkin; Andy Garcia; Al Pacino; Brad Pitt; image in Oceans 13 movie and correlate likeness to new video game[21]
- **.60 hours:** memo to file re: Judge Bird's quote enriching society
- **3.70 hours:** Research and analyze Hagens Berman class actions
- **2.10 hours:** Review on Netflix *30 for 30* episode re: Lanier's sports agency
- **2.80 hours:** Research Gene Egdorf's bio re: sports accomplishments

Finally, in addition to his own inflated lodestar, McIlwain claims an additional $491,360 lodestar consisting of "Certified Time" of attorneys "Supervised by McIlwain." No time entries are submitted for this time.

**b. Lanier Firm Time**

The Lanier Firm has submitted no time entries to support its $464,470 lodestar, and Mr. Egdorf's description of the work performed by the Lanier firm clearly indicates improper padding. For example, the Lanier firm inexplicably devoted time to preparing a "litigation plan and damages model" even though, according to Mr. McIlwain's own time entries, the Lanier firm only joined the case on July 27, 2013, *after* EA had already informed him that it wanted a "global settlement." Egdorf Decl. ¶ 13; McIlwain Decl., Ex. A at 54.

## III. ARGUMENT

The "guiding principle" for the recovery of attorneys' fees out of a common fund is that such fees be "reasonable under the circumstances." *Rodriguez v. Disner*, 688 F.3d 645, 653 (9th Cir. 2012) (quoting *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir.1990)). Moreover, "[p]laintiffs' attorneys bear the burden of submitting detailed records documenting 'the hours worked and rates claimed.'" *Jacobs v. California State Auto. Ass'n Inter-Ins. Bureau*, 2009 WL 3562871, at *3 (N.D. Cal. Oct. 27, 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), and "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433. Here, the McIlwain Attorneys have failed to adequately support their claimed

[21] This entry is an exact duplicate of the 11/20/11 entry except in one case Mr. McIlwain claims he spent 2.20 hours and in the other 4.20.

lodestar, and the Court is well within its discretion to simply ignore those numbers, especially in light of the McIlwain Attorneys minimal contribution to the ultimate settlement of this action.

*Keller* Plaintiffs submit that Hart's counsel, collectively, to *at most* to an award of $700,000, which together with the $300,000 already promised to the McKenna Attorneys by Counsel for *Keller* Plaintiffs,[22] represents a total fee award of $1,000,000.

**A. The Court Should Disregard the McIlwain Attorneys' Lodestar.**

"[T]he determination of what constitutes reasonable attorneys' fees is committed to the sound discretion of the trial court." *Synapsis, LLC v. Evergreen Data Sys., Inc.*, 2006 WL 3302432, at *2 (N.D. Cal. Nov. 14, 2006) (quoting *Hancock Laboratories, Inc. v. Admiral Ins. Co.*, 777 F.2d 520, 526 n. 12 (9th Cir.1985). That said, "a lawyer is not entitled to be compensated from a common fund . . . for hours a reasonable lawyer would not have spent, hours unreasonably spent, or work done so badly it is of no value to the common fund beneficiaries." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602, 608 (9th Cir. 1997). Thus, the Court's discretion includes the ability to reduce an attorney's claimed hours, or completely disregard an attorney's claimed lodestar due to "insufficient credible evidence." *Ellis v. Toshiba Am. Info. Sys., Inc.*, 218 Cal. App. 4th 853, 883 (2013), *as modified* (Aug. 14, 2013), *as modified on denial of reh'g* (Sept. 10, 2013), *review denied* (Nov. 26, 2013), *cert. denied sub nom. Sklar v. Toshiba Am. Info. Sys., Inc.*, 134 S. Ct. 2692 (2014) *reh'g denied*, 135 S. Ct. 25 (2014) (affirming trial court's decision to not even attempt calculation of a lodestar where attorney's billing records were "inconsistent, contained omissions, and . . . were inaccurate and even contradictory").

Here, as outlined above, Section II.D.2, the McIlwain Firm's time records are replete with improper and nonsensical time entries, and, the Lanier Firm's records are nonexistent. These defects render the entire lodestar unreliable, and the Court would be well within its discretion to disregard it entirely.[23]

---

[22] *See supra*, note 5.

[23] This is especially true considering that the McIlwain Attorneys were terminated by their client under circumstances implicating their ethical obligations to get their client's consent before entering into a settlement involving his claims.

**B. The McIlwain Attorneys' Actions Did Little to Benefit the Fund.**

"It is well-established that an award of attorneys' fees from a common fund depends on whether the attorneys' specific services benefitted the fund—whether they tended to create, increase, protect or preserve the fund." *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602, 608 (9th Cir. 1997) (quoting *Class Plaintiffs v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306, 1308 (9th Cir.1994)).

