Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| SAMUEL MICHAEL KELLER, et al., on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>          v.<br><br>ELECTRONIC ARTS, INC.; NATIONAL COLLEGIATE ATHLETICS ASSOCIATION; COLLEGIATE LICENSING COMPANY,<br><br>          Defendants. | Case No. 4:09-cv-1967 CW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. Claudia Wilken<br>Courtroom: 2, 4th Floor<br>Fairness Hearing: July 16, 2015 at 2 p.m.<br>Complaint Filed: May 5, 2009 |

1

### NOTICE OF MOTION AND MOTION

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

**PLEASE TAKE NOTICE** that at 2:00 PM on July 16, 2015, before the Honorable

4

Claudia J. Wilken, United States District Court for the Northern District of California, 1300 Clay

5

Street, Oakland, Courtroom 2, Fourth Floor, Oakland, California, Class Plaintiffs will move the

6

Court, pursuant to Federal Rule of Civil Procedure 23(e), for entry of an order granting final

7

approval of the settlement agreement with Defendant National Collegiate Athletic Association

8

("NCAA"), specifically:

9

    1.  Determining that the settlement is fair, reasonable, and adequate and meets the

10

        requirements of Federal Rule of Civil Procedure 23(e);

11

    2.  Determining that the notice provided to the class constitutes due, adequate, and

12

        sufficient notice, and meets the requirements of due process and applicable law;

13

    3.  Approving the method for allocating the settlement among claimants;

14

    4.  Directing that this and related actions be dismissed with prejudice;

15

    5.  Approving the release of claims as specified in the settlement as binding and effective;

16

    6.  Reserving exclusive and continuing jurisdiction over the settlement; and

17

    7.  Directing that final judgment of dismissal be entered as between Class Plaintiffs and

18

        Defendant NCAA.

19

The motion is supported by: (i) this notice of motion and motion; (ii) the supporting

20

memorandum of points and authorities; (iii) the accompanying declarations of Leonard W.

21

Aragon, dated July 2, 2015; Kenneth Jue, dated July 2, 2015; and Andrew Schwartz, dated July 2,

22

2015; (iv) the settlement agreement with NCAA, filed with this Court at Case No. 4:09-cv-01967-

23

CW, Dkt. No. 1158-2; (v) the Court's September 3, 2014 Order granting Plaintiffs' Motion for

24

Preliminary Approval, Case No. 4:09-cv-01967-CW, Dkt. No. 1178, as well as the Court's

25

December 29, 2014 Order extending the deadlines for the notice program, Dkt. No. 1187; (vi) any

26

further papers filed in support of this motion; (vii) the argument of counsel; and (viii) all matters

27

of record in the actions captioned *O'Bannon, Jr. v. National Collegiate Athletic Association et al.*,

28

4:09-cv-03329-CW (N.D. Cal.), *Keller v. Electronic Arts, Inc. et al.*, Case No. 4:09-cv-01967-CW

1

1   (N.D. Cal.) (later consolidated with O'Bannon as *In re NCAA Student-Athlete Name & Likeness*

2   *Litig.*, Case No. 4:09-cv-01967-CW (N.D. Cal.), and then de-consolidated in 2014); *Hart v.*

3   *Electronic Arts, Inc.*, Case No. 09-CV-05990-FLW-LHG (D.N.J.);*Alston v. Electronic Arts, Inc.*,

4   3:13-cv-05157-FLW-LHG (D. N.J.); and other related cases as identified in the settlement

5   agreement.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ................................................... 2

    A.   The Litigation. ................................................................................................ 2

    B.   Summary of Discovery. .................................................................................. 3

    C.   The Player Database. ...................................................................................... 4

    D.   The EA Settlement and the NCAA Settlement. .............................................. 6

    E.   The Revised Settlement Agreements and Coordination of Settlement Procedures. ........ 7

    F.   The Terms of the NCAA Settlement. ............................................................. 7

        1.   The Proposed Class. ............................................................................ 7

        2.   The Proposed Release ......................................................................... 8

    G.   The Court Grants Preliminary Approval of the NCAA and EA Settlements. ................. 9

        1.   The Notice Campaign. ........................................................................ 9

        2.   The Results of the Notice Campaign. ................................................. 12

III. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ........................ 12

    A.   Standard of Review. ....................................................................................... 12

    B.   The Settlement Is Fair, Reasonable and Adequate. ........................................ 14

        1.   The Strength of ROP Plaintiffs' Case and the Risk of Continued Litigation Supports Final Approval. ....................................................................... 14

        2.   There Is Potential Risk in Maintaining Class Action Status Through Trial.... 15

        3.   The Relief Provided to the Class in the Settlement Is Substantial. ................ 15

        4.   The Extent of Discovery and the Stage of the Proceedings. ........................ 16

        5.   The Recommendations of Experienced Counsel Favor Approval of the Settlement. ....................................................................................... 17

        6.   The Reaction of the Class to the Proposed Settlement. .................................. 17

IV.  The Settlement Is the Non-Collusive Product of Extensive Arm's Length Negotiations .......... 18

V.   For Purposes of Settlement Only, the Settlement Class Meets the Requirements of Rule 23..... 19

    A.   The Settlement Class Satisfies Rule 23(a). .................................................... 20

    B.   The Settlement Class Satisfies The Requirements of Rule 23(b)(3). ............... 22

    C.   Notice to the Settlement Class Was Adequate and Satisfied Due Process. ...................... 23

VI.  CONCLUSION ............................................................................................................. 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Alston v. Electronic Arts, Inc.*,
 3:13-cv-05157-FLW-LHG (D. N.J.) .................................................................................2

*Armstrong v. Davis*,
 275 F.3d 849 (9th Cir. 2001), *cert. denied*, 537 U.S. 812 (2002) ..............................20

*Boyd v. Bechtel Corp.*,
 485 F. Supp. 610 (N.D. Cal. 1979)...............................................................................13

*Chavers v. Gatke Corp.*,
 107 Cal. App. 4th 606 (2003) .......................................................................................22

*Churchill Village L.L.C. v. Beckwith Place Ltd. P'ship*,
 361 F.3d 566 (9th Cir. 2004) .......................................................................................13

*Detroit v. Grinnell Corp.*,
 495 F.2d 448 (2d Cir. 1974) ...................................................................................13, 18

*Dryer v. Nat'l Football League*,
 No. 09–2182, 2013 WL 1408351 (D. Minn. Apr. 18, 2013).......................................14

*Ellis v. Naval Air Rework Facility*,
 87 F.R.D. 15 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981)....................13, 17

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) .........................................................................13, 21, 22

*Hart v. Electronic Arts, Inc.*,
 Case No. 09-CV-05990-FLW-LHG (D.N.J.) ..................................................................2

*In re Bluetooth Headset Prods. Liability Litig.*,
 654 F.3d 935 (9th Cir. 2011) ..................................................................................18, 19

*In re Citric Acid Antitrust Litig.*,
 1996 WL 655791 (N.D. Cal. Oct. 2, 1996) ...................................................................20

*In re Mego Fin. Corp. Sec. Litig.*,
 213 F.3d 454 (9th Cir. 2000) .......................................................................................16

*In re Mfrs. Life Ins. Co. Premium Litig.*,
 No. 96-CV-230, 1998 U.S. Dist. LEXIS 23217 (S.D. Cal. Dec. 21, 1998) ...............18

*In re NCAA Student-Athlete Name & Likeness Litig.*,
 723 F.3d 1268 (9th Cir. 2013) .......................................................................................3

*In re NCAA Student-Athlete Name & Likeness Litig.*,
   No. C-09-1967, 2010 WL 5644656 (N.D. Cal. Dec. 17, 2010) .....................................3

*In re Omnivision Technologies, Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................................16

*In re Warner Comm'cns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) ...............................................................................18

