Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| SAMUEL MICHAEL KELLER, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ELECTRONIC ARTS, INC.; NATIONAL COLLEGIATE ATHLETICS ASSOCIATION; COLLEGIATE LICENSING COMPANY,<br><br>Defendants. | Case No. 4:09-cv-1967 CW<br><br>**NCAA CLASS REPRESENTATIVES' RESPONSE TO OBJECTIONS**<br><br>Judge: Hon. Claudia Wilken<br>Courtroom: 2, 4th Floor<br>Fairness Hearing: July 16, 2015 at 2 p.m.<br>Complaint Filed: May 5, 2009 |

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. THERE ARE NO MERITORIOUS OBJECTIONS TO THE SETTLEMENT ....................... 2

    A. Class Counsel's Fee Award Is Reasonable. ......................................................................... 3

        1. The Requested Fees Are Reasonable Under the Lodestar Method. ................................ 4

        2. The Requested Fees Are Reasonable As a Percentage of the Common Fund. ................ 4

    B. The Claims Process is not Burdensome, Unreasonable, or Unfair. ..................................... 5

    C. Claiming Class Members Will Not Receive a "Windfall." ................................................. 8

    D. The Recovery Is Outstanding. ............................................................................................. 9

    E. The Release is Fair and Reasonable. ................................................................................. 11

    F. The Class Representatives' Incentive Awards Are Appropriate. ...................................... 12

III. CONCLUSION ................................................................................................................... 14

i

NCAA CLASS REPRESENTATIVES' RESPONSE TO OBJECTIONS      Case. No. 09-CV-1967 CW

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Connor v. JPMorgan Chase Bank et al.*,
   Case No. 10-cv-1284 (S.D. Cal.) ................................................................................................ 1

*Couser v. Community Bank et al.*,
   Case No. 12-cv-2484 (S.D. Cal.) ................................................................................................ 1

*Ellis v. Naval Air Rework Facility*,
   87 F.R.D. 15 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981) ........................................ 10

*Garner v. State Farm Mut. Auto. Ins. Co.*,
   2010 WL 1687829 (N.D. Cal. 2010) .......................................................................................... 4

*Gascho v. Global Fitness Holdings*,
   LLC, 2014 WL 135050 (S.D. Ohio 2014) .................................................................................. 6

*In re Conseco Life Ins. Co. Life Trend Ins. Mktg. & Sales Practice Litig.*,
   2014 WL 186375 ...................................................................................................................... 13

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) .................................................................................................... 10

*In re Mercury Interactive Corp. Securities Lit.*,
   618 F.3d 988 (9th Cir. 2010) ...................................................................................................... 4

*In re Omnivision Technologies, Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................................................... 10

*In re Online DVD-Rental Antitrust Litig.*,
   2015 WL 846008 ...................................................................................................................... 13

*Maloney v. T3 Media*,
   2015 WL 3879634 (C.D. Cal., May 27, 2015) ........................................................................ 12

*Mount et al. v. Wells Fargo Bank N.A.*,
   Case No. BC395959 (Cal.Super.Ct.) .......................................................................................... 1

*Pappas v. Naked Juice Co. of Glendora, Inc.*,
   Case No. 11-cv-8276 (C.D. Cal.) ................................................................................................ 1

*Schlesinger et al. v. Ticketmaster*,
   Case No. BC 304565 (Cal. Super. Ct.) ....................................................................................... 1

*Shames v. Hertz Corp.*,
   2012 WL 5392159 ...................................................................................................................... 6

ii

NCAA CLASS REPRESENTATIVES' RESPONSE TO OBJECTIONS       Case. No. 09-CV-1967 CW

*Villegas v. J.P. Morgan Chase & Co.*,
   No. CV-09-00261-SBA-EMC, 2012 WL 5878390 (N.D. Cal. Nov. 21, 2012) ......................... 10

**STATUTES**

Cal. Civ. Code § 3344 ............................................................................................................. 12

Cal. Code Civ. P. § 425.16 ...................................................................................................... 12

**OTHER AUTHORITIES**

First Amendment ..................................................................................................................... 11

MOORE'S FEDERAL PRACTICE (3d ed. 2003) at §23.63[8][a], §23.63[8][b] ........................ 6

Federal Rule of Civil Procedure 23 .......................................................................................... 6

Federal Rule of Civil Procedure 23(e)(1) ............................................................................. 6, 7

iii

NCAA CLASS REPRESENTATIVES' RESPONSE TO OBJECTIONS                    Case. No. 09-CV-1967 CW

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

NCAA Settlement Class Representatives[1] file this response to the objections received from Class members Tate George,[2] Darrin Duncan,[3] and Nathan Harris.[4] Despite a robust notice campaign and national press coverage (almost universally favorable), only three Class members objected to the settlement,[5] one of whom is represented by a serial objector,[6] and another is a disgruntled former antitrust class representative.[7] Each objection is either frivolous or represents a fundamental misunderstanding of the settlement, as explained in detail below.

