IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAMUEL KELLER, et al.,                          No. C 09-1967 CW

          Plaintiffs,

     v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION; ELECTRONIC ARTS
INC.; and COLLEGIATE LICENSING
COMPANY,

          Defendants.
═══════════════════════════════/

EDWARD O'BANNON, et al.                          No. C 09-3329 CW

          Plaintiffs,                            CORRECTED ORDER
                                                 FOR ATTORNEYS'
     v.                                          FEES

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION; ELECTRONIC ARTS
INC.; and COLLEGIATE LICENSING
COMPANY,

          Defendants.
═══════════════════════════════/

     On August 19, 2015, this Court granted final approval of the

class action settlements in the above captioned cases.[1]  In its

final approval orders, the Court allocated twenty-nine percent of

the National Collegiate Athletic Association (NCAA) settlement

fund and thirty percent of the Electronic Arts, Inc. (EA)

settlement fund for attorneys' fees, reserving the division of

_____

     [1] On September 16, 2015, Objector Nathan Harris filed a
notice of appeal of the settlement in Keller and Objector Darrin
Duncan filed a notice of appeal of the partial settlement in
O'Bannon.  Both appeals were dismissed by stipulation on November
9, 2015.

those funds among the attorneys.  Class Counsel have filed five separate motions for attorneys' fees and costs.  Counsel for the Plaintiff class in O'Bannon v. NCAA (O'Bannon Plaintiffs) seek $8,000,000 in fees from EA.  Docket No. 1194.  Counsel for the Plaintiff class in Keller v. NCAA (Keller Plaintiffs) seek $8,580,000 in fees from EA and $5,800,000 in fees from the NCAA.  Docket Nos. 1196 and 1197.  Current counsel for the Plaintiff class in Hart v. EA, D.N.J. Case No. 09-5990, seek $883,177 in fees from EA.  Docket No. 1207.  Finally, Timothy McIlwain, former counsel for the Hart Plaintiffs, seeks $4,620,000 in fees from EA.  Docket No. 1193.  Counsel for the various Plaintiff groups oppose each other's motions for fees.  Having considered the parties' papers, oral argument on the motions and the record in this case, the Court grants Keller Plaintiffs' counsel $5,800,000 in attorneys' fees and $224,434.20 in costs from the NCAA fund.  In addition, the Court grants the following from the EA fund: $5,046,000 in fees and $224,434.20 in costs to Keller Plaintiffs' counsel; $4,000,000 in fees and $1,819,964 in costs to O'Bannon Plaintiffs' counsel[2]; $260,000 in fees and $12,367.59 in costs to

_____

[2] In addition, the Court directs that $2,000,000 in fees shall be held in escrow, pending the resolution O'Bannon Plaintiffs' counsel's motion for attorneys' fees from the NCAA. If O'Bannon Plaintiffs' counsel are paid their fees by the NCAA, the $2,000,000 will be paid to counsel for Keller Plaintiffs.  If O'Bannon Plaintiffs' counsel are not paid their fees by the NCAA, the $2,000,000 will be paid to them.

current counsel for Hart; and $694,000 in fees and $45,810.58 in costs to former counsel for Hart.

BACKGROUND

I.    Keller v. EA, No. 09-1967, and O'Bannon v. NCAA, No. 09-3329

On May 5, 2009, Hagens Berman Sobol Shapiro LLP filed Keller v. EA, 09-1967, as a putative class action, naming EA, the NCAA and Collegiate Licensing Company (CLC) as Defendants and alleging the unlawful use of college student athletes' names, images, and likenesses in NCAA-branded football and basketball videogames produced and sold by EA.  The case asserted common law and statutory right-of-publicity (ROP) claims, a California Unfair Competition Law claim and various other common law claims.

On July 21, 2009, Hausfeld LLP filed O'Bannon v. NCAA, 09-3329 as a putative class action, alleging that the NCAA, its members, EA and CLC conspired to suppress to zero the amounts paid to Division I football and men's basketball players for the use of their names, images and likenesses, in violation of the Sherman Act, 15 U.S.C. § 1.  On January 15, 2010, the Court granted Plaintiffs Keller and O'Bannon's joint motion to consolidate their cases along with several other related actions pending before the Court.  O'Bannon Docket No. 139.  On that date, the Court appointed Hausfeld LLP and Hagens Berman Sobol Shapiro LLP as co-lead counsel in the consolidated cases, with Hausfeld taking primary responsibility for the O'Bannon Plaintiffs' claims and

United States District Court
For the Northern District of California

Hagens Berman taking primary responsibility for the Keller Plaintiffs' claims.

On February 8, 2010, in Keller, the Court denied EA's so-called "Anti-SLAPP" motion, one pursuant to California Code of Civil Procedure section 425.16, which addresses Strategic Lawsuits Against Public Participation (SLAPP). Keller Docket No. 150.  The Court rejected EA's argument that its games were transformative works protected by the First Amendment, noting that "EA's depiction of Plaintiff in 'NCAA Football' is not sufficiently transformative to bar his California right of publicity claims as a matter of law."  Docket No. 150 at 9.  The Court further rejected EA's argument that "the videogame, taken as a whole, contains transformative elements," finding that the "Court's focus must be on the depiction of Plaintiff in 'NCAA Football,' not the game's other elements."  Id. at 10.  EA filed an interlocutory appeal of the order, which resulted in an automatic stay of Keller, including a stay of discovery by Keller Plaintiffs against EA.  See Docket No. 253 at 6 (citing All One God Faith, Inc. v. Hain Celestial Group, Inc., 2009 WL 4907433, at *2 n.2 (N.D. Cal.)).

During this time, Keller Plaintiffs and O'Bannon Plaintiffs worked together to seek discovery from Defendants NCAA, CLC and relevant third parties.  Both O'Bannon Plaintiffs and Keller Plaintiffs served discovery requests and obtained and indexed documents, and took and defended many depositions.  Keller

United States District Court
For the Northern District of California

Plaintiffs acknowledge that "most of the depositions covered antitrust topics unrelated to ROP claims," but state that they "monitored each deposition to identify ROP issues and protect the interests of the putative class." Keller Plaintiffs' Motion for Fees from EA, Docket No. 1196 at 5.

In addition, O'Bannon Plaintiffs sought discovery from Defendant EA, which it provided to Keller Plaintiffs. Keller Plaintiffs assert that they reviewed these materials and coded and indexed the information relevant to their case "to minimize discovery on remand." Id. Keller Plaintiffs state that, because of this work, they had "sufficient documentary evidence to move for class certification and proceed to trial against the NCAA by March 23, 2015," the Keller trial date set by the Court. Id. at 6.

At the end of August 2012, O'Bannon Plaintiffs filed their motion for class certification. Instead of opposing the motion for class certification, all three Defendants filed individual motions to strike it, arguing that O'Bannon Plaintiffs raised a new theory of liability in the motion. O'Bannon Plaintiffs opposed the motions to strike. The Court denied the motions, finding that Defendants' arguments in support of their motions to strike were "more properly considered as arguments supporting denial of the motion for class certification on its merits." Docket No. 673 at 1. Accordingly, the Court construed the motions to strike as Defendants' oppositions and set a further briefing

schedule, allowing O'Bannon Plaintiffs to file a reply and Defendants to file a sur-reply.  The Court heard oral argument and took the motion for class certification under submission on June 20, 2013.  Docket No. 829.

On July 31, 2013, the Ninth Circuit affirmed the Court's order denying EA's Anti-SLAPP motion.  In re: NCAA Student-Athlete Name & Likeness Licensing Litigation, 724 F.3d 1268 (9th Cir. 2013).[3]  The Ninth Circuit rejected EA's argument that its games were protected by the First Amendment and affirmed this Court's finding as a matter of law that EA was not entitled to the transformative use defense.  Id. at 1279.

II.  Hart v. EA, D.N.J. No. 09-5990

On June 15, 2009, the then-existing law firm McKenna McIlwain LLP had filed a putative class action on behalf of Plaintiffs Ryan Hart and Troy Taylor in New Jersey state court, alleging New Jersey state law, California state law, and common law claims against EA.  On October 26, 2009, the firm filed an amended complaint including only Mr. Hart as named Plaintiff and eliminating the California state law claim.  EA subsequently removed the case to the federal court for the District of New Jersey and filed a motion to dismiss.  The District of New Jersey court dismissed all of the claims with prejudice except the right

_____

[3] Following the preliminary approval of this settlement, the parties stipulated to dismissal of EA's petition for writ of certiorari to the Supreme Court.  Electronic Arts Inc. v. Keller, 135 S. Ct. 42 (2014).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

of publicity claim, which it dismissed without prejudice.  On October 12, 2010, Mr. Hart filed a second amended complaint alleging only the right of publicity claim and, on November 12, 2010, EA moved for summary judgment.[4]  EA argued that the First Amendment prohibited the right of publicity claim.  On September 9, 2011, the New Jersey court granted EA's motion for summary judgment, finding that EA was entitled to assert a First Amendment defense.  Hart v. Electronic Arts Inc., 808 F. Supp. 2d 757 (D.N.J. 2011).