Here, despite Mr. McIlwain's inflated claims of having "originated the right of publicity theory of liability for athletes against [EA]," McIlwain Decl. ¶ 1, the McIlwain Attorneys in fact contributed very little that served to "create, increase, protect, or preserve" the recovery of the class of NCAA student-athletes with right-of-publicity claims. To begin with, the fact that the McIlwain Attorneys were replaced by their client in the middle of settlement negotiations undoubtedly *depleted* the settlement fund by causing the McKenna Attorneys to incur time and expense reviewing everything up to that point in order to enter the negotiations. Moreover, despite McIlwain's insinuation that he effectively handed the McKenna Attorneys a pre-negotiated settlement, the McKenna Attorneys actually negotiated the final Settlement as described *supra*, Section II.C.

They did not conduct any discovery, and at the time of the settlement, apparently did not have a single document supporting their claims. Carey Decl. ¶ 27. Nor had they revealed, at the time of the settlement, any damages model showing the number of class members and the value of their claims, which would have been essential to the prosecution of—and in particular the certification of their class under—their New Jersey common law claims, since those claims lacked the statutory damages associated with the *Keller* claims. *Id*. Indeed, the McIlwain Attorneys appeared to have little grasp on the difficulties posed in this litigation by the issue of ascertainability, or what information it would take to achieve class certification. *Id*. Upon information and belief, in contrast to counsel for *Keller* Plaintiffs, the McIlwain Attorneys never sought nor collected the data required to prove that the videogame avatars are sufficiently similar to their real-life counterparts to constitute a "likeness" for the purposes of a right of publicity claim, or to decide which student-athletes listed

on real-life rosters did not have a right of publicity claim because they did not appear in the videogames. *Id*.

At most, the *Hart* action served to lengthen the class period for right-of-publicity claims due to New Jersey's six-year statute of limitations on such claims, and although the McIlwain Attorneys make much of this extended statute of limitations,[24] without statutory damages, a proposed damages model, or data supporting certification, the claims for those additional years added by the *Hart* action were substantially less valuable than those included in the original *Keller* claims—especially considering that (1) counsel for the *Keller* Plaintiffs had also brought the *Alston* action, (2) counsel for *Keller* Plaintiffs had access to materials that could support class certification and damages, and (3) the *Keller* complaint contained a contract claim with a 10-year statute of limitations. Thus, the only real benefit brought by the *Hart* action was on behalf of athletes with claims that could *only* have been brought under New Jersey law. As explained above, Section II.C at 8, the ultimate Settlement Agreement reflected the small value of those claims.

### C. At Most, Hart's Counsel Collectively Should Be Awarded Fees of No More than $1 Million.

Courts in the Ninth Circuit use a "benchmark rate" of 25% in determining the reasonableness of attorney fee awards out of a common fund. *Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1048 (9th Cir. 2002). Even assuming that the entirety of the amount allocated to New Jersey-only claims in the Settlement can be attributed to the *Hart* action (despite the pendency of the *Alston* case and ignoring that *Keller* had non-statutory claims that went back as far as the New Jersey claims), the "common fund" available to class members with New Jersey-only claims, assuming a 100% claims rate, is only $1.79 million, with the resulting 25% "benchmark" fees being $448,462 for that "fund."

In stark contrast to these benchmark fees, the McIlwain Attorneys alone seek fees of $4,620,000—representing an incredible 257.55% of the New-Jersey-only allocation.

*Keller* Plaintiffs submit that at the very most, Hart's counsel should collectively be awarded $700,000. This amount *plus* the $300,000 promised to the McKenna firm represents 55.8% of the $1.79 million New Jersey-only allocation. As noted above, Mr. McIlwain has suggested that the fee

[24] *See* McIlwain Mot. at vii, 1, 2, 14, 15.

dispute between himself and the McKenna Attorneys has been previously raised before the New Jersey District Court, *see* McIlwain Mot. at 11–12. Thus it may be appropriate to award the entire fee to the McKenna Attorneys without prejudice to Mr. McIlwain's ability to recover in *quantum meruit* in the New Jersey proceeding.

## IV. CONCLUSION

For the foregoing reasons, ROP Plaintiffs respectfully request that this Court deny the Motions and award the *Hart* Attorneys no more than $700,000 in attorneys' fees and costs.

Dated: April 27, 2015

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Robert B. Carey

Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice)*
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

Steve Berman (*Pro Hac Vice)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@smplegal.com

Celeste H.G. Boyd (*Pro Hac Vice*)
THE PAYNTER LAW FIRM PLLC
1340 Environ Way
Chapel Hill, NC 27517
Telephone: (919) 307-9991
Facsimile: (866) 734-0622
cboyd@smplegal.com