*Keegan v. American Honda Motor Co.*,
   284 F.R.D. 504 (C.D. Cal. 2012)...................................................................................23

*Keller v. Electronic Arts, Inc. et al.*,
   Case No. 4:09-cv-01967-CW (N.D. Cal.) (later consolidated with O'Bannon as
   *In re NCAA Student-Athlete Name & Likeness Litig.*, Case No. 4:09-cv-01967-
   CW (N.D. Cal.), and then de-consolidated in 2014) ......................................... passim

*Kirkorian v. Borelli*,
   695 F. Supp. 446 (N.D. Cal. 1988) ...............................................................................17

*Mba v. World Airways, Inc.*,
   369 Fed. Appx. 194 (2d Cir. 2010) ...............................................................................13

*Milstein v. Huck*,
   600 F. Supp. 254 (E.D.N.Y 1984) ................................................................................18

*Nat'l Rural Telecomm. Coop. v. Direct TV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004)...................................................................................17

*O'Bannon, Jr. v. National Collegiate Athletic Association et al.*,
   4:09-cv-03329-CW (N.D. Cal.)........................................................................................1

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ........................................................................22

*Rodriguez v. West Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ...............................................................................21, 23

*Schulken v. Wash. Mut. Bank*,
   No. 09-cv-0278-LHK, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012)..................................22

*Shames v. Hertz Corp.*,
   2012 WL 5392159 (S.D. Cal., Nov. 5, 2012)................................................................17

*Siber v. Mabon*,
   18 F.3d 1449 (9th Cir. 1994) ........................................................................................23

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) ..........................................................................................13

*United States v. McInnes,*
    556 F.2d 436 (9th Cir. 1977) ........................................................................14

*Util. Reform Project v. Bonneville Power Admin.,*
    869 F.2d 437 (9th Cir. 1989) ........................................................................12

*Van Bronkhorst v. Safeco Corp.,*
    529 F.2d 943 (9th Cir. 1976) ...................................................................12, 14

*Villegas v. J.P. Morgan Chase & Co.,*
    No. CV-09-00261-SBA-EMC, 2012 WL 5878390 (N.D. Cal. Nov. 21, 2012) ........................16

*Weinberger v. Kendrick,*
    698 F.2d 61 (2d Cir. 1982) ..........................................................................13

**STATUTES**

CAFA ...................................................................................................25

Cal. Civ. Code § 3344 .................................................................................2

Cal. Civ. Code § 3344(g) .............................................................................22

Cal. Bus. & Prof. Code § 17200 ......................................................................2

Ind. Code § 32-36-1-1 ................................................................................2

Ind. Code § 32-36-1-10 ..............................................................................22

**OTHER AUTHORITIES**

First Amendment ...............................................................................3, 6, 14

Federal Rule of Civil Procedure 23 ...............................................................19, 23

Federal Rule of Civil Procedure 23(a) ..........................................................9, 20, 21

Federal Rule of Civil Procedure 23(a)(1) ............................................................20

Federal Rule of Civil Procedure 23(a)(2) ............................................................20

Federal Rule of Civil Procedure 23(a)(3) ............................................................21

Federal Rule of Civil Procedure 23(a)(4) ............................................................21

Federal Rule of Civil Procedure 23(b)(3) .......................................................passim

Federal Rule of Civil Procedure 23(e) ...............................................................1

Federal Rule of Civil Procedure 23(e)(1) .....................................................13, 23, 25

*Newberg* § 11.4 ....................................................................................18

iv

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

   Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Class Counsel[1] submits this

4

memorandum in support of Settlement Class Representatives[2] ("Class Representatives" or "ROP

5

Plaintiffs") motion for final approval of the $20 million settlement between Class Representatives

6

and Defendant National Collegiate Athletic Association ("NCAA") ("Settlement"). The terms of

7

the Settlement are set forth in Exhibit 2 to the Joint Filing of Amended Settlement Agreements,

8

filed on July 23, 2014 ("Settlement Agreement").[3]

9

   Together with the recent settlement with Defendant Electronic Arts Inc. ("EA") ("EA

10

Settlement"),[4] this Settlement results in a gross fund of $60 million available to compensate

11

student-athletes for the use of their name, image, or likeness ("NIL") in EA's NCAA-Branded

12

Videogames—representing a substantial portion of the estimated recovery at trial, and an

13

outstanding recovery on a per-claimant basis, as outlined further below, Section III.B.3.

14

   After enormous media exposure and a hugely successful nationwide notice campaign, only

15

five Class members requested exclusion from the Settlement, and only three Class members

16

objected to the Settlement—none of whom raised meritorious objections, as explained in the

17

concurrently filed Response to Objections. Over 16,000 student-athletes, in contrast, supported the

18

Settlement by filing timely claims, and hundreds of student-athletes contacted Class Counsel to

19

express their support.

20

   This historic settlement was hard fought. Since 2009, the parties have investigated, litigated

21

and mediated their claims in state and federal courts, the Judicial Panel on Multi-District Litigation,

22

the Ninth Circuit Court of Appeals, and the Supreme Court of the United States. For six years, the

23

24

   [1] Unless otherwise distinguished, "Class Counsel" and "Counsel" refer to counsel for the NCAA Settlement Class Representatives, namely Hagens Berman Sobol Shapiro LLP and The Paynter Law Firm PLLC.

25

   [2] Dkt. No. 1178, ¶ 6 (for the purposes of this Settlement, ROP (Right of Publicity) Plaintiffs are Samuel Michael Keller, Bryan Cummings, LaMarr Watkins, and Bryon Bishop). All docket entries are to case 4:09-cv-01967-CW unless otherwise indicated.

26

   [3] Dkt. No. 1158-2.

27

   [4] Dkt. No. 1158-1.

28

1

parties have repeatedly met to discuss the merits of their respective positions, with each side presenting evidence supporting or refuting the claims and defenses at issue in this case. From the outset, Defendant adamantly denied any liability and challenged plaintiffs' ability to pursue class-wide relief. In response, Class Counsel made it clear that, while they were prepared to fairly assess the strengths and weaknesses of plaintiffs' case, they would continue to litigate absent a settlement that was fair and reasonable. After the ROP Plaintiffs' victory in the Ninth Circuit Court of Appeals, the parties agreed to a cash settlement of $20 million.

This Settlement readily satisfies the standard for final approval; its terms are fair, reasonable, and in the best interests of the Class. The Settlement was the result of extensive, arm's length settlement negotiations, with multiple mediation sessions conducted by Magistrate Judge Cousins and two professional mediators. The Settlement Notice and Claims Administrator[5] ("Administrator") has given adequate notice to the Class, and Class members, as well as public opinion, overwhelmingly support the Settlement. The Settlement should be approved so that student-athletes, for the first time in history, can be paid for the commercial use of their NIL. For these reasons, it is respectfully submitted that the Settlement is eminently fair, reasonable, and adequate, and should be approved by the Court.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Litigation.

The litigation commenced with the filing of the *Keller* action against the NCAA, EA, and the Collegiate Licensing Company ("CLC") in May 2009.[6] That complaint alleged the unlawful use of college athletes' names, images, and likenesses in NCAA-branded football and basketball videogames produced and sold by EA. The complaint asserted claims under California (as to EA) and Indiana (as to the NCAA) right-of-publicity statutes (Cal. Civ. Code § 3344, Ind. Code § 32-36-1-1), and the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) (as to EA). The complaint also asserted various common law theories, including common law right-of-

---

[5] The Court appointed Gilardi & Co. LLC as the Notice and Claims Administrator for the Settlement. Dkt. 1178, ¶ 3.