This historic settlement is the first time NCAA student-athletes will effectively receive compensation for a private corporation's use of their name, image, or likeness ("NIL").[8] Together with the EA Settlement, the NCAA Settlement results in a gross fund of $60 million available to compensate student-athletes for the use of their NIL in EA's videogames.[9] Only five Class members requested exclusion,[10] whereas over 16,000 Class members supported the Settlement by submitting timely claims for settlement funds.[11] In the aggregate, Class members who filed timely

---

[1] Dkt. No. 1178, ¶ 6 (Samuel Michael Keller, Bryan Cummings, LaMarr Watkins, and Bryon Bishop). All docket entries are to case 4:09-cv-01967-CW unless otherwise noted.

[2] Declaration of Kenneth Jue in Support of Motion for Final Approval ("Jue Decl."), ¶ 17, Ex. F.

[3] Jue Decl. ¶ 17, Ex. G.

[4] Jue Decl. ¶ 17, Ex. H.

[5] Jue Decl. ¶ 17.

[6] Objector Nathan Harris is represented by serial objector Scott A. Kron. *See, e.g., Zouras v. American* Reg. LLC, Case NO. 1:14-cv-00943 (N.D. Ill.) (Dkt. No. 58); *Couser v. Community Bank et al.*, Case No. 12-cv-2484 (S.D. Cal.) (Dkt. No. 71); *Connor v. JPMorgan Chase Bank et al.*, Case No. 10-cv-1284 (S.D. Cal.) (Dkt. No. 125); *Pappas v. Naked Juice Co. of Glendora, Inc.*, Case No. 11-cv-8276 (C.D. Cal.); *Schlesinger et al. v. Ticketmaster*, Case No. BC 304565 (Cal. Super. Ct.); *Mount et al. v. Wells Fargo Bank N.A.*, Case No. BC395959 (Cal.Super.Ct.).

[7] Mr. George's objections are exclusively aimed at his former attorneys—counsel for the Antitrust Plaintiffs—and are unrelated to the substance of the NCAA Settlement. Class Counsel has specifically responded to Mr. George's objections in the Motion for Final Approval of the EA Settlement.

[8] Defendant NCAA denies that it has used the student-athletes' likeness for a commercial purpose, and denies the allegations in the complaint. The NCAA admits no liability whatsoever.

[9] The comparison between this Settlement of $20 million and the EA Settlement of $40 million is notable, considering funds in this Settlement will come from a defendant that, it is alleged, did not directly use player likenesses, and is instead sued as a conspirator.

[10] Jue Decl. ¶ 16.

[11] Jue Decl. ¶¶ 12-13.

1

NCAA CLASS REPRESENTATIVES' RESPONSE TO OBJECTIONS                    Case. No. 09-CV-1967 CW

1  claims will receive nearly the same amount they would have received had they prevailed at trial,
2  even after excluding costs and fees from the settlement fund. This settlement is not objectionable—
3  it is an outstanding recovery for the class.

4  **II.      THERE ARE NO MERITORIOUS OBJECTIONS TO THE SETTLEMENT**

5  The objectors make four general objections: (1) attorneys' fees are unreasonable, (2) the
6  claims process was burdensome, (3) the release is too broad, and (4) the class representatives'
7  incentive awards are too high. The objections are not supported by the facts or law.

8  **Fees and Costs**: The objections to fees were made before the fee applications were filed
9  and none of the objectors have since supplemented their briefs or responded directly to the fee
10  motions. The crux of the objections is that Class Counsel[12] are seeking a double recovery because
11  they are claiming fees from both the EA and NCAA Settlements. This is frivolous. The fee
12  application clearly requests fees based on efforts to secure both settlements. Assuming the
13  objectors have not already waived their objections by not responding to the fee applications, these
14  objections based on alleged double recovery can be ignored. *See infra*, Sec. II.A.