On October 5, 2011, Mr. Hart filed a notice of appeal to the Third Circuit.  On appeal, Mr. Hart was represented by McKenna McIlwain and Altshuler Berzon LLP.  On January 25, 2012, Keith McKenna filed a notice of substitution of attorney, substituting the McKenna Law Firm, LLC for McKenna McIlwain.  On February 10, 2012, one day before Mr. Hart's opening brief was due, Mr. McIlwain filed another notice of substitution of attorney, substituting himself, Timothy McIlwain, Attorney at Law, LLC, for McKenna McIlwain.  The McKenna Law Firm filed a notice of withdrawal of appearance.

---

[4] While EA's motion for summary judgment was under submission, the Keller Plaintiffs filed a motion before the Judicial Panel on Multidistrict Litigation to transfer Hart and Hubbard v. EA, E.D. Tenn. No. 09-234, to this Court to be consolidated with Keller and other cases then pending.  Mr. Hart, Mr. Hubbard and EA opposed the motion and, on February 4, 2011, the MDL Panel denied the motion to transfer.  MDL No. 2212, Docket No. 38.

United States District Court
For the Northern District of California

In his opening brief, Mr. Hart relied on California's transformative use test, arguing that EA's use of his identity was not transformative.  The concluding paragraph of the transformative use section of Mr. Hart's brief noted that he argued "the precise conclusion" reached by this Court in Keller. Hart v. EA, 3d Cir. Case No. 11-3750, Brief Filed 2/10/2012 at 48 n.13.

On May 21, 2013, a panel of the Third Circuit reversed the District of New Jersey court's grant of summary judgment and remanded the case.  The panel held that the transformative use test was "the proper analytical framework to apply to cases" such as Hart.  Hart v. Electronic Arts, Inc., 717 F.3d 141, 165 (3d Cir. 2013).  Applying the transformative use test, the panel held that the videogames at issue did not "sufficiently transform [Mr. Hart's] identity to escape the right of publicity claim."  Id. at 170.  The Third Circuit panel noted that Keller "is simply [Hart] incarnated in California" but declined to "rely too heavily" on this Court's decision which was then on appeal to the Ninth Circuit.  Id. at 163 n.28.

In August 2013, Mr. McIlwain associated attorneys from the Lanier Law Firm, PC as co-counsel for Mr. Hart.

III. Joint Efforts to Settle Claims Against EA

The parties in Keller, O'Bannon and Hart had all attempted to reach settlements in their respective cases as early as 2011. However, those efforts were unsuccessful.  On September 10, 2013,

**United States District Court**
For the Northern District of California

the three cases proceeded to a joint mediation before Randy Wulff. During that session, Plaintiffs in all three cases reached a settlement in principle with EA that also released claims against CLC. (In this order, this settlement is referred to as the EA settlement). At the time of the mediation, Mr. Hart was represented by Mr. McIlwain. However, following the mediation, Mr. Hart rejected the settlement and replaced his counsel, re-hiring the McKenna Law Firm along with Lum, Drasco & Positan LLC (collectively, <u>Hart</u> Plaintiffs' counsel).

After further negotiations, Mr. Hart agreed to a settlement under terms <u>Keller</u> Plaintiffs' counsel describe as "substantively analogous" to those reached at the September 10, 2013 mediation. Carey Dec. at ¶ 52. The parties continued to work with Mr. Wulff to resolve issues related to the allocation of the proposed settlement fund. Part of the resolution included an agreement that Hagens Berman, counsel for <u>Keller</u> Plaintiffs, would pay current counsel for <u>Hart</u> Plaintiffs, the McKenna Law Firm and Lum, Drasco & Positan, $300,000 of any fee received from the settlement. Hagens Berman also agreed that it would not object to any lodestar amount claimed by current counsel for the <u>Hart</u> Plaintiffs but indicated that it would respond to any questions from the Court regarding <u>Hart</u> Plaintiffs' contribution to the settlement.

In May 2014, the parties filed their proposed settlement papers with the Court. <u>Keller</u> Plaintiffs and EA also filed a

9

joint motion under Federal Rule of Civil Procedure 62.1 and
Federal Rule of Appellate Procedure 12.1 for an indicative ruling.
On July 16, 2014, the Court granted the joint motion and indicated
that it would preliminarily approve the settlement, allowing for a
limited remand from the Court of Appeals.  The Ninth Circuit
granted the limited remand on July 24, 2014 and this Court finally
approved the settlement on August 19, 2015.

IV.  Continued Litigation Against and Partial Settlement with NCAA

        While settling their claims against EA, O'Bannon Plaintiffs
continued to litigate their case against the NCAA.  In November
2013, the Court granted in part and denied in part O'Bannon
Plaintiffs' motion for class certification, certifying a class of
current and former Division I football and men's basketball
players whose names, images, likenesses may be, or have been,
included in game footage or in videogames licensed or sold by the
NCAA.  Docket No. 893.  However, the Court declined to certify a
damages sub-class, finding that O'Bannon Plaintiffs failed to
present a feasible method for determining which players appeared
in videogames and were therefore eligible for monetary damages.

        O'Bannon Plaintiffs filed a motion for summary judgment and
opposed the NCAA's cross-motion for summary judgment.  On April
11, 2014, the Court granted in part and denied in part O'Bannon
Plaintiffs' motion for summary judgment and granted in part and
denied in part the NCAA's cross-motion.

United States District Court
For the Northern District of California

While the parties' cross-motions for summary judgment in O'Bannon were under submission, Keller Plaintiffs and O'Bannon Plaintiffs attended two settlement conferences with Magistrate Judge Cousins in an unsuccessful attempt to settle their claims against the NCAA. Keller Plaintiffs continued to negotiate with the NCAA and reached an agreement in principle, which they announced on June 9, 2014, the first day of O'Bannon Plaintiffs' bench trial against the NCAA.

LEGAL STANDARD

Rule 23(h) of the Federal Rules of Civil Procedure provides, "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Attorneys' fees provisions included in proposed class action agreements must be "fundamentally fair, adequate and reasonable." Staton v. Boeing Co., 327 F.3d 938, 964 (9th Cir. 2003).

In "common fund cases," a court has discretion to award attorneys' fees either as a percentage of such common fund or by using the lodestar method. Id. at 967-968. In the Ninth Circuit, the "benchmark" for attorneys' fees in common fund class actions is twenty-five percent of the common fund. Id. at 968. "The benchmark percentage should be adjusted . . . when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." Six Mexican Workers v. Arizona

_Citrus Growers_, 904 F.2d 1301, 1311 (9th Cir. 1990).  "A fee award of 30 percent is within the 'usual range' of fee awards that Ninth Circuit courts award in common fund cases."  _Garner v. State Farm Mutual Auto Ins. Co._, 2010 WL 1687829, *1 (N.D. Cal.) (citing _Vizcaino v. Microsoft_, 290 F.3d 1043, 1047 (9th Cir. 2002).

If the plaintiffs seeking fees in a class action settlement jointly propose an allocation of those fees among co-counsel, a court may consider "the relative efforts of, and benefits conferred upon the class by, co-counsel" when deciding whether to accept the proposal.  _In re FPI/Agretech Sec. Litig._, 105 F.3d 469, 474 (9th Cir. 1997).  A court may consider the same factors when no such agreement exists.  _See, e.g._, _In re Critical Path, Inc._, 2002 WL 32627559 at *10 (N.D. Cal.) (Awarding higher fees to the firm that "undertook most of the work (including document review and negotiation with defendants) that actually delivered real benefit to the classes" and lower fees to the firm that "rode its coattails and received a (close to) free ride to settlement").

DISCUSSION

I.   Fees to be Awarded

The Court's order preliminarily approving these class action settlements allowed Plaintiffs' counsel in the NCAA settlement to seek up to twenty-nine percent of the NCAA settlement fund, or

United States District Court
For the Northern District of California

$5,800,000, in attorneys' fees.[5]  The order further allowed Plaintiffs' counsel to seek up to thirty-three percent of the EA settlement fund, or $13,200,000, in attorneys' fees.

Keller Plaintiffs' counsel seek the full $5,800,000 in fees from the NCAA fund.  Keller Plaintiffs' counsel also request $8,580,000 in fees from the EA fund, for a total of $14,380,000 in requested fees from both Defendants.  Keller Plaintiffs' counsel claim a lodestar of $6,771,390.75.  O'Bannon Plaintiffs' counsel request $8,000,000 in fees from the EA fund and claim a lodestar of $33,938,865.72, representing $33,438,899.20 in fees incurred as to the NCAA, EA and CLC until September 19, 2013, the date of the successful mediation, plus $544,966.52 in fees incurred negotiating the settlement agreement, preparing the preliminary approval motion and other EA-specific tasks following the mediation.  Hart Plaintiffs' current counsel, (the McKenna Law Firm and Lum, Drasco & Positan) claim a lodestar of $883,177 and request that amount in fees from the EA fund.  Finally, Mr. McIlwain claims a lodestar of $3,026,005 and requests $4,620,000 in fees from the EA fund.