[6] Dkt. No. 1.

publicity claims and the existence of a conspiracy between EA and the NCAA to violate student-athletes' publicity rights. ROP Plaintiffs defeated an early motion by EA to strike the complaint on First Amendment grounds under California's anti-SLAPP statute, as well as motions to dismiss by all three Defendants. *Keller v. Electronic Arts, Inc.*, No. C-09-1967, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010).[7] EA filed an interlocutory appeal and this Court stayed further proceedings as to EA in *Keller* pending that appeal. *In re NCAA Student-Athlete Name & Likeness Litig.*, No. C-09-1967, 2010 WL 5644656 (N.D. Cal. Dec. 17, 2010). The importance of the First Amendment issues on appeal generated interest from across the entertainment and media industries, with dozens of parties filling amicus briefs in the case.[8] The Ninth Circuit affirmed the Court's ruling in *In re NCAA Student-Athlete Name & Likeness Litig.*, 723 F.3d 1268 (9th Cir. 2013), and EA filed a petition for certiorari to the Supreme Court, which was voluntarily dismissed after this Court preliminarily approved the parties' settlement agreements.[9]

**B.     Summary of Discovery.**

ROP Plaintiffs coordinated their discovery efforts with the Antitrust Plaintiffs[10] and Defendants to minimize the burdens on all parties and comply with the Court's order consolidating the two cases and appointing co-lead counsel.[11] With respect to the case against Defendants CLC and NCAA, ROP Plaintiffs served discovery, and negotiated and entered into ESI protocols.[12] Class Counsel efficiently reviewed and analyzed every document produced by the NCAA by coding and indexing all relevant documents, and identifying exhibits for trial.[13] Class Counsel also reviewed responses to interrogatories and RFAs relevant to right of publicity claims.[14] When

---

[7] The Court partially granted the NCAA's motion to dismiss, but denied both other Defendants' motions in their entirety. *Id.*

[8] Declaration of Leonard W. Aragon in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Aragon Decl."), filed concurrently herewith, ¶ 7.

[9] Aragon Decl. ¶¶ 5, 6, Exs. 1 (September 25, 2014 Agreement to Dismiss Case) & 2 (September 30, 2014 Order of Clerk of Supreme Court).

[10] The term "Antitrust Plaintiffs" refers to the plaintiffs raising antitrust claims in the "Third Consolidated Amended Class Action Complaint" (July 18, 2013) (Dkt. No. 831) ("TCAC").

[11] Dkt. No. 145.

[12] Aragon Decl. ¶ 8.

[13] *Id.* ¶ 9.

[14] *Id.* ¶ 10.

3

1   discovery disputes arose, ROP Plaintiffs resolved their individual disputes without judicial

2   intervention.[15] Class Counsel also participated in almost three dozen depositions relating to

3   Defendants' conduct, and while most depositions covered antitrust topics unrelated to right of

4   publicity claims, Counsel monitored each deposition to identify relevant issues and protect the

5   interests of the putative class.[16] When depositions were clearly focused on antitrust issues, Counsel

6   participated by internet and/or phone to avoid incurring unnecessary costs and travel expenses.[17]

7   When depositions were likely to discuss right of publicity issues, counsel participated in person.[18]

8         With respect to Defendant EA, ROP Plaintiffs were not permitted to serve discovery due to

9   the stay, but Counsel reviewed all materials produced in response to antitrust discovery requests,

10  coded and indexed all relevant documents produced by EA, and identified exhibits for trial.[19]

11  Counsel also monitored all EA depositions and actively communicated with counsel for EA in

12  efforts to minimize discovery on remand.[20] In addition, Class Counsel reviewed, coded, and

13  indexed thousands of documents from third parties, and conducted substantial informal discovery

14  from third parties before and during the litigation.[21] Indeed, Class Counsel's original investigation

15  led to the initial *Keller* complaint that began this litigation. Despite the stay, ROP Plaintiffs had

16  sufficient documentary evidence to move for class certification and proceed to trial against the

17  NCAA by March 23, 2015, as ordered by this Court.[22]

18  **C.      The Player Database.**

19        The Antitrust Plaintiffs' motion to certify a damages class was denied, in part, because the

20  "[Antitrust] Plaintiffs ha[d] not offered a feasible method for determining on a class-wide basis

21  which student-athletes are depicted in these videogames and which are not."[23] ROP Plaintiffs

22  identified this issue early in the case and began preparing a comprehensive interactive database of

23  ───────────────
      [15] Aragon Decl. ¶ 11.

24    [16] *Id.* ¶ 12.

25    [17] Id.

26    [18] *Id.*
      [19] Aragon Decl. ¶ 13.

27    [20] *Id.* ¶ 14.
      [21] *Id.* ¶ 15.
      [22] Dkt. No. 1092 at 10-11.

28    [23] Dkt. No. 893 at 21.

all student-athletes in real-world rosters and videogame rosters.[24] This was a massive undertaking given that the NCAA-Branded Videogames[25] contained approximately 3,900 teams and over 75,000 students.[26] To create the database, Class Counsel collected Division I football and men's basketball rosters for the *Keller* Right of Publicity Settlement Class Period (May 4, 2003 through September 3, 2014),[27] and used that information to create a database containing roster information—including, among other things, school, assigned uniform number, position, sport/division, and home state—for each student-athlete.[28] Counsel then created a second database with the same roster information pulled from the virtual rosters in EA's NCAA-Branded Videogames.[29] The two databases were merged (together, "the Player Database") to allow Counsel's database experts to match student-athletes from the real world with their virtual counterparts using uniform number, school, division, sport, position, and home state.[30]

Once the EA/CLC case was settled, ROP Plaintiffs conducted confirmatory discovery with EA regarding the Player Database, in addition to hiring consultants OSKR, LLC—experts in sports and entertainment cases—to confirm the reliability and accuracy of the Player Database.[31] OSKR confirmed that the Player Database was created using a sound methodology, based on reliable data, and that the resulting queries were reliable and accurate.[32] In fact, the database has more information than the NCAA's or EA's own records, and is just as accurate.[33]

---

[24] Aragon Decl. ¶ 16.
[25]   Unless otherwise indicated, defined terms have the same meaning given to those terms by the NCAA Settlement Agreement, Dkt. No. 1158-2.
[26] Aragon Decl. ¶ 17.
[27] *Id.* ¶ 18.
[28] *Id.* ¶ 19.
[29] *Id.* ¶ 20.
[30] *Id.* ¶ 21.
[31] Aragon Decl. ¶ 22; *see also* Declaration of Andy Schwarz, submitted herewith ("Schwartz Decl."), Section 1; and www.OSKR.com (last visited June 26, 2015).
[32] Schwarz Decl. ¶ 14.
[33] Aragon Decl. ¶ 23; *see also* Schwarz Decl., Sections 5 & 6.

5

**D.     The EA Settlement and the NCAA Settlement.**

Settlement talks among O'Bannon, Keller, NCAA, EA and CLC took place before Judge Edward Infante (Ret.) in 2011, but did not lead to a resolution.[34] Counsel for O'Bannon, Keller, and EA mediated again in 2013, to no avail.[35] On September 10, 2013, immediately after the Ninth Circuit rejected EA's First Amendment and Anti-SLAPP defense, the parties agreed to mediate with the assistance of Randy Wulff, and that mediation ultimately resulted in a settlement between plaintiffs and Defendants EA and CLC ("EA Settlement").[36] The NCAA did not participate in the EA Settlement, which did not purport to release the NCAA from liability.