15  **Claims Process**: The objectors complain that the claims process was burdensome and that
16  checks should have been sent to Class members' last-known addresses. The objectors ignore the
17  fact that the Notice and Claims Administrator ("Administrator") does not have the last-known
18  addresses of Class members; that given the inability to directly mail checks to Class members, the
19  Court-approved claims process was the best method of distributing funds to the class; and that,
20  ultimately, the notice and claims process was successful in identifying Class members with valid
21  claims. *See infra,* Sec. II.B.

22  **Release**: The objections based on the settlement's release language are baseless because
23  they ignore the actual language of the agreement—which is appropriately limited to claims related
24  to NCAA-Branded Videogames originally published or distributed by EA during the class period.
25  *See infra*, Sec. II.E.

---

[12] Unless otherwise distinguished, "Class Counsel" refers to counsel for the NCAA Settlement Class Representatives, namely Hagens Berman Sobol Shapiro LLP and The Paynter Law Firm PLLC.

**Class Representative Awards**: The Class Representatives actively litigated against Defendants EA and NCAA for six years. If either Defendant had prevailed, Class Representatives would have faced millions in fees and costs under the fee-shifting provisions of California's Anti-SLAPP and right of publicity statutes. Under these circumstances, the modest incentive awards for the Class Representatives' efforts to secure this settlement is reasonable. *See infra*, Sec. II.F.

A.   **Class Counsel's Fee Award Is Reasonable.**

Objector Duncan opposes Plaintiffs' fee request because he feels that Class Counsel will be sufficiently compensated by the money they receive as a result of the NCAA Settlement and should consequently not be compensated for obtaining the EA Settlement.[13] Duncan's only support for his position is his assertion that "Class Counsel should not be permitted to recover from two settlement funds without explicitly explaining its work for each settlement."[14] Class Counsel's fee petition has effectively mooted Duncan's argument by explicitly setting forth, in detail, the efforts made to secure each settlement, including Class Counsel's engagement in extensive discovery from Defendants and third parties, meticulous compilation of a database of Class members and virtual players in EA's videogames, and zealous litigation over the course of over four years before finally achieving the Settlements.[15]

Moreover, despite Duncan's suggestion that allowing the requested fees would be allowing Counsel to "bill twice for work it performed once," Class Counsel's petition makes clear that the requested fees are based on their *combined* work performed for *both settlements*.[16] There is no

---

[13] "Duncan Objection" refers to *O'Bannon* Dkt. No. 379 (Filed May 1, 2015).
[14] Duncan Objection at 2-3.
[15] *See generally*, Dkt. No. 1197.
[16] Although Class Counsel negotiated the ultimate NCAA Settlement Agreement separately from the EA Settlement Agreement, *see* Dkt. No. 1197 at 8-9, the work performed prior to those negotiations clearly constituted work performed in support of *both* settlements, and the fee petition is clearly based on that combined work. *See e.g.*, Dkt. No. 1197 at 17 ("Multiplying the hours spent by ROP Plaintiffs' counsel on ***the litigation*** by their respective hourly rates yields a lodestar calculation of $6,771,390.75. . . . The fee award of $5,800,000 requested here—***combined with*** the requested fee of $8,580,000 in connection with the EA Settlement—amounts to a total of $14,380,000 in attorneys' fees, which represents a multiplier of two on ROP Plaintiffs' lodestar.") (emphasis added).

3

NCAA CLASS REPRESENTATIVES' RESPONSE TO OBJECTIONS                    Case. No. 09-CV-1967 CW

1  attempt at double recovery here—Class Counsel is merely seeking recovery for the entirety of their
2  work.
3        Although Duncan's objection was filed before the fee petitions were filed, Class Counsel's
4  petitions were filed in accordance with the Court's scheduling order and Ninth Circuit law,[17] and
5  Duncan has had nearly three months to supplement his filing or otherwise object to the fee
6  petitions.[18] He has filed nothing.

### 1. The Requested Fees Are Reasonable Under the Lodestar Method.

To date, Class Counsel has expended over 20,061.3 hours on the litigation, representing a lodestar of $6,771,390.75. Class Counsel's total requested fees (across both Settlements) of $14,380,000 represents a multiplier of 2.12 on that lodestar. Not a single class member has objected to the fee petitions, and every objector concedes, by failing to contest, that (1) the fee request is reasonable under the lodestar method, including that the hours and hourly rates of counsel are reasonable; (2) Class Representatives and their counsel were subject to the possibility of incurring millions in fees and costs if they lost this case; and (3) Class members who make a timely claim will receive almost as much as they would under a total victory at trial. Based on the foregoing, a multiplier of 2.12, based on the total recovery secured, is reasonable under any measurement.[19]