Courts in the Ninth Circuit look to the following factors when determining the proper percentage for an award of attorneys'

---

[5] Only Keller Plaintiffs' counsel seek fees from the NCAA settlement fund.  The NCAA was not a defendant in the Hart case. O'Bannon Plaintiffs did not settle with the NCAA.  The NCAA's motion for de novo review of Magistrate Judge Cousins' report and recommendation granting in part O'Bannon Plaintiffs' counsel's motion for fees from the NCAA is currently pending.

**United States District Court**
For the Northern District of California

fees: (1) the results achieved; (2) the risks of litigation; (3) whether there are benefits to the class beyond the immediate generation of a cash fund; (4) whether the percentage rate is above or below the market rate; (5) the contingent nature of the representation and the opportunity cost of bringing the suit; (6) reactions from the class; and (7) a lodestar cross-check. Vizcaino, 290 F.3d at 1048–52.

Here counsel obtained a combined $60,000,000 common fund for the settlement classes. Moreover, these cases were heavily litigated and all work was performed on a contingency basis. There were only three objections to the settlements, none of which was meritorious, and 29,182 individuals filed timely claims. In addition, a lodestar cross-check supports an allocation above the twenty-five percent benchmark. Accordingly, an allocation of the requested twenty-nine percent of the common fund for attorneys' fees in the NCAA settlement is fair and reasonable. See In re Pacific Enters. Sec. Litig., 47 F.3d 373, 379 (9th Cir. 1995) (affirming attorneys' fees comprising thirty-three percent of the common fund when justified by the complexity of the issues and the risks undertaken by counsel). Only Keller Plaintiffs' counsel seek fees under the NCAA settlement. Accordingly, Keller Plaintiffs' counsel's motion for fees from the NCAA settlement is GRANTED. Docket No. 1197.

Plaintiffs' counsel request thirty-three percent of the common fund for attorneys' fees in the EA settlement. The Court

United States District Court
For the Northern District of California

finds that an attorneys' fee award of thirty percent of the common fund in the EA settlement is fair and reasonable.  Id.  The allocation of that amount among the attorneys claiminig it is addressed in the next section.

II.  Allocation of EA Fees Among Plaintiffs' Counsel

Counsel for the cases settled against EA have not reached an agreement on the proper allocation of the available fees.

Keller Plaintiffs' counsel argue that they should be awarded the majority of the fees from the EA settlement because the Ninth Circuit's opinion in Keller was the catalyst for the settlement against EA.  Keller Plaintiffs' counsel argue that, although O'Bannon Plaintiffs' counsel's lodestar is significantly higher than Keller Plaintiffs' counsels', much of that work concerned discovery and focused on preparation for the trial against the NCAA and was not useful to the settlement.  According to Keller Plaintiffs' counsel, the potential liability EA and CLC faced based on the right of publicity claims far outweighed the liability they faced based on O'Bannon Plaintiffs' claims. Moreover, Keller Plaintiffs' counsel argue that they faced greater risks litigating their class's claims because of the mandatory fee shifting provisions in California's Anti-SLAPP and right of publicity statutes.  Keller Plaintiffs' counsel further argue that Hart Plaintiffs' current counsel and Mr. McIlwain should be limited to a maximum of $700,000 in fees because their

15

United States District Court
For the Northern District of California

participation in the settlement negotiations negatively impacted _Keller_ Plaintiffs' bargaining power in those negotiations.

_O'Bannon_ Plaintiffs' counsel argue that they should be awarded the majority of the fees from the EA settlement because they did the majority of the work prior to settlement.  Because the _Keller_ Plaintiffs' claims against EA were subject to a statutorily mandated stay pending the Ninth Circuit's decision on the appeal of the denial of the Anti-SLAPP motion and because _O'Bannon_ Plaintiffs were preparing to go to trial, _O'Bannon_ Plaintiffs' counsel were responsible for almost all of the discovery leading up to the settlement.  _O'Bannon_ Plaintiffs' counsel further argue that their work was the catalyst for the settlement, noting that EA did not express interest in settling the case until after the Court took the _O'Bannon_ motion for class certification under submission.  _O'Bannon_ Plaintiffs' counsel also point out that EA would have faced treble damages under the Clayton Act if a damages class had been certified.  Finally, _O'Bannon_ Plaintiffs' counsel argue that their clients' claims against NCAA also contributed to the NCAA's decision to settle with _Keller_ Plaintiffs, noting that the settlement between those parties was announced just as _O'Bannon_ went to trial.[6]

---

[6] Although _O'Bannon_ Plaintiffs' counsel do not seek fees from _Keller_ Plaintiffs' settlement with the NCAA, they argue that they should receive more of the EA fees than _Keller_ Plaintiffs' counsel based, in part, on their asserted contribution to the EA settlement.

United States District Court
For the Northern District of California

Accordingly, O'Bannon Plaintiffs' counsel argue that they should receive two-thirds of the total EA fees, while Keller Plaintiffs' counsel and current and former Hart counsel should share the remaining third.

Mr. McIlwain argues that he should be awarded over $4,000,000 in fees for the work he performed in Hart.[7] He contends that it was the Third Circuit's decision in Hart that was the catalyst for the EA settlement. Mr. McIlwain notes that the Ninth Circuit panel that affirmed this Court's ruling in Keller cited and relied upon the Third Circuit's opinion in Hart. Moreover, Mr. McIlwain argues that, while he was representing the Hart class, he and Keller Plaintiffs' counsel reached an agreement that any fees awarded as part of the settlement of the right of publicity claims asserted in Hart, Keller and Alston should be split with sixty percent of the fees going to Keller Plaintiffs' counsel and forty percent going to Mr. McIlwain.

---

[7] Mr. McIlwain also moves to intervene in this case in order to seek attorneys' fees. In order to intervene as a matter of right under Federal Rule of Civil Procedure 24(a)(2), "an applicant must claim an interest the protection of which may, as a practical matter, be impaired or impeded if the lawsuit proceeds without" the applicant. Forest Conservation Council v. United States Forest Serv., 66 F.3d 1489, 1493 (9th Cir. 1995). Mr. McIlwain has no personal interest in the subject matter of this lawsuit and is not entitled to intervene as a matter of right in this case. Moreover, the Court declines to exercise its discretion to permit him to intervene. Nevertheless, the Court allows Mr. McIlwain to move for attorneys' fees for the work he performed on behalf of the Hart Plaintiffs to the extent that that work contributed to the creation of the common fund.

Finally, Hart Plaintiffs' current counsel seek a total of $1,183,177.00 in fees, representing their lodestar of $883,177, which they seek from the EA fund, plus the $300,000 they will receive from Keller Plaintiffs' counsel. Hart Plaintiffs' current counsel do not state an opinion on how the remainder of the fees should be allocated, except to argue that Mr. McIlwain should not be entitled to any fees.

A.   Allocation of Fees between O'Bannon Plaintiffs' Counsel and Counsel for Plaintiffs Alleging ROP Claims

The Court must first determine how to allocate fees between O'Bannon Plaintiffs' counsel and counsel for Plaintiffs alleging right of publicity claims. The Court considers several factors in weighing the contribution of each set of Plaintiffs' counsel to the settlement.

1.   Value of the Plaintiff Classes' Claims and Likelihood of Liability for Defendants

Each of the groups of Plaintiffs' counsel argues that their clients' claims exposed EA to the most liability and that activity in their respective case was the catalyst for the EA settlement.

Keller Plaintiffs' counsel argue that, if they were successful, Keller Plaintiffs would be entitled to statutory damages of $750 to $1000 per player in addition to disgorgement, fees, costs and punitive damages for each publication of the games. See Cal. Civ. Code § 3344. Moreover, Keller Plaintiffs' counsel argue that the Ninth Circuit's decision in their case took away EA's only viable defense to the right of publicity claims,

18

which pushed EA to settlement.  <u>Keller</u> Plaintiffs' counsel further note that if EA had succeeded on its First Amendment defense, the antitrust claims "would have been worthless because the competitive market value of student-athlete images in videogames would have been zero."  <u>Keller</u> Plaintiffs' Opp. to O'Bannon Plaintiffs' Motion, Docket No. 1212 at 7.  Accordingly, <u>Keller</u> Plaintiffs' counsel assert that the Ninth Circuit's July 13, 2013 opinion affirming this Court's February 8, 2010 denial of EA's Anti-SLAPP motion contributed to EA's desire to settle not only the right of publicity claims, but O'Bannon Plaintiffs' claims as well.[8]

O'Bannon Plaintiffs' counsel respond that, at the time of settlement, EA faced the risk of a certified damages class, which would have exposed EA to treble damages.  However, as <u>Keller</u> Plaintiffs' counsel point out, O'Bannon Plaintiffs' own expert stated that ninety-nine percent of their damages were attributable to live broadcasts, not to videogames.  O'Bannon Plaintiffs' counsel assert that EA could have been held jointly and severally liable for such damages as part of an antitrust conspiracy.  However, even assuming that EA would face such liability, O'Bannon

---

[8] <u>O'Bannon</u> Plaintiffs' counsel argue that the Ninth Circuit opinion could have been reversed by the Supreme Court, noting that EA had a pending petition for writ of certiorari at the time of the settlement.  However, as <u>Keller</u> Plaintiffs' counsel argue, this is speculative.  Moreover, <u>O'Bannon</u> Plaintiffs' arguments rely on an equally uncertain outcome, the potential of a favorable ruling on its motion for class certification.