All plaintiffs and the NCAA subsequently participated in two unsuccessful mediation efforts with Magistrate Judge Cousins, but were unsuccessful in reaching a settlement.[37] ROP Plaintiffs and the NCAA, however, continued their settlement discussions and reached an agreement in principle on or about June 9, 2014.[38] The resulting Settlement Agreement was signed on June 30, 2014.[39]

The settlement negotiations were challenging. ROP Plaintiffs' claims involve issues vitally important not only to student-athletes, but to the NCAA's relationship with student-athletes and its business partners, the NCAA's business model, and public perception. Talks were professional, but contentious and responsive to case developments. This case has received significant national media attention, and given the high stakes of the litigation, the principles at stake, and the strongly held feelings of the parties, negotiations were at arm's length and in good faith at all times.[40] The parties submitted their respective settlements to the Court on May 30, 2014[41] and June 30, 2014.[42]

---

[34] *See* Nov. 9, 2011 ECF notation.
[35] Aragon Decl. ¶ 24.
[36] Declaration of Robert B. Carey in Support of Mot. for Attorneys' Fees, Dkt. No. 1195 ("Carey Decl."), ¶ 51.
[37] Dkt Nos. 1015, 1017.
[38] Carey Decl. ¶ 57.
[39] Dkt. No. 1138, Ex. 1.
[40] Declaration of Steve W. Berman, Dkt. No. 1138-3 ("Berman Decl."), ¶ 9.
[41] Dkt. No. 1108.
[42] Dkt. No. 1138.

**E.      The Revised Settlement Agreements and Coordination of Settlement Procedures.**

On July 3, 2104, the Court held a telephonic status conference and provided comments on the parties' proposed class notices and claim forms for each settlement. The Court also requested that the parties submit revised settlement papers, and rescheduled the Preliminary Approval Hearing for both settlements to July 24, 2014.[43] In response, the parties to each settlement revised their agreements to allow for a single notice plan, allocation plan, preliminary and final approval schedule, objection and opt-out plan, and claims process. The parties also reached consensus regarding several ancillary issues, such as defined terms and deadlines, to ensure consistency between the two settlements. The revisions substantially altered the allocation plan in the EA Settlement by moving to a point-based system,[44] although the settlement amounts remained the same. The streamlining process—designed to reduce administrative costs, increase the claims rate, and avoid confusion—was contentious and time consuming, but ultimately fruitful.[45]

**F.      The Terms of the NCAA Settlement.**

The NCAA Settlement Agreement provides for the creation of a $20 million Settlement Fund in exchange for a release of all claims related to the litigation.[46]

### 1.  The Proposed Class.

The Settlement Class is defined as follows:

> All NCAA Division I football and basketball players (1) listed on a roster published or issued by a school whose team was included in an NCAA-Branded Videogame originally published or distributed from May 4, 2003 through September 3, 2014 and (2) whose assigned jersey number appears on a virtual player in the software, or whose photograph was otherwise included in the software.[47]

Excluded from the Settlement Class are EA, CLC, the NCAA, and their officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies;

---

[43] Dkt. No. 1145.

[44] The NCAA Settlement had originally contained a point-based system, and the EA Settlement was revised to a point-based system in order to harmonize the allocation plans in the two settlements.

[45] Aragon Decl. ¶ 25.

[46] Dkt. No. 1158-2, Sections V & VIII.

[47] Dkt. No. 1178 at 2 (Order Granting Preliminary Approval of [NCAA] Class Action Settlement).

class counsel and their employees and immediate family members; and the judicial officers and associated court staff assigned to the cases listed and their immediate family members.[48] Also excluded from the class are class members who submit a valid and timely request for exclusion.[49] Five Settlement Class members timely requested exclusion from the Class and are included in the Opt-Out List.[50] The Settlement Agreement provides that those on the Opt-Out List will not be subject to or bound by the provisions of the Settlement Agreement, the releases contained therein, or any judgment entered in favor of the Class.[51]

### 2. The Proposed Release.

The proposed release includes:

> Any and all past, present, and future claims, liabilities, or causes of action, known or unknown, existing or potential, expected or unexpected, pursuant to any theory of recovery (including but not limited to those based in contract or tort, common law or equity, federal, state, or local law, statute, ordinance, or regulation, and for claims for compensatory, consequential, punitive or exemplary damages, statutory damages, penalties, interest, attorneys' fees, costs, or disbursements, including but not limited to those incurred by Class Counsel or any other counsel representing the Keller Named Plaintiffs or any Settlement Class Members, other than those expressly awarded by the Court in the Fee and Expense Award authorized by this Agreement), arising out of, involving, or relating to the alleged use of any name, image, photograph, or likeness in EA's production, manufacture, sale, distribution, or publication of NCAA-Branded Videogames, or the alleged use of or failure to compensate for the alleged use of any NCAA student-athlete's name, image, photograph, or likeness in connection with EA's NCAA-Branded Videogames by the NCAA, EA, CLC, or any Person, that have been, could have been, or should have been asserted in the Lawsuits, including but not limited to any claims based in any way on alleged rights of publicity or name, image, and likeness rights under the law of any state or the United States, whether recognized now or hereafter, including any rights recognized in court decisions or statutes.[52]

---

[48] *Id.*

[49] *Id.* at ¶ 19.

[50] Jue Decl. ¶ 16, Ex. E. In addition, two class members submitted untimely requests for exclusion. *Id.* The parties respectfully request that the court not include the untimely requests in the Opt-Out List.

[51] Dkt. No. 1158-2 at ¶¶ 78, 81, 94.

[52] Dkt. No. 1158-2 at ¶ 33.

8

The release does not release claims against EA or CLC[53]; those claims are subject to the release

negotiated in the EA Settlement. Nor does the release impact claims unrelated to NCAA-Branded

Videogames originally released between May 4, 2003 through September 3, 2014.[54]

**G.    The Court Grants Preliminary Approval of the NCAA and EA Settlements.**

On September 3, 2014, the Court granted preliminary approval of the NCAA and EA

Settlements.[55] The Court found that the settlements were sufficiently fair, reasonable, and adequate

to allow dissemination of notice of the Settlements to the settlement classes.[56] The Court also

found, for purposes of preliminary approval and settlement only, that the settlement classes met the

requirements of Rule 23(a) and (b)(3). With respect to the NCAA Settlement, the Court appointed

Class Representatives, Class Counsel, and Administrator to their respective positions.[57]

**1.   The Notice Campaign.**

The Parties, as ordered by the Court, coordinated the notice and claims administration

processes between the NCAA and EA Settlements. By agreement, the Settlements shared

administrative costs equally; even though the NCAA Settlement is smaller than the EA Settlement,

the NCAA Settlement Class would have had to incur the full cost of notice had the EA Settlement

not occurred. The reverse is true for the EA Settlement Class. The classes, moreover, have

substantial overlap. Class Counsel for both Settlements believed it was beneficial and fair to share

costs equally because, among other things, coordination lowered administrative costs for both

Settlements and increased the likelihood that Class members would receive notice.[58]

As part of the notice campaign, the Court ordered the NCAA to request that its member

institutions and affiliated alumni associations provide to the Administrator reasonably ascertainable

information regarding the names and last-known addresses of NCAA football and basketball

players who were listed on rosters published or issued by schools appearing in the NCAA-Branded

---

[53] *Id.* (expressly reserving right to pursue EA and CLC for the released claims).
[54] *Id.* at ¶ 23.
[55] Dkt. No. 1178 (NCAA Settlement); Case 4:09-cv-03329-CW, Dkt. No. 312 (EA settlement).
[56] Dkt. No. 1178.
[57] *Id.* at 6-8.
[58] Aragon Decl. ¶ 26.

Videogames.[59] A major component of the notice campaign involved the settling parties' good-faith effort to collect last-known contact information for class members.[60] The NCAA complied with the Court's Order, requesting information from its member institutions, and the parties also created a website, through the Administrator, that allowed schools to upload address information for student-athletes. After 135 schools did not respond to the request or informed the parties that the information needed to be subpoenaed before the school could release it to a third-party, Class Counsel subpoenaed the information from those institutions.[61] Class Counsel also spoke directly with hundreds of students, school officials, attorneys, agents, and other staff members representing NCAA member institutions and their affiliates.[62] Ultimately, contact information was collected for approximately 92,732 student-athletes and 318 schools.[63]

By March 3, 2015, the Administrator mailed Notice and Claim Form packets to 65,876 addresses.[64] An additional 26,856 packets were mailed during the notice period as additional addresses were received.[65] To date, 12,756 Notice and Claim Form packets have been returned as undeliverable.[66] The Administrator updated addresses and re-mailed a Notice and Claim Form packet to 8,754 addresses. In total, then, 101,486 packets have been sent to class members' last-known address.