### 2. The Requested Fees Are Reasonable As a Percentage of the Common Fund.

Serial objector Scott Kron, on behalf of his client Nathan Harris, objects to the fee award because it slightly exceeds the twenty-five percent "benchmark" established by the Ninth Circuit for attorneys' fees calculated as a percentage of the common fund.[20] His argument is primarily based on a fundamental misunderstanding of the release, by which he claims that the Class released all claims against Defendants, not just those related to NCAA-Branded Videogames. The reasons he is mistaken are discussed more fully below, Section E. Moreover, as demonstrated in Class

---

[17] *In re Mercury Interactive Corp. Securities Lit.*, 618 F.3d 988, 995 (9th Cir. 2010).
[18] The fee petitions were filed April 13, 2015.
[19] *See Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687829, at *2 (N.D. Cal. 2010).
[20] *See id.* (noting that while the "benchmark" is 25% fee, an "award of 30 percent is within the 'usual range' of fee awards . . . in common fund cases").

Counsel's fee petition—to which Mr. Harris failed to respond—Class Counsel's fee request is reasonable under the common fund analysis given (1) the exceptional results achieved on behalf of the class as a whole, as well as those achieved for individual Class members; (2) Class Counsel's specific achievement in reaching a settlement with the NCAA—a defendant conspirator that was not even alleged to have directly used player likenesses—equal to 50% of the settlement with EA; (3) Class Counsel's extraordinary risk in bringing the action; and (4) the unique legal issues involved in the litigation.[21]

Under either a lodestar or a common fund methodology, the objections to the requested fee award are meritless.

**B.    The Claims Process is not Burdensome, Unreasonable, or Unfair.**

Objector Darrin Duncan argues that the claims process is unreasonable because Class members must make affirmative claims, whereas Duncan prefers automatic payments. Duncan's argument is based on a false premise—that the Administrator has all Class members' current addresses.[22] In fact, the Administrator only has student-athletes' last-known addresses from schools they attended years ago.[23] The class goes back to the 1930s (because of historic videogames) and the majority of the class attended school between 2002 and 2012.[24] College students are transitory—especially after graduation—so the address used in school may not be the student's current address.[25] The Administrator has stated that the addresses were "likely to be effective in disseminating information to Settlement Class Members,"[26] but did not suggest that these addresses should be used in directly disseminating settlement funds. This Court recognized in its preliminary

---

[21] *See* Dkt. No. 1197 at 13–14.
[22] Duncan Objection at 3.
[23] Aragon Decl. ¶ 39.
[24] *Id.*
[25] Duncan appears to erroneously interpret the Administrator's statement that the addresses it collected have a 97% validity rate to mean that the Administrator has addresses for 97% of the class. Duncan Objection at 3. In fact, the Administrator found 97% of the addresses collected from member institutions are on the national directory and therefore the addresses are "valid"—but this does not necessarily mean that they are addresses of all Class members. Dkt. No. 1186, Order Concerning Extension of Deadlines in Orders Granting Preliminary Approval of Class Action Settlements, at 2.
[26] *Id.*

5

approval order that the notice and claims process used in this case satisfied Rule 23 and due process,[27] but it is unreasonable to demand that checks be sent to addresses that may not be the current addresses of Class members.[28]

The addresses do provide a solid foundation to give notice to the class and, when coupled with a national media campaign, including millions in earned media, the class notice plan easily satisfies Rule 23(e)(1).[29] The media campaign, moreover, was state-of-the art and hugely successful, resulting in over 57 million impressions and dissemination of the settlement in every major media outlet, social media site, and the Court-approved website.[30] Once notice is given under Rule 23(e)(1), it is reasonable to implement a claims process, such as the one approved by this Court.[31] Here, over 16,000 Class members filed timely claims, representing approximately 24% of the class.[32] These numbers significantly exceed numbers that are routinely approved as fair, reasonable, and adequate.[33] Despite Duncan's arguments to the contrary, this process was hugely successful and represents the best method of distributing funds under the circumstances.