United States District Court
For the Northern District of California

Plaintiffs' counsel do not respond to Keller Plaintiffs' counsel's argument that, even when trebled, O'Bannon Plaintiffs' claims were worth less than Keller Plaintiffs' claims.

The settlement's apportionment of funds to class members demonstrates that the California right of publicity claims raised by Keller Plaintiffs exposed EA to the greatest liability. Assuming a 100 percent claims rate for purposes of this analysis, a class member with only an antitrust claim would receive $45.88 for each time his name appeared on a school roster, while a class member with both an antitrust claim and a California right of publicity claim would receive $302.83 for each time he appeared in a videogame.  In other words, class members with California right of publicity claims would receive $256.95 more than class members with only antitrust claims, for every relevant season. [9] Similarly, a class member with only a New Jersey right of publicity claim as raised in Hart, would receive $82.59 per season from EA.  See Carey Dec. ISO Keller Plaintiffs' Opposition, Docket No. 1214, ¶ 22.

---

[9] Mr. McIlwain argues that O'Bannon Plaintiffs' counsel's fee award should be based only on the $5,000,000 allocated to the Antitrust-Roster-Only Subclass in the May 2014 version of the settlement agreement, before the parties created a single settlement distribution plan for Plaintiffs raising antitrust and ROP claims, which allocated settlement funds by a point system. However, Mr. McIlwain's proposal fails to recognize that some individuals who have antitrust claims also have right of publicity claims.  Accordingly, it would be improper to base O'Bannon Plaintiffs' counsel's fees on the potential recovery of class members who only have antitrust claims.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

O'Bannon Plaintiffs' counsel also note that this Court took their motion for class certification under submission in June 2013, shortly before the parties reached their settlement with EA, and argue that "EA had every reason to settle the O'Bannon claims before a class certification was issued, as defendants typically do." O'Bannon Plaintiffs' Reply ISO Motion for Fees at 6. O'Bannon Plaintiffs' counsel further note that EA faced the risk of an imminent antitrust trial in O'Bannon and feared allowing "bad precedent to be set in the O'Bannon case that would have opened it up to further exposure in the Keller or Hart cases." Id. Accordingly, O'Bannon Plaintiffs' counsel argue that it was the threat of class certification and the upcoming trial in that case that caused EA to settle. Keller Plaintiffs' counsel counter that O'Bannon Plaintiffs' counsel's arguments in favor of certification of a damages class were weak and EA's arguments opposing certification were strong.[10]

The value of Keller Plaintiffs' California right of publicity claims and the likelihood that EA's strongest defense to Keller Plaintiffs' claims would be unavailable to it weigh in favor of a finding that Keller Plaintiffs' case made a more significant

---

[10] O'Bannon Plaintiffs' counsel attempt to discount the value of Keller Plaintiffs' claims, arguing that Keller Plaintiffs would have faced barriers to class certification similar to those that O'Bannon Plaintiffs faced for their damages class. However, Keller Plaintiffs' counsel have developed a player database that they could have used to support a motion for class certification. Indeed, the parties are using Keller Plaintiffs' counsel's database to assist in the administration of the settlement.

**United States District Court**
For the Northern District of California

contribution to the settlement fund than did O'Bannon Plaintiffs'
or Hart Plaintiffs'.  However, EA faced imminent trial in O'Bannon
and, as discussed below, the work O'Bannon Plaintiffs' counsel
contributed to advance that case while Keller and Hart were stayed
must also be recognized.

        2.   Time Spent on Litigation

It is undisputed that O'Bannon Plaintiffs' counsel spent many
more hours prosecuting O'Bannon through the date of the settlement
in principle than Plaintiffs' counsel spent in the other cases,
claiming a $33,938,865.72 lodestar as compared to Keller
Plaintiffs' counsel's $6,771,390.75 lodestar, Hart Plaintiffs'
current counsel's $883,177 lodestar and Mr. McIlwain's $3,026,005
lodestar.  While Plaintiffs' counsel all agree that the percentage
of the fund method is the most appropriate method for awarding
fees in this case, the claimed lodestars are relevant as a cross-
check of the reasonableness of the percentage of the fund awarded
to each set of Plaintiffs' counsel.

        3.   Risk Undertaken

As noted above, Keller Plaintiffs' counsel's arguments
include that they were exposed to an additional risk beyond taking
the case on a contingency basis because they were subject to
mandatory fee-shifting under California's right of publicity and

United States District Court
For the Northern District of California

anti-SLAPP statutes.  See Cal. Civ. Code § 3344 and Cal. Code Civ.
P. § 425.16.[11]

> 4.    Potential for O'Bannon Plaintiffs' Counsel to
>       Recover Fees from NCAA

The Court must also consider that O'Bannon Plaintiffs'
counsel may recover from the NCAA most of the fees they now seek.
O'Bannon Plaintiffs' counsel claim a lodestar of $33,438,899.20
for work done against the NCAA, EA and CLC until the date of the
settlement in principle, which includes $3,550,840.15 in fees
O'Bannon Plaintiffs' counsel were able to identify as specific to
claims against EA and CLC.  In addition, O'Bannon Plaintiffs'
counsel claim $544,966.52 in fees incurred to finalize the
settlement and seek the Court's approval.

In their litigation against the NCAA, O'Bannon Plaintiffs'
counsel have already claimed their lodestar, including the amount
they attribute to litigating against only EA and CLC, and
excluding only the amount related to the finalization of the
settlement.  As discussed above, Magistrate Judge Cousins issued a
report and recommendation that the Court grant O'Bannon
Plaintiffs' counsel $44,422,856.04 in attorneys' fees from the
NCAA.  See O'Bannon Docket No. 405.  If O'Bannon Plaintiffs'
counsel are able to collect the fees awarded from the NCAA, the

---

[11] Although Keller Plaintiffs themselves would be liable under
the fee-shifting provisions, they had an agreement with their
counsel that counsel would be responsible for any fees awarded
under those provisions.  See Transcript, Docket No. 1240 at 14.

23

equity of awarding them fees from this settlement will be reduced. However, there is no guarantee that they will be paid. First, this Court must consider the NCAA's objections to Magistrate Judge Cousins' report and recommendation, and the NCAA may appeal any fee awarded. In addition, on September 30, 2015, a panel of the Ninth Circuit affirmed this Court's finding of antitrust liability and affirmed in part the remedy ordered. However, O'Bannon Plaintiffs have filed a petition for rehearing en banc. The Ninth Circuit panel called for a response and the NCAA has filed an opposition to the petition. Accordingly, the Ninth Circuit mandate has not entered and either party could eventually petition for a writ of certiorari from the Supreme Court.

Balancing all of the factors discussed above, the Court finds that, if they are unable to recover their fees from the NCAA, O'Bannon Plaintiffs' counsel are entitled to half of the fees to be awarded from the EA settlement. To account for the uncertainty regarding the fees to be awarded from the NCAA, the Court orders that $4,000,000 in fees be paid to O'Bannon Plaintiffs' counsel at this time. Two million dollars shall be placed in escrow. If the NCAA pays the fee award related to the O'Bannon trial, the $2,000,000 will be paid to Keller Plaintiffs' counsel. If the fee award related to the O'Bannon trial is not paid by the NCAA, the $2,000,000 will be paid to O'Bannon Plaintiffs' counsel.

**United States District Court**
For the Northern District of California

B.   Allocation of Fees among Counsel for Plaintiffs Raising
     Right of Publicity Claims

Next the Court must determine the proper allocation of the remaining $6,000,000 in fees among counsel for the <u>Keller</u> Plaintiffs, the <u>Hart</u> Plaintiffs and Mr. McIlwain.  The majority of these fees will be allocated to <u>Keller</u> Plaintiffs' counsel to compensate them for the outstanding result they secured in this case and the risk they faced in litigating it.  The Court finds little evidence that the <u>Hart</u> litigation contributed to the common fund.  The Court awards some fees to compensate current and former counsel for <u>Hart</u> Plaintiffs for their work.  However, as discussed below, the Court finds insufficient evidence to support the lodestars claimed by current and former counsel for <u>Hart</u> Plaintiffs.

1.   <u>Keller</u> Plaintiffs' Counsel

As discussed above, the Court finds that the California right of publicity claims raised in <u>Keller</u> exposed EA to the greatest liability in this litigation.  Moreover, the substance and timing of the Ninth Circuit's decision as it affected the settlement weighs in favor of a finding that <u>Keller</u> Plaintiffs' claims produced the greatest benefit for the settling class.  Accordingly, the Court grants <u>Keller</u> Plaintiffs' counsel $5,046,000 in fees from the EA fund, in addition to the fees they will recover from the NCAA fund.