In addition to direct notice, the Administrator implemented a robust and effective media campaign to give notice to the Class and increase the claims rate. Through its in-house advertising agency, Larkspur Design Group (LDG), the Administrator caused the Summary Notice to be published in the following media outlets: ESPN Magazine on March 20, 2015, and Sports Illustrated on March 25, 2015.[67] The Administrator, through LDG, also utilized sponsored links and text ads through Google, Bing, and Yahoo!, and display ads through Google Display Network,

---

[59] Dkt. No. 1178 at ¶ 11.
[60] Aragon Decl. ¶ 27.
[61] *Id.* ¶ 28.
[62] *Id.* ¶ 29.
[63] Jue Decl. ¶ 3.
[64] *Id.* ¶ 9
[65] *Id.*
[66] *Id.* ¶ 10.
[67] *Id.* ¶ 4.

Xaxis Network, and Facebook, to provide Internet notice of the Settlements. The ads began running in February 2015 and ended on July 2, 2015.[68] The display ads included images of a generic football and basketball player with text stating, "If you are a former NCAA Athlete who thinks his likeness or team was included in an EA Basketball or Football videogame, you may be a class member entitled to payment."[69] To date, the implemented online Notice plan has generated the following statistics:[70]

| DELIVERABLE | IMPRESSIONS | CLICKS |
|---|---|---|
| Search Ads - Google | 683,911 | 2,689 |
| Search Ads – Bing / Yahoo! | 658,714 | 2,323 |
| Google Display Network | 16,006,545 | 26,674 |
| Xaxis Network | 25,715,798 | 8,568 |
| Facebook | 14,475,641 | 22,231 |
| **TOTAL** | **57,540,609** | **62,485** |

The parties, through the Administrator, also issued a press release on March 3, 2015, through PR Newswire; created a Facebook page, reaching 2,240,684 people to date; utilized Twitter, generating 1,490,000 impressions to date; created a LinkedIn Group; and relayed information through websites, blogs, and articles specific to this case and/or likely to be visited by Class members.[71] The Class Notice was also posted on the settlement website at www.NCAA-EA-Likeness-Settlement.com.[72] The website allows class members to view and print copies of the Long-Form Notice, Claim Form, Preliminary Approval Order, Settlement Agreements, Extension Order; and to consult Frequently Asked Questions.[73] Class members can also file an electronic claim on the website.[74] To date, there have been 111,921 visitors to the website.[75]

---

[68] Jue Decl. ¶ 5.
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] Jue Decl. ¶ 6.
[73] *Id.*
[74] *Id.*
[75] *Id.*

11

The parties also established a toll-free telephone number, 888-283-5733, that Class members could call to listen to Frequently Asked Questions, request a Claim Form and Notice packet, and speak to a live operator; to date, the Administrator has received 1,879 calls.[76]

### 2.   The Results of the Notice Campaign.

The notice campaign is still ongoing, but has been hugely successful. To date, Gilardi has received 5,862 mailed Claim Forms and 10,310 online claims, for a total of 16,172 claims. The claims rate is approximately 24% for the NCAA Settlement—an outstanding rate for a claims-made settlement utilizing partial direct and partial indirect notice.[77]

Because the claims deadline is July 2, 2015, Class Counsel will supplement this Motion, and file a proposed order, with a full list of Class members, minus duplicate and ineligible claims, before the Final Fairness Hearing.[78]

The exclusion and objection deadline having passed, only five Class members have filed timely[79] requests for exclusion,[80] and only three Class members have objected to the Settlements.[81] The objections were filed directly with the Court, and Class Representatives have responded to those objections in their Response to Objections, concurrently filed herewith.

### III.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A.   Standard of Review.

It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution."[82] "There is an overriding public interest in settling and quieting litigation," and this is "particularly true in class action suits."[83]

---

[76] Jue Decl. ¶ 11.

[77] The claims rate results from dividing the total number of claims filed (16,172), *see* Jue Decl. ¶¶ 12-13, by the total estimated number of NCAA Class members as determined by Class Counsel's database experts (68,463), *see* Schwarz Decl. ¶ 31.

[78] Aragon Decl. ¶ 30.

[79] There were two untimely requests for exclusion from the Settlement. Jue Decl. ¶ 16, Ex. E.

[80] Jue Decl. ¶ 16, Ex. E.

[81] Jue Decl. ¶ 17, Exs. F–H.

[82] The Officers for Justice v. Civil Serv. Comm'n of the City and County of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982). All internal citations and quotations omitted, unless otherwise indicated.

1       The Ninth Circuit has set forth factors that may be considered in evaluating whether the

2proposed settlement is "fair, adequate and reasonable" under Rule 23(e): (1) the strength of

3plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the

4risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5)

5the extent of discovery completed and the stage of the proceedings; (6) the experience and views of

6counsel; and (7) the reaction of the class to the proposed settlement.[84] The importance of any one

7factor "will depend upon and be dictated by the nature of the claims advanced, the types of relief

8sought, and the unique facts and circumstances presented by each individual case."[85]

9       The district court exercises its "sound discretion"[86] in approving a settlement, but should

10give the settlement a "presumption of reasonableness" based on the recommendations of plaintiffs'

11counsel.[87] The Court is now asked to ascertain whether the Settlement is within a range that

12responsible and experienced attorneys could accept, considering all relevant risk factors of

13litigation.[88] This range recognizes the uncertainties of law and fact in any particular case and the

14concomitant risks and costs necessarily inherent in taking any litigation to completion.[89] It is the

15considered judgment of the experienced Class Counsel, after extensive hard-fought litigation and

16settlement negotiations, that the Settlement is an outstanding result for the class and should be

17approved.

---

[83] *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976); *see also Util. Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989).

[84] *See Churchill Village L.L.C. v. Beckwith Place Ltd. P'ship*, 361 F.3d 566, 575-76 (9th Cir. 2004); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

[85] *Officers for Justice*, 688 F.2d at 625.

[86] *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

[87] *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979); *Ellis*, 87 F.R.D. at 18 ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

[88] *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974), *abrogated on other grounds*, *Mba v. World Airways, Inc.*, 369 Fed. Appx.194 (2d Cir. 2010).

[89] *Id.*

**B.      The Settlement Is Fair, Reasonable and Adequate.**

The Court has already initially considered all the relevant factors (with the exception of the reaction of Class members) in deciding to grant preliminary approval of the Settlement, and found that the Settlement falls within the range of reasonableness meriting possible final approval.[90] As outlined in the Motion for Preliminary Approval,[91] each of these factors supports final approval of Settlement here.

**1.      The Strength of ROP Plaintiffs' Case and the Risk of Continued Litigation Supports Final Approval.**

The Settlement provides an excellent recovery for the Class while eliminating the risk, expense, delay, and uncertainty of continued litigation. This case, like every class action, involves uncertainty on the merits. The Settlement resolves that inherent uncertainty; for this reason, settlements are thus strongly favored by the courts, particularly in class actions such as this one.[92]

ROP Plaintiffs' case is strong, but they recognize the risk and expense necessary to prosecute their claims through trial, and subsequent appeals, as well as the inherent difficulties and delays a nationwide class action may entail.[93] This case largely turns upon whether Defendants have a viable First Amendment defense to the claims. While ROP Plaintiffs have prevailed thus far, the First Amendment dispute has been limited to the context of EA's anti-SLAPP motion. Defendants continue to assert that the First Amendment bars ROP Plaintiffs' claims and would do so during the merits phase of litigation, and through appeals if necessary. The NCAA has already expressed a willingness to seek relief from the United States Supreme Court,[94] and there is no reason to believe the NCAA would not seek similar relief in the future, absent this Settlement.