Duncan also argues that the claim form requires Claimants to submit unnecessary and copious amounts of information, likely designed to deter claimants and depress the claim rate.[34] As a threshold matter, none of the parties to these settlements have any incentive to deter claims or depress the claims rate. Settlement funds do not revert to Defendants, Class Representatives, or Class Counsel—they are distributed to Class members.[35] The entire process was approved by the

---

[27] Dkt. No. 1178, ¶ 17.
[28] *See, e.g. Gascho v. Global Fitness Holdings*, LLC, 2014 WL 135050, *29 (S.D. Ohio 2014)(rejecting challenge to claims process because all direct payment cases involve situations were claims administrator had current and accurate data whereas contact information for the class here was out of date.)
[29] MOORE'S FEDERAL PRACTICE (3d ed. 2003) at §23.63[8][a], §23.63[8][b]; *Fraley*, 2012 WL 6013427, at *2.
[30] Jue Decl. ¶ 4-5.
[31] Dkt. No. 1178, ¶¶ 10-19; Newberg on Class Actions § 12:18 (5th ed.).
[32] Jue Decl. ¶¶ 12-14.
[33] *See, e.g., Shames v. Hertz Corp.*, 2012 WL 5392159 at (S.D. Cal., Nov. 5, 2012)(collecting cases where courts have approved settlements with claims rates between 2% and 9%).
[34] Duncan Objection at 4.
[35] Dkt. No. 1158-2 at ¶ 62(i), Dkt. No. 1158-2 at ¶ 76(j).

Court and has resulted in a high claims rate.[36] The Class Representatives have tried to increase the claims rate by giving interviews and posting the settlement website and reminders on their personal social media pages.[37] Class Counsel have called or e-mailed *every* class member who contacted them since 2009, often multiple times, to increase the number of eligible Class members making claims. Class Counsel have also consulted with and monitored the Administrator's work to increase the claims rate, and implemented suggestions to increase the claims rate.[38] These efforts were in addition to the herculean task of obtaining last-known contact information for over 92,000 Class members from 318 NCAA member institutions,[39] and creating an interactive database with roster information for every class member.[40] Duncan's arguments that the claims process was designed to deter claims and depress the claims rate are baseless.

Duncan is also incorrect that the claim form "requires" Class members to submit copious amounts of information. To make a claim by mail, the class member needs to review the information on his *prepopulated* claim form, make corrections (if necessary), add information (if necessary) and certify that the information on his claim form is correct.[41] To make an electronic claim, the class member needs to enter his "Claim Id" and "Access Code" into the settlement website, www.ncaa-ea-likeness-settlement.com, review the prepopulated information on his claim form, make corrections (if necessary), add information (if necessary) and certify that the information on his claim form is correct.[42] If the class member does not have a Claim ID or Access Code, he can still make a claim by submitting basic contact information, information necessary to verify that he is a class member (college/university, dates of attendance, sport, etc.), and by verifying the information is correct.[43] Prepopulating information in a claim form and asking Class members to correct or update missing information is hardly a burdensome process. The claim form,

---

[36] Jue Decl. ¶ 14.
[37] Aragon Decl. ¶ 37.
[38] Aragon Decl. ¶ 38.
[39] Jue Decl. ¶ 3.
[40] Aragon Decl. ¶¶ 16-23.
[41] Jue Decl. ¶ 7.
[42] Jue Decl. ¶ 8.
[43] *Id.*

approved by the court, gives the player the *option* of providing additional information, such as whether a class member's photograph appeared in the game, to help the Administrator process the claim.[44] The claim form explicitly states that additional information "is not necessary to make a claim, but it may help us in processing your claim."[45] It is unreasonable to argue that a simple claim form that allows class member to voluntarily give additional information is unduly burdensome. The information is not mandatory and is designed to help the claimant. Duncan's grievance is unfounded.[46]

C.     **Claiming Class Members Will Not Receive a "Windfall."**

Duncan argues that Class members who submit claims will be getting a windfall, while absent Class members will suffer from being capped at a lower basic per-Season Roster Appearance rate.[47] To begin with, the points-based allocation system ensures the fairness of the allocation among claiming Class members, with those Class members whose images were actually used in the videogames recovering more from the Settlements than those whose images were not used.[48] Moreover, the high claims rate means that the most any one class member will receive from this Settlement, someone who appeared in the game for five years after 2007, is approximately $2,442 (6.6 x 5 x $74)[49]—hardly an astronomical sum, although, as described below, an excellent recovery considering all the variables at play in the lawsuit.

---

[44] Jue Decl. ¶ 2, Ex. B.