Taking into account the $5,800,000 <u>Keller</u> Plaintiffs' counsel will recover from the NCAA fund, <u>Keller</u> Plaintiffs' counsel will receive a total of $10,846,000, representing a 1.6 multiplier of their $6,771,390.75 lodestar. <u>Keller</u> Plaintiffs' counsel have presented evidence that they have devoted 20,061.3 hours of time since the case began, which the Court finds to be reasonable given the more than six years counsel for <u>Keller</u> Plaintiffs have worked on the case. Counsel responded to the motions to dismiss and motions to strike, defended this Court's order on those motions on appeal, took discovery from the NCAA and created the player database being used to administer this settlement. The Court further finds that <u>Keller</u> Plaintiffs' counsel's hourly rates are reasonable in light of their experience, as reflected in their declarations. Moreover, the Court finds that the 1.6 multiplier is reasonable and justified in light of the risk undertaken by <u>Keller</u> Plaintiffs' counsel and the results obtained.[12]

## 2.   Current Counsel for <u>Hart</u> Plaintiffs

The Court awards current counsel for <u>Hart</u> Plaintiffs $260,000. <u>Hart</u> Plaintiffs' counsel claim a lodestar of $883,177, representing 2,012 hours of work at rates ranging from $105 per hour to $450 per hour for the McKenna Law Firm and 646.70 hours of

---

[12] If the NCAA pays the fees sought from it by <u>O'Bannon</u> Plaintiffs' counsel and <u>Keller</u> Plaintiffs' counsel receive the $2,000,000 to be held in escrow, <u>Keller</u> Plaintiffs' counsel will receive a total of $12,846,000, representing a 1.9 multiplier. This multiplier would also be reasonable and justified in light of the risk undertaken and the results obtained.

work at rates ranging from $250 per hour to $550 per hour for Lum, Drasco & Positan.  They seek this lodestar in addition to the $300,000 they will receive from <u>Keller</u> Plaintiffs' counsel under the agreement discussed above, for a total of $1,118,177 in fees.

In their initial submissions, <u>Hart</u> Plaintiffs' counsel failed to support their motion for fees with adequate time records, simply providing a summary of the total hours spent and the rate claimed for each person.  The Court allowed counsel to submit declarations itemizing the hours claimed by each individual by the tasks completed.  In response, counsel submitted declarations attaching contemporaneous time records.  The Court finds that the time records submitted by Lum, Drasco & Positan support an award of the $238,124.50 lodestar claimed.

However, the documents submitted by the McKenna Law Firm are replete with excessive time claimed for various tasks.  The Court's ability to assess the extent of the excessive time claimed is hampered by the fact that the time records submitted by the McKenna Law Firm are block billed.  "Block billing is the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks."  <u>Welch v. Metropolitan Line Ins. Co.</u>, 380 F.3d 942, 945 n.2 (9th Cir. 2007) (internal quotation marks and citations omitted).  The Ninth Circuit has recognized that "block billing makes it more difficult to

determine how much time was spent on particular activities." Id. at 948.

For example, the records claim over 140 hours devoted solely to preparing the 900 page appendix for the appeal to the Third Circuit. See McKenna Decl., Docket No. 1274, Ex. A at 19-21, Entries for work performed 12/15/2011-2/6/2012. Over eighteen hours of additional block-billed entries include work on the appendix, along with other tasks. Id. The 140 hours is itself excessive, and it is impossible for the Court to determine how much of the other block-billed time is related to the appendix.[13]

Another example of excessive billing compounded by block billing is the time spent by Mr. McKenna reviewing and responding to EA's motion to dismiss the complaint. Mr. McKenna claimed eight hours on January 14, 2010 to "Review EA's motion to dismiss." He claimed six more hours on January 15 to "Continued review of motion to dismiss." Finally, he claimed an additional six hours on January 16 for "Continued review of motion to dismiss" for a total of twenty hours reviewing a thirty-five page motion with one supporting declaration that was less than forty pages long, including exhibits. In addition, Mr. McKenna had a block-billed entry on January 18, claiming four hours to "Research

---

[13] The Court notes that Mr. McKenna's former law partner, Mr. McIlwain, seeks fees for an additional twenty-four hours of work by paralegal Katie Saluzzi for the preparation of the Appendix. See Declaration of Katie Saluzzi, Docket No. 1276-7, Ex. B at 1.

**United States District Court**
For the Northern District of California

case law cited in motion to dismiss; communication with Rosen re: scheduling and settlement."  From January 25, 2010 through March 5, 2010, Mr. McKenna had block-billed entries claiming over eighty five additional hours for tasks primarily related to the opposition to the motion to dismiss.  Other McKenna Law Firm time-keepers claimed more than fifty additional hours related primarily to reviewing the motion to dismiss and preparing the opposition to it, in addition to the time claimed by Mr. McKenna.[14]

An example of excessive time spent on tasks that likely had little impact on the success of the litigation is the more than 111 hours claimed in June and July 2009 to creating the website "youareinthegame.org."[15]  The website contains a brief paragraph describing the use of names, images and likenesses in videogames, three side-by-side comparisons of game photos to images from videogames, links to two articles about the Hart and Keller litigation, and a form where college athletes can fill in their information "to be added to the list for consideration in this case."  Not only is the amount of time devoted to creating the

---

[14] In addition, Mr. McKenna's former law partner, Mr. McIlwain, seeks fees for other people for over 100 hours of work on the motion to dismiss.  See, e.g., Jorgensen Dec., Docket No. 1276-4 at Ex. A (claiming sixty-five hours of work in February 2010, primarily related to Plaintiff's opposition to the motion to dismiss); Mullen Dec., Docket No. 1276-5 at ¶ 3 (claiming at least 62.5 hours of work related to motion to dismiss).

[15] The Court notes that Mr. McKenna's former law partner, Mr. McIlwain, seeks fees for an additional thirty-five hours of work by law student Alex Settle for the creation of this website.  See Declaration of Alex Settle, Docket No. 1276-8 at ¶ 2.

**United States District Court**
For the Northern District of California

website excessive, but there is no evidence that information gathered from the website contributed to the success of the litigation in any manner.

These are only examples of excessive time entries. There are many more. See, e.g., June 22, 2009 Entry (claiming eight hours to "Supervise law clerk and paralegals re: organization of legal research, investigation material and file material"); February 19, 2010 Entry (claiming four hours to "Review FRCP re: pleading standard); October 13, 2010 Entry (claiming one hour to "Emailed copy of second amended complaint to opposing counsel); November 16, 2010 Entry (claiming four hours to "Printed documents from ECF system online and filed in binder for KAM" when there were only thirty-six entries on the ECF docket as of that date); December 23, 2010 Entry (claiming one hour to "Send in proof of service for Filing 24"); October 15, 2011 Entry (claiming one hour by a partner to "E-filed notice of appeal").

In addition to the block-billed and excessive entries, the McKenna time records include many vague entries. For example, the entries contain over 140 hours of time claimed for unspecified legal research and memo writing. See also, e.g., June 4, 2009 Entry (claiming six hours for "Continued research into EA's use of player likeness); June 6, 2009 Entry (claiming eight hours by a partner to "Review data, documents and internet material re: EA's marketing a video game"); October 9, 2010 Entry (claiming two hours to, among other things, "review blogs"); November 18, 2011

Entry (claiming one hour to "Prepared index of box); January 20, 2014 Entry (claiming two hours to "Research docket sheet re: CA Action").

Because the McKenna Law Firm's records are replete with excessive and vague entries, the evaluation of which is made even more difficult by block billing, the Court reduces the lodestar claimed by the firm by sixty percent to $258,021. Accordingly, the total lodestar for <u>Hart</u> Plaintiffs' current counsel is $496,145.50.

<u>Hart</u> Plaintiffs' current counsel further argue that they should receive their lodestar in addition to the $300,000 they will be paid by <u>Keller</u> Plaintiffs' counsel under the agreement discussed above. <u>Hart</u> Plaintiffs' current counsel argue that the $300,000 payment should be in addition to their lodestar because the agreement with <u>Keller</u> Plaintiffs' counsel "acknowledges the overlap of the classes between the <u>Keller</u> and <u>Hart</u> matters and was intended to recognize New Jersey ROP Class Counsel's contribution [to] the class as a whole, beyond the class members whose claims arose only under New Jersey's Right of Publicity law." McKenna Dec., Docket No. 1274 at ¶ 2. However, as noted above, the Court finds little evidence that the <u>Hart</u> litigation contributed to the common fund and that <u>Hart</u> Plaintiffs' current and former counsel are only entitled to some fees to compensate them for the work performed. Accordingly, the Court will deduct from the lodestar the $300,000 that current counsel for <u>Hart</u> will receive from

**United States District Court**
For the Northern District of California

Keller Plaintiffs' counsel for a total award of $260,000 from the EA fund.

### 3. Former Counsel for Hart Plaintiffs

Finally, the Court awards former Hart counsel, Mr. McIlwain, the individuals he claims to have supervised and his co-counsel, the Lanier Law Firm, $694,000 in fees.[16]

#### a. Mr. McIlwain

Mr. McIlwain claims a lodestar of $2,070,175, representing 2,453.20 hours billed at a rate of $850 an hour. However, Mr. McIlwain does not provide any evidence that $850 is his customary hourly rate. Indeed, the declaration of Michael Rubin, which Mr. McIlwain filed in support of his motion for fees, states Mr. Rubin's belief that Mr. McIlwain's "lodestar adopts and applies an hourly rate of $750 per hour." Rubin Dec. at ¶. 8. In addition, Mr. McIlwain's former partner Mr. McKenna claimed an hourly rate of $450. Accordingly, the Court reduces Mr. McIlwain's hourly rate to $550, with a corresponding lodestar reduction to $1,349,260.