---

[90] Dkt. No. 1178 at 1.

[91] Dkt. No. 1138.

[92] *See Van Bronkhorst*, 529 F.2d at 950; *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977).

[93] *See Dryer v. Nat'l Football League*, No. 09–2182 (PAM/AJB), 2013 WL 1408351, at *2 (D. Minn. Apr. 18, 2013).

[94] Aragon Decl. ¶ 31, Ex. 3 (Motion for Leave to Intervene to File Petition for Writ of Certiorari).

ROP Plaintiffs face an additional risk in the class certification process. Absent the Settlement, Defendants would be expected to challenge class certification at every stage, and those challenges could conceivably diminish or preclude class-wide recovery.

Each of these issues presented substantial risk to the Class. Given these risks, there is no doubt that continued litigation would be expensive, complex, and time consuming. This factor should weigh heavily in favor of approving the Settlement.

**2.   There Is Potential Risk in Maintaining Class Action Status Through Trial.**

ROP Plaintiffs faced a number of risks regarding the maintenance of a class action in this litigation. Because of the relatively small size of Class members' individual claims, a ruling denying certification of a litigation class would effectively foreclose recovery completely for most—if not all—Class members. The risk faced by the Class that any recovery would need to be sought on an individualized basis further supports final approval of the Settlement.

**3.   The Relief Provided to the Class in the Settlement Is Substantial.**

This Settlement, together with the EA Settlement, will produce a total cash fund valued at $60 million before fees, expenses, and notice/administration costs. A victory at trial would, in counsel's opinion, result in a median verdict of $80 million to $120 million dollars.[95] The Class will therefore, in the aggregate, recover 50-75% of the amount a successful trial would produce. Class members who made a timely claim will receive substantial recoveries. Under the Court-approved point system, the estimated value of one Season Roster Appearance Point under the NCAA Settlement is $74,[96] which means that, for the sake of example, a student-athlete whose likeness appeared in the Videogames for four years would be entitled to approximately $1,953.60 (6.6 x 4 x $74)[97]—under this Settlement alone. This represents an outstanding recovery.

The Settlement also provides for the bulk of unclaimed monies to be distributed to Class members who qualify for Season Roster Appearance Points under the allocation plan,[98] ensuring

---

[95] Carey Decl. ¶ 63.

[96] Jue Decl. ¶ 15.

[97] A student-athlete with an avatar match receives 6.6 Season Roster Appearance Points under the Settlement. Dkt. No. 1158-2 at ¶ 62(c).

[98] Dkt. No. 1158-2 at ¶ 62(h).

15

that the vast majority of those participating in the Settlement receive substantial recoveries on a per-Season-Roster-Appearance basis.[99] Finally, the Settlement ensures that monies do not revert to Defendants by providing that any residual funds will be distributed to Class members who did not submit claims.[100] The Settlement also compares favorably to settlements finally approved in other class cases.[101] In light of the risk and expense to ROP Plaintiffs of continuing litigation, the Settlement represents a highly favorable outcome for the Class.

### 4.   The Extent of Discovery and the Stage of the Proceedings.

The stage of the proceedings and the extent of discovery also weigh in favor of approving the Settlement. The case has been pending for six years, in which Class Counsel obtained reviewed, coded, and/or indexed over a million documents, and have already identified and marked their trial exhibits.[102] Class Counsel reviewed and analyzed responses to interrogatories and RFAs, responded to voluminous discovery from Defendants, and resolved numerous discovery disputes.[103] Class Counsel participated in almost three dozen depositions and conducted substantial informal discovery from third parties before and during the litigation.[104] Despite the stay, ROP Plaintiffs had sufficient documentary evidence to move for class certification and proceed to trial against the NCAA by March 23, 2015, as ordered by this Court.[105] The well-developed state of these proceedings supports approval of this Settlement, given that both parties were well-educated on both the claims and defenses available in this action.

---

[99] The allocation plan also provides for $100 payments to any Class members who might not qualify for Points, ensuring that any Class member submitting a valid claim will receive *some* payment from the Settlement. *Id.* at ¶ 62(d).

[100] *Id.* ¶ 62(i).

[101] *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (one-sixth of potential recovery was fair and adequate); *Villegas v. J.P. Morgan Chase & Co.*, No. CV-09-00261-SBA-EMC, 2012 WL 5878390 at *6 (N.D. Cal. Nov. 21, 2012) (15% of potential recovery approved); *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (6–9% of potential recovery was fair and adequate).

[102] Aragon Decl. ¶ 32.

[103] Aragon Decl. ¶ 33.

[104] Aragon Decl. ¶ 34.

[105] Dkt. No. 1092 at 10-11.

16

**5.   The Recommendations of Experienced Counsel Favor Approval of the Settlement.**

"Great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation."[106] Here, experienced and capable Class Counsel, who are routinely and actively involved in complex federal civil litigation, have weighed all of the above factors and have concluded that the Settlement is a favorable result which is in the best interests of the class.[107] Where, as here, the Settlement is the product of serious, informed and non-collusive negotiations, "the trial judge . . . should be hesitant to substitute its own judgment for that of counsel."[108]

**6.   The Reaction of the Class to the Proposed Settlement.**

Finally, the overwhelmingly positive reaction of the Class to the proposed Settlement—the only relevant factor not considered by the Court in granting the preliminary approval of settlement—further weighs heavily in favor of the final approval. As demonstrated by the Administrator's sworn declaration, the Class has now been provided with notice of the Settlement,[109] and only a *de minimis* number have objected or sought exclusion; in contrast, over 16,000 Class members have submitted claims to date, and the claims rate for the NCAA Settlement is approximately 24%.[110] This claims rate compares favorably the rates in other class action settlements approved by federal courts.[111] The claims period does not close until July 2, 2015, and the Administrator is continuing to receive timely claim submissions.[112]

---

[106]   *Nat'l Rural Telecomm. Coop. v. Direct TV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004).

[107]   Berman Decl. ¶¶ 9, 10.

[108]   *Nat'l Rural*, 221 F.R.D. at 528; *see also Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) ("The recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement."); *Ellis*, 87 F.R.D. at 18 ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

[109]   Jue Decl. ¶¶ 4-6, 9-11.

[110]   Jue Decl. ¶ 15.

[111]   *See, e.g., Shames v. Hertz Corp.*, 2012 WL 5392159 at *14 (S.D. Cal., Nov. 5, 2012) (collecting cases where courts have approved settlements with claims rates between 2% and 9%).

[112]   Jue Decl. ¶ 14.

17

The positive reaction of the Class is an important factor in evaluating the fairness, reasonableness and adequacy of the Settlement and supports approval.[113]

## IV.      THE SETTLEMENT IS THE NON-COLLUSIVE PRODUCT OF EXTENSIVE ARM'S LENGTH NEGOTIATIONS

Experienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses, negotiated this Settlement at arm's length.[114] The parties reached this Agreement only after five years of litigation, discovery and investigation, formal mediations, appeals before the Ninth Circuit and United States Supreme Court, intense motions practice, and multiple conferrals of counsel concerning settlement constructs and amounts. The mediations were run by neutral mediators, including Magistrate Cousins—a factor in favor of a finding of non-collusiveness.[115] This prolonged process reflected the vigor with which both sides represented their interests, including those of the Class as whole, and support approval.[116]

In addition, the Settlement itself, taken as a whole, bears no signs of collusion or conflict. In *Bluetooth*, the Ninth Circuit explained that courts must, at the final approval stage, ensure that the settlement taken as a whole is free of collusion or any indication that the pursuit of the interests of the class counsel or the named plaintiffs "infected" the negotiations.[117] The Ninth Circuit outlined three factors that were particularly troubling as signs of a potential disregard for the class's interests during the course of negotiation:

- when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

- when the parties negotiate a "clear sailing" arrangement providing for payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for

---

[113] *Detroit*, 495 F.2d at 463 (small number of objectors favors approval of settlement); *In re Warner Comm'cns Sec. Litig.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985) (same); *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y 1984) (same); *In re Mfrs. Life Ins. Co. Premium Litig.*, No. 96-CV-230, 1998 U.S. Dist. LEXIS 23217, at *24 (S.D. Cal. Dec. 21, 1998) (same).