[45] *Id.*

[46] Duncan also makes the somewhat perplexing argument that the claim form is not necessary for obtaining relief under either settlement because the form contains language assuming that a class member will be participating in both settlements. Duncan Objection at 4. He argues that the opt-out/exclusion process identifies which Class members wish to decline participation. But Duncan's suggestion appears to conflate the assumption that a class member *who is already filing a claim* would want to participate in both Settlements with an assumption that a class member *is making a claim at all*—an assumption that is mutually incompatible with the entire structure of a claims-made settlement. The claim form contains the language Duncan refers to simply in order to afford Class members the opportunity, if necessary, to opt out of one Settlement without opting out of both; it does nothing to suggest—much less establish—that the Administrator would have been capable of identifying all eligible Class members *without* requiring the filing of affirmative claims.

[47] Duncan Objection, Dkt. No. 379 at 3 & 5; Harris also makes a similar objection, Dkt. No. 1215 ("Harris Objection") at 5.

[48] *See* Dkt. No. 1158-2 at ¶ 62.

[49] A student-athlete with an avatar match receives 6.6 Season Roster Appearance Points under the Settlement. Dkt. No. 1158-2 at ¶ 62(c). The current estimated value of one Season Roster

8

NCAA CLASS REPRESENTATIVES' RESPONSE TO OBJECTIONS                                    Case. No. 09-CV-1967 CW

Finally, the allocation between claiming and non-claiming Class members[50] was designed (a) to encourage Class members to submit claims, and to reward those who did so; and, consequently, (b) to reduce the amount of "residual funds" subject to the potentially lengthy post-claims distribution process.[51] Because, as outlined above, the Administrator does not have access to current contact information for the entire class, locating non-claiming Class members would be extremely difficult and time-consuming; thus, the allocation plan attempted to increase efficiency and fairness by avoiding the Settlement funds languishing in escrow (or, eventually, in scholarship funds) because of an inability to locate absent Class members.[52]

### D. The Recovery Is Outstanding.

Duncan argues that the recovery does not address the primary claims of the underlying lawsuit because "defendants should be disgorged of any reasonable percentage of their ill-gotten profits."[53] But the fact that disgorgement is a *potential* remedy under the right of publicity statute, and yet not the basis for the settlement, does not mean the settlement is not fair, reasonable, and adequate. First, Plaintiffs are not aware of any case where a court has disgorged profits on a class-wide basis based on the California or Indiana laws at issue in the suit. Second, Plaintiffs are well

---

Appearance Point is $74 in the NCAA Settlement—an estimate subject to further revision as claims continue to be made, and which is provided for illustrative purposes only, and assumes a 33% award of fees, costs, class incentive awards, and notice and administration expenses. Jue Decl. ¶ 15.

[50] In conjunction with his list of unsupported rhetorical questions apparently meant to suggest, if not actually articulate, objections to the Settlement, Harris erroneously claims that "Class Counsel has not submitted any plan for allocating unused settlement funds to absent Class Members." Harris Objection at 5. In fact, the Settlement Agreement explicitly outlines a general process for distributing "residual funds" to absent Class members. *See* Dkt. No. 1158-2 at ¶ 62(i).

[51] Aragon Decl. at ¶ 41; *see also* Dkt. No. 1158-2 at ¶ 62(i) (describing the process for distributing residual funds).

[52] Duncan also claims that it is unfair that some Class members who receive no points may receive more money than some Class members with points. Duncan Objection at 6. The Settlements do contain a provision for the flat payment of $100 to "a Settlement Class Member who submits a valid and timely Claim form [but who] has no Season Roster Appearance Points." Dkt. No. 1158-2 at ¶ 62(d). This provision was intended to deal with situations in which, for example, two Class members wore the same jersey number for the same sport and year, but one has a better claim because he meets more of the "match" criteria. Aragon Decl. ¶ 42. In that case, the less-well-matched claimant would still be a "class member" under the Settlements, but would be entitled to no points. Further, based on the claims rate, all Class members with a Season Roster Appearance will receive more than $100. *See* Jue Decl. ¶ 15.

[53] Duncan Objection at 5.