Moreover, the Court notes that Mr. McIlwain's records claim time for travel with no apparent relevant purpose. For example,

---

[16] In his supplemental declaration, Mr. McIlwain states that he welcomes an order that payment from the EA fund be made directly to the individuals on whose behalf he seeks fees. To the extent the Court awards fees to the individuals Mr. McIlwain claims to have supervised, the Court orders that the fees shall be paid directly to them. Within one week of the date of this order, Mr. McIlwain shall provide counsel for EA with the necessary information for those payments to be made.

**United States District Court**
For the Northern District of California

the records claim 8.30 hours of time for "Travel from NYC to Los Angeles" on November 24, 2010.  However, there is nothing in the subsequent time entries that indicates a case-related reason for Mr. McIlwain's trip.  McIlwain Decl., Ex. A at 19.  See also, e.g., id. at 5 (11.80 hours claimed on February 10, 2009 for "Travel from Newark to Los Angeles"); id. at 19 (6.20 hours claimed on April 28, 2009 for "Travel to California").  In addition, Mr. McIlwain's time record includes hundreds of hours for entries that claim "research and discuss" or "review" a single case.  For example, Mr. McIlwain claims 3.10 hours of time on October 3, 2009 to "Research and Discuss Namath v. Sports Illustrated."  Id. at 12.  It is not clear why this short New York state court opinion warranted 3.10 hours of research and discussion.  See also, e.g., id. at 6 (claiming 2.50 hours to "Research and discuss White v. Samsung Electronics America, Inc."; claiming 3.40 hours to "Research and Discuss Kimbragh v. Coca-Cola/USA").  In other instances, Mr. McIlwain claims what appears to be excessive time for simple tasks, see, e.g., id. at 27 (claiming 4.20 hours on January 13, 2012, to "Research the rules for admission to the 3rd circuit court of appeals and conference with paralegal to put task together for admission"), or work that does not appear to be reasonably related to the settlement in this case, see, e.g., id. at 25 (claiming 2.30 hours to "Investigate talent agency addresses and lead agents"; claiming 6.20 hours to "Research games that are similar to movies; analysis [sic] films

that could become video games; research the sales of war video games like 'Call of Duty'; Watch Oceans 13; imdb actors in Oceans 13 movie"; claiming 3.40 hours to   "Research Matt Damon; George Clooney; Don Cheatle; Bernie Mack; Ellen Barkin; Andy Garcia; Brad Pitt background"; claiming 3.70 hours to "Analysis [sic] biographical information for Matt Damon; George Clooney; Don Cheadle; Bernie Mack; Ellen Barkin; Andy Garcia; Al Pacino; Brad Pitt; image in Oceans 13 movie and correlate likeness to new video game").  Still other entries are vague.  For example, Mr. McIlwain has numerous entries for "memo to file" without a topic.  <u>See also, e.g.</u>, <u>id.</u> at 26 (claiming 3.20 hours to "Review file contents").

The Court also notes that between April 18, 2013 and May 17, 2013, while the case was under submission with the Third Circuit, Mr. McIlwain billed a total of 9.80 hours to multiple entries labeled as "Conference call with Katie Saluzzi re: Status of Case" but performed no other work on the case.  <u>Id.</u> at 42.  Ms. Saluzzi was a paralegal working with Mr. McIlwain on the case.  Her time records show similar time entries for these phone calls, but also show no other work on the case.  Saluzzi Dec., Docket No. 1276-7, Ex. B at 3 (billing a total of 10.75 hours for phone calls with Mr. McIlwain during the same time period).  It is not clear how approximately ten hours of conversations between an attorney and a paralegal that neither stemmed from tasks performed nor led to tasks being performed during a time period when there was no

34

activity in the case could be reasonably related to the litigation or successful resolution of the case.

Finally, as discussed more fully below, Mr. McIlwain claims almost $500,000 in fees on behalf of paralegals, law students and attorneys who he claims to have supervised. As will be discussed below, it appears that there is little basis for either the hours or the hourly rates he claims for those individuals. The Court finds that Mr. McIlwain's willingness to seek those fees calls into question the reliability of his own time records.

Because Mr. McIlwain's time records are replete with entries that are not reasonably related to the litigation or settlement of the case and because the Court questions the reliability of the records, the Court reduces his adjusted lodestar by an additional seventy percent. The Court awards Mr. McIlwain $405,000 in attorney's fees.

b.   Work Supervised by Mr. McIlwain

Mr. McIlwain also claims a lodestar of $491,360 on behalf of other attorneys, law students and paralegals he supervised, representing 1,169.7 hours of time billed at rates ranging from $215 per hour to $850 per hour. In his original filing, Mr. McIlwain did not provide sufficient evidence to support a finding that the hourly rates claimed were reasonable, nor did he provide time records for any of the individuals. In addition, Mr. McIlwain declared that he is a "solo lawyer" and stated that he was claiming time for individuals he "employed and was associated

United States District Court
For the Northern District of California

with for the purpose of investigating and prosecuting the Hart case." McIlwain Dec. at ¶ 1, 19.  Noting that Mr. McIlwain provided no evidence that he paid these individuals the amounts he claimed on their behalf, or that he had been authorized to seek fees on their behalf and would pay any fees ordered over to them in full, the Court directed Mr. McIlwain to file declarations by each of these individuals which itemize the hours claimed by the tasks completed and state the hourly rate or rates the individual actually charged Mr. McIlwain for the work he or she performed and the number of hours for which the individual was actually paid by Mr. McIlwain.

Mr. McIlwain has now filed declarations from nine of these ten individuals.  Because Mr. McIlwain did not submit a declaration from Rachel Cook, the Court will not award the $16,900 of fees Mr. McIlwain claims on her behalf.  Each of the declarations states that the declarant has not been paid by Mr. McIlwain but that he or she performed work for Mr. McIlwain with the understanding that he would pay him or her "upon the successful conclusion of the case."  Each of the declarants further states that he or she had an understanding that "if Mr. McIlwain received an excellent result, he would pay [him or her] a bonus or multiplier" so that he or she would receive an amount greater than a lodestar calculated with his or her usual hourly rate.

United States District Court
For the Northern District of California

Having reviewed the declarations of these individuals, only one of whom was able to provide a time record adequately itemizing the hours claimed by the tasks completed, the Court is troubled by Mr. McIlwain's original claim of fees on their behalf.  Mr. McIlwain claimed specific amounts of time that appear to have no basis in fact.  For example, Mr. McIlwain claimed 34.8 hours of time on behalf of Kris Nejat.  However, Mr. Nejat's declaration provides no itemization of time and states that he "worked well in excess of 100 hours on the Hart matter."  Nejat Decl., Docket No. 1276-6 at ¶ 5.  See also, Settle Decl., Docket No. 1276-8 at ¶ 2 (stating that the total work performed was well in excess of thirty-five hours while Mr. McIlwain claimed 51.40 hours of time on Mr. Settle's behalf); Amadeo Decl., Docket No. 1276-1 at ¶ 5 (stating that the total work performed exceeded 300 hours while Mr. McIlwain claimed 120.20 hours on Mr. Amadeo's behalf).  Mr. McIlwain provides no basis for the hours he claims on behalf of the individuals he purportedly supervised.  The lack of foundation for these claims also calls into question the reliability of his own time records.

i.   Katie Saluzzi

Mr. McIlwain claims $48,375 of fees on behalf of paralegal Katie Saluzzi for 225 hours of work performed at a rate of $215 per hour.  In her declaration, Ms. Saluzzi states that she worked "with Mr. McIlwain as a paralegal consultant" but that she "was at no time considered his employee," paid a salary or paid an hourly

rate.   Saluzzi Dec., Ex. 1276-7 at ¶ 2.   Ms. Saluzzi further declares that she prepared a "Certification of Services" for the Hart case that itemizes her time by the tasks completed and submitted it to Mr. McIlwain with the understanding that "upon the successful conclusion of the case" she would be paid $48,735.[17] Id. at ¶ 3.   Ms. Saluzzi declares that she had worked on other matters with Mr. McIlwain and billed him at a rate of $215 per hour.   Id.

Neither Ms. Saluzzi nor Mr. McIlwain provides any support for Ms. Saluzzi's claimed hourly rate.   The Court notes that the McKenna Law Firm claimed an hourly rate of $105 for its paralegals and Hagens Berman claimed rates of $150-$190 per hour for paralegals with much more experience than Ms. Saluzzi. Accordingly, the Court reduces Ms. Saluzzi's hourly rate to $105, with a corresponding lodestar reduction to $23,625.

In addition, the Court will make reductions to the hours claimed on Ms. Saluzzi's behalf.   Ms. Saluzzi has included in her time record sixty-one hours of work performed after September 30, 2013, when Mr. McIlwain was informed by Mr. Hart that he was no longer authorized to work on the case.   These fees cannot reasonably be related to the successful litigation and settlement

---

[17] Although Ms. Saluzzi states that the "Certification of Services" was prepared for the Hart litigation and the document is printed with the District of New Jersey caption for the case, it is not clear that the document was requested by the New Jersey court or filed on Hart docket.