[114] Berman Decl. ¶¶ 9, 10.

[115] *See In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 948 (9th Cir. 2011).

[116] *Newberg* § 11.4 (recognizing that settlement is entitled an initial presumption of fairness because it was the result of arm's length negotiations among experienced counsel.)

[117] *Id.* at 946-48.

18

counsel accepting an unfair settlement on behalf of the class; and

- when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.[118]

Here, none of those signs are present. *First,* the Settlement is a common fund, all-in settlement with no possibility of reversion.[119] The entire Settlement Fund will be used to cover costs and fees, and to compensate Class members based on amounts determined under a points-based system intended to compensate Class members fairly based on the strength of their claims.

*Second*, while Defendant agreed not to object to a request for attorneys' fees within certain limits, there is no provision for a payment of fees separate and apart from the Settlement Fund; to the contrary, Class Counsel have applied for fees of twenty-nine percent of the Settlement—only slightly above the Ninth Circuit benchmark of twenty-five percent.[120] Under the Settlement, the Class receives the entire $20 million Settlement Fund; Counsel is only permitted the opportunity to apply for a portion of those funds as fees and costs, and any money distributed as fees and costs must be approved the Court.[121]

*Third,* the Settlement is non-reversionary—no monies will revert to NCAA. In the event that some funds cannot be distributed, they do not revert to Defendant, but are to be distributed to absent Class members via their schools and possibly through scholarship programs in the event individual Class members cannot be located.[122]

In short, the Settlement was negotiated at arm's length, and the terms so reflect. None of the hallmarks of collusion warned of by the Ninth Circuit in *Bluetooth* are present.

## V.    FOR PURPOSES OF SETTLEMENT ONLY, THE SETTLEMENT CLASS MEETS THE REQUIREMENTS OF RULE 23

The Court has already conditionally certified the Settlement Class and appointed Class Representatives and Class Counsel to represent that Class.[123] As set forth in ROP Plaintiffs' motion

---

[118] *Id.* at 947.

[119] Dkt. No. 1158-2, ¶ 62(j).

[120] *See* ROP Plaintiffs' Notice of Motion and Motion for Attorneys' Fees, Expenses, and Incentive Awards (NCAA Settlement), Dkt. No. 1197.

[121] *See Bluetooth,* 654 F.3d at 948-49.

[122] Dkt. No. 1158-2, ¶ 62(j).

[123] Dkt. No. 1178.

19

for preliminary approval,[124] the Class satisfies the requirements for class certification set forth in Rule 23(a) and Rule 23(b)(3).[125]

**A.      The Settlement Class Satisfies Rule 23(a).**

**Numerosity**: The Class meets the criteria of Rule 23(a)(1).[126] It is undisputed that the Class is sufficiently numerous that joinder of all class members is "impracticable." There are approximately 68,463 estimated Class members,[127] which is more than sufficient to find numerosity.[128]

**Commonality**: The commonality requirement[129] is readily satisfied here as well, as this Court has already ruled in the context of the litigated antitrust class.[130] A class satisfies the commonality requirement if the "plaintiffs' grievances share a common question of law or of fact."[131] The common questions here include, but are not necessarily limited to:

- whether EA used player likenesses in its videogames;
- whether EA's use of the images in the game was lawful;
- whether the NCAA authorized, approved, or permitted EA's use of NCAA player likenesses in its videogames;
- whether EA's conduct violates California and Indiana right of publicity law; and
- whether class members have been damaged by the NCAA's conduct and, if so, the amount of such damages.

These constitute a common core of questions focusing on the central issue of the existence and effect of the alleged conspiracy and plainly satisfy the commonality requirement of Rule 23(a)(2).

**Typicality**: Typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's

---

[124] Dkt. No. 1138.

[125] Plaintiff incorporates the motion for preliminary approval, Dkt. No. 1138, as though fully set forth herein.

[126] Fed. R. Civ. P. 23(a)(1).

[127] Schwarz Decl. ¶ 31.

[128] *Rubber Chemicals,* 232 F.R.D. at 350; *In re Citric Acid Antitrust Litig.,* 1996 WL 655791, at *3 (N.D. Cal. Oct. 2, 1996).

[129] Fed. R. Civ. P. 23(a)(2).

[130] Dkt. No. 893 at 7 (Denying certification for reasons other than commonality).

[131] *Armstrong v. Davis,* 275 F.3d 849, 868 (9th Cir. 2001), *cert. denied,* 537 U.S. 812 (2002); *see also* Fed. R. Civ. P. 23(a)(2).

20

1  liability."[132] Here, all Class Representatives were injured in the same way and by the same

2  conduct—all currently play or previously played for a Division I men's football or basketball team

3  and all were injured by EA's use of their image or likenesses in an NCAA-Branded Videogame

4  without their permission or compensation.[133] Nor are there any defenses that apply uniquely to the

5  Class Representatives except for the statute of limitations applicable to the statutory claims—an

6  issue resolved by point system developed in the Plan of Allocation.[134] Because the Class

7  Representatives' claims rely on facts and legal theories identical to those of the Class, the typicality

8  requirement is satisfied.

9  **Adequacy**: The fourth requirement of Rule 23(a) is that "the representative parties will

10  fairly and adequately protect the interests of the class."[135] This final requirement is satisfied "as

11  long as one of the class representatives is an adequate class representative."[136] Adequacy under

12  Rule 23(a)(4) turns on two basic questions: "(1) do the named plaintiffs . . . have any conflicts of

13  interest with other class members and (2) will the named plaintiffs . . . prosecute the action

14  vigorously on behalf of the class?"[137]

15  Here, Class Representatives are committed to the action and have devoted substantial time

16  to assisting Counsel with this action and reviewing pleadings.[138] The Class Representatives have no

17  interests that are antagonistic to other Class members. To the contrary, the Class Representatives

18  and Class members share a strong and identical interest in establishing liability and being

19  compensated for the violations of their rights of publicity.[139] Likewise, Class Counsel satisfy the

---

[132] *Rodriguez*, 591 F.3d at 1124; Fed. R. Civ. P. 23(a)(3).

[133] *See* Third Am. Class Action Compl., ¶¶ 179-267.

[134] *See* Mot. for Prelim. Approval, Dkt. No. 1138 at 22-23.

[135] Fed. R. Civ. P. 23(a)(4).

[136] Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 n.2 (9th Cir. 2001), cert. denied, 534 U.S. 973 (2001).

[137] *Hanlon*, 150 F.3d at 1020.

[138] Aragon Decl. ¶ 35.