9

NCAA CLASS REPRESENTATIVES' RESPONSE TO OBJECTIONS  Case. No. 09-CV-1967 CW

aware of the royalties paid by EA to the NCAA and professional teams for the NIL of athletes,[54] but Duncan fails to articulate the relevance of those royalties in the particular factual context of this litigation. This Settlement, together with the EA Settlement, will produce a total cash fund of $60 million.[55] A victory at trial would have, in Class Counsel's opinion, resulted in a median verdict of $80 million to $120 million dollars.[56] The class has therefore recovered an amount that is nearly equal to what they would have received at trial. In light of the risk and expense of continuing litigation, the Settlement ensures a very favorable outcome and is more than fair, reasonable, and adequate.[57]

      Duncan also argues that relief is inadequate because there is no injunctive relief. The games, however, are no longer in production and have not been since 2010 (basketball) and 2013 (football), respectively.[58] The NCAA publicly announced that it was not renewing its license with EA,[59] and there is no indication that EA is working on any NCAA-Branded football or basketball videogames. Even if they were contemplating a new game, this Court's ruling in *O'Bannon v. NCAA* may allow Defendants to license the NIL of student-athletes, but only if they shared their revenues with student-athletes and obtained their permission. If they made the game without permission or revenue sharing, current NCAA student-athletes[60] would likely have a strong claim for punitive damages and Defendants would no longer be able to hide behind California's Anti-

---

[54] Aragon Decl. ¶ 44.

[55] Dkt. Nos. 1158-1 & 1158-2.

[56] Declaration of Robert B. Carey in Support of Mot. for Award of Attorneys' Fees, Dkt. No. 1195 ("Carey Decl."), at ¶ 63.

[57] *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (one-sixth of potential recovery was fair and adequate); *Villegas v. J.P. Morgan Chase & Co.*, No. CV-09-00261-SBA-EMC, 2012 WL 5878390 at *6 (N.D. Cal. Nov. 21, 2012) (15% of potential recovery approved); *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (6–9% of potential recovery was fair and adequate). Counsel's judgment that the Settlement is fair and reasonable is entitled to great weight. *See Churchill*, 361 F.3d at 576-77; *OFJ*, 688 F.2d at 625 (same); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981) ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

[58] Aragon Decl. ¶ 43.

[59] *Id.*

[60] It is important to note that very few Class members are current student-athletes given that the games were last released in 2010 and 2013 respectively.

SLAPP statute or First Amendment defenses. Thus, an injunction is unnecessary and may be detrimental to future student-athletes.

Further, there is no evidence that EA continues to facilitate the uploading of rosters, despite Duncan's assertions to the contrary.[61] The games were shipped with the capacity to upload rosters, but once a game is sold there is no evidence that EA can disable the function or that it is not cost prohibitive to do so. Even if EA could disable the ability to upload rosters, Duncan ignores the fact that many, if not most, student-athletes enjoy being in the game—the claims at issue here arose because student-athletes' NIL was included in the game without permission or compensation. Now that the student-athletes have received remuneration for the use of their NIL and have not asked that the roster function be disabled (except for Duncan, of course), there is no need to require EA to disable the function (assuming such a task is even possible).

### E. The Release is Fair and Reasonable.

The objectors' criticism of the release contained in the Settlement ignores the plain language of the release. The release does not "insulate EA from any future use of student athlete likenesses without compensation to those student athletes," as Duncan asserts.[62] Nor does it preclude claims against the NCAA and its members "for any use of student athletes likenesses whether in the past or the future," as Harris claims.[63] The release is limited to claims involving NCAA-Branded Videogames, a defined term in the Settlement that includes games originally released or distributed by EA between May 4, 2003 and September 3, 2014.[64] The release has no application to future games or future student-athletes, nor does the release impact student-athlete likeness claims unrelated to NCAA-Branded Videogames.[65] The release language covers:

> Any and all past, present, and future claims, liabilities, or causes of action, known or unknown, existing or potential, expected or unexpected, pursuant to any theory of recovery . . . arising out of, involving, or relating to the alleged use of any name, image, photograph, or likeness ***in EA's production, manufacture, sale,***

---

[61] *See* Duncan Objection at 5.
[62] Duncan Objection at 6.
[63] Harris Objection at 2.
[64] Dkt. No. 1158-2 ¶ 23.
[65] *Id.* at ¶ 33.

11

> *distribution, or publication of NCAA-Branded Videogames*, or the alleged use of or failure to compensate for the alleged use of any NCAA student-athlete's name, image, photograph, or likeness *in connection with EA's NCAA-Branded Videogames* by the NCAA, EA, CLC, or any Person, that have been, could have been, or should have been asserted in the Lawsuits, including but not limited to any claims based in any way on alleged rights of publicity or name, image, and likeness rights under the law of any state or the United States, whether recognized now or hereafter, including any rights recognized in court decisions or statutes.[66]

The release does not release claims against EA or CLC—those claims are subject to the release negotiated in the EA Settlement.[67] Nor does the release impact claims for NCAA-Branded Videogames released before May 4, 2003 or after September 3, 2014.[68] If EA or any other entity releases an NCAA-Branded Videogame after September 3, 2014, or anyone uses student-athletes' likenesses in a manner unrelated to NCAA-Branded Videogames, the release has no impact. The objections to the release are not supported by its plain language and should be ignored.