United States District Court
For the Northern District of California

of the case.  Accordingly, the Court reduces the lodestar by $6,405 to account for these hours.  In addition, as discussed above, Ms. Saluzzi and Mr. McIlwain both billed for numerous phone conferences "re: status" while the case was under submission before the Third Circuit.  These fees are not reasonably related to the successful litigation and settlement of the case.  Ms. Saluzzi billed 10.75 hours of time for these telephone calls.  The Court will reduce her lodestar by $1130 to account for this time. Ms. Saluzzi's reduced lodestar is $16,090.

In addition, Ms. Saluzzi's time records overstate her contribution to the litigation of <u>Hart</u> in other ways.  First, she recorded her time in quarter-hour increments.  The time record includes many entries for filing or telephone calls that likely took one or two tenths of an hour instead of a quarter hour.  In addition, Ms. Saluzzi billed for clerical tasks.  <u>See, e.g.</u>, Saluzzi Dec., Docket No. 1276-7, Ex. B at 4 (claiming time for making travel arrangements).  "[P]urely clerical or secretarial tasks should not be billed at a paralegal rate or lawyer's rate, regardless of who performs them."  <u>Davis v. City of San Francisco</u>, 976 F.2d 1536, 1543 (9th Cir. 1992) (quoting <u>Missouri v. Jenkins</u>, 491 U.S. 274, 288 n.10 (1989)) (internal alteration marks omitted).  Finally, a large percentage of Ms. Saluzzi's time entries are for meetings or telephone calls which do not appear to be related to work performed.  The Court will reduce the remaining lodestar by fifteen percent to account for these factors.

United States District Court
For the Northern District of California

The Court will award Ms. Saluzzi $13,700.

ii.   Joseph Cane

Mr. McIlwain claims $178,500 in fees on behalf of Joseph Cane, representing 210 hours of work at a rate of $850 per hour. Mr. Cane declares that he "was a consistent and constant consultant" to Mr. McIlwain throughout his representation of Mr. Hart.  Cane Dec., Docket No. 1276-2 at ¶ 4.

Despite the Court's instructions, Mr. Cane's declaration does not state what his standard hourly rate was, or any rate agreed upon between him and Mr. McIlwain.  In addition, Mr. Cane provides only the most general summary of his time.  For example, he states, "During the period from November through December, 2007, I spent over 18 hours conferring with Tim McIlwain about researching the theories of liability to be asserted in the Hart case, about Troy Taylor's participation as a class representative, about the merit of including other and multiple athletes as class representatives, and about the differences in various states' laws governing the rights of publicity."  Id. at ¶ 5.  Mr. Cane does not provide any information about how, eight years later, he is able to remember how many hours he spent assisting Mr. McIlwain during those months or the tasks he performed.  The Court finds that Mr. Cane's declaration is not adequate to support an award of fees and declines to award any of the fees claimed on his behalf. See Hensley, 461 U.S. at 433 ("Where the documentation of hours is

40

United States District Court
For the Northern District of California

inadequate, the district court may reduce the award accordingly.").

### iii. Corrine Mullen

Mr. McIlwain claims $52,700 in fees on behalf of Corrine Mullen, representing sixty-two hours at a rate of $850 per hour. Ms. Mullen, however, declares that her standard hourly rate is $450 per hour.

Ms. Mullen declares that her "work on the Hart case with Mr. McIlwain involved the research and drafting of points and authorities in opposition to EA's motion to dismiss or in the alternative motion for summary judgment" between December 10 and December 23, 2010, preparation for oral argument on the motion and drafting supplemental letter briefs filed in July 2011. Mullen Dec., Docket No. 1276-5 at ¶ 3. Ms. Mullen does not provide any further itemization of her time, but states that she "spent at least 62.5 hours on that work." Id. Ms. Mullen does not state how she is able to state with certainty that she spent the amount of time claimed on these tasks. The Court finds that Ms. Mullen's declaration is not adequate to support an award of fees and declines to award any fees claimed on her behalf. See Hensley, 461 U.S. at 433.

### iv. Amber Jorgensen

Mr. McIlwain claims $101,855 in fees on behalf of Amber Jorgensen, representing 287 hours at a rate of $355 per hour. Ms. Jorgensen declares that her standard hourly rate is $355. The

41

**United States District Court**
For the Northern District of California

Court notes that Ms. Jorgensen was a law student for part of the time that she worked on the case but that she states a single hourly rate. The Court finds that an hourly rate of $275 is more appropriate for Ms. Jorgensen's work. Like the other declarants, Ms. Jorgensen states that she expected Mr. McIlwain to pay her for her time "upon the successful conclusion of the case." Jorgensen Dec., Docket No. 1276-4 at ¶ 10. However, Ms. Jorgensen also states that "some unallocated portion" of a $3,000 payment from Mr. McIlwain to her was for work related to Hart. Id. at ¶ 11. She states that the payment "was not intended to relate solely or predominantly" to her work on Hart because she worked on other matters for Mr. McIlwain during the same time period. Id.

Ms. Jorgensen attaches a document she prepared for purposes of this fee request, which she declares summarizes work done "to the extent I can readily verify by written record, including, without limitation, a description of the documents reviewed and written by me (in whole and in part), the topics of research, a general acknowledgment of communications in which I participated." Id. at 8. The tasks are grouped by month from February 2010 through July 2013 and include a total number of hours for each month ranging from a low of one-quarter of an hour in May 2011 to a high of sixty-five hours in February 2010. Id. at Ex. A. The summary includes a total of 232.25 hours of claimed work. Ms. Jorgensen further declares that due to the passage of time she is unable to describe further details of the work she performed, but

she estimates that she spent more than 300 hours in total on the case. Although Ms. Jorgensen relied on written records to compile her time summary, the Court finds that her monthly estimates of time spent make it difficult to assess the reliability of the estimated time spent. Moreover, in some months, the only time Ms. Jorgensen billed was for reviewing case documents and telephone calls or emails, not for the creation of any work product. See, e.g., Entries for January 2011, February 2011, March 2011, May 2011, November 2011, December 2011, January 2012, February 2012, April 2012. Accordingly, the Court will reduce the time claimed on the summary by eighty percent to a total of forty-six hours. The Court will not award any fees for time not documented on the summary. In addition, the Court will reduce the amount to be awarded to Ms. Jorgensen by $3,000, the amount previously paid by Mr. McIlwain to Ms. Jorgensen. The Court awards Ms. Jorgensen $10,900 in fees.

v.   William Amadeo

Mr. McIlwain claims $42,671 in fees on behalf of William Amadeo, representing 120.20 hours at a rate of $355 per hour. Mr. Amadeo declares that his usual hourly rate is $355 per hour. Mr. Amadeo attaches to his declaration a summary of time he spent working on Hart and another purportedly related case, Brown. However, the summary is entirely unreliable. Most of the entries are for at least six hours, and some are for as many as forty-four hours. The descriptions for many of the tasks are vague. See,

43

United States District Court
For the Northern District of California

e.g., Entry for October 3, 2008 (claiming eight hours to "Review what users came up with"); Entry for December 26, 2008 (claiming eight hours to "Organization of research for TM"); Entry for January 21, 2009 (claiming eight hours to "Research done for appeal process"). Other entries are clearly excessive. See, e.g., Entries for October 1, 2008, October 2, 2008, October 3, 2008, February 20, 2009 and February 21, 2009 (claiming a total of forty-six hours to research and write a memo on a single case); Entries for January 22, 2009 and February 15, 2009 (claiming a total of twenty-two hours to research the relevance of the Class Action Fairness Act to the case). On several days, Mr. Amadeo purports to have worked as many as twenty billable hours. See, e.g., Entries for October 3, 2008 (twenty hours); Entries for October 2, 2008 (sixteen hours); Entries for October 22, 2008 (eighteen hours). Other entries are clearly erroneous if not false. See, e.g., January 11, 2009 Entry (claiming eight hours to "Did research on O'Bannon Class" although O'Bannon was not filed until July 2009).

The Court finds that Mr. Amadeo's declaration is not adequate to support an award of fees and declines to award any fees claimed on his behalf. See Hensley, 461 U.S. at 433.

vi.   Kris Nejat

Mr. McIlwain claims $12,354 in fees on behalf of Kris Nejat, representing 34.80 hours at a rate of $355 per hour. Mr. Nejat does not provide his usual hourly rate or the hourly rate he

**United States District Court**
For the Northern District of California

agreed to bill Mr. McIlwain.  In addition, Mr. Nejat provides only the most general description of the work he performed with the rough estimate that he "worked well in excess of 100 hours on the Hart matter."  Nejat Dec., Docket No. 1276-6 at ¶ 5.  The Court finds that Mr. Nejat's declaration is not adequate to support an award of fees and declines to award any fees claimed on his behalf.  See Hensley, 461 U.S. at 433.

vii. Alex Settle

Mr. McIlwain claims $13,107 in fees on behalf of Alex Settle, representing 51.40 hours of work at a rate of $255 per hour.  Mr. Settle does not provide his usual hourly rate or the hourly rate he agreed to bill Mr. McIlwain.  Moreover, Mr. Settle's general description of the tasks he completed does not support an award of fees.  Mr. Settle declares that he worked in "excess of 35 hours" on various tasks.  His descriptions of some tasks, such as "there were numerous discussions and meetings that involved the case" and "I was involved in additional legal research and writing for the briefs in the case," are vague.  Settle Decl., Docket No. 1267-8 at ¶ 2.  Mr. Settle also states that he worked on the creation of the website youareinthegame.org.  However, as discussed above, there is no evidence that the website contributed to the successful litigation or settlement of Hart.  The Court finds that Mr. Settle's declaration is not adequate to support an award of fees and declines to award any fees claimed on his behalf.