[139] *Id.*

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    No. 4:09-cv-1967-CW

1    adequacy requirement. Class Counsel have the necessary qualifications, experience, and resources

2    to successfully litigate this case on behalf of the Class and has done so faithfully.[140]

3    **B.      The Settlement Class Satisfies The Requirements of Rule 23(b)(3).**

4            For certification under Rule 23(b)(3), common questions of law or fact must predominate

5    over questions that affect only individual members of the class, and a class action must be found to

6    be superior to other available methods of adjudication.[141]

7            Common issues predominate here. The salient evidence necessary to establish the claims is

8    common to the Class Representatives and all Class members—they seek to prove that: Defendants

9    conspired to use student-athlete NIL rights in NCAA-Branded Videogames; EA used their NIL for

10   a commercial purpose in NCAA-Branded Videogames; and the NCAA, by approving, authorizing,

11   and permitting such use, violated its contractual duties to Class members. The evidentiary

12   presentation changes little if there are 100 class members or millions: in either instance, ROP

13   Plaintiffs would present the same admissions by Defendants that they agreed to use student-athlete

14   likenesses in NCAA-Branded Videogames, and that EA used student-athletes' NIL rights in

15   NCAA-Branded Videogames. Damages are also common across the Class because the publicity

16   rights statutes provide for uniform statutory damages on a per publication basis.[142] Courts routinely

17   certify class actions under such circumstances.[143] For these reasons, common issues predominate

18   over any relevant individual issues.

19           Prosecuting this action as a class action is also the superior method of adjudicating this

20   matter. Rule 23(b)(3) sets forth factors to be considered:  (1) the interest of members of the class in

21   individually controlling the prosecution of separate actions; (2) the extent and nature of any

22   litigation concerning the controversy already commenced by members of the class; and (3) the

---

[140]  *See* ROP Plaintiffs' Notice of Motion and Motion for Attorneys' Fees, Expenses, and Incentive Awards (NCAA Settlement), Dkt. No. 1197.

[141]  Fed. R. Civ. P. 23(b)(3).

[142]  Cal. Civ. Code § 3344(g); Ind. Code § 32-36-1-10; *Chavers v. Gatke Corp.*, 107 Cal. App. 4th 606, 614 (2003); *cf. Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1184 (C.D. Cal. 2002) (secondary liability applies to statutory right of publicity claims).

[143]  *See, e.g., Schulken v. Wash. Mut. Bank*, No. 09-cv-0278-LHK, 2012 WL 28099, at *14 (N.D. Cal. Jan. 5, 2012) (noting that "because Plaintiffs seek statutory damages, individual damage issues will not predominate"); *Hanlon*, 150 F.3d at 1022.

22

1    desirability of concentrating the litigation of the claims in a particular forum.[144] *Id.* Factors (1) and

2    (3) weigh in favor of concentrating the claims in a single forum, since the damages sustained by

3    individual class members are too low, compared with the costs of litigation, to incentivize Class

4    members to litigate their claims individually. This is especially true given the high cost of

5    marshaling the evidence necessary to litigate the claims, as well as the disparity in resources

6    between the typical Class member and the well-funded, litigation-savvy NCAA.[145] Class Counsel

7    devoted significant resources to this class litigation.[146] It is folly to suggest that an individual

8    litigant could invest similar resources in pursuing his/her case.

9          The second factor—the extent and nature of any similar litigation—also favors final

10    approval. Class Counsel are not aware of any other litigation in the country involving similar right

11    of publicity claims against the NCAA. Thus, all factors support a finding that the class action

12    device is the most efficient and effective means of resolving this controversy.

13    **C.**    **Notice to the Settlement Class Was Adequate and Satisfied Due Process.**

14          Notice to the Class was adequate and satisfied both Rule 23 and due process. Under Rule

15    23(e)(1), the Court must direct notice in a reasonable manner to all class members who would be

16    bound by the proposal.[147] Rule 23 requires only that the best notice practicable rather than actual

17    notice is provided.[148] "Notice is satisfactory if it generally describes the terms of the settlement in

18    sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be

19    heard."[149]

20          Here, in granting preliminary approval, this Court previously approved the Class notice

21    which, as outlined below, was effectuated by the Administrator as ordered by the Court.

22

---

23    [144]  The fourth factor, trial manageability, is not relevant when deciding whether to certify a settlement class. *Amchem*, 521 U.S. at 620.

24    [145]  *See, e.g., Keegan v. American Honda Motor Co.*, 284 F.R.D. 504, 522 (C.D. Cal. 2012).

25    [146]  Dkt. No. 1197.

26    [147]  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009); Fed. R. Civ. P. 23(e)(1).

27    [148]  *Siber v. Mabon*, 18 F.3d 1449, 1453 (9th Cir. 1994) (holding that the best notice practicable, rather than actual notice, is the proper standard for providing notice of a proposed settlement to absent class members).

28    [149]  *Rodriguez*, 563 F.3d at 962.

**Direct Notice**: The Administrator mailed Notice and Claim Form packets to 101,486 addresses, collected predominantly from 318 NCAA member institutions.[150]

**Publication to Settlement Website**: Shortly after receiving preliminary approval, the Administrator posted information about the Settlement on the website www.NCAA-EA-Likeness-Settlement.com.[151] The website allows Class members to view and print copies of the Long-Form Notice, Claim Form, Preliminary Approval Order, Settlement Agreements, Extension Order, and consult Frequently Asked Questions.[152] Class members can also file an electronic claim on the website.[153] To date, there have been 111,921 visitors to the website.[154] The parties also established a toll free telephone number, 888-283-5733, that Class members could call and listen to Frequently Asked Questions, request a Claim Form and Notice packet, and speak to a live operator. To date, the Administrator has received 1,879 calls.[155]

**National Print Publication**: The Administrator published the summary notice in the following national publications that are unquestionably popular with current and former college football and basketball players: *ESPN Magazine* on March 20, 2015, and *Sports Illustrated* on March 25, 2015. The also issued a press release on March 3, 2015, through PR Newswire.

**Online campaign**: The Settlement Administrator utilized sponsored links and text ads through Google, Bing, and Yahoo!, and display ads through Google Display Network, Xaxis Network, and Facebook. The ads began running in February 2015, and ended on July 2, 2015.[156] The ads resulted in over 57 million impressions. The Administrator also created a Facebook page, reaching 2,240,684 people to date; utilized Twitter, generating 1,490,000 impressions to date; created a LinkedIn Group; and relayed information through websites, blogs and articles specific to this case and/or likely to be visited by Class members.[157]

---

[150] Jue Decl. ¶¶ 9–10.
[151] Jue Decl. ¶ 6.
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] Jue Decl. ¶ 11.
[156] Jue Decl. ¶ 5.
[157] Jue Decl. ¶ 5.

**CAFA Notice**: The NCAA provided notice by mail to state agencies and the U.S. Attorney General pursuant to the Class Action Fairness Act on July 10, 2014.[158]

In addition, the Settlement received significant earned media.[159] The Settlement was widely discussed in national news outlets across the country. The Class Representatives and Class Counsel also made individual efforts to give notice and increase the claims rate by posting information on social media sites and calling Class members directly, asking them to inform their teammates of impending deadlines.[160] The result was a high claims rate, and extraordinarily low objection and exclusion rate.[161] The notice plan, approved by this Court, clearly satisfies Rule 23(e)(1) and due process.

## VI.    CONCLUSION

The Settlement represents a fair and reasonable resolution of Class members' claims after six years of litigation, and is supported by Class Representatives and experienced Class Counsel, who respectfully request that this Court approve the Settlement.

Dated: July 2, 2015                          HAGENS BERMAN SOBOL SHAPIRO LLP


By___/s/ Robert B. Carey_____
Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

Steve Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

---

[158]  Dkt. No. 1220.
[159]  Aragon Decl., ¶ 36. Earned media refers to publicity gained through promotional efforts, including free press, rather than paid advertising. *Id.*
[160]  Aragon Decl. ¶ 37.
[161]  Aragon Decl. ¶ 38.

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@smplegal.com

Celeste H.G. Boyd (*Pro Hac Vice*)
THE PAYNTER LAW FIRM PLLC
1340 Environ Way
Chapel Hill, NC 27517
Telephone: (919) 307-9991
Facsimile: (866) 734-0622
cboyd@smplegal.com

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                              No. 4:09-cv-1967-CW