**F.     The Class Representatives' Incentive Awards Are Appropriate.**

Class Representatives have diligently litigated this case for six years. Because California's right of publicity statute and anti-SLAPP statute both have mandatory fee shifting provisions,[69] if Class Representatives had lost their claims, they could have potentially faced millions in fees and costs, as has occurred in other right-of-publicity cases by NCAA student-athletes.[70] And while the public now overwhelmingly supports Class Representatives' efforts, that support has been neither constant nor universal, requiring Class Representatives' to defend themselves and fellow Class members in numerous television, print, and radio interviews—actions which ultimately helped change the public perception of the NCAA and this litigation. Class Counsel has spoken to hundreds of student-athletes, and cannot recall a single athlete who does not support the litigation and this Settlement; this change in public perception is largely attributable to Mr. Keller and his

---

[66] Dkt. No. 1158-2 ¶ 33 (emphasis added).
[67] *Id*. (expressly reserving right to pursue EA and CLC for the released claims).
[68] *Id*. at ¶ 23.
[69] *See, e.g.*, Cal. Civ. Code § 3344, and California's Anti-SLAPP statute, Cal. Code Civ. P. § 425.16.
[70] *See, e.g., Maloney v. T3 Media*, 2015 WL 3879634 (C.D. Cal., May 27, 2015).

fellow class representatives.[71] Mr. Keller took unpaid leave from his job to meet with counsel and attend hearings and mediation sessions.[72] Messers. Cummings, Watkins, and Bishop were added as class representatives when the Consolidated Class Action Complaint was filed, and all four named plaintiffs responded to voluminous discovery requests, including over 203 Requests for Production, 23 Interrogatories, and 189 Requests for Admission.[73] They also actively participated in the settlement of this action, including reviewing and approving the NCAA Settlement Agreement.[74] The time and effort expended by these named plaintiffs resulted in a significant recovery for the class. The incentive awards of $5,000 are reasonable and compare favorably to incentive awards in other cases.[75]

Duncan nonetheless complains that Plaintiffs seek a double recovery, and claims that the Class Representatives "should be limited to their work in NCAA."[76] This ignores the fact that Class Representatives are seeking recoveries from the two settlements for work that contributed to *both* settlements. Duncan fails to explain why the aggregate incentive awards—which, as noted in Class Counsel's fee petition, represent only .104% of the combined settlement amount of $60 million[77]—are unreasonable in light of Class Representatives' contributions to the Settlements. Indeed, as with Class Counsel's fee request, Duncan has failed altogether to respond to the support offered for Class Representatives' incentive awards in Class Counsel's fee petition, filed April 23, 2015—despite having had nearly three months to do so.

---

[71] Carey Decl. ¶ 77.
[72] Carey Decl. ¶ 78.
[73] Carey Decl. ¶ 79.
[74] Aragon Decl. ¶ 45.
[75] *See e.g., In re Online DVD-Rental Antitrust Litig.*, 2015 WL 846008, at *8 (incentive awards of $5,000); *Pierce*, 2013 WL 5402120, at *6-7 (incentive awards of $5,000); *In re Conseco Life Ins. Co. Life Trend Ins. Mktg. & Sales Practice Litig.*, 2014 WL 186375, at *3 (incentive awards of $5,000).
[76] Duncan Obj. at 7.
[77] Dkt. No. 1197 at 24.

## III. CONCLUSION

For the foregoing reasons—along with all the reasons stated in Class Representatives' Motion for Final Approval, filed concurrently herewith—the Court should reject the arguments raised by the objectors and grant the Motion.

Dated: July 2, 2015

HAGENS BERMAN SOBOL SHAPIRO LLP

By     /s/ Robert B. Carey
Robert B. Carey (*Pro Hac Vice*)
Leonard W. Aragon (*Pro Hac Vice)*
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
leonard@hbsslaw.com

Steve Berman (*Pro Hac Vice)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@smplegal.com

Celeste H.G. Boyd (*Pro Hac Vice*)
THE PAYNTER LAW FIRM PLLC
1340 Environ Way
Chapel Hill, NC 27517
Telephone: (919) 307-9991
Facsimile: (866) 734-0622
cboyd@smplegal.com