United States District Court
For the Northern District of California

viii.   Katrina Yu

Mr. McIlwain claims $6,120 in fees on behalf of Katrina Yu, representing 24.50 hours of work at a rate of $250 per hour.  Ms. Yu does not provide her usual hourly rate or the hourly rate she agreed to bill Mr. McIlwain.  Ms. Yu declares that her approximately twenty-five hours of work on the case was limited to attending a seminar at which an EA executive was a panelist.  Mr. McIlwain directed Ms. Yu to take notes and to ask certain questions.  It is not clear that Ms. Yu's attendance at the seminar contributed to the successful litigation or settlement of Hart.  Accordingly, the Court will not award fees on Ms. Yu's behalf.

ix.   Ron Chini

Mr. McIlwain claims $18,748 in fees on behalf of Ron Chini, representing 87.20 hours of work at a rate of $215 per hour.  Mr. Chini does not provide his usual hourly rate or the hourly rate he agreed to bill Mr. McIlwain.  Mr. Chini declares that he spent more than 100 hours working on Hart between January and April 2009.  It appears from Mr. Chini's declaration that he reviewed EA videogames, in an attempt to find instances of recognizable individuals in the games, and summarized other law students' work on the same project.  Because neither Mr. McIlwain nor Mr. Chini provides any basis for the rate claimed on Mr. Chini's behalf and Mr. Chini provides no basis for his estimate of the number of

United States District Court
For the Northern District of California

hours claimed, the Court will not award any fees on Mr. Chini's behalf.

c.   The Lanier Firm

Finally, Mr. McIlwain initially claimed a lodestar of $464,470 on behalf of attorneys from the Lanier Firm, representing over 600 hours of time billed at rates ranging from $500 per hour to $900 per hour.  The Court directed Mr. McIlwain to submit a supplemental declaration from Eugene Egdorf to support these fees.  Mr. McIlwain has submitted a declaration from Mr. Egdorf in which he reduces the rates claimed to a range of $350 per hour to $900 per hour for a reduced lodestar of $313,838.[18]

The Court finds that the time records submitted by Mr. Egdorf generally support an award of fees for the hours claimed in the lodestar.  However, Mr. Egdorf has included 23.25 hours of work performed after September 30, 2013, when his firm and Mr. McIlwain were informed by Mr. Hart that they were no longer authorized to represent him.  These fees cannot reasonably be understood to be related to the successful litigation and settlement of the case. Accordingly, the Court reduces the lodestar by $20,076 to account for these hours.  More importantly, the Court finds that the evidence submitted does not support a finding that the reduced hourly rates claimed are reasonable.  For example, Mr. McIlwain

---

[18] The Court notes that the supplemental declaration also reduces the number of hours claimed by Ryan Ellis from 151 to fifty-one.

United States District Court
For the Northern District of California

seeks a rate of $500 per hour for a senior legal research associate who graduated from law school in 2003 and who "works on commercial litigation cases, with an emphasis on bankruptcy-related lititgation."  Egdorf Dec. at Ex. D; see also, e.g., id. at ¶ 22 and Ex. C (claiming a rate of $500 for a senior litigation associate who graduated from law school in 2005 and whose "practice centers on bankruptcy-related litigation as well as all stages of the commercial chapter 11 and chapter 7 process"). Accordingly, the Court will reduce the lodestar claimed by an additional ten percent, for a total of $264,400.

Accordingly, the Court awards former Hart counsel a total of $694,000 in fees.

III. Costs

The NCAA settlement agreement allowed Plaintiffs' counsel to seek up to $500,000 in costs and expenses.  The EA settlement agreement allowed Plaintiffs' counsel to seek up $2,500,000 in costs and expenses.  The total amount of costs requested by Plaintiffs is less than the maximum permitted under the settlement agreements.  Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters.  See Harris v. Marhoefer, 24 F.3d 16, 19 (9th Cir. 1994). The costs claimed here are recoverable to the extent they were

necessary to secure the resolution of the litigation and are reasonable in amount.  See In re Immune Response Sec. Litig., 497 F. Supp. 2d 1166, 1177-78 (S.D. Cal. 2007); In re Media Vision Tech. Sec. Litig., 913 F. Supp. 1362, 1366 (N.D. Cal. 1995).

A.   Keller Plaintiffs' Counsel

Keller Plaintiffs' counsel seek a total of $448,868.40 in costs, half of which they seek from the NCAA and half of which they seek from EA.  The Court finds that Keller Plaintiffs' counsel have sufficiently documented their requested costs and established that they were necessary to secure the resolution of the litigation.  Accordingly, the Court grants Keller Plaintiffs' counsel's request for $224,434.20 in costs from the NCAA fund and $224,434.20 in costs from the EA fund.

B.   O'Bannon Plaintiffs' Counsel

O'Bannon Plaintiffs' counsel requested $1,836,505.89 in costs, which they now agree should be reduced by $16,541.89 to $1,819,964.  This reduction represents the amount claimed by O'Bannon Plaintiffs' counsel in their motion for fees from the NCAA and awarded in Magistrate Judge Cousin's July 13, 2015 order. See O'Bannon Docket No. 405.  The Court finds the costs to be sufficiently documented and necessary to secure the resolution of the litigation.  The Court grants O'Bannon Plaintiffs' counsel's request for $1,819,964 in costs from the EA fund.

United States District Court
For the Northern District of California

C.   Hart Plaintiffs' Current Counsel

Hart Plaintiffs' current counsel seek $13,741.77 in costs. As discussed above, Hart Plaintiffs' counsel's fee request was not properly documented.  This extends to their request for costs. Accordingly, the Court reduces the request by ten percent and awards $12,367.59 in costs to Hart Plaintiffs' current counsel from the EA fund.  See Moreno v. City of Sacramento, 534 F.3d 1006, 1112 (9th Cir. 2007) (allowing trial court to "impose a small reduction, no greater than 10 percent--a 'haircut'--based on its exercise of discretion and without a more specific explanation").

D.   Former Counsel for Hart Plaintiffs

Mr. McIlwain seeks $76,209.91 in costs on behalf of himself and co-counsel, the Lanier Law Firm.  The Court awards a total of $45,810.58.  As discussed above, Mr. McIlwain's records filed in support of his request for fees and costs include entries for travel without a stated purpose.  The Court declines to award costs related to such travel.  Mr. McIlwain has not demonstrated that this travel was reasonable or necessary to secure the resolution of this litigation.  In addition, Mr. McIlwain's records include unexplained charges at various stores, including office supply stores.  Again, Mr. McIlwain's records do not demonstrate that these costs were reasonable or necessary. Moreover, office supplies are overhead that should not ordinarily be billed to a client.  See Missouri v. Jenkins, 491 U.S. 274, 296

United States District Court
For the Northern District of California

(1989) ("[A] prudent attorney customarily includes . . . office overhead . . . in his own hourly billing rate."). Finally, Mr. McIlwain includes significant expenses related to payments to individuals with no explanation for who those individuals are or why their employment was reasonable or necessary. Accordingly, the Court reduces Mr. McIlwain's expenses by $27,851.73 and awards him $22,882.18 in costs.

In addition, the expenses claimed by the Lanier Law Firm are not itemized or supported by an adequate declaration. Accordingly, the Court reduces the Lanier Law Firm's request by ten percent and awards $22,928.40 in costs from the EA fund. See Moreno, 534 F.3d at 1112 (allowing a ten percent "haircut").

CONCLUSION

For the reasons stated above, the Court GRANTS Keller Plaintiffs' counsel' motion for $5,800,000 in attorneys' fees and $224,434.20 in costs under the NCAA settlement. In addition, the Court GRANTS Keller Plaintiffs' counsel $5,046,000, O'Bannon Plaintiffs' counsel $4,000,000, current counsel in Hart $260,000, and former counsel in Hart $694,000 in attorneys' fees from the EA fund. Two million dollars will be held in escrow, to be paid to O'Bannon Plaintiffs' counsel if they are not paid their fees by the NCAA and to be paid to Keller Plaintiffs' counsel if O'Bannon Plaintiffs' counsel are paid by the NCAA. Finally, the Court GRANTS grants Keller Plaintiffs' counsel $224,434, O'Bannon Plaintiffs' counsel $1,819,964, current counsel in Hart

$12,367.59, and former counsel in <u>Hart</u> $45,810.58 in costs from the EA fund.

IT IS SO ORDERED.



Dated: December 15, 2015

CLAUDIA WILKEN
United States District Judge